UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF and RETIREMENT SYSTEM, et al, | ) ) |
| | ) No. 21-CV-0762-WQH |
| Plaintiffs, | ) |
| | ) September 9, 2022 |
| v. | ) |
| | ) 9:00 a.m. |
| ACADIA PHARMACEUTICALS INC., et al, | ) ) San Diego, California |
| | ) |
| Defendants. | ) |
| _____ | ) |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE WILLIAM Q. HAYES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       Scott & Scott, Attorneys at Law, LLP
                         By:  WILLIAM C. FREDERICKS, ESQ.
                              JACOB B. LIEBERMAN, ESQ.
                         230 Park Avenue, 17th floor
                         New York, New York 10169

                         Levi & Korsinsky, LLP
                         By:  SHANNON HOPKINS, ESQ.
                         1111 Summer Street, Suite 403
                         Stamford, Connecticut 06905

For the Defendant:       Cooley, LLP
                         By:  PETER M. ADAMS, ESQ.
                              MATTHEW D. MARTINEZ, ESQ.
                         4401 Eastgate Mall
                         San Diego, California 92121

Court Reporter:          Melinda S. Setterman, RPR, CRR
                         District Court Clerk's Office
                         333 West Broadway, Suite 420
                         San Diego, California 92101

Reported by Stenotype, Transcribed by Computer

SAN DIEGO, CALIFORNIA, SEPTEMBER 9, 2022, 9:00 A.M.

* * * *

THE CLERK:  Calling matter Number 1, 21-CV-762, City of Birmingham Relief and Retirement System, et al, vs Acadia Pharmaceuticals, et al, for motion hearing.

THE COURT:  Please enter your appearances, counsel.

MR. ADAMS:  Good morning, Your Honor.  Peter Adams of Cooley on behalf of defendants.

MR. MARTINEZ:  And good morning, Your Honor.  Matt Martinez of Cooley, also on behalf of defendants.

THE COURT:  Good morning.

And do we have the plaintiffs on the phone?

MR. FREDERICKS:  Yes.  Good morning, Your Honor.  It is William Fredericks from Scott and Scott, Attorneys at Law, LLP.  And with me on the phone is my colleague Jacob Lieberman.  And my co-counsel I think will also enter an appearance, Shannon.

MS. HOPKINS:  Good afternoon, Your Honor.  This is Shannon Hopkins with Levi and Korsinsky, on behalf of plaintiffs.

THE COURT:  All right.  Well, it is morning here, but good afternoon there.

MS. HOPKINS:  Sorry, Your Honor.

THE COURT:  That's fine.

It is on -- we're on for the defendants' motions to --

motion to dismiss.  I have reviewed the pleadings, familiar with the arguments.

Mr. Adams, do you wish to make an argument?

MR. ADAMS:  I do, Your Honor.

THE COURT:  The podium will be fine.  Thank you, sir.

MR. ADAMS:  Thank you.  Thank you, Your Honor.

So obviously we're here on defendants' motion to dismiss, and I am sure that Your Honor has reviewed the briefing, so I am going to do my best to avoid rehashing what is in our papers, but I just want to say that at the outset that this case is -- it is pled entirely in hindsight and should be dismissed.

And to set the stage, I just want to highlight for the Court a few key facts, and that is, starting in September of 2019, that is when Acadia announced the results from the pivotal Phase III Harmony study this was designed to evaluate Acadia's lead drug, pimavanserin, for the treatment of dementia related psychosis, and Acadia at that time had announced that it had met its primary end point.

This was an interim analysis, and the statistical analysis was so high that according to a pre-stopping criteria, they stopped the trial.  An independent trial committee recommended they stop the trial given that result.

Then a few months later in December, Acadia released all of the data from the trial and released the full data set.

This is at paragraph 62 of the complaint. It is also one of our exhibits, Exhibit O. And I should say that the fact about the September 19th announcement is at paragraph 107, and that is exhibit M that we attached.

Then in June of 2020, Acadia submitted its supplemental new drug application to the FDA for pimavanserin to treat DRP. That is at paragraph 119 in the complaint.

And then about nine months later, in early March, the FDA told Acadia that there were some deficiencies in connection with the sNDA, but it did not elaborate. It was unspecified. That is at paragraph 143 and Exhibit W, and in response to that disclosure -- or at least following that disclosure, the stock dropped 45 percent.

And then a month later in April 2021, that is 19 months after the start of the class period, Acadia announced that it received a complete response letter from the FDA denying the company's supplemental new drug application, and the following -- or maybe it was that day, the stock dropped again.

So the only point I am trying to make is that these facts are undisputed, and what plaintiff has done in this case, Your Honor, is take the fact of the FDA's rejection of the supplemental new drug application that is in April of 2021 and then speculate that because of these developments two things must have been true: One, that defendants must have fabricated

an agreement with the FDA regarding the Harmony study serving as the basis of the submission; and two, that defendants must have known all along that the study was, quote, flawed and inadequate, and as a result their NDA was doomed.

The problem for plaintiff here is that there is not a whiff of factual support pled in the complaint, so let me just start, if it is okay with you, with the first allegation that there was no agreement with the FDA, so this is entirely made up. There is not a single fact in the complaint -- alleged in the complaint that contradict defendants' statements that they had an.

End-of Phase II meeting with the FDA and that they had an agreement that the Harmony study could serve as the basis for their submission. This is entirely plaintiff's conjecture, not fact.

THE COURT: Excuse me for interrupting. With respect to the agreement, the agreement is in writing; correct?

MR. ADAMS: Correct.

THE COURT: And you've seen the agreement?

MR. ADAMS: The agreement is documented in the end-of Phase II meeting's minutes, so when --

THE COURT: All right. Just so you don't have a copy of the agreement. Have you ever seen it?

MR. ADAMS: I have. Well, when you say a copy of the agreement, I have a copy of Phase II meeting minutes that were

prepared by the FDA and the company.

THE COURT:  And that is not in the record.  Is that fair to say?

MR. ADAMS:  It is fair to say it is not in the record, and companies don't disclose these end-of Phase II minutes regularly.  In fact, I am not aware of anyone doing it.  It is a ton of trade secrets and proprietary information that is often discussed in there.

THE COURT:  With respect to the agreement then, in essence, I am limited to your description of what the agreement was.  Is that fair to say?

MR. ADAMS:  I guess I am not understanding the question.  What do you mean you are limited to the description?

THE COURT:  Well, with respect to -- there is much discussion about the agreement, and as you set forth, I mean, you -- your client, and this is on August 19th, 2020, we got a clear agreement with the FDA at the end of our Phase III meeting to pursue DRP broadly.  We executed the plan.  We agreed with them.

And so there is references throughout the complaint to an agreement, and as you state, the plaintiffs allege, well, there must not have been an agreement or your client mischaracterized the agreement.  Fair to say?

MR. ADAMS:  Fair to say that that is what they are --

THE COURT:  That is the allegation.

MR. ADAMS:  They are alleging, exactly.

THE COURT:  Those are the allegations.  And so in trying to -- but with respect to the agreement itself, I mean, there is nothing in the record that says what the agreement was.

MR. ADAMS:  Well, there is.  In fact, there are statements in the record by defendants, right, that -- explaining exactly what the agreement is.  In fact, the defendants say, at the end of the Phase II meeting, we agreed with the FDA that we could use a single, well-controlled study -- that is the Harmony study, right, to -- as the basis for submitting our NDA.

And that is exactly what companies do when they meet with the FDA.  At the end of Phase II they are meeting with FDA to get a sign off on how to proceed with Phase III.

It is not that we -- it is not an agreement that the FDA is going to approve --

THE COURT:  I understand.

MR. ADAMS:  Okay.

THE COURT:  But so in your view then, did the -- did the FDA -- with respect to this agreement that your client had with the FDA, did the FDA follow through and in your client's view comply with the agreement?

MR. ADAMS:  So the FDA -- my view is obviously the company was stunned and as was everyone else that the FDA

rejected the NDA.

THE COURT: That wasn't my question. My question was, did you -- in your view did the FDA act consistent and comply with their -- with whatever the agreement was that they had with your client, did they follow through and comply with what they said they would?

MR. ADAMS: Yeah. I would say if -- I would say yes, in the sense that they didn't renege on the agreement, right, which is what plaintiffs allege or double cross the company, because in the end the FDA can always, despite agreeing on the protocol and the path forward for Acadia to submit the NDA, it can always agree that the data and the information submitted, even if the company fully followed the protocol and submitted the data, wasn't statistically and clinically persuasive.

In fact, that is what the company said. For example, I am quoting paragraph 109, and this is, quote: At the end-of Phase II meeting with the FDA, we confirmed that our supplemental NDA submission and DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.

And I should add that that doesn't mean that the FDA has to approve --

THE COURT: Right.

MR. ADAMS: -- the NDA. And, in fact, defendants never suggested that. So I would say, no, the FDA didn't

breach any agreement. It didn't go back on any agreement. It just ultimately determined that the data that the company and the submission that it had set forth wasn't statistically and clinically persuasive enough to approve the application.

THE COURT: Okay. I guess -- this statement then, it says: On April 5th defendants disclosed that they had -- and this is from the plaintiff's papers. I think this is plaintiff's papers, Document 56. They make this argument: On April 5th defendants disclosed that they had received a complete response letter from the FDA rejecting the NDA. The defendant have yet to release the CRL itself, but the April 5th release asserted as follows: Despite prior agreements with the FDA regarding the pivotal Phase III Harmony study designed targeting a broad DRP patient population analyzed as a single group.

I guess my question to you is, if in your view that the FDA complied with their agreement, what does the language despite prior agreements mean?

MR. ADAMS: I think the -- well, let me just qualify by this. The FDA can do --

THE COURT: Oh, I understand.

MR. ADAMS: -- what it wants.

THE COURT: Right.

MR. ADAMS: And certainly the company was shocked by this, and I think -- when I say it complied, actually I think

the company would argue perhaps that it moved the goalpost here, which is they designed a study to treat DRP as a single indication.

There was never any discussion about these subtypes and whether you needed certain significant statistical significance among the subtypes and whether you needed a certain sample size among the subtypes, the whole purpose of the study as discussed with FDA was to examine DRP as a single indication.  That is how they designed the study, and it was this comprehensive relapse study.

And the company met -- there is no question -- in fact, plaintiff's don't allege that we didn't meet the primary and secondary end points of the study, so I think given that, right, given that they had this conversation about what the study would need to be to support the submission -- and, again, doesn't mean the FDA has to approve it, but you are obviously talking to them about what study you need to conduct -- and you meet both end points, I think the company was rightfully shocked that then the FDA was focusing on these other items that hadn't previously been discussed, right.

THE COURT:  All right.

MR. ADAMS:  So I don't know if I am -- if I am fully answering your question.

THE COURT:  Yeah --

MR. ADAMS:  I don't know that the company is going to

come out and say, oh, the FDA is in a breach of the agreement. The FDA can agree on this path forward, and then it can say, look, everything you gave me is just not good enough; I want to see more.  And that is what happened.

THE COURT:  My point was not --obviously the FDA can do what it thinks is appropriate.  My question -- it is all -- there is so much focused on the agreement, and as I understand a lot of the allegations are in press releases that, as I understand part of the plaintiff's argument, is that your client overstated the agreement, either they embellished it or they made an agreement up or they suggested that they had an agreement that they didn't have or they misstated it.

And your -- after the application was rejected on April 5th, your client released a statement that says:  Despite prior agreements -- which I read to be that your client felt they had an agreement, at least on one end, and the FDA didn't comply with it.  Now --

MR. ADAMS:  I think they felt like they had an agreement on what was needed to be shown --

THE COURT:  Right.

MR. ADAMS:  -- in order to demonstrate that the drug was safe and effective, and the FDA asked for other things that had never been discussed and weren't part of the primary or secondary end points of the study.

THE COURT:  So your -- I think the term that you used

was move the goalpost --

MR. ADAMS:  Yes.

THE COURT:  -- that, look, we think we had an agreement that this study would be -- not that it would be accepted but that this study -- we could submit this study and it would be adequate, and then we're told, in essence, the study was not adequate.

MR. ADAMS:  Or told that there are these this additional data, right, that they would like to see that wasn't part of the initial -- the design or at least the primary and secondary end point of the study, right.

THE COURT:  Right.  So I mean, part of this seems to be, though, that -- I mean, there are a number of inferences that one can draw, right.  The inference can be that you had an agreement with the FDA, and then for whatever reason they changed their view and just said, well, you know, we agreed but we don't think that study is adequate now; we may have at the time, but we don't think it is now -- and they can change their mind if they wish -- or it also could be an inference that maybe it was ambiguous and your client felt that you had an agreement and the FDA position is we never agreed to that, and so maybe there is some ambiguity here.

MR. ADAMS:  Perhaps.

THE COURT:  Right.

MR. ADAMS:  I respectfully disagree.  But let me just

say, plaintiffs have to plead particularized facts here, and the facts are these:  The company has come out and said, we had this end-of Phase II meeting with the FDA; there was an agreement on the path forward.  They made very clear.  This wasn't an agreement to approve the drug.

And now plaintiffs are saying, oh, well, no, no, no, I am going to allege that there was no agreement, right.  Well, first they are going to mischaracterize the agreement to suggest that the agreement was somehow that the FDA had to approve the drug.  But even setting that aside, they are simply saying there was no agreement, but they have to plead particularized facts.

If there was in fact no agreement as they are alleging, I mean, there would be all kinds of confidential witnesses, right, from the company who are aware that there was, in fact, no agreement, right.  There would be some statement, perhaps by the FDA.  They could have sent book -- they could have sent a book and records demand to the company asking to see the meeting minutes.

It is their burden, right, to plead particularized facts that there is no agreement, not just to say in a conclusory statement there is no agreement and the FDA wouldn't renege on their agreement.  The reneging on the agreement is a straw man.

And I just want to turn -- or at least turn the

Court's attention to -- I know you talked about the company's statements about the agreement, but this all has to be read in context, right. And the company repeatedly disclosed -- and I am going to quote here from their 10Q in 2020 and their 10K; this is Exhibits E and J, where they say: Our sNDA for pimavanserin and DRP is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication.

The FDA retains complete discretion in deciding whether or not to approve an sNDA, and there is no guarantee that pimavanserin will be approved for treatment of DRP.

So the company at no time -- even in saying, hey, we have agreement on the path forward, it is saying the FDA has to approve this; we guarantee that the FDA will approve it.

THE COURT: And I don't think that anyone is suggesting that. I don't think that that is what the claims are. I think -- the argument as set forth in the complaint, certainly alleges some particular statements, and one is on August 19th, 2020, we got a clear agreement with the FDA at our end-of Phase III meeting to pursue DRP broadly, and we executed the plan that we agreed to with them.

And I guess maybe part of that issue is, well, what was the plan, and --

MR. ADAMS: The plan was to conduct a single comprehensive study in DRP, a relapse study.

THE COURT:  All right.

MR. ADAMS:  Right.  That was the plan.  Whereas before some of these supporting studies -- for example, they did an acute study in Parkinson's disease psychosis that was part of the 020 study.  They had done an acute study, Phase II study for Alzheimer's disease.

THE COURT:  Sure.

MR. ADAMS:  The plan and executing on the plan is -- I mean, this cost millions and millions of dollars, so they are talking to the FDA and wanting to get some guidance upfront from the FDA that if we do this study, right, and, you know, we meet these end points -- obviously the FDA can still decide not to approve -- is that enough to submit the NDA?

Because the FDA could say if you did study X, I am not even going to accept your application, right.  And so you could go through them and do a Phase III study, submit your application, and it just gets rejected.

THE COURT:  Right.

MR. ADAMS:  That is the main reason why you want to get somebody --

THE COURT:  All right.  So the FDA said, yes, we'll accept that.

MR. ADAMS:  We'll accept this single study, right, for you to submit your NDA, right.

THE COURT:  All right.

MR. ADAMS:  We will accept that with the primary end point being, you know, the time to relapse and the secondary end point being discontinuation.  We will accept that as the basis for your application.  And what happened then, they did the study, right.  They got good results or what they viewed them certainly to be, and everyone else, to be good results.  They submitted the NDA, and the FDA accepted it.

Then, you know, nine months later they get this letter, the first letter, just saying, hey, we have -- we've identified some deficiencies without saying what it is, and a month later they get the CRL that the FDA says that they are going to reject the NDA because there weren't large enough sample sizes in some of the subtypes and wasn't some statistical significance in some subtypes.

And, look, was the company shocked?  Yeah.  I mean, the whole -- the whole world was shocked, the company and the community.  Ironically though, plaintiffs don't plead a single fact at all to suggest that anyone was mislead about this, right.

I mean, the hallmark of, in my experience 10b5 cases, right, where you adequately plead falsity and scienter, that they have confidential witnesses who are saying, hey, this was not true at all; there was nothing in the FDA meeting about this agreement; or analyst's reports suggesting that somehow after this bad news came out, right, the company was misleading

analysts or investors sort of led them down this path.

None of that is here.  Literally all you have is the FDA's rejection of the -- of the NDA and the criticisms that it cited, and then the plaintiff back casting all of that and saying, well, you knew this all along and you lied, and by the way, you must never have had an agreement with the FDA.

I mean, that is just simply not enough to meet what are very high and stringent, as you know, Your Honor, pleading requirements under the federal securities laws.

THE COURT:  You may continue, sir.

MR. ADAMS:  Thanks.  I didn't know if you wanted me to keep talking about the agreement.

So anyway, my -- just to reiterate that point, there is literally no facts -- there are literally no facts in the complaint contradicting the company's statement about this agreement, just the fact that in the end the FDA was unhappy and had these criticisms.

So let me then turn to the second core allegation, and that is plaintiff's claim that the Harmony trial was, quote, flawed, inadequate.  And I just want to say again, first, these are not facts; these are plaintiff's characterizations, and courts have regularly dismissed claims premised on critiques of a drug trial.

And, for example, the Ninth Circuit decision in *Rigel* is one.  And there is not a single, well-pled fact in the

complaint to suggest that anyone at all believed the study was flawed or inadequate.  This is plaintiff's characterization, and it is driven entirely based on the FDA's CRL and suggestion that, oh, you didn't have a large enough sample size in some of these subtypes and there wasn't significant difference in some of these subtypes.

Again, no one disputes that the study met the primary end point or the secondary -- the secondary end point.

And the next point I would like to make which is really important is that Acadia fully disclosed the results and the entire data set to the public in December of 2019, everything, including this subtype information.  It all was publicly disclosed in December of 2019.

THE COURT:  Excuse me for interrupting.  Is typically the disclosure, that the disclosure is adequate, is that usually a fact-specific inquiry?

MR. ADAMS:  No.  I think the Court can decide whether it is as a matter of law, right.  I mean --

THE COURT:  At the motion to dismiss stage?

MR. ADAMS:  Absolutely, right, because they have to plead that there was a material -- something was materially false and misleading, right.  First of all, they haven't even pled that anything was false and misleading much less materially false and misleading, and that has to significantly alter, right, the information available to the -- the entire

sphere of information available to stockholders.

And here, again, I really want to emphasize this point, if their argument is somehow the investing public was mislead about these subtypes, about the data in the Harmony study that they didn't have sufficient sample size and they didn't have statistical significance, how is that even possible if all of that data is released to the public?

As we noted in our brief, and we cited the *Sona Nanotech* case, and this is a quote:  A plaintiff is hard pressed to build a fraud case from publicly disclosed information.  It is undisputed that we disclosed all of this data and the data set.

In fact, that is paragraph -- let me find it here.  I think it is paragraph 62 -- 62 of the complaint.  And so -- and I'll just add that in addition we cited a couple of analysts' reports from around -- literally the day after this presentation to -- this presentation that Acadia gave when it disclosed these results.  Both of those analysts' reports that we attached touted the Harmony results as positive.

I don't know how you could interpret it from anything else given that the study was literally stopped early by an independent data monitoring committee because the primary end point level of significance exceeded this predetermined stopping point.

And the reason they do that is because if a -- in the

study as designed, if the drug is performing well and at a very, very high level at this interim efficacy look, they don't want to deny patients who are very, very ill potentially the opportunity to get this and to get it early.  That is why they do it.

It wasn't that Acadia just wantonly said, hey, why don't we stop this.  This was all based on a prespecified protocol, and the data as designed in the study showed that it reached this very high level of significance, and -- but the point I want to make about the analysts' reports is that all that data was released; they looked at that data, and they even referenced in their reports the subgroup data that the plaintiff says was concealed somehow, like hidden from the whole market.

So I don't -- I don't understand how you can have -- have mislead the investing public, failed to disclose something, when it was fully disclosed.

And third, if the Harmony study like design and its data were so troubling, then why didn't anyone ever say so?  I mean, they don't cite a single person at all whoever considered these data flawed or inadequate or anything less than positive. No medical professional, no analyst, there is no confidential witness.  There is literally no one at all who thought these data were, quote, flawed and inadequate.

And I might add that, you know, in 2021 after the CRL

was issued, the New England Journal of Medicine published these data, and it wasn't because, you know, they thought they were flawed or inadequate, and I don't know why a respected medical journal would do that if they thought the data were so bad and troubling as plaintiff suggests.

So -- let me just take a step back. So what is the bottom line here? The bottom line is that no one aside from the plaintiff disputes that Acadia had an agreement with the FDA at the end-of Phase II meeting about the protocol and the path forward. It wasn't an agreement that they had to approve the NDA. It was just what is the path forward to submit our NDA.

No one -- there is no one -- there is nothing in the complaint about anyone disputing that. It is literally plaintiff just saying no agreement exists.

And everyone, right, thought that the Harmony data was positive, again aside from plaintiff, and everyone I think was certainly cautiously optimistic about FDA approval given the performance, right, and the results from the Harmony trial. And frankly, everyone was stunned when the FDA rejected the NDA, but that of course is the FDA's prerogative.

I mean, the fact that this unfortunate and unexpected decision came about, it doesn't mean that the defendants committed securities fraud.

And let me just make one point, if we go back to the

agreement, you know, plaintiff's in their opposition cited a number of district court cases in which the Court was talking about, you know, an agreement or at least the defendants saying that they had an agreement, and this is like the *MannKind* case, the *Skiadas* case and the *BioMarin* case.

And I'll just say that the facts there were far, far different than they are here, and one of the most important facts that is in every single one of those cases is that the defendants later admitted either that they didn't have an agreement or they didn't talk to the FDA, right, or what they had originally called an agreement then after the fact they changed their story and said, well, it was just advice, right.

So plaintiffs in those cases had pled that defendants admitted that they either didn't have an agreement or they were changing, right, their story about what exactly took place with the FDA.  That isn't here at all.  Acadia has never ever backed away from the fact that it had an agreement on this protocol in the minutes.  And I'll just say, frankly, it is plaintiff's burden to adequately plead otherwise, and it has to be more than just speculation and guesswork.

So let me just pause right there and see if you have any questions before I move to --

THE COURT:  No, not at this time.  Thank you.

MR. ADAMS:  If it is all right with you, I'll just briefly talk about the elements --

THE COURT:  Certainly.

MR. ADAMS:  -- like falsity, scienter, and loss causation.  We don't think plaintiff has adequately pled those.

On falsity I'll just say as a threshold matter, it is difficult to know what statements the plaintiff is actually challenging here as materially false and misleading.  I mean, you have 50 paragraphs and however many pages of blocked quotes, and it is not even clear to me exactly what they are saying is false or misleading.

I don't know if Your Honor had similar difficulty, but are they challenging literally every statement in those paragraphs, most of which, you know, as we highlighted for the Court are just actual statements as a matter of law.  I mean, there is forward-looking statements that are protected by the PSLRA safe harbor.

There are statements of corporate optimism, you know, or puffery.  For example, the company saying in first half of 2020, we drove robust growth of Nuplazid.  I mean, that is a conical example of a puffing statement, and it is demonstrably true.  It is hard to know what exactly the plaintiffs are attacking here.

They are attacking opinions, right, and they are also attacking, like I said, demonstrably true statements about the drug and its, you know, the number of people that suffer from DRP and so on.

But third, and this is the most important part, so setting apart the difficulty in figuring out which statements are false because, you know, as this part of this analysis, the Court is going to have to examine is a particular statement materially false or misleading; was it made with scienter; and did it cause loss?  And that analysis occurs for every alleged false statement.

But the third point I wanted to make is that even if there is an actionable misstatement, as I said earlier, nothing was materially false or misleading, and I won't sort of rehash what we already talked about, but, you know, defendants didn't lie about an agreement.  There aren't well-pled particularized facts to support -- to support that.

And defendants didn't say anything false or misleading about -- about the NDA and the Harmony study.  I mean, plaintiff's calling it -- and here I am quoting -- threadbare science, right, is not enough, right.  There is no fact anywhere in the complaint to suggest that anyone thought that the data and design of the study was in any way flawed or inadequate.

So I'll just move on to scienter then -- because that is falsity, and again, it is plaintiff's burden to plead highly particularized facts that something was materially false and misleading at the time that it was made.

As to scienter, you know, under the law they have to

plead -- they have to plead facts such that defendants acted or there is a strong inference that the defendant acted with the required state of mind here, intent or recklessness, which is a form of deliberateness.

And as Your Honor knows, this is in your *Bridge Point* opinion, and I'll quote:  To qualify a strong an inference of scienter must be more than merely plausible or reasonable.  It must be cogent and at least as compelling as any opposing inference as non-fraudulent intent.

And then the Ninth Circuit in *Silicon Graphics* said: This means that plaintiffs must plead in great detail facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.

And I would just like to say that even setting aside falsity and everything else, they don't come close to pleading that.  There is not a single fact in this complaint as to the state of mind of any individual defendant, nothing about Davis nothing about Stankovic, nothing about what they thought or knew at all.

The only thing that plaintiffs plead or -- at least what they invite the Court to do, and this was actually in their opposition, not in the complaint -- is that to infer a strong inference of scienter from a follow-on stock offering, the individual defendants automatic stock sales and basically the alleged omissions themselves.

So let me just start with the alleged omissions. There weren't any alleged omissions. That is what I can't understand here. So even if you wanted to try to infer scienter from that, and I am not sure how you would do it, you would have to plead facts, right, that these defendants were aware of these things and they were concealed, but nothing was concealed, so that is the first thing.

Then as to the follow-on offering, you know, plaintiff says that Acadia, you know, monetized the fraud from conducting this $217 million offering in September of 2019, but as we cited in our brief, you know, an allegation of, like, routine corporate objectives, such as the desire to obtain good financing does not raise an inference of scienter and with good reason, like, every company is incentivize to raise money.

They contend that the offering was, quote, patently suspicious, because it was eight days after the announcement -- the September 9th announcement of the interim results from the Harmony study, but there is nothing inherently suspicious about a company raising money after its stock price runs up. Companies do it all the time.

The alternative is if the stock price is down, you end up basically diluting or having to issue, right, more shares, so -- and labeling it patently suspicious just doesn't make it so. So I -- the point there is there is just no facts at all going to defendants' state of mind, and there is nothing pled

to allege that this offering was anything other than the company engaging in routine financing of the company.

And then on the stock sales, so these don't support an inference for a couple of reasons.  First of all, as we highlighted in our brief, the plaintiff must plead -- I am quoting now:  How the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions.

So this is from the *LeapFrog* case in the Northern District of California.  The plaintiffs make no attempt to do that.  And all of these sales were automatic.  They were pursuant to a 10b5 trading plan, or they were made to discover tax obligations associated with the vesting of restricted stock.  So in other words, they are all automatic, not discretionary, and therefore don't support a strong inference of scienter.

We'll cited the *Gigamon* case, and I'll quote: Automatic sales made pursuant to 10b5-1 plan do not support a strong inference of scienter.  And likewise the *MDC Partners* case, quote:  The disposition of shares to pay taxes does not demonstrate a defendants' motive to defraud.

So this undercuts any, in my view, inference of scienter.  I know plaintiff's will argue the alternative, oh, they made all the 10b5-1 sales in the class period and they

hadn't made any before and they made very few after, and the ones after were for purposes of paying the taxes on RSUs.

But even if you want to credit the stock sale piece, at best -- at absolute best, it alleges motive which is plainly not enough in the Ninth Circuit, and this is *Zucco*, 552 F.3d 981, where the Court said:  Motive and opportunity without more is not enough to establish a cogent and compelling inference of scienter.

And just the last point on scienter, just to be clear, is that plaintiffs are basically asking the Court to ignore all the other mitigating facts in this case, and that is that Acadia fully disclosed all of the information that they claim was omitted and is asking the Court to ignore the absence of any particular -- other particularized facts that they haven't pled, particularly anything going to the state of mind of Defendant Davis or Defendant Stankovic.

And let me just -- I've been talking for a while.  Let me just touch on lost causation and then I'll sit down. Actually before I want to do this, as part of the -- before I get to loss causation, as part of the holistic analysis in scienter, right, one thing that is clear is that the Court can certainly rely on its common sense, and that is -- if allegations are not plausible, that certainly factors into this determination.

And so, you know, setting aside the specific defects

in their allegations about scienter, about the stock sales and the offering and the alleged omissions, their theory of this case doesn't make any sense, and the Court -- I would encourage the Court to look at *Endologix* case, as well as the Fourth Circuit case that the Ninth Circuit in *Endologix* found persuasive.

In *Endologix* the plaintiffs attempted exactly what the plaintiff here is doing, and that is accusing the defendants of making false and misleading statements about of FDA approval based on the rejection of their application.

And in analyzing scienter, the Ninth Circuit said -- I am going to quote:  Based on plaintiff's complaint, the more plausible inference is that the company made optimistic statements about its prospect for FDA approval because its US testing looked promising, not because the company was quixotically seeking FDA approval for a medical device application that it knew was destine for defeat.

And the Ninth Circuit went on to say:  These allegations encounter an immediate first-level problem.  Why would defendants promise the market that the FDA would approve Nellix -- that is the device -- if defendants knew the FDA would eventually figure out that Nellix could not be approved due to a, quote, intractable and unresolvable device migration problems?  The theory doesn't make a whole lot of sense.

The same is true here.  Like, why would the company

grow to the trouble to spend millions and millions of dollars to run this study and put together the NDA if, according to plaintiffs what they are saying is true, meaning you absolutely had no agreement and the data and the study that you were using was fundamentally flawed and inadequate?  That makes no sense whatsoever.

And so let me just finish with loss causation, and on loss causation the standards that plaintiff must allege corrective disclosures by which, and I am quoting now: Defendant's fraud was revealed to the market and caused the result in losses.  That is a quote from the Ninth Circuit in the *B of I Holding* decision.

And plaintiff actually quotes that in their opposition, so I suppose we can at least agree on that.  But the problem for plaintiff is that no fraud was ever revealed in connection with the disclosures, and there are two.

There's the March 8th disclosure about the FDA informing Acadia of unspecified deficiencies, and that precluded the discussion of labeling and marketing, and then there is the April 5th, 2021, disclosure regarding the complete response letter when they rejected the NDA.

But they recognize that no fraud was actually revealed in these disclosures.  Instead they argue that the FDA's rejection of the NDA -- and I am quoting plaintiff's now: Plainly construed by shocked investors evidence of three

things.  So according to them these disclosures plainly construed that the defendant's prior assurances that the FDA had agreed on Harmony trial design were likely false, that their repeated characterization of the sNDA as supporting efficacy data was robust and meaningful, was at best materially misleading, and that defendants had similarly mislead investors as to the true magnitude of the risk that the NDA would be rejected.

I would just say that there are literally no facts pled to support any of these claims.  There is no analysts' reports.  There is no investor commentary.  There is nothing at all echoing plaintiff's manufacturing interpretation of the CRL.

What happened here was it didn't -- no fraud was revealed when these things happened.  What happened unfortunately is that the FDA sadly decided to reject the NDA, and as a result the stock reacted.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

I'll hear from the plaintiffs.

MR. FREDERICKS:  Yes, Your Honor.  This is William Fredericks for the plaintiff.

As I was discussing with your deputy clerk beforehand we have got a little bit of feedback on the line at my end, so I am kind of talking through an echo.  Hopefully you don't have

that problem and can hear me okay. If you have any problems please, please let me know.

THE COURT: Okay. I can hear you well. I can hear you.

MR. FREDERICKS: Great. And I want to start by thanking the Court for allowing us to appear telephonically. It was much appreciated.

Let me start by saying that I think Your Honor's comments at the beginning of defense counsel's argument show that the Court has a pretty good understanding of what the gravamen of plaintiff's case is, and I think that there is a lot of bluster in defendant's argument, whether it is misunderstanding or misconstruing.

But I think that from our perspective, based fundamentally misconstrue the relevant facts, misstate the relevant allegations, and in many places simply ignore and mistake the relevant law.

Let me try to go through the case much in the same order that defense counsel did and try to respond to points as they were made by defense counsel, but let me begin first by giving the Court some additional relevant background here that defendants found that strategic way opportune not to mention in their discussions of the background of the case.

First, in this instance Acadia had already obtained FDA approval to use pimavanserin as a treatment for Parkinson's

related dimension.  That is undisputed.  We don't dispute it. Defendants, of course, don't dispute it.

The question was given that there was enormous opportunity for defendants if they could expand the acceptable FDA approved indications and labeling for pimavanserin to include other types of dementia-related delusions or psychoses. That represented enormous value to the company and, of course, to investors.

So the question then was what the strategy to be adapted in order to get FDA approval for broadened indications, broadened usage?  And the company has always taken the position that, well, all these other dementia indications are essentially the same, so if it works in Alzheimer's, it will work in Parkinson's, it will work in frontotemporal dementia, it will work in Lewy body dementia, et cetera.

And what they did was they said to the FDA, let us do a study which looks simply at a mixed package of dementia patients with all sorts of different indications, Parkinson's, Alzheimer's, the frontotemporal, et cetera, and let's just look at whether the aggregate data for that is statistically significant and just approve the treatment of the symptom rather than a treatment of a symptom associated with a specific underlying disease.

And what defendants did throughout the class period, and I think the Court understands this, is they went out of

their way to tell everyone, we have an agreement with the FDA that says if we meet this end point for this study that looks at this pool of dementia sufferers, that is an okay way to do it, and the FDA is plodding to our way of looking at it; don't look at it by specific diseases; just lump them altogether and that is fine; get statistically significant results, that's fine.

Now, this is where the agreement, which Your Honor focused in on quite a bit on at the beginning comes into play, plaintiffs don't necessarily believe that there was no agreement whatsoever, but to the extent there was an agreement, defendant's repeated efforts through affirmative misstatements and omissions of trying to tell the market, oh, it is okay; we don't have to worry about subtype analysis; the FDA doesn't care.  That was false.  That was misleading, and it was highly material.

Because if that you adapted the FDA's later approach which was -- all right.  Sorry -- because if you look at things in a subtype basis that made getting approval a lot harder, and this is exactly how this panned out.

If you look at, I believe -- let me give you a cite in the complaint, paragraph 82 of the complaint, what they did was they put together in accordance with Harmony a mixed bag of patients.  Mixed bag is probably the wrong phraseology, a mixed group of patients.  15 percent were Parkinson's sufferers,

66 percent were Alzheimer's sufferers, 7 percent Lewy body, 10 percent vascular dementia, like two percent frontotemporal dementia.

Lo and behold, when the Harmony results came in, it was a statistically significant 15.7 longer period which patients did not experience a relapse, and that was statistically significant compared to a placebo.

But if you backed out the Parkinson's patients, for whom the drug had already been approved and demonstrated effective to the satisfaction of the FDA, the drug was so effective in the sample group of Parkinson's, it was -- it was stunning.  It was an astronomical 43.3 percent improvement in the Parkinson's patients.  Even though they constituted only 15 percent of the sample, it was enough to drive the overall group up to 15.7 percent, but none of the other subtypes came close to statistical significance in combination or individually.

So what you had was a situation where the only reason -- the only reason that the Harmony study met its primary end point was because it coasted on the strength of the response in Parkinson's patients for which the drug had already been approved, and that had the effect of pulling up the entire pool.

Now, was that information concealed?  I think we need to be very careful about what we're talking about when we talk

about what was concealed.  The underlying data including subtype performance data was made available.  And we candidly pled that in the complaint.  Defendants say, look, we even pled it in the complaint.  We pled it in the complaint because it is -- you know, we try to be candid with the Court.

But the significance of the subgroup's data was clearly the subject of defendant's protracted, repeated statements, misstatements to the market saying, we have an agreement with the FDA that we're going to do just this group study; subtype analysis is not going to be important to the FDA, and so who really cares about what the subtype data is. It is interest, perhaps, for future medical researchers, science at large, but it is not going to be an interest to the FDA.

And if I am an investor what I care about -- this is an investor case.  If I am an investor what I care about is the FDA going to approve this drug based on this data, this submission?  Whether I personally think the FDA's decisions are right or wrong, as an investor it is really immaterial, because I don't care what the FDA thinks.  I don't care what a man on the street thinks, what you think, what defense counsel thinks. I want to know what the FDA thinks.  That is what is material.

As everyone on this agreement agrees, it is the FDA that makes the call, so the FDA is the decisionmaker.  And so what you have here is a classic situation of -- this is a tough

set of that broader category of cases.  We cite in our brief: Was the marketplace misled as to the risks associated with FDA approval?

And as Your Honor understands, as noticed, of course, everyone understands that the FDA at the end of the day has full discretion to do what it deems most appropriate.  And so, you know, they had that boilerplate disclosure in their 10K. Everyone understands that.  Investors understands that. Everyone understands there is some risk.

But what is important to investors as security case law makes clear in a variety of contexts, lists of investing are ubiquitous.  What the investors care about are the magnitude of the risk.  And here investors were lead to believe, hey, we have the Harmony results; they are in the bag; they met the primary end point.  We're not challenging that they met their primary end point.  Plaintiffs are not challenging that.

But what defendants also said is -- effectively said all that any reasonable investor for the company should have expected the FDA to care about, so therefore, we're on a glide path to approval.  I mean, things can always happen, but the odds are really, really good because the FDA has bought into things from the outside; we have been in lockstep with the FDC -- with the FDA, to use a term from one of the defendants statements.

But that was simply untrue.  Defendants say -- and I heard Mr. Adams say this -- that there was no discussion of subtypes or subtype analysis whatsoever with the FDA during the submission and review and pre-NDA process, and then the FDA moved their goalposts.  And that is, of course, exactly what defendants in Davis said at the end of the class period, despite our agreement they reneged; you know, we are -- where the heck did the FDA come out talking about subtype analysis; they reneged on the agreement; the FDA told us that would be immaterial.  And that was simply false.

Now, let's go to defendant's point as to, well, allegedly there is not a shred of evidence to suggest to support our theory.  With all due respect, if you look at the *MannKind* and *Skiadas* cases, for example -- and then Your Honor was getting at this as well -- there are basically two options here.  Either that you believe that the FDA without ever having said boo about subtypes allegedly then moved the goalposts. That is defendant's story.

And I can tell you, you know, we try to plead short, manageable complaints because when we plead hundred-page complaints, the Court tends to yell at us for ignoring Rule 8 and having a plain simple statement of the case under Rule 8.

But if we had added additional commentary from April 5, when the company talked about what happened, the press reports were not that Acadia was disappointed that the FDA

didn't approve.  Their headline was that Acadia fumed that, you know, FDA reneged on the deal.  I am recalling what they basically said.  They basically used the word Acadia fumes.

There is no doubt what the company went out and said afterwards was what happened was the FDA changed the goalpost, how success -- so that is possible in the realm of human events.  That is one inference.  The other inference is that defendants simply were not being handed with the investing public during the period.

Now, Your Honor raised a third possibility which is, well, maybe things were ambiguous, but unless I completely misheard Mr. Adams, Mr. Adams said, oh, there is no ambiguity here; our agreement with the FDA was clear.

So the one thing that I think both plaintiffs and defendants agree on on this record, was that there was an agreement that this is not a case of misunderstanding what the FDA said; it is a case of either the FDA moving the goalposts, as the company said in the class period, or it is a case of defendants misleading the public.

Now, we're not at summary judgment.  We're prediscovery, but as the *MannKind* case -- the *MannKind* case makes clear, when you are left with those two options, sort of the culpable fraudulent option and the non-culpable option, the notion that the company lies is at least as plausible as the competing inference that the FDA moved the goalpost.

And, yes, we don't have a copy of the agreement, and I can't tell you how many times I've read and now heard Mr. Adams say, oh, well, we don't produce the agreement, you know. Defendants produced probably 100 or close to it or 75 exhibits to their motion, including plaintiff's documents which we never reference in the complaint, and the one thing they don't produce is the agreement.  No surprise they didn't produce the alleged agreement in *MannKind* and any these other cases.

So I don't know how we can be faulted for not producing the actual agreement when they talk about how confidential the agreement is.  They haven't produced it on this record, and it is not in the public record anyway.  Well, they say:  Where are your CW's say what the agreement was or the FDA say that Acadia breached this agreement?

First of all, I would just represent to the Court -- I would be happy to produce the authority, if the Court really finds it necessary -- Government agencies rarely accuse other people of fraud unless this is the SEC.  The FDA does not issue a press release every time it thinks it is mislead.  That is not its job.

And as litigant even in discovery passing motions to dismiss, it is almost impossible to get documents out of the FDA because they assert executive privilege.  So no one from the FDA is going to talk to a plaintiff lawyer even after litigation to talk about an agreement, let alone issue a press

release.

As for confidential witnesses, I will represent to the Court that if the Court thinks again it is helpful, I mean, we could add to the complaint some allegations of CWs we did talk to you in the company who said, you know, we were really kind of surprised that the subtype analysis had allegedly gotten a pass; we kind of understood -- we really think that the company was taking a big gamble on this study design; and, you know, we weren't really surprised by the FDA results.

But those people didn't see the agreement either. My guess is that there are probably only a small number of people at the company who actually have access to that agreement. So if we pled those CWs, defendants would have simply come in and predictably said: Well, these CWs admit that they hadn't seen the agreement either, so the Court can count their speculation as to what is in them.

But basically just to sum up on this point that I want to invite the Court to interject with any questions, we have -- we agree that it in all likelihood there was an agreement, but we think that drawing inferences which is a force entirely appropriate in the motion to dismiss stage, as between the inferences that the FDA reneged on the deal and moved the goalpost, reference the inference that the -- versus the inference that defendants were candid throughout, that the FDA had assured it that the subtype analysis was unimportant, we --

Case 3:21-cv-00762-WQH-MSB   Document 88   Filed 02/24/23   PageID.1431   Page 42 of 58

the tie goes to the runner.

And that is even without getting to the issue of the defendant's insider sales.  You know, they don't dispute our calculations based on their own documents that these defendants sold, you know, millions of dollars worth of their shares during the class period and that it managed to represent 80 percent of their shares.  And they said:  Oh, well, we had a 10b, you know, 1 plan so the sales shouldn't count.

But they essentially completely ignored well-established Ninth Circuit case law -- I think it is universal case law across the country --  that sales pursuant to 10b1 plans are irrelevant as exculpatory where they were introduced after the defendants already had knowledge of the material -- of the allegedly material undisclosed facts.

And here Davis and Stankovic's plans were all entered into just like two weeks after the Harmony study was announced, and you can presume that defendants actually knew the Harmony results before they actually issued a press release, or they were unambiguously approved the 10b5 trading plans during the class period, so they had no exculpatory value as a matter of law.

So on the scienter fraud, you know, I think, you know, that we have better facts for insider sales than even *Skiadas* and *Mann* had.  And I would like to wrap up on the scienter fraud, and I do want to give Your Honor an opportunity to

interrupt me just on the scienter points.

The secondary offering, we agree with defendants that the 247 million offering done right after the announcement of the start of the class period where they announced the Harmony results that that would not alone establish scienter, but even defendants own case, the *Arrowhead* case says that it is a relevant factor.

And the timing is certainly suspicious. There is a big offering, and, you know, it clearly seems the offering was calculated to fall after they made this announcement when happily enough the stock price went up 63 percent on the company's September 2019 announcement. So it is suspicious.

Would it be enough standing alone? We are aren't arguing that. We're not arguing that. That is not part of this case. It is part of the analysis.

And then just the final thing I want to say on scienter is that they keep coming back to this argument that, oh, there is no conceivable motive; it was an illogical scheme; why would we have invested millions of dollars to undertake this higher-risk approach if we in fact knew what the FDA's position was going to be?

Well, you know, the *Skiadas* case and the *MannKind* case actually address this so-called irrationality argument themselves. *Skiadas,* the Westlaw site is page 1112, and the *Biomarin* case at star 14, and Judge Orrick said in *Biomarin,*

the defendant's allegations of irrationally are really a strawman.

Because here the allegation is not that the defendants were convinced that the FDA would deny approval, it is that they withheld important warnings from it, ie, they misrepresented the magnitude of the risks.

Now, maybe you and I think that a more prudent course would have been to try to adopt a more -- you know, a different trial strategy and not one which was subject to this risk that materialized that they met their end point solely because the Parkinson's patients performances was so strong.

But that doesn't mean that it would be irrational for them to say, well, let's take a chance; let's do this broad pollywog study with people from all different dementia types, and maybe the data will come out strong enough that there won't be a problem, and, you know, we're willing to take that gamble.

And there is -- let me be clear, Your Honor, there is absolutely nothing wrong under the securities laws with corporate executives, pharmaceutical companies, taking risks, taking gambles.  It happens all the time in every business.

But what is a violation of the securities laws, you can't go around telling people, oh, the FDA has bought into my highly risky strategy and has assured me that subtype analysis is going to be irrelevant when in fact they had gotten zero such assurance from the FDA.

Maybe discovery will come out and Mr. Adams will produce the agreement that shows that the FDA signed in blood that we will never look at the subtype analysis and the FDA will be proven to be a bunch of untrustworthy people who reneged on their understandings and agreements.

But on this record where the Court has to draw between competing inferences as to both falsity and scienter.  On falsity we obviously don't have to meet the PSLRA strong-inference standard.  But even on the PSLRA strong-inference standard, we need that standard in space just on those facts alone even leaving aside the insider sales, even leaving aside the transaction or the 247 million secondary offering transaction.

So I hope that that makes sense to, Your Honor, as to what plaintiff's allegations are.  And defendants keep trying to pigeon hole us into that category of cases of, oh, you know, we're -- there is just a difference of opinion as to whether the data is strong or weak or whatnot.

That is not this case.  The issue is a subjective difference of opinion as to whether the data was somehow strong or whether they met the end point, et cetera.  The issue is whether defendants misled the market as to whether certain types of data, the subtype analysis data, was even relevant.

And it is the combination of the two, the two things, the reliance in the Harmony data, which is undisputed that you

only got statistically significant results if you included the extraordinary performance of the Parkinson's patients, which -- you know, for which the drug had already been approved, so proving great results in Parkinson's added nothing to the value of the drug.

It is the combination of that fact, plus the fact that the FDA had said we're -- we're going to look at the subgroup performance and we're aren't going to approve the drug for five additional indications of dementia when the only data is -- that supports a meaningful result is all driven by Parkinson's for which it is already approved.

And I think, Your Honor can, I hope you can understand the logic to that.  If you are doing the study and half the patients are, you know -- well, 15 percent of the patients here -- are already shown to be responsive, and 85 percent are from other categories not responsive, and you get all the juice, all the civil and the study from the people for whom it is already shown to work, that is not going to help you get FDA approval for these five other types that the results were simply different.  But the defense did their darnedest to say don't worry about it.

So I appreciate the Court's indulgence.  I hope the Court has been able to hear me reasonably well over the telephone.  I do have a couple of other things I do want to respond to, but I very much want to respond to any concerns the

Court may have at this point on anything that I've said today.

THE COURT:  I've been able to hear you well.  At this point I don't have any questions.  So if you want to complete your comments, that's fine.

MR. FREDERICKS:  Thank you, Your Honor.

I just want to go and address some of the defendant's comments about solidness of their exculpatory arguments.  They make an argument in their papers, well, we only said that the FDA had approved this for submission, not for approval.

I think it is the company's own comments at the end of the class period make clear, you know, defendants they were conditioning the market to believe that the FDA had said don't worry about subtype analysis and have been bought into that.

Whether it is at the submission stage or approval stage, obviously the two stages are inextricably interlinked because what is acceptable for submission is presumptively what the FDA has agreed to is going to be relevant to its consideration for approval.  The whole purpose of the submission is to provide the basis for approval after all.

Again, as I alluded to before, defendant keeps saying, well, the FDA asked for things that had never even been discussed, subtypes that had never been discussed.  Well, that is their story, and I agree with them.  They have stuck with their story both in the public statements both prior to and throughout the class period and at the end of the class period.

But that is what discovery is going to be about here, who is telling the truth, the FDA or the defendants, and where is that agreement?  Again, it is very telling that defendants having produced all of these other documents, analysts' reports we never cited to help tell their story.  The one thing that they haven't chosen to submit is the agreement themselves.

I just have a note here, counsel said, oh, we can make a books and records request for this information, if that were true.  As Your Honor probably knows, books and records requests are typically permitted under state law to assess ongoing corporate governing issues.  They are not a way to bypass PSLRA state of discovery, which I am sure that Your Honor is also well aware of.

I think I discussed defendant's irrational motives claims.  Again, I would direct the Court, as I referenced earlier, to the *MannKind* and *BioMarin* cases where Judge Orrick and the judge I think from the Southern District of New York clearly discuss the irrational motive argument is often tried by defendants but rarely succeed.

I mean, when you are caught and sued, everyone says, oh, why would we have done that because, you know, we wouldn't have done it?  Well, the answer is most people wouldn't have been assuming they would be caught or if they knew with certainty that events would pan out in a negative way.  But here, you know, defendants had a chance.  Maybe the FDA would

have turned a blind eye to the subtype analysis, but they certainly didn't, and they misrepresented the magnitude, the risk of FDA rejection.

They say again, oh, all the data was made transparent. That should count towards defendant's mitigation of scienter because if you were a Ph.D statistician, you could have gotten copies of the studies' results from that medical conference and figured out all these things yourself.

Again, this is a case where it is not that they misrepresented what the results were of the data. It is that they misrepresented what the FDA's position was on subtype data so that why would anyone have -- even Bill Fredericks as an investor without a degree into biophysics, why would I go digging into that subtype data when I was told it is not important to the FDA?

And as we argued in our brief, they would still have to show that the fraud -- or the corrective disclosure information was broadcast to the market with the same degree of intensity as their misrepresentations.  Here defendants every quarter on the quarterly call, the press releases were telling investors, don't worry about the subtype data.

The fact that someone might have put it together and it is buried in some medical conference article is not the same as -- remotely the same impact as when the CEO of the company is talking to analysts every quarter.

They made reference of the study was stopped early because the end point was reached early.  Again, that is an irrelevant fact because we are aren't disputing that the study was stopped early based on a prespecified criteria, but that goes to nothing about how the subtype -- subcategory data was still going to be relevant.

I think I'll just try to briefly touch on loss causation.  I think that defendants citing the *LeapFrog* case, Your Honor, this is a very interesting situation.  They cite the *LeapFrog* case, a district court case from 2007, and I think that that case said you have to link specific stock sales to specific misrepresentations and specific things that were misrepresented.

I Shepardized that case.  I couldn't find a single case that cited *LeapFrog* for that standard in terms of whether insider sales were suspicious.  I couldn't find a single other case in the United States that cited the *LeapFrog* standard. Instead, the *Quality Systems* case which is cited in the briefs but not for this point made clear that the test for insider sales being suspicious is are they suspicious in a mass compared to prior sales; do they involve a large percentage of the defendant's sales; and is the timing suspicious, which both courts, which is *BioMarin*, said, well, were they sold during a class period at a price is, you know, pretty high?  Did they maximize the gain from the fraud?

And those are the three factors, Ninth Circuit law, *quality systems*, we check all the boxes. It is 80 percent openings based on defendant's own submissions to the record which we cited in our brief. They sold no stock before the class period and then they gained this massive amount of selling, and that is what is left in the dollar terms.

And you know, so now timing of the sales during the class period; sales clearly consistent with prior sell history; we check all the boxes, the 10b5 claims are irrelevant for the reasons previously discussed.

On lost causation -- well, I'll just say briefly from their arguments, they say, oh, it is puffery, corporate optimism, forward-looking statements. The omissions at issue here are omissions of historical fact, what the FDA agreed. It is not puffery. It is not statements of corporate optimism. It was what was the deal with the FDA, and were investors deceived by that?

There is nothing about opinions. There is nothing about projections; nothing about forward-looking statements; puffery opinion. That is a good, old fashioned misrepresentation of historical fact. It is not fraud by hindsight.

And I think the only -- there are two other points that I would just make are with respect to lost causation. Again, defendants simply mischaracterized the law. They did it

in their brief -- the reply brief and in oral argument --
saying that there has to be some disclosure of fraud.

As we made clear in our brief, loss causation is typically pled on a materialization of the risk basis. And here the risk was that investors had been mislead as to the likelihood of FDA approval. That risk materialized first in March when they the FDA announced that they couldn't even discuss labeling or marketing issues at that stage, and then it was finally fully revealed when they rejected the application as a whole.

The notion that you need to have some revelation of fraud is universally rejected by the courts, and I would like to give you an example of accounting fraud cases, you know, the double counting fraud case. We saw a lot of these as earlier in the year. The company was cooking the books for a year, and then finally the music stops and they had to report a really bad quarter because all their prior quarters had been inflated.

The market reacts immediately to the news that the quarter is bad. The sales have suddenly dropped to nothing, for example, or dropped 50 percent because they were falsely inflating all the sales in the past and now the company has to come clean and basically say, well, you know, we don't have any sales.

But the market can react to the news of the undisclosed -- previously undisclosed risk that materialized

even if the truth as to why those results were so bad, ie, fraud, only comes out later. So at a very basic level they misconstrue.

Finally, I would just say that defendant's recitation of the facts also did not cash up with recent news events. In August the FDA rejected a revised pimavanserin application by defendants based on the same Harmony study which was designed to get approval just for the Alzheimer's treatment alone. And the rejection was nine to three.

And once again, it was because, you know, the FDA advisory committee was not convinced that the company had shown that there was actually a specific benefit in this one additional indication of Alzheimer's. There is additional information that I think would be relevant to this case, which is they have become public as a result of news that was coming out about, again, this recent August 22 FDA rejection of the revised submission.

But we filed our complaint in December of last year. It is a good complaint for all the reasons we've set forth in our brief. You know, if I write the complaint or my team would rite the complaint today, of course, we could have added stuff or would have added stuff, but the complaint that is in front of Your Honor, we're confident that it satisfies every pleading requirement.

If the Court were to say, oh, I would like some

additional details about insider sales in the complaint rather than just relying on unrefuted statements in your brief, of course, we could do that. That is why we asked for leave to replete.

But I think I will stop there unless the Court has any specific questions.

THE COURT: All right. No questions at this point.

Any final comments, sir?

MR. ADAMS: Sure, if you don't mind.

THE COURT: Sure.

MR. ADAMS: So there was a lot to digest there, but let me just say that what was clear to me in listening to opposing counsel is: Where are the facts in this complaint? They have to plead particularized facts, and I can't stress this enough, showing that there was a material misstatement, it was made with scienter, and it caused loss.

I didn't hear opposing counsel one time refer to a specific statement in the complaint or something defendants said. He repeatedly made comments like, oh, if the FDA said, oh, you never have to worry about subtypes, okay. None of this is alleged. And I will say, I never mentioned once and we never mentioned once that the word subtype never came up.

But the point is, you have to look at what statements were made and whether they were materially false or misleading and whether this plaintiff with this complaint, not, oh, we

might be able to get a CW or not, with this complaint has pled anything false or misleading and made with scienter.

And one other point, Your Honor, and I'll just want to go back to this is you can't have a securities fraud case premised on data that is disclosed to the market, so this idea that somehow the market didn't appreciate the Harmony data and didn't appreciate the subtype data, it is nonsense.

First of all, it is not pled anywhere in the complaint. And we attached just by way of example, Exhibits KK and LL, and I'll just read to you part of this analyst report, right, where they are analyzing the full set of data. This is on December 5th, 2019.

And by the way, Your Honor doesn't have to accept any of this stuff as true. The whole point is this information out in the market, right, is it disclosed because their whole theory is that it was withheld, that the bad news was withheld, and that the company and the defendants mislead the public.

But in here it says, just referring to the Harmony study, you know: Overall HR -- that is hazard ratio -- shows significant decline in psychosis relapse, and efficacy data were positive across the board.

It goes on to say: Relapse rates were AD, 13.1 percent verses 22.6 percent placebo. That is the subtype number that they are relying on. Parkinson's disease, 6.7 percent versus 50 percent placebo, and vascular dementia,

16.7 percent verses 16.7 percent, so there is no difference in vascular dementia.

They literally, they meaning this analyst, is literally replicating the information that plaintiffs are saying was not disclosed to the public.

And same thing in Exhibit LL.  This is an account analyst's report on December 5th.  It says:  All dementia subtypes on the study, Alzheimer's, PDP, DLB, vascular, FTD, were represented in enrollment, randomization, and adjudicated relapses and importantly, data showed strong initial response as well as well relapse prevention with pima treatment across the subtypes.  While effects in PDP, G1 -- that is Parkinson's disease and dementia from Lewy bodies -- were particularly strong, data in Alzheimer's patients was also encouraging.

So again, I am just struggling to understand how the company or defendants could have misled anyone about the subtype information when it was plainly disclosed.

And just one more point.  There was a lot to sort of parse through.

This whole idea that they couldn't have pled facts or that they couldn't have sent a 220 demand, I mean, don't file a complaint, right.  They claim they do this investigation.  They can go as a stockholder and ask the company, hey, you know, I think -- if I have some theory that there was mismanagement or something was going wrong -- for example, people file

derivative cases all the time on the heels of security cases.

My point here, right, is that this complaint doesn't have any particularized facts. It doesn't have any documents. It doesn't have any CWs. It doesn't have anything. And all they are saying is, well, why don't you just solve the problem and disclose the meeting minutes?

Well, first of all, we don't disclose the meeting minutes because, like I said, there is proprietary and trade secret information in there, and companies don't want to do that. I am not aware of any company that publicly discloses their end-of Phase II meeting minutes.

So anyway, I'll just stop there. I appreciate taking Your Honor's time.

THE COURT: Thank you for your arguments. Your briefing was well done. It was helpful. Your arguments were well done as well and helpful.

I'll issue a written decision.

And enjoy the rest of your day. Thank you.

MR. FREDERICKS: Thank you, Your Honor.

(Proceedings concluded at 10:34 a.m.)

---o0o---

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:  September 19, 2022, at San Diego, California.

/s/ Melinda S. Setterman

_____
Melinda S. Setterman,
Registered Professional Reporter
Certified Realtime Reporter