COOLEY LLP
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
MATTHEW D. MARTINEZ (333932)
(mmartinez@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:  +1 858 550 6000
Facsimile:   +1 858 550 6420

CHRISTOPHER B. DURBIN
(cdurbin@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
Telephone:  +1 206 452 8700
Facsimile:   +1 206 452 8800

Attorneys for Defendants
Acadia Pharmaceuticals, Inc., Stephen R.
Davis, and Srdjan (Serge) R. Stankovic

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>Defendants. | Case No. 3:21-CV-00762-WQH-MSB<br><br>CLASS ACTION<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Courtroom: 14B<br>Judge: Hon. William Q. Hayes |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  RELEVANT BACKGROUND ............................................................................3

    A.  Acadia's Development of Pimavanserin .....................................................3

    B.  Acadia's Agreement with the FDA About the HARMONY Study. ...........................................................................................................3

    C.  The HARMONY Study Meets Key Endpoints and Acadia Submits sNDA for DRP. ...........................................................................4

    D.  The FDA Denies Approval of Acadia's sNDA for DRP. .........................5

    E.  Procedural Posture and Plaintiffs' Theory of Liability .............................6

III.  LEGAL STANDARD .........................................................................................7

IV.  ARGUMENT ......................................................................................................8

    A.  The Lack of Price Impact Rebuts the *Basic* Presumption and Requires Individual Inquiries into Reliance. .............................................8

        1.  The allegedly omitted information about HARMONY and -019 was public before the March Deficiency Letter. ..............10

        2.  Defendants' statements regarding an agreement with the FDA had no price impact ......................................................19

            a.  The September 9 stock price increase was not based on alleged misstatements about an FDA agreement. .....19

            b.  There is a mismatch between the alleged misstatements and purported corrective disclosures. ......21

    B.  Plaintiffs' Materialization-of-the-Risk Theory Cannot Support Class Certification. .................................................................................24

        1.  Plaintiffs' theory runs afoul of *Comcast* ...................................25

            a.  Plaintiffs' damages model does not account for their materialization-of-the-risk theory of liability. ........25

            b.  Plaintiffs' model cannot measure materialization-of-the risk damages on a class-wide basis ......................27

        2.  Plaintiffs' theory runs afoul of *Basic* ........................................30

V.  CONCLUSION ..................................................................................................30

Cooley LLP
Attorneys at Law
San Diego

**TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................................7

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...................................................................................2, 18

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ............................................................................22

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...............................................................................*passim*

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014) ..............................................29

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................*passim*

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..........................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ........................................................................................7

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ................................................11

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) ....................................................................2, 9, 10, 22

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ..........................................................................9

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ....................................................................9, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258, (2014) ...........................................................................1, 2, 9, 10

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ...........................................................27, 28, 30

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

ii

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ..........................................26, 27

*Mandalevy v. BofI Holding, Inc.*,
2018 WL 3032588 (S.D. Cal. June 19, 2018) ......................................................11

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .........................................................................11

*Mulderrig v. Amyris, Inc.*,
340 F.R.D. 575 (N.D. Cal. 2021) .............................................................26, 27

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)................................................................................7

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023)................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................................................................................7, 8

**Other Authorities**

Fed. R. Civ. P. 23....................................................................1, 7, 8, 25

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

## I.   INTRODUCTION

This case stems from the FDA's denial of Acadia's supplemental New Drug Application ("sNDA") to market pimavanserin for the treatment of hallucinations and delusions caused by dementia-related psychosis ("DRP"). Plaintiffs do not allege that Defendants knew in advance that the FDA would deny approval of the sNDA. Nor do Plaintiffs allege that investors were unaware of the risk that the FDA might deny approval. Rather, Plaintiffs accuse Defendants of misleading investors about the magnitude of that risk because Defendants allegedly (1) failed to disclose purported design deficiencies and disappointing results in two clinical trials supporting the sNDA submission (the -019 and HARMONY Studies); and (2) lied to investors about an agreement with the FDA regarding the HARMONY Study.

This is a fiction.[1] Plaintiffs survived a motion to dismiss by means of a favorable pleading standard. But we are past that now. On a motion for class certification, Plaintiffs must actually prove that they are entitled to pursue their case on a class-wide basis. They have the burden of establishing all four requirements of Rule 23(a) and one of three provisions under Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3). But they cannot satisfy this predominance requirement with respect to reliance and damages.

***First***, Defendants' alleged misstatements did not impact Acadia's stock price as required to support a class-wide presumption of reliance. To satisfy the predominance requirement of Rule 23(b)(3), Plaintiffs invoke the *Basic* presumption of reliance. That presumption is based on the "fraud-on-the-market" theory, which holds that "market prices of shares traded on well-developed markets reflect all publicly available information, and, hence, any material misrepresentations." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) (*Halliburton*

---

[1] Plaintiffs know that Defendants fully (and repeatedly) disclosed the design and results of HARMONY and -019 Studies; that information is public. And they know the FDA agreed with Acadia on the design of the HARMONY study because they now have the 2017 End-of-Phase-2 meeting minutes, along with Acadia's entire FDA correspondence file, which plainly document the agreement.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

*II*) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).) That presumption, however, is rebuttable at class certification. And one way for defendants to rebut the *Basic* presumption is by showing a lack of "price impact"—*i.e.*, "that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* Without the *Basic* presumption, individualized issues of reliance will predominate and will "preclude certification of a [securities fraud] class action." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462–63 (2013). There are many ways to show a lack of price impact, and the Supreme Court has instructed courts to "consider all probative evidence" and to use "a good dose of common sense" in evaluating a class certification motion. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021).

Here, Defendants have rebutted the presumption. With respect to the alleged omissions about trial design deficiencies and disappointing results, the evidence shows there was no price impact because the allegedly omitted information was publicly disclosed well before the two alleged stock drops, precluding the use of either to demonstrate price impact of the alleged misstatements. With respect to the alleged misrepresentations about Acadia's agreement with the FDA, the evidence shows there was no price impact because (1) that agreement was publicly disclosed long before the start of the proposed class period, and in an efficient market, the repetition of such information would not increase the stock price; and (2) there is a mismatch in content between the alleged misrepresentations and what was revealed when the risk ultimately materialized, precluding reliance on the later stock price declines to infer artificial inflation from the alleged misrepresentations.

***Second***, Plaintiffs' materialization-of-the-risk theory of liability is inconsistent with class treatment. To start, Plaintiffs have not offered a class-wide damages model that is consistent with this theory, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Nor can a materialization-of-the-risk model be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

have bought the stock at the heightened risk for a lower price with those who would not have bought the stock at all. Further, this theory presumes substantial reliance on factors other than price (*i.e.*, risk), which is not supported by *Basic* and the rationale for the fraud-on-the-market presumption.

In light of these defects, as discussed more fully below and supported by the expert report of Rene Stulz, Plaintiffs' motion for class certification should be denied.

## II.    RELEVANT BACKGROUND

### A.    Acadia's Development of Pimavanserin.

Acadia is a publicly traded life sciences company focused on the development and commercialization of medicines to address unmet medical needs in central nervous system disorders. In 2016, after years of research and clinical trials, the FDA approved Acadia's lead drug, pimavanserin, for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis ("PDP"). (¶¶ 45–47.)[2]

Following the success of its pivotal Phase 3 trial in PDP patients (the "-020 Study"), but before receiving FDA approval, Acadia began to explore pimavanserin's potential to treat other neurological and psychiatric disorders. To that end, in November 2013, Acadia announced the initiation of an exploratory, single-site, Phase 2 study to evaluate the efficacy and safety of pimavanserin in patients suffering from Alzheimer's disease psychosis (the "-019 Study"). (¶ 48; Ex. 2.) In December 2016, Acadia announced positive top-line results from the -019 Study, including that pimavanserin met its primary endpoint at week six, but did not meet several secondary endpoints, including the efficacy endpoint at week 12. (¶ 49; Ex. 8.)

### B.    Acadia's Agreement with the FDA About the HARMONY Study.

In May 2017, following the conclusion of the -019 Study, Acadia met with the FDA to discuss a proposed Phase 3 trial that could serve as the basis for an sNDA expanding pimavanserin's authorized uses to treat DRP as a broad group. (¶ 50; Ex.

---

[2] Unless otherwise noted, "¶" refers to Plaintiffs' Consolidated Amended Complaint; "App." and "Ex." refer to the appendices and exhibits to the Declaration of Peter M. Adams; emphasis is added; and internal citations and quotation marks are omitted.

Cooley LLP
Attorneys at Law
San Diego

3

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

18 at 7–9.) As Acadia explained to both investors and the FDA, it is often difficult to diagnose subtypes of DRP, and patients frequently suffer from more than one type. (Ex. 67 at 5.) Accordingly, Acadia proposed a Phase 3 clinical trial that would enroll patients suffering from any of the five most common types of DRP: Alzheimer's disease psychosis, PDP, dementia with Lewy bodies, vascular dementia, and frontotemporal dementia (the "HARMONY Study"). (¶ 50.) ***The FDA agreed that DRP was a potentially approvable indication and that Acadia's proposed HARMONY Study design would be sufficient to support submission of an sNDA for DRP so long as the results were clinically and statistically persuasive***, which—as Defendants told investors—is documented in the FDA's End-of-Phase-2 meeting minutes. (¶ 132; Ex. 18 at 7–9.)

Thereafter, in October 2017, Acadia announced the initiation of the HARMONY Study—a large Phase 3 clinical trial evaluating pimavanserin in patients with DRP. (¶ 52; Exs. 22–23.) Following this announcement, securities analysts widely reported on the HARMONY Study design, noting it would "enroll a broad spectrum of DRP" patients (Ex. 27 at 2), with "***no pre-specified number for DRP subtypes***" (Ex. 28 at 2; *see also* Exs. 24–26, 29–32 (similar analyst reports)).

### C.    The HARMONY Study Meets Key Endpoints and Acadia Submits sNDA for DRP.

In September 2019, the independent Data Monitoring Committee overseeing the HARMONY Study performed a pre-planned interim analysis and found that the already-strong efficacy results supported stopping the trial early. (¶ 57; Ex. 62.) Acadia promptly informed investors of the good news, adding that the full results would be shared once they were available. (¶ 57; Ex. 62; Ex. 63 at 6, 10.)

As promised, on December 4, 2019, Acadia disclosed the HARMONY Study results at a medical conference and during an investor webcast later that same day. (¶ 62; Ex. 67.) In addition to sharing the full top-line results, Acadia disclosed the detailed results of its exploratory analyses for each subtype within the broader DRP

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

4

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

category. (Exs. 67–68.) Acadia, however, cautioned against "overinterpretation" as "some of those categories have just extremely small numbers of patients." (Ex. 67 at 8.) In the wake of these disclosures, which were widely reported by securities analysts (Exs. 69–80), Acadia's stock price increased over 14%. (Report on Market Efficiency and Damages Methodology by Professor Steven Feinstein ("Feinstein Rpt.") at 154; Expert Report of Rene Stulz ("Stulz Rpt.") at 129.)

On May 7, 2020, Acadia announced that it met with the FDA for a pre-sNDA meeting, during which the FDA confirmed that the results from the HARMONY, -020, and -019 Studies would support the *submission* of an sNDA—but not necessarily final *approval*. (Ex. 82 at 8.) In fact, Acadia expressly cautioned investors that its submission of the sNDA did not assure final approval: "the sNDA will be subject to FDA review to determine whether [it] is adequate to support approval of pimavanserin for [DRP]. ***Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of [DRP]***." (Ex. 65 at 7; Ex. 81 at 5; Ex. 83 at 4; *see also* Ex. 84 at 4–5 (similar and also warning that trial "results may not meet the level of statistical significance required by the FDA"); Ex. 85 at 4, 6 (same); Ex. 86 at 4–6 (same).)

In July 2020, Acadia announced that the FDA had accepted Acadia's sNDA for filing and had not identified any potential review issues. (¶ 127.)

**D.    The FDA Denies Approval of Acadia's sNDA for DRP.**

Unfortunately, Defendants' and investors' optimism following Acadia's disclosure of the HARMONY Study results and submission of the sNDA was ultimately dashed. On March 8, 2021, Acadia announced that the FDA had identified deficiencies that precluded discussion of labeling and post-marketing at that time ("March Deficiency Letter"). (¶ 143.) Following this announcement, Acadia's stock price fell $20.76 per share, closing at $25.02 per share on March 9, 2021. (¶ 144; Feinstein Rpt. at 156; Stulz Rpt. at 129.)

Cooley LLP
Attorneys at Law
San Diego

5

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

Then, on April 5, 2021, Acadia announced that the FDA had issued a complete response letter denying approval of the sNDA because it did not find the submission sufficiently compelling ("April CRL"). (¶ 145.) The FDA "cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes." (¶ 145.) Following this announcement, Acadia's stock price fell $4.41 per share, closing at $21.18 per share on April 5, 2021. (¶ 146; Feinstein Rpt. at 156; Stulz Rpt. at 129.)

**E.      Procedural Posture and Plaintiffs' Theory of Liability.**

On December 10, 2021, Plaintiffs filed an Amended Complaint. (ECF 45.) It challenges two groups of alleged misstatements: (1) positive statements about the HARMONY and -019 Studies that were allegedly misleading because Defendants purportedly failed to disclose design deficiencies and disappointing results, and (2) alleged misstatements about an FDA agreement. (ECF 65 at 14, 18.)[3]

On February 15, 2022, Defendants moved to dismiss the Complaint for failure to state a claim. Among other things, Defendants argued that the allegedly negative information about the HARMONY and -019 Studies could not render any challenged statement misleading because the full design and results had already been publicly disclosed. (ECF 53-1 at 15–16.) The Court rejected Defendants' argument, holding "*[a]t the pleading stage*, the allegations in the FAC are sufficient to show that a failure to disclose that the studies were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." (ECF 65 at 19.)

Defendants also argued that Plaintiffs failed to plead loss causation because neither of the alleged corrective disclosures revealed any fraud nor corrected any prior misstatement. (ECF 53-1 at 32.) In response, Plaintiffs argued that they were proceeding under a materialization of the risk theory, claiming Acadia "misled

---

[3] All citations to documents filed on ECF are to the ECF-stamped page numbers at the top of each page.

Cooley LLP
Attorneys at Law
San Diego

6

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-cv-00762-WQH-MSB

investors as to the ***true magnitude of the risk*** that the sNDA would be rejected." (ECF 56 at 30.) Plaintiffs' counsel reiterated this position at oral argument. (Ex. 88 at 5–6.) And the Court ultimately adopted Plaintiffs' view, finding that "the FAC alleges sufficient facts to support an inference that Defendants' statements . . . misled investors into ***underestimating the risk*** that the FDA would deny Acadia's sNDA," and that "the FDA's denial of approval of the sNDA represented the ***materialization of the risk*** about which investors had allegedly been misled." (ECF 65 at 26.)

Plaintiffs now seek to certify a class of investors (subject to certain exceptions) who purchased Acadia stock during the period September 9, 2019, to April 4, 2021 (the "Proposed Class Period"). (ECF 108-1 ("Mot." or "Motion").)

## III.   LEGAL STANDARD

Plaintiffs seeking class certification must prove each of the four requirements of Rule 23(a), as well as one of the three provisions of Rule 23(b) by a preponderance of the evidence. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–51 (2011); *Comcast*, 569 U.S. at 33; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This "criterion is far more demanding" than the commonality requirement of Rule 23(a). *Id.* at 623–24. "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*). It often turns on the element of damages too. *Comcast*, 569 U.S. at 34 (plaintiff's failure to "establish[] that damages are capable of measurement on a classwide basis" will violate Rule 23(b)(3) and preclude class certification).

To determine whether Plaintiffs have satisfied Rule 23's requirements, the Court is required to conduct a "***rigorous analysis***" of Plaintiffs' submission. *Wal-Mart*, 564 U.S. at 351. This obliges the Court to "***probe behind the pleadings***" and

consider "the merits of the claim." *Comcast*, 569 U.S. at 33, 35; *see also Wal-Mart*, 564 U.S. at 351 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) ("In many cases, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."). The Court's obligation to consider all relevant evidence also includes taking into account expert opinions. *Id.* at 982.

## IV.   ARGUMENT

Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance requirement in at least two respects: (A) the lack of price impact rebuts the *Basic* presumption and requires individual inquiries into reliance; and (B) Plaintiffs' materialization-of-the-risk theory runs afoul of *Comcast* and *Basic*.

### A.   The Lack of Price Impact Rebuts the *Basic* Presumption and Requires Individual Inquiries into Reliance.

Plaintiffs argue that they "may benefit from a class-wide presumption of reliance" because "the common stock of Acadia (a multibillion dollar, NASDAQ-listed company) traded in an efficient market throughout the [Proposed] Class Period." (Mot. at 7.)[4] This presumption, however, is rebuttable at class certification.

"***Any showing*** that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. This is because "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* A defendant may thus rebut the *Basic* presumption at class certification by demonstrating that "the asserted misrepresentation (or its correction) did not affect

---

[4] Reliance is typically an individualized inquiry. For publicly traded securities, however, the Supreme Court has recognized a rebuttable presumption of reliance on public misstatements because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. When the presumption applies, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Id.* at 247.

Cooley LLP
Attorneys at Law
San Diego

8

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

the market price of the defendant's stock"—that is, there was no "price impact." *Halliburton II*, 573 U.S. at 263–64, 279–80. "***Price impact is thus an essential precondition for any Rule 10b-5 class action***." *Id.* at 282. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse" and individualized questions of reliance will predominate. *Id.* at 278.

In assessing price impact, a district court's inquiry should be flexible and holistic. "[C]ourts should be open to ***all probative evidence*** on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960. Further, the Supreme Court has instructed courts that they "***must take into account*** all record evidence relevant to price impact, ***regardless whether that evidence overlaps with materiality or any other merits issue***," and they "may not use the overlap to refuse to consider the evidence." *Id.* at 1961 & n.2.

One way to rebut price impact is to show that the market already knew of the allegedly corrective information, in which case the stock price could not have been inflated through the omission of that information. *See Basic*, 485 U.S. at 248 (If "'market makers' were privy to the truth . . . [then] the market price would not have been affected by [defendants] misrepresentations."); *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) ("Because publicly available information in an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price."); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price."); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) ("If the corrective disclosures did not actually contain new information correcting the alleged misrepresentations, it becomes less likely that their announcement caused the back-end price drops and less reasonable to assume that Defendants' alleged misrepresentations caused front-end inflation in the first place.").

Cooley LLP
Attorneys at Law
San Diego

9

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

A defendant may also rebut price impact by demonstrating that the alleged misstatement was too dissimilar from the allegedly corrective information to be linked to the stock price decline. *See Goldman*, 141 S. Ct. at 1961. In *Goldman*, the Supreme Court clarified that "front-end price inflation"—*i.e.*, the effect on the stock price at the time an alleged misrepresentation is made—may be inferred from a decline in the stock price after the "corrective" information was disclosed, but only if the decline was the market's reaction to the actual alleged misrepresentation. *Id.*; *cf. Halliburton II*, 573 U.S. at 281 (certifying a class "is inconsistent with *Basic*'s own logic" if "the evidence shows no price impact with respect to the **specific misrepresentation** challenged in the suit"). For that reason, "that final inference— that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961.

Although defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence," the Supreme Court has emphasized that "the burden of persuasion should rarely be outcome determinative." *Id.* at 1958. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 1963. If not, class certification must be denied. *Halliburton II*, 573 U.S. at 277–78, 281–83.

The evidence here demonstrates that none of the alleged omissions or misrepresentations impacted Acadia's stock price.

### 1. The allegedly omitted information about HARMONY and -019 was public before the March Deficiency Letter.

Plaintiffs allege that investors were misled about the risk that the FDA would deny Acadia's sNDA because Defendants purportedly failed to disclose design deficiencies and disappointing results in the HARMONY and -019 Studies. (Mot. at 8.) Plaintiffs further allege that these purported omissions artificially inflated

Cooley LLP
Attorneys at Law
San Diego

10

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

Acadia's stock price during the Proposed Class Period, and that this artificial inflation was removed (*i.e.*, the stock price dropped) when the design deficiencies and disappointing results were revealed in the March Deficiency Letter and April CRL. (ECF 56 at 30; *see also* Mot. at 10.)

In an efficient market, however, the repetition of previously disclosed information will not impact the stock price. *See Qualcomm*, 2023 WL 2583306, at *13 (finding no price impact because the allegedly omitted information was previously disclosed to the market); *see also In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017) (An efficient market is "said to digest or impound news into the stock price in a matter of minutes."). In this sense, "[t]he efficient market theory . . . is a Delphic sword: it cuts both ways." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013); *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at*13 (S.D. Cal. June 19, 2018).

Here, Acadia repeatedly disclosed, and analysts reported on, the design and results of the HARMONY and -019 Studies well before the March Deficiency Letter and April CRL. (*See* Exs. 2–17, 19, 21–38, 40–45, 47–52, 55–60, 62–80; *see also* Apps. A–B (excerpting 78 disclosures from 2013 to 2019 from the cited exhibits).)

**<u>Disclosure of HARMONY Study Design.</u>** Beginning in 2017 and continuing throughout the Proposed Class Period, Acadia publicly, repeatedly, and exhaustively disclosed the HARMONY Study design in press releases, investor conference calls, SEC filings, and on ClinicalTrials.gov. Among other things, Acadia disclosed that the HARMONY Study would enroll patients diagnosed with one or more of the five most common subtypes of DRP, that there was no prespecified number of patients to be enrolled in each subtype, and the rationale for focusing on DRP as a whole rather than specific subtypes. (*See* Exs. 22–23, 38, 43, 45, 47–50, 52, 55–59, 62–63; App. A; Stulz Rpt., ¶¶ 65–70, 88.) For example:

In an October 4, 2017, Press Release, Acadia Disclosed:

"HARMONY is a Phase III, randomized, double-blind, placebo-

Cooley LLP
Attorneys at Law
San Diego

11

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-cv-00762-WQH-MSB

controlled study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. The objective of the study is to evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms *in a broad population of patients with the most common subtypes of dementia*: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia. The study will be conducted globally and is expected to enroll approximately 360 patients." (Ex. 22 at 3.)

During an October 4, 2017, Investor Conference Call, Acadia Disclosed:

"[B]y pursuing dementia-related psychosis, pimavanserin is able to address psychosis and dementia *regardless of subtype, including dementia not otherwise specified*.
. . .
We'll be stratifying by groups of dementia but just certain groups of dementia. But I do want to point out that in our discussions and agreement with the FDA, *there was no prespecified proportion of different subtypes of dementia that we have to reach*. So we don't have a prespecified number, but we will be analytically evaluating different subtypes or groups of subtypes." (Ex. 23 at 9, 12.)

During a July 31, 2019, Investor Conference Call, Acadia Disclosed:

"And both in terms of the enrolling people in the open-label trial as well as people that qualify for -- that essentially respond and then qualify for a randomized double-blind stage of the trial, *we are tracking very, very close to epidemiological data on the proportion of different subtypes*." (Ex. 58 at 13.)

During a December 4, 2019, Investor Conference Call, Acadia Disclosed:

"So I think it's important to take a moment to say why dementia-related psychosis and why not Alzheimer's disease psychosis. Fundamentally, this is a symptomatic trial, so not a disease modification trial. But more importantly, when we see these patients in clinic, *it can be very difficult to tell one subtype apart from another*, depending on when the patient presents. Clinically, there's a lot of overlap.
. . .
So it's for that reason . . . that *we enrolled any 1 of the 5 most common neurodegenerative dementias into this trial*. And so we did ask clinicians to choose the subtype that they thought was most likely the primary subtype in these patients, but we *encouraged patients to come in with mixed presentations*. And we did collect that information, and we know that many of our patients were suspected to have mixed pathologies." (Ex. 67 at 5.)

Following these disclosures, multiple analysts published reports commenting on (and praising) the HARMONY Study design, including the target population. (*See*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

Exs. 24–33, 35–37, 41, 60; App. A; Stulz Rpt., ¶¶ 89–90.) For example:

On October 4, 2017, J.P. Morgan Reported:

"***Management does not appear concerned by the broad patient population.*** ACAD maintains that despite the differences in the underlying pathophysiology, the emergent psychosis manifests – and can be dealt with – in a materially similar fashion. It appears that the FDA agrees, as evidenced by the BTD." (Ex. 25 at 2.)

On October 5, 2017, H.C. Wainwright Reported:

"With the initiation of HARMONY study in dementia-related psychosis . . . *we applaud what we view as a smart move by Acadia of pursuing a broader indication for pimavanserin, and more importantly, doing so with a solid clinical plan moving forward*. At first glance, the seemingly bold move into DRP from ADP may appear over-ambitious (killing "multiple" birds with one stone). However, we note that a psychosis focus/approach may prove to be a smart play from both the commercial point of view and also from the mechanistic perspective. The blessing from the FDA with a Breakthrough Designation further elevates our sanguine outlook for the program." (Ex. 28 at 2.)

On August 1, 2019, Goldman Sachs Reported:

"On the type of DRP patients being enrolled in the study, ***ACAD noted the proportion of the different subsets of DRP patients continues to track well with epidemiology data***." (Ex. 60 at 3.)

**Disclosure of HARMONY Study Results.** Beginning on September 9, 2019 (the first day of the Proposed Class Period) and continuing through December 4, 2019, Acadia publicly disclosed the HARMONY Study results in press releases, investor conference calls, corporate slide presentations posted to Acadia's website, and SEC filings. Among other things, Acadia disclosed that the HARMONY Study met its primary endpoint and provided a breakdown of the results by subtype, flagging to investors that certain subtypes had very small numbers of patients. (*See* Exs. 62–63, 65–68; App. A; Stulz Rpt., ¶¶ 71–78, 80–86, 91.) For example:

In a September 9, 2019, Press Release, Acadia Disclosed:

"ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) today announced that its Phase 3 HARMONY study . . . *met its primary endpoint* . . . *Upon the recommendation of the study's independent data monitoring committee*, which met to review the data from the planned interim efficacy analysis, *the study will now be stopped early based on pre-*

*specified stopping criteria.*" (Ex. 62 at 2–3.)

During a September 9, 2019, Investor Conference Call, Acadia Disclosed:

"The distribution of different dementia subtypes in our open-label stage as well as in the randomized population are similar and match roughly the epidemiology of the disease. ***Approximately 2/3 of patients were Alzheimer patients, about 15% of patients were with Parkinson's dementia, approximately 10% were with vascular dementia, and somewhat less than 10% patients with Lewy body dementia and with dementia with Lewy bodies, and the rest was frontotemporal dementia.***" (Ex. 63 at 10.)

During a December 4, 2019, Investor Conference Call, Acadia Disclosed:

"So I'm going to switch now to a couple of exploratory analyses that are based on the most likely clinical diagnosis that the investigator gave the patient upon enrollment into the trial. And there are some caveats here. . . . We know that a lot of these patients are suspected to have mixed pathologies, and that's really not represented in what I'm about to show you. ***And when we talk about the double-blind results, some of those categories have just extremely small numbers of patients. So just a word of caution on overinterpretation.***

. . .

***When we look at the double-blind relapse rates, it's, again, a bit hard to interpret these results given the small numbers. And we really were not powered to look at this in any meaningful statistical way. So the best we can do is just describe it.***" (Ex. 67 at 8.)

In a December 4, 2019, Corporate Slide Presentation, Acadia Disclosed:

Stabilization and relapse rates by most likely clinical diagnosis — HARMONY / ACADIA Pharmaceuticals

| | Open-label Stabilization rate % | Double-blind relapse rate | |
| --- | --- | --- | --- |
| | | PBO % | PIM % |
| Overall | 61.8 | 28.3 | 12.6 |

Most Likely Clinical Diagnosis

| | Open-label Stabilization rate % | PBO % | PIM % |
| --- | --- | --- | --- |
| AD | 59.8 | 22.6 | 13.1 |
| DLB | 45.5 | 66.7 | 0.0 |
| PDD | 71.2 | 50.0 | 6.7 |
| VaD | 71.4 | 16.7 | 16.7 |
| FTD | 50.0 | 0.0 | 100 |

Relapses on PBO (n/N): Overall=28/99; AD: 14/62; DLB 2/3; PDD: 10/20; VaD 2/12; FTD 0/2
Relapses on PIM (n/N): Overall=12/95; AD: 8/61; DLB 0/6; PDD: 1/15; VaD 2/12; FTD 1/1

NUPLAZID is approved in the U.S. for hallucinations and delusions associated with Parkinson's disease psychosis.
Provided December 4, 2019 as part of an oral presentation and is qualified by such; contains forward-looking statements; actual results may vary materially; ACADIA disclaims any duty to update.

(Ex. 68 at 28 ("AD" refers to Alzheimer's Disease; "DLB" to Dementia with Lewy

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

Bodies; "PDD" to Parkinson's Disease; "VaD" to Vascular Dementia; and "FTD" to Frontotemporal Dementia).)

Following these announcements, multiple securities analysts published reports commenting on the HARMONY Study results, including the specific sample sizes and results within each subtype, and in some cases, reproducing copies of the above slide. (*See* Exs. 64, 69–80; App. A; Stulz Rpt., ¶¶ 90, 92–93.) For example:

On December 5, 2019, Cowen Reported:

"Overall, the dementia subtypes behaved similarly in terms of the psychosis score, with the greatest stabilization seen in PDD (71.2%) and VaD (71.4%) populations. ***Decreases in rate of relapse with pimavanserin treatment compared to PBO was observed in all subtypes except for VaD and FTD (although we note small patient numbers; there was only 1 patient enrolled with FTD).*** The relapse rate for ***AD patients (majority of the patients, 62/99)*** was reduced to 13.1% with pimavanserin compared to 22.6% with PBO. While ***we note the effect seen in AD was smaller than what was observed in DLB and PDD***, we still view the change of 9.5% between these groups, an almost 50% reduction, as being very clinically meaningful." (Ex. 72 at 4; *id.* at 5 (***reproducing copy of above slide***).)

On December 5, 2019, SVB Leerink Reported:

"In the open-label period, Nuplazid had clinically meaningful reduction of psychosis across all 5 dementia subtypes (73.1%-83.3% range) with 61.8% of patients meeting pre-specified response criteria at both week 8 and week 12 and continuing to the double-blind period (placebo relapse rate in the 0-67% range across subtypes, Nuplazid in the 0-17% range) – this should support a broad DRP label for Nuplazid and increase physician comfort using Nuplazid in all types of dementia. That said, ***one caveat is that the study was not powered for statistical analysis in different dementia types given the small numbers of patients per group***.
. . . .
***The KOLs agreed that the data were very clinically meaningful*** results that were strong compared to the current standard of care (off-label antipsychotics) . . ." (Ex. 78 at 2–3.)

On December 6, 2019, Oppenheimer Reported:

"Full results of the Ph3 HARMONY study of pimavanserin in patients with Dementia Related Psychosis (DRP) exceeded investor expectations." (Ex. 80 at 2; *id.* at 8 (***reproducing copy of above slide***).)

**Disclosure of the -019 Study Design & Results.** Beginning in 2016 (nearly three years before the start of the Proposed Class Period) and continuing throughout

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

the Proposed Class Period, Acadia publicly disclosed both the design and results of the -019 Study in press releases, investor conference calls, SEC filings, on ClinicalTrials.gov. Among other things, Acadia disclosed that the -019 Study was a single site study, that it met the primary endpoint at week 6 but did not meet the secondary endpoint at week 12, and that it did not meet several other secondary endpoints. (*See* Exs. 2, 6–9, 17, 19, 21, 34, 45; App. B; Stulz Rpt., ¶¶ 105–09, 112–13, 115–16, 119–20.) For example:

> During a November 7, 2016, Investor Conference Call, Acadia Disclosed:
>
> "[The -019 Study] is being conducted through a **single site** with a large network of nursing homes in the London, England, area. This is an exploratory, Phase II 12-week randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of 34-milligram dose of pimavanserin compared to placebo in patients with AD psychosis. We enrolled 181 patients in this study." (Ex. 7 at 10.)
>
> During a December 20, 2016, Investor Conference Call, Acadia Disclosed:
>
> "As you've heard me say before, the primary objective of the -019 Study was to get information to enable us to make an informed decision about what to do next. We accomplished that in this study. The data from -019 provides solid evidence of pimavanserin improved psychosis in another major neurological disorder with significant unmet needs beyond PD psychosis. **Pimavanserin met the primary endpoint, showing a statistically significant reduction on psychosis when compared to placebo at week 6**. . . . **On the secondary endpoint** of mean change, in NPI-NH psychosis score at week 12, pimavanserin maintained the improvement in psychosis achieved at the week 6 primary endpoint, but **[did] not statistically separate from placebo**. On the study of agitation and aggression as secondary measure, as we have noted previously, this study was not designed to optimize this assessment and the analysis **did not reveal notable differences between treatment groups**." (Ex. 9 at 7–8.)

Multiple analysts covering Acadia reported on both the design and results of the -019 Study, including that it was a single center study, that it met its primary endpoint at week 6, and that it failed to meet multiple secondary endpoints. (*See* Exs. 3–5, 10–16, 35–37, 40–42; App. B; Stulz Rpt., ¶¶ 118, 121–22.) For example:

> On December 20, 2016, Cowen Reported:
>
> "Today, ACAD announced top-line data from the Ph2 '019 Alzheimer's Disease Psychosis trial. Data showed a **stat sig treatment benefit** on the NPI-NH Psychosis subscale **at 6wks (primary endpoint) but was not sustained through 12wks (secondary endpoint)**. . . The Ph2 '019 trial

was a 12-week *single center* (comprised of 130 nursing homes) randomized trial of 40mg daily pimavanserin or placebo in 181 patients with ADP." (Ex. 10 at 2.)

On December 20, 2016, JMP Reported:

"Key points of debate on the conference call were the magnitude and clinical meaningfulness of the effect on psychosis, *loss of statistically significant benefit at 12 weeks* (vs. primary endpoint at six weeks), conduct of the trial at a *single network of nursing homes* in the UK, and lack of effect on the CGI-S." (Ex. 11 at 2.)

On November 8, 2017, H.C. Wainwright & Co. Reported:

"At the CTAD meeting, Acadia also presented additional data on the Phase 2 -019 study of pimavanserin in the ADP patients. We acknowledge that there are *concerns around the readout*, specifically: (1) *pimavanserin showed a significant effect compared to placebo at week 6* (39.5% reduction as measured by the NPI-NH score), but *failed to maintain the efficacy at week 12*; and (2) -019 study also *missed several key secondary endpoints*, such as ADCS-CGIC, ADCS-ADL and CMAI-SF." (Ex. 42 at 3.)

On November 8, 2017, Goldman Sachs Reported:

"While we viewed the full pima Ph2 data in Alzheimer's disease (AD) psychosis as supportive of prior efficacy and safety, and KOLs were optimistic on the data and ongoing Ph3 study in DRP, *investor concerns remain regarding the lack of separation of drug-placebo effect at 6-12 weeks*. KOLs attributed the high placebo rates in the Ph2 study at week 12 to spontaneous remissions common in dementia psychoses." (Ex. 41 at 4.)

*        *        *

Further, the -019 Study design and results were detailed in peer-reviewed articles, published in *The Lancet, Neurology* on February 26, 2018, and *Journal of Prevention of Alzheimer's Disease* on August 16, 2018. (Exs. 44, 51; Stulz Rpt., ¶ 110–11, 114–17.)

The disclosures excerpted above represent only a small sample of the public disclosures regarding the HARMONY and -019 Study design and results. Nonetheless, they amply demonstrate that the full design and results of the HARMONY and -019 Studies were publicly known well before the March Deficiency Letter and April CRL. Indeed, as Plaintiffs themselves concede, dissemination of information "through press releases, on earnings calls with analysts

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

(transcripts of which were also promptly made public), at industry conferences for market participants, and in filings made with the SEC" are sufficient for such information to become public and incorporated in the stock price. (Mot. at 21.)

Thus, if Acadia's stock traded in an efficient market—as Plaintiffs and their expert contend—there can be no dispute that:

1. All previously disclosed information about the HARMONY and -019 Studies designs and results was incorporated into Acadia's stock price before the March Deficiency Letter and April CRL;

2. Any repetition of this information (or materialization of risk stemming from such information) in connection with the March Deficiency Letter or April CRL could have no impact on Acadia's stock price; and

3. Any stock drop following the March Deficiency Letter or April CRL cannot support front-end inflation at the time of the alleged misrepresentations.

(*See* Stulz Rpt., ¶¶ 95–97, 124–25; Feinstein Rpt., ¶ 44 ("An efficient market . . . is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness.").) *See Amgen*, 568 U.S. at 466 ("[I]n an efficient market, all publicly available information is rapidly incorporated into . . . the market price."); *Qualcomm.*, 2023 WL 2583306, at *13 ("The alleged corrective disclosures only repeated already public information . . . At a 'common sense,' level, this evidence makes it less likely that Defendants' alleged misrepresentations inflated [the] stock price on the front end and the information in the disclosures caused the price drop on the back end.").

The evidence demonstrates that the alleged omissions—regarding the purported design deficiencies and disappointing results of the HARMONY and -019 Studies—had no price impact. Thus, Defendants have rebutted the *Basic* presumption, and individual issues of reliance overwhelm those common to class as to this theory. Accordingly, Plaintiffs' Motion should be denied as to any to alleged misstatements (*e.g.*, about "positive" trial results) that are premised on purported

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

omissions regarding the design and results of the HARMONY and -019 Studies. (*See* ECF 65 at 19–20 (addressing Plaintiffs' theory that the "failure to disclose that the studies were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading").) *See also Qualcomm*, 2023 WL 2583306, at *17 (denying class certification with respect to those theories for which defendants successfully rebutted the *Basic* presumption by demonstrating lack of price impact).

> **2.    Defendants' statements regarding an agreement with the FDA had no price impact.**

The remainder of the challenged statements concern Defendants' representations regarding the FDA agreement. (Mot. at 8.) The evidence, however, demonstrates that (a) the increase in Acadia's stock price on September 9 (the start of the Proposed Class Period) cannot be attributed to an alleged misrepresentation regarding the FDA agreement, and (b) the decrease in Acadia's stock price after the March Deficiency Letter and April CRL cannot be used to infer artificial inflation from any alleged misrepresentations regarding the FDA agreement. In other words, there is no price impact based on a front-end price increase or a back-end price drop.

> **a.    The September 9 stock price increase was not based on alleged misstatements about an FDA agreement.**

Plaintiffs allege that, at the start of the Proposed Class Period, Defendants' statements about Acadia's agreement with the FDA on the HARMONY Study design caused Acadia's stock price to increase, resulting in artificial inflation. (¶¶ 4–6.) But, ***long before September 9, 2019***, Acadia repeatedly disclosed (in press releases, investor conference calls, and SEC filings), and analysts widely reported on, the existence and terms of its agreement with FDA. (*See* Exs. 19–24, 26–29, 32–33, 38–39, 43, 45–50, 52–61; App. C (excerpting 31 public disclosures from cited exhibits).)

Beginning in 2017 (nearly two years before the start of the Proposed Class Period), Acadia publicly disclosed its agreement with the FDA regarding the

Cooley LLP
Attorneys at Law
San Diego

19

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-cv-00762-WQH-MSB

HARMONY Study design and its ability to serve as a basis for an sNDA in DRP. (Exs. 19, 21–23, 38–39, 43, 45–50, 52–59; App. C; Stulz Rpt., ¶¶ 126–35.) For example:

> In an October 4, 2017, Press Release, Acadia Disclosed:

> "We are pleased the **FDA has agreed** to an efficient development path for pimavanserin in this broad indication and granted Breakthrough Therapy Designation in recognition of this serious unmet need, . . . The initiation of the pivotal study in dementia-related psychosis, referred to as HARMONY, follows an End-of-Phase II Meeting and **agreement with the FDA on the clinical development plan and the design of the Phase III study**." (Ex. 22 at 2.)

> During an October 4, 2017, Investor Conference Call, Acadia Disclosed:

> "The DRP indication of the HARMONY study design are results of the end-of-phase II meeting we held with the FDA around midyear. We went into the end of Phase II meeting with a plan we felt would provide the best results for patients, that is a plan which would enable us to reach the broadest number of patients as soon as possible, and we came out of that meeting with exactly the plan we went in with. . . . **There was alignment [with FDA] on the overall clinical development plan and the design of the proposed Phase III study**. We are confident that we have a clear understanding of the path forward to potential registration. And as a result, we believe that **robust positive results from a single Phase III study**, together with supportive data from prior studies with pimavanserin, **can serve as the basis of a supplemental new drug application, or sNDA, in dementia-related psychosis**." (Ex. 23 at 7.)

> In its November 7, 2017, 10-Q (3Q 2017), Acadia Disclosed:

> "Following our End-of-Phase II Meeting with the FDA and **agreement with the agency on our clinical development plan**, we initiated our Phase III HARMONY relapse prevention study in October 2017, which allows us to evaluate pimavanserin for a broader indication than AD Psychosis alone." (Ex. 38 at 3.)

> At the January 9, 2019, JP Morgan Healthcare Conference, Acadia Disclosed:

> "[W]e had an [end-of-]phase II meeting with FDA and **agreed on our Phase III plan**, and it's represented here on this slide. We're running a relapse prevention study. It's a single study. We have agreement with the FDA that with robust results from this single study, that can serve as the basis for an . . . sNDA submission." (Ex. 53 at 9.)

In addition to Defendants' own disclosures, multiple analysts commented on the Company's statements regarding its agreement with the FDA about pursuing an

indication in DRP and relying on the HARMONY Study to serve as the basis for submission of an sNDA. (*See* Exs. 20, 24, 26–29, 32–33, 60–61; App. C; Stulz Rpt., ¶ 136.) For example:

> On October 9, 2017, JP Morgan Reported:
>
> "Given that the company has already established the activity of Nuplazid (pimavanserin) in the acute setting, the FDA signed off on a relapse prevention study for registration purposes as opposed to post approval. . . . Management cited several reasons for the decision (and ***agreement with FDA) to pursue a DRP indication***." (Ex. 33 at 2.)
>
> On August 1, 2019, Goldman Sachs Reported:
>
> "ACAD noted ***agreement with the FDA for HARMONY to serve as the basis for an sNDA submission***." (Ex. 60 at 3.)
>
> On August 1, 2019, Stifel Reported:
>
> "Final HARMONY readout in DRP refined to 2H20 (from 2020), but as the interim analysis remains on track for 2H19, ***mgmt reaffirmed FDA agreement that robust results can serve as the basis for a supplemental NDA submission***." (Ex. 61 at 2.)

Accordingly, even assuming there was no agreement with the FDA about the HARMONY Study design (there absolutely was), this information was publicly disclosed ***two years prior to the start of the Proposed Class Period***. And, in an efficient market, repetition of previously disclosed information does not impact the stock price. *See Grigsby*, 979 F.3d at 1205. Thus, any increase in Acadia's stock price on or after September 9, 2019 cannot be attributed to an alleged misrepresentation about an agreement with the FDA. (Stulz Rpt., ¶ 137.)

### b. There is a mismatch between the alleged misstatements and purported corrective disclosures.

The evidence further demonstrates that the back-end price drops (following the March Deficiency Letter and April CRL) cannot serve as a proxy for front-end price impact because there is a mismatch in content between the alleged misrepresentations and what was revealed when the risk ultimately materialized. *See*

Cooley LLP
Attorneys at Law
San Diego

21

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

*Goldman*, 141 S. Ct. at 1961.

Here, Acadia's stock price dropped when the market learned that, despite an agreement regarding the ***design*** of the HARMONY Study, the FDA did not find the ***results*** of the HARMONY and -019 Studies to be sufficiently meaningful and persuasive to support approval of the sNDA for DRP. (*See* ¶ 145.)

To determine whether this back-end price drop can be used as a proxy to support front-end price impact, the Court must ask: If Acadia had spoken truthfully, at the outset, regarding the FDA's discretion to deny the sNDA despite an agreement on the HARMONY Study design, would the stock price have been lower?[5] *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 98 (2d Cir. 2023) ("[A]pplication of the back-end—front-end inference rested on a finding that, had the company spoken truthfully regarding its debt problems at an equally generic level, the market would have reacted.").

Fortunately, the Court need not speculate as to the answer. From the outset, Acadia made clear that the FDA's agreement was limited to the HARMONY Study's ***design***, and approval of the sNDA would remain contingent on the FDA finding the ***results*** from the HARMONY Study to be "both statistically and clinically very persuasive." (¶ 109 (challenged statement made on September 9, 2019).) And throughout the Proposed Class Period, Acadia warned investors that (i) "the sNDA will be subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication"; (ii) "the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis"; and (iii) "the results may not meet the level of statistical significance required by the

---

[5] To be clear, the question is ***not*** whether the stock price would have been lower had Defendants disclosed that the sNDA would ultimately be denied. As Plaintiffs have previously acknowledged, "the allegation is ***not*** that the defendants were convinced that the FDA would deny approval" and lied about it. (Ex. 88 at 9; *see also* ECF 65 at 24 (noting the allegations are "***not*** that Defendants knew from the start that the sNDA would not be approved.").)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

FDA." (Ex. 65 at 7; Ex. 81 at 5; Ex. 83 at 4; Ex. 84 at 4; Ex. 85 at 4; Ex. 86 at 4–6.)

And to be clear, Plaintiffs cannot fall back on purported omissions regarding design deficiencies and dissapointing results because that information was already public. (*See* Section IV.A.1.)

Moreover, ***not one analyst*** interpreted the March Deficiency Letter or April CRL as an indication that Acadia lied or misled the public about its agreement with the FDA. (Stulz Rpt., ¶ 138.) To the contrary, even the most critical analyst at that time (H.C. Wainwright) reiterated its view that the agreement between Acadia and the FDA was exactly as Defendants stated, but that the results of the HARMONY Study simply fell short of the FDA's mandate—*i.e.*, the FDA did not agree that the results were sufficiently persuasive (just as Acadia warned could happen):

> Based on the CRL, we believe ACAD completely failed to appreciate the FDA's advice at the end of the Phase 2 meeting, which clearly stated that a single well-controlled study must be very persuasive, offer statistical significance with a very small probability of Type I error, and that it should be clinically meaningful. . . . [W]e believe ACAD clearly failed in satisfying all three of these requirements . . . We believe the HARMONY trial and the AD trial in retrospect were anything but persuasive. (Ex. 87 at 2.)

\* \* \*

Although Plaintiffs' bald allegations regarding the lack of agreement were sufficient to overcome a motion to dismiss, the same is not true at class certification.[6] The evidence above demonstrates that the alleged misstatements regarding an agreement with the FDA had no price impact. Accordingly, Defendants have rebutted the *Basic* presumption, and Plaintiffs' Motion should be denied to the extent Plaintiffs seek to certify their claims regarding alleged misstatements about the FDA agreement. *See Qualcomm*, 2023 WL 2583306, at \*17 (tailoring class definition to

---

[6] Defendants produced the End-of-Phase 2 meeting minutes (which unambiguously document the agreement with the FDA as disclosed by Defendants), along with the entire FDA correspondence file, several months ago. Yet Plaintiffs have not amended their Complaint and continue to allege that the FDA agreement never existed. (*See, e.g.*, ECF No. 45 at 27, ¶ 110 ("[T]he assertion that the FDA had blessed Acadia's approach to the sNDA was false because no such agreement was reached.").)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

exclude theories for which Defendants proved lack of price impact).

### B.   Plaintiffs' Materialization-of-the-Risk Theory Cannot Support Class Certification.

At this stage, Plaintiffs' case rests entirely on a "materialization-of-the-risk" theory of liability. The central issue, according to them, is: "Was the marketplace *misled as to the risks* associated with FDA approval?" (Ex. 88 at 8; *id.* at 7 ("[H]ere the risk was that investors had been *misled as to the likelihood of FDA approval*. That *risk materialized* first in March when the FDA announced that they couldn't even discuss labeling or marketing issues at that stage, and then it was finally fully revealed when they rejected the application as a whole.").)

Although Plaintiffs have also used the term "corrective disclosure" when it suits them, that theory has no application here because all of the allegedly omitted information was publicly disclosed. (*See supra*, Section IV.A.1.) And whenever Plaintiffs are pressed to explain what new information was revealed by any purported corrective "disclosure," they revert to their core materialization-of-the-risk theory. They relied on it in opposing Acadia's motion to dismiss (ECF 56 at 29–30), touted it at oral argument (Ex. 88 at 8–11), and the Court adopted it in its decision allowing Plaintiffs' claims to proceed (ECF 65 at 26).

Indeed, time and again, Plaintiffs have relied on a materialization-of-the-risk theory to explain away otherwise fatal flaws in their case—*e.g.,* the fact that Acadia repeatedly warned investors there was no guarantee of FDA approval. As Plaintiffs put it: "the allegation is *not* that the defendants were convinced that the FDA would deny approval" and lied about it. (Ex. 88 at 9.) That claim never would have survived a motion to dismiss, as Plaintiffs well know. (*Id.* at 4 ("[E]veryone understands that the FDA at the end of the day has full discretion to do what it deems most appropriate. . . . Investors understand[] that. Everyone understands there is some risk.").) Instead, Plaintiffs contend that Acadia "misled investors as to the *true magnitude of the risk* that the sNDA would be rejected." (ECF 56 at 30.) And the Court accepted this theory

Cooley LLP
Attorneys at Law
San Diego

24

Defs.' Opp. to Mot. for Class Certification
Case No. 3: 21-cv-00762-WQH-MSB

at the pleading stage: "[T]he FAC alleges sufficient facts to support an inference that Defendants' statements concerning the agreement with the FDA and omissions of adverse information about the Harmony and -019 Studies misled investors into **underestimating the risk** that the FDA would deny Acadia's sNDA. . . . Further, the FDA's denial of approval of the sNDA represented the **materialization of the risk** about which investors had allegedly been misled." (ECF 65 at 26.)

Plaintiffs' materialization-of-the-risk theory, however, cannot support class certification because it runs afoul of both *Comcast* and *Basic*.

### 1. Plaintiffs' theory runs afoul of *Comcast*

To satisfy Rule 23(b)(3), Plaintiffs must propose a methodology for measuring class-wide damages consistent with their theory of liability. *Comcast*, 569 U.S. at 35. This means that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id*. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*. Moreover, the proposed methodology cannot be based on "speculative" inferences because "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id*. at 35–36.

Here, Plaintiffs have failed to meet this exacting standard. Their proposed "out-of-pocket" damages model cannot support class certification because: (a) it is incompatible with Plaintiffs' materialization-of-the-risk theory of liability; and (b) it cannot measure materialization-of-the risk damages on a class-wide basis.

### a. Plaintiffs' damages model does not account for their materialization-of-the-risk theory of liability.

Plaintiffs have staked their case on a materialization-of-the-risk theory of liability, yet their expert's report does not even mention "materialization-of-the-risk," much less explain how his proposed model could measure damages attributable to this theory. As such, Plaintiffs fail to meet their burden under *Comcast*.

Cooley LLP
Attorneys at Law
San Diego

25

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

The decision in *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575 (N.D. Cal. 2021) is instructive. In *Amyris,* the court denied class certification as to plaintiffs' materialization-of-the-risk theory because, like here, the plaintiffs' expert "does not at all explain how the proposed model calculates damages based on the materialization-of-the-risk theory." 340 F.R.D. at 590. The plaintiff's expert's report in *Amyris* failed to "identif[y] the materialized risk that plaintiffs allege, much less explain[] how such risk would be factored into the damages model." *Id.* Because the proposed damages model did not "attribute damages to a materialization of the risk theory," the court held that no class could be certified as to that theory. *Id.*

The decision in *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023), is equally instructive. As in *Amyris*, the court in *AAC* denied class certification where plaintiffs proceeded under a materialization-of-the-risk theory because the "Plaintiff's expert report as to calculation of damages appears to omit any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory." *AAC*, 2023 WL 2592134, at *24. Indeed, the court noted that plaintiff's expert "appears to be referencing corrective disclosures rather than risk" given his "references to 'curative events' and previously withheld information being 'disclosed to the market.'" *Id.* The court further explained: "A corrective disclosure *cures* a prior misleading or incorrect statement and it includes information previously withheld from the market, but a materialized risk is not curative in the same way that a corrective disclosure is curative; a materialized risk (once revealed) may 'cure' inflation in stock price by potentially removing the inflation, but it does not correct prior incorrect information." *Id.*

Here too, Plaintiffs' expert makes no attempt at all to attribute damages to a materialization-of-the-risk theory. (*See, e.g.*, Feinstein Rpt., ¶¶ 169(i)–(ii) (referring to "corrective disclosures" rather than a "materialization of risk").) He dedicates just 12 paragraphs to his damages methodology, which does little more than raise questions without providing answers. (Feinstein Rpt., ¶¶ 160–71.) Indeed, both

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26

DEFS.' OPP. TO MOT. FOR
CLASS CERTIFICATION
CASE NO. 3: 21-CV-00762-WQH-MSB

Plaintiffs and their expert presume that an out-of-pocket damages model is essentially a **one-size-fits-all** for securities fraud class actions. (*See* Mot. at 27 ("In securities fraud cases, courts routinely find that use of the 'out-of-pocket' or 'event study' method satisfies the class-wide damages requirement."); Feinstein Rpt., ¶ 21 ("Specifically, the out-of-pocket damages model, which is used in virtually all Section 10(b) class action securities cases.").) As *Amyris* and *AAC* demonstrate, that is simply not true. *See Amyris*, 340 F.R.D. at 590; *AAC*, 2023 WL 2592134, at *24. Accordingly, because Plaintiffs do not put forth a damages model that is specific to their materialization-of-the-risk theory, they fail to satisfy *Comcast* and their Motion should be denied. *See id.*

> **b.** **Plaintiffs' model cannot measure materialization-of-the risk damages on a class-wide basis**

Plaintiffs also have not demonstrated their proposed "out-of-pocket" damages model can measure materialization-of-the-risk damages on a class-wide basis, as required by *Comcast*, for at least three reasons.

***First***, the model lumps together two classes of plaintiffs: (i) those who would have bought Acadia stock at the heightened risk for a lower price; and (ii) those who would not have bought the stock at all. This problem was explained by the Fifth Circuit *in Ludlow v. BP, P.L.C. ("BP II")*, 800 F.3d 674 (5th Cir. 2015). In that case, the plaintiffs also relied on a materialization-of-the-risk theory with respect to the announcement of the April 20, 2010, Deepwater Horizon oil spill. *Id.* at 678, 680. The plaintiffs argued that the spill was the "materialization of [a] risk"—the risk of an oil spill—that was greater than defendants' alleged misstatements had led investors to believe. *Id.* at 680. The Fifth Circuit found that plaintiffs' damages model—which purported to allocate as damages the entire stock drop following an alleged materialization of an undisclosed risk—"cannot be applied uniformly across the class, as *Comcast* requires." *Id.* at 691. That is because the model "lumps together those who would have bought the stock at the heightened risk with those who would

Cooley LLP
Attorneys at Law
San Diego

27

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

not have." *Id.* Class members who "might have purchased the stock even assuming the true risk . . . cannot be compensated for the materialization of a risk [they] may have been willing to take," even if such class members might be "entitled" to smaller "damages based on [an] inflated price." *Id.* at 690. Thus, treating as damages the entire stock decline following the materialization of a risk would overcompensate the second class of plaintiffs. *Id.* Additionally, the court noted that because there are two classes of plaintiffs, the appropriate measure of damages would be subject to "a determination [whether] each plaintiff would not have bought . . . stock ***at all*** were it not for the alleged misrepresentations—a determination not derivable as a common question, but rather one requiring individualized inquiry." *Id.* Plaintiffs would thus be subject to individualized inquiries as to whether they fell into the first or second class of plaintiffs. As such, "[q]uestions of individual damage calculations w[ould] inevitably overwhelm questions common to the class." *Comcast,* 569 U.S. at 34.

The same is true here. Plaintiffs' Complaint plainly acknowledges these two different sets of putative class members. (¶ 164 ("Had Plaintiff and the other members of the Class known the truth, ***[1] they would not have purchased or otherwise acquired said securities, or [2] would not have purchased or otherwise acquired them at the inflated prices that were paid***.").) And, as in *BP II,* Plaintiffs' proposed damages model lumps together putative class members who would have bought Acadia stock even if they fully understood the risk with those who only bought stock because of the allegedly understated risk. Feinstein's model fails because it provides no mechanism for separating these two classes of plaintiffs, and it requires individualized inquiries into whether each plaintiff would have bought Acadia stock had they known the allegedly "true" risk that the FDA would deny approval of the sNDA. Thus, damages cannot be calculated on a class-wide basis, and common issues do not predominate. *See Comcast,* 569 U.S. at 34; *BP II,* 800 F.3d at 691.

***Second***, Plaintiffs' proposed "out of pocket" damages model also fails to

Cooley LLP
Attorneys at Law
San Diego

28

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

differentiate between: (i) losses caused by the stock's reaction to the materialization of the **disclosed** portion of the risk that the FDA would not approve the sNDA; and (ii) losses caused by the stock's reaction to the materialization of the allegedly **understated** portion of that same risk—the only losses attributable to the alleged wrongful conduct. If, as Plaintiffs allege, Acadia understated the risk that the FDA may not approve the sNDA, then to reliably estimate price inflation and damages, an expert would need to assess (i) the true risk over time, and (ii) the degree to which the true risk was known to market participants. (Stulz Rpt., ¶¶ 141, 153–59.) But Feinstein does not explain how his proposed methodology would assess these factors, or whether doing so would even be possible in this case. (*Id.*) Instead, he says only that he would conduct an event study and measure damages by calculating the "residual stock price declines" following the March Deficiency Letter and April CRL. (Feinstein Rpt., ¶ 169.) The "residual price decline" is the stock price decrease that is attributable to "company-specific" information (as opposed to market-wide or industry factors). (*Id.*, ¶ 109.) The problem with using this methodology here is that the residual price decline captures the entire stock drop attributable to "company-specific" information, as opposed to isolating only that portion attributable to the incremental risk that was allegedly understated. (Stulz Rpt., ¶¶ 150–52 (including examples to highlight the fundamental defect in Plaintiffs' model).) As such, Plaintiffs' proposed model is incompatible with their materialization-of-an-understated-risk theory of liability. (*See id.*) *See also In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) ("*BP I*") (observing that "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) **will not equate** to inflation on the date of purchase").

**Third**, Plaintiffs' proposed "out of pocket" damages model fails to address how it would account for changes in the magnitude of the allegedly understated risk over time. (Stulz Rpt., ¶¶ 155–58.) This is critical because analyst commentary

Cooley LLP
Attorneys at Law
San Diego

29

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

suggests that market's perceptions of risk were evolving in response to the evolving regulatory review during the Proposed Class Period. (*Id.*, ¶¶ 155–57.) For example, analysts expected that the sNDA would be assigned a priority review by the FDA but learned during the Proposed Class Period that it was assigned a standard review. (*Id.*, ¶¶ 155–56.) The Company also announced that the FDA was not planning to hold an Advisory Committee meeting. (*Id.*) And analysts also discussed the risk to the sNDA given recent decisions from the FDA on other drugs. (*Id.*, ¶ 157.) These are but a few data points that suggest the allegedly understated risk (if any) would not have been constant throughout the Proposed Class Period. (*Id.*, ¶ 158.) Because Plaintiffs' expert's report does not address such consideration, Plaintiffs have failed to demonstrate that their proposed damages model is capable of assessing class-wide damages, as required by *Comcast*. (*Id.*, ¶¶ 158–59.)

### 2.    Plaintiffs' theory runs afoul of *Basic*

Plaintiffs' materialization-of-the-risk theory creates an additional barrier to class certification: it is fundamentally inconsistent with their request for the *Basic* presumption. *See BP II*, 800 F.3d at 691. The *Basic* presumption is rebuttable, and Plaintiffs' own model has rebutted it. "Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based upon **price and price alone**." *See id.*; *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Plaintiffs, however, have alleged that if they and other putative class members had known the true risk, "they would not have purchased or otherwise acquired said securities." (¶ 164; *see also* ¶ 108 (discussing risk).) These allegations demonstrate that Plaintiffs (and other putative class members) "relied on something other than price: risk." *BP II*, 800 F.3d at 691. Accordingly, Plaintiffs' own allegations undercut the fundamental rationale for the *Basic* presumption and rebuts it.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Cooley LLP
Attorneys at Law
San Diego

30

Defs.' Opp. to Mot. for
Class Certification
Case No. 3: 21-CV-00762-WQH-MSB

Dated: October 20, 2023                    COOLEY LLP


By: */s/ Peter M. Adams*
     Peter M. Adams

Attorneys for Defendants
Acadia Pharmaceuticals, Inc., Stephen R. Davis, and Srdjan (Serge) R. Stankovic

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

31