# Exhibit 1

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>     Defendants, | No. 3:21-cv-00762-WQH-MSB<br>Hon. William Q. Hayes |

# EXPERT REPORT OF RENÉ M. STULZ, PH.D.

# EVERETT D. REESE CHAIR OF BANKING AND MONETARY ECONOMICS

# THE OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS

October 20, 2023

**Ex. 1**

**P. 2**

# Table of Contents

I. Qualifications ................................................................................................ 1

II. Assignment ................................................................................................... 2

III. Summary of Opinions ................................................................................... 3

IV. Background .................................................................................................... 5

    A. Acadia and Its Lead Drug, Pimavanserin ............................................ 5

    B. The -019 Study.................................................................................... 6

    C. The End-of-Phase-2 Meeting............................................................... 8

    D. The HARMONY Study ...................................................................... 10

    E. Acadia's sNDA for DRP...................................................................... 13

    F. Summary of Allegations ...................................................................... 15

V. Background on Market Efficiency, Price Discovery and Event Study Analysis.............. 20

    A. Overview of Market Efficiency and Price Discovery in Efficient Markets.......... 20

        1. Market Efficiency in Financial Economics............................. 20

        2. Price Discovery in Efficient Markets...................................... 21

        3. Not All Market Participants Need to Be Equally and Fully Informed in an Efficient Market for the Price to Reflect All Public Information ........................ 23

    B. Event Study Analysis .......................................................................... 24

        1. Overview of Event Study Methodology ................................. 24

        2. Regression Model Specification ............................................ 26

VI. Information Regarding Acadia's HARMONY Study Identified in the Complaint, Including Target Population and Results for Subgroups, Was Publicly Known Prior to the March Deficiency Letter, and Repetition of This Information Would Not Have Affected Acadia's Stock Price in an Efficient Market........................ 28

    A. Acadia Publicly Disclosed the Design and Results of the HARMONY Study Prior to the March Deficiency Letter ............................. 29

    B. Securities Analysts Discussed the Design and Results of HARMONY Study .... 41

    C. Stock Price Changes Associated with the March Deficiency Letter and the April CRL Are Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding the Design and Results of the HARMONY Study........................ 50

VII. Information Regarding the -019 Study, Including Designation of a Primary Efficacy Outcome at Six Weeks, the Lack of Statistical Significance for Most Secondary Endpoints and Subgroup Analyses, Patient Heterogeneity, Single Center, And No Type I Error Control of Secondary Endpoints Identified in the Complaint, Was Publicly Known

**Ex. 1**
**P. 3**

Prior to the March Deficiency Letter, and Repetition of This Information Would Not Have Affected Acadia's Stock Price in an Efficient Market ............................................ 52

    A.       Information Regarding the Design and Results of the -019 Study Was Publicly Known Prior to Acadia's March Deficiency Letter ......................................................... 55

    B.       Securities Analysts Discussed the Design and Results of the -019 Study ............ 63

    C.       Stock Price Changes Associated with the March Deficiency Letter and the April CRL Are Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding -019 Study's Designation of a Primary Efficacy Outcome at Six Weeks, the Lack of Statistical Significance of Most of the Secondary Endpoints and Subgroup Analyses, Patient Heterogeneity, Single Center, and No Type I Error Control of Secondary Endpoints ............................................................................................................... 67

VIII.    A Stock Price Increase at the Start of the Proposed Class Period Is Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding the FDA Agreement ............ 68

IX.    Professor Feinstein Has Not Presented a Damages Methodology That Can Measure Damages Associated with Materialization of Allegedly Understated Risk ...................... 74

    A.       Summary of Professor Feinstein's Damages Approach ...................................... 76

    B.       The Risk That the FDA May Not Approve the sNDA Was Disclosed by the Company and Discussed by Market Participants .............................................................. 77

    C.       Stock Price Declines Associated with Materialization of Risk Overstate Inflation . ................................................................................................................................ 84

    D.       Professor Feinstein Has Not Proposed a Methodology That Could Estimate the Degree to Which Risk Was Understated ............................................................. 86

Ex. 1
P. 4

## I.    Qualifications

1.    I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.    I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland.  I have also been recognized by many organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.

3.    I belong to the editorial boards of many academic and practitioner publications.  Further, I am a member of the Asset Pricing and Corporate Finance Programs and was the director of the Risk of Financial Institutions Group of the National Bureau of Economic Research for more than 15 years.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics).  Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

4.    I have published more than 100 studies in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am the author of a textbook titled *Risk Management and Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have

---

[1] *See, e.g.*, "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, pp. 3, 46.

edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

5.      I have taught in executive development programs in North America, Europe, and Asia.  I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I also served as a member of an advisory board of the U.S. Treasury, as a director of several banks and of an asset management firm, and as a member, as vice-chairman, and as chair of the governance committee of the board of trustees of the Global Association of Risk Professionals.

6.      A copy of my curriculum vitae is attached as **Appendix A**, which includes a list of my publications over the last ten years.  Additionally, a list of my testimony over the last four years is attached as **Appendix B**.

## II.      Assignment

7.      In Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, Plaintiffs seek to certify a class, subject to certain exclusions, comprising "[a]ll persons and entities who purchased or otherwise acquired shares of Acadia common stock during the period from September 9, 2019 through April 4, 2021 (inclusive)" (the "Proposed Class Period").[2]  In support of their Motion, Plaintiffs filed the Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, dated August 21, 2023 ("Feinstein Report").

8.      I have been retained by counsel for Acadia Pharmaceuticals Inc. ("Acadia" or the "Company"), Stephen R. Davis, and Srdjan (Serge) R. Stankovic (collectively, "Defendants"), in the above captioned matter.  As discussed in further detail in Section IV.F below, I understand that the alleged misstatements and omissions ("misrepresentations") in this matter generally comprise three categories:  1) alleged misrepresentations regarding the FDA agreement; 2) alleged misrepresentations regarding the design and results of the HARMONY Study; and 3)

---

[2] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *City of Birmingham Relief and Retirement System et al v. Acadia Pharmaceuticals Inc. et al*, United States District Court for the Southern District of California, Case No. 3:21-cv-00762-WQH-MSB, August 21, 2023 ("Motion"), p. 6.

alleged misrepresentations regarding the design and results of the -019 Study. I have been asked to evaluate the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, and the alleged misrepresentations regarding the design and results of the -019 Study. I have also been asked to evaluate whether a stock price increase at the start of the Proposed Class Period is evidence of price impact of the alleged misrepresentations regarding the FDA agreement.

9.      In addition, I have also been asked to review and respond to the Feinstein Report. In particular, I have been asked to evaluate whether Professor Feinstein has proposed a methodology capable of calculating class-wide damages in a manner consistent with Plaintiffs' theory of liability.[3]

10.     The analyses and opinions expressed in this report are my own. I am being compensated for my time and services at my regular hourly rate of $1,325. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

11.     In undertaking this assignment, I have considered documents and data related to the issues in this matter. In Appendix C, I have listed the documents I considered for this report. My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that additional information or arguments are provided to me or submitted in connection with this matter.

### III.    Summary of Opinions

12.     For the purposes of this report, I have been asked to assume that the market for Acadia's stock was semi-strong form efficient and my opinions on price impact rely on that assumption. My assumption of semi-strong form efficiency is consistent with Professor Feinstein's stated

---

[3] I have not been asked to opine on, and I am not offering an opinion, on market efficiency. When referring to market efficiency and efficient markets in this report, I refer to the semi-strong form of market efficiency. See Section V below.

opinion that "Acadia stock traded in an efficient market throughout the Class Period."[4] For a market to be efficient, it is necessary that there are investors who are able to take advantage of situations where they are aware of public information that is not incorporated in stock prices, if and when such situations arise. Such investors are often referred to as "arbitrageurs." Importantly, assuming Acadia's stock traded in an efficient market during the Proposed Class Period, as Professor Feinstein contends, Acadia's stock price reflected all public information, even if not all investors had accessed the same information and even if not all investors were in a position to understand the value implications of that information.

13.     As discussed in more detail in the rest of this report, and based on the assumption above, I have reached the following conclusions:

a.  The stock price declines following the March Deficiency Letter and the April CRL (both of which are defined below) are not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, including information about the target population and results of subgroups identified in the Complaint. Instead, these price declines reflect the market's reaction to new information such as the regulatory updates. This is because the information regarding the design and results of the HARMONY Study identified in the Complaint was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

b.  The stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding the -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints. This is because this information was already publicly known prior to the March Deficiency Letter, and in an efficient market, it could

---

[4] Feinstein Report, ¶ 20. Additionally, I note that Professor Feinstein testified that "the tests that [he] conducted would indicate that [Acadia stock] was trading in efficient market" if the Proposed Class period started one trading day earlier. Deposition of Steven P. Feinstein, Ph.D., CFA, October 6, 2023 ("Feinstein Deposition"), 119:1–7. He also testified that "Extrapolating, I mean, I have no reason to believe that it wouldn't be efficient over a period [in 2019] prior to the class period." (Feinstein Deposition, 119:24–120:12).

not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

    c. The stock price increase at the start of the Proposed Class Period is not evidence of the price impact of the alleged misrepresentations regarding the FDA agreement. This is because the alleged misrepresentations regarding the agreement with the FDA for the HARMONY Study design were publicly known as early as 2017, prior to the beginning of the Proposed Class Period, and in an efficient market, could not have caused Acadia's stock price to increase on the first day of the Proposed Class Period. Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.

14. Additionally, also as discussed in more detail below, it is also my opinion that Professor Feinstein has failed to propose a damages methodology consistent with Plaintiffs' theory of liability.

## IV. Background

15. This section summarizes my understanding of the background that informs my opinions.

### A. Acadia and Its Lead Drug, Pimavanserin

16. Acadia is a "biopharmaceutical company focused on the development and commercialization of innovative medicines that address unmet medical needs in central nervous system" ("CNS") disorders.[5] Acadia stock has traded on the Nasdaq exchange since 2004 under the ticker symbol ACAD.[6] The company is headquartered in San Diego, California.[7]

---

[5] *See, e.g.*, Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2019, filed February 27, 2020 ("FY2019 10-K"), p. 1.
[6] FY2019 10-K, p. 48, F-21.
[7] FY2019 10-K, p. 3.

17.     During the Proposed Class Period, Acadia had a portfolio of product opportunities led by pimavanserin.[8]  In April 2016, the FDA approved pimavanserin for the treatment of hallucinations and delusions associated with Parkinson's Disease Psychosis ("PDP").[9]  It is the only FDA-approved drug in the United States for this condition and is marketed under the tradename NUPLAZID in the United States.[10]  Pimavanserin is a "selective serotonin inverse agonist/antagonist preferentially targeting the 5-HT$_{2A}$ receptor, a key serotonin receptor that plays an important role in psychosis."[11]

## B.     The -019 Study

18.     After completing its pivotal Phase 3[12] study in patients with PDP, Acadia explored pimavanserin's potential to treat other diseases.  In November 2013, Acadia initiated a Phase 2[13] trial, referred to as the "-019 Study."[14]  The -019 Study was a "double-blind, placebo-controlled exploratory trial designed to evaluate the efficacy and safety of pimavanserin as a treatment for patients with AD [Alzheimer's disease] psychosis."[15]  The -019 Study was announced on November 14, 2013 through a press release.[16]

---

[8] Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2020, filed February 25, 2021 ("FY2020 10-K"), p. 1.

[9] *See, e.g.,* FY2019 10-K, p. 1.

[10] *See, e.g.*, FY2020 10-K, p. 4.

[11] FY2020 10-K, p. 4.

[12] The FDA defines Phase 3 clinical trial studies as follows: "Researchers design Phase 3 studies to demonstrate whether or not a product offers a treatment benefit to a specific population. Sometimes known as pivotal studies, these studies involve 300 to 3,000 participants. Phase 3 studies provide most of the safety data. In previous studies, it is possible that less common side effects might have gone undetected. Because these studies are larger and longer in duration, the results are more likely to show long-term or rare side effects," *see* "Step 3: Clinical Research" *U.S. Food & Drug Administration*, January 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#phases, accessed October 16, 2023.

[13] The FDA defines Phase 2 clinical trial studies as follows: "In Phase 2 studies, researchers administer the drug to a group of patients with the disease or condition for which the drug is being developed. Typically involving a few hundred patients, these studies aren't large enough to show whether the drug will be beneficial. Instead, Phase 2 studies provide researchers with additional safety data. Researchers use these data to refine research questions, develop research methods, and design new Phase 3 research protocols," *see* "Step 3: Clinical Research" *U.S. Food & Drug Administration*, January 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#phases, accessed October 16, 2023.

[14] Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2013, filed February 27, 2014, p. 10.

[15] Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2017, filed February 27, 2018 ("FY2017 10-K"), p. 5.

[16] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," November 14, 2013, p. 1.

19.    According to Acadia's FY2017 10-K, "[a] total of 181 patients were enrolled in [the -019 Study] in the United Kingdom.  Following a screening period that included brief psycho-social therapy, patients were randomized on a one-to-one basis to receive either 34 mg of pimavanserin or placebo once-daily."[17]  In December 2016, Acadia announced positive top-line results from the -019 Study.[18]  Specifically, Acadia announced that "[p]imavanserin demonstrated efficacy on its primary endpoint[19] of the -019 Study," showing a statistically significant treatment improvement compared to the placebo group at week six.[20]  Acadia also announced that "in the -019 Study, over the course of 12 weeks of treatment, pimavanserin did not impair cognition as measured by the Mini-Mental State Examination (MMSE) score."[21]  Acadia further stated that "[i]n the -019 Study, pimavanserin was generally well tolerated and the safety profile was consistent with what has been observed in previous studies."[22]  The press release also stated that "[p]atients continued dosing through week 12 to gather information on secondary endpoints…."[23]  Acadia disclosed that "at week 12, pimavanserin maintained the improvement on psychosis observed at the week 6 primary endpoint, but did not statistically separate from placebo."[24]  The results from the -019 Study were presented at the 10th Clinical Trials on Alzheimer's Disease ("CTAD") Meeting in November 2017 in Boston, Massachusetts.[25]  As I

---

[17] FY2017 10-K, p. 5.

[18] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis," December 20, 2016 ("Acadia December 20, 2016 Press Release"), p. 1.

[19] "An endpoint is a targeted outcome of a clinical trial that is statistically analyzed to help determine the efficacy and safety of the therapy being studied. … Chosen endpoints are usually clearly defined prior to the start of a clinical trial. A clinical study may have one or more primary, secondary, and exploratory endpoints. Primary endpoints will be the basis for determining whether the study met its objective or, in the case of interventional clinical trials, will be the main data evaluated for regulatory approval. Secondary endpoints are those that may provide supportive information about a therapy's effect on the primary endpoint or demonstrate additional effects on the disease or condition. Exploratory endpoints may include clinically important events that are expected to occur too infrequently to show a treatment effect or endpoints that for other reasons are thought to be less likely to show an effect but are included to explore new hypotheses."  See, "Endpoint," *National Center for Advancing Translational Sciences* Toolkit, https://toolkit.ncats.nih.gov/glossary/endpoint/, accessed October 10, 2023.

[20] Acadia December 20, 2016 Press Release, p. 2.

[21] Acadia December 20, 2016 Press Release, p. 2.

[22] Acadia December 20, 2016 Press Release, p. 2.

[23] Acadia December 20, 2016 Press Release, p. 1.

[24] Acadia December 20, 2016 Press Release, p. 2.

[25] FY2017 10-K, p. 5.

describe in more detail below, the results were also discussed in several articles published in medical journals.

### C.    The End-of-Phase-2 Meeting

20.    In May 2017, following the conclusion of -019 Study, Acadia met with the FDA regarding a Phase 3 trial.[26]  According to the FDA's minutes from that End-of-Phase 2 meeting, "[t]he primary objective of this meeting is to obtain feedback on the ACP-103-045 study, as designed, in the context of planned, ongoing, and completed clinical studies with pimavanserin to support an indication of hallucinations and delusions" associated with dementia-related psychosis ("DRP").[27]  I understand that the ACP-103-045 study is referred to as the "HARMONY Study."[28]  I understand that the meeting minutes identify three questions regarding clinical issues posed by Acadia to the FDA, the FDA responses to those questions, as well as discussion on certain questions:[29]

- **Question 1**:  "Does the [FDA] agree that treatment of hallucinations and delusions in [DRP] is an approvable indication [for pimavanserin]?"

  **FDA Response to Question 1**:  "We agree that treatment of hallucinations and delusions in [DRP] is a potentially approvable indication. We agree that dementias need not be etiologically related for the common symptom of psychosis to respond to pimavanserin."

- **Question 2**:  "The proposed [HARMONY Study] is a randomized, double-blind, placebo-controlled, relapse prevention study to evaluate the efficacy and safety of pimavanserin in subjects with hallucinations and delusions in [DRP] associated with neurodegenerative disorders, and is intended to be the basis of an sNDA [supplemental New Drug Application][30] for the proposed indication."

---

[26] Email from Brendan Muoio to Teresa Brandt, "PIND 133880 End of Phase 2 Meeting Minutes," with attached document "Meeting Minutes," May 24, 2017, ACAD_SECLIT_0019792–810at 0019794.

[27] Email from Brendan Muoio to Teresa Brandt, "PIND 133880 End of Phase 2 Meeting Minutes," with attached document "Meeting Minutes," May 24, 2017, ACAD_SECLIT_0019792–810at 0019797.

[28] "Relapse Prevention Study of Pimavanserin in Dementia-related Psychosis," *National Institutes of Health*, https://clinicaltrials.gov/study/NCT03325556?tab=history&a=1, accessed October 11, 2023.

[29] Email from Brendan Muoio to Teresa Brandt, "PIND 133880 End of Phase 2 Meeting Minutes," with attached document "Meeting Minutes," May 24, 2017, ACAD_SECLIT_0019792–810 at 0019798 – 0019800.

[30] A sNDA refers to a supplemental new drug application.  According to the FDA, "[c]ompanies are allowed to make changes to drugs or their labels after they have been approved. To change a label, market a new dosage or

- **Question 2(a)**: "Does the [FDA] agree with the proposed overall study design?"

  **FDA Response to Question 2(a)**: "… [W]e suggest combining the proposed study with the postmarketing commitment (PMC) for a safety study in frail, elderly subjects. Subjects with dementia-related psychosis could be randomized to placebo or pimavanserin and counted towards the number required for the PMC safety study in the elderly. Responders could then be entered into a randomized withdrawal paradigm as proposed for study -045."

  **Discussion for Question 2(a)**: "… After the above discussion, the Division agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of a sNDA for the indication of hallucinations and delusions associated with dementia-related psychosis."

- **Question 2(b)**: "Does the [FDA] agree with the proposed study population to be included in the study?"

  **FDA Response to Question 2(b)**: "Yes, we agree with the proposed study population as long as subjects are stratified by their current clinical diagnosis (as proposed). Labeling will reflect the actual composition and response of patients enrolled in the study."

- **Question 2(c)**: "Does the [FDA] agree with the timing and selection of study endpoints?"

  **FDA Response to Question 2(c)**: "See our answer to Question 2(a). In general, we agree with the timing and endpoints of the study…"

  **Discussion for Question 2(c)**: "The Sponsor agreed with our concern regarding the determination of relapse criteria for the study. In addition to considering a centralized review of study ratings, they agreed to submit the relapse CRF [case report form] for Division review prior to conducting the study. The Sponsor proposed a five-point, Likert-type clinician rating of suicidality based on the

---

strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA)." See, "Drugs@FDA Glossary of Terms: Supplement Number," *U.S. Food & Drug Administration*, November 14, 2017, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms#S, accessed October 10, 2023.

**Ex. 1**

**P. 13**

suicide item from the Hamilton Depression Rating Scale. The clinician will obtain information from the subject and the caregiver before making the rating.  As a monitoring instrument for safety, the Division found the proposal acceptable."

- **Question 3**:  "It is ACADIA's position that in the context of the overall existing and planned safety database for pimavanserin that the single well-controlled Phase 3 study in the proposed patient population would be sufficient for a sNDA filing in the proposed indication. Additionally, the safety database would include the data contained in the approved NUPLAZID® NDA, safety exposures from the completed Phase 2 study in [ADP], as well as additional ongoing and planned pimavanserin studies.  Does the [FDA] agree?"

  **FDA Response to Question 3**:  "If you wish to rely on a single well-controlled study for your sNDA filing, the findings must be very persuasive. This means statistically significant with a very small probability of Type I error and a finding that is clinically meaningful. We agree that the total exposures from pimavanserin's development programs would provide a sufficient safety database once the safety-related PMC [Pub Med Central] studies from the psychosis in Parkinson's disease approval are completed."

21.     On August 8, 2017, Acadia informed investors that it had completed the End of Phase 2 meeting with the FDA and that Acadia planned "to commence the Phase III program in the next couple of months and look forward to sharing more details about the program at that time."[31]

### D.     The HARMONY Study

22.     In October 2017, Acadia announced the initiation of the HARMONY Study, a study evaluating the efficacy and safety of "pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis."[32]  The HARMONY Study was a Phase III clinical study which "included a 12-week open-label stabilization period during which 392 patients with dementia-related psychosis were treated with pimavanserin 34 mg once daily. Dose reduction to 20 mg once daily was allowed based on tolerability within the first four weeks.

---

[31] Q2 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, August 8, 2017 ("Acadia August 8, 2017 Earnings Call"), p. 3.
[32] FY2017 10-K, pp. 4–6.

Following the 12-week open-label period, patients who met pre-specified criteria for treatment response at both weeks 8 [sic] and weeks 12 [sic] were then randomized into the double-blind period of the study to continue their pimavanserin dose (34 mg or 20 mg per day) or switched to placebo and followed for up to 26 weeks or until a relapse of psychosis occurred."[33]

23.     On October 4, 2017, Acadia issued a press release describing the objective of the study was to "evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms in a broad population of patients with the most common subtypes of dementia:  Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia."[34]

24.     Further, on an investor call on October 4, 2017, Acadia stated:  "The DRP indication of the HARMONY study design are results of the end-of-phase II meeting we held with the FDA," and that "we came out of the meeting with exactly the plan we went in with …  There was alignment on the overall clinical development plan and the design of the proposed Phase III study.  We're confident that we have a clear understanding of the path forward to potential registration. And as a result, we believe that robust positive results from a single Phase III study, together with supportive data from prior studies with pimavanserin, can serve as the basis of a supplemental new drug application, or sNDA, in dementia-related psychosis."[35]

25.     During the call, Defendant Stankovic responded as follows to a question from a securities analyst regarding the enrollment criteria and power[36] of the HARMONY Study:

> **Jason Nicholas Butler**
> *JMP Securities LLC, Research Division – MD and Senior Research Analyst*
> Let me add my congratulations on the progress. Just on the enrollment criteria, will you stratify by dementia subtype? And then, will you measure -- or are you powered to measure things like movement symptoms and cognition?
> …
> **Srdjan R. Stankovic**

---

[33] FY2019 10-K, p. 5.

[34] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," October 4, 2017 ("Acadia October 4, 2017 Press Release"), p. 1–2.

[35] "ACADIA Pharmaceuticals Inc. Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis – Call – Edited Transcript," *Thomson Reuters,* October 4, 2017 ("Acadia October 4, 2017 Conference Call"), p. 3.

[36] Power refers to "[t]he probability that a statistical test will reject the null hypothesis. To compute power, one has to fix the size of the test and specify parameter values outside the range given by the null hypothesis. A powerful test has a good chance of detecting an effect when there is an effect to be detected."  See, David Kaye and David Freedman (2011), "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, 3rd ed., Washington, DC: The National Academies Press, p. 292.

Ex. 1
P. 15

*Head of Research & Development and EVP*
Yes, absolutely. We'll be stratifying by groups of dementia but just certain groups of dementia. But I do want to point out that ***in our discussions and agreement with the FDA, there was no prespecified proportion of different subtypes of dementia that we have to reach***. So we don't have a prespecified number, but we will be in analytically evaluating different subtypes or groups of subtypes. Related to your other question, of course, we will be measuring both, any changes in cognitive function as well as the motor function throughout the trial.[37]

26.     On October 4, 2017, Acadia also announced that the FDA had granted pimavanserin "Breakthrough Therapy Designation" for DRP.[38]

27.     In September 2019, Acadia announced that "[u]pon the recommendation of the study's independent data monitoring committee, which met to review the data from the planned interim efficacy analysis," the HARMONY Study would be stopped early as it "met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo."[39]

28.     On December 4, 2019, Acadia presented top-line results from the HARMONY Study at the 12th CTAD Meeting.[40]  On the same day, after the CTAD presentation, Acadia presented the top-line and sub-group data from the HARMONY Study at an investor event.[41]

29.     Acadia further advised through its 2019 10-K filing, filed on February 27, 2020, that "even if we submit a sNDA for pimavanserin in [DRP], the sNDA will be subject to FDA review to determine whether [it] is adequate to support approval of pimavanserin for [DRP].  Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in

---

[37] Acadia October 4, 2017 Conference Call, p. 8 (emphasis added).

[38]  Breakthrough Therapy Designation is reserved for "drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."  "Breakthrough Therapy," *U.S. Food & Drug Administration*, January 4, 2018, https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy, accessed October 11, 2023, p. 1.  See, Acadia October 4, 2017 Press Release, p. 1.

[39] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," September 9, 2019, p. 1.

[40] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting," December 4, 2019, p. 1.

[41] "Investor Event: Presentation and Discussion of the Phase 3 HARMONY Top-line Results: 12th Clinical Trial of Alzheimer's Disease," *Acadia Pharmaceuticals Inc.*, December 4, 2019 ("Investor Event Presentation, December 4, 2019").  *See also* "Acadia Pharmaceuticals Inc. to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters,* December 5, 2019 ("Investor Event Transcript, December 4, 2019").  I note that the transcript for the investor event is dated December 5, 2019 at 3:15 AM GMT, which corresponds to December 4, 2015 at 10:15 PM ET.

**Ex. 1
P. 16**

deciding whether or not to approve [an] sNDA and there is no guarantee that pimavanserin will be approved for the treatment of [DRP]."[42]

### E.    Acadia's sNDA for DRP.

30.    On May 7, 2020, during its Q1 2020 earnings call, Acadia stated the following regarding its sNDA for DRP ("sNDA"): "as planned, [Acadia] successfully completed a pre-sNDA meeting with the FDA," and that the results from the "HARMONY study, together with the confirmatory and supportive results from our Alzheimer's disease psychosis Phase II study and our Parkinson's disease psychosis Phase III study will all support the submission of an sNDA for pimavanserin in [DRP]."[43]

31.    On May 12, 2020, at the Bank of America Merrill Lynch Healthcare Conference, Stephen Davis informed investors that "we had our pre-sNDA meeting in the first quarter.  The feedback was very consistent with what we heard with our end-of-Phase II meeting.  The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's disease psychosis study as supportive efficacy studies."[44]

32.    On June 15, 2020, Acadia announced that it "submitted its supplemental New Drug Application (sNDA) to the U.S. Food and Drug Administration (FDA) to support a potential new indication for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP)," and the sNDA included results from both the HARMONY Study and the -019 Study.[45]  The press release stated that "[i]f approved by the FDA, NUPLAZID would be the first drug approved to treat the hallucinations and delusions

---

[42] FY 2019 10-K, p. 17.

[43] "ACADIA Pharmaceuticals Inc., FQ1 2020 Earnings Call Transcripts," *S&P Global Market Intelligence*, May 7, 2020, p. 7.

[44] "ACADIA Pharmaceuticals Inc. at Bank of America Merrill Lynch Healthcare Conference (Virtual)– Edited Transcript," *Thomson Reuters,* May 12, 2020, p. 4.

[45] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Submits Supplemental New Drug Application to U.S. FDA for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," June 15, 2020, p. 1.

associated with dementia-related psychosis and would be the second indication for NUPLAZID."[46]

33.     On July 20, 2020, Acadia announced that the FDA accepted the sNDA for filing and had assigned standard review[47] with a Prescription Drug User Fee Act ("PDUFA") date[48] of April 3, 2021. Acadia also disclosed that the "FDA has also informed the company that it has not identified any potential review issues at this point in its evaluation and at this time it was not planning to hold an Advisory Committee meeting."[49]

34.     On March 8, 2021, after the market close, Acadia issued a press release disclosing "that the Company received a notification from the [FDA] on March 3, 2021, stating that, as part of its ongoing review of the Company's [sNDA], the FDA has identified deficiencies that preclude discussion of labeling and post- marketing requirements/commitments at this time" and that "[t]he notification does not specify the deficiencies identified by the FDA and there has been no clarification by the FDA at this time."[50]  That same day, Acadia also held a conference call with securities analysts.[51]

---

[46] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Submits Supplemental New Drug Application to U.S. FDA for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," June 15, 2020, p. 1.

[47] The review designation of a new drug application can be either standard or priority.  "Standard review designation is assigned to applications for drugs that do not meet the priority review designation criteria," whereas "priority review designation is assigned to applications for drugs that treat serious conditions and provide significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions compared to available therapies."  Further, a "standard review designation will set a goal date for taking action on an application within 10 months of receipt," whereas "a priority review designation will set a goal date for taking actions on an application within 6 months of receipt."  See "Policy and Procedures: Office of New Drugs," *U.S. Food & Drug Administration*, June 25, 2013,
https://www.fda.gov/media/72723/download#:~:text=Standard%20review%20designation%20is%20assigned,the%20priority%20review%20designation%20criteria.&text=A%20priority%20review%20designation%20will,within%206%20months%20of%20receipt, accessed October 11, 2023.

[48] A PDUFA date refers to "[t]he goal date set by the FDA for announcing its decision on a company's New Drug Application/ Biologics License Application/sBLA/sNDA after reviewing the applications."  See "FDA Calendar," *RTT News*, https://www.rttnews.com/corpinfo/fdacalendar.aspx, accessed October 11, 2023.

[49] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," July 20, 2020, p. 1.

[50] Acadia Pharmaceuticals Inc. Press Release, "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," March 8, 2021, 4:05 PM EST, p. 1.

[51] "ACADIA Pharmaceuticals Inc. Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv,* March 8, 2021.

Ex. 1
P. 18

35.     On April 5, 2021, prior to the market open, Acadia issued a press release announcing that the Company had received a complete response letter ("CRL") from the FDA, and the FDA issued the CRL to indicate that Acadia's sNDA for pimavanserin "cannot be approved in its present form."[52]  The press release stated that "[d]espite prior agreements with the Division of Psychiatry regarding the pivotal Phase 3 HARMONY study design targeting a broad DRP patient population analyzed as a single group, the Division, in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval," and that "the Division also stated in the CRL that it considers the Phase 2 Alzheimer's disease psychosis study -019, a supportive study in the sNDA filing, to not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred."[53]  That same day, Acadia also held a conference call with securities analysts.[54]

### F.     Summary of Allegations

36.     I understand that the alleged misrepresentations generally comprise three categories.

37.     *First*, Plaintiffs allege that the "design of the [HARMONY] Study was patently flawed," and that the "[s]ubgroup data Acadia [s]ubmitted to the FDA in [c]onnection with the sNDA was [i]tself [w]eak."[55]  For the purposes of this report, I refer to these allegations as "alleged misrepresentations regarding the design and results of the HARMONY Study."  With respect to the alleged misrepresentations regarding the design and results of the HARMONY Study, I understand that the Complaint identifies the following:

        a.  Plaintiffs allege that the "second largest subgroup" in the HARMONY Study, "a study Defendants put forward to extend pimavanserin's use into new indications,

---

[52] Acadia Pharmaceuticals Inc. Press Release, "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," April 5, 2021, 6:30 AM EDT ("Acadia April 5, 2021 Press Release"), p. 1.

[53] Acadia April 5, 2021 Press Release, p. 1.

[54] "ACADIA Pharmaceuticals Inc. to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application – Edited Transcript," *Refinitiv,* April 5, 2021.

[55] Amended Class Action Complaint for Violations of the Federal Securities Laws, *City of Birmingham Relief and Retirement System et al v. Acadia Pharmaceuticals Inc. et al.*, December 10, 2021 ("Complaint"), ¶¶ 73, 79.

consists of patients suffering from Parkinson's disease dementia, a condition pimavanserin is *already* approved for."[56]  Plaintiffs also allege that the HARMONY Study included an "insufficient number of patients for each subgroup analyzed" to determine the effectiveness of pimavanserin for the treatment "across the population of those suffering from DRP."[57]  Specifically, Plaintiffs allege that the patients with "vascular dementia, dementia with Lewy bodies and frontotemporal dementia subgroups, represented by a mere 73 patients, and each objectively lacked sufficient numbers to demonstrate efficacy, particularly given the millions of patients in the U.S. alone suffering from dementia-related psychosis caused by these underlying conditions."[58]

b.  Plaintiffs allege that "Defendants knew that the Harmony Study did not effectively take into account the disparate nature of the individuals that Acadia was seeking approval to treat."[59]  Plaintiffs also allege that "because patients with Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia, respectively, have different (if not widely varying) profiles, there can be no a fortiori assurance that patients in these different groups will respond to the same drug in the same way, either in terms of efficacy or safety."[60]

c.  Plaintiffs allege that the HARMONY Study "was 'under-powered' from the outset for purposes of generating the kinds of results at the relevant patient subgroup levels that would support FDA approval to additional types of DRP patients, Defendants knew or recklessly disregarded that the HARMONY Study would have to produce truly extraordinary results within the relevant subgroup populations to support approval for those subgroups."[61]  Plaintiffs also allege that

---

[56] Complaint, ¶ 76 (emphasis in original).  Plaintiffs also allege that the HARMONY Study included "patients suffering from dementia associated with Parkinsons' disease – the condition for which pimavanserin was *already* FDA-approved."  Complaint, ¶ 8 (emphasis in original).

[57] Complaint, ¶ 73.

[58] Complaint, ¶ 77.

[59] Complaint, ¶ 73.

[60] Complaint, ¶ 7.

[61] Complaint, ¶ 8.

the study "simply was not reasonably designed to contain a sufficient number of patients in any of its non-PSP [Parkinson's disease psychosis] subgroups to allow the FDA (or any reasonable biostatistician) to conclude, based on statistically significant evidence, that pimavanserin was an effective treatment for patients in those subgroups."[62]

d. In addition, Plaintiffs allege that "even the limited data the Company possessed on each subgroup was poor and demonstrated lack of efficacy"[63] and that "[t]he Harmony Study's data showed that, despite the small sample size, the drug was actually ineffective or in some cases less effective (favoring the placebo) in the subgroups Acadia was seeking new approval for, further underscoring the deficiencies in the Harmony Study. Take for instance the patients suffering from vascular dementia. Seventeen percent of those patients suffered a relapse irrespective of whether they were given pimavanserin or a placebo. This indicates that the drug provided no benefit to patients suffering from this particular condition. Likewise, no benefit was observed in patients with frontotemporal dementia, as 100% of those enrolled in this double-blinded portion of the study suffered a relapse on pimavanserin compared to 0% of those given the placebo. Tellingly, even in the AD cohort, statistical significance was missed with 13% of patients given pimavanserin suffering a relapse, compared to 23% of patients provided the placebo. Consequently, the Harmony Study's 'success' was clearly driven by the PDD patients it (improperly) included."[64]

e. Further, Plaintiffs allege that "'positive' overall results were powered by a surplus of individuals with Parkinson's disease dementia, the condition for which pimavanserin was already approved, skewing the results in favor of pimavanserin."[65] Specifically, Plaintiffs allege that "in the double-blinded portion of the study, a 43.3% placebo-adjusted improvement in relapse rate" was observed in Parkinson's disease dementia ("PDD") patients, "which lead to a

---

[62] Complaint, ¶ 8.
[63] Complaint, ¶ 79.
[64] Complaint, ¶ 83.
[65] Complaint, ¶ 81.

Ex. 1
P. 21

15.7% improvement observed among all patients enrolled in the study. However, when PDD patients were removed from the overall group, the improvements observed in relapse rate of all the other subgroups combined dramatically declined to 9%, which effectively equaled the result observed in the Harmony Study's largest subgroup, Alzheimer's."[66]  Additionally, Plaintiffs allege that "Defendants knew that the HARMONY Study trial data was damaging, especially without the PDD data upon which they relied."[67]

38.     *Second*, Plaintiffs allege that "[d]espite Defendants' effort to highlight the best results," the -019 Study had "poorly analyzed data and poor design" among other shortcomings, which rendered the dataset of the -019 Study not supportive of the sNDA.[68]  For the purposes of this report, I refer to these allegations as "alleged misrepresentations regarding the design and results of the -019 Study."  With respect to the alleged misrepresentations regarding the design and results of the -019 Study, I understand the Complaint identifies the following:

    a.  Plaintiffs further allege that "the -019 Study's designation of a primary efficacy outcome at six weeks, despite continuing double-blinded treatment for 12 weeks, led to a distorted picture of the treatment's efficacy (and a hasty conclusion). … What the data actually showed after continuing to treat patients until twelve weeks was that Acadia did not observe any effect on the NPI–NH psychosis scale at any other time during the 12-week trial.  Therefore, had the primary outcome been specified for 12 weeks (which is typical of trials with antipsychotics), pimavanserin would likely not have been considered efficacious at all—a particularly meaningful point as it undercuts the likelihood that pimavanserin could be approved for AD."[69]

    b.  Plaintiffs allege that "an assessment of the patient profile of the -019 Study showed that 17 of 18 secondary and exploratory outcomes and six of seven subgroup analyses did not demonstrate evidence of efficacy, even though the Company at the time cherry-picked a finding that there was a significant effect

---

[66] Complaint, ¶ 82.

[67] Complaint, ¶ 84.

[68] Complaint, ¶ 90.

[69] Complaint, ¶¶ 87-88.

**Ex. 1**
**P. 22**

that favored pimavanserin within a subgroup of patients with more severe symptoms."[70]

c. Plaintiffs allege that "patient heterogeneity continued to be an issue. Again, as an example, pimavanserin demonstrated particular effects on visual hallucinations in Alzheimer's patients, but any beneficial effect it might have for people with Lewy body pathology were not recognized in this trial."[71]

d. In addition, Plaintiffs allege that the "-019 Study was predicated on a single center study with no type 1 error control of secondary endpoints in which certain 'protocol deviations' occurred, including the administration of 'prohibited medications' to patients enrolled in the study, which tainted results."[72]

39. *Third*, Plaintiffs allege that that "[c]ontrary to Defendants' claim that the FDA and Acadia agreed to the pivotal HARMONY Study's design, targeting a broad DRP patient population analyzed as a single group, during the end of Acadia's Phase II meeting (after the -019 Study), no such agreement actually existed."[73] For the purposes of this report, I refer to these allegations as "alleged misrepresentations regarding the FDA agreement."

40. Plaintiffs claim that the alleged truth came out on the following two dates:

a. On March 8, 2021, after market close, when Acadia issued a press release disclosing "that the Company received a notification from the [FDA] on March 3, 2021, stating that, as part of its ongoing review of the Company's [sNDA], the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time."[74] For the purposes of this report, I refer to this press release as the "March Deficiency Letter."

b. On April 5, 2021, prior to market open, when Acadia issued a press release announcing that "the Company had received a Complete Response Letter ('CRL') from the FDA indicating that the pimavanserin sNDA could not be approved in its

---

[70] Complaint, ¶ 89.

[71] Complaint, ¶ 85.

[72] Complaint, ¶ 86.

[73] Complaint, ¶ 92.

[74] Complaint, ¶¶ 9, 143. See also, Acadia Pharmaceuticals Inc. Press Release, "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," March 8, 2021, 4:05 PM EST, p. 1.

Ex. 1
P. 23

current form."[75]  For the purposes of this report, I refer to this press release as the "April CRL."

**V.      Background on Market Efficiency, Price Discovery and Event Study Analysis**

**A.      Overview of Market Efficiency and Price Discovery in Efficient Markets**

**1.      Market Efficiency in Financial Economics**

41.     The question of whether markets are efficient has been investigated in various financial markets over the past fifty years.  The concept of market efficiency in financial economics was introduced in the 1960s by Eugene Fama and Paul Samuelson.  Professor Fama defined an efficient market as a "market in which prices provide accurate signals for resource allocation: that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time 'fully reflect' all available information."[76]

42.     Financial economists recognize three forms of market efficiency:  weak form, semi-strong form, and strong form.[77]  In a weak form efficient market, historical returns or prices cannot be used to predict future price movements.[78]  In a semi-strong form efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information, so that security prices reflect all public information at all times.  As a result, neither historical returns or prices, nor other public information, can be used to predict future price movements in a semi-strong form efficient market.[79]  In a strong form efficient market, prices react quickly and fully not only to new public information (as in semi-strong form efficient markets), but also to private information.[80]

43.     When referring to market efficiency and efficient markets in this report, I refer to the

---

[75] Complaint, ¶ 10 (emphasis removed).  See also, Acadia April 5, 2021 Press Release, p. 1.

[76] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25, no. 2, 1970, pp. 383–417 ("Fama (1970)"), at p. 383.

[77] Fama (1970), p. 388.

[78] Fama (1970), p. 388.  *See also* Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 ("Fama (1991)"), at p. 1576.

[79] Fama (1970), p. 388. *See also* Fama (1991), p. 1576.

[80] Fama (1970), p. 388.

**Ex. 1**
**P. 24**

semi-strong form of market efficiency.  Professor Feinstein uses the same definition of efficiency in his report.  Professor Feinstein notes that market efficiency means "that material public information is not ignored by the market, but rather is considered by market participants, and is incorporated and reflected in the trading price of securities with reasonable promptness."[81] Similarly, finance textbooks define the market for a stock as being semi-strong form efficient if all public information is rapidly incorporated into the stock price.[82]

44.    In this litigation, I understand that Plaintiffs must establish that the market for Acadia's stock was efficient to support a presumption of reliance on the alleged misrepresentations.  For the purposes of this report, I have been asked to assume that the market for Acadia's stock was semi-strong form efficient.  Therefore, I am assuming that any frictions that may have existed in the market for Acadia's stock did not prevent Acadia shares from incorporating all public information as implied by this form of market efficiency.[83]  My assumption of semi-strong form efficiency is consistent with Professor Feinstein's stated opinion that "Acadia stock traded in an efficient market throughout the Class Period."[84]

### 2.    Price Discovery in Efficient Markets

45.    Consistent with my assumption of market efficiency, trading by investors will quickly eliminate situations where public information is not incorporated in stock prices because investors will be strongly incentivized to take advantage of such situations.  If, at any given

---

[81] Feinstein Report, ¶ 37.  Professor Feinstein further states, "[a]n efficient market […] is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."  (Feinstein Report, ¶ 44).

[82] Stephen Ross et al. (2022), *Corporate Finance*, 13th ed., New York, NY: McGraw-Hill/Irwin, p. 437 ("A market is semistrong form efficient if prices reflect, or incorporate, all publicly available information, including information such as published accounting statements for the firm, as well as historical price information. … However, if the market is semistrong form efficient, the price should rise immediately upon the news release.").

[83] While the general findings of the literature in financial economics as of the late 1980s provided much support for semi-strong form market efficiency, empirical research at that time had also identified examples that appeared to be inconsistent with semi-strong form market efficiency (as summarized by Professor Fama in 1991). Since 1991, academic research has studied implications for the efficient markets hypothesis of real-world practicalities and complexities in markets, including limits to efficiency that may sometimes arise because of the existence of frictions in the workings of markets. *See* Fama (1991); Andrei Shleifer and Robert Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52 no. 1, 1997, pp. 35–55.

[84] Feinstein Report, ¶ 20.  Additionally, I note that Professor Feinstein testified that "the tests that [he] conducted would indicate that [Acadia stock] was trading in efficient market" if the Proposed Class period started one trading day earlier (Feinstein Deposition, 119:1-7).  He also testified that "Extrapolating, I mean, I have no reason to believe that it wouldn't be efficient over a period [in 2019] prior to the class period." Feinstein Deposition, 119:24–120:12.

time, some positive public piece of information about the future prospects of a company is not, for whatever reason, yet incorporated in the company's stock price, then, in an efficient market, traders with access to that information will rapidly choose to buy the stock, thereby driving the price up.  Similarly, traders with access to negative public information about the future prospects of a company that is not yet incorporated in the company's stock price will rapidly choose to sell the stock, thereby driving the price down.  Traders can sell the stock by reducing existing positions or by selling the stock short.[85]

46.     For a market to be efficient, it is necessary that there are investors who are able to take advantage of situations where they are aware of public information that is not incorporated in stock prices, if and when such situations arise. Such investors are often referred to as "arbitrageurs."  If some piece of public information is not incorporated in a stock's price, arbitrageurs could earn profits from trading on that piece of information. Therefore, investors have strong incentives to find public information that is not yet incorporated in a firm's stock price and trade on it.

47.     In particular, institutional investors could make large profits if they access some public information that is not yet incorporated in the stock price because they can generally trade in large sizes to take advantage of that information.  This creates incentives for them to pay close attention to whether public information is incorporated in a stock price and to seek out public information that may not yet be incorporated in that stock price.[86]  However, institutional investors can only make these profits if they discover this information before other investors discover it, and trade on it, thereby incorporating the information into the stock price.  If there is a large number of institutional investors, they can compete against each other to be first in taking advantage of public information.  Thus, when market prices do not yet reflect public information, traders take advantage of profitable trading opportunities arising from temporary mispricing.  As a result, as long as frictions to trade on information are small, in an efficient market new public

[85] A "short seller" is an investor who seeks to profit from a decline in a company's stock price. According to Brealey et al. (2011), "[t]o sell a stock short, you borrow shares from another investor's portfolio, sell them, and then wait hopefully until the price falls and you can buy the stock back for less than you sold it for." *See* Richard Brealey et al. (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin LLC, p. 327.

[86] Professor Feinstein highlights that during the Proposed Class Period, "at least 688 major institutions owned Acadia stock."  Professor Feinstein also notes that "large investment firms often employ financial analysts who conduct their own research on the securities they buy…"  Feinstein Report, ¶¶ 69–71.

**Ex. 1**
**P. 26**

information will be incorporated in stock prices quickly and investors will not be able to profit from such information once it is incorporated in stock prices.

### 3. Not All Market Participants Need to Be Equally and Fully Informed in an Efficient Market for the Price to Reflect All Public Information

48. In an efficient market, all public information about a company is incorporated in the stock price. This does not mean that all investors have that information.[87] To start with, if the market for a stock is efficient, investors can rely on the stock price to incorporate all the relevant information. As a result, some investors may not find it worthwhile to acquire information. That is, if the market for a stock is efficient, investors who may not be able to out-compete other investors in acquiring public information and trading on it may not benefit from investing resources to acquire new public information. Given their competitive disadvantage, these investors would not generally make profits from trading on public information if they were to acquire it because that information would already be incorporated in the stock price.

49. Importantly, however, if the market for a stock is efficient, the price of that stock is set *as if* everybody has all the public information concerning the stock.[88] As described above, investors who gain access to new information about a company can profit from trading on the information, up to the point at which the information is fully reflected in the market price and there are no further opportunities to profit by trading on the information. Thereafter, by trading in the stock, investors trade at a price that reflects all public information, even though those investors may only know a fraction of the public information concerning that stock.

50. Moreover, even for those participants who have access to a certain piece of public information, an efficient market does not require all market participants to understand or agree on the implications of that piece of information for the stock price. In a seminal academic paper

---

[87] Professor Fama explains that "the market may be efficient if 'sufficient numbers' of investors have ready access to available information." *See* Fama (1970), p. 388. *See also*, Frederic Mishkin (2004), *The Economics of Money, Banking, and Financial Markets*, 7th ed., Boston, MA: Addison Wesley, p. 152 (emphasis in original) ("An extremely important factor in this reasoning is that *not everyone in a financial market must be well informed about a security or have rational expectations for its price to be driven to the point at which the efficient markets condition holds.* Financial markets are structured so that many participants can play. As long as a few keep their eyes open for unexploited profit opportunities, they will eliminate the profit opportunities that appear because in so doing, they make a profit. The efficient market hypothesis makes sense because it does not require everyone in a market to be cognizant of what is happening to every security.").

[88] William Beaver, "Market Efficiency," *The Accounting Review* 56 no. 1, 1981, pp. 23–37 at 23.

Ex. 1
P. 27

on market efficiency, Professor Fama notes that "disagreement among investors about the implications of given information does not in itself imply market inefficiency unless there are investors who can consistently make better evaluations of available information than are implicit in market prices."[89]

51.     Assuming Acadia's stock traded in an efficient market during the Proposed Class Period, as Professor Feinstein contends, Acadia's stock price reflected all public information, even if not all investors had accessed the same information and even if not all investors were in a position to understand the value implications of that information.  Conversely, if some market frictions prevented investors from taking advantage of profitable trading opportunities arising from mispricing such that the price of Acadia's stock price did not reflect all public information, that would mean that the market for Acadia's stock could not have been efficient.

52.     A corollary of the above is that, to the extent Plaintiffs contend that some analysts/investors did not, for example, correctly understand the design and results of the HARMONY Study because it was presented at a medical conference, it would not mean that Acadia's stock price would have been affected by this lack of understanding, if one assumes market efficiency.  In other words, if the market for Acadia stock was efficient during the Proposed Class Period, as Dr. Feinstein contends, then Acadia's stock price reflected all public information even if not all investors had accessed that information or fully understood that information or assigned the same value to that information.[90]

    B.     **Event Study Analysis**

        1.     **Overview of Event Study Methodology**

53.     Event studies have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on security prices.  I have employed this technique numerous times in my peer-reviewed research.[91]  Professor Craig MacKinlay summarizes the

---

[89] Fama (1970), p. 388.

[90] Additionally, as I discuss in Section VI.A and VI.B, analysts were present at and commented on the design and results of the HARMONY Study presented at a medical conference in December 2019.

[91] Appendix A lists my publications. The first event study listed on my CV is Yong Cheol Kim and Rene M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics* 22 no. 2, 1988, pp. 189–205.

essence of the event study approach as follows:  "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[92]  Because of their ability to isolate the impact of firm-specific information, event studies are commonly used in securities litigation.

54.     Typically, event studies use a regression model to isolate the firm-specific stock price change ("return") after controlling for market-wide and/or industry-wide factors.  To do so, a financial economist selects the appropriate market and/or industry indices and typically assumes that there exists a stable linear relationship between the firm's stock return and the returns of the market and/or industry-wide indices over the period used to estimate the relationship, the "estimation window."[93]  Using this estimated relationship, it is possible to calculate the firm's expected return on any given day based on that day's market and/or industry index returns. Intuitively, the firm's expected return is the return one would predict on a particular day based on the typical relationship between the stock's return and the market and industry indices. Because financial economists are interested in the "typical" relationship, they often exclude from the estimation window the events being tested to ensure that the returns on the event dates do not affect the measurement of the typical relationship.[94]

55.     The difference between a stock's actual ("raw" or "observed") return and its expected return estimated from the regression model is called the stock's "residual" return.  The period over which the stock's return is analyzed is called the "event window" (e.g., one day).  Financial economists use statistical measures to determine whether a return is statistically distinguishable from zero, that is, whether the return is greater in magnitude than the typical variation in the residual returns of that stock during the estimation window.  Residual returns that exceed the threshold are "statistically significant."

56.     The statistical significance of a residual return is generally evaluated using a t-statistic.  A t-statistic is defined as the ratio between the residual return on a particular date of interest and the

---

[92] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35 no. 1, 1997, pp. 13–39 ("MacKinlay (1997)"), at p. 13.

[93] Professor Feinstein agrees, stating that "[o]ne component of an event study is the statistical regression analysis that determines how much of a security price change is explained by market-wide and industry sector factors, rather than company-specific information, so that those influences can be statistically factored out." *See* Feinstein Report, ¶ 109.

[94] *See, e.g.*, MacKinlay (1997), p. 20.

volatility of that residual return.[95]  A residual return is "statistically significant" using a two-sided test at the 95% confidence level when the absolute value of the t-statistic is greater than 1.96.[96]  Thus, when the t-statistic for a particular date is greater than 1.96 (in absolute value), the residual return is considered statistically significant relative to the typical range of residual returns that one would expect to observe on that date, indicating the arrival of new, value-relevant, firm-specific information.

57.     In an event study, a statistically significant residual return over a given event window reflects the estimated stock price impact of the total mix of information released during that event window.  The typical null hypothesis being tested is that the residual return over a particular event window is equal to zero.  In other words, a residual return that is statistically significant indicates the arrival of new, value-relevant information to the market.  An event study is helpful to assess whether the totality of new information arriving to the market over a specific event window affected the stock price.[97]  However, an event study cannot answer the question of how a specific new piece of information arriving to the market among multiple pieces of new information at the same time caused the stock price to change.

### 2.     Regression Model Specification

58.     To assess whether information affected the price of Acadia stock, I performed an event study to evaluate the movement of Acadia's stock on the impact dates associated with the first day of the Proposed Class Period, the March Deficiency Letter date, the April CRL date, and the

---

[95] Specifically, the volatility of the residual return on a given date is the estimated standard deviation of the residual return for that specific date (also known as the forecast standard error).

[96] The 95% confidence level is the commonly accepted scientific standard in peer-reviewed journals in finance and economics. *See, e.g.*, James Stock and Mark Watson (2012), *Introduction to Econometrics*, 3rd ed., Pearson Education Limited, pp. 78–79, available at https://archive.org/details/introductiontoec0000stoc_l3e7 ("What significance level should you use in practice?  In many cases, statisticians and econometricians use a 5% significance level.… For example, legal cases sometimes involve statistical evidence, and the null hypothesis could be that the defendant is not guilty; then one would want to be quite sure that a rejection of the null (conclusion of guilt) is not just a result of random sample variation. In some legal settings, the significance level used is 1%, or even 0.1%, to avoid this sort of mistake.… Many economic and policy applications can call for less conservatism than a legal case, so a 5% significance level is often considered to be a reasonable compromise.")

[97] Professor Feinstein agrees as he similarly states: "The portion of a security price change that cannot be attributed to market-wide or sector factors is called the residual security price movement or 'residual return.'  The event study isolates the residual return and also tests whether or not the residual return can reasonably be explained as merely a random fluctuation.  If a stock's event date residual return is statistically significant, it indicates that the stock price movement cannot be attributed to market-wide factors, industry sector factors, or to random volatility, but rather was caused by new, company-specific information." *See* Feinstein Report, ¶¶ 109–110.

Ex. 1
P. 30

date of the 12th CTAD conference when results of the HARMONY Study were presented. According to the academic literature, a regression model used in an event study should be properly specified, which requires (i) defining the estimation window, and (ii) selecting appropriate market and/or industry indices to account for market- and/or industry-wide factors.[98]

59.    I have used a "rolling" estimation window consisting of the 126 trading days immediately before each event date.  To allow for changes over time in the relationship between a firm's stock return and the market and/or industry factors, one can use a rolling regression approach,[99] and I have concluded that in this case it is appropriate to do so.[100]  I excluded from each "rolling" estimation window any stock return corresponding to (i) the impact dates on which Plaintiffs identify an alleged misrepresentation, and (ii) the impact dates of the March Deficiency Letter and the April CRL.[101]

60.    In order to estimate the relationship between Acadia's stock return and market and industry factors, I used the returns on the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index to control for market movements and returns on the NASDAQ Biotechnology Index to control for industry movements.[102]  The NASDAQ Biotechnology Index is a broad industry index of biotechnology and pharmaceutical companies,[103] and the Company compared its stock performance to the NASDAQ Biotechnology Index in the 2019 SEC Form 10-K.[104]  Exhibit 1

---

[98] *See, e.g.*, MacKinlay (1997), pp. 14–15, 18.

[99] For use of rolling regressions when the parameters of the market model change over time, *see, e.g.*, Eugene F. Fama and Kenneth French, "Industry Costs of Equity," *The Journal of Financial Economics* 43, no. 2, 1997, pp. 153–193, at p. 158.

[100] I note that the Proposed Class Period includes the COVID-related increase in overall market uncertainty during which time the relationship between Acadia's stock return and market- and/or industry-wide factors may have varied.  In the future, I may modify my regression specification if I need to estimate abnormal returns for dates around the period of high volatility early in the COVID-19 pandemic.

[101] Specifically, the dates excluded from the regressions are the relevant impact dates for each alleged misrepresentation and alleged corrective disclosure, that is, for alleged misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date would be the following trading date.

[102] For my event study analysis, I reconstructed the NASDAQ Biotechnology Index to exclude Acadia. Additionally, I note that Professor Feinstein also uses the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index and the NASDAQ Biotechnology Index to control for market and industry movements.  *See* Feinstein Report, ¶¶ 134–135.

[103] "The NASDAQ Biotechnology Index is designed to track the performance of a set of securities listed on The NASDAQ Stock Market (NASDAQ) that are classified as either biotechnology or pharmaceutical companies, and is a modified market capitalization weighted index."  *See* "NASDAQ Biotechnology Index," *Nasdaq*, September 29, 2023, https://indexes.nasdaqomx.com/docs/FS_XNBI.pdf, accessed October 11, 2023.

[104] FY2019 10-K, p. 48.

provides a summary of the event study model, and Exhibit 2 shows the firm-specific (residual) return for Acadia stock on each relevant event date.

**VI.    Information Regarding Acadia's HARMONY Study Identified in the Complaint, Including Target Population and Results for Subgroups, Was Publicly Known Prior to the March Deficiency Letter, and Repetition of This Information Would Not Have Affected Acadia's Stock Price in an Efficient Market**

61.     As discussed above in Section IV.F, Plaintiffs allege that the "design of the [HARMONY] Study was patently flawed," and that the "[s]ubgroup data Acadia [s]ubmitted to the FDA in [c]onnection with the sNDA was [i]tself [w]eak."[105]  As I discuss in this section, information regarding the design and results of the HARMONY Study identified in the Complaint was already publicly known prior to the March Deficiency Letter.  In an efficient market, this information would have already been incorporated in the stock price prior to the March Deficiency Letter.  Thus, any repetition of this information would not have affected Acadia's stock price.

62.     Specifically, as I discuss in **Section VI.A**, Acadia publicly discussed the design and results of the HARMONY Study identified in the Complaint numerous times prior to the March Deficiency Letter.  The Company publicly disclosed the subgroup sample size of the HARMONY Study on September 9, 2019 and disclosed the details about the subgroup sample size and response rates on December 4, 2019.  Thus, the full design and results of the HARMONY Study identified in the Complaint were publicly known by December 2019.  Additionally, as I discuss in **Section VI.B**, securities analysts also commented on and discussed the design and results of the HARMONY Study prior to the March Deficiency Letter.

63.     In an efficient market, any subsequent disclosures of the above information would not have affected Acadia's stock price because the information was already publicly known before the March Deficiency Letter.  Accordingly, the stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study.

---

[105] Complaint, ¶¶ 73, 79.

64.     In addition, as I discuss in **Section VI.C**, consistent with the information being public, in my review of the analyst commentary following the March Deficiency Letter and the April CRL, I did not identify evidence suggesting that the analysts were surprised by any information regarding the design or results of the HARMONY Study.  Rather, following the March Deficiency Letter, a number of analysts wrote that they were surprised by the FDA's notification that it had identified deficiencies that precluded discussion of labeling and post-marketing requirements/commitments at the time.  Moreover, following the March Deficiency Letter and the April CRL, some analysts referred to a lack of clarity from and apparent changes at the FDA.

### A.      Acadia Publicly Disclosed the Design and Results of the HARMONY Study Prior to the March Deficiency Letter

65.      As an initial matter, I note that the Complaint states that "[o]n December 4, 2019, Acadia presented the Harmony Study's top-line results" and that "[i]n connection with this presentation, the Company released the full data set of the Harmony Study."[106]  Indeed, prior to the March Deficiency Letter, Acadia publicly discussed the design and results of the HARMONY Study multiple times.  Notably, Acadia publicly discussed that the HARMONY Study was designed to evaluate pimavanserin in patients suffering from hallucinations and delusions associated with DRP generally, and not for any specific subgroup.  Additionally, by no later than December 4, 2019, Acadia had publicly disclosed the HARMONY Study results, including the data for each subgroup.  Below, I discuss examples of Acadia's public statements regarding the design and results of the HARMONY Study prior to the March Deficiency Letter.

66.     On October 4, 2017, after an end-of-phase II meeting with the FDA,[107] Acadia issued a press release announcing the initiation of the HARMONY Study and describing the study design including the patient population, the primary endpoint, and the two phases of the study, i.e., the 12-week open label phase followed by a double-blind phase:

---

[106] Complaint, ¶ 62.

[107] "We previously stated that we would hold an end of Phase II meeting with FDA around midyear, and we've now done that. We went into the FDA meeting with data from our Phase II work, and a thoughtfully constructed clinical plan for completing development. I'm pleased to report that we came out of the meeting with the same plans that we went in with, and we feel like we have a very clear path towards registration. We plan to commence the Phase III program in the next couple of months and look forward to sharing more details about the program at that time," Acadia August 8, 2017 Earnings Call, p. 3.

**Ex. 1**
**P. 33**

> HARMONY is a Phase III, randomized, double-blind, placebo-controlled study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. The objective of the study is to evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms in a broad population of patients with the most common subtypes of dementia: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia. The study will be conducted globally and is expected to enroll approximately 360 patients.
>
> The study includes a 12-week open-label stabilization period during which patients with dementia-related psychosis will be treated with pimavanserin 34 mg once daily. Dose reduction to 20 mg once daily will be allowed if clinically justified. Following the 12-week stabilization period, patients who meet pre-specified criteria for treatment response will then be randomized into the double-blind period of the study to continue their pimavanserin dose (34 mg or 20 mg per day) or be switched to placebo and followed for up to 26 weeks or until a relapse of psychosis occurs. The primary endpoint in the study is time to relapse in the double-blind period.[108]

67.     By October 30, 2017, the HARMONY Study design, including both the primary and secondary endpoints, was also publicly available at clinicaltrials.gov, a website and online database of clinical research studies and information about their results, created as part of the Food and Drug Administration Modernization Act of 1997.[109]  Further, during Acadia's Q3 2017 earnings call (held on November 7, 2017), an analyst from Goldman Sachs asked a question about the publicly-available information posted on clinicaltrial.gov regarding the HARMONY Study design.[110]

68.     Moreover, in its Q3 2017 earnings call, the Company disclosed that it had initiated the HARMONY Study in October 2017 and that it had received Breakthrough Therapy Designation from the FDA for pimavanserin for the treatment of DRP.  The Company once again discussed the design of the HARMONY Study:

---

[108] Acadia October 4, 2017 Press Release.

[109] "Relapse Prevention Study of Pimavanserin in Dementia-related Psychosis," *National Institutes of Health*, https://clinicaltrials.gov/study/NCT03325556?tab=history&a=1, accessed October 11, 2023.

[110] "Q3 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2017, p. 11.  Additionally, analysts also referenced data on clinicaltrial.gov in their reports.  *See*, for example, "It's PIM-O-Clock!: We See Lead Drug as a CNS Mega-Blockbuster – Initiate at BUY," *Jefferies*, April 16, 2020, [JEFF00002691-782], pp. 12–15; "2019 Was Just the Tip of the Iceberg. Initiating at Buy with $69 PT," *Citi*, March 5, 2020, [CITI_0000001-47], pp. 18, 24, 29, 35.

**Ex. 1**
**P. 34**

We initiated our Phase III HARMONY Study in dementia-related psychosis or DRP in October. There are several important items to note here. First, we received Breakthrough Therapy Designation from the FDA for pimavanserin for the treatment of dementia-related psychosis. This is an important acknowledgment by the FDA of this serious medical condition for which no drug is currently approved, together with the potential for pimavanserin to address this need … So as I'll discuss in greater detail in a moment, in the HARMONY Study, we are essentially contrasting 2 things. The durability of effect we've observed in patients on pimavanserin, against the waxing and waning of psychotic symptoms in patients on placebo. Hence, the primary endpoint of the study is the average time to relapse between these 2 groups … Thus, the analysis of Phase II-019 data led to the design of our Phase III HARMONY Study. Let me now review key elements of HARMONY in a little more detail. The Phase III Study is a randomized placebo-controlled study, evaluating the ability of pimavanserin to prevent relapse of psychotic symptoms in patients with dementia. We expect to enroll approximately 360 patients. Prior to randomization in the double-blind period, study participants will be treated with pimavanserin in an open-label fashion for 12 weeks. At the end of the 12-week open-label treatment period, patients who meet pre-specified criteria for response will be randomized into the double-blind placebo-controlled period of the study, where they will either continue their pimavanserin treatment or receive placebo, meaning, their active treatment will be withdrawn. Patients will be followed for up to 26 weeks or until an occurrence of relapse in psychotic symptoms. The primary endpoint as we said in this study is time to relapse in the double-blind period.[111]

69.     Prior to the March Deficiency Letter, Acadia also discussed the design of the HARMONY Study in several 10-K and 10-Q filings. For example, in its 2017 10-K filed on February 27, 2018, Acadia stated the objective of the HARMONY Study:

In October 2017, we initiated our HARMONY relapse prevention study, a Phase 3, randomized, double-blind, placebo-controlled study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. **The objective of the study is to evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms in a broad population of patients with the most common subtypes of dementia: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia.** In

---

[111] "Q3 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2017, pp. 3, 5, 6.

October 2017, the FDA granted Breakthrough Therapy Designation to pimavanserin for dementia-related psychosis.[112]

70.     Subsequently, in its 2018 10-K filed on February 27, 2019, Acadia once again disclosed that the HARMONY Study would allow the Company to evaluate pimavanserin for a broad indication:

> We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis represents one of our most important opportunities for further exploration. **Following our End-of-Phase 2 Meeting with the FDA and agreement with the agency on our clinical development plan, we initiated our Phase 3 HARMONY relapse prevention study in the fourth quarter of 2017, which allows us to evaluate pimavanserin for a broader indication than AD Psychosis alone. More specifically, HARMONY will evaluate pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis, which includes psychosis in patients with Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia.**[113]

71.     Plaintiffs allege that the "second largest subgroup" in the HARMONY Study, "a study Defendants put forward to extend pimavanserin's use into new indications, consists of patients suffering from Parkinson's disease dementia, a condition pimavanserin is *already* approved for."[114]  Plaintiffs also allege that the HARMONY Study included an "insufficient number of patients for each subgroup analyzed" to determine the effectiveness of pimavanserin for the treatment "across the population of those suffering from DRP."[115]  Additionally, Plaintiffs allege that the patients with "vascular dementia, dementia with Lewy bodies and frontotemporal dementia subgroups, represented by a mere 73 patients, and each objectively lacked sufficient numbers to demonstrate efficacy, particularly given the millions of patients in the U.S. alone

---

[112]  FY2017 10-K, p. 4 (emphasis added).

[113]  Acadia Pharmaceuticals Inc., 10-K for Fiscal Year Ended December 31, 2018, filed February 27, 2019 ("FY2018 10-K"), p 50 (emphasis added).

[114]  Complaint, ¶ 76 (emphasis in original).  Plaintiffs also allege that the HARMONY Study included "patients suffering from dementia associated with Parkinsons' disease - the condition for which pimavanserin was *already* FDA-approved."  Complaint, ¶ 8 (emphasis in original).

[115]  Complaint, ¶ 73.

suffering from dementia-related psychosis caused by these underlying conditions."[116]  This information was publicly disclosed prior to the March Deficiency Letter.  Indeed, on September 9, 2019, Acadia announced that the HARMONY Study had been stopped early and had met its prespecified endpoint, and provided further details about the enrolled patient population, including a breakdown by subtype diagnosis:

> The distribution of different dementia subtypes in our open-label stage as well as in the randomized population are similar and match roughly the epidemiology of the disease. Approximately two thirds of patients were Alzheimer patients, about 15% of patients were with Parkinson's dementia, approximately 10% were with vascular dementia, and somewhat less than 10% patients with Lewy body dementia and with dementia with Lewy bodies, and the rest was frontotemporal dementia.[117]

72.    Specifically, based on the Company's disclosure noted above, it was publicly known that patients with vascular dementia,  Lewy body dementia, and frontotemporal dementia accounted for approximately 18.3% of the patients enrolled in the HARMONY Study.[118]  Additionally, prior to the March Deficiency Letter, it was also publicly known that approximately 392 patients had been enrolled in the HARMONY Study.[119]  Thus, it was publicly known that 18.3% of 392 patients, or approximately 72 patients enrolled in the HARMONY Study were patients with vascular dementia,  Lewy body dementia, and frontotemporal dementia.[120]  Moreover, as I show in Section VI.B below, securities analysts commented that the study's "success at the interim may have been helped by the Parkinson's/Dementia-Lewy Bodies subset (12 relapses placebo, 1

---

[116] Complaint, ¶ 77.

[117] "ACADIA Pharmaceuticals Inc. ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial – Edited Transcript," *Thomson Reuters,* September 9, 2019, p. 6.

[118] I calculate this as 100% – 66.67% ("two thirds patients were Alzheimer's patients) – 15% ("about 15% of patients were with Parkinson's dementia") = 18.3%.; "ACADIA Pharmaceuticals Inc. ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial – Edited Transcript," *Thomson Reuters*, September 9, 2019, p. 6.

[119] Investor Event Presentation, December 4, 2019, p. 9.

[120] According to an article in a medical journal, "a total of 392 patients were enrolled into the open-label treatment period with the following distribution of dementia subtypes: 66.8% AD [Alzheimer's disease], 14.3% PDD [Parkinson's disease Dementia], 9.7% VaD [vascular dementia], 7.4% DLB [dementia with Lewy bodies], and 1.8% FTD [frontotemporal degeneration spectrum disorders]."  According to this, 18.9% (9.7% + 7.4% + 1.8%) of 392 patients, or approximately 74 patients enrolled in HARMONY Study were patients with vascular dementia, Lewy body dementia, and frontotemporal dementia.  Erin Foff et al., "Late Breaking News: LB1: HARMONY Relapse-Prevention Study: Pimavanserin Significantly Prolongs Time to Relapse of Dementia-Related Psychosis," *The Journal of Prevention of Alzheimer's Disease*, 6 supplement 1, 2019, pp. S30–S31, at p. S30.

drug), whereas evidence of efficacy in Alzheimer's is clearly there, but comes down to a meaningful but smaller event difference (14 relapses placebo, 8 drug)."[121]

73.     On October 3, 2019, Acadia announced that it would present the HARMONY Study results at the 12th CTAD Meeting on December 4, 2019 at 5:45 p.m. Pacific Time.[122]  The CTAD conference aims to "bring together academic and industry leaders to develop the most accurate clinical trials in Alzheimer's disease to demonstrate the efficacy of drugs in development."[123]  Abstracts for oral communications and poster presentations are subject to peer review by "an international, scientific committee."[124]  The conference is "organized once a year in the United States or in Europe," and the "[p]roceedings are published in the JPAD, Journal of Prevention of Alzheimer's Disease, and are accessible to all in free access … after the CTAD conference to allow the medical and scientific community to benefit from the new findings presented at the CTAD conference."[125]

74.     In its Q3 2019 10-Q filed on October 31, 2019, Acadia again discussed that the HARMONY Study had been stopped early for positive efficacy:

> In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of DRP, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. Upon the recommendation of the study's independent data monitoring committee, which met to review the data from the planned interim efficacy analysis, the study was stopped early based on pre-specified stopping criteria requiring a one-sided p-value less than 0.0033 on the study's primary endpoint. In the first half of 2020 we plan to meet with FDA to discuss a supplemental New Drug Application, or sNDA submission for DRP.[126]

---

[121] "Solid HARMONY Data At CTAD Underlie Mgmt's Confidence in Approaching FDA; Out Take on the Full Results," *Stifel,* December 5, 2019, p. 1, [STIFEL_ACADIA_0000552-556].

[122] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Late-Breaking Oral Presentation of the Phase 3 HARMONY Study of Pimavanserin in Dementia-Related Psychosis at the Clinical Trials on Alzheimer's Disease (CTAD) 2019 Meeting," October 3, 2019.

[123] "CTAD Conference: Clinical Trial Alzheimer's Disease (CTAD) Conference," *CTAD Alzheimer Congress*, https://www.ctad-alzheimer.com/ctad-conference, accessed October 11, 2023, ("CTAD Conference Website").

[124] CTAD Conference Website.

[125] CTAD Conference Website.

[126] Acadia Pharmaceuticals Inc., Form 10-Q for Quarterly Period Ended September 30 2019, filed October 31, 2019, p. 16.

75.     On November 11, 2019, Acadia announced it would be hosting a live investor event after the CTAD presentation on December 4, 2019 at 7:00 p.m. Pacific Time to present the HARMONY Study results to investors followed by a Question-and-Answer ("Q&A") session with a panel of Company executives and the Key Opinion Leaders ("KOLs").[127]

76.     On December 4, 2019, Acadia presented the results of the HARMONY Study at the 12th CTAD Meeting.[128]  After the conference presentation, Acadia held its previously-announced investor event, which was attended by analysts, including those from Cowen, Cantor Fitzgerald, Bank of America Merrill Lynch, Canaccord Genuity, Oppenheimer, RBC Capital Markets, and was subsequently discussed in the analyst reports.[129]  Further, both the conference presentation and the subsequent investor event were also discussed in public press.  For example, an Acadia press release on December 4, 2019 stated:

> ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) today presented positive top-line results from its Phase 3 HARMONY study at the 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting, December 4 -7, 2019 in San Diego, California... The live webcast will include a presentation of the results by ACADIA management followed by a KOL panel discussion and will begin at 7:15 p.m. Pacific Time.  The live webcast will be available on ACADIA's website, www.acadia-pharm.com, under the investors section and will be archived there through January 4, 2020.[130]

77.     As another example, a *Dow Jones Institutional News* article from December 5, 2019 stated that "Acadia said Wednesday evening that a phase-three study of the drug, called

---

[127] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting on December 4, 2019," November 11, 2019, p. 1.

[128] "CTAD 2019 Final Program," *CTAD Alzheimer's Congress*, December 4–7, 2019, https://www.ctad-alzheimer.com/files/files/Final%20program%20november%2019.pdf, accessed on August 11, 2023.; *see also* Complaint, ¶ 62 ("On December 4, 2019, Acadia presented the Harmony Study's top-line results.  In connection with this presentation, the Company released the full data set of the Harmony Study.")

[129] Investor Event Transcript, December 4, 2019.  See also, "The Secret of Pim: Word Getting Out on Pimavanserin with Solid DRP Data at CTAD," *RBC Capital Markets*, December 5, 2019, [RBCCM00000020–9].  See also discussion in Section VI.B.

[130] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting," December 4, 2019, pp. 1–2.  *See also* Investor Event Transcript, December 4, 2019.  *See also* "ACADIA Pharmaceuticals Inc. (ACAD) CEO Steve Davis on CTAD Investor Event (Transcript) >ACAD," *Dow Jones Institutional News,* December 5, 2019.

pimavanserin, significantly reduced 'the risk of relapse of psychosis by 2.8 fold' compared to a placebo."[131]

78.     Plaintiffs allege that "Defendants knew that the Harmony Study did not effectively take into account the disparate nature of the individuals that Acadia was seeking approval to treat."[132] Plaintiffs also allege that "because patients with Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia, respectively, have different (if not widely varying) profiles, there can be no a fortiori assurance that patients in these different groups will respond to the same drug in the same way, either in terms of efficacy or safety."[133]  The fact that the HARMONY Study combined different types of patients in a broad DRP group was publicly disclosed multiple times prior to the March Deficiency Letter.[134]  In fact, at the investor event after the CTAD presentation on December 4, 2019, Dr. Erin Foff, Senior Director of Clinical Research at Acadia, stated why the HARMONY Study was designed to target DRP as a broad group:

> So we talk about DRP. So I think it's important to take a moment to say why dementia-related psychosis and why not Alzheimer's disease psychosis. Fundamentally, this is a symptomatic trial, so not a disease modification trial. But more importantly, when we see these patients in clinic, it can be very difficult to tell one subtype apart from another, depending on when the patient presents. Clinically, there's a lot of overlap. . . . I think one of the most important features is that we manage the symptoms of psychosis the same regardless of the underlying disease subtype with the exception of dementia with Lewy bodies because in that case, we are particularly aware of the fact that those patients have neuroleptic sensitivity. So we may be less inclined to reach for an antipsychotic in those patients. So it's for that reason or those reasons in aggregate that we enrolled any 1 of the 5 most common neurodegenerative dementias into this trial. And so we did ask clinicians to choose the subtype that they thought was most

---

[131] *"Acadia Shares Jump on Positive Drug-Trial News," Dow Jones Institutional News,* December 5, 2019.  *See also*, "BRIEF-ACADIA Pharmaceuticals Says Pivotal Phase 3 Harmony Study Showed Pimavanserin Reduced Risk of Psychotic Relapse," *Reuters News,* December 5, 2019.

[132] Complaint, ¶ 73.

[133] Complaint, ¶ 7.

[134] See, for example, Acadia October 4, 2017 Press Release, p. 2.  *See also* FY2018 10-K, p. 5 ("In October 2017, we initiated our HARMONY relapse prevention study, a Phase 3, randomized, double-blind, placebo-controlled study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. The objective of the study is to evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms in a broad population of patients with the most common subtypes of dementia: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia.").

likely the primary subtype in these patients, but we encouraged patients to come in with mixed presentations. And we did collect that information, and we know that many of our patients were suspected to have mixed pathologies.[135]

79.     Plaintiffs further allege that the HARMONY Study "was 'under-powered' from the outset for purposes of generating the kinds of results at the relevant patient subgroup levels that would support FDA approval to additional types of DRP patients, Defendants knew or recklessly disregarded that the HARMONY Study would have to produce truly extraordinary results within the relevant subgroup populations to support approval for those subgroups."[136]  Plaintiffs also allege that Harmony Study "simply was not reasonably designed to contain a sufficient number of patients in any of its non-PSP subgroups to allow the FDA (or any reasonable biostatistician) to conclude, based on statistically significant evidence, that pimavanserin was an effective treatment for patients in those subgroups."[137]  In addition, Plaintiffs allege that "[e]ven the limited data the Company possessed on each subgroup was poor and demonstrated lack of efficacy"[138] and that:

> …[T]he Harmony Study's data showed that, despite the small sample size, the drug was actually ineffective or in some cases less effective (favoring the placebo) in the subgroups Acadia was seeking new approval for, further underscoring the deficiencies in the Harmony Study.  Take for instance the patients suffering from vascular dementia.  Seventeen percent of those patients suffered a relapse irrespective of whether they were given pimavanserin or a placebo.  This indicates that the drug provided no benefit to patients suffering from this particular condition.  Likewise, no benefit was observed in patients with frontotemporal dementia, as 100% of those enrolled in this double-blinded portion of the study suffered a relapse on pimavanserin compared to 0% of those given the placebo. Tellingly, even in the AD cohort, statistical significance was missed with 13% of patients given pimavanserin suffering a relapse, compared to 23% of patients provided the placebo. Consequently, the Harmony Study's "success" was clearly driven by the PDD patients it (improperly) included.[139]

---

[135] Investor Event Transcript, December 4, 2019, pp. 3–4.

[136] Complaint, ¶ 8.

[137] Complaint, ¶ 8.

[138] Complaint , ¶ 79.

[139] Complaint, ¶ 83.

Ex. 1
P. 41

80.     The breakdown of the results by subtype was publicly disclosed by Acadia prior to the March Deficiency Letter.  Indeed, at the investor event Dr. Foff discussed the breakdown of the results by subtype.  Dr. Foff also provided "a word of caution on overinterpretation" because "some of those categories have extremely small numbers of patients" and "a lot of these patients are suspected to have mixed pathologies, and that's really not represented in what I'm about to show you."[140]  She further stated that "**we really were not powered to look at [the individual subtypes] in any meaningful statistical way**."[141]

81.     Moreover, the presentation at the investor event disclosed the specific results for the subgroups for both the open-label phase and the double-blind phase of the HARMONY Study.  For example, page 28 of the presentation specifically showed that relapse rates in the double-blind phase of the study for the patients who received pimavanserin as well as the patients who received the placebo for each of the subgroups:  Parkinson's disease dementia (PDD), Alzheimer's disease (AD), dementia with Lewy body (DLB), Frontotemporal dementia (FTD), and Vascular dementia (VaD).[142]  In particular, page 28 of the presentation shows that for the frontotemporal dementia subgroup, 100% of patients who received pimavanserin suffered a relapse and 0% of the patients who received the placebo suffered a relapse.[143]  Page 28 also shows that for the Alzheimer's disease subgroup, 13% of patients who received pimavanserin suffered a relapse and 23% of the patients who received the placebo suffered a relapse.[144]

82.     Further, Plaintiffs allege that "overall results were powered by a surplus of individuals with Parkinson's disease dementia, the condition for which pimavanserin was already approved, skewing the results in favor of pimavanserin."[145]  Specifically, Plaintiffs allege that "in the double-blinded portion of the study, a 43.3% placebo-adjusted improvement in relapse rate was observed in PDD patients, which lead to a 15.7% improvement observed among all patients enrolled in the study. However, when PDD patients were removed from the overall group, the improvements observed in relapse rate of all the other subgroups combined dramatically declined

---

[140] Investor Event Transcript, December 4, 2019 , pp. 6–7.

[141] Investor Event Transcript, December 4, 2019, p. 7 (emphasis added).

[142] Investor Event Presentation, December 4, 2019, p. 28.

[143] Investor Event Presentation, December 4, 2019, p. 28.

[144] Investor Event Presentation, December 4, 2019, p. 28.

[145] Complaint, ¶ 81.

to 9%, which effectively equaled the result observed in the Harmony Study's largest subgroup, Alzheimer's."[146]  Additionally, Plaintiffs allege that "Defendants knew that the HARMONY Study trial data was damaging, especially without the PDD data upon which they relied."[147] Prior to the March Deficiency Letter, at the investor event in December 2019, the Company presented the design and results of the HARMONY Study, including patient subgroup sample size and response rate.[148]  Page 28 of the presentation at the investor event shows that 10 out of the 20 PDD Patients in the placebo group and 1 out of the 15 patients in the treatment group had a relapse, so the placebo-adjusted improvement in relapse rate among PDD patients was 43.3%.[149]  Page 28 of the presentation also shows that the placebo group had a relapse rate of 28.3% and the treatment group had a relapse rate of 12.6%, so the improvement observed among all patients was 15.7% (28.3% - 12.6%).[150]  Further, page 28 of the presentation shows that when the PDD patients were removed from the sample, there were 18 relapses for 79 patients in the placebo group and 11 relapses for 80 patients in the treatment group, so the improvement observed in relapse rate of the remaining subgroups was 9.0%.[151]  Page 28 of the presentation further shows that the Alzheimer's patient subgroup had an improvement in relapse rate of 9.5%.[152]  Further, the Company also provided some baseline characteristics of the HARMONY Study population, including that "we had about 58% female predominance, and this is to be expected since Alzheimer's is more common in women and Alzheimer's is the largest representative dementia subtype."[153]

83.     Further, at the investor event, KOL Dr. Jeffrey Cummings discussed his assessments of the study design focusing on the DRP patients as a whole group:

> The other thing about this trial that I really like is that it's doctor-friendly. So doctors are not very good at differentially diagnosing dementia, right? I can tell a frontotemporal dementia from a DLB patient from an AD patient, probably pretty

---

[146] Complaint, ¶ 82.

[147] Complaint, ¶ 84.

[148] Investor Event Presentation, December 4, 2019, p. 28.

[149] This can be calculated as (10/20) - (1/15).  See, Investor Event Presentation, December 4, 2019, p. 28.

[150] Investor Event Presentation, December 4, 2019, p. 28.

[151] This can be calculated as (18/79) – (11/80).  See, Investor Event Presentation, December 4, 2019, p. 28.

[152] This can be calculated as (14/62) – (8/61).  See, Investor Event Presentation, December 4, 2019, p. 28.

[153] Investor Event Transcript, December 4, 2019, pp. 4–5.

well because I've spent a lifetime doing it. But your average guy who's seeing a dementia patient between a gall bladder and a broken leg isn't going to be too good at this. So when you put all of the patients with dementia on the -- in the same trial, you remove that obligation to have to make a specific diagnosis, and I think that's very important in terms of the use of the drug. The other is the patients were systematically withdrawn. Well, that's what doctors want to do, they want to get their patients off the medication as soon as they can. But what you saw was when you do that, they relapse. So that's very important in terms of teaching the doctor how to optimally manage the psychotic episode. So I like this trial in many ways. I think it maps onto clinical practice in a great way, and the trial itself was very patient-centric.[154]

84.     Another KOL, Dr. Gary Small, commented that the results of the HARMONY Study were "very impressive," stating:

[w]hen you look at the results, they're very impressive. As you heard, in the open label phase, 62% of patients responded. And in double-blind phase, they had a threefold reduction in the risk of relapse. And very often, we don't see -- actually, most often we don't see those kinds of results in these studies. And to top it off, in terms of the safety profile, it's very favorable. The drugs we have right now do not have favorable safety profiles. You have pimavanserin didn't cause these side effects that we see so often from the antipsychotics we use.[155]

85.     Another KOL, Maria Soto-Martin, stated that the results of the HARMONY Study were "very clinically meaningful":

[a]nd also, these are very clinical meaningful results because this trial and it's kind of Dr. Cummings said, answer 2 critical questions that clinicians we have. First question, "Does this treatment work in the acute phase?" And the open-label answer is yes, it works. The second question is, "Okay. But for how long this is going to work -- this drug is going to work?" And the answer for the double-blind phase it's at least 9 months.[156]

86.     In its 2019 10-K filed on February 27, 2020, Acadia discussed the results of the HARMONY presented at the 12th CTAD Meeting and noted that it planned to submit the sNDA for DRP in the summer of 2020:

---

[154] Investor Event Transcript, December 4, 2019, p. 9.
[155] Investor Event Transcript, December 4, 2019, p. 10.
[156] Investor Event Transcript, December 4, 2019, pp. 10–11.

In December 2019, we announced top-line results from the HARMONY study in connection with a presentation at the 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting. Pimavanserin met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). In addition, pimavanserin met the key secondary endpoint in the study by significantly reducing the risk of discontinuation of any reason by 2.2 fold (HR = 0.452; one-sided p=0.0024). In the 12-week open-label treatment period, 61.8% of eligible patients met pre-specified criteria for pimavanserin treatment response at both week 8 and week 12 and were subsequently randomized into the double-blind period of the study. For patients in the open-label treatment period, change from baseline to week 8 and week 12 on the Scale for the Assessment of Positive Symptoms-Hallucinations and Delusions (SAPS-H+D) score improved by 63.0% and 75.2% respectively. Pimavanserin was well tolerated over the entire nine-month study duration. Patients receiving pimavanserin treatment had no worsening in cognition, as measured by the mean change in Mini-Mental State Examination (MMSE) score from baseline and no worsening of motor symptoms, as measured by the Extrapyramidal Symptom Rating Scale A-score (ESRS-A) from baseline. We plan to submit a supplemental New Drug Application (sNDA), to the FDA for DRP in the summer of 2020.[157]

## B.    Securities Analysts Discussed the Design and Results of HARMONY Study

87.    Consistent with Acadia's own disclosures, securities analysts also discussed the design and results of the HARMONY Study prior to the March Deficiency Letter. Specifically, as I discuss below, analysts commented on the target population and the results for the subgroups. Further, analysts also asked questions regarding the design and results of the HARMONY Study during conference calls and healthcare conferences.[158, 159]

---

[157] FY 2019 10-K, p 2.

[158] I note that Professor Feinstein testified (Feinstein Deposition, 164:19 – 165:4):

> Q. So is it fair to say based on your review of the information that's cited in your report and all the analyst reports that analysts were keenly focused on efficacy, safety, regulatory progression of pimavanserin to treat DRP during the class period?
> MR. FREDERICKS: Objection to form.
> THE WITNESS: I want to say yes, but -- or yes to the extent that what they were interested in was the probability of approval. So to the extent that that information informed them about probability of approval, the answer is yes. Because the probability of approval then relates to the probability of these extra cash flows and this extra profits and revenue.

[159] I also note that several individual analysts covering the Acadia stock during the Class Period had degrees in pharmacy, pharmaceutical science, biology, and neuroscience. For example, Danielle Brill, who covered the Acadia stock for Needham and Raymond James, earned her Doctor of Pharmacy; Charles C. Duncan, who covered the Acadia stock for Cantor Fitzgerald earned a PhD, Pharmaceutical Science, Neuropharmacology; Jason N. Butler, who covered the Acadia stock for JMP Securities earned his PhD in Biology. and Eddie Hickman, who covered

88.     After it first announced the HARMONY Study on October 4, 2017, Acadia held a conference call on the same day.  During the conference call, the Company answered a question from an analyst regarding the number of patients in various subgroups:

> Analyst at *JMP Securities*:  "Let me add my congratulations on the progress. Just on the enrollment criteria, will you stratify by dementia subtype? And then, will you measure -- or are you powered to measure things like movement, symptoms and cognition?"
>
> Stephen R. Davis:  "Serge, do you want to take that question?"
>
> Srdjan R. Stankovic:  "Yes, absolutely. **We'll be stratifying by groups of dementia but just certain groups of dementia. But I do want to point out that in our discussions and agreement with the FDA, there was no prespecified proportion of different subtypes of dementia that we have to reach.** So we don't have a prespecified number, but we will be in analytically evaluating different subtypes or groups of subtypes. Related to your other question, of course, we will be measuring both, any changes in cognitive function as well as the motor function throughout the trial."[160]

89.     Additionally, following the announcement of the HARMONY Study, several analysts commented on the study design, including that it was designed to target DRP as a broad group, that included various subtypes.  For example:

> **J.P Morgan, October 4, 2017:**  "ACAD announced that it received breakthrough therapy designation (BTD) for pimavanserin (Nuplazid) **in the broad indication of 'dementia related psychosis' along with plans to initiate a Phase 3 study (HARMONY) across a variety of disease subtypes.** The BTD follows an EOP2 meeting with the FDA based on data generated from both the Phase 2 -019 study in Alzheimer's disease psychosis and the Phase 3 -020 study in Parkinson's disease psychosis (for which Nuplazid is of course approved). **In addition to dementia associated with Alzheimer's and Parkinson's, the BTD**

---

Acadia stock for Guggenheim earned his PhD in Neuroscience.   See, "Danielle Brill, PharmD," *Raymond James,* https://www.raymondjames.com/corporations-and-institutions/global-equities-and-investment-banking/equity-research/equity-research-team/bio?id=5c1d5699314548c59dff04e97f2e6905&bioListId=d4056c1955234cbdac19b6685fd1c40f, accessed on October 10, 2023;  "Eddie Hickman, Ph.D.," *LinkedIn*, available at https://www.linkedin.com/in/eddiehickman/, accessed on October 10, 2023;  "Charles C. Duncan," *LinkedIn*, https://www.linkedin.com/in/charles-c-duncan-66663b27/?original_referer=https%3A%2F%2Fwww.linkedin.com%2Fin%2Fcharles-c-duncan-66663b27, accessed on October 10, 2023;  "Jason Butler," *LinkedIn*, https://www.linkedin.com/in/jason-butler-47855015/, accessed on October 10, 2023.

[160] Acadia October 4, 2017 Conference Call, p. 8 (emphasis added).

**encompasses several other etiologies such as vascular and frontotemporal dementia.**

HARMONY is designed as a relapse prevention study. 360 patients will be enrolled in a 12wk open label lead-in period after which responders will be randomized to receive either pimavanserin or placebo for an additional 26wks. The primary endpoint will be time until relapse in the randomized 26wk portion as assessed by either SAPS or CGI."[161]

**Bank of America, October 5, 2017:  "HARMONY will enroll a broad spectrum of DRP including Alzheimer's, dementia with Lewy bodies, Parkinson's, vascular dementia and frontotemporal dementia.** The trial entails a 12wk lead-in with all pts (n=~360) on Nuplazid. Responders will be randomized to remain on Nuplazid or receive placebo, and time to relapse of symptoms will be evaluated as the primary endpoint during a 26wk follow-up. The relapse design provides a larger long-term efficacy/safety population and enriches for responders, which ACAD thinks could reduce placebo responses. **The company also believes a single positive ph 3 trial would provide enough clinical data to file for approval in DRP.**"[162]

**H.C. Wainwright, October 5, 2017:**  "With the initiation of HARMONY study in dementia-related psychosis (DRP) and discontinuation of SEREN study in AD agitation, we applaud what we view as a smart move by Acadia of pursuing a broader indication for pimavanserin, and more importantly, doing so with a solid clinical plan moving forward. **At first glance, the seemingly bold move into DRP from ADP may appear over-ambitious (killing "multiple" birds with one stone).  However, we note that a psychosis focus/approach may prove to be a smart play from both the commercial point of view and also from the mechanistic perspective. The blessing from the FDA with a Breakthrough Designation further elevates our sanguine outlook for the program.** … As DRP spans across multiple dementia subtypes with distinct and overlapping etiology, a multiple dementia subtypes with distinct and overlapping etiology, a natural question around the rationale behind targeting psychosis with one compound in pathologically different subgroups arises. **The curiosity is two-fold: (1) can psychosis be treated as a commonality of dementia subtypes clinically and mechanistically (therefore as a distinct and standalone symptom)? And (2) if so, can pimavanserin work in treating the psychotic aspect of DRP regardless of underlying pathology?** We note that from the clinical point of view, DRP shares common symptoms (often in later stages of disease) regardless of the etiology, including hallucination (usually visual), delusion, and delusional

---

[161] "ACAD Receives BTD in Dementia Related Psychosis; Starting Phase 3 Trial in a Broad Population – ALERT," *J.P. Morgan*, October 4, 2017, p. 1 [JPMC-00000155–00000159] (emphasis removed and added).

[162] "ACAD unveils new indication with dementia psychosis ph 3 trial; PO to $46," *Bank of America Merrill Lynch*, October 5, 2017, p.1 [BOFAS-ACAD-000099–106] (emphasis added).

**Ex. 1
P. 47**

misidentifications, which are difficult to discern symptomatically (and often, DRP is not diagnosed into subtypes). Although the precise pathoetiological mechanisms underlying DRP are not fully elucidated, a multifactorial etiology for psychotic symptoms is supported by a body of studies. We would like to highlight the role of dopaminergic and serotoninergic dysfunction in DRP as evidenced by the fact that virtually all antiparkinsonian drugs may produce or worsen psychotic symptoms. Dementia along with other neurotransmitter system imbalances (occur in all forms of dementia) are also identified as possible risk factors for psychosis. **On the other hand, given the fact that pimavanserin acts in the serotoninergic system, and the positive results in both PDP and ADP studies (and stronger signal in enriched subgroup of PDP with dementia), we think repositioning pimavanserin in the broadest indication may be a smart move for Acadia from both the commercial point of view and also from the mechanistic perspective.**

[…]

On top of the repositioning move, **we are also pleasantly surprised by the smart and solid design of the Ph3 HARMONY study.** Recall, the placebo effect presented as a major roadblock in previous Ph3 studies of pimavanserin in PDP. Going into HARMONY, a relapse prevention design with a 12-week open-label stabilization period should serve to tease out responders from non-responders, subsequently mitigating the pitfall of placebo effect while in the meantime, enriching the target population (and the probability of success). **Management also highlighted the power of the design, which historically yielded better results in numerous neuropsychiatric studies (i.e ., bipolar). As the company commented that there is no pre-specified number for DRP subtypes, it is difficult at this point to analyze the statistical power and plan of the trial with the stratification unknown.** We will likely gain more clarity as enrollment progresses, which may take 2 to 2.5 years."[163]

**J.P. Morgan, October 9, 2017: "In speaking to initial investor concern regarding possible variability in a seemingly broad patient population like DRP, management emphasized that the relapse prevention design being utilized in HARMONY offers something of a fail-safe mechanism as you naturally enrich patients (by only randomizing those that respond to pima in the 3 month open label run-in) and eliminate the undesired variability (in addition to reducing placebo response).** Further, the heterogeneity of different subtypes of dementia is more relevant to the main disorder and cognition

---

[163] "First Take - ACADIA Pharmaceuticals, Inc. (ACAD) - HARMONY Harmony Study Initiation: Killing 'Multiple' Birds With One Stone? Reit Buy and $60 PT," *H.C. Wainwright & Co.*, October 5, 2017, p. 1 [HCW0000163–6] (emphasis added).

impairment; there is, however, no heterogeneity in terms of psychotic symptoms, in the company's view."[164]

90.     Following Acadia's announcement in September 2019 that it was stopping the HARMONY Study early because it had met its primary endpoint, securities analysts discussed enrolled patient population, including a breakdown by subgroup:

> **Bank of America, September 9, 2019:** "On the company call, **mgmt. provided additional color: (1) distribution of dementia subtypes in HARMONY (n=356): Alzheimer's (two-thirds), Parkinson's (15%), vascular dementia (10%) with rest as Lewy bodies (<10%) and FTD; and (2) 20% of pts did not achieve efficacy criteria during the stabilization period and some pts discontinued for other reasons.** Overall, >50% of pts advanced into latter part of the study and a proportion of pts have gone through 6 to 9 mos of treatment. ACAD is in process of closing out the study and is planning to meet with FDA in 1H20. We note sNDA package will include HARMONY, prev. dementia studies and post-mkt safety data in approved indication Parkinson's disease psychosis (PDP)."[165]

> **Needham, September 9, 2019:** "Alzheimers Disease (66%), Lewy Body Dementia (<10%), Parkinsons Dementia (15%), Vascular Dementia (10%), and Frontotemporal Dementia (<10%) pts were enrolled in trial."[166]

> **J.P. Morgan, September 9, 2019:** "The subtypes of DRP matched the overall epidemiology of the disease: ~67% ADP, 15% PDP, 10% vascular dementia, <10% dementia with lewy bodies, and <5% frontotemporal dementia."[167]

91.     At the investor event at the 12th CTAD Meeting held on December 4, 2019, analysts discussed the design and results of the HARMONY Study with the Company and KOLs. For example:

---

[164] "Highlights from Our Management Conference Call," *J.P. Morgan*, October 9, 2017, p. 1–2, [JPMC-00000160–6] (emphasis added).

[165] "Interim look at DRP study gives positive surprise; Reiterate Buy and PO to $48," *Bank of America Merrill Lynch,* September 9, 2019, [BOFAS-ACAD-000282–9] (emphasis added).

[166] "–Positive Nuplazid Phase 3 Dementia Psychosis Trial Results. Raise PT to $60." *Needham,* September 9, 2019, p. 1, [NEEDHAM_ACADIA_0000287–96].

[167] "–A Harmonious Beginning to the Fall for ACAD," *J.P. Morgan*, September 9, 2019, p. 1, [JPMC-00000721–6].

Analyst from Cowen: "And you mentioned that the FDA asked for statistically and clinically persuasive data. Did they define this? And did they define any requirement for that initial response rate?"

Srdjan R. Stankovic: "I would just say in the world of statistics the persuasive and robust results are usually defined by the p-value of less than 0.01. So by that measure, we definitely exceeded that. And I think that from clinical meaningfulness that threefold reduction of risk and 65% reduction of risk for pimavanserin -- with pimavanserin treatment definitely meets that clinical meaningfulness, with a hazard ratio that we saw in this trial. So I believe that certainly, we met that threshold. Directly to answer to your question, there was no any definition that we needed to meet other than what we shared."

Jeffrey Cummings (KOL): "Certainly also, Serge, that you're well positioned to argue for the clinical persuasiveness because of the design of the trial being very close to the actual clinical practice. And I think that's going to help you when you get into that discussion with the FDA."

[…]

Analyst from Cantor Fitzgerald: "[H]ow do you look at the -- or how do you feel about the sample versus the overall population of patients that will be presenting with dementia to you? And how will you use this drug? Could you see it being -- I don't know if frontline is really the way to think about it. But could it be used very early in the diagnosis of dementia with your patients?"

Jeffrey Cummings (KOL): "I think another way to look at this is in order to come into the trial, the patient had to have at least moderate severity of psychosis. So their score was 4.7 on this rating scale. Well, your ordinary doc, including me and probably the panelist, isn't going to wait for that in the clinic, right? We're going to treat patients who have psychotic symptoms. We're not looking for some sort of threshold for them to come into a trial. We are – we're going to treat when we have a clearly defined delusion and hallucination. And I think that's how it will be used."[168]

92.     Following the 12th CTAD Meeting, securities analysts continued to discuss the design and results of the HARMONY Study. More specifically, several analysts commented favorably on the study results and noted the limitations regarding sample size and statistical power for the subgroups. For example:

---

[168] Investor Event Transcript, December 4, 2019, pp. 11–13.

**Goldman Sachs, December 5, 2019**: "**While not powered to detect statistical significance (and acknowledging the small numbers of patients within each subtype**), exploratory secondary endpoints suggest similar effect of psychosis reduction (73.1% to 83.3%) due to Nuplazid treatment in the open-label portion **across the dementia subtypes** and relapse rates were tightly clustered. In comparison, patients in the placebo arm exhibited a wider and more variable relapse rate across subtypes. In our view, the data point to Nuplazid's benefit in DRP patients and support the KOLs' view that the results are clinically meaningful and have the potential to reshape the treatment paradigm."[169]

**Stifel, December 5, 2019**: "If there's one (small) thing to nitpick in this trial it's that success at the interim may have been helped by the Parkinson's/Dementia-Lewy Bodies subset (12 relapses placebo, 1 drug), whereas evidence of efficacy in Alzheimer's is clearly there, but comes down to a meaningful but smaller event difference (14 relapses placebo, 8 drug). … **As we noted above, this trial wasn't just favorable for pimavanserin because of its design, but also because ACAD was able to include patients with Parkinson's, where the drug is already approved. And while the numbers are small, the relapse reduction in PDD and DLB (closely related to Parkinson's) look superior to that in Alzheimer's, which ultimately represents the major population of interest**, and is where bulls generally model multi billions in revenue."[170]

**Bank of America Merrill Lynch, December 5, 2019**: "ACAD released the **full data for the HARMONY study** showing compelling efficacy for Nuplazid … We are attending the CTAD conference this week. On Wednesday ACAD presented the **full dataset from its phase 3 HARMONY study** for pimavanserin (Nuplazid) in Dementia Related Psychosis (DRP)... As a reminder HARMONY had enrolled dementia patients from **five subtypes** (Parkinson's Disease Dementia, Alzheimer's, Lewy Body, Frontotemporal and Vascular). Results showed a strong response **across all of the types**. We view this as presenting compelling reason for physicians to prescribe the drug if it gets approved to a majority of their dementia patients suffering from psychosis."[171]

**H.C. Wainwright & Co, December 5, 2019**: "Symptom reduction and psychosis stabilization occurred **across all five diagnosed subtypes** in the open-

---

[169] "Impressive Full Ph3 HARMONY Data Likely Supports sNDA in 2H20," *Goldman Sachs*, December 5, 2019, p. 1, [GS-000088–95], (emphasis added).

[170] "Solid HARMONY Data At CTAD Underlie Mgmt's Confidence in Approaching FDA; Our Take on the Full Results," *Stifel,* December 5, 2019, p. 1, [STIFEL_ACADIA_0000552–6], (emphasis removed and added).

[171] "HARMONY shows nearly three-fold reduction in relapse risk in DRP; Buy," *Bank of America Merrill Lynch*, December 5, 2019, p. 1, [BOFAS-ACAD-000317–321], (emphasis added).

label portion with 62% meeting treatment response at weeks 8 and 12 for subsequent randomization into the double-blind portion."[172]

**Needham, December 5, 2019:** "Pts w/ **various types of dementia** were enrolled (Alzheimer's [n=123 in part 2], Lewy Body [n=9], Parkinson's [n=35], Vascular [n=24], and Frontotemporal [n=3]) … J. Cummings emphasized the benefits of enrolling a **diverse group of dementia pts** in the HARMONY trial. **Diagnosis is a challenge and ability to prescribe based on symptoms rather than dementia subtype is a meaningful positive.**"[173]

**RBC Capital Markets, December 5, 2019**: "Topline data in ACAD's HARMONY ph.III, at CTAD in San Diego, where we are on-site, reiterate pimavanserin's prospects in dementia-related psychosis, eclipsing expectations on efficacy and earning high marks on clinical application from KOLS, even following the program's recent stoppage for success in September. **The impressive benefit-risk profile now more established by last night's fuller data** continues to support a visible path to market and high likelihood of approval – and with pimavanserin's opportunity in DRP setting up as a robust source of revenue potential in the 2020's, we believe ACAD's neuropsychiatric franchise is on the brink of a breakout. … **We are attending CTAD in San Diego where ACAD presented full data on the pimavanserin ph.III HARMONY trial** as a late breaker oral presentation, followed by a company event where docs attested to the program results and clinical potential."[174]

**Oppenheimer, December 6, 2019**: "ACAD shares rallied (+14% vs NBI -1% and S&P500 flat on Dec. 5) as **full results** of the Ph3 HARMONY study of pimavanserin in patients with Dementia Related Psychosis (DRP) exceeded investor expectations. … **Broad clinical overlap across dementia subtypes enables symptom management with pharmacological treatment regardless of specific diagnoses** … Efficacy **across dementia subtypes** with 73-83% psychosis symptom reductions … Psychosis symptom reduction efficacy corresponds to overall stabilization rates."[175]

93.     Even after the 12th CTAD Meeting, analysts continued to discuss the design and results of the HARMONY Study.  For example, on June 16, 2020, Citi hosted a conference call with Dr.

---

[172] "Pimavanserin Phase 3 HARMONY Trial Topline Meets Primary and Key Secondary Endpoint at CTAD'19; Reit Buy and $60 PT", *H.C. Wainwright & Co*, December 5, 2019, p. 1,[HCW0000116–9], (emphasis added).

[173] "Impressive Dementia Psychosis Data Presented at CTAD Meeting," *Needham*, December 5, 2019, p. 1, [NEEDHAM_ACADIA_0000323–5], (emphasis added).

[174] "The Secret of Pim: Word Getting Out on Pimavanserin with Solid DRP Data at CTAD," *RBC Capital Markets*, December 5, 2019, p. 1, [RBCCM00000020–9], (emphasis added).

[175] "Favorable HARMONY Strikes a Chord with Investors," *Oppenheimer*, December 6, 2019, pp. 1, 3, 7, [OPCO_00064–75], (emphasis added and removed).

Paul Andreason, a former "lead medical reviewer at FDA who handled the review of pimavanserin in PDP in 2016," on thoughts on the upcoming FDA review for pimavanserin in DRP.[176]  Subsequently, on June 17, 2020, Citi published a report stating that "Former FDA Reviewer Sees Pima[vanserin] Approval in DRP as an Easy Decision."[177]  The Citi report also stated that Dr. Andreason "believes FDA will approve pimavanserin with broad label covering psychosis related to dementia on a priority review timeline (likely with an AdCom), and that the black box warning will be updated to reflect such an approval."[178]  As another example, on January 4, 2021, an analyst from Goldman Sachs noted:

> **Goldman Sachs, January 4, 2021**:  "Investors are looking to the upcoming expansion potential for Nuplazid in dementia-related psychosis (DRP; April 3, 2021 PDUFA), the key value driver. While we are positive into the decision, we note some risk given a string of FDA surprise regulatory decisions in 2020 - however, given notification timeline requirements (55 business days prior), we do not expect the FDA to change its position of not holding an AdCom and management has maintained its confidence in the efficacy and safety profile of Nuplazid. As a reminder, the pivotal HARMONY data is serving as the basis for the sNDA submission (demonstrating a 2.8x reduction in the risk of psychosis relapse; HR=0.353, one-sided p=0.0023) in combination with efficacy data from the two previous acute studies (Ph2 Alzheimer's disease psychosis and pre-specified subgroup analysis of dementia patients from the Ph3 PDP trial) and additional safety data from the ongoing placebo-controlled post-marketing commitment safety study of Nuplazid."[179]

94.    In sum, the design and results of the HARMONY Study were publicly discussed by Acadia and were commented on by securities analysts multiple times prior to the March Deficiency Letter.  In particular, at the investor event at 12th CTAD Meeting, the Company discussed the population of patients and results by subtype, and why the HARMONY Study was designed to target DRP as a broad group.  The investor event occurred after market close on December 4, 2019.  My event study analysis shows that Acadia's residual stock price movement

---

[176] "Alert: Call with Former FDA Reviewer on Upcoming Pimvanserin Review in DRP TUESDAY @ 2PM ET," *Citi*, June 14, 2020, p. 1, [CITI_0000070–77]; "Former FDA Reviewer Sees Pima[vanserin] Approval in DRP as an Easy Decision; Replay & Transcript from Our Expert Call," *Citi*, June 17, 2020, p. 3, [CITI_0000086-105] , ("June 17, 2020 Citi Report").

[177] June 17, 2020 Citi Report , p. 1.

[178] June 17, 2020 Citi Report, p. 1.

[179] "Outlook for 2021: Playing offense with catalysts," *Goldman Sachs,* January 4, 2021, p. 9, [GS-000623–89].

on the next trading day, December 5, 2019, was 16.89% and was statistically significant.[180] Thus, the market overall interpreted positively the totality of the new information it learned about Acadia, including the opinions of the KOLs, as evidenced by the statistically significant stock price increase on that date. Importantly, given that the design and results of the HARMONY Study were previously disclosed, in an efficient market, this information would have already been incorporated into Acadia's stock price prior to the March Deficiency Letter.

> **C.    Stock Price Changes Associated with the March Deficiency Letter and the April CRL Are Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding the Design and Results of the HARMONY Study**

95.     The March Deficiency Letter and the April CRL correspond to regulatory updates about the sNDA, namely the notification about unspecified deficiencies in the sNDA precluding discussion of labeling and post-marketing requirements in March 2021 and the CRL in April 2021 provided by the FDA.[181] According to my event study, the residual returns following these disclosures were negative and statistically significant (see Exhibit 2). However, the price declines following these disclosures are not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, and instead reflect the market's reaction to new information such as the regulatory updates. This is because, as discussed above, the information regarding the design and results of the HARMONY Study identified in the Complaint was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

96.     Consistent with this, following the March Deficiency Letter, a number of analysts wrote that they were surprised by the FDA's notification that it had identified deficiencies that preclude discussion of labeling and post- marketing requirements/commitments at this time. Moreover, I

---

[180] Professor Feinstein's event study also finds a statistically significant positive residual return on this date. According to Professor's Feinstein's event study, Acadia's residual return on December 5, 2019 was 14.57% (t-stat = 5.62) or 14.84% (t-stat = 6.03). *See* Feinstein Report, Exhibit-12 and Exhibit-13.

[181] As discussed above in Section IV.E, in addition to the press releases on March 8, 2021 and April 5, 2021, Acadia also held conference calls on those two dates. *See,* "ACADIA Pharmaceuticals Inc. Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv,* March 8, 2021; "ACADIA Pharmaceuticals Inc. to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application – Edited Transcript," *Refinitiv,* April 5, 2021.

reviewed 30 analyst reports that immediately followed the March Deficiency Letter and found no analyst report that claimed that the design or results of the HARMONY study identified in the Complaint were not previously disclosed publicly.[182]  Likewise, I reviewed 28 analyst reports that immediately followed the April CRL and found no analyst report that claimed that the design or results of the HARMONY study identified in the Complaint were not previously disclosed publicly.[183]

97.      In contrast, following the March Deficiency Letter and the April CRL, some analysts referred to a lack of clarity from and apparent policy changes at the FDA.  For example:

> **Cantor Fitzgerald, March 8, 2021:  "Seems that the FDA 'pendulum' has swung back (again) to a new stage of conservatism, in our view.**  In the recent past, we believe the FDA has become more conservative and has been scrutinizing requests to a greater degree. This has been evident by the clinical holds it has put on a number of programs, including Voyager's (VYGR, N) Huntington's disease and Parkinson's disease programs, as an example. In addition, it has been reported that the FDA initiated an industry-wide review of US accelerated approvals whose confirmatory trials have failed, which may have resulted in the voluntary withdrawal of for [sic] anti-PD-(L)1 drugs for specific indications. We believe these recent actions, and the nature of the communication between FDA and ACADIA this late in the cycle, may point to a less flexible or more capacity-constrained FDA."[184]

> **Goldman Sachs, March 9, 2021:**  "As we noted prior, heading into 2021, **we were monitoring the regulatory backdrop, particularly under expected new FDA leadership and given the current COVID-19 related-environment. Today's setback further leads to uncertainty on interpretations of agency conversations/disclosures and the significance of Breakthrough Therapy Designation.**  For context, ACAD noted the agency informed the company twice (latest in December 2020) that it had identified no review issues and was not planning on holding an Advisory Committee.  More recently, as of three weeks ago, the FDA confirmed it was on track to initiate labeling discussions on March 3. Thus the notification by the FDA of the deficiencies (particularly within a month of the PDUFA date) comes as a surprise."[185]

---

[182] Specifically, I reviewed 30 analyst reports dated from March 8, 2021 through March 15, 2021.

[183] Specifically, I reviewed 28 analyst reports dated from April 5, 2021 through April 12, 2021.

[184] "Pima' in DRP – Despite P3 Efficacy & No Approved Alternatives, Late Cycle Uncertainty Created by FDA," *Cantor Fitzgerald*, March 8, 2021, p. 2.

[185] "Acadia Pharmaceuticals Inc. (ACAD): Nuplazid sNDA for DRP Hangs in the Balance; Decent likelihood of a CRL," *Goldman Sachs*, March 9, 2021, p. 2, [GS-000170–76] (emphasis added).

**Guggenheim, March 9, 2021**:  "At this point, we don't have enough clarity on what is going on and recently we are seeing similar situations with other companies where **there seems to be a lack of regulatory clarity from the agency**. We believe that the approval of Nuplazid in DRP is likely to be delayed until the issue(s) is (are) resolved."[186]

**Citi, April 5, 2021**:  "More broadly, **this decision does signal to us that FDA is becoming increasingly conservative**. … FDA signed off on HARMONY's design, which planned to enroll a representative sample of dementia subtypes without powering for significance in any specific subgroup. As such, **this does appear to be a stark reversal in FDA's stance on the overall drug development process for DRP which could leave the door to dispute resolution open."**[187]

**Cowen, April 5, 2021**:  "Overall, **the FDA's comments suggest a lack of clarity and consistency on how they view and evaluate treatments for DRP as a broad population.**  As of now, it is unclear what the next steps are for the program."[188]

**VII.   Information Regarding the -019 Study, Including Designation of a Primary Efficacy Outcome at Six Weeks, the Lack of Statistical Significance for Most Secondary Endpoints and Subgroup Analyses, Patient Heterogeneity, Single Center, And No Type I Error Control of Secondary Endpoints Identified in the Complaint, Was Publicly Known Prior to the March Deficiency Letter, and Repetition of This Information Would Not Have Affected Acadia's Stock Price in an Efficient Market**

98.     As discussed above in Section IV.F, Plaintiffs allege that "despite Defendants' effort to highlight the best results," the -019 Study had "poorly analyzed data and poor design" among other shortcomings, which rendered the dataset of the -019 Study not supportive of the sNDA.[189] As I discuss in this section, information regarding the -019 Study, including designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I

---

[186] "ACAD - FDA Finds Deficiencies in Nuplazid's DRP sNDA, Could Result In a CRL; The IP Clock Is Ticking; Downgrade to Neutral," *Guggenheim*, March 9, 2021, p. 1, [GUG000114–21] (emphasis added).

[187] "ACADIA Pharmaceuticals Inc (ACAD.O) - Likely to Pursue New Phase 3 Planning & Dispute Resolution in Parallel; Additional Comments from Mgmt; PT to $25 (-$10)," *Citi*, April 5, 2021, p. 1 [CITI_0000284–96], (emphasis added).

[188] "Pima CRL for DRP: Opp'y in DRP in Question as FDA Asks for More Efficacy Data," *Cowen*, April 5, 2021, p. 3, [TDCowen_Acadia00041950–61] (emphasis added).

[189] Complaint, ¶ 90.

error control of secondary endpoints identified in the Complaint, was already publicly known prior to the March Deficiency Letter.  In an efficient market, this information would have already been incorporated in the stock price prior to the March Deficiency Letter.  Thus, any repetition of this information would not have affected Acadia's stock price.

99.     As an initial matter, with respect to the -019 Study, I note that the Complaint states that the Company's data set was "presented in **full** in the *Journal of Prevention in Alzheimer's Disease* **in August 2018**."[190]  Moreover, in addition to the article in the *Journal of Prevention in Alzheimer's Disease ("JPAD* Article"),[191] another medical journal also published information about the design and results of the -019 Study.  Specifically, the article "Evaluation of the safety, tolerability, and efficacy of pimavanserin versus placebo in patients with Alzheimer's disease psychosis: a phase 2, randomised, placebo-controlled, double-blind study," published in *The Lancet Neurology* in 2018 ("*The Lancet Neurology* Article") listed results for the primary as well as secondary and exploratory endpoints in the -019 Study.[192]  In addition, a comment to this article was published in the same issue of *The Lancet Neurology* which critiqued the -019 Study ("Comment on *The Lancet Neurology* Article"),[193] and a Supplementary Index published in 2018 provided more detailed information about the -019 Study ("Supplement to *The Lancet Neurology* Article").[194]  Additionally, as discussed below, analysts directly referenced information about the -019 Study provided in the *JPAD* Article, and *The Lancet Neurology* Article prior to the March Deficiency Letter.

100.    Further, as I discuss in **Section VII.A.** below, the alleged "shortcomings" of the -019 Study identified in the Complaint, with the possible exception of information about protocol deviations discussed below, were publicly known prior to the March Deficiency Letter.  Specifically, prior to the March Deficiency Letter, it was publicly known that the -019 Study's

---

[190] Complaint, ¶ 87 (emphasis added).

[191] Clive Ballard et al., "Pimavanserin in Alzheimer's Disease Psychosis: Efficacy in Patients with More Pronounced Psychotic Symptoms," *The Journal of Prevention of Alzheimer's Disease* 6, no. 1, 2019, pp. 27–33.

[192] Clive Ballard et al. "Evaluation of the Safety, Tolerability, and Efficacy of Pimavanserin Versus Placebo in Patients with Alzheimer's Disease Psychosis: A Phase 2, Randomised, Placebo-Controlled, Double-Blind Study," *The Lancet Neurology* 17 no. 3, 2018, pp. 213–222.

[193] Lon S. Schneider, "Pimavanserin for Patients with Alzheimer's Disease Psychosis," *The Lancet Neurology* 17, no. 3, 2018, pp. 194–195.

[194] Clive Ballard et al. "Evaluation of the Safety, Tolerability, and Efficacy of Pimavanserin Versus Placebo in Patients with Alzheimer's Disease Psychosis: A Phase 2, Randomised, Placebo-Controlled, Double-Blind Study [Supplementary Appendix]," *The Lancet Neurology* 2018; 17: 213–222.

"designation of a primary efficacy outcome" was "at six weeks."[195]  It was also publicly known that "17 of 18 secondary and exploratory outcomes and six of seven subgroup analyses did not demonstrate evidence of efficacy."[196]  Additionally, it was publicly known that the -019 Study had "an issue" with "patient heterogeneity," and the study "was predicated on a single center study with no type 1 error control of secondary endpoints."[197]

101.    The only information identified in the Complaint about the -019 Study that was potentially new on April 5, 2021 was that "certain 'protocol deviations' occurred, including the administration of 'prohibited medications' to patients enrolled in the study, which tainted the results."[198]  However, as discussed below, some information about potential protocol deviations was publicly known prior to the April CRL.

102.    Further, as discussed in **Section VII.B**, analyst reports also discussed the design and results of the -019 Study prior to the March Deficiency Letter.  Additionally, analysts also asked questions regarding the design and results of the -019 Study on conference calls prior to the March Deficiency Letter.

103.    In an efficient market, any subsequent disclosures of the information about the -019 Study that had been previously disclosed would not have affected Acadia's stock price because the information was already publicly known before the March Deficiency Letter.  Accordingly, the stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints.

---

[195] Complaint, ¶ 87.
[196] Complaint, ¶ 89.
[197] Complaint, ¶¶ 85–86.
[198] Complaint, ¶ 86.

**A.    Information Regarding the Design and Results of the -019 Study Was Publicly Known Prior to Acadia's March Deficiency Letter**

104.    Prior to the March Deficiency Letter, there were multiple public disclosures of the design and results of the -019 Study.[199]  Below I discuss examples of such disclosures.

105.    The -019 Study and its design were announced in a press release in November 2013:

> ACADIA Pharmaceuticals Inc. (NASDAQ:ACAD), […] today announced that it has initiated a Phase II feasibility trial designed to examine the efficacy and safety of pimavanserin as a treatment for patients with Alzheimer's disease psychosis (ADP).
>
> […]
>
> The Phase II feasibility trial, referred to as the -019 Study, is a randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of pimavanserin in about 200 patients with ADP. The study is being conducted through a large network of research care homes established as part of the National Institute for Health Research (NIHR) Maudsley Biomedical Research Unit. Following a screening period that includes brief psycho-social therapy, patients will be randomized on a one-to-one basis to receive either 40 mg of pimavanserin or placebo once-daily for 12 weeks. The -019 Study will assess several key efficacy endpoints, including use of the Neuropsychiatric Inventory – Nursing Home (NPI-NH) scale to measure psychosis (hallucinations and delusions), agitation/aggression, and sleep/nighttime behavior, as well as use of the Cohen-Mansfield Agitation Inventory – Short Form (CMAI-SF) scale and the Alzheimer's Disease Cooperative Study – Clinical Global Impression of Change (ADCS-CGIC) scale. Key efficacy endpoints will be based on the change at week six from baseline. The study will also assess additional exploratory endpoints, including the cognitive status of patients using the Mini-Mental State Examination (MMSE) scale, and the durability of response to pimavanserin through twelve weeks of therapy.[200]

106.    Plaintiffs allege that "the -019 Study was predicated on a single center study."[201]  This information was publicly disclosed prior to the March Deficiency Letter.  In fact, over four years

---

[199] Additionally, prior to the March Deficiency Letter, Acadia had publicly disclosed that the -019 Study would be included in its sNDA application.  See, for example, FY2020 10-K, p 5.

[200] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," November 14, 2013, p. 1.

[201] Complaint, ¶ 86.

earlier, on Acadia's Q3 2016 earnings (held on November 7, 2016), the Company disclosed details about the -019 Study design, including that it was being conducted through a "single site."

> [-019 Study] is being conducted through a single site with a large network of nursing homes in the London, England, area. This is an exploratory, Phase II, 12-week, randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of 34-milligram dose of pimavanserin compared to placebo in patients with AD psychosis. We enrolled 181 patients in this study. [202]

107.    In a conference call to discuss the top-line results of the -019 Study that occurred on December 20, 2016, Acadia once again disclosed that "[t]he study was conducted through a single site with a large network of nursing home in London, England area.  Around 130 nursing homes participated in the study."[203]

108.    Plaintiffs allege that "the -019 Study's designation of a primary efficacy outcome at six weeks, despite continuing double-blinded treatment for 12 weeks, led to a distorted picture of the treatment's efficacy (and a hasty conclusion). … What the data actually showed after continuing to treat patients until twelve weeks was that Acadia did not observe any effect on the NPI–NH psychosis scale at any other time during the 12-week trial.  Therefore, had the primary outcome been specified for 12 weeks (which is typical of trials with antipsychotics), pimavanserin would likely not have been considered efficacious at all—a particularly meaningful point as it undercuts the likelihood that pimavanserin could be approved for AD."[204]  The information that the primary endpoint of the -019 Study was at six weeks, and that the secondary endpoint of mean change in NPI-NH Psychosis score at week 12 was not statistically significant was publicly disclosed prior to the March Deficiency Letter.  Indeed, on December 20, 2016, Acadia announced the results of the -019 Study in a press release, stating:

---

[202] "Q3 2016 Acadia Pharmaceuticals Inc. Earnings Call –Edited Transcript," *Thomson Reuters,* November 7, 2016, p. 7.

[203] "ACADIA Pharmaceuticals Conference Call to Discuss Top-Line Results from Phase II Study With Pimavanserin for AD Psychosis – Edited Transcript, *Thomson Reuters*," December 20, 2016 ("December 20, 2016 Conference Call"), p. 4.

[204] Complaint, ¶¶ 87–88.

ACADIA Pharmaceuticals Inc. (NASDAQ: ACAD) today announced positive top-line results from its Phase II exploratory study (-019 Study) of pimavanserin in patients with Alzheimer's disease psychosis (AD Psychosis).

[…]

**Pimavanserin demonstrated efficacy on the primary endpoint of the -019 Study with a 3.76 point improvement in psychosis at week 6 compared to a 1.93 point improvement for placebo, representing a statistically significant treatment improvement in the NPI-NH Psychosis score (p=0.0451).** Baseline mean scores for the pimavanserin and placebo treated groups were 9.52 and 10.00, respectively.

Atypical antipsychotics have been associated with a statistically significant worsening of cognitive function in patients with Alzheimer's disease. In the -019 Study, over the course of 12 weeks of treatment, pimavanserin did not impair cognition as measured by the Mini-Mental State Examination (MMSE) score and was similar to placebo. **On the secondary endpoint of mean change in NPI-NH Psychosis score at week 12, pimavanserin maintained the improvement on psychosis observed at the week 6 primary endpoint, but did not statistically separate from placebo.**[205]

109.    Acadia also repeatedly disclosed information about the design and results of the -019 Study in its 10-K filings.  For example, in its 2016 10-K filed on February 28, 2017, Acadia discussed that the focus of the -019 Study was on patients with Alzheimer's disease.  Acadia also disclosed that the study had not met its secondary endpoint of mean change in NPI-NH Psychosis score at week 12:

In December 2016 we announced positive top-line results from our Phase II study, referred to as the -019 Study, examining the safety and efficacy of pimavanserin as a treatment for AD Psychosis. **The -019 Study was a double-blind, placebo-controlled exploratory trial designed to evaluate the efficacy and safety of pimavanserin as a treatment for patients with AD Psychosis**. A total of 181 patients were enrolled in the study in the United Kingdom. Following a screening period that included brief psycho-social therapy, patients were randomized on a one-to-one basis to receive either 34 mg of pimavanserin or placebo once-daily. The primary endpoint of the study was antipsychotic efficacy as measured by the mean change in the Neuropsychiatric Inventory—Nursing Home, or NPI-NH, Psychosis score (combined hallucinations and delusions

---

[205] Acadia December 20, 2016 Press Release, pp. 1–2 (emphasis added).

domains) from baseline to week six of dosing. The study also assessed additional secondary endpoints, including the cognitive status of patients and the durability of response to pimavanserin, through week 12 of dosing. Pimavanserin demonstrated efficacy on the primary endpoint of the -019 Study with a 3.76 point improvement in psychosis at week six compared to a 1.93 point improvement for placebo, representing a statistically significant treatment improvement in the NPI-NH Psychosis score (p=0.0451). Baseline mean scores for the pimavanserin and placebo treated groups were 9.52 and 10.00, respectively.

Pimavanserin was generally well tolerated and the safety profile was consistent with what has been observed in previous studies. Based on a preliminary analysis of safety data, the most common adverse events reported were falls, urinary tract infection and agitation. The mortality rate was the same in the pimavanserin and placebo treatment groups. Over the course of 12 weeks of treatment, pimavanserin did not impair cognition as measured by the Mini-Mental State Examination, or MMSE, score and was similar to placebo. **On the secondary endpoint of mean change in NPI-NH Psychosis score at week 12, pimavanserin maintained the improvement on psychosis observed at the week six primary endpoint, but did not statistically separate from placebo.** The mean age of patients in the study was 86 years.[206, 207]

110.    Furthermore, as discussed above, multiple articles were published in medical journals in 2018 discussing the design and results of the -019 Study, including the *JPAD* Article and *The Lancet Neurology* Article.[208]  Additionally, analysts referenced information about the -019 Study

---

[206] Acadia Pharmaceutical Inc., Form 10-K for Fiscal Year ended December 31, 2016, filed February 28, 2017, p. 4 (emphasis added).

[207] *See also, e.g.,* FY2017 10-K, p. 5, FY2018 10-K, p. 6.

[208] The author submission guidelines for *The Lancet Neurology* state: "Every Article, Review, Rapid Review, and Personal View published in The Lancet Neurology has been peer reviewed."  *See* "Information for Authors," *The Lancet Neurology*, https://www.thelancet.com/pb/assets/raw/Lancet/authors/tl-info-for-authors-1690986041530.pdf. The submission guidelines for *The Journal of Prevention of Alzheimer's Disease* state "[p]eer review assists the Editor-in-Chief in making editorial decisions and through the editorial communications with the author may also assist the author in improving the paper."  *See*, "Instructions for Authors," *The Journal of Prevention of Alzheimer's Disease*, https://media.springer.com/full/springer-instructions-for-authors-assets/pdf/42414_IAJPAD_March2023.pdf.

provided in the *JPAD* Article,[209] and *The Lancet Neurology* Article.[210]  Moreover, regarding the primary endpoint of the -019 Study at six weeks, and the secondary endpoint of mean change in NPI-NH Psychosis score at week 12 not being statistically significant, the Comment on *The Lancet Neurology* Article noted that:

> **Despite a statistically significant effect for pimavanserin on the NPI–NH psychosis scale at 6 weeks, the results of this trial cannot be considered to be positive or clinically meaningful**. The effect itself was small (mean change in NPI–NH psychosis score –3·76 points [SE 0·65] for pimavanserin and –1·93 points [0·63] for placebo, mean difference –1·84 [95% CI –3·64 to –0·04]; p=0·045) and no effect was evident for the NPI–NH psychosis scale at any other time during the 12-week trial . … **The significance of the primary outcome was driven by a worsening of the placebo-treated group at 6 weeks that was not observed at 4 weeks of treatment or at 9 and 12 weeks of treatment.**[211]

111.    The Comment on *The Lancet Neurology* Article also noted that:

>  The absence of effect for pimavanserin both before and after 6 weeks, however, casts doubt on the clinical relevance of the score at 6 weeks. **If the primary outcome had been specified for 12 weeks, typical of previous trials with**

---

[209] For example, a Stifel report dated September 2, 2019 noted that "While pimavanserin showed statistically significant improvement over placebo on the Neuropsychiatric Inventory-Nursing Home version Psychosis Score (NPI-NH PS) in the 181 patient Ph .2 -019 trial in Alzheimer's Disease Psychosis (ADP) at 6 weeks (the pre-specified primary endpoint), there was little-to-no separation from placebo observed during continued treatment out to 12 months or at early time points. Even in a subgroup analysis of patients with more severe symptoms (N = 57; NPI-NH PS ≥ 12), statistically significant separation was only achieved at 6 weeks, albeit with a larger delta. While we acknowledge that the pre-specified primary endpoint was at 6 weeks, we view the subsequent lack of separation as worrisome when thinking about not just the realness of the signal, but also long-term treatment durability, as pimavanserin would, if successful, be primarily utilized a chronic medication in this population."  The source of the accompanying tables in the Stifel Report refers to Clive Ballard et al., "Pimavanserin in Alzheimer's Disease Psychosis: Efficacy in Patients with More Pronounced Psychotic Symptoms," *The Journal of Prevention of Alzheimer's Disease* 6, no. 1, 2019, pp. 27–33.).  *See* "Deep Dive on DRP; The Tremendous Trial vs The Weak Antipsychotic," *Stifel,* September 2, 2019, pp. 5–7, [STIFEL_ACADIA_0000367–389].

[210] "It's PIM-O-Clock!: We See Lead Drug as a CNS Mega Blockbuster - Initiate at BUY," *Jefferies*, April 16, 2020, [ JEFF00002691-782], p. 46. ("The primary endpoint was achieved at week 6, however, no separation was found at week 12 in part due to the increasing placebo response (middle figure)"), names as source for accompanying graphics;  Clive Ballard et al., "Evaluation of the Safety, Tolerability, and Efficacy of Pimavanserin Versus Placebo in Patients with Alzheimer's Disease Psychosis: A Phase 2, Randomised, Placebo-Controlled, Double-Blind Study," *The Lancet Neurology* 17, no. 3, 2018, pp. 213–222.).  See also, "2019 Was Just the Tip of the Iceberg. Initiating at Buy with $69 PT," *Citi*, March 5, 2020, p. 18 [CITI_000001–47].

[211] Comment on *The Lancet Neurology* Article, p. 194 (emphasis added).

**antipsychotics, then pimavanserin would have been considered as not effective.**[212]

112. By October 2017, the results of the -019 Study were posted on ClinicalTrials.gov.[213]

113. Plaintiffs allege that "an assessment of the patient profile of the -019 Study showed that 17 of 18 secondary and exploratory outcomes and six of seven subgroup analyses did not demonstrate evidence of efficacy, even though the Company at the time cherry-picked a finding that there was a significant effect that favored pimavanserin within a subgroup of patients with more severe symptoms."[214] The results for the -019 Study were presented by Acadia at the 10th CTAD conference in November 2017, and in a press release dated November 3, 2017.[215] Among other things, the press release disclosed that multiple secondary and exploratory endpoints of the -019 Study were not statistically significant:

> Pimavanserin met the primary endpoint in the study, showing a statistically significant reduction in psychosis versus placebo as measured by the Neuropsychiatric Inventory-Nursing Home (NPI-NH) Psychosis score at week 6 of dosing (delta = 1.84, p=0.0451, effect size [Cohen's d] = 0.32). The proportion of responders at week 6 that had an NPI-NH Psychosis score improvement of $\geq$ 30% was 55.2% for pimavanserin-treated patients versus 37.4% for placebo (p=0.0159). … **The pimavanserin and placebo groups did not separate statistically on the secondary endpoints of the Alzheimer's Disease Cooperative Study – Clinical Global Impression of Change (ADCS-CGIC) or the Cohen-Mansfield Agitation Inventory Short Form (CMAI-SF), nor on the exploratory endpoints of the mean change in NPI-NH Psychosis score at week 12 or the Alzheimer's Disease Cooperative Study – Activities of Daily Living (ADCS-ADL).**[216]

---

[212] Comment on *The Lancet Neurology* Article, p. 195 (emphasis added).

[213] "A Study of the Safety and Efficacy of Pimavanserin in Patients With Alzheimer's Disease Psychosis," *National Institutes of Health*, https://www.clinicaltrials.gov/study/NCT02035553, accessed October 11, 2023. As discussed in Section VI.A above, during Acadia's Q3 2017 earnings call (held on November 7, 2017), an analyst from Goldman Sachs asked questions about the publicly-available information posted on clinicaltrial.gov. Additionally, analysts also referenced data on clinicaltrial.gov in their reports. See, for example, "It's PIM-O-Clock!: We See Lead Drug as a CNS Mega-Blockbuster – Initiate at BUY," *Jefferies*, April 16, 2020, pp. 12–15 [JEFF00002691–782]; "2019 Was Just the Tip of the Iceberg. Initiating at Buy with $69 PT," *Citi*, March 5, 2020, p. 18, [CITI_0000001–47].

[214] Complaint, ¶ 89.

[215] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Presents Data from the Phase II Study of Pimavanserin in Alzheimer's Disease Psychosis at the Clinical Trials on Alzheimer's Disease (CTAD) 2017 Meeting," November 3, 2017 ("Acadia November 3, 2017 Press Release").

[216] Acadia November 3, 2017 Press Release, p. 2 (emphasis added).

114.    Moreover, *The Lancet Neurology* Article listed results for all 18 secondary and exploratory outcomes.[217]  Additionally, the Comment on *The Lancet Neurology* Article stated that "17 out of 18 secondary and exploratory outcomes and six of seven subgroup analyses did not show evidence of efficacy."[218]  Further, *The Lancet Neurology* Article also stated, "[p]respecified subgroup analyses provided evidence of increased benefit in the group of participants with more severe psychotic symptoms NPI-NH psychosis score ≥12), but not in those with mild symptoms (NPI-NH psychosis score < 12), who were given pimavanserin compared with those given placebo."[219]

115.    Regarding the -019 Study, Plaintiffs also allege that "patient heterogeneity continued to be an issue.  Again, as an example, pimavanserin demonstrated particular effects on visual hallucinations in Alzheimer's patients, but any beneficial effect it might have for people with Lewy body pathology were not recognized in this trial."[220] As discussed earlier, Acadia had disclosed prior to the March Deficiency Letter that the -019 Study was a "double-blind, placebo-controlled exploratory trial designed to evaluate the efficacy and safety of pimavanserin as a treatment for patients" with *Alzheimer's disease* psychosis.[221]  Further, the Comment on *The Lancet Neurology* Article, specifically noted that "[a] therapeutic effect of pimavanserin might depend on underlying brain pathology, and the population of this study probably would have particularly heterogeneous proteinopathy, hippocampal sclerosis, and vascular brain injury.  For example, in view of pimavanserin's particular effects on visual hallucinations in Parkinson's disease, any salutary effect it might have for people with Lewy body pathology and visual hallucinations might not be recognised in this trial."[222]

116.    Plaintiffs further allege that the "-019 Study was predicated on a single center study with no type 1 error control of secondary endpoints in which certain 'protocol deviations' occurred, including the administration of 'prohibited medications' to patients enrolled in the study, which

---

[217] *The Lancet Neurology* Article, p. 219.  The *JPAD* Article also provided results for "secondary and exploratory outcomes for the subgroup with baseline NPI-NH psychosis score ≥12."  *See, JPAD* Article, p. 30.

[218] Comment on *The Lancet Neurology* Article, p. 194.

[219] *The Lancet Neurology* Article, p. 220.

[220] Complaint, ¶ 85.

[221] FY2017 10-K, p. 5.

[222] Comment on *The Lancet Neurology* Article, p. 195.

tainted results."[223]  As discussed above, on the Q3 2016 earnings call (held on November 7, 2016), Acadia disclosed details about the study design including that it is being conducted through a "single site."[224]  Also as discussed above, the 019-Study results, including those for the secondary endpoints, were published in medical journals in 2018,[225] and the Company disclosed that multiple secondary and exploratory endpoints were not statistically significant.[226] Moreover, *The Lancet Neurology* Article also noted that "all efficacy analyses were done using two-sided tests at the 5% level of significance.  No adjustment for multiplicity of testing was used."[227]  The only information identified in the Complaint about the -019 Study that was potentially new on April 5, 2021 was that "certain 'protocol deviations' occurred, including the administration of 'prohibited medications' to patients enrolled in the study."[228]  On April 5, 2021, Acadia's press release noted that the FDA had stated in the CRL that "certain protocol deviations occurred" in connection with the -019 Study.[229]  Further, on the conference call on April 5, 2021, Acadia stated:

> In terms of deviations, there were some – there were deviations in terms of the entry criteria qualifying for the study as well as some prohibitive [sic] – use of prohibited medications and the certain deviations in terms of the administration of the informed consent that were pointed out in the complete response letter.  But in regard to deviations we did, these were clearly outlined in the clinical study report that were submitted even before our overall submission that was completed, then as well as in that report, in addition to disclosure, we did a sensitivity analysis by analysis per protocol patients without those with the deviations.  And all of the sensitivity analysis indicated clearly that the conclusions of the study and primary outcomes are not changed on the basis of this analysis. So from the perspective of these deviations, we clearly demonstrated that there were no impact on the overall conclusions of the study.[230]

---

[223] Complaint, ¶ 86.

[224] "Q3 2016 Acadia Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters,* November 7, 2016, p. 7.

[225] See, for example, *The Lancet Neurology* Article, p. 219.

[226] Acadia November 3, 2017 Press Release, p. 2.

[227] *The Lancet Neurology* Article, p. 217.

[228] Complaint, ¶86.

[229] Acadia April 5, 2021 Press Release, p. 1.

[230] "ACADIA Pharmaceuticals Inc. to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application – Edited Transcript," *Refinitiv,* April 5, 2021, p. 11.

117.    However, some information about potential protocol deviations was publicly known prior to the April CRL.  The Supplement to *The Lancet Neurology* Article shows sensitivity analyses using the "per protocol (PP) analysis set."[231, 232]

### B.    Securities Analysts Discussed the Design and Results of the -019 Study

118.    Consistent with the public disclosures discussed above, analyst reports also discussed the design and results of the -019 Study prior to the March Deficiency Letter.  Further, analysts also asked questions regarding the design and results of the -019 Study on conference calls prior to the March Deficiency Letter.

119.    For example, in a conference call held on December 20, 2016, the Company responded to a question from an analyst, citing ClinicalTrials.gov, regarding the primary endpoint of the study being at six weeks, and the lack of statistical significance of the study results at 12 weeks:

> Analyst from Goldman Sachs:  "… I just wonder if I could clarify one point on that last question. So am I right to assume that at 12 weeks the delta between placebo and treatment was actually smaller? And could this be driving -- this is why it was not stat sig? And then another question on that is I saw in clinicaltrials.gov that the primary is listed as 12 weeks. So just curious why you decided to cut the data at 6 here."

> Serge Stankovic:  "Right. Yes, you are right in your conclusion. **Due to improvement observed in placebo from week 6 to week 12, we did not see separation between placebo and pimavanserin at that point. The primary point from the beginning was week 6 NPI psychosis score.** So I am not sure that that information is correct that at 12 week it was a primary endpoint. That was from the beginning and it was in the protocol and in all of our announcements."[233]

120.    In the same conference call held on December 20, 2016, the Company also responded to questions from other analysts about the lack of statistical significance at 12 weeks and the study design with a single location:

---

[231] Supplement to *The Lancet Neurology Article,* p. 2.

[232] Additionally, as discussed later in Section VII.B, a Citi analyst report dated March 12, 2021 referenced "protocol deviations" in connection with the -019 Study.  See, "FDA Expert Feedback Call MONDAY (3/15) at 12PM ET with Former FDA Reviewer Dr. Paul Andreason on Recent DRP Filing Update," *Citi*, March 12, 2021, p. 1, [CITI_0000244–53].

[233] December 20, 2016 Conference Call, p. 7 (emphasis added).

Analyst from J.P. Morgan: "… Just two on the curve versus placebo -- how early did the curve separate? And then at 12 weeks, can you provide any more information of how different it was from placebo? Thank you."

Steve Davis: "Yes. So again, I'll start. And Serge, feel free to jump in. So we were numerically separated at all time points. But again, it was an exploratory study. **We got a very clear signal on efficacy, but we were not, as it relates to other time points or secondary measures, we didn't get significance on everything, and which we wouldn't expect in this exploratory study.**"[234]

[…]

Analyst from *JMP Securities:* "To what extent were each individual homes independent? How many physicians were actually involved in conducting the assessments? And what gives you confidence that when you move to a more multicenter, multi-geographical type trial that the results will maintain their significance?"

Serge Stankovic: "The patients were in nursing homes. **But all of the study assessment was conducted by the same team from King's College. And that include several physicians, a number of raters, and coordinators. And the teams would actually travel to this nursing home and provide -- conduct assessments and evaluations for the study. So there was a relatively wide team of people, but it was one center, one team that conducted all of the assessments in the trial.** This is for the nursing home study design. This was very appropriate. As we move forward, we have to think in a number of ways what actually population would be the best positioned population for the trial and whether that is the nursing homes or outpatient population. We are early in looking at the data and understanding. We also are looking at the experience of other clinical studies conducted in this indication, and we will make our conclusions in moving forward."[235]

121.    Following the CTAD conference in November 2017, securities analysts discussed the design and results of the -019 study, including the lack of statistical significance at 12 weeks, that the study missed secondary endpoints, and the focus of the study on ADP patients. For example:

---

[234] December 20, 2016 Conference Call, p. 7 (emphasis added).
[235] December 20, 2016 Conference Call, p. 8 (emphasis added).

**Cowen, November 5, 2017:** "**After releasing positive top-line data in December 2016, ACAD reported full data from the Ph2 trial of pimavanserin in Alzheimer's Disease Psychosis (ADP) at CTAD.** The trial randomized 90 ADP patients to pimavanserin and 91 to placebo and was conducted at 133 nursing homes. Patients in the trial had significant psychosis at baseline, with -1/3 of patients meeting criteria for severe psychosis, though the PI of the trial noted lower antipsychotic use and lower severity of agitation than expected in a broader population. The trial met its primary endpoint of psychosis score improvement on the NPI-NH hallucinations and delusions subscale at 6 weeks with a 39.50/0 reduction in psychosis score (p<0.05). […] **The major criticism of the ADP data to date have been the lack of statistical significance vs. placebo on improvement of psychosis at 12 weeks (following significance at 6 weeks).** KOLs suggested the lack of significance was due in part to the relapsing-remitting nature of dementia-related psychoses and noted 70% of patients spontaneously remit over 12 weeks, though 50% of them will relapse over the subsequent year. The KOLs indicated the relapsing remitting course of psychosis may be different for Lewy Body-related dementias vs. AD, though there have not been substantial longitudinal studies to specifically characterize them."[236]

**Goldman Sachs, November 6, 2017:** "**ACAD presented the full pimavanserin Ph2 (N=181) data in ADP** including new responder analyses and subgroup analyses of patients with severe ADP. On the primary efficacy endpoint of change from baseline to week 6 in the Neuropsychiatric Inventory-Nursing Home Version (NPI-NH) psychosis score, ACAD previously reported 3.76 in the treated vs. 1.93 in the placebo arm (p=0.0451) representing a 39.5% reduction; **however, the drug-placebo delta at 12 weeks did not show a statistically significant separation.**"[237]

**Needham, November 6, 2017:** "Acadia had previously disclosed Phase 2 trial primary endpoint 6wk Neuropsychiatric Inventory-Nursing Home Psychosis score improved relative to placebo (NPI-NH; -3.76 Nuplazid vs -1.93 Pbo; p=0.0451). **The effect continued through wk12, but was not statistically significant. Acadia had also previously announced that secondary 6wk CMAI-SF and ADCS-CGIC endpoints were not met.**"[238]

**H.C. Wainwright & Co., November 8, 2017:** "At the CTAD meeting, Acadia also presented additional data on the Phase 2 -019 study of pimavanserin in the ADP patients. **We acknowledge that there are concerns around the readout,**

---

[236] "Acadia Pharmaceuticals - CTAD Field Report: Encouraging KOL Feedback on Ph3 HARMONY DRP Trial," *Cowen*, November 5, 2017, p .1, [TDCowen_Acadia00000046-51] (emphasis added).

[237] "Takeaways from CTAD: ADP data reinforced; KOLs like optimized Ph3," *Goldman Sachs,* November 6, 2017, p. 1–3, [GS-000226–233] (emphasis added).

[238] "ACADIA Pharmaceuticals Inc. (ACAD) - CTAD Investor Meeting Review," *Needham*, November 6, 2017, p. 1, [NEEDHAM_ACADIA_0000297–300] (emphasis added).

**specifically: (1) pimavanserin showed a significant effect compared to placebo at week 6 (39.5% reduction as measured by the NPI-NH score), but failed to maintain the efficacy at week 12; and (2) -019 study also missed several key secondary endpoints, such as ADCS-CGIC, ADCS-ADL and CMAI-SF.** While the durability of efficacy raises doubt, we note that a combination of factors could play into the result, including the placebo effect, relapse cycle, and a lack of long-lasting effect of pimavanserin. The silver lining here, in our view, is in the sub-group analysis, where a better efficacy was seen in patients with more severe psychosis and are more agitated at baseline (effect size is -0.734 vs. -0.32 in the severe and overall population, respectively)."[239]

**Goldman Sachs, November 8, 2017:** "While we viewed the full pima Ph2 data in Alzheimer's disease (AD) psychosis as supportive of prior efficacy and safety, and KOLs were optimistic on the data and ongoing Ph3 study in DRP, **investor concerns remain regarding the lack of separation of drug-placebo effect at 6-12 weeks. KOLs attributed the high placebo rates in the Ph2 study at week 12 to spontaneous remissions common in dementia psychoses."[240]**

**Bank of America, November 7, 2017:** "**ACAD reported detailed results from its phase 2 study in Alzheimer's Disease Psychosis at the CTAD meeting this week** in Boston. We believe the company's decision to design the phase 3 HARMONY study to include a broader patient population in Dementia Related Psychosis (DRP) makes strategic sense."[241]

122.    As discussed above in Section VII.A, the results of the -019 Study were published in *The Lancet Neurology* Article that was referenced by securities analysts.  The Supplement to *The Lancet Neurology* Article shows sensitivity analyses using the "per protocol (PP) analysis set."[242] In an analyst report published on March 12, 2021, Citi provided the following commentary regarding prior disclosures of protocol deviations:

Recall, ACAD had alignment with FDA on contents of the DRP sNDA submission, including: 1) HARMONY DRP Phase 3 data, 2) Phase 2 Alzheimer's psychosis (ADP) study (Ballard et al. 2018) data, 3) post-marketing safety commitment study interim data cut, and 4) analyses of the existing PDP data in

---

[239] "Is Pimavanserin a Pony With Multiple Tricks? Reit Buy with $60 PT," *H.C. Wainwright & Co.,* November 8, 2017, p. 2, [HCW0000177–181] (emphasis added).

[240] "Nuplazid 3Q beat and raise; Launch Remains the Focus," *Goldman Sachs,* November 8, 2017, p. 3, [GS-000127–33] (emphasis added).

[241] "Nuplazid sales beat expectations; guidance raised," *Bank of America Merrill Lynch,* November 7, 2017, p. 1, [BOFAS-ACAD-000107–15] (emphasis added).

[242] Supplement to *The Lancet Neurology Article,* p. 2.

**Ex. 1**

**P. 70**

patients with probable dementia. Based on management's commentary around the January inspection of the ADP Phase 2 and HARMONY data and the outcome of that inspection, as well as the timing of FDA's shift in rhetoric around the review (no review issues identified in December mid-cycle review communication), we think FDA may try to push back on the supportive nature of the Phase 2 ADP study. **Management has been clear with us, however, that observations identified on the inspection of those data (protocol deviations mostly) do not impact the overall takeaways from that study** and that these issues were disclosed to FDA ahead of the inspection via the clinical study report.[243]

123.    In sum, the -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance for most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints identified in the Complaint was already publicly known prior to the March Deficiency Letter.

C.    **Stock Price Changes Associated with the March Deficiency Letter and the April CRL Are Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding -019 Study's Designation of a Primary Efficacy Outcome at Six Weeks, the Lack of Statistical Significance of Most of the Secondary Endpoints and Subgroup Analyses, Patient Heterogeneity, Single Center, and No Type I Error Control of Secondary Endpoints**

124.    As discussed earlier, according to my event study, the residual returns following the March Deficiency Letter and the April CRL were negative and statistically significant (see Exhibit 2).  However, the stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints.  This is because this information was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

---

[243] "FDA Expert Feedback Call MONDAY (3/15) at 12PM ET with Former FDA Reviewer Dr. Paul Andreason on Recent DRP Filing Update," *Citi*, March 12, 2021, p. 1, [CITI_0000244–53] (emphasis added).

Ex. 1
P. 71

125.     Consistent with this, in my review of analyst reports that immediately followed the March Deficiency Letter and the April CRL,[244] I found no analyst report that claimed that the -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints identified in the Complaint were not previously disclosed publicly.

**VIII.   A Stock Price Increase at the Start of the Proposed Class Period Is Not Evidence of the Price Impact of the Alleged Misrepresentations Regarding the FDA Agreement**

126.     As discussed above, Plaintiffs allege that that "[c]ontrary to Defendants' claim that the FDA and Acadia agreed to the pivotal HARMONY Study's design, targeting a broad DRP patient population analyzed as a single group, during the end of Acadia's Phase II meeting (after the -019 Study), no such agreement actually existed."[245]  Further, Plaintiffs allege that partially due to Defendants' alleged misrepresentation regarding the agreement with the FDA, Acadia's stock price increased by more than 63% on September 9, 2019, the first day of the Proposed Class Period.[246, 247]  However, as I discuss in this section, information regarding Acadia's agreement with the FDA regarding the design of the HARMONY Study was publicly known prior to the Proposed Class Period.  Thus, in an efficient market, this information would have already been incorporated in Acadia's stock price prior to the Proposed Class Period, and any repetition of that information could not have caused Acadia's stock price to increase on September 9, 2019.[248]

---

[244] Specifically, I reviewed 30 analyst reports dated from March 8, 2021 through March 15, 2021, and 28 analyst reports dated from April 5, 2021 through April 12, 2021.

[245] Complaint, ¶ 92.

[246] Complaint, ¶¶5–6.

[247] My event study analysis shows that Acadia's residual stock price movement on September 9, 2019 was 64.73% and was statistically significant (see Exhibit 2).  I note that according to Professor Feinstein's event study analysis, Acadia's residual stock price movement on September 9, 2019 was 49.77% or 49.96%, and was statistically significant.  *See* Feinstein Report, Exhibit-12, pp. 148–156 and Exhibit-13, pp. 157–165.

[248] I note that Professor Feinstein testified that "the tests that [he] conducted would indicate that [Acadia stock] was trading in efficient market" if the Proposed Class period started one trading day earlier. (Feinstein Deposition, 119:1-7)  He also testified that "Extrapolating, I mean, I have no reason to believe that it wouldn't be efficient over a period [in 2019] prior to the class period." Feinstein Deposition, 119:24–120:12.

127.    In May 2017, Acadia announced its upcoming End-of-Phase II meeting with the FDA in mid-year 2017 and that it would propose a plan for the Phase III (HARMONY Study).[249]  On an earnings call on August 8, 2017, Acadia disclosed that it had completed the End-of-Phase II meeting with the FDA and that Acadia planned "to commence the Phase III program in the next couple of months."[250]

128.    Subsequently, in a press release dated October 4, 2017, the Company stated:

> "**We are pleased the FDA has agreed to an efficient development path for pimavanserin in this broad indication and granted Breakthrough Therapy Designation in recognition of this serious unmet need**, … The initiation of the pivotal study in dementia-related psychosis, referred to as HARMONY, follows an End-of-Phase II Meeting and agreement with the FDA on the clinical development plan and the design of the Phase III study."[251]

129.    During a conference call held on October 4, 2017, Defendant Davis stated the following about the agreement with the FDA regarding the design of the HARMONY Study:

> **The DRP indication of the HARMONY study design are results of the end-of-phase II meeting we held with the FDA around midyear.** We went into the end of Phase II meeting with a plan we felt would provide the best results for patients, that is a plan which would enable us to reach the broadest number of patients as soon as possible, and **we came out of that meeting with exactly the plan we went in with.**
>
> […]
>
> Against this backdrop, we propose to study pimavanserin in a single DRP study with key subtypes represented. Having established supportive evidence of efficacy in acute studies -019 and -020, we also propose that the DRP study be designed as a relapse prevention study.

---

[249] "Q1 2017 Acadia Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters,* May 9, 2017, p. 6. ("We are preparing for the FDA meeting. It will happen midyear, so it did not happen yet. And in regard -- obviously, we have a very good idea what we will be proposing to FDA in terms of the Phase III trial, based on our learnings from the successful ADP Phase II trial as well as other considerations in terms of planning for the pivotal program. But at this point, we are not yet discussing this until we actually have the interaction and receive the feedback and have the opportunity to better understand what the final path for the Phase III development will be.").

[250] Acadia August 8, 2017 Earnings Call, p. 3.

[251] Acadia October 4, 2017 Press Release, pp. 1–2 (emphasis added).

[…]

As I've stated, **we were pleased to come out of that meeting with the plan we went in with. There was alignment on the overall clinical development plan and the design of the proposed Phase III study**.[252]

130. During the same conference call on October 4, 2017, Defendant Stankovic stated:

**The FDA has agreed** that dementias do not need to be [theologically] [sic] related in order to effectively treat the common symptom of psychosis.

[…]

We'll be stratifying by groups of dementia but just certain groups of dementia. But I do want to point out that **in our discussions and agreement with the FDA, there was no prespecified proportion of different subtypes of dementia that we have to reach.**[253]

131. Further, on January 9, 2018, a J.P. Morgan Healthcare Conference, Defendant Stankovic noted:

Typically, antipsychotics are approved by showing an acute response over 4 to 6 weeks. You get a label that will allow you to dose the drug indefinitely. But the FDA always requires you to come back after the approval and show durability of response that is usually done in a relapse prevention study. We went to FDA and said, we want to go directly to a relapse-prevention study. We think we've already established acute efficacy in our Parkinson's study and in our Alzheimer's study. And now for this broader indication that includes them and some other types of dementia, **we can think we can go right to a relapse-prevention study and the FDA agreed. They also agreed that with robust positive results of that study, that can serve as the basis of a sNDA application.**

[…]

**We went to FDA and said, "Look, we think we have enough acute data from the 2 studies we've done in Parkinson's and Alzheimer's to go directly to this," they agreed.** And so, as a consequence, we've gone to this relapse

---

[252] Acadia October 4, 2017 Conference Call, p. 3. (emphasis added).
[253] Acadia October 4, 2017 Conference Call, pp. 5, 8  (emphasis added).

prevention study which we think gives us a very, very attractive path forward from a regulatory perspective."[254]

132.   At the 2019 J.P. Morgan Healthcare Conference, Defendant Davis noted:

Following the – these two studies, **we had an end-of-phase 2 meeting with FDA and agreed on our Phase 3 plan**, and it's represented here on this slide. We're running a relapse prevention study. It's a single study. **We have agreement with the FDA that with robust results from this single study,** that can serve as the basis for an NDA submission -- sNDA submission, excuse me.[255]

133.   Subsequently, on an earnings call on February 26, 2019, the Company stated:

As highlighted on Slide 17, our program in dementia-related psychosis is leveraging the benefits we observed in 2 previous studies: our PDP          pivotal study as well as our Phase II study in Alzheimer's disease psychosis. **Following these 2 studies, we had an end-of-Phase-II meeting with the FDA and agreed on our Phase III plan**, and it's represented on the next slide. As a reminder, this development program also received Breakthrough Therapy Designation from FDA.

**Our Phase III HARMONY study is a relapse prevention study. We have agreement with the FDA that robust results from this single study can serve as the basis for an sNDA submission.** We anticipate final results of this study in 2020 with an interim read in the second half of this year.[256]

134.   Further, on earnings calls on May 1, 2019 and July 31, 2019, the Company reiterated that it has an "agreement with the FDA that robust results with HARMONY can serve as a basis for a supplemental NDA submission."[257]

---

[254] "ACADIA Pharmaceuticals Inc. at JPMorgan Healthcare Conference – Edited Transcript," *Thomson Reuters*, January 9, 2018, pp. 5, 9 (emphasis added).

[255] "ACADIA Pharmaceuticals Inc. at JPMorgan Global Healthcare Conference – Edited Transcript," *Thomson Reuters*, January 9, 2019, p. 5 (emphasis added).

[256] "Q4 2018 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, February 26, 2019, p. 5 (emphasis added).

[257] "Q1 2019 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, May 1, 2019, p. 4 (emphasis added).  See also, "Q2 2019 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript, *Thomson Reuters*," July 31, 2019, p. 4 (emphasis added).

135.    Prior to the Proposed Class Period, the Company also discussed the HARMONY Study design and the agreement with the FDA in its 10-K filings.  For example, in its 2017 10-K filed February 27, 2018, the Company noted:

> **Following our End-of-Phase 2 Meeting with the FDA and agreement with the agency on our clinical development plan, we initiated our Phase 3 HARMONY relapse prevention study in October 2017, which allows us to evaluate pimavanserin for a broader indication than AD Psychosis alone.** More specifically, HARMONY will evaluate pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis, which includes psychosis in patients with Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia, and frontotemporal dementia. Furthermore, in October 2017, the FDA granted Breakthrough Therapy Designation to pimavanserin for dementia-related psychosis.[258]

136.    Moreover, analyst commentary further demonstrates that the Company's statements on its agreement with the FDA regarding the HARMONY Study design were publicly known prior to the Proposed Class Period.  For example:

> **H.C. Wainwright & Co., August 9, 2017:**  "The company also noted that it held its end of Phase 2 meeting with the FDA, which resulting in largely the same clinical plan that they had entered the meeting with.  **We are encouraged by this update, as it likely means a clearer path to registration and likely a quicker commencement of the pimavanserin Phase 3 program (set to occur in the next couple months)."**[259]

> **J.P. Morgan, October 4, 2017:**  "This afternoon, ACAD announced that it received breakthrough therapy designation (BTD) for pimavanserin (Nuplazid) in the broad indication of 'dementia related psychosis' along with plans to initiate a Phase 3 study (HARMONY) across a variety of disease subtypes. The BTD follows an EOP2 meeting with the FDA based on data generated from both the Phase 2 -019 study Alzheimer's disease psychosis and the Phase 3-020 study in Parkinson's disease psychosis (for which Nuplazid is of course approved). … **Management does not appear concerned by the broad patient population. ACAD maintains that despite the differences in the underlying pathophysiology, the emergent psychosis manifests — and can be dealt with**

---

[258] FY2017 10-K, pp. 1–2 (emphasis added); See also, FY2018 10-K, p. 1.

[259] "Underlying Marketing Dynamics Give Us Confidence Going Forward; Reit Buy and $60 PT," *H.C. Wainwright & Co.*, August 9, 2017, p. 1, [HCW0000149–154] (emphasis added).

**— in a materially similar fashion. It appears that the FDA agrees, as evidenced by the BTD."**[260]

**J.P. Morgan, October 9, 2017**:  "Given that the company has already established the activity of Nuplazid (pimavanserin) in the acute setting, the **FDA signed off on a relapse prevention study** for registration purposes as opposed to post approval. … **Management cited several reasons for the decision (and agreement with FDA) to pursue a DRP indication**, including 1) when looking across all psychotic symptoms, there are much more similarities than differences across disease subtypes; 2) there's greater observation and understanding that all psychotic symptoms are treated in much the same way; and 3) pimavanserin has demonstrated clear efficacy in both PDP and ADP.[261]

**Goldman Sachs, August 1, 2019**:  "ACAD noted **agreement with the FDA for HARMONY** to serve as the basis for an sNDA submission."[262]

**Stifel, August 1, 2019**:  "Final HARMONY readout in DRP refined to 2H20 (from 2020), but as the interim analysis remains on track for 2H19, mgmt **reaffirmed FDA agreement** that robust results can serve as the basis for a supplemental NDA submission."[263]

137.    In sum, the stock price increase at the start of the Proposed Class Period is not evidence of the price impact of the alleged misrepresentations regarding the FDA agreement.  This is because the alleged misrepresentations regarding the agreement with the FDA for the HARMONY Study design were publicly known as early as 2017, prior to the beginning of the Proposed Class Period.  In an efficient market, repetition of this information could not have caused Acadia's stock price to increase on the first day of the Proposed Class Period.   Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.

---

[260] "ACAD Receives BTD in Dementia Related Psychosis; Starting Phase 3 Trial in a Broad Population - ALERT," *J.P. Morgan*, October 4, 2017, p. 1, [JPMC-00000155–159] (emphasis added).

[261] "Highlights from Our Management Conference Call," *J.P. Morgan*, October 9, 2017, p. 1, [JPMC-00000160–166] (emphasis added).

[262] "2Q Nuplazid beat and raise; DRP interim next," *Godman Sachs*, August 1, 2019, p. 2, [GS-000015–21] (emphasis added).

[263] "2Q19 Recap: Great Quarter for Pim, Guidance Increased; DRP Interim and Schizo Readouts Next," *Stifel*, August 1, 2019, p. 1, [STIFEL_ACADIA_0000190–0000196] (emphasis removed).

138.    Consistent with this, in my review of analyst reports that immediately followed the March Deficiency Letter and the April CRL,[264] I found no analyst report that stated that the feedback from the FDA in March and April 2021 showed that there was no agreement with the FDA.  One analyst that seemed more negative than others stated:

> Based on the CRL, we believe ACAD completely failed to appreciate the FDA's advice at the end of the Phase 2 meeting, which clearly stated that a single well-controlled study must be very persuasive, offer statistical significance with a very small probability of Type I error, and that it should be clinically meaningful. In effect, failure to fully appreciate a prospective worst-case scenario following the EOP2 meeting has resulted in just that for DRP advancement, in our view. Based on the emerging details since the last March update (our note here), we believe ACAD clearly failed in satisfying all three of these requirements. Apart from the HARMONY trial being internally inconsistent, the supportive data from the AD trial based on our analysis below was weak enough not to offer clinically meaningful data. We believe the HARMONY trial and the AD trial in retrospect were anything but persuasive. [265]

## IX.    Professor Feinstein Has Not Presented a Damages Methodology That Can Measure Damages Associated with Materialization of Allegedly Understated Risk

139.    Professor Feinstein opines that "Section 10(b) damages in this matter can be computed for all Class members using a common methodology that is consistent with Lead Plaintiffs' theory of liability" and that "the out-of-pocket damages model, which is used in virtually all Section 10(b) class action securities cases, is appropriate and applicable here."[266]  I understand that per-share damages under Section 10(b) are determined using an out-of-pocket damages measure—which is equal to inflation at purchase minus inflation at sale—capped by the amount of losses caused by the alleged misrepresentations (as opposed to price declines caused by other factors) and the statutory limitations in the Private Securities Litigation Reform Act

---

[264] Specifically, I reviewed 30 analyst reports dated from March 8, 2021 through March 15, 2021, and 28 analyst reports dated from April 5, 2021 through April 12, 2021.

[265] "CRL Debacle Seemingly Pushes DRP Progression Years Into Future; PT to $18." *H. C. Wainwright & Co*, April 7, 2021, p. 1, [HCW0000035–41].

[266] Feinstein Report, ¶ 21.

("PSLRA").[267]  Inflation on a particular day is defined as the difference between the actual share price on that day and the hypothetical share price that would have prevailed absent the alleged misrepresentations (the "true value").

140.    I further understand that Plaintiffs must establish the existence of a methodology for calculating class-wide damages that is consistent with the specific allegations in the case.  A damages model should have the ability to calculate inflation stemming from the alleged misrepresentations, and not from any other causes.  As discussed above, the March Deficiency Letter and April CRL correspond to regulatory updates about the sNDA.  Specifically, in March 2021, the Company announced that it had received a notification from the FDA that unspecified deficiencies in the sNDA precluded discussion of labeling and post-marketing requirements.  In April 2021, the Company announced that it had received a CRL from the FDA.  Further, in the MTD order, the Court noted that "Defendants actions plausibly demonstrate that they misled investors into overestimating the likelihood of approval, not that Defendants knew from the start that the sNDA would not be approved."[268]  Thus, according to the Court, Plaintiffs allege that the market underestimated the likelihood that the FDA may identify deficiencies or may not approve the sNDA as compared to the true risk that would have been known absent the alleged misrepresentations.  In other words, I understand Plaintiffs allege that the risk that the FDA may identify deficiencies or may not approve the sNDA was understated.

141.    Professor Feinstein has not articulated a damages methodology that could account for disclosures that reflect the materialization of an allegedly understated risk.  As I discuss in this section, Professor Feinstein's proposed approach to estimate damages relies on residual price declines following the March Deficiency Letter and the April CRL to estimate inflation during the Proposed Class Period.  However, when the alleged disclosure represents the materialization

---

[267] 15 U.S.C. § 78u-4 at (e)(1) ("Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.").

[268] MTD Order, p. 24. I note that Professor Feinstein testified, "The complaint alleges that the company was well aware of deficiencies in a test that combined various cohorts of indications, and the complaint alleges that the company never let on to the investors that they were aware of these deficiencies, and that as a result the assessed likelihood of success or failure by the market was different from the assessed likelihood of success or failure from the company." (Feinstein Deposition, 144:5–14).

of an understated risk, the residual price declines will overestimate inflation because they overstate the price decline that would have occurred had the true degree of the understated risk been disclosed earlier. Further, if as Plaintiffs allege, the market underestimated the risk that the FDA may identify deficiencies or may not approve the sNDA due to the alleged misrepresentations, then to reliably estimate inflation, an expert would need to assess (i) the true risk (probability) over time, and (ii) the degree to which the risk was known to market participants. However, Professor Feinstein has not proposed any methodology that could measure the degree to which the risk that the FDA may identify deficiencies or may not approve the sNDA was allegedly understated (if at all). An event study, such as the one proposed by Professor Feinstein, does not provide an approach to reliably estimate over time the "true" risk (if it was concealed), or the degree to which the risk was underestimated by the market over time. Accordingly, Professor Feinstein fails to show that the generic methodology he provides can address the specific allegations in this matter.

### A. Summary of Professor Feinstein's Damages Approach

142. Professor Feinstein proposes the following general steps for estimating damages.

   a. First, Professor Feinstein states that "out-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale, or if held, at the end of the Class Period;"[269]

   b. Second, Professor Feinstein notes that "valuation tools, which would include event study analysis," would be "used to establish if the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of Acadia stock to fall;"[270]

   c. Third, Professor Feinstein states that "[c]onstruction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure back to the start of

---

[269] Feinstein Report, ¶ 164.
[270] Feinstein Report, ¶ 169.

the Class Period, accounting for alleged fraud-related residual price declines as they occurred;"[271]

d. Fourth, Professor Feinstein asserts that "the full array of generally accepted and widely used valuation tools can be applied" and would enable "computation of the artificial inflation ribbon even in cases where there is confounding information, changes in the concealed information, and changes in the value of the concealed information, among other potential complexities."[272]

143.     Professor Feinstein appears to be proposing to calculate inflation using the residual price declines on the dates of alleged corrective disclosures and then back-casting the inflation to the start of the Proposed Class Period.  He appears to also recognize the need to account for confounding information and changes in inflation.  Professor Feinstein, however, is silent on how "the full array of generally accepted and widely used valuation tools" can be used to reliably estimate over time the "true" risk (if it was concealed) or the degree to which the risk was underestimated by the market over time.

### B.      The Risk That the FDA May Not Approve the sNDA Was Disclosed by the Company and Discussed by Market Participants

144.     During the Proposed Class Period and prior to the submission of the sNDA, Acadia repeatedly disclosed the risk, in its 10-Q and 10-K filings, that the FDA may not approve the sNDA.  For example:

> **FY 2019 10-K (filed February 27, 2020):**  "To establish a new product candidate's safety and efficacy, the FDA requires companies seeking approval to market a drug product to submit extensive preclinical and clinical data, along with other information, for each indication for which the product will be labeled. The data and information are submitted to the FDA in the form of a New Drug Application (NDA), which must be accompanied by payment of a significant user fee unless a waiver or exemption applies. Generating the required data and information for an NDA takes many years and requires the expenditure of substantial resources. **Information generated in this process is susceptible to**

---

[271] Feinstein Report, ¶ 169.
[272] Feinstein Report, ¶ 169.

**varying interpretations that could delay, limit or prevent regulatory approval at any stage of the process. The failure to demonstrate adequately the quality, safety and efficacy of a product candidate under development would delay or prevent regulatory approval of the product candidate**… Moreover, the outcome of the review, even if generally favorable, may not be an actual approval but **a 'complete response letter' that describes additional work that must be done before the NDA can be approved.** Before approving an NDA, the FDA can choose to inspect the facilities at which the product is manufactured and will not approve the product unless the manufacturing facility complies with GMPs. The FDA may also audit sites at which clinical trials have been conducted to determine compliance with GCPs and data integrity. The FDA's review of an NDA may also involve review and recommendations by an independent FDA advisory committee, particularly for novel indications. The FDA is not bound by the recommendation of an advisory committee.… In addition, **delays or rejections may be encountered based upon changes in regulatory policy, regulations or statutes governing product approval during the period of product development and regulatory agency review.**"[273]

[…]

"We plan to submit a sNDA to the FDA for DRP in the summer of 2020 … In particular, even if we submit a sNDA for pimavanserin in dementia-related psychosis, the sNDA will be subject to FDA review to determine whether [it] is adequate to support approval of pimavanserin for [DRP]. **Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of [DRP].**"[274]

**Q1 2020 10-Q (filed May 8, 2020):** "We plan to submit a sNDA to the FDA for the treatment of dementia-related psychosis in the summer of 2020. We initiated a Phase 3 program for pimavanserin as an adjunctive treatment for major depressive disorder in April 2019 and we initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. We are currently making preparations to initiate the Phase 3 ADVANCE-2 study of pimavanserin for the treatment of the negative symptoms of schizophrenia in the second half of 2020. There is no guarantee that any of these ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, even if we submit a sNDA for pimavanserin in dementia-related psychosis, the sNDA will be subject to FDA review to determine whether the sNDA is adequate to support

---

[273] FY2019 10-K, p. 10 (emphasis added).
[274] FY2019 10-K, p. 17 (emphasis added).

approval of pimavanserin for that indication. **Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.**"[275]

145.    Further, in its 10-K and 10-Q filings after the submission of the sNDA, Acadia continued to discuss the risk that the FDA may not approve the sNDA.  For example:

> **Q2 2020 10-Q (filed August 6, 2020):**  "In particular, our sNDA for pimavanserin in dementia-related psychosis is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. **The FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.**"[276]

> **Q3 2020 10-Q (filed November 4, 2020):**  In particular, our sNDA for pimavanserin in dementia-related psychosis is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. **The FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.**"[277]

146.    Securities analysts also discussed the risk that the FDA may not approve the sNDA for DRP prior to the March Deficiency Letter.  For example:

> **Stifel, September 2, 2019:**  "If positive, can a single study lead to pimavanserin approval in DRP? We have no doubt that ACAD has had favorable interactions with the agency (BTD corroborates this); **that said, we've been unable to find precedent in psychiatry for a drug approval based on a single ph3 relapse-prevention/maintenance trial**. In turn, if DRP is successful, we'd expect FDA to hold an advisory committee to discuss the data, as well as the strength of supportive results in ADP/PDP. For these reasons, our probability-adjustment in DRP considers both clinical and regulatory variables. … on balance, these data could be interpreted positively or negatively for pimavanserin: (1) on the positive

---

[275] Acadia Pharmaceutical Inc., Form 10-Q for Quarterly Period Ended March 31, 2020, filed May 8, 2020, p. 25 (emphasis added).

[276] Acadia Pharmaceutical Inc., Form 10-Q for Quarterly Period Ended June 30, 2020, filed August 6, 2020, p. 26 (emphasis added).

[277] Acadia Pharmaceutical Inc., Form 10-Q for Quarter ended September 30, 2020, filed November 4, 2020, p. 28 (emphasis added).

side, a maintenance trial was enough to tease out a stat. sig effect for lamotrigine twice but (2) **on the negative side, it's unclear of the effect size that was elucidated in these examples would be enough for a. single study approval**, which is of course the hope if the DRP trial succeeds … But one thing to consider that we don't believe is currently part of the DRP investment discussion - as alluded to above, we we're not 100% sure that this single study pimavanserin could support approval on its own. It will certainly depend on the strength of the data, and we'd expect FDA to convene an advisory committee."[278]

**Stifel, September 9, 2019:** "Our odds of regulatory approval are high, though they do reflect a small degree of uncertainty around how the FDA will treat a single relapse-prevention pivotal for approval, given lack of good precedent."[279]

**Stifel, September 13, 2019:** "On the regulatory side, the clinicians offered both bullish and bearish insights as Acadia prepares to approach the FDA in 2020. Given the degree of unmet need, both physicians agreed that the bar is likely lower for pima's approval in DRP (all else equal) relative to other psychiatric indications. Dr Cantillon, while for the most part optimistic, did express that the FDA is very likely to hold an adcomm, which he characterized as **to a certain degree unpredictable**. Dr. Tarazi highlighted the open question around the implications for a relapse-prevention study as the sole ph3; he pointed out that this study design is generally utilized to verify maintenance of effect, and **he was correspondingly uncertain as to whether or not FDA will view the trial as supportive of a broad efficacy claim that includes acute treatment**."[280]

**Goldman Sachs, October 18, 2019:** "Outside of EPS, the focus has shifted to additional indications for Nuplazid on the back of the recent positive interim read for the Ph3 HARMONY study in dementia related psychosis (DRP). While management has guided to commencing the trial stopping protocol with full data at the upcoming Clinical Trials in Alzheimer's Disease (CTAD; December 4) meeting, we note **some investor debate as to whether the randomized withdrawal study (with responder enrichment) will be sufficient for FDA sNDA submission**."[281]

**Stifel, October 30, 2019:** "While we think DRP approval is more likely than not, one outstanding question that remains in our mind -potentially to be discussed at a

---

[278] "Deep Dive on DRP; The Temendous Trail vs The Weak Antipsychotic," *Stifel,* September 2, 2019, p 1, 8, 12, [STIFEL_ACADIA_0000367–389] (emphasis added and removed).

[279] "Raising Our ACAD Target Price on Surprisingly Positive Interim DRP Data," *Stifel,* September 9, 2019, p. 1, [STIFEL_ACADIA_0000492–500].

[280] "KOL Call Recap: A Bull/Bearish on Primavanserin, Though Both Agree on the Size and Realness of the DRP Oppty," *Stifel,* September 13, 2019, p. 1, [STIFEL_ACADIA_0000065–69] (emphasis added and removed).

[281] "3Q EPS preview; 4Q catalysts in abundance," *Goldman Sachs,* October 18, 2019, p. 7, [GS-000465–507] (emphasis added).

**Ex. 1
P. 84**

panel - it how much weight FDA will assign to the prior data in ADP (the most prevalent subset of DRP), where the study met its primary endpoint at 6 weeks (p=0,04) but failed to show meaningful drug/placebo separation at weeks 9 or 12.”[282]

**Guggenheim, December 16, 2019:**  “The FDA may require two trials in order to grant Nuplazid approval in DRP, regardless of the improvement Nuplazid generated in DRP in HARMONY.”[283]

**Goldman Sachs, March 31, 2020:**  “While we acknowledge that a component of the bear thesis suggests inability to file on the available data (investor pushback against the use of relapse prevention trials highlighting the enriched population of patients despite March 2019 FDA guidelines for enrichment strategies to determine effectiveness of drugs) or approval limited to only the Alzheimer’s disease psychosis indication, in our view, the data from the Ph3 HARMONY study support use across the range of dementia subtypes.”[284]

**Stifel, July 6, 2020:**  “From a regulatory perspective, the pimavanserin DRP sNDA package is admittedly unique, and this does raise some legitimate questions. There are two key questions with pimavanserin, one of efficacy and one of safety. On the efficacy side, thinking through the question requires some context regarding different types of evidence in support of psychiatric medications. FDA generally separates trials into two buckets: acute and maintenance (relapse-prevention). The Acadia ph2 ADP trial was your typical acute study: placebo controlled, all patients who were initially randomized are included in the intent-to-treat analysis for the primary endpoint at week 6, with additional follow up to week 12 (mainly for safety but efficacy data were captured). Conversely, the DRP phi trial was a maintenance study, wherein patients who met pre-specified response criteria were then re-randomized to either pimavanserin or placebo, and various measures regarding maintenance of response in these patients already doing well on drug (time-to-relapse, relapse rate, discontinuation rate, etc) were examined. Generally speaking maintenance trials are only conducted after clear evidence of acute benefit is established; in fact, maintenance studies are often done as post-marketing trials for antipsychotics or antidepressants**.** In the case of pimavanserin, the ADP ph2 study met its primary endpoint (p=0.04, so significant albeit not a home run), but missed statistical significance at multiple follow-up time points. Subsequently, ACAD’s maintenance DRP trial produced a very strong result, showing

---

[282] “3Q19 Recap: Solid Beat and Raise With Tweaked Expense guidance; Primary Focus Remains on DRP & CTAD,” *Stifel,* October 30, 2019, p. 1, [STIFEL_ACADIA_0000430–436].

[283] “ACAD - A Psychosis Success Story; Initiate at BUY and $60 PT,” *Guggenheim*, December 16, 2019, p. 10, [GUG000001–48].

[284] “More legs to Nuplazid in 2020 and beyond; Upgrade to Buy,” *Goldman Sachs*, March 31, 2020, p. 5, [GS-000109–126] (emphasis removed).

**Ex. 1**
**P. 85**

maintenance of benefit in patients who do meet pre-specified response criteria. **Thus, the totality of the data here beg the question: does ACAD have strong enough evidence of acute clinical benefit to support registration in DRP?** How does FDA think about different types of evidence in neuropsychiatry?"[285]

147.    In addition, some analysts also discussed the implications of the FDA not approving the sNDA, i.e., that it would lead to an extremely large drop in the stock price.  For example:

> **Oppenheimer, February 23, 2021:**  "Our scenario analysis supports our neutral view of ACAD ahead of the FDA's decision on pimavanserin for DRP by the 4/3/21 PDUFA date. We estimate a 90% probability of +5% upside upon approval and a 10% probability of -50% downside upon a CRL, equating to a probability-adjusted expected move of 0%, based on our model assumptions and market-implied expected volatility ((Exhibit 1). The sNDA filing for DRP was accepted by FDA with standard review and without a planned AdComm, contrary to investor expectations of priority review and AdComm based on BTD and the novel indication. ACAD investors may consider trading strategies to hedge against the potential near-term downside risk."[286]

148.    Thus, prior to the March Deficiency Letter, the market was aware of the risk that the FDA may not approve the sNDA.  After the March Deficiency Letter, analysts continued to comment on the risk that the FDA may not approve the sNDA for DRP and how that would affect the stock price. For example:

> **Bank of America, March 9, 2021**:  "While we see significant need for a novel therapy in DRP and our doctor checks indicate desire to prescribe the drug, the surprise update introduces overhangs that include: 1) whether the FDA's concerns in part revolve around efficacy (we think safety is less of an issue given first PDP indication has been on the market for nearly five years); 2) whether an additional study will be needed for approval; 3) when we should expect clarity on next steps. Given DRP is the biggest contributor to our PO for ACAD shares, we think it is prudent to lower our rating to Neutral (from Buy) and adjust our expectations as

---

[285] "Acadia Pharmaceuticals, Inc. - Upgrading to Buy: KOL Feedback on DRP Too Good to Overlook; MDD An Undervalued Option With Data coming Shortly," *Stifel,* July 6, 2020, pp. 4-5, [STIFEL_ACADIA_0000164–176] (emphasis added and removed).

[286] "A Tempered View of DRP PDUFA Scenarios," *Oppenheimer*, February 23, 2021, p. 1, [OPCO_00185–193].

**Ex. 1 P. 86**

we await visibility. In our DCF-based model, we adjust our assumptions to now assume a Complete Response Letter (CRL)."[287]

**Oppenheimer, March 9, 2021:** "FDA notified ACAD that it identified deficiencies in the DRP sNDA for pimavanserin that preclude discussion of labeling and post-marketing requirements. Although the exact deficiencies are not yet specified, FDA stated this notification does not reflect its final decision on the sNDA, and the originally scheduled PDUFA date (4/3/2021) remains unchanged. We expect ACAD to receive a CRL, and consequently adjust our DRP sales forecast for launch in 2022. … We believe the post-market ACAD share reaction is consistent with our scenario analysis. … Our scenario analysis for the DRP review process described the possibility of a negative outcome, and we believe that the post-market ACAD share reaction is consistent with our estimates. We lower our POS estimate for DRP to 50% from 90%, driving our new $28 price target from $42 prior. We maintain Perform (Exhibits 7-8)."[288]

**Raymond James, March 9, 2021**: "We believe ACAD management was as transparent as possible in tonight's update, but given the lack of feedback from the agency to their multiple inquiries (since being notified on March 3), it unfortunately looks like a CRL is now the most likely outcome for Nuplazid by its April 3 PDUFA date. … we remain hopeful that the deficiencies are minor and will only result in an approval delay. Still, it is possible that the deficiency is something more substantial (requiring another study). … but given the uncertainty, we are lowering our PoS to 25% (was 90%) and are downgrading from Strong Buy."[289]

149.    Hence, the risk that the FDA may not approve the sNDA was disclosed by the Company and widely discussed by securities analysts throughout the Proposed Class Period. Professor Feinstein does not discuss how his damages approach would account for the public knowledge of the risk when modeling the degree to which the risk was allegedly understated (if at all).

---

[287] "FDA surprisingly delays start of label discussion for DRP; Lower to Neutral," *Bank of America Merrill Lynch,* March 9, 2021, p. 1, [BOFAS-ACAD-000400–407].

[288] "Challenging Path to DRP Lays Groundwork for Followers," *Oppenheimer*, March 9, 2021, p. 1, [OPCO_00206–215] (emphasis removed).

[289] "Downgrading to Outperform; Did Not See This One Coming – DRP Seems To Be Headed For A CRL," *Raymond James*, March 9, 2021, p. 1, [RJA - 000075–86].

### C.      Stock Price Declines Associated with Materialization of Risk Overstate Inflation

150.      Professor Feinstein's proposed approach to estimate damages relies on residual price declines on the alleged corrective disclosure dates.  However, when the alleged corrective disclosure represents a materialization of an understated risk, the residual price decline will overestimate the price decline that would have occurred had the true degree of the understated risk been disclosed earlier.  In other words, the residual stock price decline upon materialization of the risk will overstate inflation.  A damages methodology to address the materialization of risk therefore needs to include a methodology for separating the impact of the allegedly understated risk (if any) from the impact of the materialization of the risk.

151.      I illustrate this point using a simple hypothetical example. Assume that investors believe, based on a company's public disclosures, that there is a 20% chance of an adverse regulatory action against a company that will result in a $1 million fine.  Assume further that the company has fully disclosed the risk of regulatory actions and has not concealed any other information about its business practices.  Prior to learning the outcome, the company's market value would reflect the expected loss of $200,000 from the regulatory action (20% chance of a $1 million fine).  If the regulator then announced its investigation and the resulting fine, the company's stock price would decline to incorporate the additional $800,000 loss corresponding to the difference between the realized loss of $1 million due to the fine and the previously expected loss of $200,000.  In this example, the company disclosed the risk and the shareholders were informed of it.  The risk materialized, and the shareholders incurred a loss of $800,000.  However, the observed loss is completely uninformative about damages to shareholders stemming from any alleged misrepresentations.  In fact, in this example, there were no misrepresentations, no damages, and nevertheless a loss of $800,000 occurred.  Suppose now that instead of fully disclosing the risk of the regulatory action, the company understated the risk by representing it to be only 10% and the market believed the company.  Under this scenario, the company's market value would reflect the expected loss of only $100,000 from the regulatory action prior to the risk materializing.  Once the investigation is announced, the company's stock price would decline to incorporate not an $800,000 loss, but a $900,000 additional loss.  However, only the incremental loss of $100,000 represents prior inflation due to understatement

of the risk. Importantly, price inflation cannot be measured from the decline in the stock price when the risk materializes and becomes a certainty (the $900,000 decline), because the decline reflects both the price reaction to the materialization of the disclosed portion of the risk as well as the portion of risk that was understated. Further, any damages approach that uses only the decline in the stock price to measure the loss to shareholders ($900,000 in this example) would incorrectly conclude that damages were about nine times greater in this hypothetical example than the actual damages suffered by shareholders ($900,000 vs. $100,000).

152. Another way to understand this is with an example of a random experiment. Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble. It is important to note that this example can be adapted to show that the value implications of a misstatement are considerably overstated when using the decline in value resulting from the materialization of the risk even if the company

had stated that there were no red marbles,[290] or if the company also misrepresented the amount lost in the event of drawing a red marble.[291]

> **D.      Professor Feinstein Has Not Proposed a Methodology That Could Estimate the Degree to Which Risk Was Understated**

153.    If as Plaintiffs allege, the market underestimated the risk that the FDA may identify deficiencies or may not approve the sNDA due to the alleged misrepresentations, then to reliably estimate inflation, an expert would need to assess (i) the true risk (probability) over time, and (ii) the degree to which the risk was known to market participants.  However, Professor Feinstein offers no discussion of how to assess either of these given the particularities of this matter or whether doing so would even be possible.

154.    An event study, which can assess whether the totality of new information arriving to the market over a specific event window affected the stock, does not provide a means to estimate either of these.  In other words, an event study is generally not capable of estimating the degree to which the risk was allegedly understated.  While Professor Feinstein makes a reference to other "valuation tools" he has not specified how he would use any these tools to measure damages associated with materialization of risk.  In fact, he has not established that there is a "valuation tool" capable of reliably estimating over time the "true" risk (if it was concealed), or the degree to which the risk was underestimated by the market over time, and capable of converting these estimates into a measure of inflation in Acadia's stock price.

---

[290] For example, a company announced that it was going to draw a marble from an urn of 100 marbles, of which all 100 were black and there were no red marbles.  If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect $0 expected loss from this lottery.  If the company subsequently drew a red marble, the market value would have fallen $1 million to reflect the new information.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble.  If the company had told the truth prior to the drawing, the market value would have reflected an expected loss of $20,000, only $20,000 lower than the actual market value, not the $1 million less than would be implied by looking at the reaction to the drawing of a red marble.

[291] For example, a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red, and that if it drew a red marble it would have to pay $1 million.  Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble) and it would have to pay $2 million if it drew a red marble, the share price would have fallen by $1,990,000 when the company drew a red marble.  Suppose the company had told the truth prior to the drawing, the market value would have reflected an expected loss of $40,000 (2% of $2 million), only $30,000 lower than the actual market value, not the $1,990,000 less than would be implied by looking at the reaction to the drawing of a red marble.

155.     Further, Professor Feinstein's proposed approach to estimating damages also needs to account for the possible evolution of the degree of alleged understatement of risk over time.   In fact, analyst commentary suggests that market's perceptions of risk were evolving in response to the evolving regulatory review during the Proposed Class Period.  For example, analysts expected that the sNDA would be assigned a priority review by the FDA, but learned during the Proposed Class Period that it was assigned a standard review.  Specifically, on July 20, 2020, Acadia announced that while the FDA accepted the sNDA, "[t]he FDA has assigned a standard review with a PDUFA (Prescription Drug User Fee Act) action date of April 3, 2021."[292]  The Company also announced that the FDA was not planning an Advisory Committee (AdCom) for DRP.  Following Acadia's July 20, 2020 announcement, some securities analysts commented that it was unclear why the FDA assigned a standard rather a priority review to the sNDA and at least one analyst suggested that there may be additional complexity to the review.  For example:

> **Citi, July 20, 2020**:  "While we aren't all that surprised about the failure in MDD (we assigned 60% PoS), we are surprised that FDA assigned a standard review to pimavanserin in DRP. Given breakthrough designation, we expected a priority review with an approval decision in early Dec, setting up an early 2021 launch. A standard review pushes launch back by a full quarter and we believe it is this update that is actually weighing on shares more heavily than the MDD failure. **Lack of commentary from the FDA on rationale for not granting the priority review suggests that there may be some additional complexity to the review that FDA has not voiced to mgmt., whether administrative or more substantive.**"[293]

> **J.P. Morgan, July 20, 2020:**  "On the disappointing side, ACAD announced a standard review (vs priority), which equates to a PDUFA date of April 3, 2021 (rather than year-end). … While the agency is not planning to hold an AdCom (which we view as incrementally positive), a key focus on the call was the reasoning for standard review vs priority review. On that front, it is unclear as to why the sNDA is under standard review."[294]

---

[292] Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," July 20, 2020.

[293] "MDD Study Fails, but DRP 'Delay' More Surprising, PT to $63 (-6)," *Citi*, July 20, 2020, p. 1, [CITI_0000117–27] (emphasis added).

[294] "Nuplazid Fails in MDD; DRP Review Slightly Longer Than Expected but No AdCom is a Plus," *J.P. Morgan*, July 20, 2020, p. 1, [JPMC-00000935–44].

**Oppenheimer, July 20, 2020**:  "Separately, we were surprised to learn the FDA has accepted ACAD's sNDA for pimavanserin to treat DRP with a standard review after we were told on the 4Q19 earnings call that ACAD was expecting a priority review. On the positive side, FDA is not planning an Ad Comm for DRP, which is yet another surprise, since ACAD was expecting one."[295]

156.    Consistent with this, an analyst from SVBLeerink noted in a report dated March 8, 2021 that "investors have been skeptical regarding the DRP indication ever since Acadia provided the investment community with a PDUFA date that wasn't reflective of a fast-track, high unmet need indication."[296]

157.    As another example, on January 4, 2021, an analyst from Goldman Sachs noted the risk to the sNDA given recent FDA decisions, stating:

> ACAD: Investors are looking to the upcoming expansion potential for Nuplazid in dementia-related psychosis (DRP; April 3, 2021 PDUFA), the key value driver. While we are positive into the decision, **we note some risk given a string of FDA surprise regulatory decisions in 2020** - however, given notification timeline requirements (55 business days prior), we do not expect the FDA to change its position of not holding an AdCom and management has maintained its confidence in the efficacy and safety profile of Nuplazid.[297]

158.    The discussion above suggests that the allegedly understated risk (if any) would not have been constant over time through the Proposed Class Period.  Nevertheless, Professor Feinstein has not provided a methodology that would allow him to assess whether there were changes in the degree to which the risk was allegedly understated and to account for such changes if they did occur.

159.    In short, Professor Feinstein failed to propose a damages methodology consistent with Plaintiffs' theory of liability.

---

[295] "Lack of Clarity; PT to $42," *Oppenheimer,* July 20, 2020, p. 1, [OPCO_00119–26].

[296] "Surprise Negative FDA Letter, but We Still Think DRP Can Work," SVBLeerink*,* March 8, 2021, p. 1.

[297] "Americas Healthcare: Biotechnology – Outlook for 2021: Playing offense with catalysts," *Goldman Sachs,* January 4, 2021, p. 9, [GS-000623–89] (emphasis added).

Executed this 20th Day of October, 2023

_____

Rene M. Stulz, Ph. D

Appendix A

**René M. Stulz**

Fisher College of Business
806 Fisher Hall
2100 Neil Avenue
Columbus, OH 43210-1144
Phone:  (614) 292-1970
Fax:     (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

Home Address:
3419 River Seine Street
Columbus, OH 43221
Phone: (614) 771-1110
Cell:    (614) 206-0265

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

1

Appendix A

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to 2023.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

2

Appendix A

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005; New York University Finance Department, 2022.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to 2023.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2004 (chair), 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, European Financial Management Association, Financial Management Association, Financial Management Association European Conference, FDIC Annual

3

Appendix A

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, ECGI Annual Meeting, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop, Asian Pacific Risk and Insurance Association, Institute for Private Capital Annual Research Conference.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

4

Ex. 1
P. 97

Appendix A

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

Special issue of the Journal of Applied Corporate Finance in honor of René M. Stulz.

**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives
Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence,"
Subcommittee on Capital Markets and Government Sponsored Enterprises, House of
Representatives Committee on Financial Services, 2011.

**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and
Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and
Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group,
Princeton University Press, 2010.

5

Appendix A

**PUBLISHED PAPERS**

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

Appendix A

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, 3, 247-262.

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

7

Appendix A

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

8

Appendix A

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

Appendix A

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

10

Appendix A

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

11

Appendix A

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

Appendix A

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

13

Appendix A

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

14

Appendix A

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

2017, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

15


Appendix A

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Were there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2), 927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, 2022, 77(3), 1829-1875.

"Leverage and Cash Dynamics" with Harry DeAngelo and Andrei S. Gonçalves, Review of Finance, 2022, 26(5)1101-1144.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of financial Economics, 2023, 147(1), 75-105.

"Crisis Risk and Risk Management," European Financial Management, forthcoming.

**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

16

Ex. 1
P. 109

Appendix A

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

Appendix A

"Why has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Gregory Brown.

"Who Benefits from Analyst 'Top Picks?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Why Did Small Business FinTech Lending Dry Up During the COVID-19 Crisis?" with Itzhak Ben-David and Mark Johnson.

"The Determinants of Bank Liquid Asset Holdings," with Alvaro Taboada and Mathijs A. van Dijk.

"The Unicorn Puzzle," with Daria Davydova, Rüdiger Fahlenbrach, and Leandro Sanz.

"Does Greater Public Scrutiny Hurt a Firm's Performance?" with Benjamin Bennett and Zexi Wang.


## EDITORIAL AND REFEREEING ACTIVITIES

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

18

# Appendix A

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

19

Appendix B

# Deposition and Trial Testimony of René M. Stulz
# During the Past Four Years

**Case Name:**    SSA Bonds
**Case No.:**    A.T.40346, European Commission
**Date of Testimony:**  July 2019 (Oral Hearing)

**Case Name:**    In Re Equifax, Inc. Securities Litigation
**Case No.:**    No. 17-CV-3463-TWT, United States District Court, Northern District of Georgia
**Date of Testimony:**  September 2019 (Deposition)

**Case Name:**    Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al.
**Case No.:**    No. 16-112-MN, United States District Court, District of Delaware
**Date of Testimony:**  December 2019 (Deposition), June 2021 (Deposition)

**Case Name:**    Joseph Prause v. TechnipFMC PLC et al.
**Case No.:**    No. 4:17-cv-02368, United States District Court, Southern District of Texas
**Date of Testimony:**  February 2020 (Depositions)

**Case Name:**    In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action")
**Case No.:**    MDL No. 2672-CRB (JSC), United States District Court, Northern District of California
**Date of Testimony:**  February 2020 (Deposition)

**Case Name:**    Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A.
**Case No.:**    No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York
**Date of Testimony:**  May 2020 (Deposition)

**Case Name:**    In re WeWork Litigation
**Case No.:**    No. 2020-0258-AGB, Court of Chancery, Delaware
**Date of Testimony:**  February 2021 (Deposition)

**Ex. 1**
**P. 113**

Appendix B

**Case Name:**   In re Envision Healthcare Corporation Securities Litigation
**Case No.:**   No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division
**Date of Testimony:**   May 2021 (Deposition)


**Case Name:**   In Re Navient Corporation Securities Litigation
**Case No.:**   No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey
**Date of Testimony:**   June 2021 (Deposition)


**Case Name:**   Evanston Police Pension Fund v. McKesson Corporation et al.
**Case No.:**   No. 3:18-cv-06525-CRB, United States District Court, Northern District of California
**Date of Testimony:**   July 2021 (Deposition)


**Case Name:**   In re Allergan PLC Securities Litigation
**Case No.:**   No. 18-cv-12089, United States District Court, Southern District of New York
**Date of Testimony:**   September 2021 (Deposition)


**Case Name:**   Gordon v. Vanda Pharmaceuticals Inc. et al.
**Case No.:**   No. 1:19-cv-01108-FB-LB, United States District Court, Eastern District of New York
**Date of Testimony:**   October 2021 (Deposition)


**Case Name:**   Tollen v. Geron Corporation et al
**Case No.:**   No. 3:20-cv-00547-WHA, United States District Court, Northern District of California
**Date of Testimony:**   October 2021 (Deposition)


**Case Name:**   Patrick McDermid v. Inovio Pharmaceuticals, Inc. et al.
**Case No.:**   No. 2:20-cv-01402-GJP, United States District Court, Eastern District of Pennsylvania
**Date of Testimony:**   November 2021 (Deposition)


**Case Name:**   Strathclyde Pension Fund v. Bank OZK et al.
**Case No.:**   No. 4:18-cv-00793-DPM, United States District Court, Eastern District of Arkansas
**Date of Testimony:**   December 2021 (Deposition)

**Ex. 1**
**P. 114**

Appendix B

**Case Name:**     Boston Retirement System v. Uber Technologies, Inc. et al.
**Case No.:**       No. 3:19-cv-06361-RS, United State District Court, Northern District of California
**Date of Testimony:**  February 2022 (Deposition)


**Case Name:**     Ahmad Odeh v. Immunomedics, Inc. et al.
**Case No.:**       No. 2:18-17645-MCA-ESK, United States District Court, District of New Jersey
**Date of Testimony:**  May 2022 (Deposition)


**Case Name:**     In re Qualcomm Incorporated Securities Litigation
**Case No.:**       No. 3:17-cv-00121-JAH-WVG, United States District Court, Southern District of California
**Date of Testimony:**  November 2022 (Deposition)

Appendix C

# Documents Considered List

**Academic Articles**

- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35 no. 1, 1997, pp. 13–39

- Andrei Shleifer and Robert Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52 no. 1, 1997, pp. 35–55

- Clive Ballard et al., "Pimavanserin in Alzheimer's Disease Psychosis: Efficacy in Patients with More Pronounced Psychotic Symptoms," *The Journal of Prevention of Alzheimer's Disease* 6, no. 1, 2019, pp. 27–33

- Clive Ballard et al. "Evaluation of the Safety, Tolerability, and Efficacy of Pimavanserin Versus Placebo in Patients with Alzheimer's Disease Psychosis: A Phase 2, Randomised, Placebo-Controlled, Double-Blind Study," *The Lancet Neurology* 17, 2018, pp. 213–222

- Clive Ballard et al. "Evaluation of the Safety, Tolerability, and Efficacy of Pimavanserin Versus Placebo in Patients with Alzheimer's Disease Psychosis: A Phase 2, Randomised, Placebo-Controlled, Double-Blind Study [Supplementary Appendix]," *The Lancet Neurology* 2018; 17: 213–222

- Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417

- Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617

- Eugene F. Fama and Kenneth French, "Industry Costs of Equity," *The Journal of Financial Economics* 43, no. 2, 1997, pp. 153–193

- Lon S. Schneider, "Pimavanserin for Patients with Alzheimer's Disease Psychosis," *The Lancet Neurology* 17, no. 3, 2018, pp. 194–195

- Erin Foff et al., "Late Breaking News: LB1: HARMONY Relapse-Prevention Study: Pimavanserin Significantly Prolongs Time to Relapse of Dementia-Related Psychosis," *The Journal of Prevention of Alzheimer's Disease*, Volume 6, Supplement 1, 2019, pp. S30–S31, p. S30.

- William Beaver, "Market Efficiency," *The Accounting Review* 56 no. 1, 1981, pp. 23–37

- Yong Cheol Kim and Rene M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics* 22 no. 2, 1988, pp. 189–205

Appendix C

**Analyst Reports**

- Analyst reports issued by Bank of America, available at BOFAS-ACAD-000001 through BOFAS-ACAD-000442

- Analyst reports issued by Cantor Fitzgerald, available at CANTOR000001 through CANTOR000193

- Analyst reports issued by Citi, available at CITI0000001 through CITI0000363

- Analyst reports issued by Goldman Sachs, available at GS000001 through GS000833

- Analyst reports issued by Guggenheim, available at GUG000001 through GUG000239

- Analyst reports issued by H.C. Wainwright & Co., available at HCW0000001 through HCW0000181

- Analyst reports issued by Jefferies, available at JEFF00002534 through JEFF00002922

- Analyst reports issued by JMP, available at JMP_ACADIA_0000635 through JMP_ACADIA_0000862

- Analyst reports issued by J.P. Morgan Chase, available at JPMC-00000001 through JMPC-00001406

- Analyst reports issued by Mizuho, available at MSUSA0000000001 through MSUSA0000000966

- Analyst reports issued by Morgan Stanley, available at MS_ACADIA_000001 through MS_ACADIA_000136

- Analyst reports issued by Needham & Company, available at NEEDHAM_ACADIA_-0000001 through NEEDHAM_ACADIA_-0000489

- Analyst reports issued by Oppenheimer, available at OPCO_00001 through OPCO_00307

- Analyst reports issued by Raymond James, available at RJA - 000001 through RJA - 000627

- Analyst reports issued by RBC, available at RBCCM00000001 through RBCCM00004956

- Analyst reports issued by Stifel, available at STIFEL_ACADIA_0000041 through STIFEL_ACADIA_0000583

- Analyst reports issued by TD Cowen, available at TDCowen_Acadia00000001 through TDCowen_Acadia00054162

Appendix C

- "ACAD 4Q13 Earnings: Pimavanserin Remains on Track for 2014 Filing," *Jefferies*, March 3, 2014, [JEFF00002523–33].

- "Therapeutics Monthly," *Canaccord Genuity*, September 3, 2019, [HCW0003620–762]

- "Pipeline in a Drug CNS Development Complimented by Trofinetide Pivotal Trial Initiation; Reit Buy and $60 PT," *H.C. Wainwright & Co.*, November 1, 2019, [HCW0006323–8]

- "First Take: ADVANCE Topline Win Adds Momentum to Indication Expansion Endeavour," *H.C. Wainwright & Co.*, November 26, 2019, [HCW0006320–2]

- "Therapeutics Monthly: Please Join Us for Our 'Horizons in Oncology' Conference on April 8, 2020," *Canaccord Genuity*, March 1, 2020, [HCW0004294–445]

- "Future of CNS II: Major Themes and Therapeutic Area Deep Dives in Neuroscience," *Stifel*, Spring 2020, [HCW0001196–417]

- "DRP Cleared to File This Summer; Reiterate Buy," *Bank of America Securities*, May 7, 2020, [BOFAS-ACAD-000347–54]

- "Bueller, Bueller...Bueller! Nuplazid Regulatory Update Appears Bleak but Waiting on Response from FDA," *J.P. Morgan Chase*, March 8, 2021, [JPMC00005186–91]

- "Deficiency Notice Increases Risk of CRL/DRP Delay; PT to $40," *Jefferies*, March 8, 2021, [JEFF00009573–82]

- "Pima' in DRP – Despite P3 Efficacy & No Approved Alternatives, Late Cycle Uncertainty Created by FDA," *Cantor Fitzgerald*, March 8, 2021

- "Surprise Negative FDA Letter, but We Still Think DRP Can Work," *SVBLeerink*, March 8, 2021

- "Negative Surprise from FDA on DRP sNDA Adds Uncertainty; PT Down from $61 to $40, Maintain BUY," *Canaccord Genuity*, March 9, 2021

- "Ominous FDA Feedback Forebodes CRL for Dementia-Related Psychosis sNDA," *SMBC Group*, March 9, 2021

- "Biotech: Noteworthy Weekly Rx Trends/Forecast: RBC Coverage W/E 3/5 – Wk 10 of 1Q," *RBC Capital Markets*, March 12, 2021

- "Biotech Brunch: Weekly Howerton Coverage Update (ACAD, HRMY, ZIOP, & 4Q Recaps)," *Jefferies*, March 14, 2021

- "[Video] Biotech Brunch: Herbaceous Persian Frittata: IBD, LABP, PTGX, GMTX, ACAD: Key Takeaway," *Jefferies*, March 14, 2021

- "Biotech: Noteworthy Weekly Rx Trends/Forecast: RBC Coverage W/E 3/12 – Wk 11 of 1Q," *RBC Capital Markets*, March 19, 2021

**Ex. 1**

**P. 118**

Appendix C

- "Catalysts in 2021 and Beyond for Our Biotechnology Coverage: March 2021 Edition," *Canaccord Genuity*, March 22, 2021

- "Please Join Our Virtual KOL Conference Call to Discuss the Recent FDA Regulatory Landscape on CRLs and Delays on 3/24 at 10am ET," *Cantor Fitzgerald*, March 22, 2021

- "150 Notable Stock Catalysts for 2021 & Up/Down - JefBio Universe," *Jefferies*, March 25, 2021 [JEFF00010687–701]

- "Biotech: Noteworthy Weekly Rx Trends/Forecast: RBC Coverage W/E 3/19 – Wk 12 of 1Q," *RBC Capital Markets*, March 26, 2021

- "Biotech: RBC's Neuropsych Day – Dementia-Related Psychosis," *RBC Capital Markets*, March 29, 2021

- "Biotech: RBC's Neuropsych Day – Schizophrenia," *RBC Capital Markets*, March 29, 2021

- "Biotech: Noteworthy Weekly Rx Trends/Forecast: RBC Coverage W/E 3/26 – Wk 13 of 1Q," *RBC Capital Markets*, April 4, 2021

- "ACAD's CRL - What Does It Mean For KRTX?" *RBC Capital Markets*, April 5, 2021

- "Afternoon Research Summary," *Oppenheimer*, April 5, 2021, [OPCO_00216–25]

- "CRL As Expected: FDA Changed Its Mind," *SVBLeerink*, April 5, 2021

- "CRL Portends More Clinical Work Required for DRP - D/G to HOLD & PT to $21," *Jefferies*, April 5, 2021, [JEFF00010924–32]

- "DRP Interrupted by FDA Moving Goal Posts Increases Risk for Pima', Patients, & Possibly Neuro-Innovators More Broadly," *Cantor Fitzgerald*, April 5, 2021e

- "FDA Deploys Nuclear Option with CRL for Dementia-Related Psychosis sNDA," *SMBC Group*, April 5, 2021

- "An Unfortunate Round Trip; Downgrading to HOLD on DRP-Related Uncertainty, PT from $40 to $26," *Canaccord Genuity*, April 6, 2021

- "Biotech: Our Top-Read & Most Differentiated Notes: March 2021 Edition," *RBC Capital Markets*, April 7, 2021

- "Please Join Our Virtual KOL Conference Call to Discuss Emerging Therapies for Psychiatric Symptoms of Alzheimer's & Other Neurodegenerative Diseases," *Cantor Fitzgerald*, April 7, 2021

- "Biotech: Noteworthy Weekly Rx Trends/Forecast: RBC Coverage W/E 4/2 – Wk 1 of 2Q," *RBC Capital Markets*, April 9, 2021

Appendix C

## Books

- David Kaye and David Freedman (2011), "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, 3rd ed., Washington, DC: The National Academies Press

- Frederic Mishkin (2004), *The Economics of Money, Banking, and Financial Markets*, 7th ed., Boston, MA: Addison Wesley

- James Stock and Mark Watson (2012), *Introduction to Econometrics*, 3rd ed., Pearson Education Limited

- Richard Brealey et al. (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin LLC

- Stephen Ross et al. (2022), *Corporate Finance*, 13th ed., New York, NY: McGraw-Hill/Irwin LLC

## Conference and Earnings Calls and Presentations

- "Q3 2016 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters,* November 7, 2016

- "ACADIA Pharmaceuticals Conference Call to Discuss Top-Line Results from Phase II Study With Pimavanserin for AD Psychosis – Edited Transcript, *Thomson Reuters*, December 20, 2016

- "Q1 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters,* May 9, 2017

- "Q2 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, August 8, 2017

- "ACADIA Pharmaceuticals Inc. Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis – Call – Edited Transcript," *Thomson Reuters*, October 4, 2017

- "Q3 2017 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2017

- "ACADIA Pharmaceuticals Inc. at JPMorgan Healthcare Conference – Edited Transcript," *Thomson Reuters*, January 9, 2018

- "ACADIA Pharmaceuticals Inc. at JPMorgan Global Healthcare Conference – Edited Transcript," *Thomson Reuters*, January 9, 2019

- "Q4 2018 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, February 26, 2019

- "Q1 2019 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, May 1, 2019

**Ex. 1**
**P. 120**

Appendix C

- "Q2 2019 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, July 31, 2019

- "Second Quarter 2019 Earnings Call," *Acadia Pharmaceuticals Inc.*, July 31, 2019

- "ACADIA Pharmaceuticals Inc. ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial – Edited Transcript," *Thomson Reuters*, September 9, 2019

- "Q3 2019 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, October 30, 2019

- "Third Quarter 2019 Earnings Call," Acadia Pharmaceuticals Inc., October 30, 2019

- "ACADIA Pharmaceuticals Inc. to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters,* December 5, 2019

- "Investor Event: Presentation and Discussion of the Phase 3 HARMONY Top-line Results: 12th Clinical Trial of Alzheimer's Disease," *Acadia Pharmaceuticals Inc.*, December 4, 2019

- "Fourth Quarter and Full Year 2019 Earnings Call," *Acadia Pharmaceuticals Inc.,* February 26, 2020

- "Q4 2019 ACADIA Pharmaceuticals Inc. Earning Call – Edited Transcript," *Thomson Reuters*, February 26, 2020

- "ACADIA Pharmaceuticals Inc., FQ1 2020 Earnings Call Transcripts," *S&P Global Market Intelligence*, May 7, 2020

- "First Quarter 2020 Earnings Call," *Acadia Pharmaceuticals Inc.,* May 7, 2020

- "Q1 2020 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, May 7, 2020

- "ACADIA Pharmaceuticals Inc. at Bank of America Merrill Lynch Healthcare Conference (Virtual) – Edited Transcript," *Thomson Reuters,* May 12, 2020

- "Q2 2020 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Thomson Reuters*, August 5, 2020

- "Second Quarter 2020 Earnings Call," *Acadia Pharmaceuticals Inc.,* August 5, 2020

- "Q3 2020 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Refinitiv*, November 4, 2020

- "Third Quarter 2020 Earnings Call," *Acadia Pharmaceuticals Inc.,* November 4, 2020

- "Fourth Quarter and Full Year 2020 Earnings Call," *Acadia Pharmaceuticals Inc.*, February 24, 2021

Appendix C

- "Q4 2020 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Refinitiv*, February 24, 2021

- "ACADIA Pharmaceuticals Inc. Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv,* March 8, 2021

- "Regulatory Update on DRP sNDA," *Acadia Pharmaceuticals Inc.*, March 8, 2021

- "ACADIA Pharmaceuticals Inc. to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application – Edited Transcript," *Refinitiv,* April 5, 2021

- "Regulatory Update on DRP sNDA," *Acadia Pharmaceuticals Inc.*, April 5, 2021

- "First Quarter 2021 Earnings Call," *Acadia Pharmaceuticals Inc.*, May 5, 2021

- "Q1 2021 ACADIA Pharmaceuticals Inc. Earnings Call – Edited Transcript," *Refinitiv*, May 5, 2021

**Depositions**

- Deposition of Steven P. Feinstein, Ph.D., CFA, October 6, 2023

**Expert Reports**

- Report on Market Efficiency and Damages Methodology of Professor Steven P. Feinstein, Ph.D., CFA, August 21, 2023

**Pleadings**

- Amended Class Action Complaint for Violations of the Federal Securities Laws, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, December 10, 2021

- Declaration of Peter M. Adams in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, February 15, 2022 with Appendices

- Memorandum of Points and Authorities in Support of Defendants' Motion for to Dismiss Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Law, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, February 15, 2022

- Order, City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al., the Court's Order regarding the Motion to Dismiss, September 27, 2022

Appendix C

- Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, United States District Court for the Southern District of California, Case No. 3:21-cv-00762-WQH-MSB, August 21, 2023

**Press Releases**

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," November 14, 2013

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis," December 20, 2016

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," October 4, 2017

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Presents Data from the Phase II Study of Pimavanserin in Alzheimer's Disease Psychosis at the Clinical Trials on Alzheimer's Disease (CTAD) 2017 Meeting," November 3, 2017

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," September 9, 2019

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces Late-Breaking Oral Presentation of the Phase 3 HARMONY Study of Pimavanserin in Dementia-Related Psychosis at the Clinical Trials on Alzheimer's Disease (CTAD) 2019 Meeting," October 3, 2019

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting on December 4, 2019," November 11, 2019

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12[th] Clinical Trials on Alzheimer's Disease (CTAD) Meeting," December 4, 2019

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID[®] (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," July 20, 2020

Appendix C

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," March 8, 2021, 4:05 PM EST

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," April 5, 2021, 6:30 AM EDT

- Acadia Pharmaceuticals Inc. Press Release, "ACADIA Pharmaceuticals Submits Supplemental New Drug Application to U.S. FDA for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," June 15, 2020

**Produced Documents**

- Email from Brendan Muoio to Teresa Brandt, "PIND 133880 End of Phase 2 Meeting Minutes," with attached document "Meeting Minutes," May 24, 2017, ACAD_SECLIT_0019792–810

- Letter from Tiffany R. Farchione to Teresa Brandt, "Complete Response," April 2, 2021, ASCA_0001059030

**SEC Filings**

- Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2013, filed February 27, 2014

- Acadia Pharmaceutical Inc., Form 10-K for Fiscal Year ended December 31, 2016, filed February 28, 2017

- Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2017, filed February 27, 2018

- Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year Ended December 31, 2018, filed February 27, 2019

- Acadia Pharmaceuticals Inc., Form 10-Q for Quarterly Period Ended September 30, 2019, filed October 31, 2019

- Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2019, filed February 27, 2020

- Acadia Pharmaceutical Inc., Form 10-Q for Quarterly Period Ended March 31, 2020, filed May 8, 2020

Appendix C

- Acadia Pharmaceutical Inc., Form 10-Q for Quarterly Period Ended June 30, 2020, filed August 6, 2020

- Acadia Pharmaceutical Inc., Form 10-Q for Quarterly Period Ended September 30, 2020, filed November 4, 2020

- Acadia Pharmaceuticals Inc., Form 10-K for Fiscal Year ended December 31, 2020, filed February 25, 2021

**Statutes and Regulations**

- 15 U.S.C. § 78u-4

**Websites**

- "A Study of the Safety and Efficacy of Pimavanserin in Patients With Alzheimer's Disease Psychosis," *National Institutes of Health*, https://www.clinicaltrials.gov/study/NCT02035553, accessed October 11, 2023

- "Breakthrough Therapy," *U.S. Food & Drug Administration*, January 4, 2018, https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy, accessed October 11, 2023

- "Charles C. Duncan," *LinkedIn*, https://www.linkedin.com/in/charles-c-duncan-66663b27/?original_referer=https%3A%2F%2Fwww.linkedin.com%2Fin%2Fcharles-c-duncan-66663b27, accessed on October 10, 2023

- "CTAD 2019 Final Program," *CTAD Alzheimer's Congress*, December 4–7, 2019, https://www.ctad-alzheimer.com/files/files/Final%20program%20november%2019.pdf, accessed on August 11, 2023

- "CTAD Conference: Clinical Trial Alzheimer's Disease (CTAD) Conference," *CTAD Alzheimer Congress*, https://www.ctad-alzheimer.com/ctad-conference, accessed October 11, 2023

- "Danielle Brill, PharmD," *Raymond James*, https://www.raymondjames.com/corporations-and-institutions/global-equities-and-investment-banking/equity-research/equity-research-team/bio?id=5c1d5699314548c59dff04e97f2e6905&bioListId=d4056c1955234cbdac19b6685fd1c40f, accessed on October 10, 2023

- "Drugs@FDA Glossary of Terms: Supplement Number," *U.S. Food & Drug Administration*, November 14, 2017, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms#S, accessed October 10, 2023

- "Eddie Hickman, Ph.D.," *LinkedIn*, https://www.linkedin.com/in/eddiehickman/, accessed on October 10, 2023

Appendix C

- "Endpoint," *National Center for Advancing Translational Sciences Toolkit*, https://toolkit.ncats.nih.gov/glossary/endpoint/, accessed October 10, 2023

- "FDA Calendar," *RTT News*, https://www.rttnews.com/corpinfo/fdacalendar.aspx, accessed October 11, 2023

- "Information for Authors," *The Lancet Neurology*, https://www.thelancet.com/pb/assets/raw/Lancet/authors/tl-info-for-authors-1690986041530.pdf

- "Instructions for Authors," *The Journal of Prevention of Alzheimer's Disease*, https://media.springer.com/full/springer-instructions-for-authors-assets/pdf/42414_IAJPAD_March2023.pdf

- "Jason Butler," *LinkedIn*, https://www.linkedin.com/in/jason-butler-47855015/, accessed on October 10, 2023

- "NASDAQ Biotechnology Index," *Nasdaq*, September 29, 2023, https://indexes.nasdaqomx.com/docs/FS_XNBI.pdf, accessed October 11, 2023

- "Relapse Prevention Study of Pimavanserin in Dementia-Related Psychosis," *National Institutes of Health*, https://clinicaltrials.gov/study/NCT03325556?tab=history&a=1, accessed October 11, 2023

- "Policy and Procedures: Office of New Drugs," *U.S. Food & Drug Administration*, June 25, 2013, https://www.fda.gov/media/72723/download#:~:text=Standard%20review%20designatio n%20is%20assigned,the%20priority%20review%20designation%20criteria.&text=A%20 priority%20review%20designation%20will,within%206%20months%20of%20receipt, accessed October 11, 2023

- "Step 3: Clinical Research" *U.S. Food & Drug Administration*, January 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#phases, accessed October 16, 2023

**Public Press**

- "ACADIA Pharmaceuticals Inc. (ACAD) CEO Steve Davis on CTAD Investor Event (Transcript) >ACAD," *Dow Jones Institutional News,* December 5, 2019

- "Acadia Shares Jump on Positive Drug-Trial News," *Dow Jones Institutional News,* December 5, 2019

- "BRIEF-ACADIA Pharmaceuticals Says Pivotal Phase 3 Harmony Study Showed Pimavanserin Reduced Risk of Psychotic Relapse," *Reuters News,* December 5, 2019

- Public press articles available from Factiva that contain the search term "Acadia Pharma*" or are tagged as related to ticker ACAD or Acadia that were published on all

Appendix C

wires and publications on the following dates: September 6, 2019 – September 10, 2019, December 3, 2019 – December 5, 2019, March 5, 2021 – March 9, 2021, April 2, 2021 – April 6, 2021

**Data Sources**

- CRSP

- Nasdaq

- Refinitiv

**Miscellaneous**

- "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015

- FDA Briefing Document, "Supplement New Drug Applications 207318 & 210793," *Psychopharmacologic Drugs Advisory Committee (PDAC)*, June 17, 2022

**Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.**

**Ex. 1**
**P. 127**

# Exhibit 1
# Acadia Pharmaceuticals Inc.
# Summary of Event Study Regression Results for
# Selected Dates[1]

| Date | Intercept Coefficient[2] | Market Index Return Coefficient[2][3] | | Industry Index Return Coefficient[2][4] | | Adjusted R-Squared | Root Mean Squared Error (RMSE) | Number of Observations |
|---|---|---|---|---|---|---|---|---|
| 9/9/2019 | 0.0013 | -1.080 | * | 1.918 | * | 0.34 | 0.0267 | 126 |
| 12/5/2019 | -0.0002 | -1.414 | * | 1.774 | * | 0.19 | 0.0295 | 124 |
| 3/9/2021 | 0.0008 | 0.062 | | 0.814 | * | 0.25 | 0.0217 | 121 |
| 4/5/2021 | 0.0004 | 0.388 | | 0.656 | * | 0.21 | 0.0252 | 121 |

Source: Amended Complaint dated December 10, 2021; CRSP; Refinitiv; Nasdaq

Note:

[1] Regressions for each day are based on "rolling" estimation periods consisting of the 126 trading days immediately before the event date, excluding alleged corrective disclosure and alleged misrepresentation impact dates. The alleged corrective disclosure impact dates are 3/9/21 and 4/5/21. The alleged misrepresentation impact dates are 9/9/19, 10/31/19, 2/27/20, 5/8/20, 5/12/20, 6/15/20, 7/21/20, 8/6/20, 8/19/20, 9/14/20, 11/5/20, 11/17/20, 1/12/21, and 2/25/21. For alleged misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date would be the following trading date.

[2] "*" denotes statistical significance at the 95% confidence level.

[3] The Market Index refers to the value-weighted CRSP NYSE/Amex/Nasdaq/Arca Index.

[4] The Nasdaq Biotechnology Index "is designed to measure the performance of a set of Nasdaq-listed biotechnology and pharmaceutical companies." See "NASDAQ BIOTECHNOLOGY INDEX," NASDAQ, https://indexes.nasdaqomx.com/docs/methodology_nbi.pdf. The index is reconstructed to exclude Acadia.

**Ex. 1**
**P. 128**

# Exhibit 2
# Acadia Pharmaceuticals Inc.
# Summary of Residual Returns
# on Selected Dates[1]

| Date | ACAD Closing Price | ACAD Return | Market Index Return[2] | Industry Index Return[3] | ACAD Predicted Return[4] | ACAD Residual Return[5] | $t$-statistic[6] | |
|---|---|---|---|---|---|---|---|---|
| 9/9/2019 | $38.85 | 63.24% | 0.06% | -0.81% | -1.49% | 64.73% | 24.07 | * |
| 12/5/2019 | $50.48 | 14.00% | 0.11% | -1.53% | -2.89% | 16.89% | 5.60 | * |
| 3/9/2021 | $25.02 | -45.35% | 1.69% | 3.27% | 2.85% | -48.20% | -21.69 | * |
| 4/5/2021 | $21.18 | -17.23% | 1.15% | 0.52% | 0.83% | -18.06% | -7.11 | * |

Source: Amended Complaint dated December 10, 2021; *CRSP*; *Refinitiv*; *Nasdaq*

Note:

[1] Regressions for each day are based on "rolling" estimation periods consisting of the 126 trading days immediately before the event date, excluding alleged corrective disclosure and alleged misrepresentation impact dates. The alleged corrective disclosure impact dates are 3/9/21 and 4/5/21. The alleged misrepresentation impact dates are 9/9/19, 10/31/19, 2/27/20, 5/8/20, 5/12/20, 6/15/20, 7/21/20, 8/6/20, 8/19/20, 9/14/20, 11/5/20, 11/17/20, 1/12/21, and 2/25/21. For alleged misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date would be the following trading date.

[2] The Market Index refers to the value-weighted CRSP NYSE/Amex/Nasdaq/Arca Index.

[3] The Nasdaq Biotechnology Index "is designed to measure the performance of a set of Nasdaq-listed biotechnology and pharmaceutical companies." *See* "NASDAQ BIOTECHNOLOGY INDEX," NASDAQ, https://indexes.nasdaqomx.com/docs/methodology_nbi.pdf. The index is reconstructed to exclude Acadia.

[4] Acadia Predicted Return is calculated as the sum of the Market Index Return multiplied by the Market Return Coefficient, the Industry Index Return multiplied by the Industry Index Return Coefficient, and the Intercept Coefficient.

[5] Acadia Residual Return is the difference between Acadia Return and Acadia Predicted Return.

[6] "*" denotes statistical significance at the 95% confidence level.

Ex. 2
P. 1

# Exhibit 2

Case 3:21-cv-00762-WQH-MSB   Document 117-3   Filed 10/20/23   PageID.2083   Page
131 of 241

10/19/23, 11:19 AM                ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis - Acadia P...

November 14, 2013
General News

## ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis

Share Page

SAN DIEGO–(BUSINESS WIRE)–Nov. 14, 2013– ACADIA Pharmaceuticals Inc. (NASDAQ:ACAD), a biopharmaceutical company focused on innovative treatments that address unmet medical needs in neurological and related central nervous system disorders, today announced that it has initiated a Phase II feasibility trial designed to examine the efficacy and safety of pimavanserin as a treatment for patients with Alzheimer's disease psychosis (ADP). No drug is approved in the United States to treat ADP and the off-label use of current antipsychotics is linked to increased mortality, serious adverse events, and cognitive decline in elderly patients with dementia-related psychosis.

"The development of psychosis and related behavioral disturbances in patients with Alzheimer's disease carries a poor prognosis and often has a devastating impact on both patients and their caregivers," said Clive Ballard, M.D., Professor of Age Related Diseases at King's College London. "Finding new therapies that can effectively treat ADP without compromising safety is an important priority for the neurology community and society as a whole. Pimavanserin's attractive efficacy, tolerability and safety profile observed in a Phase III trial in patients with Parkinson's disease psychosis suggests that it may offer the potential for an important new therapeutic advance for patients suffering from ADP."

The Phase II feasibility trial, referred to as the -019 Study, is a randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of pimavanserin in about 200 patients with ADP. The study is being conducted through a large network of research care homes established as part of the National Institute for

Ex. 2
P. 2

Health Research (NIHR) Maudsley Biomedical Research Unit. Following a screening period that includes brief psycho-social therapy, patients will be randomized on a one-to-one basis to receive either 40 mg of pimavanserin or placebo once-daily for 12 weeks. The -019 Study will assess several key efficacy endpoints, including use of the Neuropsychiatric Inventory – Nursing Home (NPI-NH) scale to measure psychosis (hallucinations and delusions), agitation/aggression, and sleep/nighttime behavior, as well as use of the Cohen-Mansfield Agitation Inventory – Short Form (CMAI-SF) scale and the Alzheimer's Disease Cooperative Study – Clinical Global Impression of Change (ADCS-CGIC) scale. Key efficacy endpoints will be based on the change at week six from baseline. The study will also assess additional exploratory endpoints, including the cognitive status of patients using the Mini-Mental State Examination (MMSE) scale, and the durability of response to pimavanserin through twelve weeks of therapy.

"We are delighted to pursue this clinical study in collaboration with Professor Ballard and King's College London," said Roger G. Mills, M.D., ACADIA's Executive Vice President of Development and Chief Medical Officer. "We believe that their unique clinical research infrastructure and expertise will provide access to a pool of well-characterized ADP patients and enable the use of a small and geographically-focused group of highly trained raters, which we expect to enhance study precision."

*About Alzheimer's Disease Psychosis*

According to the Alzheimer's Association, 5.4 million people in the United States are living with Alzheimer's disease. While the criteria for diagnosing Alzheimer's disease are mostly focused on cognitive deficits, it is often the psychiatric and related behavioral symptoms that are most troublesome for caregivers and lead to poor quality of life for patients. An estimated 25 to 50 percent of Alzheimer's patients may develop Alzheimer's disease psychosis (ADP), which is commonly characterized by disturbing visual hallucinations and delusions. The diagnosis of ADP is associated with more rapid cognitive and functional decline and institutionalization. There currently is no therapy approved for the treatment of ADP in the United States.

*About Pimavanserin*

Ex. 2
P. 3

Case 3:21-cv-00762-WQH-MSB    Document 117-3    Filed 10/20/23    PageID.2085    Page
133 of 241

10/19/23, 11:19 AM           ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis - Acadia P…

Pimavanserin is ACADIA's proprietary small molecule that acts selectively as an antagonist/inverse agonist on serotonin 5-HT$_{2A}$ receptors. ACADIA has successfully completed a pivotal Phase III trial with pimavanserin, which demonstrated robust efficacy, tolerability and safety in patients with Parkinson's disease psychosis (PDP), potentially positioning it to be the first drug approved in the United States for the treatment of this disorder. Pimavanserin is also in Phase II development for Alzheimer's disease psychosis (ADP) and has completed a Phase II trial as a co-therapy in schizophrenia. Pimavanserin is formulated as a tablet and is administered orally once-a-day. ACADIA discovered pimavanserin and holds worldwide rights to this new chemical entity.

*About ACADIA Pharmaceuticals*

ACADIA is a biopharmaceutical company focused on innovative treatments that address unmet medical needs in neurological and related central nervous system disorders. ACADIA has a pipeline of product candidates led by pimavanserin, which is in Phase III development as a potential first-in-class treatment for Parkinson's disease psychosis. ACADIA also has clinical-stage programs for chronic pain and glaucoma in collaboration with Allergan, Inc. and two advanced preclinical programs directed at Parkinson's disease and other neurological disorders. All product candidates are small molecules that emanate from discoveries made at ACADIA. ACADIA maintains a website at www.acadia-pharm.com to which ACADIA regularly posts copies of its press releases as well as additional information and through which interested parties can subscribe to receive e-mail alerts.

*About NIHR Maudsley Biomedical Research Centre*

The National Institute for Health Research (NIHR) Mental Health Biomedical Research Centre and Dementia Unit (BRC/U) at South London and Maudsley NHS Foundation Trust and Institute of Psychiatry, King's College London aim to turn the latest scientific knowledge in mental health into improved medical treatments for the benefit of all patients and carers. We are the only BRC/U specialising in mental health research.

We are part of King's Health Partners Academic Health Sciences Centre, a pioneering collaboration between King's College London, and Guy's and St Thomas', King's

Ex. 2
P. 4

Case 3:21-cv-00762-WQH-MSB   Document 117-3   Filed 10/20/23   PageID.2086   Page
134 of 241

10/19/23, 11:19 AM          ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis - Acadia P...

College Hospital and South London and Maudsley NHS Foundation Trusts
(http://brc.slam.nhs.uk/).

*Forward-Looking Statements*

Statements in this press release that are not strictly historical in nature are forward-looking statements. These statements include but are not limited to statements related to the progress and timing of ACADIA's drug discovery and development programs, including clinical trials and the results therefrom, and the potential of and the benefits to be derived from product candidates, in each case including pimavanserin. These statements also include any suggestion that the results from trials with pimavanserin in PDP will be predictive of results in the -019 Study for ADP or whether the use of a geographically-focused group of raters will enhance precision in the -019 Study. These statements are only predictions based on current information and expectations and involve a number of risks and uncertainties. Actual events or results may differ materially from those projected in any of such statements due to various factors, including the risks and uncertainties inherent in drug discovery, development and commercialization and collaborations with others, and the fact that past results of clinical trials may not be indicative of future trial results. For a discussion of these and other factors, please refer to ACADIA's annual report on Form 10-K for the year ended December 31, 2012 as well as ACADIA's subsequent filings with the Securities and Exchange Commission. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. This caution is made under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All forward-looking statements are qualified in their entirety by this cautionary statement and ACADIA undertakes no obligation to revise or update this press release to reflect events or circumstances after the date hereof, except as required by law.

*ACADIA Pharmaceuticals Inc.*
*Uli Hacksell, Ph.D., Chief Executive Officer*
*Lisa Barthelemy, Director of Investor Relations*
*858-558-2871*

Ex. 2
P. 5

# Exhibit 3

**Ex. 3**
**P. 1**

# Zacks Small-Cap Research

February 28, 2014
Jason Napodano, CFA
David Bautz, PhD
312-265-9421 / jnapodano@zacks.com

scr.zacks.com                                                111 North Canal Street, Chicago, IL  60606

## Acadia Pharmaceuticals, Inc.     (ACAD-NASDAQ)

### ACAD: Still on track for NDA filing at end of 2014, ADP Phase 2 Trial continues…

**UPDATE**

At its fourth quarter earnings conference call, Acadia Pharmaceuticals (ACAD) provided an update on its clinical and regulatory programs. These include the ongoing stability testing of the three registration batches of pimavanserin produced in the third quarter of 2013, the ongoing drug-drug interaction studies, the ongoing accumulation of data from the -015 extension study, and the Phase 2 Alzheimer's Disease Psychosis (ADP) trial. Importantly, management indicated that they remain on track for a planned NDA submission near the end of 2014. While we are still quite bullish on the pimavanserin story for PDP, we have downgraded the stock to Neutral, since we believe at close to $30 it is fully valued. However, we would look at any pull-back in the share price as a buying opportunity.

| | |
|---|---|
| **Current Recommendation** | **Neutral** |
| Prior Recommendation | Outperform |
| Date of Last Change | 02/28/2014 |
| | |
| Current Price (02/28/14) | $29.00 |
| **Target Price** | **$30.00** |

## SUMMARY DATA

| | | | |
|---|---|---|---|
| **52-Week High** | **$30.10** | **Risk Level** | **Above Average** |
| **52-Week Low** | **$5.86** | **Type of Stock** | **Small-Growth** |
| **One-Year Return (%)** | **395.88** | **Industry** | **Med-Biomed/Gene** |
| **Beta** | **2.91** | | |
| **Average Daily Volume (sh)** | **1,795,790** | | |

| | |
|---|---|
| **Shares Outstanding (mil)** | **91** |
| **Market Capitalization ($mil)** | **$2,735** |
| **Short Interest Ratio (days)** | **8.12** |
| **Institutional Ownership (%)** | **19** |
| **Insider Ownership (%)** | **5** |

| | |
|---|---|
| **Annual Cash Dividend** | **$0.00** |
| **Dividend Yield (%)** | **0.00** |

| | |
|---|---|
| **5-Yr. Historical Growth Rates** | |
| Sales (%) | **18.0** |
| Earnings Per Share (%) | **N/A** |
| Dividend (%) | **N/A** |
| | |
| **P/E using TTM EPS** | **N/A** |
| **P/E using 2014 Estimate** | **N/A** |
| **P/E using 2015 Estimate** | **N/A** |

### ZACKS ESTIMATES

**Revenue**
(In millions of $)

| | Q1 (Mar) | Q2 (Jun) | Q3 (Sep) | Q4 (Dec) | Year (Dec) |
|---|---|---|---|---|---|
| 2013 | 0.4 A | 0.5 A | 0.2 A | 0.0 A | 1.1 A |
| 2014 | 0.0 E | 0.1 E | 0.0 E | 0.1 E | 0.2 E |
| 2015 | | | | | 5.0 E |
| 2016 | | | | | 147.4 E |

**Earnings per Share**
(EPS is operating earnings before non-recurring items)

| | Q1 (Mar) | Q2 (Jun) | Q3 (Sep) | Q4 (Dec) | Year (Dec) |
|---|---|---|---|---|---|
| 2013 | -$0.08 A | -$0.11 A | -$0.12 A | -$0.13 A | -$0.44 A |
| 2014 | -$0.14 E | -$0.15 E | -$0.16 E | -$0.18 E | -$0.63 E |
| 2015 | | | | | -$0.43 E |
| 2016 | | | | | $0.86 E |

© Copyright 2014, Zacks Investment Research. All Rights Reserved.

**Ex. 3**

## WHAT'S NEW

### Clinical and Regulatory Update

At its fourth quarter earnings conference call, Acadia Pharmaceuticals (ACAD) provided an update on its clinical and regulatory programs. These include the ongoing stability testing of the three registration batches of pimavanserin produced in the third quarter of 2013, the ongoing drug-drug interaction studies, the ongoing accumulation of data from the -015 extension study, and the Phase 2 Alzheimer's Disease Psychosis (ADP) trial.

The registration stability testing is designed to comply with ICH guidelines and to meet the regulatory filing requirements for major markets worldwide. As expected, the company now has the initial three months of stability on the registration lots of pimavanserin, and the data appears to be consistent with what was seen earlier with the stability of the clinical trial formulation. Long-term stability of pimavanserin in the clinical trial formulation was previously established covering a three-year period. The initial stability data from the registration batches, which is from the same manufacturing suppliers and general processes as our clinical trial formulation, is encouraging. The stability testing began in October 2013, with the anticipation that one year of stability testing will be required for the NDA submission. We believe this is the rate-limiting step to filing the NDA.

There was also an update on the ongoing custom and short duration drug-drug interaction (DDI) studies. Management reported that they are in the process of completing the planned DDI program, and that the profile of pimavanserin appears consistent with what has been observed in the long-term Parkinson's Disease Psychosis (PDP) safety extension studies. Since PDP patients are usually on a number of medications simultaneously, there has been ample opportunity to accumulate real-life clinical experience from an active patient population through these extension studies. Most importantly, pimavanserin continues to be generally safe and well-tolerated in PDP patients and management does not anticipate any major surprises from the DDI program.

The Phase 3 PDP open label safety extension study, referred to as the -015 Study, remains on-going and will continue until pimavanserin becomes commercially available. A large amount of data has been and continues to be generated from this study in terms of long-term safety. Thus far, there are over 250 patients who have been treated for one year or longer, which far exceeds the ICH guidelines. In addition, there are well over 100 patients that have been treated for over two years with the longest single patient exposure exceeding eight years. This long-term safety data will provide strong support for the potential of pimavanserin to offer significant advantages in relation to current off-label PDP treatments.

Most importantly of all, management indicated that they remain on track for a planned NDA submission near the end of 2014. In support of this, pre-NDA meetings with the FDA will commence in the spring, which will allow Acadia to outline the NDA submission and its organization. In regards to registration in the EU, there has been an initial series of interactions with the regulatory agencies from several EU member states. These meetings will continue so as to clarify the pathway for registration in the EU. Management anticipates being able to delineate a path forward by the end of the year. Ultimately, we believe Acadia will seek to partner pimavanserin for commercial launch in Europe, but at this time a partnership seems unlikely prior to finalizing plans for the MAA.

The Phase 2 clinical trial of pimavanserin in ADP, Study-019, is currently underway and will follow a similar design of the successful Phase 3 trial in PDP in incorporating a screening period with brief psychosocial therapy and a limited number of trained raters. Study-019 is a randomized double-blind, placebo-controlled study seeking to enroll about 200 patients. The study will be conducted through a network of research care facilities established as part of the Biomedical Research Centre for Mental Health at King's College, London. This institution incorporates a geographically focused network of nursing care homes that will facilitate the use of a limited number of raters. As in the PDP trial, this is expected to limit statistical "noise" in the efficacy analysis. Patients will be randomized 1:1 between pimavanserin and placebo, treated for 12 weeks, with the primary efficacy endpoint being the change from baseline to Week 6. Endpoints will include the neuropsychiatric inventory and the nursing home (NPINH) scale with measurements of psychosis, aggression, agitation, sleep, nighttime behavior, and other exploratory endpoints.

The full 12 weeks of treatment will allow the exploration of other endpoints, including determining whether there are any negative impacts on cognition, since currently marketed antipsychotics are linked to cognitive decline in elderly patients with dementia related psychosis. The company continues to offer guidance that it will take up to two years from initiation of enrollment to top-line results. That means data from the Phase 2 ADP program should be available in late 2015.

Ex. 3
P. 3

The company continues to anticipate being able to market and promote pimavanserin itself to high prescribing neurologists in the U.S. with 75 sales representatives. In support of this, management indicated that they have assembled a core commercial organization to help prepare for the planned launch of pimavanserin, including experienced professionals in marketing, reimbursement and managed markets, marketing research and commercial operations, along with sales force planning and management. Through its market research analysis, the company has confirmed the high unmet medical need for PDP patients, with prescribers in need of a safe and effective alternative to the off-label use of antipsychotics.

## Recent Financial Results

On February 27, 2014 financial results for the fourth quarter and full year 2013 were released. Revenues in the fourth quarter totaled $37,000 compared to $380,000 for the fourth quarter of 2012, with the decrease primarily due to the conclusion of Acadia's 2003 research collaboration with Allergen in March 2013. For the full year 2013, total revenues were $1.1 million.

Net loss for the quarter totaled $12.0 million, or $0.13 per share, compared to a net loss of $6.8 million, or $0.11 per share, in the fourth quarter of 2012. The net loss included $2.2 million in non-cash, stock-based compensation expense. R&D expenses increased to $7.9 million compared to $4.9 million in the fourth quarter of 2012, with the increase being driving by the pimavanserin Phase 3 program expenses as well as by increased personnel and stock-based compensation expenses. SG&A expenses increased to $4.3 million in the fourth quarter of 2013, compared to $2.3 million in the fourth quarter of 2012. The increase was mainly driven by increased stock-based compensation costs, personnel costs, and professional fees, including costs related to pre-commercial activities.

For the year, Acadia reported a net loss of $37.9 million, or $0.44 per share, compared to a net loss of $20.8 million, or $0.38 per share, for 2012. The net losses for 2013 and 2012 included $5.7 million and $1.9 million, respectively, in non-cash, stock-based compensation expense.

Acadia ended 2013 with approximately $185.8 million in cash, cash equivalents, and short-term investments. The cash position was strengthened by a $107.9 million equity raise in May 2013. An aggregate of $30 million in cash was used to fund operations in the 2013 financial year, which was in-line with management's previous guidance. For 2014, management has indicated they anticipate having greater than $120 million in cash, cash equivalents and short-term investments at the end of the year. We do not anticipate Acadia raising cash in the near-term. However, we suspect that significant cash well beyond $120 million will be required to successfully launch pimavanserin in 2016. The ideal scenario for shareholders would be to see management out-license the Ex-North American rights to the drug for upfront cash – say $100 to $200 million – and use that money to fund the commercial launch. That being said, if a deal cannot be struck by the middle of 2015, we would expect Acadia to seek to raise these funds through a public offering.

## Conclusion

Pimavanserin is looking like a blockbuster drug. We encourage investors to read our article from November 2013 outlining our beliefs as to why we believe this will be the case:

http://seekingalpha.com/article/1830812-acadias-pimavanserin-is-the-next-blockbuster-for-psychosis

However, despite our enthusiasm for the drug, we are lowering our rating on the shares 'Neutral' because the stock has hit our $30 target. Our 'Buy' recommendation from early 2013 netted investors 161% return. We are still very bullish on the pimavanserin story, but we would not chase the stock at its current valuation of approximately $2.65 billion. Meaningful new "news" over the next six to nine months is limited.

We anticipate the NDA filing late 2014. The expected PDUFA will be 12 months later, or late 2015. We are not anticipating results from the Phase 2 ADP -019 trail until late 2015 as well. Our advice to investors would be to Hold shares if they are already long the stock, or book some profits and perhaps wait for a pull-back (or broad biotech market sell-off) before re-establishing a position. We can justify $30 per share via DCF, and thus investment below $25 per share (+20% upside) may warrant re-entry.

Ex. 3
P. 4

## PROJECTED FINANCIALS

**Acadia Pharmaceuticals Inc.**
Income Statement

| Acadia Pharma | 2013 A | Q1 E | Q2 E | Q3 E | Q4 E | 2014 E | 2015 E | 2016 E |
|---|---|---|---|---|---|---|---|---|
| pimavanserin (NA Sales) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $142 |
| pimavanserin (Ex-NA) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **pimavanserin (EX-US royalty)** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| **Collaborations** | **$1.1** | **$0** | **$0** | **$0** | **$0** | **$0** | **$5.0** | **$5.0** |
| **Total Revenues** | **$1.1** | **$0.0** | **$0.1** | **$0.0** | **$0.1** | **$0.2** | **$5.0** | **$147.4** |
| *YOY Growth* | *-76.7%* | - | - | - | - | - | - | - |
| Cost of Goods Sold | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Gross Margin* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| SG&A | $9.2 | $3.0 | $3.2 | $3.5 | $4.0 | $13.7 | $12.5 | $36.7 |
| R&D | $24.5 | $7.9 | $8.8 | $9.3 | $10.2 | $36.2 | $30.0 | $20.0 |
| Stock Options | $5.7 | $2.2 | $2.4 | $2.7 | $3.3 | $10.6 | $5.5 | $5.5 |
| Operating Income | ($38.3) | ($13.1) | ($14.3) | ($15.5) | ($17.5) | ($60.3) | ($43.0) | $85.3 |
| *Operating Margin* | - | - | - | - | - | - | - | - |
| Interest & Other Income | $0.3 | $0.1 | $0.1 | $0.1 | $0.1 | $0.3 | $0.3 | $0.3 |
| Pre-Tax Income | ($37.9) | ($13.0) | ($14.3) | ($15.4) | ($17.4) | ($60.0) | $42.7 | $85.6 |
| Taxes + Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Tax Rate* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Net Income | ($37.9) | ($13.0) | ($14.3) | ($15.4) | ($17.4) | ($60.0) | ($42.7) | $85.6 |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| *Net Margin* | - | - | - | - | - | - | - | - |
| **Reported EPS** | **($0.44)** | **($0.14)** | **($0.15)** | **($0.16)** | **($0.18)** | **($0.63)** | **($0.43)** | **$0.86** |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| Diluted Shares Out | 85.7 | 92.2 | 94.8 | 96.0 | 98.5 | 95.4 | 99.0 | 99.0 |

*Source:  Zacks Investment Research Inc.*                *Jason Napodano,  CFA*

© Copyright 2014, Zacks Investment Research. All Rights Reserved.

**Ex. 3**
**P. 5**

## HISTORICAL ZACKS RECOMMENDATIONS



## DISCLOSURES

The following disclosures relate to relationships between Zacks Investment Research ( "ZIR"), Zacks & Company (ZCO") and Zacks Small-Cap Research ("Zacks SCR) and the issuers covered by the Zacks SCR analysts in the Small-Cap Universe.

ZIR or Zacks SCR Analysts do not hold or trade securities in the issuers which they cover. Each analyst has full discretion on the rating and price target based on their own due diligence. Analysts are paid in part based on the overall profitability of Zacks SCR.  Such profitability is derived from a variety of sources and includes payments received from issuers of securities covered by Zacks SCR for non-investment banking services. No part of analyst compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in any report or blog.

ZIR and Zacks SCR do not make a market in any security nor do they act as dealers in securities.  Zacks SCR has never received compensation for investment banking services on the small-cap universe. Zacks SCR does not expect received compensation for investment banking services on the small-cap universe. Zacks SCR has received compensation for non-investment banking services on the small-cap universe, and expects to receive additional compensation for non-investment banking services on the small-cap universe, paid by issuers of securities covered by Zacks SCR.  Non-investment banking services include investor relations services and software, financial database analysis, advertising services, brokerage services, advisory services, investment research, and investment management.

Additional information is available upon request. Zacks SCR reports are based on data obtained from sources we believe to be reliable, but is not guaranteed as to accuracy and does not purport to be complete. Because of individual objectives, the report should not be construed as advice designed to meet the particular investment needs of any investor. Any opinions expressed by Zacks SCR Analysts are subject to change. Reports are not to be construed as an offer or the solicitation of an offer to buy or sell the securities herein mentioned.

ZCO and Zacks SCR are separate legal entities. ZCO is U.S. broker-dealer registered with the U.S. Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corp. This report is for your information only and is not an offer to sell, or a solicitation of an offer to buy, the securities or instruments through ZCO.

Zacks SCR uses the following rating system for the securities it covers. Buy/Outperform: The analyst expects that the subject company will outperform the broader U.S. equity market over the next one to two quarters. Hold/Neutral: The analyst expects that the company will perform in line with the broader U.S. equity market over the next one to two quarters. Sell/Underperform: The analyst expects the company will underperform the broader U.S. Equity market over the next one to two quarters.

The current distribution of Zacks Ratings is as follows on the  1036 companies covered: Buy/Outperform- 15.5%, Hold/Neutral- 77.5%, Sell/Underperform – 6.3%.  Data is as of midnight on the business day immediately prior to this publication.

© Copyright 2014, Zacks Investment Research. All Rights Reserved.

# Exhibit 4

# Zacks Small-Cap Research

**May 7, 2014**
**Jason Napodano, CFA**
**David Bautz, PhD**
**312-265-9421 / jnapodano@zacks.com**

**scr.zacks.com**

**10 S. Riverside Plaza, Suite 1600, Chicago, IL  60606**

## Acadia Pharmaceuticals, Inc.    (ACAD-NASDAQ)

### *ACAD: Still on track for NDA filing at end of 2014, ADP Phase 2 Trial continues…*

**UPDATE**

On May 6, 2014, Acadia Pharmaceuticals (ACAD) announced results for the first quarter 2014 and provided an update on its clinical and regulatory programs. These include the ongoing stability testing of the three registration batches of pimavanserin produced in the third quarter of 2013, the ongoing drug-drug interaction studies, the ongoing accumulation of data from the -015 extension study, and the Phase 2 Alzheimer's Disease Psychosis (ADP) trial. Importantly, management indicated that they remain on track for a planned NDA submission near the end of 2014.

We are still quite bullish on the pimavanserin story for PDP, but with few catalysts to drive the stock in the next six to nine months we are maintaining a 'Neutral' rating.

| Current Recommendation | **Neutral** |
|---|---|
| Prior Recommendation | Outperform |
| Date of Last Change | 02/28/2014 |
| Current Price (05/07/14) | $19.16 |
| **Target Price** | **$30.00** |

## SUMMARY DATA

| | | | |
|---|---|---|---|
| **52-Week High** | **$30.10** | **Risk Level** | **Above Average** |
| **52-Week Low** | **$11.65** | **Type of Stock** | **Small-Growth** |
| **One-Year Return (%)** | **59.27** | **Industry** | **Med-Biomed/Gene** |
| **Beta** | **3.46** | | |
| **Average Daily Volume (sh)** | **2,245,702** | | |
| **Shares Outstanding (mil)** | **98** | | |
| **Market Capitalization ($mil)** | **$1,868** | | |
| **Short Interest Ratio (days)** | **4.93** | | |
| **Institutional Ownership (%)** | **57** | | |
| **Insider Ownership (%)** | **25** | | |
| **Annual Cash Dividend** | **$0.00** | | |
| **Dividend Yield (%)** | **0.00** | | |
| **5-Yr. Historical Growth Rates** | | | |
| **Sales (%)** | **18.0** | | |
| **Earnings Per Share (%)** | **N/A** | | |
| **Dividend (%)** | **N/A** | | |
| **P/E using TTM EPS** | **N/A** | | |
| **P/E using 2014 Estimate** | **N/A** | | |
| **P/E using 2015 Estimate** | **N/A** | | |

### ZACKS ESTIMATES

**Revenue**
(In millions of $)

| | Q1 (Mar) | Q2 (Jun) | Q3 (Sep) | Q4 (Dec) | Year (Dec) |
|---|---|---|---|---|---|
| 2013 | 0.4 A | 0.5 A | 0.2 A | 0.0 A | 1.1 A |
| 2014 | 0.0 A | 0.1 E | 0.0 E | 0.1 E | 0.2 E |
| 2015 | | | | | 5.0 E |
| 2016 | | | | | 147.4 E |

**Earnings per Share**
(EPS is operating earnings before non-recurring items)

| | Q1 (Mar) | Q2 (Jun) | Q3 (Sep) | Q4 (Dec) | Year (Dec) |
|---|---|---|---|---|---|
| 2013 | -$0.08 A | -$0.11 A | -$0.12 A | -$0.13 A | -$0.44 A |
| 2014 | -$0.17 A | -$0.15 E | -$0.16 E | -$0.18 E | -$0.63 E |
| 2015 | | | | | -$0.43 E |
| 2016 | | | | | $0.86 E |

© Copyright 2014, Zacks Investment Research. All Rights Reserved.

**Ex. 4**

## WHAT'S NEW

### Recent Financial Results

On May 6, 2014 financial results for the first quarter 2014 were released. Revenues in the first quarter totaled $30,000 compared to $417,000 for the first quarter of 2013, with the decrease primarily due to the conclusion of Acadia's 2003 research collaboration with Allergen in March 2013.

Net loss for the quarter totaled $17.8 million, or $0.19 per share, compared to a net loss of $6.1 million, or $0.08 per share, in the first quarter of 2013. The net loss included $3.2 million in non-cash, stock-based compensation expense. R&D expenses increased to $11.7 million compared to $4.4 million in the first quarter of 2013, with the increase being driving by the pimavanserin Phase 3 program expenses as well as by increased personnel and stock-based compensation expenses. SG&A expenses increased to $6.3 million in the first quarter of 2014, compared to $2.2 million in the first quarter of 2013. The increase was mainly driven by increased stock-based compensation costs, personnel costs, and professional fees, including costs related to pre-commercial activities.

Acadia exited the first quarter with approximately $369.3 million in cash, cash equivalents, and short-term investments. The cash position was strengthened by a $198 million equity raise in March 2014. For 2014, management now anticipates having greater than $300 million in cash, cash equivalents and short-term investments at the end of the year. We forecast that this will be enough cash to fund the company into 2017.

### Clinical and Regulatory Update

There were a number of updates provided during the first quarter conference call, which we summarize below:

➤ Acadia continues to make steady progress in the Parkinson's Disease Psychosis (PDP) development program, including stability testing of pimavanserin registration batches and supportive studies, which include standard drug-drug interaction studies. During the first quarter, the company completed an assessment of the initial three months of stability data from the pimavanserin registration lots and confirmed that the data are consistent with historical data observed with the clinical trial formulations. The company continues to accumulate data in the registration stability program and expects to have six month stability data available during the second quarter of 2014. We believe twelve month data will be required during the FDA's review of the NDA.

➤ There was substantial progress made with supportive studies that include customary short duration drug-drug interaction (DDR) studies. This is important because patients with PDP are frequently on a number of concomitant medications. The company is now in the process of finalizing the planned DDR program, and thus far the safety profile of pimavanserin appears consistent with what has been observed in the long-term PDP safety extension studies.

➤ The Phase 3 PDP open label safety extension trial (015 Study) is designed to continue until pimavanserin is commercially available. This study has provided the company with a large amount of valuable, long-term safety data regarding the use of pimavanserin in PDP patients. The company has already far exceeded the ICH guidelines for required one year exposures with well over 250 patients having been treated for one year or longer, over 100 patients having been treated for at least two years, and the longest patient exposure exceeds eight years.

➤ Management continues to indicate that they remain on track for a planned NDA submission near the end of 2014. In support of this, pre-NDA meetings with the FDA will commence in the second quarter of 2014, which will allow Acadia to outline the NDA submission and its organization.

➤ In regards to registration in the EU, there has been an initial series of interactions with the regulatory agencies from several EU member states. The company characterized these initial interactions as very informative, with the 020 Study being seen as a strong study with the medial needs of patients with PDP being appreciated in the EU. These meetings will continue so as to clarify the pathway for registration in the EU. Ultimately, we believe Acadia will seek to partner pimavanserin for commercial launch in Europe, but at this time a partnership seems unlikely prior to finalizing plans for the MAA.

Ex. 4
P. 3

➢ The Phase 2 clinical trial of pimavanserin in ADP, Study-019, is currently underway and will follow a similar design of the successful Phase 3 trial in PDP in incorporating a screening period with brief psychosocial therapy and a limited number of trained raters. Study-019 is a randomized double-blind, placebo-controlled study seeking to enroll about 200 patients. The study will be conducted through a network of research care facilities established as part of the Biomedical Research Centre for Mental Health at King's College, London. This institution incorporates a geographically focused network of nursing care homes that will facilitate the use of a limited number of raters. As in the PDP trial, this is expected to limit statistical "noise" in the efficacy analysis. Patients will be randomized 1:1 between pimavanserin and placebo, treated for 12 weeks, with the primary efficacy endpoint being the change from baseline to Week 6. Endpoints will include the neuropsychiatric inventory and the nursing home (NPINH) scale with measurements of psychosis, aggression, agitation, sleep, nighttime behavior, and other exploratory endpoints. We believe this study will report out in late 2015.

➢ In addition to ADP, the company is planning a number of new studies to examine additional indications for pimavanserin. One particular area of interest to the company is sleep disturbance, which is a frequent problem to patients with neurological disorders including both PDP and ADP. The company has observed long sedating sleep related benefits of pimavanserin including in the 020 Study, where pimavanserin demonstrated significant improvement in nighttime sleep, with the improvement not accompanied by any sedation effects. In addition, pimavanserin produced a significant improvement in daytime wakefulness in PDP patients, with patients having severe nighttime disturbances benefiting the most from pimavanserin therapy. Interestingly, the positive effects of pimavanserin nighttime sleep and daytime wakefulness did not tolerate the psychosis measures, indicating that sleep and wakefulness may represent independent treatment benefits of pimavanserin use. The company indicated that additional studies in sleep disturbances may allow for further characterization and highlight the potentially important clinical benefits associated with pimavanserin use.

➢ Another area of focus for broadening the pimavanserin clinical program is schizophrenia. The company believes that pimavanserin's selective mechanism of action and attractive clinical profile may enable it to be used in multiple ways to improve the therapy for patients with schizophrenia. First, pimavanserin may be used as a co-therapy together with low doses of existing atypical antipsychotic drugs to enhance the clinical profile. Secondly, pimavanserin may be used as a monotherapy in the maintenance phase of schizophrenia treatment, as the selective action of the drug may allow for effective symptom control while avoiding interactions with dopamine and other receptors that are linked to many of the side effects caused by existing antipsychotics. The company's commercial assessment has reinforced the idea that schizophrenia treatment represents a sizable commercial opportunity and study designs in the schizophrenia program are currently on-going with the company set to share further details on this program later in the year. Our enthusiasm for the use of pimavanserin in schizophrenia is low due to the significant number of generic typical and atypical molecules on the market. We do not believe combination therapy will be attractive to treating physicians and we do not believe the efficacy of pimavanserin monotherapy is strong enough to drive meaningful use.

➢ The company briefly discussed some of the other programs in the R&D portfolio. Acadia has two clinical stage programs in partnership with Allergan, Inc. (AGN) in the areas of chronic pain and glaucoma, along with preclinical development of an additional compound as a potential new treatment for glaucoma. The company also has two additional preclinical programs, the ER-beta and Nurr-1 programs, which are being pursued as potential treatments for Parkinson's and other neurological diseases. The ER-beta program is being supported by a grant from the National Institute on Neurological Disorders and Stroke, with preclinical studies in the Nurr-1 program being supported by a grant from the Michael J. Fox Foundation. We assign no value to these programs. Clinical work with Allergan has been stalled for years and we do not include pre-IND candidates in our valuation models.

**Conclusion**

Pimavanserin is looking like a blockbuster drug for PDP and ADP. We encourage investors to read our article from November 2013 outlining our beliefs as to why we believe this will be the case:

*http://seekingalpha.com/article/1830812-acadias-pimavanserin-is-the-next-blockbuster-for-psychosis*

However, despite our enthusiasm for the drug, we continue to rate the shares 'Neutral' as there will be limited meaningful new "news" over the next six to nine months to drive the stock price. We anticipate the NDA filing late 2014. The expected PDUFA will be 12 months later, or late 2015. We are not anticipating results from the Phase 2 ADP -019 trail until late 2015 as well.

## PROJECTED FINANCIALS

**Acadia Pharmaceuticals Inc.**
Income Statement

| Acadia Pharma | 2013 A | Q1 A | Q2 E | Q3 E | Q4 E | 2014 E | 2015 E | 2016 E |
|---|---|---|---|---|---|---|---|---|
| pimavanserin (NA Sales) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $142 |
| pimavanserin (Ex-NA) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **pimavanserin (EX-US royalty)** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| **Collaborations** | **$1.1** | **$0** | **$0** | **$0** | **$0** | **$0** | **$5.0** | **$5.0** |
| **Total Revenues** | **$1.1** | **$0.0** | **$0.1** | **$0.0** | **$0.1** | **$0.2** | **$5.0** | **$147.4** |
| *YOY Growth* | *-76.7%* | - | - | - | - | - | - | - |
| Cost of Goods Sold | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Gross Margin* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| SG&A | $9.2 | $4.1 | $3.2 | $3.5 | $4.0 | $14.8 | $12.5 | $36.7 |
| R&D | $24.5 | $10.7 | $8.8 | $9.3 | $10.2 | $39.0 | $30.0 | $20.0 |
| Stock Options | $5.7 | $3.2 | $2.4 | $2.7 | $3.3 | $11.6 | $5.5 | $5.5 |
| Operating Income | ($38.3) | ($18.0) | ($14.3) | ($15.5) | ($17.5) | ($65.2) | ($43.0) | $85.3 |
| *Operating Margin* | - | - | - | - | - | - | - | - |
| Interest & Other Income | $0.3 | $0.1 | $0.1 | $0.1 | $0.1 | $0.3 | $0.3 | $0.3 |
| Pre-Tax Income | ($37.9) | ($17.8) | ($14.3) | ($15.4) | ($17.4) | ($64.9) | $42.7 | $85.6 |
| Taxes + Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Tax Rate* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Net Income | ($37.9) | ($17.8) | ($14.3) | ($15.4) | ($17.4) | ($64.9) | ($42.7) | $85.6 |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| *Net Margin* | - | - | - | - | - | - | - | - |
| **Reported EPS** | **($0.44)** | **($0.19)** | **($0.15)** | **($0.16)** | **($0.18)** | **($0.68)** | **($0.43)** | **$0.86** |
| *YOY Growth* | - | - | - | - | - | - | - | - |
| Diluted Shares Out | 85.7 | 93.0 | 94.8 | 96.0 | 98.5 | 95.6 | 99.0 | 99.0 |

*Source: Zacks Investment Research Inc.*          *Jason Napodano, CFA*

© Copyright 2014, Zacks Investment Research. All Rights Reserved.

**Ex. 4**
**P. 5**

## HISTORICAL ZACKS RECOMMENDATIONS



© Copyright 2014, Zacks Investment Research. All Rights Reserved.

**Ex. 4**

**P. 6**

## DISCLOSURES

The following disclosures relate to relationships between Zacks Small-Cap Research ("Zacks SCR"), a division of Zacks Investment Research ("ZIR"), and the issuers covered by the Zacks SCR Analysts in the Small-Cap Universe.

ANALYST DISCLOSURES

I, Jason Napodano, CFA, CFA, hereby certify that the view expressed in this research report accurately reflect my personal views about the subject securities and issuers. I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the recommendations or views expressed in this research report. I believe the information used for the creation of this report has been obtained from sources I considered to be reliable, but I can neither guarantee nor represent the completeness or accuracy of the information herewith. Such information and the opinions expressed are subject to change without notice.

INVESMENT BANKING, REFERRALS, AND FEES FOR SERVICE

Zacks SCR does not provide nor has received compensation for investment banking services on the securities covered in this report. Zacks SCR does not expect to receive compensation for investment banking services on the Small-Cap Universe.  Zacks SCR may seek to provide referrals for a fee to investment banks. Zacks & Co., a separate legal entity from ZIR, is, among others, one of these investment banks. Referrals may include securities and issuers noted in this report.  Zacks & Co. may have paid referral fees to Zacks SCR related to some of the securities and issuers noted in this report.  From time to time, Zacks SCR pays investment banks, including Zacks & Co., a referral fee for research coverage.

Zacks SCR has received compensation for non-investment banking services on the Small-Cap Universe, and expects to receive additional compensation for non-investment banking services on the Small-Cap Universe, paid by issuers of securities covered by Zacks SCR Analysts. Non-investment banking services include investor relations services and software, financial database analysis, advertising services, brokerage services, advisory services, equity research, investment management, non-deal road shows, and attendance fees for conferences sponsored or co-sponsored by Zacks SCR. The fees for these services vary on a per client basis and are subject to the number of services contracted. Fees typically range between ten thousand and fifty thousand USD per annum.

POLICY DISCLOSURES

Zacks SCR Analysts are restricted from holding or trading securities placed on the ZIR, SCR, or Zacks & Co. restricted list, which may include issuers in the Small-Cap Universe. ZIR and Zacks SCR do not make a market in any security nor do they act as dealers in securities. Each Zacks SCR Analyst has full discretion on the rating and price target based on his or her own due diligence. Analysts are paid in part based on the overall profitability of Zacks SCR. Such profitability is derived from a variety of sources and includes payments received from issuers of securities covered by Zacks SCR for services described above. No part of analyst compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in any report or article.

ADDITIONAL INFORMATION

Additional information is available upon request. Zacks SCR reports are based on data obtained from sources we believe to be reliable, but are not guaranteed as to be accurate nor do we purport to be complete. Because of individual objectives, this report should not be construed as advice designed to meet the particular investment needs of any investor. Any opinions expressed by Zacks SCR Analysts are subject to change without notice. Reports are not to be construed as an offer or solicitation of an offer to buy or sell the securities herein mentioned.

ZACKS RATING & RECOMMENDATION

ZIR uses the following rating system for the  1092 companies whose securities it covers, including securities covered by Zacks SCR:
Buy/Outperform: The analyst expects that the subject company will outperform the broader U.S. equity market over the next one to two quarters.
Hold/Neutral: The analyst expects that the company will perform in line with the broader U.S. equity market over the next one to two quarters.
Sell/Underperform: The analyst expects the company will underperform the broader U.S. Equity market over the next one to two quarters.

The current distribution is as follows: Buy/Outperform- 16.8%, Hold/Neutral- 75.7%, Sell/Underperform – 6.7%.  Data is as of midnight on the business day immediately prior to this publication.

Ex. 4
P. 7

# Exhibit 5

# J.P.Morgan

**North America Equity Research**
15 May 2014

# ACADIA Pharmaceuticals

## Positive Phase 3 Data + Unmet Medical Need = Compelling Investment Opportunity...Initiating at OW

**Initiation**

## Overweight

**ACAD, ACAD US**
Price: $18.87

**Price Target: $33.00**

**Biotechnology**

**Cory Kasimov** [AC]
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

**Whitney G Ijem**
(1-212) 622-4668
whitney.g.ijem@jpmorgan.com

**Matthew J. Lowe, Ph.D.**
(1-212) 622-0848
matthew.j.lowe@jpmorgan.com
J.P. Morgan Securities LLC

We are initiating coverage of ACADIA Pharmaceuticals with an Overweight rating based on the potential of pimavanserin in Parkinson's Disease Psychosis (PDP) and, to a lesser extent, in Alzheimer's Disease Psychosis (ADP). Psychotic symptoms develop in 20-50% of PD and AD pts, though there are currently no approved therapies to treat them. While antipsychotics are used off-label, they are associated with significant side effects. In contrast, pimavanserin has been shown to be effective in the treatment of PDP *with a remarkably clean safety/tolerability profile*. In PDP alone, we (conservatively) estimate pimavanserin has peak sales potential of ~$1B in just the US, and ADP represents ~3-4x that opportunity. Thus, with a high probability of success (highly positive Phase 3 data in hand), we believe ACAD's paucity of 2014 catalysts plus the recent biotech sell-off have combined to create a highly compelling long-term investment opportunity. Our December 2014 price target of $33 reflects 80% probability of success in PDP and 30% in ADP.

- **Pimavanserin's Phase 3 trial in PDP met all endpoints in a highly stat sig fashion; NDA submission is expected in 4Q for potential 2H15 approval.** Pimavanserin has the potential to be the first drug approved in the US to treat PDP. In its Phase 3 trial, pimavanserin was shown to be safe and well tolerated, in addition to producing highly statistically significant improvements in symptoms of psychosis relative to placebo through three independently measured outcomes.

- **Docs we spoke with highlight the need for safer antipsychotics for use in these elderly patient populations.** Antipsychotics have black-box warnings against use in elderly dementia patients due to an increased risk of death, though they are widely used off-label. We spoke with 5 neurologists (community and academic), all of whom were impressed with pimavanserin's clean Phase 3 safety profile. They all indicated they would use pimavanserin in their PDP patients, and likely off-label in other elderly patients with psychosis given the lack of other safe/approved options.

- **Potential expansion into additional neuro/psych indications provides optionality, in our view.** Pimavanserin's unique profile could be attractive in additional markets where current antipsychotics are unsuitable/not sufficient. A Phase 2 trial is ongoing (data expected in 2015) in ADP, which represents an opportunity 3-5x that of PDP. Additional opportunities (e.g. schizophrenia, for which ACAD already has positive POC) appear underappreciated by investors, but could drive significant upside.

- **Initiating at OW.** Our YE14 PT of $33 is based on a blended average of our NPV (50%) and scenario analysis (50%). Pimavanserin in PDP is the key driver, and we note that this asset is wholly owned by ACAD. Key risks include gaining regulatory approval and competition from existing generic antipsychotics.



**Price Performance**

|  | YTD | 1m | 3m | 12m |
|---|---|---|---|---|
| Abs | -22.2% | -29.7% | -19.1% | 57.8% |
| Rel | -21.1% | -25.5% | -16.5% | 32.3% |

**ACADIA Pharmaceuticals Inc (ACAD;ACAD US)**

| FYE Dec | 2012A | 2013A | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|
| EPS Reported ($) | | | | | |
| Q1 (Mar) | (0.12) | (0.08) | (0.19)A | - | - |
| Q2 (Jun) | (0.10) | (0.11) | (0.18) | - | - |
| Q3 (Sep) | (0.04) | (0.12) | (0.19) | - | - |
| Q4 (Dec) | (0.11) | (0.13) | (0.19) | - | - |
| FY | (0.38) | (0.44) | (0.76) | (0.78) | (0.65) |

Source: Company data, Bloomberg, J.P. Morgan estimates.

| Company Data | |
|---|---|
| Price ($) | 18.87 |
| Date Of Price | 14 May 14 |
| 52-week Range ($) | 32.00-12.60 |
| Market Cap ($ mn) | 1,754.31 |
| Fiscal Year End | Dec |
| Shares O/S (mn) | 93 |
| Price Target ($) | 33.00 |
| Price Target End Date | 31-Dec-14 |

**See page 27 for analyst certification and important disclosures.**

J.P. Morgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

**Ex. 5**
**P. 2**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Table of Contents

Table of Contents ..................................................................2

Investment Thesis ................................................................3

Risks to Ratings and Price Target .....................................5

Company Description ...........................................................5

Upcoming Events .................................................................6

Pipeline..................................................................................6

Parkinson's Disease Psychosis (PDP) ..............................7

PDP and the Current Treatment Landscape..................................7
The 5-HT2A Mechanism in PDP .....................................................9

Pimavanserin .....................................................................10

Clinical Data Review .....................................................................10
Market Opportunity and Commercial Strategy............................15
Pimavanserin Pipeline Opportunities ..........................................16
Intellectual Property .....................................................................18

Financial Outlook ...............................................................19

Valuation ..............................................................................20

Management .........................................................................22

Models ..................................................................................23

**Ex. 5**

**P. 3**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Investment Thesis

**ACADIA Pharmaceuticals (ACAD)**

**Overweight**

**Pimavanserin has the potential to be the first FDA-approved therapy for the treatment of Parkinson's Disease Psychosis**

Parkinson's Disease Psychosis (PDP) is characterized by visual and auditory hallucinations, and is estimated to affect 20-40% of the 4-6M Parkinson's patients worldwide. While there is data showing that treating psychotic symptoms is associated with better outcomes, there are currently no approved therapies to treat PDP in the US. Antipsychotic medications are frequently used off-label in this setting, though all of them have black-box warnings against use in elderly dementia patients due to an increased risk of death. In addition, many of these agents have been shown to worsen motor symptoms, an especially problematic side effect in patients with Parkinson's. Pimavanserin, on the other hand, has been shown to treat psychotic symptoms while being very safe, well tolerated, and with no worsening of motor symptoms.

**Pimavanserin successfully completed a single Phase 3 trial, which the FDA indicated is sufficient for filing; we expect NDA submission around year-end**

ACAD conducted a Phase 3 trial, the -020 study, in ~200 PDP patients in the US and Canada who were treated for 6 weeks. Treatment with pimavanserin resulted in highly statistically significant improvements in symptoms of psychosis relative to placebo through three independently measured outcomes (each assessed by a different person who was masked to other findings): SAPS-PD, CGI, and CBS. After completion of the -020 study, the FDA agreed that data from this trial, in addition to supportive data from other already completed studies, would be sufficient for filing. ACADIA is currently completing the final pre-NDA work (CMC is the rate-limiting step), and is planning to submit the NDA around YE14. In the EU, discussions are ongoing with the EMA, and clarity on a path forward is also expected by year-end.

**Doctor feedback underscores unmet need in PDP (and ADP)**

We spoke with both academic and community-based neurologists who manage PD patients. Depending on the doctor, anywhere from 10% to 70% of their PDP patients are actually prescribed an atypical antipsychotic for PDP. Docs who rarely prescribe a treatment cited safety concerns around the existing options and the lack of approval in this setting. Docs who were heavy prescribers also expressed concern around the side effects, but generally felt that the benefits outweigh the risks in many of their patients. In both cases, docs were cautiously enthusiastic about a product with a profile like pimavanserin's, though noted that real-world experience will be key given the lack of head-to-head data with the currently used therapies.

**Next up for pimavanserin is Alzheimer's Disease Psychosis (ADP), a market that is 3-5x that of PDP; Phase 2 data expected in 2015**

Alzheimer's Disease Psychosis (ADP) is similar to PDP, sharing many of the same characteristics and psychiatric symptoms. As with PDP, there is currently no drug approved to treat ADP in the US, and current anti-psychotics have a black-box warning for use in ADP. ACAD is currently running a Phase 2 trial of pimavanserin in ADP – the -019 study – at a single center in London. Data from this trial is expected in 2015. ACADIA believes the ADP opportunity is 3-5x that of PDP, and notes that the PDP infrastructure can be readily leveraged for the ADP indication given similarity in patient populations.

**Ex. 5
P. 4**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

**Pipeline opportunities: PDP and ADP provide potential entry point into broader neurology and psychiatric indications**

Pimavanserin's unique mechanism of action may prove useful in a variety of other neuro/psych markets. For example, Phase 2 data indicate that there are several advantages to the addition of pimavanserin on top of low-dose risperdone in the treatment of schizophrenia. The trial showed that pimavanserin/risperidone co-therapy had an improved side-effect profile, including significantly less weight gain compared to the standard 6mg dose of risperdone. ACADIA intends to run additional trials in this indication, as well as exploring pimavanserin monotherapy efficacy. Other related indications, such as LBD psychosis, MID psychosis and psychosis in elderly patients with other neurodegenerative diseases, could provide additional expansion opportunities (and could also drive meaningful off-label use).

**ACADIA retains worldwide rights to pimavanserin, which has IP into 2028**

Pimavanserin was internally discovered, and ACADIA has retained worldwide rights to the drug and established a significant IP portfolio. The company holds 19 issued US patents related to pimavanserin, including three composition of matter patents that expire in 2021, additional method of use patents in PDP that expire in 2026, and patents around polymorphs of pimavanserin that expire in mid-2028. Outside US, ACADA has 55 issued foreign patents that cover pimavanserin, including 35 patents in key geographies that expire in 2024. While ACADIA plans to commercialize itself in the US, the company has indicated it is open to alternative options outside US.

**We estimate peak combined US/EU sales of pimavanserin of $1.5B+ and $4B+ in PDP and ADP, respectively**

ACADIA estimates there are ~400-600K PDP patients in the US alone, and plans to launch with ~75 sales reps targeting high-prescribing neurologists (~5K neurologists). We anticipate pricing will be consistent with that of other currently approved atypical antipsychotics which ranges from $15 to $35 per day. In PDP, we conservatively model launch in early 2016, conservatively assuming a gross cost of $25/day, or ~$9,100 per year. We model a gross-to-net adjustment of 12% and a compliance rate of 80%. We assume pimavanserin reaches peak penetration in the US of 35% in the moderate/severe patient population, implying revenues of nearly ~$1B in the US PDP market.

**Balance sheet: ACAD is well positioned financially**

ACAD ended 1Q14 with ~$369M in cash, including ~$197M from a secondary offering of common stock in March. We believe the company has sufficient capital through the expected 2H15 launch of pimavanserin.

**Initiate at OW: First-in-class antipsychotic with clear safety benefits in a fragile patient population**

We believe the unmet need in PDP, and eventually ADP and other indications as well, will drive robust use of pimavanserin. Our YE14 price target of $33 is based on a blended average of our risk-adjusted NPV model (50%) and proprietary scenario analysis (50%). On a sum-of-the-parts basis, we assign ~$15/share to pimavanserin for PDP in the US (80% probability of approval) and Europe (60%), ~$11/share to pimavanserin in ADP (30%), with the balance in pipeline value (other pima indications) and cash.

4

**Ex. 5**

**P. 5**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Risks to Ratings and Price Target

ACADIA is susceptible to the standard risks that apply to the entire biotech industry, including development, regulatory, commercial, manufacturing, financing, and IP pitfalls. Risks more specific to ACADIA are outlined below.

**IP risk**

Our model assumes pimavanserin receives patent term. If for some reason it does not, the exclusivity period provided by the current patent could expire sooner than we model, and pose downside to our expectations.

**Regulatory risk**

Though the FDA has indicated that the data in hand is sufficient for an NDA submission, there remains the risk that pimavanserin will not be approved by the agency. Further, ACADIA has yet to meet with the EMA to determine a path forward, and it is possible that the EMA will require additional trials and/or will not approve pimavanserin. If approved, it is possible that regulatory agencies could remove pimavanserin from the market if the drug shows additional or more severe adverse events in a real-world setting.

**Commercial risk**

The rate of uptake and/or pricing could limit sales of pimavanserin. The drug would be ACAD's first commercial drug, and it is possible that uptake of the drug by physicians may be slower than expected. Two currently available antipsychotics, clozapine and quetiapine, while not approved by the FDA for use in this indication, are currently used to treat PDP (and are generic). Thus physicians may be slower to try a new, more expensive product in this older and more fragile patient population.

**Competitive risk**

While we are not currently aware of any other selective 5-HT$_{2A}$ targeted therapies in development, it is possible that future products could present significant competition for pimavanserin. Any other new atypical antipsychotic medications that may make it to market could also prove to be efficacious in PDP, depending on their mechanism of action, and could be a competitive threat to ACADIA.

## Company Description

San Diego–based ACADIA Pharmaceuticals is a development-stage biopharmaceutical company focused on products for the treatment of neurological and related nervous system disorders. The company is developing pimavanserin, a selective 5-HT2A receptor antagonist, for the treatment of Parkinson's disease psychosis (PDP). Pimavanserin has successfully completed a Phase 3 trial in PDP patients. NDA submission is expected in 4Q14. ACADIA is also developing pimavanserin for the treatment of Alzheimer's disease psychosis (ADP). A Phase 2 trial is ongoing, with data expected in 4Q15. ACADIA has worldwide rights to pimavanserin, which has IP protection to roughly 2028.

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

**J.P.Morgan**

# Upcoming Events

**Figure 1: ACAD Newsflow Highlights**

| Anticipated Newsflow Highlights | | | |
|---|---|---|---|
| Program | Event | Expected Timing | Significance |
| **Pimavanserin in PDP** | NDA Filing | YE2014 | Low-Medium |
| | Potential US Approval and Launch | 2H15 | High |
| **Pimavanserin in ADP** | Top-line data from Ph2 Data | 2015 | High |

Source: Company reports.

While we anticipate that the duration of 2014 will be fairly quiet for ACAD, we anticipate the most notable catalyst will be submission of the NDA for pimavanserin in PDP which is expected near year-end. In the EU, ACADIA hopes to delineate a path forward also by the end of this year. In the meantime, we expect incremental updates on commercial preparations in the US throughout the year. ACADIA also plans to announce more details on the life-cycle management opportunities for pimavanserin, specifically planned studies in schizophrenia, later this year. A key event in 2015 should be pimavanserin data in ADP.

# Pipeline

**Figure 2: ACAD's Pipeline**



| Product Pipeline Highlights | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Program | P/C | Ph1 | Ph2 | Ph3 | FDA | Mkt | Partner | Comments | |
| **pimavanserin** | | | | | | | | 5-HT2A antagonist | |
| PD Psychosis | | | | | | | | | |
| AD Psychosis | | | | | | | | | |

Source: Company reports.

While pimavanserin is ACADIA's most advanced pipeline candidate, the company also has several other programs in development. Together with Allergan, ACADIA has discovered small molecule, alpha adrenergic agonists, for the treatment of chronic pain. Allergan has reported positive POC data in visceral pain, and has seen efficacy in trials in fibromyalgia and irritable bowel syndrome. Allergan is seeking a partner for further development of this program. Allergan/ACADIA are also developing small molecule activators of muscarinic receptors for the treatment of glaucoma. This program has completed Phase 1 development.

ACADIA also has two preclinical programs, ER-beta and Nurr1, which are advancing with the potential to treat a variety of neurological disorders. Preclinical work in the ER-beta program as a novel pain treatment is supported by a grant from the National Institute of Neurological Disorders and Stroke. ACADIA is also conducting preclinical work in this program around neurodegeneration, with a specific focus on multiple sclerosis. Preclinical work in the Nurr1 program, which has the potential to be disease modifying in Parkinson's and other neurological disorders, is supported by a grant from the Michael J. Fox Foundation.

**Ex. 5**

**P. 7**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Parkinson's Disease Psychosis (PDP): Background

## PDP and the Current Treatment Landscape

**Parkinson's Disease**

Parkinson's Disease (PD) is a neurodegenerative brain disorder, and one of several progressive motor system disorders that are caused by the loss of dopaminergic neurons. It is the second most common neurodegenerative disease, and is estimated to affect 4-6 million people worldwide.

**Figure 3: Expected Prevalence of Parkinson's Disease**

|  | 2011 | 2015 |
|---|---|---|
| United States | 1,055,700 | 1,151,800 |
| Europe | 1,474,300 | 1,587,500 |
| Japan | 742,900 | 837,900 |

Cognos Study #4. Parkinson's disease. Cognos, Decision Resources, Inc. Waltham, MA, USA. June 2006

Source: Company presentation.

Dopamine is an important neurotransmitter that relays messages within the brain to coordinate movement. In PD, when the brain is unable to produce a sufficient amount of it, a common set of motor symptoms occur including tremor, rigidity of the limbs and trunk, bradykinesia, and postural instability. The pathology of non-motor symptoms of PD are not well understood, but can include depression or other emotional changes, sleep disturbances, urinary problems or constipation, and difficulty swallowing, chewing or speaking. There is currently no cure for the disease, and treatment is instead focused on replenishing dopamine in the brain via levodopa (L-Dopa), which neurons can convert into dopamine.

**Parkinson's Disease Psychosis (PDP)**

**PDP develops in 40-60% of PD patients, generally in the later stages of disease, and manifests as visual and auditory hallucinations.**

While Parkinson's disease is generally defined as a motor disorder, there is increasing recognition of the disease's neurobehavioral aspects. These symptoms had traditionally been considered treatment related, but there is increasing evidence that psychotic symptoms may in fact be intrinsic to the disease. Parkinson's Disease Psychosis (PDP) is characterized by visual and auditory hallucinations. Visual hallucinations are about twice as common as auditory among PDP patients; delusions can also occur and manifest as paranoia/jealousy, though are much less frequent in the early stages of PD but increase in frequency as dementia worsens.

The pathology of PDP is not well understood, and there are no therapies approved to treat PDP in the US. Data shows that treating psychotic symptoms is associated with a better outcome. Additionally, it has been shown that caregiver stress is significantly elevated in those managing PDP patients. Accordingly, there are increased rates of nursing home placement among PD patents with PDP as compared to PD patients who don't have psychotic symptoms.

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

**Current Treatment Landscape**

**There are no medications approved to treat PDP in the US.**

Treatment of PDP first involves adjustments of any non-PD medications that may be contributing to the psychotic episodes, e.g., anticholinergics for bladder control, sedatives, antidepressants or anxiolytics. Reduction of anti-PD medications including L-Dopa is also considered, though changes in these medications can have a negative effect on motor function.

**Antipsychotics are used off-label (mostly quetiapine) despite the fact that they carry a black-box warning for use in elderly dementia patients and lack definitive efficacy in the treatment of PDP.**

While there are currently no medications approved to treat PDP in the US, antipsychotics are typically used off-label to treat PDP. Specifically, agents with action at the 5-HT$_{2A}$ receptor have been shown to be effective in treating psychotic symptoms, though off-target activity leads to unwanted/untolerable side effects in this patient population. Antipsychotic agents with dopaminergic activity (e.g., olanzipine, aripiprazole, risperidone) have a black-box warning against the use of the drug in elderly patients with dementia-related psychosis due to the increased risk of death. Though they are not FDA-approved in this indication, low-dose clozapine and quetiapine are the most commonly used antipsychotic agents used to treat PDP. A host of other antipsychotic medications have been tested in PDP, but have shown varying degrees of efficacy and all have been found to worsen motor function. As such, the American Academy of Neurology (AAN) recommends clozapine and quetiapine for "consideration" only in the treatment of PDP due to safety issues with the former and lack of proven efficacy with the latter.

- **Quetiapine.** Based on our conversations with doctors, quetiapine is the most commonly used medication to treat PDP, with docs estimating that 75-100% of their PDP patients on treatment take it. Quetiapine (brand name Seroquel) is an atypical antipsychotic approved to treat schizophrenia and bipolar mania. Open-label studies showed the drug to be effective in the treatment of PDP with no worsening of motor symptoms. However, randomized, controlled trials did not find efficacy, though continued to show relatively clean safety profile. As such, AAN also recommends quetiapine for "consideration" only given the lack of confirmed efficacy.

- **Clozapine.** Clozapine (brand name Clozaril) is an atypical antipsychotic that is approved for the treatment of severe schizophrenia. The label notes that *"Because of the significant risk of agranulocytosis and seizure associated with its use, CLOZARIL should be used only in patients who have failed to respond adequately to treatment with appropriate courses of standard drug treatments for schizophrenia."* Doses used in schizophrenia range between 300 and 800 mg/day. In PDP, low-dose clozapine (6.25-50mg/day) has been shown to be effective in treating psychotic symptoms. Randomized, controlled trials were conducted testing low-dose clozapine in PDP, which showed that the drug drastically reduced psychosis, was relatively well tolerated, and did not have a significant effect on motor function. However, AAN refrains from more strongly recommending clozapine's use in PDP due to the risk of agranulocytosis (which is not dose related). This risk also necessitates cumbersome blood monitoring (weekly for the first 6 months, then bi-weekly for 6 months, then once a month for the duration of use) that provides a logistical barrier to use. Every doc to whom we spoke cited the blood monitoring and safety concerns with clozapine as a key reason why they rarely use the drug.

**Ex. 5**

**P. 9**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

## The 5-HT2A Mechanism in PDP

**Data has shown that the efficacy of antipsychotic meds in PDP is driven by activity at the 5HT$_{2A}$ receptor, while off-target activity at other receptors leads to problematic side effects.**

Clozapine and quetiapine are non-selective inhibitors of the 5-HT$_{2A}$ receptor, a subtype of the 5-HT family of serotonin receptors. Data has shown that clozapine's activity in PDP is driven by its activity at the 5-HT$_{2A}$ receptor, with the unwanted side effects described above being driven by its activity at other receptors. This discovery led to the exploration of several other atypical antipsychotics (those with higher affinity for 5-HT$_{2A}$ such as risperdone, olanzapine) as potential treatments for PDP. Unfortunately, due to the relatively similar binding pocket that is shared among the 5-HT receptors and other off-target activity of these drugs, the side effect/ tolerability profile precludes their use in PDP, as described above.

**ACADIA developed pimavanserin to be highly selective for the 5HT$_{2A}$ receptor.**

Thus, ACADIA developed pimavanserin, a selective 5-HT$_{2A}$ inverse agonist, which is 40-fold more selective for 5-HT$_{2A}$ over 5-HT$_{2C}$ and has little affinity for 5-HT$_{2B}$ or D$_2$ receptors.

**Figure 4: Receptor Activity of Antipsychotic Agents Tested in PDP**

| | 5-HT$_{2A}$ | D$_2$ | H$_1$ | α |
|---|---|---|---|---|
| Pimavanserin | ✓ | — | — | — |
| Seroquel® | ✓ | ✓ | ✓ | ✓ |
| Zyprexa® | ✓ | ✓ | ✓ | ✓ |
| Risperidone | ✓ | ✓ | — | ✓ |
| Clozapine | ✓ | ✓ | ✓ | ✓ |

Source: Company presentation.

9   **Ex. 5**
    **P. 10**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Pimavanserin

**Pimavanserin is a selective 5HT$_{2A}$ inverse agonist currently in development for the treatment of Parkinson's Disease Psychosis.**

Pimavanserin is a non-dopaminergic 5-HT$_{2A}$ inverse agonist, selectively preventing receptors activation while also blocking the intrinsic basal level of receptor signaling. 5-HT$_{2A}$ is a serotonin receptor that plays a key role in psychosis. Pimavanserin is a new chemical entity (NCE) currently being developed for the treatment of PDP. Pimavanserin successfully completed a Phase 3 trial in PDP, showing a statistically significant improvement in psychosis with no worsening in motor function. An NDA filing is expected by year-end 2014. ACAD is also evaluating pimavanserin in Alzheimer's Disease Psychosis (ADP); A Phase 2 trial was initiated in late 2013, from which data is expected in 2015.

## Clinical Data Review

**Phase 2.** Pimavanserin was evaluated in a randomized, double-blind, placebo-controlled Phase 2 trial. 60 PDP patients were enrolled (mean age of 71), and were treated with pimavanserin or placebo for 4 weeks. Patients received starting doses of 20mg starting on day 1, with the option to increase to 40mg or 60mg QD on study days 8 and 15, respectively. The mean final doses in the pimavanserin and placebo arms were 44.8 and 52.9mg, respectively.

**Phase 2 data showed that pimavanserin was safe and well tolerated with no adverse affects on motor function.**

The trial was powered to demonstrate safety/motor effects. The primary measure to determine pimavanserin's effect on motor symptoms was the Unified Parkinson's Disease Rating Scale (UPDRS) Parts II (activities in daily living) and III (motor examination). A non-significant improvement in UPDRS Parts II and III was observed in both treatment arms, with no statistically significant differences observed in treatment effect. Efficacy measures included SAPS hallucination and delusion individual item scores and global SAPS scores. Relative to placebo, treatment with pimavanserin resulted in a statistically significant improvement in the global rating of hallucinations (p=0.02; effect size=0.58). Pimavanserin also resulted in improvements in the hallucinations domain score though the result was not statistically significant (p=0.16).

**Treatment with pimavanserin also resulted in statistically significant benefits in certain measures of PDP, and positive efficacy trends in others.**

Statistically significant improvements were also observed in the SAPS delusion domain measures including persecutory delusions (p=0.009, effect size=0.41), ideas and delusions of reference (p=0.05, effect size=0.36), and global ratings of delusions (p=0.03, effect size=0.53). Pimavanserin-treated patients also showed greater improvement in the SAPS total domain score (p=0.09, effect size=0.52), with a 40% improvement in pimavanserin-treated patients vs. an 11% improvement in placebo patients. A complete overview of efficacy measures is provided below.

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

**J.P.Morgan**

**Figure 5: Mean (SD) Baseline and Day 28 SAPS Scores; Change from Baseline (Screening Visit) to Day 28 – Per Protocol Population**

| Parameter | Pimavanserin (n = 24) | | Placebo (n = 28) | | LS mean difference[a] | 95% CI | p-value[b] | Effect size[c] |
|---|---|---|---|---|---|---|---|---|
| | Base | Day 28 | Base | Day 28 | | | | |
| *SAPS hallucinations items and domain score* | | | | | | | | |
| Auditory hallucinations | 1.4 (1.56) | 1.1 (1.61) | 1.6 (1.95) | 1.4 (2.03) | −0.36 | −1.30, 0.58 | 0.44 | 0.23 |
| Voices commenting | 0.5 (1.18) | 0.5 (1.32) | 0.7 (1.49) | 0.8 (1.71) | −0.41 | −1.35, 0.52 | 0.38 | 0.24 |
| Voices conversing | 0.7 (1.31) | 0.5 (1.10) | 1.3 (1.96) | 1.1 (1.92) | −0.57 | −1.51, 0.36 | 0.22 | 0.33 |
| Somatic or tactile hallucinations | 0.8 (1.26) | 0.3 (0.82) | 0.7 (1.49) | 0.8 (1.79) | −0.59 | −1.37, 0.18 | 0.13 | 0.43 |
| Olfactory hallucinations | 0.1 (0.45) | 0.2 (0.83) | 0.3 (0.90) | 0.5 (1.14) | −0.25 | −0.81, 0.30 | 0.36 | 0.29 |
| Visual hallucinations | 3.8 (0.87) | 2.7 (1.97) | 3.8 (1.39) | 2.9 (1.92) | −0.68 | −1.75, 0.39 | 0.21 | 0.40 |
| Global rating of hallucinations | 3.5 (0.72) | 2.4 (1.79) | 3.2 (1.32) | 2.9 (1.66) | −1.00 | −1.83, −0.16 | 0.02 | 0.71 |
| SAPS hallucination (H) score[d] | 10.8 (4.09) | 7.6 (6.70) | 11.6 (6.59) | 10.5 (9.19) | −2.8 | −6.8, 1.2 | 0.16 | 0.52 |
| *SAPS delusions items and domain score* | | | | | | | | |
| Persecutory delusions | 1.3 (1.65) | 0.7 (1.12) | 1.5 (1.73) | 1.5 (1.75) | −1.00 | −1.74, −0.26 | 0.009 | 0.69 |
| Delusions of jealousy | 0.8 (1.28) | 0.4 (0.93) | 0.6 (1.13) | 0.6 (1.03) | −0.25 | −0.75, 0.24 | 0.31 | 0.23 |
| Delusions of sin or guilt | 0.3 (1.01) | 0.2 (0.48) | 0.5 (1.14) | 0.3 (0.77) | −0.17 | −0.55, 0.21 | 0.36 | 0.15 |
| Grandiose delusions | 0.2 (0.59) | 0.1 (0.61) | 0.0 (0.00) | 0.0 (0.00) | 0.04 | −0.16, 0.24 | 0.68 | 0.11 |
| Religious delusions | 0.5 (1.38) | 0.2 (0.64) | 0.3 (1.00) | 0.3 (1.00) | −0.11 | −0.52, 0.30 | 0.59 | 0.12 |
| Somatic delusions | 0.2 (0.72) | 0.2 (0.64) | 0.2 (0.61) | 0.3 (1.01) | 0.06 | −0.44, 0.57 | 0.80 | 0.07 |
| Ideas and delusions of reference | 0.3 (0.62) | 0.3 (0.74) | 0.4 (0.92) | 0.8 (1.37) | −0.62 | −1.25, 0.00 | 0.05 | 0.56 |
| Delusions of being controlled | 0.2 (0.56) | 0.1 (0.45) | 0.1 (0.52) | 0.2 (0.61) | −0.11 | −0.46, 0.23 | 0.50 | 0.15 |
| Delusions of mind reading | 0.2 (0.48) | 0.1 (0.41) | 0.2 (0.63) | 0.0 (0.19) | 0.14 | −0.04, 0.33 | 0.12 | 0.23 |
| Thought broadcasting | 0.0 (0.20) | 0.0 (0.20) | 0.1 (0.38) | 0.0 (0.00) | 0.07 | −0.01, 0.15 | 0.09 | 0.20 |
| Thought insertion | 0.0 (0.00) | 0.0 (0.00) | 0.3 (0.75) | 0.1 (0.42) | −0.05 | −0.21, 0.11 | 0.55 | 0.12 |
| Thought withdrawal | 0.0 (0.00) | 0.0 (0.20) | 0.0 (0.19) | 0.0 (0.00) | 0.07 | −0.01, 0.15 | 0.09 | 0.35 |
| Global rating of delusions | 1.9 (1.72) | 1.2 (1.49) | 2.1 (1.83) | 2.2 (1.75) | −1.00 | −1.89, −0.11 | 0.03 | 0.58 |
| SAPS delusion (D) score[e] | 5.9 (5.85) | 3.5 (5.66) | 6.3 (6.84) | 6.3 (6.21) | −2.3 | −4.7, 0.1 | 0.06 | 0.46 |
| *Sums of SAPS hallucinations and delusions global and domain scores* | | | | | | | | |
| SAPS global ratings total (H+D) score[f] | 5.4 (1.76) | 3.5 (2.84) | 5.3 (2.54) | 5.1 (3.06) | −1.89 | −3.39, −0.39 | 0.02 | 0.66 |
| SAPS total (H+D) domain score[g] | 16.7 (7.45) | 11.0 (11.09) | 17.9 (11.79) | 16.8 (14.35) | −4.6 | −10.0, 0.7 | 0.09 | 0.56 |

Abbreviation: SAPS, Scale for the Assessment of Positive Symptoms.
[a]Difference in LS means (pimavanserin–placebo).
[b]Test for treatment effect from ANCOVA on the change from baseline score with fixed effects for treatment and center. Baseline score is the covariate. p-values are not adjusted for multiple comparisons.
[c]Estimated as the absolute value of the difference in the adjusted mean change from baseline (pimavanserin–placebo) divided by the pooled standard deviation of the mean change from baseline score.
[d]Sum of all seven items for hallucinations.
[e]Sum of all 13 delusion items.
[f]Sum of global ratings for hallucinations and delusions.
[g]Sum of Domain scores for hallucinations and delusions; primary measure of efficacy.
*Negative numbers indicate greater improvement in the pimavanserin-treated group.

Source: Meltzer et al.; Neuropsychopharmacology. Mar 2010; 35(4): 881–892.

No significant difference in the incidence of adverse events was observed between the pimavanserin and placebo arms. Treatment-emergent AEs occurred in 72% of pimavanserin-treated patients and 77% of patients receiving placebo. 51% of all TEAEs were considered treatment related. AEs occurring in ≥10% of patients in the pimavanserin arm were somnolence, edema, and increased blood urea nitrogen (10.3% each); and in the placebo arm were hallucinations (16.1%), dizziness (12.9%), and fall, headache, confusional state, and hypotension (9.7%).

**Ex. 5**
**P. 12**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

Treatment-emergent motor function AEs were infrequent in each arm, were mild, and did not lead to drug discontinuation. Throughout the trial, there were 4 SAEs reported, none of which were considered related to study drug.

**In the Phase 3 trial, treatment with pimavanserin resulted in improvements in symptoms of psychosis relative to placebo through three independently measured outcomes: SAPS-PD, CGI, and CBS.**

**Phase 3.** In the -020 study, pimavanserin was evaluated vs. placebo in US and 2 Canadian Centers (52 sites in total). The trial enrolled patients who were 40 or older who had a clinical diagnosis of PDP with a minimum duration of 1 year, and psychotic symptoms must have developed after the diagnosis of Parkinson's disease. At screening, patients had to have a combined score of ≥6 or an individual score of ≥4 on the NPI (neuropsychiatric inventory) items A (delusions) or B (hallucinations). Screening was followed by a 2-week run-in period during which patients began a program of daily social interactions with their caregiver, which were tailored to their interests and capabilities, in an attempt to reduce the effect of placebo response within the trial. Trial eligibility was confirmed at the end of the two-week period, and required a score of ≥3 on the SAPS hallucinations or delusions global item and ≥3 on at least one other non-global item on the SAPS-PD.

**Figure 6: Baseline Characteristics**

| | Placebo (n=90) | Pimavanserin (n=95) |
|---|---|---|
| Age, years | 72·4 (7·92) | 72·4 (6·55) |
| Sex, female | 38 (42%) | 31 (33%) |
| Ethnic group, white | 85 (94%) | 90 (95%) |
| Body-mass index, kg/m² | 26·4 (5·65) | 26·2 (4·57) |
| Stereotactic surgery | 3 (3%) | 10 (11%) |
| Mini-mental status examination score | 26·6 (2·40) | 26·0 (2·61) |
| UPDRS-II score | 19·3 (6·77) | 18·7 (6·62) |
| UPDRS-III score | 33·3 (12·23) | 32·8 (12·86) |
| Time since first PDP symptoms, months | 36·4 (39·57) | 30·9 (30·01) |
| Antipsychotic exposure within 21 days before baseline | 15 (17%) | 18 (19%) |
| Clozapine | 0 | 2 (2%) |
| Quetiapine | 13 (14%) | 16 (17%) |
| Risperidone | 1 (1%) | 0 |
| Ziprasidone | 1 (1%) | 0 |
| Use of dopaminergic drugs at baseline and throughout trial | 89 (99%) | 94 (99%) |
| Use of cholinesterase inhibitors at baseline and throughout trial | 32 (36%) | 31 (33%) |
| NPI total (H+D) score | 12·2 (5·33) | 11·8 (5·85) |
| SAPS-PD | 14·7 (5·55) | 15·9 (6·12) |
| SAPS-H+D | 15·8 (6·52) | 17·5 (7·57) |
| CGI-S | 4·32 (0·91) | 4·27 (0·92) |
| SCOPA-sleep (night-time score) | 5·48 (3·82) | 5·84 (3·84) |
| Caregiver burden scale score | 30·66 (15·92) | 28·71 (14·23) |

Data are mean (SD) or n (%). The full analysis set consisted of all patients who received ≥1 dose and had SAPS assessments at baseline and ≥1 post-baseline. UPDRS=unified Parkinson's disease rating scale. PDP=Parkinson's disease psychosis. NPI=neuropsychiatric inventory. H+D=hallucinations and delusions. SAPS=scale for the assessment of positive symptoms. SAPS-PD=sum of nine item Parkinson's disease-adapted SAPS. CGI-S=clinical global impression severity. SCOPA=scale for outcomes of Parkinson's disease.

Source: Cummings et al., The Lancet. Volume 383, Issue 9916, 8–14 February 2014, Pages 533–540.

Ex. 5
P. 13

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

The trial randomized 199 patients to receive 40mg of pimavanserin (two 20mg tablets) or placebo for 6 weeks. The mean age of patients enrolled in the trial was 72. Treatment with pimavanserin resulted in improvements in symptoms of psychosis relative to placebo through three independently measured outcomes (each assessed by a different person who was masked to other findings): SAPS-PD, CGI, and CBS.

In the primary endpoint, SAPS-PD scores showed a statistically significant improvement from baseline. A mean improvement of 37% was observed in the pimavanserin arm, vs. 14% for placebo (p=0.0006). 63% of patients in the pimavanserin arm vs. 47% of patients in the placebo arm experienced a reduction of greater than 20% in SAPS-PD scores (p=0.0242). Importantly, SAPS-PD assessments were conducted via live video stream with a centralized, independent rater who was masked to treatment assignment. A benefit was also observed on the full SAPS hallucinations plus delusions scale and on each scale separately. Pimavanserin-treated patients also had greater improvements in CGI-S and CGI-I, which are investigator-assessed measures of antipsychotic benefit.

**Figure 7: Treatment Effects on Psychosis Severity Reduction in the Six-Week Study Period – Full Analysis Set**



Source: Cummings et al., The Lancet. Volume 383, Issue 9916, 8–14 February 2014, Pages 533–540.

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

**Treatment with pimavanserin also resulted in reductions in caregiver burden, improved nighttime sleep and daytime wakefulness.**

In an exploratory analysis, caregivers also completed assessments of benefit via the Zarit 22-item caregiver burden scale (CBS). Caregivers of pimavanserin-treated patients reported a reduction in burden compared to the placebo arm. Pimavanserin also outperformed placebo in other exploratory analyses including scales for outcomes in Parkinson's disease-sleep assessing nighttime sleep quality (SCOPA-NS) and daytime wakefulness (SCOPA-DS). Given that sleep disorders affect up to 90% of PD patients, pimavanserin's improvement on nighttime sleep (without increasing daytime sedation) could be another important feature in this patient population. Interestingly, improvement in sleep was not correlated with improvement in psychosis, which could suggest that improvement in sleep was an independent effect of treatment. Caregiver burden score also did not correlate strongly with psychosis scores. Subgroup analyses showed that pimavanserin efficacy was independent of age, sex, and mental status at screening.

**Figure 8: Treatment Effects on SCOPA-Sleep (Nighttime Sleep and Daytime Wakefulness Measures) and Caregiver Burden – Full Analysis Set**



Source: Cummings et al., The Lancet. Volume 383, Issue 9916, 8–14 February 2014, Pages 533–540.

**Ex. 5
P. 15**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

Pimavanserin continued to be safe and well tolerated, with no evidence of treatment-related impairment of motor function in either group. On the contrary, small, non-significant improvements were observed in both arms of the trial. 11% and 4% of patients had SAEs in the pimavanserin and placebo group, respectively. Treatment-emergent AEs occurring in at least 5% of patients were generally balanced between pimavanserin and placebo arms, and included nausea, peripheral edema, UTI, fall, confusional state, headache and hallucinations.

**Figure 9: Treatment-Emergent Adverse Events in All Participants Who Received ≥1 Dose of Study Drug**

| | Placebo (n=94) | Pimavanserin 40 mg (n=104) |
|---|---|---|
| Nausea | 6 (6%) | 6 (6%) |
| Peripheral oedema | 3 (3%) | 7 (7%) |
| Urinary tract infection | 11 (12%) | 14 (13%) |
| Fall | 8 (9%) | 11 (11%) |
| Confusional state | 3 (3%) | 6 (6%) |
| Headache | 5 (5%) | 1 (1%) |
| Hallucination (including visual) | 4 (4%) | 7 (7%) |

Data are n (%).

Source: Cummings et al., The Lancet. Volume 383, Issue 9916, 8–14 February 2014, Pages 533–540.

Treatment with pimavanserin also resulted in a mean increase of 7.3ms in the QTcB interval from baseline (vs. no change in the placebo arm), though no clinical events were associated with this increase.

Open-label extensions studies have demonstrated the favorable long-term safety and tolerability profile for pimavanserin. The safety database includes >700 patient years of exposure in PDP, with >200 patients treated ≥1 year, and >100 patients treated ≥2 years. The longest patient exposure is more than 8 years on therapy.

## Market Opportunity and Commercial Strategy

**ACADIA has gotten okay from FDA to file for approval on the basis of the single Phase 3 trial.**

After meeting with the FDA following completion of the -020 study, the agency indicated that data from this Phase 3 trial, in addition to supportive data from other already completed studies, would be sufficient for filing. ACADIA is currently completing the remaining pre-filing activities (CMC is the rate-limiting step), and plans to submit the NDA around year-end 2014. In the EU, discussions are ongoing with the EMA, and clarity on a path forward is also expected by the end of the year.

**An estimated 40-60% of PD patients also suffer from PDP, and there are no currently approved therapies in the US.**

An estimated 40-60% of patients with Parkinson's disease develop PDP, which translates to ~400,000-600,000 PDP patients in the US alone. Based on our conversations with neurologists, anywhere from 10% to 70% of PDP patients are actually prescribed an atypical antipsychotic for PDP. Docs who rarely prescribe a treatment cited safety concerns around the existing options and the lack of approval in this setting. Docs who were heavy prescribers also expressed concern around the side effects, but generally felt that the benefits outweigh the risks in many of their

**Ex. 5
P. 16**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

patients. In both cases, docs were cautiously enthusiastic about pimavanserin, though noted that real-world experience will be key with this product. ACADIA plans to launch with ~75 sales reps, which will target high-prescribing neurologists (~5K neurologists). We anticipate pricing will be consistent with that of other currently approved atypical antipsychotics which ranges from $15 to $35 per day. ACADIA has worldwide rights to pimavanserin.

**We model launch in early 2016, with pimavanserin reaching peak US sales of nearly $1B in PDP alone based off what we consider to be conservative assumptions.**

In PDP, we model launch in early 2016, conservatively assuming a gross cost of $25/day, or ~$9,100 per year. We model a gross-to-net adjustment of 12% and a compliance rate of 80%. We assume pimavanserin reaches peak penetration in the US of 35% of the two-thirds of PDP patients with moderate/severe disease that typically seek treatment. The result is peak sales of ~$1B in the US PDP market.

**Figure 10: Pimavanserin PDP Revenue Build**

| | | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|---|---|---|---|
| **United States PDP** | | | | | | | | | | |
| US PD Prevelance | 1.0% | 1,087,689 | 1,098,566 | 1,109,551 | 1,120,647 | 1,131,853 | 1,143,172 | 1,154,604 | 1,166,150 | 1,177,811 |
| PD patients w/ PDP | 40% | 435,076 | 439,426 | 443,821 | 448,259 | 452,741 | 457,269 | 461,841 | 466,460 | 471,124 |
| PDP Pts on Treatment | 66% | 287,150 | 290,021 | 292,922 | 295,851 | 298,809 | 301,797 | 304,815 | 307,863 | 310,942 |
| PDP Pts on pimavanserin | | | - | 8,788 | 20,710 | 35,857 | 60,359 | 91,445 | 107,752 | 108,830 |
| *pimavanserin penetration* | | | | *3%* | *7%* | *12%* | *20%* | *30%* | *35%* | *35%* |
| Gross Annual WAC | 4% | | | $9,125 | $9,490 | $9,870 | $10,264 | $10,675 | $11,102 | $11,546 |
| Net Annual WAC | 12% | | | $8,030 | $8,351 | $8,685 | $9,033 | $9,394 | $9,770 | $10,161 |
| Compliance Adjusted | 80% | | | $6,424 | $6,681 | $6,948 | $7,226 | $7,515 | $7,816 | $8,128 |
| **US PDP Revenue ($m)** | | | | **$56.5** | **$138.4** | **$249.1** | **$436.2** | **$687.2** | **$842.2** | **$884.6** |
| | | | | | | | | | | |
| **ex-US PDP** | | | | | | | | | | |
| Ex-US PD Prevelance | 1.0% | 2,284,383 | 2,307,227 | 2,330,299 | 2,353,602 | 2,377,139 | 2,400,910 | 2,424,919 | 2,449,168 | 2,473,660 |
| PD patients w/ PDP | 40% | 913,753 | 922,891 | 932,120 | 941,441 | 950,855 | 960,364 | 969,968 | 979,667 | 989,464 |
| PDP Pts on Treatment | 66% | 603,077 | 609,108 | 615,199 | 621,351 | 627,565 | 633,840 | 640,179 | 646,580 | 653,046 |
| PDP Pts on pimavanserin | | | - | - | 6,214 | 18,827 | 44,369 | 70,420 | 96,987 | 130,609 |
| *pimavanserin penetration* | | | | *0%* | *1%* | *3%* | *7%* | *11%* | *15%* | *20%* |
| Gross Annual WAC | 0% | | | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 |
| Net Annual WAC | 15% | | | $4,654 | $4,654 | $4,654 | $4,654 | $4,654 | $4,654 | $4,654 |
| Compliance Adjusted | 80% | | | $3,723 | $3,723 | $3,723 | $3,723 | $3,723 | $3,723 | $3,723 |
| **ex-US PDP Revenue ($m)** | | | | **$0.0** | **$23.1** | **$70.1** | **$165.2** | **$262.2** | **$361.1** | **$486.3** |
| Royalty to Acadia | 25% | | | $0.0 | $5.8 | $17.5 | $41.3 | $65.5 | $90.3 | $121.6 |

Source: J.P. Morgan estimates.

## Pimavanserin Pipeline Opportunities

**Pimavanserin's selectivity for the 5-HT$_{2A}$ receptor has potential for broader use across other psychiatric indications, including Alzheimer's Disease Psychosis (ADP) and schizophrenia.**

Alzheimer's Disease Psychosis (ADP) is similar to PDP, sharing many of the same characteristics and psychiatric symptoms. As with PDP, there is currently no drug approved to treat ADP in the US, and current anti-psychotics have a black-box warning for use in ADP. ACAD is currently running a Phase 2 trial of pimavanserin in ADP – the -019 study. The double-blind, placebo-controlled trial is being conducted at a single center in London, and will enroll ~200 ADP patients. Following an initial three-week screening period, study participants will be randomized to receive 40mg pimavanserin or placebo for 12 weeks. Efficacy will be assessed using the Neuropsychiatric Inventory – Nursing Home Version (NPI-NH), which measures psychosis, agitation/aggression, and sleep/nighttime behavior.

Ex. 5
P. 17

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

### Figure 11: ADP Phase 2 Trial Design

| Phase II Efficacy, Tolerability and Safety Study | |
| --- | --- |
| Location | Nursing homes at Biomedical Research Centre for Mental Health, Kings College |
| Patients | 200 ADP patients with psychosis |
| Type of design | Randomized, double-blind, placebo-controlled |
| Key efficacy endpoints | NPI-NH, CMAI-SF, ADCS-CGIC |



Source: Company presentation.

Data from this trial is expected in 2015. The ADP opportunity is likely 3-5x that of PDP, and the company notes that the PDP infrastructure can be readily leveraged for ADP given similarity in patient populations. ACADIA does anticipate that the sales force of ~75 reps for PDP would need to be expanded by 2-3x to successfully target all ADP prescribers.

### Figure 12: Pimavanserin ADP Revenue Build

| | | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **United States ADP** | | | | | | | | | | |
| US AD Prevelance | 1.0% | 5,454,000 | 5,508,540 | 5,563,625 | 5,619,262 | 5,675,454 | 5,732,209 | 5,789,531 | 5,847,426 | 5,905,900 |
| AD patients w/ ADP | 30% | 1,636,200 | 1,652,562 | 1,669,088 | 1,685,778 | 1,702,636 | 1,719,663 | 1,736,859 | 1,754,228 | 1,771,770 |
| ADP Pts on Treatment | 50% | 818,100 | 826,281 | 834,544 | 842,889 | 851,318 | 859,831 | 868,430 | 877,114 | 885,885 |
| ADP Pts on pimavanserin | | | | - | - | - | 25,540 | 60,188 | 104,212 | 175,423 | 265,766 |
| *pimavanserin penetration* | | | | *0%* | *0%* | *3%* | *7%* | *12%* | *20%* | *30%* |
| Gross Annual WAC | 4% | | | $9,125 | $9,490 | $9,870 | $10,264 | $10,675 | $11,102 | $11,546 |
| Net Annual WAC | 12% | | | $8,030 | $8,351 | $8,685 | $9,033 | $9,394 | $9,770 | $10,161 |
| Compliance Adjusted | 80% | | | $6,424 | $6,681 | $6,948 | $7,226 | $7,515 | $7,816 | $8,128 |
| **US PDP Revenue ($m)** | | | | **$0.0** | **$0.0** | **$177.5** | **$434.9** | **$783.2** | **$1,371.1** | **$2,160.3** |
| **ex-US ADP** | | | | | | | | | | |
| ex-US AD Prevelance | 1.0% | 10,908,000 | 11,017,080 | 11,127,251 | 11,238,523 | 11,350,909 | 11,464,418 | 11,579,062 | 11,694,852 | 11,811,801 |
| AD patients w/ ADP | 30% | 3,272,400 | 3,305,124 | 3,338,175 | 3,371,557 | 3,405,273 | 3,439,325 | 3,473,719 | 3,508,456 | 3,543,540 |
| ADP Pts on Treatment | 50% | 1,636,200 | 1,652,562 | 1,669,088 | 1,685,778 | 1,702,636 | 1,719,663 | 1,736,859 | 1,754,228 | 1,771,770 |
| ADP Pts on pimavanserin | | | | - | - | - | 17,197 | 52,106 | 122,796 | 194,895 |
| *pimavanserin penetration* | | | | *0%* | *0%* | *0%* | *1.0%* | *3%* | *7%* | *11%* |
| Gross Annual WAC | 0% | | | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 | $5,475 |
| Net Annual WAC | 15% | | | $4,818 | $4,818 | $4,818 | $4,818 | $4,818 | $4,818 | $4,818 |
| Compliance Adjusted | 80% | | | $3,854 | $3,854 | $3,854 | $3,854 | $3,854 | $3,854 | $3,854 |
| **US PDP Revenue ($m)** | | | | **$0.0** | **$0.0** | **$0.0** | **$66.3** | **$200.8** | **$473.3** | **$751.2** |
| Royalty to Acadia | 25% | | | $0.0 | $0.0 | $0.0 | $16.6 | $50.2 | $118.3 | $187.8 |

Source: J.P. Morgan estimates.

Other related expansion opportunities include Lewy Body Disease (LBD) psychosis, MID psychosis and psychosis in elderly patients with other neurodegenerative diseases, which offer potential label-expansion opportunities or sources of possible off-label use.

**Ex. 5**
**P. 18**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

**Figure 13: Evolution of Neurology Market Opportunities**



*Charts reflect ACADIA internal estimate of market size.

Source: Company presentation.

Pimavanserin has also been evaluated in a Phase 2 trial in schizophrenic patients, as an adjunct therapy to low-dose risperdone. The proof-of-concept trial was double-blind and placebo controlled at multiple centers. Data indicate that there are several advantages to the addition of pimavanserin on top of low-dose risperdone. Specifically, pimavanserin+2mg risperdone had efficacy comparable to that of a monotherapy dose of 6mg risperdone, and the combination regimen also demonstrated more rapid onset of antipsychotic action. The combination also demonstrated an improved side-effect profile, including significantly less weight gain compared to the standard 6mg dose of risperdone. ACADIA also believes that pimavanserin could be useful in a maintenance setting in schizophrenic patients. The company intends to run additional trials in this indication.

**Figure 14: Pimavanserin Co-Therapy in Schizophrenia**



Source: Company presentation.

## Intellectual Property

ACADA holds 49 issued US patents and 238 issued foreign patents. Nineteen of the US patents are related to pimavanserin, including three composition of matter patents that expire in 2021. Additional issued patents cover pimavanserin, polymorphs thereof, the use in treating PDP, ADP, schizophrenia, bipolar disorder, Lewy body disease, sleep disorders, and other methods of treatment. Patents covering the treatment of PDP expire in 2026, and those that cover polymorphs of pimavanserin expire in 2028. Outside US, ACADA has 55 issued foreign patents that cover pimavanserin, including 35 patents in key geographies that expire in 2024.

**Ex. 5**
**P. 19**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Financial Outlook

**ACAD is a development-stage biotech company that is not yet profitable; it ended 1Q14 with a healthy $369M in cash.**

ACADIA is a developmental-stage biotechnology company with upcoming regulatory events (NDA submission around YE14 in PDP) and an ongoing Phase 2 trial in a potential major follow-on indication (ADP) with data expected in 2015. Currently, we do not model profitability until 2018 (this assumes US and EU approval for just PDP). We do not anticipate a consistent, significant revenue contribution until pimavanserin is approved in these territories.

**ACADIA ended 1Q14 with ~$369 million in cash**

The company's cash, cash equivalents and marketable securities totaled $369 million as of March 31, 2014 including ~$171M from a secondary offering of common stock in March (J.P. Morgan acted as a joint book-runner). ACAD believes it has sufficient capital through 2017, and expects to end 2014 with >$300M in cash and equivalents. We model cash burn of ~$68M in 2014. For general operating trends, we expect SG&A to continue to ramp up over time as the company gets closer to commercialization. We assume the at launch sales force will cost ~$25M/year (75 reps at ~$300K/yr), and roughly the same amount for marketing materials and other launch costs, such that the total amount of SG&A to support the launch will be ~$50M/year.

**Share count**

We estimate ACADIA currently has ~109 million fully diluted shares outstanding (including ~99 million common shares, 7.7 million stock options, and 2.0 million warrants as of 1Q14).

**Figure 15: ACAD Key Financial Metrics**

Key Financial Metrics

In $ M
December financial year-end

| | 2012A | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash ($, millions) | 57.90 | 11.70 | 230.53 | 234.89 | 174.62 | 184.10 | 306.40 | 622.47 | 1,216.61 | 2,051.10 | 3,038.20 |
| Debt ($, millions) | - | - | - | - | - | - | - | - | - | - | - |
| CFOp + CapEx ($, millions) | (78.36) | (243.36) | (59.46) | (75.21) | (59.60) | 10.20 | 123.08 | 316.93 | 595.15 | 835.59 | 988.24 |
| Expected financing ($, millions) | 98.20 | 111.68 | 198.66 | - | - | - | - | - | - | - | - |
| Revenue ($, millions) | 4.91 | 1.15 | 0.03 | - | 56.45 | 144.14 | 266.67 | 477.46 | 752.76 | 932.44 | 1,006.18 |
| EPS | (0.38) | (0.44) | (0.76) | (0.78) | (0.65) | (0.00) | 0.79 | 2.02 | 3.65 | 4.92 | 5.58 |
| Consensus EPS | | (0.44) | (0.36) | (0.37) | (0.20) | 0.76 | 1.59 | 2.82 | | | |
| Average shares outstanding (millions) | 55.12 | 85.72 | 98.66 | 110.11 | 117.92 | 125.77 | 133.66 | 141.59 | 149.55 | 157.56 | 165.61 |
| Fully diluted shares outstanding (millions) | 66.37 | 96.08 | 108.30 | 119.75 | 127.57 | 135.41 | 143.30 | 151.23 | 159.20 | 167.21 | 175.25 |

Source: Company reports and J.P. Morgan estimates.

**Ex. 5**

**P. 20**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

**J.P.Morgan**

# Valuation

**We are initiating coverage of ACAD with an Overweight rating and a December 2014 price target of $33.**

Our target is based on a blended average of our proprietary probability-adjusted scenario analysis (50%) and a risk-adjusted NPV model (50%).

**Figure 16: ACAD Valuation Summary**

| ACAD Valuation Summary | | | |
|---|---|---|---|
| Discount rate | 13.0% | | |
| 4Q14 Fully Diluted Shares (mm) | 113.7 | | |
| | | Peak WW sales est | |
| **Main value drivers** | Prob of approval | (avg. scenario) | Avg peak yr |
| pimavanserin - US PDP | 80% | $ 1,028 | 2020 |
| pimavanserin - ex-US PDP | 60% | $ 501 | 2022 |
| pimavanserin - WW ADP | 30% | $ 2,928 | 2022 |
| | | | |
| **Valuation methodology** | Value / share | Weighting | Adj. value/ share |
| DCF | | | |
| P/E 2016 | NM | 0% | NM |
| Real options scenario analysis | $ 33.83 | 50% | 16.91 |
| Risk adjusted NPV analysis | $ 32.93 | 50% | 16.47 |
| Total | | | $ 33.38 |
| Catalyst/liquidity discount | | | 0% |
| **YE13 Price Target** | | | **$ 33** |

Source: J.P. Morgan estimates.

**Risk-adjusted NPV analysis (50% weighting)**

In our risk-adjusted NPV analysis, we estimate the revenues and associated expenses (including taxes) over the expected patent life of a product. We complete this exercise for conservative, moderate, and aggressive sales scenarios and then assign a range of probabilities to each of these outcomes as well as to the possibility that the product is ineffective and generates zero value (which is 20% in our model). For pimavanserin in the US and EU, we assume patent protection through 2027. We apply a discount rate of 13%, based on ACAD's weighted average cost of capital (WACC). We believe this is appropriate given the applied probability adjustments. As an example, we provide our rNPV for PDP in the US below.

**Figure 17: Pimavanserin rNPV Analysis**

pimavanserin, US, PDP

| | Peak Sales | NPV | NPV/Share | Probability | Value/Share |
|---|---|---|---|---|---|
| Not Approved | - | - | - | 20% | - |
| Aggressive | 1,979.5 | 3,515.7 | 30.9 | 15% | 4.6 |
| Base | 1,131.2 | 1,924.7 | 16.9 | 50% | 8.5 |
| Disappointing | 452.5 | 605.0 | 5.3 | 15% | 0.8 |
| **Total** | | | | **100%** | **13.90** |

Source: J.P. Morgan estimates.

**Proprietary real options scenario analysis (50% weighting)**

Using this model, we estimate the value of the company's development programs by assigning a range of probabilities to six different commercial scenarios (ranging from an ineffective product that generates zero value to a breakthrough treatment option) and analyze them over several possible peak sales years. We also evaluate a range of price-to-peak sales multiples for a small-molecule asset (3-5x for a small-molecule drug). In addition, we again apply the company's WACC-derived discount rate of 13%.

**Ex. 5**
**P. 21**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

**North America Equity Research**
15 May 2014

J.P.Morgan

*Value contribution of Pimavanserin*

Below, we demonstrate our analysis for pimavanserin for PDP in the US and in Europe, ACAD's key value driver. We assume an 80% probability that pimavanserin reaches the market for PDP in the US, and assume that sales peak in 2018. For example, below is our calculated value contribution from pimavanserin for PDP for a range of multiples if the drug generates peak sales of ~$1B in the US in a base case scenario.

**Figure 18: Pimavanserin Scenario Analysis**

| Product: | pimavanserin | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indication: | PDP | | | Peak year | | 2019 | | | 2020 | | | 2021 | | | Average prob-adj value /share |
| Market: | US | | | Discount period | | 5.0 | | | 6.0 | | | 7.0 | | | |
| Ownership: | Unpartnered | | | Price/sales mult. | 3 | 4 | 5 | 3 | 4 | 5 | 3 | 4 | 5 | |
| | | Peak sales (millions) | Peak royalties (millions, 100%) | | | | Value/share | | | | | | | | |
| | Prob. | | | | | | | | | | | | | |
| Ineffective | 20% | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Disappointment | 5% | 411 | $ 411 | | $ 5.89 | $ 7.85 | $ 9.81 | $ 5.21 | $ 6.95 | $ 8.68 | $ 4.61 | $ 6.15 | $ 7.68 | 0.35 |
| Below average | 15% | 771 | $ 771 | | $ 11.04 | $ 14.72 | $ 18.40 | $ 9.77 | $ 13.02 | $ 16.28 | $ 8.64 | $ 11.53 | $ 14.41 | 1.96 |
| Average | 40% | 1,028 | $ 1,028 | | $ 14.72 | $ 19.62 | $ 24.53 | $ 13.02 | $ 17.37 | $ 21.71 | $ 11.53 | $ 15.37 | $ 19.21 | 6.98 |
| Above average | 15% | 1,542 | $ 1,542 | | $ 22.08 | $ 29.44 | $ 36.80 | $ 19.54 | $ 26.05 | $ 32.56 | $ 17.29 | $ 23.05 | $ 28.82 | 3.93 |
| Breakthrough | 5% | 2,055 | $ 2,055 | | $ 29.44 | $ 39.25 | $ 49.06 | $ 26.05 | $ 34.73 | $ 43.42 | $ 23.05 | $ 30.74 | $ 38.42 | 1.75 |
| **Total** | **100%** | | | | | | | | | | | | | **$ 14.97** |

Source: J.P. Morgan estimates.

**Ex. 5**
**P. 22**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

## Management

Below we highlight key executives at ACADIA:

**Uli Hacksell, Ph.D., CEO**

Dr. Hacksell has served as ACADIA's Chief Executive Officer and as a director since 2000. Prior to this, he served as the Executive Vice President of Drug Discovery from 1999 to 2000. Before joining ACADIA, Dr. Hacksell held various senior executive positions at a pharmaceutical company, Astra, including Vice President of Drug Discovery and Technology and as President one of Astra's largest research and development subsidiaries. From 1991 to 1994, he served as VP of CNS Preclinical R&D at another Astra subsidiary.

**Thomas H. Aasen, Executive VP, CFO and CBO**

Mr. Aasen joined ACADIA in 1998, prior to which he held financial management positions at several public life science companies including Axys Pharmaceuticals, Genta, Inc., and Gen-Probe, Inc. Prior to this, he held various positions in public accounting at KPMG Peat Marwick.

**Roger G. Mills, M.D., Executive VP, Development and CMO**

Dr. Mills joined ACADIA in 2006, prior to which he served as VP, Development at Pfizer Global R&D where he played a key role in the development of Sutent as a treatment for renal cell carcinoma. Before joining Pfizer, Dr. Mills held senior clinical management positions at Gilead and Abbot Laboratories.

**Terrence O. Moore, Executive VP, CCO**

Mr. Moore joined ACADIA in 2013, and was formerly a Principal at Cooke-Moore Consulting. Before founding Cooke-Moore Consulting, Mr. Moore was a VP in charge of commercial strategy BD and commercial alliance activities at Transcept Pharmaceuticals. Prior to Transcept, he served as VP, US Head of Neuroscience Marketing at Organon BioSciences and before that was VP, Global Strategy Depression Portfolio at Wyeth Pharmaceuticals. Mr. Moore has also held various senior management positions at Johnson & Johnson and various sales and marketing roles at Eli Lilly.

**Glenn F. Baity, VP, General Counsel and Secretary**

Mr. Baity joined ACADIA in 2004, and was previously a senior associate at Cooley LLP from 2000. Over 1997-2000 Mr. Baity was an associate at Brown & Wood LLP.

**Ex. 5**
**P. 23**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

# Models

## Figure 19: ACAD Income Statement

**Acadia Pharmaceuticals** Income Statement

Cory Kasimov
cory.w.kasimov@jpmorgan.com
212.622.5266

| | 2012A | 2013A | 1Q14A | 2Q14E | 3Q14E | 4Q14E | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pimavanserin - PDP only | - | - | - | - | - | - | - | - | 56.5 | 144.1 | 266.7 |
| Collaborative Revenues | 4.9 | 1.1 | 0.0 | - | - | - | 0.0 | - | - | - | - |
| **Total Revenues** | **4.9** | **1.1** | **0.0** | **-** | **-** | **-** | **0.0** | **-** | **56.5** | **144.1** | **266.7** |
| | | | | | | | | | | | |
| COGS | - | - | - | - | - | - | - | - | 8.5 | 17.3 | 24.0 |
| R&D | 18.8 | 26.7 | 11.7 | 11.8 | 11.9 | 12.0 | 47.4 | 48.5 | 49.7 | 50.9 | 52.1 |
| SG&A | 7.0 | 12.7 | 6.3 | 6.7 | 7.5 | 7.6 | 28.1 | 37.4 | 75.0 | 76.8 | 78.4 |
| **Total Operating Expenses** | **25.8** | **39.4** | **18.0** | **18.5** | **19.4** | **19.6** | **75.5** | **85.9** | **133.1** | **145.0** | **154.5** |
| | | | | | | | | | | | |
| **Operating Income** | **(20.9)** | **(38.3)** | **(18.0)** | **(18.5)** | **(19.4)** | **(19.6)** | **(75.5)** | **(85.9)** | **(76.7)** | **(0.8)** | **112.2** |
| Net interest & other income | 0.0 | 0.3 | 0.1 | 0.2 | 0.2 | 0.2 | 0.6 | 0.6 | 0.4 | 0.3 | 0.5 |
| Income Tax | - | - | - | - | - | - | - | - | - | - | - |
| **Net Income** | **(20.8)** | **(37.9)** | **(17.8)** | **(18.3)** | **(19.3)** | **(19.5)** | **(74.8)** | **(85.3)** | **(76.3)** | **(0.5)** | **112.7** |
| | | | | | | | | | | | |
| **Basic EPS** | **(0.38)** | **(0.44)** | **(0.19)** | **(0.18)** | **(0.19)** | **(0.19)** | **(0.76)** | **(0.78)** | **(0.65)** | **(0.00)** | **0.84** |
| **Diluted EPS** | **(0.38)** | **(0.44)** | **(0.19)** | **(0.18)** | **(0.19)** | **(0.19)** | **(0.76)** | **(0.78)** | **(0.65)** | **(0.00)** | **0.79** |
| Basic Shares Outstanding | 55.1 | 85.7 | 93.0 | 99.6 | 101.6 | 104.1 | 98.7 | 110.1 | 117.9 | 125.8 | 133.7 |
| Diluted Shares Outstanding | 55.1 | 85.7 | 93.0 | 99.6 | 101.6 | 104.1 | 98.7 | 110.1 | 117.9 | 125.8 | 143.3 |
| | | | | | | | | | | | |
| *Margin Analysis:* | | | | | | | | | | | |
| *Gross margin* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *85%* | *88%* | *91%* |
| *Operating margin* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *42.08%* |
| *Net margin* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *42.25%* |
| *Tax Rate* | *0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| *Cost Analysis:* | | | | | | | | | | | |
| *COGS as % of tot. prod. sales* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *0.0%* | *0%* | *15%* | *12%* | *9%* |
| *R&D as % of tot. revenue* | *383.00%* | *2333.80%* | *#########* | *NM* | *NM* | *NM* | *158069.02%* | *NM* | *88.03%* | *35.30%* | *19.54%* |
| *SG&A as % of tot. revenue* | *142.63%* | *1110.92%* | *#########* | *NM* | *NM* | *NM* | *93608.02%* | *NM* | *132.80%* | *53.28%* | *29.39%* |
| *Year-over-year growth:* | | | | | | | | | | | |
| *Total revenue* | *137.40%* | *-76.67%* | *-92.81%* | *NM* | *NM* | *NM* | *-97.38%* | *NM* | *NM* | *155.34%* | *85.00%* |
| *R&D Expense* | *8.58%* | *42.18%* | *163.39%* | *65.81%* | *64.29%* | *51.94%* | *77.46%* | *2.37%* | *2.38%* | *2.39%* | *2.39%* |
| *SG&A Expense* | *-8.03%* | *81.74%* | *193.82%* | *166.83%* | *98.07%* | *77.31%* | *120.77%* | *33.01%* | *100.70%* | *2.44%* | *2.04%* |
| *Total operating expenses* | *3.51%* | *52.92%* | *173.33%* | *92.05%* | *75.89%* | *60.83%* | *91.43%* | *13.76%* | *54.99%* | *8.90%* | *6.54%* |
| *Operating income* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *97.07%* | *13.81%* | *-10.73%* | *-98.91%* | *-13554.25%* |
| *Net income* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *97.18%* | *14.05%* | *-10.63%* | *-99.36%* | *-23220.37%* |
| *EPS* | *NM* | *NM* | *NM* | *NM* | *NM* | *NM* | *71.31%* | *2.19%* | *-16.55%* | *-99.40%* | *-20391.53%* |
| *Basic Shares* | *5.62%* | *55.52%* | *18.06%* | *19.46%* | *13.56%* | *14.41%* | *15.10%* | *11.61%* | *7.09%* | *6.66%* | *6.27%* |
| *Diluted Shares* | *NM* | *38.63%* | *24.23%* | *34.55%* | *20.39%* | *15.60%* | *24.23%* | *16.59%* | *7.33%* | *6.87%* | *6.46%* |

Source: Company reports and J.P. Morgan estimates.

**Ex. 5**
**P. 24**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

**Figure 20: ACAD Balance Sheet**

| | 2009A | 2010A | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet ($m)** | | | | | | | | | | |
| Current Assets: | | | | | | | | | | |
| Cash and Equivalents | 18.1 | 6.8 | 6.9 | 57.9 | 11.7 | 230.5 | 234.9 | 174.6 | 184.1 | 306.4 |
| Short Term Investments | 28.9 | 30.2 | 24.2 | 50.1 | 174.1 | 94.1 | 14.1 | 14.1 | 14.1 | 14.1 |
| Prepaid Expense | 1.4 | 0.8 | 0.9 | 0.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 |
| Total Current Assets | 48.5 | 37.8 | 31.9 | 108.5 | 188.4 | 327.2 | 251.5 | 191.3 | 200.8 | 323.1 |
| PP&E | 1.1 | 0.4 | 0.2 | 0.0 | 0.6 | 0.5 | 0.5 | 0.8 | 0.9 | 0.9 |
| Other assets, net | 0.1 | 0.1 | 0.0 | - | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **TOTAL ASSETS** | **49.7** | **38.4** | **32.1** | **108.6** | **189.1** | **327.9** | **252.2** | **192.2** | **201.8** | **324.2** |
| Current Liabilities: | | | | | | | | | | |
| Accounts Payable | 2.9 | 2.0 | 2.0 | 1.4 | 0.4 | 0.7 | 0.8 | 1.3 | 1.4 | 1.5 |
| *% of OpEx* | | | *7.87%* | *5.33%* | *0.94%* | *0.94%* | *0.94%* | *0.94%* | *0.94%* | *0.94%* |
| Accrued Expenses | 5.4 | 3.2 | 3.5 | 4.1 | 6.6 | 12.5 | 14.3 | 22.1 | 24.1 | 25.7 |
| *% of OpEx* | | | *14.06%* | *16.05%* | *16.61%* | *16.61%* | *16.61%* | *16.61%* | *16.61%* | *16.61%* |
| Current Portion of Deferred Revenue | 6.0 | 0.7 | 0.7 | 0.4 | 0.1 | - | - | - | - | - |
| Current Portion of Long Term Debt | 0.4 | 0.1 | 0.0 | - | - | - | - | - | - | - |
| Total Current Liabilities | 14.7 | 6.0 | 6.2 | 5.9 | 7.0 | 13.3 | 15.1 | 23.4 | 25.5 | 27.1 |
| Long-term liabilities | 22.9 | 2.7 | 2.6 | - | 0.0 | - | - | - | - | - |
| **TOTAL LIABILITIES** | **37.6** | **8.7** | **8.8** | **5.9** | **7.0** | **13.3** | **15.1** | **23.4** | **25.5** | **27.1** |
| Redeemable Common Stock | - | - | - | 17.658 | - | - | - | - | - | - |
| Preferred Stock | - | - | - | - | - | - | - | - | - | - |
| Common Stock | 0.004 | 0.004 | 0.005 | 0.007 | 0.009 | 0.009 | 0.010 | 0.010 | 0.010 | 0.010 |
| Additional Paid-in capital | 350.9 | 353.3 | 370.2 | 452.7 | 587.7 | 795.0 | 803.0 | 810.9 | 818.9 | 826.9 |
| Accumulated Defecit | (339.2) | (324.1) | (346.9) | (367.7) | (405.7) | (480.5) | (565.8) | (642.1) | (642.6) | (529.9) |
| Accumulated other comprehesive income | 0.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **TOTAL STOCKHOLDERS' EQUITY** | **12.1** | **29.7** | **23.4** | **102.6** | **182.1** | **314.6** | **237.2** | **168.9** | **176.4** | **297.1** |
| **TOTAL LIABILITIES AND SH EQUITY** | **49.7** | **38.4** | **32.1** | **108.6** | **189.1** | **327.9** | **252.2** | **192.2** | **201.8** | **324.2** |

Source: Company reports and J.P. Morgan estimates.

**Ex. 5**
**P. 25**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

**North America Equity Research**
15 May 2014

J.P.Morgan

**Figure 21: ACAD Cash Flow Statement**

| | 2009A | 2010A | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows ($m)** | | | | | | | | | | |
| Net Income | (45.1) | 15.1 | (22.8) | (20.8) | (37.9) | (74.8) | (85.3) | (76.3) | (0.5) | 112.7 |
| Depreciation and Amortization | 1.1 | 0.6 | 0.3 | 0.1 | 0.1 | 0.5 | 0.4 | 0.4 | 0.6 | 0.7 |
| SBC | 2.1 | 1.6 | 1.6 | 1.9 | 5.7 | 7.8 | 7.8 | 7.8 | 7.9 | 7.9 |
| Amortization of investment premium/discount | 0.3 | (0.1) | 0.1 | (0.1) | 1.5 | 0.8 | 0.1 | 0.1 | 0.1 | 0.1 |
| *% of Short Term Investments* | *0.90%* | *-0.39%* | *0.43%* | *-0.27%* | *0.88%* | *0.88%* | *0.88%* | *0.88%* | *0.88%* | *0.88%* |
| Other | 0.3 | (0.1) | 0.8 | (0.3) | (0.0) | - | - | - | - | - |
| *Changes in Assets and Liabilities :* | | | | | | | | | | |
| Prepaid expenses, receivables and other current | 1.0 | 0.7 | (0.1) | 0.3 | (2.0) | - | - | - | - | - |
| Other assets | 0.0 | 0.0 | 0.1 | 0.0 | (0.2) | - | - | - | - | - |
| Accounts Payable | 0.7 | (1.0) | (0.0) | (0.6) | (1.0) | 0.3 | 0.1 | 0.4 | 0.1 | 0.1 |
| Accrued Expenses | (2.3) | (2.1) | 0.3 | 0.6 | 2.4 | 6.0 | 1.7 | 7.8 | 2.0 | 1.6 |
| Deferred Revenue | 28.2 | (25.3) | (0.1) | (2.8) | (0.4) | - | - | - | - | - |
| Other Long Term Liabilities | (0.0) | (0.1) | (0.1) | - | - | - | - | - | - | - |
| **Net Cash Used in Operating Activities** | **(13.7)** | **(10.7)** | **(19.9)** | **(21.6)** | **(31.8)** | **(59.5)** | **(75.2)** | **(59.6)** | **10.2** | **123.1** |
| | | | | | | | | | | |
| purchases of investment securities | (50.3) | (54.7) | (48.1) | (56.7) | (211.6) | - | - | - | - | - |
| *growth* | | *8.77%* | *-12.09%* | *18.02%* | *272.98%* | | | | | |
| Maturities/sales of investment securities | 59.8 | 53.5 | 54.0 | 30.9 | 86.1 | 80.0 | 80.0 | - | - | - |
| Sale of (purchase) of PP&E | (0.0) | 0.1 | (0.0) | 0.3 | (0.6) | (0.4) | (0.4) | (0.7) | (0.7) | (0.8) |
| **Net cash provided by investing activities** | **9.4** | **(1.1)** | **6.0** | **(25.5)** | **(126.1)** | **79.6** | **79.6** | **(0.7)** | **(0.7)** | **(0.8)** |
| | | | | | | | | | | |
| Proceeds from public offerings, net | 1.9 | 0.8 | 14.0 | 98.2 | 111.7 | 198.7 | - | - | - | - |
| Shares Issued(m) | | | | | | 6.4 | | | | |
| Repayment of long-term debt | (0.8) | (0.4) | (0.1) | (0.0) | - | - | - | - | - | - |
| **Net Cash provided by financing activities** | **1.2** | **0.5** | **13.9** | **98.2** | **111.7** | **198.7** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | |
| Effect of Exchange Rate on Cash | 0.1 | 0.0 | 0.0 | (0.0) | (0.0) | - | - | - | - | - |
| Net decrease in cash and cash equivalents | (3.0) | (11.3) | 0.0 | 51.0 | (46.2) | 218.8 | 4.4 | (60.3) | 9.5 | 122.3 |
| | | | | | | | | | | |
| Cash at beginning of year | 21.2 | 18.1 | 6.8 | 6.9 | 57.9 | 11.7 | 230.5 | 234.9 | 174.6 | 184.1 |
| Cash at end of year | **18.1** | **6.8** | **6.9** | **57.9** | **11.7** | **230.5** | **234.9** | **174.6** | **184.1** | **306.4** |

Source: Company reports and J.P. Morgan estimates.

**Ex. 5**
**P. 26**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

**North America Equity Research**
15 May 2014

J.P.Morgan

# ACADIA Pharmaceuticals: Summary of Financials

| Income Statement - Annual | FY13A | FY14E | FY15E | FY16E | Income Statement - Quarterly | 1Q14A | 2Q14E | 3Q14E | 4Q14E |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | 1 | 0 | 0 | 56 | Revenues | 0A | 0 | 0 | 0 |
| Cost of products sold | 0 | 0 | 0 | (8) | Cost of products sold | 0A | 0 | 0 | 0 |
| Gross profit | - | - | - | - | Gross profit | - | - | - | - |
| SG&A | (13) | (28) | (37) | (75) | SG&A | (6)A | (7) | (8) | (8) |
| R&D | (27) | (47) | (49) | (50) | R&D | (12)A | (12) | (12) | (12) |
| Operating income | (38) | (75) | (86) | (77) | Operating income | (18)A | (18) | (19) | (20) |
| EBITDA | (38) | (75) | (86) | (77) | EBITDA | (18)A | (18) | (19) | (20) |
| Net interest (income) / expense | 0 | 1 | 1 | 0 | Net interest (income) / expense | 0A | 0 | 0 | 0 |
| Other income / (expense) | - | - | - | - | Other income / (expense) | - | - | - | - |
| Income taxes | 0 | 0 | 0 | 0 | Income taxes | 0A | 0 | 0 | 0 |
| Net income - GAAP | (38) | (75) | (85) | (76) | Net income - GAAP | (18)A | (18) | (19) | (19) |
| Net income - recurring | (38) | (75) | (85) | (76) | Net income - recurring | (18)A | (18) | (19) | (19) |
| Diluted shares outstanding | 86 | 99 | 110 | 118 | Diluted shares outstanding | 93A | 100 | 102 | 104 |
| EPS - excluding non-recurring | (0.44) | (0.76) | (0.78) | (0.65) | EPS - excluding non-recurring | (0.19)A | (0.18) | (0.19) | (0.19) |
| EPS - recurring | (0.44) | (0.76) | (0.78) | (0.65) | EPS - recurring | (0.19)A | (0.18) | (0.19) | (0.19) |
| **Balance Sheet and Cash Flow Data** | **FY13A** | **FY14E** | **FY15E** | **FY16E** | **Ratio Analysis** | **FY13A** | **FY14E** | **FY15E** | **FY16E** |
| Cash and cash equivalents | 12 | 231 | 235 | 175 | Sales growth | (76.7%) | (97.4%) | (100.0%) | - |
| Accounts receivable | - | - | - | - | EBIT growth | 83.4% | 97.1% | 13.8% | (10.7%) |
| Inventories | - | - | - | - | EPS growth - recurring | 17.0% | 71.3% | 2.2% | (16.5%) |
| Other current assets | 3 | 3 | 3 | 3 | | | | | |
| Current assets | 188 | 327 | 252 | 191 | Gross margin | - | - | - | - |
| PP&E | 1 | 0 | 1 | 1 | EBIT margin | (3344.7%) | (251577.0%) | - | (135.8%) |
| Total assets | 189 | 328 | 252 | 192 | EBITDA margin | (3344.7%) | (251577.0%) | - | (135.8%) |
| | | | | | Tax rate | 0.0% | 0.0% | 0.0% | 0.0% |
| Total debt | 0 | 0 | 0 | 0 | Net margin | (3314.2%) | (249424.4%) | - | (135.1%) |
| Total liabilities | 7 | 13 | 15 | 23 | | | | | |
| Shareholders' equity | 182 | 315 | 237 | 169 | Net Debt / EBITDA | 30.4% | 305.4% | 273.5% | 227.7% |
| | | | | | Net Debt / Capital (book) | (6.8%) | (274.2%) | (10296.4%) | 3027.5% |
| Net income (including charges) | (38) | (75) | (85) | (76) | | | | | |
| D&A | 0 | 0 | 0 | 0 | Return on assets (ROA) | (25.5%) | (28.9%) | (29.4%) | (34.3%) |
| Change in working capital | (1) | 6 | 2 | 8 | Return on equity (ROE) | (26.7%) | (30.1%) | (30.9%) | (37.6%) |
| Other | 7 | 9 | 8 | 8 | | | | | |
| Cash flow from operations | (32) | (59) | (75) | (60) | Enterprise value / sales | - | - | - | - |
| | | | | | Enterprise value / EBITDA | - | - | - | - |
| Capex | (1) | (0) | (0) | (1) | Free cash flow yield | (2.0%) | (3.2%) | (3.6%) | (2.7%) |
| Free cash flow | (32) | (60) | (76) | (60) | | | | | |
| Cash flow from investing activities | (126) | 80 | 80 | (1) | | | | | |
| Cash flow from financing activities | 112 | 199 | 0 | 0 | | | | | |
| Dividends | - | - | - | - | | | | | |
| Dividend yield | - | - | - | - | | | | | |

Source: Company reports and J.P. Morgan estimates.
Note: $ in millions (except per-share data).Fiscal year ends Dec

26

**Ex. 5**
**P. 27**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

**North America Equity Research**
15 May 2014

J.P.Morgan

**Analyst Certification:** The research analyst(s) denoted by an "AC" on the cover of this report certifies (or, where multiple research analysts are primarily responsible for this report, the research analyst denoted by an "AC" on the cover or within the document individually certifies, with respect to each security or issuer that the research analyst covers in this research) that: (1) all of the views expressed in this report accurately reflect his or her personal views about any and all of the subject securities or issuers; and (2) no part of any of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst(s) in this report. For all Korea-based research analysts listed on the front cover, they also certify, as per KOFIA requirements, that their analysis was made in good faith and that the views reflect their own opinion, without undue influence or intervention.

## Important Disclosures

- **Market Maker:** JPMS makes a market in the stock of ACADIA Pharmaceuticals.

- **Lead or Co-manager:** J.P. Morgan acted as lead or co-manager in a public offering of equity and/or debt securities for ACADIA Pharmaceuticals within the past 12 months.

- **Client:** J.P. Morgan currently has, or had within the past 12 months, the following company(ies) as clients: ACADIA Pharmaceuticals.

- **Client/Investment Banking:** J.P. Morgan currently has, or had within the past 12 months, the following company(ies) as investment banking clients: ACADIA Pharmaceuticals.

- **Investment Banking (past 12 months):** J.P. Morgan received in the past 12 months compensation from investment banking ACADIA Pharmaceuticals.

- **Investment Banking (next 3 months):** J.P. Morgan expects to receive, or intends to seek, compensation for investment banking services in the next three months from ACADIA Pharmaceuticals.

**Company-Specific Disclosures:** Important disclosures, including price charts, are available for compendium reports and all J.P. Morgan–covered companies by visiting https://jpmm.com/research/disclosures, calling 1-800-477-0406, or e-mailing research.disclosure.inquiries@jpmorgan.com with your request. J.P. Morgan's Strategy, Technical, and Quantitative Research teams may screen companies not covered by J.P. Morgan. For important disclosures for these companies, please call 1-800-477-0406 or e-mail research.disclosure.inquiries@jpmorgan.com.

**ACADIA Pharmaceuticals (ACAD, ACAD US) Price Chart**



Source: Bloomberg and J.P. Morgan; price data adjusted for stock splits and dividends.

The chart(s) show J.P. Morgan's continuing coverage of the stocks; the current analysts may or may not have covered it over the entire period.
J.P. Morgan ratings or designations: OW = Overweight, N= Neutral, UW = Underweight, NR = Not Rated

**Explanation of Equity Research Ratings, Designations and Analyst(s) Coverage Universe:**
J.P. Morgan uses the following rating system: Overweight [Over the next six to twelve months, we expect this stock will outperform the average total return of the stocks in the analyst's (or the analyst's team's) coverage universe.] Neutral [Over the next six to twelve months, we expect this stock will perform in line with the average total return of the stocks in the analyst's (or the analyst's team's)

**Ex. 5**
**P. 28**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

coverage universe.] Underweight [Over the next six to twelve months, we expect this stock will underperform the average total return of the stocks in the analyst's (or the analyst's team's) coverage universe.] Not Rated (NR): J.P. Morgan has removed the rating and, if applicable, the price target, for this stock because of either a lack of a sufficient fundamental basis or for legal, regulatory or policy reasons. The previous rating and, if applicable, the price target, no longer should be relied upon. An NR designation is not a recommendation or a rating. In our Asia (ex-Australia) and U.K. small- and mid-cap equity research, each stock's expected total return is compared to the expected total return of a benchmark country market index, not to those analysts' coverage universe. If it does not appear in the Important Disclosures section of this report, the certifying analyst's coverage universe can be found on J.P. Morgan's research website, www.jpmorganmarkets.com.

**Coverage Universe: Kasimov, Cory W**: Aegerion Pharmaceuticals (AEGR), Alkermes, Inc. (ALKS), Arena Pharmaceuticals, Inc. (ARNA), Ariad Pharmaceuticals (ARIA), Array BioPharma (ARRY), BioMarin Pharmaceuticals (BMRN), Clovis Oncology (CLVS), Dendreon (DNDN), Emergent BioSolutions (EBS), Exelixis, Inc (EXEL), Geron Corp (GERN), ImmunoGen (IMGN), Incyte Corporation (INCY), Infinity Pharmaceuticals (INFI), Isis Pharmaceuticals (ISIS), Keryx Biopharmaceuticals (KERX), Lexicon Pharmaceuticals (LXRX), MannKind Corporation (MNKD), Nektar Therapeutics (NKTR), Orexigen Therapeutics (OREX), Pharmacyclics, Inc. (PCYC), Rigel Pharmaceuticals (RIGL), Seattle Genetics (SGEN), The Medicines Company (MDCO), Ultragenyx (RARE), VIVUS, Inc (VVUS), ZIOPHARM Oncology (ZIOP), bluebird bio (BLUE)

### J.P. Morgan Equity Research Ratings Distribution, as of March 31, 2014

|  | Overweight (buy) | Neutral (hold) | Underweight (sell) |
|---|---|---|---|
| J.P. Morgan Global Equity Research Coverage | 44% | 44% | 11% |
| IB clients* | 58% | 49% | 40% |
| JPMS Equity Research Coverage | 45% | 48% | 7% |
| IB clients* | 78% | 67% | 60% |

*Percentage of investment banking clients in each rating category.

For purposes only of FINRA/NYSE ratings distribution rules, our Overweight rating falls into a buy rating category; our Neutral rating falls into a hold rating category; and our Underweight rating falls into a sell rating category. Please note that stocks with an NR designation are not included in the table above.

**Equity Valuation and Risks:** For valuation methodology and risks associated with covered companies or price targets for covered companies, please see the most recent company-specific research report at http://www.jpmorganmarkets.com, contact the primary analyst or your J.P. Morgan representative, or email research.disclosure.inquiries@jpmorgan.com.

**Equity Analysts' Compensation:** The equity research analysts responsible for the preparation of this report receive compensation based upon various factors, including the quality and accuracy of research, client feedback, competitive factors, and overall firm revenues.

## Other Disclosures

J.P. Morgan ("JPM") is the global brand name for J.P. Morgan Securities LLC ("JPMS") and its affiliates worldwide. J.P. Morgan Cazenove is a marketing name for the U.K. investment banking businesses and EMEA cash equities and equity research businesses of JPMorgan Chase & Co. and its subsidiaries.

All research reports made available to clients are simultaneously available on our client website, J.P. Morgan Markets. Not all research content is redistributed, e-mailed or made available to third-party aggregators. For all research reports available on a particular stock, please contact your sales representative.

**Options related research:** If the information contained herein regards options related research, such information is available only to persons who have received the proper option risk disclosure documents. For a copy of the Option Clearing Corporation's Characteristics and Risks of Standardized Options, please contact your J.P. Morgan Representative or visit the OCC's website at http://www.optionsclearing.com/publications/risks/riskstoc.pdf

**Legal Entities Disclosures**
**U.S.**: JPMS is a member of NYSE, FINRA, SIPC and the NFA. JPMorgan Chase Bank, N.A. is a member of FDIC. **U.K.**: JPMorgan Chase N.A., London Branch, is authorised by the Prudential Regulation Authority and is subject to regulation by the Financial Conduct Authority and to limited regulation by the Prudential Regulation Authority. Details about the extent of our regulation by the Prudential Regulation Authority are available from J.P. Morgan on request. J.P. Morgan Securities plc (JPMS plc) is a member of the London Stock Exchange and is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. Registered in England & Wales No. 2711006. Registered Office 25 Bank Street, London, E14 5JP. **South Africa**: J.P. Morgan Equities South Africa Proprietary Limited is a member of the Johannesburg Securities Exchange and is regulated by the Financial Services Board. **Hong Kong**: J.P. Morgan Securities (Asia Pacific) Limited (CE number AAJ321) is regulated by the Hong Kong Monetary Authority and the Securities and Futures Commission in Hong Kong and/or J.P. Morgan Broking (Hong Kong) Limited (CE number AAB027) is regulated by the Securities and Futures Commission in Hong Kong. **Korea**: J.P. Morgan Securities (Far East) Ltd, Seoul Branch, is regulated by the Korea Financial Supervisory Service. **Australia**: J.P. Morgan Australia Limited (JPMAL) (ABN 52 002 888 011/AFS Licence No: 238188) is regulated by ASIC and J.P. Morgan Securities Australia Limited (JPMSAL) (ABN 61 003 245 234/AFS Licence No: 238066) is regulated by ASIC and is a Market, Clearing and Settlement Participant of ASX Limited and CHI-X. **Taiwan**: J.P.Morgan Securities (Taiwan) Limited is a participant of the Taiwan Stock Exchange (company-type) and regulated by the Taiwan Securities and Futures Bureau. **India**: J.P. Morgan India Private Limited, having its registered office at J.P. Morgan Tower, Off. C.S.T. Road, Kalina, Santacruz East, Mumbai - 400098, is a member of the National Stock

**Ex. 5**
**P. 29**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

Exchange of India Limited (SEBI Registration Number - INB 230675231/INF 230675231/INE 230675231) and Bombay Stock Exchange Limited (SEBI Registration Number - INB 010675237/INF 010675237) and is regulated by Securities and Exchange Board of India. For non local research reports, this material is not distributed in India by J.P. Morgan India Private Limited. **Thailand**: This material is issued and distributed in Thailand by JPMorgan Securities (Thailand) Ltd., which is a member of the Stock Exchange of Thailand and is regulated by the Ministry of Finance and the Securities and Exchange Commission and its registered address is 3rd Floor, 20 North Sathorn Road, Silom, Bangrak, Bangkok 10500. **Indonesia**: PT J.P. Morgan Securities Indonesia is a member of the Indonesia Stock Exchange and is regulated by the OJK a.k.a. BAPEPAM LK. **Philippines**: J.P. Morgan Securities Philippines Inc. is a Trading Participant of the Philippine Stock Exchange and a member of the Securities Clearing Corporation of the Philippines and the Securities Investor Protection Fund. It is regulated by the Securities and Exchange Commission. **Brazil**: Banco J.P. Morgan S.A. is regulated by the Comissao de Valores Mobiliarios (CVM) and by the Central Bank of Brazil. **Mexico**: J.P. Morgan Casa de Bolsa, S.A. de C.V., J.P. Morgan Grupo Financiero is a member of the Mexican Stock Exchange and authorized to act as a broker dealer by the National Banking and Securities Exchange Commission. **Singapore**: This material is issued and distributed in Singapore by or through J.P. Morgan Securities Singapore Private Limited (JPMSS) [MCI (P) 199/03/2014 and Co. Reg. No.: 199405335R] which is a member of the Singapore Exchange Securities Trading Limited and is regulated by the Monetary Authority of Singapore (MAS) and/or JPMorgan Chase Bank, N.A., Singapore branch (JPMCB Singapore) which is regulated by the MAS. This material is provided in Singapore only to accredited investors, expert investors and institutional investors, as defined in Section 4A of the Securities and Futures Act, Cap. 289. Recipients of this document are to contact JPMSS or JPMCB Singapore in respect of any matters arising from, or in connection with, the document. **Japan**: JPMorgan Securities Japan Co., Ltd. is regulated by the Financial Services Agency in Japan. **Malaysia**: This material is issued and distributed in Malaysia by JPMorgan Securities (Malaysia) Sdn Bhd (18146-X) which is a Participating Organization of Bursa Malaysia Berhad and a holder of Capital Markets Services License issued by the Securities Commission in Malaysia. **Pakistan**: J. P. Morgan Pakistan Broking (Pvt.) Ltd is a member of the Karachi Stock Exchange and regulated by the Securities and Exchange Commission of Pakistan. **Saudi Arabia**: J.P. Morgan Saudi Arabia Ltd. is authorized by the Capital Market Authority of the Kingdom of Saudi Arabia (CMA) to carry out dealing as an agent, arranging, advising and custody, with respect to securities business under licence number 35-07079 and its registered address is at 8th Floor, Al-Faisaliyah Tower, King Fahad Road, P.O. Box 51907, Riyadh 11553, Kingdom of Saudi Arabia. **Dubai**: JPMorgan Chase Bank, N.A., Dubai Branch is regulated by the Dubai Financial Services Authority (DFSA) and its registered address is Dubai International Financial Centre - Building 3, Level 7, PO Box 506551, Dubai, UAE.

**Country and Region Specific Disclosures**
**U.K. and European Economic Area (EEA):** Unless specified to the contrary, issued and approved for distribution in the U.K. and the EEA by JPMS plc. Investment research issued by JPMS plc has been prepared in accordance with JPMS plc's policies for managing conflicts of interest arising as a result of publication and distribution of investment research. Many European regulators require a firm to establish, implement and maintain such a policy. This report has been issued in the U.K. only to persons of a kind described in Article 19 (5), 38, 47 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (all such persons being referred to as "relevant persons"). This document must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this document relates is only available to relevant persons and will be engaged in only with relevant persons. In other EEA countries, the report has been issued to persons regarded as professional investors (or equivalent) in their home jurisdiction. **Australia:** This material is issued and distributed by JPMSAL in Australia to "wholesale clients" only. This material does not take into account the specific investment objectives, financial situation or particular needs of the recipient. The recipient of this material must not distribute it to any third party or outside Australia without the prior written consent of JPMSAL. For the purposes of this paragraph the term "wholesale client" has the meaning given in section 761G of the Corporations Act 2001. **Germany:** This material is distributed in Germany by J.P. Morgan Securities plc, Frankfurt Branch and J.P.Morgan Chase Bank, N.A., Frankfurt Branch which are regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht. **Hong Kong:** The 1% ownership disclosure as of the previous month end satisfies the requirements under Paragraph 16.5(a) of the Hong Kong Code of Conduct for Persons Licensed by or Registered with the Securities and Futures Commission. (For research published within the first ten days of the month, the disclosure may be based on the month end data from two months prior.) J.P. Morgan Broking (Hong Kong) Limited is the liquidity provider/market maker for derivative warrants, callable bull bear contracts and stock options listed on the Stock Exchange of Hong Kong Limited. An updated list can be found on HKEx website: http://www.hkex.com.hk. **Japan:** There is a risk that a loss may occur due to a change in the price of the shares in the case of share trading, and that a loss may occur due to the exchange rate in the case of foreign share trading. In the case of share trading, JPMorgan Securities Japan Co., Ltd., will be receiving a brokerage fee and consumption tax (shouhizei) calculated by multiplying the executed price by the commission rate which was individually agreed between JPMorgan Securities Japan Co., Ltd., and the customer in advance. Financial Instruments Firms: JPMorgan Securities Japan Co., Ltd., Kanto Local Finance Bureau (kinsho) No. 82 Participating Association / Japan Securities Dealers Association, The Financial Futures Association of Japan, Type II Financial Instruments Firms Association and Japan Investment Advisers Association. **Korea:** This report may have been edited or contributed to from time to time by affiliates of J.P. Morgan Securities (Far East) Ltd, Seoul Branch. **Singapore:** JPMSS and/or its affiliates may have a holding in any of the securities discussed in this report; for securities where the holding is 1% or greater, the specific holding is disclosed in the Important Disclosures section above. **India:** For private circulation only, not for sale. **Pakistan:** For private circulation only, not for sale. **New Zealand:** This material is issued and distributed by JPMSAL in New Zealand only to persons whose principal business is the investment of money or who, in the course of and for the purposes of their business, habitually invest money. JPMSAL does not issue or distribute this material to members of "the public" as determined in accordance with section 3 of the Securities Act 1978. The recipient of this material must not distribute it to any third party or outside New Zealand without the prior written consent of JPMSAL. **Canada:** The information contained herein is not, and under no circumstances is to be construed as, a prospectus, an advertisement, a public offering, an offer to sell securities described herein, or solicitation of an offer to buy securities described herein, in Canada or any province or territory thereof. Any offer or sale of the securities described herein in Canada will be made only under an exemption from the requirements to file a prospectus with the relevant Canadian securities regulators and only by a dealer properly registered under applicable securities laws or, alternatively, pursuant to an exemption from the dealer registration requirement in the relevant province or territory of Canada in which such offer or sale is made. The information contained herein is under no circumstances to be construed as investment advice in any province or territory of Canada and is not tailored to the needs of the recipient. To the extent that the information contained herein references securities of an issuer incorporated, formed or created under the laws of Canada or a province or territory of Canada, any trades in such securities must be conducted through a dealer registered in Canada. No securities commission or similar regulatory authority in Canada has reviewed or in any way passed judgment upon these materials, the information contained herein or the merits of the securities described herein, and any representation to the contrary is an offence. **Dubai:** This report has been issued to persons regarded as professional clients as defined under the DFSA rules. **Brazil**: Ombudsman J.P. Morgan: 0800-7700847 / ouvidoria.jp.morgan@jpmorgan.com.

**General:** Additional information is available upon request. Information has been obtained from sources believed to be reliable but JPMorgan Chase & Co. or its affiliates and/or subsidiaries (collectively J.P. Morgan) do not warrant its completeness or accuracy except with respect to any disclosures relative to JPMS and/or its affiliates and the analyst's involvement with the issuer that is the subject of the research. All pricing is as of the close of market for the

**Ex. 5**
**P. 30**

Cory Kasimov
(1-212) 622-5266
cory.w.kasimov@jpmorgan.com

North America Equity Research
15 May 2014

J.P.Morgan

securities discussed, unless otherwise stated. Opinions and estimates constitute our judgment as of the date of this material and are subject to change without notice. Past performance is not indicative of future results. This material is not intended as an offer or solicitation for the purchase or sale of any financial instrument. The opinions and recommendations herein do not take into account individual client circumstances, objectives, or needs and are not intended as recommendations of particular securities, financial instruments or strategies to particular clients. The recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein. JPMS distributes in the U.S. research published by non-U.S. affiliates and accepts responsibility for its contents. Periodic updates may be provided on companies/industries based on company specific developments or announcements, market conditions or any other publicly available information. Clients should contact analysts and execute transactions through a J.P. Morgan subsidiary or affiliate in their home jurisdiction unless governing law permits otherwise.

"Other Disclosures" last revised April 5, 2014.

**Copyright 2014 JPMorgan Chase & Co. All rights reserved. This report or any portion hereof may not be reprinted, sold or redistributed without the written consent of J.P. Morgan.**

J.P.Morgan

**Ex. 5**

**P. 31**

# Exhibit 6

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**Or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| **3611 Valley Centre Drive, Suite 300** **San Diego, California** | **92130** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**
**(858) 558-2871**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| **Common Stock, par value $0.0001 per share** | **The NASDAQ Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Securities Exchange Act of 1934:

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐ No ☒

As of June 30, 2015, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $2.6 billion, based on the closing price of the registrant's common stock on the NASDAQ Global Select Market on June 30, 2015 of $41.88 per share.

As of January 29, 2016, 112,636,457 shares of the registrant's common stock, $0.0001 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement to be filed with the Securities and Exchange Commission by April 29, 2016 are incorporated by reference into Part III of this report.

**Table of Contents**

**PART I**

**FORWARD-LOOKING STATEMENTS**

This report and the information incorporated herein by reference contain forward-looking statements that involve a number of risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially from those expressed or implied by such forward-looking statements. Although our forward-looking statements reflect the good faith judgment of our management, these statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from results and outcomes discussed in the forward-looking statements.

Forward-looking statements can be identified by the use of forward-looking words such as "believes," "expects," "hopes," "may," "will," "plans," "intends," "estimates," "could," "should," "would," "continue," "seeks," "aims," "projects," "predicts," "pro forma," "anticipates," "potential" or other similar words (including their use in the negative), or by discussions of future matters such as the development of product candidates or products, technology enhancements, possible changes in legislation, and other statements that are not historical. These statements include but are not limited to statements under the captions "Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations" as well as other sections in this report. You should be aware that the occurrence of any of the events discussed under the caption "Risk Factors" and elsewhere in this report could substantially harm our business, results of operations and financial condition and cause our results to differ materially from those expressed or implied by our forward-looking statements. If any of these events occurs, the trading price of our common stock could decline and you could lose all or a part of the value of your shares of our common stock.

The cautionary statements made in this report are intended to be applicable to all related forward-looking statements wherever they may appear in this report. We urge you not to place undue reliance on these forward-looking statements, which speak only as of the date of this report.

**Item 1.**   *Business.*

**Company Overview**

We are a biopharmaceutical company focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system disorders. We have a portfolio of product opportunities led by our novel drug candidate, NUPLAZID™ (pimavanserin), for which we have reported positive Phase III pivotal trial results in Parkinson's disease psychosis, or PDP, and which has the potential to be the first drug approved in the United States for this condition. NUPLAZID is a selective serotonin inverse agonist, or SSIA, preferentially targeting 5-HT$_{2A}$ receptors. Through this novel mechanism, NUPLAZID has demonstrated significant efficacy in Parkinson's disease psychosis in our Phase III pivotal trial and has the potential to avoid many of the debilitating side effects of existing antipsychotics, none of which are approved for use in PDP patients. We hold worldwide commercialization rights to pimavanserin.

We are pursuing Parkinson's disease psychosis as our lead indication for NUPLAZID. In September 2015, we submitted a New Drug Application, or NDA, to the U.S. Food and Drug Administration, or FDA, for NUPLAZID for the treatment of psychosis associated with Parkinson's disease, which was accepted for priority review by the FDA on October 30, 2015 with a Prescription Drug User Fee Act, or PDUFA, goal date of May 1, 2016. In January 2016, we announced that the FDA's Psychopharmacologic Drugs Advisory Committee will review data included in the NDA for NUPLAZID. At the Advisory Committee meeting, scheduled for March 29, 2016, the Advisory Committee will discuss and advise the FDA on the risk-benefit profile of NUPLAZID for the treatment of PDP. In September 2014, we announced that the FDA granted Breakthrough Therapy designation for NUPLAZID for the treatment of Parkinson's disease psychosis. The Breakthrough Therapy designation was created to expedite the development and review of drugs that are intended to treat serious or life-threatening

1

**Ex. 6**

**P. 3**

Table of Contents

conditions. If approved, we intend to commercialize NUPLAZID for Parkinson's disease psychosis in the United States by establishing a specialty sales force focused primarily on physicians who treat PDP patients, including neurologists, psychiatrists and long-term care physicians.

Our NDA submission is based on data from a comprehensive development program assessing the safety and efficacy of NUPLAZID for Parkinson's disease psychosis. The NDA includes data from the pivotal Phase III -020 Study, in which NUPLAZID met all primary and secondary endpoints with statistical significance, along with supportive data from other studies with NUPLAZID. In the -020 Study, NUPLAZID significantly reduced psychosis compared to placebo in patients with Parkinson's disease psychosis with no worsening of motor function. These results were further supported by significant improvements in all secondary efficacy measures and by significant benefits in exploratory efficacy measures of nighttime sleep, daytime wakefulness and caregiver burden.

We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders beyond PDP and we plan to continue to study the use of pimavanserin in multiple disease states. We believe Alzheimer's disease represents one of our most important opportunities for further exploration. We are currently conducting a Phase II study exploring the utility of pimavanserin for the treatment of Alzheimer's disease psychosis, or ADP, a disorder for which no drug is currently approved by the FDA, and expect to complete enrollment of this study around mid-year 2016 and have top-line results of the study in the fourth quarter of 2016. We also plan to initiate a Phase II study in Alzheimer's disease agitation in the first half of 2016. We also believe that schizophrenia represents a disease with multiple unmet or ill-served needs and we are currently evaluating the most attractive development opportunities there. We have successfully completed a Phase II study of pimavanserin in the treatment of schizophrenia where we observed significant anti-psychotic effects when pimavanserin was co-administered with a low dose of risperidone, a generic drug currently approved for the treatment of schizophrenia.

We were originally incorporated in Vermont in 1993 as Receptor Technologies, Inc. We reincorporated in Delaware in 1997 and our headquarters are in San Diego, California. We maintain a website at *www.acadia-pharm.com*, to which we regularly post copies of our press releases as well as additional information about us. Our filings with the Securities and Exchange Commission, or SEC, are available free of charge through our website as soon as reasonably practicable after being electronically filed with or furnished to the SEC. Interested persons can subscribe on our website to email alerts that are sent automatically when we issue press releases, file our reports with the SEC or post certain other information to our website. Information contained in our website does not constitute a part of this report or our other filings with the SEC.

We own or have rights to various trademarks, copyrights and trade names used in our business, including ACADIA® and NUPLAZID™. Our logos and trademarks are the property of ACADIA Pharmaceuticals Inc. All other brand names or trademarks appearing in this report are the property of their respective holders. Use or display by us of other parties' trademarks, trade dress, or products in this report is not intended to, and does not, imply a relationship with, or endorsement or sponsorship of us, by the trademark or trade dress owners.

**Recent Events**

In January 2016, we raised net proceeds of approximately $281.6 million from the sale of 10,344,827 shares of our common stock in a follow-on public offering.

In September 2015, we submitted an NDA to the FDA for NUPLAZID for the treatment of psychosis associated with Parkinson's disease. The NDA has been accepted for priority review by the FDA with a PDUFA goal date of May 1, 2016. In January 2016, we announced that the FDA's Psychopharmacologic Drugs Advisory Committee will review data included in the NDA for NUPLAZID. At the Advisory Committee meeting, scheduled for March 29, 2016, the Advisory Committee will discuss and advise the FDA on the risk-benefit profile of NUPLAZID for the treatment of PDP.

2

**Ex. 6**
**P. 4**

Table of Contents

**Our Strategy**

Our strategy is to discover, develop and commercialize innovative small molecule drugs that address unmet medical needs in central nervous system disorders. We have assembled a management team with significant industry experience to lead the discovery, development, and commercialization of our product opportunities. We complement our management team with scientific and clinical advisors, including recognized experts in the fields of Parkinson's disease psychosis, Alzheimer's disease, schizophrenia, and other central nervous system disorders. Key elements of our strategy are to:

- ***Commercialize our lead product candidate, NUPLAZID, for Parkinson's disease psychosis.*** In September 2015, we submitted an NDA to the FDA for NUPLAZID for the treatment of psychosis associated with Parkinson's disease, which has been accepted for priority review by the FDA with a PDUFA goal date of May 1, 2016. If approved, NUPLAZID would be the first drug approved by the FDA for the treatment of Parkinson's disease psychosis. If approved, we intend to commercialize NUPLAZID for this indication in the United States by establishing a specialty sales force focused primarily on physicians who treat PDP patients, including neurologists, psychiatrists and long-term care physicians. Outside of the United States, we may choose to commercialize NUPLAZID in selected markets by establishing one or more strategic alliances.

- ***Leverage the commercial potential of pimavanserin by expanding to additional neurological and psychiatric disorders.*** We intend to pursue the development and commercialization of pimavanserin in additional neurological and psychiatric indications that are underserved by currently available antipsychotics and represent large unmet medical needs. In the second quarter of 2015, we initiated a significant life cycle planning project to assess and prioritize other medically important and attractive development opportunities for pimavanserin. In addition to the ongoing development of pimavanserin in Alzheimer's disease psychosis, we plan to initiate a Phase II study in Alzheimer's disease agitation in the first half of 2016. In addition, we have completed a Phase II study in schizophrenia and through our life cycle planning are assessing various areas of large unmet need in schizophrenia. We will also consider other indications that are a good strategic fit and which have large unmet medical needs.

- ***Seek to in-license or acquire complementary products or product candidates.*** Although all of the product opportunities currently in our pipeline, including NUPLAZID (pimavanserin) emanate from internal discoveries, in the future we may in-license or acquire assets, which could include clinical-stage product candidates or commercial-stage products, to leverage the sales force that we intend to establish.

- ***Continue to develop our other product candidates for the treatment of central nervous system and related disorders.*** We plan to continue developing other product candidates. While our resources are currently focused on the development and commercialization of pimavanserin, we plan to pursue additional product candidates in the future. These may be directed at neurological and related central nervous system disorders and may be developed independently or in partnerships. We believe that a diversified portfolio will mitigate risks inherent in drug development and increase the likelihood of our success.

3

Ex. 6

P. 5

Table of Contents

**Our Product Candidates and Programs**

Our portfolio of product opportunities includes product opportunities being explored in clinical development and in advanced preclinical testing. We believe that our product opportunities offer innovative therapeutic approaches and may provide significant advantages relative to current therapies. The following table summarizes our product opportunities and programs:



| COMPOUND/ PROGRAM | INDICATION | IND-TRACK | PHASE I | PHASE II | PHASE III | REGULATORY REVIEW | WORLDWIDE COMMERCIALIZATION RIGHTS |
|---|---|---|---|---|---|---|---|
| NUPLAZID™ (pimavanserin) | Parkinson's Disease Psychosis | | | | | | ACADIA |
| Pimavanserin | Alzheimer's Disease Psychosis | | | | | | |
| Pimavanserin | Schizophrenia | | | | | | |
| Adrenergic | Chronic pain | | | | | | Allergan |
| Muscarinic | Glaucoma | | | | | | ACADIA |

*NUPLAZID (Pimavanserin)*

Pimavanserin is a new chemical entity that we discovered and that has successfully completed Phase III development, positioning it to be potentially the first drug approved in the United States for the treatment of Parkinson's disease psychosis. During 2014, the FDA provisionally accepted NUPLAZID as the trade name for pimavanserin. NUPLAZID (pimavanserin) is a selective serotonin inverse agonist preferentially targeting the $5\text{-HT}_{2A}$ receptor, a key serotonin receptor that plays an important role in psychosis. Through this novel mechanism, NUPLAZID has demonstrated significant efficacy in Parkinson's disease psychosis in our Phase III pivotal trial and has the potential to avoid many of the debilitating side effects of existing antipsychotics, none of which are approved for use in PDP patients. We hold worldwide commercialization rights to NUPLAZID (pimavanserin) for all indications and have established a broad patent portfolio, which includes numerous issued patents in the United States, Europe, and several additional countries.

In September 2015, we submitted an NDA to the FDA for NUPLAZID for the treatment of psychosis associated with Parkinson's disease, which was accepted for priority review by the FDA on October 30, 2015 with a PDUFA goal date of May 1, 2016. In January 2016, we announced that the FDA's Psychopharmacologic Drugs Advisory Committee will review data included in the NDA for NUPLAZID and will hold a meeting, scheduled for March 29, 2016, to discuss and advise the FDA on the risk-benefit profile of NUPLAZID for the treatment of PDP. In 2014, the FDA granted Breakthrough Therapy designation for NUPLAZID for the treatment of Parkinson's disease psychosis. The Breakthrough Therapy designation was created by the FDA to expedite the development and review of drugs that are intended to treat serious or life-threatening conditions. If approved, we intend to commercialize NUPLAZID for Parkinson's disease psychosis in the United States by establishing a specialty sales force focused primarily on physicians who treat PDP patients, including neurologists, psychiatrists and long-term care physicians. We have established our core commercial team, and we are currently expanding our commercial organization in preparation for the planned future launch of NUPLAZID. During 2015, we expanded our existing infrastructure to support the planned launch and commercialization of NUPLAZID by adding to our commercial level manufacturing, field sales management, managed markets, medical affairs, quality control and compliance capabilities. In addition, we plan to hire a commercial sales force to coincide approximately with a NUPLAZID approval, if any. It is anticipated that the recommended dosing of NUPLAZID, if approved, will be two 17 mg tablets taken together once a day.

4

**Table of Contents**

*NUPLAZID as a Treatment for Parkinson's Disease Psychosis*

Parkinson's disease is the second most common neurodegenerative disorder after Alzheimer's disease. According to the National Parkinson Foundation, about one million people in the United States and between four to six million people globally suffer from this disease. Parkinson's disease is more common in people over 60 years of age and the prevalence of this disease is expected to increase significantly as the population ages.

Parkinson's disease psychosis is a debilitating disorder commonly characterized by visual hallucinations and delusions that afflicts about 40 percent of the one million Parkinson's disease patients in the United States. The development of psychosis in patients with Parkinson's disease substantially contributes to the burden of Parkinson's disease and deeply affects their quality of life. Parkinson's disease psychosis is associated with a diminished quality of life, nursing home placement, and increased caregiver stress and burden.

The FDA has not approved any drug to treat Parkinson's disease psychosis. Therefore, despite substantial limitations, physicians frequently resort to off-label use of currently marketed antipsychotic drugs, including Seroquel and clozapine, to treat patients with Parkinson's disease psychosis. These drugs are associated with a number of side effects, which can be especially problematic for elderly patients with Parkinson's disease.

The only currently marketed antipsychotic drug that has demonstrated efficacy in reducing psychosis in patients with Parkinson's disease without further impairing motor function is clozapine when given at low doses. Studies suggest that this unique clinical utility of low-dose clozapine arises from its potent blocking of a key serotonin receptor, a protein that responds to the neurotransmitter serotonin, known as the 5-$HT_{2A}$ receptor. The use of low-dose clozapine has been approved in Europe, but not in the United States, for the treatment of psychotic disorders in Parkinson's disease. However, routine use of clozapine is limited by safety concerns, including its potential to cause a rare, and potentially fatal, blood disorder that necessitates stringent blood monitoring. Currently, there is a large unmet medical need for new therapies that will effectively treat psychosis in patients with Parkinson's disease without compromising motor control or causing other serious side effects in this elderly and fragile patient population.

NUPLAZID provides an innovative, non-dopaminergic approach and, we believe, has the potential to be the first safe and effective drug that will treat Parkinson's disease psychosis without compromising motor control, thereby significantly improving the quality of life for patients with Parkinson's disease.

In November 2012, we announced successful top-line results from our pivotal Phase III -020 Study, evaluating the efficacy, tolerability, and safety of NUPLAZID in patients with Parkinson's disease psychosis. Results from the -020 Study were presented at the American Academy of Neurology Meeting in March 2013, and published in The Lancet, a peer-reviewed medical journal, in November 2013. The -020 Study was a multi-center, double-blind, placebo-controlled clinical trial. A total of 199 patients were enrolled in the study and randomized on a one-to-one basis to receive either 34 mg of NUPLAZID (the equivalent of 40mg of pimavanserin tartrate) or placebo once-daily for six weeks, following a two-week screening period that included brief psycho-social therapy. Patients also received stable doses of their existing anti-Parkinson's therapy throughout the study.

NUPLAZID met the primary endpoint in the -020 Study by demonstrating a highly significant reduction in psychosis (p=0.001) as measured using the SAPS-PD, a scale consisting of nine items from the hallucinations and delusions domains of the Scale for the Assessment of Positive Symptoms. These results were further supported by highly significant improvements in all secondary efficacy measures, including the Clinical Global Impression Severity, or CGI-S, scale (p<0.001), the Clinical Global Impression Improvement, or CGI-I, scale (p=0.001), and a CGI-I responder analyses (p=0.008). In addition, statistically significant benefits were observed in exploratory efficacy measures of nighttime sleep, daytime wakefulness and caregiver burden. Consistent with previous studies, data from the -020 Study indicate that NUPLAZID was safe and well tolerated. Importantly, NUPLAZID met the key secondary endpoint for motor tolerability as measured using Parts II and III of the

5

Table of Contents

Unified Parkinson's Disease Rating Scale, or UPDRS, suggesting NUPLAZID did not affect motor function when given together with the therapies patients in the study were taking to treat their Parkinson's motor symptoms. Three deaths occurred in the -020 Study, one in the placebo group and two in the pimavanserin group; all were regarded as unrelated to study drug. Two deaths occurred in our earlier completed Phase III study with pimavanserin for Parkinson's disease psychosis, which tested two active arms, 8.5 mg and 34 mg, of pimavanserin versus placebo on a 1-1-1 basis. There was one death in each of the 8.5 mg and 34 mg arms, each of which was regarded as unrelated to study drug.

We also are continuing to conduct our open-label safety extension study, referred to as the -015 Study, involving patients with Parkinson's disease psychosis who have completed the -020 Study and our earlier Phase III studies. The -015 Study, together with a similar extension study from our earlier Phase II Parkinson's disease psychosis trial, has generated a considerable amount of long-term safety data on NUPLAZID. A total of over 250 patients have been treated with NUPLAZID for at least one year, and of those at least 170 patients have been treated for at least two years. Our longest single-patient exposure is greater than 10 years. We believe that our experience to date suggests that long-term administration of NUPLAZID is generally safe and well tolerated in this elderly and fragile patient population.

*Pimavanserin as a Treatment for Alzheimer's Disease Psychosis*

According to the Alzheimer's Association, an estimated 5.3 million people in the United States have Alzheimer's disease, with only half being diagnosed, and it is currently the fifth leading cause of death for people age 65 and older. Studies have suggested that approximately 25 to 50 percent of patients diagnosed with Alzheimer's disease may develop psychosis, commonly consisting of hallucinations and delusions. The diagnosis of Alzheimer's disease psychosis is associated with more rapid cognitive and functional decline and increased institutionalization.

The FDA has not approved any drug to treat Alzheimer's disease psychosis. As symptoms progress and become more severe, physicians often resort to off-label use of antipsychotic medications in these patients. In addition to the long-term safety risks, studies have shown the use of atypical antipsychotics doubles the expected rate of cognitive deterioration among Alzheimer's disease patients. There is a large unmet medical need for a safe and effective therapy to treat the psychosis in patients with Alzheimer's disease.

We are in Phase II development with pimavanserin as a potential new treatment for Alzheimer's disease psychosis. Patients with Alzheimer's disease psychosis and Parkinson's disease psychosis share many characteristics and often exhibit similar psychiatric symptoms associated with their respective underlying neurodegenerative disease. We have shown that pimavanserin attenuates psychosis-related behaviors in preclinical models of Alzheimer's disease psychosis. In preclinical models, pimavanserin also has been shown to positively interact with cholinesterase inhibitors to enhance their pro-cognitive effect. Because of its selective mechanism of action and its efficacy and safety profile observed to date in studies conducted in elderly patients with Parkinson's disease psychosis, we believe that pimavanserin also may be ideally suited to address the need for a new treatment for Alzheimer's disease psychosis that is safe, effective, and well tolerated.

In November 2013, we initiated a Phase II trial, referred to as the -019 Study, to examine the efficacy and safety of pimavanserin as a treatment for Alzheimer's disease psychosis. The -019 Study is a randomized, double-blind, placebo-controlled study designed to enroll 200 patients with Alzheimer's disease psychosis. Following a screening period that includes brief psycho-social therapy, patients are randomized on a one-to-one basis to receive either 34 mg of pimavanserin (the equivalent of 40mg of pimavanserin tartrate) or placebo once-daily for twelve weeks. The -019 study will assess several key efficacy endpoints, including use of the Neuropsychiatric Inventory—Nursing Home scale to measure psychosis and other behavioral disorders. Key efficacy endpoints will be based on the change at week 6 from baseline. The study will also assess additional exploratory endpoints, including the cognitive status of patients and the durability of response to pimavanserin, through twelve weeks of therapy. We expect to complete enrollment of this study around mid-year 2016.

6

**Ex. 6**
**P. 8**

Table of Contents

*Pimavanserin as a Treatment for Alzheimer's Disease Agitation*

While the diagnostic criteria for Alzheimer's disease focus mostly on the related cognitive deficits, it is the behavioral and neuropsychiatric symptoms that can be most troublesome for caregivers and lead to poor quality of life for patients. In addition to psychosis, these symptoms include agitation and aggressive behaviors. Alzheimer's disease agitation and aggression, or collectively AD agitation, is characterized by inappropriate verbal, vocal, or motor activity that can be independent of perceptible needs or confusion, and includes screaming, restlessness, wandering, and strange movements. Agitation and aggression in Alzheimer's disease patients are a major cause of acute care inpatient hospitalizations and pose a major challenge for patient care. Therefore, the detection, management, and treatment of these symptoms is critical to Alzheimer's disease patient care. Studies suggest that 40 to 50 percent of patients diagnosed with Alzheimer's disease in the United States exhibit AD agitation.

The FDA has not approved any drug for the treatment of agitation in Alzheimer's disease. Therefore, antipsychotics are frequently used off-label, despite their limited efficacy and associated long term safety risks. Preclinical and clinical studies suggest that blockade of the 5-HT$_{2A}$ receptor is associated with decreased agitation and aggression. We believe pimavanserin's selective activity at the 5-HT$_{2A}$ receptor may confer efficacy in AD agitation. In addition, pimavanserin's favorable side effect profile observed to date in treating elderly patients with PDP may make it an ideal therapy for AD agitation. We plan to initiate a Phase II study in AD agitation in the first half of 2016.

*Pimavanserin as a Treatment for Schizophrenia*

Schizophrenia is a severe chronic mental illness that involves disturbances in cognition, perception, emotion, and other aspects of behavior. The positive symptoms of schizophrenia include hallucinations and delusions, while the negative symptoms may manifest as loss of interest and emotional withdrawal. Schizophrenia is associated with persistent impairment of a patient's social functioning and productivity. Cognitive disturbances often prevent patients with schizophrenia from readjusting to society. As a result, patients with schizophrenia are normally required to be under medical care for their entire lives.

According to the National Institute of Mental Health, approximately one percent of the U.S. population suffers from schizophrenia. Antipsychotic drugs increasingly have been used by physicians to address a range of disorders in addition to schizophrenia, including a variety of psychoses and related conditions in elderly patients. Despite their commercial success, current antipsychotic drugs have substantial limitations, including inadequate efficacy and severe side effects.

Most schizophrenia patients in the United States today are treated with second-generation, or atypical, antipsychotics, which induce fewer motor disturbances than typical, or first-generation, antipsychotics, but still fail to address most of the negative symptoms of schizophrenia. In addition, currently prescribed treatments do not effectively address or may exacerbate cognitive disturbances associated with schizophrenia. It is believed that the efficacy of atypical antipsychotics is due to their interactions with dopamine and 5-HT$_{2A}$ receptors. The side effects induced by the atypical agents may include weight gain, non-insulin dependent (type II) diabetes, cardiovascular side effects, sleep disturbances, and motor disturbances. We believe that these side effects generally arise either from non-essential receptor interactions or from excessive dopamine blockade.

The limitations of currently available antipsychotics result in poor patient compliance. A study conducted by the National Institute of Mental Health, which was published in *The New England Journal of Medicine* in September 2005, found that 74 percent of patients taking typical or atypical antipsychotics discontinued treatment within 18 months because of side effects or lack of efficacy. We believe there is a large unmet medical need for new therapies that have improved side effect and efficacy profiles.

Pimavanserin's selective blockade of the 5-HT$_{2A}$ receptor may enable it to be used in certain treatment approaches to improve the therapy for patients with schizophrenia. We published results in 2012 from an earlier multi-center, double-blind, placebo-controlled Phase II trial designed to evaluate pimavanserin as a co-therapy in

7

**Ex. 6**
**P. 9**

# Exhibit 7

**S&P Global**
Market Intelligence

# ACADIA Pharmaceuticals Inc.

# NasdaqGS:ACAD

# FQ3 2016 Earnings Call Transcripts

## Monday, November 07, 2016 10:00 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ3 2016- | | | -FQ4 2016- | -FY 2016- | -FY 2017- |
|---|---|---|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS Normalized | (0.57) | (0.61) | NM | (0.50) | (2.18) | (1.86) |
| Revenue (mm) | 2.62 | 5.27 | ▲101.14 | 12.25 | 14.44 | 97.61 |

Currency: USD
Consensus as of Oct-19-2016 1:27 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

- EPS NORMALIZED -

|  | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| FQ4 2015 | (0.41) | (0.45) | NM |
| FQ1 2016 | (0.42) | (0.45) | NM |
| FQ2 2016 | (0.47) | (0.63) | NM |
| FQ3 2016 | (0.57) | (0.61) | NM |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants .............................................................................................. 3

Presentation .............................................................................................. 4

Question and Answer .............................................................................................. 11

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

**Ex. 7**

**P. 3**

# Call Participants

## EXECUTIVES

**Lisa Barthelemy**
*Director of Investor Relations*

**Srdjan R. Stankovic**
*President*

**Stephen R. Davis**
*CEO & Director*

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

**Todd S. Young**
*Former Executive VP & CFO*

## ANALYSTS

**Alan Carr**

**Charles Cliff Duncan**
*Piper Jaffray Companies, Research Division*

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

**Jason Nicholas Butler**
*JMP Securities LLC, Research Division*

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

**Robert Cummins Hazlett**
*BTIG, LLC*

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

spglobal.com/marketintelligence

# Presentation

**Operator**

Good day, ladies and gentlemen, and welcome to ACADIA Pharmaceuticals' Third Quarter 2016 Financial Results Conference Call. My name is Suzanne, and I will be your coordinator for today. [Operator Instructions] I would now like to turn the presentation over to Lisa Barthelemy, Senior Director of Investor Relations of ACADIA. Please proceed.

**Lisa Barthelemy**
*Director of Investor Relations*

Thank you, Suzanne. Good afternoon, and welcome to ACADIA's Third Quarter 2016 Financial Results Conference Call.

This call is being recorded, and an archived copy will be available on our website at www.acadia-pharm.com through November 21, 2016.

Joining me on the call today from ACADIA are Steve Davis, our President and Chief Executive Officer; Dr. Serge Stankovic, our Executive Vice President and Head of Research and Development; Terry Moore, our Executive Vice President and Chief Commercial Officer; and Todd John, our Executive Vice President and Chief Financial Officer.

Before we proceed, I would first like to remind you that during our call today, we will be making a number of forward-looking statements, including statements regarding our strategy, including the timing, results or implications of clinical trials, other development efforts or regulatory approval; the benefits or advantages to be derived from future approvals of and the commercial potential for our product candidates in each case, including NUPLAZID or pimavanserin; future development, financial results and the future development and commercialization of our product candidates.

During our call today, we may use words such as anticipate, believe, could, expect, intend, may, plan, potential, predict, project, should or the negative of those terms and similar expressions that convey uncertainty of future events or outcomes to identify these forward-looking statements. These forward-looking statements are based on current information, assumptions and expectations that are inherently subject to change and involve a number of risks and uncertainties that may cause actual results to differ materially from those contained in the forward-looking statements. These factors and other risks associated with our business can be found in our filings made with the SEC. You are cautioned not to place undue reliance on these forward-looking statements, which are made only as of today's date. ACADIA disclaims any obligation to update these forward-looking statements.

I'll now turn the call over to Steve Davis, our President and Chief Executive Officer.

**Stephen R. Davis**
*CEO & Director*

Thank you, Lisa, and good afternoon. Let me first take the opportunity to thank each of you for joining us on today's conference call.

Today I'll address a couple of areas in my prepared remarks. First, I'll touch upon the strong progress we've made with the launch of NUPLAZID. And second, I'll discuss the important advancements we've made in executing on our broad development plans for pimavanserin in new indications. Following my remarks, Todd will discuss our financial results for the quarter. Terry will then later review our key commercial activities and priorities for NUPLAZID. And Serge will go into more detail about our clinical development programs with pimavanserin.

Now let me turn to the launch. We've made great progress in our first full quarter with NUPLAZID on the market. We saw solid growth and uptake of NUPLAZID and recorded $5.3 million in net revenues for the first full quarter of commercialization. We also saw very good reimbursement and access for NUPLAZID

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 7
P. 5

from public and private payers and have had early success getting on formularies. NUPLAZID is now on virtually all Medicare formularies, and consistent with our expectations, continues to be added to commercial formularies.

Additionally, our sales specialists have made excellent inroads in broadening and deepening awareness of NUPLAZID, and are getting good access to physicians, including neurologists and psychiatrists. Through our market research and feedback from our sales specialists, we've received strong positive feedback from physicians, who prescribe NUPLAZID and about their intent to prescribe in the future. Importantly is we've received favorable feedback from physicians about NUPLAZIDconnect, our provider and patient support services center.

In September, we had strong presence at the World Parkinson's Congress, with multiple poster presentations on NUPLAZID and booth exhibits for healthcare providers, patients and caregivers. In conjunction with the congress, we sponsored the National Parkinson Foundation's first caregiver summit. As we expect, for a groundbreaking product in a first-in-class indication, the launch we're seeing is consistent with our view that NUPLAZID sales will grow steadily over many years. And that continues to be the focus of our business.

As we pull back the lens to look at the foundational elements of the launch in these early days, we see a very compelling opportunity. We see steady rates of new patients starting and continuing growth in the number of prescribing physicians and patients on NUPLAZID.

Let's take a look at some of these elements. On the access and reimbursement front, it's important early in the launch to have broad and easy access. We're seeing this. In fact, what we see is consistent with our expectations based on the very significant body of work we did with payers in advance of the launch.

Another key element of our foundation is that NUPLAZID appears to be performing as expected and consistent with what we observed in our pivotal Study -020. The safety and tolerability profile was consistent with what we observed in the clinical studies. And on the efficacy front, we are hearing from physicians that they are very pleased with the efficacy of NUPLAZID. They report a profile that lines up on all fronts with our clinical study observations.

As we all know, this is not always the case when we get into broader populations. Of course, it's still relatively early in the launch, but we like what we see and hear today.

Looking at yet another element of our foundation, and as Terry will note later on in the call, most of our assumptions regarding initial patient use, physician mix, payer coverage, are all in line with what we expected and healthy.

Finally, looking through yet another lens. We reviewed daily, weekly, monthly indicators and trends to assess the health of the launch. We look at things such as number of patients starts, number of patients on drug, number of physicians writing the drug, growth of the prescriber base, number of bottles shipped, NRx and TRx, penetration by physician segment, et cetera. Importantly, when we look at these indicators, we see a picture that is consistent with a healthy launch, and it's consistent with a positive feedback we're hearing from the medical community.

As we previously discussed, paradigm shifts require heavy lifting. They require repetition of message, diligence and physician experience. And they carry the potential for dramatic returns over the lifetime of the drug.

As you've heard me say before, we want to be transparent about our goals and how we think about the business. When we look at the sell-side revenue estimates for 2016, it seems like consensus estimates for the fourth quarter center in the high $8 million to low $9 million range, which is consistent with how we see the remainder of the year shaping up and is consistent with our expectations regarding the early-stage dynamics of the paradigm shift that NUPLAZID represents. So we're off to a good start. And over the coming quarters and years, we're confident that NUPLAZID will fundamentally change the way PD psychosis is treated.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

spglobal.com/marketintelligence

Ex. 7
P. 6

I'm going to move now to our pipeline. While our top priority, of course, is focused on the commercial launch of NUPLAZID, we're also excited to be executing on our life cycle management plans through a number of new studies across multiple indications together with the completion later this year of our ongoing study in AD psychosis. Over the last couple of weeks, we've initiated 2 important clinical studies with pimavanserin: the SERENE study for Alzheimer's disease agitation, or AD agitation; and the ENHANCE study as an adjunctive treatment for schizophrenia in patients with an inadequate response to current antipsychotic treatment. Each indication represents a sizable medical and commercial opportunity and has been an area where new and improved therapies are greatly needed. Serge will go into more detail on these studies later in the call, so I'll just briefly touch on each of these new programs.

For AD agitation, there is no drug approved by the FDA. Around 40% to 50% of patients diagnosed with Alzheimer's suffer from AD agitation. Today, antipsychotics are frequently used off-label to treat this condition. And as you've heard me say before, one of the complicating factors with the use of these drugs in Alzheimer's patients is that they've been shown to impair cognition. In other words, they make the primary symptoms of Alzheimer's disease, cognitive impairment, worse.

Pimavanserin, of course, works very differently than other antipsychotics. With its selective sertonin inverse agonism mechanism of action, we believe pimavanserin has the potential to be an important new treatment option.

For schizophrenia, the marketplace is different. Unlike PDP, where we are the only FDA-approved drug or AD psychosis or AD agitation, where there are no therapies approved by the FDA, there are over 15 medicines approved today for schizophrenia. Despite this large number, drugs used to treat schizophrenia today just do not adequately address the very important symptoms of the disease and they also carry significant side effects. They also tend to be fairly mechanistically similar. So with these drugs as a backdrop, studies show that approximately 30% of patients with schizophrenia have an inadequate response to their antipsychotic treatment. As a result, it is a common clinical practice to prescribe 2 or more antipsychotics despite the fact that these drugs all primarily target the dopaminergic pathway. Through its highly selective mechanism of action, pimavanserin targets 5-HT2A receptors but avoids activity of dopamine and other receptors commonly targeted by these antipsychotics.

We believe adding pimavanserin to atypical antipsychotics may boost the antipsychotic effect, improve overall treatment response and lessen the undesirable side effects associated with polypharmacy.

As I noted previously, Serge will have additional comments on these important new studies and the potential benefits that pimavanserin may bring to patients suffering from Alzheimer's disease and schizophrenia. Before turning the call over to Todd to review our financial performance, let me make a brief introduction.

Todd recently joined ACADIA as our Chief Financial Officer. He brings a wealth of financial and operational experience in the biopharmaceutical industry and held finance leadership roles at Baxalta and the Baxter. We're delighted to have him as part of our team.

And with that, I'll turn the call over to Todd.

**Todd S. Young**
*Former Executive VP & CFO*

Thank you, Steve and good afternoon, everyone. I'd like to start off by saying how excited I am to have joined ACADIA and to be part of an organization making a meaningful difference in the lives of Parkinson's disease patients.

Today I'll highlight our third quarter financial results, starting with our product revenue for our first full quarter since launching NUPLAZID. And I'll wrap up by providing some insights into our outlook for the remainder of 2016.

For the third quarter, we generated net product sales of $5.3 million, with a gross to net percentage in the mid-20s. Our gross to net adjustments include fees paid to specialty pharmacies and specialty distributors,

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 7

P. 7

rebates and chargebacks associated with government programs, including our share of the donut hole for Medicare Part D patients, patient assistance to eligible privately insured patients and any product returns.

I would like to mention that our gross to net adjustments can vary quarter-to-quarter, primarily because our share of the donut hole for Medicare Part D patients will fluctuate each quarter. Please note that we recognize revenue when a specialty pharmacy dispenses NUPLAZID to a patient based on the fulfillment of a prescription or when a specialty distributor sells NUPLAZID. This approach is frequently referred to as the sell-through revenue recognition model and is a common practice for companies launching their first product.

Moving to the expense side of the P&L. Total operating expenses for the third quarter of 2016 were $77.7 million. R&D expenses for the quarter increased to $25.8 million from $18.7 million in the third quarter of 2015. This increase was driven by increased clinical costs relating to the launch of our AD agitation study and our schizophrenia study plus preparation for the development of pimavanserin for additional indications.

We also have increased personnel and related costs, including stock-based compensation expense associated with our expanded research and development organization.

SG&A expenses increased to $50.5 million for the third quarter of 2016 from $20.3 million for the comparable quarter of 2015. This increase was driven by costs associated with the hiring of our specialty sales force in April 2016, increased costs related to supporting our commercial activities for NUPLAZID, and increased costs related to additional medical education programs.

Turning now to our cash position. We ended the quarter with just under $589 million in cash and investment securities. For the third quarter, cash used in operations was approximately $50 million. We expect our cash used in operations to continue to increase in future quarters from investments to drive commercial growth and from our further development of pimavanserin for additional indications.

Looking ahead, for the fourth quarter, we expect R&D expense to be in the mid-$30 million range and for SG&A expense to be in the high $50 million. These amounts include expected stock-based compensation expense.

With that, I will now turn the call over to Terry, who will be discussing on the commercial launch of NUPLAZID.

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

Thanks, Todd, and good afternoon, everyone. As Steve has already mentioned, the launch is doing very well, and I'm pleased to report that to date, NUPLAZID performance and prescription growth are right on track of where we expected to be at this point in the launch. Of note, I'm especially pleased to report that we're seeing steady adoption by physicians with consistent additions of new writers each week through the launch.

Although it's still relatively early, our latest launch tracking survey as well as feedback from the field force suggests that physicians that prescribing NUPLAZID are seeing results that are consistent with what we saw in our pivotal clinical trial, including, in some cases, reports of patients who see complete remission of their hallucinations and delusions.

Operationally, we are pleased with our sales force call activity. And importantly, we're getting very good access to physicians.

During the third quarter, our sales representatives met with over 13,000 healthcare professionals. In addition, our messages are resonating with physicians and our most recent market research survey shows that NUPLAZID brand awareness among physicians continues to grow. In fact, unaided awareness of NUPLAZID went from 42% in June to 62% in September, and aided awareness increased from 66% to 76%. Among those aware of NUPLAZID, 93% are aware of its attributes, and this is up from 73% in our previous market survey.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

We're also pleased with the overall performance of NUPLAZIDconnect in providing both provider and patient support. To date, the vast majority of patients through NUPLAZIDconnect are starting with a 30-day free trial of NUPLAZID, which they usually receive within 5 to 10 days after seeing the doctor.

Now turning to the prescriber mix. As you may recall, our prelaunch research estimated our prescriber mix to be a little more than 50% neurologists, around 30% psychiatrists and around 20% long-term care. What we've seen today is that our prescriber mix is about 2/3 neurologists, about 10% to 15% psychiatrists and around 20% in long-term care. At this early stage, we're not surprised to see the higher proportion of neurologists given that they have a higher density of PDP patient and are generally tiered higher on our call list than are psychiatrists. So far, our long-term care is on track with our prelaunch estimates, but I just want to remind everyone it's early in the launch and that may change.

In terms of patient type. Our latest survey indicates that a vast majority of patients who are prescribed NUPLAZID were experiencing disruptive symptoms.

Switching gears to access and reimbursement. We are very pleased to report that NUPLAZID is now covered on virtually all Medicare Part D formularies. And as a reminder, NUPLAZID is in a protected class for Medicare.

As you'd expect, it's taking longer for the commercial segment of our business to make their formulary decisions, and to date, NUPLAZID is now on formularies covering about 35% covered lives. The majority of plans covering NUPLAZID are requiring a prior authorization that simply confirms the PDP diagnosis. For those plans where a formal decision has not yet been made, things are generally being adjudicated with prior authorization or a letter of medical necessity.

As far as our payer mix. We're seeing that about 3/4 of patients have Medicare Part D coverage, about 15% to 20% are covered under commercial plans, with the remainder of patients covered by VA, TRICARE and Medicaid.

Overall, we are making excellent progress in shifting healthcare providers from what has been a well-established treatment paradigm of using antipsychotic off-label to establishing NUPLAZID as the first choice, best choice for the treatment of hallucinations and delusions in Parkinson's disease patients. We're confident the initial positive experiences reported by physicians will continue to accelerate prescribing NUPLAZID for patients with Parkinson's disease psychosis and are very excited by the days ahead.

And I'll now turn the call over to Serge.

**Srdjan R. Stankovic**
*President*

Thank you, Terry, and good afternoon, everyone. We've made significant progress in executing on our broad development plans for pimavanserin. We are pursuing a number of additional indications with pimavanserin in areas of large medical need.

Last week, we announced the initiation of 2 important studies and plan to initiate 2 more by the end of the year. Before I review these new studies, let me discuss briefly our currently ongoing study with pimavanserin for Alzheimer's disease psychosis.

As we previously discussed, this is our first study in AD psychosis. It is being conducted through a single site with a large network of nursing homes in the London, England area. This is an exploratory, Phase II 12-week randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of 34-milligram dose of pimavanserin compared to placebo in patients with AD psychosis. We enrolled 181 patients in this study.

The primary endpoint is psychosis as measured by the psychosis subscale, or to put it in other words, combined hallucinations and delusions domains of NPI-NH score at week 6.

We're also assessing secondary measures, including behavioral symptoms and sleep. Additionally, we're assessing mini mental status exam over 12 weeks of treatment to evaluate the impact of pimavanserin on

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

Ex. 7
P. 9

cognitive status compared to placebo. As previously stated, we plan to announce top line data from this study by the end of the year.

Let me now turn to our new programs for pimavanserin, and let's start with AD agitation. Similar to AD psychosis, there is no drug approved by the FDA for AD agitation. AD agitation is a serious and common condition that is a major cause of distress for Alzheimer's disease patients, their families and caregivers. Over 5 million people in the United States are living with Alzheimer's disease, and approximately half are diagnosed with this disease. Studies suggest around 40% to 50% of patients diagnosed with Alzheimer's disease exhibit agitation. And agitation is associated with more rapid cognitive decline, greater caregiver burden and earlier institutionalization.

Agitation in AD is characterized by verbal aggression such as screaming, shouting; physical aggression such as grabbing, pushing, hitting; and excessive motor activity such as pacing and recklessness. With no FDA therapy for AD agitation, physicians often prescribe antipsychotics off-label. However, there are drawbacks with these therapies, including inadequate efficacy and significant side effects.

The KD AD [ph] study, Alzheimer's disease study, has shown that antipsychotic treatments associated with worsening cognitive functioning at a magnitude equivalent to 1 additional year of disease progression. Preclinical and clinical data suggest that antagonism at 5-HT2A receptors may play a role in decreasing symptoms of agitation. Involvement of serotonin system in the pathophysiology of agitation is further replicated by the off-label use of trazodone, citalopram and other SSRIs in treatment of AD agitation.

Given its normal mechanism of action as a selective serotonin inverse agonist or SSIA, preferentially targeting 5-HT2A receptors, we believe pimavanserin may compare efficacy in patients with AD agitation. In addition, pimavanserin overall favorable side effect profile may make it a promising therapy for AD agitation.

Our SERENE study in AD agitation is a randomized double-blind placebo-controlled multicenter outpatient study designed to examine the efficacy and safety of pimavanserin in approximately 430 patients. Study participants will be randomized to receive once daily oral doses of 34-milligram pimavanserin, 20-milligram pimavanserin or placebo for 12 weeks. The primary endpoint of the study is the reduction in total score on the Cohen-Mansfield Agitation Inventory. Following participation in SERENE, patients will be eligible to enroll in an open-label safety extension study.

Let me now turn to schizophrenia. As many of you know, schizophrenia is a chronic debilitating mental illness characterized by thought disorder, emotional and cognitive dysfunction and behavioral disturbances. According to the National Institute of Mental Health, approximately 1% of the U.S. population develop schizophrenia during their lifetime. These disturbances may include positive symptoms such as hallucinations, delusions and disorganized speech, as well as a range of negative symptoms, including flat affect, loss of interest, emotional withdrawal and cognitive disturbances.

As Steve mentioned earlier, current antipsychotics used to treat schizophrenia have substantial limitations, including severe side effects and inadequate response on the full range of symptoms of the disease. According to the American Psychiatric Association, about 10% to 30% of patients do not respond to antipsychotic treatment or are, what we call treatment-resistant. Another 30% of patients have inadequate response to antipsychotic medications, meaning that they exhibit some improvement but continue to have psychotic symptoms. This is the population we're addressing in our study.

Today, we know that about 25% to 50% of patients with schizophrenia are treated with 2 or more antipsychotics. This polypharmacy had led to increase incidents of side effects and more complicated treatment regimens that can further for poor compliance and subsequent relapse in patients with schizophrenia.

Given pimavanserin's highly selective pharmacological profile and our past clinical experience with pimavanserin in schizophrenia, we believe adding pimavanserin to background antipsychotic -- atypical antipsychotics could potentiate the antipsychotic effect, improve overall treatment response and lessen the undesirable side effects often associated with polypharmacy.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Ex. 7
P. 10

Last week, we announced we had initiated our Phase III schizophrenia study called ENHANCE-1. It is a 6 weeks randomized double-blind, placebo-controlled, multi-center outpatient study, designed to examine the efficacy and safety of adjunctive use of pimavanserin in patients with schizophrenia who have an inadequate response to current antipsychotic treatment.

Approximately 380 patients will be randomized to receive pimavanserin or placebo orally once daily added to their ongoing antipsychotic in a flexible dosing regimen. The starting daily dose of 20-milligram of pimavanserin at baseline may be adjusted to 34 or 10 milligrams during the first 3 weeks of treatment.

The primary endpoint of the study is the change from baseline to week 6 on the positive and negative syndrome scale, or PANSS, total score. Following participation in ENHANCE-1, patients will be able to enroll in a 52-week open-label extension study.

In addition to these 2 recently launched studies, we plan to initiate 2 studies in additional indication by the end of the year.

Let me now turn the call back over to Steve.

**Stephen R. Davis**
*CEO & Director*

Thanks a lot, Serge. In summary, it's an exciting time at ACADIA. Our commercial team continues to raise awareness to drive adoption in NUPLAZID. And we're pleased with the progress we've made and look forward to continuing to build on this foundation.

At the same time, we've taken our development programs to the next phase with the initiation of these 2 new studies in AD agitation and schizophrenia, and plan to commence 2 additional studies by the end of the year.

Before turning the call over to the operator, I'd like to thank everyone at ACADIA for their hard work and dedication. All of us here remain deeply committed and driven to improving the lives of people with CNS disorders.
I'll now turn the call over to the operator to commence the Q&A session.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And your first question comes from the line of Cory Kasimov of JPMorgan.

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

It's good to see a nice start for NUPLAZID. I guess, a question for you on the commercial side and also one on the clinical side. So can you give any quantitative decision of how many sample or just a rough estimation of how many samples are out in the field? I guess I'm curious how much of the sales numbers in the third quarter are reflective of actual demand because I think people were thinking that the sampling program you had might depress numbers a little bit in the early stages of the launch. And then I have one clinical question.

**Stephen R. Davis**
*CEO & Director*

Yes, thanks, Cory. This is Steve. I'll -- let me give a really quick response, and Terry may want to fill in a little bit more detail. So I just want to remind you we have 2 types of sampling. One is the physical bottles that we've all experienced -- we go ahead, our physicians give them to us or one thing or another. And then in addition to that, for physicians that write scripts going through the hub, they have -- we make available to each patient a 30-day free trial. So very consciously, we have provided a lot of free drug in the form of samples in the system. And that will continue to be the case through these early days and quarters at launch. So Terry, I don't know if you want to add anything more to that.

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

Sure, Steve. Cory, one of the things that we really felt was important was that physicians have access to the drug in a variety of forms and that they can get their patients on the drug immediately. We felt strongly that a 30-day free trial would be an ample amount to get the patients through the adjudication process. And we know that the majority of our prescriptions are going through our hub. Therefore, the majority of patients are having their 30-day supply accompanying that. However, we also know that physicians are handing out samples. In some cases, they may hand the sample out to both a patient going home with samples that's awaiting a 30-day free trial or someone who is not going to get that 30-day free trial. In both cases, we made a concerted effort to make sure that there are lots of opportunities for the physician to sample out there. And although we haven't given numbers, we have, as with any launch, really amped up the sampling in the marketplace during the launch period.

**Stephen R. Davis**
*CEO & Director*

And just one -- I would echo everything that Cory said, let me care to say just one quick annotation. I think it's a very important element of building the right foundation. We care about short-term targets and short-term indicators. We care a lot more about the long-term and making certain that we're building the right foundation and making certain that we don't have -- that we can minimize patients or physicians having immediate access issues with the drug. It's a very important part of laying that foundation.

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

Okay. All right, terrific. And then on the clinical side. I just want to ask about the recently started Phase III schizophrenia trial. And really how long that has been in the works? It seems like the schizophrenia indication is something you're always talking about, maybe figuring out down the road while prioritizing some other indications such as AD agitation. So if that was the case, I'm wondering kind of what's changed there.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Stephen R. Davis**
*CEO & Director*

Yes. So I'll start, and then Serge may want to jump in as well. We have always been interested in schizophrenia. Our interest in schizophrenia has never waned. I think as everyone knows, it's a new management team relatively speaking. And we -- while the company has had an interest in schizophrenia, the original path that the company had laid out was a monotherapy maintenance approach, which we think is very interesting. But we think the approach that we're taking now is a much more interesting approach, and we did an awful lot of commercial analyses around this before choosing this. So this has been in the works for literally almost a year now to get to this point of starting the study. We've known this is what we're going to do for some time. We just haven't talked a lot about it. For a variety of reasons, including competitive reasons. There are other people working in this space, and quite frankly, we don't see any reason to tell them exactly what we're going to be doing since we'll be competing for patients. So I just want to underscore, we've had a very long-term interesting schizophrenia, primarily driven by -- not primarily, almost entirely driven by the very significant unmet need, which Serge described in his remarks. Serge, I don't know if you have anything else to add to in that?

**Srdjan R. Stankovic**
*President*

Just to add that really pursuing schizophrenia indication is a natural place for pimavanserin, not only on the basis of the clear medical need and unmet need in schizophrenia but also on the basis of pharmacology of pimavanserin and the clinical data that we already have in pimavanserin that naturally extend to pursuing this indication.

**Stephen R. Davis**
*CEO & Director*

Yes, Cory, I'm sorry. This just reminds me one of the -- I know that I've said this before, probably everyone on the phone has heard me say it, but you don't -- there are certain advantages to being in a position where instead of trying to displace cheap generics, which we do have in schizophrenia, being in a position where -- and the mechanism of the drug just lends itself to this, so we find this very intriguing, to be adjunct therapy going on top of existing medication. So we don't need, if we're successful here, we don't need to displace them if we show an additive benefit to those existing generic drugs.

**Operator**

And your next question comes from the line of Alan Carr of Needham & Company.

**Alan Carr**

A couple of them. I wonder if you can give us an update on where things stand with Europe in that pediatric plan? And actually, a follow-up on schizophrenia. A little bit of a different strategy maybe than the Phase II trial going way back to, I think it was '06 or '07, where you had a lower dose of the anti-psychotic in combination with pimavanserin. Can you talk a little bit more about that in terms of why do it this way? And also, a little bit more also around why the 3 different doses in NUPLAZID? What's going to drive the titration? Is this going to be a titration where they start off by 20 and then you try to force them up? And if they don't tolerate, you'll lower? What's the thinking behind that?

**Stephen R. Davis**
*CEO & Director*

So Alan, I'm going to ask Serge to respond to that question.

**Srdjan R. Stankovic**
*President*

Yes, Alan. First, let me start with Europe. On our Q2 call in August, we announced that we would need to resubmit a proposed pediatric investigational plan. As you know, that's a requirement to have either label [ph] or agreed PIP plan with the PIP -- pediatric committee of EMEA before we can submit our PDP MAA.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 7**
**P. 13**

We did submit our PIP in the third quarter, and we are waiting to hear back from the pediatric committee on our plan. Once we get our PIP approved, we can provide an update on the timing of our filing of the marketing authorization in Europe. And in regards to the dose, our Phase II trial in schizophrenia indeed did had lower doses with the antipsychotics that are used in that trial, risperidone and haloperidol, with the idea that a similar efficacy with improved side effect profile can be achieved in combination with pimavanserin. The approach we are taking in adjunctive therapy is really to achieve the same potentiation of antipsychotic effect but this time in patients that are -- have inadequate response to currently used antipsychotic. And the treatment regimen that we decided to pursue is the flexible dosing regimen. The rationale for that is this is an all-comer study with almost all antipsychotics being eligible for patients be included in the trial. And from that perspective, it is allowing flexibility to investigators and physicians to adjust the dose to the need of patients if best. So it's not a forced titration. It is on basis everybody will start on 20 milligrams. But adjustment of dose in the first 3 weeks of treatment will be based on the efficacy seen in patients as well as, obviously, tolerability profile.

**Alan Carr**

And -- so you're focusing on PANNS. Are there other -- would you share -- are there a lot of other secondary end points in here that you're going to be watching in this Phase III trial?

**Srdjan R. Stankovic**
*President*

Oh yes. We have -- as it is usually done, we have a number of secondary measures. Our -- obviously, the key secondary measure is clinical global impression of severity. But in addition to that, there is a personal and social performance scale. We are measuring a number of other scales that are -- as a secondary measure in this study, as usually is done in these trials.

**Alan Carr**

Any reason you would expect any impact on negative symptoms with this drug? Or just positive?

**Srdjan R. Stankovic**
*President*

Well, the patients that will be enrolled in this trial will have positive symptoms. And in the context of positive symptoms, the evaluation of negative symptoms in the context of improvement of the overall psychotic symptoms is methodologically complex because of pseudo-specificity. But we absolutely expect on the basis of our prior experience and on the basis of mechanistic assumptions around pimavanserin that we will have a positive impact of negative symptoms. And we are definitely thinking of specifically addressing those symptoms in our development.

**Alan Carr**

Okay. And then -- and I guess you're planning here as if this is positive, you'll just run another one in SERENE right after to confirm it?

**Srdjan R. Stankovic**
*President*

The idea, obviously, is we need to learn from this trial and the idea being we will be starting the trial. The trial have -- this ENHANCE-1 will have a preplanned interim analysis for futility. And provided that, that interim analysis suggests continuation of that trial, we will be then planning on starting the second trial in schizophrenia with the same indication.

**Stephen R. Davis**
*CEO & Director*

Alan, this is Steve. I just wanted to add a couple of echoing comments to what Serge mentioned. When we did the previous study in adjunct therapy when added to Risperdal, we did see highly significant results. And they did translate in both positive and negative symptoms. So negative symptoms in

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 7
P. 14

schizophrenia is, as we said before, is also an area of high interest to us. It's an area that has -- there's no drug approved to treat negative symptoms in schizophrenia. It's an area that has long, long been, if not the highest, one of the highest unmet needs in schizophrenia. And as I mentioned, it's an area that we continue to be very interested in. When you look at the profile of pimavanserin, in addition to having shown a strong antipsychotic effect in 2 different -- very different patient populations and PDP psychotic patients and in schizophrenia, we also see a profile that has strong potential in depression as an antidepressant. And we've seen in the clinic a strong effect on night-time sleep and daytime wakefulness, also areas that feed into the entire consolation of symptoms that schizophrenic patients have. So we need to do this study that we've laid out. But we'll get a lot of very helpful important information out of the study that I think will guide our further development of the molecule. And we'll just simply say for now that both the schizophrenic patients with an inadequate response to a single antipsychotic and negative symptoms of schizophrenia remain areas of very significant unmet need and of interest to us.

**Operator**

And your next question comes from the line of Ritu Baral of Cowen.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Congrats on the early start, and looking forward to future quarters. On the sales reported today, what -- can you tell us what percentage of those sales were from patients who rolled over from clinical trials or were previously exposed to the drug versus new to drug patients?

**Todd S. Young**
*Former Executive VP & CFO*

Ritu, I can't give you the exact number. But all I can tell you is rollovers from clinical trials was a very, very small part of those sales, a very, very small part. We just didn't have a lot of patients that rolled over onto commercial drug from ongoing clinical studies.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Okay. Fair enough. And what are you observing as far as current time to fill a prescription? Is the 30-day free drug, is that sort of covering the gap that's needed to get insurance authorization? Or is it sort of extending past that?

**Stephen R. Davis**
*CEO & Director*

Yes, Terry is going to take that question.

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

This is Terry. It turns out that the 30-day supply is ample time for most patients to get their claims adjudicated in the prescription sense. So we're very pleased with that today.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

And what's your final -- I'm sorry, go ahead.

**Stephen R. Davis**
*CEO & Director*

Yes, I'm sorry. As we said before, we do have a bridging program. We have done some bridging, but Terry is right. For the most part, 30 days have been sufficient. And of course, we anticipate that as we get on more commercial formularies that the time to adjudication will shorten and there will be less need to bridge in the future.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 7
P. 15

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

What's your target time to fill?

**Stephen R. Davis**
*CEO & Director*

As soon as possible.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

All right, fair enough. And then you mentioned that that your gross to net may fluctuate for a number of factors. Like what -- can you bracket what the range could be? Given variability with the donut hole, but also, it looks like an increasing proportion of commercial patients over the next few quarters.

**Stephen R. Davis**
*CEO & Director*

So Todd, you're going to take that question.

**Todd S. Young**
*Former Executive VP & CFO*

Ritu, as you know, we haven't guided specifically. Obviously, in Q3, we're in the mid-20s on our gross to net. The donut hole is the biggest driver of fluctuations from quarter-to-quarter. I think everyone realizes that it's a calendar year based program. But it's individual to each patient based on the total portfolio of drugs they take. Now for most of our PDP patients, their motor meds or generics that wouldn't create as big a donut hole liability as the drug price in our range. And so we would expect that early in a calendar year, our percentage of donut hole would be higher than it would be later in the year as more patients progress through it. The caveat on that is obviously, we're early and lost. We've lost in the second half of the year. And so we still are getting our arms wrapped around what the specific amounts will be. But certainly, the donut hole is the biggest driver of fluctuations quarter-over-quarter. And as you mentioned, as the commercial mix and the Medicare mix change over time, that will also affect it. But at this point, mid-20s this quarter and we'll see what happens here in Q4.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Got it. And then a question for Serge. As we think about that 20-milligram dose in both the agitation study and the schizophrenia study, what is the receptor occupancy of the 20-milligram dose, the 10-milligram dose in comparison to the 34-milligram dose? I guess why did you pick the 20 versus others?

**Srdjan R. Stankovic**
*President*

There was only one small study done some years ago on the receptor occupancy. And what we know that nearly complete occupancy is achieved fairly fast were on the escalation of dosage. So we -- the we certainly are close to full occupancy at the 20-milligram and above. Of course, this was a study done in very few patients. So one should take results with some caution in this respect. But the point that we need to remember is that receptor occupancy per se is not necessarily the only element when we take into consideration when thinking of the those. What guided us mostly are 2 things. One is that at 17 milligrams -- equivalent of 17-milligram dose in the previous study clearly demonstrated enhanced MedAvante psychotic effect with risperidone, and as Steve said, both in positive and negative symptoms. And the study was done in acute patients. So that guided us that the starting dose of 20 milligrams is certainly the dose that is reasonable for this trial. Second thing is that, as I said, we have patients here on different doses of atypical antipsychotic and different atypical antipsychotic that will enter the trial. So allowing flexibility around 20-milligram dose that we know that has antipsychotic potentiation is a reasonable approach that we thought we should take in the trial.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 7**
**P. 16**

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Got it. And then last question. How are you defining inadequate response or inadequate control in the schizophrenia study?

**Srdjan R. Stankovic**
*President*

It is defined by essentially a constellation of criteria. One is the certain severity of the overall psychotic symptoms as measured on the total 10 score and then on the presence and severity of the particular specific positive symptoms that have to be at the moderate or higher severity present in order for patients to qualify, and finally, on the overall global assessment of severity of psychotic symptoms. So it's not only one criteria. It's kind of a constellation of criteria that define these patients.

**Operator**

And your next question comes from the line of Charles Duncan from Piper Jaffray.

**Charles Cliff Duncan**
*Piper Jaffray Companies, Research Division*

One commercial and 2 brief clinical questions. First of all, on the commercial side. Yes, wow, really nice quarter out of the box. So congratulations on that. I'm wondering if you can provide any additional -- yes, so Steve, any additional color on the main driver for the early out-of-the-box strength? Because I mean, you beat consensus pretty handily, yet Terry said that this is consistent with where you would have expected the drug to be. How do you see the next quarter turning out?

**Stephen R. Davis**
*CEO & Director*

I hate to repeat myself, but we -- so many things so far about the launch had really been very consistent with what we expected. The payer reaction, very consistent with what we expected, but we knew the error bars were very wide. It could have been very different, but it's very consistent. Physician experience again, it's just something you just don't know. There's no way of knowing until you get the drug into these broader populations, and it's early. But so far, very, very consistent. So I think -- I guess we're not surprised that we're not surprised because so many things have been consistent with what we had anticipated that we -- so we did, in the quarter, come out ahead of our own plan a little bit. But it's very consistent. And most importantly, it's just very consistent with the type of launch that we had expected based upon the market research we did, looking at a lot of other drug launches with paradigm shifting potential, et cetera. And what we have expected is that we would establish a foundation and then build -- and build on it. And I think that when we look at The Street and how The Street had thought about it, and we tried to be very transparent as much as we can, giving all of the subjective and dynamic observation that we have. I think there's are a pretty good correlation, as we said, with how we're expecting this launch in the early days and how people on The Street are expecting it. So yes, we did come in above consensus estimates in the third quarter. As I've mentioned, we also observed what The Street is anticipating for the fourth quarter. And we think that's consistent with our view of that. And then as we roll into 2017, of course, it's way, way -- it would be way, way premature for us to have any public view on that. But I think so far in the launch, we're seeing things are rolling out as we expect it. And it feels like it's kind of as The Street has expected, at least from a ZIP Code type of perspective.

**Charles Cliff Duncan**
*Piper Jaffray Companies, Research Division*

Okay. That's helpful. Well, great execution thus far. And it sounds like there wasn't any like bolus of patients that were waiting for the drug or anything. It's just new demand for a new drug.

**Stephen R. Davis**
*CEO & Director*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 7**
**P. 17**

Yes. I mean, we did have a little bit of what I would characterize as low-hanging fruit. We saw that early on. And we saw a tiny bit of that in June. It kind of got masked by all the free drug. I think we saw some of that in July. But by and large, again, it's been kind of just -- the best way we can maybe characterize it is the foundation that we're laying. We are doing a lot of sampling. We are doing things that have a negative impact on near-term revenues but help build the foundation for the long run. And of course, at the end of the day, that's what's most important to us in terms of reaching the full potential of patients that can benefit from the drug, and of course, the benefit of our shareholders.

**Charles Cliff Duncan**
*Piper Jaffray Companies, Research Division*

Okay. And then my 2 quick clinical questions for Serge. Just first of all, on the ENHANCE study. Could you share with us any of the measures that you plan to take to ensure, call it, site -- clinical site or patient quality or control for a placebo response in terms of over the course of the 6 weeks study? And then quickly for SERENE, what drove the decision to conduct the program in 100% of outpatient setting, which is really different than the ADA study in terms of this ADP. Is that caregiver input? Different severity of patients? What really drove that strategy?

**Srdjan R. Stankovic**
*President*

All right. Let me take one by one. In the schizophrenia study, we are applying all of the standard measures to reduce the placebo response as well as particularly measures for inter-rater reliability. So we are doing pretty much everything that current methodology and clinical trials in schizophrenia is sort of standardly applying to this. And then nothing specifically unusual. But call it, one of the things that we particularly believe is important for any clinical trial and by implication is schizophrenia is actually enrolling the right patients in the clinical trial. So we do have -- and we will try to do that in all of our trials, independent confirmation of the eligibility, particularly from the psychiatric diagnosis and criteria for that is not only relying on the investigator but as well as the independent qualified interviewer that the patient is really the right patient for the trial. And that I think it's the critical element that we hope will improve significantly the quality and performance in the trial. The second question, I'm sorry, it escapes my mind right now, I can't...

**Charles Cliff Duncan**
*Piper Jaffray Companies, Research Division*

Yes. Just quickly, the SERENE trial, what drove the decision to conduct the program in 100% outpatient setting different from the ADA or different from the ADP study?

**Srdjan R. Stankovic**
*President*

It is mostly the severity of illness that we're targeting, primarily moderate to severe patients. The patients that are already in the institutions may have much more advanced Alzheimer disease. And it may be more difficult to evaluate properly the treatment effect. So these patients that they are outpatient, they can still be in the supportive care but not receiving around-the-clock medical care. So as long as they are capable to actually do their visit at the site as an outpatient, they are eligible for the trial.

**Operator**

Your next question comes from the line of Tazeen Ahmad from Bank of America.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Just a couple on the launch, if I might. So in terms of your expectations, Steve, you mentioned that what you're seeing in the metrics have been consistent thus far with what you would have expected before the launch. So why not think about issuing sales guidance if so far that the launch is going as you expected? I mean, do you think that there could be -- you mentioned some low-hanging fruit. But do you think that, that would be meaningful enough to potentially have an impact at the beginning and then dissipate and

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

**Ex. 7
P. 18**

then perhaps have an impact on what the future trajectory of the launch would be? It would just be a lot easier for us to be able to get a sense from you as to where you think the sales trends are going over the next couple of quarters. And then for PDP in Europe, can we just get a sense from you about what kind of pricing you would think would be reasonable to expect? Obviously, it would be lower than what you're getting here in the U.S. But is it something that is more in the 20% to 30% discount range or something more meaningful like 50% less than what we would expect to get here in the U.S.? And then maybe one question after that on the free trial.

**Stephen R. Davis**
*CEO & Director*

Yes. Thanks for the question, Tazeen. Let me take the last one first regarding the EU pricing. Of course, it's way premature for us to comment about how we would price NUPLAZID outside of the United States. But I will just repeat what we said before that for these kinds of drugs, because we're not in the orphan space, oncology space, et cetera, it's not uncommon to see pricing out of the U.S. be dramatically lower than the U.S. So greater than 50% discounted from the U.S. price. It's not uncommon if you look at some of the other CNS drugs, particularly neuropsychotic drugs, for them to be in the 15% or 20% of the U.S. price. Now I have no idea if that's the ZIP Code we'll be in for NUPLAZID. We've obviously got a lot of advantages to the drug that we think should be reflected. But I just want to be clear that the pricing outside of the United States for these kind of drugs is just very different. I certainly appreciate the desire for us to give guidance. I just think at this point, although today things have been very consistent with our expectations, it is still very early. And the error bars, as we look further into the future, are still very wide. And so we just don't think it will be appropriate or prudent to do that at this stage. There will come a time where that won't be the case. But today, we think it's just premature for us to do that. And we're also somewhat comforted by what we see, as I mentioned, when we look at how The Street has looked at the fourth quarter and looking into 2017. It at least appears that we are at least qualitatively looking at this in a similar fashion in terms of launch dynamics and the potential to establish a foundation and grow and grow. So we -- trust me, we look forward to a point in time where we can be more precise and be more quantitative. But we just -- it's just not now.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Okay. And then maybe just one question on the 30-day free trial. Are there instances where you're allowing patients to renew a 30-day free trial after they've already had one? And if so, what type of criteria are you using to determine if somebody should be given a renewal?

**Stephen R. Davis**
*CEO & Director*

Yes. So Terry's going to take that question, Ritu -- excuse me, Tazeen, sorry.

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

So the answer is, yes, there are situations where the adjudication is taking longer. It's very important to us that the patient's therapy not be interrupted. In those cases, we are granting bridges for those patient so that they can remain on therapy while the adjudication process takes place. So it's a minority of cases, but we do that to make sure that therapy is not interrupted.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

And have you had that happen? I guess you must have had that happen a few times already since you've launched?

**Terrence O. Moore**
*Former Chief Commercial Officer and Executive Vice President*

Sure. It's happened a few times. As I said, it's a minority of cases. But we have done it.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Ex. 7**

**P. 19**

**Operator**

Your next question comes from the line of Jason Butler with JMP Securities.

**Jason Nicholas Butler**
*JMP Securities LLC, Research Division*

Just first on the schizophrenia trial. I know we're some way away from results. But can you give us any kind of benchmark for what clinically relevant effects would be as an adjunctive therapy? I mean, when you look at the atypicals, you're seeing effect sizes of schizophrenia from 0.3 to, let's say, 0.6. Are you looking for any incremental benefit? Or do you need to see something that's in line with what we see as a monotherapy?

**Srdjan R. Stankovic**
*President*

We certainly are -- want to see something that is clinically meaningful. And what we believe and what generally it seems that there is agreement is what we assume as a difference that we will see from placebo in the context of adjunctive therapy. It's probably not going to be of an effect size that we see in monotherapy, but fairly close to that is what we're looking at. And we're just -- in the assumption of our sample size, we assume a difference between placebo and active treatment of 6 points on PANSS as a meaningful difference. And that is what we expect to see at the minimum in our trial.

**Jason Nicholas Butler**
*JMP Securities LLC, Research Division*

Okay. That's helpful. And then so shift -- just wanted to ask about your comments on the mechanistic rationale for the potential lack of cognitive impact with NUPLAZID in Alzheimer's patients. Are you thinking that the drug has a greater impact on serotonin than other atypical antipsychotics and that's what would drive potentially the lack of cognitive effects? Or is it the fact that you're not hitting the other targets like dopamine that maybe is driving cognitive decline with those drugs that you wouldn't cause?

**Srdjan R. Stankovic**
*President*

No. Obviously, to some extent, commenting on this is always speculative, but it could be the latter what we believe. And that is that the absence of direct effect of dopamine transmission would be something that we believe will be beneficial in terms of the pimavanserin action.

**Operator**

Your next question comes from the line of Paul Matteis with Leerink.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

Congrats on all the progress. I have one commercial question. First, on the commercial side. Of the $5.3 million in sales, was there any change in inventory? And is that driving any of the effect that you saw this quarter?

**Todd S. Young**
*Former Executive VP & CFO*

Paul, it's Todd. No, the inventory, in fact, was up there with respect -- to suggest any big load into the channel and sort of things you might see on drug launches. Specialty pharmacies are not being incentivized in any way to load inventories. So this is very much patient demand-driven results.

**Stephen R. Davis**
*CEO & Director*

Yes. Just to give a little bit more color there. Because, one, it's a very simple molecule to make; and two, we're distributing exclusively through specialty pharmacies and specialty distributors, we still have the

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 7**
**P. 20**

kind of inventory in the channel that you might expect if we were distributing through a typical wholesale type of distribution. So our inventory in the system just won't be at the same kind of levels that you would have elsewhere.

**Todd S. Young**
*Former Executive VP & CFO*

And I should mention, Paul, it's been on a sell-through revenue recognition model. We don't recognize revenue just when specialty pharmacies buys the products from us. That is up on the balance sheet in our deferred revenue account.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

Okay. That all makes a lot of sense. And then if I might just ask 2 quick clinical questions. My first one is on agitation. I'm wondering, with the ADP data coming up so soon, why not wait until you see data from that study before starting a program in agitation since agitation is a secondary endpoint in that trial? Do you expect to get useful information on the effect on agitation symptoms in the ADP trial?

**Stephen R. Davis**
*CEO & Director*

So Serge, is going to answer that question, Paul.

**Srdjan R. Stankovic**
*President*

The primarily reason is that although it is a secondary outcome, the ADP trial did not specifically require any level of -- any threshold of agitation to qualify for that trial and did not even require a minimum agitation to qualify for the trial. Therefore, we don't really -- there will be a subset of patients that we will -- may see some effects of pimavanserin on agitation because not all patients will have sufficient severity of symptoms to evaluate that. So we do not -- although that will be interesting and informative data from the trial in regard to agitation as well as other behavioral symptoms that are measured by the neuropsychiatry inventory. Remember that we measure about 12 different domains across behavioral neuropsychiatric symptoms. The only really decisive information that we will have is on psychotic symptoms, on hallucinations and delusions. So we did not consider that whatever outcome of the ADP trial in regard to agitation merits decisive criterion for the start of the AD Agitation trial. And we just -- and that's the just rationale why we did not wait for the results.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

That makes a lot of sense, Serge. And then if I may just ask one quick one on schizophrenia. I'm honestly a little bit confused of the mechanism in schizophrenia because my understanding is that these patients will be on background therapy with an atypical antipsychotic, which already modulates 5-HT2A. So I'm wondering, when you think about adding on pimavanserin, isn't that receptor already saturated by the patient's current therapy or at least in some of the patients? Maybe you could just comment a little bit on what you think is going to be driving the added benefit of pimavanserin in schizophrenia in that context?

**Srdjan R. Stankovic**
*President*

Well, there is the direct modulation on the 5-HT2A, but there is also the indirect modulation of other neurotransmitter via 5-HT2A. And it's actually some of the explanations for drugs that have both D2 and 5HT2 action -- mechanism of action. It's still -- there is a space for additional efficacy because they're not really completely ameliorating symptoms of psychosis. So the logic here is that pimavanserin -- adding pimavanserin to the mix of effect of atypical antipsychotic throughout different receptors in neurotransmitters systems is increasing the effects of -- through a direct and indirect effect not only on serotonin system but on dopamine system and others. So that's -- I know it's probably not a very

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 7
P. 21

-- a fully satisfactory explanation, but it's a lot of theory going on in there. And of course, they're all hypothesis. We don't have an exact knowledge of the precise mechanism.

**Operator**

Your next question comes from the line of Salveen Richter with Goldman Sachs.

**Stephen R. Davis**
*CEO & Director*

Operator, why don't we try to circle back to Salveen. We can't hear her, if she's asking a question.

**Operator**

Your next question comes from the line of Bert Hazlett with BTIG.

**Robert Cummins Hazlett**
*BTIG, LLC*

Congratulations on all the progress. I have 2 quick questions. Is there any sense that the 30-day sample you're giving out, do you have any sense of whether or not there's -- that's taking longer than 30 days to get through? Meaning is there any titration of the dosing going on? And then just the second one. As you think of the patients that are having experience with NUPLAZID, is there any way to tell whether this is part of the installed base? Meaning these are long-term Parkinson's psychosis patients? Or are they newly diagnosed patients that are just simply coming into the system. So are they getting switched from other atypicals? Or are they brand-new Parkinson's psychosis patients? Or can you tell that at this point?

**Stephen R. Davis**
*CEO & Director*

Let me take -- just because we're running short again, let me take a really quick stab at that. And Terry, you may want to jump in as well. In terms of refill rates, it's just way too early for us to have a feel for that. We'd love to have a refined view of that. We just don't. So we don't have an update at this early stage yet as we're ramping up and as, of course, we have more patients on therapy week-to-week and month-to-month. We just don't have a good feel yet for the refill frequency and rates as they go month-to-month. And I'm sorry, your second question was...

**Robert Cummins Hazlett**
*BTIG, LLC*

Is it just...

**Stephen R. Davis**
*CEO & Director*

Yes, yes, on switching versus [indiscernible] patients. I know this isn't going to be a very satisfactory answer. We're getting both. It's just too fluid at this juncture for us to really comment on that. We're seeing that move around a little bit. So that's also the kind of thing we look forward to having a more refined view on in the future.

**Operator**

Last question comes from the line of Tazeen Ahmad of Bank of America.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Can I just ask one question on the ADP trial? Are you looking definitively to hit your primary endpoint in order to decide whether this indication is something worth pursuing? Or could it be the case that if you see directional trends, that might encourage you to maybe redesign a different trial and keep looking at this indication? We're just trying to get a sense of whether it's all or nothing with the readout?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

spglobal.com/marketintelligence

Ex. 7
P. 22

**Stephen R. Davis**
*CEO & Director*

So again, Tazeen, I'll take a quick stab. Serge may want to chime in. I will draw a little bit of a distinction between the -019 Study that we'll read out by the end of the year and the studies that we're initiating. The -019 Study is really designed and executed as really a very exploratory study. And we've talked about this in the past. Of course, it's all in one center, and there are other things that are unique to that study that I think give us a certain lens to look through in terms of what -- the data we'll get from it. I think it's highly likely that we'll get -- we'll achieve the objective of the study, and that is get enough information to have an informed view about what to do next. And in these early exploratory studies' design and the way this one was, it may be that we have on one end of the spectrum a highly statistical significant result, positive result. And it gives fairly good clarity when we pressure test it. We think that, that is a believable result and gives us very good clarity to go forward on the others into the spectrum. It's possible in these studies that you get a result and you feel like it was a valid test of the mechanism. It wasn't a failed study. There's no reason to go forward. And then there's a whole lot of gray area in between, and in these early exploratory studies, you wind up in the gray area more often than not. So we just don't know. We're still blinded to the study results. So we're very eager to get to the study results. But we think there's a very good likelihood, doesn't always happens, with the subjective endpoints in CNS but a very good likelihood that we'll get -- we'll achieve the objectives of the study and get information that will tell us what to do next.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

So even if you do hit stat sig, the assumption would be that you would have to move to a Phase III and you wouldn't be able to just file on the study results if it was highly statistically significant. Is that right?

**Stephen R. Davis**
*CEO & Director*

Yes, I mean, it's always -- you hate to -- before you actually open the envelope in a study, you hate to say whether a study could or couldn't be registrational, but this really was not designed to be a registrational study nor executed to be a registrational study. So it's probably very unlikely. Now when we open the envelope, we'll, of course, take a look at that. But I think it's very unlikely that this would be a registrational study. And it just wasn't designed and executed in the way that the -020 study was. That did serve as the basis of a single study approval in PDP, of course.

**Operator**

There are no further questions at this time. I turn the call back over to Mr. Davis.

**Stephen R. Davis**
*CEO & Director*

Great. With that, I know it's been a long call. So thanks again for everyone for joining us today and for your continued support. We look forward to updating you in the future on our ongoing progress.

**Operator**
This concludes today's conference call. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

Ex. 7
P. 24

# Exhibit 8

December 20, 2016
Earnings News

## ACADIA Pharmaceuticals Announces Positive Top-Line Results From Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis

Share Page


***Data Support Moving Forward With Further Development in Alzheimer's Disease Psychosis***

***Conference Call and Webcast to Be Held Today, December 20, 2016, at 8:30 a.m. Eastern Time***

SAN DIEGO–(BUSINESS WIRE)–Dec. 20, 2016– ACADIA Pharmaceuticals Inc. (NASDAQ: ACAD) today announced positive top-line results from its Phase II exploratory study (-019 Study) of pimavanserin in patients with Alzheimer's disease psychosis (AD Psychosis). As a selective serotonin inverse agonist (SSIA) preferentially targeting 5-HT$_{2A}$ receptors, pimavanserin has a different biological mechanism than other marketed antipsychotics. Pimavanserin has been approved by the United States Food and Drug Administration (FDA) for hallucinations and delusions associated with Parkinson's disease psychosis and currently is being studied in several other disease states, including AD Psychosis. The FDA has not approved any drug to treat AD Psychosis.

In this Phase II exploratory study, pimavanserin met the primary endpoint showing a statistically significant reduction in psychosis versus placebo as measured by the Neuropsychiatric Inventory-Nursing Home (NPI-NH) Psychosis score at week 6 of dosing (p=0.0451). Pimavanserin was generally

Ex. 8
P. 2

well tolerated and the safety profile was consistent with what has been observed in previous studies.

"Alzheimer's disease patients suffer from a number of debilitating symptoms, of which psychosis carries a poor prognosis and is associated with earlier placement into nursing homes," said Steve Davis, ACADIA's President and Chief Executive Officer. "Data from the -019 Study provide solid evidence that pimavanserin can improve psychosis in another major neurological disorder and provide strategic momentum for the further development of pimavanserin to address the needs of AD Psychosis patients."

*About the Phase II -019 Study*

The Phase II -019 Study was a double-blind, placebo-controlled exploratory trial designed to evaluate the efficacy and safety of pimavanserin as a treatment for patients with AD Psychosis. A total of 181 patients were enrolled in the study in the United Kingdom and randomized on a one-to-one basis to receive either 34 mg of pimavanserin or placebo once daily. The primary endpoint of the study was antipsychotic efficacy as measured by the mean change in the NPI-NH Psychosis score (combined hallucinations and delusions domains) from baseline to week 6 of dosing. Patients continued dosing through week 12 to gather information on secondary endpoints, including changes in cognition.

Pimavanserin demonstrated efficacy on the primary endpoint of the -019 Study with a 3.76 point improvement in psychosis at week 6 compared to a 1.93 point improvement for placebo, representing a statistically significant treatment improvement in the NPI-NH Psychosis score (p=0.0451). Baseline mean scores for the pimavanserin and placebo treated groups were 9.52 and 10.00, respectively.

Atypical antipsychotics have been associated with a statistically significant worsening of cognitive function in patients with Alzheimer's disease. In the -019 Study, over the course of 12 weeks of treatment, pimavanserin did not impair

Ex. 8
P. 3

cognition as measured by the Mini-Mental State Examination (MMSE) score and was similar to placebo. On the secondary endpoint of mean change in NPI-NH Psychosis score at week 12, pimavanserin maintained the improvement on psychosis observed at the week 6 primary endpoint, but did not statistically separate from placebo.

In the -019 Study, pimavanserin was generally well tolerated and the safety profile was consistent with what has been observed in previous studies. Based on a preliminary analysis of safety data, the most common adverse events reported were falls, urinary tract infection and agitation. The mortality rate was the same in the pimavanserin and placebo treatment groups. The mean age of patients in the study was 86 years.

The data analysis of the Phase II -019 Study is ongoing and ACADIA plans to present data from this study at a future medical conference.

*Conference Call and Webcast Information*
ACADIA will host a conference call and webcast today, December 20, 2016 at 8:30 a.m. Eastern Time to discuss top-line results from its Phase II trial with pimavanserin in patients with Alzheimer's disease psychosis. The conference call can be accessed by dialing 844-821-1109 for participants in the U.S. and Canada and 830-865-2550 for international callers (reference passcode 43052480). The conference call will be webcast live on ACADIA's website, www.acadia-pharm.com, under the investors section and will be archived there until January 3, 2017. A telephone replay also may be accessed through January 3, 2017 by dialing 855-859-2056 for participants in the U.S. and Canada and 404-537-3406 for international callers (reference passcode 43052480).

*About Alzheimer's Disease Psychosis (AD Psychosis)*
According to the Alzheimer's Association, around 5.4 million people in the United States are living with Alzheimer's disease and approximately half are

Ex. 8
P. 4

diagnosed with the disease. Studies suggest that 25 to 50 percent of patients diagnosed with Alzheimer's disease may develop psychosis, commonly consisting of hallucinations and delusions. AD Psychosis is associated with more rapid cognitive and functional decline, greater caregiver burden, and earlier institutionalization. The FDA has not approved any drug to treat AD Psychosis.

## About Pimavanserin

Pimavanserin is a selective serotonin inverse agonist (SSIA) preferentially targeting 5-HT$_{2A}$ receptors. These receptors are thought to play an important role in AD Psychosis. Pimavanserin is being evaluated in an extensive clinical development program by ACADIA across multiple other indications including Alzheimer's disease agitation, schizophrenia – inadequate response, schizophrenia – negative symptoms, and major depressive disorder. Pimavanserin (34 mg) was approved for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis by the FDA in April 2016 under the trade name NUPLAZID®. NUPLAZID is not approved for patients with AD Psychosis.

## About ACADIA Pharmaceuticals

ACADIA is a biopharmaceutical company focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system disorders. ACADIA maintains a website at www.acadia-pharm.com to which we regularly post copies of our press releases as well as additional information and through which interested parties can subscribe to receive e-mail alerts.

## Forward-Looking Statements

Statements in this press release that are not strictly historical in nature are forward-looking statements. These statements include but are not limited to statements related to the progress and timing of ACADIA's drug discovery and development programs; the benefits to be derived from NUPLAZID

(pimavanserin) and ACADIA's product candidates, including whether pimavanserin can improve psychosis in another major neurological disorder or be used to treat AD Psychosis; whether the data from the -019 Study support moving forward with further development in AD Psychosis or provide strategic momentum for the further development of pimavanserin to address the needs of AD Psychosis patients; and ACADIA's plans to present data from the -019 Study. These statements are only predictions based on current information and expectations and involve a number of risks and uncertainties. Actual events or results may differ materially from those projected in any of such statements due to various factors, including the risks and uncertainties inherent in drug discovery, development, approval and commercialization, and in collaborations with others, and the fact that past results of clinical trials may not be indicative of future trial results. For a discussion of these and other factors, please refer to ACADIA's annual report on Form 10-K for the year ended December 31, 2015 as well as ACADIA's subsequent filings with the Securities and Exchange Commission. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. This caution is made under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All forward-looking statements are qualified in their entirety by this cautionary statement and ACADIA undertakes no obligation to revise or update this press release to reflect events or circumstances after the date hereof, except as required by law.

**Important Safety Information and Indication for NUPLAZID (pimavanserin) tablets**

**WARNING: INCREASED MORTALITY IN ELDERLY PATIENTS WITH DEMENTIA-RELATED PSYCHOSIS**
**Elderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death. NUPLAZID is not approved for the treatment of patients with dementia-related psychosis**

Ex. 8
P. 6

**unrelated to the hallucinations and delusions associated with Parkinson's disease psychosis.**

NUPLAZID is an atypical antipsychotic indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis.

QT Interval Prolongation: NUPLAZID prolongs the QT interval. The use of NUPLAZID should be avoided in patients with known QT prolongation or in combination with other drugs known to prolong QT interval including Class 1A antiarrhythmics or Class 3 antiarrhythmics, certain antipsychotic medications, and certain antibiotics. NUPLAZID should also be avoided in patients with a history of cardiac arrhythmias, as well as other circumstances that may increase the risk of the occurrence of torsade de pointes and/or sudden death, including symptomatic bradycardia, hypokalemia or hypomagnesemia, and presence of congenital prolongation of the QT interval.

Adverse Reactions: The most common adverse reactions (≥2% for NUPLAZID and greater than placebo) were peripheral edema (7% vs 2%), nausea (7% vs 4%), confusional state (6% vs 3%), hallucination (5% vs 3%), constipation (4% vs 3%), and gait disturbance (2% vs <1%).

Drug Interactions: Strong CYP3A4 inhibitors (eg, ketoconazole) increase NUPLAZID concentrations. Reduce the NUPLAZID dose by one-half. Strong CYP3A4 inducers may reduce NUPLAZID exposure, monitor for reduced efficacy. Increase in NUPLAZID dosage may be needed.

Renal Impairment: No dosage adjustment for NUPLAZID is needed in patients with mild to moderate renal impairment. Use of NUPLAZID is not recommended in patients with severe renal impairment.

Hepatic Impairment: Use of NUPLAZID is not recommended in patients with hepatic impairment. NUPLAZID has not been evaluated in this patient population.

Ex. 8
P. 7

Pregnancy: Use of NUPLAZID in pregnant women has not been evaluated and should therefore be used in pregnancy only if the potential benefit justifies the potential risk to the mother and fetus.

Pediatric Use: Safety and efficacy have not been established in pediatric patients.

Dosage and Administration: Recommended dose: 34 mg per day, taken orally as two 17-mg tablets once daily, without titration.

For additional Important Safety Information, including boxed warning, please see the full Prescribing Information for NUPLAZID at https://www.nuplazid.com/pdf/NUPLAZID_Prescribing_Information.pdf.

View source version on businesswire.com: http://www.businesswire.com/news/home/20161220005379/en/

Investor Contact:
ACADIA Pharmaceuticals Inc.
Lisa Barthelemy, (858) 558-2871
ir@acadia-pharm.com
or
Media Contact:
Taft Communications
Jon Shure, (240) 426-4282
jon@taftcommunications.com

Ex. 8
P. 8

# Exhibit 9

**S&P Global**
Market Intelligence

# ACADIA Pharmaceuticals Inc.
# NasdaqGS:ACAD
# Special Call
## Tuesday, December 20, 2016 1:30 PM GMT

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

spglobal.com/marketintelligence

1

Ex. 9

P. 2

**Contents**

---

# Table of Contents

Call Participants ............................................................................... 3

Presentation ..................................................................................... 4

Question and Answer ......................................................................... 7

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

**Ex. 9**
**P. 3**

# Call Participants

**EXECUTIVES**

**Lisa Barthelemy**
*Director of Investor Relations*

**Srdjan R. Stankovic**
*President*

**Stephen R. Davis**
*CEO & Director*

**ANALYSTS**

**Alan Carr**
*Needham & Company, LLC,
Research Division*

**Brittany R. Terner**
*JP Morgan Chase & Co, Research
Division*

**Jason Nicholas Butler**
*JMP Securities LLC, Research
Division*

**Michael John Higgins**
*Roth Capital Partners, LLC,
Research Division*

**Paul Andrew Matteis**
*SVB Leerink LLC, Research
Division*

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC,
Research Division*

**Sarah Reid Weber**
*Piper Jaffray Companies, Research
Division*

**Tazeen Ahmad**
*BofA Merrill Lynch, Research
Division*

**Thomas Trimarchi**
*Goldman Sachs Group Inc.,
Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 9**
**P. 4**

# Presentation

**Operator**

Good day, ladies and gentlemen, and welcome to ACADIA Pharmaceuticals' conference call. My name is Carol, and I will be your coordinator for today. [Operator Instructions].

I would now like to turn the presentation over to Lisa Barthelemy, Senior Director of Investor Relations at ACADIA. Please proceed.

**Lisa Barthelemy**
*Director of Investor Relations*

Thank you, Carol. Good morning, and welcome to ACADIA's call to discuss topline results from our Phase II -019 Study with pimavanserin for Alzheimer's disease psychosis. Earlier this morning, we issued a press release announcing positive top line results from the study. To obtain a copy of this release, please visit our website at www.acadia-pharm.com and visit the news link.

This call is being recorded and an archived copy will be available on our website through January 3, 2017. Joining me on the call today from ACADIA are Steve Davis, our President and Chief Executive Officer; Dr. Serge Stankovic, our Executive Vice President and Head of Research and Development; Terry Moore, our Executive Vice President and Chief Commercial Officer; and Todd Young, our Executive Vice President and Chief Financial Officer.

Steve will begin the call today with some introductory remarks, and then Serge will review top line results from the study. We will then open the floor to questions. We estimate the call duration will be 30 minutes.

Before we proceed, I would first like to remind you that during our call today, we will be making a number of forward-looking statements, including statements regarding our strategy, including the timing, results or implications of clinical trial; other development efforts or regulatory approval; the benefits or advantages to be derived from future approval of and the commercial potential for our product candidates in each case, including NUPLAZID or pimavanserin, and the future development or commercialization as our product candidates. During our call today, we may use words such as anticipate, believe, could, expect, intend, may, plan, potential, predict, project, should, will or the negative of those terms and similar expressions that convey uncertainty of future events or outcomes to identify these forward-looking statements. These forward-looking statements are based on the current information, assumptions and expectations that are inherently subject to change and involve a number of risks and uncertainties that may cause actual results to differ materially from those contained in the forward-looking statements. These factors and other risks associated with our business can be found in our filings made with the SEC. You are cautioned not to place undue reliance on these forward-looking statements, which are made only as of today's date. ACADIA disclaims any obligation to update these forward-looking statements.

I will now turn the call over to Steve Davis, our President and Chief Executive Officer.

**Stephen R. Davis**
*CEO & Director*

Thank you, Lisa, and good morning. Let me first take the opportunity to thank all of you joining us on today's conference call. This morning, we announced positive top line results from our Phase II -019 Study with pimavanserin in Alzheimer's disease psychosis.

I'd like to start with a short reminder of the unmet need in Alzheimer's psychosis. According to the Alzheimer's Association, there are approximately 5.4 million Alzheimer's patients in the U.S., approximately 1/2 of whom are diagnosed with the disease. It is the fifth leading cause of death for people aged 65 and older. Of the approximately 2.7 million diagnosed Alzheimer's patients, it is estimated that between 25% and 50% suffer from AD psychosis. While the diagnostic criteria for Alzheimer's disease mostly focus on cognitive deficits, it is often the behavioral and psychiatric symptoms that are most troublesome for caregivers and lead to poor quality of life for patients. Not surprisingly, psychosis

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

Ex. 9
P. 5

in Alzheimer's patients is associated with more rapid cognitive and functional decline and increased institutionalization relative to patients without psychosis.

Today, there are no drugs approved by the FDA to treat AD psychosis. However, atypical antipsychotics are frequently used off-label to treat anti -- to treat psychosis in these patients to fill the void. Unfortunately, the off-label use of antipsychotics in Alzheimer's patients has been shown to significantly impair cognition in this patient population. So in other words, they make the primary symptom these patients suffer from worse. This is a very significant unmet medical need for a safe and effective therapy to treat psychosis in these patients.

Shifting now to our study results, the -019 Study was designed to evaluate the efficacy and safety of pimavanserin in patients with Alzheimer's disease psychosis. This is the first time we have studied pimavanserin in this patient population. We are extremely pleased with the results, and as I noted in the release, we look forward to the further development of pimavanserin for the benefit of AD psychosis patients.

As you've heard me say before, the primary objective of the -019 Study was to get information to enable us to make an informed decision about what to do next. We accomplished that in this study. The data from -019 provides solid evidence of pimavanserin improved psychosis in another major neurological disorder with significant unmet needs beyond PD psychosis. Pimavanserin met the primary endpoint, showing a statistically significant reduction on psychosis when compared to placebo at week 6. Importantly, pimavanserin was able to demonstrate antipsychotic effect without worsening cognition. Pimavanserin also was generally well tolerated in the -019 study, and we were pleased to see a safety profile very consistent with what we have observed in previous studies.

So to sum up, data from the -019 Study provide 2 things. First, it provides convincing evidence that we should move forward in AD psychosis, and we are. Second, it also gives us a very clear picture of how to leverage the data for the benefit of future study design to help us understand what we should do the same and what we would consider changing.

Before turning the call over to Serge, I'd like to just make one additional observation. During the conduct of study -019, many of you very understandably had held the psychotic -- antipsychotic benefits of pimavanserin that we observed in PD psychosis might read through to AD psychosis. And our response was always that while the underlying disease stage is admittedly very different between these disorders, we are treating a very troublesome symptom of the disease and the symptom, while not identical, is similar across the diseases. We also noted that while we were -- that we were very encouraged by the fact that ACADIA had previously demonstrated an antipsychotic effect in schizophrenia, which, of course, is also very different from Parkinson's disease.

With the results of study -019, pimavanserin has now demonstrated an antipsychotic effect in 3 major CNS disorders. Parkinson's disease psychosis, schizophrenia, and now Alzheimer's disease psychosis. This coupled with the observation that other atypical antipsychotics have been approved in multiple indications buttress our optimism in the potential for pimavanserin to address unmet needs in multiple disease states and in our extensive life cycle management program, where in addition to AD psychosis, we also have ongoing studies in schizophrenia and inadequate responders, Alzheimer's education, schizophrenia negative symptoms and major depressive disorder.

I'll now turn the call over to Serge, who will walk us through with more of the top line data.

**Srdjan R. Stankovic**
*President*

Thank you, Steve, and good morning, everyone. As Steve mentioned, this is our first study in AD psychosis. The study was conducted through a single site with a large network of nursing home in the London, England area. Around 130 nursing homes participated in the study. This Phase II 12-week randomized, double-blind, placebo-controlled study was designed to examine the efficacy and safety of 34-milligram dose of pimavanserin compared to placebo in patients with AD psychosis. We enrolled 181 patients in this study. The average age of study participants was 86 years. The primary endpoint of

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 9
P. 6

the -019 study psychosis, as measured by the main change of the Neuropsychiatric Inventory - Nursing Home version psychosis score, or in other words, hallucinations and delusions domains combined score from baseline to week 6 of dosing. Pimavanserin met the primary endpoint of the study by demonstrating a significant reduction of psychosis compared to placebo. The pimavanserin arm observed 3.76 point improvement in psychosis at week 6 compared to 1.93 point improvement for placebo with a p value of 0.0451. Baseline scores were 9.52 for pimavanserin and 10 for placebo-treated group.

On the measure of cognition, pimavanserin did not impair cognition over the course of 12 weeks of treatment and was similar to placebo, as measured by the Mini-Mental Status Exam. On the secondary endpoint of mean change, in NPI-NH psychosis score at week 12, pimavanserin maintained the improvement in psychosis achieved at the week 6 primary endpoint, but it's not statistically separate from placebo. On the study of agitation and aggression as secondary measure, as we have noted previously, this study was not designed to optimize this assessment and the analysis did not reveal notable differences between treatment groups. Overall, the observed safety profile of pimavanserin was consistent with previous studies, although the serious events were more balanced than what we saw in previous studies. In these elderly and frail patient population, we saw the same rate of adverse events leading to death, which was 4 deaths in each treatment group. We also saw more balanced rate of serious adverse events and the rate of adverse events leading to discontinuations were higher in placebo than the pimavanserin are. The most frequently observed adverse events were falls, urinary tract infection and agitation.

Before we move to Q&A, I would like to make sure to thank the patients, their families and caregivers for participation in the study. Without their participation, this research would not be possible. Let me now turn over the call to Lisa, who would initiate the Q&A portion of the call.

**Lisa Barthelemy**
*Director of Investor Relations*

Thank you, Serge. At this point, we will begin the Q&A portion of our call. As a reminder, we are going to keep this call brief. We ask that each person limit themselves to one question and they re-queue with any additional questions.
Operator, please open the call for questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 9
P. 7

ACADIA PHARMACEUTICALS INC. SPECIAL CALL |  DEC 20, 2016

# Question and Answer

**Operator**

[Operator Instructions] First today, we have Charles Duncan from Piper Jaffray.

**Sarah Reid Weber**
*Piper Jaffray Companies, Research Division*

This is Sarah on for Charles. So my question -- yes, it seems as though the benefit you saw of the little under 2 points over placebo. So can you just provide some context for the clinical meaning for most of this change? And is this the magnitude of benefit you'd want to see in a larger pivotal trial?

**Stephen R. Davis**
*CEO & Director*

Yes. I'm going to ask Serge to take that question.

**Srdjan R. Stankovic**
*President*

Yes. The -- if you look at the percent change from baseline and these differences we observed are dependent on the baseline of severity that is observed in the study, we are seeing that the percent change decrease from baseline in pimavanserin and placebo group are very similar to what we saw in the PDP program, and the difference is very similar what we saw there. As well, looking at the effect size we observed, that is what the antipsychotic trials -- successful antipsychotic trials in this indication reported approximately similar effect size.

**Sarah Reid Weber**
*Piper Jaffray Companies, Research Division*

So it's about the same, and Srdjan, you'd plan to use in your next trial?

**Srdjan R. Stankovic**
*President*

I think it's premature for us. We will certainly need to do some additional looking at the data, thinking through what is the best outcome measure, and obviously, discuss with the FDA what will be the most appropriate outcome measure to use in the next trial.

**Operator**

Our next question comes from Ritu Baral from Cowen.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

I just wanted to ask about the most frequent -- 2 of the most frequent side effects seen, falls and agitation. Was there any numerical difference between the 2 groups? And also, were there any sequela from the falls and potentially from the agitation seen?

**Srdjan R. Stankovic**
*President*

The -- in terms of fall and -- falls and urinary tract infections, as a most frequently observed adverse event. There was fairly balanced between placebo and pimavanserin. Agitation was somewhat higher, frequency reported in pimavanserin group, but there was a relatively frequently reported in placebo group as well.

**Stephen R. Davis**
*CEO & Director*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

**Ex. 9**
**P. 8**

And Ritu, just can also add to what Serge mentioned that as we were frequently asked about what why wouldn't we wait until we get the results of the study to initiate the agitation study. And we said that this study was really not designed for that endpoint. It wasn't powered for it, nor was the entry criteria set up for that. And so when you look at the baseline measures of agitation, they're very low. So we just -- this was just not a study to really measure that. The study that we are doing in agitation is an appropriate study to really examine that endpoint.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

So the numerical imbalance and agitation you don't see as any sort of mechanistic signal or clinical signal at all within this dataset?

**Stephen R. Davis**
*CEO & Director*

We just think it's noise in the data. This is just not the patient population. It's not -- entry criteria wasn't set up for it, just wasn't the study to examine that endpoint.

**Operator**

Our next question comes from Tazeen Ahmad from Bank of America.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Just wanted to ask you a question in terms of the type of the population that you had enrolled. In the past, you said that the type of Alzheimer's patients that you had included in the study perhaps were pretty advanced on the severity scale. As you look forward and we know that you haven't designed the next trial, would you be inclined to include more moderate age patients, which, I guess, would potentially increase the potential of success of the p-value and also, obviously, would increase the possibility of the type of people that you could treat with the drug?

**Stephen R. Davis**
*CEO & Director*

Yes. And Tazeen, it's a great question. I'll answer it. Serge, feel free to jump in if you have any additional color. As we -- as everybody on the call knows, we're not alone in this space. There are other people developing competitive drugs. And so there is a certain level of information that we are not going to be able to get in today. I would love to be able to answer that question, but I just -- to be honest with you, we feel like we've got a, I think, a really clear signal in this study on 2 fronts. One is very clear signal on efficacy and that we should move forward, which we are. But also exactly what we would want to do and what we -- how we might benefit from the study for future study designs, but we just aren't going to get into things that might read on that at this point. We just don't see any reason to equip other people that might be working in the area and wanting to enroll studies and will just have to -- say, they will just have to do their own study to try to learn what we know at this point. But we feel like we got a lot of really useful information from this study.

**Srdjan R. Stankovic**
*President*

Yes, and I would like to add to that. I mean, this is a great outcome for the study and we are very excited about this. But I'm, frankly, even more excited about the treasure trove of information that we are able to analyzing this data, and that will certainly guide us very well where we need to go in our next trial and in our pivotal trial on the -- in this indication. So this is a phenomenally rich data that will provide us with a whole a lot of learnings that we can use for the future.

**Operator**

Your next question comes from Cory Kasimov from JPMorgan.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

**Ex. 9**
**P. 9**

**Brittany R. Terner**
*JP Morgan Chase & Co, Research Division*

This is actually Brittany on for Cory. Just 2 on the curve versus placebo. How early did the curve separate? And then at 12 weeks, can you provide any more information of how different it was from placebo?

**Stephen R. Davis**
*CEO & Director*

Yes. So -- again, I'll start, and Serge, feel free to jump in. So we were numerically separated at all time points. But again, it was an exploratory study, and we got a very clear signal on efficacy, but we weren't -- this relates to other type points or secondary measures. We didn't get significance on everything, and -- which we wouldn't expect in this exploratory study. But what I would say -- what was most important to us, and we really, although we got more analysis than we -- we're probably our own worst critics and it really thoroughly vetted the data. And what I would say is what we find most compelling is that we -- the efficacy curve, much like we saw in PDP, drops down and stays very -- at a very constant level throughout the 12 weeks. The 12-week numbers actually slightly improved over the 6-week number. Placebo as we got closer to what we treated and separated and so you can correctly infer from that the placebo group dropped or had more of a -- showed more of a response at week 12 than it did at week 6.

**Operator**

Your next question comes from Salveen Richter from Goldman Sachs.

**Thomas Trimarchi**
*Goldman Sachs Group Inc., Research Division*

This is actually Tom on for Salveen. I just wonder if I could clarify one point on that last question. So am I right to assume that at 12 weeks, the delta between placebo and treatment was actually smaller and could this be driving, this is why it was not that big? And then another question on that is, I saw on clinicaltrials.gov that the primaries will sit at 12 weeks. So I was just curious why you decided to cut the data at 6 here.

**Stephen R. Davis**
*CEO & Director*

No. Serge, do you want to take focused instructions?

**Srdjan R. Stankovic**
*President*

Right. Yes, you are right in your conclusion. Due to the improvement observed in placebo from week 6 to week 12, we did not see separation between placebo and pimavanserin at that point. The primary point from the beginning was week 6 NPI psychosis score. So I'm not sure that, that information is correct that the 12 week, it was the primary endpoint. That was from the beginning and it's in -- it was in the protocol and in all of our announcements.

**Operator**

Your next question comes from Jason Butler from JMP Securities.

**Jason Nicholas Butler**
*JMP Securities LLC, Research Division*

Can you just give us some more details around the network of nursing homes that you use in this trial? To what extent were the each individual homes independent? How many physicians were actually involved in conducting the assessments? And just what gives you confidence that when you move to a more multicenter, multi-geographical type trial that the results will maintain their significance?

**Stephen R. Davis**
*CEO & Director*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

**Ex. 9**
**P. 10**

Serge?

**Srdjan R. Stankovic**
*President*

The patients were in nursing homes, and -- but all of the study assessments were conducted by the same team from King's College. And that includes several physicians, a number of raters and coordinators and the teams would actually travel to this nursing home and provide conduct assessments and evaluations for the study. So there was a relatively wide team of people, but it was one center, one team that conducted all of the assessments in the trial. I mean, this is for the nursing home study design. This was very appropriate. As we move forward, we have to think in a number of ways, what actually population would be the best position population for the trial and whether that is a nursing home or outpatient population. I mean, we are early in looking at the data, understanding. We also are looking at the experience of other clinical studies conducted in this indications, and we'll make our conclusions moving forward. I mean, from the perspective of the scalability of the result, on one side, we do have results as it is. And then other side, we are, as we said, much better understanding what are the factors that may enhance the effect that we are seeing with pimavanserin treatment, and we'll certainly incorporate those in our future test trials.

**Operator**

Your next question comes from Paul Matteis from Leerink.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

Just a couple of very quick ones. One, I'm curious if you can talk a little bit about the statistical primary analysis. Was this done via intent to treat? And how were dropouts, and other things like that handled? And two, did you look at the CGI, clinical global impression, scale? Oftentimes, that's used in psychiatry to actually put into context a meaningful and that's a bit effect size?

**Stephen R. Davis**
*CEO & Director*

So Serge, do you want to -- Paul, I just want to make sure I got both questions. The second was on CGI, and the first one was...

**Srdjan R. Stankovic**
*President*

What was the analysis population?

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

I made it clear -- [indiscernible].

**Srdjan R. Stankovic**
*President*

The full analysis set, what we call the efficacy analysis population, included all patients that were randomized, received at least one dose of study drug and had at least one false baseline primary assessment. And a vast majority of patients was included in the study. I believe, only 3 patients were not included out of 181 patient that was included in the study in that analysis. From the safety analysis side, all 181 patients were included because all of the patients actually received at least 1 dose of the drug. So yes, it was intent-to-treat population and defined as I just described.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

Okay. And then on the CGI?

**Srdjan R. Stankovic**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

**Ex. 9
P. 11**

*President*

On the CGI, we did not see a separation similar as we saw on the primary measure. It's a fairly rough assessment, and we did not observe the similar separation.

**Paul Andrew Matteis**
*SVB Leerink LLC, Research Division*

If you don't mind me just asking a quick follow-up on that, without a separation on the CGI, can you talk a little bit about the meaningfulness of the change? Was it hard for physicians to really detect meaningful implications of a 2-point effect size?

**Srdjan R. Stankovic**
*President*

What we believe is more the manner -- in the manner of how the assessments are done. It is in the multicenter study, where the investigator following patient is one investigator, and they are conducted a global clinical assessments on the patient throughout the study. So it's easier for them to compare improvement over time on a basis of what they saw in the patients from the beginning at baseline. Here, we have multiple assessors and there wasn't a high rate of overlapping in terms of a global -- clinical global assessment that was the same assessor over time. So that -- we believe that may have played a role and somewhat difficult to see the changes over time.

**Stephen R. Davis**
*CEO & Director*

It's just as opposed to the more discrete scale, maybe just to echo Serge's point. In this particular study, and in this arrangement to this network of nursing homes, in the vast majority of patients, the investigator rating the patient on CGI at the baseline was not the same investigator that rated them at the primary endpoint. So there was just a lot of change in the investigators. So it was maybe -- so the CGI would not be as an appropriate a measure for looking at this in the study, as you might normally expect, where you -- and Serge mentioned, normally it's just the opposite with the vast majority of investigators are the same investigator at each time point.

**Operator**

Your next question comes from Michael Higgins from Roth Capital.

**Michael John Higgins**
*Roth Capital Partners, LLC, Research Division*

Just a follow-up on the primary endpoints. I was looking at the NPI-NH scale on the roughly 2000 Alzheimer's study, the clinicaltrials.gov. I'm not seeing that endpoint being used. Is it something that you expect to use in follow-up studies? And if so, can you give us some guideline as to what kind of trial design we look for in the pivotal?

**Stephen R. Davis**
*CEO & Director*

Michael, we are having a hard time hearing you. Can you just try to give away just the first part of the question?

**Michael John Higgins**
*Roth Capital Partners, LLC, Research Division*

Sure. It's just a follow-up on primary endpoints. The NPI-NH primary endpoint, I did not find that in the -- except for one of the study amongst the 2,000 Alzheimer's studies posted on clinicaltrials.gov. So just trying to get a sense for why that's being used and what the end-point would be in the pivotal?

**Srdjan R. Stankovic**
*President*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 9
P. 12

Well, to be perfectly honest, it is hard for me to provide a precise rationale on why NPI nursing home version was chosen for a primary outcome measured in this study, because I wasn't there when that decision was made. Although if does make sense considering that NPI's issues in the trial was done in nursing homes, and this is -- it was one of the natural choices for this measure. As in respect to what we will be using in the next trial, that depends on many factors. First of all, we'll learn quite a bit from this trial. Second, we will learn from experience of other trials in the same indication and variety of instruments that have been used. And finally, it will depend on our discussions with FDA. We will propose what instrument, but we ultimately have to have an agreement with them on the primary outcome measure for that trial and that is how we will arrive to the primary endpoint for the next pivotal trial.

**Stephen R. Davis**
*CEO & Director*

And just to echo Serge's comments. As Serge mentioned, this study was designed and executed entirely in nursing homes. And so one of the things that will impact our view of what endpoint to use will be whether the next study is entirely in nursing homes or not. So that's one of -- that's the primary reason that Serge is noting that we have to -- we'll have to do some additional analysis and the FDA to nail down exactly what the primary endpoint will be in the next study. What I would say, though, is all of these trials and all these endpoints are composite at hallucinations and delusions. And so there are a number of well-established tools that we can use in the next study.

**Operator**

Our final question comes from Alan Carr from Needham.

**Alan Carr**
*Needham & Company, LLC, Research Division*

Can you tell us a bit about the domains here, delusions versus hallucinations? Were those like at baseline? And did you see any difference in the impact on them relative to each other in the trial?

**Srdjan R. Stankovic**
*President*

Yes, of course. Not unexpectedly, we observed more delusions than hallucinations in the trial, which is, as I said, something that we expected on the basis of epidemiology of the psychosis in Alzheimer's disease and differences, vis-à-vis maybe Parkinson's disease psychosis. So there was improvement on either in the course of the trial, but there was a higher prevalence of starting severity on delusions compared to hallucinations.

**Alan Carr**
*Needham & Company, LLC, Research Division*

Is the -- I guess, for context, your baseline score was 10, but what's the maximum amount that it could have been on the scale?

**Srdjan R. Stankovic**
*President*

24. Each scale gives 12, and add, that's 24.

**Alan Carr**
*Needham & Company, LLC, Research Division*

Did the patients have, I guess, the baseline severity that you were looking for here at around 10?

**Srdjan R. Stankovic**
*President*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 9**
**P. 13**

I looked at a variety of trials, just to try to compare some particularly done in the nursing homes. And severity that we see is about either within the range what is seen in this trial, although maybe on the lower end of that range.

**Operator**

We have no further questions in queue at this time, so I'll turn the call back to Mr. Davis for closing remarks.

**Stephen R. Davis**
*CEO & Director*

Great. Thank you very much. And thanks again to everyone for joining us on today's call and for your continued support. We look forward to updating you in the future on our ongoing projects.

**Operator**

Thank you for participating in today's conference call. This concludes the presentation. You may now disconnect. Have a great day.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ex. 9**
**P. 14**

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# Exhibit 10

**COWEN**
AND COMPANY

Biotechnology

## Acadia Pharmaceuticals

| | |
|---|---|
| Equity Research | Quick Take: Company Update |

December 20, 2016

**Price: $25.43** (12/19/2016)
**Price Target: $42.00**

**OUTPERFORM (1)**

**Ritu Baral**
646.562.1379
ritu.baral@cowen.com

**Key Data**

| | |
|---|---|
| Symbol | NASDAQ: ACAD |
| Market Cap (MM) | $3,079.9 |

# *Surprise Stat Sig Hit on ADP: Evidence of Effect, Q's on Data Nuances Remain*

### The Cowen Insight

Today, ACAD announced top-line data from the Ph2 '019 Alzheimer's Disease Psychosis trial. Data showed a stat sig treatment benefit on the NPI-NH Psychosis subscale at 6wks (primary endpoint) but was not sustained through 12wks (secondary endpoint), which ACAD attributes to late placebo benefit. We look forward to the full dataset including key secondary endpoint data at a medical meeting in 2H17.

- **Ph2 '019 ADP Trial Design: Modest but Stat Sig Positive Data.** This morning, ACAD announced positive top-line data from the Ph2 '019 trial of pimavanserin in Alzheimer's Disease Psychosis (ADP). The Ph2 '019 trial was a 12-week single center (comprised of 130 nursing homes) randomized trial of 40mg daily pimavanserin or placebo in 181 patients with ADP. The trial utilized a composite primary endpoint of Psychosis (hallucinations and delusions subscales) of the Neuropsychiatric Index-Nursing Home (NPI-NH) scale at 6 weeks, with treatment continuing to 12 weeks. We note that Street expectations heading into the trial were extremely low, driven by what was viewed as poor trial design by the previous management team (particularly with respect to inclusion criteria and statistical powering), lack of precedent data on ADP-specific psychosis symptoms and generally modest views on pimavanserin potency.

- **Modestly Positive Data Exceeds Expectations but Questions Remain on Nuances and Meaningfulness.** Today's release included only top-line data showing pimavanserin led to a modest statistically significant placebo-adjusted treatment benefit of 1.83 on the NPI-NH Psychosis scale (p=0.045) with an effect size >0.3, generally considered the threshold for clinically meaningful benefit, at 6 weeks and no benefit on the CGI (although management noted different raters were utilized on these scales). ACAD management previously suggested a placebo-adjusted benefit of 3 points would be clinically meaningful while our KOLs saw even a 1-2 point benefit as meaningful. While treatment benefit was not seen at 12 weeks, management believes this is due to a relative increase in the placebo response between weeks 6-12 rather than a drop off of treatment effect. Further, the relatively low baseline scores (~10) suggest an impressive absolute magnitude of change, while we also note the placebo-adjusted percent benefit was similar to that seen in the PDP trials (~20%). Discussion on today's conference call suggested clinical benefit was driven at least in part by improvements in delusions, the predominant manifestation of psychosis in ADP. No data were released on other NPI-NH subscales (e.g. agitation/aggression, sleep, irritability/lability) though management noted a numerical increase of agitation symptoms on pimavanserin vs. placebo in the trial. ACAD believes this increase is noise and has no mechanistic read through to the ongoing Ph2 SERENE AD Agitation trial, particularly as presence of agitation/aggression symptoms were not included in the ADP trial inclusion criteria. Importantly, cognition was maintained on pimavanserin treatment (as measured by MMSE) and there were no imbalances in mortality or AEs (including falls, urinary tract infections) other than agitation. While we view these data as incrementally positive, we look forward to more granularity surrounding specific

Please see pages 3 to 6 of this report for important disclosures.

**Ex. 10**
**P. 2**

Cowen and Company
Equity Research

Acadia Pharmaceuticals
December 20, 2016

benefit on the hallucinations vs. delusions subscales, as well as any other signs of potential benefit on other measures. We think full data are likely to be presented at a medical meeting in 2H17 after the initiation of a pivotal trial.

- **Substantial Regulatory Input Required for Path Forward in ADP, Next Step is Pivotal Trial.** ACAD believes today's data justify advancing the ADP program forward into pivotal studies and expects meaningful input from FDA at an end of Ph2 meeting on the potential design of a pivotal trial. Management confirmed that the next ADP trial would represent a registrational study. We expect discussions to revolve around trial powering, population, endpoints and inclusion/exclusion criteria. Given the current management team's lack of involvement in the design of the Ph2 '019 trial, we expect a Ph3 trial could look substantially different, including potentially a different primary endpoint at 12 weeks rather than 6 weeks (we note Nuedexta trials utilize 12 week timepoints though schizophrenia studies are ~4-6 week trials). We expect an update on FDA discussions likely in mid-2017.

lbarthelemy@acadia-pharm.com Lisa Barthelemy 12/20/16 07:56:22 PM Acadia Pharmaceuticals.

**Ex. 10**

**P. 3**

**Cowen and Company**
Equity Research

**Acadia Pharmaceuticals**
December 20, 2016

# *Valuation Methodology And Risks*

## Valuation Methodology

### Biotechnology:

In calculating our 12-month target price, we employ one or more valuation methodologies, which include a discounted earnings analysis, discounted cash flow analysis, net present value analysis and/or a comparable company analysis. These analyses may or may not require the use of objective measures such as price-to-earnings or price-to-sales multiples as well as subjective measures such as discount rates.

We make investment recommendations on early stage (pre-commercial) biotechnology companies based upon an assessment of their technology, the probability of pipeline success, and the potential market opportunity in the event of success. However, because these companies lack traditional financial metrics, we do not believe there are any good methodologies for assigning a specific target price to such stocks.

## Investment Risks

### Biotechnology:

There are multiple risks that are inherent with an investment in the biotechnology sector. Beyond systemic risk, there is also clinical, regulatory, and commercial risk. Additionally, biotechnology companies require significant amounts of capital in order to develop their clinical programs. The capital-raising environment is always changing and there is risk that necessary capital to complete development may not be readily available.

## Risks To The Price Target

Acadia's Nuplazid was approved in 2016 for the treatment of Parkinson's Disease Psychosis (PDP). While the antipsychotic space is crowded with numerous branded and generic drugs available, only Nuplazid is specifically indicated for PDP, though FDA approval does not guarantee commercial success. Ongoing Ph2 clinical programs for Alzheimer's Disease Psychosis (ADP), schizophrenia, Alzheimer's Disease Agitation and Major Depressive Disorder are not guaranteed success in clinical trials or commercialization.

lbarthelemy@acadia-pharm.com Lisa Barthelemy 12/20/16 07:56:22 PM Acadia Pharmaceuticals.

Cowen and Company
Equity Research

Acadia Pharmaceuticals
December 20, 2016

# *Addendum*

## Stocks Mentioned In Important Disclosures

| Ticker | Company Name |
|--------|--------------|
| ACAD | Acadia Pharmaceuticals |

## Analyst Certification

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

## Important Disclosures

Cowen and Company, LLC and or its affiliates make a market in the stock of Acadia Pharmaceuticals securities.

Cowen and Company, LLC managed or co-managed a public offering of Acadia Pharmaceuticals in the past 12 months.

Cowen and Company, LLC received compensation for investment banking services from Acadia Pharmaceuticals in the past 12 months.

Acadia Pharmaceuticals is or has been in the past 12 months a client of Cowen and Company, LLC; Cowen and Company, LLC has provided or is providing investment banking services during the past 12 months.

Cowen and Company, LLC compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking, sales and trading or principal trading revenues. Cowen and Company, LLC does not compensate research analysts based on specific investment banking transactions or specific sales and trading or principal trading revenues.

## Disclaimer

Our research reports are simultaneously available to all clients are on our client website. Research reports are for our clients only. Not all research reports are disseminated, e-mailed or made available to third-party aggregators. Cowen and Company, LLC is not responsible for the redistribution of research by third party aggregators. Selected research reports are available in printed form in addition to an electronic form. All published research reports can be obtained on the firm's client website, https://cowenlibrary.bluematrix.com/client/library.jsp.

The information, opinions, estimates and forecasts are as of the date of this report and subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Research reports are published at irregular intervals as appropriate in the analyst's judgement.

Further information on subject securities may be obtained from our offices. This research report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Other than disclosures relating to Cowen and Company, LLC, the information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. The opinions and recommendations herein do not take into account individual client circumstances, objectives or needs and are not intended as recommendations of investment strategy. The recipients of this report must make their own independent decisions regarding any securities subject to this research report. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. To the extent that this report discusses any legal proceedings or issues, it has not been prepared to express or intended to express any legal conclusion, opinion or advice. Our salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions that are contrary to the opinions expressed in our research. Our principal trading area and investing businesses may make investment decisions that are inconsistent with recommendations or views expressed in our research. Cowen and Company, LLC maintains physical, electronic and procedural information barriers to address the flow of information between and among departments within Cowen and Company, LLC in order to prevent and avoid conflicts of interest with respect to analyst recommendations.

For important disclosures regarding the companies that are the subject of this research report, please contact Compliance Department, Cowen and Company, LLC, 599 Lexington Avenue, 20th Floor, New York, NY 10022. In addition, the same important disclosures, with the exception of the valuation methods and risks, are available on the Firm's disclosure website at https://cowen.bluematrix.com/sellside/Disclosures.action.

**Equity Research Price Targets:** Cowen and Company, LLC assigns price targets on all companies covered in equity research unless noted otherwise. The equity research price target for an issuer's stock represents the value that the analyst reasonably expects the stock to reach over a performance period of twelve months. Any price targets in equity securities in this report should be considered in the context of all prior published Cowen and Company, LLC equity research reports (including the disclosures in any such equity report or on the Firm's disclosure website), which may or may not include equity research price targets, as well as developments relating to the issuer, its industry and the financial markets. For equity research price target valuation methodology and risks associated with the achievement of any given equity research price target, please see the analyst's equity research report publishing such targets.

**Cowen Credit Research and Trading:** Due to the nature of the fixed income market, the issuers or debt securities of the issuers discussed in "Cowen Credit Research and Trading" research reports do not assign ratings and price targets and may not be continuously followed. Accordingly, investors must regard such branded reports as providing stand-alone analysis and reflecting the analyst's opinion as of the date of the report and should not expect continuing analysis or additional reports relating to such issuers or debt securities of the issuers.

From time to time "Cowen Credit Research and Trading" research analysts provide investment recommendations on securities that are the subject of this report. These recommendations are intended only as of the time and date of publication and only within the parameters specified in each individual report. "Cowen Credit Research and Trading" investment recommendations are made strictly on a case-by-case basis, and no recommendation is provided as part of an overarching rating system or other set of consistently applied benchmarks. The views expressed in this report may differ from the views offered in the firm's equity research reports prepared for our clients.

**Notice to UK Investors:** This publication is produced by Cowen and Company, LLC which is regulated in the United States by FINRA. It is to be communicated only to persons of a kind described in Articles 19 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. It must not be further transmitted to any other person without our consent.

**Notice to European Union Investors:** Individuals producing recommendations are required to obtain certain licenses by the Financial Regulatory Authority (FINRA). You can review the author's current licensing status and history, employment history and, if any, reported regulatory, customer dispute, criminal and other matters via "Brokercheck by

lbarthelemy@acadia-pharm.com Lisa Barthelemy 12/20/16 07:56:22 PM Acadia Pharmaceuticals.

**Ex. 10**
**P. 5**

**Cowen and Company**
Equity Research

**Acadia Pharmaceuticals**
December 20, 2016

FINRA" at http://brokercheck.finra.org/. An individual's licensing status with FINRA should not be construed as an endorsement by FINRA. General biographical information is also available for each Research Analyst at www.cowen.com.

Additionally, the complete preceding 12-month recommendations history related to recommendation in this research report is available at https://cowen.bluematrix.com/sellside/Disclosures.action

The recommendation contained in this report was produced at December 20, 2016, 14:41 ET. and disseminated at December 20, 2016, 14:41 ET.

**Copyright, User Agreement and other general information related to this report**

© 2016 Cowen and Company, LLC. Member NYSE, FINRA and SIPC. All rights reserved. This research report is prepared for the exclusive use of Cowen clients and may not be reproduced, displayed, modified, distributed, transmitted or disclosed, in whole or in part, or in any form or manner, to others outside your organization without the express prior written consent of Cowen. Cowen research reports are distributed simultaneously to all clients eligible to receive such research reports. Any unauthorized use or disclosure is prohibited. Receipt and/or review of this research constitutes your agreement not to reproduce, display, modify, distribute, transmit, or disclose to others outside your organization the contents, opinions, conclusion, or information contained in this report (including any investment recommendations, estimates or price targets). All Cowen trademarks displayed in this report are owned by Cowen and may not be used without its prior written consent.

**Cowen and Company, LLC. New York** (646) 562-1000 **Boston** (617) 946-3700 **San Francisco** (415) 646-7200 **Chicago** (312) 577-2240 **Cleveland** (440) 331-3531 **Atlanta** (866) 544-7009 **Stamford** (646) 616-3000 **Washington D.C.** (202) 868-5300 **London** (affiliate) 44-207-071-7500

**COWEN AND COMPANY EQUITY RESEARCH RATING DEFINITIONS**

**Outperform (1):** The stock is expected to achieve a total positive return of at least 15% over the next 12 months

**Market Perform (2):** The stock is expected to have a total return that falls between the parameters of an Outperform and Underperform over the next 12 months

**Underperform (3):** Stock is expected to achieve a total negative return of at least 10% over the next 12 months

**Assumption:** The expected total return calculation includes anticipated dividend yield

## Cowen and Company Equity Research Rating Distribution

**Distribution of Ratings/Investment Banking Services (IB) as of 09/30/16**

| Rating | Count | Ratings Distribution | Count | IB Services/Past 12 Months |
|---|---|---|---|---|
| Buy (a) | 438 | 59.03% | 77 | 17.58% |
| Hold (b) | 292 | 39.35% | 12 | 4.11% |
| Sell (c) | 12 | 1.62% | 0 | 0.00% |

(a) Corresponds to "Outperform" rated stocks as defined in Cowen and Company, LLC's equity research rating definitions. (b) Corresponds to "Market Perform" as defined in Cowen and Company, LLC's equity research ratings definitions. (c) Corresponds to "Underperform" as defined in Cowen and Company, LLC's equity research ratings definitions. Cowen and Company Equity Research Rating Distribution Table does not include any company for which the equity research rating is currently suspended or any debt security followed by Cowen Credit Research and Trading.

Note: "Buy", "Hold" and "Sell" are not terms that Cowen and Company, LLC uses in its ratings system and should not be construed as investment options. Rather, these ratings terms are used illustratively to comply with FINRA regulation.

### Acadia Pharmaceuticals Equity Research Rating History as of 12/19/2016





**Legend for Price Chart:**

I = Initiation | 1 = Outperform | 2 = Market Perform | 3 = Underperform | UR = Price Target Under Review | T = Terminated Coverage | $xx = Price Target | NA = Not Available | S=Suspended

lbarthelemy@acadia-pharm.com Lisa Barthelemy 12/20/16 07:56:22 PM Acadia Pharmaceuticals.

**Ex. 10**
**P. 6**

Cowen and Company
Equity Research

Acadia Pharmaceuticals
December 20, 2016

## *Points Of Contact*

**Reaching Cowen**

### Main U.S. Locations

**New York**

599 Lexington Avenue
New York, NY 10022
646.562.1000
800.221.5616

**Boston**

Two International Place
Boston, MA 02110
617.946.3700
800.343.7068

**Cleveland**

20006 Detroit Road
Suite 100
Rocky River, OH 44116
440.331.3531

**San Francisco**

One Maritime Plaza, 9th Floor
San Francisco, CA 94111
415.646.7200
800.858.9316

**Atlanta**

3399 Peachtree Road NE
Suite 417
Atlanta, GA 30326
866.544.7009

**Chicago**

181 West Madison Street
Suite 3135
Chicago, IL 60602
312.577.2240

**Stamford**

262 Harbor Drive
Stamford, CT 06902
646.616.3000

**Washington D.C.**

2900 K Street, NW
Suite 520
Washington, DC 20007
202.868.5300

### International Locations

**Cowen International Limited**

**London**

1 Snowden Street – 11th Floor
London EC2A 2DQ
United Kingdom
44.20.7071.7500

**Cowen and Company (Asia) Limited**

**Hong Kong**

Suite 1401 Henley Building
No. 5 Queens Road Central
Central, Hong Kong
852 3752 2333



 @CowenResearch

 Cowen and Company

lbarthelemy@acadia-pharm.com Lisa Barthelemy 12/20/16 07:56:22 PM Acadia Pharmaceuticals.

**Ex. 10**

**P. 7**