# Exhibit 81

Ex. 81
P. 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## Form 10-K

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**Or**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| **3611 Valley Centre Drive, Suite 300** | |
| **San Diego, California** | **92130** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**

**(858) 558-2871**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **ACAD** | **The Nasdaq Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Securities Exchange Act of 1934:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐ No ☒

As of June 28, 2019, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $2.2 billion, based on the closing price of the registrant's common stock on the Nasdaq Global Select Market on June 28, 2019 of $26.73 per share.

As of January 31, 2020, 155,339,667 shares of the registrant's common stock, $0.0001 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement to be filed with the Securities and Exchange Commission by April 29, 2020 are incorporated by reference into Part III of this report.

We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. Beyond PD Psychosis, we believe dementia-related psychosis, or DRP, represents one of our most important opportunities for further development. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of DRP, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in connection with a presentation at the 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting. Pimavanserin met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). In addition, pimavanserin met the key secondary endpoint in the study by significantly reducing the risk of discontinuation of any reason by 2.2 fold (HR = 0.452; one-sided p=0.0024). In the 12-week open-label treatment period, 61.8% of eligible patients met pre-specified criteria for pimavanserin treatment response at both week 8 and week 12 and were subsequently randomized into the double-blind period of the study. For patients in the open-label treatment period, change from baseline to week 8 and week 12 on the Scale for the Assessment of Positive Symptoms-Hallucinations and Delusions (SAPS-H+D) score improved by 63.0% and 75.2% respectively. Pimavanserin was well-tolerated over the entire nine-month study duration. Patients receiving pimavanserin treatment had no worsening in cognition, as measured by the mean change in Mini-Mental State Examination (MMSE) score from baseline and no worsening of motor symptoms, as measured by the Extrapyramidal Symptom Rating Scale A-score (ESRS-A) from baseline. We plan to submit a supplemental New Drug Application (sNDA), to the FDA for DRP in the summer of 2020. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

According to the National Institute of Mental Health, major depressive disorder, or MDD, affects approximately 17 million adults in the United States, with approximately 2.5 million adults treated with adjunctive therapy. The majority of people who suffer from MDD do not respond adequately to initial antidepressant therapy. In October 2018, we announced positive top-line results from CLARITY, a randomized, double-blind, placebo-controlled, multi-center, sequential parallel design (SPCD) Phase 2 study evaluating pimavanserin 34 mg once daily for adjunctive treatment in 207 patients with MDD who had a confirmed inadequate response to existing first-line, selective serotonin reuptake inhibitor (SSRI) or serotonin norepinephrine reuptake inhibitor (SNRI), antidepressant therapy. In this two-stage SPCD study, pimavanserin met the pre-specified primary endpoint and key secondary endpoint, weighted average results of Stage 1 and Stage 2, demonstrating statistically significant overall improvement in the Hamilton Depression-17 Rating Scale (HAMD-17) (p=0.039) and the Sheehan Disability Scale (SDS) (p=0.004), respectively, relative to placebo. In the all-comers (n=207), parallel design Stage 1 portion of this study, adding pimavanserin to first-line SSRI or SNRI therapy also significantly reduced HAMD-17 scores compared to placebo (p=0.0003). In the overall study, positive results were also observed in seven additional secondary endpoints including response rate, improvement in the symptoms of sexual dysfunction, and a reduction in daytime sleepiness. Pimavanserin was generally well-tolerated in the study with no meaningful weight gain observed or impact on motor function. In February 2019, we conducted an End-of-Phase 2 Meeting with the FDA, and in April 2019 we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 and CLARITY-3, evaluating pimavanserin as an adjunctive treatment for major depressive disorder. Based on current enrollment projections, we expect to report top-line results from CLARITY-2, our U.S.-based study, in the fourth quarter of 2020. We expect to report top-line results from CLARITY-3, our international study in the first quarter of 2021.

Schizophrenia remains a disease area with high unmet need and we are currently exploring the utility of pimavanserin in this area. In the fourth quarter of 2016, we initiated our ADVANCE study, a 26-week, randomized, double-blind, placebo-controlled Phase 2 study that evaluated pimavanserin for the adjunctive treatment of the negative symptoms of schizophrenia, for which there are currently no FDA-approved therapies. Negative symptoms of schizophrenia have been associated with poor long-term outcomes and disability even when the positive symptoms are well controlled, representing a high unmet need. In November 2019, we announced positive top-line results from our ADVANCE study that evaluated the efficacy of adjunctive pimavaserin compared to placebo in 403 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment. Pimavanserin demonstrated a statistically significant improvement on the study's primary endpoint, the change from baseline to week 26 on the Negative Symptom Assessment-16, or NSA-16, total score, compared to placebo (p=0.043). A greater improvement in the NSA-16 total score compared to placebo was observed in patients who received the highest pimavanserin dose of 34 mg (n=107; unadjusted p=0.0065). 53.8% of patients who were randomized to receive pimavanserin completed the trial on 34 mg, 44.7% on 20 mg, and 1.5% on 10 mg. In the study, pimavanserin did not separate from placebo on the key secondary endpoint, the Personal and Social Performance (PSP), scale. We plan to commence a second pivotal study, ADVANCE-2, with the 34 mg dose of pimavanserin during the summer of 2020.

2

**Ex. 81**

**P. 3**

In connection with the FDA approval of NUPLAZID, we have agreed to four post-marketing commitments. Two of four commitments are already completed within the agreed upon timelines. The remaining two commitments, including a randomized, placebo-controlled withdrawal study in PD Psychosis patients treated with NUPLAZID and a randomized, placebo-controlled eight-week study or studies in predominantly frail and elderly patients that would add to the NUPLAZID safety database by exposing an aggregate of at least 500 patients to NUPLAZID, are on-track to be completed according to timelines agreed to with the FDA.

*Pimavanserin as a Treatment for Dementia-Related Psychosis*

An estimated 8.0 million people in the United States are living with dementia and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP.

Symptoms of DRP are often persistent and occur with increasing frequency with progression of disease as patient becomes more impaired. Serious consequences have been associated with persistent or severe psychosis in persons with dementia such as repeated hospital admissions, earlier progression to nursing home care, severe dementia, and death. There is currently no FDA-approved treatments for dementia-related psychosis. Off-label use of typical and atypical antipsychotics is associated with modest and often equivocal efficacy in these patients. In addition, use of currently available antipsychotics is associated with a significant acceleration in cognitive decline in patients with dementia as well as numerous off-target toxicities, thus negatively impacting the primary illness. The cognitive effects of treatment with an atypical antipsychotic were evaluated in the National Institute of Mental Health Clinical Antipsychotic Trials of Intervention Effectiveness-Alzheimer's Disease (CATIE-AD) study. In this study, patients on any atypical antipsychotic had significantly greater rates of decline in cognitive function compared to patients on placebo. This pronounced negative impact of currently used antipsychotics on cognitive function is believed to be associated with the common pharmacologic property of these drugs, namely blocking of dopamine receptors. Atypical antipsychotics are associated with a number of off-target and dose-limiting side effects, such as extrapyramidal symptoms, orthostatic hypotension, hematologic abnormalities, and metabolic, gastrointestinal and sedative effects. These off-target toxicities are associated with increased risk for falls, infection, aspiration pneumonia, and other serious complications in this vulnerable patient population. With no approved therapies for the treatment of patients with dementia-related psychosis and current off-label use of atypical antipsychotics carrying significant morbidity risks including worsening in cognitive decline and other off target toxicities, we believe that dementia-related psychosis represents an area of high unmet need.

In September 2017, we initiated HARMONY, a Phase 3, randomized, double-blind, placebo-controlled relapse prevention study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. The objective of the study was to evaluate the ability of pimavanserin to prevent relapse of psychosis in a broad population of patients with the most common subtypes of dementia. Furthermore, in the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation to pimavanserin for the treatment of DRP.

The HARMONY study included a 12-week open-label stabilization period during which 392 patients with dementia-related psychosis were treated with pimavanserin 34 mg once daily. Dose reduction to 20 mg once daily was allowed based on tolerability within the first four weeks. Following the 12-week open-label period, patients who met pre-specified criteria for treatment response at both weeks 8 and weeks 12 were then randomized into the double-blind period of the study to continue their pimavanserin dose (34 mg or 20 mg per day) or switched to placebo and followed for up to 26 weeks or until a relapse of psychosis occurred. The primary endpoint in the study was time to relapse in the double-blind period as represented by the Kaplan-Meier curve and the hazard ratio.

In September 2019, we announced that our Phase 3 HARMONY relapse prevention trial evaluating pimavanserin for the treatment of DRP would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). In addition, pimavanserin met the key secondary endpoint by significantly reducing risk of discontinuation for any reason by 2.2 fold (HR = 0.452; one-sided p=0.0024). In the 12-week open-label treatment period, 61.8% of eligible patients met pre-specified criteria for pimavanserin treatment response at both week 8 and week 12 and were subsequently randomized into the double-blind period of the study. For patients in the open-label treatment period, change from baseline to week 8 and week 12 on the SAPS-H+D score improved by 63.0% and 75.2% respectively.

Pimavanserin was well-tolerated over the entire nine-month study duration. Patients receiving pimavanserin treatment had no worsening in cognition, as measured by the MMSE score, from baseline and no worsening of motor symptoms, as measured by the ESRS-A, from baseline. In the double-blind period, adverse events were observed in 41.0% of patients on pimavanserin and 36.6% of patients on placebo. Discontinuations due to adverse events were 2.9% for pimavanserin and 3.6% for placebo. Serious adverse events were 4.8% in the pimavanserin group and 3.6% in the placebo group. One death was reported in the open-label period and one death was reported in the pimavanserin group during the double-blind period. Investigators determined neither death was related to the study drug. Additionally, pimavanserin did not result in clinically significant differences in vital signs, weight, or daytime sedation compared to placebo. We plan to submit a sNDA to the FDA for DRP in the summer of 2020.

5

*If we do not obtain regulatory approval of pimavanserin for other additional indications in the United States, or for any indication in foreign jurisdictions, or regulatory approval of trofinetide for Rett syndrome, we will not be able to market pimavanserin for other indications or in other jurisdictions or market trofinetide at all, which will limit our commercial revenues.*

While pimavanserin has been approved in the U.S. by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis, it has not been approved by the FDA for any other indications, and it has not been approved in any other jurisdiction for this indication or for any other indication. In order to market pimavanserin for other indications or in other jurisdictions, we must obtain regulatory approval for each of those indications and in each of the applicable jurisdictions, and we may never be able to obtain such approval. Approval of NUPLAZID by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis does not ensure that foreign jurisdictions will also approve NUPLAZID for that indication, nor does it ensure that NUPLAZID will be approved by the FDA for any other indication. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). We plan to submit a sNDA to the FDA for DRP in the summer of 2020. In the fourth quarter of 2016, we initiated clinical studies of pimavanserin in schizophrenia and we initiated a Phase 3 program for pimavanserin as an adjunctive treatment for major depressive disorder in April 2019 and we initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. There is no guarantee that any of these ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, even if we submit a sNDA for pimavanserin in dementia-related psychosis, the sNDA will be subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.

The research, testing, manufacturing, labeling, approval, sale, import, export, marketing, and distribution of pharmaceutical product candidates are subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, whose regulations differ from country to country. We will be required to comply with different regulations and policies of the jurisdictions where we seek approval for our product candidates, and we have not yet identified all of the requirements that we will need to satisfy to submit NUPLAZID for approval for other indications or in other jurisdictions or to submit trofinetide for approval for Rett syndrome. This will require additional time, expertise and expense, including the potential need to conduct additional studies or development work for other jurisdictions beyond the work that we have conducted to support our NDA submission in PD Psychosis. In addition, strategic considerations need to be taken into account when determining whether and when to submit NUPLAZID for approval in other jurisdictions. For example, in the fourth quarter of 2016, the European Medicines Agency, or EMA, approved our proposed pediatric investigation plan related to our planned submission of a marketing authorization application, or MAA, for NUPLAZID for the treatment of PD Psychosis in Europe. However, in light of our continuing clinical development of pimavanserin in indications other than in PD Psychosis, and the time-limited data exclusivity currently granted by the EMA that commences on first approval of a product in Europe, we deferred submission of the MAA and we do not yet have a revised estimate of when we will make that filing. If we do not receive marketing approval for NUPLAZID for any other indication or from any regulatory agency outside of the United States or any marketing approval for trofinetide, we will never be able to commercialize NUPLAZID for any other indication in the United States or for any indication in any other jurisdiction or be able to commercialize trofinetide at all. Even if we do receive additional regulatory approvals, we may not be successful in commercializing those opportunities.

If the results or timing of regulatory filings, the regulatory process, regulatory developments, clinical trials or preclinical studies, or other activities, actions or decisions related to NUPLAZID do not meet our or others' expectations, the market price of our common stock could decline significantly.

*Even though the FDA has granted approval of NUPLAZID for the treatment of hallucinations and delusions associated with PD Psychosis, the terms of the approval may limit its commercial potential. Additionally, NUPLAZID is still subject to substantial, ongoing regulatory requirements.*

Even though the FDA has granted approval of NUPLAZID, the scope and terms of the approval may limit our ability to commercialize NUPLAZID and, therefore, our ability to generate substantial sales revenues. The FDA has approved NUPLAZID only for the treatment of hallucinations and delusions associated with PD Psychosis. The label for NUPLAZID also contains a "boxed" warning that elderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death, and that NUPLAZID is not approved for the treatment of patients with dementia-related psychosis unrelated to the hallucinations and delusions associated with PD Psychosis. This "boxed" warning may discourage physicians from prescribing NUPLAZID to patients diagnosed with PD Psychosis, including those with dementia.

17

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin as an adjunctive treatment for major depressive disorder and in April 2019, we initiated our Phase 3 CLARITY program evaluating pimavanserin as an adjunctive treatment for major depressive disorder. In July 2019, we announced top-line results from the Phase 3 ENHANCE study evaluating pimavanserin as an adjunctive treatment in inadequate response schizophrenia. In this study pimavanserin did not achieve statistical significance on either the primary endpoint or the key secondary endpoint. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). We plan to submit a sNDA to the FDA for dementia-related psychosis in summer 2020. We cannot guarantee that the full results of the HARMONY study and other existing clinical data will be sufficient to support the approval of a supplemental NDA, or whether regulatory agencies will require additional clinical trials or information, which could impact the approvability or commercialization timing and prospects of pimavanserin in the dementia-related psychosis indication. In November 2019, we announced positive top-line results from the Phase 2 ADVANCE study evaluating pimavanserin for the negative symptoms of schizophrenia for patients whose positive symptoms were controlled on a stable background antipsychotic treatment. We may plan and conduct additional studies in the future, and have initiated the Phase 3 LAVENDER study of trofinetide in Rett syndrome in October 2019.

In connection with clinical trials, we face risks that:

- a product candidate may not prove to be efficacious or safe;

- patients may die or suffer other adverse effects for reasons that may or may not be related to the product candidate being tested;

- the results may not be consistent with positive results of earlier trials; and

- the results may not meet the level of statistical significance required by the FDA or other regulatory agencies.

If we do not successfully complete preclinical and clinical development, we will be unable to market and sell products derived from our product candidates and to generate product revenues. Even if we do successfully complete clinical trials, those results are not necessarily predictive of results of additional trials that may be needed before an NDA may be submitted to the FDA. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization.

***Delays, suspensions and terminations in our clinical trials could result in increased costs to us and delay our ability to generate product revenues.***

The commencement of clinical trials can be delayed for a variety of reasons, including delays in:

- demonstrating sufficient safety and efficacy to obtain regulatory approval to commence a clinical trial;

- reaching agreement on acceptable terms with prospective contract research organizations and clinical trial sites;

- manufacturing sufficient quantities of a product candidate;

- obtaining clearance from the FDA to commence clinical trials pursuant to an Investigational New Drug application;

- obtaining institutional review board approval to conduct a clinical trial at a prospective clinical trial site; and

- patient recruitment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial.

Once a clinical trial has begun, it may be delayed, suspended or terminated due to a number of factors, including:

- competition for internal and external resources, including clinical sites and study patients, that we may choose to allocate to other programs;

- ongoing discussions with regulatory authorities regarding the scope or design of our clinical trials or requests by them for supplemental information with respect to our clinical trial results;

- imposition of clinical holds by regulatory authorities or institutional review boards;

29

# Exhibit 82

Ex. 82
P. 1

**S&P Global**
Market Intelligence

# ACADIA Pharmaceuticals Inc.

# NasdaqGS:ACAD

# FQ1 2020 Earnings Call Transcripts

## Thursday, May 07, 2020 8:30 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ4 2019- | -FQ1 2020- | | | -FY 2019- | -FY 2020- |
|---|---|---|---|---|---|---|
| | CONSENSUS | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.36) | (0.47) | - | NM | (1.62) | (1.84) |
| **Revenue (mm)** | 96.69 | 90.76 | 90.07 | ▼(0.76 %) | 337.55 | 449.80 |

Currency: USD
Consensus as of  May-05-2020 11:56 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

**- EPS NORMALIZED -**

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ1 2019** | (0.53) | (0.59) | NM |
| **FQ2 2019** | (0.46) | (0.38) | NM |
| **FQ3 2019** | (0.40) | (0.29) | NM |
| **FQ4 2019** | (0.36) | (0.34) | NM |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

**Call Participants** ...................................................................................... **3**

**Presentation** ...................................................................................... **4**

**Question and Answer** ...................................................................................... **10**

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

**2**

**Ex. 82**

**P. 3**

# Call Participants

**EXECUTIVES**

**Elena H. Ridloff**
*Executive VP, CFO & Principal Accounting Officer*

**Mark C. Johnson**
*Vice President of Investor Relations*

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

**Srdjan R. Stankovic**
*President*

**Stephen R. Davis**
*CEO & Director*

**ANALYSTS**

**Charles Cliff Duncan**
*Cantor Fitzgerald & Co., Research Division*

**Christopher Lawrence Howerton**
*Jefferies LLC, Research Division*

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

**Gregory James Renza**
*RBC Capital Markets, Research Division*

**Joseph Robert Stringer**
*Needham & Company, LLC, Research Division*

**Marc Harold Goodman**
*SVB Leerink LLC, Research Division*

**Neena Marie Bitritto-Garg**
*Citigroup Inc, Research Division*

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

**Salveen Jaswal Richter**
*Goldman Sachs Group Inc., Research Division*

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

spglobal.com/marketintelligence

# Presentation

**Operator**

Good day, ladies and gentlemen, and welcome to the ACADIA Pharmaceuticals First Quarter 2020 Financial Results Conference Call. My name is Sarah, and I will be your coordinator for today. [Operator Instructions]

I would now like to turn the presentation over to Mark Johnson, Vice President of Investor Relations at ACADIA. Please proceed.

**Mark C. Johnson**
*Vice President of Investor Relations*

Thank you, Sarah. Good afternoon, and thank you for joining us on today's call to discuss ACADIA'S first quarter 2020 financial results. Joining me on the call today from ACADIA are Steve Davis, our Chief Executive Officer, who will provide an overview of our Q1 2020 financial performance and provide a review of our business operations and how we are addressing the ongoing COVID-19 pandemic. Also joining us today is Michael Yang, our Chief Commercial Officer, who will provide updates on our commercial initiatives; and Dr. Serge Stankovic, our President, who will discuss our pipeline projects. Our Chief Financial Officer, Elena Ridloff, will then discuss our financial results in more detail before turning it back to Steve for final remarks and opening the call up for your questions.

I would also like to point out that we're using supplement slides, which are available on the Events & Presentations section of our website.

Before we proceed, I would first like to remind you that, during our call today, we'll be making a number of forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements, including goals, expectations, plans, prospects, growth potential, timing of events or future results are based on current information, assumptions and expectations that are inherently subject to change and involve a number of risks and uncertainties that may cause actual results to differ materially. These factors and other risks associated with our business can be found in our filings made with the SEC. You are cautioned not to place undue reliance on these forward-looking statements, which are made only as of today's date.

I'll now turn the call over to Steve.

**Stephen R. Davis**
*CEO & Director*

Thank you, Mark. Good afternoon, everyone. Thank you for joining us today. Please turn to Slide 5.

Before we review our progress for the quarter, I'd like to take a moment and address the extraordinary circumstances we're all navigating with the COVID-19 pandemic. First, I hope all of you and your families are healthy and faring well. Second, I want to extend our gratitude to the health-care workers on the front lines, whose selfless care is helping so many who have been impacted by the virus. And third, I want to thank our employees. I'm grateful for their continued focus on the patients, caregivers and the families we serve.

Please turn to Slide 6. As the COVID-19 pandemic has evolved globally, ACADIA has made it a priority to support patients who rely on our current and developing medicines, protect the health and safety of our employees, and do our part to minimize spread of the virus. As it relates to our business specifically, we view the challenges caused by the pandemic to be temporal. It does not change the underlying need of our medicines. Unfortunately, hallucinations and delusions associated with Parkinson's disease or dementia do not stop. Patients with major depression or the negative symptoms of schizophrenia still suffer. And patients with Rett syndrome and their families still need an effective treatment option. We remain focused on our mission because patients are waiting, and we continue to move forward to deliver on a multiyear cadence of potential product approvals over the next few years.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 5

During this time, we've taken numerous proactive steps to adapt our business. All of our office and field-based employees continue to work from home to reduce the potential risk of the virus. We've embraced new ways of working. Let me describe just a few quick examples.

Although we are not physically in doctors' offices, we quickly moved our promotional and educational materials to portals accessible by health-care professionals, enabling them and our field employees to be looking at the same document at the same time when we engage virtually. Recognizing the significant shift to telemedicine, we've rapidly moved to support key continuing medical education programs. On a related point, we also quickly expanded the ability for physicians to prescribe NUPLAZID using our online tools, an important advantage when they're treating patients virtually.

Regarding our supply chain, we continue to maintain an uninterrupted supply of medicine and have more than sufficient inventory. On an important related note, I'd like to remind you that patients never have to travel to an outside pharmacy to fill NUPLAZID prescription. We've always delivered NUPLAZID directly to patient homes or directly to long-term care pharmacies and facilities.

With respect to our clinical trials, we've made it a priority to protect the well-being of study participants and research partners. Like many others in our industry, we temporarily paused new-patient enrollment in our studies and have been working with our clinical trial sites and study investigators to focus our efforts on current participants. We're also working with our sites and CRO partners to begin enrolling new patients as soon as possible. We entered 2020 in a position of strength and the fundamentals of the company remain strong.

As we turn to Slide 7, I'd like to highlight the progress across our business during the quarter. We expect 2020 to be a transformational year for ACADIA and are focused on our 3 strategic pillars: drive growth of NUPLAZID, deliver on the DRP opportunity and develop new treatment options for patients. This year, we are investing in the continued growth of PDP as well as the potential approval and launch of DRP, transforming the NUPLAZID opportunity in the very near term. We're also advancing our MDD, Rett syndrome and negative symptoms of schizophrenia development programs. If successful, we will have 3 additional approvals over the next 3 years that will drive our mid- and long-term growth.

Let's take a closer look at NUPLAZID's performance in Q1 as we turn to Slide 8. For the first quarter of 2020, NUPLAZID achieved $90.1 million in net sales, a 43% year-over-year increase, driven by strong commercial execution. While we have quickly pivoted to what we believe is best-in-class virtual education and engagement, there are some limitations in the current environment that are having a short-term impact on the rate of new-patient growth. As a result, we are revising our net sales guidance to $420 million to $450 million, representing a 28% growth year-over-year at the midpoint of the range. Importantly, we see continued growth in NUPLAZID this year, and we remain confident in driving the long-term market opportunity in PDP. Michael will provide additional insight into our commercial performance during his remarks.

As we turn to Slide 9, I'm very pleased to share that we remain on track to deliver on the DRP opportunity, a potential second indication for pimavanserin. During the quarter, we met with the FDA and plan to submit our supplemental NDA this summer. With Breakthrough Therapy Designation, we expect a priority review and a potential approval around year-end. You'll hear more from both Michael and Serge on our progress with DRP.

Please turn to Slide 10. We continued to make important investments in our clinical portfolio while navigating the near-term impact of the pandemic. In our adjunctive major depressive disorder program, we're now prepared to reinitiate new-patient enrollment at certain sites. As Serge will discuss, given that both of these identical studies are just over 50% enrolled, we're also pursuing a strategy to not enroll any additional patients and, instead, combine these studies into one study and, if positive, submit an sNDA on the basis of this work and our previous positive pivotal CLARITY-1 study. Serge will discuss further details to this approach. In addition, we plan to initiate our ADVANCE-2 study for the negative symptoms of schizophrenia in the second half of this year.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

spglobal.com/marketintelligence

Ex. 82
P. 6

In our Rett syndrome program, where we are pursuing the first drug approval for this serious and rare neurological disorder, the FDA granted Rare Pediatric Disease designation to trofinetide. We plan to reinitiate enrollment in the LAVENDER Rett Syndrome study as soon as possible.

Today, we also announced a new licensing and collaboration agreement with Vanderbilt University. Through this collaboration, we've added a new muscarinic receptor program to our portfolio. What exactly did we license? The M1 PAM program is a portfolio of early-stage clinical candidates that are complementary to our development pipeline focused on new potential therapies for CNS disorders. The lead compound is in Phase I testing with several additional preclinical compounds.

Finally, we continue to focus and invest in our future through additional business development opportunities that shape our long-term growth strategy.

With that, I will now turn it over to Michael to discuss our commercial performance and highlights.

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Thank you, Steve. Today, I'd like to review our first quarter performance, which highlights the strength of the fundamentals of our business and gives us confidence in our long-term expectations for NUPLAZID in Parkinson's disease psychosis. The strong base of PDP patients continuing on NUPLAZID and our focus on growth initiatives will enable us to deliver double-digit volume growth in 2020. We're also on track and making good progress with our DRP launch plans.

Please turn to Slide 12. NUPLAZID continues to transform the standard of care for patients with PDP. First, we have a strong base of patients continuing on NUPLAZID. In the first quarter, we delivered net sales of $90.1 million, driven by year-over-year volume growth of 32%. Our commitment to programs to support patient access and continued leverage of the 34-milligram capsule helped to sustain consistently high monthly bottle fulfillment rates for patients established on therapy.

Second, we continue to deliver new-to-brand patients consistent with previous quarters in both the specialty pharmacy and specialty distribution channels, reflecting positive customer engagement to our commitment to establish NUPLAZID as standard of care for patients with PDP.

As Steve mentioned earlier, we have quickly pivoted to what we believe is best-in-class virtual education and engagement. However, at the end of the quarter and into April, we have seen reduced patient visits and delayed diagnosis. According to a recent survey from IQVIA, in-person physician visits remain down significantly when compared to the pre-COVID time period. While neurologists have prior experience with telemedicine and are leveraging this technology to manage patients at a distance, overall visits remain significantly lower than pre-pandemic levels.

Importantly, even during this time, NUPLAZID new-patient starts have outpaced the overall market new-to-brand trends. As such, our revised 2020 revenue forecast reflects 28% year-over-year revenue growth at the midpoint of the range.

Let's review our growth initiatives further on Slide 13. Parkinson's disease, hallucinations and delusions are serious neuropsychiatric symptoms that could be very disruptive to the family and patients. As health-care providers adjust to seeing patients with telemedicine during the recent crisis, PDP remains an important medical condition that needs to be addressed.

To support new patient identification, we've done a number of things to optimize our approach to sales, marketing and medical education in a virtual environment, for example, leveraging technology to conduct peer-to-peer educational programs and product theaters, launched our online treatment form that is optimized for the telemedicine paradigm. This is important because patients can now be diagnosed and prescribed NUPLAZID remotely, receive samples in the mail and, upon reimbursement verification, monthly prescriptions will be shipped to the patient's home. All of this keeping this vulnerable patient population safely sheltering at home.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 7

And finally, we continue to use digital campaigns to further stimulate patient and caregiver conversations with their physicians about PD Psychosis and NUPLAZID. Our commercial plan remains committed to increasing PDP awareness and establishing NUPLAZID as standard of care. Importantly, we continue to educate on the inclusion of NUPLAZID and the Movement Disorder Society guidelines, new long-term patient safety data and data on the positive impact on NUPLAZID therapy on the caregiver burden scale.

Now let's turn to our second potential indication for pimavanserin, dementia-related psychosis on Slide 14. We are excited about the opportunity to expand our label with another first and only FDA-approved indication. Dementia-related psychosis is a significant unmet need and bringing pimavanserin forward as a treatment option could make a meaningful difference for patients and caregivers.

We continue to advance our readiness plans focused on market research, disease awareness and education with the medical community on the high burden of disease. Most of these efforts have temporarily pivoted to virtual programs for obvious reasons. A few examples include advisory boards and payer engagements. In addition, we're seeing strong HCP interest in learning more about DRP. For example, our disease education website, MoreThanCognition.com has -- had over 20,000 visitors since launch in late 2019, and we continue to see growth in site utilization month-over-month.

Since NUPLAZID's launch in 2016, we have built significant awareness for the need to appropriately treat PD psychosis. The DRP opportunity is approximately 10x larger than PDP. And we have previously outlined our field expansion expectations, but it should be recognized that we already have a significant base of engaged and experienced personnel to leverage. Much of the additional preparation for the DRP launch is scheduled to occur in the second half of 2020, mostly the hiring and training of our field-based teams. We made good progress in laying the groundwork and are well positioned to execute on our launch plans.

With that, I'd like to turn it over to Serge to discuss our R&D progress beginning on Slide 15.

**Srdjan R. Stankovic**
*President*

Thank you, Michael, and good afternoon. I would like to take this opportunity to share with you the important R&D updates that have occurred since we last spoke in February. As Steve mentioned, with the ongoing pandemic, we have made it a priority to protect the well-being of our study participants and research partners as well as to minimize disruption to our clinical operations. We have been working with our clinical trial sites and study investigators on their plans to continue appropriate assessment and safety monitoring of ongoing study participants as well as to ensure adequate conditions for future enrollment of new patients in our late-stage clinical trials.

I'm pleased to report that our teams have been able to continue to collect data by implementing remote monitoring and at-home assessments. However, considering the rapid pandemic spread over the past couple of months, we have temporarily paused new-patient enrollment in our clinical studies. To reinitiate enrollment, we will use a phased approach, which will be both study- and site-specific and reflect local health authorities and regulatory guidances.

Let's now turn to Slide 16 for an update on the DRP regulatory path. As planned, we successfully completed a pre-sNDA meeting with the FDA and confirm that the pivotal data from our HARMONY study, together with the confirmatory and supportive results from our Alzheimer's disease psychosis Phase II study and our Parkinson's disease psychosis Phase III study, will all support the submission of an sNDA for pimavanserin in dementia-related psychosis. In addition, we discussed the overall safety database and analysis plan. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect a priority review with a potential approval for DRP around year-end.

Turning to our major depressive disorder, or MDD program, on Slide 17. Both our ongoing CLARITY-2 and CLARITY-3 Phase III studies have identical study designs with the same endpoints and analysis plans.

Please turn to Slide 18. Today, both our CLARITY Phase III studies have enrolled slightly over 50% of the total patients planned. The pandemic has created many uncertainties in regards to maintaining appropriate experimental conditions for the execution of clinical trials and the timing of results. As Steve mentioned earlier, we're now pursuing a strategy to move our depression program forward toward the

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

7

Ex. 82
P. 8

timely and successful completion. Given our progress with enrollment and the identical design of the 2 studies, we're pursuing a strategy to not enroll any additional patients in the CLARITY-2 and CLARITY-3 and, instead, to combine these 2 studies into 1 study with a prespecified statistical analysis plan.

As a result, potential top-line results of the combined study would be available in the third quarter of this year. If positive, these results, with our previously announced positive CLARITY-1 study, could serve as the basis of a supplemental NDA submission. If negative, we would initiate another pivotal Phase III MDD study in the second half of this year. We plan to discuss our proposal with the FDA in a meeting already scheduled for the second quarter. We look forward to updating you further on our plans for the MDD program.

Moving to the negative symptoms of schizophrenia on Slide 19. We're continuing to prepare for the second pivotal study, ADVANCE-2, which will utilize a fixed dose of 34 milligram and will be conducted exclusively in sites outside of the United States. We plan to initiate this study in the second half of this year.

Rett syndrome is a rare and debilitating disorder with the unmet need highlighted here on Slide 20. As I mentioned earlier, while we are continuing monitoring an assessment of ongoing study participants, we're currently initiating plans for gradual return to recruitment and enrollment in our Phase III LAVENDER study. At this time, we continue to anticipate the ability to complete and announce top line results next year.

Please turn to Slide 21 to review our clinical stage pipeline, which now includes the M1 PAM program. We licensed Vanderbilt's M1 PAM program, which is comprised of highly selective positive allosteric modulators, or PAMs, of the M1 subtype of muscarinic acetylcholine receptor. This is an exciting new program for our pipeline, which may represent a novel approach for improving cognitive function and other neuropsychiatric symptoms in patients suffering from CNS disorders. The study of muscarinic modulators has been an area of high interest as there is an evidence of their ability to address cognitive and neuropsychiatric symptoms associated with CNS diseases and schizophrenia.

Recent advances in the potential efficacy of muscarinic agonists have only increased its interest in the industry. The M1 PAM approach may achieve the efficacy recently observed with muscarinic agonists while minimizing the potential side effects. Consistent with our strategy, we remained focused on developing innovative new treatments, and that is reflected in our growing and advancing pipeline, both early and late stage.

With that, I will now turn the call over to Elena to discuss our financial performance.

**Elena H. Ridloff**
*Executive VP, CFO & Principal Accounting Officer*

Thank you, Serge. Today, I'll discuss our first quarter 2020 results and our updated 2020 financial outlook. Please turn to Slide 23.

In the first quarter of 2020, we recorded $90.1 million in net sales, an increase of approximately 43% compared to $63 million of net sales in Q1 of 2019. This was driven by approximately 32% volume growth year-over-year. The gross-to-net adjustment for Q1 2020 was 25.4%. As a reminder, gross-to-net is typically highest in the first quarter due to the annual reset of the donut hole for Medicare Part D patients. Weeks of inventory in the channel at the end of the first quarter were consistent with year-end 2019.

Moving down the P&L. GAAP R&D expenses increased to $72.6 million in Q1 2020 from $52.9 million in Q1 2019. The increase was primarily due to an upfront payment of $10 million to Vanderbilt University for the M1 PAM program, and increased development cost associated with trofinetide. GAAP SG&A expenses increased to $102 million for the first quarter from $93.1 million in the first quarter of last year. This is largely due to increased personnel and medical affairs costs.

Noncash stock-based compensation expense during the quarter was $22.3 million compared to $19.9 million for the same period in 2019. Cash used in operations during the quarter was $49 million compared to $54.2 million for Q1 2019. Our cash balance at the end of the quarter was $651.4 million.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

spglobal.com/marketintelligence

Please turn to Slide 24. For the full year 2020, we are revising our NUPLAZID revenue guidance to $420 million to $450 million from a previous range of $440 million to $470 million to incorporate the short-term impact of COVID-19. The revised revenue range reflects year-over-year revenue growth of approximately 28% at the midpoint of the range. This guidance incorporates a range of scenarios, which reflect our currently anticipated impact of COVID-19 on our business. Namely, at the low end, we've assumed a delayed return of face-to-face physician visits resulting in recent new-patient initiation trends persisting through the remainder of the year.

At the upper end, we've assumed that we start to see an increase in face-to-face physician visits and an increased rate of new-patient growth starting in the third quarter. We continue to anticipate overall gross-to-net discount in 2020 to be in the range of 17% to 18%. We forecast gross-to-net decreasing sequentially from 25.4% in the first quarter to approximately 13% to 15% in the second quarter.

On the expense side for 2020, we expect GAAP R&D to be towards the low end of our previous range of $270 million to $285 million. We expect GAAP SG&A to be between $425 million to $445 million from a previous range of $440 million to $460 million. This reduction reflects costs that will be naturally lower due to the current virtual engagement environment. Our guidance continues to reflect the important investments we are making to prepare for our DRP launch, including an expansion of the field team towards the end of the year.

We continue to anticipate noncash stock-based compensation expense to be between $90 million and $100 million in 2020. We will end 2020 with a strong balance sheet and expect our year-end cash balance to be approximately $470 million to $500 million, unchanged from our previous guidance.

And with that, I'll turn the call back over to Steve.

**Stephen R. Davis**
*CEO & Director*

Thank you, Elena. Please turn to Slide 26. ACADIA has proven the ability to quickly adjust and excel in the current environment. We have important work ahead of us and are focused on delivering on our commitments to our patients, caregivers and physicians. As I stated earlier, the challenges caused by the pandemic will pass, but the underlying needs of our medicines remain. I have great confidence in our future as we look forward to delivering on the multiyear cadence of pivotal trial readouts and potential approvals.
Finally, I'd like to acknowledge and, again, thank our employees who exemplified true leadership and resiliency during these challenging times. I will now open the call up for questions. Operator?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from the line of Cory Kasimov with JPMorgan.

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

Can you hear me? Hello? Sorry about that.

**Operator**

Yes, we can. Go ahead.

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

So I wanted to start by asking on the CLARITY program in MDD. Exciting that data is coming sooner than anticipated now but wanted to just make sure I get this. I understand the studies are identically designed. But one -- if I recall correctly, one's U.S.-based and one was outside of the U.S. So if that is the case, are there nuances to combining these that kind of add incremental risk to readout in terms of underlying baseline characteristics or anything like that? Are you confident in that front?

And then the follow-up on this is just whether you -- I know you're meeting with the FDA this quarter, but do you have any preliminary feedback from the agency that gives you the confidence to publicly announce this new strategy now?

**Stephen R. Davis**
*CEO & Director*

Yes. Thanks, Cory. I'm going to ask Serge to respond to both questions.

**Srdjan R. Stankovic**
*President*

Yes, Cory, we're obviously adding these 2 studies combining into 1 study. Based on the variability we have observed in each of the studies, in terms of the baseline characteristics and the overall variability and other differences, we have not seen any indication of an increase or substantial difference between the 2 clarity studies in that respect. So we feel fairly comfortable with that.

**Cory William Kasimov**
*JP Morgan Chase & Co, Research Division*

Okay. And then if the FDA agrees to your proposal this quarter, do you just lock the database at that point and begin the process of scrubbing and analyzing the data?

**Srdjan R. Stankovic**
*President*

Yes. We're basically -- as we mentioned, we paused the enrollment in the studies. We are seeing the last few patients going through the study. So following positive FDA interaction toward the end of this month, we will be moving forward, cleaning the database, locking database and producing the results.

**Operator**

Our next question comes from the line of Neena Bitritto with Citi.

**Neena Marie Bitritto-Garg**
*Citigroup Inc, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 11

So I just want to ask about the DRP launch. Just thinking about whether or not there's going to be a resurgence of COVID-19, kind of around the time that you would be launching and the bunch of patients are, of course, going to be in that higher-risk bucket. I mean how are you thinking about that? Are you kind of making plans to assume that this is going to be a virtual launch?

**Stephen R. Davis**
*CEO & Director*

Yes. Thanks much for the question. I'll just start by saying we've done a lot of alternate scenario planning, and I'll let Michael fill you in a little bit more on time.

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Yes. Thanks for the question. We have very thoughtful online plans to execute the expansion to support the launch that #1 are tied to the key regulatory milestones. As you've already alluded to, the environment is different than just simply a few months ago, and we're monitoring that environment very carefully. And I just want to remind you that this is a significant expansion opportunity for ACADIA and for NUPLAZID, but we already have a very well-established team, we have ongoing support in our operations model, and are on the ground supporting PDP. So we can leverage that to build upon and support our launch plans. But again, you've outlined it. This is a fluid situation. We'll continue to kind of monitor the situation as things evolve, and we're being prepared for multiple scenarios. And I think we'll be ready to go no matter what environment we find ourselves into.

**Neena Marie Bitritto-Garg**
*Citigroup Inc, Research Division*

Okay. Great. And then in terms of just performance in the first quarter, you talked a little bit about specialty versus -- specialty pharmacy versus specialty distribution channels. Could you just talk about -- did you see any impact in one channel more than the other due to COVID-19 and in particular, kind of the long-term care setting and how you expect that to kind of play out looking forward and as we think about DRP down the road?

**Stephen R. Davis**
*CEO & Director*

Yes. Michael, you want to take that?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Yes, I'll take it, sure. We anticipate growth in 2020 in both the specialty pharmacy and specialty distribution channel. As we've said in the past and we saw in the first quarter, often, there is quarter-by-quarter variability and fluctuations between which channel grows versus another one. We would always anticipate, I think, the specialty distribution channel to be 1/3 of our franchise business. Obviously, long-term care is an important segment for us and one that has a lot of DRP patients already sitting there, and we'll be evaluating the go-to-market principles as it relates to the office setting versus the long-term care setting, but we expect that we'll be able to operate in both settings going forward.

**Operator**

Our next question comes from the line of Ritu Baral with Cowen.

Our next question will be from Alan Carr with Needham & Company.

**Joseph Robert Stringer**
*Needham & Company, LLC, Research Division*

This is Joey on for Alan. A few quick ones on NUPLAZID sort of performance. Can you comment on overall market share in PDP? Previously, you've given some metrics around that and how this sort of most recent quarter and looking forward affects that market share, if at all?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

And also, I -- maybe I missed this, but quarter-over-quarter volume growth, could you [ maybe take ] that, and I have a quick question on the DRP launch.

**Stephen R. Davis**
*CEO & Director*

Yes, I'm sure. So the sequential volume growth was minus 1% or essentially flat. Michael, do you want to take the other question?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Sure. Yes. I think for a brand like NUPLAZID and where we sit, new-to-brand is an important focus of our efforts. We're still in the growth and penetration phase of the life cycle. As I mentioned, our share overall is in the high teens, but we have a higher share in the new-to-brand dynamic market. And that's based on a PDP market of 130,000 patients.

**Joseph Robert Stringer**
*Needham & Company, LLC, Research Division*

Okay. And just quickly on the potential DRP launch. You mentioned hiring second half of this year. How much of the existing sales force would you be able to leverage towards that?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Right, sure. And when I talk about force, that's not just reach and frequency representatives. That also includes our patient support and other capabilities. But in general, we've outlined our plan to go to between 400 and 500. And today, we have around 180 to 200 personnel to leverage.

**Operator**

Our next question comes from the line of Tazeen Ahmad with Bank of America.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

As it relates to guidance, can you give us a little bit more detail? I know you've made some remarks on your prepared statements, but for the area that you think is most at risk, can you just give us a little bit more color on that? Is it that it's new patient adds from long-term care facilities? Or is it new patient adds perhaps in general because it does seem from the strategy that you laid out that, for continuing patients, it really should not be much of an issue at all to stay on job just given all the changes? I'm just trying to get a better sense of where most of the exposure to COVID is coming from?

**Stephen R. Davis**
*CEO & Director*

Michael, do you want to take that?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Sure. Yes. Thanks for the question. And as it relates to the guidance, I think the first thing to start with is that Parkinson's disease psychosis is a very serious situation, and it's quite bothersome and disruptive to the family. So therefore, it elevates into a -- it elevates on the ladder of need-to-treat. So with that being said, that's a good thing. Another good thing is we have a strong base of continuing patients that we have continued to demonstrate a high and sustained fulfillment rate. So that's also good with the franchise. We do expect to grow new-to-brand patients, both in the SP and the SD channel. But the thing that I was trying to articulate in my prepared remarks is that physician visits and diagnoses are down in general. And so it's really a funnel issue, while we may have a higher share of the types of patients that are seen,

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

overall visits are down. So once we're doing very well in engaging with our virtual tactics. But that's what is reflected, really, I think, is in the new-to-brand area vis-à-vis the marketplace.

**Stephen R. Davis**
*CEO & Director*

So Elena, you want to just offer any additional thoughts on the overall volume growth that we're anticipating in our guidance.

**Elena H. Ridloff**
*Executive VP, CFO & Principal Accounting Officer*

Yes. So the midpoint of our guidance assumes high teens year-over-year volume growth. And just as a reminder, when we see the impact we've seen to our new-patient growth rate in the first part of the year, when you add patients in the beginning of the year, they have a cumulative benefit to the full year. So that's why when we look at the full year guidance range, we've reflected it -- reflected the change in our new guidance.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

Okay. And can you tell us what percent of sales is coming currently from long-term care?

**Stephen R. Davis**
*CEO & Director*

It's about...

**Elena H. Ridloff**
*Executive VP, CFO & Principal Accounting Officer*

25%.

**Tazeen Ahmad**
*BofA Merrill Lynch, Research Division*

I'm sorry.

**Elena H. Ridloff**
*Executive VP, CFO & Principal Accounting Officer*

About 25% is from long-term care.

**Operator**

And our next question comes from the line of Marc Goodman with SVB Leerink.

**Marc Harold Goodman**
*SVB Leerink LLC, Research Division*

Can you talk about the M1 PAM that you guys licensed in? How's the product set differentiated versus some of the others in development? You said the lead asset is in Phase I. What indication is that? Is it schizophrenia or Alzheimer's? And then just back on NUPLAZID, can you talk about just what April has looked like so far relative to March, relative to February, relative to maybe what you were expecting, just so we get a sense of what's happened so far?

**Stephen R. Davis**
*CEO & Director*

Yes, we'll take those one at a time. Let me offer a couple thoughts on the PAM program first, and I'll ask Michael to respond to the second question. So we really like this program. I'm sure many of you are aware, there's a lot of literature describing the potential of muscarinic modulators, both with M1 -- the M1 and M4 subtypes. And a -- the literature is mostly supportive of potential utility in schizophrenia and

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 14

cognition and dementia. The challenge in this area has always been how to control the -- or mitigate the unwanted cholinergic side effects. So there's some approaches that have been -- shown very intrigued promise by trying to -- when you can block some of those side effects, you can really -- what's been observed is a very strong efficacy signal. The approach that Vanderbilt's taken and that we are collaborating with them on is, by modulating the M1 receptor subtype to the positive allosteric modulators, and we believe this PAM approach is designed to achieve a similar level of efficacy but potentially without the side effects due to high selectivity of these PAMs. So we're very excited about the approach. We've liked the program a lot and eager to get it incorporated and get going. Michael, do you want to take the other question?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Sure. Thanks for the question. I think that maybe this is a chance to brag a little bit. I'm really proud of the commercial team for what they've been able to do quickly pivoting in a time of a crisis, whereby, we were able to do a lot of things that optimized the commercial approach. I mentioned the ability to diagnose, treat and get patients on therapy remotely. We've had product feeders that are very well attended. Our existing sales force leveraging their relationships have had what I would call a surprisingly good take in their effectiveness to reach customers and engage in meaningful conversations. And obviously, the first part of the state shelter in place, I think, was a pretty devastating thing for the country and the marketplace in general. But as physicians have come to get their feet under the ground, I've been impressed with their response to telemedicine. As I mentioned earlier, the PDP situation is one of serious need. And therefore, we have credible conversations and reasons to engage with customers. So I think April is certainly seeing better days than the latter parts of the -- of March when a pandemic was first raging and shelter-in-place was a kind of a new thing. So our employees are really engaged. The customers are really responding. And I think qualitatively, I would say that we've reached a pretty good space to operate from in April.

**Marc Harold Goodman**
*SVB Leerink LLC, Research Division*

And just to confirm...

**Stephen R. Davis**
*CEO & Director*

I'll just -- I'm sorry, I'll just echo Michael's comments. I think I've been very, very pleased and proud with the work that his team has done in very quickly adapting to this very unusual and very different environment. I think what we've seen is, as Michael mentioned, while in-person visits are down, as you can see from our guidance and from the results that we've published, it has not had nearly as significant an impact on our revenues and our projected revenues and all of the other indicators that we look at. So the business continues to be very strong. And I think the quick pivot that we've done, the work that Michael's team has done is reflected in the fact that we're -- we've revised guidance down by only 5%. I think we feel very good about where we stand. Of course, we have to -- we all recognize it's a fairly fluid situation. But I think our team has done a great job of working virtually.

**Marc Harold Goodman**
*SVB Leerink LLC, Research Division*

And did the $90 million in the first quarter include any buy-in because of COVID, like we've seen in other companies? Or was this pretty much demand driven?

**Stephen R. Davis**
*CEO & Director*

No. It's demand driven -- the inventory levels during the quarter.

**Operator**

And our next question comes from the line of Charles Duncan with Cantor Fitzgerald.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Ex. 82
P. 15

**Charles Cliff Duncan**
*Cantor Fitzgerald & Co., Research Division*

Congrats on a good quarter. I wanted to ask one commercial question and then probably two relatively simple pipeline questions. So the commercial question for you is, I know there's been a fair amount of discussion about components of guidance, and appreciate Elena's input there. But I'm specifically wondering about the dynamics in the long-term care facility setting. I know there's been some discussion about that setting being hit hard by COVID-19. And I guess I'm wondering if you're seeing continued persistence and/or I guess, improved or continued compliance in that setting in particular and what your assumptions are in the second half of the year with regard to the COVID-19 perhaps second wave?

**Stephen R. Davis**
*CEO & Director*

Michael, you want to take that?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Yes. Thanks, Charles. Thanks for the question. And our hearts go out to the [ patients ] in the long-term care setting, which is a setting that has seen a little bit more of an impact on the COVID. Our -- we expect to continue to see the similar dynamics in our ability to kind of operate, as I said, on the SP and the SD side. Recall that we have already a well-established franchise. The product flow goes through there, and continuing patients have shown no -- we don't see a general impact on the continuing patients. As I mentioned earlier, for both SP and SD, the ability to get new patients, that's kind of where the focus is on the guidance, and we're speculating in that guidance some reduction in that ability to get new patient starts in both SP and SD. But that's a fluid situation, and we're continuing to monitor that, and we'll continue to evolve our promotional and operational mix to that category when we see it. It could be that we get back to state-to-state and market-to-market opportunities, and it's going to be an evolution of how we get back into that market.

**Charles Cliff Duncan**
*Cantor Fitzgerald & Co., Research Division*

That makes sense to me. However, we...

**Stephen R. Davis**
*CEO & Director*

I'm sorry, go. Sorry, just to be clear, the low end of the guidance assumes that new-patient starts stay where they are what we've observed so far. And we don't anticipate that to be the case. The high end of our guidance assumes that we're able to get back into physicians' offices in the third quarter and receive more growth on new-patient starts. So I think the guidance, again, is very well rounded into what we're seeing today, recognizing, again, it's a fluid situation that could change.

**Charles Cliff Duncan**
*Cantor Fitzgerald & Co., Research Division*

Okay. Very good. That's helpful, Steve. And then perhaps if I could ask a couple of pipeline questions. One is related to DRP. Pretty clear guidance that you'll be filing an sNDA soon. I know that summer starts here in a matter of weeks, but I'm wondering if, Serge, you could provide us any additional color on kind of rate-limiting steps or additional work that needs to be done to file the DRP sNDA?

And then on the MDD program, like that, think it's creative, interesting. But I'm wondering if you could give us some color around the impact on powering, if there's any penalties that you think from a statistical perspective you would take in combining those 2 studies?

**Srdjan R. Stankovic**
*President*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 16

Yes, Charles. On the first question, really, we are -- as you can imagine, well advanced in the preparation of our supplemental NDA. Our discussions with FDA did not bring any significant or meaningful changes to that strategy. So we are continuing with the finalization of the documents that are components of the supplemental NDA. And we are, as I mentioned earlier, completely on track for that submission in the summer. And we -- with a 6-month priority review, we are expecting that action date will be toward the end of the year.

Related to the second question, in terms of the potential statistical impact or penalties for combining the study. All of this we -- is done and will be done with alignment with the FDA and, prospectively, prior to any database lock or anything on that. It is -- as a part of our discussion, we're proposing statistical analysis plan. And this is something that -- precedents already exist for this. And it has been done, and we anticipate that FDA will be open for such a solution.

I do want to say is that, starting in general, even the regulators and most of the sponsors are recognizing that there are certain risks involved in the starting and -- stopping and starting the enrollment where a portion of patients will be assessed and enrolled pre-COVID and portion of patient post-COVID. So that solution also brings certain risks. And our assessment is that the proposal that we have offer opportunity for us to still maintain our 2 shots on the goal strategy by already planning to, in case of negative outcome, start the second study but also offer opportunity. We feel very comfortable with proposed statistical plans and analysis.

## Charles Cliff Duncan
*Cantor Fitzgerald & Co., Research Division*

That's helpful. If I could sneak one more in. With regard to the Vanderbilt deal that you did, congrats on that, I'm wondering if the current compound that's in Phase I testing, it's from an academic, and not to say anything about that. But would you see that as a pharmaceutically optimized compound or really a tool candidate to test hypothesis with regard to the strategy to get to selectivity?

## Stephen R. Davis
*CEO & Director*

It's a great question, Charles. It's something that we spend a lot of time and our diligence on. Vanderbilt's done something that is a little different than what you typically see with academic institutions. But they've really dedicated a lot of resources to building the same kind of capabilities in an independent lab structure they set up under Jeff Conn to do the same kinds of things, have the same types of capabilities in-house as you would have at a pharmaceutical company or at a well-positioned biotech company. And so that was one of the real advantages we saw in partnering with them is, not only are they -- have they gone through the same paces that we and others would go through, but they have the capability to continue doing that with other compounds. So -- and by the way, Jeff Conn, who leads this endeavor at Vanderbilt spent a lot of time in industry, and they built a really substantial platform there. So we're very excited about the mechanism, the program, the potential, but also the capabilities are great for our capabilities.

## Operator

Our next question comes from the line of Gregory Renza with RBC Capital Markets.

## Gregory James Renza
*RBC Capital Markets, Research Division*

Congrats on all the progress. And also thank you for all the color this afternoon and today. Really appreciate it. Steve, I just wanted to ask a bit, certainly more, a little, on COVID. And as you discussed really setting the company and the portfolio up for the longer term, just curious -- you're discussing getting through some of the COVID-19 pressures now. But I'm just curious your thoughts on maybe more of the lingering negative effects that the pandemic could have on the market certainly setting up for a very important launch but then also with respect to the patient population, the toll perhaps on mental health. Is there any read-through to that market really being that would be growing and led itself to the assets of ACADIA and certainly, secondarily and perhaps connected to the CLARITY changes,

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Ex. 82
P. 17

any additional FDA or further amenability for them to be more flexible with helping to get products like [ pimavanserin ] through to these patient populations?

**Stephen R. Davis**
*CEO & Director*

Yes. Thanks for the question. I'll start, and then Michael or Serge, if you guys have additional commentary, please jump in. But look, this is obviously a really tragic situation that we're experiencing globally. The impact that we're seeing with COVID-19 is short term. As we mentioned, it's not going to change the fact that symptoms with Parkinson's, dementia, depression, schizophrenia, Rett syndrome, they continue to suffer symptoms despite the pandemic. I think in terms of longer-term impact, I think it will underscore the utility of drugs that help treat these symptoms. I do think that we'll see some exacerbation of depression and anxiety-induced depression. I think we'll see some, again, further impact on the -- on hallucinations and delusions that Parkinson's and dementia patients suffer. And in some respects, the ability to actually treat those symptoms and possibly keep patients out of the nursing home longer or in a nursing home setting to be able to treat those symptoms to make those patients have a higher quality of life and be easier to manage, et cetera, will be things that will be at an even higher value than they are -- than the very high value than they are today. So I think as we think about the potential rippling effects, I guess, I'd say, I think they will just underscore the utility of treating the disease that we're pursuing. And perhaps equally important, we're treating them with an agent that, so far, has shown very robust efficacy and a very, very tolerable safety and tolerability profile. So I think it will just simply underscore the value of NUPLAZID and in all the indications we're pursuing.

Michael or Serge, do you guys anything else to offer?

**Michael J. Yang**
*Executive VP & Chief Commercial Officer*

Yes, Steve, I would offer a couple more things. I think that one of the things that mental health has attached to it is, number one, a stigma and, number two, an awareness. And a lot of our medical and consumer education is awareness. And obviously, folks being together in a longer period of time exposes that information or that situation, and that can make that a lot more front and center as a problem to solve.

Second, I would say that I think that we're fortunate in that psychiatry and neurology are some of the 2 highest users of telemedicine. And I think the telemedicine trend that has been established at a necessity in this COVID environment, I think, is going to continue long after this. And I think that telemedicine is going to be here to stay. Companies that are optimized for that kind of environment, and our product and company is, are going to continue to serve, I think, the physician customers extremely well.

And then the third, I just want to anchor this to Steve's comments that a product like NUPLAZID whose overall positioning across the sequence of indications is improvement without impairment. In the case of PDP, that was a nonimprovement in psychosis without impacting motor. In the case of dementia, it's potentially the impact on cognition, say, on falls and other safety benefits that we don't see with the dopaminergic side effects.

And then, of course, with depression and others, we have benefits that we've shown in our studies if they were to be part of the claims. In terms of sexual dysfunction, weight gain, metabolic, the list goes on. So a product like NUPLAZID in the future environment of the things I just discussed and Steve anchored on, I think are -- it's a really potentially good situation in that regard.

**Srdjan R. Stankovic**
*President*

Yes. And I'll just add that, likewise, on the R&D side, we have been able to really quickly and efficiently move toward the remote assessments and ability to properly monitor safety of the patients through in a remote manner. I want to thank the regulators who reacted really fast in providing the guidelines or guidance for sponsors, how to do this. And with application of all of this, now we have actually essentially systems in place to operate whatever circumstances come up. Of course, with pandemic, you never know

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 18

if things may get to some catastrophic level. But in the circumstances as it is, we can really run both models, both on-site visits or remote visits, and we're ready for any circumstance.

**Operator**

All right. Ritu Baral from Cowen.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

Thanks for fitting me back in. Really sorry about that. My question is for Serge. I know somebody asked a little bit of this previously, but how should we think about the activity of your M1 PAM from Vanderbilt? Specifically, how do we think about that allosteric modulation and what sets it apart activity-wise from like xanomeline? And how are -- like is it possible to separate the antimuscarinic side effects from the antipsychotic effects that xanomeline has shown? Can you walk us through that?

**Srdjan R. Stankovic**
*President*

Well, Steve, do you want me to address this?

**Stephen R. Davis**
*CEO & Director*

Yes, please, go right ahead.

**Srdjan R. Stankovic**
*President*

Yes. The one of the really distinguishing feature of the compounds that we in-license is it's a high level of selectivity, which really would impact the entire side effect profile. In terms of the efficacy, that -- it shouldn't be any distinguishing difference. But with the muscarinic receptors and agonists, what happens often is that their selectivity is not exactly what is proclaim or what's predominant selectivity, and that often impacts the peripheral side effect profiles, particularly. So what we are impressed with the Vanderbilt compounds is that it's high selectivity and their technology for producing the positive allosteric modulator with high precision. So we are really impressed with that and anticipate that we will ultimately see the efficacy that is observed already with M1 with muscarinic agonist, but with the side effect profiles and some initial data that we have also are indicating in that direction.

**Stephen R. Davis**
*CEO & Director*

Yes, I would just -- the last thing Serge mentioned, I mean, in these early-stage programs, you always have a biochemical hypothesis, and you do testing in vitro and then in vivo, then you ultimately get in the clinic and test that [ out ] in humans. And all of the data that we've seen so far is supportive of the theory that we have that we -- that to this positive allosteric modulation at M1, we may be able to avoid the cholinesterase side effects. So again, it's an early-stage program. It has the risk/reward profile of an early-stage program, but we're very excited about it.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

And when's the fastest that we get into the clinic?

**Stephen R. Davis**
*CEO & Director*

We have -- well, so the lead compound is in Phase I now. It's in the early Phase I. And I think as we progress further, we'll give more updates on it. But another thing we liked about the program is the fact that, with the small-molecule early-stage programs, you always want to have multiple shots on goal.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82

P. 19

And we've got other compounds that are progressing rapidly as well. So we feel good about the portfolio approach that Vanderbilt's taking.

**Ritu Subhalaksmi Baral**
*Cowen and Company, LLC, Research Division*

And last question. I apologize if this is a repeat. But in your conversations with FDA about your DRP sNDA, has the topic of the AdCom come up now that AdComs are definitely virtual for this foreseeable future.

**Stephen R. Davis**
*CEO & Director*

Serge, do you want to take that?

**Srdjan R. Stankovic**
*President*

Yes. We continue to expect that there is a high likelihood that we will have advisory committee, and we are preparing for the advisory committee. That topic did not come up yet because it's not time for that. That's not something that generally is customarily discussed either the -- at any of the meetings or of the pre-sNDA meeting. We expect that we will be -- once we file and file is accepted that we will, at that point, hear what their thoughts on that. I do want to remind everybody that it's not typical for supplemental NDA to have advisory committee but because this is the first approval of antipsychotic in this indication that we anticipated, it is a likelihood that we will have, and we are behaving in that way.

**Operator**

And our next question comes from the line of Salveen Richter with Goldman Sachs.

**Salveen Jaswal Richter**
*Goldman Sachs Group Inc., Research Division*

With regards to the CLARITY trials, could you just comment on the risk in terms of differences previously seen with placebo response or other factors in the context of U.S. and ex-U.S. patients or U.S. and ex-U.S. sites. And then just to clarify in the muscarinic receptors, what the rationale is behind targeting M1 and not both M1 and M4.

**Stephen R. Davis**
*CEO & Director*

Serge, do you want to take that?

**Srdjan R. Stankovic**
*President*

Yes. In regard to clarity, first of all, let me just say that, in terms of the placebo response in the depression trial, the difference is that we were seeing -- we generally see in schizophrenia are not replicated in the depression trial. The regional organization of the studies was -- is more related to the potential control of the overall variability. And as I mentioned, the data we have and what we observed so far does not indicate that there is a significant concern in terms of the differential variability that we are observing in these 2 studies. So from that perspective, we are reassured that the risks are not of a concerning nature in that regard. And obviously, combining the studies, you're combining the number of clinical sites. But as with the observed variabilities between 2 studies, we feel fairly comfortable in that respect.

On the M1 versus M4, it's a significant debate what actually cognitive/neuropsychiatric symptoms are better addressed or more efficiently addressed with the agonism at M1 versus M4. There is a kind of school of talk that M1 is more on a cognitive side that M4 is more on the acute psychotic symptoms side. But there is no -- actually, looking historically through the studies, I think that there are arguments to be made that both cognition -- cognitive symptoms and more broader neuropsychiatric symptoms in schizophrenia, which would include both negative symptoms as the positive symptoms, would be and

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ex. 82
P. 20

can be addressed with M1. I will simply say that what we intend to do in developing these molecules is to simply listen to and clinical observations and adjust our development programs as we are moving through the stages of development, so that we pursued the most appropriate indications with this. But we are open-minded in that respect at this point.

**Operator**

And our next question is from the line of Chris Howerton with Jefferies.

**Christopher Lawrence Howerton**
*Jefferies LLC, Research Division*

Great. I'll try and make this quick. So Steve, we've had some initial discussions about growing the company through BD, and I just wanted to understand what the scope of the deals you're thinking about in the future, just given the precedent of these 2 relatively small deals that we've seen so far?

**Stephen R. Davis**
*CEO & Director*

Yes. Thanks for the question. Maybe as we've previously indicated, growing the company transactionally is a key pillar of our business plan. You'll see more transactions for us as we go forward. I think the 2 deals that we've done so far are good examples. I would characterize the kind of deals we are doing, but I wouldn't -- you shouldn't limit the scope -- or assume that our scope is limited to just those kinds of deals or those sizes of deals. The -- of course, as I mentioned, trofinetide is a good example of a later stage opportunity that we're very excited about. Those Vanderbilt deals we've been discussing is an earlier stage opportunity. We have presence both in neurology and psychiatry. We've built a very -- I would characterize it as a very, very formidable R&D engine. I think the results that you guys have seen us produce support that. And I think we've built a very, very substantial presence commercially. So we've got capabilities that we can leverage, and we will continue to do that.

**Operator**

I'm not showing any more questions at the time.

**Stephen R. Davis**
*CEO & Director*

Great. Thanks, operator. Look, I know we've run a little bit long here. I just want to say thanks to all of you for joining us today. We appreciate it. Look forward to updating you on our progress next quarter.

**Operator**
Ladies and gentlemen, this does conclude the program. You may now disconnect. Everyone, have a great day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

Ex. 82
P. 22

# Exhibit 83

Ex. 83
P. 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2020**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.
**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **3611 Valley Centre Drive, Suite 300** | |
| **San Diego, California** | **92130** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(858) 558-2871**
**(Registrant's Telephone Number, Including Area Code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **ACAD** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Total shares of common stock outstanding as of the close of business on April 22, 2020:

| Class | Number of Shares Outstanding |
|---|---|
| Common Stock, $0.0001 par value | 155,724,104 |

**Ex. 83**

**P. 2**

*Background*

We are a biopharmaceutical company focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system disorders. We have a portfolio of product opportunities led by our novel drug, NUPLAZID (pimavanserin), which was approved by the U.S. Food and Drug Administration (FDA), in April 2016 for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis, or PD Psychosis. We hold worldwide commercialization rights to pimavanserin. NUPLAZID is available in 34 mg capsule and 10 mg tablet.

We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of DRP, would be stopped early as part of a planned interim efficacy analysis for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo. In December 2019, we announced top-line results from the HARMONY study in connection with a presentation at the 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting. Pimavanserin met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided $p=0.0023$). In addition, pimavanserin met the key secondary endpoint in the study by significantly reducing the risk of discontinuation of any reason by 2.2 fold (HR = 0.452; one-sided $p=0.0024$). Pimavanserin was well-tolerated over the entire nine-month study duration. Patients receiving pimavanserin treatment had no worsening in cognition or motor symptoms from baseline. Following our meeting with the FDA in March 2020, we plan to submit a supplemental New Drug Application (sNDA) for DRP in the summer of 2020. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

According to the National Institute of Mental Health, major depressive disorder (MDD), affects approximately 17 million adults in the United States, with approximately 2.5 million adults treated with adjunctive therapy. The majority of people who suffer from MDD do not respond adequately to initial antidepressant therapy. In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin for adjunctive treatment in 207 patients with MDD who had a confirmed inadequate response to existing first-line, SSRI or SNRI, antidepressant therapy. In the study, pimavanserin met the pre-specified primary endpoint and key secondary endpoint demonstrating statistically significant improvement in the Hamilton Depression-17 Rating Scale and the Sheehan Disability Scale, respectively, relative to placebo. Positive results were also observed in seven additional secondary endpoints including response rate, improvement in the symptoms of sexual dysfunction, and a reduction in daytime sleepiness. Pimavanserin was generally well-tolerated in the study with no meaningful weight gain observed or impact on motor function. In February 2019, we conducted an End-of-Phase 2 Meeting with the FDA and in April 2019 we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 (U.S. study) and CLARITY-3 (international study), evaluating pimavanserin as an adjunctive treatment for major depressive disorder. Although we temporarily paused enrollment of new patients due to the COVID-19 pandemic, we are now ready to resume enrollment of new patients in these studies. However, given that CLARITY-2 and CLARITY-3 are just over 50% enrolled, we are also considering not enrolling any additional patients and instead combining these two studies into one study with a pre-specified statistical analysis plan. We plan to discuss this proposal with the FDA in a meeting scheduled for the second quarter.

Schizophrenia remains a disease area with high unmet need and we are currently exploring the utility of pimavanserin in this area. In the fourth quarter of 2016, we initiated our ADVANCE study, a Phase 2 study that evaluated pimavanserin for the adjunctive treatment of the negative symptoms of schizophrenia, for which there are currently no FDA-approved therapies. Negative symptoms of schizophrenia have been associated with poor long-term outcomes and disability even when the positive symptoms are well controlled, representing a high unmet need. In November 2019, we announced positive top-line results from our ADVANCE study that evaluated the efficacy of adjunctive pimavaserin compared to placebo in 403 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment. Pimavanserin demonstrated a statistically significant improvement on the study's primary endpoint, the change from baseline to week 26 on the Negative Symptom Assessment-16 (NSA-16) total score compared to placebo ($p=0.043$). A greater improvement in the NSA-16 total score compared to placebo was observed in patients who received the highest pimavanserin dose of 34 mg (n=107; unadjusted $p=0.0065$). 53.8% of patients who were randomized to receive pimavanserin completed the trial on 34 mg, 44.7% on 20 mg, and 1.5% on 10 mg. In the study, pimavanserin did not separate from placebo on the key secondary endpoint, the Personal and Social Performance (PSP), scale. We plan to commence a second pivotal study, ADVANCE-2, with the 34 mg dose of pimavanserin during the second half of 2020. While we are continuing preparatory activities, including virtual site initiation visits where necessary so we are fully prepared to start ADVANCE-2, due to the COVID-19 pandemic, there can be no assurance at this time that we will be able to initiate the study in the second half of 2020.

16

**Ex. 83**
**P. 3**

Successful commercialization of NUPLAZID is subject to many risks, and there is no guarantee that we will be able to successfully commercialize NUPLAZID for additional approved indications beyond PD Psychosis. There are numerous examples of failures to meet high expectations of market potential, including by pharmaceutical companies with more experience and resources than us. While we have established our commercial team and have hired our U.S. sales force, we will need to further expand and develop the team in order to successfully commercialize NUPLAZID for additional indication. Even if we are successful in developing our commercial team, there are many factors that could cause the commercialization of NUPLAZID to be unsuccessful, including a number of factors that are outside our control. Because no drug has previously been approved by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis, it is especially difficult to estimate NUPLAZID's market potential for its approved indication and potential additional indications. The commercial success of NUPLAZID currently depends on the extent to which patients and physicians recognize and diagnose PD Psychosis and accept and adopt NUPLAZID as a treatment for hallucinations and delusions associated with PD Psychosis, and we do not know whether our or others' estimates in this regard will be accurate. For example, if the patient population suffering from hallucinations and delusions associated with PD Psychosis is smaller than we estimate or if physicians are unwilling to prescribe or patients are unwilling to take NUPLAZID, perceived safety issues, or for other reasons, the commercial potential of NUPLAZID will be limited. We have limited information about how physicians, patients and payors have responded and will respond to the pricing of NUPLAZID. We have changed, and may continue to change, the price of NUPLAZID from time to time. Physicians may not prescribe NUPLAZID and patients may be unwilling to use NUPLAZID if coverage is not provided or reimbursement is inadequate to cover a significant portion of the cost. Additionally, any negative publicity related to NUPLAZID, or negative development for NUPLAZID in our post-marketing commitments, in clinical development in additional indications, or in regulatory processes in other jurisdictions, may adversely impact the commercial results and potential of NUPLAZID. Thus, significant uncertainty remains regarding the commercial potential of NUPLAZID.

In addition, our business could be adversely affected by the effects of public health threats, including the ongoing COVID-19 pandemic. Although we did not see a material impact on our net sales of NUPLAZID for the quarter ended March 31, 2020, we are expecting sales of NUPLAZID to be negatively impacted by changes in commercial practices resulting from COVID-19, such as the need to adapt to the widespread transition to telemedicine and possible decreases in initial diagnoses, and therefore we recently revised our financial guidance for 2020 to reflect this expectation. The ultimate effects of COVID-19, and the duration thereof, are difficult to assess or predict at this time and no assurances can be given that the pandemic will not have a significant impact on our business, results of operations, financial condition and prospects.

If the commercialization of NUPLAZID is less successful than expected or perceived as disappointing, our stock price could decline significantly and the long-term success of the product and our company could be harmed.

***If we do not obtain regulatory approval of pimavanserin for other additional indications in the United States, or for any indication in foreign jurisdictions, or regulatory approval of trofinetide for Rett syndrome, we will not be able to market pimavanserin for other indications or in other jurisdictions or market trofinetide at all, which will limit our commercial revenues.****

While pimavanserin has been approved in the U.S. by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis, it has not been approved by the FDA for any other indications, and it has not been approved in any other jurisdiction for this indication or for any other indication. In order to market pimavanserin for other indications or in other jurisdictions, we must obtain regulatory approval for each of those indications and in each of the applicable jurisdictions, and we may never be able to obtain such approval. Approval of NUPLAZID by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis does not ensure that foreign jurisdictions will also approve NUPLAZID for that indication, nor does it ensure that NUPLAZID will be approved by the FDA for any other indication. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). We plan to submit a sNDA to the FDA for the treatment of dementia-related psychosis in the summer of 2020. We initiated a Phase 3 program for pimavanserin as an adjunctive treatment for major depressive disorder in April 2019 and we initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. We are currently making preparations to initiate the Phase 3 ADVANCE-2 study of pimavanserin for the treatment of the negative symptoms of schizophrenia in the second half of 2020. There is no guarantee that any of these ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, even if we submit a sNDA for pimavanserin in dementia-related psychosis, the sNDA will be subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. Even if a sNDA submission is accepted for filing by the FDA, the FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.

25

Ex. 83
P. 4

***We are solely responsible for the development and advancement of this program and commercialization of the product.***

We have full responsibility for the pimavanserin program throughout the world. We expect our research and development costs for continued development of pimavanserin to be substantial. While we currently are undertaking the ongoing development work for pimavanserin, including clinical trials of pimavanserin for indications other than in PD Psychosis and a planned supplemental NDA submission for pimavanserin in dementia-related psychosis, in the event of approval for dementia-related psychosis, we would need to add significant resources, and possibly raise additional capital, in order to further commercialize pimavanserin, and to conduct the necessary sales and marketing activities, and to conduct further development activities. Our current strategy is to continue to commercialize NUPLAZID for the treatment of hallucinations and delusions associated with PD Psychosis in the United States using our specialty sales force focused primarily on neurologists, a small group of psychiatrists, and pharmacists and physicians in long-term care facilities who treat PD Psychosis patients. In preparation for a potential U.S. launch in dementia-related psychosis, we will need to increase the U.S. sales force significantly, and expand additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for pimavanserin in dementia-related psychosis. In addition, if we are approved to commercialize NUPLAZID in markets outside of the United States, we may need to establish one or more strategic alliances in the future for that purpose. Without future additional resources or collaboration partners in the United States and abroad, we might not be able to realize the full value of NUPLAZID.

Furthermore, even though NUPLAZID is approved for the treatment of hallucinations and delusions associated with PD Psychosis, a failure in a subsequent pimavanserin study for another indication, including our ongoing studies in schizophrenia and depression, or any additional studies that may be required in dementia-related psychosis, or a failure in our post-marketing studies could harm our ability to successfully market NUPLAZID for the treatment of hallucinations and delusions associated with PD Psychosis or could lead to it being withdrawn from the market. If we are unable to develop pimavanserin for other indications, we may not be able to maximize the potential of the compound and that could have a material adverse effect on our future revenues and our success as a company.

***Pimavanserin is currently in late-stage development for several additional indications other than in PD Psychosis, and we have initiated Phase 3 development of trofinetide for Rett syndrome. Drug development is a long, expensive and unpredictable process with a high risk of failure.***

Preclinical testing and clinical trials are long, expensive and unpredictable processes that can be subject to delays. It may take several years to complete the preclinical testing and clinical development necessary to commercialize a drug, and delays or failure can occur at any stage. Interim results of clinical trials do not necessarily predict final results, and success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful. A number of companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in advanced clinical trials even after promising results in earlier trials.

Our drug development programs are at various stages of development and the historical rate of failures for product candidates is extremely high. In fact, we had an unsuccessful Phase 3 trial with NUPLAZID in 2009. An unfavorable outcome in any of our ongoing or future development efforts or in the post-marketing studies for NUPLAZID could be a major set-back for the program and for us, generally. In particular, an unfavorable outcome in our NUPLAZID program or in the post-marketing studies may require us to delay, devote additional substantial resources to, reduce the scope of, or eliminate this program and could have a material adverse effect on us and the value of our common stock. In the fourth quarter of 2017, we initiated a Phase 3 study of pimavanserin in patients with dementia-related psychosis, and in the fourth quarter of 2016 we initiated both a Phase 2 and a Phase 3 study of pimavanserin as an adjunctive treatment in patients with schizophrenia.

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin as an adjunctive treatment for major depressive disorder and in April 2019, we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 and CLARITY-3, evaluating pimavanserin as an adjunctive treatment for major depressive disorder. In July 2019, we announced top-line results from the Phase 3 ENHANCE study evaluating pimavanserin as an adjunctive treatment in inadequate response schizophrenia. In this study pimavanserin did not achieve statistical significance on either the primary endpoint or the key secondary endpoint. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

38

In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). We plan to submit a sNDA to the FDA for dementia-related psychosis in summer 2020. We cannot guarantee that the full results of the HARMONY study and other existing clinical data will be sufficient to support the approval of a supplemental NDA, or whether regulatory agencies will require additional clinical trials or information, which could impact the approvability or commercialization timing and prospects of pimavanserin in the dementia-related psychosis indication. In November 2019, we announced positive top-line results from the Phase 2 ADVANCE study evaluating pimavanserin for the negative symptoms of schizophrenia for patients whose positive symptoms were controlled on a stable background antipsychotic treatment. We may plan and conduct additional studies in the future, and have initiated the Phase 3 LAVENDER study of trofinetide in Rett syndrome in October 2019.

In connection with clinical trials, we face risks that:

- a product candidate may not prove to be efficacious or safe;

- patients may die or suffer other adverse effects for reasons that may or may not be related to the product candidate being tested;

- the results may not be consistent with positive results of earlier trials; and

- the results may not meet the level of statistical significance required by the FDA or other regulatory agencies.

If we do not successfully complete preclinical and clinical development, we will be unable to market and sell products derived from our product candidates and to generate product revenues. Even if we do successfully complete clinical trials, those results are not necessarily predictive of results of additional trials that may be needed before an NDA may be submitted to the FDA. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization.

***Delays, suspensions and terminations in our clinical trials could result in increased costs to us and delay our ability to generate product revenues.\****

The commencement of clinical trials can be delayed for a variety of reasons, including delays in:

- demonstrating sufficient safety and efficacy to obtain regulatory approval to commence a clinical trial;

- reaching agreement on acceptable terms with prospective contract research organizations and clinical trial sites;

- manufacturing sufficient quantities of a product candidate;

- obtaining clearance from the FDA to commence clinical trials pursuant to an Investigational New Drug application;

- obtaining institutional review board approval to conduct a clinical trial at a prospective clinical trial site; and

- patient recruitment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial.

Once a clinical trial has begun, it may be delayed, suspended or terminated due to a number of factors, including:

- competition for internal and external resources, including clinical sites and study patients, that we may choose to allocate to other programs;

- ongoing discussions with regulatory authorities regarding the scope or design of our clinical trials or requests by them for supplemental information with respect to our clinical trial results;

- imposition of clinical holds by regulatory authorities or institutional review boards;

- failure to conduct clinical trials in accordance with regulatory requirements;

- patient enrollment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial;

- lower than anticipated screening or retention rates of patients in clinical trials;

Ex. 83
P. 6

Ex. 84
P. 1

# Exhibit 84

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2020**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| **(State of Incorporation)** | **(I.R.S. Employer Identification No.)** |
| **3611 Valley Centre Drive, Suite 300** | |
| **San Diego, California** | **92130** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(858) 558-2871**

**(Registrant's Telephone Number, Including Area Code)**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol** | **Name of Each Exchange on Which Registered** |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **ACAD** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Total shares of common stock outstanding as of the close of business on July 22, 2020:

| **Class** | **Number of Shares Outstanding** |
|---|---|
| Common Stock, $0.0001 par value | 157,680,830 |

**Ex. 84**

**P. 2**

*Background*

We are a biopharmaceutical company focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system disorders. We have a portfolio of product opportunities led by our novel drug, NUPLAZID (pimavanserin), which was approved by the U.S. Food and Drug Administration (FDA), in April 2016 for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis, or PD Psychosis. We hold worldwide commercialization rights to pimavanserin. NUPLAZID is available in 34 mg capsule and 10 mg tablet.

We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In June 2020, we submitted a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin for adjunctive treatment in 207 patients with major depressive disorder (MDD). In July 2020, we announced that our Phase 3 CLARITY study, which combined the two identical, double-blind, placebo-controlled studies (CLARITY-2 and CLARITY-3) in 298 patients, did not achieve statistical significance on the primary endpoint. At this time we do not plan on initiating any additional Phase 3 studies to evaluate pimavanserin for the adjunctive MDD indication.

Schizophrenia remains a disease with high unmet need, and we are currently exploring the utility of pimavanserin in this area. In the fourth quarter of 2016, we initiated our ADVANCE study, a Phase 2 study that evaluated pimavanserin for the negative symptoms of schizophrenia, for which there are currently no FDA-approved therapies. Negative symptoms of schizophrenia have been associated with poor long-term outcomes and disability even when the positive symptoms are well controlled, representing a high unmet need. In November 2019, we announced positive top-line results from our ADVANCE study that evaluated the efficacy of pimavaserin compared to placebo in 403 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment. Pimavanserin demonstrated a statistically significant improvement on the study's primary endpoint, the change from baseline to week 26 on the Negative Symptom Assessment-16 (NSA-16) total score compared to placebo (p=0.043). A greater improvement in the NSA-16 total score compared to placebo was observed in patients who received the highest pimavanserin dose of 34 mg (n=107; unadjusted p=0.0065). 53.8% of patients who were randomized to receive pimavanserin completed the trial on 34 mg, 44.7% on 20 mg, and 1.5% on 10 mg. In the study, pimavanserin did not separate from placebo on the key secondary endpoint, the Personal and Social Performance (PSP), scale. In the third quarter of 2020, we initiated a second pivotal study, ADVANCE-2. The Phase 3 study will evaluate the efficacy of pimavaserin 34 mg once daily compared to placebo in approximately 386 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment.

In August 2018, we acquired an exclusive North American license to develop and commercialize trofinetide for Rett syndrome and other indications from Neuren. Rett syndrome is a debilitating neurological disorder that occurs predominantly in females following apparently normal development for the first six months of life. Typically, between six to eighteen months of age, patients experience a period of rapid decline with loss of purposeful hand use and spoken communication and inability to independently conduct activities of daily living. Symptoms also include seizures, disorganized breathing patterns, scoliosis and sleep disturbances. Trofinetide is a novel synthetic analog of the amino-terminal tripeptide of insulin-like growth factor 1 (IGF-1), designed to treat the core symptoms of Rett syndrome by reducing neuroinflammation and supporting synaptic function. Trofinetide has been granted FDA Fast Track Status and an Orphan Drug Designation in the U.S. and an Orphan Designation in Europe, as well as Rare Pediatric Disease designation in the U.S. Currently, there are no approved medicines for the treatment of Rett syndrome. In October 2019, we initiated the Phase 3 LAVENDER randomized, double-blind placebo-controlled study evaluating trofinetide in girls and young women 5-20 years of age with Rett syndrome. We expect results from our LAVENDER study in the second half of 2021, but we are unable to predict with certainty how the pandemic might affect the timing for completion of the study.

16

***If we do not obtain regulatory approval of pimavanserin for other additional indications in the United States, or for any indication in foreign jurisdictions, or regulatory approval of trofinetide for Rett syndrome, we will not be able to market pimavanserin for other indications or in other jurisdictions or market trofinetide at all, which will limit our commercial revenues.****

While pimavanserin has been approved in the U.S. by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis, it has not been approved by the FDA for any other indications, and it has not been approved in any other jurisdiction for this indication or for any other indication. In order to market pimavanserin for other indications or in other jurisdictions, we must obtain regulatory approval for each of those indications and in each of the applicable jurisdictions, and we may never be able to obtain such approval. Approval of NUPLAZID by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis does not ensure that foreign jurisdictions will also approve NUPLAZID for that indication, nor does it ensure that NUPLAZID will be approved by the FDA for any other indication. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). We submitted a sNDA to the FDA for the treatment of dementia-related psychosis on June 3, 2020. In July 2020 the FDA notified us of acceptance of our sNDA with a filing date of August 2, 2020 and a PDUFA action date of April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. We initiated a Phase 3 program for pimavanserin as an adjunctive treatment for major depressive disorder in April 2019. In July 2020, we announced that our Phase 3 CLARITY study, which combined two identical, double-blind, placebo-controlled studies, did not achieve statistical significance on the primary endpoint. As a result, at this time we do not plan on initiating any additional Phase 3 studies to evaluate pimavanserin for the broader adjunctive MDD indication.

We initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. We initiated the Phase 3 ADVANCE-2 study of pimavanserin for the treatment of the negative symptoms of schizophrenia in August 2020. There is no guarantee that our ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, our sNDA for pimavanserin in dementia-related psychosis is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. The FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.

The research, testing, manufacturing, labeling, approval, sale, import, export, marketing, and distribution of pharmaceutical product candidates are subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, whose regulations differ from country to country. We will be required to comply with different regulations and policies of the jurisdictions where we seek approval for our product candidates, and we have not yet identified all of the requirements that we will need to satisfy to submit NUPLAZID for approval for other indications or in other jurisdictions or to submit trofinetide for approval for Rett syndrome. This will require additional time, expertise and expense, including the potential need to conduct additional studies or development work for other jurisdictions beyond the work that we have conducted to support our NDA submission in PD Psychosis. In addition, strategic considerations need to be taken into account when determining whether and when to submit NUPLAZID for approval in other jurisdictions. For example, in the fourth quarter of 2016, the European Medicines Agency, or EMA, approved our proposed pediatric investigation plan related to our planned submission of a marketing authorization application, or MAA, for NUPLAZID for the treatment of PD Psychosis in Europe. However, in light of our continuing clinical development of pimavanserin in indications other than in PD Psychosis, and the time-limited data exclusivity currently granted by the EMA that commences on first approval of a product in Europe, we deferred submission of the MAA and we do not yet have a revised estimate of when we will make that filing. If we do not receive marketing approval for NUPLAZID for any other indication or from any regulatory agency outside of the United States or any marketing approval for trofinetide, we will never be able to commercialize NUPLAZID for any other indication in the United States or for any indication in any other jurisdiction or be able to commercialize trofinetide at all. Even if we do receive additional regulatory approvals, we may not be successful in commercializing those opportunities.

If the results or timing of regulatory filings, the regulatory process, regulatory developments, clinical trials or preclinical studies, or other activities, actions or decisions related to NUPLAZID do not meet our or others' expectations, the market price of our common stock could decline significantly

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin as an adjunctive treatment for major depressive disorder and in April 2019, we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 and CLARITY-3, evaluating pimavanserin as an adjunctive treatment for major depressive disorder. In July 2020, we announced that our Phase 3 CLARITY study, did not achieve statistical significance on the primary endpoint. In July 2019, we announced top-line results from the Phase 3 ENHANCE study evaluating pimavanserin as a treatment in inadequate response schizophrenia. In this study pimavanserin did not achieve statistical significance on either the primary endpoint or the key secondary endpoint. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. We cannot guarantee that the full results of the HARMONY study and other existing clinical data will be sufficient to support the approval of a supplemental NDA, or whether regulatory agencies will require additional clinical trials or information, which could impact the approvability or commercialization timing and prospects of pimavanserin in the dementia-related psychosis indication. In November 2019, we announced positive top-line results from the Phase 2 ADVANCE study evaluating pimavanserin for the negative symptoms of schizophrenia for patients whose positive symptoms were controlled on a stable background antipsychotic treatment. We may plan and conduct additional studies in the future, and have initiated the Phase 3 LAVENDER study of trofinetide in Rett syndrome in October 2019.

In connection with clinical trials, we face risks that:

- a product candidate may not prove to be efficacious or safe;

- patients may die or suffer other adverse effects for reasons that may or may not be related to the product candidate being tested;

- the results may not be consistent with positive results of earlier trials; and

- the results may not meet the level of statistical significance required by the FDA or other regulatory agencies.

If we do not successfully complete preclinical and clinical development, we will be unable to market and sell products derived from our product candidates and to generate product revenues. Even if we do successfully complete clinical trials, those results are not necessarily predictive of results of additional trials that may be needed before an NDA may be submitted to the FDA. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization.

*Delays, suspensions and terminations in our clinical trials could result in increased costs to us and delay our ability to generate product revenues.\**

The commencement of clinical trials can be delayed for a variety of reasons, including delays in:

- demonstrating sufficient safety and efficacy to obtain regulatory approval to commence a clinical trial;

- reaching agreement on acceptable terms with prospective contract research organizations and clinical trial sites;

- manufacturing sufficient quantities of a product candidate;

- obtaining clearance from the FDA to commence clinical trials pursuant to an Investigational New Drug application;

- obtaining institutional review board approval to conduct a clinical trial at a prospective clinical trial site; and

- patient recruitment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial.

Ex. 84
P. 5

# Exhibit 85

Ex. 85
P. 1

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2020**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.
**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| **(State of Incorporation)** | **(I.R.S. Employer Identification No.)** |
| **12830 El Camino Real, Suite 400** | |
| **San Diego, California** | **92130** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(858) 558-2871**
**(Registrant's Telephone Number, Including Area Code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **ACAD** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Total shares of common stock outstanding as of the close of business on October 22, 2020:

| Class | Number of Shares Outstanding |
|---|---|
| Common Stock, $0.0001 par value | 158,978,087 |

**Ex. 85**

**P. 2**

Although we did not see a significant impact on NUPLAZID net sales through September 30, 2020, the duration and ultimate effect of the COVID-19 pandemic on our business, results of operations, financial condition and prospects are difficult to assess or predict at this time. For example, we have re-initiated enrollment in clinical studies that were temporarily paused due to COVID-19 on a study-by-study and site-by-site basis. It is possible that future enrollment in these studies, or enrollment in future studies, could be impacted due to COVID-19. We are continuing to actively monitor the situation and may take further actions affecting our business operations as we deem necessary and in the best interests of our employees, customers, partners, suppliers, and stakeholders, or as required by federal, state, or local authorities.

*Background*

We are a biopharmaceutical company focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system disorders. We have a portfolio of product opportunities led by our novel drug, NUPLAZID (pimavanserin), which was approved by the U.S. Food and Drug Administration (FDA), in April 2016 for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis (PD Psychosis). We hold worldwide commercialization rights to pimavanserin. NUPLAZID is available in 34 mg capsule and 10 mg tablet.

We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In June 2020, we submitted a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of their filing of our sNDA with a Prescription Drug User Fee Act (PDUFA) target action date of April 3, 2021. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8-fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

Schizophrenia remains a disease with high unmet need, and we are currently exploring the utility of pimavanserin in this area. In the fourth quarter of 2016, we initiated our ADVANCE study, a Phase 2 study that evaluated pimavanserin for the negative symptoms of schizophrenia, for which there are currently no FDA-approved therapies. Negative symptoms of schizophrenia have been associated with poor long-term outcomes and disability even when the positive symptoms are well controlled, representing a high unmet need. In November 2019, we announced positive top-line results from our ADVANCE study that evaluated the efficacy of pimavanserin compared to placebo in 403 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment. Pimavanserin demonstrated a statistically significant improvement on the study's primary endpoint, the change from baseline to week 26 on the Negative Symptom Assessment-16 (NSA-16) total score compared to placebo (p=0.043). A greater improvement in the NSA-16 total score compared to placebo was observed in patients who received the highest pimavanserin dose of 34 mg (n=107; unadjusted p=0.0065). 53.8% of patients who were randomized to receive pimavanserin completed the trial on 34 mg, 44.7% on 20 mg, and 1.5% on 10 mg. In the study, pimavanserin did not separate from placebo on the key secondary endpoint, the Personal and Social Performance (PSP), scale. In the third quarter of 2020, we initiated a second pivotal study, ADVANCE-2. The Phase 3 study will evaluate the efficacy of pimavanserin 34 mg once daily compared to placebo in approximately 386 patients with predominantly negative symptoms of schizophrenia who have achieved adequate control of positive symptoms with their existing antipsychotic treatment.

17

***If we do not obtain regulatory approval of pimavanserin for other additional indications in the United States, or for any indication in foreign jurisdictions, or regulatory approval of trofinetide for Rett syndrome, we will not be able to market pimavanserin for other indications or in other jurisdictions or market trofinetide at all, which will limit our commercial revenues.\****

While pimavanserin has been approved in the U.S. by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis, it has not been approved by the FDA for any other indications, and it has not been approved in any other jurisdiction for this indication or for any other indication. In order to market pimavanserin for other indications or in other jurisdictions, we must obtain regulatory approval for each of those indications and in each of the applicable jurisdictions, and we may never be able to obtain such approval. Approval of NUPLAZID by the FDA for the treatment of hallucinations and delusions associated with PD Psychosis does not ensure that foreign jurisdictions will also approve NUPLAZID for that indication, nor does it ensure that NUPLAZID will be approved by the FDA for any other indication. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8-fold compared to placebo (HR = 0.353; one-sided p=0.0023). We submitted a sNDA to the FDA for the treatment of dementia-related psychosis on June 3, 2020. In July 2020 the FDA notified us of their filing of our sNDA with a filing date of August 2, 2020 and a PDUFA action date of April 3, 2021. As part of their filing communication, the FDA advised us that it has not identified any potential review issues at that point in their evaluation and at that time were not planning to hold an Advisory Committee meeting. We initiated a Phase 3 program for pimavanserin as an adjunctive treatment for major depressive disorder in April 2019. In July 2020, we announced that our Phase 3 CLARITY study, which combined two identical, double-blind, placebo-controlled studies, did not achieve statistical significance on the primary endpoint. As a result, at this time we do not plan on initiating any additional Phase 3 studies to evaluate pimavanserin for the broader adjunctive major depressive disorder indication.

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin for adjunctive treatment in 207 patients with major depressive disorder (MDD). In July 2020, we announced that our Phase 3 CLARITY study, which combined the two identical, double-blind, placebo-controlled studies (CLARITY-2 and CLARITY-3) in 298 patients, did not achieve statistical significance on the primary endpoint. At this time we do not plan on initiating any additional Phase 3 studies to evaluate pimavanserin for the adjunctive MDD indication.

We initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. We initiated the Phase 3 ADVANCE-2 study of pimavanserin for the treatment of the negative symptoms of schizophrenia in August 2020. There is no guarantee that our ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, our sNDA for pimavanserin in dementia-related psychosis is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. The FDA retains complete discretion in deciding whether or not to approve a sNDA and there is no guarantee that pimavanserin will be approved for the treatment of dementia-related psychosis.

The research, testing, manufacturing, labeling, approval, sale, import, export, marketing, and distribution of pharmaceutical product candidates are subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, whose regulations differ from country to country. We will be required to comply with different regulations and policies of the jurisdictions where we seek approval for our product candidates, and we have not yet identified all of the requirements that we will need to satisfy to submit NUPLAZID for approval for other indications or in other jurisdictions or to submit trofinetide for approval for Rett syndrome. This will require additional time, expertise and expense, including the potential need to conduct additional studies or development work for other jurisdictions beyond the work that we have conducted to support our NDA submission in PD Psychosis. In addition, strategic considerations need to be taken into account when determining whether and when to submit NUPLAZID for approval in other jurisdictions. For example, in the fourth quarter of 2016, the European Medicines Agency (EMA), approved our proposed pediatric investigation plan related to our planned submission of a marketing authorization application (MAA), for NUPLAZID for the treatment of PD Psychosis in Europe. However, in light of our continuing clinical development of pimavanserin in indications other than in PD Psychosis, and the time-limited data exclusivity currently granted by the EMA that commences on first approval of a product in Europe, we deferred submission of the MAA and we do not yet have a revised estimate of when we will make that filing. If we do not receive marketing approval for NUPLAZID for any other indication or from any regulatory agency outside of the United States or any marketing approval for trofinetide, we will never be able to commercialize NUPLAZID for any other indication in the United States or for any indication in any other jurisdiction or be able to commercialize trofinetide at all. Even if we do receive additional regulatory approvals, we may not be successful in commercializing those opportunities.

28

*We are solely responsible for the development and commercialization of pimavanserin.\**

We have full responsibility for the pimavanserin program throughout the world. We expect our research and development costs for continued development of pimavanserin to be substantial. While we currently are undertaking the ongoing development work for pimavanserin, including clinical trials of pimavanserin for indications other than in PD Psychosis and the sNDA submission for pimavanserin in dementia-related psychosis, in the event of approval for dementia-related psychosis, we would need to add significant resources, and possibly raise additional capital, in order to further commercialize pimavanserin, and to conduct the necessary sales and marketing activities, and to conduct further development activities. Our current strategy is to continue to commercialize NUPLAZID for the treatment of hallucinations and delusions associated with PD Psychosis in the United States using our specialty sales force focused primarily on neurologists, a small group of psychiatrists, and pharmacists and physicians in long-term care facilities who treat PD Psychosis patients. In preparation for a potential U.S. launch in dementia-related psychosis, we will need to increase the U.S. sales force significantly, and expand additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for pimavanserin in dementia-related psychosis. In addition, if we are approved to commercialize NUPLAZID in markets outside of the United States, we may need to establish one or more strategic alliances in the future for that purpose. Without future additional resources or collaboration partners in the United States and abroad, we might not be able to realize the full value of NUPLAZID.

Furthermore, even though NUPLAZID is approved for the treatment of hallucinations and delusions associated with PD Psychosis, a failure in a subsequent pimavanserin study for another indication, including our ongoing studies in schizophrenia and our previous studies in depression, or any additional studies that may be required in dementia-related psychosis, or a failure in our post-marketing studies could harm our ability to successfully market NUPLAZID for the treatment of hallucinations and delusions associated with PD Psychosis or could lead to it being withdrawn from the market. If we are unable to develop pimavanserin for other indications, we may not be able to maximize the potential of the compound and that could have a material adverse effect on our future revenues and our success as a company.

*Pimavanserin is currently in late-stage development for several additional indications other than in PD Psychosis, and we have initiated Phase 3 development of trofinetide for Rett syndrome. Drug development is a long, expensive and unpredictable process with a high risk of failure.\**

Preclinical testing and clinical trials are long, expensive and unpredictable processes that can be subject to delays. It may take several years to complete the preclinical testing and clinical development necessary to commercialize a drug, and delays or failure can occur at any stage. Interim results of clinical trials do not necessarily predict final results, and success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful. A number of companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in advanced clinical trials even after promising results in earlier trials.

Our drug development programs are at various stages of development and the historical rate of failures for product candidates is extremely high. In fact, we had an unsuccessful Phase 3 trial with NUPLAZID in 2009. An unfavorable outcome in any of our ongoing or future development efforts or in the post-marketing studies for NUPLAZID could be a major set-back for the program and for us, generally. In particular, an unfavorable outcome in our NUPLAZID program or in the post-marketing studies may require us to delay, devote additional substantial resources to, reduce the scope of, or eliminate this program and could have a material adverse effect on us and the value of our common stock. In the fourth quarter of 2017, we initiated a Phase 3 study of pimavanserin in patients with dementia-related psychosis, and in the fourth quarter of 2016 we initiated both a Phase 2 and a Phase 3 study of pimavanserin as a treatment in patients with schizophrenia.

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin as an adjunctive treatment for major depressive disorder and in April 2019, we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 and CLARITY-3, evaluating pimavanserin as an adjunctive treatment for major depressive disorder. In July 2020, we announced that our Phase 3 CLARITY study, did not achieve statistical significance on the primary endpoint. In July 2019, we announced top-line results from the Phase 3 ENHANCE study evaluating pimavanserin as a treatment in inadequate response schizophrenia. In this study pimavanserin did not achieve statistical significance on either the primary endpoint or the key secondary endpoint. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

Ex. 85
P. 5

In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8-fold compared to placebo (HR = 0.353; one-sided p=0.0023). In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. We cannot guarantee that the full results of the HARMONY study and other existing clinical data will be sufficient to support the approval of a supplemental NDA, or whether regulatory agencies will require additional clinical trials or information, which could impact the approvability or commercialization timing and prospects of pimavanserin in the dementia-related psychosis indication. In November 2019, we announced positive top-line results from the Phase 2 ADVANCE study evaluating pimavanserin for the negative symptoms of schizophrenia for patients whose positive symptoms were controlled on a stable background antipsychotic treatment. We may plan and conduct additional studies in the future, and have initiated the Phase 3 LAVENDER study of trofinetide in Rett syndrome in October 2019.

In connection with clinical trials, we face risks that:

- a product candidate may not prove to be efficacious or safe;
- patients may die or suffer other adverse effects for reasons that may or may not be related to the product candidate being tested;
- the results may not be consistent with positive results of earlier trials; and
- the results may not meet the level of statistical significance required by the FDA or other regulatory agencies.

If we do not successfully complete preclinical and clinical development, we will be unable to market and sell products derived from our product candidates and to generate product revenues. Even if we do successfully complete clinical trials, those results are not necessarily predictive of results of additional trials that may be needed before an NDA may be submitted to the FDA. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization.

***Delays, suspensions and terminations in our clinical trials could result in increased costs to us and delay our ability to generate product revenues.\****

The commencement of clinical trials can be delayed for a variety of reasons, including delays in:

- demonstrating sufficient safety and efficacy to obtain regulatory approval to commence a clinical trial;
- reaching agreement on acceptable terms with prospective contract research organizations and clinical trial sites;
- manufacturing sufficient quantities of a product candidate;
- obtaining clearance from the FDA to commence clinical trials pursuant to an Investigational New Drug application;
- obtaining institutional review board approval to conduct a clinical trial at a prospective clinical trial site; and
- patient recruitment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial.

Once a clinical trial has begun, it may be delayed, suspended or terminated due to a number of factors, including:

- competition for internal and external resources, including clinical sites and study patients, that we may choose to allocate to other programs;
- ongoing discussions with regulatory authorities regarding the scope or design of our clinical trials or requests by them for supplemental information with respect to our clinical trial results;
- imposition of clinical holds by regulatory authorities or institutional review boards;
- failure to conduct clinical trials in accordance with regulatory requirements;
- patient enrollment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial;
- lower than anticipated screening or retention rates of patients in clinical trials;

41

# Exhibit 86

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

**Or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 000-50768**

# ACADIA PHARMACEUTICALS INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **06-1376651** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| **12830 El Camino Real, Suite 400** | |
| **San Diego, California** | **92130** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**

**(858) 558-2871**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **ACAD** | **The Nasdaq Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Securities Exchange Act of 1934:

| | | |
|---|---|---|
| Large accelerated filer ☒ | | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | | Smaller reporting company ☐ |
| | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐ No ☒

As of June 30, 2020, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $4.6 billion, based on the closing price of the registrant's common stock on the Nasdaq Global Select Market on June 30, 2020 of $48.47 per share.

As of February 10, 2021, 160,047,470 shares of the registrant's common stock, $0.0001 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement to be filed with the Securities and Exchange Commission by April 30, 2021 are incorporated by reference into Part III of this report.

serious complications in this vulnerable patient population. With no approved therapies for the treatment of patients with DRP and current off-label use of atypical antipsychotics carrying significant morbidity risks including worsening in cognitive decline and other off target toxicities, we believe that DRP represents an area of high unmet need.

In September 2017, we initiated HARMONY, a Phase 3, randomized, double-blind, placebo-controlled relapse prevention study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with DRP. The objective of the study was to evaluate the ability of pimavanserin to prevent relapse of psychosis in a broad population of patients with the most common subtypes of dementia. Furthermore, in the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation to pimavanserin for the treatment of DRP.

The HARMONY study included a 12-week open-label stabilization period during which 392 patients with DRP were treated with pimavanserin 34 mg once daily. Dose reduction to 20 mg once daily was allowed based on tolerability within the first four weeks. Following the 12-week open-label period, patients who met pre-specified criteria for treatment response at both weeks 8 and weeks 12 were then randomized into the double-blind period of the study to continue their pimavanserin dose (34 mg or 20 mg per day) or switched to placebo and followed for up to 26 weeks or until a relapse of psychosis occurred. The primary endpoint in the study was time to relapse in the double-blind period as represented by the Kaplan-Meier curve and the hazard ratio.

In September 2019, we announced that our Phase 3 HARMONY relapse prevention trial evaluating pimavanserin for the treatment of DRP would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8 fold compared to placebo (HR = 0.353; one-sided p=0.0023). In addition, pimavanserin met the key secondary endpoint by significantly reducing risk of discontinuation for any reason by 2.2 fold (HR = 0.452; one-sided p=0.0024). In the 12-week open-label treatment period, 61.8% of eligible patients met pre-specified criteria for pimavanserin treatment response at both week 8 and week 12 and were subsequently randomized into the double-blind period of the study. In an exploratory analysis in the open label-phase, the mean percent reduction from baseline on the SAPS+HD was 46.9%, 63.0% and 75.2%, at Weeks 4, 8 and enriched Week 12 population, respectively.

Pimavanserin was well-tolerated over the entire nine-month study duration. Patients receiving pimavanserin treatment had no worsening in cognition, as measured by the MMSE score, from baseline and no worsening of motor symptoms, as measured by the ESRS-A, from baseline. In the double-blind period, adverse events were observed in 41.0% of patients on pimavanserin and 36.6% of patients on placebo. Discontinuations due to adverse events were 2.9% for pimavanserin and 3.6% for placebo. Serious adverse events were 4.8% in the pimavanserin group and 3.6% in the placebo group. One death was reported in the open-label period and one death was reported in the pimavanserin group during the double-blind period. Investigators determined neither death was related to the study drug. Additionally, pimavanserin did not result in clinically significant differences in vital signs, weight, or daytime sedation compared to placebo.

In July 2020 the FDA notified us of their filing of our sNDA with a PDUFA target action date of April 3, 2021. The sNDA is supported by results from the pivotal Phase 3 HARMONY study. The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with PDP. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease.

*Pimavanserin as a Treatment for the Negative Symptoms of Schizophrenia*

Schizophrenia is a severe chronic mental illness that involves disturbances in cognition, perception, emotion, and other aspects of behavior. These disturbances may include positive symptoms, such as hallucinations and delusions, and a range of negative symptoms, including loss of interest and emotional withdrawal. Schizophrenia is associated with persistent impairment of a patient's social functioning and productivity. Cognitive disturbances often prevent patients with schizophrenia from readjusting to society. As a result, patients with schizophrenia are normally required to be under medical care for their entire lives. According to the National Institute of Mental Health (NIMH), approximately 1% of the U.S. population suffers from schizophrenia.

Most patients with schizophrenia in the United States today are treated with second-generation, or atypical, antipsychotics, which induce fewer motor disturbances than typical, or first-generation, antipsychotics, but still fail to fully address some of the negative symptoms of schizophrenia for a significant portion of patients. In addition, currently prescribed

5

Ex. 86
P. 3

possible decreases or delays in initial diagnoses, and decreased access to certain market segments. Accordingly, in May 2020 we reduced the range of our revenue guidance for 2020 by approximately five percent to reflect this expectation. The ultimate effects of COVID-19, and the duration thereof, are difficult to assess or predict at this time and no assurances can be given that the pandemic will not have a significant impact on our business, results of operations, financial condition and prospects.

If the commercialization of NUPLAZID is less successful than expected or perceived as disappointing, our stock price could decline significantly and the long-term success of the product and our company could be harmed.

***If we do not obtain regulatory approval of pimavanserin for other indications in addition to treatment of PDP in the U.S., or for any indication in foreign jurisdictions, or regulatory approval of trofinetide for Rett syndrome, we will not be able to market pimavanserin for other indications in the U.S. or in other jurisdictions or market trofinetide at all, which will limit our commercial revenues.***

While pimavanserin has been approved in the U.S. by the FDA for the treatment of hallucinations and delusions associated with PDP, it has not been approved by the FDA for any other indications, and it has not been approved in any other jurisdiction for this indication or for any other indication. In order to market pimavanserin for other indications or in other jurisdictions, we must obtain regulatory approval for each of those indications and in each of the applicable jurisdictions, and we may never be able to obtain such approval. Approval of NUPLAZID by the FDA for the treatment of hallucinations and delusions associated with PDP does not ensure that foreign jurisdictions will also approve NUPLAZID for that indication, nor does it ensure that NUPLAZID will be approved by the FDA for any other indication. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of DRP, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis. In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8-fold compared to placebo (HR = 0.353; one-sided p=0.0023). We submitted an sNDA to the FDA for the treatment of DRP on June 3, 2020. In July 2020 the FDA notified us of their filing of our sNDA with a filing date of August 2, 2020 and a PDUFA target action date of April 3, 2021. As part of their filing communication, the FDA advised us that it had not identified any potential review issues at that point in their evaluation and at that time were not planning to hold an Advisory Committee meeting. We initiated a Phase 3 program for pimavanserin as an adjunctive treatment for MDD in April 2019. In July 2020, we announced that our Phase 3 CLARITY study, which combined two identical, double-blind, placebo-controlled studies, did not achieve statistical significance on the primary endpoint. As a result, at this time we do not plan on initiating any additional Phase 3 studies to evaluate pimavanserin for adjunctive use with SSRI/SNRI drugs for the treatment of MDD.

We initiated the Phase 3 LAVENDER study of trofinetide for Rett syndrome in October 2019. We initiated the Phase 3 ADVANCE-2 study of pimavanserin for the treatment of the negative symptoms of schizophrenia in August 2020. There is no guarantee that our ongoing studies will be successful, or that the FDA or any regulatory authority in foreign jurisdictions will approve pimavanserin or trofinetide for any of those indications. In particular, our sNDA for pimavanserin in DRP is subject to FDA review to determine whether the sNDA is adequate to support approval of pimavanserin for that indication. The FDA retains complete discretion in deciding whether or not to approve an sNDA and there is no guarantee that pimavanserin will be approved for the treatment of DRP.

The research, testing, manufacturing, labeling, approval, sale, import, export, marketing, and distribution of pharmaceutical product candidates are subject to extensive regulation by the FDA and other regulatory authorities in the U.S. and other countries, whose regulations differ from country to country. We will be required to comply with different regulations and policies of the jurisdictions where we seek approval for our product candidates, and we have not yet identified all of the requirements that we will need to satisfy to submit NUPLAZID for approval for other indications or in other jurisdictions or to submit trofinetide for approval for Rett syndrome. This will require additional time, expertise and expense, including the potential need to conduct additional studies or development work for other jurisdictions beyond the work that we have conducted to support our NDA submission in PDP. In addition, strategic considerations need to be taken into account when determining whether and when to submit NUPLAZID for approval in other jurisdictions. For example, in the fourth quarter of 2016, the European Medicines Agency (EMA), approved our proposed pediatric investigation plan related to our planned submission of a marketing authorization application (MAA), for NUPLAZID for the treatment of PDP in Europe. However, in light of our continuing clinical development of pimavanserin in indications other than in PDP, and the time-limited data exclusivity currently granted by the EMA that commences on first approval of a product in Europe, we deferred submission of the MAA and we do not have a revised estimate of when we will make that filing. If we do not receive marketing approval for NUPLAZID for any other indication or from any regulatory agency outside of the U.S. or any

19

**Ex. 86**
**P. 4**

Furthermore, even though NUPLAZID is approved for the treatment of hallucinations and delusions associated with PDP, a failure in a subsequent pimavanserin study for another indication, including our ongoing studies in schizophrenia and our previous studies in depression, or any additional studies that may be required in DRP, or a failure in our post-marketing studies could harm our ability to successfully market NUPLAZID for the treatment of hallucinations and delusions associated with PDP or could lead to it being withdrawn from the market. If we are unable to develop pimavanserin for other indications, we may not be able to maximize the potential of the compound and that could have a material adverse effect on our future revenues and our success as a company.

*Pimavanserin is currently in late-stage development for additional indications other than in PDP, and we have initiated Phase 3 development of trofinetide for Rett syndrome. Drug development is a long, expensive and unpredictable process with a high risk of failure.*

Preclinical testing and clinical trials are long, expensive and unpredictable processes that can be subject to delays. It may take several years to complete the preclinical testing and clinical development necessary to commercialize a drug, and delays or failure can occur at any stage. Interim results of clinical trials do not necessarily predict final results, and success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful. A number of companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in advanced clinical trials even after promising results in earlier trials.

Our drug development programs are at various stages of development and the historical rate of failures for product candidates is extremely high. In fact, we had an unsuccessful Phase 3 trial with NUPLAZID in 2009. An unfavorable outcome in any of our ongoing or future development efforts or in the post-marketing studies for NUPLAZID could be a major set-back for the program and for us, generally. In particular, an unfavorable outcome in our NUPLAZID program or in the post-marketing studies may require us to delay, devote additional substantial resources to, reduce the scope of, or eliminate this program and could have a material adverse effect on us and the value of our common stock. In the fourth quarter of 2017, we initiated a Phase 3 study of pimavanserin in patients with DRP, and in the fourth quarter of 2016 we initiated both a Phase 2 and a Phase 3 study of pimavanserin as a treatment in patients with schizophrenia.

In October 2018, we announced positive top-line results from CLARITY, a Phase 2 study evaluating pimavanserin as an adjunctive treatment for MDD and in April 2019, we initiated our Phase 3 CLARITY program, consisting of two Phase 3 studies, CLARITY-2 and CLARITY-3, evaluating pimavanserin as an adjunctive treatment with SSRI/SNRI drugs for MDD. In July 2020, we announced that our Phase 3 CLARITY study, did not achieve statistical significance on the primary endpoint. In July 2019, we announced top-line results from the Phase 3 ENHANCE study evaluating pimavanserin as a treatment in inadequate response schizophrenia. In this study pimavanserin did not achieve statistical significance on either the primary endpoint or the key secondary endpoint. In September 2019, we announced that our Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of DRP, would be stopped early for positive efficacy as it met the primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis.

In December 2019, we announced top-line results from the HARMONY study in a presentation at the 12th CTAD Meeting. Pimavanserin was well-tolerated in the study and met the primary endpoint of the study by significantly reducing the risk of relapse of psychosis by 2.8-fold compared to placebo (HR = 0.353; one-sided p=0.0023). In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA target action date of April 3, 2021. We cannot guarantee that the full results of the HARMONY study and other existing clinical data will be sufficient to support the approval of a supplemental NDA, or whether regulatory agencies will require additional clinical trials or information, which could impact the approvability or commercialization timing and prospects of pimavanserin in the DRP indication. In November 2019, we announced positive top-line results from the Phase 2 ADVANCE study evaluating pimavanserin for the negative symptoms of schizophrenia for patients whose positive symptoms were controlled on a stable background antipsychotic treatment. We may plan and conduct additional studies in the future, and have initiated the Phase 3 LAVENDER study of trofinetide in Rett syndrome in October 2019.

In connection with clinical trials, we face risks that:

- a product candidate may not prove to be efficacious or safe;

- patients may die or suffer other adverse effects for reasons that may or may not be related to the product candidate being tested;

25

- the results may not be consistent with positive results of earlier trials; and

- the results may not meet the level of statistical significance required by the FDA or other regulatory agencies.

If we do not successfully complete preclinical and clinical development, we will be unable to market and sell products derived from our product candidates and to generate product revenues. Even if we do successfully complete clinical trials, those results are not necessarily predictive of results of additional trials that may be needed before an NDA may be submitted to the FDA. Of the large number of drugs in development, only a small percentage result in the submission of an NDA to the FDA and even fewer are approved for commercialization.

*Delays, suspensions and terminations in our clinical trials could result in increased costs to us and delay our ability to generate product revenues.*

The commencement of clinical trials can be delayed for a variety of reasons, including delays in:

- demonstrating sufficient safety and efficacy to obtain regulatory approval to commence a clinical trial;

- reaching agreement on acceptable terms with prospective contract research organizations and clinical trial sites;

- manufacturing sufficient quantities of a product candidate;

- obtaining clearance from the FDA to commence clinical trials pursuant to an Investigational New Drug application;

- obtaining institutional review board approval to conduct a clinical trial at a prospective clinical trial site; and

- patient recruitment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial.

Once a clinical trial has begun, it may be delayed, suspended or terminated due to a number of factors, including:

- competition for internal and external resources, including clinical sites and study patients, that we may choose to allocate to other programs;

- ongoing discussions with regulatory authorities regarding the scope or design of our clinical trials or requests by them for supplemental information with respect to our clinical trial results;

- imposition of clinical holds by regulatory authorities or institutional review boards;

- failure to conduct clinical trials in accordance with regulatory requirements;

- patient enrollment, which is a function of many factors, including the size of the patient population, the nature of the protocol, the proximity of patients to clinical trial sites, the availability of effective treatments for the relevant disease and the eligibility criteria for the clinical trial;

- lower than anticipated screening or retention rates of patients in clinical trials;

- serious adverse events or side effects experienced by participants; and

- insufficient supply or deficient quality of product candidates or other materials necessary for the conduct of our clinical trials.

In addition, enrollment and retention of patients in clinical trials could be disrupted by man-made or natural disasters or public health emergencies. For example, as a result of the COVID-19 pandemic, we temporarily paused enrollment of new patients in our ongoing clinical trials, as well as commencement of new trials. However, we have re-initiated enrollment in clinical trials on a study-by-study and site-by-site basis. It is possible that future enrollment in these studies, or enrollment in future studies, could be impacted due to COVID-19. If patients withdraw from our trials, miss scheduled doses or follow-up visits or otherwise fail to follow trial protocols, or if our trial results are otherwise disputed due to COVID-19 or actions taken to slow its spread, the integrity of data from our trials may be compromised or not accepted by the FDA or other regulatory authorities, which would represent a significant setback for the applicable program.

Ex. 86
P. 6

# Exhibit 87

Ex. 87
P. 1



**H.C.WAINWRIGHT&CO.**

| | |
|---|---|
| **Ratings Revision** | |
| **Healthcare** | |
| **April 7, 2021** | |

## ACADIA Pharmaceuticals, Inc. (ACAD)
### Rating: Neutral

Andrew S. Fein
212-356-0546
afein@hcwresearch.com

Matthew Caufield
646-975-6964
mcaufield@hcwresearch.com

Andres Y. Maldonado, Ph.D.
212-856-5727
amaldonado@hcwresearch.com

### CRL Debacle Seemingly Pushes DRP Progression Years Into Future; PT to $18

| Stock Data | 04/06/2021 |
|---|---|
| Price | $20.64 |
| Exchange | NASDAQ |
| Price Target | $18.00 |
| 52-Week High | $58.72 |
| 52-Week Low | $20.92 |
| Enterprise Value (M) | $2,758 |
| Market Cap (M) | $3,390 |
| Public Market Float (M) | 79.7 |
| Shares Outstanding (M) | 160.0 |
| 3 Month Avg Volume | 2,073,922 |
| Short Interest (M) | 6.52 |

| Balance Sheet Metrics | |
|---|---|
| Cash (M) | $632.0 |
| Total Debt (M) | $0.0 |
| Total Cash/Share | $3.95 |

| EPS ($) Diluted | | | |
|---|---|---|---|
| Full Year - Dec | 2020A | 2021E | 2022E |
| 1Q | (0.57) | (0.52) | -- |
| 2Q | (0.27) | (0.48) | -- |
| 3Q | (0.54) | (0.45) | -- |
| 4Q | (0.42) | (0.46) | -- |
| FY | (1.79) | (1.90) | (1.18) |

| Revenue ($M) | | | |
|---|---|---|---|
| Full Year - Dec | 2020A | 2021E | 2022E |
| 1Q | 90.1 | 126.0 | -- |
| 2Q | 110.1 | 132.3 | -- |
| 3Q | 120.6 | 138.9 | -- |
| 4Q | 121.0 | 144.4 | -- |
| FY | 441.8 | 541.6 | 666.2 |



**Failure to appreciate FDA advice presents Achilles' heel for program.** Based on the CRL, we believe ACAD completely failed to appreciate the FDA's advice at the end of the Phase 2 meeting, which clearly stated that a single well-controlled study must be very persuasive, offer statistical significance with a very small probability of Type I error, and that it should be clinically meaningful. In effect, failure to fully appreciate a prospective worst-case scenario following the EOP2 meeting has resulted in just that for DRP advancement, in our view. Based on the emerging details since the last March update (our note here), we believe ACAD clearly failed in satisfying all three of these requirements. Apart from the HARMONY trial being internally inconsistent, the supportive data from the AD trial based on our analysis below was weak enough not to offer clinically meaningful data. We believe the HARMONY trial and the AD trial in retrospect were anything but persuasive. Therefore, announcement of the CRL is not that surprising despite the way the company projected it to be. From what we have learned from historic CNS trials, be it AD trials or schizophrenia trials, defining patient population and subgroups are keys to the success of the trial. In our opinion, the first blunder that ACAD made was bundling different types of psychosis under one umbrella. Additionally, despite some of the subgroups not having sufficient patient numbers to justify efficacy, ACAD maintained that HARMONY was statistically significant and a clinically meaningful study, which we find surprising given all the recent discussions in CNS trials. Therefore, we believe the only path left for ACAD is likely to run more than one trial in order to prove the efficacy of pimavanserin among different patient populations. Based on our assumption of a repeat trial to be conducted in DRP patients, we have moved estimated commercial launch out to 2024 in DRP from 2021. As discussed below, we are reducing our price target to $18 from $43, and downgrading our rating to Neutral from Buy.

**Underlying biology for different psychosis was ignored.** We note neuroscientists have historically believed that specific contents of hallucinations and delusions are preferentially associated with specific pathological diagnoses (Nassan *et al.,* Brain, 2021), specifically reflecting the anatomical and physiological differences among these conditions. For instance, patients with Lewy Body Dementia (LBD)/AD are more likely to have visual misperceptions and hallucinations than FTLD-TDP where delusions of misidentification occurred more frequently. Furthermore, patients with FTLD-TDP are more likely than those with any other pathology to report paranoid delusions, as well as delusions that were self-elevating, including grandiosity and erotomania. We highlight that not only the neurobiology of psychosis in different neurodegenerative diseases like PD, AD, and FTLD might differ, but that there is notable heterogeneity even among a single class of neurodegenerative diseases like FTLD.

For definitions and the distribution of analyst ratings, analyst certifications, and other disclosures, please refer to pages 6 - 7 of this report.

HCW0000035

**Ex. 87**
**P. 2**

**Importance of dementia subgroups.** For instance in a cohort of patients with genetic mutations known to cause FTLD, different mutations were associated with different patterns of cortical atrophy in those who displayed psychotic and other neuropsychiatric symptoms (Sellami *et al.,* J. Alzheimers Dis., 2018). We believe these results suggest heterogeneity in symptoms among different neurodegenerative diseases, and therefore the least ACAD might have incorporated in the trial design was to implement delusion subtype knowledge to differentiate patients with clinical psychosis with different origins. Therefore, we believe it is not surprising that the FDA cited a lack of statistical significance in certain subgroups of dementia (FTD and LBD, as mentioned). Therefore, we believe grouping all patients under dementia-related psychosis might be a blunder that is clearly evident, in subgroups with minimal efficacy. We believe the FDA read through redirection from the inconsistent data across different subtypes, which questions the MOA of pimavansaren for a broad DRP indication, in our view.

**Seeing what you want to see—meek data from the Phase 2 ADP trial.** As we think about the AD trial, instead of being supportive, that trial should have been the trial for introspection, in our view. The data as we had discussed in our earlier note had all the red flags for ACADIA to take a step back and re-analyze the trial design. Recall that the mean change in NPI–NH psychosis score –3.76 points [SE 0.65] for pimavanserin and –1.93 points [0.63] for placebo shows a mean difference –1.84 [95% CI –3.64 to –0.04]; p=0.045), suggesting that the effect might be small (Schneider, L., The Lancet Neurol., 2018). We also noted that there was no effect on the NPI–NH psychosis scale at any other time during the 12-week trial. The designation of a primary efficacy outcome at six weeks while continuing double-blind treatment for 12 weeks allowed assessment for a continuing effect over 12 weeks and was a unique feature of this trial, in our opinion. Therefore, the absence of an effect for pimavanserin both before and after six weeks questions the MOA of the drug for AD patients at the very least, in our view. This meant that had the primary outcome been specified for 12 weeks (which is typical of previous trials with antipsychotics), then pimavanserin might not have been considered efficacious. FDA clearly has a very similar conclusion from the AD trial data in our opinion, and hence we think it was a strategic mistake to include the AD data in support of the HARMONY trial. The point that ACAD used weak data as a supportive dataset shows that they were not confident in the HARMONY trial data based on its own strengths, in our assessment.

**Tell-tale signs from the AD trials were overlooked.** Let's revisit the AD trial design to further understand the issue of patient stratification within the design. We had reasoned that the primary outcome's significance might be the result of worsening of the placebo-treated group at six weeks that was not observed at four weeks of treatment or 9 and 12 weeks of treatment. However, within the subgroup with more severe symptoms (NPI–NH psychosis scores of ≥12, that made up only a third of the study sample), there was a significant effect that favored pimavanserin (mean difference –4.43 [95% CI –7.81 to –1.04]; p=0.011). We believe that might be due to the placebo group's unusual worsening at six weeks and not seen before or after six weeks (Schneider, L., The Lancet Neurol., 2018). Additionally, with this subgroup showing considerable improvement in both the placebo and pimavanserin-treated groups, we believe the data showed that the patients were still very symptomatic, and scores at 12 weeks remained above the eligibility threshold for study entry. Of note, virtually all patients in this more severe subgroup had hallucinations along with delusions. By comparison, the larger, less symptomatic subgroup with NPI–NH psychosis scores less than 12 had delusions, but more than 75% had no hallucinations, and the rest had very mild hallucinations occurring infrequently and causing little or no distress. We believe this essentially means that the trial was not only potentially poorly designed but the results were poorly analyzed and cherry-picked to highlight efficacy, in our opinion.

**Valuation and risks.** Based on our assumption of a repeat trial to be conducted in DRP patients, we have moved estimated commercial launch out to 2024 in DRP, from 2021. We adjusted our POS to 20%, down from 40% for the DRP indication. We are downgrading our Buy rating to Neutral, and are reducing our price target to $18 From $43. Our $18 price target is based on an equally weighted composite of: (a) $18.57/share, as a 30x multiple of taxed and diluted FY30 GAAP EPS of $2.41 discounted back to FY21 at 16%; and (b) an NPV of $18.27/share (discount rate 10%, growth rate 2%). Risks to our investment thesis and target price include: (1) failure of Nuplazid (the brand name for pimavanserin) in further clinical studies; (2) failure of Nuplazid to secure regulatory approval in further indications; and (3) failure of Nuplazid to achieve peak commercial revenue estimates in our model, due to market size, penetration rates, and pricing.

HCW0000036

**Ex. 87
P. 3**

ACADIA Pharmaceuticals, Inc.                                                                                                April 7, 2021

**ACADIA Pharmaceuticals Inc.**
**Income Statement**
*(in $ MM except per share values)*

Andrew Fein
H.C. Wainwright & Company
(212) 356-0546, afein@hcwco.com

| | 2018 | 2019 | Mar Q1:20 | Jun Q2:20 | Sep Q3:20 | Dec Q4:20 | 2020 | Mar Q1:21E | Jun Q2:21E | Sep Q3:21E | Dec Q4:21E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PD Nuplazid Revenue (prob. adj) | 223.80 | 339.08 | 90.07 | 110.10 | 120.58 | 121.01 | 441.76 | 126.00 | 132.30 | 138.92 | 144.40 | 541.61 | 666.20 | 751.39 | 907.23 | 1,145.93 | 1,199.20 | 1,233.73 | 1,269.35 | 1,415.40 | 1,456.84 |
| *QoQ growth* | *79%* | *52%* | | | | | *30%* | | | | | *23%* | *23%* | *13%* | *21%* | *26%* | *5%* | *3%* | *3%* | *12%* | *3%* |
| AD Nuplazid Revenue (prob. adj) | - | - | | | | | - | - | - | - | - | - | - | - | 21.32 | 65.87 | 134.70 | 190.52 | 231.27 | 235.50 | 239.85 |
| Other Revenue | | | | | | | | | | | | | | | | | | | | | |
| **Total Revenue** | **223.80** | **339.08** | **90.07** | **110.10** | **120.58** | **121.01** | **441.76** | **126.00** | **132.30** | **138.92** | **144.40** | **541.61** | **666.20** | **751.39** | **928.55** | **1,211.80** | **1,333.91** | **1,424.25** | **1,500.62** | **1,650.89** | **1,696.69** |
| *% change YoY* | *79%* | *52%* | | | | | *30%* | | | | | *23%* | *23%* | *13%* | *24%* | *31%* | *10%* | *7%* | *5%* | *10%* | *3%* |
| | | | | | | | | | | | | | | | | | | | | | |
| COGS, license fees and royalites | (16.94) | (19.60) | (4.97) | (5.47) | (4.80) | (5.30) | (20.55) | (9.00) | (9.09) | (9.18) | (10.73) | (38.00) | (46.70) | (53.02) | (56.59) | (71.89) | (74.20) | (65.65) | (67.76) | (76.50) | (78.96) |
| *% of revenue* | *8%* | *8%* | *8%* | *8%* | *8%* | *8%* | *8%* | | | | | *8%* | *8%* | *8%* | *7%* | *7%* | *7%* | *6%* | *6%* | *6%* | *6%* |
| Gross profit | 206.86 | 319.48 | 85.09 | 104.63 | 115.78 | 115.71 | 421.21 | 117.00 | 123.21 | 129.73 | 133.66 | 503.61 | 619.50 | 698.37 | 871.96 | 1,139.90 | 1,259.70 | 1,358.60 | 1,432.86 | 1,574.39 | 1,617.73 |
| *Gross margin* | *92%* | *94%* | | | | | *95%* | | | | | *93%* | *93%* | *93%* | *94%* | *94%* | *94%* | *95%* | *95%* | *95%* | *95%* |
| | | | | | | | | | | | | | | | | | | | | | |
| License fees and royalties | (1.33) | | | | | | 0.00 | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| R&D | (187.16) | (240.39) | (72.64) | (64.30) | (120.08) | (62.12) | (319.13) | (76.00) | (76.76) | (77.53) | (80.86) | (311.15) | (314.26) | (317.41) | (320.58) | (323.79) | (327.02) | (330.29) | (333.60) | (336.93) | (340.30) |
| *% of revenue* | *84%* | *71%* | | | | | *72%* | | | | | *57%* | *47%* | *42%* | *35%* | *27%* | *25%* | *23%* | *22%* | *20%* | *20%* |
| SG&A | (265.76) | (325.64) | (101.97) | (84.34) | (81.59) | (120.75) | (388.66) | (126.00) | (127.26) | (128.53) | (133.18) | (514.98) | (566.47) | (623.12) | (654.28) | (686.99) | (687.68) | (688.37) | (689.05) | (689.74) | (690.43) |
| *% of revenue* | *119%* | *96%* | | | | | *88%* | | | | | *95%* | *85%* | *83%* | *70%* | *57%* | *52%* | *48%* | *46%* | *42%* | *41%* |
| | | | | | | | | | | | | | | | | | | | | | |
| Total Operating Expense | (471.26) | (585.62) | (179.58) | (154.11) | (206.48) | (188.17) | (728.34) | (211.00) | (213.11) | (215.24) | (224.78) | (864.13) | (927.43) | (993.55) | (1,031.45) | (1,082.67) | (1,088.91) | (1,084.31) | (1,090.41) | (1,103.18) | (1,109.70) |
| **Operating Income (EBIT)** | **(247.46)** | **(246.55)** | **(89.52)** | **(44.01)** | **(85.90)** | **(67.16)** | **(286.59)** | **(85.00)** | **(80.81)** | **(76.33)** | **(80.38)** | **(322.52)** | **(261.23)** | **(242.16)** | **(102.89)** | **129.13** | **245.00** | **339.94** | **410.21** | **547.72** | **586.99** |
| | | | | | | | | | | | | | | | | | | | | | |
| Interest Income | 3.51 | 11.17 | 2.99 | 1.83 | 1.24 | 0.55 | 6.61 | 1.75 | 1.77 | 1.79 | 1.97 | 7.27 | 8.00 | 8.80 | 9.68 | 10.65 | 11.71 | 12.88 | 14.17 | 15.59 | 17.14 |
| Other expense | | 1.00 | (1.50) | 0.44 | (0.20) | 0.27 | (1.00) | | | | | | | | | | | | | | |
| Pretax Income | (243.94) | (234.38) | (88.02) | (41.75) | (84.86) | (66.34) | (280.97) | (83.25) | (79.04) | (74.54) | (78.41) | (315.25) | (253.23) | (233.36) | (93.22) | 139.77 | 256.71 | 352.82 | 424.38 | 563.30 | 604.14 |
| Income Taxes | (1.26) | (0.88) | 0.00 | (0.39) | (0.20) | (0.42) | (1.01) | | | | | 0.00 | 53.18 | 49.01 | 19.58 | (29.35) | (53.91) | (74.09) | (89.12) | (118.29) | (126.87) |
| *Tax rate* | *0%* | | | | | | | | | | | *21%* | *21%* | *21%* | *21%* | *21%* | *21%* | *21%* | *21%* | *21%* | *21%* |
| **Net Income** | **(245.19)** | **(235.26)** | **(88.02)** | **(42.14)** | **(84.66)** | **(66.76)** | **(281.58)** | **(83.25)** | **(79.04)** | **(74.54)** | **(78.41)** | **(315.25)** | **(200.05)** | **(184.35)** | **(73.64)** | **110.42** | **202.80** | **278.73** | **335.26** | **445.01** | **477.27** |
| | | | | | | | | | | | | | | | | | | | | | |
| EPS (basic) | (1.94) | (1.60) | (0.57) | (0.27) | (0.54) | (0.42) | (1.79) | (0.52) | (0.48) | (0.45) | (0.46) | (1.90) | (1.18) | (1.07) | (0.42) | 0.62 | 1.11 | 1.49 | 1.76 | 2.29 | 2.41 |
| **EPS (diluted)** | **(1.94)** | **(1.60)** | **(0.57)** | **(0.27)** | **(0.54)** | **(0.42)** | **(1.79)** | **(0.52)** | **(0.48)** | **(0.45)** | **(0.46)** | **(1.90)** | **(1.18)** | **(1.07)** | **(0.42)** | **0.62** | **1.11** | **1.49** | **1.76** | **2.29** | **2.41** |
| | | | | | | | | | | | | | | | | | | | | | |
| Basic Shares Outstanding | 126.58 | 147.20 | 155.37 | 156.54 | 158.13 | 159.26 | 157.33 | 160.86 | 164.07 | 167.35 | 170.70 | 165.75 | 169.06 | 172.44 | 175.89 | 179.41 | 183.00 | 186.66 | 190.39 | 194.20 | 198.08 |
| **Diluted Shares Outstanding** | **126.58** | **147.20** | **155.37** | **156.54** | **158.13** | **159.26** | **157.33** | **160.86** | **164.07** | **167.35** | **170.70** | **165.75** | **169.06** | **172.44** | **175.89** | **179.41** | **183.00** | **186.66** | **190.39** | **194.20** | **198.08** |

*Source: Company reports, HC Wainwright estimates.*

HCW0000037

Ex. 87
P. 4

ACADIA Pharmaceuticals, Inc.                                                                                                April 7, 2021

**ACADIA Pharmaceuticals Inc.**                                                                          Andrew Fein
**P/E Multiple Valuation**                                                                    H.C. Wainwright & Company
                                                                                      *(212) 356-0546, afein@hcwco.com*

**ACAD EPS**

| | 12/31/2030 | Discount Rate | Discount to | Discounted EPS | P/E Multiple | PE Multiple Step | Discount Step | Variance Step |
|---|---|---|---|---|---|---|---|---|
| $ | 2.41 | 16% | 12/31/2021 | $ 0.62 | 30x | 2.0 | 2.0% | 3.0% |

**Implied Share Price**

| Discount Rate | | 24.0x | 26.0x | 28.0x | P/E Multiples 30.0x | 32.0x | 34.0x | 36.0x |
|---|---|---|---|---|---|---|---|---|
| 10.3% | $ | 23.93 | $ 25.92 | $ 27.92 | $ 29.91 | $ 31.91 | $ 33.90 | $ 35.90 |
| 12.3% | | 20.36 | 22.05 | 23.75 | 25.45 | 27.14 | 28.84 | 30.54 |
| 14.3% | | 17.37 | 18.81 | 20.26 | 21.71 | 23.16 | 24.60 | 26.05 |
| 16.3% | | 14.86 | 16.09 | 17.33 | $ 18.57 | 19.81 | 21.05 | 22.28 |
| 18.3% | | 12.74 | 13.80 | 14.87 | 15.93 | 16.99 | 18.05 | 19.11 |
| 20.3% | | 10.96 | 11.87 | 12.78 | 13.70 | 14.61 | 15.52 | 16.44 |
| 22.3% | | 9.45 | 10.23 | 11.02 | 11.81 | 12.60 | 13.38 | 14.17 |

**Sensitivity to EPS Estimate**

| EPS Sensitivity | Implied EPS | 24.0x | 26.0x | 28.0x | P/E Multiples 30.0x | 32.0x | 34.0x | 36.0x |
|---|---|---|---|---|---|---|---|---|
| -9.0% | $ 2.19 | $ 13.52 | $ 14.65 | $ 15.77 | $ 16.90 | $ 18.03 | $ 19.15 | $ 20.28 |
| -6.0% | 2.26 | 13.96 | 15.13 | 16.29 | 17.46 | 18.62 | 19.78 | 20.95 |
| -3.0% | 2.34 | 14.41 | 15.61 | 16.81 | 18.01 | 19.21 | 20.42 | 21.62 |
| **0.0%** | **2.41** | 14.86 | 16.09 | 17.33 | $ **18.57** | 19.81 | 21.05 | 22.28 |
| 3.0% | 2.48 | 15.30 | 16.58 | 17.85 | 19.13 | 20.40 | 21.68 | 22.95 |
| 6.0% | 2.55 | 15.75 | 17.06 | 18.37 | 19.68 | 21.00 | 22.31 | 23.62 |
| 9.0% | 2.63 | 16.19 | 17.54 | 18.89 | 20.24 | 21.59 | 22.94 | 24.29 |

*Source: Company reports, HC Wainwright estimates.*

HCW0000038

**Ex. 87**
**P. 5**

ACADIA Pharmaceuticals, Inc.                                                                                                                                       April 7, 2021

**ACADIA Pharmaceuticals Inc.**                                                                                                                          Andrew Fein
**DCF Analysis**                                                                                                                                    H.C. Wainwright & Company
*(in $MM except per share values)*                                                                                                             *(212) 356-0546, afein@hcwco.com*

| Period Ending | | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unlevered FCF** | | | | | | | | | | | |
| Operating Income | | (322.52) | (261.23) | (242.16) | (102.89) | 129.13 | 245.00 | 339.94 | 410.21 | 547.72 | 586.99 |
| Depreciation & Amortization | | 0.23 | 0.24 | 0.26 | 0.27 | 0.28 | 0.30 | 0.31 | 0.33 | 0.34 | 0.36 |
| Changes in Working Capital | | (1.02) | (1.08) | (1.15) | (1.23) | (1.32) | (1.41) | (1.52) | (1.63) | (1.75) | (1.89) |
| Capital Expenditures | | (0.34) | (0.21) | (0.12) | (0.07) | (0.04) | (0.03) | (0.02) | (0.01) | (0.01) | (0.00) |
| Taxes | | - | - | - | - | (27) | (51) | (71) | (86) | (115) | (123) |
| **Total Unlevered Free Cash Flow** | | **(324)** | **(262)** | **(243)** | **(104)** | **101** | **192** | **267** | **323** | **431** | **462** |
| **Present Value (PV) Calculation:** | | | | | | | | | | | |
| Period (Year) | | - | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 |
| Discounted Cash Flow | | (324) | (238) | (200) | (77) | 68 | 118 | 148 | 162 | 197 | 191 |
| **Total Present Value** | 46 | | | | | | | | | | |

**Terminal Value**

| **Perpetuity Method:** | | | **DCF Total Valuation** | | | **Price Target** | | |
|---|---|---|---|---|---|---|---|---|
| Unlevered FCF | 462 | | Total Enterprise Value | 2,397 | | | Weight | PT |
| | | | Net Cash | 632 | | DCF | 50% | $18.27 |
| **Discount Rate** | 10% | | | | | P/E Multiple | 50% | $18.57 |
| **Growth Rate** | 2% | | Total Equity Value | 3,029 | | | | |
| | | | Diluted Share Count | 166 | | **Weighted Price Target** | | $18 |
| Terminal Value | 5,680 | | | | | Current stock price | | $21 |
| Present Value | 2,351 | | **Equity Value Per Share** | **18.27** | | Upside/Downside | | -10.74% |

*Source: H.C. Wainwright & Co.*

HCW0000039

**Ex. 87**
**P. 6**

ACADIA Pharmaceuticals, Inc.                                                                April 7, 2021

**Important Disclaimers**

This material is confidential and intended for use by Institutional Accounts as defined in FINRA Rule 4512(c). It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply to unsubscribe@hcwresearch.com and delete it from your system; you may not copy this message or disclose its contents to anyone. The integrity and security of this message cannot be guaranteed on the Internet.

**H.C. WAINWRIGHT & CO, LLC RATING SYSTEM:** H.C. Wainwright employs a three tier rating system for evaluating both the potential return and risk associated with owning common equity shares of rated firms. The expected return of any given equity is measured on a RELATIVE basis of other companies in the same sector. The price objective is calculated to estimate the potential movements in price that a given equity could reach provided certain targets are met over a defined time horizon. Price objectives are subject to external factors including industry events and market volatility.

**RETURN ASSESSMENT**

**Market Outperform (Buy):** The common stock of the company is expected to outperform a passive index comprised of all the common stock of companies within the same sector.

**Market Perform (Neutral):** The common stock of the company is expected to mimic the performance of a passive index comprised of all the common stock of companies within the same sector.

**Market Underperform (Sell):** The common stock of the company is expected to underperform a passive index comprised of all the common stock of companies within the same sector.



Investment Banking Services include, but are not limited to, acting as a manager/co-manager in the underwriting or placement of securities, acting as financial advisor, and/or providing corporate finance or capital markets-related services to a company or one of its affiliates or subsidiaries within the past 12 months.

| Distribution of Ratings Table as of April 6, 2021 | | | | |
|---|---|---|---|---|
| | | | IB Service/Past 12 Months | |
| Ratings | Count | Percent | Count | Percent |
| Buy | 455 | 89.39% | 189 | 41.54% |
| Neutral | 52 | 10.22% | 13 | 25.00% |
| Sell | 0 | 0.00% | 0 | 0.00% |
| Under Review | 2 | 0.39% | 1 | 50.00% |

H.C. Wainwright & Co, LLC (the "Firm") is a member of FINRA and SIPC and a registered U.S. Broker-Dealer.

I, Andrew S. Fein, Matthew Caufield and Andres Y. Maldonado, Ph.D. , certify that 1) all of the views expressed in this report accurately reflect my personal views about any and all subject securities or issuers discussed; and 2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation or views expressed in this research report; and 3) neither myself nor any members of my household is an officer, director or advisory board member of these companies.

None of the research analysts or the research analyst's household has a financial interest in the securities of ACADIA Pharmaceuticals, Inc. (including, without limitation, any option, right, warrant, future, long or short position).

As of March 31, 2021 neither the Firm nor its affiliates beneficially own 1% or more of any class of common equity securities of ACADIA Pharmaceuticals, Inc..

Neither the research analyst nor the Firm knows or has reason to know of any other material conflict of interest at the time of publication of this research report.

HCW0000040

**Ex. 87**
**P. 7**

ACADIA Pharmaceuticals, Inc.                                                                                              April 7, 2021

The research analyst principally responsible for preparation of the report does not receive compensation that is based upon any specific investment banking services or transaction but is compensated based on factors including total revenue and profitability of the Firm, a substantial portion of which is derived from investment banking services.

The Firm or its affiliates did not receive compensation from ACADIA Pharmaceuticals, Inc. for investment banking services within twelve months before, but will seek compensation from the companies mentioned in this report for investment banking services within three months following publication of the research report.

The Firm does not make a market in ACADIA Pharmaceuticals, Inc. as of the date of this research report.

The securities of the company discussed in this report may be unsuitable for investors depending on their specific investment objectives and financial position. Past performance is no guarantee of future results. This report is offered for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. This research report is not intended to provide tax advice or to be used to provide tax advice to any person. Electronic versions of H.C. Wainwright & Co., LLC research reports are made available to all clients simultaneously. No part of this report may be reproduced in any form without the expressed permission of H.C. Wainwright & Co., LLC. Additional information available upon request.

H.C. Wainwright & Co., LLC does not provide individually tailored investment advice in research reports. This research report is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of any specific person. Investors should seek financial advice regarding the appropriateness of investing in financial instruments and implementing investment strategies discussed or recommended in this research report.

H.C. Wainwright & Co., LLC's and its affiliates' salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies that reflect opinions that are contrary to the opinions expressed in this research report.

H.C. Wainwright & Co., LLC and its affiliates, officers, directors, and employees, excluding its analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives (including options and warrants) thereof of covered companies referred to in this research report.

The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data on the company, industry or security discussed in the report. All opinions and estimates included in this report constitute the analyst's judgment as of the date of this report and are subject to change without notice.

Securities and other financial instruments discussed in this research report: may lose value; are not insured by the Federal Deposit Insurance Corporation; and are subject to investment risks, including possible loss of the principal amount invested.

HCW0000041

**Ex. 87**
**P. 8**

# Exhibit 88

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CITY OF BIRMINGHAM RELIEF and      )
RETIREMENT SYSTEM, et al,          )
                                   ) No. 21-CV-0762-WQH
      Plaintiffs,                  )
                                   ) September 9, 2022
         v.                        )
                                   ) 9:00 a.m.
ACADIA PHARMACEUTICALS INC., et    )
al,                                ) San Diego, California
                                   )
      Defendants.                  )
_____   )


                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE WILLIAM Q. HAYES
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      Scott & Scott, Attorneys at Law, LLP
                        By:  WILLIAM C. FREDERICKS, ESQ.
                             JACOB B. LIEBERMAN, ESQ.
                        230 Park Avenue, 17th floor
                        New York, New York 10169

                        Levi & Korsinsky, LLP
                        By:  SHANNON HOPKINS, ESQ.
                        1111 Summer Street, Suite 403
                        Stamford, Connecticut 06905

For the Defendant:      Cooley, LLP
                        By:  PETER M. ADAMS, ESQ.
                             MATTHEW D. MARTINEZ, ESQ.
                        4401 Eastgate Mall
                        San Diego, California 92121

Court Reporter:         Melinda S. Setterman, RPR, CRR
                        District Court Clerk's Office
                        333 West Broadway, Suite 420
                        San Diego, California 92101

Reported by Stenotype, Transcribed by Computer

that problem and can hear me okay.  If you have any problems please, please let me know.

THE COURT:  Okay.  I can hear you well.  I can hear you.

MR. FREDERICKS:  Great.  And I want to start by thanking the Court for allowing us to appear telephonically. It was much appreciated.

Let me start by saying that I think Your Honor's comments at the beginning of defense counsel's argument show that the Court has a pretty good understanding of what the gravamen of plaintiff's case is, and I think that there is a lot of bluster in defendant's argument, whether it is misunderstanding or misconstruing.

But I think that from our perspective, based fundamentally misconstrue the relevant facts, misstate the relevant allegations, and in many places simply ignore and mistake the relevant law.

Let me try to go through the case much in the same order that defense counsel did and try to respond to points as they were made by defense counsel, but let me begin first by giving the Court some additional relevant background here that defendants found that strategic way opportune not to mention in their discussions of the background of the case.

First, in this instance Acadia had already obtained FDA approval to use pimavanserin as a treatment for Parkinson's

related dimension.  That is undisputed.  We don't dispute it. Defendants, of course, don't dispute it.

The question was given that there was enormous opportunity for defendants if they could expand the acceptable FDA approved indications and labeling for pimavanserin to include other types of dementia-related delusions or psychoses. That represented enormous value to the company and, of course, to investors.

So the question then was what the strategy to be adapted in order to get FDA approval for broadened indications, broadened usage?  And the company has always taken the position that, well, all these other dementia indications are essentially the same, so if it works in Alzheimer's, it will work in Parkinson's, it will work in frontotemporal dementia, it will work in Lewy body dementia, et cetera.

And what they did was they said to the FDA, let us do a study which looks simply at a mixed package of dementia patients with all sorts of different indications, Parkinson's, Alzheimer's, the frontotemporal, et cetera, and let's just look at whether the aggregate data for that is statistically significant and just approve the treatment of the symptom rather than a treatment of a symptom associated with a specific underlying disease.

And what defendants did throughout the class period, and I think the Court understands this, is they went out of

their way to tell everyone, we have an agreement with the FDA that says if we meet this end point for this study that looks at this pool of dementia sufferers, that is an okay way to do it, and the FDA is plodding to our way of looking at it; don't look at it by specific diseases; just lump them altogether and that is fine; get statistically significant results, that's fine.

Now, this is where the agreement, which Your Honor focused in on quite a bit on at the beginning comes into play, plaintiffs don't necessarily believe that there was no agreement whatsoever, but to the extent there was an agreement, defendant's repeated efforts through affirmative misstatements and omissions of trying to tell the market, oh, it is okay; we don't have to worry about subtype analysis; the FDA doesn't care.  That was false.  That was misleading, and it was highly material.

Because if that you adapted the FDA's later approach which was -- all right.  Sorry -- because if you look at things in a subtype basis that made getting approval a lot harder, and this is exactly how this panned out.

If you look at, I believe -- let me give you a cite in the complaint, paragraph 82 of the complaint, what they did was they put together in accordance with Harmony a mixed bag of patients.  Mixed bag is probably the wrong phraseology, a mixed group of patients.  15 percent were Parkinson's sufferers,

66 percent were Alzheimer's sufferers, 7 percent Lewy body, 10 percent vascular dementia, like two percent frontotemporal dementia.

Lo and behold, when the Harmony results came in, it was a statistically significant 15.7 longer period which patients did not experience a relapse, and that was statistically significant compared to a placebo.

But if you backed out the Parkinson's patients, for whom the drug had already been approved and demonstrated effective to the satisfaction of the FDA, the drug was so effective in the sample group of Parkinson's, it was -- it was stunning.  It was an astronomical 43.3 percent improvement in the Parkinson's patients.  Even though they constituted only 15 percent of the sample, it was enough to drive the overall group up to 15.7 percent, but none of the other subtypes came close to statistical significance in combination or individually.

So what you had was a situation where the only reason -- the only reason that the Harmony study met its primary end point was because it coasted on the strength of the response in Parkinson's patients for which the drug had already been approved, and that had the effect of pulling up the entire pool.

Now, was that information concealed?  I think we need to be very careful about what we're talking about when we talk

about what was concealed.  The underlying data including subtype performance data was made available.  And we candidly pled that in the complaint.  Defendants say, look, we even pled it in the complaint.  We pled it in the complaint because it is -- you know, we try to be candid with the Court.

But the significance of the subgroup's data was clearly the subject of defendant's protracted, repeated statements, misstatements to the market saying, we have an agreement with the FDA that we're going to do just this group study; subtype analysis is not going to be important to the FDA, and so who really cares about what the subtype data is. It is interest, perhaps, for future medical researchers, science at large, but it is not going to be an interest to the FDA.

And if I am an investor what I care about -- this is an investor case.  If I am an investor what I care about is the FDA going to approve this drug based on this data, this submission?  Whether I personally think the FDA's decisions are right or wrong, as an investor it is really immaterial, because I don't care what the FDA thinks.  I don't care what a man on the street thinks, what you think, what defense counsel thinks. I want to know what the FDA thinks.  That is what is material.

As everyone on this agreement agrees, it is the FDA that makes the call, so the FDA is the decisionmaker.  And so what you have here is a classic situation of -- this is a tough

set of that broader category of cases.  We cite in our brief: Was the marketplace misled as to the risks associated with FDA approval?

And as Your Honor understands, as noticed, of course, everyone understands that the FDA at the end of the day has full discretion to do what it deems most appropriate.  And so, you know, they had that boilerplate disclosure in their 10K. Everyone understands that.  Investors understands that. Everyone understands there is some risk.

But what is important to investors as security case law makes clear in a variety of contexts, lists of investing are ubiquitous.  What the investors care about are the magnitude of the risk.  And here investors were lead to believe, hey, we have the Harmony results; they are in the bag; they met the primary end point.  We're not challenging that they met their primary end point.  Plaintiffs are not challenging that.

But what defendants also said is -- effectively said all that any reasonable investor for the company should have expected the FDA to care about, so therefore, we're on a glide path to approval.  I mean, things can always happen, but the odds are really, really good because the FDA has bought into things from the outside; we have been in lockstep with the FDC -- with the FDA, to use a term from one of the defendants statements.

Ex. 88
P. 8

the defendant's allegations of irrationally are really a strawman.

Because here the allegation is not that the defendants were convinced that the FDA would deny approval, it is that they withheld important warnings from it, ie, they misrepresented the magnitude of the risks.

Now, maybe you and I think that a more prudent course would have been to try to adopt a more -- you know, a different trial strategy and not one which was subject to this risk that materialized that they met their end point solely because the Parkinson's patients performances was so strong.

But that doesn't mean that it would be irrational for them to say, well, let's take a chance; let's do this broad pollywog study with people from all different dementia types, and maybe the data will come out strong enough that there won't be a problem, and, you know, we're willing to take that gamble.

And there is -- let me be clear, Your Honor, there is absolutely nothing wrong under the securities laws with corporate executives, pharmaceutical companies, taking risks, taking gambles.  It happens all the time in every business.

But what is a violation of the securities laws, you can't go around telling people, oh, the FDA has bought into my highly risky strategy and has assured me that subtype analysis is going to be irrelevant when in fact they had gotten zero such assurance from the FDA.

have turned a blind eye to the subtype analysis, but they certainly didn't, and they misrepresented the magnitude, the risk of FDA rejection.

They say again, oh, all the data was made transparent. That should count towards defendant's mitigation of scienter because if you were a Ph.D statistician, you could have gotten copies of the studies' results from that medical conference and figured out all these things yourself.

Again, this is a case where it is not that they misrepresented what the results were of the data. It is that they misrepresented what the FDA's position was on subtype data so that why would anyone have -- even Bill Fredericks as an investor without a degree into biophysics, why would I go digging into that subtype data when I was told it is not important to the FDA?

And as we argued in our brief, they would still have to show that the fraud -- or the corrective disclosure information was broadcast to the market with the same degree of intensity as their misrepresentations. Here defendants every quarter on the quarterly call, the press releases were telling investors, don't worry about the subtype data.

The fact that someone might have put it together and it is buried in some medical conference article is not the same as -- remotely the same impact as when the CEO of the company is talking to analysts every quarter.

Ex. 88
P. 10

in their brief -- the reply brief and in oral argument -- saying that there has to be some disclosure of fraud.

As we made clear in our brief, loss causation is typically pled on a materialization of the risk basis. And here the risk was that investors had been mislead as to the likelihood of FDA approval. That risk materialized first in March when they the FDA announced that they couldn't even discuss labeling or marketing issues at that stage, and then it was finally fully revealed when they rejected the application as a whole.

The notion that you need to have some revelation of fraud is universally rejected by the courts, and I would like to give you an example of accounting fraud cases, you know, the double counting fraud case. We saw a lot of these as earlier in the year. The company was cooking the books for a year, and then finally the music stops and they had to report a really bad quarter because all their prior quarters had been inflated.

The market reacts immediately to the news that the quarter is bad. The sales have suddenly dropped to nothing, for example, or dropped 50 percent because they were falsely inflating all the sales in the past and now the company has to come clean and basically say, well, you know, we don't have any sales.

But the market can react to the news of the undisclosed -- previously undisclosed risk that materialized

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:  September 19, 2022, at San Diego, California.

/s/ Melinda S. Setterman
_____
Melinda S. Setterman,
Registered Professional Reporter
Certified Realtime Reporter

**Ex. 88**
**P. 12**