# EXHIBIT 1

Case 3:21-cv-00762-WQH-MSB    Document 122-4    Filed 12/12/23    PageID.3110    Page 1 of 66

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>   Defendants. | No. 3:21-cv-00762-WQH-MSB<br><br>Judge: Hon. William Q. Hayes |

## REBUTTAL REPORT OF

## PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

## DECEMBER 12, 2023

No. 3:21-cv-00762-WQH-MSB

# TABLE OF CONTENTS

I.    SCOPE OF PROJECT AND REPORT ............................................................. 1

II.   SUMMARY OF CONCLUSIONS AND OPINIONS ................................... 3

III.  DEFINING AND ASSESSING PRICE IMPACT ........................................ 7

IV.   CRITIQUE OF DR. STULZ'S PRICE IMPACT ANALYSIS AND OPINION.......................................................................................................... 10

    A.    The Undisputed Facts Prove Price Impact................................. 10

        1.    9 September 2019: The Company Announces Positive Top-Line Results from the Harmony Study ............................ 10

        2.    9 March 2021: The Company Announces Receipt of the Deficiency Letter from the FDA ............................................... 13

        3.    5 April 2021: The Company Announces Receipt of a CRL from the FDA.................................................................... 15

        4.    The Acadia Stock Chart is Strong Evidence Supporting Price Impact ...................................................................... 18

    B.    Dr. Stulz's Price Impact Analysis Rests on a Rejection of Plaintiffs' Allegations and a Contortion of Economic Reality.......................... 19

V.    Dr. Stulz Improperly Analyzes the Alleged Misstatements in Isolation ...... 24

VI.   Dr. Stulz Incorrectly Assumes that the Full Truth about the FDA Agreement, the Harmony Study, and the 019 Study Was Previously Disclosed ............. 31

VII.  CRITIQUE OF DR. STULZ'S DAMAGES METHODOLOGY OPINION ....................................................................................................... 34

    A.    The Out-of-Pocket Damages Methodology Can Be Applied Commonly to Measure Damages for All Class Members ................. 36

    B.    The Out-of-Pocket Damages Methodology Is Consistent with Plaintiffs' Theory of Liability................................................... 39

    C.    The Opening Feinstein Report Also Explained that Valuation Tools Can be Applied on a Classwide Basis to Handle Potential Complexities Encountered In Implementing the Out-of-Pocket Damages Methodology ................................................................ 40

1.    Analysts Used the Standard Valuation Tools Referenced in the Opening Feinstein Report to Value Acadia Common Stock and Other Securities Routinely.......................40

2.    The Out-of-Pocket Damages Methodology Appropriately Accommodates Materialization of Known Risks and Unknown Risks, As Well As Any Potential "Confounding Information" ......................................................44

3.    Dr. Stulz's Erroneous Argument About a Missing Key Piece of Information .................................................................51

4.    Time-Varying Inflation.............................................................52

VIII.    LIMITING FACTORS AND OTHER ASSUMPTIONS............................58

# I.    SCOPE OF PROJECT AND REPORT

1.    On 21 August 2023, I submitted a report addressing market efficiency and the methodology for computing damages in this matter (the "Opening Feinstein Report"). Based on the analyses presented in the Opening Feinstein Report, I concluded that the common stock of Acadia Pharmaceuticals Inc. ("Acadia" or the "Company")[1] traded in an efficient market over the Class Period, 9 September 2019 through 4 April 2021, inclusive.[2]

2.    In the Opening Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that Acadia stock traded in an efficient market.[3] The analyses included an event study and statistical tests that compared the price behavior of Acadia stock on two sets of high information flow dates with the stock price movements on ordinary non- or lesser-news dates. These tests proved that Acadia responded to new Company-specific information and thereby demonstrated market efficiency during the Class Period.[4]

3.    In the Opening Feinstein Report, I further concluded that Section 10(b) damages consistent with the Plaintiffs' theory of liability can be computed in this matter using a methodology that is common for all Class members.[5] In the Opening Feinstein Report, I described that methodology – the out-of-pocket damages methodology – which is commonly applied in virtually all class action securities cases.[6] I explained how available valuation tools routinely address the various

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Opening Feinstein Report.

[2] Opening Feinstein Report, ¶17.

[3] Opening Feinstein Report, ¶20.

[4] Opening Feinstein Report, ¶19.

[5] Opening Feinstein Report, ¶21.

[6] Opening Feinstein Report, ¶¶160-171.

case-specific complexities that arise in the application of the out-of-pocket damages methodology.[7]

4. I am now asked by Scott + Scott Attorneys at Law LLP ("Plaintiffs' Counsel"), Counsel for the Lead Plaintiff City of Birmingham Relief and Retirement System, to consider, evaluate, and respond to the arguments and conclusions in the Expert Report of René Stulz, Ph.D., dated 20 October 2023 (the "Stulz Report"), which was submitted by Defendants in this matter. To that end, I analyzed the Stulz Report. I also reviewed the transcript of Dr. Stulz's deposition, dated 10 November 2023 (the "Stulz Deposition").

5. According to Dr. Stulz, he was asked to: (i) "evaluate the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, and the alleged misrepresentations regarding the design and results of the -019 Study,"[8] (ii) "evaluate whether a stock price increase at the start of the Proposed Class Period is evidence of price impact of the alleged misrepresentations regarding the FDA agreement,"[9] and (iii) "review and respond to the Feinstein Report."[10] Dr. Stulz adds: "In particular, I have been asked to evaluate whether Professor Feinstein has proposed a methodology capable of calculating class-wide damages in a manner consistent with Plaintiffs' theory of liability."[11]

6. This report presents my analysis and conclusions relating to the Stulz Report and the Stulz Deposition.

7. I have not been asked to opine on or conduct analyses of loss causation

---

[7] Opening Feinstein Report, ¶167.

[8] Stulz Report, ¶8.

[9] Stulz Report, ¶8.

[10] Stulz Report, ¶9.

[11] Stulz Report, ¶9.

or damages. Should I be asked to do so, I will comprehensively address loss causation and damages at the appropriate stage in this litigation.

8.     My conclusions are based on the information presently available to me. I reviewed and relied upon all the data and documents cited and listed in the Opening Feinstein Report. Additional data and documents considered are listed in Exhibit-1. My credentials and compensation are presented in the Opening Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony I have provided since the Opening Feinstein Report is identified in Exhibit-2 of this report.

9.     My work in this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.     SUMMARY OF CONCLUSIONS AND OPINIONS

10.     Dr. Stulz does not contest my conclusion that Acadia stock traded in an efficient market throughout the Class Period. In fact, he explicitly adopts efficiency of the market as an assumption in his analysis and report.[12] Thus, the efficiency of the market for Acadia stock is undisputed.

11.     Dr. Stulz proffers an opinion that the alleged misrepresentations and omissions had no impact on the price of Acadia stock.[13] This opinion, however, is unsupported by Dr. Stulz's analysis and runs contrary to the undisputed facts of this case. Moreover, rather than accept as assumptions Plaintiffs' factual allegations, several of Dr. Stulz's price impact arguments inappropriately rely on the assumption that Plaintiffs will not be able to prove their account of the facts and their allegation

---

[12] Stulz Report, ¶¶12, 44, 51-52; and Stulz Deposition at 18:5-14, 128:24-129:3, 260:4-6.

[13] Stulz Report, ¶13.

of liability in this case.

12. Dr. Stulz and I agree that the Acadia stock price increased by a statistically significant amount in response to the Company's announcement on 9 September 2019, an event where Plaintiffs allege misrepresentations and omissions were made. Dr. Stulz does not contest that the announcement of the Harmony Study top-line results that day was made in the context of and in conjunction with statements regarding Acadia's purported agreement with the FDA concerning what data would be necessary to obtain approval of the sNDA, and that this information is what caused the dramatic and statistically significant increase in the Acadia stock price. Assuming Plaintiffs' allegations are true, this cause-and-effect relationship establishes that the alleged misrepresentations and omissions had "front-end" price impact.

13. However, Dr. Stulz maintains that the positive results from the Harmony Study had nothing to do with Plaintiffs' allegations. Dr. Stulz ignores that Plaintiffs allege that the Company's announcement misinformed analysts and investors that successful top-line results from the Harmony Study would be sufficient to win the FDA approval the Company sought. Plaintiffs allege and the Court found that "the allegations concerning the omission of adverse information [about Harmony's subgroup data and design limitations] must be considered in conjunction with the allegations that Defendants misrepresented an agreement with the FDA concerning the exact same information."[14] Dr. Stulz's opinion that there was no "front-end" price impact from the alleged misstatements on 9 September 2019 is based on his fundamental misunderstanding of Plaintiffs' allegations and his disregard of fundamental principles of valuation that dictate that the value of new information may depend on the total mix of information provided to the market.

14. Dr. Stulz and I agree that Acadia's stock price declines on 9 March

---

[14] Recon. Order p. 9.

2021 and 5 April 2021, events that Plaintiffs allege were corrective disclosures, were statistically significant. Dr. Stulz and I also agree that the significant stock price declines on 9 March 2021 and 5 April 2021 were attributable to the Company's announcement of the receipt of the Deficiency Letter and the Company's announcement of the receipt of the Complete Response Letter ("CRL"), respectively. Dr. Stulz and I agree that the statistically significant decreases in Acadia's stock price were due primarily to investors' and analysts' realization that they had been wrong about the likelihood of FDA approval of the sNDA. Plaintiffs allege, and Dr. Stulz does not dispute, that the Company's (mis)representations misled the market about that likelihood. Assuming Plaintiffs' allegations are true, these facts and this cause-and-effect relationship establish that the alleged misrepresentations and omissions had "back-end" price impact.

15.     Dr. Stulz erroneously finds that these two corrective disclosures had no price impact. Again, Dr. Stulz reaches this conclusion by (i) rejecting, rather than assuming as true Plaintiffs' allegations, and (ii) incorrectly separating the alleged misstatements about the terms of Acadia's purported agreement with the FDA from the alleged misstatements concerning the data submitted in support of the sNDA. Dr. Stulz's conclusions about "back-end" price impact are erroneous as they run counter to the allegations at issue in this case and disregard the effect the alleged misrepresentations had on the market's expectations of FDA approval. In short, it is undisputed that the stock price declines on 9 March 2021 and 5 April 2021 were statistically significant and that the Company's announcements concerning the Deficiency Letter and CRL caused those stock price declines. Notably, Dr. Stulz assumes that all of the price declines on 9 March 2021 and 5 April 2021 were caused by factors other than the alleged fraud, as he denies the obvious effect the alleged misrepresentations and omissions had on the market's expectations of FDA approval and on the market's understanding of the importance of the factors that were the reasons for the FDA's decision.

16.    Dr. Stulz acknowledges the existence of the out-of-pocket damages methodology.[15] He does not dispute that it is widely used to compute damages in virtually all class action securities cases and that it is approved in published legal scholarship.[16] He does not dispute that the out-of-pocket damages methodology can be applied commonly for all Class members.[17] He also acknowledges that my description of the methodology addresses how the methodology accommodates and overcomes potential complexities of precisely the sort he suggests may be encountered.[18]

17.    Dr. Stulz's primary criticism is that my methodology does not address the case-specific issues that he contends must be addressed at the current stage of the litigation.[19] Dr. Stulz does not identify a single factor that valuation analysis cannot address when constructing an inflation ribbon. Indeed, Dr. Stulz's concerns overlook the fact that market participants arrive at valuations for virtually all publicly traded securities, all the time, in real-time, no different from those analyses undertaken in many securities class actions. I found no complexities in this case, and Dr. Stulz identified none, that would cause me to reach a different opinion.

18.    Dr. Stulz does contend that one would need to understand the purported "undisclosed" risk, which necessarily requires the full development of the record. Assessment of perceived and undisclosed risks will be informed by the full development of the record, and is routinely analyzed in valuation analysis, both in common equity analysis for investment purposes and in forensic applications.

---

[15] Stulz Report, ¶139; and Stulz Deposition at 95:10-24.

[16] Stulz Deposition at 95:25 – 96:23.

[17] Stulz Deposition at 97: 24 – 98: 5.

[18] Stulz Report, ¶143; and Stulz Deposition at 104:8-19; 235:24-236:5; 249:17-250:5.

[19] Stulz Report, ¶14 and §XI.

19. Dr. Stulz's criticisms of a hypothetical inflation ribbon in no way cause me to change my opinion that the inflation ribbon, when constructed, will appropriately reflect the difference between the stock price that actually prevailed in the marketplace and the price that Acadia stock would have traded at had there been no alleged misrepresentations and omissions. In fact, by claiming to identify what an inflation ribbon must address, Dr. Stulz appears to concede that it is possible to construct an inflation ribbon in this matter.

20. I have not yet conducted a loss causation or damages analysis, but will do so at the appropriate stage, if requested, and the inflation ribbon will appropriately reflect the difference between the stock price that prevailed in the marketplace and the trading price of Acadia stock in the absence of any misrepresentations and omissions. In sum, the Stulz Report provides no reason to revise my conclusion that a common methodology exists to calculate damages for Class members.

## III.    DEFINING AND ASSESSING PRICE IMPACT

21. The U.S. Supreme Court in *Halliburton II* held that defendants at the class certification stage may rebut the presumption of reliance "by showing that the alleged misrepresentation did not actually affect the stock price – that is, that it had no 'price impact.'"[20] I understand that doing so requires presentation of evidence that completely "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff."[21] From an economic perspective, a statement has price impact if it either (i) causes the stock price to move, or (ii) maintains the stock price at a level other than what it would be but for the statement.

---

[20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 259, 344, (2014) ("*Halliburton II*"), at 2402.

[21] *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)); *see also Goldman Sachs Grp., Inc. v. Ark. Tcher. Ret. Sys.*, 141 S. Ct. 1915, 1963 (2021) ("The defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff. … and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish that feat.").

Thus, price impact can be shown at the time of misstatement or its correction.[22]

22.    Moreover, no price impact means that there was none. If the possibility remains that there was some price impact, it cannot be said to have been proved that there was no price impact.

23.    Price impact and price movement are two different concepts. Information that prevents a stock price decline has price impact although there may be no movement in the stock price. Therefore, while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction, or even no price movement at all, does not prove there was no price impact. Misstatements that are consistent with market expectations or that omit material negative information would generally not be expected to cause a contemporaneous, statistically significant price movement. Such statements would have price impact by preventing a stock price decline that would otherwise have occurred had the truth been disclosed.

24.    The Opening Feinstein Report noted that misrepresentations and omissions can have price impact not only by measurably increasing the stock price, but also by maintaining the stock price where it was, or even supporting the stock price so that it fell less than it otherwise would have but for the false and misleading statements.[23] This principle is discussed in the forensic finance literature:

> "Misrepresentations that falsely confirm market expectations will not lead to an *observable change in price*. But this does not mean they have no *price impact*. As the Second Circuit explained in *Vivendi*, 'a statement may cause inflation not simply by *adding* it to a stock, but by maintaining it.' The relevant price impact is simply counterfactual: the price would have fallen had there not been fraud."
> **"The Logic and Limits of Event Studies in Securities Fraud Litigation," by Jill E. Fisch et al., *Texas Law Review*, vol. 96, no. 3, 2018, pp. 564-565 (emphasis in original).**

---

[22] *Halliburton II*, at 2402.

[23] Opening Feinstein Report, ¶¶126-130.

"Price maintenance theory posits that a misrepresentation can have a price impact *even if* there is no price change after the misrepresentation. This *lack* of change can represent the maintenance of a stock price through the misrepresentation. Alternatively, there might be a failure to disclose, i.e., an omission, that would prevent a stock price from falling absent the disclosure. In both cases, the price impact is expected to be revealed when the subsequent corrective disclosure(s) is made or discovered. Courts accepting this argument reason that, if there was a price impact at the time of corrective disclosure, then there was a price impact at the time of misrepresentation or omission."

**"Event Studies in Securities Litigation," by Adrian Cowan et al., Chapter 47 of *The Comprehensive Guide to Economic Damages*, 6th Edition, edited by Nancy J. Fannon et al., Business Valuation Resources, LLC, 2022, p. 1022 (emphasis in original).**

25. Price impact analysis must be conducted comprehensively and diligently. A price impact analysis that only assesses statistical significance of residual stock returns on misrepresentation dates is an incomplete and unreliable price impact analysis. The reasons for this are explicated in detail below.

26. First, statistical non-significance does not mean that the stock price did not move, and it does not prove that the misrepresentations had no price impact. Statistical significance of a price movement proves that a price change could not have been caused by random volatility alone, and therefore company information must have had an impact. However, non-significance is an indeterminate result that does not rule out either company information or random volatility as having caused the price movement. Thus, non-significance does not prove there was no price impact from alleged misrepresentations.

27. Moreover, additional tools and principles of finance, economics, and statistics should be brought to bear in an investigation of price impact. One must also conduct analysis to determine whether the information at issue is important to the company, analysts, and investors. Once market efficiency is established, it follows that important valuation relevant information necessarily has price impact. This is one critical element of the analysis that Dr. Stulz neglected to do. Appropriateness of clinical test design and successful test results are certainly material information

for a company seeking an FDA approval based on a clinical test. The Company itself highlighted that its purported agreement with the FDA was material positive information. Dr. Stulz fails to make the connection that given these undisputed facts, and market efficiency, the alleged misrepresentations and omissions most certainly had price impact.

28.    These principles will be explicated in detail below.

## IV.    CRITIQUE OF DR. STULZ'S PRICE IMPACT ANALYSIS AND OPINION

### A.    The Undisputed Facts Prove Price Impact

#### 1.    9 September 2019: The Company Announces Positive Top-Line Results from the Harmony Study

29.    On 9 September 2019, the Company announced that the Phase 3 Harmony trial "met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis."[24] On a conference call with investors that day, Company President Srdjan Stankovic stated that "I would also like to remind you that at the end of Phase II meeting with FDA, we confirmed that for our supplemental NDA submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive" and that Harmony's top-line results met this standard.[25]

30.    Analyst commentary following the Company's announcement on 9 September 2019 was favorable. Highlighting the Company's statements regarding

---

[24] "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," *Business Wire*, Company press release, 9 September 2019.

[25] "ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, conference call transcript, 9 September 2019, p. 4.

the Harmony Study top-line results, many analysts increased their assessments of the probability of success (approval from the FDA) of the Company's forthcoming DRP sNDA. They increased their valuations for Acadia stock accordingly.

"**Pima' could be approved in large market indication** … DRP in our view is a sig. driver for ACAD shares given under-met need in a large addressable pop'n (1.2mn pts) with no approved treatments available. In our model, we increase our likelihood of success (LoS) for DRP to 65% (prev. 40%), reflecting launch in 2021E. We now assume $100mn risk-adj. sales in DRP ($44/sh in our PO) at launch in 2021 ramping to peak sales (risk-adj.) of $2.9bn by 2027E. We also continue to model $200mn cash raises in 2019 and 2020 as ACAD could increase its sales footprint. We reit. our Buy with new $48 PO (prev. $31), which assumes impact from now in the money options."
**"Interim Look at DRP Study Gives Positive Surprise; Reiterate Buy and PO to $48," by Tazeen Ahmad et al., Bank of America, analyst report, 9 September 2019, p. 1 (emphasis in original).**

"This morning, ACAD reported that the ongoing Ph3 HARMONY trial in dementia-related psychosis (DRP) has been stopped early for positive efficacy with Nuplazid demonstrating a statistically significant longer time (p=0.0033) to psychosis relapse compared to placebo on an interim look. On the back of the study's independent data monitoring committee recommendation, management guided to an sNDA filing in 2020, and we adjust our model to reflect today's announcement (DRP US/EU launches in 2021/2022 with WW peak sales of $3bn in 2030). Heading into 4Q19, we now see investor focus shifting to: (1) topline Nuplazid Ph2 ADVANCE schizophrenia negative symptoms by YE - where the prior benefit on negative symptoms could be encouraging on read-through and (2) initiation of trofinetide Ph3 LAVENDER trial in Rett syndrome in 4Q19."
**"Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs, analyst report, 9 September 2019, p. 1.**

"**Model Changes:** We (1) increase our PoS for Nuplazid in DRP to 85% (from 15%) on the positive interim read; (2) adjust our market build for DRP to incorporate the most common forms of dementia (Alzheimer's disease, Parkinson's disease dementia, Lewy body dementia, frontotemporal dementia, Lewy Body dementia) on the expected breadth of label (vs. Alzheimer's alone prior)… **Valuation:** On account of the changes, our new 12-month PT of $46 (vs. $23 prior) is based on a 100% DCF analysis (unchanged 12% WACC, 1% TGR)."
**"Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs, analyst report, 9 September 2019, p. 6 (emphasis in original).**

**"DRP Phase 3 interim hits on overwhelming efficacy, providing a clear path to label expansion in 2020; we reiterate our Market Outperform rating and raise our price target on Acadia Pharmaceuticals from $30 to $55**. We believe the results clearly demonstrate the potential for pimavanserin in a large addressable market with no approved drugs."
**"HARMONY Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason Butler et al., JMP Securities, analyst report, 9 September 2019, p. 1 (emphasis in original).**

31.     As shown in the Opening Feinstein Report, Acadia's stock price increased 49.00% (on a logarithmic basis) on 9 September 2019, from $23.80 at the close of trading on 6 September 2019 (Friday), to $38.85 at the close of trading on 9 September 2019.[26] After adjusting for market and sector factors, the residual return of Acadia stock on 9 September 2019 was 49.96%, which was statistically significant at the 99% confidence level.[27]

32.     Dr. Stulz does not dispute that the Company's stock price increased by a statistically significant amount on 9 September 2019. Dr. Stulz does not dispute that the Company's announcement regarding the positive Harmony Study top-line results caused the stock price to increase. Dr. Stulz does not dispute that Plaintiffs allege that the Company's announcement was misleading. Rather, Dr. Stulz's price impact argument with respect to the statistically significant price increase on 9 September 2019 is focused on whether analysts and investors were previously aware of the purported agreement between the Company and the FDA.

33.     Dr. Stulz's price impact argument with respect to the start of the Class Period is wrong because the Company's allegedly misstatements about an agreement with the FDA, made that day in conjunction with, and to provide context for, the Harmony Study top-line results, misled the market about the implications of the Harmony Study top-line results for success of the sNDA. In that manner, the alleged

---

[26] Opening Feinstein Report, Exhibit-13.

[27] Opening Feinstein Report, Exhibit-13.

misrepresentations and omissions had price impact that day. Dr. Stulz failed to consider this price impact, and consequently his price impact analysis is incomplete, rendering his price impact conclusion unreliable if not decidedly incorrect.

34.     In sum, the undisputed statistically significant price increase in response to the alleged misrepresentations and omissions proves that the information announced on 9 September 2019 had price impact. Dr. Stulz argues, nonetheless, that some of the allegedly false and misleading information was not entirely new, and from this observation he erroneously contends it could not have had price impact.

### 2.     9 March 2021: The Company Announces Receipt of the Deficiency Letter from the FDA

35.     On 8 March 2021, after the close of trading, the Company issued a press release announcing that "the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time" (the "Deficiency Letter").[28]

36.     Analyst commentary following the Company's announcement on 8 March 2021 was negative. Many analysts expressed surprise and noted that approval of the sNDA had become less likely.

---

[28] "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, Company press release, 8 March 2021 4:05 PM.

"**We are downgrading ACAD from Strong Buy to Outperform following today's disclosure that the FDA found deficiencies in their sNDA filing that preclude labeling discussions for Nuplazid in dementia related psychosis (DRP)**. We have no good guesses as to what 'deficiencies' the FDA found, but one thing is quite clear - the regulatory outlook for DRP suddenly appears quite dire. We believe ACAD management was as transparent as possible in tonight's update, but given the lack of feedback from the agency to their multiple inquiries (since being notified on March 3), it unfortunately looks like a CRL is now the most likely outcome for Nuplazid by its April 3 PDUFA date. Considering Nuplazid was granted breakthrough therapy designation (BTD), and nothing major was ever discussed/ highlighted by the agency in prior interactions throughout the review process, we remain hopeful that the deficiencies are minor and will only result in an approval delay. Still, it is possible that the deficiency is something more substantial (requiring another study)."
**"Downgrading to Outperform; Did Not See This One Coming – DRP Seems to be Headed for a CRL," by Danielle Brill et al., Raymond James, analyst report, 9 March 2021, p. 1 (emphasis in original).**

"**Our view**: Surprising setback for ACAD announced today after the close as the receipt of a filing deficiency notice on March 3, and a subsequent 5 days of ghosting, from the FDA regarding Nuplazid's DRP sNDA add a new but curious dimension of uncertainty, and now what we see as an increasing likelihood for a CRL to be issued in short order. … PT lowered to $36 on revisions reflecting the new risk and unknowns to the DRP opportunity but remain Outperform rated."
**"FDA's sNDA Deficiency Notice Adds New Surprise, Uncertainty to DRP Opportunity," by Gregory Renza et al., RBC Capital Markets, analyst report, 8 March 2021, p. 1 (emphasis in original).**

"FDA notified ACAD that it identified deficiencies in the DRP sNDA for pimavanserin that preclude discussion of labeling and post-marketing requirements. Although the exact deficiencies are not yet specified, FDA stated this notification does not reflect its final decision on the sNDA, and the originally scheduled PDUFA date (4/3/2021) remains unchanged. We expect ACAD to receive a CRL, and consequently adjust our DRP sales forecast for launch in 2022. We believe potential competitors in DRP such as KRTX should benefit from ACAD's regulatory precedence, and we consider KarXT uniquely differentiated. We believe the post-market ACAD share reaction is consistent with our scenario analysis. We lower our POS estimate for DRP to 50% from 90%, driving our new $28 price target ($42 prior) and maintain our Perform rating."
**"Challenging Path to DRP Lays Groundwork for Followers," by Jay Olson et al., Oppenheimer, analyst report, 9 March 2021, p. 1.**

37. As shown in the Opening Feinstein Report, Acadia's stock price declined 60.42% (on a logarithmic basis) on 9 March 2021.[29] After adjusting for market and sector factors, the residual return of Acadia stock on 9 March 2021 was -63.68%, which was statistically significant at the 99% confidence level.[30]

38. Dr. Stulz does not dispute that the Company's stock price declined by a statistically significant amount on 9 March 2021. Dr. Stulz does not dispute that the Company's announcement of the receipt of the Deficiency Letter caused the stock price to decline. Dr. Stulz does not dispute that Plaintiffs allege that this was a corrective disclosure. Nonetheless, Dr. Stulz opines that this is "not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study."[31]

39. Dr. Stulz's opinion of no price impact is unfounded and at odds with the allegations in this case, which Dr. Stulz claims he assumed to be true for the purposes of his purported price impact analysis.[32] The undisputed statistically significant price decline in response to the alleged corrective information on 9 March 2021 is strong evidence that the alleged misstatements had price impact that day. Dr. Stulz has not and cannot prove otherwise.

### 3. 5 April 2021: The Company Announces Receipt of a CRL from the FDA

40. On 5 April 2021, the Company issued a press release announcing that the "FDA issued a CRL to indicate that they have completed their review of the application and has determined that the application cannot be approved in its present

---

[29] Opening Feinstein Report, Exhibit-13.

[30] Opening Feinstein Report, Exhibit-13.

[31] Stulz Report, ¶¶13(a), 63, 95.

[32] Stulz Deposition at 94: 16-23, 121:8-15.

form."[33] The Company explained that in the CRL, the FDA "cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval."[34] The Company also stated that in the CRL, the FDA considered the 019 Study to "not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred."[35] In addition, the Company blamed the FDA for denying the sNDA "despite prior agreements" and for reneging on those agreements in denying the sNDA.[36]

41. Analyst commentary following the Company's announcement on 5 April 2021 was negative but appears to have taken at face value Acadia's assertion that denial of the sNDA was a "shift" in the FDA's prior position.

---

[33] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, Company press release, 5 April 2021 6:30 AM.

[34] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, Company press release, 5 April 2021 6:30 AM.

[35] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, Company press release, 5 April 2021 6:30 AM.

[36] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, Company press release, 5 April 2021 6:30 AM.

"The FDA has shifted its prior stance regarding subgroup analyses in DRP, concluding ACAD's data are unsupportive. The pivotal trial was designed to hit on overall effect size, and frustratingly could have been powered to achieve stat sig for subgroups. Despite Co's assertion they can convince FDA, we now expect add'l clin work will be required, delaying launch to '24 & lower PoS in the indication to a 'coin-flip.' As a result, we D/G to HOLD & lower PT to $21. Despite prior agreements, the CRL cites efficacy in dementia subgroups as insufficient for approval."

**"CRL Portends More Clinical Work Required for DRP – D/G to HOLD & PT to $21," by Chris Howerton et al., Jefferies, analyst report, 5 April 2021, p. 1 (emphasis in original).**

"ACAD announced today FDA issued a Complete Response Letter (CRL) for Nuplazid in Dementia-Related Psychosis (DRP). We think the news was mostly expected as ACAD had hosted a recent (3/8/21) update call where it disclosed FDA had identified deficiencies in the sNDA. However, the issues raised today in the CRL are significant and include FDA concerns around a broad DRP label based the Ph3 HARMONY trial due in part to 1) lack of stat sig diff w/in some dementia subgroups and 2) insufficient # pts w/ certain less common dementia subtypes. ACAD will request a Type A mtg w/ FDA and we await outcome to gain more visibility on a regulatory path forward. The issues raised by FDA in the CRL suggest addn trial(s) will likely be needed prior to any type of approval. We are lowering our DRP POS to 20% (was 60%) and adjusting our Nuplazid sales ests."

**"FDA Issues CRL for Nuplazid in DRP. Lowering PT to $30," by Joseph Stringer, Needham, analyst report, 5 April 2021, p. 1 (emphasis in original).**

42.    As shown in the Opening Feinstein Report, Acadia's stock price declined 18.91% (on a logarithmic basis) on 5 April 2021.[37] After adjusting for market and sector factors, the residual return of Acadia stock on 5 April 2021 was -19.32%, which was statistically significant at the 99% confidence level.[38]

43.    Dr. Stulz does not dispute that the Company's stock price declined by a statistically significant amount on 5 April 2021. Dr. Stulz does not dispute that the Company's announcement of the receipt of the CRL caused the stock price to

---

[37] Opening Feinstein Report, Exhibit-13.

[38] Opening Feinstein Report, Exhibit-13.

decline. Dr. Stulz does not dispute that Plaintiffs allege that this was a corrective disclosure.

44.    Dr. Stulz's opinion of no price impact is unfounded and at odds with the allegations in this case, which Dr. Stulz claims he assumed to be true for the purposes of his purported price impact analysis.[39] The undisputed statistically significant price decline proves that the information announced that day had price impact. The information released that day was a corrective disclosure as it corrected the alleged misrepresentations and omissions, and their price effects. Thus, Dr. Stulz has failed to prove that there was no price impact from the alleged misstatements on 5 April 2021.

### 4.    The Acadia Stock Chart is Strong Evidence Supporting Price Impact

45.    The Company's announcements on 9 September 2019, which the Plaintiffs alleged contained misrepresentations and omissions, caused a statistically significant price rise that day. Later, the stock price declined by statistically significant amounts on both of the alleged corrective disclosure dates. The graph below illustrates the price impact of the initial announcement that raised the Acadia stock price and the later disclosures that caused the stock price to fall. The similar magnitudes of the stock increase, which occurred when investors were allegedly misled into believing approval of Acadia's sNDA was likely, and the price decline precipitated when the disclosures informed investors that approval was not likely, is strong evidence that the alleged misrepresentations and omissions had price impact. Dr. Stulz did not consider this stock chart and the similarity of magnitudes.

---

[39] Stulz Deposition at 94:16-23, 121:8-15.



Graph-1: Acadia Stock Price During the Class Period

### B.     Dr. Stulz's Price Impact Analysis Rests on a Rejection of Plaintiffs' Allegations and a Contortion of Economic Reality

46.     As explained in the Opening Feinstein Report, Plaintiffs contend that Defendants made a series of materially false and misleading statements and omissions at the start and throughout the Class Period. Plaintiffs allege the misrepresentations and omissions artificially inflated Acadia's stock price by causing investors and analysts to overstate the likelihood the sNDA would be approved. The artificial inflation was ultimately dissipated by events and announcements on two corrective disclosure event dates.[40] The corrective disclosures addressed sufficiency of the data and studies underlying the sNDA and

---

[40] Opening Feinstein Report, ¶30.

any purported agreement the Company had with the FDA. The disclosures corrected the market's assessment of the likelihood of the sNDA's success that was based on the prior misrepresentations and omissions. The corrective disclosures thusly dissipated the artificial inflation and caused the Acadia stock price to fall.

47. I understand that the Court determined, twice, that Plaintiffs sufficiently pled that investors were misled by the alleged misrepresentations and omissions.[41] Dr. Stulz disregards the Court's findings and the factual record that supports it.

48. As I understand Plaintiffs' allegations and the Court's interpretation of those allegations, Plaintiffs' theory of falsity is that Defendants affirmatively misrepresented the "existence *or terms* of an agreement with the FDA concerning the approval of pimavanserin to treat [DRP]."[42] I further understand that the allegedly misrepresented "term" was that the FDA had agreed to "base its decision [to approve the sNDA] on the overall results of the Harmony Study rather than on the data for individual subgroups" of dementia.[43] I have accepted these allegations as true and Dr. Stulz claims to have done the same.[44]

49. I further understand that Plaintiffs have alleged (as found by the Court)

[41] MTD Order, pp. 1-27; and Motion for Recon., pp. 1-12.

[42] Recon. Order p. 3 (emphasis added); *see also* MTD Order p. 15 (Complaint alleges "Defendants misrepresented the existence *or terms* of the agreement" with FDA) (emphasis added); Complaint ¶103 ("even if there was a general agreement that Defendants could do a single adequate and well-controlled study, that agreement was obviously contingent on the data being supportive of the subgroups that Acadia sought to treat with pimavanserin").

[43] MTD Order, p. 15; *see id.* p. 17 (Defendants' statements "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups"); Recon. Order p. 3 ("Defendants' statements suggested that the agreement with the FDA contained terms . . . that the FDA would not 'base its decision on . . . the data for individual subgroups' in the Harmony study").

[44] Stulz Deposition at 94:16-23, 121:8-15.

that Defendants misrepresented that the FDA would only consider Harmony's "overall results" or "top-line results," which inflated the perceived likelihood of the sNDA's approval. As the Court explained, Plaintiffs allege such statements were misleading because the Harmony Study's high-risk design and "disappointing data" were major obstacles to FDA approval."[45] Consequently, as the Court previously found, "the allegations concerning the omission of adverse information [about Harmony] must be considered in conjunction with the allegations that Defendants misrepresented an agreement with the FDA concerning the exact same information."[46] I have accepted these allegations as true and Dr. Stulz purportedly claims to have done the same.[47]

50.    Despite stating that he accepts Plaintiffs' allegations as true, Dr. Stulz disputes Plaintiffs' allegations that the market was misled by the misrepresentations and omissions. Dr. Stulz disputes that these misrepresentations and omissions were corrected on 9 March 2021 and 5 April 2021.[48]

51.    Dr. Stulz contends that the purported agreement between the FDA and Acadia was mentioned by the Company before the start of the Class Period and therefore could have no further impact when emphasized and elaborated upon later in conjunction with the release of the Harmony Study results. Dr. Stulz likewise claims that the data and designs of the Harmony and 019 studies were disclosed prior to the corrective disclosure dates, and therefore could not have been the reason for the stock price declines at the end of the Class Period. What Dr. Stulz neglects to

[45] MTD Order, p. 18.

[46] Recon. Order p. 9; *see* MTD Order p. 19 ("Defendants' alleged misrepresentation concerning the agreement with the FDA support an inference that Defendants knew that the studies' shortcomings would materially increase the risk that the sNDA would not be approved.").

[47] Stulz Deposition at 94:16-23, 121:8-15.

[48] Stulz Deposition at 94:16-23, 121: 8-15.

consider is that the corrective disclosures informed the market that they had been misinformed about the sufficiency of the test design and results necessary to support approval of the sNDA, and the alleged misrepresentations and omissions were the cause of that misunderstanding. True information about the test designs and results data could not have constituted fully corrective disclosure while the market was still misinformed about the purported sufficiency of the test designs and results data.

52.   The corrective disclosures near and at the end of the Class Period provided the missing information that corrected the alleged misrepresentations and omissions, and their price impact. The corrective disclosures informed the market that they had been misled about the sufficiency of the test designs and results data, that they had consequently overestimated the likelihood of sNDA success, and they had consequently overstated expected future cash flow and valuation of Acadia. The Acadia stock price fell in response, and investors suffered losses.

53.   Plaintiffs explain in the Complaint how and why the alleged misrepresentations and omissions artificially inflated the Acadia stock price and how and why the corrective disclosures precipitated losses. However, Dr. Stulz apparently fails to comprehend the allegations, and his opinion is predicated on his assumption that Plaintiffs will fail to prove their factual allegations.

54.   With respect to the 9 September 2019 misrepresentations and omissions Dr. Stulz opines:

> "The stock price increase at the start of the Proposed Class Period is not evidence of the price impact of the alleged misrepresentations regarding the FDA agreement. This is because the alleged misrepresentations regarding the agreement with the FDA for the HARMONY Study design were publicly known as early as 2017, prior to the beginning of the Proposed Class Period, and in an efficient market, could not have caused Acadia's stock price to increase on the first day of the Proposed Class Period. Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint."
> **Stulz Report, ¶13(c).**

55. As for the 9 March 2021 and 5 April 2021 corrective disclosures, Dr. Stulz concludes:

> "The stock price declines following the March Deficiency Letter and the April CRL (both of which are defined below) are not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, including information about the target population and results of subgroups identified in the Complaint. Instead, these price declines reflect the market's reaction to new information such as the regulatory updates. This is because the information regarding the design and results of the HARMONY Study identified in the Complaint was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL."
> **Stulz Report, ¶13(a).**

> "The stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding the -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints. This is because this information was already publicly known prior to the March Deficiency Letter, and in an efficient market, it could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL."
> **Stulz Report, ¶13(b).**

56. Dr. Stulz fails to consider or appreciate that the alleged misrepresentations and omissions about Harmony's top-line data and an agreement with the FDA observably inflated the Acadia stock price on 9 September 2019 because they caused the market to attach more positive significance to the positive Harmony Study test top-line results than those results would otherwise have deserved. In this manner, the misrepresentations and omissions had price impact. The significant stock price increase on 9 September 2019 establishes price impact.

57. Dr. Stulz similarly fails to consider or appreciate that the corrective disclosures on 9 March 2021 and 5 April 2021 fixed precisely the misunderstandings caused by the misrepresentations and omissions. They eliminated the optimism for sNDA approval caused by the misrepresentations and omissions, and dissipated the

artificial inflation those misrepresentations and omissions had observably introduced. The price responses to the corrective disclosures thus further prove price impact.

58.    Dr. Stulz's conclusions run contrary to the facts of this case and other basic economic principles. At a minimum, his opinion is unreliable as his analysis neglected to consider the explicated avenues of price impact, and for at least this reason, he has not proved that the alleged misrepresentations and omissions had no price impact.

## V.    DR. STULZ IMPROPERLY ANALYZES THE ALLEGED MISSTATEMENTS IN ISOLATION

59.    In the Stulz Report, Dr. Stulz separates Plaintiffs' alleged misstatements into three categories – "Information Regarding Acadia's Harmony Study," "Information Regarding the -019 Study," and "Alleged Misrepresentation Regarding the FDA Agreement" and then purports to analyze the price impact of each category separately.[49] This approach is incorrect for several reasons.

60.    To start, Plaintiffs' allegations are clear: "the omission of adverse information [about Harmony and 019] must be considered in conjunction with the allegations that Defendants misrepresented an agreement with the FDA concerning the exact same information."[50] Dr. Stulz's analysis ignores several basic economic realities.

61.    First, Dr. Stulz does not contest the opinion in the Opening Feinstein Report that investors were most focused on "the potential future commercialization of [Acadia's] pipeline products, which was a function of the probability that the Company would be able to obtain FDA approval for new drugs and for the expanded use of pimavanserin" so "[w]hether pimavanserin would receive approval for

---

[49] Stulz Report, ¶¶61-138.

[50] Recon. Order, p. 9.

treatment of DRP was thus critically important throughout the Class Period."[51] Investors' assessment of the likelihood of sNDA approval was based on the data from the Harmony and 019 Studies together with what the Company told them about a purported agreement Acadia had with FDA regarding how those data would be evaluated when the FDA reviewed the sNDA, which is the subject of Plaintiffs' allegations.

62.    Dr. Stulz points out that the Harmony Study results were not misrepresented on 9 September 2019. He also contends that the Company's alleged misrepresentations about an agreement with the FDA were not new on that date. He concludes therefore that no alleged misrepresentations and omissions could have impacted the stock price on 9 September 2019. In particular, he submits that the alleged misrepresentations and omissions were not responsible for the statistically significant Acadia stock price increase that happened that day. But, Dr. Stulz is wrong. He fails to consider that the alleged misrepresentations and omissions impacted the Acadia stock price by impacting the value of the Harmony Study results that the Company announced. Without the alleged misrepresentations and omissions that misinformed analysts and investors that successful top-line results would likely be sufficient to achieve FDA approval of the sNDA, the released study results would not have had the positive stock price impact they did. Thus, the alleged misrepresentations about an agreement Acadia had with the FDA, which Plaintiffs allege was reiterated, emphasized, and embellished upon on 9 September 2019, did positively impact the Acadia stock price that day, artificially inflating the stock price.

63.    In the Stulz Report and in numerous prior cases, Dr. Stulz has argued that the value of information can change over time and can change in reaction to

[51] Opening Feinstein Report, ¶116.

what other information becomes available.[52] He conveniently disregards this principle when arguing that the alleged misrepresentations and omissions in this case could not have caused the statistically significant Acadia stock price increase on 9 September 2019, because some of the Company's representations that day, while possibly false, were reiterations of alleged (mis)statements made previously by the Company on an earlier date. In this case, the facts indicate that the alleged misrepresentations and omissions did impact the Acadia stock price, by impacting the value of information that came out on 9 September 2019, which information in turn, indisputably impacted the Acadia stock price.

64.     Analysts increased their valuations and price targets for Acadia stock to reflect their assessments that the probability of success had increased following the 9 September 2019 release of top-line Harmony Study results.[53] A probability that is assessed in concert with a particular set of information is termed a "conditional probability" in the parlance of statistics. A conditional probability, which takes into account related or ancillary information, differs from the unconditional probability, which would be the outlook without the additional related information. Conditional probability may be defined as the "probability of an event given that another event

[52] See *e.g.*, Stulz Report, ¶¶153-158; Expert Report of René M. Stulz, Ph.D., *In Re Eletrobras Securities Litigation*, Case No.: 15-cv-5754-JGK (SDNY), dated 6 October 2017, ¶¶140-149; Amended Expert Report of René M. Stulz, Ph.D., *In Re BHP Billiton Limited Securities Litigation*, Civil Action No. 1:16-cv-01445-NRB (SDNY), dated 18 May 2018, ¶¶131-134; Expert Report of René M. Stulz, Ph.D., *In Re Equifax, Inc. Securities Litigation*, Civil Action No. 17-CV-3463-TWT, dated 12 August 2019, ¶¶93-100.

[53] See *e.g.*, "Interim Look at DRP Study Gives Positive Surprise; Reiterate Buy and PO to $48," by Tazeen Ahmad et al., Bank of America, analyst report, 9 September 2019, p. 1; "Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs, analyst report, 9 September 2019, pp. 1, 6; "HARMONY Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason Butler et al., JMP Securities, analyst report, 9 September 2019, p. 1; and "A Harmonious Beginning to the Fall for ACAD," by Cory Kasimov et al., J.P. Morgan, analyst report, 9 September 2019, p. 1.

has occurred."[54] It is a concept that Dr. Stulz has used extensively in his research, and he defined it in the Stulz Deposition as "… the probability of something occurring given that some conditions established."[55] Upon the Company's announcement on 9 September 2019 that the Harmony Study was successful and met its target, and that it stopped the Harmony Study due to the positive top-line results, which Acadia represented were the results on which the FDA would determine its approval of the sNDA, the valuation impact of the Harmony Study results was clearly affected by the alleged misrepresentations and omissions about sufficiency of the study design and an agreement with the FDA. Similarly, the valuation impact of the alleged misrepresentations and omissions about study design and an agreement with the FDA were affected by the newly released study results. In that manner, the misrepresentations and omissions impacted the Acadia stock price that day.

65.    It is clear from analyst reports and the market's reaction to the news on 9 September 2019, that the alleged misrepresentations and omissions about study design and an agreement with the FDA constituted relevant information that impacted the market's conditional probability assessment of sNDA approval. Without the misrepresentations and omissions, the market's assessment of the probability of success would certainly have been lower. But, in light of the Company's misrepresentations and omissions, the perceived conditional probability of success was much greater. Dr. Stulz failed to consider how the market's conditioning of its probability assessment on the alleged misrepresentations and omissions exaggerated the positive impact of the announced Harmony Study results, and thereby artificially inflated the Acadia stock price. He ignores basic tenets of statistics and financial economics to arrive at his erroneous conclusion.

[54] "Probability Concepts," by Richard DeFusco, et al., CFA Institute, 2023, p. 7.

[55] Stulz Deposition at 205:5-21.

66.    Additionally, Dr. Stulz neither mentions nor considers that the existence of the agreement between the FDA and the Company may have had price impact through maintenance of the inflation during the course of the Class Period. Clearly, announcements revealing the truth to the market about both Harmony's subgroup data and the purported agreement with the FDA would have caused a stock price decline during the Class Period prior to the corrective disclosures that conveyed that same information to the market. If alleged misrepresentations and omissions are repeated and thereby maintain artificial inflation in a security price by preserving the false information mix in the market, this repetition would have price impact, with or without a significant price change. This concept was mentioned above in ¶24 and in the Opening Feinstein Report.[56] Rather than considering and addressing this form of price impact, however, Dr. Stulz oversimplifies the concepts of market efficiency and price impact, arguing incorrectly that a repetition of public information (in the instant case, an alleged misrepresentation) could not have impacted the stock price on account of market efficiency. His disregarding basic principle of valuation and price maintenance renders Dr. Stulz's analysis incomplete at best, and his conclusion about price impact flat out wrong.

67.    Consistent with these common-sense economic principles, analysts included commentary on, and appeared to assess the likelihood of the sNDA being approved based upon, both the data from Harmony and 019 studies, together with the Company's statements about its agreement with the FDA. For example, on or shortly after 9 September 2019, analysts articulated that the Company's apparent agreement with the FDA was a significant plus in light of Harmony's newly-announced top-line results, and vice versa.

---

[56] Opening Feinstein Report, ¶¶126-130.

"We are confident that the results from [Harmony] will support label expansion given: 1) the strength of the results and reinforcement of the clinical profile that has already secured Breakthrough Therapy designation in this indication, 2) **clear feedback from the FDA at the end-of-Phase 2 meeting that a single trial would be supportive of approval**, and 3) the unmet medical need."
**"HARMONY Phase 3 Dementia-Related Psychosis Stopped Early for Success," by Jason Butler, et al., JMP Securities, 9 September 2019, p. 1 (emphasis added).**

"HARMONY and other supportive Ph2/post-hoc analysis is enough to drive FDA approval, …The combined acute treatment data should address any FDA questions, especially given agency conferred breakthrough status **and written agreement that the HARMONY would generate sufficient pivotal data to support sNDA review**."
**"Hitting the Harmony: DRP Success, New Market Opp Raises PT To $66," Ritu Baral, et al., Cowen, 9 September 2019, p. 1 (emphasis added).**

"Acadia announced this morning that the Phase 3 trial of Nuplazid in Dementia Psychosis met the interim analysis primary endpt. … Mgmt guided for sNDA submission in 2020. We assume commercial launch in 2021 and $1.SB peak sales in this indication in 2030 (unch). Given favorable outcome of the trial, we are increasing our price target to $60 (was $34). Reiterate BUY. … **FDA reportedly informed mgmt. that a single well-controlled trial will be sufficient for approval in this indication**."
**"Positive Nuplazid Phase 3 Dementia Psychosis Trial Results. Raise PT to $60," Alan Carr, et al., Needham, 9 September 2019, p. 1 (emphasis added).**

68.  Similarly, on and shortly after 4 December 2019, the date Dr. Stulz claims all the material data from Harmony was disclosed, analysts again viewed the data as supporting the approval of the sNDA in part because of what the Company had told them about its agreement with the FDA.[57]

---

[57] See Appendix A.

"The HR of 0.352 (65% reduction in risk of relapse) beat our expectations of an HR ≥ 0.5 (50% reduction in risk of relapse) by quite a margin. We think most investors had similar if not more modest expectations for the data. We view the 2.8 fold reduction in risk of relapse and inclusion of all dementia subtypes in the study as demonstrating strong, clinically meaningful efficacy that should drive approval and commercial adoption. We were also very encouraged by the 60%+ open-label response rate. All dementia subtypes on the study (ALZ, PDP/DLB, vascular, FTD) were represented in enrollment, randomization, and adjudicated relapses and importantly, data showed strong initial response as well as well relapse prevention with pima treatment across the subtypes. While effects in PDP/DLB were particularly strong, data in ALZ patients was also encouraging. Given the strong efficacy and favorable safety profile, we believe this data will support broad label expansion. **The combined acute treatment data should address any FDA questions, especially given agency gave written agreement that the HARMONY would generate sufficient pivotal data to support sNDA review**."
**"Perfect Harmony: CTAD Data Shows 65% Reduction in Risk of Relapse In DRP," by Rita Baral, et al., Cowen, analyst report, 5 December 2019, p. 1 (emphasis added).**

"On the back of these results, ACAD plans to meet with the FDA in 1H20, post which a supplementary NDA submission could come in 2020. A**s a reminder, at the end of Ph2 meeting with the FDA, ACAD noted that a single well-controlled study with statistically and clinically relevant data could serve as the basis for the supplemental NDA submission in combination with efficacy data from the two previous acute studies** (Ph2 Alzheimer's disease psychosis and prespecified subgroup analysis of dementia patients from the Ph3 PDP trial) and additional safety data from the ongoing placebo-controlled post-marketing commitment safety study of Nuplazid."
**"Acadia Pharmaceuticals Inc. (ACAD): Impressive Full Ph3 HARMONY Data Likely Supports sNDA in 2H20," by Salveen Richter, et al., Goldman Sachs, analyst report, 5 December 2019, p. 3 (emphasis added).**

"ACAD plans to meet with FDA in H120 to discuss sNDA submission. ACAD believes previous discussions indicate robust Ph3 HARMONY results along with Ph2 DRP and previous PDP data are supportive of filing. We note that efficacy across dementia subtypes enables a large market opportunity. We maintain our Perform based on current valuation with $48 PT (Exhibits 7-10)."
**"Favorable HARMONY Strikes a Chord with Investors," by Jay Olson, et al., Oppenheimer, analyst report, 6 December 2019, p. 1.**

"**Our view**: Topline data in ACAD's HARMONY ph.III, at CTAD in San Diego, where we are on-site, reiterate pimavanserin's prospects in dementia-related psychosis, eclipsing expectations on efficacy and earning high marks on clinical application from KOLS, even following the program's recent stoppage for success in September. The impressive benefit-risk profile now more established by last night's fuller data continues to support a visible path to market and high likelihood of approval – and with pimavanserin's opportunity in DRP setting up as a robust source of revenue potential in the 2020's, we believe ACAD's neuropsychiatric franchise is on the brink of a breakout. We reiterate our Outperform rating and $60 PT. **Next steps remain intact: FDA interaction for an sNDA still in sight for 1H2020, key phase for converting on the opportunity set-up by the data**. We continue to believe pimavanserin has a strong likelihood for a smooth approval in DRP, though we see guidance post FDA interactions and securing the 2020 filing path as crucial. As a key driver of pimavanserin's potential and the opportunity for extension beyond Nuplazid and PDP, the DRP program accounts for 40% of our valuation supported by $1.6B U.S. peak sales potential - and setting the groundwork for continued expansion prospects that, following a 2H of several rich data points, remains worth monitoring- see our recent note: Pimavanserin's Perpetual Promise: Positive ADVANCE Topline, CTAD, PDP."
**"The Secret of Pim: Word Getting Out on Pimavanserin with Solid DRP Data at CTAD," by Gregory Lenza, RBC Capital Markets, analyst report, 5 December 2019, pp. 1, 3 (emphasis in original).**

69.      In sum, Plaintiffs' allegations, the Court's prior orders, basic economic principles, and the actual evidence in this case demonstrate that Dr. Stulz's price impact analysis is misguided and arrives at an erroneous conclusion. He incorrectly views the alleged misstatements and other announcements in isolation when they should be viewed together and in context.

**VI.    DR. STULZ INCORRECTLY ASSUMES THAT THE FULL TRUTH ABOUT THE FDA AGREEMENT, THE HARMONY STUDY, AND THE 019 STUDY WAS PREVIOUSLY DISCLOSED**

70.      Dr. Stulz contends that the full truth about the FDA agreement, the Harmony Study, and the 019 Study – the very information Plaintiffs allege was improperly not disclosed to the market – had been fully disclosed to the market in a

timely manner.[58] To reach these conclusions and disagree with Plaintiffs' allegations, Dr. Stulz relies on two documents produced in discovery and a handful of analyst reports.[59] However, Dr. Stulz's reading of the facts and his reasoning are incorrect, as explained next.

71.    Dr. Stulz contends that the Company's representations regarding an agreement with the FDA did not have price impact on 9 September 2019 because investors already knew that the Company had an agreement with the FDA regarding the Harmony Study. Dr. Stulz provides cites to analyst reports prior to the Class Period mentioning the existence of an agreement, and he excerpts extensively from the FDA's 15 May 2017 meeting minutes to demonstrate that the market was aware of the existence of an agreement. However, analysts were merely aware of the existence of an agreement, they did not know the specifics of the agreement or any terms of the agreement except for what they were told by the Company. Analysts had to rely on the Company's representations that the Harmony Study design and results would support the approval of the sNDA. Dr. Stulz disregards that the FDA's 15 May 2017 meeting minutes, which purportedly describe the terms of the agreement between the Company and FDA, were not made public until after the end of the Class Period.[60] Market participants were unaware of the full terms and conditions of the agreement during the Class Period. Dr. Stulz fails to consider that had analysts and investors been correctly apprised of the terms of the agreement, rather than having to rely on Company misrepresentations, the stock price would not have exhibited a statistically significant increase on 9 September 2019.

72.    Further, Plaintiffs' allegations are not that the Harmony Study's design

---

[58] Stulz Report, ¶126.

[59] Stulz Report, ¶¶127-138.

[60] Defendants' Opposition to Plaintiffs' Motion for Class Certification and Appointment Of Class Representatives And Class Counsel, p. 4.

and data were unknown to market participants since the start of the Class Period, or that the data themselves were untrue. Rather, Plaintiffs allege that Defendants misrepresented to the market that, per an agreement, the FDA would base its decision about Acadia's sNDA on the top-line Harmony Study results alone rather than subgroup data. The alleged misrepresentations and omissions thus allegedly caused analysts and investors to attach undue significance and optimism to the top-line data. The MTD Order and Reconsideration Order expressed that these were the allegations and appreciated that the alleged misrepresentations and omissions would consequently have impact:

> "Despite allegedly possessing information that the studies were not properly designed and that the Harmony Study had disappointing subgroup data, Defendants touted the studies' results. Defendants' alleged misrepresentations concerning the agreement with the FDA support an inference that Defendants knew that the studies' shortcomings would materially increase the risk that the sNDA would not be approved."
> **MTD Order, p. 19.**

> "Further, in this case, the allegations concerning the omission of adverse information [Harmony Study's subgroup data and design flaws] must be considered in conjunction with the allegations that Defendants misrepresented an agreement with the FDA concerning the exact same information. Defendants have failed to identify any clear error with this aspect of the Court's analysis."
> **Recon. Order, p. 9.**

73. As noted in the Opening Feinstein Report, Defendants' misrepresentations caused the market to underestimate the risk of FDA rejection of the sNDA, and overestimate the likelihood of FDA approval.[61] Analyst commentary following the disclosures on 9 March 2021 and 5 April 2021 demonstrate that investors were misled by the Company's misrepresentations.[62]

---

[61] Opening Feinstein Report, ¶33 (citing MTD Order p. 26).

[62] See *e.g.*, "Ok, Now That the Initial Shock Has Worn Off a Bit ... Let's Think About What Could Lie Ahead," by Danielle Brill et al., Raymond James, analyst report, 9 March 2021; "Tension Mounts on DRP Expansion with CRL; Unsurprising

74.    Dr. Stulz's conclusion that Plaintiffs' allegation related to the design of the Harmony Study did not have price impact is similarly flawed. Dr. Stulz fails to consider that the FDA expressed concerns to Acadia regarding the proposed design of the Harmony Study prior to and during the 15 May 2017 meeting,[63] and that these concerns were not communicated to the market. The FDA's meeting minutes show that the FDA suggested an alternative design for the Harmony Study and that Acadia did not implement FDA's suggestion.[64]

75.    Ultimately, to reach his conclusion that the alleged misrepresentations and omissions regarding the Harmony Study had no price impact, Dr. Stulz disputes Plaintiffs' factual allegations and overlooks key facts established by documentation produced to date. Among the documentation Dr. Stulz fails to consider is the analyst commentary expressing surprise when they learned, contrary to the Company's prior (mis)representations, that the FDA would not base its decision on top-line results alone, and that the studies' designs and top-line results were not sufficient for approval of the sNDA.

## VII. CRITIQUE OF DR. STULZ'S DAMAGES METHODOLOGY OPINION

76.    Dr. Stulz acknowledges the existence of the out-of-pocket damages methodology and does not dispute that it is widely used to compute damages in virtually all class action security cases, and that it is approved in published legal scholarship.[65] He does not dispute that it can be applied commonly for all Class

---

Development, Unclear Path Forward," by Gregory Renza et al., RBC, analyst report, 5 April 2021; and "Nuplazid CRL as expected; Looking for clarity on forward path from Type A meeting - downgrade to Neutra", by Salveen Ritcher et al., Goldman Sachs, analyst report, 5 April 2021.

[63] FDA Meeting Minutes, 15 May 2017, [ACAD_SECLIT 0001000].

[64] FDA Meeting Minutes, 15 May 2017, [ACAD_SECLIT 0001000].

[65] Stulz Report, ¶139; and Stulz Deposition at 95: 10-96: 23.

members.[66] Dr. Stulz acknowledges that my description of the methodology addresses how it accommodates and can overcome potential complexities of precisely the sort he suggests may be encountered.[67]

77.     Dr. Stulz's criticism is that my opinion regarding the appropriateness of the out-of-pocket damages methodology does not provide sufficient details as to how the damages will be calculated, which he contends must be addressed at the current stage of this litigation.[68] However, Dr. Stulz does not identify a single factor that cannot be addressed using one or more of the generally accepted valuation tools, including those referenced in the Opening Feinstein Report. As stated in my Opening Report (and summarized again below), such valuation tools are commonly employed to construct an inflation ribbon in the course of implementing the out-of-pocket damages methodology. Indeed, Dr. Stulz's criticism disregards that market participants routinely arrive at valuations for virtually any type of publicly traded security in real time using the same valuation tools that would be readily applicable to estimate but-for prices in a securities class action such as this. I have found no particularly unusual complexities in this case that would cause me to reach a different opinion, and Dr. Stulz identified none.

78.     In sum, Dr. Stulz offers that it may be difficult to construct an inflation ribbon that accurately reflects the difference between the stock price that actually prevailed in the marketplace and the price that Acadia stock would have traded at had there been no alleged misrepresentations and omissions (the "but-for" price).

---

[66] Stulz Deposition at 97: 24-98: 5.

[67] Stulz Report, ¶143; and Stulz Deposition at 235:24-236:5, 249:17-250:5.

[68] In other words, Dr. Stulz professes a need for more of a description of the inputs that would hypothetically be used in the implementation of the out-of-pocket damages methodology, which would constitute something "sufficiently concrete" about how a loss causation and damages analysis would work in the instant matter. See *e.g.*, Stulz Deposition at 104:16-19, 109:7-10, 110:2-9, 237:23 – 238:7; and Stulz Report, ¶143.

But by identifying what a correct analysis should consider, Dr. Stulz provides what he believes are instructions for correct construction of the inflation ribbon, and thusly concedes that such construction is possible in this matter.

## A. The Out-of-Pocket Damages Methodology Can Be Applied Commonly to Measure Damages for All Class Members

79.     The Opening Feinstein Report explains that the out-of-pocket damages methodology can be applied commonly to compute damages for all Class members. As stated there, "out-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the Class Period. The out-of-pocket method of calculating damages also takes into account formulaic prescriptions in relevant case law and statutes."[69]

80.     The Opening Feinstein Report also explains the steps to measure stock price inflation that are undertaken in the implementation of the out-of-pocket damages methodology:

> "First, valuation tools, which would include event study analysis, and potentially other empirical analyses, if necessary, would be used to establish if the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of Acadia stock to fall. This analysis, after controlling for potentially nonfraud- related information, would establish whether the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and if corrective disclosure caused that artificial inflation to dissipate, in turn causing investor losses. This analysis would apply on a Class-wide basis."
> **Opening Feinstein Report, ¶169(i).**

---

[69] Opening Feinstein Report, ¶164.

"Second, an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Acadia stock on each day during the Class Period, if any. An inflation ribbon is a time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. The corrective disclosure that finally eliminates all remaining artificial inflation may occur at or after the end of the Class Period."
**Opening Feinstein Report, ¶ 169(ii).**

"Supplementing event study results, the full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure. This analysis would also apply on a Class-wide basis."
**Opening Feinstein Report, ¶ 169(iii).**

"Third, the measure of per-share damages generally applied in Section 10(b) cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss). That is, for each Class member, per-share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold."
**Opening Feinstein Report, ¶ 169(iv).[70]**

"Per-share damages are limited, however, to be no greater than the decline in the share price over the investor's holding period, which is the investment loss actually sustained."
**Opening Feinstein Report, ¶ 169(v).**

---

[70] Note: this is one of the customary mechanical limitations that, as I understand it, is imposed by formulaic prescriptions under prevailing securities case law precedents.

"Pursuant to the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)), for purposes of computing the investment loss limitation on damages, for any shares sold during the 90-day period after the final corrective disclosure, the investment loss is computed as if the selling price was the greater of the actual selling price or the average closing price following the final corrective disclosure up to the sale date. For any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average closing price over the 90 days following the final corrective disclosure."
**Opening Feinstein Report, ¶ 169(vi).**

"The calculation of each Class member's per-share damages would be a mechanical arithmetic exercise for all Class members who bought Acadia stock during the Class Period, conducted the same way for all Class members, and applying the results of the same Class-wide analyses described above to each Class member's stock trading data."
**Opening Feinstein Report, ¶ 169(vii).**

81.   The Opening Feinstein Report specifically identifies many of the practical and routinely used valuation tools, in addition to event study analysis, that are available to a financial economist constructing an inflation ribbon under the out-of-pocket damages methodology:

"Valuation analysis is undertaken continuously, every day, for virtually every publicly traded security, and these tools address the very complexities that could potentially be encountered in the course of computing inflation and damages in this case. Valuations assuming alternative scenarios are commonly conducted by analysts and investors."
**Opening Feinstein Report, ¶167.**

"Among the commonly used valuation tools that are available to investors, analysts in real time, and forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as reputation, transparency, governance, and the quality of internal controls. In addition, forensic analysts have the added advantage of being able to use event study analysis, which quantifies the price effects that occurred when information did reach the market."
**Opening Feinstein Report, ¶168.**

82.   Dr. Stulz acknowledges that these valuation tools are frequently and

successfully used by securities analysts to compute real time valuations and valuations under a range of various alternative hypothetical scenarios.[71] Such valuation analysis is precisely what is called for to construct a correct inflation ribbon in this case.

**B.    The Out-of-Pocket Damages Methodology Is Consistent with Plaintiffs' Theory of Liability**

83.    The out-of-pocket damages methodology, specified in the Opening Feinstein Report, is consistent with Plaintiffs' theory of liability in the instant matter. Plaintiffs' theory of liability is that Defendants violated Section 10(b) by making misleading statements and omissions of material fact, which were widely disseminated to analysts and the investing public. The Complaint alleges that Plaintiffs and other members of the Class purchased or otherwise acquired Acadia common stock relying upon the integrity of the market price for Acadia's common stock and public information relating to Acadia. The alleged misrepresentations and omissions artificially inflated the price of Acadia stock according to Plaintiffs, such that investors overpaid for the security.

84.    As Plaintiffs further allege, when the truth began to emerge, the price of Acadia stock declined promptly as the artificial inflation dissipated from the market price of the stock, causing investors to sustain losses, and causing substantial damage to Plaintiffs and the Class.[72]

85.    The out-of-pocket damages methodology measures the loss caused by the introduction and subsequent dissipation of artificial inflation. Therefore, this damages methodology measure is consistent with Plaintiffs' theory of liability, and the methodology is applied commonly for all Class members.

---

[71] Stulz Deposition at 210:14-212:17, 213:18-214:11, 243:4-19.

[72] Complaint, ¶¶9-11.

**C.    The Opening Feinstein Report Also Explained that Valuation Tools Can be Applied on a Classwide Basis to Handle Potential Complexities Encountered In Implementing the Out-of-Pocket Damages Methodology**

86.    As detailed in the Opening Feinstein Report, to the extent there may be "specific issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damage methodology due to potentially unique facts and circumstances of this case," standard valuation tools can resolve any potential issues and accordingly facilitate the construction of the daily inflation ribbon.[73] I also provided examples of specific tools that could be used to address potential issues and explained that the forensic expert conducting a loss causation analysis will have all the valuation tools available to analysts and investors, plus the added benefit of event study analysis.[74]

**1.    Analysts Used the Standard Valuation Tools Referenced in the Opening Feinstein Report to Value Acadia Common Stock and Other Securities Routinely**

87.    Dr. Stulz contends that my articulation of the damages methodology is insufficient, in part, because I did not identify which specific valuation tools would be necessary to construct the artificial inflation ribbon given the facts and circumstances of the instant case and the potential valuation complexities that therefore could arise.[75]

88.    Artificial inflation on any particular day is the difference between what the prevailing price of Acadia common stock was that day and what the price would have been but for the alleged misrepresentations and omissions. The actual prevailing prices are publicly available and thus indisputable. The alternative but-for prices can be readily estimated by a valuation of the common stock under the but-

---

[73] Opening Feinstein Report, ¶166.

[74] Opening Feinstein Report, ¶¶165-169.

[75] Stulz Report, ¶143.

for scenario of prior full disclosure. In the instant case, this analysis would take into account event study results that quantify the significant stock price rise observed at the start of the Class Period and the quantity of inflation observably dissipated by the corrective disclosures near and at the end of the Class Period. If the valuation impact of the concealed but later revealed information is determined to be relatively constant over the course of the Class Period, the inflation level indicated by the event study is sufficient to construct the inflation ribbon. Only if the value of the information changes over time is additional valuation analysis necessary. Nonetheless, conducting this but-for valuation is straightforward and routinely undertaken, and is also common for all Class members.

89. Indeed, the types of but-for valuation analysis that may be necessary or appropriate to construct the inflation ribbon if complexities are encountered are essentially the same as those that are conducted by innumerable finance professionals who value all kinds of publicly traded securities every day. Finance professionals value all financial assets (such as a portfolio of new and existing drug products) under not only the current set of facts, but also frequently assess what valuations might be under a broad range of alternative scenarios. The field of valuation analysis is exactly this endeavor: determining the appropriate valuation of an asset under a specific set of facts, and also the valuation under alternative or changing facts. The valuation work that may be necessary to implement the out-of-pocket damages methodology if complexities are encountered has at its disposal the full set of tools and techniques comprised by the rich field of valuation analysis, and has the added benefit of the information provided by the event study analysis.[76]

90. Numerous analysts following Acadia employed the valuation tools and techniques I identified in the Opening Feinstein Report, e.g., discounted cash flow

---

[76] Opening Feinstein Report, ¶¶166-169.

(DCF) models, Price/Earnings multiple (P/E), and Enterprise Value/Sales multiple (EV/Sales).[77]

> "Our DCF-derived PO of $48 encompasses commercial drug Nuplazid in PDP at $8/share. Additional indication for Nuplazid in dementia-related psychosis (DRP) represents the majority of our NPV and contributes $44/share. The remainder of our NPV comes from pipeline and cash. We use a WACC of 10% for PDP and 10% for DRP, consistent with how we value other drugs in similar stages of development in our coverage universe. We assume a 21% tax rate for ACAD and zero terminal value."
> **"Interim Look at DRP Study Gives Positive Surprise; Reiterate Buy and PO to $48," by Tazeen Ahmad et al., Bank of America, analyst report, 9 September 2019, p. 3.**

> "Our PT of $58 for ACAD is based on sum-of-the-parts (SOTP) net-present-value (NPV) analysis. We include (1) probability-adjusted NPV of Nuplazid in PDP/DRP, (2) pipeline/technology value, and (3) the company's anticipated YE20 net cash position. We use a 10% discount rate with zero terminal value, which we believe is appropriate for similar stage companies."
> **"ACAD – 1Q2020 Nuplazid Sales in Line, 2020 Guide Slightly Lowered; DRP sNDA on Track for Summer Submission," by Yatin Suneja et al., Guggenheim, analyst report, 8 May 2020, p. 4.**

> "Our new 12-month PT of $65 (vs. $64 prior) is based on an 85%/15% blend of DCF value of $55 (vs $54 prior; 11 % WACC, 1 % TGR) and theoretical M&A value of $124 (vs. $121 prior; 11x 2023E sales). We assign an M&A rank of "2" (representing medium or 15%-30% probability of the company becoming an acquisition candidate) given ACAD is a commercial neurology player with lead asset Nuplazid on the cusp of entering multiple indications."
> **"Acadia Pharmaceuticals Inc. (ACAD): Return in New Patient Starts Drives 2Q Beat," by Salveen Richter et al., Goldman Sachs, analyst report, 5 August 2020, p. 3.**

---

[77] Opening Feinstein Report, ¶168.

"We reiterate our Buy rating and our $60 price target. Our $60 PT is based on an equally weighted composite of: (a) $56.79/share, as a 35x multiple of taxed and diluted FY30 GAAP EPS of $7.22 discounted back to FY20 at 16%; and (b) an NPV of $64.08/share (discount rate 10%, growth rate 2%). Risks to our investment thesis and target price include: (1) failure of Nuplazid (the brand name for pimavanserin) in further clinical studies; (2) failure of Nuplazid to secure regulatory approval in further indications; and (3) failure of Nuplazid to achieve peak commercial revenue estimates in our model, due to market size, penetration rates, and pricing."

**"Diversified CNS Disorder Pipeline Ushers in Hope," by Matthew Caufield et al., H.C. Wainwright, analyst report, 5 November 2020, p. 3.**

"Our price target is based on a blend of two valuation methods: 1) a probability-adjusted DCF through 2030 with an 11% discount rate, 0% terminal growth, 100% POS Parkinsons Psychosis, 60% Dementia Psychosis, and 60% Schizophrenia; and 2) a SOTP analysis based on a 5.0x EV/peak sales (probability-adjusted) multiple for Parkinsons Psychosis, Dementia Psychosis, and Schizophrenia. We exclude ex-U.S. revenue projections in our valuation."

**"Regulatory Surprise in DRP, Lowering PT to $44," by Joseph Stringer, Needham, analyst report, 9 March 2021, p. 4.**

"In calculating our 12-month target price, we employ one or more valuation methodologies, which include a discounted earnings analysis, discounted cash flow analysis, net present value analysis and/or a comparable company analysis. These analyses may or may not require the use of objective measures such as price-to-earnings or price-to-sales multiples as well as subjective measures such as discount rates."

**"Pima CRL for DRP; Opp'y in DRP in Question as FDA Asks for More Efficacy Data," by Ritu Baral and Lyla Youssef, Cowen, analyst report, 5 April 2021, p. 6.**

91.    These stock valuation tools and techniques, properly applied, would accurately measure and accommodate any potential adjustments to inflation that are necessary.[78] The selection of specific tools that could be brought to bear on such issues would be directly informed by the evidence. Disaggregation of simultaneous effects could be handled with the same valuation tools.

92.    Dr. Stulz's requirement that any proposed damages methodology must

---

[78] Opening Feinstein Report, ¶168.

identify now, at this pre-close-of-discovery class certification stage, which specific valuation tools would (or would not) be used to accommodate potential valuation complexities when refining the inflation ribbon, would be unworkable, imprudent, and unnecessary. First, relevant complexities will often not be adequately identifiable until after discovery is complete. But secondly, and more importantly, to commit to a specific valuation tool prior to the close of discovery is unnecessary as the field of valuation analysis is rich enough, and the array of valuation tools is broad enough, to conclude confidently that any particular valuation complexity that actually does arise can be handled. Dr. Stulz also ignores that one can adequately identify the out-of-pocket damages methodology, as I have described it, without having to identify how each of a wide array of valuation tools would specifically be marshalled to address potential complexities that might arise.

93.     Indeed, Dr. Stulz has not identified the appropriate or inappropriate valuation tools for the instant case at this stage of litigation. Although premature, to address Dr. Stulz's most specific concern, there certainly are tools for the forensic financial analyst to quantify the level of risk investors perceived regarding approval of the sNDA, and to quantify how that risk assessment was impacted by the alleged misrepresentations and omissions. As described below in ¶101, analysts discussed the anticipated cash flows that would derive from sNDA approval, and how an expectation of sNDA approval fed into their valuations of Acadia stock. The same relationships between risk assessment and valuation performed by analysts can solve the computational challenges at the center of Dr. Stulz's concerns.

**2.     The Out-of-Pocket Damages Methodology Appropriately Accommodates Materialization of Known Risks and Unknown Risks, As Well As Any Potential "Confounding Information"**

94.     Dr. Stulz contends that "when the alleged corrective disclosure represents a materialization of an understated risk, the residual price decline will overestimate the price decline that would have occurred had the true degree of the

understated risk been disclosed earlier."[79] Dr. Stulz continues that a "damages methodology to address the materialization of risk therefore needs to include a methodology for separating the impact of the allegedly understated risk (if any) from the impact of the materialization of the risk."[80] By way of example Dr. Stulz presents his urn analogy.[81]

95.    Dr. Stulz is wrong to imply that any component of a materialization of an under-disclosed risk is necessarily non-fraud related information, i.e., confounding information. If a company's misrepresentations conceal that a risk has already materialized or has begun to materialize, and only discloses the adverse development as a potential risk that may yet materialize, that misinformation would artificially inflate the security price, and that artificial inflation would have been caused by the misrepresentations and omissions. The disclosure of the materialization would not be confounding information unrelated to the alleged fraud, because in that scenario the company could have earlier disclosed that the risk materialized.

96.    Further, Dr. Stulz acknowledges that the out-of-pocket damages methodology can accommodate materialization of known and unknown risks, for all Class members commonly, given the liability theory and facts of this case.[82] He cautions, however, that the forensic financial analyst must proceed carefully to do so. With that, I agree.

97.    However, Dr. Stulz is wrong to suggest that the methodology as I have explicated it would necessarily make mistakes. He arrives at this incorrect conjecture by mischaracterizing the damages methodology I presented as relying exclusively

---

[79] Stulz Report, ¶150.

[80] Stulz Report, ¶150.

[81] Stulz Report, ¶¶151-152.

[82] Stulz Report, ¶¶139-141.

on the event study to measure artificial inflation. Dr. Stulz overlooks that the Opening Feinstein Report explains that the event study could be coupled with standard tools of valuation to separate confounding effects and thereby construct a correct inflation ribbon. The additional disaggregation and attribution analysis can account for any potential valuation complexities, including any difference between the disclosed and concealed likelihoods of a risk realization, if the evidence indicates a measurable difference.[83]

98.    When executing the out-of-pocket damages methodology, one can assess whether a risk at issue was previously disclosed, and if so to what extent. One may also apply generally accepted valuation principles to determine how investors would have reacted had they been honestly informed about the Company's conduct. Valuation principles and tools also indicate what impact truthful and timely disclosure would have had on investors' assessments of risk and their valuation of the Company stock. This analysis estimates the but-for stock price. The comparison of this but-for stock price with the actual prevailing stock price measures artificial inflation and, in turn, damages.

99.    Dr. Stulz does not opine that this analysis is impossible, nor that the damages methodology cannot incorporate it. Whether this valuation analysis will be necessary, however, depends on what the evidence ultimately indicates about the nature of the concealed or misrepresented information, what could have been disclosed, when the information could have been disclosed, how much of the ultimate disclosures were corrective of prior misrepresentations and omissions, what confounding information there may have been if any, and the measured impact of the eventual disclosures on the common stock price. Dr. Stulz has not completed this analysis, so his criticism is just conjecture. Dr. Stulz implicitly agrees that the

---

[83] Feinstein Report, ¶¶166-168.

analysis requires the full development of the record.[84] He should therefore concur that his demand for identification of the specific valuation tools to be applied in the implementation of the out-of-pocket damages methodology is premature at this juncture.

100.  Development of the record and examination of the evidence regarding what the Company knew about event probability and potential severity will not only reveal if there is any merit to Dr. Stulz's concerns, but will also facilitate the computations to address that concern if it does have merit. That is, the very evidence that may hypothetically suggest that some of the surprise and price decline engendered by the corrective disclosures would also have occurred in a but-for scenario with full and timely disclosure, could be evaluated to measure that level of surprise and price decline and factor it out of the damage computation. Among the available tools for this purpose, if necessary, are the body of generally accepted economic principles regarding how securities are valued under uncertainty and information asymmetry – that is, the effect on a security price when information is withheld from the public.[85] Other tools that may be brought to bear on this issue are the valuation tools aimed at uncovering information and probability estimates implied by security prices. Two such publications that review and extend this branch

---

[84] Stulz Deposition at 112:3-113:7.

[85] The Nobel Prize in Economics was twice awarded for developing the principles about behavior and pricing under conditions of asymmetric information. "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," by George Akerlof, *The Quarterly Journal of Economics*, Vol. 84, No. 3, 1970; "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, Vol. 104, No. 2, June 2002; and "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020, describing the award to Paul Milgrom in 2020 for his work addressing asymmetric information, which cited, among others, "Rational Expectations, Information Acquisition, and Competitive Bidding," by Paul Milgrom, *Econometrica*, Vol. 49, No. 4, 1981.

of the literature include the following: "Recovering Probability Distributions from Option Prices" by Jens Jackwerth and Mark Rubinstein [1996] and "Measuring Stock Market Performance" by Richard Dobbs and Tim Koller [2005].[86]

101. As discussed above, it is unnecessary to construct the actual artificial inflation ribbon at this juncture because one can confidently state that it can be done after a full record is developed in discovery. However, if, as Dr. Stulz suggests, the inflation ribbon should reflect the difference between the perceived risk and true risk of sNDA approval, I describe below one way in which one can compute this difference in a straightforward manner consistent with generally accepted principles and methodologies.

    i. Prior to and throughout the Class Period, analysts' valuations of Acadia stock reflected the estimated probability of success (the likelihood of approval) of the sNDA.[87] Assume for illustrative purposes that consensus analyst estimates indicate that $50 per share of value would be added to the Company's stock price if the Company's sNDA was

---

[86] "Recovering Probability Distributions from Option Prices," by Jens Jackwerth and Mark Rubinstein, *The Journal of Finance*, Vol. 51, No. 5, 1996; and "Measuring Stock Market Performance," by Richard Dobbs and Tim Koller, *McKinsey on Finance*, No. 16, 2005.

[87] See *e.g.*, "Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter, et al., Goldman Sachs, analyst report, 9 September 2019, p. 6; "Updating Model for DRP; PT to $50," by Cory Kasimov, et al., J.P. Morgan, analyst report, 10 September 2019, p. 1; "3Q19: Continued Strong Commercial Execution, Anticipate Inflection Into Potential DRP Launch," by Beau Miller, RBC Capital Markets, analyst report, 30 October 2019, p. 2; "Solid HARMONY Data at CTAD Underlie Mgmt's Confidence in Approaching FDA; Our Take on the Full Results," by Paul Matteis, et al., Stifel, analyst report, 5 December 2019, p. 2; "Takeaways From Our Investor Call with ACAD CEO and President," by Tazeen Ahmad, et al., Bank of America, analyst report, 3 February 2020, p. 1; "2019 Was Just the Tip of the Iceberg. Initiating Coverage at Buy with $69 PT," by Neena Bitritto-Garg, Citigroup, analyst report, 5 March 2020, p. 7; "Is DRP Approval Fully Priced In? Will Pima Get a Broad Label? What About the Black Box? Our Thoughts on Your DRP Qs," by Neena Bitritto-Garg, Citibank, analyst report, 28 January 2021, p. 1; and See Appendix B.

approved. Assume that consensus analyst estimates of the likelihood of success that the sNDA would be approved was 95%. It follows that the Acadia stock price would reflect at least $47.50 per share of value attributable to the 95% probability of sNDA approval.

ii. Further assume that with full development of the record, the true likelihood of sNDA approval is determined to have been 5%. That is, with correct information the but-for stock price would have reflected only $2.50 per share of value attributable to the probability of sNDA approval (equal to 5% multiplied by the $50.00 per share).

iii. The difference between the $47.50 and $2.50 per share is $45.00 per share, which in this example would be the amount of artificial inflation in the stock price.

102. There are several potential approaches to arriving at the true probability of success of the sNDA. For example, a forensic financial analyst could perform a cohort study based on past sNDA submissions to estimate the likelihood of approval when a company deviates from the FDA study design, or the likelihood of approval when a study fails to show statistically significant subgroup results. Alternatively, the forensic financial analyst could rely on the likelihood of approval as assessed by a competent expert with expertise relevant to assessing the prospects for FDA drug approval. The forensic financial analyst may also look to what the price of Acadia stock was before the alleged misrepresentations and omissions were made. Exactly which method is used will depend on, among other things, what information is uncovered by discovery in this case.

103. I also note that Dr. Stulz complains that the out-of-pocket damages methodology may not be able to account adequately for other potentially confounding information released to the market on the alleged corrective disclosure dates. Confounding information is valuation-relevant information unrelated to the alleged fraud that emerges simultaneously with a fraud-related disclosure. In my

experience, potentially confounding information is a fairly common complexity arising in securities class actions. I have frequently disaggregated fraud-related from non-fraud related information on corrective disclosure dates, thereby removing the effect of confounding information when it has been present in other matters. Nonetheless, once again the Stulz Report fails to identify any kind of unusual confounding information that is actually present in the instant matter. Indeed, it appears undisputed that on the corrective event disclosure dates the Company-specific news was confined to news directly relating to the probability of FDA rejection of the sNDA, which is case-related.

104.   The one piece of confounding information that Dr. Stulz claims would need to be measured and accounted for under the out-of-pocket damages methodology was the irreducible risk that the FDA might reject the Company's sNDA due to some non-fraud related reasons. But as noted above, the out-of-pocket damages methodology is fully capable of accounting for this alleged "complexity."

105.   Dr. Stulz is therefore left to resort to vague insinuations that there may be other problematic pieces of confounding information in the instant matter. However, Dr. Stulz fails to support that they likely exist, let alone prove that they actually exist. Further, he conceded at his deposition that he did not actually conduct any independent quantitative analysis to determine if there might actually be confounding information.

> [Question:] "Did you perform or try to perform any quantitative analysis to try to determine whether any confounding information issues are actually present in this case?"
> [Answer:] "I did not perform a quantitative analysis. I was not asked to do so."
> Stulz Deposition at 246:5-10.

106.   In sum, Dr. Stulz's opinion ultimately rests on his view that I should have already addressed in the Opening Feinstein Report alleged hypothetical confounding information that Dr. Stulz is incapable himself of actually identifying and articulating. Until the full development of the factual record, it is premature to

address in advance every conceivable piece of confounding information that might exist, without any proof that such confounding information does exist. There is nothing in the Stulz Report that gives me any reason to change my opinion that any confounding information "complexities," to the extent they exist, cannot be adequately addressed under the out-of-pocket damages methodology.

### 3. Dr. Stulz's Erroneous Argument About a Missing Key Piece of Information

107. Dr. Stulz insinuates that implementation of the out-of-pocket damages methodology, as described in the Opening Feinstein Report, might be challenging in the instant matter because there will likely be a fatal missing key piece of information. Specifically, Dr. Stulz claims that absent a "key piece of information" concerning the real versus actual probability of FDA rejection of the sNDA, it will be impossible to determine the but-for stock price and therefore damages in the instant matter.[88]

108. However, for the same reasons that I have already discussed above in ¶¶98-102, this argument is a red herring because there are multiple ways that one can determine both the market's induced misperception of the risk of FDA rejection during the Class Period (e.g. from analyst reports), as well as the but-for correct perception of the risk that investors would have had but-for the misrepresentations and omissions (e.g. considering the stock price prior to the misrepresentations, reference to empirical studies, analysis by relevant subject matter experts, and additional event study with valuation analysis). With such information, as also discussed above, it is a relatively straightforward exercise to calculate the necessary metrics and the impact of the probability differences on the valuation of Acadia stock.

---

[88] Stulz Deposition at 104:20-105:16.

### 4.   Time-Varying Inflation

109.   Without completion of discovery and without a complete evidentiary record, Dr. Stulz surmises that inflation may have varied over time and that this time-varying inflation may complicate the computation of damages in this case.[89] Time-varying inflation means that the valuation effect of the alleged misrepresentations and omissions may have changed over the course of the Class Period. Interestingly, Dr. Stulz denies this principle of finance when he argues that a maintained, uncorrected, or reiterated misrepresentation can have no further impact on a stock price in an efficient market. Here, he contends quite the opposite. Time-varying inflation, however, is a common issue in class action securities cases, and I am confident that here it will not pose insurmountable difficulties.

110.   Dr. Stulz theorizes that the alleged undisclosed true risk of FDA rejection may have changed over the course of the Class Period, thereby causing the artificial inflation in Acadia stock to change.[90] Notwithstanding the absence of a complete evidentiary record, Dr. Stulz asserts that time-varying inflation, a frequently encountered phenomenon, could make the computation of damages in the instant case difficult.[91] Specifically, according to the Stulz Report, the supposed undisclosed risk that Acadia's sNDA would be rejected changed over the course of the Class Period, such that the but-for corrective disclosure would have revealed different risk levels and thus different valuation effects depending on when full disclosure would have been made.[92]

111.   The Stulz Report suggests that time-varying inflation may exist in the

---

[89] Stulz Report, ¶155.

[90] Stulz Report, ¶155; and Stulz Deposition at 247:9-22.

[91] Stulz Report, ¶¶153-158; and Stulz Deposition at 247:9-13.

[92] Stulz Report, ¶155; and Stulz Deposition at 247:9-22.

instant matter, but does not prove or opine with any certainty that it is in fact present. Dr. Stulz also admitted in his deposition that he did not conduct any quantitative analysis to determine if time-varying inflation was actually present in the instant matter.[93] Dr. Stulz's criticism is more of an admonition about the importance of further discovery to identify whether this "complexity" may exist here, rather than evidence of any deficiency in the proposed damage methodology. For the same reasons as I have already discussed, detailing precisely what the evidence will show and what valuation tools will be used to evaluate it (e.g., discounted cash flow, price/earnings multiples, varying inputs in analysts' valuation models, etc.) is premature until the evidentiary record is complete – and also unnecessary for me to conclude with confidence that whatever "complexities" may ultimately be determined to exist can be dealt with by my previously detailed list of available valuation tools (including event study analysis). The criticism that the description of the methodology is incomplete because it does not detail how currently unavailable documents and information will be evaluated is therefore off base.

112. In class action securities cases, time-varying inflation is a common issue that in my experience does not pose insurmountable difficulty. Nor does Dr. Stulz contend that the potential presence of time-varying inflation in the instant case would raise insurmountable problems.[94] In the instant case, if it is determined by the factual record that inflation actually varied during the Class Period, that very same evidence will indicate how to resolve time-varying inflation, and which valuation tools are most relevant and useful for doing so. Personally, in matters where I have served as the expert at the merits stage, when the facts indicate artificial inflation varied over time, the same facts that indicated the presence of the issue also facilitated the appropriate measurement and accounting for it in the computation of

[93] Stulz Deposition at 252: 9-19.

[94] Stulz Deposition at 251:4-13; 252:24-253:16.

damages.[95]

113.  Presently, however, it is premature to agree or disagree with the conjecture that the truth about the probability that the FDA would reject Acadia's sNDA changed substantially over the course of the Class Period, other than after the initial alleged partial corrective disclosure on 8 March 2021. If and to what extent the true probability and the market's induced misperception of the probability of an FDA rejection changed over the Class Period is the kind of information that discovery will likely illuminate.

114.   An event study measures the valuation effect of new information at the time that information is disclosed to the market. An event study is essentially a controlled experiment that indicates the value of the subject stock both with and without the new information. If there is confounding information accompanying the arrival of the new information, valuation analysis can account for it, revealing the impact of the allegation-related corrective information. Similarly, the but-for stock price on dates earlier than the corrective disclosures can be determined by valuing the stock under the alternative but-for scenario on those earlier dates. The out-of-pocket damages methodology uses the information produced during discovery to gauge what was known but concealed by Defendants, and the valuation impact of whatever was concealed. Importantly, this type of but-for valuation (i.e., under alternative scenarios and different as-of dates) is conducted by securities analysts every day for virtually all publicly traded securities. This but-for scenario analysis is a routinely applied step when executing the out-of-pocket damages methodology in securities cases. Just as valuation tools produced reliable measurements of time-

---

[95] See *e.g.*, Report On Loss Causation And Damages Professor Steven P. Feinstein, Ph.D., CFA, *Marvin Pearlstein, vs. Blackberry Limited (formerly known as Research In Motion Limited)*, No. 1:13-CV-7060-CM-KHP, 29 May 2020, ¶¶341-343; and Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund vs. Michael J. Burns and Robert C. Richter*, No. 3:05-cv-07393-JGC, 4 August 2014, ¶¶121-124.

varying inflation and thus damages in prior cases, the array of valuation tools can be relied upon for the same purpose in the instant case.

115. Dr. Stulz overlooks that computational issues such as time-varying inflation are common and are routinely encountered and addressed in class action securities cases – and certainly identifies no "time-varying" inflation complexities that are so unusual (let alone unique) here as to suggest that the out-of-pocket method will not work here. The computational issues are more about the execution of the common damage methodology at the loss causation stage rather than the existence of a common damage methodology at the class certification stage. Personally, in matters where I have served as the expert at the merits stage, such complexities were identified, accounted for, and appropriately addressed. One such case that is a matter of public record, was *Marvin Pearlstein, vs. Blackberry Limited* ("*Blackberry*").

> "While the misrepresentations and omissions caused and maintained inflation since the start of the Class Period, they also caused an increase in artificial inflation on 12 August 2013. As described in ¶¶96-97 and ¶¶210-211 above, on that date the Company announced that it would explore strategic alternatives. The stock price rose significantly on this news, as an acquisition target typically commands an acquisition premium. However, when the final corrective disclosures on 20 September 2013 revealed the true state and prospects for BlackBerry 10, analysts commented that BlackBerry's attractiveness and value as an acquisition target had waned considerably. … Some of the price decline that occurred on September 20th, therefore, was the reduction in the value accretion that entered the stock price on August 12th. Just as the full truth caused that value reduction on September 20th, the full truth, had it been known, would have prevented the value accretion on August 12th. Therefore, of the $1.75 per share artificial inflation that dissipated on September 20th, $0.94 per share had newly entered the stock price on August 12th. The rest, $0.81 per share, was in the stock price since the beginning of the Class Period."
> **Report On Loss Causation And Damages Professor Steven P. Feinstein, Ph.D., CFA, *Marvin Pearlstein, vs. Blackberry Limited (formerly known as Research In Motion Limited)*, No. 1:13-CV-7060-CM-KHP, 29 May 2020, ¶¶341-343.**

116. Another example of a case that is publicly available, where I constructed a time-varying inflation ribbon, is *Plumbers & Pipefitters National*

*Pension Fund vs. Michael J. Burns and Robert C. Richter* case (*Dana Corporation* securities litigation, or "*Dana*"). In that case, I constructed an artificial inflation ribbon that increased in connection with successive earnings overstatements. Specifically, in *Dana*, I determined based on principles espoused in the published peer-reviewed literature that "artificial inflation caused by concealment of the internal control deficiencies and unreliability of the Company's accounting and reporting grew as the cumulative earnings overstatements accrued. That is, just as the alleged accounting fraud grew in magnitude, so too did the artificial inflation attributable to the reputation effect."[96]

117.   It is noteworthy that the appropriate valuation tool needed to address time-varying inflation in each of those two cases, *Blackberry* and *Dana*, depended on what was the cause of the inflation variation in each case. Different causes dictated the application of different valuation tools. In the *Blackberry* case, it was the changing likelihood that *Blackberry* would be acquired that caused inflation to vary. In the *Dana* case, it was the change in reputation effect stemming from an accumulating earnings overstatement that caused inflation to vary. In the *Blackberry* case, the artificial inflation ribbon was constructed to reflect appropriately the increase and then decrease in the acquisition premium. In the *Dana* case, the artificial inflation ribbon was scaled up over time to reflect the increasing earnings overstatement, consistent with the published peer-reviewed literature linking reputation effect to the magnitude of an earnings overstatement.

118.   Importantly, if the evidence reveals that the risk of FDA rejection of the sNDA changed substantially over the Class Period, that same evidence will measure and time that change so that it can be incorporated into the artificial inflation ribbon. Specifically, should the evidentiary record ultimately indicate that artificial inflation

---

[96] Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund vs. Michael J. Burns and Robert C. Richter*, No. 3:05-cv-07393-JGC, 4 August 2014, ¶141.

did change over the course of the Class Period on account of fluctuating levels of probability that the FDA would or would not approve the Company's sNDA, or if that the probability is even relevant, that very same evidence considered with valuation tools and the event study can be used to assess changing artificial inflation accordingly.

119.    Presently, however, neither in his report nor in his deposition testimony did Dr. Stulz claim that he had proved artificial inflation in Acadia's stock price varied during the Class Period.[97] Ultimately, the issue he raises is only a hypothetical concern. Dr. Stulz's discussion of time-varying inflation does not refute the existence or feasibility of implementing the out-of-pocket damages methodology. If anything, it acknowledges the existence of the damages methodology and that that the methodology can be applied commonly for all Class members.

---

[97] Stulz Deposition at 251: 21-252:19.

## VIII.  LIMITING FACTORS AND OTHER ASSUMPTIONS

120.   This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 12, 2023

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Opening Feinstein Report**

**CASE DOCUMENTS**

- Scheduling Order Regulating Discovery and Other Pre-Trial Proceedings, dated 17 March 2023.
- Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, Ph.D., CFA, dated 21 August 2023.
- Expert Report of René Stulz, dated 20 October 2023.
- Defendants' Opposition to Plaintiffs' Motion for Class Certification and Appointment Of Class Representatives And Class Counsel, dated 20 October 2023.
- Stenographic and Video-Recorded Deposition of René Stulz, dated 10 November 2023.

**DOCUMENTS FROM PLAINTIFFS' COUNSEL**

- ACAD_SECLIT_0000995 (May 15 2017 Meeting Minutes).

**ANALYST REPORTS**

- Bank of America, 9 September 2019.
- Cowen, 9 September 2019.
- Goldman Sachs, 9 September 2019.
- JMP Securities, 9 September 2019.
- J.P. Morgan, 9 September 2019.
- Needham, 9 September 2019.
- J.P. Morgan, 10 September 2019.
- RBC Capital Markets, 30 October 2019.
- Cowen, 5 December 2019.
- Goldman Sachs, 5 December 2019.
- RBC Capital Markets, 5 December 2019.
- Stifel, 5 December 2019.
- Goldman Sachs, 6 December 2019.
- Bank of America, 3 February 2020.
- Citigroup, 5 March 2020.
- Guggenheim, 8 May 2020.
- Goldman Sachs, 5 August 2020.
- H.C. Wainwright, 5 November 2020.
- Citigroup, 28 January 2021.
- RBC Capital Markets, 8 March 2021.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the Opening Feinstein Report**

- Raymond James, 9 March 2021.
- Oppenheimer, 9 March 2021.
- Needham, 9 March 2021.
- Cowen, 5 April 2021.
- Goldman Sachs, 5 April 2021.
- Jefferies, 5 April 2021.
- Needham, 5 April 2021.
- RBC Capital Markets, 5 April 2021.


**ACADEMIC AND PROFESSIONAL LITERATURE**

- Akerlof, George, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *The Quarterly Journal of Economics*, vol. 84, no. 3, 1970.
- Cowan, Adrian, Paul Seguin, Sean Malone, "Event Studies in Securities Litigation," Chapter 47 of *The Comprehensive Guide to Economic Damages*, 6th Edition, edited by Nancy J. Fannon, Jonathan Dunitz, Business Valuation Resources, LLC, 2022.
- DeFusco, Richard, et al., "Probability Concepts," CFA Institute, 2023.
- Fisch, Jill, Jonah Gelbach, and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review*, vol. 96, no. 3, 2018.
- Jackwerth, Jens and Mark Rubenstein, "Recovering Probability Distributions from Option Prices," *The Journal of Finance*, vol. 51, no. 5, 1996.
- Koller, Tim and Richard Dobbs, "Measuring Stock Market Performance," *McKinsey on Finance*, no. 16, 2005.
- Lofgren, Karl-Gustaf, Torsten Persson, and Jorgen Weibull, "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," The Scandinavian Journal of Economics, vol. 104, no. 2, 2002.
- Milgrom, Paul, "Rational Expectations, Information Acquisition, and Competitive Bidding," *Econometrica*, vol. 49, no. 4, 1981.


**LEGAL CASES**

- *Goldman Sachs Grp., Inc. v. Ark. Tcher. Ret. Sys.*, 141 S. Ct. 1915, 1963 (2021).


**OTHER LEGAL CASE DOCUMENTS**

- Report of Professor Steven P. Feinstein, Ph.D., CFA, *Mary K. Jones vs. Pfizer Inc.*, No. 1:10-cv-03864-AKH, 10 June 2014.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the Opening Feinstein Report**

- Report of Professor Steven P. Feinstein, Ph.D., CFA, *Plumbers & Pipefitters National Pension Fund vs. Michael J. Burns and Robert C. Richter*, No. 3:05-cv-07393-JGC, 4 August 2014.
- Expert Report of René M. Stulz, Ph.D., *In Re Eletrobras Securities Litigation*, Case No.: 15-cv-5754-JGK (SDNY), 6 October 2017.
- Amended Expert Report of René M. Stulz, Ph.D., *In Re BHP Billiton Limited Securities Litigation*, Civil Action No. 1:16-cv-01445-NRB (SDNY), 18 May 2018.
- Expert Report of René M. Stulz, Ph.D., *In Re Equifax, Inc. Securities Litigation*, Civil Action No. 17-CV-3463-TWT, 12 August 2019.
- Report On Loss Causation And Damages Professor Steven P. Feinstein, Ph.D., CFA, *Marvin Pearlstein, vs. Blackberry Limited (formerly known as Research In Motion Limited)*, No. 1:13-CV-7060-CM-KHP, 29 May 2020.


**OTHER**

- "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020.
- Any other documents cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Opening Feinstein Report**

In Re Kirkland Lake Gold Ltd. Securities Litigation
Case No. 20-cv-04953
United States District Court
Southern District of New York
Deposition Testimony
March 2023
Deposition Testimony
October 2023

In Re Vale S.A. Securities Litigation
Civil Action No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
October 2023

In Re Alta Mesa Resources, Inc. Securities Litigation
Case No. 4:19-cv-00957
United States District Court
Southern District of Texas
Deposition Testimony
November 2023

In Re Ripple Labs Inc. Litigation
Case No. 4:18-cv-06753-PJH
United States District Court
Northern District of California
Deposition Testimony
January 2023
Deposition Testimony
December 2023