# EXHIBIT 3

Case 3:21-cv-00762-WQH-MSB    Document 122-6    Filed 12/12/23    PageID.3209    Page 1 of 69

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

-------------------------------*

CITY OF BIRMINGHAM RELIEF AND

RETIREMENT SYSTEM and OHIO          Case number:

CARPENTERS' PENSION FUND,      3:21-cv-00762-WQH-MSB

Individually and on Behalf of

All Others Similarly Situated,

                    Plaintiffs,

          vs.

ACADIA PHARMACEUTICALS INC.,

STEPHEN R. DAVIS, and SRDJAN

(SERGE) R. STANKOVIC,

                    Defendants.

-------------------------------*

STENOGRAPHIC AND VIDEO-RECORDED

DEPOSITION OF RENÉ M. STULZ, Ph.D.

Friday, November 10, 2023

9:41 a.m.


Stenographically recorded by:

Josephine H. Fassett, RPR, CCR

Page 2

Friday, November 10, 2023

9:41 a.m.

T R A N S C R I P T  of the stenographic and video-recorded deposition of RENÉ M. STULZ, Ph.D., pursuant to the Federal Rules of Civil Procedure, held at the offices of Cooley LLP, 55 Hudson Yards, New York, New York, on Friday, November 10, 2023, commencing at approximately 9:41 a.m., stenographically recorded by Josephine H. Fassett, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey.

Page 4

APPEARANCES (cont'd.):

COUNSEL FOR DEFENDANTS ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, AND SRDJAN (SERGE) R. STANKOVIC:

COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1117
858.550.6000
BY:  PETER M. ADAMS, ESQ.
padams@cooley.com
HEATHER M. SPEERS, ESQ.
hspeers@cooley.com
JAMIE ROBERTSON, ESQ. (remote)
jrobertson@cooley.com

ALSO PRESENT:
COREY WAINAINA, Videographer

Page 3

APPEARANCES:

COUNSEL FOR LEAD PLAINTIFF CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM:

SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue
New York, New York 10169
212.223.6444
BY:  WILLIAM C. FREDERICKS, ESQ.
wfredericks@scott-scott.com
MARC J. GRECO, ESQ.
mgreco@scott-scott.com
JACOB B. LIEBERMAN, ESQ. (remote)
jlieberman@scott-scott.com

Page 5

---------------------INDEX-----------------------

| WITNESS | PAGE |
|---|---|
| RENÉ M. STULZ, Ph.D. | |
| By Mr. Fredericks | 9 |

AFTERNOON SESSION - 121

--------------------EXHIBITS---------------------

| PLAINTIFFS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | Expert Report of René M. Stulz, Ph.D. | 14 |
| Exhibit 27 | Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws | 35 |
| Exhibit 28 | Order filed February 2, 2023 | 36 |
| Exhibit 29 | Excerpt of Transcript of Motion Hearing (Exhibit 88) | 38 |
| Exhibit 30 | Email Exchange, Bates ACAD_SECLIT_0023439 to ACAD_SECLIT_0023441 | 186 |

2 (Pages 2 - 5)

Page 6

--------------------EXHIBITS---------------------

PLAINTIFFS  DESCRIPTION                    PAGE

Exhibit 31  FDA Complete Response Letter,    200
            Bates ACAD_SECLIT_0001088 to
            ACAD_SECLIT_0001093

Exhibit 32  The Lancet Neurology             225
            Supplementary Appendix

Exhibit 33  Plaintiffs' Amended Notice of    263
            Deposition of Expert Witness René
            M. Stulz, Ph.D.

Page 8

STULZ, Ph.D.

My name is Corey Wainaina representing Veritext Legal Solutions, and I am the videographer.

The court reporter is Josephine Fassett from the firm Veritext Legal Solutions.

I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. FREDERICKS:  William Fredericks, Scott+Scott Attorneys at Law LLP, and with me is my colleague, Marc Greco.

MR. ADAMS:  Pete Adams with Cooley, and Heather Speers with Cooley, on behalf the defendants and here on behalf of the witness.

Page 7

STULZ, Ph.D.

(On the stenographic and video record 9:41 a.m.)

THE VIDEOGRAPHER:  Good morning everyone.  We are going on the record at 9:41 a.m. Eastern Time on Friday, November 10, 2023.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of René Stulz.

I'm not sure if I said that correctly.

THE WITNESS:  Yes.

THE VIDEOGRAPHER:  In the matter of City of Birmingham Relief and Retirement System, et al. versus Acadia Pharmaceuticals Inc., et al.  This was filed in the United States District Court, Southern District of California.  The case number is 3:21-cv-00762-WQH-MSB.

Page 9

STULZ, Ph.D.

MR. LIEBERMAN:  Jacob Lieberman, also from Scott+Scott with Mr. Fredericks.

MS. ROBERTSON:  This is Jamie Robertson at Cooley LLP on behalf of Defendants.

THE VIDEOGRAPHER:  Okay.  Will the court reporter please swear in the witness.

RENÉ M. STULZ, Ph.D.

the witness, having been duly sworn, was examined and testified under oath as follows:

EXAMINATION

BY MR. FREDERICKS:

Q.  Dr. Stulz, good morning.  Could you just state and spell your name for the record, please.

A.  So my full name is René with an accent on the second e, and Stulz, S-t-u-l-z.

Q.  And what is your current address?

A.  3419 River Seine, S-e-i-n-e, Street, Columbus, Ohio.

Q.  How many times, roughly, would you say you've been deposed before?

A.  More than fifty, less than a hundred.

Q.  Okay.  Accordingly, you probably heard a number of the instructions that I'm about to give

Veritext Legal Solutions

212-267-6868                    www.veritext.com                    516-608-2400

Page 10

STULZ, Ph.D.

now, but let me just go through them to make sure that we're on the same page.

If you could answer questions orally and avoid ums and uh-huhs, those are rather hard for the reporter to take down. So if you mean yes or no, if you could say yes or no rather than nod or give uh-ums or uh-huhs.

Let me know if you don't understand a question and I'll try to rephrase it, otherwise I'll assume that you do understand the question.

If you need to take a break, just let us know, as long as it's not in the middle of a pending question.

Your counsel may from time to time offer some objections, but as you know from having done this before, unless he instructs you not to answer a question, in all likelihood, I will ask you to answer the question in any event, or you should answer the question in any event. So if you could just try to keep the question in mind without being unduly distracted by any objections.

So do you understand those instructions?

A.  I do.

Q.  Are you taking any medication that might

Page 11

STULZ, Ph.D.

prevent you from giving full and truthful testimony today?

A.  No.

Q.  Are there any reasons of any kind that you are aware of that might prevent you from giving full and truthful testimony today?

A.  No.

Q.  Are you represented by counsel today?

A.  For the deposition?

Q.  Yes, that's the question.

A.  Right.  And I am -- I mean, Mr. Adams is, I mean, said when he introduced himself that he's representing me for the deposition.

Q.  Okay.  What is Acadia Pharmaceuticals?

MR. ADAMS:  Objection.

A.  It's a firm that is a biotech that is focused on a specific set of diseases having to do with the nervous system and holds a patent or patents to a specific medication pimavanserin.

Q.  And is pimavanserin known as Nuplazid?

A.  That's a commercial name.  That's correct.

Q.  Well, today then let's just use pimavanserin as interchangeable with Nuplazid and

Page 12

STULZ, Ph.D.

vice versa, if that's okay with you?

A.  That's okay with me.

Q.  Okay.  Acadia's counsel has retained you to do certain work in this matter, correct?

A.  Correct.

Q.  Before your work in this matter, had you ever done any prior work for Acadia or on behalf of Acadia?

A.  No.

Q.  Had you done any prior work for the lawyers representing Acadia?  That would be the Cooley firm.

A.  I had been retained by Cooley before.

Q.  And approximately how many times?

A.  Maybe three times by that office.

Q.  And by the firm as a whole?

Withdrawn.

When you say "by that office," are you referring to a particular branch of Cooley?

A.  San Diego.  Yes.

Q.  Got it.  And have you done other work for the Cooley firm as a whole?

A.  So I remember some direct retentions. It's a small number, maybe it's three or less in

Page 13

STULZ, Ph.D.

addition.  But I have done many cases where there were many defendants and each one of the defendant retained a law firm.  Sometimes Cooley was one of the law firm retained by the defendant.  By a defendant.  I don't keep track of those.

Q.  Okay.  Leaving this case aside, when was the most recent other retention by the Cooley firm that you can remember?

A.  My understanding is that Cooley was involved in a litigation I did last year.  They weren't the attorneys that I interacted with directly for that litigation but they were, they were part of it.

Q.  And what was the name of that case?

A.  Qualcomm.

Q.  And when was the last time you recall working directly with Cooley attorneys?

A.  It would be two years before, I believe, and it was a case that is on the list that I gave, which is Inovio.

Q.  Okay.  Leaving aside your work in this matter, have you previously ever studied or analyzed any aspects of Acadia's business?

A.  No.

4 (Pages 10 - 13)

Page 14

STULZ, Ph.D.

Q. To the best of your knowledge, have you had any prior social or business dealings with anyone who, to the best of your knowledge, was an officer or director of Acadia?

A. I don't believe so.

(Expert Report of René M. Stulz, Ph.D. marked as Plaintiffs Exhibit 26, as of this date.)

BY MR. FREDERICKS:

Q. Okay. Let me show you what's been marked as Exhibit 26.

MR. FREDERICKS: This is a copy -- well, I'll ask Dr. Stulz to identify this document that I just marked as Exhibit 26.

Q. Can you identify this document?

A. Yes, I can. It looks like my report.

Q. Okay. And that's the report you prepared in connection with this matter?

A. That is correct.

Q. Okay. And is that your signature on page 89?

MR. ADAMS: And are you -- you're referring to the small page numbers?

MR. FREDERICKS: Yes.

Page 15

STULZ, Ph.D.

A. There's a signature on page 89 of the report or page 93 of the exhibit is my signature.

Q. Okay. Did you hand sign this document or did you sign it electronically?

A. I signed it electronically.

Q. Okay. And how did the report come to be electronically signed? Did you direct someone to sign it electronically on your behalf?

A. My recollection is it happened fairly late in the day that the report was submitted and that I gave instructions to Cornerstone to put my electronic signature. I was at dinner at that time and so that's how we did it.

Q. Okay. And if you look at paragraphs 8 and 9 of your report, do those paragraphs set forth the scope of the assignment you undertook in this matter?

A. That's correct.

Q. Paragraph 9 states, in part, "I have also been asked to review and respond to the Feinstein Report. In particular, I have been asked to evaluate whether Professor Feinstein has proposed a methodology capable of calculating class-wide damages in a manner consistent with

Page 16

STULZ, Ph.D.

plaintiffs' theory of liability."

Do you see that language?

A. I do.

Q. Okay. Were you asked to respond to any specific aspects of Dr. Feinstein's report other than with respect to Dr. Feinstein's proposed methodology for calculating class-wide damages?

A. So paragraphs 8 and 9 describe exactly what I was asked to do.

Q. Okay. My question is: It says you were asked to review and respond to the Feinstein report. Can you just tell us for what purposes you were asked to review and respond to the Feinstein report?

MR. ADAMS: Objection. Asked and answered. And it says "in particular."

A. So my focus was on the second sentence, the "in particular" sentence, and that's what I did.

Q. Okay. Were you asked to review and respond to any other aspects of the Feinstein report, other than what's specifically referenced in paragraph 9?

A. I was not asked to respond to anything

Page 17

STULZ, Ph.D.

else.

Q. Okay. Did you review Dr. Feinstein's report in its entirety?

A. I did.

MR. ADAMS: Can I have a copy of...

Q. I'm going to mark --

MR. FREDERICKS: I'm sorry.

Q. I'm going to show you, Dr. Stulz, a copy of the document that has previously been marked as Exhibit 1 in the Feinstein deposition. Have you seen this document before?

A. I have seen the report of Dr. Feinstein.

Q. And do you recognize the document I've shown you, previously marked as Feinstein Exhibit 1, do you recognize that as the same report that you reviewed?

A. It looks like the report that I saw.

Q. Okay. Did you review Dr. Feinstein's report in its entirety?

MR. ADAMS: Objection. Asked and answered.

A. I did.

Q. Okay. Did you read the portions of Dr. Feinstein's report dealing with his opinion

5 (Pages 14 - 17)

Page 18

STULZ, Ph.D.

that Acadia common stock traded in an efficient market during the class period?

A. I read it in its entirety.

Q. Okay. So for purposes of your report, and conclusions, for purposes of your report, did you assume that the market for Acadia common stock during the class period was efficient?

A. I was asked to assume that it was efficient.

Q. And you did, in fact, assume that it was efficient in preparing your report?

A. I am assuming that it is efficient because I was asked to do so.

Q. Okay. And you made that assumption for all purposes in connection with preparing your report?

A. It's an assumption that I hold throughout the report, that is correct.

Q. Okay. Do you have any opinions as to the accuracy or thoroughness of Dr. Feinstein's analysis of whether Acadia common stock traded on an efficient market during the class period?

A. I was not asked to form an opinion on this issue so I do not have an opinion.

Page 19

STULZ, Ph.D.

Q. Okay. Did you, in the course of your reading of Dr. Feinstein's report, did you identify anything that you thought was an error or a mistake in Dr. Feinstein's market efficiency analysis?

A. I have one footnote in my report where I differentiate my event study from what he did and I explain why I do not agree with what he did. As far as I know, that would be the only disagreement that I express in my report concerning the efficiency part of his report.

Q. Okay. Were you asked to conduct a loss causation analysis in this matter?

A. My understanding is that loss causation is not an issue that arises at class certification. I was not asked to conduct a loss causation analysis.

Q. And understanding that you weren't asked to conduct one, is it also correct that you, in fact, did not conduct one?

A. I was not asked to do it and I did not do it.

Q. Were you asked to conduct a damages analysis in this matter?

Page 20

STULZ, Ph.D.

A. Can you explain what you mean by "damages analysis"?

Q. Well, is it your understanding that in most Section 10(b) securities class actions each side will present a report giving its assessment of damages and the basis on which they calculate damages?

MR. ADAMS: Objection.

A. I was not asked to provide such an analysis.

Q. Okay. And were you asked to perform or have you performed any market efficiency analysis in this matter?

A. I was asked to assume that the market for Acadia stock is efficient and that's all I did.

Q. When you say that's all you did, you didn't do any additional analysis with respect to market efficiency beyond making the assumption you discussed earlier?

A. That is correct.

Q. Thank you.

Now, you've been assisted in this matter by a staff at Cornerstone Research; is that

Page 21

STULZ, Ph.D.

correct?

A. That's correct.

Q. Can you identify each person at Cornerstone who assisted you in this matter by name and position?

A. I cannot do that because there are individuals who helped me that I did not interact with but they did help me. I can identify the people that I interacted directly. That would be Alexander Aganin. That would be Ahsan Kirmani. That would be Zach Wong.

Q. And then what are their positions or titles at Cornerstone, to the best of your understanding?

A. I know that Alexander Aganin is a senior vice president. I don't know the titles of the other two.

Q. Is it your understanding that they're more akin to junior analysts or that they have more senior management type titles?

MR. ADAMS: Objection. Vague.

A. I have interacted with them before. I, believe that I have done that a number of years in the past, so I suspect they are not junior.

6 (Pages 18 - 21)

Page 22

STULZ, Ph.D.

Q. Okay. And then approximately how many other people at Cornerstone worked on this engagement whose names you can't recall?

A. I have no idea. I mean, I know that there were analysts involved, but I have no idea how many and I have no idea of any of that.

Q. Okay. For the people who you cannot identify, do you have any understanding of what types of assistance they provided in connection with your report?

A. I don't. I mean, I don't know what they have done. I would give instructions to the people I interacted with. They would execute my instructions but not -- my understanding of how the firm works is that they have various associates that help with projects.

Q. Okay. Do you have an idea of roughly how many hours each of the persons you can identify spent assisting you in this matter?

A. I have no idea whatsoever.

Q. Okay. Do you know what the approximate billing rates of those persons are?

A. I have no idea.

Q. Okay. Do you monitor or did you monitor

Page 23

STULZ, Ph.D.

how much time they spent on this engagement?

A. I did not.

Q. How much time in terms of hours have you personally spent on this matter?

Or let me be a little more specific.

Roughly how many hours have you personally spent on preparing your report?

A. I believe it's around 42.

Q. Okay. And you're being compensated for your time in this matter at your regular rate of $1,325 an hour?

A. That is correct.

Q. And do you see any invoices that Cornerstone submits on behalf of the Cornerstone employees that assisted you in this matter?

A. No, I do not.

Q. Okay. So basically you have no idea what Cornerstone has charged for assisting you?

A. That's correct.

Q. Do you have any understanding of the total amount that Acadia's -- I'm sorry. Withdrawn.

Do you have an understanding of the total amount that you and Cornerstone together

Page 24

STULZ, Ph.D.

have invoiced Acadia in connection with this matter?

MR. ADAMS: Objection. Asked and answered.

A. I only know what I have invoiced. I have no idea what Cornerstone invoiced.

Q. Are you paid separately from Cornerstone for your work on this matter?

A. I'm paid separately, yes.

Q. And is that payment made to you personally or to a legal entity that you have involvement in?

A. It is paid to me through such a legal entity, yes.

Q. And what's the name of that entity?

A. I think it's called René M. Stulz Inc.

Q. Does René M. Stulz Inc., if I got that correct, does it have any employees or partners or officers or directors other than yourself?

A. Nobody else but me.

Q. Okay. And the fees you've received in connection with this matter have, if I heard you correctly, been paid to René M. Stulz Inc.?

A. I don't keep track of the payments, so

Page 25

STULZ, Ph.D.

if payments were made they would have been made to that, but I don't know what has been paid so far.

Q. Okay. Is it correct that the materials you considered in preparing your report are set forth at Exhibit C of your report?

A. That's correct.

Q. Now, if I could direct your attention to Exhibit C, page 1 of Exhibit C, and I want to draw your attention to the first -- I'm sorry -- to the third, fourth and fifth bullet points on Exhibit C. Those are references to articles by Clive Ballard, et al. Do you see that?

A. Yes.

Q. And then a couple of bullet points down there's reference to an article by a Lon Schneider. You see that?

A. Yes.

Q. And then right below that reference is a reference to an article or publication by Erin Foff, et al. You see that?

A. Yes.

Q. Okay. And is it fair to characterize these as all being publications that were published in professional medical journals?

7 (Pages 22 - 25)

Page 26

STULZ, Ph.D.

A. It is fair to say that they were published in specific journals that specialize in medical, I mean, medical issues of some sort.

Q. Very good. And then I think at the very end of this exhibit, it's marked page 127 in the court-filed copy, there's a note that reads: In addition to the documents on this list, I considered all documents cited in my report to form my opinions. You see that?

A. Yes.

Q. Okay. And I'll just represent that there may have been one or two or, you know, several additional medical journal articles that you may have cited in the text of your report. Does that accord with your recollection?

MR. ADAMS: Objection. Are you saying that aren't in Appendix C?

MR. FREDERICKS: Well, I'm just, in fairness to Dr. Stulz, pointing out that at the end of his Exhibit C he's saying, in addition to those documents specifically referenced in Appendix C, he's incorporated by reference any other medical journal articles or any other articles he quotes in

Page 27

STULZ, Ph.D.

his report.

So I guess my question is -- let me rephrase it.

BY MR. FREDERICKS:

Q. Dr. Stulz, to the extent that you cite any other journal articles from scientific journals specializing in medical matters, those would also have been journal articles that you would have considered in preparing your opinion in this matter?

A. If there is such an article, then yes.

Q. Okay.

A. I'm not aware of such an article.

Q. Well, I didn't want to have us spend a lot of time going back through every page of your report, but thank you for your answer to the question.

How did you come to be aware of the medical journal articles that we've just been talking about?

MR. ADAMS: Before you answer, I'm going to object. And I think you can speak generally about that, but we're not going to get into specific back-and-forth whether

Page 28

STULZ, Ph.D.

it's with counsel or with Cornerstone.

A. So my recollection is that all of those, if I remember correctly, are cited by analysts in analyst reports that I reviewed. There might be an exception to that which is the Erin Foff one. I'm not completely sure where I saw that one.

Q. So if I understand what you just said, your testimony is that all of the medical journal articles in your report happen to be cited in analyst reports that you also looked at, correct?

A. That is correct, for the articles on page 1.

Q. So for the articles on page 1 of Appendix C?

A. That's correct.

Q. Okay. Is that how those articles first came to your attention?

A. I don't remember the exact details of how they came to my attention. That is one way they may have come to my attention.

Q. Did you conduct any independent review yourself of medical literature for purposes of determining what medical literature might or might not be relevant to subjects you discuss in your

Page 29

STULZ, Ph.D.

report?

MR. ADAMS: Objection. Vague.

A. So two things. I'm not here as an expert on the medical issues, I'm here as an expert in financial economics.

The second issue is, I did at one point conduct a Google Scholar search on -- I mean, I saw those articles at that point. I don't remember if I saw all of them, but I think I was aware of the articles at that point.

Q. What was involved in the Google Scholar search that you just referenced?

A. I don't remember what the search term I used then, but I did, I did look at it.

I also looked at -- I went to the cite of The Lancet Neurology to see what kind of drug it was just by interest.

Q. So although you may not remember the specific search term you used, what was the purpose of the search you conducted?

A. I was just interested to see whether somebody -- something showed up that I wasn't aware of.

Q. And what was the something that you

8 (Pages 26 - 29)

Page 30

STULZ, Ph.D.

wanted to look for to see whether it might have showed up on your search but was something you weren't aware of?

A.  Well, if I had known what I wanted to see, then that would have been easy.  Just to be thorough that there wasn't something else that somehow I needed to be aware of.

Q.  Okay.  Now, you testified earlier that you spent about 42 hours in total working on your report.  Approximately how much time did you spend doing the Google searches or internet searches that you've just referred to?

A.  Very little time.

Q.  Okay.  Maybe 10 or 15 minutes?

A.  I don't know, but it's certainly less than an hour.  I just -- I mean, I'm curious by nature and so.

Q.  Okay.  And did you in the course of your search process identify any other documents beyond those that are referenced in your report?

A.  No.

Q.  Okay.  So you didn't -- you didn't find anything else that was of interest to you for purposes of preparing your report?

Page 31

STULZ, Ph.D.

MR. ADAMS:  Objection.

A.  That is correct.

Q.  Okay.  And just to be clear on this.  You may have answered it before.

Do you personally claim to have any expert qualifications relating to pharmacological matters?

A.  As I pointed out before, I'm not a medical expert, and more generally I'm not an expert on any scientific matters that would be related to the medications we are talking about here or to the diseases we are talking about here.

Q.  Okay.  So you have no expertise, for example, relating to dementia-related psychosis?

MR. ADAMS:  Objection.  Asked and answered.

A.  That is correct.

Q.  And no expertise relating to any treatments or potential treatments for any type of dementia-related psychosis?

A.  That is correct.

MR. ADAMS:  Same objection.

A.  That's correct.

Q.  Do you have any expertise or expert

Page 32

STULZ, Ph.D.

qualifications relating to the FDA's processes or procedures for obtaining FDA approval of new drugs?

A.  I have been involved in other cases where issues arose concerning the FDA approval and FDA applications, so I have some experience with that, but I'm not, I mean, I wouldn't describe myself as an expert on the procedures and processes and so on of the FDA.

Q.  Okay.  So aside from -- well, withdrawn.

In connection with those other cases where issues arose concerning FDA approval and FDA applications, was the scope of your work limited to the kinds of price impact and market efficiency issues that are discussed in your report in this matter?

MR. ADAMS:  Objection.  Ambiguous.

A.  In the other litigations I was hired as an expert in financial economics and my reports used my skills as an expert in financial economics.

Q.  Okay.  And so notwithstanding your financial qualifications and experiences of a financial economist, do you have any expertise

Page 33

STULZ, Ph.D.

relating to the FDA's processes or procedures for obtaining FDA approval of new drugs?

MR. ADAMS:  Objection.  Asked and answered.

A.  Sorry, I didn't quite get the start of your question, can you repeat it?

Q.  Well, is it your understanding that there are people in the greater outside world who do have expert qualifications relating to the FDA's processes or procedures for obtaining approval of new drugs?

A.  Absolutely, I have read reports written by such individuals.

Q.  Okay.  Are you one of those people who has expert qualifications relating to the FDA's processes or procedures for obtaining approval of new drugs?

A.  No, I'm not.

Q.  Okay.  Do you have any expertise relating to what it means to have, quote, an agreement, close quote, with the FDA?

MR. ADAMS:  Objection.  Are we going to go through all the things he's not an expert in, Bill?

9 (Pages 30 - 33)

Page 34

STULZ, Ph.D.

Q.  You can answer.

A.  I have no legal expertise on, so whether something qualifies as an agreement or not from a legal perspective would be something outside of my expertise.

Q.  For purposes of FDA regulatory processes or procedures at a practical level, do you have any understanding of what the term agreement means in that context?

MR. ADAMS:  Objection.

Q.  Or FDA agreement means in that context.

MR. ADAMS:  Bigger objection.

A.  My understanding from reading the complaint is that the plaintiffs have some views as to what it means that seem to me to be legal views.  I don't, I don't have any expertise on this.

Q.  Okay.  And do you have an understanding of what the term labeling refers to or encompasses when used in the context of FDA documents?

A.  I mean, I have a layperson understanding of labels on medications, but I have no expertise as to what should be on the label or how one gets to a label and so on.

Page 35

STULZ, Ph.D.

Q.  And what is your layperson's understanding of labels on medications?

A.  That it is important in terms of understanding who can use the medication and what the medication is for and what the FDA approves the medication to be for.

Q.  Okay.

MR. FREDERICKS:  I'd like to mark a couple of exhibits here.  I think these will be -- what are we up to?

So these will be 27, 28, and 29.

(Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws marked as Plaintiffs Exhibit 27, as of this date.)

BY MR. FREDERICKS:

Q.  Do you have Exhibit 27 in front of you?

A.  Yes, I do.

MR. ADAMS:  Can I have a copy of 27?

Thanks.

Q.  This is a document that's entitled on the first page Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended

Page 36

STULZ, Ph.D.

Class Action Complaint for Securities -- I'm sorry -- for Violations of the Federal Securities Laws.

Have you ever seen Exhibit 27 before?

A.  Not that I can remember.

Q.  Okay.

MR. FREDERICKS:  Exhibit 28.

(Order filed February 2, 2023, marked as Plaintiffs Exhibit 28, as of this date.)

BY MR. FREDERICKS:

Q.  And I'm showing you what's just been marked as Exhibit 28, which is an order in this case filed February 2, 2023.  Have you ever seen this document before?

A.  If this is the court's decision on motion to dismiss, I have seen it, and I have read it.  I haven't -- I've seen it on my computer, and the format is a bit different, so that's why I have some hesitation.  I have in my list of exhibit, it would -- the documents that I saw is on that list.

MR. ADAMS:  I think there's a little --

MR. FREDERICKS:  Yeah, let, let --

Page 37

STULZ, Ph.D.

MR. ADAMS:  -- confusion.

MR. FREDERICKS:  Yeah, let me clean it up.

MR. ADAMS:  Yeah.

BY MR. FREDERICKS:

Q.  Dr. Stulz, let me represent to you that there was an initial order by Judge Hayes denying the Motion to Dismiss filed by Defendants and that thereafter Defendants filed a motion to reconsider that dismissal that the judge thereafter entered an order on the separate motion to reconsider.

And you'll see, if you look at the first sentence of this document, it says, "The matter before the Court is the Motion for Reconsideration."  Do you see that?

A.  Yes, I do.

Q.  Okay.  With that additional background, do you recall ever having seen this particular order before?

A.  It says the order I cite is a different, seems to be a different one from this one.

Q.  Okay.  And so if you didn't list it in your Appendix C to your report, it wouldn't have been a document that you considered in preparing

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



Page 38

STULZ, Ph.D.

your report; is that fair to say?

A. That is fair to say, unless there's a mistake in Appendix C, for example.

Q. Okay. Well, to the best of your knowledge, though, there's no mistake in Exhibit C with respect to this order because you don't recall having seen it before, correct?

A. That is correct.

Q. Okay.

(Excerpt of Transcript of Motion Hearing (Exhibit 88) marked as Exhibit 29, as of this date.)

BY MR. FREDERICKS:

Q. And finally, let me show you what's been marked as Exhibit 29.

MR. FREDERICKS: Oh, I'm sorry. 29?

Q. And aside from a cover page which says Exhibit 88, the second page cites this document as being a Transcript of Motion Hearing Before the Honorable William Q. Hayes with the date of September 9, 2022. Do you see that?

A. Yes, I do.

Q. Okay. Have you ever seen this transcript before?

Page 39

STULZ, Ph.D.

A. No, I have not seen this transcript.

Q. And I'll represent that this is only a partial transcript of the hearing that day, so let me ask whether to the best of your knowledge you've seen any transcript or portion thereof from a hearing held September 9, 2022, on plaintiffs' motion hearing on their motion to dismiss in this matter?

A. No, I've not.

Q. Okay. And we'd agree that none of these three exhibits are listed on page 7 of your Appendix C?

A. That is correct.

Q. Okay. What did you do to prepare for today's deposition?

A. I reread my report. I looked at some of the documents that I cited in my report. I had meetings with the folks at Cornerstone. And I had one meeting with the attorneys.

Q. And so how many meetings did you have with the folks at Cornerstone?

A. I think it is three.

Q. Were those in-person or by other means?

A. All three meetings were on Zoom.

Page 40

STULZ, Ph.D.

Q. And approximately how long were those respective meetings?

A. The first one may have been a bit more than two hours. The subsequent ones were less than two hours.

Q. Would those have been closer to one hour in length?

A. I don't remember the exact amount of time.

Q. And when were your meetings -- I'm sorry.

When was your one meeting with your attorneys?

A. Yesterday.

Q. And how long was that meeting?

A. Slightly more than four hours.

Q. Was anyone else present for that meeting with your attorneys?

A. Alexander Aganin was present.

Q. Anyone else?

A. Besides attorneys, no.

Q. And in the three meetings you testified to a moment ago with Cornerstone personnel, were there any other persons who were not Cornerstone

Page 41

STULZ, Ph.D.

employees at those meetings?

A. No.

Q. Was there anyone there other than the three individuals from Cornerstone who you identified earlier in your testimony?

MR. ADAMS: Objection. Assumes facts not in evidence.

A. So the individuals at those meetings differ across the meetings.

Q. All right. And I believe the three people that you identified before were named -- I'll just use their first names -- Alex, Isaac, and Zach. Is that correct?

A. So Alexander, Ahsan and Zach. And the Ahsan is written A-h-s-a-n.

Q. Okay. Other than those three individuals, did any other individuals at Cornerstone participate in any of the three meetings that you had to prepare for this deposition?

A. No.

Q. In the course of preparing your opinion and report in this matter, did you speak or converse with anyone other than those three

11 (Pages 38 - 41)

Page 42

STULZ, Ph.D.

individuals at Cornerstone and your attorneys?

A. No.

Q. So in preparing your report and opinion, you didn't use or consider the substance of any conversations or communications you may have had with persons other than the folks at Cornerstone and counsel?

A. That is correct.

MR. ADAMS: Objection. Asked and answered.

Q. As you use the terms public information and publicly known information in your report, let me first ask, do you use those terms interchangeably?

A. As the way I understand them I do.

Q. Okay. So as the way you've used those terms, you would define them the same way?

A. I believe so.

Q. Okay. And what is your working definition of public information or publicly known information since we know they're the same thing?

A. That it includes all the types of information that investors that are sophisticated would -- would find when they're following a

Page 43

STULZ, Ph.D.

corporation would be available to them when they are following a corporation.

Q. Anything else you want to add to that definition?

A. I think that's a very broad definition that it includes generalities and what investors, I would call arbitragers, would have as information.

Q. Okay. Let me try to parse this out a little bit through some hypotheticals.

If certain negative material adverse information about a publicly traded company were available only in a publicly available file kept in a public library in India, is that information publicly known under your definition?

MR. ADAMS: Objection.

A. I guess I have had that question before and my answer before was no.

Q. Okay. If certain negative material adverse information about a publicly traded company were available only on the LinkedIn profile of some secondary school teacher here in New York City, is that information publicly known under your definition?

Page 44

STULZ, Ph.D.

MR. ADAMS: Objection.

A. I'm not sure I can answer the question with what you have told me, because I don't know anything about that teacher and its possible relationship to a firm or anything.

Q. Well, let's just say it's an English teacher of the seventh grade here in New York who's bought 10 shares of Acadia and every month she likes to post something on her LinkedIn account talking about Acadia. Is that information publicly known under your definition?

A. The way that your hypothetical evolved it could be.

Q. And how might it be?

A. Well, if you have a sophisticated investor interested in a company, you are going to be following blogs that might have interesting information about the company, depending on known figures, your economic state and the stake on your interest in the company.

Q. Okay. Well, let me just be clear in my hypothetical that my seventh grade English teacher here in New York is a teacher by profession. She has no particular investment expertise, she's just

Page 45

STULZ, Ph.D.

a teacher who likes to write about stocks she's bought.

With that clarification, do you think information that says a person might post on Acadia would be public information or publicly known?

A. I don't think your qualification necessarily resolves the issue. I mean, there are cases of blogs by individuals who would be like your seventh grade teacher and have had influence on the markets. So I just can't give you an answer the ways the hypothetical is framed. It could be or it could not.

Q. And what type of analysis would you perform to determine whether it is or isn't publicly known in this type of hypothetical?

A. If an analyst were to reference that blog that would obviously be useful information for my determination. I would have to, I would have to think about it and I would have to, to conduct my analysis.

Q. But is it fair to say that -- based on your response -- whether the information posted by our hypothetical seventh grade teacher might or

12 (Pages 42 - 45)

Page 46

STULZ, Ph.D.

might not be publicly known would be dependent on whether that information was picked up and was then transmitted by other people such as investment analysts?

A. Now the question is whether it would be the type of information that investors would be, would be seeking and would be paying attention to.

Q. Okay. But it's your testimony that you would need more information to know whether standing alone a seventh grade teacher's blog post on Acadia would be deemed public information under your definition?

MR. ADAMS: Objection. Asked and answered.

A. That is correct. I understand that you have a dim view of seventh grade teachers, but no, I would have to, I would have to look at it.

Q. To be clear, I think very highly of seventh grade English teachers, I'm just not certain that their expertise extends to stock picking.

Are you familiar with the legal concept of buried facts, with the buried facts doctrine?

A. Just one, one point on the question that

Page 47

STULZ, Ph.D.

you had asked.

You didn't refer to stock picking before, you added that at the end, and that wasn't part of your hypothetical.

I am not here as a legal expert. I'm not a legal expert. And so the answer to your question about the legal doctrine of buried facts, this is not a doctrine that I have expertise on.

Q. Okay. Are you -- understanding that you're not an attorney and you may not have expertise in the legal nuances of the buried facts doctrine, what is your general understanding of what the buried facts doctrine is?

A. I don't think I would advance an understanding.

Q. So you have no understanding of what the buried facts doctrine refers to in the context of whether information has been adequately disclosed in a securities case?

A. I have read many decisions where there were discussion about the issue of whether something had been adequately disclosed in a context that is different from the one of this report. And so I have seen that. I haven't seen

Page 48

STULZ, Ph.D.

the term buried facts doc -- facts doctrine associated with it, and so I'm not quite sure what you are referring to.

Q. Okay. Well, I'm referring to a legal doctrine which it can sum is that where facts at issue are buried in a very long document or are disclosed in a piecemeal fashion, such as in multiple documents, that such a disclosure of facts in this manner may be deemed insufficient to allow a reasonable investor to appreciate the relevance of the facts or the correlation of various facts. Does this doctrine have any analogue in financial analysis?

MR. ADAMS: Objection. He just got done saying he wasn't familiar with the doctrine.

Q. Well, if you assume my summary of the doctrine is correct, does the doctrine as I've just summarized it have any analogue in financial analysis or financial economics?

A. So two things. Now you use the term doctrine of buried facts. I, as I said, I have not heard that, that term.

What you described, I obviously had read

Page 49

STULZ, Ph.D.

myself and heard of and was fully aware of decisions with that type of language.

In terms of financial economics, there is a vast amount of research that deals with various aspects of how investors may or may not pay attention to information and you might say that maybe it's related to what you're talking about. It's a different set of issues from what I'm focusing on in my report. In my report I'm not focusing on a typical investor or I will present a typical investor.

Q. All right. You're not focusing on a typical investor. What do you mean by saying that you're -- that in your report you're not focusing on the typical investor?

A. I have no opinion in my report about the information that some kind of representative investor would have had. In market efficiency information that affects the price is not the one of the representative investor. All it takes is a subset of investors to have information for that information to affect the price.

Q. And how large a subset of investors have to have information for it to affect the price?

13 (Pages 46 - 49)

Page 50

STULZ, Ph.D.

A. It can be very few investors.

Q. But in your report you're referring to information that at least some investors actually had reviewed and absorbed?

MR. ADAMS: Objection.

A. It has to be information that some investors have.

Q. And when you say "have," do you mean investors have -- not only have it in the sense of having it somewhere in a computer or somewhere in a file but that you mean that they have it in the sense of actually being aware of the information?

MR. ADAMS: Is the question, does have mean aware? Is that what you're asking?

MR. FREDERICKS: I'm trying to understand what the witness meant when he says that information that someone has.

A. So in terms for it to be include -- incorporated in the price, it has to be information that they can act upon.

Q. And it has to be information that the market participant has actually reviewed, correct?

MR. ADAMS: Objection.

A. It has to be information that is

Page 51

STULZ, Ph.D.

available to market participants and that if it is valuable and relevant information they can act upon it.

Q. Okay. All right. I want to move on, but I'd like to give you a hypothetical.

I'm a Wall Street analyst at Goldman Sachs. Someone sends me an envelope with a confidential report on Company X that anyone would agree has material new information about Company X.

I receive an envelope, I put it in my desk and I just forget about it.

Now, would you agree that technically I have the information because it's sitting in my desk?

A. I would agree with you that you have the information, but the information we are talking about here is not public information. So it wouldn't qualify as public information and it wouldn't be the type of information that I focused on when I talk about semi-strong form of market efficiency.

Q. But when you're talking about public information that impacts market prices, you're

Page 52

STULZ, Ph.D.

talking about information that is actually known to and reviewed by a person?

MR. ADAMS: Objection. He's already defined public information.

A. It is a type of information that sophisticated investors would have or would be looking for and would be available to them.

Now, market efficiency is not based on finding specific individuals who have a piece of information. It is a statement about public information being incorporated in the stock price.

For public information to be incorporated in the stock price it needs to be available to some investors and doesn't need to be available to, I mean, understood by all investors or the typical investor.

Q. And notwithstanding what you just testified to, didn't you also testify about 15 minutes ago that if material adverse information was available in a public file in a public library in India that that would likely not fall within your definition of publicly known information?

MR. ADAMS: Objection.

A. And that is perfectly consistent with

Page 53

STULZ, Ph.D.

what I just said.

Q. So you're drawing a distinction between information that might be technically available to a member of the public if they knew where to look for it and other types of information?

MR. ADAMS: Objection. I'm confused.

Q. You can answer.

A. Can you rephrase your question?

Q. Well, you said that your definition of public information in the context of documents publicly available in a library in India was consistent with how you've subsequently described public information.

My question is: How is your usage consistent when in both cases we're talking about information that, you know, an investor could access if they wanted to, if they knew where to look?

A. So could access if they knew where to look is not the standard. Information that is published in the type of outlets that investors would be looking at would qualify. Information that would be kind of value relevant and known by investor to potentially be value relevant in a

14 (Pages 50 - 53)

Page 54

STULZ, Ph.D.

specific -- for a specific firm would be the type of information that would be public. Obviously, something buried somewhere that nobody knows about doesn't qualify as public information.

Q. And in some cases would you agree that information that's buried that only a limited number of people may be aware of might also be not -- might also fail to qualify as public information?

MR. ADAMS: Objection. Vague. Ambiguous.

A. So in studies of market efficiencies as a distinction between the strong form of market efficiency and the semi-strong form of market efficiency, with a strong form of efficiency information that would be in the hands of a few individuals and would not be accessible beyond them would be incorporated in the stock price, that is not the definition of market efficiency that either Professor Feinstein or I use.

Q. You use what's referred to as the semi-strong version of market efficiency?

A. That's correct.

Q. Okay.

Page 55

STULZ, Ph.D.

MR. ADAMS: Do you want to take a break in a little bit?

THE WITNESS: Sure.

MR. FREDERICKS: Let me just finish up with a couple of related questions and then we'll take a break.

MR. ADAMS: Okay.

MR. FREDERICKS: So that we don't revisit this subject after the break.

BY MR. FREDERICKS:

Q. If a piece of negative material information about a company is published in a small city newspaper but nowhere else, is that information incorporated into the market price of the company's stock?

MR. ADAMS: Objection.

A. Again, the question is framed in such a way that I can't really give you an answer. I don't know if San Diego has a small local newspaper. It probably does. Having something about Acadia there as opposed to somewhere in Alaska would seem to be different. And so your question is too vague for me to have an answer. It could be or it could not.

Page 56

STULZ, Ph.D.

Q. If the same piece -- well, let's say in our hypothetical we're talking about a small town newspaper in Alaska. You'd still need more information to form an opinion as to whether information published in such a newspaper is incorporated into the market price of the company's stock?

A. There's a whole bunch of questions about this hypothetical. I mean, what is the information. I mean -- now without knowing, I mean, the information, it's a little bit difficult to comment and answer it. If that, you know, reveal something about the CEOs that is important, now you would think that that kind of information could get picked up by somebody following the corporation closely. So I really don't have an answer.

Q. Okay. If the same piece of negative material information about a company is published in The Wall Street Journal, is the publication of that information in The Wall Street Journal likely to have a greater impact on the price of the company's stock than had it been published only in the small city newspaper such as our newspaper in

Page 57

STULZ, Ph.D.

Alaska?

MR. ADAMS: Objection.

A. Again, I think you would need to know more than what you're saying to answer the question. I mean, it would depend on the nature of the information. You know, is it a fact or is that a fact plus a bunch of opinions. So no, I can see cases where information published in The Wall Street Journal might have more of an impact. I can also see cases where it would not. It all depends.

Q. Okay. Let's just say in this hypothetical the only place that this news report is published is in the Alaska town paper. In that scenario, would the publication of information in that newspaper, where it's not picked up by everyone else or republished by everyone else, is that likely to have less of an impact on the price of a company's stock than if the same information had been published in The Wall Street Journal?

MR. ADAMS: Objection. Are you saying the only place it's published is in Alaska?

MR. FREDERICKS: Yeah.

MR. ADAMS: And where did the

15 (Pages 54 - 57)

Page 58

STULZ, Ph.D.

information that got published come from?

MR. FREDERICKS: I'm --

MR. ADAMS: You're saying -- well, just explain exactly then what.

MR. FREDERICKS: I was just trying to be very clear about the hypothetical.

BY MR. FREDERICKS:

Q. The hypothetical is that information that if true would be deemed material information about a company is published in a small town newspaper in Alaska, and your review of media from the same time period shows that no other publication picked it up. Since that was the only place that the information is published by a media source, is that information likely to have less of an impact on market price than if the same information had been published in The Wall Street Journal?

MR. ADAMS: Objection. Vague. All of this calls for speculation.

A. I would have to look at the precise information you are talking about to understand what seems a really odd set of facts, which is that some things that is matter on the

Page 59

STULZ, Ph.D.

implications for the value of that corporation ends up being picked up by nobody.

Now, I could see that 40 years ago, but now investors have all sorts of search mechanism in place to look at publications across the world, so I'm not sure how I can make sense of what you're asking.

Q. Okay. Just one more hypothetical, then let's take a break.

If a piece of arguably negative material information is published by just one analyst firm that covers a company, but the same information is not covered by 20 other analysts covering the same company, is the arguably material information published by just the one analyst firm incorporated into the securities market price?

MR. ADAMS: Objection. Again vague.

Q. Or I should say, in the price of the company's securities.

A. If the information is a fact about the company that is a negative fact and it is published by an analyst, you would expect in an efficient market that information to be in the stock price.

Page 60

STULZ, Ph.D.

Q. Okay. And if the same arguably negative material information is covered by 15 analyst firms, is the publication of that information by 15 analyst firms likely to have a greater impact on the market price of a company's stock than had it been published by only one analyst?

MR. ADAMS: Objection. Are you asking about the magnitude of the impact or whether there's impact?

MR. FREDERICKS: Why don't I reread the question.

Q. If the same arguably negative material information is covered by 15 analyst firms, is the publication of that information by 15 analyst firms likely to have had a greater impact on the market price of a company's stock than had it been published by only one analyst?

A. I think you're conflating a variety of things here. You are conflating opinions and facts. If analysts end up having a similar opinion about something going on in a corporation, then, then not whether all analyst all agree or all have the same opinion or have different opinions can affect the stock differently.

Page 61

STULZ, Ph.D.

My focus is on facts. And, you know, once a fact is known, if the market is efficient, it's going to be incorporated in the stock price.

Q. If the factual information at issue is subject to different opinions as to the significance of the fact, does it matter how many analysts interpret the same facts favorably as opposed to the number of analysts who view the facts unfavorably?

MR. ADAMS: Objection.

Q. And when I say does it matter, I mean does it matter in terms of the magnitude of the impact of the interpreted facts on the market price of the company's stock?

MR. ADAMS: Objection.

A. We're not talking about facts here, we are talking about analyst opinions. And with analyst opinions, you know, different analysts can have different impact through their opinions depending on a whole variety of factors.

Now, I have done research on analysts on a whole slew of determinants of the impact of analysts. Some analysts have no impact whatsoever with their opinions.

16 (Pages 58 - 61)

Page 62

STULZ, Ph.D.

Q.   And what are some of the other factors that you've identified?

A.   I mean, for instance, whether an analyst is an all American analyst can affect his influence and so on.  But we're talking about opinions by an analyst as opposed to the disclosure of facts.

Q.   And all things being equal, if you had a group of 20 analysts all from the same general expertise, same reputational qualities, and you had 19 analysts interpret certain information one way and only one analyst interpreted it in a different way, does the -- does that balance likely have a different impact on market price than if analyst opinion were evenly divided on the interpretation of the facts?

MR. ADAMS:  Objection.  This makes no sense.

A.   I mean, your question seems to imply that the market maker is a voting mechanism.  Well, that's not the way it works under market efficiency.

Q.   So you would agree that sometimes the opinion of one analyst might have a much greater

Page 63

STULZ, Ph.D.

impact than the opinions of 20 other analysts in a given circumstance, hypothetically?

MR. ADAMS:  Objection.

A.   I agree that analysts have opinions and I agree that those opinions may influence the actions of some investors.  That's the extent of what I can say.  My report is not about opinions.  My opinion -- my report is about facts and whether facts were known or not.

Q.   Okay.  Let me just ask this:  If factual information comes out and different analysts interpret it differently, what is your view as to which opinion or opinions will actually have impact on market price?

MR. ADAMS:  Objection.

A.   That is not a question that I address in my report.

Q.   I understand you may not address in your report, but I'm asking you the question here.

MR. ADAMS:  Can you restate the question?

MR. FREDERICKS:  Sure.

Q.   If factual information comes out and different analysts interpret it differently, what

Page 64

STULZ, Ph.D.

is your view as to which analyst opinion or opinions will actually have impact on market price?

A.   My report is not about the impact of analysts on the market price with their opinions, my report is about how in an efficient market facts that are publicly known will be incorporated in the stock price.

Q.   But doesn't how facts are incorporated into a stock price depend on market participants' interpretation of the significance and implication of the fact?

A.   I agree that analyst opinions can have an impact on how the market interprets facts.  I would agree with that.  But that's not what I am focused on.  I'm focused on whether information is public in an efficient market and information that is public is going to be incorporated in the stock price.

Q.   I understand your testimony that my prior question isn't something that you may have opined on in your report, but I'm entitled to ask this question, and I would like an answer to it.  My question, if you could answer my

Page 65

STULZ, Ph.D.

question, is:  Doesn't how facts are incorporated into a stock price depend on market participants' interpretation of the significance and implication of those facts?

MR. ADAMS:  So wait, just so I'm clear.  You're not asking whether it's incorporated, you're asking about the impact, the value of the information; is that right?

Q.   You understood my question, Dr. Stulz, yes?

A.   So the market has to go from learning a fact to assessing its implications for the stock price.  And then that has to be -- no, that's the way that the information would be incorporated in the stock price.  So the market has to determine how the stock price is going to be affected by the information.

Q.   So let me just restate my question, another question from before.  If factual information comes out and different analysts interpret it differently, what is your view as to which analyst opinion or opinions will actually have the greater impact on

17 (Pages 62 - 65)

Page 66

STULZ, Ph.D.

market price?

MR. ADAMS:  Objection.

Q.  And, again, this hypothetical assumes that we're talking of analysts of equal stature and reputational value.

MR. ADAMS:  Objection.  Vague. Ambiguous.  Improper hypothetical.  And we don't know anything about the analysts or the information.

MR. FREDERICKS:  I'm saying that the information would be deemed by a reasonable investor is clearly -- well.

MR. ADAMS:  Your question just asked which analyst would have a -- right?

Q.  Well, if factual information comes out and different analysts interpret it differently, is it possible that the views of some analysts will have greater impact on market price than others?

MR. ADAMS:  Objection.

A.  It is possible that the information will be fully incorporated in the stock price before even one analyst opens his mouth, or her mouth. So there are lots of ways that this could evolve

Page 67

STULZ, Ph.D.

once that piece of information becomes public information.

Q.  I'm --

A.  I just want to clarify one issue.

You keep talking about typical investors and so on.  Those market efficiency doesn't work that way.  I mean, it doesn't depend on the typical investor.

Q.  I don't think I've asked any questions about typical investors recently, but -- but my question is:

You would agree that it's entirely possible -- in fact, regularly happens -- that information and opinions about information that come out in analyst reports will not all have the same impact on market price?

MR. ADAMS:  Objection.

A.  I agree that analyst statements can have different impacts depending on the analyst making the statement.

Q.  Okay.  And in some cases some analyst opinions or statements will have no impact, whereas other analyst opinions on the same corpus of facts may have considerable impact; is that

Page 68

STULZ, Ph.D.

fair to say?

MR. ADAMS:  Objection.

A.  The answer is that it depends on the whole situation that we are talking about in terms of what those opinions are.  What are the facts that are already in the stock price, the characteristics of the analyst, the brokerage house they work for and so on.

MR. FREDERICKS:  Okay.  Why don't we take a break.

MR. ADAMS:  All right.

THE VIDEOGRAPHER:  We are off the record.  The time is 11:17 a.m. Eastern Time.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:34 a.m. Eastern Time.

BY MR. FREDERICKS:

Q.  Dr. Stulz, you realize you're still under oath?

A.  I do.

Q.  Okay.  Am I correct that consistent with

Page 69

STULZ, Ph.D.

what you say at paragraph 8 of your report, you use the term, quote, misrepresentations, close quote, to refer collectively to both alleged, quote, misrepresentations, close quote, and to, quote, omissions, close quote?

A.  I mean, line 4 of paragraph 8, all I say is that the alleged misstatements and omissions and I call that misrepresentations.

Q.  Okay.  And I take it you found it convenient for purposes of your report just to use misrepresentations to include both misstatements, untrue statements and statements that are misleading by virtue of their failing to include additional information necessary to make the statements not misleading.

Is that fair to say you found it convenient just to use the one term misrepresentations to include everything I just referred to?

A.  That's correct.

Q.  Okay.  So similarly in this deposition when I use the term misrepresentations, I'm going to use it in the same sense as including both what might be called an affirmative or untrue statement

18 (Pages 66 - 69)

Page 70

STULZ, Ph.D.

as well as a statement that is misleading by virtue of an omission. Do you understand?

A. I understand.

Q. Okay. And if at some point you feel it's important to clarify, you know, you mean a misrepresentation or you mean an omission because your answer or understanding of the question depends on that distinction, let me know and I may have questions about omissions specifically, in which case I'll try to just use the term omissions. But otherwise, just for purposes of making it simple in this deposition, we'll have an understanding that, generally speaking, misrepresentations include both misrepresentations and omissions. Fair enough?

A. That is fair.

Q. Okay. With that understanding -- well, let me ask first of all: What is the basis of your understanding of plaintiffs' theories of liability in this matter?

MR. ADAMS: Objection. What is the basis or what is the theory?

MR. FREDERICKS: Well, first I want to know what the basis is for his

Page 71

STULZ, Ph.D.

understanding, then I'll ask for his understanding.

MR. ADAMS: All right.

A. I read the complaint. I read the court's decision on the motion to dismiss. I had conversations with Cornerstone about it.

Q. Did you have conversations with Acadia's counsel about that?

A. Not directly.

Q. Did you have indirect communications with Acadia's counsel on that subject; and, if so, could you describe the nature of the communications?

A. My conversations were with Cornerstone on plaintiffs' theories of liability.

Q. Okay. So you had no direct communications with any defendant's counsel as to what the substance of plaintiffs' theories of liability are in this matter?

A. Not while I was working on the report.

Q. Thereafter?

A. As I mentioned earlier, I had a meeting with the attorneys yesterday.

Q. Okay. Has your understanding of

Page 72

STULZ, Ph.D.

plaintiffs' theories of liability in this matter changed since you prepared your report?

A. I don't believe so.

Q. Okay. So what is your understanding of what plaintiffs' contend to be the actionable misrepresentations in the instant matter?

A. I understand that there are three sets of misrepresentations.

The first set has to do with the design and the results of the Harmony trial.

The second set has to do with the design and results of the -019 trial.

And the third one has to do with whether there was an agreement with the FDA on the nature of that agreement.

Q. Okay. And those are the categories that you itemize at paragraph 8 of your report?

A. That is correct.

Q. And your report analyzes these three categories of misrepresentations separately, correct?

A. My report deals with those alleged misrepresentations only to address the issues that I was asked to address by the attorneys. So

Page 73

STULZ, Ph.D.

saying that I analyzed them, I probably did not do any kind of legal analysis or anything like that.

Q. I understand. But for purposes of your report, there are sections of your report which address each of these three categories of misrepresentation separately, correct?

A. That is correct.

Q. And that's the way you conducted your financial analysis?

A. That's correct.

Q. Okay.

MR. ADAMS: Sorry. Before you move on, can we just clarify?

MR. FREDERICKS: Sure.

MR. ADAMS: You said, "that's the way you conducted your financial analysis?" Like what are you referring to there?

Q. Well, what I mean by financial analysis, I mean the analysis that is reflected in your report.

A. Yeah, I would say my analysis as a financial economist to address the questions that I was asked to address.

Q. Okay. And I think we've established

19 (Pages 70 - 73)

Page 74

STULZ, Ph.D.

earlier that the only analysis that you've made here was in your capacity as an expert in financial analysis, correct?

A. That is correct.

Q. Okay. Is it your understanding that plaintiffs allege that Acadia's misrepresentations misled investors about the probability that certain adverse events would occur?

MR. ADAMS: Objection. Vague as to adverse event.

A. The way I would understand the theory of the plaintiffs is that one consequence of the alleged misrepresentations is since the market didn't have the same assessment of the probability of rejection by the FDA than management had or Acadia had.

Q. Well, let me try to unpack what you just said a little bit.

Is it your understanding that plaintiff alleges that Acadia's misrepresentations misled investors about the probability that the FDA would not grant approval to their sNDA for Nuplazid?

A. My understanding is that plaintiffs do allege that those misrepresentations, those

Page 75

STULZ, Ph.D.

alleged misrepresentations, led investors to have a mistaken view of the probability of approval of the sNDAs that is part, I mean, that is in this litigation.

Q. Okay. Is it your opinion that the market was aware throughout the class period that there was a risk that the FDA would reject the sNDA?

A. As I discuss in my report, Acadia disclosed throughout the class period that the sNDA could be rejected, and that the agreement, what is called the agreement with the FDA, did not imply that the sNDA would be accepted.

Q. Okay. We'll get to the -- what you mean by the FDA agreement shortly. But would you agree that there is a difference between knowing that there is a risk of an adverse event occurring and knowing the magnitude of the risk of that adverse event occurring?

A. That there's a difference between knowing that there is a risk and quantifying that risk.

Q. So is your answer to my question yes?

A. I'm not sure I fully understand the

Page 76

STULZ, Ph.D.

question.

Q. Well, let me read it back.

Would you agree that there is a difference between knowing that there is a risk of an adverse event occurring and knowing the magnitude of the risk of that adverse event actually occurring?

MR. ADAMS: Objection. Asked and answered.

Q. Well, I think it's a yes-or-no question.

A. So my was that knowing that there is a risk is different from the quantification of that risk.

Q. So isn't the answer to my question yes? And if not yes, could you explain why your answer is substantively different than just giving a yes to my question?

A. I mean, if your question is, is it the same knowing that there is a risk of knowing the probability of rejection, the answer is no. I mean that knowing the probability is having quantified the risk which is different from just knowing that there is a risk.

Q. Okay. Thank you.

Page 77

STULZ, Ph.D.

Is it your opinion that investors in this case were provided with enough accurate information to correctly assess the true magnitude of the risk that the FDA would reject the sNDA?

MR. ADAMS: Objection.

Q. And let me clarify that by saying my question refers to the class period. Do you want me to restate it?

A. No, I -- I mean, I am willing -- I mean, I view your question as being questions that requires legal expertise. I mean, I'm not in a position to say whether the investors had sufficient data the way you stated it. I mean, to me that's a legal question that's partly the subject of litigation.

What I'm saying in my report is that the pieces of information that the complaint refers to as having been misrepresented, misrepresented or omitted, were subject to some caveats of public information.

Q. Let me ask the question again, and let me ask it in the context of your expertise as a financial economist and not as a legal question. Okay?

20 (Pages 74 - 77)

Page 78

STULZ, Ph.D.

So as a financial economist, is it your opinion that investors were provided with enough accurate information by the company to correctly assess the actual magnitude of the risk that the FDA would reject the sNDA?

MR. ADAMS:  Objection.  It's a legal question.  And he wasn't asked to opine on that.

Q.  Well, let me ask you this:  Isn't it fair to say that investment analysts everyday in America are making judgments about the magnitude of risks that affect various aspects of all kinds of businesses here in the United States and abroad?

A.  It is fair to say that an analyst develop many different kinds of opinions.

Q.  And when analysts are formulating opinions about the magnitude of risks that may face various companies, is that something that is a subject that's studied within the field of financial economics?

A.  It seems to me it's difficult to answer the question because we are not defining risks, know the risks that financial economists study

Page 79

STULZ, Ph.D.

more than others, the risks that they haven't really studied, and so the answer is it would depend.

Q.  Okay.  Well, let's take the case of a company like Acadia whose future cash flows depend largely on their success in obtaining FDA approval for drugs.

First of all, would you agree that Acadia is a company whose future cash flows depend largely on their success in obtaining FDA approval for their drug products?

A.  I agree that success with the FDA affects the value of the common stock of Acadia.

Q.  Okay.  And you're saying that as a financial economist, not as a lawyer, correct?

A.  That is correct.

Q.  Okay.  And in the course of your long career, have you done valuations of companies where you have had to assess the magnitude of various types of risks facing their businesses?

A.  I have done valuations where I had to assess some types of risks, yes.

Q.  Okay.  As a general matter, do you believe that it is inappropriate to base a

Page 80

STULZ, Ph.D.

financial analysis of a company on an analysis that does not take into account the most significant risks that face that company?

MR. ADAMS:  Objection.

A.  Can you restate the question?

Q.  You want me to restate?  Sure.

As a general matter, do you believe it's inappropriate to base the financial analysis of a company on an analysis that does not take into account the most significant risks that face that company?

MR. ADAMS:  Objection.

A.  The way the question is framed, I would have to say it depends.  Because it would depend on what type of financial analysis, what is the purpose of that financial analysis, so I don't, I mean, I would say it depends.

Q.  Okay.  Well, let's say that the purpose of the financial analysis is to opine on the value of the subject company's common stock.

A.  I'm sorry, so what is the question then?

Q.  Well, I think it's a pretty simple question.

Don't you think that a reasonable

Page 81

STULZ, Ph.D.

financial analyst would take into account their assessment of the magnitude of the risks facing a company when opining on the company's value or opining on what an appropriate stock price valuation range would be for that company?

MR. ADAMS:  Objection.  He just said it depends on the valuation.

A.  I mean, I think the answer depends on how you would define risk in this context, what exactly you mean by risk.

Q.  Well, let me give you a context.

In the context of a pharmaceutical company such as Acadia whose future cash flows are likely to be heavily dependent on the extent to which they obtain FDA approval for their drug products.

A.  So, in general, you would certainly be focused on the expected income that comes from the drug, and that expected income would depend on how likely it is that you will be able to market that drug.

Q.  And would you say that that is a very common type of analysis to perform as a matter of financial analysis?

21 (Pages 78 - 81)

Page 82

STULZ, Ph.D.

MR. ADAMS: Objection.

MR. FREDERICKS: Well, I'm just trying to clarify --

MR. ADAMS: You're talking about a discounted cash flow now?

MR. FREDERICKS: Yeah, the witness seems to think sometimes I'm asking him legal questions and I'm just trying to clarify that all these lines of questions, I'm asking from a perspective of financial economics and financial analysis.

Q. So can you answer the question?

A. The answer is no, you would want to compute to see if estimates the expected cash flows for analysts that use the discounted cash flow method. Not all of them do. But for those that do, that's the type of analysis they would do.

Q. Okay. And in the case of Acadia, is it your opinion that an appropriate discounted cash flow analysis would take into account inter alia a discount that reflects the market's assessment of the probability of FDA approval of the sNDA?

MR. ADAMS: Objection.

Page 83

STULZ, Ph.D.

A. I don't know what you mean by discount.

Q. Well, you use the term discounted cash flow when -- what does discount mean in the context of discounted cash flow?

A. So with the analysis that I had in mind you would compute the expected cash flows and you would discount them at some rate that is appropriate based on financial economics.

Q. Okay. But you can also discount cash flows based on other factors, correct?

A. So the discounting that is part of the discounted cash flow approach now has to reflect a discount rate that has a foundation in financial economics.

Q. Maybe this is just a semantic question, but would you agree that it is common for financial analysts when looking at projected future cash flows of an entity to discount particular cash flow streams based on their assessment of the probability that those cash flow streams will actually become operable?

MR. ADAMS: Objection.

A. I think there's some confusion about your use of the term discount. You would be

Page 84

STULZ, Ph.D.

computing the expected cash flows and the expected cash flows would depend on the probabilities that you will be able to market the drug.

Q. Okay. So my question is: From a financial economics perspective, do you have an opinion as to whether investors were provided with enough accurate information to correctly assess the actual magnitude of the risk that the FDA would reject the sNDA?

MR. ADAMS: Objection. Calls for a legal conclusion. Couching it as in your experience as a financial economist doesn't change it, so.

Q. You can answer the question.

A. No, I think we have gone through this before. I mean, to me it's a question that's intrinsically a legal question.

Q. Well, let me ask you this: If you were an investment analyst at a Wall Street investment bank and you had completely misconstrued the magnitude of the risk that an adverse event had occurred, and your defense to your opinion was that it was simply a legal mistake on your part, don't you think your boss at Goldman Sachs would

Page 85

STULZ, Ph.D.

say that's not a sufficient response as to why you misunderstood the situation?

MR. ADAMS: Objection. I don't even understand what --

MR. FREDERICKS: You know, it's withdrawn.

Q. Look, I think we've just established from your prior live questioning that investment analysts and other market participants regularly, in the course of their work, make assessments of the magnitude of various risks facing companies, correct?

A. Analysts that use a discounted cash flow method to value companies will have to make assessment about how likely various cash flows are. But there seems to be confusion in the way the questions are framed in the sense that an important part of the analysis for an analyst would be to know how precise his assessment is of the probabilities. And he or she may have that answer to lead it to a precise assessment of the probability or may not have such data and ends up pulling a number out of a hat. So the question is, what is the information available and how

22 (Pages 82 - 85)

Page 86

STULZ, Ph.D.

precise is the assessment of the probability.

Q.  Okay.  How many of the investment analysts that covered Acadia whose analyst reports you read in your opinion were just pulling a number out of a hat when they were assessing the magnitude of the risk that the FDA would reject Acadia's sNDA for Nuplazid?

MR. ADAMS:  Objection.

A.  So analysts had information that they could use to inform their assessment of the probability of rejection and they had all the information that I discuss in my report.

Now, going back to what you said earlier, the fact that the FDA rejected the submission is not informative about whether the analyst did a good job in estimating that probability or not.

Q.  So to answer the question that I actually asked is:  How many of the investment analysts that cover Acadia whose analyst reports you read in your opinion were, quote, just pulling a number out of a hat, close quote, when they were assessing the magnitude of the risk that the FDA would reject Acadia's sNDA?

Page 87

STULZ, Ph.D.

MR. ADAMS:  Objection.

A.  My reading of the reports is that all the analysts were well-informed and did serious analysis.

Q.  I'm sorry, you said they "were well-informed on"?

A.  Well-informed and did serious analysis.

MR. ADAMS:  "And.  Well-informed and did serious analysis."

MR. FREDERICKS:  "Well-informed and did serious analysis."  Okay.

Q.  And part of their process of informing themselves was collecting public information about Acadia that related to the prospects for FDA approval, correct?

A.  Among other things.

Q.  Okay.  And is it your opinion that analysts were provided with enough accurate information to make reasonably accurate assessments of the actual magnitude of the risk that the FDA would reject Acadia's sNDA?

MR. ADAMS:  Objection.  Calls for a legal conclusion.  I mean, his opinions are in the report.  Are you asking for some

Page 88

STULZ, Ph.D.

other opinion?

MR. FREDERICKS:  No.  The witness has just testified that, quote, analysts were well-informed and did serious analysis.

Q.  So you use the term well-informed when they were doing their financial analysis.  I'm asking you simply in this context of analysts doing financial analysis.

Do you think that analysts were provided with enough accurate information to correctly assess the actual magnitude of the risk that the FDA would reject Acadia's sNDA?

MR. ADAMS:  Objection.  You're asking him if they're fully informed.  You keep going back to the same question, which ultimately is a legal question.

Q.  You can answer.

MR. FREDERICKS:  Your objection is noted.

A.  So the answer of your question -- to your question does not follow from the statement I made earlier.

What I have noticed is that the analysts worked hard to acquire information.  They, as I

Page 89

STULZ, Ph.D.

say in my report, they looked at medical journals.  They talked to experts.  They themselves were -- had expertise.  So I can testify to that.

But the issue of whether they had enough information to reach some level of precision is not a question that I have been asked to address and is not a question that I have studied.

Q.  Okay.  So you have no opinion, you have formed no opinion as to whether investors during the class period were provided with enough accurate information to correctly assess the actual magnitude of the risk that the FDA would reject the sNDA?

MR. ADAMS:  Objection.  Asked and answered.

A.  The way you framed the question...

Q.  Well, you understand I get to ask the questions and you get to answer them, but can you answer my question?

A.  Right.

Q.  You can editorialize about my question, but can you just answer it first and then editorialize about it?

MR. ADAMS:  Let him try and answer it.

23 (Pages 86 - 89)

Page 90

STULZ, Ph.D.

There's so much packed into it, it's difficult to answer.

A.  So, as a financial economist, I would have to study the issue in ways that I was not asked to do and is not in my report.  The question one would have to figure out is what was the correct assessment.  Did the analyst have that correct assessment?  They may well have had the correct assessment, but to reach a conclusion on this issue would require work that I have not performed.

As I said before, the fact that FDA rejected the sNDA does not mean that the analysts were wrong.  They could have had the correct assessment -- using your language -- and the outcome could still have been what it was.  Notice, the outcome doesn't tell us about whether the analysts were correct or not.

Q.  Okay.  Well, I think you're -- the latter part of your answer is unresponsive to the question I asked, but let me ask you this:

Is it your understanding that as of September 6, 2019, that Acadia had even submitted its sNDA?

Page 91

STULZ, Ph.D.

A.  In September?

Q.  2019.

A.  2019 Acadia had not submitted the sNDA.

Q.  Okay.  And that's because the sNDA wasn't submitted until some point in 2020, correct?

A.  That is correct.

Q.  Okay.  So in September 2019, is it fair to say that the FDA hadn't even had an opportunity to review the contents of the sNDA, correct?

A.  I agree that it had not been submitted by that time.

Q.  And you'd also agree that the FDA hadn't formed any opinion in advance that it was going to reject whatever was in the sNDA, correct?

MR. ADAMS:  Objection.  Are you asking him about -- to give an opinion about what the FDA --

MR. FREDERICKS:  Is that his understanding.  Is that his understanding.

A.  I don't know what people at the FDA were thinking at that point in time.

Q.  Okay.  So in September, in early September 2019 -- and I'm going to say September 6

Page 92

STULZ, Ph.D.

because we know there's an announcement of news September 9, so I'm going to draw a distinction between before and after.  Okay?

So, let's say, on September 6, 2019, did the market have information which market participants used to try to assess as best they could the probability that the company had sufficient data that it would be able to obtain FDA approval for broader indications of pimavanserin?

MR. ADAMS:  Objection.  Sorry.

A.  An efficient market on September -- you said September 6?

Q.  Yes.

A.  -- that the price of Acadia would reflect public information that was available about Acadia on the future of its -- of pimavanserin.

Q.  Okay.  And then that would include the future prospects of ultimately obtaining FDA approval for broader usage of pimavanserin?

A.  That is correct.

Q.  Okay.  Now, on September 10, 2019, is it your understanding that the market's assessment of

Page 93

STULZ, Ph.D.

the prospects for FDA approval of Nuplazid for additional purposes, is it your understanding that that market assessment changed compared to what it had been on September 6?

A.  That's correct.

Q.  Okay.  And what's your understanding of the reason why the market's assessment changed in that regard?

A.  The company was conducting a trial.  With a trial the results can be negative, they can be positive, and it turned out that they were positive.

Q.  And you're referring to the Harmony study, yes?

A.  That is correct.

Q.  Okay.  And do you recall generally just how significant the market price reaction was to the news that was announced on September 9th?

MR. ADAMS:  Objection.

Are you asking about statistical significance or what the price return was or the increase was or what?

Q.  You can answer in both respects.

A.  I'm not sure that I am remembering the

24 (Pages 90 - 93)

Page 94

STULZ, Ph.D.

percentage return correctly, but my recollection is it's maybe of the order of 68 percent was highly statistically significant.

Q. And I think your report references the t-stat for the significance of the market change on that date.

A. I have a figure in my report which is in Exhibit 2 and it's not -- I'm sorry. 63.24 percent, and the t-statistic is very large, yes.

Q. And what was that t-statistic?

A. 24.07.

Q. That's very large, yes?

A. Yes.

Q. Okay. For the purposes of the portions of your report which concluded that Dr. Feinstein failed to propose a damages methodology consistent with plaintiffs' theory of liability, did you assume that plaintiffs' factual allegations were true?

A. I assumed that plaintiffs will be able to prove the allegations.

Q. Are you finished with your answer?

A. Yeah.

Page 95

STULZ, Ph.D.

Q. Just wanted to make sure, I didn't want to interrupt you.

And when you say "prove the allegations," you mean prove all of their allegations or substantially all of their allegations?

A. I took the allegations to be true for purposes of the report.

Q. Okay. Do you agree that the out-of-pocket damages methodology is the methodology used in nearly every Section 10(b) class action securities case?

MR. ADAMS: Objection.

A. I'm not an attorney and so I wouldn't want to have an opinion that could be construed as being a legal opinion.

I understand that it's generally the case that one is going to look at the difference between the price of a stock and what the price would be absent inflation as the start of a measurement of damages. So when asked to compute inflation but not the limitations to the use of that number.

Q. Okay. How long have you spent in terms

Page 96

STULZ, Ph.D.

of years or decades consulting in cases which involve an out-of-pocket damages methodology? I mean, Section 10(b) cases that involve an out-of-pocket damages methodology.

A. I'm not sure how many years, but I suspect it's more than 20.

Q. Okay. So based on your personal experience, how often in a Section 10(b) case has a plaintiff advanced the damages methodology other than an out-of-pocket damages methodology?

A. Well, if you mean by that that the damages computation looks at the difference between the stock price at purchase, what the stock price would have been absent inflation, that's an approach that is generally used. I think the issues have to, I mean, deal with how one computes the stock price absent inflation and how one computes inflation.

Q. Okay. The stock price absent inflation is commonly referred to as the but-for price, correct?

A. That's correct.

Q. Okay. So if I use but-for price, I'll use it in that context.

Page 97

STULZ, Ph.D.

Do you agree that an out-of-pocket damages methodology is, as applied in Section 10(b) cases, is a methodology that's common to all class members?

MR. ADAMS: Objection.

And can -- before we go on, can we be clear what you're referring to as out-of-pocket damages methodology?

MR. FREDERICKS: Well, to quote the witness, I'm referring to it as damages computation which looks at the difference between the stock price at purchase and what the stock price would have been absent inflation.

MR. ADAMS: I know what he said, so you're using the same definition then?

MR. FREDERICKS: For purposes of this line of questioning I'll accept it.

A. Okay. So, I'm sorry, you told me early on that I should keep the question in mind when there was an objection, but...

MR. ADAMS: That's my fault.

Q. Do you agree that an out-of-pocket damages methodology, as is customarily applied in

25 (Pages 94 - 97)

Page 98

STULZ, Ph.D.

Section 10(b) cases, is a methodology that is common for all class members?

MR. ADAMS: Objection.

A. It can be.

Q. All right. Can you think of circumstances where it is not common for all class members?

A. I can think of cases where class was denied because of the lack of a common methodology, even though the plaintiffs started from out-of-pocket approach.

Q. Okay. And those were Section 10(b) securities cases?

A. Yeah.

Q. And are any of those cases in which you've offered an opinion?

A. Yes.

Q. Which ones that you can remember?

A. So I can't remember the details of the cases and exactly how the argument or how the judge's decision was exactly framed. But in the BP case that I was involved with, you know, it turned out that the way it was pled by the plaintiffs there wasn't -- estimation of damages

Page 99

STULZ, Ph.D.

wasn't a class-wide issue.

And in the Moody's case that I was involved with there was -- there were knowledge issues that prevented that from being a class-wide solution.

Q. Do you recall in what court and what year approximately the Moody's case was?

A. I don't remember the exact year. It was -- it could be 2012. It was in this district.

Q. Here in the Southern District of New York?

A. Yes.

Q. Okay. Do you agree that the out-of-pocket damages methodology uses an inflation ribbon to measure the amount of artificial inflation in the stock price?

Or, I guess I should say more specifically: Is it used to measure the amount of artificial inflation in the stock price at the times of purchase and sale of a subject security?

A. I agree that the out-of-pocket measure would involve comparing the inflation when you buy versus the inflation when you sell. That could be the measure of damages. But as I mentioned, there

Page 100

STULZ, Ph.D.

are limitations and so it may not be the measure of damages.

Q. I think we'll get in a moment, or maybe after lunch, to some of the factors that I think you may be alluding to, but why don't I just ask it this way:

Have you heard the term inflation ribbon before in the context of computing damages in 10(b) cases?

A. I have. I actually think that Professor Feinstein uses the term in his report.

Q. Do you disagree with his discussion of how an inflation ribbon is commonly used in securities cases?

MR. ADAMS: Objection.

A. As you know, I mean, one of my opinions has to do with his proposed approach to estimated damages, but the way he describes the use of the inflation ribbon in terms of his own work now seems correct.

Q. Would -- well, let me ask you: What is an inflation ribbon as you, you know, use the term?

Well, let me withdraw.

Page 101

STULZ, Ph.D.

Have you ever constructed an inflation ribbon or attempted to construct an inflation ribbon in the context of damages in a Section 10(b) case?

A. I don't believe that I have had a report where I affirmatively proposed an inflation ribbon. I have had opinions where I made arguments about the nature of the ribbon proposed by a plaintiff expert on short results based on -- I mean, short results where I evaluated how that ribbon would change if some assumptions were changed from what the plaintiff expert had done.

Q. Okay. Would you agree that at least some financial analyst or financial analysis or economist create inflation ribbons in the context of doing damages analyses?

MR. ADAMS: Ever?

MR. FREDERICKS: Yeah. I think it's a straightforward question.

A. I mean, is it the case that plaintiff experts usually create a ribbon starting from the abnormal returns on alleged corrective base, yes.

Q. Okay. And as such inflation ribbons are commonly used and constructed, can you just

26 (Pages 98 - 101)

Page 102

STULZ, Ph.D.

provide a layperson's definition of what an inflation ribbon attempts to do?

MR. ADAMS: Objection. I think he's already done that, but go ahead.

A. To compute damages using the out-of-pocket method you need inflation at purchase and you need inflation at sale. The inflation -- the inflation ribbon is a way to have the amount of inflation throughout the class period.

Q. It's a way to measure the amount of inflation?

A. That's correct.

Q. Okay. Do you contend that the out-of-pocket damages methodology referenced in Dr. Feinstein's report is not consistent with plaintiffs' theory of liability?

MR. ADAMS: Objection.

A. My opinion is that the abnormal returns on the two dates, the letter efficiency date and the CRL date, cannot be used to construct an inflation band as such.

Q. I think you mean to say it cannot be used to construct an efficient ribbon?

Page 103

STULZ, Ph.D.

A. An inflation ribbon.

Q. An inflation ribbon?

A. Yes. Sorry.

Q. And is that due to particular problems with applying an out-of-pocket damages methodology in this particular case?

A. It's definitely that problems that arises in this specific case that other cases where the approach doesn't have that problem, so I'm not saying it's problems that is generic to this approach.

Q. Okay. So other than your opinion that abnormal returns on, I think it's March 5 and April 9, 2021, can't be used to construct an inflation ribbon, are there any other respects in which you contend that the out-of-pocket damages methodology proposed by Dr. Feinstein is inconsistent with plaintiffs' theory of liability?

MR. ADAMS: Objection.

So this is the point distinguishing between out-of-pocket damages versus Feinstein's methodology for calculating those. You keep calling it out-of-pocket damages methodology.

Page 104

STULZ, Ph.D.

Q. Well, would you agree that Dr. Feinstein's proposed methodology is an out-of-pocket damages methodology?

A. So just one correction to what you just said. It's March 9 and April 5.

Q. Thank you.

A. As I say in my report and said earlier, out-of-pocket methodology is to compute inflation at the time of purchase and inflation at the time of sale, and using the difference subject to limitations as a measure of damage, I have no objection to the out-of-pocket methodology. Now its use is a legal issue, and if it is the appropriate method legalese and that's the method that will -- I mean, is implemented. The issues I have is with how Professor Feinstein says he would implement that approach on as opposed to the use of the out-of-pocket methodology.

Q. Is it your opinion that any declines observed on either March 9 or April 5 cannot be considered at all in whole or in part in the application of an appropriate out-of-pocket damages methodology in this case?

A. My opinion is because those two dates

Page 105

STULZ, Ph.D.

reflects a material in part or in whole the materialization of a risk. The abnormal returns do not include a key piece of information that you would need to compute the amount of inflation.

Q. And what is the key piece of information that you would need to compute the amount of inflation?

A. The key piece is to know what the expected loss would have been had the market had the information that the plaintiffs claim it should have had.

Q. And that's information that relates to the probability or improbability that the FDA would approve the sNDA, correct?

A. Correct. So in his deposition, Professor Feinstein says that the probabilities the market had was different from the probabilities that management had. So what he's missing from the abnormal return is information about what the probability would have been had the market known the information that you allege was misrepresented.

Q. Okay. You said Professor Feinstein's report. What part of his report are you

27 (Pages 102 - 105)

Page 106

STULZ, Ph.D.

specifically referring to when you reference that Professor Feinstein said that the probabilities that the market had were different from the probabilities that management had?

MR. ADAMS: I don't think he was referring to the report.

A. I was referring to his deposition. I'm not sure I can -- I mean, I can -- yes, Footnote 2000 -- 268.

Q. What page are you looking at?

A. Page 75 of the report or 79 of the exhibit.

Q. I'm sorry, of your report?

A. Of my report.

Q. Okay. I'm sorry, I was looking at the Feinstein report.

A. Yeah, that's where the cite is.

Q. Page 79?

A. Of the exhibit, yes, so it's the board letters.

Q. And it's footnote number?

A. 268.

MR. FREDERICKS: Okay. I realize we're almost at a good time for lunch, but

Page 107

STULZ, Ph.D.

let me just see if I can --

MR. ADAMS: No problem.

MR. FREDERICKS: -- finish up this line.

MR. ADAMS: I just sent Heather to check on it.

MR. FREDERICKS: Perfect.

BY MR. FREDERICKS:

Q. Do you agree that in Section 10(b) securities cases a substantially complete evidentiary record usually needs to be developed before a reasonably reliable loss causation analysis can be conducted?

MR. ADAMS: Objection. Calls for a legal conclusion.

A. My report is not about loss causation, my report is about the methodologies that Professor Feinstein would use and about the facts that he has nothing to say about how he would figure out the probabilities that is crucial here.

Q. Do you agree that in Section 10(b) securities cases a substantially complete evidentiary record usually needs to be developed before an inflation ribbon can be constructed?

Page 108

STULZ, Ph.D.

MR. ADAMS: Objection. Same objection. Calls for a legal conclusion.

A. Nowhere in my report do I criticize Professor Feinstein for not having constructed a ribbon. That's not what I am talking about and that's not the state of this litigation. I am saying that he does not provide an approach that he would use to compute that very specific probability.

Q. Do you think that you would have access to sufficient information to make that computation yourself based on the factual record developed in this case to date?

MR. ADAMS: Objection. Outside the scope.

A. It is not an issue that I have addressed. The way you are framing the question you are making it about implementation of a methodology. I mean, in terms of what data would be used, I mean, is the data there to implement a methodology. My criticism is that Professor Feinstein has said nothing concrete about the methodology he would actually use.

Q. Well, is it that he hasn't said anything

Page 109

STULZ, Ph.D.

concrete about his methodology or that in your opinion he hasn't provided information that would be the actual inputs used to implement his methodology?

MR. ADAMS: Objection.

A. I'm not asking about the value of inputs, I'm asking about what approach he would be using, what kind of inputs would he be looking for.

Q. I'm sorry, could you restate your answer. The transcript I think didn't do a very -- may have missed something in the translation.

Why don't I restate the question and you can restate your answer.

The question is: Well, isn't it that Professor Feinstein hasn't said anything concrete -- well, I'm sorry, withdrawn.

Is it your comment that Dr. Feinstein hasn't said anything concrete about his methodology or is it in your opinion that he hasn't provided information that would be the actual inputs used to implement his methodology?

A. My answer was that I'm not asking for

28 (Pages 106 - 109)

Page 110

STULZ, Ph.D.

the actual inputs for the value of the inputs, I am asking for him to be sufficiently concrete that it would be possible to assess the methodology he's going to use. He has not described concretely a methodology to obtain the probabilities that plays a crucial role in the computation of inflation, assuming that there actually is inflation.

Q. Okay. What's your understanding of how much discovery has been completed in this action to date?

MR. ADAMS: Objection.

A. Actually, I don't have an answer to your question, I don't know.

Q. Okay. Are you aware of whether any depositions of any fact witnesses, with the exception of the named class plaintiffs, have been taken in this case?

A. I have no information about this. I don't think this is relevant to the point I make in my report, because the criticism I make in my report is about methodology, it's not about values of inputs or such things.

Q. Let me suggest that whether my

Page 111

STULZ, Ph.D.

particular questions or your answers are relevant is, in fact, a legal question, and so therefore I don't think again your comments on the legal significance of my questions are responsive. And I think the deposition will go faster if you listen to my questions and just answer.

MR. ADAMS: Likewise, I think if you listen to his answer, it will go faster too. He's not talking about legal relevance, he's talking about relevance to his economic opinion.

MR. FREDERICKS: Thank you for that testimony.

MR. ADAMS: You're welcome.

MR. FREDERICKS: I'm trying to hit the right button for my live feed.

BY MR. FREDERICKS:

Q. Okay. Do you have any understanding as to whether defendants are still producing documents in this case?

A. I have absolutely no understanding of this. I don't have any information. I just want to make it absolutely clear that I had no legal opinion whatsoever. I'm not a legal expert and I

Page 112

STULZ, Ph.D.

have no legal opinions.

Q. Okay. Do you have any opinion as to whether additional information will be developed in the course of discovery that would make application of an out-of-damages methodology appropriate in this case?

MR. ADAMS: Objection. Misstates prior testimony.

A. I mean, Professor Feinstein could describe the approach that he would use concretely and then explain that he's relying on discovery to provide him values for the inputs in his approach.

Q. All right. Do you agree that the propriety of different approaches could well depend on how the factual development of this case actually proceeds?

MR. ADAMS: Objection.

A. I just -- I mean, correction. I said Professor Feinstein. I mean, he may not be the expert if say it's merits phase, so just the plaintiff expert. But I -- I'm just asking for enough of a discussion of how is that probability would be obtained, that it is possible to evaluate a methodology. I'm not asking for more than that.

Page 113

STULZ, Ph.D.

Q. But you have no legal opinion as to whether the additional information that you would like to see from Dr. Feinstein is required at the class certification stage or not?

A. I have absolutely no legal opinion on this or anything else.

Q. Okay. And do you have any opinion as to whether -- assuming discovery runs to the end of its completion in this case -- as to whether an out-of-pocket damages methodology could be appropriately tailored in this case?

A. The critical issues that I raise in my report is that whatever the methodology is, it cannot be one that looks at the abnormal return on the two dates we have been discussing, and brings back the dollar loss on those days backwards to earlier in the class period. That's the key point of my analysis and it is the one that he's not responsive to.

Q. And so in your opinion no portion of the price declines on either March 9th or April 5th are relevant to the potential calculation of damages under an out-of-pocket methodology?

MR. ADAMS: Objection. Misstates

29 (Pages 110 - 113)

Page 114

STULZ, Ph.D.

testimony.

A.   What I'm saying is that the abnormal return on those two dates cannot be the basis for the computation of damages using the out-of-pocket method.

Q.   And is it your opinion that no set of facts could possibly be discovered that would change your opinion in that regard?

MR. ADAMS:  Objection.

A.   Not facts that would be consistent with what the court says in the motion to dismiss decision.

Q.   The court's decision was made before any discovery, correct?

A.   That's correct, as far as I know.

Q.   Okay.  So if new facts came to light in the course of discovery, which the court didn't have an opportunity to consider in its motion to dismiss, or that plaintiffs didn't have an opportunity to consider in forming their complaint in 2021, would you agree that it is possible that such newly discovered facts could change your opinion regarding the unusability of the March 9 and April 5 dates for the computation of damages

Page 115

STULZ, Ph.D.

using an out-of-pocket damages methodology?

MR. ADAMS:  Objection.  I couldn't even follow the question.

Q.   Can you answer the question?  I'm sorry.

A.   As long as the litigation involves understated risks, then my opinion would be unchanged.

Q.   So it's your view that there are -- that there are no new facts that could possibly come to light in this litigation that would change your opinion regarding the extent to which any risks of FDA approval in this case may have been understated?

MR. ADAMS:  Objection.  Misstates testimony.

A.   So the title of Section IX of my report is Professor Feinstein has not presented a damages methodology that can measure damages associated with materialization of allegedly understated risk.

(Request to repeat.)

MR. ADAMS:  Do you want me to read it?

"With materialization of allegedly understated risk."

Page 116

STULZ, Ph.D.

Q.   Okay.  I think you answered a different question from the one I asked.

My question is:  Is it your view that there are no new facts beyond those that you've seen that could possibly come to light in this litigation that would change your opinion that the price declines observed on March 9 and April 5, 2021 -- withdrawn.

I'm having a little problem reading back on my machine.

Let me just read back the prior question.

So it's your view that there are no new facts that could possibly come to light in this litigation that would change your opinion regarding the extent to which any risks of FDA approval in this case may have been understated?

MR. ADAMS:  Objection.  Misstates testimony.

A.   So my opinion is that Professor Feinstein has not presented a damages methodology that can measure damages associated with materialization of allegedly understated risk.  That opinion is not going to change, it is my

Page 117

STULZ, Ph.D.

opinion and it holds.

Q.   Okay.

A.   Now, if there is no materialization of allegedly understated risk, then obviously this opinion doesn't apply.

Q.   I understand that it's your opinion that Professor Feinstein has, in your view, not sufficiently articulated certain aspects of his methodology.

My question is:  It's not a question about the adequacy or inadequacy of Professor Feinstein's description of his methodology, it's that are there any facts that could possibly come to light in this litigation that would change your opinion regarding the extent to which any risks of FDA approval in this case may have been understated?

MR. ADAMS:  I don't understand what that means.  Are there any facts that could come to light that would change your opinion regarding the extent to which risks may have been understated?

He's not opining on the extent to which risks were understated.  That's the

30 (Pages 114 - 117)

Page 118

STULZ, Ph.D.

whole problem with your question.

He's saying there's no methodology presented that's consistent with this theory of liability of an understated risk.

So I don't understand the question, so objection. Vague. Ambiguous.

BY MR. FREDERICKS:

Q. Do you agree with counsel's statement?

A. So I did not hear your questions that way earlier. I mean, I don't, I don't quite understand the question, so if you can rephrase it, that would be helpful.

Q. Okay. This began with the question that was -- that addressed your opinion that no portion of the price declines on either March 9 or April 5 are relevant to the potential calculation of damages under an out-of-pocket methodology.

A. I think I was more precise on that. I am saying that the price drops do not provide information about what is needed to compute inflation, that the key ingredient to a computation of inflation is not in the price drops, and Professor Feinstein has not shown how he would compute or estimate that key ingredient

Page 119

STULZ, Ph.D.

what his methodology would be in any ways that would be concrete.

Q. All right. Do you believe that -- well, again, my question is: Is it your opinion that no set of facts could possibly be discovered in the balance of discovery yet to be taken or discovery that has been taken that would change the opinion you've just given?

MR. ADAMS: Objection.

A. So the answer I have given and that I'm giving again is that my opinion is one about materialization of allegedly understated risk. And as long as there is materialization of allegedly understated risk, my opinion stands, which is that the price drops cannot be used to compute the key quantities that is required to compute inflation.

Q. And do you believe that that information doesn't exist or simply that Dr. Feinstein hasn't identified it for you sufficiently to your taste?

A. Neither. What I'm saying is that he has not proposed a methodology that he could use to estimate that quantity.

MR. FREDERICKS: Okay. Why don't we

Page 120

STULZ, Ph.D.

take a break for lunch.

THE VIDEOGRAPHER: We are off the record. The time is 1:06 p.m. Eastern Time.

(Off the record.)

(Lunch recess.)

Page 121

STULZ, Ph.D.

A F T E R N O O N    S E S S I O N

(Resumed.)

THE VIDEOGRAPHER: We are now back on the record. The time is 1:53 p.m. Eastern Time.

BY MR. FREDERICKS:

Q. Dr. Stulz, I want to just get briefly to some of your opinions relating to price impact.

With respect to the portions of your report dealing with price impact, did you assume the plaintiffs' factual allegations were true?

A. I'm taking the allegations as given unless you mean that the plaintiffs would prevail on the allegations.

Q. Okay. What is your understanding of what price impact means as you use it in your report?

A. As the way I understand it is that evidence of price impact would be evidence that the alleged misstatements made the price different from what it would otherwise have been.

Q. Is that the same thing as that alleged misrepresentations have an effect on the price of the subject security?

31 (Pages 118 - 121)

Page 122

STULZ, Ph.D.

A. The alleged misrepresentation makes the price be something different than what it would have been absent the allegations. I mean absent the misstatements.

Q. Okay. Is it true that a failure to prove price impact is not the same thing as proving that there was no price impact?

MR. ADAMS: Objection.

A. I'm not sure that there is a general answer to your question.

Q. Well, it's a conceptual question.

On the one hand my question posits that there's such a thing failure to prove price impact. I'm contrasting that with the concept of proving that there is no price impact.

So my question is: Do you recognize a distinction between those two concepts?

A. I think it would depend.

Q. Okay. So sometimes failure to prove price impact might be the same thing as proving that there was no price impact but it depends?

A. I think I would have to know the context. I would have to know the ways that it's used to show the absence of price impact, or that

Page 123

STULZ, Ph.D.

there is no price impact.

Q. Okay. But, I guess -- let me try to rephrase it by saying:

Is a failure to prove price impact necessarily the same thing as proving that there was no price impact?

A. I think it would depend on the specifics. I would have to look at a specific case.

Q. So you don't recognize the distinction between the two concepts as a conceptual matter?

A. I admit that it is possible in specific cases that there's a difference that proving one is not the equivalent as proving the other.

Q. But do you agree that conceptually they involve proof of two different things?

A. I agree that there's separate statement on that proving one may or may not be sufficient to prove the other.

Q. Okay. What type of evidence did you look for that might be evidence of price impact in this case?

A. I mean, what I did is described in my report. It is straightforward. There are a

Page 124

STULZ, Ph.D.

number of allegations concerning the two trials. And I looked at whether the information that was in the market corresponded to -- and that was in the market, I mean, at the time of the two disclosures at the end whether that information was information that had been alleged to not have been disclosed.

Q. Did you look for that information yourself or did you delegate that responsibility to Cornerstone?

A. Well, it is my report and I'm responsible for every part of my report, but I did the work of looking at a considerable amount of information.

Q. And looking at that information was done in the first instance by folks at Cornerstone, correct?

MR. ADAMS: Objection.

A. I'm not quite sure that that's correct. I think that I read a large amount of analyst reports, for instance. I think in some cases I read them before the folks at Cornerstone and in some cases we're working on them in parallel. So I wouldn't, I wouldn't agree with what you said.

Page 125

STULZ, Ph.D.

Q. Okay. Approximately how much of the 42 hours of time that you spent working on this report, would you say you spent personally reviewing analyst reports or portions of analyst reports?

A. I don't know. I mean, I didn't keep track separately. And so, I mean, I don't think it's a case where I necessarily kind of started from the top of the pile of an analyst report and went to the bottom. I might have gone and looked at other things that was suggested by seeing analyst reports, so I don't think I can answer the question.

Q. Okay. But you don't purport to have looked at all the analyst reports that were issued on Acadia during the 2017-2021 period, do you?

A. I would think that I looked at most of them. I mean, if you look at the analyst reports, there are some that have nothing to do with this litigation, and so I didn't look at those. They might have been about other trials, for instance. But the ones, I mean, the discussions that were related to the litigation, I believe that -- I mean, I wouldn't say that I have seen everything,

32 (Pages 122 - 125)

Page 126

STULZ, Ph.D.

because another analyst report came in three or four different waves, but I think I have seen the large bulk of it.

Q.  Okay.  Did you use any particular criteria to screen out reports that you looked at versus ones you didn't?

A.  Well, so, now, if a report has a title that has to do with some other trial and the summaries about other trials, I mean, I would stop reading, but I might still scan it to make sure that there is nothing, nothing else.

No, I did not read the discussions of other trials because that doesn't seem to be relevant.

Q.  Okay.  And does proving price impact involve the same types of proof for both material misstatements and material omissions?  In this case I am drawing a distinction between misrepresentations and omissions.

MR. ADAMS:  Objection.

Just so I understand.  You mean what type of -- is it the same evidence in showing price impact for material misrepresentations versus material

Page 127

STULZ, Ph.D.

omissions, is that what you mean?

MR. FREDERICKS:  Yeah.

Q.  Is your financial analysis, is your approach to analyzing price impact the same with respect to misstatements versus omissions?

A.  I mean, there are differences.  Knowing the case of an omission, now if management doesn't, doesn't say something, then it does not follow that there is a change in the stock price for not saying something.  Whereas, if it's now a statement that is wrong but inflates the stock price, you would be able to look at whether there is an abnormal return.  And so that would be a difference that would affect the approach that you take, at least in some cases.

Q.  Okay.  If there is evidence that the alleged misrepresentations in this case caused -- well, withdrawn.

Is there evidence that the alleged misrepresentations caused a statistically significant increase in Acadia's stock price, in your opinion?

MR. ADAMS:  Objection.  Vague as to time and which statements.

Page 128

STULZ, Ph.D.

MR. FREDERICKS:  Withdraw.  Let me ask, hopefully, an easier question.

Q.  If there is evidence that any given alleged misrepresentation caused a statistically significant increase in Acadia's stock price, does that prove that that misrepresentation caused an increase in the company's stock price?

A.  I'm not sure I understand the question.

Q.  Well, assume you have evidence that an alleged misrepresentation caused a statistically significant increase in Acadia's stock price.  You can make that assumption.  Does that prove that it had price impact?

MR. ADAMS:  Objection.  Vague as to prove.

A.  Assuming I understand your question correctly and you are saying that the misrepresentation causes a decrease in the stock price, then we have one of two options.  Either it is evidence that the market for Acadia stock is not efficient if that information was already public or it would be evidence of price impact.

Q.  And for purposes of your report, you've already assumed that the market for Acadia stock

Page 129

STULZ, Ph.D.

was efficient, correct?

A.  I assumed that to be the case, yes.

Q.  Okay.  Generally speaking, when a security price movement is statistically significant, does it indicate that the price movement was caused by material new public information?

A.  I seem to have missed something in the question, could you repeat it?

Q.  Sure.  Generally speaking, when a security price movement is statistically significant, does it indicate that the price movement was caused by material new public information?

MR. ADAMS:  Objection.  Are you assuming that information came out then?

MR. FREDERICKS:  I'm asking him generally speaking.  I think the witness can answer.

MR. ADAMS:  Well, except it doesn't make any sense.

MR. FREDERICKS:  Well...

MR. ADAMS:  If the stock moves, you're saying is that based on new information.

33 (Pages 126 - 129)

Page 130

STULZ, Ph.D.

Well, was there any information disclosed or?

MR. FREDERICKS: Well, Dr. Stulz, I'm sure you can answer this question despite the objection.

BY MR. FREDERICKS:

Q. Generally speaking, when a security price movement is statistically significant, does it indicate that the price movement was caused by material new public information?

A. A stock price can move with a significant abnormal return in the absence of new public information, so it doesn't mean that there was necessarily new public information.

Q. Okay. Generally speaking, when a security that trades in an efficient market has a price movement that's statistically significant, does it indicate that the price movement was caused by material new public information?

A. The answer is the same.

MR. ADAMS: Objection.

THE WITNESS: Sorry, sorry.

MR. ADAMS: Sorry.

A. The answer is the same, no?

Page 131

STULZ, Ph.D.

Q. Okay. Does price impact analysis rule out random volatility as the sole cause of such a material stock price movement?

MR. ADAMS: Objection.

A. I'm afraid that I really don't understand the question.

Q. Well, when one is doing price impact analysis, if there is a conclusion that there was price impact, does that rule out random volatility as the sole cause of the price movement at issue?

MR. ADAMS: Objection. Vague as to "rule out."

A. Are you talking about an econometric analysis of abnormal returns or what should I be thinking about?

Q. Have you done price impact analysis in the course of your career?

A. When I just did it here.

Q. Okay. Does your analysis here rule out random volatility as the sole cause of the subject price movements that were analyzed in your report?

MR. ADAMS: Objection. Vague. Which analysis?

MR. FREDERICKS: The witness's price

Page 132

STULZ, Ph.D.

impact analysis.

MR. ADAMS: Well, there's a ton of detail in that analysis.

A. So, remember, that main analysis relies on the fact that the market is efficient, that public information is incorporated in the stock price, so the issues that you talk about really doesn't arise in the analysis that I did.

Q. Can information have price impact if there is not a statistically significant return observed on the date when the information is made public?

A. Again, this is not an issue that arises in my report, it's completely irrelevant to my report, so I don't have to address it in the context of my report given the analysis that I performed.

Q. I'm not asking you whether you did or didn't deem it necessary to address it in your report. But in your expert opinion, can information have price impact if there is not a statistically significant return on the date that the statement contained the information comes out?

A. I understand that some courts would like

Page 133

STULZ, Ph.D.

to see further analysis beyond just looking at the significance of the abnormal return, and so this has to do with the standard of the court.

In general, no financial economist use a standard of whether something is statistically significant or not. And know if it's not statistically significant, it's not discernible from noise, so then it becomes an academic matter.

Q. Does the price of a security have to increase in response to a misrepresentation for there to be price impact?

Now I'm going back to using misrepresentation and the term in the way you use it as misrepresentation or omission.

MR. ADAMS: You mean both? Sorry.

MR. FREDERICKS: Yeah, yeah. I am using misrepresentation in the same way that Dr. Stulz used it in his report in the sense of misrepresentation or omission.

MR. ADAMS: Well, now I'll object just because it's compound. I don't know that the response is the same for each, but I'll let him answer.

A. So I know the words, and then you

34 (Pages 130 - 133)

Page 134

STULZ, Ph.D.

switched standards on me during the previous conversation, and so I am not quite sure whether that mattered or not.

Q. Let's go back to the ground rules we had this morning that misrepresentation includes both misrepresentation and omissions as you previously described them. Now, if your answer is different for a true misrepresentation as opposed to an omission, you can clarify that in your answer.

But the question is: Does the price of a security have to increase in response to a misrepresentation for there to be price impact?

MR. ADAMS: I'll object again as compound. You're talking about an affirmative misstatement or an omission, correct?

MR. FREDERICKS: I'm using misrepresentation the way the witness used it in his report.

A. So we discussed this issue previously. Now when an omission is made, the stock price does not necessarily increase, or may not increase.

Q. Okay. And does the price of a security have to decrease in response to a

Page 135

STULZ, Ph.D.

misrepresentation for there to be price impact?

MR. ADAMS: Objection. Again, compound and vague.

A. If the question is whether the price increases at the time the misrepresentation is made, then we just discussed that in the case of an omission it may not increase and that wouldn't mean that there wasn't an omission.

Q. And it wouldn't mean that there wasn't price impact?

A. That's correct.

Q. Okay. How many days in the class period did you examine to determine if information that had been made public on those days had corrected in whole or in part any of the alleged misrepresentations in this case?

MR. ADAMS: Objection. Foundation.

A. My report is clear on the question that you ask now, which is that I looked at the day of the deficiency letter and I looked at the day of the complete response letter. My opinions are that those -- the drops on those days are not evidence of price impact for a number of the allegations.

Page 136

STULZ, Ph.D.

Q. Okay. Did you look at any other days?

MR. ADAMS: Objection.

A. That means the complaint doesn't allege that there is any other day when the truth was allegedly revealed, and so I focused on those days. I have looked at many other days that had information being disclosed by the company during that period of time, I suspect I looked at all the days when information was disclosed, but my report is clear as to what my opinions are.

Q. Okay. In order for a statement to impact a stock price, is it necessary that all market participants accept the statement as true?

A. I don't see what this has to do with my report, but I'm clear in my discussion of market efficiency that market efficiency doesn't require that everybody has the information that has been made public so everybody knows that information. That's not how market efficiency works.

Q. And by the same token it's not necessary that all market participants accept a statement as true or all those who become aware of the statement accept it as true?

MR. ADAMS: Objection.

Page 137

STULZ, Ph.D.

A. I have a quote in my report from Professor Feinstein saying that differences of opinions do not means that the market is not efficient.

Q. Again, if you could, with all due respect, answer my question, which was:

Isn't it true that it's not necessarily -- it's not necessary that all market participants accept a statement as true or that all those who become aware of the statement accept it as true for the statement to have price impact?

MR. ADAMS: Objection. He did answer your question.

A. Yeah, I thought that my citation was on point. But for price impact to take place, now you need the market to be efficient in the sense that investors who can put the information in the stock price. It doesn't require that everybody knows the information or even that everybody now has the same views on information. That was what the former quote was about.

Q. Okay. So would you similarly agree that if some market participants disagree with a company's representation on a particular matter,

35 (Pages 134 - 137)

Page 138

STULZ, Ph.D.

that doesn't prove that the representation had no price impact?

A. I think it would depend. It could be a matter of study. I don't think it's an issue for my report.

Q. Okay. In terms of price impact, I think I may -- we may have alluded to this before, but paragraph 8 of your report. And I won't reask the questions, but -- but I believe that we talked about how you identify three categories of alleged misrepresentations in this report for price impact purposes?

MR. ADAMS: Is that a question?

MR. FREDERICKS: Yeah.

MR. ADAMS: Which is?

Q. I.e. the three categories referenced in paragraph 8 of your report.

MR. ADAMS: What's the question?

Are there three categories; is that the question?

MR. FREDERICKS: Yeah.

Q. And it's correct that as stated in your report at paragraph 8 you did price impact analysis with respect to the three categories of

Page 139

STULZ, Ph.D.

misrepresentations reflected in paragraph 8, correct?

A. So to make sure that we are precise, paragraph 8 has essentially two halfs.

The first half talks about the alleged misstatements and omissions and puts them in three buckets. One bucket having to do with the FDA agreement. The bucket having to do with the Harmony study. And the bucket having to do with the -019 study.

Then the second half talks about what I was asked to do, which is more specifics on those buckets.

Q. Okay. And it's your opinion that none of the alleged misrepresentations made at the front end of the class period, for example, September 9, 2019, had any price impact; is that correct?

MR. ADAMS: Objection.

A. My opinions are extremely clear on that. Some ways I thought very clearly. And I think we should stick to what my opinions are. What you described doesn't reflect my opinions. So I think we should go back to the opinions, which is that

Page 140

STULZ, Ph.D.

the price drops at the end of the class period are not evidence of price impact for the alleged misrepresentation for Harmony and the price drops at the end are not -- with the exception of the issue of deviations, that I'm sure we'll come back to -- are not evidence of price impact for the -019 misrepresentations.

I then discuss in the report that the alleged misrepresentations concerning -019. So the information that wasn't made public these omissions, that all of that was in the public domain before the class period started and, hence, couldn't have a price impact during the class period.

The design of Harmony was known before the start of the class period and again couldn't have an impact during the class period.

And then the last opinion has to do with the agreement -- no, understandings that -- when I talk of the agreement is what the corporation was talking about and that's subject to litigation as to whether it was an agreement.

But the alleged misrepresentations regarding to that, the market knew about the

Page 141

STULZ, Ph.D.

existence of the agreement as reported by the corporation before the start of the class period and, hence, that couldn't have a price impact during the class period.

Q. And just to confirm. All your opinions with respect to price impact are set forth in your report?

A. What I just said are my opinions on price impact and my report is consistent with those opinions, yes.

Q. Okay. Okay. Did you form any opinions on price impact other than the ones set forth here in your report?

A. My report contains all my opinions, there's no opinion outside of the report.

Q. Okay. Is it your opinion that there was no disclosure of adverse information concerning the design or results of the Harmony study that was made on March 9, 2021, that had any price impact?

MR. ADAMS: Objection. I think it misstates his opinion. But you can answer, if you understand.

A. Can you repeat your question?

36 (Pages 138 - 141)

Page 142

STULZ, Ph.D.

Q.  Yeah.  Is it your opinion that there was no disclosure of adverse information concerning the designs or results of the Harmony study that was made on March 9, 2021, that had any price impact?

A.  So there was information disclosed on March 9 -- on March 8 with a price with -- which was a market price on the following day.

On April 5, that was adverse, but that information had to do with the views of regulators as opposed to information about the Harmony trial that wasn't already known.

Q.  And what was the, or what is the error rate that you would assign to your reaching of this conclusion?

MR. ADAMS:  Objection.  I don't even know what that means.

Q.  Well, like, put another way:  How sure are you that you've found no evidence of price impact in this regard, zero percent would be a hundred percent certainty, a hundred would be zero percent certainty?

MR. ADAMS:  Objection.  Again, makes no sense.

Page 143

STULZ, Ph.D.

A.  I think the critical issue here is whether the market for Acadia is efficient or not. So if my assumption that it's efficient is not correct, then obviously there's a problem with my opinion.  But if the assumption that it's efficient is correct, then my opinion follows from the definition of market efficiency and from my understanding of what was disclosed and what was known before.

Q.  And so there is no doubt in your mind that the market is efficient that your conclusion in this regard holds?

A.  I have shown in my report that the information about Harmony that is discussed or referred to in the Acadia disclosures on those two dates is information that the analysts were already aware of given the quotes that I -- I mean, I gave in my report.  So as long as my understanding of those quotes is correct, I don't have any, any doubts.

Q.  Okay.  In your report, how did you analyze whether there was or wasn't any price impact?  Or to clarify, did you perform any analysis other than just looking at information

Page 144

STULZ, Ph.D.

that you assert was publicly known?

MR. ADAMS:  Objection.

A.  Well, as you know, I performed an event study and I estimated the residual returns on four separate dates during the class period, and so I have those results in my Exhibit 2.  So I did that analysis.  But then I proceeded to study the information that was public ahead of the various dates.  And my report provides quotes from disclosures by the company, quotes by analysts that correspond to the information that was discussed on the dates of March 5 and April -- no, I'm sorry -- March 8 and April -- March 9 and April 5.

Q.  Okay.  Let's -- well, can you just briefly summarize in laymen's terms what your calculation of residual price changes entailed?

A.  So I use our regression model that is one uses broad market index and uses the NASDAQ Biotech Index and believes that Professor Feinstein uses the same indices.

I estimate the model on the 120 days before the event that I study and I use that model to predict the abnormal return -- I mean predicted

Page 145

STULZ, Ph.D.

return of Acadia on the disclose -- I mean on the days that I study on given day.  And then subtract that predicted return from the actual return that's going to be my residual return.  And then I use the regression model to estimate the statistical significance of the residual return.

Q.  And calculating statistical significance involves calculating what's known as a t-statistic or t-stat; is that correct?

A.  That's correct.

Q.  And in laymen's terms what's a t-stat in this context?

A.  Well, it's a ratio of the residual return on the standard error, and a value above 195 is typically viewed to be a significant value.

Q.  Okay.  And would you agree that the residual price increase on September 9, 2019, was highly statistically significant?

A.  We already talked about it and I agreed to that.

Q.  Okay.  All right.  Do you agree that such a t-stat result shows the company-related news announced on that date caused Acadia's stock price to increase?

37 (Pages 142 - 145)

Page 146

STULZ, Ph.D.

A.  I agree that the stock price increased on that day as a result of the new information coming to the market about the company.

Q.  Okay.  And what was the news on that day that resulted in the stock price increase?

A.  We discussed that earlier.  The news on that day is that the company stopped the Harmony trial because it had reached its primary endpoint.

Q.  Hypothetically, would, in your opinion, Acadia's stock price have gone up as much as it did on September 9, 2019, if there had been no agreement between Acadia and the FDA?

MR. ADAMS:  Objection.  Calls for speculation.  I don't even know what that has to do with his testimony that he just gave on why the stock price increased.

Q.  You can answer.

A.  As I discuss in my report, all the information about the agreement was public before September 9, and so at that point the stock reflected the information having to do with the agreement.  If at some point before September 9 there had been disclosures that there wasn't an agreement, then the stock price before September 9

Page 147

STULZ, Ph.D.

would have been different.

Q.  And my question is:  Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if there had been no agreement between Acadia and the FDA?

MR. ADAMS:  Objection.  Are you asking if there's no agreement or it's disclosed that there's no agreement?

MR. FREDERICKS:  You'll have an opportunity to ask your questions, let me ask.

MR. ADAMS:  Well, it doesn't make any sense.

Q.  Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if there had been no agreement between Acadia and the FDA?

MR. ADAMS:  Same objection.

A.  I'm not quite sure how to answer the question because it doesn't tell me how we got to the point where there was no agreement.

Q.  Okay.  Let me give you a simple hypothetical.

Let's -- well, the hypothetical is that

Page 148

STULZ, Ph.D.

there was no agreement with the FDA.  I'm just asking you to assume that as a hypothetical.

If that hypothetical were true, would Acadia's stock price have gone up as much as it did on September 9, 2019?

MR. ADAMS:  Same objection.  I don't know what's disclosed.

A.  I don't quite understand the assumptions underlying this.  I mean, suppose that there had never been an agreement and the corporation said, look, I mean, we didn't talk about an agreement because there wasn't any, I don't know what the stock price increase on September 9 would have been.

Q.  Okay.

A.  What I know --

MR. ADAMS:  Let him finish.

A.  What I know is that at that point there was a disclosure of an agreement.  I know that the complaint said that the agreement led to a higher return.  And I'm saying that can't be the case if the market is efficient because the agreement was known.

Q.  Okay.

Page 149

STULZ, Ph.D.

A.  So my opinion in my report is very specifically related to the allegation in the complaint that discussion of the -- I mean, that the disclosure of the agreement on September 9 caused an increase in the stock price.

Q.  Is it your understanding that there was no prior statement by the company referencing the existence of an FDA agreement prior to September 9, 2019?

MR. ADAMS:  What?  Objection.

A.  I -- I think I'm saying the opposite.  I'm saying that the market knew about the agreement as discussed by the corporation since August 2017.

Q.  Okay.  And I really don't -- I mean, of course, I'm reserving all rights, including the right to be able to have Dr. Stulz come back and answer the questions, but I'm going to ask this question one more time:

Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if the company's representations that there was an agreement between them and the FDA were false?

38 (Pages 146 - 149)

Page 150

STULZ, Ph.D.

MR. ADAMS: Objection. The same objections.

A. So I thought I understood the question before. No, I totally -- you are alleging that what they say about the agreement is false.

Q. My question isn't about any allegations in the complaint. It's a hypothetical question.

Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if there had been no agreement between FDA and Acadia?

MR. ADAMS: Objection. That's a different question.

A. My understanding of the allegation is that the plaintiffs allege that there was no agreement. What I say in my -- I mean, show in my report citing the company and the analyst before September 9 is that there are disclosures of the existence of an agreement.

Then we have September 9 and the stock price goes up with the market knowing that there is an agreement, and then learning that the Harmony trial was very successful.

Q. Are you contending that you've seen a

Page 151

STULZ, Ph.D.

document which was publicly disclosed to investors which sets forth the FDA's understanding of any alleged agreement?

A. No, absolutely not.

Q. Okay. So your testimony about the market's understanding of the existence of an agreement is based on what the market was told by Acadia, correct?

A. That is precisely what I said.

Q. Okay. So my question is:
Hypothetically, assuming that the company's representations to, you know, the market about this alleged agreement were either false or materially misconstrued the terms of the agreement, if that had been the case, would Acadia's -- so that's the hypothetical I'm asking you to assume in my question. I'll try one more time.

So hypothetically, would Acadia's stock price have gone up as much as it did on September 9 if the company's representations about the existence of an agreement were either simply false or materially misleading?

MR. ADAMS: Objection. And you don't

Page 152

STULZ, Ph.D.

have to get aggressive, Bill.

MR. FREDERICKS: I --

MR. ADAMS: He's assumed -- it's in the report. He assumed they're false. I mean, that's the whole assumption. Like I don't understand what the question's getting at.

MR. FREDERICKS: Okay. I don't need the speaking objection, can I just have the answer to the question?

THE WITNESS: Absolutely.

A. I mean, the issue is that I have trouble with the question. Because the way I understand your question is you're asking me if the allegations of the plaintiffs about the agreement is correct, would the stock price have increased as much as it did on September 9.

The answer is, the market abnormal return would be exactly the same whether the allegations are true or not, as long as the public information up to September 9 is the same.

Q. You're a very true gentleman that I compliment you for. Let me try to ask the question one more time.

Page 153

STULZ, Ph.D.

Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if the market had understood that there had been no agreement between Acadia and the FDA?

MR. ADAMS: And I'll object, calls for speculation.

Just so I understand, because we just went through like 10 minutes of this, you're now saying if the market understands there's no agreement; is that right?

MR. FREDERICKS: Yes.

MR. ADAMS: Okay. So you want him to decide how much the stock is going or to opine on how much the stock would react if it's disclosed on September 9 there's no agreement, plus --

MR. FREDERICKS: I don't need the speaking objection.

MR. ADAMS: I'm asking for clarification.

MR. FREDERICKS: I didn't ask for how much. Where did you find that in my question? My question is, hypothetically, would the stock price have gone up as much.

39 (Pages 150 - 153)

Page 154

STULZ, Ph.D.

MR. ADAMS:  No, how much.

MR. FREDERICKS:  No, I'm not asking him to qualify.

Q.  Dr. Stulz --

MR. ADAMS:  Okay.  The much is --

MR. FREDERICKS:  Your objections are noted.

Q.  Hypothetically, would Acadia's stock price have gone up as much as it did on September 9, 2019, if the market had concluded, contrary to Acadia's representations up to that point, that there was, in fact, no agreement between Acadia and the FDA?

A.  I don't see a way I can answer the question, because I would have to understand when and why the market concluded that there was no agreement and what happened to the stock price at that point.  So by September 9 it would have been a very different situation.  And so I can't -- I mean, that would be pure speculation on my part.

Q.  Why is it important to understand why the market might have reached a particular conclusion for purposes of answering this question if the market had, in fact, reached that

Page 155

STULZ, Ph.D.

conclusion?

A.  Because we would be in a very different world from the one we are in on September 9.  And so, I mean, I don't know what kind of world it would be.  There's no new information on September 9 about the agreement.

Q.  Okay.

A.  So I'm not quite sure how the market would have reached the conclusion you want me to assume.  I don't know when the market would have reached that conclusion and I don't know what the market would have learned that led it to have that conclusion.

Q.  Let me ask a slightly different question.

Would Acadia's stock price have gone up as much as it did on September 9, 2019, if the market had understood that Acadia had materially misrepresented the terms of any alleged agreement between it and Acadia, would your answer basically be the same as what you just gave?

MR. ADAMS:  I'm going to object.  Incomplete hypothetical.  Vague as to time.  Calls for speculation.

Page 156

STULZ, Ph.D.

A.  I mean, I wouldn't know -- I would need to know exactly what the path is from August 2017 to September 9 that leads the market to conclude that there's no agreement on what it means that there is no agreement.

Q.  And the question I asked was -- I understand I asked before for you to assume that the market had formed an understanding that there was no agreement.  The second question I'm asking is:

If I'm asking you to assume that the market had concluded that the company had materially misrepresented the terms of some agreement that actually existed, would your answer in substance be the same?

MR. ADAMS:  Objection.  Same objections as to time.  Speculation.  Incomplete hypothetical.  Vague.

A.  I mean, the stock price on September 8 wouldn't be the same so, again, we would be in a completely different universe.

Q.  The stock price on September --

A.  8.

Q.  -- 8 might have been different.  But to

Page 157

STULZ, Ph.D.

the extent that the stock market reacted positively to the other portions of the company's announcement on September 9, 2019, would it have reacted less positively if it had understood that there was either no FDA agreement or that the company had materially misrepresented the terms of the agreement?

MR. ADAMS:  Objection.  Vague as to time.  Calls for speculation.

A.  I have a hard time figuring out what you mean by "no agreement."  I mean, is it the FDA saying don't ever come to us with this Harmony study or what is it "no agreement," I don't know.

Q.  Okay.  So your answer would depend on just what was misrepresented in the agreement?

A.  And what was said that led the market to look at this differently from what it did.  I mean, it can't be that one morning the market wakes up and decides that there's no agreement.

Q.  Your report refers throughout to the FDA agreement or an FDA agreement.  What are you referring to as you use that term in your report?

A.  I want to make clear that when I refer to the agreement -- that has no legal implication

40 (Pages 154 - 157)

Page 158

STULZ, Ph.D.

whatsoever -- that I don't mean that there is an agreement in the sense of that the plaintiffs are discussing. What I mean is that there was an understanding between the -- I have an understanding of some kind of agreement between the company and the FDA that corresponds to what I cite on page 12 and 13 of Exhibit 1 that there was a set of questions and my understanding is that responses to those questions are responses from the FDA.

Q. That's 12 and 13 of the exhibit as filed with the court, it's pages 8 and 9 of your actual report as you submitted it, correct?

A. 8, 9 and 10, that's correct.

Q. Yeah. As we go forward, why don't we use the page numbers that you actually put on your report and we'll ignore the other numbers. I think that might minimize confusion. Okay?

A. Absolutely.

Q. Okay. So it's your understanding that the FDA agreement that the company was referring to throughout the class period is reflected in the questions and answers that you cite here at paragraph 20 of your report; is that correct?

Page 159

STULZ, Ph.D.

MR. ADAMS: Objection. The agreement was prior to and after the class period.

Q. You can answer the question.

A. So the class period starting in August 2017, the company talks about an agreement with the FDA that it claims makes it possible for it to submit an sNDA with the Harmony study and that would be focused on DRP. So this is -- so these are questions that it asked from the FDA that it talks about in its disclosure throughout the class period.

Q. Let me show you what's been marked as Exhibit 25 previously in this litigation and ask if you've seen this document before.

A. This is a document that I cite.

Q. That's the document you're quoting from in paragraph 20 of your report?

A. That's correct.

Q. Okay. Have you seen a full and complete copy of this exhibit in connection with preparing your report?

A. If what you are giving me is a full and complete copy, then I've seen it.

Q. Okay. So are any terms of the agreement

Page 160

STULZ, Ph.D.

between FDA and Acadia that you refer to as the FDA agreement in your report spelled out or memorialized in any other writings exchanged between FDA and Acadia other than Exhibit 25?

MR. ADAMS: Objection.

A. So my focus in my report is on what the company said. It is not -- I mean, I'm not an expert on the agreement, on the facts here. When the company discusses the agreement, it discusses, you know, what it believed it heard from the FDA concerning the questions that are here.

Q. Okay. So my question again is: When you use the term FDA agreement, are there any other documents, other than Exhibit 25, that, to your knowledge, spell out in writing the terms of or some of the terms of the FDA agreement which documents were actually exchanged between FDA and Acadia?

MR. ADAMS: Objection. Ambiguous.

Q. I mean, I understand there are a lot of documents in this case where people are talking about an agreement. I'm asking, other than Exhibit 25, have you seen any documents which you understand to reflect the terms of the agreement

Page 161

STULZ, Ph.D.

which were actually exchanged between FDA and Acadia?

A. So the purpose of this part of my report is extremely limited. There was an end of Phase II meeting. The company always refers to that end of Phase II meeting on the agreement that it had at that time. And so the disclosures of the company known in its public filings, in its earnings calls and various conferences, always refer to this, and those are the questions that were addressed in that meeting from my understanding of this document. I'm not testifying to whether this document is actually -- I mean, an agreement in the sense meant by the plaintiffs or any of that kind. I was not hired to make an investigation of the correspondence between the company and the FDA, all I am saying in my report is that the company disclosed the agreement as it understood it, way before September 9, starting in August 2017.

Q. Okay. Have you formed an opinion as to whether any of the company's statements about the agreement do, in fact, fully and faithfully reflect its understanding? Did you form an

41 (Pages 158 - 161)

Page 162

STULZ, Ph.D.

opinion --

MR. ADAMS:  Objection.

Q.  -- on that subject?

MR. ADAMS:  Calls for a legal conclusion.

A.  I should have qualified what I said as the company purported to understand the agreement.

Q.  Thank you.

A.  I agree with you.

Q.  Thank you.

So when the company talked to investors about an FDA agreement -- in the sense that you've used the term FDA agreement in your report -- are there any documents, other than Exhibit 25, to your knowledge, which were exchanged between the FDA and Acadia which reflected the terms of the agreement or reflected additional or different terms of the agreement compared to Exhibit 25?

A.  That issue is beyond my report.  I did not ask whether there were other documents because that was not relevant to my report.  My report is about what the company says about the agreement. What it says was said before September 9, and until September 9 did not provide new information

Page 163

STULZ, Ph.D.

about the agreement in the sense that I use the term, you know, and that's -- that's my opinion.

Q.  Okay.  So for purposes of your analysis, Exhibit 25 is the only document exchanged between FDA and Acadia which reflects the terms of the FDA agreement as you use that term in your report?

MR. ADAMS:  Objection.  I think that misstates his testimony.

A.  So my testimony is that in August 2017 the company discloses the existence of what it calls the agreement.  And that has to do with the path forward concerning Harmony going to sNDA. That's disclosed then.  On every single letter to the agreement that is disclosed is disclosed before September 9, and that's why it's important to my report because it is disclosed before September 9.

Q.  Okay.  And so when you're referring to the agreement, again, you are referring to the content of Exhibit 25, and not to the content of any other document between FDA and Acadia?

MR. ADAMS:  Objection.

A.  I wouldn't even go that far.  When I'm referring to the agreement, I'm referring to the

Page 164

STULZ, Ph.D.

public disclosures of the corporation having to do with an end of Phase II meeting on the path forward for Harmony to an sNDA.

Q.  Okay.

A.  So documents that I send -- that I cite is a document that reflects the state of affairs. That's my understanding of the state of affairs at the end of this Phase II meeting and so it's the background for what the company discloses.  That's the extent of what I have to say.

Q.  Okay.  Let me just ask you this because I think you may have misspoken.

You said that when you're referring to the agreement, quote, I'm referring to the public disclosures of the corporation having to do with an end of Phase II meeting.

When you're referring to the agreement, are you referring just to what the company said it was or are you referring to what you read in Exhibit 25?

A.  I'm referring to what the company said it was.  My opinion is about the public disclosures.

Q.  So if any of the company's statements

Page 165

STULZ, Ph.D.

about the agreement, the company's public statements about the agreement are materially false or misleading, you would -- that would be an assumption contrary to the assumptions that you based your report on?

MR. ADAMS:  Objection.

A.  I don't think that's correct.  My opinion -- now we are talking about the opinion that the stock price increase on September 9 is not evidence of misstatements concerning the FDA agreement.  That opinion does not assume that there are no misrepresentations.

As I have said, I take the allegations to be given untrue that you are going to be able to prove them.  So that's a different issue.  It's unrelated to my opinion.

Q.  Let me ask it to you this way:

When the company was referring to the FDA agreement or the terms of the FDA agreement, is it your understanding that the company was referring to terms or provisions different than or in addition to what's reflected in Exhibit 25?

MR. ADAMS:  Objection.

A.  So the disclosures that the company

42 (Pages 162 - 165)

Page 166

STULZ, Ph.D.

makes before September 9 have to do with its ability or its understanding with the FDA that it could submit an sNDA that would be focused on DRP as opposed to ADP. You know, that it could have a broad-based -- a broad-based trial as opposed to one specialized to a form of psychosis having to do with Alzheimer's, and a number of related issues that it believed came out of that end of Phase II meeting.

Q. And my question is: When the company was referring to its agreement or understanding with the FDA, is it your understanding that the company was referring to terms or provisions different than or in addition to what's reflected in Exhibit 25?

MR. ADAMS: Objection. Asked and answered.

A. So I'm not here to testify as to whether the company was truthful in disclosures relative to this document. What the company says in its public disclosures is quoted in my report. And what I'm saying is that those quotes corresponds to disclosures of what it purports to be an agreement, and all of that is public before

Page 167

STULZ, Ph.D.

September 9. So September 9 does not convey new information about the purported agreement. That is based on quotes from the company on its officers.

MR. FREDERICKS: Obviously I'm reserving all my rights to bring the witness back to get answers to my questions.

Let me try to get an answer one more time to my question.

Q. When the company was referring to its agreement or understanding with the FDA, is it your understanding that the company was referring to terms or provisions different than or in addition to what's reflected in Exhibit 25?

MR. ADAMS: Objection. Answered like four times.

A. I'm not here as a legal expert and I'm not here to testify on whether what the company said reflects this agreement, this document, Exhibit 25, exactly or not, or whether I should have done something else. That's beyond my expertise and it's beyond what I was asked to do.

Q. I'm not asking you what you asked to do,

Page 168

STULZ, Ph.D.

what you were asked to do, what's in your report, I'm asking you a question. And it's my deposition, I get to ask the questions. It's your job, consistent with your oath to tell the truth and the full truth, to answer them. And I think an enormous amount of time has been wasted in this deposition. With all due respect, you're giving evasive answers which are not responsive to my question. I'll try it one more time.

When the company was referring to its agreement or understanding with the FDA, is it your understanding that the company was referring to terms or provisions different than or in addition to what's reflected in Exhibit 25?

MR. FREDERICKS: And I will grant defendants' counsel all the same objections he's previously stated.

MR. ADAMS: Well, I'm going to object right now because there's no reason to continue with this line of questioning. He's telling you he hasn't been asked to form an understanding about whether or not the agreement that we're referring to is fully reflected in that document or not.

Page 169

STULZ, Ph.D.

You can ask it 15 times and we're going to spend all day here. It has nothing to do, he's told you, with his opinion. Whether or not his understanding of the agreement one way or the other is reflected in this document or nine other documents, he's talking about what the company disclosed about an agreement. So --

MR. FREDERICKS: Are you instructing, are you instructing the witness not to answer?

MR. ADAMS: I'm going to let him answer one more time and then we're going to move on.

MR. FREDERICKS: Okay.

MR. ADAMS: And then you can take it to Magistrate Byrd, if you want.

MR. FREDERICKS: We'll see if that happens.

BY MR. FREDERICKS:

Q. When the company was referring to its agreement or understanding with the FDA, is it your understanding that the company was referring to terms or provisions different than or in

43 (Pages 166 - 169)

Page 170

STULZ, Ph.D.

addition to what's reflected in Exhibit 25?

A. As I've said, I know this is beyond my report and I don't have -- I mean, I wasn't asked to develop an understanding on this question.

Q. So you have no idea what the answer to my question is?

A. I don't have an opinion.

Q. Do you have an understanding? I understand you don't have an expert opinion, do you have an understanding as you sit here today?

A. As I've said, to have an understanding, I would need to have legal expertise, which I don't.

Q. You would need legal expertise to know if you have an understanding as to what the company itself was referring to when it referred to the FDA agreement, that's your testimony?

MR. ADAMS: Objection, that isn't his testimony.

MR. FREDERICKS: It certainly sounded like it to me.

Q. Am I correct?

MR. ADAMS: You're --

MR. FREDERICKS: Yeah, you can -- I

Page 171

STULZ, Ph.D.

understand your objection. Can I just have the witness --

MR. ADAMS: Why don't we just try and cut through it and figure out what you're trying to ask.

MR. FREDERICKS: Yeah, no. Stop wasting my deposition time.

MR. ADAMS: You're wasting everyone else's time. We've been going back-and-forth for an hour on this.

MR. FREDERICKS: Well, I can --

MR. ADAMS: He's already said it has nothing to do with his opinion.

MR. FREDERICKS: You're instructing the witness not to answer?

MR. ADAMS: You can try and answer, if you want.

A. I think I've -- I mean, I'm trying to be clear about what I was asked to do and what I can say given what I have studied. I did not conduct a study of trying to figure out whether the company said exactly what was in this agreement or not. That's beyond my expertise as it requires legal expertise.

Page 172

STULZ, Ph.D.

In my report I discuss the fact that in August 2017 the corporation said that we had our end of Phase II meeting. At that meeting we reached an agreement or understanding with the FDA about the path forward and from then on it kept talking about this agreement and what it implied for the path forward. I cite this document as being a summary of the questions and answers at that end of Phase II meeting. I was not asked to reach an opinion as to whether the company was truthful to that document, which I have said an opinion would be beyond my expertise. I am not a lawyer.

Q. Okay. Let me just try to get you some questions and perhaps we can get shorter yes-or-no answers.

To your knowledge, did the parties to the FDA agreement, as you use that term, memorialize the alleged terms of the FDA agreement in any documents other than Exhibit 25? Yes or no.

A. I think that's a similar question to one I have already answered. This is not an issue that I pursued in any way.

Page 173

STULZ, Ph.D.

Q. So the answer is you don't know?

A. The answer is I don't know.

Q. Okay. To your understanding, were there any oral communications between FDA and Acadia that constituted part of the FDA agreement as you use that term in your report?

A. My report says exactly what I know and what research I did to learn what I know.

Q. Okay. So if your report doesn't cite any oral communications between the FDA and Acadia, you didn't consider them in your report?

A. This is not something that comes anywhere close to what I was asked to do. I'm focused on price impact in an efficient market and that's all I do.

Q. Okay. And so you didn't consider any oral communications, if any?

A. I'm not --

MR. ADAMS: Objection. Asked and answered.

A. I'm not aware of communications, but that wasn't part of the research I did. There was no reason for me to do research in that direction.

Q. Okay.

44 (Pages 170 - 173)

Page 174

STULZ, Ph.D.

A. That's not what my report is about.

Q. Okay. Do you have any understanding -- and maybe you have none, in which case you can just say you have no understanding.

But do you have any understanding to what extent either of the parties to the FDA agreement sought to document, for the other party, any interpretations they had of relevant terms of the agreement?

MR. ADAMS: Objection. I couldn't even follow that. Did you understand that?

Q. Well, are you aware that sometimes in the course of human life people try to put together a written document that will clarify an understanding of what an agreement means? Are you aware that that sometimes happens?

MR. ADAMS: Objection.

A. I certainly am aware that sometimes that happens. I mean, those sets of issues have nothing to do with my report.

Q. Okay. Are you aware of any efforts to clarify either side's interpretation of the FDA agreement?

MR. ADAMS: Objection.

Page 175

STULZ, Ph.D.

A. No, I'm not.

Q. Okay. Are you familiar with the term special protocol assessment in the FDA context?

A. I don't think I'm aware of it at this time. I may have, I may have known at one point but not in the context of this report.

Q. So you have no understanding of whether the FDA agreement that we've been talking about is the type of agreement that was reached under the FDA special protocol assessment procedures?

A. I guess I withdraw my previous answer.

I know you have a discussion in the complaint about types of agreements with the FDA inter alia, this is not of that type, so that I remember.

Q. Okay. And I think it's clear, but I want to just give you a final answer to clarify it.

Do you have any expertise as to different types of agreements that or understandings that the FDA enters into or may enter into with a drug sponsor?

A. No, I don't.

Q. Okay. So going back to Exhibit 25.

Page 176

STULZ, Ph.D.

Have you seen any evidence that Exhibit 25 was made public at anytime during the class period?

MR. ADAMS: Objection. You mean the full doc?

MR. FREDERICKS: Yes.

Q. Excluding the first two pages of the exhibit. So referring just to the minutes themselves as opposed to the cover correspondence, which constitutes the first two pages of the exhibit. Do you need the question read back?

A. No, I don't. What I know is that the company referred to an agreement for coming out of the end of Stage 2 -- I mean meeting, but I'm not aware of it having issued the text itself, disclose the text itself.

Q. Okay. Let's go back to the pages of your report which quote from Exhibit 25. I think that's paragraph 20, if I'm not mistaken, of Exhibit 26.

A. That's correct.

Q. Okay. I want to draw your attention to the top of page 9 of your opinion where there's a Question 2(a) and then FDA Responds to Question

Page 177

STULZ, Ph.D.

2(a). Do you see that?

A. Right.

Q. Can you look at the FDA response to Question 2(a) in Exhibit 25. I think it's at page 5.

A. Right.

Q. Okay. You'll notice that in your report you did not completely quote the language of the FDA Response to Question 2(a) as it appears in the minutes. Do you see that you have ellipses in your report?

A. I definitely do because I couldn't -- I mean, it didn't make any sense to cite the whole document.

Sorry. I was looking at the wrong page. It actually is -- it's actually on page 6 of the document. 6 and 7.

Q. No, I'm looking at page 5. Do you see where it says Question 2 and then FDA Response to Question 2(a) in the middle of page 5? Not on page 6, on page 5.

MR. ADAMS: He's referring to this, and this, and just the --

THE WITNESS: Oh, okay. I see, yeah,

45 (Pages 174 - 177)

Page 178

STULZ, Ph.D.

yeah, absolutely.

Q. Okay. Am I correct that your report omitted inter alia the language from the FDA Response to Question 2(a), which reads, "We, FDA, have concerns with the proposal to use a randomized withdrawal trial to establish efficacy." Do you see that?

A. That's correct, I went to the part where the FDA suggests what the company should do.

Q. So is it your opinion that the language that you did not include from the FDA's response to Question 2(a) when writing your report is immaterial to how a reasonable investor might view the FDA agreement?

MR. ADAMS: Objection.

Q. The alleged FDA agreement.

MR. ADAMS: I don't even know what that question means.

Q. Well, you didn't include it in your report, correct?

MR. ADAMS: He's summarizing the minutes.

A. Right.

Q. Okay. But it's your testimony, as I

Page 179

STULZ, Ph.D.

understand it, that -- well, let me not make assumptions.

Is it your understanding that the company's public statements about the alleged FDA agreement were not materially false or misleading with respect to their description of what the FDA agreement was?

MR. ADAMS: Objection. Asked and answered like six times.

MR. FREDERICKS: He can answer it again.

A. So I was not asked to form an opinion on this issue because it would be legal opinion. Even if it weren't a legal opinion, it's not relevant to my report in the sense that the opinion in my report is that the company made disclosures about the purported agreement, that those disclosures were made starting in August 2017, and so the existence of that purported agreement was well-known and public before September 9. It was in SEC filings of the corporation. It was in earnings calls. It was in other calls with analysts, and so on.

Q. Did you see any evidence in your review

Page 180

STULZ, Ph.D.

of documents in connection with this matter that investors were ever advised that the FDA had concerns with Acadia's proposal to use a randomized withdrawal trial to establish efficacy?

MR. ADAMS: Objection.

Q. You can answer.

MR. ADAMS: You're asking --

MR. FREDERICKS: No speaking, no speaking objections.

MR. ADAMS: I'm going to finish. We've been going for two hours. You're asking him all these questions that have nothing to do with his opinions, which he said like multiple times.

MR. FREDERICKS: With all due respect, Mr. Adams, I don't need your permission to ask questions.

MR. ADAMS: Well, I don't need permission to object.

MR. FREDERICKS: Instruct the witness, instruct the witness not to answer, state it succinct, and let him answer after stating your objection.

MR. ADAMS: I will. Let me finish my

Page 181

STULZ, Ph.D.

objection, which is this is completely outside the scope. You're just wasting everyone's time continuing to ask questions that have nothing to do with his opinion, and he's already answered.

MR. FREDERICKS: He has not answered that question.

MR. ADAMS: I wasn't referring to that question, I'm referring to the ones we just went through for the last two hours.

But go ahead and answer, if you understand.

MR. FREDERICKS: Well, we may well have a colloquy in front of Magistrate Judge Byrd and see who's been wasting whose time --

MR. ADAMS: Great.

MR. FREDERICKS: -- and who's been giving evasive and nonresponsive answers.

MR. ADAMS: You just don't like the answers.

MR. FREDERICKS: Anyway, let's --

THE WITNESS: I wouldn't mind a bathroom break soon.

46 (Pages 178 - 181)

Page 182

STULZ, Ph.D.

MR. ADAMS: Yeah, answer the question and then we'll take a break.

MR. FREDERICKS: Can you read the pending question back, Madam Reporter.

(Whereupon, the requested portion was read back by the Reporter:

"QUESTION: Did you see any evidence in your review of documents in connection with this matter that investors were ever advised that the FDA had concerns with Acadia's proposal to use a randomized withdrawal trial to establish efficacy?")

MR. ADAMS: Same objection as before, but you can answer.

A. What I know is that the issue of whether a withdrawal trial would be enough was discussed even ahead of September 9 by analysts. That's all I know. I mean, if you read all of the document, I mean, that's kind of beyond -- yeah, I'm not going to go there. Sorry. That's beyond what I was asked to work on.

Q. Okay. You know that the issue of whether a withdrawal trial would be enough was the subject of discussion in documents you read.

Page 183

STULZ, Ph.D.

Did you see any documents in which there was a discussion that the FDA itself had concerns, it had expressed concerns about Acadia's proposal to use a randomized withdrawal trial?

A. No, I'm not an expert on this document. I cite it in my report and I cite the conclusions of it, and the conclusions don't seem to indicate at the end of the day there was a solution forward that that's a path that was followed. That's all I can say.

Q. So you haven't seen any such document that was publicly available that referenced the FDA actually having concerns about Acadia's proposal as reflected in Exhibit 25?

MR. ADAMS: Objection. Misstates testimony.

A. I have already said that Acadia did not disclose this document as a whole and I have already said that in my report I cite the conclusions of the responses to the various questions, which draws a path forward. I'm not an expert on this document. I am focused on the public disclosures of Acadia. And my opinion is clear that what I'm saying is that the purported

Page 184

STULZ, Ph.D.

agreement was disclosed before September 9.

Q. Fully and completely?

MR. ADAMS: Objection. Misstates testimony.

Q. Fully and completely with respect to all its material terms?

MR. ADAMS: Objection.

A. I don't have that opinion. That would require me to be a lawyer, I'm not a lawyer.

MR. FREDERICKS: Okay. We can take a break. I'll just make a brief statement on the record.

In another context I would be making motions to strike the witness's answers as unresponsive. Obviously, this proceeding is going to be in front of a judicial officer. The judicial officer, whether it's Judge Byrd or Judge Hayes, can obviously form their own conclusions as to what answers have and haven't been responsive. As I've alluded to before, we reserve all our rights with respect to getting answers to questions we believe may not have been answered. But that's just a

Page 185

STULZ, Ph.D.

statement for the record. We can take a break.

MR. ADAMS: Well, I'll just say we reserve all our rights as well.

MR. FREDERICKS: Understood.

MR. ADAMS: Okay.

THE VIDEOGRAPHER: We are off the record. The time is 3:35 p.m. Eastern Time.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER: We are now back on the record. The time is 3:53 p.m. Eastern Time.

BY MR. FREDERICKS:

Q. Dr. Stulz, did you discuss any aspect of your testimony with counsel during the break?

A. We're concerned about our flights on when this might finish.

Q. Okay. But nothing relating to the substance of your testimony?

A. Nothing of substance, no.

Q. Okay.

A. Just about the time left.

47 (Pages 182 - 185)

Page 186

STULZ, Ph.D.

MR. FREDERICKS:  Let's -- let's mark the 2020 document.

(Email Exchange, Bates ACAD_SECLIT_0023439 to ACAD_SECLIT_0023441, marked as Plaintiffs Exhibit 30, as of this date.)

MR. FREDERICKS:  This is Exhibit 30.

BY MR. FREDERICKS:

Q.  I'm showing you what's been marked as Exhibit 30.

Dr. Stulz, this is an email chain between and amongst others Danbi Lee, who I will represent is from the FDA, and Teresa Brandt, who I will represent is from Acadia.  That's Bates stamped ACAD_SECLIT_0023439 through 441.

Have you ever seen this document before?

A.  No, I have not.

Q.  Let's just go through it and, like a lot of email chain documents, chronologically it starts at the end of the document and works forward.

So the first email in the chain is dated Friday, July 10.  You see that?

A.  Uh-hum.

Page 187

STULZ, Ph.D.

Q.  And in it Dr. Lee writes to Teresa Brandt, "Attached is a courtesy copy of our latest communication regarding certain documents relating to Nuplazid."  Do you see that?

A.  Yep.

Q.  Okay.  The next email in the chain is from Teresa Brandt to Danbi Lee dated Friday, July 10, sent at 5:13 p.m.  Do you see that?

A.  Uh-hum.

Q.  And she writes, in part, "Dear Danbi," and in the same paragraph she says, "We noted the standard review classification and would appreciate if you could provide background as to why a priority classification was not assigned considering this is a Breakthrough Therapy product that we considered met the FDA's criteria of priority review."

You see that language?

A.  Uh-hum.

Q.  I realize you haven't seen the document before, but is it your understanding that this document appears to be Ms. Brandt referencing the FDA's decision to give only standard review rather than priority review to the Nuplazid sNDA?

Page 188

STULZ, Ph.D.

MR. ADAMS:  Objection.  Scope. Foundation.  He's not on any of these emails.

Q.  Is that the way you construe the document?

A.  I mean, I'm not an expert in documents here.  I was not asked to consider that document. I don't think this document is relevant to my report.

Q.  Are you aware that the company made an announcement in the latter part of July that it was not -- that the FDA was not granting priority review to its sNDA?

A.  Yes.

Q.  Okay.  And instead it was only granted standard review by the FDA, correct?

A.  That's correct.

Q.  Okay.  So you would find it at least plausible that this email here is referencing that FDA decision to grant only standard review rather than priority review, correct?

MR. ADAMS:  Objection.  Foundation. Relevance.

A.  I mean, I see the email asking questions

Page 189

STULZ, Ph.D.

about the decision of the FDA.  I mean, that's my plain reading on, but I don't see what it has to do with my report.

Q.  Okay.  Well, again, it's not important that you see why it may or may not be relevant as long as you answer my questions.

So then the third email in the chain, I think, starts on the third page of the document, or the exhibit.  It shows it's an email from Danbi Lee to Teresa Brandt and another person dated July 17, 2020.  You see that?

A.  Yeah, I'm just -- you skipped one of the emails and so I wanted to read it.  I'm sorry.

Q.  Oh, I --

A.  Okay.

Q.  Yeah, I think that that email that starts on the first page carries over to the next page, so I think we're going through everything chronologically.  If you want to read it, that's fine.  It's a short document.

A.  Yeah, I read it.  I'm good.  I'm at a Saturday email.  Is that the one you want me to read?

Q.  Yeah.  The third email.  It says at the

48 (Pages 186 - 189)

Page 190

STULZ, Ph.D.

end of the first paragraph -- and this is Danbi Lee of the FDA writing -- well, withdrawn.

In the last email we discussed, this is the February 10 email, Ms. Brandt is asking Mr. Lee if he could provide background as to why a priority classification was not assigned to the sNDA. Do you see that in the second paragraph?

A. Correct.

Q. And in the email of Mr. Lee in reply he says, in part, looking at the last sentence of the first paragraph, "Based on a preliminary review of your submission, it is unclear if the clinical data demonstrate this potential." You see that?

A. Uh-hum.

Q. And the potential he's referring to is the potential for the drug in question to be a significant improvement in safety or effectiveness, parens, e.g., evidence of safety and effectiveness in a new subpopulation, closed parens. Do you see that?

A. Right. Uh-hum.

Q. You see that?

A. Uh-hum.

Q. Okay. Did you in your work on this

Page 191

STULZ, Ph.D.

engagement ever see any indication that the market had been informed at any time during the class period that based on FDA's preliminary review, the FDA had opined that it was unclear if the clinical data demonstrated the potential referenced in Mr. Lee's email?

MR. ADAMS: Objection. Foundation.

A. I was not asked to consider this document.

Now, I did look at the disclosure having to do with not being granted priority status. It was public information what was required for priority review designation. My understanding here is that Mr. Lee actually is just referring to the publicly known criteria.

Q. What was the company's public comment as to why it didn't get priority review during this time period July 2020?

A. I reviewed emails for that date earlier in my work. I didn't go back to refresh my memory, so I don't think I cite that in my report.

Q. Do you recall the company making public comments to the effect, in substance, that the company really had gotten no indication from the

Page 192

STULZ, Ph.D.

FDA as to why it wasn't being granted priority review?

MR. ADAMS: Objection.

A. I don't remember that detail I'm afraid.

Q. Okay. The last line of the email Mr. Lee writes -- this is the -- to be clear -- the July 17 email.

Mr. Lee writes, "As for holding an Advisory Committee meeting, we're not planning on holding one at this time." Do you see that?

A. Yes.

Q. I believe it's referenced in your report that the company announced that the FDA had indicated that it wasn't holding -- wasn't planning on holding an advisory committee meeting. Is that correct?

A. It's certainly correct that it was public information that there would not be such a committee meeting.

Q. Okay. Now, do you have any understanding of whether the holding of an advisory committee meeting on a new drug application is genuinely perceived as a good thing or a bad thing by market participants, analysts,

Page 193

STULZ, Ph.D.

sophisticated investors and such?

MR. ADAMS: Objection. Compound.

A. I mean, I'm not an expert on the FDA practices. The analyst discussed that issue. It was publicly disclosed. So, I mean, it was something that was publicly known.

Q. Okay. But do you have any opinion, you may have none, but do you have any opinion as to whether as a general matter the FDA deciding to hold an advisory committee or not hold an advisory committee on a new drug application at the stage of the process that Acadia was in is a good thing or a bad thing in terms of trying to assess the prospects of FDA approval?

A. I don't have an opinion of my own. I read what the analyst had to say. You know, on that day the analysts viewed it as bad news that it would be a standard review. I don't remember them looking at it as bad news since there would not be a committee. I mean, the committee can introduce uncertainty is what they say.

Q. Do you have an opinion as to whether a market analyst opinion or, I should say, a pharmaceutical company analyst opinion about the

49 (Pages 190 - 193)

Page 194

STULZ, Ph.D.

significance of the FDA having an advisory committee meeting or not holding an advisory committee meeting depends, in part, on whether the FDA has raised any questions about the efficacy of the clinical data that's been submitted?

MR. ADAMS: Objection.

Q. Or, I'll say, about whether the clinical data has shown efficiency.

A. Remember that I was asked to do something very specific. The company has allegations about what was known and what wasn't known. I looked at the price impact of those allegations. I'm not aware of allegations that have to do with this.

Q. And, again, the allegations you looked at are from a complaint that was filed in 2021, correct?

A. I believe that the allegations I looked at are from the operating complaint.

Q. Okay.

MR. ADAMS: Is there some other complaint?

Q. Well, my question is: Do you have any understanding as to whether plaintiffs had the

Page 195

STULZ, Ph.D.

opportunity to seek to file a further amended or updated complaint?

MR. ADAMS: Sorry. What was the question again?

MR. FREDERICKS: Does he have an understanding, he may not, of whether plaintiffs will have the opportunity to seek to file a further amended complaint.

MR. ADAMS: I'll object because he's not a lawyer, but you can answer.

A. I was not asked anything or told anything about this. I was asked to look at, I mean, to look at the allegations in the complaint, and I have said repeatedly I take those as given. Then I studied the implications for price impact of those allegations.

Q. Okay.

MR. ADAMS: Are you planning to amend your complaint?

MR. FREDERICKS: We're certainly reserving our right to do so, but that's not for purposes of this deposition.

MR. ADAMS: Well, it is, because we're going down this path of briefing class

Page 196

STULZ, Ph.D.

cert, right? And if you're going to materially alter your complaint, we're going to have to go through this process again.

MR. FREDERICKS: Well, we can have this discussion when it's not chewing into Dr. Stulz's deposition.

MR. ADAMS: You brought it up about an amended complaint.

MR. FREDERICKS: Well, of all the things that are not relevant to today's proceedings, that would be high on the list.

MR. ADAMS: Yeah, behind this email the entire discussion about it.

BY MR. ADAMS:

Q. And just looking at the last email in this chain on July 28, it's the first one on the document. Mr. Lee writes, "We will not be scheduling a t-con," that I think is a reference to a telephone conference that Ms. Brandt had requested.

And he goes on to write, "Your application did not receive priority review

Page 197

STULZ, Ph.D.

designation because, based on our initial review, your application does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement and safety or effectiveness in the treatment of dementia-related psychosis."

Do you see that language?

A. I see that language.

Q. And just for the sake of completeness.

In the course of your work on this engagement, did you see any indication that the substance of Mr. Lee's comment about the reasons for the FDA denying priority review were conveyed to the public?

MR. ADAMS: Objection. I'd also point out, I think Danbi might be a female.

MR. FREDERICKS: Yeah, that's my bad.

MR. ADAMS: And all of this is irrelevant. But you can answer.

A. So I was not asked to study this document or how disclosures matched with the document.

Q. So you weren't asked to -- I understand that.

50 (Pages 194 - 197)

Page 198

STULZ, Ph.D.

Whether you were asked to or not, is it also fair to say that in the course of your work on this engagement you never saw any evidence that the substance of the second paragraph of Ms. Lee's email was disclosed to the public; is that correct?

MR. ADAMS: Objection. Misstates his testimony.

A. As I said, the criteria for accelerated evaluation were publicly known, but I have not seen this email being disclosed.

Q. Are you familiar with all of the criteria for accelerated evaluation?

A. No.

Q. So there could be different reasons, as far as you know, as to why accelerated evaluation might be denied, correct?

A. That's right. I was referring to the email on the second page which lists another guidance for priority review designation. That is what was known and that is what Ms. Danbi refers to. She doesn't refer to anything else.

Q. Okay. Did you see any analyst commentary that suggested that the reason why

Page 199

STULZ, Ph.D.

priority review might have been denied was COVID related in some respects?

A. There were a lot of discussions as to why the FDA did what at various points in time including in July 2020.

Q. Okay. But as far as you know, the public was not provided with any information that the FDA had contacted the company in July 2020 and said that the reasons for denial of priority review were related to the FDA's concerns about whether the data showed efficacy?

MR. ADAMS: Objection. Compound.

A. I might be confused about the dates here. The email on top seems to be subsequent to the disclosures of the company about the standard review.

Q. So the July 28 email came after the company's disclosures about being denied priority review?

A. On July 20, yeah.

Q. Okay. But, I take it, you would agree that Mr. Lee's email of July 17 was received before the company's disclosures of July 20?

A. Correct.

Page 200

STULZ, Ph.D.

Q. Okay. Do you see anything inconsistent between what Mr. Lee said in his -- what Ms. Lee said in her email of July 28 and what she said in her email of July 17 as to the reasons the FDA was denying priority review?

MR. ADAMS: Objection. He's already testified he's not an expert on FDA.

A. This is beyond my expertise and beyond the scope. I don't want to be testifying as to what the FDA is saying in a document.

Q. So you haven't considered any of these issues in your report?

A. There was no reason for me to consider them.

Q. Okay.

A. My opinion is unchanged by any of those issues. None of my opinions are affected. None of my opinions would have required me to look at things like this.

MR. FREDERICKS: What are we up to?

(FDA Complete Response Letter, Bates ACAD_SECLIT_0001088 to ACAD_SECLIT_0001093, marked as Plaintiffs Exhibit 31, as of this date.)

Page 201

STULZ, Ph.D.

BY MR. FREDERICKS:

Q. I show you what's been marked as Exhibit 31, and let me ask: This appears to be a copy of the actual FDA complete response letter from April 2021.

MR. ADAMS: Objection.

A. It looks to me like it is.

Q. Have you ever seen this document before?

A. Yes, I've seen it.

Q. Did you see this document before or after you prepared your report?

A. Before.

Q. Okay. And similar to my prior questions, to the best of your understanding, based on the work that you've conducted to date, have you seen any evidence that the text of this complete response letter, Exhibit 31, was ever publicly disclosed?

MR. ADAMS: Objection.

Q. During your prior -- during or immediately after the class period.

MR. ADAMS: Objection as to vague as to text.

I just want to be clear. Are you

51 (Pages 198 - 201)

Page 202

STULZ, Ph.D.

asking him if the whole document was disclosed?

MR. FREDERICKS: Thank you, Peter.

Q. I'm asking, Dr. Stulz, have you seen any evidence or indication that this letter, this document, Exhibit 31, has ever been made publicly available?

A. I mean, what I know is that it wasn't made publicly available on April 5. That at the conference call with analysts much of this was summarized by the corporation, but I don't know if all of it was summarized. I didn't form an opinion as beyond the fact that those things were discussed.

Q. Under Clinical on the first page of this exhibit, the FDA complete response letter states, quote, We have concluded that your sNDA submission does not provide substantial evidence of effectiveness to support the approval of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis, close quote. Do you see that language?

A. Yes.

Q. Based on what you now know, including

Page 203

STULZ, Ph.D.

the contents of the July 2020 emails in the prior exhibit, was this letter, the complete response letter, the first time that the FDA had raised concerns about the adequacy of the sNDA's data to support approval?

MR. ADAMS: Objection. Again, he's not an FDA expert. You've assumed that, facts that are not in evidence, and you're asking him to opine on what the FDA believed back then and now.

MR. FREDERICKS: Are you instructing him not to answer the question?

MR. ADAMS: He can try to answer it. It's totally irrelevant. You're asking a witness who wasn't asked to do this whether they have some view on the FDA's decision to not award priority review and then to reject the NDA.

MR. FREDERICKS: With all due respect, I think your speaking objection is --

MR. ADAMS: I am speaking, because we're wasting heaps of time about stuff that has nothing to do with that report. Pretty soon we're just going to shut this

Page 204

STULZ, Ph.D.

down if you're not going to ask about his opinion and the report.

Do you understand the question?

MR. FREDERICKS: Why don't I repeat it, and maybe you can just give a response and we can move on.

BY MR. FREDERICKS:

Q. Based on what you know now, including the contents of the July 2020 emails in the prior exhibit, was this letter, the complete response letter that's in front of you, the first time that the FDA had raised concerns about the adequacy of the sNDA's data to support approval?

MR. ADAMS: Objection. Scope. Relevance. Foundation.

A. I don't have any opinion on this. I don't have the expertise to have an opinion. I was not asked to form an opinion.

Q. Okay.

A. And the answer would not be relevant to my report.

Q. Can you define what the term conditional probability means to a financial economist?

A. Where do you see that?

Page 205

STULZ, Ph.D.

Q. I'm sorry. We're moving on. You can put that exhibit aside.

So let's start fresh without the distraction of any exhibits.

Can you define what the term conditional probability means to a financial economist?

A. It would be the probability of something occurring given some conditions that's established.

Q. Okay. Do you ever use conditional probability concepts in any of your published research?

A. I mean, it doesn't come to mind immediately. I use it in my textbook, yeah.

Q. Is it a concept that investment analysts apply oftentimes in valuing a company or a company's publicly traded stock?

A. Absolutely. Now that I think about it, I have plenty of papers where I use conditional probabilities.

Q. In the current matter, have you attempted to assess the conditional probability of the FDA approving Acadia's sNDA given that Acadia had represented that it had an agreement with the

52 (Pages 202 - 205)

Page 206

STULZ, Ph.D.

FDA?

MR. ADAMS: Sorry. Are you asking if he calculated conditional probability?

MR. FREDERICKS: Yes.

A. It is not clear to me why I would have done so.

Q. So the answer is you did not do so?

A. The answer is I did not do so.

Q. Thank you.

Had an investment analyst covering Acadia during the class period wanted to perform an analysis of the conditional probability of the FDA approving the sNDA, based on the assumption that Acadia allegedly had an agreement with the FDA, how would such an analyst go about conducting that analysis or what are the acceptable methods in your view that an analyst would go about conducting such an analysis?

MR. ADAMS: Objection.

A. I think we're going back to a topic that we examined quite a bit earlier, namely, the issues that Professor Feinstein does not explain how he would estimate the probability of rejection absent the agreement, so that question is exactly

Page 207

STULZ, Ph.D.

the same. I said at the time that that was not an issue for his proposed damages approach. It is not an issue that I had to examine in my report.

Q. Do you have any opinion as to whether investment analysts performed conditional probability analyses of the type I referenced in my last question?

MR. ADAMS: Sorry. Objection. Are you asking whether they just performed conditional probability analyses or related to the agreement? I thought there was something about the agreement. Was there not? Did I miss --

MR. FREDERICKS: Yes, that was embedded in my question.

MR. ADAMS: So, again, I'm not trying to cause trouble. Are you asking whether any analyst to his knowledge conducted a conditional probability analysis related to the agreement?

MR. FREDERICKS: I think I've phrased it or would phrase it slightly differently, so let me try it again.

Page 208

STULZ, Ph.D.

BY MR. FREDERICKS:

Q. In the instant matter, did you see any indication that investment analysts performed any type of conditional probability analyses that involved assessing the likelihood of FDA approval of the sNDA?

A. I'm sorry, so that's a different question?

Q. Yeah, I'm trying to make it simpler so this perhaps can go faster.

A. There are some analyst reports with estimates of the probability of acceptance on an analyst to change their estimate over time.

Q. And did you see any indication that any of those conditional probability analyses involved an assumption that the FDA actually had an agreement with the FDA consistent with the company's descriptions of that alleged agreement?

MR. ADAMS: Objection. Ambiguous. If you understand the question, you can answer.

A. I can say the following, which is that the estimates I have seen from analysts were based on the public information available at the time,

Page 209

STULZ, Ph.D.

including the existence, what's the probability for the existence of an agreement.

And I've seen an analyst report where the analyst ask a question of what the probability would be if there were no agreement. I have not seen that.

Q. Okay. But the -- when you say that you've seen estimates from analysts based on public information available at the time regarding the existence of an agreement, would you agree that those valuation analyses would have been different had the truth about the FDA agreement not been fully and completely disclosed?

MR. ADAMS: Objection. Calls for speculation.

A. Well, this would be going back to our discussion we already had when we discussed what the abnormal return would have been on September 9 had there been no agreement. I think everything I said at that time still holds.

Q. So you have nothing to add to your prior testimony on that point?

A. I have not seen an analyst nor discuss how the probability -- his estimate or her

53 (Pages 206 - 209)

Page 210

STULZ, Ph.D.

estimate of the probability would be different if the allegations of the plaintiffs were true.

Q. Okay. And do you have an opinion as to whether if any analysts had actually done such revised conditional probability assessment that they would have reached different valuation conclusions?

MR. ADAMS: Objection.

A. I have no opinion on what conclusions an individual analyst would have reached had he known about the allegations of the plaintiffs had he believed them to be true.

Q. Do you have a view as to whether there's a standard methodology that securities analysts use in order to assess the probability of events occurring?

MR. ADAMS: Objection.

A. I am aware of methods that are fairly standard to estimate probabilities for some outcomes, but they are specific to various classes of outcomes.

Q. Can you give some examples of what you're thinking of?

A. Yes. So in risk management it's fairly

Page 211

STULZ, Ph.D.

standard to use the actual formula, kind of the underlying mechanism of the Black-Scholes formula to extract probabilities of some events occurring.

For instance, if you wanted the probability of the S&P falling by 15 percent, what would be an approach you would use. You would estimate the distribution of the return and then extract from the distribution of the return the probability of the drug.

Q. Okay. And that's an analysis that's based in substantial measure on historical data or application of historical data to present day risk?

A. It requires a number of assumptions.

Q. Okay.

A. Absolutely.

Q. Okay. I don't mean to take us down a rabbit hole.

How about in a merger-arbitrage scenario, do you have an understanding of how analysts determine the probabilities of deals successfully or not successfully closing?

A. In that case you look at the gap between the price at which the target is trading and the

Page 212

STULZ, Ph.D.

offer price.

Q. And in terms of assessing the probability of whether a deal actually closes or doesn't close, how is that typically done in your view, is there a standard methodology?

A. There is a methodology in the case of merger-arbitrage because you know that if the merger is successful, at some future date it has -- there is going to be a price that shareholders will receive.

Q. But in that case you discount the price that investors would receive to reflect the risk that the deal might blow up, correct?

A. Yes, it's a little bit more complicated than that, but you're right in terms of the general approach.

Q. Okay. So --

A. But it's -- no, it's possible because you know exactly what the value is going to be later.

Q. Okay. But just focusing in on the probability of a merger deal closing versus blowing up, is there any standard methodology that analysts perform to assess that probability to

Page 213

STULZ, Ph.D.

your understanding?

A. Yeah. It's based on the intuitions that I mentioned. But all the examples that we have discussed and I have mentioned now rely on market prices not that don't rely on a but-for world.

Q. Is there a standard methodology to your understanding that analysts use to assess the probability of FDA approval of a new drug application or supplemental new drug application?

A. So during this litigation we have been talking about two different probabilities. We have been talking about the probabilities that the market believes that it's going to be successful versus what a probability would have been had the market known what the plaintiffs allege was the truth.

Q. Okay. I'm not asking anything fact-specific to this case, I'm asking something which I think goes only to your first scenario, which is, is there a standard methodology that analysts use today and that is used in recent years to assess the probability of FDA approval of new drugs or supplementary new drug applications?

A. There are approaches of the types that I

54 (Pages 210 - 213)

Page 214

STULZ, Ph.D.

discussed that can be used for this. They've also complications. No, it's not. I'm not sure what standards they are. But you can extract from market prices if you have such other information. Now you need to know the standard on value of the corporation and so on that you can extract the probability that the market believes. But it's not -- I mean, it's a lot more complicated than the case we talked about of merger-arbitrage, for instance.

Q. Okay. I think I understand the nuance of your last response. Let me try to get you just to embellish your response.

If an investment analyst wants to independently assess, based on their own independent opinion, what the probability of FDA approval is for a new drug application, based on publicly available information, what types of processes does that analyst follow?

And just to explain. I understand from your last answer that an investment analyst might be able to derive what other investment analysts' assessment is of the probability, but if they're just doing it themselves, independently, is there

Page 215

STULZ, Ph.D.

a standard methodology that investment analysts follow for that process.

MR. ADAMS: Objection. I'm just going to object. This is outside the scope. You're basically asking him to tell you and your expert how to calculate probabilities in the absence of your expert doing that. So, he wasn't asked to opine on any of that. It's not in his report. This is totally irrelevant.

Q. You can answer.

A. So it is outside the scope of what I was asked to do. I read the analyst reports. They don't describe a methodology. There's no standard methodology that they would be using.

Q. And in your view is it wrong that different investment analysts may pursue different approaches to assessing probability of FDA acceptance or rejection of a new drug application?

MR. ADAMS: Objection. Vague.

Q. Or is it simply that there are many different ways that are acceptable potentially?

MR. ADAMS: Same objection.

A. I don't have the answer because I don't

Page 216

STULZ, Ph.D.

describe how they reach that conclusion. From my recollection.

Q. Understanding your comment, accepting your comment that not every analyst may explain why they reached a particular probability assessment, is it your view that there are varying ways that one could perform a legitimate probability analysis of the type we've been discussing?

MR. ADAMS: Objection.

A. I was not asked to form an opinion on the various ways to estimate probability if there are ways to do so.

Q. I understand that you weren't asked to form an opinion on that question. My question did not ask whether you have formed an opinion for purposes of this litigation in your report.

But separate and apart from your opinion, is it your view that there are varying ways that one could perform a legitimate probability analysis of the type we've been discussing?

MR. ADAMS: Same objection.

Q. Yes, no or you don't know.

Page 217

STULZ, Ph.D.

MR. ADAMS: Outside the scope.

A. I'm not sure exactly what the question is.

No, I said that there are ways to extract from market prices the market's estimate of the probability. Beyond that, I don't know what kind of approaches that would be used. So one analyst that did not discuss the probability of acceptance saying how he formed his opinion is a CitiBank analyst and he talked to the person who had reviewed the -019 study. That person was highly optimistic about acceptance.

Q. So --

A. I'm sorry. The person who worked at the FDA on review of the -019 study.

Q. Okay. So one valid or potentially valid way of trying to make a probability assessment might involve talking to people with expertise in regulatory approval, correct?

MR. ADAMS: Objection. He didn't say valid or potentially valid.

A. I just said that that's the one case I remember was somebody said something about how they formed their opinion.

55 (Pages 214 - 217)



Page 218

STULZ, Ph.D.

Q. I mean, did you think that was an invalid basis for the analyst to consider in forming his valuation?

MR. ADAMS: Objection.

Q. Or don't you have an opinion on that?

A. I wasn't asked to form an opinion on those various approaches. I didn't -- no, I didn't pursue an examination of, of this at all.

I mean, what Citi did would be a problem here because those are conclusions that you would reach would be inconsistent with the allegations, so that wouldn't be a solution.

Q. I'm not sure your answer is responsive, but let's try to move on.

Can you now look at Exhibit 28. This is the --

A. Okay.

Q. Now, I understand you hadn't seen this document before today's deposition; is that correct?

A. That's correct.

Q. Okay. If you could look at page 9 of the court's opinion at the end of the long carryover footnote, the sentence that begins

Page 219

STULZ, Ph.D.

"Further."

"Further, in this case, the allegations," you see that? Sort of in the middle of the page.

MR. ADAMS: Page 9?

MR. FREDERICKS: Yeah, page 9.

MR. ADAMS: Right here.

THE WITNESS: Okay.

MR. ADAMS: Yeah, line 14.

Q. Do you see that sentence?

A. Yeah. Unfortunately, I don't understand it, I would need the context here.

Q. Okay. So the line that I'm drawing your attention to is the line where Judge Hayes writes, quote, Further, in this case, the allegations concerning the omission of adverse information must be considered in conjunction with the allegations that Defendants misrepresented an agreement with the FDA concerning the exact same information. Close quote.

You see that language?

A. I see that language.

Q. Do you agree with that statement by Judge Hayes?

Page 220

STULZ, Ph.D.

MR. ADAMS: Objection. He's not a lawyer and can't define what Judge Hayes thought.

Q. Well, from the perspective of a financial economist --

MR. ADAMS: This has nothing to do with financial economics.

MR. FREDERICKS: Can I finish my question?

Q. From the potential -- from the perspective of a financial economist, would one's analysis of price impact, based on omissions of adverse information, appropriately be considered in conjunction with any allegations that the defendants misrepresented the FDA agreement in this case?

MR. ADAMS: Objection. He's not a lawyer. This is a motion to dismiss order, it has nothing to do with price impact.

But you can answer, if you have an answer.

A. I just don't understand the context. I don't understand what is being said. I don't understand the relationship to price impact. I

Page 221

STULZ, Ph.D.

don't understand the implications for financial economics.

Q. Well, I understand Judge Hayes is applying in financial economics-speak some of the conditions are principles of conditional probability that we discussed earlier, that when you're looking at allegations about the omission of adverse information, you have to view those allegations in the broader context of other relevant facts. Do you agree with that?

MR. ADAMS: Objection. I have no idea what you're talking about or where you get conditional probability out of this.

A. What I can say is that I don't see how this is related to my opinion about the stock price increase on September 9 not being evidence of the alleged misrepresentations concerning the FDA agreement as discussed in the complaint.

Remember that the complaint discusses September 9 as the misrepresentation causing the increase in the stock price. My opinion is that that's not correct because the market is efficient, and that was known.

Q. Okay. But my question is: Isn't an

56 (Pages 218 - 221)

Page 222

STULZ, Ph.D.

assessment of whether an omission had price impact something that also needs to consider the context in which the alleged omission was made?

MR. ADAMS: Objection. I don't understand the question, but if you do, you can answer.

A. All I know is as of September 9 the information of the alleged misrepresentation concerning the FDA agreement is in the stock price because that agreement has been disclosed and has been discussed extensively in the disclosures of the corporation.

Q. Is the significance of the Harmony data that was also announced on this same day dependent, in part, on the market's understanding of what the FDA agreement was?

MR. ADAMS: Objection.

A. What I say in my report is that the alleged misrepresentation concerning the FDA agreement, the purported agreement, could not by itself increase the price on September 9 because that alleged misrepresentation was made earlier on once in the public domain. That's all I'm saying in my report, I'm not going beyond that.

Page 223

STULZ, Ph.D.

Q. Okay. What about an alleged misrepresentation concerning the FDA agreement in conjunction with disclosure of information about the Harmony study, are there any circumstances in which you could say that that would have an impact on market price on September 9?

MR. ADAMS: Objection. I don't understand the question.

A. What my report says is, as of September 9 that misrepresentation is reflected in the stock price, so repeating the misrepresentation is not going to change that.

Q. And does the misrepresentation -- which we'll assume for present purposes there was, in fact, a misrepresentation -- does that impact how the market viewed the significance of the Harmony results that were also announced on September 9?

MR. ADAMS: Objection. Asked and answered.

A. We had that long discussion earlier about this. I don't think I have anything to add to my discussion.

Q. Okay. In your report, do you recall providing an example in which there are 100

Page 224

STULZ, Ph.D.

marbles in an urn?

A. Right.

Q. And you gave the hypothetical of 100 marbles in an urn where 2 are red and 98 are black, correct?

A. Uh-hum.

Q. And in your example you state that the probability of a red marble being drawn is 2 percent, correct?

A. Correct.

Q. Okay. Are you opining that the probability that the FDA would reject the sNDA was ever as low as 2 percent prior to the issuance of the CRL?

A. No. Those are examples to discuss the issue of the materialization of risk. There is no attempt on my part to use probabilities that would have anything to do with what we talked about so far.

Q. Okay.

A. It's an example, I mean, to explain what's going on.

Q. Okay. And just to close the loop on this.

Page 225

STULZ, Ph.D.

You haven't formed any opinion as to the probabilities of the FDA rejecting the sNDA at any given point in time in this case?

A. No.

MR. ADAMS: Objection. Asked and answered.

A. I was not asked to do so. I did not make, as a result, I did not make a determination of whether I could do so reliably or not. That's all I can say.

Q. Yeah. Let me show you what will be Exhibit 32.

(The Lancet Neurology Supplementary Appendix marked as Plaintiffs Exhibit 32, as of this date.)

BY MR. FREDERICKS:

Q. Have you seen this document before?

A. Yes, I have.

Q. Okay. Can you tell us what it is.

A. It's not what in my field we would say an online appendix for a paper published by a refereed journal.

Q. And that journal is The Lancet, correct?

A. Not The Lancet, The Lancet Neurology.

57 (Pages 222 - 225)

Page 226

STULZ, Ph.D.

Q. Thank you.

Have you formed any opinions in whole or in part based upon the contents of this document?

A. I discuss this document in my report because it looks at a number of kind of robustness investigations and one of those investigation has to do with doing, I mean, doing the statistical analysis what they call protocol, which means, from my understanding, using the observation set met the protocol of the trial.

Q. Do you have an understanding of what the reference to MMRM is in this document? It appears on page 2. The fourth bullet point.

A. It has to do with one of the outcomes, if I remember correctly. I don't remember what -- it's a type of model that are used. I'm sorry.

Q. So it's the type of model that who uses?

A. The authors of the article.

Q. Okay. But that's the most you can recall as to what that refers to?

A. Right. The point of me mentioning this doesn't have what's the type of models, it has to do with the fact that this is a robustness analysis that is done per protocol, which means

Page 227

STULZ, Ph.D.

that the overall analysis done in the main body of the article includes patients that did not meet the protocol.

Q. How much time did you spend reviewing this document in the 42 hours you spent on this engagement?

A. I went through it. Focused on the per protocol. I did not go through this document trying to understand all of it because I had no reason to do so. Some of it would be distinctly beyond my expertise. Some of it would not in the sense that I can relate to a lot of the statistical concepts. But the point here is that there is a per protocol analysis, it is discussed in during the class period, and so that's all I did.

Q. What's your understanding of the date of the appearance of this article?

A. It's February 2018.

Q. Okay. And did you see any indication of any investment analysts drawing any conclusions from this document?

A. I remember the investment analysts referring to the main body of the article, so

Page 228

STULZ, Ph.D.

that's the extent of my recollection. They refer to it before the start of the class period as well.

Q. Any other instances?

A. I think there was subsequent mentions of this, I don't remember the exact time. But this, The Lancet article, was mentioned by analysts.

Q. Do you recall the extent to which -- withdrawn.

Do you have an understanding of the extent to which certain protocol deviations were or were not allegedly being analyzed in this document?

MR. ADAMS: Objection. Form.

Were you asking if the deviations were being analyzed?

MR. FREDERICKS: I think he's already testified about the document, is that there's some type of comparison going on in this document based on per protocol analysis versus non-per protocol analysis.

Q. Is that correct?

A. That is correct.

Q. Do you know or have an understanding in

Page 229

STULZ, Ph.D.

what respects any --

Do you have an understanding of what types of possible protocol deviations were being discussed in these analyses referenced in the exhibit?

MR. ADAMS: Objection.

A. Remember what my report says on this it's very explicit.

I am saying that the price drops on March 8 and April 5 are not evidence of the alleged misrepresentations concerning the -019 study, and I list a number of the misrepresentations.

I then discuss the issue of the deviations and I explain that there was information about deviations before April 8, but that information did not include everything that was discussed on April 8.

Q. Okay. Would you agree that to understand or to form an opinion of the significance of protocol deviations, you would want to know what type of protocol deviations are at issue?

MR. ADAMS: Objection.

58 (Pages 226 - 229)

Page 230

STULZ, Ph.D.

A.  Which goes exactly to what I just said.

Now, the disclosure on April 8 during the analyst conference talked about those deviations.  And that information that was given then, some of it is already in the public domain, but not all of it is in the public domain.

Q.  Okay.  And I believe your opinion speaks to this, but did you form an opinion as to whether information about protocol deviations in the -019 study were publicly known as of, let's say, March 5, 2021?

MR. ADAMS:  Objection.  Asked and answered.

A.  What was available before March 5, 2021, is the existence of protocol analysis which would indicate that the sample, the complete sample was not per protocol.  That's the information that was public.

Then shortly after March 5 there was a CitiBank report that had more information about deviations.

And then on April 5, during the analyst conference, there were further disclosures about -- about the deviations.

Page 231

STULZ, Ph.D.

Q.  Okay.  Let me direct your attention to paragraph 100 of your report.

You write, quote, As I discuss in Section VII.A. below, the alleged shortcomings of the -019 Study identified in the Complaint, with the possible exception of information about protocol deviations discussed below, were publicly known prior to the March Deficiency Letter.

You see that language?

A.  Yes.

Q.  Okay.  As you sit here today, have you formed an opinion as to whether the information about protocol deviations discussed below was publicly known prior to the March deficiency letter or is that something you need more information on to form a final conclusion?

MR. ADAMS:  Objection.  Asked and answered.  And the opinion is there.

A.  So my report is clear that the only information identified in the complaint about the -019 study that was potentially known on April 5 was that certain protocol deviations occurred, including the administration of prohibited medications to patients involved in the study.

Page 232

STULZ, Ph.D.

Q.  So your opinion today is the same as stated in paragraph 100?

A.  That's correct.

MR. FREDERICKS:  Okay.  We've been going a little bit, so why don't we take a 10-minute break.

MR. ADAMS:  Okay.

THE VIDEOGRAPHER:  We are off the record.  The time is 5:07 p.m. Eastern Time.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 5:24 p.m. Eastern Time.

BY MR. FREDERICKS:

Q.  Okay.  Dr. Stulz, you realize you're still under oath?

A.  Yes.

Q.  Do you agree that an event study can be used to measure the amount of artificial inflation in a security's market price?

A.  In some cases.

Q.  And what about in this case?

Page 233

STULZ, Ph.D.

A.  If by event study you mean that we question models that yields an abnormal return, we discussed already extensively why does he have abnormal return on March 9 and April 5 is not a measure of inflation in this case.

Q.  I want to talk about, in particular, your analysis of confounding or your discussion of confounding information and time-varying inflation in the context of calculating damages.  I don't think I've given you an opportunity to expound more fully on those subjects, and those are the subjects I'd like to focus on now.

I'd like to start with your discussion of confounding information.

In the current case, your report references confounding information issues as potentially affecting the calculation of damages in this case; is that correct?

A.  That's correct.

Q.  And are confounding information issues that should be addressed -- well, misstated.  Let me -- withdrawn -- try again.

Are confounding information issues issues that should be addressed in calculating an

59 (Pages 230 - 233)

Page 234

STULZ, Ph.D.

appropriate inflation ribbon?

MR. ADAMS: Objection.

A. I mean, it depends on whether you are going to use the event study to calculate the inflation ribbon or not.

Q. All right. If you're going to use an event study to calculate an inflation ribbon, is confounding information an issue that should be addressed as part of calculating an appropriate inflation ribbon?

MR. ADAMS: Objection. Are we talking about in this case or are you just talking generally?

MR. FREDERICKS: Well, in this case.

A. Well, meaning any case the abnormal return on an alleged corrective disclosure day is not going to be a measure of inflation if there is confounding information. I mean information. It's not going to be a measure if inflation's that day, then you have the further issue of figuring out what's the measure of inflation earlier in the class period.

Q. Okay. And I understand you say that inflation -- I'm sorry -- that an abnormal return

Page 235

STULZ, Ph.D.

on an alleged corrective disclosure is not necessarily the measure of artificial inflation.

A. Right.

Q. Yeah. And I'm trying to be simple here without being dense. But it's your position that in this case there's confounding information which means that you have to go beyond looking simply at the price stock movement on any corrective disclosure dates, correct?

A. That is correct. Remember, we have had a very long discussion about issues at the abnormal return. Even absent confounding information would not be a measure of inflation in this case because of the materialization of understated risk.

Q. I don't want to rehash everything we've previously covered in the deposition. The record will speak for itself, so I'd just try to confine or cabin these questions to your analysis of confounding information.

Yeah, that's partly to spare you time and effort, Dr. Stulz.

Are confounding information issues typically capable of being addressed in

Page 236

STULZ, Ph.D.

calculating an appropriate inflation ribbon in Section 10(b) cases?

A. Sometimes it can be done credibly and other times it can't.

Q. And can you just summarize for us in layperson's terms what you mean when you refer to potentially confounding information? What is potentially confounding information?

A. Well, an example that is not relevant to this case would be where a firm announces several economic performance measures on a given day and only one is affected by the allegations, the other ones are not, but the other ones now could be -- if it's corrective disclosures, the other ones could be negative as well. And so the stock could have fallen because of all those measures and you would have to take out the effect of the measures that are not affected by the allegations.

Q. Okay. Is an analysis of the impact, if any, of confounding information on calculation of damages in a Section 10(b) case typically common to all class members?

MR. ADAMS: Objection. Calls for a legal conclusion.

Page 237

STULZ, Ph.D.

A. To the extent that there are no other obstacles to a common analysis, you could have an analysis of confounding effects that is common to the class.

Q. And do you have an opinion based on your experience and involvement in 10(b) cases over at least the last 20 years that that is, in fact, typically the case?

MR. ADAMS: Objection.

A. I think that's often the case, yes.

Q. Okay. In this case, is a finding of confounding information something that would or would not be common to all members in the class?

I should say, is a potential finding of confounding information.

MR. FREDERICKS: Objection. I'm going to object. Are you saying assuming there was a model that could be applied?

Q. Well, Dr. Stulz, you've raised the concept of confounding information in your report, correct?

A. That is correct. But remember, we have had extensive discussion about the issues having to do with the damages model of Professor

Page 238

STULZ, Ph.D.

Feinstein. He has not proposed a model that is concrete that addresses the issue of the materialization of an understated risk. To be sure about my answer to your question, I would need to have his more concrete model. I don't have it at this point.

Q. I think we're having regression of a different type at this point in the deposition.

My question is, Dr. Stulz, did you raise the concept of confounding information in your report? Yes or no.

MR. ADAMS: He said that is correct.

MR. FREDERICKS: Okay.

Q. To the extent that there are issues of potentially confounding information that you have identified in this case, would those issues be common to all class members?

A. That's the answer I just gave. What gave me pause is that we lack concreteness on the models that Professor Feinstein is going to use, and so I would hate to give an answer that could turn out to be wrong when we have more concreteness on his model.

Q. So the -- so whether potentially

Page 239

STULZ, Ph.D.

confounding information is or is not a common issue in this case would in your view turn on additional details provided by Dr. Feinstein as to his methodology?

A. As I discussed, I was not asked to develop a methodology. That wasn't part of my mandate. There was some things that he's supposed to do, at least that's my understanding. He's supposed to propose methodologies of risk which is the theory of liability of the plaintiffs.

Q. And that's a legal understanding you have?

A. That's a legal understanding.

Q. Notwithstanding that you aren't a lawyer?

A. It's an understanding that I have, as I said. So, I mean, I don't know how things are going to interact within his more concrete model if we were to have more concrete model.

Q. What kinds of methods do financial economists use to identify and appropriately quantify the impact of potentially confounding information?

MR. ADAMS: Objection. Go ahead.

Page 240

STULZ, Ph.D.

A. In the example I gave earlier of multiple performance measures, now you could, you could use a model that specifies how the stock reacts to various pieces of information concerning performance and you could use that model to try to disentangle things, that could be a possible approach.

Q. Okay. Would you agree that in this case the drop in price experienced in -- withdrawn.

So it's your testimony that the price impact from an announcement that the FDA has rejected an sNDA application is something that would have to be disaggregated from the impact of the market realizing that its assessment of the probabilities of FDA approval were different, or differed?

A. I would say the challenge here in terms of the fact that the FDA rejecting the application does not tell you that the market was wrong. It does not follow.

Q. It doesn't follow necessarily?

A. It doesn't follow. Period. I mean, the market could be completely correct and have the correct probability and the FDA rejects. That

Page 241

STULZ, Ph.D.

could occur with exactly the same fact patterns that we have on the days of the two disclosures. Knowing that the FDA said no does not tell you that the probabilities were wrong.

Q. So you would have to look to additional information to determine whether their probability assessments before the announcements in question were off-base?

A. That goes back to the issue we have discussed extensively. It's the drop in the stock doesn't tell you the probability the market should have had, it tells you what's the market view.

Q. If you could turn to page -- I'm sorry -- paragraph 168 of the Feinstein report. It's on page 60. Are you there?

A. Yeah, I'm there.

Q. At paragraph 168 he says, "Among the commonly used valuation tools that are available to investors, analysts in realtime and forensic analysts when computing damages are, for example, valuation multiple models." Do you agree with that statement?

A. I mean, I think we could go on a long discussion as to which one of those tools, the

61 (Pages 238 - 241)

Page 242

STULZ, Ph.D.

ones that are best and under which circumstances.

Notice these are paragraphs that he has routinely in his reports. It does not address the specifics of that litigation. It does not address a circumstance where you have to figure out what somehow the probability of the FDA doing something under different circumstances, what that probability would have been.

I mean, I don't see in those tools which ones have a known and established track record of enabling somebody to compute a probability in a reliable way. I mean, I would need more information, I don't have it.

Q. But have you formed an opinion that no type of discounted cash flow model would be an appropriate valuation tool in this case?

A. The way I think of this paragraph is like if somebody tells me he's going to use arithmetic to solve a problem. Now, he doesn't have content that allows me to evaluate whether there is actually an approach that would work.

Q. In your opinion?

A. It's only my opinion. I'm a financial economist.

Page 243

STULZ, Ph.D.

Q. And just to close the loop on this subject.

Are the valuation tools that Dr. Feinstein references in paragraph 168 of his report, will you agree that professional securities analysts regularly use this bucket of valuation tools to value securities under different circumstances?

MR. ADAMS: Objection as to form.

A. I certainly agree that when an analyst compute target prices that they use discounted cash flow and they use valuation multiples, that it was acting in a fairly routine way. But the problems that is at hand is not that kind of model. The issue here is you have to have a credible approach to figure out probability for something that is quite different from what was going on in the world at the time.

Q. Okay. You referenced in particular use of valuation multiples in your answer. That's one of the things that Dr. Feinstein talked about in paragraph 168.

Are there any of the tools referenced in paragraph 168 which you would say are not

Page 244

STULZ, Ph.D.

regularly used by securities analysts everyday on Wall Street to value securities?

MR. ADAMS: Objection to form.

A. I mean, I view this as being completely unrelated to the problem at hand. The problem at hand is what would have been the probability of rejection under the theory of liability of the plaintiffs. That's a problem at hand. That's what we need. None of those things, none of those tools get us an answer to that.

Q. With respect, that may be an issue on which there's disagreement in the litigation.

Could you just answer my question as to whether you believe that any of the valuation tools referenced in paragraph 168 in Dr. Feinstein's report are not among the valuation tools that are regularly used by professional investment analysts to value securities.

MR. ADAMS: Objection. Asked and answered.

A. I talked about some of those tools. I mean, I've read a very large number of analyst reports. I haven't seen analysts use a literature regarding valuation effects of factors such as

Page 245

STULZ, Ph.D.

reputation, transparency, governance and quality of internal controls. I'm not sure what he means there, so I don't think I've seen references to those articles in analyst reports.

Q. In this case?

A. No, just generally. I mean, among the thousands of analyst reports I have seen in my life. So I'm not quite sure what it means. So it may just be that the paragraph is not very clear.

Q. Other than taking into account literature regarding valuation effects of factors such as reputation, transparency, governance and the quality of internal controls, are there any other valuation tools that Dr. Feinstein lists that you believe are not regularly used by professional securities analysts?

A. Well, I think the sentence is a bit strange. He says using valuation tools and then he refers to the literature. I'm not quite sure what regarding valuation effects I mean.

I have not seen references to papers for -- to those papers in analyst reports, but -- that's all I can say. But now as I have said repeatedly, this is not the issue at hand, and so

62 (Pages 242 - 245)

Page 246

STULZ, Ph.D.

it's besides the point.

Q. Well, what's beside the point is not for either of us to decide in this litigation.

Did you perform or try to perform any quantitative analysis to try to determine whether any confounding information issues are actually present in this case?

A. I did not perform a quantitative analysis. I was not asked to do so.

Q. So your opinion is based on your qualitative assessment; is that fair to say?

A. It is based on me looking at information that arrived to the market on those dates.

Q. Okay. And none of that involved performing a quantitative analysis, correct?

A. That wasn't part of my mandate.

Q. And it was not part of any analysis you performed, actually performed?

A. It was not required for any of my opinions.

Q. That wasn't my question. My question was: Was quantitative -- was performing any quantitative analysis with respect to confounding information anything that you actually did?

Page 247

STULZ, Ph.D.

A. The answer is --

MR. ADAMS: Objection.

THE WITNESS: Sorry.

MR. ADAMS: Go ahead.

A. The answer is that I was not asked to do that and it was not part of my mandate, so I did not do it.

Q. Okay. Your report also references time-varying inflation as an issue that potentially affects the proper calculation of damages; is that correct?

A. That's correct.

Q. And how does that issue potentially impact the proper calculation of artificial inflation per share in this case?

A. Well, we talked about one event that is involved in this afternoon. That was what happened in July 2020. Now, as the FDA decided to not choose the accelerated process, that was new information and that new information would affect inflation.

Q. And any --

A. Artificial inflation.

Q. And any material omissions that might

Page 248

STULZ, Ph.D.

have been part of the company's July 2020 disclosures, would that also potentially impact the proper calculation of artificial inflation in the same way?

MR. ADAMS: Objection.

A. What we say is that there in the class period where the stock price falls by more than 10 percent and has new information, you would have to look at it carefully and figure out its implications.

Q. Let me try to just clean up my question because it may have had an ambiguity in it.

Would any material omissions that might have been part of the company's July 2020 disclosures also potentially impact the proper calculation of artificial inflation in this case?

MR. ADAMS: Objection. Calls for speculation.

A. I mean, I haven't studied that day. I know since there was new information arriving to the market, that new information should be taken into account.

Q. Okay. Have you ever offered an opinion on damages in a Section 10(b) case that did not

Page 249

STULZ, Ph.D.

identify time-varying information as a potential complication in calculating damages, to the best of your knowledge?

A. I think so. But, I mean, I know I can't even identify it, it's too late in the day, but I think so, yes.

Q. Do most of the opinions that you can recall that you've offered on damages in a Section 10(b) case identify time-varying information as a potential complication?

A. So I have no class certification report where I have no discussion of damages models. I have class certification proposed where when it's called for I will raise the issue of time-varying damages.

Q. Would any of the valuation tools that we discussed earlier from paragraph 168 in the Feinstein report be capable of addressing in whole or in part the purported time-varying inflation complexities that you reference in your report?

A. I mean, I have not at this point conducted a study to think -- I mean to investigate whether they would or they would not. That was not part of my mandate. No valuation

63 (Pages 246 - 249)

Page 250

STULZ, Ph.D.

tools were used by financial economists now at times successful in dealing with such issues. And so I'm not saying it's impossible, I'm saying he hasn't told us anything.

Q. Right. Would you agree that any potential time-varying inflation complexities in this case would be common to the entire class rather than unique to individual class members?

MR. ADAMS: Objection.

A. They could be, it doesn't necessarily have to be the case.

Q. You haven't formed an opinion as to the likelihood of whether those issues would or would not be common to all members of the class in this case?

A. That is correct.

Q. In your experience, are time-varying inflation complexities typically accounted for adequately when estimating damages in a Section 10(b) securities case?

A. I don't understand the question.

Q. Well, I think we've established that the issue of time-varying inflation has come up in other cases in which you've rendered opinions,

Page 251

STULZ, Ph.D.

correct?

A. That's correct.

Q. Okay. Based on your twenty-plus, if not thirty-plus years of experience working on 10(b) securities cases, are time-varying inflation complexities typically accounted for adequately whether there are estimated economic damages in a Section 10(b) case?

MR. ADAMS: Objection. Vague. Ambiguous.

A. I would say sometimes they are and sometimes they're not.

Q. And would your answer be the same if I asked, are time-varying inflation complexities typically capable of being accounted for adequately in 10(b) cases?

MR. ADAMS: Again, objection.

A. My answer would be the same. Sometimes they are and sometimes they are not.

Q. Did you perform any quantitative analysis to determine whether time-varying inflation complexities are actually present in this case?

MR. ADAMS: Objection. Asked and

Page 252

STULZ, Ph.D.

answered.

A. To know the impact of those issues, I would need to know more about the model of Professor Feinstein. As I have said repeatedly, we are missing a critical part of that model, and so commenting on other issues is really hard to do given that I don't know this basic information.

Q. Okay. So am I to understand from what you just said that you have not performed any quantitative analysis to determine whether there are, in fact, time-varying inflation complexities in this case?

MR. ADAMS: Objection. Asked and answered.

A. I was not asked to perform a quantitative analysis and I did not perform a quantitative analysis. I gave you an example of time variation that is important.

Q. Are you finished?

A. Yeah.

Q. Okay. Sorry. Again, I don't want to interrupt. And apologies if I asked this before. When time-varying inflation complexities arise in a damages analysis in a Section 10(b)

Page 253

STULZ, Ph.D.

matter, does it make any potential valuation of damages impossible?

MR. ADAMS: Objection.

A. I mean, that makes the analysis more complex and they create difficulties when they interact with the other things we have discussed. At this point it's hard for me to make statements about this litigation given the holes that we have with Professor Feinstein's model. Now, often those complexities can be addressed.

Q. But you haven't formed an opinion in this matter as to whether it would be impossible to adequately take into account time-varying inflation complexities, if any, in this case?

A. No.

Q. Okay. Is the question of whether plaintiffs can establish loss causation based on a materialization of risk theory capable of being resolved on a class-wide basis?

MR. ADAMS: Objection.

A. I have -- was not asked to think about loss causation. I have done nothing concerning loss causation.

Q. So you have no opinion, for example, as

64 (Pages 250 - 253)

Page 254

STULZ, Ph.D.

to whether plaintiffs can establish loss causation based on materialization of risk theory on a class-wide basis in this case?

A.  To me that is a legal question that I was not asked to consider and I would not be able to consider.

Q.  Do you have an understanding of whether or not plaintiffs are offering only a materialization of risk theory in this case?

MR. ADAMS:  Objection.  Are you asking him what plaintiffs are doing?

MR. FREDERICKS:  I'm asking him what his understanding is.

MR. ADAMS:  You can answer, if you can.

A.  I mean, I was asked to consider some very specific allegations.  That's what I address in my report.  That's my understanding of the plaintiffs' theory.  I have not studied that theory beyond that.  I'm not an attorney.

Q.  Okay.  Do you understand that there's something called materialization of the risk is a concept of loss causation under Section 10(b)?

MR. ADAMS:  Objection.

Page 255

STULZ, Ph.D.

A.  I understand that, but I'm not an attorney.

Q.  Okay.  And do you understand there's also a loss causation concept based on corrective disclosure or corrective disclosures?

MR. ADAMS:  Objection.

A.  Again, I understand that, but I'm not an attorney.

Q.  Okay.  Have you been asked to, in your experience, have you ever been asked to opine on the validity of a plaintiff's damages theory where loss causation is predicated on materialization of the risk theory of damages?

A.  It strikes me what you're discussing would be a mandate for a legal expert, not for a financial economic expert.  For a financial economic expert, I would be asked more precise questions, which could be useful to the court or could be useful to the attorneys.

Q.  Okay.  I'm just trying to set up a question which is ultimately going to ask for possibly a distinction.

In the cases in which you have rendered an opinion on plaintiff's theory of damages, are

Page 256

STULZ, Ph.D.

there occasions when you have understood that plaintiff's theory of loss causation is a materialization of the risk theory of loss causation?

A.  Yes.

Q.  And are there cases where you have rendered an opinion on plaintiff's theory of damages where it was your understanding that plaintiff's theory of loss causation was based on a corrective disclosure theory of loss causation?

A.  Let's put it this way:  I have been a damages expert in cases where plaintiffs pled loss causation through an alleged corrective disclosure, as well as cases where they pled loss causation through materialization of the risk.

Q.  Okay.  And in this case do you have an understanding of whether plaintiffs' ability to show loss causation is dependent only on a materialization of risk theory or is it dependent on their ability to show either the materialization of risk or corrective disclosure?

MR. ADAMS:  Objection.  Asked and answered.  Calls for a legal conclusion.

A.  It's the same.  It's unrelated to what I

Page 257

STULZ, Ph.D.

was asked to study onto my opinions, so it is an issue that I have not studied.  But to me it's a legal issue as to what the plaintiffs are pleading, but it's not relevant to my report.

Q.  I believe your report contains various references to materialization of risk; is that fair to say?

A.  That's fair to say, but not as an analysis of loss causation.  It is in terms of trying to assess the damages model that Professor Feinstein proposes on me saying that this model is not adequate given that there is a materialization of an understated risk.

Q.  Have you done any analysis of -- withdrawn.

Is it fair to say that in conducting your analysis your assumption was that plaintiffs' theory of loss causation was materialization of risk theory of loss causation?

A.  I don't think that's fair to say.  I think my assumption is that what happens on March 8 and April 5 is a disclosure of a decision that could have gone either way on where the allegation is that there were misrepresentations

65 (Pages 254 - 257)

Page 258

STULZ, Ph.D.

that led the market to misestimate the probability of how that decision was going to go.

Q. And do you recall ever using the term corrective disclosure in your report?

A. In this report?

Q. Yes.

A. I would have to check. I --

Q. That's fair. The document speaks for itself, correct?

A. Right.

Q. Okay.

MR. FREDERICKS: I'm told we're hitting the six-minute warning moment, so why don't we take a --

MR. GRECO: It's six minutes before the five-minute warning.

MR. FREDERICKS: Oh, so we're at the 11-minute warning. Why don't we take an 11th-minute warning break and we'll reconvene. This should only be a short break.

MR. ADAMS: Okay.

THE VIDEOGRAPHER: We are off the record. The time is 6:10 p.m. Eastern

Page 259

STULZ, Ph.D.

Time.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER: We are back on the record. The time is 6:18 p.m. Eastern Time.

BY MR. FREDERICKS:

Q. Dr. Stulz, have you ever offered an opinion in a securities case that a publicly traded stock traded in an efficient market?

A. Traded in an efficient market? I don't believe that I have had this affirmative opinion. I have numerous class cert reports where I don't challenge the efficiency.

Q. And had there been occasions where you've offered an opinion in a securities case that a publicly traded stock did not trade in an efficient market?

A. I have had the opinions that the plaintiff expert had not established that that stock traded in an efficient market.

Q. You read and reviewed Dr. Feinstein's report here. Are there any relevant market efficiency factors that you feel Dr. Feinstein did

Page 260

STULZ, Ph.D.

not consider in his analysis?

MR. ADAMS: Objection.

A. I have no opinion on his analysis of market efficiency. I assumed the market for Acadia stock is efficient.

Q. Are there times -- regardless of whether you've been in a securities case or not -- where you have analyzed the market efficiency for a particular stock?

A. I mean, I have academic papers where I point to market inefficiencies. I have economic papers where for some stocks information is incorporated in the price very quickly. I mean, I have, as you know, a large number of academic papers.

Q. Okay. In -- and then we can move on.

In what ways does your analysis of market efficiency as reflected in your other work that you just alluded to materially differ from the type of analysis that Dr. Feinstein performed here?

MR. ADAMS: Objection.

A. Academic papers don't generally perform the type of analysis that he performs here.

Page 261

STULZ, Ph.D.

Q. So you aren't able to answer my question?

A. I thought I answered it. The analysis he conducts is not the type of analysis you could have in academic papers that is refereed in a top journal.

Q. Okay. And is it your understanding that what courts look for in market efficiency may differ from what practitioners in the field of financial economics look for in determining finan -- in determining market efficiency?

A. The analysis is very different, I mean, for a variety of reasons. You could not take Dr. Feinstein's analysis and publish it in an academic journal. It's simply different.

Q. Okay. Let me -- let me draw your attention to Exhibit 25 one more time.

This is the document that incorporates the FDA minutes to the May 15, 2017 --

A. Okay.

Q. -- meeting. You've got that?

A. Yep.

Q. And if you could turn to page 5 of that document.

66 (Pages 258 - 261)

Page 262

STULZ, Ph.D.

A. Okay.

Q. Okay. There's a heading that begins 2.0 Discussion. Do you see that at the very top?

A. Of page 5?

MR. ADAMS: I think he's referring to this.

THE WITNESS: Oh, okay. Yeah.

A. Uh-huh.

Q. Yeah. Okay. You have to say yes for the court reporter.

A. Yes. I'm sorry.

Q. I know it's getting late.

And the section 2.0 Discussion runs through page 9, correct?

A. Correct.

Q. Have you formed any opinion as to which portions of the section 2.0 of the exhibit are material?

MR. ADAMS: Objection. Calls for a legal conclusion.

Q. Or constitute material terms of the alleged FDA agreement.

MR. ADAMS: Same objection. Calls for a legal conclusion.

Page 263

STULZ, Ph.D.

A. I think we are going back to the earlier discussion. I'm not an expert in evaluating this document. I was not asked to evaluate this document from your perspective. The purpose of the document in my report is quite clear, and I am not representing myself as an expert of the FDA information exchanges or as a legal expert.

Q. Okay. And just to close the loop here.

Consistent with what you've just said, you have not formed any opinion as to what portions of section 2.0 of this exhibit do or do not constitute material terms of the purported FDA agreement?

MR. ADAMS: Objection. Asked and answered. Calls for a legal conclusion.

A. That's correct, I have not done so. I was not asked and I am not an attorney.

MR. FREDERICKS: What are we up to? 33?

This is just the deposition notice.

(Plaintiffs' Amended Notice of Deposition of Expert Witness René M. Stulz, Ph.D. marked as Plaintiffs Exhibit 33, as of this date.)

Page 264

STULZ, Ph.D.

BY MR. FREDERICKS:

Q. Dr. Stulz, have you ever seen this document before or documents similar to this?

A. I have seen documents similar to this.

Q. Similar in the sense that it's a deposition notice for your testimony in the Acadia matter?

A. No. I don't seem to have seen this document.

Q. Okay. I'll just represent to you that this is the operative Amended Notice of Deposition of René M. Stulz pursuant to which this deposition has been taken today of.

MR. FREDERICKS: Mr. Adams, do you disagree?

MR. ADAMS: I don't disagree. And I'll represent that you served this amended notice on us.

MR. FREDERICKS: Okay.

It's been a long day. I see that nominally there's two minutes left on the clock.

I am not going to declare the deposition closed. To the contrary,

Page 265

STULZ, Ph.D.

plaintiffs reserve all their rights to keep this deposition open on the grounds that the witness's nonresponsive answers and to some extent defendants' counsel's objections have unduly taken up time in the course of this deposition. It's not going to be productive to try in a minute and 34 to try to cover lines of questioning which in our view we believe have been frustrated by either lack of time or evasive and incomplete responses. But, you know, time has expired.

So, again, we're reserving our rights with respect to keeping the deposition open but we have hit the seven-hour mark.

MR. ADAMS: Before we go, I'll just say, we clearly disagree. I think if there was any time that was wasted, it was going through hours and hours of information that's unrelated to Professor Stulz's report. So, of course, we reserve our rights, but we're at seven hours and this deposition in our view is over.

The other thing I'll add, and I'll ask

67 (Pages 262 - 265)

Page 266

STULZ, Ph.D.

you, Bill, is, so are you intending to amend your complaint and when did you guys decide to amend? Because we just spent a million dollars opposing class certification, and if you're going to amend your complaint, I'm not sure why you haven't done it. Particularly because you know there's no -- that there is an agreement with the FDA and you can't possibly stand before the court and argue otherwise.

MR. FREDERICKS: Let me -- let me just say, Mr. Adams, that in deference to the witness and the hour, I suggest we pursue that discussion on a further occasion. Plaintiffs obviously reserve all their rights to file a further amended complaint deposition having started discovery is ongoing. We're trying to litigate the case as best we can on, you know, the state of the record as it exists, but I'm happy to meet and confer further on the issue.

MR. ADAMS: Well, we'll do that, but I'm asking, do you intend to amend or not?

Page 267

STULZ, Ph.D.

MR. FREDERICKS: I am certainly reserving all of plaintiffs' rights under the rules.

MR. ADAMS: Okay.

MR. FREDERICKS: And I'll just leave it at that, but I'm happy to have further discussion.

MR. ADAMS: Okay.

MR. FREDERICKS: So I think plaintiffs' position is the deposition is suspended, defendants' position is the deposition should be deemed concluded, and subject to those differing views and positions I think we can send everyone home. Would you agree, counsel?

MR. ADAMS: That's fine.

MR. FREDERICKS: Thank you very much.

THE VIDEOGRAPHER: We are off the record. The time is 6:31 p.m. Eastern Time, and this concludes today's testimony. Thank you everyone and take care.

(Off the record.)

(Stenographic and video-recorded deposition adjourned 6:31 p.m.)

Page 268

CERTIFICATE

I, JOSEPHINE H. FASSETT, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey, do hereby certify that the witness, whose stenographically recorded deposition is hereinbefore set forth, was first duly sworn by me on the date indicated, and that the foregoing stenographically recorded deposition is a true and accurate record of the testimony given by such witness.

I FURTHER CERTIFY that I am not employed by nor related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have subscribed my hand this 15th day of November 2023.

JOSEPHINE H. FASSETT, RPR, CCR
NCRA License No. 32148
CCR License No. 30XI00098400
New York Notary Public
New Jersey Notary Public

Page 269

CERTIFICATION OF WITNESS

I, RENÉ M. STULZ, Ph.D., hereby certify that I have read the transcript of my testimony taken under oath in my stenographically recorded deposition on November 10, 2023, and that the transcript is a true, complete and accurate record of my testimony, and that the answers on the record as given by me are true and correct, subject to the changes and/or corrections, if any, shown on the attached page.

_____
RENÉ M. STULZ, Ph.D.

Subscribed and sworn to before me this_____ day of_____, 2023.

_____
Notary Public State of

68 (Pages 266 - 269)