# EXHIBIT 10

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

ACAD.OQ - ACADIA Pharmaceuticals Inc To Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application

EVENT DATE/TIME: APRIL 05, 2021 / 12:00PM GMT

**OVERVIEW:**

On 04/05/21, Co. announced that it has received a Complete Response Letter from US Food and Drug Administration regarding its supplemental New Drug Application.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

ACAD_SECLIT_0998164

APRIL 05, 2021 / 12:00PM, ACAD.OQ - ACADIA Pharmaceuticals Inc To Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application

## CORPORATE PARTICIPANTS

**Elena H. Ridloff** *ACADIA Pharmaceuticals Inc. - Executive VP & CFO*

**Mark C. Johnson** *ACADIA Pharmaceuticals Inc. - VP of IR*

**Srdjan R. Stankovic** *ACADIA Pharmaceuticals Inc. - President*

**Stephen R. Davis** *ACADIA Pharmaceuticals Inc. - CEO & Director*

## CONFERENCE CALL PARTICIPANTS

**Andrea R. Tan** *Goldman Sachs Group, Inc., Research Division - Research Analyst*

**Charles Cliff Duncan** *Cantor Fitzgerald & Co., Research Division - Senior Analyst*

**Christopher Lawrence Howerton** *Jefferies LLC, Research Division - Equity Analyst*

**Cory William Kasimov** *JPMorgan Chase & Co, Research Division - Senior Biotechnology Analyst*

**Danielle Catherine Brill** *Raymond James & Associates, Inc., Research Division - Research Analyst*

**Gregory James Renza** *RBC Capital Markets, Research Division - Analyst*

**Jason Nicholas Butler** *JMP Securities LLC, Research Division - MD, Director of Healthcare Research & Equity Research Analyst*

**Neena Marie Bitritto-Garg** *Citigroup Inc., Research Division - VP & Analyst*

**Paul Andrew Matteis** *Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst*

**Ritu Subhalaksmi Baral** *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

**Sumant Satchidanand Kulkarni** *Canaccord Genuity Corp., Research Division - Analyst*

**Tazeen Ahmad** *BofA Securities, Research Division - VP*

**Vamil Kishore Divan** *Mizuho Securities USA LLC, Research Division - MD*

**Yatin Suneja** *Guggenheim Securities, LLC, Research Division - MD & Senior Biotechnology Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to ACADIA Pharmaceuticals conference call. My name is Catherine, and I'll be your coordinator for today. (Operator Instructions)

I would now like to turn the presentation over to Mark Johnson, Vice President of Investor Relations at ACADIA. Please proceed.

---

**Mark C. Johnson** - *ACADIA Pharmaceuticals Inc. - VP of IR*

Thank you, Catherine. Joining me on today's call from ACADIA are Steve Davis, our Chief Executive Officer; and Dr. Serge Stankovic, our President, who will provide some prepared remarks before opening the call for your questions. Also joining us today is Elena Ridloff, our Chief Financial Officer.

I would also like to point out that we are using supplement slides, which are available on the Events and Presentations section of our website. Please turn to Slide 2.

Before we proceed, I would first like to remind you that during our call today, we'll be making a number of forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements, including goals, expectations, plans, prospects,

2

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998165

growth potential, timing of events or future results are based on current information, assumptions and expectations that are inherently subject to change and involve a number of risks and uncertainties that may cause actual results to differ materially.

These factors and other risks associated with our business can be found in our filings made with the SEC. You are cautioned not to place undue reliance on these forward-looking statements, which are made only as of today's date.

I'll now turn the call over to Steve.

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Thank you, Mark, and good morning, everyone. Please turn to Slide 4. Earlier today, we issued a press release stating that we received a complete response letter, also known as the CRL, from the FDA regarding our sNDA for DRP.

Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase III HARMONY study design, targeting a broad DRP population analyzed as a single group, the division in the CRL cited a lack of statistical significance in some of the subgroups of dementia and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support an approval. This is very disappointing and is not consistent with our agreements with the division on the pivotal study design since the time of our end of Phase II meeting that the study would have a representative sample of the various etiologies but not be individually powered for statistical significance by subtype.

Over the past 4 years, we've had clear agreement on analyzing the broad DRP population as a single group. This was reinforced and agreed to, not only at the end of Phase II meeting but with our HARMONY study protocol submission at the pre sNDA meeting and at the time of the sNDA submission. The CRL is the first time we learned about the division's apparent shift in position to demonstrate statistical significance by subtype.

The division also stated in the CRL that it considers the Phase II Alzheimer's disease psychosis study 019, a supportive study in the sNDA filing, to not be adequate and well controlled, citing it was a single center study with no Type I error control with secondary endpoints in which certain protocol deviations occur. We believe these observations are not impactful to the positive results on the study primary endpoint nor to the overall study conclusions of efficacy. Importantly, the CRL did not raise any safety issues for pimavanserin.

Please turn to Slide 5. It is also important to highlight what the division did not say in their letter. They did not say that the HARMONY pivotal study did not meet its primary endpoint. It did. They did not say that the HARMONY study results were not highly statistically significant. They were. They did not say that the secondary endpoints for HARMONY were not highly statistically significant as designed. They were. They did not say that the HARMONY study failed to show meaningful clinical benefit. It did. They did not say we failed to run the Phase III program in the manner agreed to at the end of Phase II meeting. We did.

The views expressed in the CRL represent an apparent recent shift in their position by the division. The pivotal program we agreed upon, simply put, was not designed to address the division's expectations now stated in the CRL. We clearly strongly disagree with how the division executed the review process of our sNDA. However, putting the process aside for a moment, we also disagree with the division on the even more important matter of substance.

We believe the correct way to study this population is to analyze DRP patients as a single group due to the fact that while dementias may have different underlying etiologies, the psychosis is very similar between subtypes. The assigned diagnosis of subtypes is frequently wrong, and many patients have mixed etiology. In other words, they don't fall cleanly into a single subtype. We stand behind our position that the pivotal Phase III HARMONY study design we previously agreed to with the division is the right way to study this indication and plan to immediately request a Type A meeting to engage with the FDA.

I'll now turn it over to Serge to discuss those previous agreements and our data in more detail. Serge?

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Thank you, Steve. I will now review the facts of what we agreed to with the Division of Psychiatry, what we delivered and what transpired in the CRL. Please turn to Slide 7.

At the end of Phase II meeting, the division agreed and clearly stated in the minutes that we could run 1 pivotal relapse prevention study as the basis of our application in support of the treatment of dementia-related psychosis as long as the findings were very persuading, meaning clinically meaningful and statistically significant with a very small probability of Type I error. Here is what we delivered.

First, the HARMONY study was stopped by an independent data monitoring committee for overwhelming efficacy at the prespecified interim analysis. Pimavanserin significantly reduced the risk of relapse of psychosis by almost 3 times compared to placebo, with a hazard ratio of 0.353 and one-sided p-value of 0.0023. In addition, pimavanserin met the key secondary endpoint by significantly reducing risk of discontinuation for any reason by over twofold with a hazard ratio of 0.452 and one-sided p-value of 0.0024.

Second, during the open-label portion of this study, pimavanserin demonstrated a meaningful reduction in the symptoms of psychosis across all subtypes of dementia in a consistent manner. And finally, in this relatively long trial of chronic treatment of up to 9 months, pimavanserin was very well tolerated, both over -- overall and particularly in respect to the lack of negative impact on cognitive functioning as well as motor function, 2 very important elements of safety in this patient group.

Let's discuss the specific agreements on Slide 8. At the end of Phase II meeting, and I quote, "the division agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of an sNDA for the indication of hallucinations and delusions associated with dementia-related psychosis."

In contradiction to what was agreed to at the end of Phase II meeting and what our entire pivotal HARMONY study for the treatment of DRP was based on, in the CRL, the division appeared to change their point of view to stay -- say that this randomized withdrawal study is no longer sufficient. Instead, it appears the division now expects to see that the individual dementia subgroups or subtypes independently demonstrate statistical significance. And I quote from the CRL, "The sNDA submission does not provide substantial evidence of effectiveness to support the approval of pimavanserin for the hallucinations and delusions associated with DRP." And further in the latter, the CRL states, "the results from the Alzheimer's disease subgroup were not nominally significant."

It is completely unreasonable for the division to claim that the robustly positive pivotal study conducted exactly in accordance with the agreed plan did not provide substantial evidence of effectiveness. Let's discuss further on Slide 9. At the end of Phase II meeting, we clearly agreed on what the target patient population would be in the pivotal HARMONY study to support approval of the broad DRP indication. The division clearly stated that, and I quote, "We agree that treatment of hallucinations and delusions in dementia-related psychosis is a potentially approvable indication. We agree that dementias need not be etiologically related for the common symptoms of psychosis to respond to pimavanserin."

The division agreed to this position because as we discussed with them at the end of Phase II meeting, the subtypes of dementia are often mixed and can be very difficult to distinguish in the clinical setting. Furthermore, these diseases all overlap pathologically and the rates of overlapping pathology increases with age. Although the prevalence of psychosis varies depending on the underlying disease, the symptoms are treated similarly across dementia subtypes. Therefore, the approach to look at dementia broadly when developing a symptom-based treatment makes sense and was agreed to by the division with no further discussion or pushback.

As per our agreement with the division, the pivotal HARMONY study enrolled dementia subtypes in line with the actual prevalence of these -- those in the real world. Those subtypes were accurately represented in both the open-label portion and the double-blind portion of the study. Statistical separation by dementia subgroups and certain minimum numbers of patients with specific subtypes were not among the prespecified requirement agreed to for the pivotal HARMONY study to support approval of the broad DRP indication.

The response in the CRL clearly represents a recent shift in thinking by the division as they conclude, based on their new criteria and their interpretation of the HARMONY data, that the subtypes demonstrated a differential response. The pivotal HARMONY study design and criteria for establishing efficacy in DRP, we agreed to, was never designed to prove this.

4

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998167

APRIL 05, 2021 / 12:00PM, ACAD.OQ - ACADIA Pharmaceuticals Inc To Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application

Before turning it back to Steve, let me just state that we remain highly confident, as we have been since day 1, that we have a complete and robust data package to support the approval of pimavanserin for treatment of DRP. The unmet need is dramatic. Pimavanserin has demonstrated a positive benefit risk profile and we are determined to bring it to the patients, caregivers and physicians who are waiting for this important new therapy. I would also like to take a moment to express my deep thanks to all the patients, their families and investigators who participated in our DRP program.

And with that, I'll now turn the call back to Steve.

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Thank you, Serge. Please turn to Slide 11. Let me just summarize what this boils down to. We had clear agreement with the division on our pivotal study design and what was required for approval. We delivered highly statistically significant and clinically meaningful results on the primary and key secondary outcomes of the agreed-upon pivotal study.

The division issued a CRL based on what appears to be a change in position, now requiring a new set of analyses by dementia subtype that the agreed-upon pivotal program was never intended, designed or powered to demonstrate. We strongly disagree with the FDA's decision and we'll immediately request a Type A meeting to discuss our previous agreements with the division, the issues raised in the CRL and our next steps.

We'll now open up the call for questions. Operator?

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question comes from Cory Kasimov with JPMorgan.

---

**Cory William Kasimov** - *JPMorgan Chase & Co, Research Division - Senior Biotechnology Analyst*

I guess, were there any major changes in the division since your agreement with the FDA or even during the review? And do you see any path wherein there's an approval on a narrow label? Or does the inadequacy now of that Phase IIb ADP trial eliminate that?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Serge, do you want to take that?

---

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. Thanks, Cory. Within the period of our development programs and discussions with FDA around DRP development as well as review, there have been significant changes in the leadership of both the Division of Psychiatry as well as Office of Neuroscience. As you know, there has been reorganizations in the new leadership due to either some of the previous leaders leaving the FDA or some reassignments within the FDA. So from that perspective, there has been some changes, although the team that we have been working with as well stayed pretty much the same throughout with these leadership changes through the review process.

As far as the impact of that on the decisions and positions of the FDA, I would not like to speculate in that respect whether there has any connection with it or not.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998168

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

And Cory, to your question about the potential for a more narrow label, I'll just simply say we stand strongly behind the position that we described on this call. We think the right way to study this is the way we studied it, the way that the division agreed to it at our end of Phase II meeting. I don't want to, at this juncture, get into other potential avenues. We need to get to our Type A meeting, have that discussion. Obviously, that's an opportunity to get a lot more color, present our position as well. And then once we've had that meeting, it will -- we'll be in a much better position to comment on next steps.

**Operator**

Our next question comes from Ritu Baral with Cowen.

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

So it doesn't look like FDA believes in DRP anymore. Was this based solely on the HARMONY study? Or has there been other -- have there been other clinical trials, other research, other publications within the past 3 or 4 years, while you were running HARMONY and had your end of Phase II meeting, that support that differential activity that FDA is pointing their finger to saying DRP is not the same?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Serge, do you want to start?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. Thanks, Ritu. What I would say is that there hasn't been any specific research, to our knowledge, that would, in any way, undermine the general position and agreement that we have that studying symptomatic treatment in the dementia is -- should not be related to the subtypes or subgroups of dementia, but rather studied as 1 group, as we discussed at the end of phase -- and agreed at the end of Phase II meeting.

If nothing, actually, the literature has been quite supportive about a significant overlap on the underlying neuropathology between different dementia subtypes and that overlap actually increases with age, and that's actually supportive of the position that subtyping and clinical diagnosis is often not the right way to categorize dementia when we are talking about evaluating the symptomatic treatment in dementia.

So I would say that recent research is much more supportive of the position that we agreed upon than opposing that scientifically.

**Operator**

Our next question comes from Charles Duncan with Cantor Fitzgerald.

**Charles Cliff Duncan** - *Cantor Fitzgerald & Co., Research Division - Senior Analyst*

So first -- first question is in terms of the Type A meeting. Any new information that you plan to present including the possibility of an additional new study? Is there a protocol that you're contemplating? Or if you want to pursue approval based on the existing data set?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Serge, do you want to start?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998169

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. Thanks, Charles. Procedurally, actually, we are -- we would not be either expected or allowed to bring any new data in the discussion at the Type A meeting. Aside from that, as we said, we are very confident in -- both in our position and approach to study dementia-related psychosis and in the data demonstrated benefit risk profile.

So our approach to Type A meeting is to, first of all, better understand the rationale for this position that FDA expressed and to bring the arguments and the data and the evidence to bear to support our position that we clearly demonstrated on a basis of agreed upon trials and data package demonstrated benefit risk profile to support approval of pimavanserin in dementia-related psychosis.

**Operator**

Our next question comes from Tazeen Ahmad with Bank of America.

**Tazeen Ahmad** - *BofA Securities, Research Division - VP*

So I know this is all kind of evolving quickly, but just so that I'm clear, when you guys first got this notification about not being able to start labeling discussions about a month ago, it seems like FDA's question was more about the Phase II study as opposed to HARMONY. But based on the language in your press release today, it seems like in that time, they had more questions about HARMONY develop. And I guess my question to you is that if at this Type A meeting, they determine that you do need to run a study that's specific for each subtype, how long do you think such a study would take?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Let me just clarify 1 thing, Tazeen, and then I'll turn it over to Serge to talk about the Type A meeting. So we didn't -- we are very surprised that this is the deficiency that the division is referring to -- was referring to when we got the letter a month ago and disclosed that. We -- this is -- when we received the CRL, it's the first time that they've disclosed the deficiency to us. So we didn't have any idea at the time that they sent the previous letter nor until we got the CRL that this was what the deficiency is.

Serge, do you want to take the question on next steps?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. Complete response letter is primarily focused around 045 study and either the number of patients in the particular subgroups or analysis of statistical separation in certain subgroups. Phase II study is mentioned, but it does not appear to be a main subject in the discussion around the DRP.

Related to our approach to Type A meeting, as I mentioned, we are looking forward to sit down with the FDA and discuss, try to understand where they're coming from, from their perspective, and better understand the rationale for the change in the position that they have. And looking forward to have the opportunity to finally make our case for the data package that we have and benefit risk profile of pimavanserin in this indication.

So it would be, at this point, premature for us to speculate around different further pathways and next step. Our intention is to bring the package that we have and discuss it with FDA because we believe it is sufficient and convincing for approval in this indication. And it's based on the agreements that we had with the FDA and the study 045 was exactly designed to demonstrate those requirements as they were -- as they outlined in our agreements.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



                                                                                       ACAD_SECLIT_0998170

**Operator**

Our next question comes from Neena Bitritto-Garg with Citi.

---

**Neena Marie Bitritto-Garg** - *Citigroup Inc., Research Division - VP & Analyst*

So I just wanted to ask about kind of the internal escalation process at the FDA. And I guess, if you can talk a little about whether or not you were able to actually get this escalated before receiving the CRL and if anybody beyond the Division of Psychiatry that you're aware of has kind of looked at the application at this point?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Yes, thanks for the question. So we did escalate within the FDA and never received any additional information regarding the nature of the deficiencies to be -- as you know, an sNDA is reviewed by and the decision is made by the division, in our case, the Psychiatry Division. We really don't have a sense yet as to how much exposure this application has had at higher levels. We know that we have inquired and pushed. We don't really know how involved other -- other levels of FDA have been involved.

---

**Operator**

Our next question comes from Salveen Richter with Goldman Sachs.

---

**Andrea R. Tan** - *Goldman Sachs Group, Inc., Research Division - Research Analyst*

This is Andrea on for Salveen. I guess we understand that it's early and you're planning on engaging with the FDA here, but just in thinking about the potential range of scenarios, do you think it's potentially likely that you would need 2 additional studies if they are bringing up the Phase II trial as well as some deficiencies with HARMONY? And then for Elena, just if you could just remind us on the resource allocation and your ability to be able to capitalize 1 or potentially 2 studies?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Let me take the first part of the question, and then I'll turn it over to Elena. I want to be careful at this juncture not to get too far down the path of what alternate scenarios could look like until we've had our Type A meeting. But logically, you could imagine a range of potential outcomes here. Of course, the position -- our very strong position today is the FDA got it right the first time at our end of Phase II meeting, and they should stand by that position. And we will push very hard on that point.

Beyond that, of course, as you would expect, we do a lot of scenario planning, and there are a multitude of scenarios that could require a study -- could require a study broadly in DRP, could require a study in more narrow indication. So of course, we're doing all that scenario planning. But I just don't want to get too far down the path until we've had the Type A meeting and had an opportunity to present our case, which we feel like is very strong, to FDA.

Elena, you want to take the capital allocation question?

---

**Elena H. Ridloff** - *ACADIA Pharmaceuticals Inc. - Executive VP & CFO*

Yes. So we're in a very strong cash position. As a reminder, we ended 2020 with over $630 million in cash. As Steve mentioned, it's premature until we have greater clarity from FDA in what's needed for approval to talk about additional studies. But in a scenario where we would need to run

8

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



CONFIDENTIAL

ACAD_SECLIT_0998171

additional clinical studies, and therefore, our launch investments would be pushed out, we could turn cash flow positive during the second half of next year, 2022.

**Operator**

Our next question comes from Gregory Renza with RBC Capital Markets.

**Gregory James Renza** - *RBC Capital Markets, Research Division - Analyst*

Just in relation to, of course, the focus on the Type A meeting and your efforts there, I'm just curious if you could comment on perhaps what else you can do or are planning to do with other aspects of the business and the development that is with just shoring up and ensuring the stability and growth of the commercial franchise as well as the other ongoing studies and how you intend to message and at least address the DRP developments in light of everything else that is happening in your business?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Yes. Thanks so much for the question, Greg. Of course, we're continuing to execute in our PDP franchise. As I've said many times, we believe that pimavanserin could be a very large drug just in PDP alone. We will continue to press very hard on DRP. As I mentioned, we need to get to the Type A meeting so that we'll have a better sense for what implications that has for our business plan.

We'll continue to allocate capital based upon our business plan. And as Elena mentioned, we've got a very strong balance sheet. We can fund -- continue to fund the aggressive franchise in PDP if we needed to run another study. I want to be really very, very clear, our intent and our position is that we do not need to do any additional clinical work.

Now obviously, we need to get alignment with FDA around that, but that is our very strong position today, but if we needed to do any additional clinical work, we've got the balance sheet to support that and to continue to do Rett syndrome, negative symptoms of schizophrenia, our pain programs in acute and chronic pain, our M1 PAM program and other things that we're doing. So we have a very strong balance sheet. We're well capitalized to be able to continue operating the business at a very full level.

**Operator**

Our next question comes from Jason Butler with JMP Securities.

**Jason Nicholas Butler** - *JMP Securities LLC, Research Division - MD, Director of Healthcare Research & Equity Research Analyst*

Just another 1 for Elena. Obviously, still an evolving situation. But can you just remind us of the context for the SG&A guidance you gave earlier this year? What percentage of that was for the DRP launch? And how might that now change looking forward?

**Elena H. Ridloff** - *ACADIA Pharmaceuticals Inc. - Executive VP & CFO*

Jason, so our SG&A guidance did include our planned launch investments for DRP, including our field team expansion. The field team has not yet been expanded. We had contingent offers out, and we had not transitioned those. So we haven't broken out the specifics of that. And once we have greater clarity on next steps, we'll be in a position to update that expense guidance.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998172

**Operator**

Our next question comes from Paul Matteis with Stifel.

---

**Paul Andrew Matteis** - *Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst*

I was wondering at the Type A meeting, do you plan on addressing from a design perspective or scope perspective what an additional trial might need to look like? Or could that require a follow-up meeting if it is affirmed as needed?

And then on the IP side, I was just wondering to clarify something, the composition of matter patent that I think was originally going to expire in 2027. Were you given Hatch-Waxman extension for that to 2030? And if not, what's the status of that?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Let me take the second part of the question first, and then I'll turn it over to Serge. So our composition of matter, let me take a little bit more running start. Of course, with small molecules, composition matter patents are what we look to first. And in our case, our composition of matter patent, including Hatch-Waxman extension, will run to -- into 2030. We'll get the full 14 years that's allowable under Hatch-Waxman. We were initially approved in April of 2016.

The timing of that always comes later in the process. We have applied for Hatch-Waxman extension. It goes -- we're going through the normal process there, and we will get that. You don't see it in the Orange Book yet. You won't until we're done with that process, but you will see that. So composition of matter patent on NUPLAZID will run into 2030.

In addition to the composition of matter patents, we have method of use patents on the 10-milligram tablet that is used in very small numbers of patients that are taking potent 3A4 inhibitors. And then formulation patents listed in the Orange Book on the 34-milligram capsule. Those 2 forms of the drug were the only 2 forms of the drug available today. So we continue to have a very strong IP position, and we'll, of course, continue to prosecute that vigorously.

Serge, do you want to take the second part of the question?

---

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. Jason, our position going into the Type A meeting is fairly simple. We have defined -- agreed and defined on what is the question that we need to answer in order to receive approval for treatment of hallucinations and delusions in dementia-rated psychosis. And that is whether pimavanserin is efficacious and safe in this group of patients analyzed as 1 single group. That is the question. And our -- we designed the program to answer that question. And we believe we clearly answered that question in a positive manner.

The question that are -- now we're being asked is to -- it's different, to demonstrate efficacy in -- by subgroup -- by different subtypes. And that's a completely different question that would require a different program that obviously we did not run. So from our perspective, we will go into the Type A meeting in -- with a clear position to justify and remind the FDA about not only agreements, but the rationale and scientific arguments that support the position and the way how we initially agreed and executed this program. And the results of that program that clearly demonstrate approvability of pimavanserin in this indication.

So from that perspective, Paul, we -- although we obviously have been developing a variety of contingencies, we will not be bringing into the Type A program, as an initial position, any new studies as that was not really indicated in the complete response letter either.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL                                                          ACAD_SECLIT_0998173

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Just to -- Paul, just to remind everyone of kind of the broader context. So the process that FDA has is when you receive a CRL, you are entitled to -- then to a Type A meeting to get more color around the FDA's position. And so this will be our opportunity to speak to the division, the Psychiatry Division, to learn more about their current perspective.

Beyond that, there's an appeal process that, certainly, we will be considering if needed. That appeal process can go through a couple of different offices and different levels above the Psychiatry Division. And so we're hopeful to gain more color at the Type A meeting. Again, that will be with the division, where we'll have an opportunity to learn more about their current perspective.

---

**Operator**

Our next question comes from Chris Howerton with Jefferies.

---

**Christopher Lawrence Howerton** - *Jefferies LLC, Research Division - Equity Analyst*

I guess just very simple for me is do you know of any precedents by which the FDA would have reconsidered their position in such a situation like this, such as allowing a reanalysis or re-narrow label?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Serge, do you want to take that?

---

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. I mean, there are precedents both ways. I'm not aware of any exact situation or precedents, although I'm sure they exist, of the exact situation. But we have been -- we have -- we saw a number of different situations like with Sarepta or others in terms of that. So I'm not aware of any directly comparative situation at this point, but we'll certainly be looking into that as well.

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Yes. Just looking at it a little bit more broadly, with the backdrop of the process that I just described, certainly, there are examples of companies that go through the Type A meeting, appeal, appeal process and get decisions reversed. So it's way premature for us to handicap on -- for us to speculate on just what process we'll need to go through or the outcome of that, but there certainly are a number of examples where decisions do get altered through that process.

---

**Operator**

Our next question comes from Vamil Divan with Mizuho Securities.

---

**Vamil Kishore Divan** - *Mizuho Securities USA LLC, Research Division - MD*

So just a couple, 1 following up on the Type A meeting. Can you just get a sense of how long you think it will take you to have the meeting and kind of report back to us kind of what the next steps might be?

And then maybe for Steve, just a bigger picture question. If it does seem after Type A meeting, I know this is obviously an evolving situation, so you don't want to get too far ahead of ourselves here, but if it does look like there's going to be a multiyear delay or need to do additional work,

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

ACAD_SECLIT_0998174

can you just talk about how you think that might change your sort of long-term strategy? You talked about composition of matter patent expiring in about 9 years. Is there sort of a need for further business development? Or maybe just how you're thinking about that scenario generally would be helpful to understand.

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Yes, sure. So the Type A meeting is required to be had within 30 days of submission. It does take us a little bit of time measured in days to get a briefing document together and send the required materials in for the Type A meeting. So roughly a month, a little bit longer, maybe, before we have the Type A meeting. We'll, of course, report back to everyone at the earliest possible time once we have additional news to report.

In terms of the implications beyond, again, it's a little bit premature to talk about implications of this. I'll just simply repeat what I said earlier. We've got a very strong balance sheet today. We will continue to prosecute the programs that you've heard us talk about that I mentioned earlier on this call that we're prosecuting today with a very promising pipeline of new opportunities.

As it relates to business development, again, it will remain. Under any of the scenarios that we are mapping out, it will remain a very important part of our business. And we'll continue to advance on that front. We've built a strong capability on business development. As I mentioned, you will see more deals from us. We have a very substantial footprint to further leverage in psychiatry and neurology, and we'll continue to do that. And just how this situation with DRP evolves and how that might potentially impact precisely the kinds of deals we're doing, et cetera, is something that we'll assess as we go forward. It's a little bit premature at this juncture.

**Operator**

Our next question comes from Danielle Brill with Raymond James.

**Danielle Catherine Brill** - *Raymond James & Associates, Inc., Research Division - Research Analyst*

So I'm curious when in the review cycle these types of deficiencies would typically be highlighted? I mean given the magnitude of the issues cited, Steve, would you have expected to have heard something earlier on? And then what protocol violations occurred in the Phase II trial and were these ever disclosed in the past?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

I'll start, Serge, feel free to chime into, if you like. Look, the first time that we learned of this change in position or what appears to be a change in position of the division is when we got the CRL. We absolutely would have expected to learn of this earlier in the process, we didn't. And so it's very disappointing to us, both on a substance and process level. But the question at this juncture is what do we do from here?

So obviously, the next step for us is to have a Type A meeting. I'll just reiterate, we feel very strongly about our position. We feel very strongly that the process we agreed to, the Phase III program we agreed to with FDA at the end of Phase II -- our end of Phase II meeting was correct. And so we're eager to get to the -- our Type A meeting.

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Right. If I may add a little bit of color. Danielle, I went back and re-reviewed our briefing document for the pre sNDA meeting. And in a prominent place, in that briefing document, we have displayed clearly, the full information about distribution of different subtypes, number of patients in different subgroups as well as the number of relapses and hazard ratio by different subtype and by different subgroup.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

ACAD_SECLIT_0998175

So all of the information and the questions that are raised in the complete response letter were clearly available for their review, even at that very early pre sNDA stage. And if these questions were very critical to them in terms of the review and approvability, that was their first opportunity to raise these questions and have a discussion, much less when we submitted the full supplemental NDA at mid-cycle as well as a late cycle. So none of these opportunities were taken to raise this question, as Steve said, and we were completely kept in dark about any concerns or issues or questions related to this.

---

**Danielle Catherine Brill** - *Raymond James & Associates, Inc., Research Division - Research Analyst*

Okay. That's helpful. And then just on the protocol violations for the Phase II?

---

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. There were 2 things that were pointed out as meaningful. First of all, as I said, first 2 reasons were that this is a single center study and that there was no Type I error control for the secondary outcome measure. Neither of this present a regulatory requirement for the study to be considered adequate and well controlled.

In terms of the deviations, there were some -- there were deviations in terms of the entry criteria qualifying for the study as well as some prohibitive -- use of prohibited medications and the certain deviations in terms of the administration of the informed consent that were pointed out in the complete response letter. But in regard to deviations we did, these were clearly outlined in the clinical study report that were submitted even before our overall submission that was completed, then as well as in that report, in addition to disclosure, we did a sensitivity analysis by analysis per protocol patients without those with the deviations.

And all of the sensitivity analysis indicated clearly that the conclusions of the study and primary outcomes are not changed on the basis of this analysis. So from the perspective of these deviations, we clearly demonstrated that there were no impact on the overall conclusions of the study.

---

**Operator**

Our next question comes from Yatin Suneja with Guggenheim.

---

**Yatin Suneja** - *Guggenheim Securities, LLC, Research Division - MD & Senior Biotechnology Analyst*

More of a financial-related question. Just trying to get a sense of the amount that has been committed towards the launch activity. Obviously, you have a pretty robust R&D and G&A guidance for this year. Just trying to get a sense that in light of this event, how much money can be saved, given that it doesn't seem like the approval is likely in the very, very near term. So just trying to get a sense of how we should sort of adjust the model going forward in this year?

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Elena, do you want to take that?

---

**Elena H. Ridloff** - *ACADIA Pharmaceuticals Inc. - Executive VP & CFO*

Yes. Yatin, as we talked about, it's premature today to give new updated SG&A guidance, but I could just give you a little color to some of what the key drivers were in the year-over-year increase in our SG&A guidance we provided in February. So that guidance included our field team expansion, which, as I mentioned, has not yet occurred. It also included our marketing investments for DRP launch, including our plans to run disease state as

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL                                                                                                    ACAD_SECLIT_0998176

well as branded DTC and it also included starting Phase IV programs for DRP. So there were a number of key investments that, until we have additional insights, we will not be making until we have greater clarity on next steps.

**Operator**

Our next question comes from Sumant Kulkarni with Canaccord.

**Sumant Satchidanand Kulkarni** - *Canaccord Genuity Corp., Research Division - Analyst*

We know you believe underlying psychosis could be similar across subtypes, which appears like a fair contention. And you had included this information that I'm going to be asking about in your sNDA package, but could you remind us as to how pimavanserin performed in HARMONY, specifically in Alzheimer's patients, which is the largest fraction of patients within the DRP indication and how that information might specifically help your arguments as you head into a potential Type A meeting?

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Yes, sure. Serge, do you want to start with that?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes. The Alzheimer's group was the largest group -- subgroup of dementias in our trial. We had a total of 123 patients that were randomized in the double-blind stage. The relapse rates and hazard ratio achieved in that particular subgroup is 0.61, which indicate that there was about 40% reduction in risk -- relapse risk in that particular group. I will remind you that this is about in the range of what you usually see as the benefit in risk reduction in the randomized withdrawal trials along different antipsychotics.

As we spoke many times before, there was 1 trial done in Alzheimer's patients with psychosis and agitation with risperidone that Dr. Devanand conducted. This trial is published in The New England Journal of Medicine. And this trial had a kind of 2 separate 3-month period. In the first period that is akin our double-blind stage, the risk reduction that Devanand saw is about 50%. So about the range that what we saw as well.

So we believe that clinically meaningful and comparable efficacy was seen in Alzheimer's. The reason, obviously, that we did not see a statistically significant separation is simply the fact that the number of the Alzheimer group was not powered specifically for that -- for -- to demonstrate statistical significance. And that's simply because we stopped the trial early. If -- that's what we are saying, the trial was not designed for to demonstrate statistical significance for different subtypes and subgroups.

If that was the case, we would certainly design interim analysis in the way that we have sufficient numbers of events in the subgroups in order to demonstrate a statistical significance, but that was not the question that we agreed to answer with this trial. I hope this helps a little bit of color.

**Operator**

And we have a follow-up from Ritu Baral with Cowen.

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

So you mentioned that in the CRL, the FDA specifically said that Alzheimer's -- the Alzheimer's subpopulation did not reach nominal statistical significance. And I believe the p-value was just out of balance of the usual 0.05. Did they mention any need for additional exposure in Alzheimer's patients, sort of patient numbers? Any indication that it would have been adequate had you guys not stopped the study early?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

14

CONFIDENTIAL                                                                                          ACAD_SECLIT_0998177

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

No, Ritu, that -- the context in which they colored the complete response was that in a certain subtypes, and here we are talking about Lewy body dementia and frontotemporal dementia, you had too few patients in order to be able to make any conclusion about efficacy. But in the subgroup where you had sufficient number of patients, you did not -- although you see benefit, you did not demonstrate statistical separation. So that was the context, in which they did not talk about any larger number of patients or stopping early and that sort of thing.

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

Got it. So the implication was that you had enrolled enough Alzheimer's patients for their expectations in HARMONY?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Yes.

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

I just want to follow-up on it. Given the number of Alzheimer's patients that we had in the randomized portion, we think the results are actually very, very supportive of efficacy in that particular subtype.

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

Hello?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

Steve has some difficulties, looks like, with his connection.

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

Serge, just 1 quick follow-up. Who signed the CRL?

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

The Division Director, Tiffany Farchione.

Right. Steve, obviously, had some difficulties here. So I'll try to channel him. He's trying to reconnect, so please give us a moment.

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

I'm back on, Serge. I'm not sure what happened, I lost the connection there. Okay. So what I was saying is given the number of patients we had, which, of course, is a reflection of us having stopped the study at the interim read, we think the data is quite supportive of efficacy in Alzheimer's patients. But the study was certainly not powered to show that and certainly not powered based upon the number of patients you would have upon stopping on interim analysis, which again was agreed to with FDA.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**REFINITIV**

CONFIDENTIAL

ACAD_SECLIT_0998178

APRIL 05, 2021 / 12:00PM, ACAD.OQ - ACADIA Pharmaceuticals Inc To Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application

We've done some calculations to determine well, what would have been required. And we would have needed to have about almost double the number of Alzheimer's patients for that to be statistically significant. So again, given that we only had half the number of patients that you would expect to be properly powered, we think the results in Alzheimer's are quite impressive, as Serge described.

Ritu, I just want to circle back to one of the things you mentioned earlier about does the division think that DRP is not a thing? I don't think there's any doubt in their mind or the FDA's mind that DRP is a thing. It's a very significant disorder. These patients have use of the existing dopaminergic antipsychotics. It is very problematic in those patients. And the FDA themselves refer frequently to dementia-related psychosis. They do it in all of the labels of the existing antipsychotics in the box warning where they refer to dementia-related psychosis as a broad group.

So there's no doubt in my mind that they recognize it as a thing and as a very serious disorder. The question really is what do you need to do to get an approval in this to treat this population.

---

**Ritu Subhalaksmi Baral** - *Cowen and Company, LLC, Research Division - MD & Senior Biotechnology Analyst*

Got it.

---

**Srdjan R. Stankovic** - *ACADIA Pharmaceuticals Inc. - President*

And if I may just -- if I may just add 1 bit of color, just to avoid confusion about the numbers of patients in certain subtypes and subgroups of dementia. Just for people not to misunderstand, there is no -- this is not -- this should not have been surprise to anybody because our agreement was that we generally follow the epidemiological distribution of dementia subtypes in our study. And considering that prospectively, we define how big the study will be, how many patients it will be. And if you just apply prevalence to this, we exactly came with the numbers of patients, both in the open label and in the double-blind, randomized stage, exactly what one would anticipate and expect.

So it is a little bit puzzling that at this point, the FDA comes and say, well, you have too few patients with frontotemporal dementia. That's about 1% of all dementias. And if you look at the numbers of patients in the study, the numbers that we had in our study is exactly what you would expect. No surprise there.

---

**Operator**

Thank you. And Mr. Davis, please proceed to closing remarks.

---

**Stephen R. Davis** - *ACADIA Pharmaceuticals Inc. - CEO & Director*

Great. Well, thank you, all, for joining us on today's call. We'll keep you updated on our progress as we learn more information.

---

**Operator**

Thank you for participating in today's conference call. This concludes the presentation. You may now disconnect. Everyone, have a good day.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

ACAD_SECLIT_0998179

APRIL 05, 2021 / 12:00PM, ACAD.OQ - ACADIA Pharmaceuticals Inc To Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2021, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2021 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

ACAD_SECLIT_0998180