# Exhibit A

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>Defendants, | No. 3:21-cv-00762-WQH-MSB<br>Hon. William Q. Hayes |

## REPLY EXPERT REPORT OF RENÉ M. STULZ, PH.D.

## EVERETT D. REESE CHAIR OF BANKING AND MONETARY ECONOMICS

## THE OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS

January 12, 2024

# Table of Contents

I.      Qualifications ...................................................................................................... 1

II.     Assignment ......................................................................................................... 1

III.    Summary of Opinions ......................................................................................... 2

IV.     Nothing in the Feinstein Rebuttal Report Undermines, Much Less Refutes,
        My Opinions Regarding Price Impact of the Alleged Misrepresentations ........................ 3

        A.      The Feinstein Rebuttal Report Does Not Refute My Price Impact
        Opinion No. 1 ...................................................................................................... 3

        B.      The Feinstein Rebuttal Report Does Not Refute My Price Impact
        Opinion No. 2 ...................................................................................................... 5

        C.      The Feinstein Rebuttal Report Does Not Refute My Price Impact
        Opinion No. 3 ...................................................................................................... 5

V.      The Feinstein Rebuttal Report Contains Numerous Mischaracterizations
        of My Opinions and Irrelevant Criticisms Based on Such Mischaracterizations .............. 9

VI.     In Response to My Opinions Regarding Price Impact, Dr. Feinstein Offers
        Several Speculative Conclusions Not Supported by Analysis......................................... 13

EXHIBIT A PAGE 2

## I.      Qualifications

1.      I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  In my report in this matter dated October 20, 2023 ("Stulz Opening Report" or "my Opening Report"),[1] filed with the Court, I set forth my qualifications as an expert witness in detail.  Since the filing of my Opening Report, I received an Honorary Doctorate of Laws from University College Dublin and had a study accepted for publication in a peer-reviewed journal.  An updated version of my CV is attached as Appendix A1.  Additionally, a list of my testimony since the filing of my Opening Report is attached as Appendix B1.

## II.      Assignment

2.      I have been asked by counsel for Defendants, in the above captioned matter, to review the rebuttal report submitted by Steven P. Feinstein dated December 12, 2023 ("Feinstein Rebuttal Report") and address Dr. Feinstein's statements regarding price impact analyses presented in my Opening Report.[2]

3.      The analyses and opinions expressed in this report are my own.  I am being compensated for my time and services at my regular hourly rate of $1,450.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

4.      In undertaking this assignment, I have considered documents and data related to the issues in this matter.  In Appendix C to my Opening Report, I have listed the documents I considered for my Opening Report.  In addition to those documents, any documents that I considered for this report are listed in Appendix C1.  My work in this matter is ongoing, and I

---

[1] All terms defined in my Opening Report hold the same meaning in this report.

[2] My reply report is focused on only some criticisms of Dr. Feinstein and the absence of discussion of other criticisms should not be interpreted as agreement with these criticisms.

reserve the right to supplement my opinions in the event that additional information or arguments are provided to me or submitted in connection with this matter.

### III.   Summary of Opinions

5.   In my Opening Report, I reached the following conclusions regarding the price impact of the alleged misrepresentations:[3]

a.   **Price Impact Opinion No. 1**.  The stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding the design and results of the HARMONY Study, including information about the target population and results of subgroups identified in the Complaint.  Instead, these price declines reflect the market's reaction to new information such as the regulatory updates.  This is because the information regarding the design and results of the HARMONY Study identified in the Complaint was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

b.   **Price Impact Opinion No. 2**.  The stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding the -019 Study's designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints.  This is because this information was already publicly known prior to the March Deficiency Letter, and in an efficient market, it could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

c.   **Price Impact Opinion No. 3**.  The stock price increase at the start of the Proposed Class Period is not evidence of the price impact of the alleged misrepresentations regarding the FDA agreement.  This is because the alleged

---

[3] Stulz Opening Report, ¶ 13.

misrepresentations regarding the agreement with the FDA for the HARMONY Study design were publicly known as early as 2017, prior to the beginning of the Proposed Class Period, and in an efficient market, could not have caused Acadia's stock price to increase on the first day of the Proposed Class Period.  Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.

6.      Nothing in the Feinstein Rebuttal Report undermines, much less refutes, these opinions.

7.      Instead, the Feinstein Rebuttal Report contains numerous mischaracterizations of my opinions and irrelevant criticisms based on such mischaracterizations.

8.      Additionally, in response to my opinions regarding price impact, Dr. Feinstein offers several speculative conclusions not supported by analysis.

**IV.     Nothing in the Feinstein Rebuttal Report Undermines, Much Less Refutes, My Opinions Regarding Price Impact of the Alleged Misrepresentations**

      **A.      The Feinstein Rebuttal Report Does Not Refute My Price Impact Opinion No. 1**

9.      As I demonstrated in Section VI of my Opening Report, the information about the design and results of the HARMONY Study identified in the Complaint that I discussed in my Opening Report was already publicly known prior to the March Deficiency Letter.  In an efficient market, this information would have already been incorporated in the stock price prior to the March Deficiency Letter.  Thus, any repetition of this information would not have affected Acadia's stock price.[4]

10.      Dr. Feinstein does not dispute that this information was publicly disclosed prior to the March Deficiency Letter.

---

[4] I note that Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Motion For Class Certification and Appointment of Class Representatives and Class Counsel, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, Case No. 3:21-cv-00762-WQH-MSB, December 12, 2023 ("Plaintiffs' Reply Memorandum") states that "the reporting of Harmony's top-line data (and of certain subgroup data at a later CTAD meeting) was accurate."  (Plaintiffs' Reply Memorandum, p. 5.)

EXHIBIT A PAGE 5

11.     Nor does Dr. Feinstein point to any information about the design and the results of the HARMONY Study identified in the Complaint that was new to the market on the date of the March Deficiency Letter or on the date of the April CRL, and could have affected Acadia's stock price on March 9, 2021 or April 5, 2021.[5]

12.     Instead, Dr. Feinstein writes:

> Once market efficiency is established, it follows that important valuation relevant information necessarily has price impact. This is one critical element of the analysis that Dr. Stulz neglected to do. Appropriateness of clinical test design and successful test results are certainly material information for a company seeking an FDA approval based on a clinical test.[6]

This flawed critique of my analysis confuses price levels with price changes.  In an efficient market, value-relevant public information about clinical study design and results is fully incorporated in price levels so that security prices reflect all public information at all times.[7] Therefore, price changes are due to the arrival of new value-relevant public information.  My analysis appropriately focused on whether particular pieces of public information were new information that could conceivably be responsible for the statistically significant stock price declines on March 9, 2021 and April 5, 2021.  Previously disclosed public information was already incorporated in Acadia's stock price and could not move the stock price again on these dates.

---

[5] Instead of addressing my opinion, Dr. Feinstein focuses his criticisms on allegations regarding the FDA agreement.  Dr. Feinstein writes, "True information about the test designs and results data could not have constituted fully corrective disclosure while the market was still misinformed about the purported sufficiency of the test designs and results data."  (Feinstein Rebuttal Report, ¶ 51.)  Dr. Feinstein also writes, "Plaintiffs' allegations are not that the Harmony Study's design and data were unknown to market participants since the start of the Class Period, or that the data themselves were untrue. Rather, Plaintiffs allege that Defendants misrepresented to the market that, per an agreement, the FDA would base its decision about Acadia's sNDA on the top-line Harmony Study results alone rather than subgroup data. The alleged misrepresentations and omissions thus allegedly caused analysts and investors to attach undue significance and optimism to the top-line data." (Feinstein Rebuttal Report, ¶ 72.) Additionally, Dr. Feinstein states "Dr. Stulz's conclusion that Plaintiffs' allegation related to the design of the Harmony Study did not have price impact is similarly flawed. Dr. Stulz fails to consider that the FDA expressed concerns to Acadia regarding the proposed design of the Harmony Study prior to and during the 15 May 2017 meeting,[] and that these concerns were not communicated to the market. The FDA's meeting minutes show that the FDA suggested an alternative design for the Harmony Study and that Acadia did not implement FDA's suggestion.[]" (Feinstein Rebuttal Report, ¶ 74, citations are omitted.)  I discuss these and other criticisms in Section IV.C below.

[6] Feinstein Rebuttal Report, ¶ 27.

[7] Stulz Opening Report, ¶ 42.

13.    Therefore, nothing in the Feinstein Rebuttal Report undermines, much less refutes, my Price Impact Opinion No. 1.

**B.    The Feinstein Rebuttal Report Does Not Refute My Price Impact Opinion No. 2**

14.    As I demonstrate in Section VII of my Opening Report, the information about the design and results of the -019 Study identified in the Complaint that I discussed in my Opening Report was already publicly known prior to the March Deficiency Letter.  In an efficient market, this information would have already been incorporated in the stock price prior to the March Deficiency Letter.  Thus, any repetition of this information would not have affected Acadia's stock price.

15.    Dr. Feinstein does not dispute that this information was publicly disclosed prior to the March Deficiency Letter.

16.    Nor does Dr. Feinstein point to any information identified in the Complaint about designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints of the -019 Study that was new to the market on the date of the March Deficiency Letter or on the date of the April CRL, and could have affected Acadia's stock price on March 9, 2021 or April 5, 2021.

17.    Therefore, nothing in the Feinstein Rebuttal Report undermines, much less refutes, my Price Impact Opinion No. 2.

**C.    The Feinstein Rebuttal Report Does Not Refute My Price Impact Opinion No. 3**

18.    Plaintiffs allege that "[c]ontrary to Defendants' claim that the FDA and Acadia agreed to the pivotal HARMONY Study's design, targeting a broad DRP patient population analyzed as a single group, during the end of Acadia's Phase II meeting (after the -019 Study), no such agreement actually existed."[8]  Plaintiffs also allege that, on the first day of the Proposed Class Period (September 9, 2019), Acadia's stock price increased by more than 63% due in part to

---

[8] Complaint, ¶ 92.

Defendants' alleged misrepresentation regarding the FDA agreement.[9]  However, as set forth in Section VIII of my Opening Report, the alleged misrepresentations regarding the agreement with the FDA for the HARMONY Study design were publicly known as early as 2017, i.e., well before the beginning of the Proposed Class Period.  In an efficient market, repetition of this information could not have caused Acadia's stock price to increase on the first day of the Proposed Class Period.  Instead, that stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.[10]  Dr. Feinstein presents several attacks against this opinion, but none of these attacks undermines my conclusion based on market efficiency.  <u>All his attacks boil down to an incorrect assertion that old news can move prices in an efficient market</u>.

19.    First, Dr. Feinstein writes:

> Dr. Stulz does not contest that the announcement of the Harmony Study top-line results that day was made in the context of and in conjunction with statements regarding Acadia's purported agreement with the FDA concerning what data would be necessary to obtain approval of the sNDA, and that this information is what caused the dramatic and statistically significant increase in the Acadia stock price.[11]

I agree that <u>the stock price increase on September 9, 2019 was due to new information</u> such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.  However, I disagree that the stock price increase was due to Defendants' statement regarding the agreement with the FDA.  That <u>statement about the</u>

---

[9] Complaint, ¶¶ 5–6, emphasis removed. ("Moreover, to further assure investors that the Harmony Study provided a strong foundation for obtaining expanded use approval, Defendants represented that the FDA had already blessed the adequacy of the study's design for purposes of obtaining such lucrative approval. For example, on September 9, 2019, Defendant Stankovic stated: 'I would also like to remind you that at the end of [our] Phase II meeting with FDA, we confirmed that for our [s]NDA submission [for pimavanserin] in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.' Similarly, on February 26, 2020, Stankovic stated 'The pivotal HARMONY study results will be the basis of the sNDA submission, which was previously agreed upon at the end of Phase II meeting.' []. Thereafter, Defendants repeatedly continued to stress both the 'positive' results of the Harmony Study, and that the FDA had already signed off on the adequacy of that study's design for purposes of obtaining the broader use authorization that the Company wanted. In response to these positive reports, the price of Acadia's common stock shot up more than 63%, closing at $38.85 on September 9, 2019.")

[10] Stulz Opening Report, ¶ 137.

[11] Feinstein Rebuttal Report, ¶ 12.

agreement with the FDA was old news as of September 9, 2019 and, in an efficient market, the repetition of this information could not have caused Acadia's stock price to increase that day.[12]

20.     Second, Dr. Feinstein writes:

> In the Stulz Report and in numerous prior cases, Dr. Stulz has argued that the value of information can change over time and can change in reaction to what other information becomes available.[] He conveniently disregards this principle when arguing that the alleged misrepresentations and omissions in this case could not have caused the statistically significant Acadia stock price increase on 9 September 2019, because some of the Company's representations that day, while possibly false, were reiterations of alleged (mis)statements made previously by the Company on an earlier date.[13]

Dr. Feinstein's criticism is off base.  It is true that context can magnify or mitigate the valuation effect of a differential between disclosed and allegedly concealed information.  However, my opinion with respect to the September 9, 2019 disclosures is not about a differential between disclosed and allegedly concealed information, i.e., it is not about how the stock price would have changed had Acadia disclosed something different regarding the existence or terms of the FDA agreement.  My opinion is that the actual stock price increase on September 9, 2019 could not be due to repetition of information that was already publicly available in an efficient market. It is true that, in some circumstances, repetition of previously disclosed information, such as reaffirmation of financial guidance, may lead to a positive and statistically significant stock price reaction if market participants started to doubt the previously disclosed information in the interim (i.e., when the guidance reaffirmation is surprising "new news").  However, I am not aware of Plaintiffs alleging – and Dr. Feinstein does not present any evidence – that securities analysts started doubting Acadia's prior public statements regarding the FDA agreement ahead of the September 9, 2019 disclosures.  Therefore, Dr. Feinstein establishes no reason why Acadia's stock price would react to the old news regarding the FDA agreement, i.e., why, in an efficient market, Acadia's stock price would react, on September 9, 2019, to Acadia repeating its prior statement regarding the FDA agreement.  It would not if, as Feinstein admits, the market for Acadia's stock was efficient.

---

[12] See, Stulz Opening Report, Section VIII.

[13] Feinstein Rebuttal Report, ¶ 63, citations are omitted.

EXHIBIT A PAGE 9

21.     Finally, Dr. Feinstein faults me for not addressing an "inflation maintenance" theory with respect to the September 9, 2019 disclosures:

> Dr. Stulz's price impact argument with respect to the start of the Class Period is wrong because the Company's allegedly misstatements about an agreement with the FDA, made that day in conjunction with, and to provide context for, the Harmony Study top-line results, misled the market about the implications of the Harmony Study top-line results for success of the sNDA. In that manner, the alleged misrepresentations and omissions had price impact that day.[14]

> Dr. Stulz failed to consider how the market's conditioning of its probability assessment on the alleged misrepresentations and omissions exaggerated the positive impact of the announced Harmony Study results, and thereby artificially inflated the Acadia stock price. He ignores basic tenets of statistics and financial economics to arrive at his erroneous conclusion.[15]

> Additionally, Dr. Stulz neither mentions nor considers that the existence of the agreement between the FDA and the Company may have had price impact through maintenance of the inflation during the course of the Class Period. … If alleged misrepresentations and omissions are repeated and thereby maintain artificial inflation in a security price by preserving the false information mix in the market, this repetition would have price impact, with or without a significant price change.[16]

22.     By using the terms "conditional probability" and "maintenance of the inflation,"[17] Dr. Feinstein asserts that the stock price on September 9, 2019 could have been lower had Acadia disclosed the alleged truth regarding its agreement with the FDA.  However, this strawman attack does not change my opinion.  As discussed above, it is Plaintiffs who contend that Acadia's stock price increased on September 9, 2019 due in part to Defendants' alleged misrepresentation regarding the FDA agreement,[18] and that no such agreement allegedly existed.[19]  My opinion is very simple:  in an efficient market, the actual stock price increase on September 9, 2019 could not be due to repetition of information that was already publicly

---

[14] Feinstein Rebuttal Report, ¶ 33.
[15] Feinstein Rebuttal Report, ¶ 65.
[16] Feinstein Rebuttal Report, ¶ 66.
[17] Feinstein Rebuttal Report, ¶¶ 64–66.
[18] Complaint, ¶¶ 5–6.
[19] Complaint, ¶ 92.

available. Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint.[20] Dr. Feinstein establishes no reason why, in an efficient market, Acadia's stock price would react positively (on September 9, 2019) to the repetition of Acadia's statement regarding the FDA agreement.

23.    In sum, nothing in the Feinstein Rebuttal Report undermines, much less refutes, my Price Impact Opinion No. 3.

**V.    The Feinstein Rebuttal Report Contains Numerous Mischaracterizations of My Opinions and Irrelevant Criticisms Based on Such Mischaracterizations**

24.    The Feinstein Rebuttal Report contains numerous mischaracterizations of my opinions and irrelevant criticisms based on such mischaracterizations. In this section, I discuss several examples.

25.    Dr. Feinstein incorrectly asserts that I assume that plaintiffs will not be able to prove their allegations and that I disregard the Court's findings for the purposes of my price impact analysis. For example:

    a.    Dr. Feinstein states, "Dr. Stulz contends that the full truth about the FDA agreement, the Harmony Study, and the 019 Study – the very information Plaintiffs allege was improperly not disclosed to the market – had been fully disclosed to the market in a timely manner."[21] He cites to ¶126 of my Opening Report, but that paragraph does not make this assertion. My opinions are plainly set forth in my Opening Report and my opinions regarding price impact of the alleged misrepresentations are summarized above in Section III.

    b.    Dr. Feinstein also declares, without any citation, "rather than accept as assumptions Plaintiffs' factual allegations, several of Dr. Stulz's price impact arguments inappropriately rely on the assumption that Plaintiffs will not be able to

---

[20] Stulz Opening Report, ¶ 137.
[21] Feinstein Rebuttal Report, ¶ 70.

prove their account of the facts and their allegation of liability in this case."[22]  I make no such assumption.

    c.  Dr. Feinstein also writes, "I understand that the Court determined, twice, that Plaintiffs sufficiently pled that investors were misled by the alleged misrepresentations and omissions.[] Dr. Stulz disregards the Court's findings and the factual record that supports it."[23]  Dr. Feinstein again mischaracterizes my opinions.  As I testified in my deposition, for the purposes of my price impact analysis, I assume that Plaintiffs will be able to prove their allegations.[24]

26.  <u>Dr. Feinstein mischaracterizes the role of the End-of-Phase-2 Meeting Minutes in my analysis</u>.  He asserts that I "excerpt[] extensively from the FDA's 15 May 2017 meeting minutes to demonstrate that the market was aware of the existence of an agreement."[25]  Dr. Feinstein is wrong.  Dr. Feinstein mistakes both my intent for citing the meeting minutes, and the extent of my reliance on these meeting minutes for my analysis and opinions regarding the September 9, 2019 disclosures.  I quote from and cite to the meeting minutes <u>only</u> in Section IV of my Opening Report, which provides background information.  Section VIII of my Opening Report, which analyzes the disclosures on September 9, 2019, cites <u>only</u> to public disclosures such as Acadia's public statements regarding its agreement with FDA and analyst reports.  As I testified in my deposition, I do not contend that the market had access to the FDA's meeting minutes documenting its agreements with Acadia regarding the HARMONY Study and sNDA.[26]  Such a contention, which I do not make, is not needed to reach my conclusion with respect to September

---

[22] Feinstein Rebuttal Report, ¶ 11.  Dr. Feinstein makes similar statements elsewhere in the Feinstein Rebuttal Report: "Dr. Stulz maintains that the positive results from the Harmony Study had nothing to do with Plaintiffs' allegations" (Feinstein Rebuttal Report, ¶ 13);  "Dr. Stulz reaches this conclusion by (i) rejecting, rather than assuming as true Plaintiffs' allegations" (Feinstein Rebuttal Report, ¶ 15);  "Dr. Stulz's Price Impact Analysis Rests on a Rejection of Plaintiffs' Allegations" (Feinstein Rebuttal Report, p. 19);  "Dr. Stulz disputes Plaintiffs' factual allegations" (Feinstein Rebuttal Report, ¶ 75).  Dr. Feinstein does not cite to anything in my Opening Report or my deposition in this matter (Deposition of René M. Stulz, November 10, 2023 ("Stulz Deposition")), to support these incorrect assertions.

[23] Feinstein Rebuttal Report, ¶ 47.

[24] Stulz Deposition, 121:8–15, 165:14–16.

[25] Feinstein Rebuttal Report, ¶ 71.

[26] Stulz Deposition, 150:25–151:10.  I also note that Plaintiffs' Reply Memorandum asserts that the minutes of the End-of-Phase-2 Meeting (held on May 15, 2017) "were never publicly disclosed until after the Class Period" aside from a few lines and that I "nonetheless [cite] those minutes at length" even though I "was unaware that they had never been made public."  (Plaintiffs' Reply Memorandum, pp. 2–3, emphasis removed.)  Plaintiffs misstate my deposition testimony.

9, 2019. My analysis of information on September 9, 2019 is focused only on what was in the public domain about Acadia's agreement with the FDA before this date and on this date.[27]

27.    Dr. Feinstein incorrectly attributes to me sweeping price impact opinions with respect to March 9, 2021 and April 5, 2021 stock price declines. He asserts (without any citation to my Opening Report or deposition) that I find that the "two corrective disclosures [the March Deficiency Letter and the April CRL] had no price impact" and that I "assume[] that all of the price declines on 9 March 2021 and 5 April 2021 were caused by factors other than the alleged fraud."[28] This is another mischaracterization. Given that I do not have such an opinion (or assumption), Dr. Feinstein's strawman argument is not relevant to my actual opinions in my Opening Report. My opinions with respect to the "back-end" price impact are clearly stated in my Opening Report – repetition of information that was already publicly known (such as the information about the design and results of the HARMONY Study and the -019 Study identified in the Complaint that I discussed in my Opening Report) could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.[29] Therefore, the stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding these previously disclosed items.[30] Instead, these price declines reflect the market's reaction to new information such as the regulatory updates.

28.    Dr. Feinstein wrongly states (without citation to my Opening Report or deposition): "Dr. Stulz and I agree that the statistically significant decreases in Acadia's stock price were due primarily to investors' and analysts' realization that they had been wrong about the likelihood of FDA approval of the sNDA."[31] I do not have any such conclusion in my Opening Report. In Section IX of my Opening Report, where I focused on Dr. Feinstein's purported damages

---

[27] Stulz Opening Report, Section VIII; Stulz Deposition, 163:19–164:4, 164:18–164:24, 166:19–167:5.

[28] Feinstein Rebuttal Report, ¶ 15. Dr. Feinstein also misleadingly states, "Dr. Stulz proffers an opinion that the alleged misrepresentations and omissions had no impact on the price of Acadia stock" (Feinstein Rebuttal Report, ¶ 11.) To purportedly support this statement, he cites to ¶ 13 of my Opening Report that has much more precise opinions with respect to price impact. ¶¶ 39, 44 of the Feinstein Rebuttal Report again misleadingly attack a purported opinion of "no price impact" with respect to the stock price declines on March 9, 2021 and April 5, 2021. As I discuss in this paragraph, my Opening Report does not have such an opinion, and therefore, Dr. Feinstein's attack is misguided.

[29] Stulz Opening Report, ¶ 13.

[30] Stulz Opening Report, ¶ 13.

[31] Feinstein Rebuttal Report, ¶ 14.

methodology, I show that the stock price can decline in response to materialization of risk even if the market has a correct assessment of this risk ex ante.[32]  Assuming that the market had an inflated estimate of the likelihood of FDA approval, Acadia's stock price declines on March 9, 2021 and April 5, 2021 would have two components: (i) a price decline from the actual price before the disappointing FDA news to an unknown, corrected price (i.e., what the price would have been had the market's estimate of the likelihood of FDA approval been correct); and (ii), a price decline from that unknown, corrected market price (i.e., what the price would have been had the market's estimate of the likelihood of FDA approval been correct) to the actual price following the disappointing FDA news.  Importantly, even in the absence of other factors that could affect the price, the residual price declines on March 9, 2021 and April 5, 2021 do not reveal the decomposition of the price declines in these two components.  The residual price declines on March 9, 2021 and April 5, 2021 do not show what the market price would have been before the disappointing FDA news if the market's estimate of the likelihood of FDA approval had been the "correct" likelihood.  Dr. Feinstein does not present a decomposition of Acadia's stock price declines on March 9, 2021 and April 5, 2021, and therefore presents no support for his assertion that "the statistically significant decreases in Acadia's stock price were due primarily to investors' and analysts' realization that they had been wrong about the likelihood of FDA approval of the sNDA."[33]

29.     Dr. Feinstein incorrectly states that my opinion is that "there was no 'front-end' price impact from the alleged misstatements on 9 September 2019"[34] and then proceeds with attacking this purported opinion.  However, as I made it clear in my Opening Report, my opinion is simply observing that the stock price increase on September 9, 2019 could not be due to the repetition of information that was already publicly available; instead, it was due to new information.[35]  I

---

[32] Stulz Opening Report, ¶ 151.

[33] Feinstein Rebuttal Report, ¶ 14.  If the market's probability of approval was somehow wrong, which Dr. Feinstein has not shown, it does not follow that it was wrong because of the alleged misrepresentations.

[34] Feinstein Rebuttal Report, ¶ 13.  See also Feinstein Rebuttal Report, ¶ 62 ("he submits that the alleged misrepresentations and omissions were not responsible for the statistically significant Acadia stock price increase that happened that day") and Feinstein Rebuttal Report, ¶ 66 ("Dr. Stulz oversimplifies the concepts of market efficiency and price impact, arguing incorrectly that a repetition of public information (in the instant case, an alleged misrepresentation) could not have impacted the stock price on account of market efficiency.")

[35] Stulz Opening Report, ¶ 137. Unlike Dr. Feinstein, Plaintiffs' Reply Memorandum acknowledges this scope of my opinions. (Plaintiffs' Reply Memorandum, p.11.)

specifically acknowledge the new information that was responsible for the stock price increase on September 9, 2019: "Instead, the stock price increase reflects the market's reaction to new information such as the Company's announcement that the HARMONY Study had been stopped early and had met its prespecified endpoint."[36]

## VI.   In Response to My Opinions Regarding Price Impact, Dr. Feinstein Offers Several Speculative Conclusions Not Supported by Analysis

30.     In addition to repeatedly mischaracterizing my opinions regarding price impact, Dr. Feinstein offers multiple unsupported conclusions regarding the difference between the actual share price and the hypothetical share price that would have prevailed absent the alleged misrepresentations.  Below are examples of such unsupported conclusions offered by Dr. Feinstein:

> [T]he alleged misrepresentations and omissions about Harmony's top-line data and an agreement with the FDA observably inflated the Acadia stock price on 9 September 2019 because they caused the market to attach more positive significance to the positive Harmony Study test top-line results than those results would otherwise have deserved.[37]

> Without the alleged misrepresentations and omissions that misinformed analysts and investors that successful top-line results would likely be sufficient to achieve FDA approval of the sNDA, the released study results would not have had the positive stock price impact they did.[38]

> In this case, the facts indicate that the alleged misrepresentations and omissions did impact the Acadia stock price, by impacting the value of information that

---

[36] Stulz Opening Report, ¶ 137. Contrary to what the Feinstein Rebuttal Report, ¶ 62, attributes (without any citation) to me, I never expressed an opinion that "the Harmony Study results were not misrepresented on 9 September 2019."  I note that Plaintiffs' Reply Memorandum states that "the reporting of Harmony's top-line data (and of certain subgroup data at a later CTAD meeting) was accurate."  (Plaintiffs' Reply Memorandum, p. 5.)  After incorrectly attributing to me a "no 'front-end' price impact" opinion with respect to the September 9, 2019 disclosures in the Feinstein Rebuttal Report, ¶ 13, Dr. Feinstein concedes the true scope of my opinion in the Feinstein Rebuttal Report, ¶ 32: "Dr. Stulz does not dispute that the Company's announcement regarding the positive Harmony Study top-line results caused the stock price to increase. Dr. Stulz does not dispute that Plaintiffs allege that the Company's announcement was misleading. Rather, Dr. Stulz's price impact argument with respect to the statistically significant price increase on 9 September 2019 is focused on whether analysts and investors were previously aware of the purported agreement between the Company and the FDA."

[37] Feinstein Rebuttal Report, ¶ 56.

[38] Feinstein Rebuttal Report, ¶ 62.

came out on 9 September 2019, which information in turn, indisputably impacted the Acadia stock price.[39]

Without the misrepresentations and omissions, the market's assessment of the probability of success would certainly have been lower.[40]

Clearly, announcements revealing the truth to the market about both Harmony's subgroup data and the purported agreement with the FDA would have caused a stock price decline during the Class Period prior to the corrective disclosures that conveyed that same information to the market.[41]

31.    These speculative conclusions are surprising because I see no analysis in the Feinstein Rebuttal Report (or in the Feinstein Report) of how Acadia's stock would have traded each day had there been no alleged misstatements or omissions.  Dr. Feinstein offers Acadia's stock price chart and an observation that the stock price increased significantly at the start of the Proposed Class Period and declined by a similar combined amount following the March Deficiency Letter and the April CRL as purported "strong evidence supporting price impact."[42] Drawing a stock price chart and using the words "indisputably," "certainly" and "clearly" is not economic evidence of price impact.[43]

---

[39] Feinstein Rebuttal Report, ¶ 63.

[40] Feinstein Rebuttal Report, ¶ 65.  Dr. Feinstein also refers to "the *obvious* effect the alleged misrepresentations and omissions had on the market's expectations of FDA approval and on the market's understanding of the importance of the factors that were the reasons for the FDA's decision."  (Feinstein Rebuttal Report, ¶ 15, emphasis added.)

[41] Feinstein Rebuttal Report, ¶ 66.

[42] Feinstein Rebuttal Report, pp. 18–19.

[43] The Feinstein Rebuttal Report provides commentary on the chart and stock price decline on March 9, 2021.  See, Feinstein Rebuttal Report, ¶¶ 39, 45.  These two paragraphs of the report have the language of "strong evidence that the alleged misstatements had price impact" (Feinstein Rebuttal Report, ¶ 39) and "strong evidence that the alleged misrepresentations and omissions had price impact" (Feinstein Rebuttal Report, ¶ 45).  The logic of these two paragraphs appears to be that, as long as plaintiffs allege that information was corrective and the stock price declined statistically significantly, this provides "strong evidence" of price impact.  Sections VI and VII of my Opening Report demonstrate that this logic is false.  The Complaint alleges that Acadia misrepresented the design and results of the HARMONY Study as well as information regarding the -019 Study, including the designation of a primary efficacy outcome at six weeks, the lack of statistical significance of most of the secondary endpoints and subgroup analyses, patient heterogeneity, single center, and no type I error control of secondary endpoints.  (Complaint, ¶¶ 73, 79, 85–87, 89–90.)  The Complaint also alleges that the March Deficiency Letter and the April CRL contained information regarding these allegedly misrepresented items.  (Complaint, ¶¶ 9-10, 143-146.)  However, the stock price declines following the March Deficiency Letter and the April CRL are not evidence of the price impact of the alleged misrepresentations regarding these items.  This is because the information regarding these items was already publicly known prior to the March Deficiency Letter, and in an efficient market, could not have caused Acadia's stock price to decline following the March Deficiency Letter and the April CRL.

Executed this 12th Day of January, 2024

_____

Rene M. Stulz, Ph. D

Appendix A1

**René M. Stulz**

Fisher College of Business
806 Fisher Hall
2100 Neil Avenue
Columbus, OH 43210-1144
Phone:  (614) 292-1970
Fax:     (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

Home Address:
3419 River Seine Street
Columbus, OH 43221
Phone: (614) 771-1110
Cell:    (614) 206-0265

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

1

EXHIBIT A PAGE 18

Appendix A1

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.

**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to 2023.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

Appendix A1

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005; New York University Finance Department, 2022.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to 2023.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2004 (chair), 2016, 2018.

**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, European Financial Management Association, Financial Management Association, Financial Management Association European Conference, FDIC Annual

3

Appendix A1

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, ECGI Annual Meeting, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop, Asian Pacific Risk and Insurance Association, Institute for Private Capital Annual Research Conference.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

EXHIBIT A PAGE 21

Appendix A1

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

Special issue of the Journal of Applied Corporate Finance in honor of René M. Stulz, 2022.

Best Paper Award, Southern Finance Association Meeting, 2023.

Honorary Doctor of Laws, University College Dublin, 2023.

**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.

**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

5

Appendix A1

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

6

Appendix A1

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company, 1989, 3, 247-262.

7

# Appendix A1

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

8

Appendix A1

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

9

Appendix A1

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

10

Appendix A1

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of

11

Appendix A1

Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

12

# Appendix A1

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

13

Appendix A1

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

14

Appendix A1

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

2017, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

15

Appendix A1

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Were there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2), 927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, 2022, 77(3), 1829-1875.

"Leverage and Cash Dynamics" with Harry DeAngelo and Andrei S. Gonçalves, Review of Finance, 2022, 26(5)1101-1144.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of financial Economics, 2023, 147(1), 75-105.

"Crisis Risk and Risk Management," European Financial Management, forthcoming.

"Are Analyst 'Top Picks' Informative?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Review of Financial Studies, forthcoming.

**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

16

Appendix A1

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-94.

17

Appendix A1

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.

**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Gregory Brown.

"Who Benefits from Analyst 'Top Picks?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Why Did Small Business FinTech Lending Dry Up During the COVID-19 Crisis?" with Itzhak Ben-David and Mark Johnson.

"The Determinants of Bank Liquid Asset Holdings," with Alvaro Taboada and Mathijs A. van Dijk.

"The Unicorn Puzzle," with Daria Davydova, Rüdiger Fahlenbrach, and Leandro Sanz.

"Does Greater Public Scrutiny Hurt a Firm's Performance?" with Benjamin Bennett and Zexi Wang.

**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

18

# Appendix A1

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

19

Appendix B1

# Additional Deposition and Trial Testimony of René M. Stulz Since October 20, 2023

**Case Name:**       City of Birmingham Relief and Retirement System, et al. v. Acadia Pharmaceuticals Inc., et al.

**Case No.:**       No. 3:21-cv-00762-WQH-NLS, United States District Court, Southern District of California

**Date of Testimony:**  November 2023 (Deposition)

**Case Names:**      In re Alta Mesa Resources, Inc. Securities Litigation
Alyeska Master Fund, L.P., et al. v. Alta Mesa Resources, Inc., et al.
Orbis Global Equity LE Fund, et al., v. Alta Mesa Resources, Inc., et al.

**Case No.:**       No. 4:22-cv-1189, United States District Court, Southern District of Texas

**Date of Testimony:**  November 2023 (Depositions)

EXHIBIT A PAGE 37

Appendix C1

# Additional Documents Considered List

**Depositions**

- Deposition of René M. Stulz, Ph.D., November 10, 2023

**Expert Reports**

- Expert Report of René M. Stulz, Ph.D., October 20, 2023.

- Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA, December 12, 2023.

**Pleadings**

- Order on the Motion for Reconsideration, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, February 2, 2023

- Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Motion For Class Certification and Appointment of Class Representatives and Class Counsel, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, Case No. 3:21-cv-00762-WQH-MSB, December 12, 2023

- Declaration of William C. Fredericks in Further Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *City of Birmingham Relief and Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, December 12, 2023, including Appendices and Exhibits.