# Exhibit B

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
John T. Jasnoch (SBN 281605)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff City of*
*Birmingham Retirement and Relief System*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>Defendants. | No. 3:21-cv-00762-WQH-MSB<br><br>**LEAD PLAINTIFF'S FIRST SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANT ACADIA PHARMACEUTICALS INC.'S FIRST SET OF INTERROGATORIES** |

Propounding Party:        Defendant Acadia Pharmaceuticals Inc.

Responding Party:        Lead Plaintiff City of Birmingham Retirement and Relief System

Set Number:        One

Lead Plaintiff City of Birmingham Retirement and Relief System ("Lead Plaintiff"), by and through its undersigned counsel, submits the following supplemental answers and objections to Defendant Acadia Pharmaceuticals Inc.'s First Set of Interrogatories to Lead Plaintiff served on September 15, 2023 ("Interrogatories"), and pursuant and subject to the Parties' agreement reached on November 29, 2023. Lead Plaintiff reserves the right to further supplement, amend, and/or modify the answers and objections set forth below.

## PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS

The Interrogatories expressly seek Lead Plaintiff's "conten[tions]" on several disputed issues that are the subject of ongoing fact discovery and that will (in most if not all cases) almost certainly also be the subject of expert discovery. Moreover, the Interrogatories were served a full six months before the current fact discovery cutoff of March 15, 2024 (*see* Dkt. No. 114 ("The deadline to complete fact discovery [is] March 15, 2024"), and the Court has yet to even set a schedule for expert discovery. Consequently, the Interrogatories are clearly premature as Lead Plaintiff's investigation and the development of the factual record are still ongoing, and expert discovery has not even begun yet.

For the avoidance of doubt, Lead Plaintiff's investigation and review of discovery materials to date has been significant, but Lead Plaintiff is not close to finishing its investigation of the facts relating to this case, nor its review of the document and written discovery in this action. Indeed, although Lead Plaintiff served its First Set of Requests for Production of Documents on March 22, 2023, Defendants—aside from production of insurance policies and a few organizational charts and meeting minutes—did not begin to start producing any meaningful

quantum of documents until June 23, 2023, and their still unfinished production of documents did not begin to substantially "ramp up" until mid-August 2023. Instead, it appears that Defendants are still at least several months away from completing their production of documents.[1]  Moreover, with document discovery still plainly incomplete (and very large volumes of documents having been produced only recently), no depositions have been taken or scheduled by either side (except for the depositions of the two named Plaintiffs and the Parties' respective class certification experts).  And, as noted above, the Court has not even set a schedule for expert discovery on merits issues.

Any responses that may be given below are without waiver of, or prejudice to, Lead Plaintiff's right at any later date to introduce any documents, affidavits or evidence, including any subsequently discovered fact or facts, as may be relevant to any issues that may actually be before the Court (including, without limitation, in connection with any later motions for summary judgment).  Lead Plaintiff further expressly reserves, to the extent such interrogatories are timely re-served or responded to at a later, timely date:  (i) the right to object to other discovery procedures involving or relating to the subject matter of the Interrogatories; (ii) the right to interpose additional objections to these Interrogatories beyond those listed herein; (iii) the right to correct, supplement, or clarify any responses herein; and (iv) the right to make use of any information or documents obtained in discovery or at any deposition, hearing, or any other court proceeding (including documents that Defendants may have already produced, but that Lead Plaintiff has not yet had the

---

[1]  For example, during July 2023, Defendants produced 10,392 documents; during August 2023, Defendants produced an additional 49,306 documents; during September 2023, Defendants produced an additional 83,415 documents; and through just the first half of October 2023, Defendants have produced an additional 22,158 documents.  Moreover, while Defendants have still not completed their production of all relevant documents from an initial list of 15 agreed-to individual custodians (plus certain specified central files at Acadia), Defendants have recently agreed to produce relevant documents from an additional three individual custodians—the production of which is still ongoing.

LEAD PL.'S 1ST SUPPL. ANSWERS & OBJS.
TO ACADIA'S INTERROGS.
NO. 3:21-cv-00762-WQH-MSB
EXHIBIT B PAGE 41

time to adequately review).

Lead Plaintiff is willing to meet and confer with Defendants in good faith regarding whether and the extent to which it may be possible for them to significantly narrow some or all of these premature contention interrogatories, such that providing answers at this early stage in the proceedings would be reasonable and proportionate to the needs of this Action, and not unduly burdensome, wasteful and/or harassing.

Lead Plaintiff is providing these supplemental answers and objections to the Interrogatories as a compromise and to avoid the cost and expense of unnecessary litigation. Specifically, as agreed on November 29, 2023, Lead Plaintiff is only supplementing its response to Interrogatory No. 1 to further identify the specific quotes in the Complaint that are at issue in this Action. By doing so, Lead Plaintiff does not concede that its October 16, 2023 answers and objections to any of the Interrogatories, including Interrogatory No. 1, were inadequate or inappropriate in any way and, instead, avers that its October 16, 2023 answers and objections were adequate, appropriate and complied with the applicable rules in all material respects. The serving of these supplemental answers and objections to the Interrogatories should not be construed as, and is not, a waiver of any of the objections asserted in Lead Plaintiff's October 16, 2023 answers and objections to the Interrogatories. For the avoidance of doubt, Lead Plaintiff reserves all rights.

## GENERAL OBJECTIONS

Lead Plaintiff makes the following general objections to each instruction, definition, and specific Interrogatory made in the Interrogatories:

1. Lead Plaintiff objects to the Interrogatories to the extent they purport to require Lead Plaintiff (i) to provide or summarize information that is not in Lead Plaintiff's possession, custody or control; (ii) to provide or summarize information available from a more convenient, less burdensome, or less expensive source; (iii) to produce or identify documents that are equally available to Defendants; and/or

(iv) to provide or summarize information that is already in Defendants' or their representatives' possession, custody or control.  Moreover, given the relatively early stage of document discovery, Lead Plaintiff expressly disclaims any obligation or ability to finish, prior to providing any responses to the Interrogatories, its review or analysis of documents produced by Defendants to date.

2.     Lead Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, work-product doctrine, common interest privilege, or any other applicable privileges, immunities, or restrictions on discovery.  In this regard, Lead Plaintiff further states that the Interrogatories are objectionable to the extent that they require Lead Plaintiff to disclose its mental impressions of what facts or documents that they have reviewed to date may—or may not—be relevant based on the current incomplete factual posture of this case, which improperly seeks not only protected work product but also represents an improper and premature attempt by Defendants to gain a tactical advantage by gaining advance insight into, *e.g.*, Lead Plaintiff's beliefs as to what documents and possible facts it may (or may not) deem to be relevant before Lead Plaintiff has had a sufficient opportunity to prepare to take, and take, the depositions of Defendants and other relevant fact witnesses.

3.     Similarly, Lead Plaintiff objects to the Interrogatories to the extent they prematurely seek information concerning the protected views and opinions of any of Lead Plaintiff's experts in a case where the interpretation and significance of various documents may well be the subject of later expert testimony—but where no dates for the completion of expert discovery (or even the submission of expert reports) has yet been established by the Court.  Interrogatories that effectively seek to require Lead Plaintiff to identify the bases of any of its experts' opinions are premature, as such disclosure is not required until such time as expert witness reports are due.

4.     Lead Plaintiff objects to the Interrogatories to the extent they purport to require Lead Plaintiff to state "all facts," "all undisclosed facts," or Lead Plaintiff's

contentions responsive to a specific Interrogatory. To the extent an Interrogatory purports to require "all facts," "all undisclosed facts," and/or other information regarding Lead Plaintiff's contentions, even if the Interrogatories were not otherwise premature and objectionable, such Interrogatories would still be and are objectionable to the extent that they seek more than what Lead Plaintiffs believes at the time constitutes a short and plain summary of the principal facts responsive to the Interrogatory, based on the completion of its review of the discovery had to date.

5. Lead Plaintiff objects to the Interrogatories as constituting patently premature contention interrogatories on the grounds that fact discovery in this complex securities action is not only ongoing, but is far from complete with a current fact discovery deadline that (even assuming no further extensions are granted) is still five months away, with Defendants still in the process of producing documents (and having only produced the bulk of their documents to date within the last approximately six weeks.

6. If and to the extent that Lead Plaintiff responds to any Interrogatory, it does so without prejudice to its right to use for any purpose any subsequently discovered facts, documents or other information that it may later discover or identify, including the right to alter or amend its current preliminary assessments of the relevance of particular facts, documents or other information in light of its ongoing review of the factual record as a whole (including but not limited to the significant document discovery yet to be produced by Defendants and third parties, Lead Plaintiff's completion of the review of the voluminous material that has only been produced recently, and further review and analysis by Lead Plaintiff's experts as well as other information that may be developed in the course of expert discovery).

7. Lead Plaintiff further reserves the right to supplement, amend, correct, or clarify these answers and objections to the Interrogatories, and to assert additional objections as may be appropriate based on matters developed or discovered during

the course of this litigation. Lead Plaintiff, however, further reiterates all of its objections to the Interrogatories as being premature, and for similar reasons disclaims any obligation or duty to update any answers it may provide prior to, at the earliest, 60 days after the close of fact discovery.

8.     Lead Plaintiff reserves all objections to the relevance or admissibility of the information requested in the Interrogatories or produced in response thereto.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Lead Plaintiff objects to the definition of "You" and "Your" as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include persons or entities whose documents are not within Lead Plaintiff's possession, custody or control, including by referring to Lead Plaintiff's "agents, . . . attorneys, brokers, accountants and financial advisors." Lead Plaintiff construes "You" and "Your" as referring to the City of Birmingham Retirement and Relief System, the Lead Plaintiff in this Action.

2.     Lead Plaintiff objects to each Instruction to the extent they differ from, are inconsistent with, or purport to impose obligations beyond those under the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Southern District of California, including but not limited to Civil Rule 33.1(a), and any other relevant law or rules, and thus purport to impose undue burden on Lead Plaintiff in responding to the Interrogatories. In responding to the Interrogatories, Lead Plaintiff will act consistent with its obligations under these applicable rules.

## SPECIFIC ANSWERS AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO. 1:

Identify each portion of the quoted statements in the section titled "Materially False and Misleading Statements Issued During the Class Period" of the COMPLAINT that YOU contend was materially false or misleading when made.

LEAD PL.'S 1ST SUPPL. ANSWERS & OBJS.
TO ACADIA'S INTERROGS.
NO. 3:21-cv-00762-WQH-MSB
EXHIBIT B PAGE 45

<u>ORIGINAL ANSWER TO INTERROGATORY NO. 1</u>:

Lead Plaintiff expressly incorporates its Preliminary Statement and Reservation of Rights, General Objections, and Objections to Definitions and Instructions as if fully set forth in response to Interrogatory No. 1.  Lead Plaintiff further specifically objects to Interrogatory No. 1, on the grounds that the undefined phrase "each portion of the quoted statements in the section titled 'Materially False and Misleading Statements Issued During the Class Period' of the COMPLAINT" is vague, ambiguous and confusing.  The section of the COMPLAINT entitled "Materially False and Misleading Statements Issued During the Class Period," consists of 35 individual paragraphs across 23 pages, which contain at least 23 different quoted statements, so it is not clear what portions of these statements are and are not the subject of this Interrogatory.  Given that there are at least 23 different quoted statements potentially at issue, Lead Plaintiff further objects to this Interrogatory because it is compound and contains at least 23 discrete subparts each of which should be counted as separate interrogatories under Federal Rule of Civil Procedure 33(a)(1) and Local Civil Rule 33.1(a).  To the extent that this Interrogatory is not otherwise objectionable, Lead Plaintiff states that each sub-part thereof should be treated as (and will be treated by Lead Plaintiff as) a separate interrogatory under Federal Rule of Civil Procedure 33(a)(1) and Local Civil Rule 33.1(a).  Lead Plaintiff further objects to this compound Interrogatory to the extent that it improperly suggests or implies that Defendants' statements should be read in isolation, rather than in context.

Lead Plaintiff also objects to Interrogatory No. 1 as effectively seeking to improperly obtain information that, to the extent obtainable for a proper purpose at all, should have been sought via a motion for a more definitive statement pursuant to Federal Rule of Civil Procedure 12(e).  Lead Plaintiff avers that Defendants' Motion to Dismiss (and supporting papers), Motion for Reconsideration (and supporting papers), and Answer to the COMPLAINT (as well as Defendants' course

of conduct since the filing of their Answer) makes clear that Defendants sufficiently understood the allegations in the section entitled "Materially False and Misleading Statements Issued During the Class Period" to provide a responsive pleading such that no further clarification of these allegations is necessary or required. *See* Dkt. No. 69, ¶¶107–42.

Lead Plaintiff additionally objects to Interrogatory No. 1 on the grounds that the COMPLAINT speaks for itself and the allegations in the COMPLAINT, including those in the section entitled "Materially False and Misleading Statements Issued During the Class Period," have been sustained twice by the District Court as sufficiently particularized as to identify what statements Lead Plaintiff contends were materially false or misleading when made (*see* Dkt. Nos. 65, 82), so reproducing those allegations in response to this Interrogatory would be unduly burdensome, unnecessary, and wasteful. Similarly, that Defendants have at no time filed any Motion for Clarification of either the Court's original order denying their motion to dismiss, or of the Court's subsequent order denying their motion to reconsider, only further confirms that that no further clarification of these allegations is necessary or required and that the burden of providing a further response to this Interrogatory is not proportionate to the needs of the case.

Subject to and without waiving any of the foregoing objections, Lead Plaintiff responds to Interrogatory No. 1 as follows: Lead Plaintiff directs Defendants to the COMPLAINT at ¶¶107–42, and further states that it will consider providing a further response to Interrogatory No. 1 60 days after the completion of fact discovery.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1

Lead Plaintiff expressly incorporates its Preliminary Statement and Reservation of Rights, General Objections, and Objections to Definitions and Instructions as if fully set forth in response to Interrogatory No. 1. Lead Plaintiff further specifically objects to Interrogatory No. 1, on the grounds that the undefined phrase "each portion of the quoted statements in the section titled 'Materially False

and Misleading Statements Issued During the Class Period' of the COMPLAINT" is vague, ambiguous and confusing. The section of the COMPLAINT entitled "Materially False and Misleading Statements Issued During the Class Period," consists of 35 individual paragraphs across 23 pages, which contain at least 23 different quoted statements, so it is not clear what portions of these statements are and are not the subject of this Interrogatory. Given that there are at least 23 different quoted statements potentially at issue, Lead Plaintiff further objects to this Interrogatory because it is compound and contains at least 23 discrete subparts each of which should be counted as separate interrogatories under Federal Rule of Civil Procedure 33(a)(1) and Local Civil Rule 33.1(a). To the extent that this Interrogatory is not otherwise objectionable, Lead Plaintiff states that each sub-part thereof should be treated as (and will be treated by Lead Plaintiff as) a separate interrogatory under Federal Rule of Civil Procedure 33(a)(1) and Local Civil Rule 33.1(a). Lead Plaintiff further objects to this compound Interrogatory to the extent that it improperly suggests or implies that Defendants' statements should be read in isolation, rather than in context.

Lead Plaintiff also objects to Interrogatory No. 1 as effectively seeking to improperly obtain information that, to the extent obtainable for a proper purpose at all, should have been sought via a motion for a more definitive statement pursuant to Federal Rule of Civil Procedure 12(e). Lead Plaintiff avers that Defendants' Motion to Dismiss (and supporting papers), Motion for Reconsideration (and supporting papers), and Answer to the COMPLAINT (as well as Defendants' course of conduct since the filing of their Answer) makes clear that Defendants sufficiently understood the allegations in the section entitled "Materially False and Misleading Statements Issued During the Class Period" to provide a responsive pleading such that no further clarification of these allegations is necessary or required. *See* Dkt. No. 69, ¶¶107–42.

Lead Plaintiff additionally objects to Interrogatory No. 1 on the grounds that

the COMPLAINT speaks for itself and the allegations in the COMPLAINT, including those in the section entitled "Materially False and Misleading Statements Issued During the Class Period," have been sustained twice by the District Court as sufficiently particularized as to identify what statements Lead Plaintiff contends were materially false or misleading when made (*see* Dkt. Nos. 65, 82), so reproducing those allegations in response to this Interrogatory would be unduly burdensome, unnecessary, and wasteful. Similarly, that Defendants have at no time filed any Motion for Clarification of either the Court's original order denying their motion to dismiss, or of the Court's subsequent order denying their motion to reconsider, only further confirms that that no further clarification of these allegations is necessary or required and that the burden of providing a further response to this Interrogatory is not proportionate to the needs of the case.

Subject to and without waiving any of the foregoing objections, Lead Plaintiff responds to Interrogatory No. 1 as follows: Lead Plaintiff directs Defendants to the COMPLAINT at ¶¶107–42, and further states that it will consider providing a further response to Interrogatory No. 1 60 days after the completion of fact discovery. In addition, Lead Plaintiff responds to Interrogatory No. 1 as set forth below. In so doing, however, it expressly notes that Defendants, in the parties' meet and conferrals, expressly demanded that, where Lead Plaintiff previously identified or referenced a Defendant's answer to a question as materially false or misleading, that Plaintiff's supplemental response to this interrogatory be provided in a form that *excludes* the question to which the Defendant's referenced answer responded. Lead Plaintiff therefore makes this supplemental response while fully reserving all rights to amend this supplemental response in such instances so as to also include the relevant questions as well as answers, and in no way waives any of its rights to argue during this case, at trial or otherwise, that it is the combination of a given question *with* the Defendant's response thereto and provides the appropriate context for determining whether the response to such question was actionably false or

misleading.

Paragraph 107

"ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) today announced that its Phase 3 HARMONY study, a double-blind, placebo-controlled relapse prevention trial evaluating pimavanserin for the treatment of dementia-related psychosis, met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis."

"The Company is planning to meet with the FDA regarding a supplemental NDA submission in 2020 and the results from the HARMONY study will be submitted for presentation at upcoming medical meetings."

"'We are very excited that today's results bring us one step closer to the potential of offering patients with dementia-related psychosis a critically needed treatment option,' said Serge Stankovic, M.D., M.S.P.H., ACADIA's President. 'We look forward to speaking with the FDA about a supplemental new drug application to support pimavanserin for the treatment of dementia-related psychosis. I want to thank all of the patients, their families, and the investigators for their participation in this important study.'"

Paragraph 109

"As Steve mentioned, pimavanserin was previously granted Breakthrough Therapy Designation for dementia-related psychosis. This was based on the seriousness of the disease with unmet need and the clinical results we have already observed, including our positive Alzheimer's disease psychosis study, which showed statistically significant reduction in psychotic symptoms in patients with Alzheimer's disease versus placebo without a negative impact on measure of cognitive function. And our positive Phase III pivotal study showing improvement in severity and frequency of hallucinations and delusions in patients with Parkinson's disease psychosis. This study included a prespecified subgroup analysis of dementia patients who, when treated with pimavanserin, also showed a statistically significant improvement in psychosis compared to placebo."

I would also like to remind you that at the end of Phase II meeting with FDA, we confirmed that for our supplemental NDA submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.

In addition to the pivotal HARMONY study, we plan to submit in the supplemental NDA positive data in patients with dementia from the 2 previous efficacy studies as well as additional safety data from our ongoing placebo-controlled post-marketing commitment safety study of pimavanserin in elderly frail patients with neuropsychiatric symptoms related to neurodegenerative disease."

11

Paragraph 111

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes, sure. Let me first tackle the -- what data we will plan to present at CTAD. We will be sharing all material top line results from the study, meaning efficacy data from the open-label portion of the trial, primary and key secondary endpoint details in the trial, particularly obviously, in the randomized withdrawal portion, as well as overall safety data. So as part of that to -- specifically to your question, we will be presenting the data related to different subtypes of dementia as well.

To your second question, all discussions that we had with the FDA and our initial intention were related to us pursuing indication of the treatment of hallucinations and delusions in dementia-related psychosis. So yes, indeed, that is what we are pursuing, and that is what we had discussed with the FDA."

Paragraph 113

"Yes. Ritu, we have all of the data that will constitute our supplemental NDA. The pivotal HARMONY study results will be the basis of the sNDA submission, which was previously agreed upon at the end of Phase II meeting. And in addition, we will have supportive efficacy results from our previous short-term studies, which provided evidence of acute efficacy of pimavanserin in Alzheimer's disease and in Parkinson's disease psychosis for patients -- with patients with dementia. And finally, we plan to submit our extensive safety data from completed and ongoing studies. So what is left for us is to essentially put that all together in the format required for the supplemental NDA, all the study reports and summary documents and once we agree with FDA on that, to submit."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes. We generated all the -- both efficacy and safety data that we will be submitting with that supplemental NDA."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes, happy to. As I mentioned earlier, we are meeting with the FDA primarily to review the content and format of our application, meaning we will be discussing with the totality of the data. We are bringing both efficacy and safety data. We are bringing to the sNDA as well as the different ways of analysis and pooling of the data in order to present better and enable reviewers to do their review both on the efficacy and the safety side. So discussing then that content and the format of that data presentation is -- are our main objectives in the discussion with the FDA."

Paragraph 115

"As planned, we successfully completed a pre-sNDA meeting with the FDA and confirm that the pivotal data from our HARMONY study, together with the confirmatory and supportive results from our Alzheimer's disease psychosis Phase II study and our Parkinson's disease psychosis Phase III study will all support the submission of an sNDA for pimavanserin in dementia-related psychosis. In addition, we discussed the overall safety database and analysis plan. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect a priority review with a potential approval for DRP around year-end."

Paragraph 117

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"So as I mentioned, we had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard with our end-of-Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's disease psychosis study as supportive efficacy studies."

Paragraph 119

"SAN DIEGO--(BUSINESS WIRE)--ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) announced today that the company submitted a [sNDA] to the [FDA] to support a potential new indication for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). The FDA previously granted Breakthrough Therapy Designation for pimavanserin for the treatment of hallucinations and delusions associated with DRP.

'This is an important step forward for the approximately 2.4 million people in the U.S. who suffer from dementia-related hallucinations and delusions, representing a large unmet need with currently no approved treatment options," said Steve Davis, ACADIA's Chief Executive Officer. "Our pivotal HARMONY study showed a meaningful reduction of the symptoms and stabilization of psychosis and a nearly three-fold reduction in the risk of relapse of psychosis for patients continuing treatment on pimavanserin compared to placebo. We look forward to working with the FDA as it reviews our submission.'

The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: The Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety and tolerability database from completed and ongoing studies representing over 1500 patients with neurodegenerative disease."

Paragraph 121

"We are pleased that the FDA has accepted our sNDA for filing and we will be working closely with the FDA to facilitate completion of the review in a timely manner," said Steve Davis, ACADIA's Chief Executive Officer. "If approved, NUPLAZID would be the first therapy indicated for the treatment of hallucinations and delusions associated with dementia-related psychosis. We look forward to potentially bringing this important treatment advancement to patients, caregivers and physicians."

Paragraph 123

"In the first half of 2020 we drove robust growth of NUPLAZID®. With the FDA filing of our sNDA for dementia-related psychosis we are one step closer to potentially delivering the first and only approved treatment for this devastating condition," said Steve Davis, ACADIA's Chief Executive Officer. "Building upon the successful development of our PDP and DRP programs, our clinical team is focused on advancing our innovative early- and late-stage pipeline."

Paragraph 125

"I'll just -- just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the -- and as we've said before, the "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimers, dementia with Lewy bodies or vascular dementia, et cetera.

And so -- and one of the advantages, of course, pursuing dementia-related psychosis broadly, which is just, as a reminder, we got a clear agreement from -- with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them. One of the advantage is it picks up what's referred to as dementia not otherwise specified, that's coded as not otherwise specified. And that's a big chunk of patients. And that -- the fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose. So as Michael mentioned, the good news is physicians understand that. They operate in that world. And with the indication that we are seeking, it won't matter. They won't have to try to make a determination, whether it's Alzheimer's or vascular dementia or something else."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes. Well, let me take it in from 2 perspectives. Let me take it from a regulatory perspective and then from a medical perspective. From a regulatory perspective, I just want to remind everyone that the sNDA that we've submitted includes the HARMONY study, the relapse prevention study but also includes -- or the kind of study that we did in Parkinson's disease psychosis. It includes acute -- we'll call it acute data as well over a much shorter time frame and it showed positive results, both in an Alzheimer's population as well as our -- of course, our Parkinson's disease psychosis population. So we have both in the submission.

More importantly, we agreed with the FDA on that approach at our end of Phase II meeting and agreed on the plan for Phase III, and then we've executed that plan. From a medical perspective, it's also important because physicians -- and they think -- again, when they think about dementia-related psychosis, they oftentimes just think about it more broadly speaking. As they think about a relapse prevention study, what we hear over and over is it really resonates with them.

Many times in neuropsychiatry, when you get approval on a drug, it's based upon -- we ran 1 arm with drug, 1 arm with placebo. We measured them on -- we measured progress on the scale. We compared those 2 and have indication of efficacy. But physicians don't do that in practice. They don't use those scales, and they're really just looking at the clinical manifestation of the disease in the patient that they're seeing in the examining room on. And they're thinking about things like will this impact their symptoms, and if so, will it have a durability of effect. So the relapse prevention study really resonates with the medical community because it aligns with a clinical outcome and the kinds of things that they think about."

Paragraph 127

"[W]e believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In June 2020, we submitted a [sNDA] for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints:  the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP."

Paragraph 128

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review

15

or details of the data and all that. We do not see -- each situation is different, and we do not see any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to be able to complete those things and asking for additional data. We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes. Let me take just a little bit of running start at it. So in dementia-related psychosis, sometimes people think about various subtypes. And of course, we've talked about that as well. But just one, just as a background reminder that we received agreement with the FDA that we would pursue dementia-related psychosis broadly in order to treat the symptoms of psychosis, regardless of their clinically diagnosed subtype. And I just want to be clear here, that subtype diagnosis is very subjective. It's difficult to diagnose. Many times, physicians don't know what the underlying etiology is as you sometimes going to only find it out through autopsy."

Paragraph 130

"We are well-prepared to achieve the long-term market opportunity for NUPLAZID in PDP and look forward to the addition of the DRP indication."
"We are excited that pimavanserin could be the first and only FDA approved medicine for the treatment of dementia-related psychosis."
"We are confident in both the efficacy and safety data supporting our supplemental NDA and we will continue to work with the FDA to facilitate their review with a PDUFA date of April 3, 2021.

We continue to make important progress in our late stage development pipeline as shown on Slide 8, with but ongoing Phase 3 studies with pimavanserin for the treatment of negative symptoms of schizophrenia and with trofinetide for the treatment of Rett Syndrome."

Paragraph 132

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes. Thanks much for the question. So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission. And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. And just as a brief reminder, our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in Alzheimer's and Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP.

So again, just as I put it -- with that backdrop, at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in acute setting. We'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion. Two, that we run a relapse-prevention study now to demonstrate the -- not only that we can stabilize patient symptoms, but that we get a durable effect over time. And then three, that we -- that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those. That's documented in our minutes. So fast forward to today, we then executed the exact plan that we laid out for them. And again, that underlines the confidence we have in the potential for approval in DRP."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"Yes. They're both important. One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in addition to those 3 points, we also just asked FDA very specifically. We said we just want to make certain that you are on board with approving a drug to treat dementia-related psychosis. Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to.

And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that -- if we weren't of that mind. So again, fast forward to today, we've been on the market for 4 years. We've continued to run placebo controlled studies. If you look at the totality of the data that we have today on -- just on safety, if anything, the safety profile and tolerability profile of the drug looks even better than it did when we got our PDP approval.

Most recently, or as a component of that PDP approval, we agreed to a post-marketing commitment to run a substantial number of patients in placebo-controlled study for elderly patients, evaluating them over -- against placebo over a period of at least 8 weeks. And we -- that commitment is due to be completed in the next year or 2. But any time you file an sNDA, you need to collect all the safety data that you've generated since your prior NDA approval. We've done that, including the most recent cut from that safety study. And like I said before, every cut of data that we've had continues to support, if not look even better than the original basis for approval in PDP. So we've submitted that data and that all looks very consistent with what we know about the drug."

**[Note:  text of analyst's question omitted at Defendant's insistence]**

"We're following the same path that we did in the PDP review and that most companies do when they're in registration, that is, we're not going to comment on the specific back and forth that we're having with FDA.

17

I just don't think that will be productive. But what I will say is, we remain on track. We remain just as confident as we've ever been in the potential for approval and just eager to get to the PDUFA date."

Paragraph 134

"Pimavanserin has the potential to be the first treatment approved for DRP, and I'm pleased to report that our sNDA submission is progressing well and as we would expect at this point in the review cycle. Pimavanserin selective serotonergic mechanism is highly differentiated. It's unlike any other antipsychotic on the market. And as I mentioned, the DRP market opportunity is very large, and approximately two thirds of the 1.2 million patients treated for DRP today are treated with off-label atypical antipsychotics, which, as I mentioned, carry significant disease burden or side effect burden. Our sNDA is supported by strong and robust efficacy data. Pimavanserin demonstrated an almost three-fold reduction in risk of relapse of psychosis in our pivotal HARMONY study. Our sNDA also includes positive results from 2 supportive efficacy studies, a positive Phase II study in Alzheimer's Disease psychosis; and positive data from our pivotal Phase III study in Parkinson's disease psychosis in patients with dementia. Our sNDA is also supported by strong safety data. Pimavanserin is well tolerated and notably exhibited no worsening of cognition, no worsening of motor function and no increase in sedation. As we prepare for the DRP launch, we are well positioned to leverage our established capabilities and expertise."

Paragraph 135

**[Note: text of analyst's question omitted at Defendant's insistence]**

"Yes. Thanks much, Cory. I'll start and then -- and Serge may want to add some additional color as well. So the indication we'll be seeking is as NUPLAZID is indicated for the treatment of dementia-related psychosis. And there are probably 2 key elements that we should touch on here: One is the -- as I mentioned, we're seeking the treatment of dementia-related psychosis. So we're not looking at individual subtypes as they are often referred to of dementia. The psychosis that we see is very similar between the -- irrespective of the underlying etiology and it responds in a similar way. So we're seeking that broad indication. That's supported by a very both alignment we established with the FDA at our end of Phase II meeting and then again at their pre-sNDA meeting when we submitted our application. The efficacy and safety data that we have, that underpins that indication, is very strong. We've got a well-established, safety and tolerability profile of the drug. Any time you file an sNDA, you need to collect all of the safety data you have from either prior or ongoing studies we've done that, all of that data continues to look very positive. If anything, the profile of the drug might look even a little bit cleaner than the very, very clean profile that we observed when we submitted in PDP."

Paragraph 137

"'Acadia delivered strong financial results in the fourth quarter and full year 2020, driven by robust sales of NUPLAZID in Parkinson's disease psychosis. Additionally, we made significant advancements in two

Phase 3 programs and further expanded our pipeline in pain and neuropsychiatry through strategic business development," said Steve Davis, Chief Executive Officer. "In 2021, we are focused on delivering continued growth of NUPLAZID, the upcoming potential approval and launch of pimavanserin for dementia-related psychosis and advancing our business development strategy.'"

Paragraph 138

"Additional highlights from 2020 include our submission of an sNDA for DRP. The FDA review is progressing as expected, and we look forward to the potential NUPLAZID becoming the first and only approved treatment for this indication, and the first new treatment in the dementia space in over 15 years."

"The significant potential of pimavanserin, combined with our clinical pipeline, will drive meaningful long-term growth. We continue to grow NUPLAZID sales, and based on our 2020 performance and current outlook, we are providing net sales guidance for PDP in fiscal year 2021 of $510 million to $550 million.

We're on the cusp of a potential approval in DRP, a significantly larger market opportunity for which our teams have been preparing for approximately two years. We will be ready to execute on day 1. In addition, we're advancing our pipeline with clinical trials across five separate indications."

Paragraph 140

"[W]e believe dementia-related psychosis (DRP), represents one of our most important opportunities for further development. In June 2020, we submitted to the FDA a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of their filing of our sNDA with a Prescription Drug User Fee Act (PDUFA) target action date of April 3, 2021."

Paragraph 141

"Our strategy is to identify, develop and commercialize innovative therapies that address unmet medical needs in CNS disorders. Key elements of our strategy are to:

. . .

Deliver pimavanserin to the market for the treatment of patients with dementia-related psychosis. In June 2020, we submitted an sNDA for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. Our PDUFA target action date is April 3, 2021. In preparation for a potential U.S. launch, we plan to increase the U.S. sales force, including expansion of additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for NUPLAZID in DRP. If approved, NUPLAZID will be the first and only FDA-approved treatment for DRP."

DATED:  December 15, 2023

SCOTT+SCOTT
ATTORNEYS AT LAW LLP

/s/ William C. Fredericks

William C. Fredericks (*pro hac vice*)
Donald A. Broggi (*pro hac vice*)
Marc J. Greco (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
mgreco@scott-scott.com

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Jacob B. Lieberman (*pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
jlieberman@scott-scott.com

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
John T. Jasnoch (SBN 281605)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff City of Birmingham Retirement and Relief System*

LEAD PL.'S 1ST SUPPL. ANSWERS & OBJS.
TO ACADIA'S INTERROGS.
NO. 3:21-cv-00762-WQH-MSB
EXHIBIT B PAGE 59

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
shopkins@zlk.com
gpotrepka@zlk.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Telephone: (415) 273-1671
aapton@zlk.com
amccall@zlk.com

*Attorneys for Additional Plaintiff Ohio Carpenters' Pension Fund*

LEAD PL.'S 1ST SUPPL. ANSWERS & OBJS.
TO ACADIA'S INTERROGS.
NO. 3:21-CV-00762-WQH-MSB
EXHIBIT B PAGE 60

## PROOF OF SERVICE

I, the undersigned, declare as follows:

I am employed in the County of New York, New York.  I am over the age of 18 years and not a party to this action.  My business address is Scott+Scott Attorneys at Law LLP, The Helmsley Building, 230 Park Avenue, 17th Floor, New York, New York 10169.

On December 15, 2023, I served true and correct copies of the foregoing document on counsel for all parties of record via electronic mail to the e-mail addresses identified below.

| Party or Parties | Counsel |
| --- | --- |
| Acadia Pharmaceuticals Inc., Stephen R. Davis, and Srdjan (Serge) R. Stankovic | COOLEY LLP<br>Peter M. Adams<br>padams@cooley.com<br>Koji F. Fukumura<br>kfukumura@cooley.com<br>Christopher B. Durbin<br>cdurbin@coooley.com<br>Heather M. Speers<br>hspeers@cooley.com<br>Matthew D. Martinez<br>mmartinez@cooley.com |
| Ohio Carpenters' Pension Fund | LEVI & KORSINSKY LLP<br>Gregory M. Potrepka<br>gpotrepka@zlk.com<br>Shannon L. Hopkins<br>shopkins@zlk.com<br>Cole Von Richthofen<br>cvrichthofen@zlk.com<br>Adam M. Apton<br>aapton@zlk.com<br>Adam C. McCall<br>amccall@zlk.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of December, 2023, at New York, New York.

_____
Marc J. Greco