**PLAINTIFFS' DEMONSTRATIVE REGARDING
<u>ORAL ARGUMENT ON THEIR MOTION FOR CLASS CERTIFICATION</u>**

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms. Inc.*, No. 3:21-cv-00762-WQH-MSB

**Sample Excerpts from the Record Refuting Defendants' Assertions (Def. Surreply at 1, 4–8) that Plaintiffs Have "[R]ewrit[ten] [Their] Entire Theory of Fraud" or Rely on a "New Unpled Theory of Fraud"**

| No. | Source | Relevant Excerpt |
|---|---|---|
| 1 | Transcript of Oral Argument on Defendants' Motion to Dismiss, Dkt. No. 88 ("MTD Tr.") at 6:14–7:1 | **THE COURT**:  Well, with respect to—there is much discussion about the agreement, and as you set forth, I mean, you—your client, and this is on August 19th, 2020, [said] ["]we got a clear agreement with the FDA at the end of our Phase III meeting to pursue DRP broadly. We executed the plan. We agreed with them.["]<br><br>And so there [are] references throughout the complaint to an agreement, and as you state, ***the plaintiffs allege [] there must not have been an agreement <u>or your client mischaracterized the agreement</u>. Fair to say?***<br><br>**MR. ADAMS** [counsel for Defendants]:   ***<u>Fair to say</u> that that is what they are—***<br><br>**THE COURT**:   ***<u>That is the allegation</u>.***<br><br>**MR. ADAMS**:   ***They are alleging, <u>exactly</u>.***[1] |

---

[1] Unless otherwise noted, all emphasis is added.

| No. | Source | Relevant Excerpt |
|---|---|---|
| 2 | Amended Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 45, filed 12/10/2021 ("AC") ¶8 | "[W]hen the Harmony study results became available, the data for the non-P[D]P subgroups was actually disappointing, whether viewed by individual subgroup or based on a pooling of all such non-P[D]P groups. In sum, contrary to Defendants' representations, the Harmony Study's results were not 'positive' in terms of supporting the primary purpose of the trial as it had failed to establish a statistically significant benefit for non-P[D]P [subgroups], and *far from having obtained any assurances from the FDA that the Harmony Study's design was likely sufficient to obtain approval, in fact <u>no such assurances had ever been given</u>*. And Defendants knew or recklessly disregarded throughout the Class Period that the Company's high risk gamble on the Harmony Study's underpowered design would likely not support expanded FDA approval of pimavanserin." |
| 3 | AC ¶103 | "Consequently, in light of what happened, and based on the foregoing, it is quite implausible that a written or oral agreement existed between the FDA and Acadia. And, *even if there was a general agreement that the Company could do a single adequate and well-controlled study, <u>that agreement was obviously contingent on the data being supportive of the subgroups that Acadia sought to treat with pimavanserin</u>*, and that was most certainly not the case." |

2

| No. | Source | Relevant Excerpt |
|---|---|---|
| 4 | AC ¶¶108, 110 | "The foregoing [statements by Acadia were] false and misleading because [they] failed to disclose that, due to a very small sample size of patients in each subgroup, the Harmony Study could not effectively determine whether pimavanserin was an effective treatment for the different subgroups. Therefore, undisclosed by Defendants, FDA approval was extremely unlikely unless the results from the Harmony Study were very strong. ***In fact, the data was disappointing, particularly as to the non-Parkinson's patients, indicating that the likelihood of approval was very low***. Moreover, the assertion that the FDA had blessed Acadia's approach to the sNDA was false because ***no such agreement*** was reached." |
| 5 | AC ¶¶114, 116, 118, 120, 122, 124 | "The foregoing [statements by Acadia were] false and misleading because Defendants failed to disclose that known shortcomings in the studies submitted with the sNDA, ***including disappointing [subgroup] data***, posed major obstacles to FDA approval." |
| 6 | AC ¶¶129, 131 | "The foregoing statements [by Acadia] were false and misleading because Defendants failed to disclose that, due to a very small sample size of patients in each subgroup, the Harmony Study could not effectively determine whether pimavanserin was an effective treatment for the different subgroups. Therefore, undisclosed by Defendants, FDA approval was extremely unlikely unless the results from the Harmony Study were very strong. ***In fact, the data was disappointing, particularly as to the non-Parkinson's patients, indicating that the likelihood of approval was very low***. Moreover, the assertion that the FDA had blessed Acadia's approach to the sNDA was false because ***no such agreement*** was reached." |

3

| No. | Source | Relevant Excerpt |
|---|---|---|
| 7 | AC ¶¶133, 136, 142 | "The foregoing [statements by Acadia were] false and misleading because Defendants failed to disclose that the Harmony Study was not properly designed to evaluate the efficacy of pim[a]vanserin and that *the data supporting the sNDA was disappointing and not strong enough to support approval*. Also, the assertion that the FDA agreed with Acadia on its approach was false." |
| 8 | Plaintiffs' Opposition to Defendants' Motion to Dismiss, Dkt. No. 56 ("Pltfs' MTD Opp.") at 5 | "HARMONY's design and results, either standing alone or together with 019 and 020, could thus not be reasonably expected (by Defendants or investors) to support FDA approval for an sNDA to expand pimavanserin's indication to include all DRP patients—*unless there was an agreement with the FDA [to] allow the 'overall' results, in a mixed population of DRP patients, from a 'single, well-controlled study' such as HARMONY, to support approval*." |
| 9 | Pltfs' MTD Opp. at 8 | "Unfortunately for investors, however, such statements about a purported 'agreement' with the FDA were materially false and misleading, *because the FDA had never agreed (a) that a single study that was able to report positive 'aggregate' results in DRP patients would support an expanded sNDA* (to include a broadened treatment indication beyond just Parkinson's DRP patients) *where, as in HARMONY, the data failed to also demonstrate positive results in the non-Parkinson's patients or any sub-group thereof*; or that (b) any of Acadia's other existing 'acute studies' (*e.g.* 019) could support FDA approval given HARMONY's problematic design and woeful results in non-Parkinson's DRP patients." |

4

| No. | Source | Relevant Excerpt |
|---|---|---|
| 10 | Pltfs' MTD Opp. at 24 | "Thus, as discussed above, accepting Defendants' 'innocent inference' counter-narrative necessarily requires this Court to accept that the FDA either (i) affirmatively misled Acadia about its requirements for the sNDA, or (ii) reneged on a prior agreement. Accordingly, here the inference that Defendants made up **or misrepresented an agreement** with the FDA to mislead investors as to the (un)likelihood that Acadia's sNDA would be approved 'is at least as compelling as' any opposing inference that it was the FDA that misled the Company." |
| 11 | MTD Hr'g Tr. at 34:8–16 | MR. FREDERICKS [counsel for Plaintiffs]: Now, this is where the agreement, which Your Honor focused in on quite a bit [] at the beginning comes into play, ***plaintiffs don't necessarily believe that there was no agreement whatsoever, but to the extent there was an agreement, defendant[s]' repeated efforts through affirmative misstatements and omissions of trying to tell the market, oh, it is okay; we don't have to worry about subtype analysis; the FDA doesn't care. That was false. That was misleading, and it was highly material.*** |
| 12 | Order Denying Defendants' Motion to Dismiss, Dkt. No. 65 ("MTD Order") at 9 | [Under section entitled "Allegations in the FAC"]:  "'[E]ven if there was a general agreement that [Acadia] could do a single adequate and well-controlled study, ***that agreement was obviously contingent on the data being supportive of the subgroups that Acadia sought to treat with pimavanserin***.'" [quoting AC ¶103.] |
| 13 | MTD Order at 11 | [Under section entitled "[The Parties'] Contentions"]:  "Plaintiffs contend that at the pleading stage, '***the falsity of Acadia's claims to having an "agreement" with the FDA can be readily inferred from the FDA's rejection of the sNDA on grounds inconsistent with the terms of the purported "agreement*."'" [quoting Pltfs' MTD Opp. at 16–17.] |

5

| No. | Source | Relevant Excerpt |
|-----|--------|------------------|
| 14 | MTD Order at 15 | "*To the extent that Defendants represented that the agreement contained terms that are inconsistent with the FDA's basis for ultimately denying approval*—namely, that the FDA had approved the design of the Harmony and -019 Studies *or would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups*—a plausible inference may be drawn at the pleading stage that Defendants misrepresented the existence <u>or terms of</u> the agreement." |
| 15 | MTD Order at 22 | "*The FAC's allegations that Defendants affirmatively <u>misrepresented the terms of</u> the purported agreement with the FDA* support an inference that Defendants acted with intent or deliberate recklessness." |
| 16 | MTD Order at 24 | "Defendants further assert that it 'defies common sense' for them to have <u>*misrepresented the terms*</u> *of an agreement with the FDA* and the likelihood of approval, knowing the whole time that approval would not be granted. (ECF No. 53-1 at 27.) However, Defendants' actions plausibly demonstrate that that they misled investors into overestimating the likelihood of approval, not that Defendants knew from the start that the sNDA would not be approved." |
| 17 | MTD Order at 26 | "The Court has determined that the FAC alleges sufficient facts to support an inference that *Defendants' statements concerning the agreement with the FDA and omissions of adverse information about the Harmony and -019 Studies misled investors into underestimating the risk that the FDA would deny Acadia's sNDA*." |
| 18 | Plaintiffs' Opp. to Defendants' Motion for Reconsideration, Dkt. No. 78 ("Pltf's Recon. Opp.") at 5 | "[A]s the Court concluded [in its MTD Order], '[Plaintiffs'] assertions support an inference' of scienter because *the existence of the kind of agreement that Defendants claim to exist was 'ultimately not consistent with the FDA's rationale for denying approval*.'" [quoting MTD Order at 23.] |

| No. | Source | Relevant Excerpt |
|---|---|---|
| 19 | Pltf's Recon. Opp. at 7 | "Also, disclosure of Harmony's bare top-line results is not what mattered here. Instead, what mattered was the selective disclosure of those results in this context, where **Defendants knew (or recklessly disregarded) that**, because of its questionable design, **Harmony was likely insufficient to support FDA approval absent either (i) exceptionally strong sub-group performance, or** (ii) **clear agreement by the FDA that sub-group performance was irrelevant** – and they also knew (at the time of disclosure) that neither condition was met." |
| 20 | Pltfs' Recon. Opp. at 9 | "[A]s the Court correctly found, **Plaintiffs allege that Defendants (i) misrepresented a purported agreement with the FDA about the design of their Harmony trial** ([MTD Order] at 14–17), and (ii) misleadingly touted Harmony's purported 'success' even though they knew that FDA approval for using pimavanserin to treat additional DRP sub-types was unlikely absent either exceptionally strong sub-group results or clear FDA agreement that sub-group data would be irrelevant ([MTD Order] at 17–20)." |
| 21 | Order Denying Defendants' Motion for Reconsideration, Dkt. No. 82 ("Recon. Denial Order") at 2–3 | "***The Court identified two categories of false or misleading statements alleged in the FAC: (1) allegations that Defendants affirmatively misrepresented the <u>existence or terms of</u> an agreement with the FDA concerning the approval of pimavanserin to treat dementia-related psychosis***; and (2) allegations that Defendants failed to disclose issues with the design and sub-group level results of the studies (including the 'Harmony Study') used to support the application for FDA approval. (*See* [MTD Order] at 14.)." |
| 22 | Recon. Denial Order at 3 | "The Court concluded that under these circumstances, 'a plausible inference may be drawn at the pleading stage that **Defendants misrepresented the <u>existence or terms of</u> the agreement**.'" [quoting MTD Order at 15.] |

| No. | Source | Relevant Excerpt |
|---|---|---|
| 23 | Recon. Denial Order at 8 | "Further, the Court does not find at this stage that the possibility that the FDA broke its agreement with Acadia outweighs *the competing inference that Defendants misrepresented the terms of the agreement*." |
| 24 | Recon. Denial Order at 9 | "Further, in this case, the allegations concerning the omission of adverse information must be considered *in conjunction with* the allegations that *Defendants misrepresented an agreement with the FDA concerning the exact same information*. Defendants have failed to identify any clear error with this aspect of the Court's analysis." |
| 25 | Plaintiffs' Brief in Support of Class Certification, Dkt. No. 108-1 ("Pltfs' Class Cert. Br.") at 1 | "At bottom, *Plaintiffs allege that Defendants misled investors about the nature and scope of agreements that Acadia allegedly had with the Food and Drug Administration ('FDA')* as to the clinical data it needed to see to approve the sNDA, and the nature and results of the key clinical trials offered to support the sNDA." |
| 26 | Pltfs' Class Cert. Br. at 3 | "*Plaintiffs allege that Defendants made various material misrepresentations and omissions during the Class Period concerning the nature and scope of Acadia's purported agreements with the FDA* about the data needed to obtain approval of the sNDA." |