UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CITY OF BIRMINGHAM RELIEF &          )  No. 21-cv-0762-WQH
RETIREMENT SYSTEMS, INC., *et al.*,  )
                                     )  February 28, 2024
                        Plaintiffs,  )
     vs.                             )  Hearing on Motion for
                                     )  Class Certification
ACADIA PHARMACEUTICALS, *et al.*,    )
                                     )
                        Defendants.  )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM Q. HAYES
UNITED STATES DISTRICT JUDGE

PAGES 1 - 77

APPEARANCES:

For Plaintiffs:        SCOTT + SCOTT, ATTORNEYS AT LAW
                       230 Park Avenue, 17th Floor
                       New York, New York  10169
                       *By: WILLIAM C. FREDERICKS, Esq.*
                       *MARC J. GRECO, Esq.*
                       *JOHN T. JASNOCH, Esq. (San Diego)*


For Defendants:        COOLEY, LLP
                       10265 Science Center Drive
                       San Diego, California  92121
                       *By: PETER M. ADAMS, Esq.*
                       *HEATHER M. SPEERS, Esq.*

Reported By:

Anne Roldan, RMR, CRR, Cal. CSR #13095
Official Court Reporter
U.S. District Court, Southern District of California
333 West Broadway, Suite 420
San Diego, California  92101

Reported by stenotype; transcribed by computer.

*WEDNESDAY, FEBRUARY 28, 2024, 2:00 P.M.*

**\*\*\***

**THE CLERK:**  Calling Matter No. 4, 21-cv-762, City of Birmingham Relief and Retirement Systems, *et al.,* vs. Acadia Pharmaceuticals, Inc., *et al.,* for motion hearing.

**THE COURT:**  Appearances?

**MR. FREDERICKS:**  Your Honor, William Fredericks, Scott and Scott, Attorneys at Law, LLP, for Plaintiffs.  With me today at counsel table are my colleague, Marc Greco, also from New York; and my partner, John Jasnoch, of my firm in the San Diego office.

**THE COURT:**  Good afternoon.

**MR. ADAMS:**  Good afternoon, your Honor.  Peter Adams with Cooley for the defendants, and with me is Heather Speers, also with Cooley, for the defendants.

**THE COURT:**  Thank you.  Good afternoon.  Counsel, it's on for the plaintiff's motion.  I have read the materials.  I'm familiar with your arguments.  You can -- so you can focus on matters that mean the most to you.

Let's talk about timing.  My inclination is -- I don't know that you'll indeed it, but my inclination is to give 30 minutes to Plaintiff, 30 minutes to Defendant.

Does that seem to be sufficient?

**MR. ADAMS:**  Sure, your Honor.

**MR. FREDERICKS:**  *(Nods head.)*

THE COURT:  Fair enough?

MR. FREDERICKS:  Yes.

THE COURT:  Okay.  I think it's all in our best interest for us all to be exiting the courtroom at 3:15, unless you want to be walking down 14 flights of stairs, because I think there may be an exercise around 3:30.  Unless you want to walk down the stairs, you may want to exit around 3:15.  I'm familiar with your arguments.

Counsel?

MR. FREDERICKS:  Your Honor, I was also going to suggest that there are really two issues before the Court, was the damages *Comcast* argument, and one is the price impact argument.  Customarily, when this has been done, the parties sort of go in order of the issues of which they bear the burden of proof.  So I would go first on the damages *Comcast* issue, and then I'd propose letting defense counsel speak to any issues on that.

And then I'd -- I think it's probably appropriate for defense counsel to speak first on price impact, because it's their burden of proof on price impact.  So if that's amenable?

THE COURT:  I'm fine with that.  Are you fine with that, Counsel?

MR. ADAMS:  That's fine with me.

THE COURT:  Great.  Thank you.

MR. FREDERICKS:  Thank you, your Honor.

We're here on Plaintiffs' motion for class certification under Rule 23.  I think it's uncontested in the record that all the required elements of Rule 23(a) have been met, and all the required elements of Rule 23(b)(3) have been met, with the exception of the *Comcast* and price-impact arguments that I think we'll be occupying ourselves with today. Unless the Court has any questions as to the elements that Defendants don't seem to contest, I'll move straight to the contested issue of *Comcast* damages.

Your Honor may recall that this is the case where the fundamental question is did the FDA renege on an agreement that it had with Acadia and move the goalpost on the requirements and relevant factors for Defendant's sNDA application for pimavanserin;

Or were Defendants aware throughout that the FDA had advised them from the beginning that it was going to consider subgroup data from non-Parkinson's patients in deciding whether to expand the existing label for pimavanserin to include various subgroups beyond non-Parkinson's patients.

With respect to damages, there is essentially no case law to support Defendants' application or request that *Comcast* should somehow bar application of the out-of-pocket damages methodology in this case.

It's widely, if not universally, accepted that the out-of-pocket damages methodology is the method for calculating

damages in a Section 10(b) class action.  It is also virtually universally accepted -- I'll touch on the exceptions in just a moment -- that you don't need to spell out the details or specifics of how the out-of-pocket damages methodology would apply in a particular case.

You just need to show that a methodology is available to essentially require someone to prove that it can be done by doing the actual analysis as to impose a requirement for producing the analysis, which courts are very clear is not required.

We cite about eight District of California cases on this point.  We cite probably a half dozen or more from outside the Ninth Circuit.  We tried to limit it to 2022 and '23 cases.  But the case law is pretty overwhelming on this.

I'll just to draw the Court's attention to Judge Alsup's opinion in the *Junge v. Geron* case from April 2022 in the Northern District of California, cited in our brief.  I think it pretty much comprehensively addresses and rejects all of Defendants' arguments on *Comcast* here.

Defendants really rely on the progeny of one case, which is the *BP* case, where the Court in *BP* -- I think appropriately -- declined to certify a class based on a theory of consequential damages, which is, I think, uniquely available in the Fifth Circuit under 10(b), because the consequential damages methodology was quite clearly not the same thing as an

out-of-pocket damages methodology.

The *BP* court actually certified the class as to those claims which were relying on the out-of-pocket methodology, and declined to certify only with respect to those claims that involved a different theory of consequential damages.

In this case, we are not alleging any theory of consequential damages. We're alleging only the traditional damages based on the inflationary -- the inflation in the stock, which is precisely measured by the out-of-pocket damages methodology.

*Mulderrig v. Amyris,* if I'm pronouncing it correctly, in an out-of-state case called *Indiana Retirement System*, Judge Rogers, who is the judge from the Middle District of Tennessee, respectively declined to certify a class under *Comcast* because the defendants there hadn't even specified what the risk was. They had -- in the Indiana case, it specifically said Plaintiff's expert had provided no explanation whatsoever as to how the risk of the defendant's practices would be factored into Plaintiff's damages model.

Our Feinstein rebuttal report goes into great detail at paragraphs 86 to 106 as to how the out-of-pocket damages method can handle all the problems that the defendants' expert seems to have concerns about. So I think we've addressed all of Defendants' issues on this point. And I will be happy to stand on the cases in our brief and let Defendants make whatever

rebuttal they wish to make.

**THE COURT:**  Sure.

**MR. FREDERICKS:**  Thank you.

**THE COURT:**  Thank you.

Counselor?

**MR. ADAMS:**  Good afternoon, your Honor.

Let me just start by saying out-of-pocket damages is a measure of damages, not a model.  And our fundamental argument here is one under *Comcast*.  And it goes like this:

Plaintiffs have asserted the "materialization of the risk" theory.  And whether you call it the "theory of liability" or "theory of loss" or "theory of damages," it's still their theory.  And the problem is their expert didn't put forth a model whatsoever addressing that theory.

So I'm just going to start with their opening report, which, you know, we highlighted in our opposition.  And he doesn't even mention materialization of the risk.  He mentions corrective disclosure, I think, like, nine times in paragraph 169 of his report, which is the fundamental paragraph where is he talking about his event study.

By the way, the event study is his methodology.  Out-of-pocket is a measure of damages.  And so we think this is -- alone is fatal under *Comcast*.  And I'll just quote from *Comcast*, which says:

"A model purporting to serve as evidence of damages in

this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."

So that's the first point, is that their expert didn't even attempt.  And so then they come back and they say, well -- they've got a couple arguments.

One is that this is -- this *Comcast* argument is premature loss causation.  They say this case isn't like *BP 2,* where the Fifth Circuit said that individualized considerations would defeat predominance.  And then they say, sort of generally, that their rebuttal report saves the day.

So let me just talk briefly about those three counterarguments, so the first about it being premature to consider loss-causation arguments.  Again, this is wholly contrary to what *Comcast* says.  And again, I'm quoting the Supreme Court:

"Class determination generally involves considerations that are enmeshed in the factual and legal issues comprised in Plaintiff's cause of action.  By refusing to entertain arguments against Respondent's damages model that bore on the propriety of class certification simply because those arguments would also be pertinent to the merits determination, the

Court of Appeals ran afoul of our precedence requiring precisely that inquiry."

So I don't see how they can get around the Supreme Court by saying this is somehow a premature loss-causation argument.  Opposing counsel mentioned the *Junge,* or *Geron*, case.  First of all, that case is an outlier.  We cited *AAC Holdings*, which said, you know*, Junge* is certainly an outlier in that regard "as several courts have grappled with how to reconcile the 'materialization of the risk' theory with *Comcast* while still conceptualizing it as a theory of loss causation."

He also mentioned *Mulderrig* and *AAC*.  In both of those cases the Court said, look, the expert didn't put forth a model for materialization of the risk, and therefore they didn't satisfy their burden under *Comcast*.

And even setting all of that aside, the *Junge* case, or the *Geron* case, which they're relying on, actually hurts them, not helps them.  In that case, the plaintiffs had not confirmed nor denied whether they would use materialization of the risk as a basis for seeking damages.  That's the opinion at page 8.

There's no such question here.  They've confirmed that they're proceeding under a "materialization of the risk" theory of damages.  And that court also distinguished this case -- that case, the *Junge* case -- from *BP 2* because Plaintiffs -- and I'm quoting -- "argue that investors would have refused to purchase Geron shock had they known the truth about TSS and CRPR data."

So here, Plaintiffs allege in paragraph 164 of their complaint -- and I'm quoting:

"Had Plaintiffs and other members of the class known the truth," meaning the truth about the risk, "that the FDA would reject the Supplemental New Drug Application, they would not have purchased or otherwise acquired said securities."

That's a quote from their complaint. So let me just -- if it's all right with you, I'll just touch on a few more issues, and we can move on to price impact.

So the second problem for Plaintiffs is their complaint really contemplates two purchasers within their proposed class. And again, paragraph 164 saying, quote, "Had Plaintiff and the other members of the class known the truth, they would not have purchased or otherwise acquired said securities."

So they wouldn't have bought at all or would not have purchased or otherwise acquired them at inflated prices that were paid. So they clearly have two classes in there, subject to damages, as pled in their complaint.

They came back and said, oh, well, here's our class definition, which consists of all those who purchased or otherwise acquired Acadia common stock during the class period and were damaged.

Well, that doesn't solve the problem. That still applies to both groups. And I should point out, this is yet

another attempt for them to rewrite their complaint in their reply brief, which is something we'll -- I'll speak to when we get to price impact.

So on this issue of individualized questions of risk tolerance, they clearly have alleged that at least some members of the class wouldn't have purchased based on risk instead of price.  So that runs afoul of *Basic* right there, the Supreme Court's opinion in *Basic* where it says, "An investor who buys or sells stock at the price set by the market does so on reliance on the integrity of that price."

So if someone's not relying on the integrity of the price making a purchase decision, they can't rely on the *Basic* presumption, the fraud-on-the-market presumption, and that group of stockholders, then, you're going to have to show individual issues of reliance.

Likewise, the Fifth Circuit decision in *BP 2*, I think laid it out very succinctly.  And if you'll indulge me, I'll just quote from that case, which is at page 691.

"Plaintiff's 'materialization of the risk' theory
cannot support class certification for two reasons.
Unlike the stock inflation model, the 'materialization
of the risk' model cannot be applied uniformally
across the class as *Comcast* requires because it lumps
together those who would have bought the stock at the
heightened risk with those who would not have.  It

also presumes substantial reliance on factors other than price, a theory not supported by *Basic* and the rationale for the fraud-on-the-market theory."

That's precisely what we have here.

And finally, as to their rebuttal report, I'll simply say they haven't set forth any specific methodology whatsoever. While they don't have to calculate damages, their expert simply came back and said, Hey, just trust me. I'll find a way to do this. I'll perform some type of cohort analysis, or maybe I'll just hire another expert and have him or her -- him or her do it.

But I just want to reiterate, it was their burden to set forth the model. His model didn't once mention the theory that's at issue in this case, the theory of damages, materialization of the risk. I think, you know, under *Comcast*, under *BP*, under *Basic,* we prevail.

Let me pause there and just see if your Honor has any questions.

**THE COURT:** No questions at this point.

**MR. ADAMS:** Should I --

**THE COURT:** Do you want to do rebuttal on this issue?

**MR. FREDERICKS:** Yes, and then we'll move on to price impact.

**THE COURT:** Okay. Thank you.

**MR. ADAMS:** Thanks, your Honor.

**THE COURT:**  Thank you.

**MR. FREDERICKS:**  Your Honor, I think that Defendants' reliance on paragraph 164 is about as big a red herring as you will find.  My guess is that you find that language in paragraph 164 in just about every securities complaint that's filed.

The point is all people who purchased in the defined class are the people that we want to be in the class.  And our proposed methodology of damages -- we only have one.  We only have one in this case -- is that everyone, regardless of the reasons they bought, are only going to get out-of-pocket inflationary measures of damages.  No one's asking for consequential damages.

I suppose I could divide our class into all sorts of different people:  Smart investors, stupid investors, sophisticated investors; investors who, you know, follow astrological charts.

The point is, in this case all we're asking for is one common method of damages for everyone.  It's a complete red herring that, oh, we're going to have different methodologies for other people.

And regardless of the term, "materialization of the risk" was used versus "corrective disclosures," materialization of risk and corrective disclosures are sometimes used interchangeably.  There always has to be some disclosure of the

truth or what the true risk was.

And all we're saying is here our method will address that by focusing on damages only based on the inflationary measure.  Mr. Feinstein, in contrast to what my colleague says, explains in great detail -- paragraph 101 to 102 -- of how it can be done in this case.

And they're really building an argument on a complete strawman.  There's one class, one method of damages, universally accepted.  And that can certainly be dispositive.

And I should also mention that there are plenty of cases -- your Honor's law clerk can find them -- where out-of-pocket damages are used in materialization of risk, to the extent this nomenclature is even important.  Although for the reasons Judge Alsup has said, it is really immaterial in this context.  Thank you very much.

**THE COURT:**  Thank you.  Counsel?

**MR. ADAMS:**  Thank you, your Honor.  Am I permitted to say anything to respond to that?

**THE COURT:**  Certainly.

**MR. ADAMS:**  I'll make it quick.

First of all, "materialization of the risk" damages and "corrective disclosure" damages are clearly not the same thing.  It's articulated in *BP 2*, *Amyris, AAC*.  It's a fundamentally different theory of damages.  So that's the one point I want to make.

Second, their expert, on rebuttal, says, "Oh, I can set forth a model, and here's what I'm proposing to do," even though he doesn't set forth any model whatsoever.

I think one thing I should point out is he didn't do that in his opening report. We didn't have an opportunity then to even respond to that because this was in his reply. And on the surreply, we were limited to price impact. So it's fundamentally unfair for him to just punt on his obligation to set forth a damages model that complies with Supreme Court authority in *Comcast*.

And then when we point that out, say, "Oh, oh, oh, sorry. Here's what I think I'll do," and we have no opportunity to respond.

And the last thing I'll say is about, sort of, the bundle of authority. We just cited a bundle of authority, including Supreme Court authority, on this issue. So that's the last thing I'll say about damages. Would you like me -- am I moving on --

**THE COURT:** Yes.

**MR. ADAMS:** -- to price impact?

**THE COURT:** Absolutely. Thank you.

**MR. ADAMS:** Yeah. So our position, your Honor, on price impact is pretty straightforward. I mean, we think that you should -- that we've shown that defendants have shown a lack of price impact as to the alleged misstatements in the

complaint, which rebuts the *Basic* presumption and requires individual inquiries into reliance.

Before I get into the details of that, I thought it might be helpful to talk through a little bit of background. But if you think that's not helpful, I won't do that.

**THE COURT:** It's up to you what background you want to go to. If it's in your briefs and it's a factual argument, I'm familiar with it. Whatever you want to do. I'll leave it to you.

**MR. ADAMS:** It was more just walking through this timeline that I think we handed to your Honor. I won't belabor it, but I think it's --

**THE COURT:** Sure.

**MR. ADAMS:** -- it's helpful. So since we haven't been here in a while, I thought it would be helpful to walk through this. And that is, you know --

Acadia's lead drug is pimavanserin. It was approved in 2016 by the FDA to treat hallucinations and delusions associated with Parkinson's Disease psychosis. And in late 2016, the company announced that it had positive results from a Phase 2 study for pimavanserin in Alzheimer's disease psychosis. Just so we're all clear, that's the 019 study that we referred to, or that the parties refer to in their papers.

So what happened? After the company announced those positive results, it set up a meeting and met with the FDA.

This is sort of the first point on our timeline here, which is May 15th, 2017.

And why did it do that?  Because it wanted to basically have a discussion with the FDA -- which is common; it's called the End-of-Phase-2 meeting -- to discuss a Phase-3 trial for pimavanserin but this time to broadly treat hallucinations and delusions associated with DRP.

So the company here was pivoting.  It had had the drug approved for PDP, got a positive study in the 019 study for DRP, but it wanted to get pimavanserin approved broadly for DRP.  So the entire purpose of this was to get the FDA's sign-off on the proposed Phase-3 trial to support that broad indication.

And so I just highlighted -- or at least there's a blurb here from the End-of-Phase-2 meeting minutes, and that's Defendants' Exhibit 18, which it says:

"The primary objective of this meeting to obtain feedback on the ACP-103-045 study" -- That's the Harmony study -- "as designed, in the context of planned, ongoing, and completed clinical studies with pimavanserin to support an indication of hallucinations and delusions associated with dementia-related psychosis."

So this is very important.  I can't stress this enough, that conducting a Phase-3 clinical trial is a massive undertaking.  It costs tens of millions of dollars and takes

years.

And so what was Acadia doing?  It was meeting with the FDA to get sign-off on its pivotal trial in order to move forward, because it didn't want to go down that road and end up with the FDA, at the time of putting forth a New Drug Application submission, saying, "Well, this trial wasn't designed.  We never signed off on the design."

THE COURT:  Right.

MR. ADAMS:  So at that meeting they discussed a number of things, and they agreed to a number of things.  And one was "the treatment of hallucinations and delusions in DRP as a potentially approvable indication."  That's in the End-of-Phase-2 meeting minutes.

They also agreed that the Harmony trial is an "acceptable and well-controlled trial for submission of a sNDA for indication of hallucinations and delusions associated with dementia-related psychosis."

And they also agreed that Acadia could rely on this single well-controlled trial, provided -- and I'm quoting -- "the findings are very persuasive," meaning "statistically significant with a very small Type-1 error and a finding that is clinically meaningful."

All of that is reflected in the End-of-Phase-2 meeting minutes.

THE COURT:  But they also said, "We have concerns with

the proposal to use a randomized withdrawal trial to establish efficacy." Correct?

MR. ADAMS: Correct. And if I pull up the full set of minutes --

THE COURT: I have them right here. I have it in front of me. They said:

"We agree with the proposed study population as long as subjects are stratified by their current clinical diagnoses. Labeling will reflect the actual composition and responsive of patients enrolled in the study."

Isn't that -- isn't what happened that they said, look, you can use one study, but we're going to look at the results for the subtypes?

MR. ADAMS: Well, so let's back up. First of all, I think you're reading things into what's in the agreement -- right? -- that aren't in the language of the agreement. Yes, they said -- and I can pull up the --

THE COURT: Sure. That's not what I'm reading. I mean, did they say it? Obviously, this is the dispute that -- or the discussion that you're having about what the agreement was, like what was the agreement. I think that's --

MR. ADAMS: Wait, there's a couple things I just want to unpack here.

THE COURT: Sure.

MR. ADAMS: Because -- and -- so first of all, we can debate all day about what Plaintiffs, I think, want everyone to believe that the labeling statement says.

THE COURT: Sure.

MR. ADAMS: Right? But where in this document, anywhere in here -- and I challenge Plaintiffs to show me -- does it say that you're going to have to show statistical separation by subtype? Right? Statistical significance. And you're going to have to have sufficient samples in your study by certain subtypes.

This is important --

THE COURT: Sure.

MR. ADAMS: -- because that goes straight to the design of the trial. There's no question that the FDA was going to look at the data by subtype. The company presented the data by subtype. The company gave all the data to the FDA. There's no -- there's no question that the population was stratified by subtype.

But the whole reason that they went to this broad indication for DRP, broadly, is because it was predicated on the belief that hallucinations and delusions from psychosis -- sorry -- from dementia-related psychosis, the treatment of those hallucinations was similar across the subtypes regardless of the underlying etiology of the disease.

One other point I want to make: They also -- it's very

difficult to identify exactly what group someone is in.

And so I'll just point to the first question in the End-of-Phase-2 meeting minutes where the company asked if the Agency agrees that "treatment of hallucinations and delusions in dementia-related psychosis is an approvable indication."

They say yes, "We agree that" --

**THE COURT:**  I have it in front of me.

**MR. ADAMS:**  Right after that, they say, "We agree that dementias need not be etiologically related for the common symptom of psychosis to respond."

Now, there's nothing that the company said at any time, before or during the class period, that Plaintiffs can point to that wasn't actually true.  They've now pivoted to this theory about labeling and that we've omitted -- right? -- we omitted something.

What did we omit?  They're saying we omitted telling people that labeling will reflect the actual composition and results of the patients enrolled in the trial.

This is a very different allegation.  And this is the point I want to make, and we made in our -- in our brief, that their complaint -- and we have to rely on their complaint --

**THE COURT:**  Sure.

**MR. ADAMS:**  -- basically when conducting our price impact analysis.  Their complaint says that "Defendants lied about the existence of an agreement."

I'm going to turn to --

THE COURT:  Sure.

MR. ADAMS:  So I got sidetracked from our background discussion, but we should talk about this because this goes straight to their, sort of, new theory of liability here.

Two things are clear about the FDA agreement.  One, there absolutely was an agreement with the FDA.  There's no question there's an agreement.  It's laid out in the End-of-Phase-2 meeting minutes.  And in their brief, their reply brief, they said, "Acadia and FDA apparently reached several agreements on May 15, 2027.  These agreements were documented in FDA's meeting minutes."  So I think we can agree on that.

Second, they were, in their complaint, alleging there was no agreement; right?  That the agreement did not exist.  And there's a whole section in their brief -- sorry -- in their complaint.

THE COURT:  Right.

MR. ADAMS:  Let me just turn to the --

THE COURT:  I have it in front of me.

MR. ADAMS:  Yeah, that says, "Defendants fabricate the existence of an agreement with the FDA."

What else does that mean?  It certainly doesn't mean that Defendants spoke truthfully about an agreement with the FDA.  But they forgot to mention something about labeling.  Or whatever -- they forgot to mention this sentence; right?  And

that is hugely important.

**THE COURT:**  Don't they address that in later paragraphs?  Don't they say that, well, we don't think there was an -- if there was an agreement, we don't think that -- we think, in essence, that it would have had to include the subgroups.  Those are, like, paragraphs 103 and 108 and 109.

Isn't there some discussion that's -- aren't those paragraphs somewhat consistent with their arguments?

**MR. ADAMS:**  Well, let's be honest.  Let's be clear. They can say whatever they want.  If there was an agreement, we think it would have had to say something about subgroups. Right?  But that's at the pleading stage.  We're at price impact now; right?

And the statements they're challenging as false, they're challenging as affirmatively false.  If they're not challenging them as affirmatively false, if they're challenging them like they are now, as false by omission -- meaning, yes, what you said was true, but you left something out; right? Don't you have to, at some point, let someone know what the omitted information is in order for it to be false?

I mean, how in the world can we conduct a price-impact analysis relying on their complaint if they never say what the omission is?  They had no problem saying, oh, you lied by omission about the Harmony study and the 019 study because you left out, you know, information by subtype.  You left out

certain things about the design; right?

That's in their complaint. And we address that in our price-impact analysis. I mean, of course none of it is true, but -- and so we fully refuted that. But my point is you don't get to proceed on a complaint that says, "You lied about the existence of an agreement. There was no agreement." Right?

Whatever they're characterization is, you have to look at what we said. They said that there was an affirmative misrepresentation about the agreement.

Let me just pull up -- I think this chart -- I think that they -- one second. I have too many pieces of paper here.

They clearly put together this chart, I think, to try and persuade your Honor that, oh, well, yes, even though we have a section that says you fabricate the existence of an agreement, even though we say "no such agreement," like, three or four times, because the Court -- and because we may have said "agreement" and "terms of the agreement," that that somehow encompasses, now, this omission. Right? Which I don't even see how that's possible.

Nowhere in the complaint do they use the word "omission" when it comes to "agreement," the FDA agreement with Acadia. Nowhere in the complaint do they say that you failed to disclose something about the agreement.

So honestly, I guess, I -- I'll say it again. How can we be asked to assess price impact as to this new omission if

it's never been mentioned until their reply brief?  I mean, it's patently unfair and prejudicial.  They could have amended their complaint; right?

They could have specified this new theory in discovery. We asked them about it.  We served requests saying, hey, which statements are you saying are false and why?  And they punted. They said, look, everything is in the complaint.  So we've had no opportunity to test this new theory of omission at the pleading stage.  And on this point, we cited the *NCAA* case where the Court, you know, allowed Defendants to move to dismiss.

Our expert didn't have an opportunity to do a full price-impact analysis now about this labeling statement, and we didn't have an opportunity to provide other expert analysis as to this price-impact question and the labeling statement -- for example, an FDA expert who can talk about what that statement actually means.  I know what they want it to mean.  Right?  But these words -- these words matter.

So I think it's important, your Honor, to go back and focus on what's actually alleged in the complaint.  That's what we have to operate on, and that's what we moved -- or sorry -- that's what we opposed class cert on, and that's the price impact analysis we did.

Look, if they're pivoting to, you know, a new theory -- which they clearly, clearly are.  They no longer say that no agreement existed.  They're not saying that we've affirmatively

lied about anything about the agreement.

They're saying whatever we said about the agreement was misleading because of omission.  "You didn't tell people this one sentence about labeling."  That's entirely -- an entirely different theory of falsity, and we should certainly have the opportunity to respond to it.

I just -- I want to point out your Honor's order, the motion-to-dismiss order at page 22.  This is Item 15 in their chart.  It says, and I quote, "The FAC's allegations that Defendants affirmatively misrepresented the terms of the purported agreement with the FDA."

Likewise, the reconsideration order at page 3, that's Item 21 in their chart, "Defendants affirmatively misrepresented the existence or terms of an agreement with the FDA."

That's not an omission theory and that's an important distinction because it has huge implications for price impact; right?  If we're addressing an affirmative misstatement like we did here on the FDA agreement, right, we're looking to see whether that statement was made prior to the class period.

Here, they alleged that we lied, affirmatively lied, about the agreement, and that resulted in the price increase at the beginning of the class period.  Our expert unequivocally rebutted that.  It couldn't possibly have impacted the price at the beginning of the class period because the company had disclosed long before the agreement and the terms of the

agreement.

And under the Efficient Market Hypothesis -- which we agree, they agree, that Acadia stock trades in an efficient market -- that information is already impounded into the stock price.  So they can't possibly-- you cannot possibly infer price impact at the -- based on a front-end price increase when the statement that they allege is false about having an agreement was made many, many, many times leading up to the beginning of the class period.  So that's one point I want to make on that.

Then can you infer price impact on the back end as to the FDA agreement?  Now, the problem here -- and the reason our expert didn't look at the back-end price decrease, whether you can infer price impact, is because there's no disclosure whatsoever coming out saying that there was no agreement.

And so he -- he had to take their allegation that there was no agreement, right, or that we affirmatively misrepresented an agreement as true.  But nothing on the back end with the price decrease can you infer from that that there was no agreement.

The FDA didn't say there was no agreement.  The company didn't say there was no agreement.  In fact, the company, after it got the CRL, reminded everyone there was an agreement.  And there absolutely was.  So this whole issue is now moot about whether or not we've rebutted price impact as to the existence of an agreement we clearly have.  They agree there's an

agreement, and we agree that there's an agreement.

The only thing left now is they're arguing, hey, we now have this omission theory.  Okay.  Well, if you -- if you have this omission theory, we should have a chance to respond to that.  We can't possibly divine what their theory is if it's not in their complaint and they won't tell us.  And a second point on this -- and again, this is a theme that's percolating throughout my remarks.

So they bring up this brand new omission theory of liability based on the agreement.  And while we're on that subject, they bring up a second new omissions theory, right, which is nowhere in the complaint.  This whole issue about priority review; right?  That's entirely absent from the complaint.

And again, for the same reasons we didn't have an opportunity to address this omission theory as to the labeling statement in the End-of-Phase-2 meeting minutes, the same is true about priority review.  Again, it's unfair.  If they wanted to amend their complaint, they could.  They've had these documents.  They've had the End-of-Phase-2 meeting minutes for almost a year.

And so I guess I'll just pause right there and see if you have any more questions about --

**THE COURT:**  Not at this time.

**MR. ADAMS:**  -- about that.  But I feel like -- so on

the FDA agreement, the existence of the FDA agreement, we've unequivocally shown that there can be no price impact.

If your Honor is inclined to entertain this new omission theory, even though the deadline to amend pleadings has passed, then fine. We can go down that road. But we would ask that we be able to move to dismiss at minimum, test that theory on the pleadings. If they survive, then we'll have this price-impact discussion as to this omission theory.

Let me just touch base briefly, then, on the price impact argument for the Harmony and the 019 study. And this one, I think, will be pretty short.

So the plaintiffs here don't dispute now that the information about Harmony and its design and results was disclosed. It absolutely was disclosed. In fact, it was disclosed many times but, most notably, on December 4th, 2019.

I think if you go back to this handout that I gave you, you can look at pages 5 and 6. These are just two pages from, like, the 40-page dec. that the company presented at CTAD in San Diego, presented at this conference. After that it had an investor call with key opinion leaders and a Q-and-A, presented this entire dec. and then posted it on their website. And so I don't understand how they can allege at all that the information about the design and results of the Harmony trial was not disclosed.

They're relying -- they have to, because if you're

saying that you didn't disclose something -- so maybe I should take a step back.

Would it be helpful to talk about, sort of, front-end price increase and back-end price decrease and how to infer price impact?

**THE COURT:**  I leave it to you, Counsel.  Whatever you wish to discuss, I leave it to you.

**MR. ADAMS:**  As to an omission, the reason that's different than an affirmative misrepresentation is because they're essentially arguing a price-maintenance theory.  Right?

You're not going to see -- if we failed to disclose something negative -- and here they're saying we failed to disclose negative trial results or a negative design about the Harmony study -- you're not going to see a price increase on the front end.

What you would see if it's negative information, or you wouldn't see, is if we had disclosed it, you would see a price drop.  So the only way to infer the inflation associated with an omission is on the back end; right?  You have to look at the price drop, look at what was disclosed, and make a determination as to whether that increase and the information disclosed, you can infer that the omission caused inflation, and therefore there's price impact.

Now, if the omitted information gets disclosed before the price drops, the price drop can't possibly be related to the

omitted information.  It's impossible in an efficient market; right?  Because in an efficient market, all information is incorporated into the stock price.

So our expert showed unequivocally that all the information about the Harmony design and its results that they're claiming we failed to disclose was disclosed prior to March of 2021, which was the deficiency letter and then, a month later, the CRL.  The same is true for the 019 study, which, by the way, was published in two peer-reviewed journals, I think back in 2018, like three years prior to the Complete Response Letter -- maybe I should speak into the microphone -- prior to the Complete Response Letter and the March deficiency letter.

And, your Honor, I'll just say they don't rebut any of that.  They don't provide any evidence to the contrary.  They basically concede that this information is out there; right?  Their only argument is, oh, well, you know, we think you should have to -- to examine that, you know, in context -- or you should have to piece that together with the FDA agreement.

But wait.  Let's take a step back, because that has no -- that basically has no basis in economics or the law.

So if the information is disclosed, it's incorporated into the stock price.  If the subtype information was disclosed, which it unquestionably was, it's incorporated into the stock price.

Now, if there's some other lie that defendants are

making -- which, according to Plaintiffs, we're lying about the agreement -- okay, well, if that lie gets remedied, will that impact the stock price?  Yes.  And could that rely on all the other public information that's out there?  Yes, of course. Every time information is disclosed, market-makers and professionals are taking into account, now, the whole body of information.

But the point is if the omitted information is disclosed, you can't possibly have a fraud based on that omission, and you can't possibly have price impact based on a supposed misstatement by that omission.

Really what they're arguing is, oh, you lied about the agreement, even though this information was disclosed.  And so had you not lied about the agreement, investors would have changed their valuation of the likelihood of approval and so on.

Okay.  That may be.  I mean, we know that there's an agreement.  But if you accept the premise that there's a lie about the agreement, and if you reveal that there isn't, yeah, but that's -- that's price impact from the misrepresentation associated with the agreement, not with the omitted information. I hope I'm making myself clear.

*THE COURT:*  Thank you.

*MR. ADAMS:*  So I'm going to pause, if it's all right, let Mr. Fredericks go, and then respond to his comments.

*THE COURT:*  Sure.  Thank you.

**MR. FREDERICKS:**  For the record, I'm happy to walk down 14 flights of stairs, but I understand not everyone may.

**THE COURT:**  Sure.  We'll see where we are with the argument.  And the interruption will be about an hour, maybe less.  But if we need to go beyond that, we will.  We'll just take it, see how it goes.

**MR. FREDERICKS:**  Thank you, your Honor.

You know, I hardly know where to begin, because I think that Mr. Adams may be the only person who purports not to understand what this case is about -- notwithstanding, for example, everything we submitted in our demonstrative on Monday.

It's been clear from day one, literally from day one, that this case involved an agreement, whether there was an agreement or whether the client mischaracterized the agreement.

And as Entry 1 of my demonstrative indicates, Mr. Adams knew a year and a half ago, yes, that's exactly the allegation. He didn't have any problem with understanding that Rule 8 allows plaintiffs to plead in the alternative.

And what's more troubling than he didn't read our complaint terribly closely is that Defendants don't appear to have read your Honor's own opinion very closely, where your Honor repeatedly, throughout the motion-to-dismiss order and then again in the motion-to-reconsider order -- made clear that this case is -- either there was no agreement or Defendants misrepresented the agreement.

I guess not being content with the motion to reconsider, Defendants now want a third bite of the apple on the motion to dismiss, which I believe is overly generous on the part of any court. But he says, okay, well, even if we allege that we -- that the agreement was misrepresented, that's just sort of an amorphous omission. There was no omission alleged.

Well, in fact, if you look at Item 3 in our demonstrative, this is a quote from our amended complaint, paragraph 103, which your Honor flagged right away:

We allege, "Consequently, what happened based on the forgoing is quite implausible that a written or oral agreement existed between the FDA and Acadia. And even if there was a general agreement that the company could do a single adequate and well-controlled study, that agreement was obviously contingent on the data being supportive of the subgroups that Acadia sought to treat with pimavanserin."

If that isn't as clear as the nose on your face as to what we allege is omitted, I don't know how a plaintiff could be any clearer. In fact, this case, it's like manna from heaven, your Honor.

Because Plaintiffs are lucky when, without the benefit of discovery under the PSLRA, our theory of liability actually is spot on with how the facts are developed. Because what we alleged was the FDA denied your sNDA because it told you from

the beginning that the FDA was going to consider the subgroup data.

And lo and behold, when we actually get the complete response letter from the FDA -- this is the letter they issued in April and which, until this fall and the briefing on this motion, was as confidential as the May 17 minutes, which defendants have, again, until briefing on this motion, have deemed super sensitive and never made public.

When the CRL actually was produced to us, the FDA actually said in so many words, That's the primary reason we're nixing your Supplemental New Drug Application. It's because the subgroup data was a problem. And that was never disclosed.

And yes, Mr. Adams points to paragraph 15 of our demonstrative where it says, quoting your Honor, "The facts allegations the defendants affirmatively misrepresent the terms support an inference that Defendants acted with intent or deliberate recklessness."

But again, Mr. Adams is reading only one part of the complaint, one part of the pages that your Honor has already written on this motion. Because I'd like to draw the Court's attention to page 19 of your own motion-to-dismiss order, which I thought Defendants would have read and paid some attention to, where your Honor said, "There are no adequately alleged facts from which the Court can infer the descriptions of the Acadia studies were false." Okay, point to Defendants. "Further,

Defendants' interpretation of the data and results of the studies were plainly expressions of opinion."

But here's the key point. And again, it's right here in black and white in your Honor's own letter. "However" -- your Honor's own order. Your Honor goes on to write:

"However, even statements that are demonstrably true or expressions of opinion are nevertheless actionable if the statements omit additional material information whose absence makes the fact or opinion misleading to a reasonable person reading the statement fairly and in context."

There's never been any mystery as to what Defendants allege wasn't disclosed. It was that the FDA had told these folks from the beginning that the subgroup data was going to be important.

And then we get the minutes, which your Honor's already alluded to, the May 17 minutes. And what does it say? It says exactly the language your Honor was referring to:

"Yes, we agree with the proposed study population as long as subjects are stratified by their current clinical diagnosis, as proposed labeling will reflect the actual composition and responsive patients enrolled in the study."

I mean, we allege that this is what's omitted. And then finally, we get the super-secret document which says

exactly what we've alleged from the beginning. And Defendants, I just don't understand that they have the temerity to accuse us of abandoning our theory of the complaint, embarking on some new theory? I just don't even know how to respond to that kind of argument. I honestly don't.

Now, your Honor also picked up on something else, which is that Mr. Adams tried to read that language differently from how the FDA put it. And there was some colloquy between you and counsel. Maybe there's dispute as to what that means.

Mr. Adams says, oh, we didn't put anything in our motion papers as to what it means. Well, your Honor, we put in the Complete Response Letter from the FDA. So I think we know what the FDA thinks its language means.

We cited 21 CFR 201.57 in our brief, and I invite your Honor to look at it. Because it says very clearly that labeling in the FDA context -- it may be some other context and mean something else. But in the FDA context, where we're in, labeling includes any treatment indications and usage for which a drug is approved.

In lay terms, what Acadia saw in the sNDA and asked to approve was expanding the labeling for pimavanserin to include non-PDP groups. And obviously, the fact that the FDA was concerned about the subgroup data could not be more material. Nothing could be more material to the FDA's consideration of that issue.

And finally, your Honor, I do want to quote Defendants' expert, Dr. Stultz, who, in his deposition, went out of his way to say, "I'm really not an expert on FDA, so whether FDA agreement would have increased the risk of that and likelihood of that, I don't know because I'm not an FDA expert."

Even Dr. Stultz, when I asked him in his deposition -- this is the Stultz transcript at page 34:19 to page 35:7. I'd invite the Court to read it. It's almost humorous. I think it's Plaintiff's Exhibit 3. I asked him, "What is your layperson's understanding of labeling?"

And even Dr. Stultz, who's not an FDA person, he answered the question:

"My understanding is that it is important in understanding who can use the medication and what the medication is for and what the FDA approves the medication to be for."

Apparently, the FDA, the FDA's regulations, even Defendants' expert, all have one understanding of what labeling means. But it's Defendants who are now sort of coming in and saying, oh, you know, Plaintiffs have really misconstrued what labeling means. It means something completely other in this context.

And I could have begun this argument -- I'll say it now -- with reminding the Court what the standards are for price impact. It's Defendants' burden of proof. We don't have to say

anything on price impact.

They have to affirmatively disprove price impact, completely sever the causal link, say that none of their omissions or misleading statements had any impact at all on the $20 price rise or $30 price decline. I mean, the price rise up and price rises down are staggering.

And defendants make a comment in their footnote that, well, the size of these price rises shows only that there's some Acadia-specific news. Well, darn tootin' there's some Acadia-specific news. But it's their obligation to show that not one *iota* of either of those price movements had anything to do with, you know, essentially the fraud they perpetrated on the investing public here, which was to mislead investors as to what was, you know, important to the FDA.

So again, if Defendants -- I mean, we all killed a lot of trees on the briefing. I apologize, your Honor. But Defendants, I think, attach, like, 90 analyst reports, SEC reports, conference call transcripts, all of which they could have done on their motion to dismiss. And I don't really understand why, because it actually makes Plaintiffs' point that analysts were very interested, obviously, in what the FDA agreement was. They were interested in Harmony. They were interested, of course, in the company getting the approval of this New Drug Application.

But they admit that none of the stuff in this binder

discloses the key fact that this case has been about from the beginning. Nothing discloses that language from the FDA agreement. We'll call it "agreement," I mean "agreement" in air quotes, but the understanding.

Nothing discloses the language from the May 2017 minutes. Nothing. They don't even try to argue it was disclosed. Instead, they say it's a new theory. New theory? It's ridiculous. I mean, even courts under the PSRA say Rule 8, a short and plain statement of the claim, you don't need to plead evidence.

You know, what defendants are complaining about is, oh, well, we should file a new amended complaint every time we get more evidence that supports our theory. That's not the law. It's never been the law. Heaven help us if that were the law. We'd be filing new complaints every two weeks.

So we set forth a theory of liability in the case: Omissions, misleading statement theory. Defendants' demonstrative, he went through a couple of statements. I just was making some notes.

An August 19th statement, the Court addressed that in its motion-to-dismiss order, page 15. November 17th, the Court addressed in its motion-to-dismiss order at page 16. Same for the January 12 order. The August 19 statement addressed in the motion-to-dismiss order, page 15; November 17, 2020, statement addressed in the motion-to-dismiss order, page 16 of the Court's

prior mission-to-dismiss order.

The Court's already held these statements are false and misleading for reasons that I think only Mr. Adams doesn't fully understand, and for reasons I don't understand.

So in keeping an eye on the clock, what can they fall back on?  We've talked about how they're saying we've abandoned our theory of the case, some brand new theory that no one's ever heard of, they weren't even allowed an opportunity to respond to.  On the last point, of all of Defendants' statements, that statement is the most demonstrably false.  They got a surreply on the brief.  They got to file a surreply rebuttal report from their expert.  You know, they've had an opportunity to reply.

But the bigger point is everyone knows what this case has been about from the beginning, including Mr. Adams, if you believe Entry No. 1 from our demonstrative.

So let me go to what I think is their other bogus argument here.  And I find it really frustrating to have to deal with because they have all this -- I mean, I probably shouldn't call it "gibberish."  I'd just say they have all this stuff about efficient market, it's truth-on-the-market, and everything was disclosed.  And, you know, they had this problem in that the language from the FDA minutes isn't disclosed.

So they say, oh, we have a solution for that.  The FDA agreement, whatever was said about the FDA agreement, is in a box over here and could have no impact on an investor's

understanding of the significance of the Harmony study results or the trial design.

Well, your Honor, let me just read something from their brief, and then I'll read something from your own order.

"Plaintiffs insist that Defendants' disclosures about the Harmony study design and result cannot be analyzed separately from the disclosures about Acadia's agreement with the FDA because the two are necessarily interrelated."  We agree.

Defendants go on to write -- this is their surreply at page 4 to 5.  I invite the Court to look at it.  Defendants go on to say, "This position of Plaintiffs of course is a cop-out."  A cop-out.  Plaintiffs argue the issue was never about the design and results in isolation but rather --

THE COURT:  You have to, please, speak slower.

MR. FREDERICKS:  I'm sorry.

-- "but rather Defendants' statements about the design and results coupled with misstatements about the FDA agreement.  But that is simply a roundabout way of admitting that no alleged omission about Harmony's design or results inflated Acadia's stock price."

Well, that's -- that's quite a mouthful from Defendants.  Of course it's not an admission.  But this reference to "cop-out," your Honor, the legal argument that defendants expressly called a cop-out was the hornbook legal

principle that even literally true statements must be read in context to assess whether they are nonetheless materially misleading.

When Defendant -- when Plaintiffs were making this proposition in our brief, we were -- we were quoting your Honor's opinion. We were quoting your Honor's opinion at page 2, I think -- I'm sorry -- at various places.

You can look at our reply brief at 2 and 13 through 16 which they say is a cop-out. We were quoting the principle that your Honor correctly identified. And it's not a cop-out. It's simply the law. They don't like the law. I guess they want to re-litigate this for a third time.

But of course it's just a matter of common sense that how investors are going to look at the study results is going to depend on how they've been conditioned to feel about the FDA agreement and the study's design. They're all intertwined. Simply stated, the results of Harmony were only relevant to investors to the extent that, taken as a whole, they impacted the odds of FDA approval of the sNDA.

Again, what other factors support analyzing these matters collectively and in context for price-impact purposes? This novel approach that we and, I think, your Honor have of looking at statements in context and in conjunction

We have the Feinstein rebuttal report. We have the analyst reports that we cite in Plaintiffs' own reply brief,

pages 14 to 16.  The analysts themselves are talking about, well, the results are this; but the assurances that we understand the managers got from the FDA, we aren't too troubled about.  So analysts are looking at things in contention.

And again, best evidence of all is the FDA's own Complete Response Letter where they say, You know why you got the sNDA?  Because you didn't listen to us when we said we would need subgroup data, and we'd be looking at it and that would be highly relevant.

And I confess, they didn't say "highly relevant," but they put it in the minutes.  They make -- presumably, they wouldn't have put it in the minutes if they didn't mean what they say.  So I think that's sufficient to say the FDA agrees it's relevant.

So again, we have a huge stock price up and down at the front end, at the back end.  I don't think I need to belabor for the Court the nuances of front-end price impact, back-end price impact.  Suffice it to say that you can show it either way. We've showed it both ways.

Defendants haven't even rebutted it more than -- they haven't rebutted it at all.  And they basically say, well, it's our burden to show how much these price increases up and down are due to misrepresentations and omissions.  Your Honor, it's not our burden.  Case law is clear.  It's their burden on price impact, and it's their burden to sever the causal link

completely.

You know, I -- there's probably some portions of these price increases up and down, some of which Mr. Feinstein's -- Dr. Feinstein discusses in his rebuttal report, which he can't get under the out-of-pocket damages method because, as Dr. Feinstein explains, there's always some residual risk that the FDA is going to, you know, reject an sNDA.

But as he explains, you can figure out what that residual risk is, and you can measure the difference with what the but-for price would have been if the market had fully understood the risk, and the actual inflated price.

And again this goes back to the GAB model *[ph],* only going to get that. There's going to be some part of that delta which we don't get. But we're certainly entitled to -- they haven't even shown how we aren't entitled to any bit of it.

So you know, again, I've been trying to think of analogies. I mean, sort of like you go into baseball stadium and look on the scoreboard and see runs hits and errors. And if you're someone from Britain, where the game is rugby or cricket or whatnot, you look at runs hits and errors and say, Oh, runs hits and errors, those might be important.

You have to know the rules of the game to know that that really what counts at the end of the day is runs. Hits and errors are just sort of incidental things that they put up on the scoreboard. But it's almost like saying here that, you

know, just because we gave the subgroup results at CTAD, people should understand what they mean.

And let me -- we still have time available to address this argument, because I think it's -- it's perhaps one of their more colorable arguments.

They say, oh, well, we went to the CTAD conference, and we presented all the subgroup data. So doesn't that show that there's no price impact?

Well, they disclosed the raw subgroup data. But as we say in our brief, when they did so, they affirmatively concealed and misrepresented the significance of the subgroup data. They did it on two pages. If you look at the slide presentation that Mr. Adams referred to, how is the subgroup labeled? How is that subgroup data labeled on page 27 or 28 of the 33-page slide presentation?

It's described as data that's being part of a mere exploratory analysis by most likely clinical diagnosis. It's just exploratory analysis that Ms. Foff, on behalf of the company, expressly told her audience to avoid overinterpreting the data because of its limitations.

You know, if you're telling people the data is not important, people are probably going to think the data's not important. And so if you tell them it is important, then I don't think we'd be in court today.

But the truth was the facts from this May '17 minutes

were never disclosed, and so the fraud was never dissipated. And so they're making this weird sort of truth-on-the-market argument on facts -- on a factual situation where everyone has to concede the fundamental truth was never disclosed.

It's a little bit *Alice in Wonderland*. Dr. Stultz's analysis is a little bit *Alice in Wonderland.* Dr. Stultz himself, generally, pains to say, "I don't know anything about ADA *[sic]* process or procedures. I'm not an" -- he doesn't know what the importance of this information is, other than he knows that labeling has to deal with whether you're going to get expanded usage. He is at least smart enough to know that, counter to what Defendants seem to be arguing in their last brief.

I don't know how you can prevail on truth-of-the-market-type argument when it's uncontested that material omissions were made, uncorrected. I don't see how you can possibly be arguing that it's a cop-out, let alone wrong, for this Court to find that the impact of statements has to be judged in context.

You know, I mean, it's as simple as this: If I tell you I'm a car company, and I've just manufactured 100,000 cars more than estimated, maybe that's good news. Maybe it's disappointing news. Don't you need some context to know whether that's good news or bad news?

And, you know, in fact, at one point -- I'll try to

find it in Mr. Stultz's testimony.  He was asked, "Why did Acadia's stock price rise?"  This is in his testimony, page 93, line 7, to 93, line 13:

"Why did Acadia's stock price rise?"

He said, "The company was conducting a trial.  With a trial, the results could be negative; they can be positive.  And here, it turned out they were positive."

Oh?  Really?  What's his context for that?  How do you even know whether the results were negative or positive unless you know the terms of the FDA's understanding as to what it wanted?  You know, we think that the Harmony study results were not positive.  We believe they were positive in some respects, but otherwise they were fatal to the application.

Mr. Stultz is absolutely right.  Were they negative, positive -- if they're positive, they should go up.  If they're negative, they should go down.  But, you know, he doesn't have any clue as to whether these results were actually positive.  He is just assuming they're positive because the top-line numbers were great.

Well, their expert did exactly what we submit the market did here.  The market said let's look at the top-line results.  They're great.  They're positive.  That's all I need to know.  Material omissions, irrelevant, not necessary context.

We respectfully side with your Honor's

motion-to-dismiss order, your Honor's motion-to-reconsider order, the three or four Ninth Circuit cases, and U.S. Supreme Court case that your Honor relied on.

The context of this information matters. It's as plain as the nose on your face that what happened in this case was the stock went up because defendants misrepresented the importance of, quote, "positive data," and it came crashing down when the FDA said you didn't listen to us when we said the subgroup data was important.

I can't imagine a weaker case for lack of price impact than this one. As Justice Ginsberg says in *Halliburton*, concurring, the burden of price impact in a normal case should be a pretty slight one. So Plaintiffs, you know, I'm not really concerned about.

This case, the notion that a price-impact argument was even brought, I find questionable. But the motion for class certification should clearly be granted. All of Defendants' objections to class certification should be overruled.

Unless the Court has any specific questions, I'm happy to close there.

**THE COURT:** Sure. Mr. Adams, you can come to the podium. How much time do you think you have? If we have to come back, we can come back. Obviously, there's a fire drill at 3:30.

**MR. ADAMS:** I don't know what time it is now.

**THE COURT:** It's 3:15. I understand the motion is an important motion, and I don't want someone to feel like, well, they had a fire drill, and I didn't get to make my presentation. So what we can do, depending on how much time you have, and if you want more time, we'll take more time.

The fire drill, I think, starts at 3:30. If you want more than, you know, 5 or 10 minutes, we can stop at 3:20, you can exit the building, you can probably use the elevators to exit the building. And then my guess is, you know, they take about 40 minutes or so, 45 minutes. Then we'll come back, and we'll pick up where we left off.

**MR. ADAMS:** Why don't I go, and if we get close to the fire drill, then we can come back.

**THE COURT:** Fair enough.

**MR. ADAMS:** Is that all right?

**THE COURT:** Sure. I don't want someone to feel like they didn't get time to, you know, make their argument. It's an important motion, and if we need to come back, we'll come back, you know, after the fire alarm.

**MR. ADAMS:** Understood. I appreciate that.

So I guess the first thing I would say, your Honor, is Mr. Fredericks spent a lot of time up here talking about the motion to dismiss and what you found in the motion to dismiss.

We're way past the motion to dismiss; right? The ruling on the motion to dismiss, your Honor thought they had

pled enough to clear that hurdle. Now we're at the stage where there's actual evidence. So all this talk about, oh, well, you found X or Y at the motion to dismiss, fine. I'm not disputing the motion to dismiss. Right?

What we're now disputing is whether information was actually disclosed or not. And this isn't some kind of game; right? They're relying on a presumption -- the *Basic* presumption; right? -- which is predicated on the Efficient Market Hypothesis. That means something. That means if information is disclosed, it's impounded in the stock price.

He can talk in circles about context and everything else; right? But if it's disclosed, it's impounded in the stock price; right?

Now, if the -- if investors -- and by the way, there's millions of sophisticated investors looking at this data; right? And it's not like the company -- oh, the company buried it because it wrote at the top, "Exploratory Analysis."

Analysts replicated these exact charts in their analyst reports; right? The reason it wasn't the first page is it's not the primary or the secondary end point of the study. Right? What does that mean? Those are the two key end points to show efficacy; right? If the company was so intent on misleading everyone, why would it even show the data?

So let me just say this about -- let me just say this about disaggregation. So there's all this sort of discussion by

Mr. Fredericks about, you know, context and everything else and how you -- you know, you can't disaggregate one thing from the other.

But this whole analysis of price impact involves disaggregation. It requires looking at what information was actually disclosed and could that impact the stock price, which is precisely -- precisely what we did.

This idea that, yes, you could have disclosed the subgroup data, but the market misinterpreted the value of that data because you lied about the agreement, that's similarly the argument they're making. I hear that. And that's certainly possible.

But guess what? The price impact then is from the lie about the agreement. There no lie based on the failure to disclose the subgroup data, because it's disclosed; right? The fact that the market may have misapprehended -- I'm not even saying they did because I don't think anyone lied -- is based on the information that they're saying was concealed. The Harmony data was not concealed. So that's Point No. 1.

The statistical significance point, too, is absurd; right? It certainly isn't enough that you say there was a statistically significant increase at the beginning and there was a statistically significant decrease at the end; right? Every single stock-drop case involves a stock drop at the end; right?

If it's statistically significant, what can you infer from that? You can infer that the company's specific disclosure, whatever that was, impacted the stock price. Or at least, basically, if it's statistically significant at 5 percent, there's only a 5 percent chance that you would see that kind of stock drop by pure chance alone, which allows you to infer that it must have been some reaction to the company's specific information.

But that still didn't tell you whether that reaction, whether it's an increase in the beginning or a decrease at the end, is responding to a misstatement. I mean, their expert in their reply -- sorry -- they acknowledge as much. They say there's no dispute that something Acadia-specific was impacting Acadia's share price September 9, March 9, and April 5.

Agreed. The only dispute at issue is what caused the impact. That's exactly why we're here today. And so the idea that the stock price increase on September 9th -- because it was significant, that must be related to the fraud -- they haven't produced any evidence to suggest that. We've produced tons of evidence that suggests that's not true.

First of all, it cannot be impacted -- it cannot increase based on their theory of omission; right? It cannot. Because that's a price maintenance theory. You didn't disclose something bad that otherwise would have caused the stock to drop. So the only way you could have a statistically

significant increase is if you said something affirmative on that day; right?

Now, the question is what was said on that day and whether it was false or not.  A lot of things came out on September 9th.  The company announced that it was stopping its trial early.  That's incredible.  It had an interim stopping point that the FDA agreed to in the protocol.  That level of significance is massive.  It was .0033.  The normal level of statistical significance is .05.

So what happened?  The company is halfway through the study.  It does a pre-planned interim look -- actually, an independent monitoring company does a pre-planned interim look at the data, and it's so significant on the primary end point that they recommend stopping the trial.  Certainly, that's good news; right?

They allege, well, yes, there's good news, but that must have been because you lied about the agreement because you said something about the agreement on that day.  Well, what we said about the agreement on that day, we said prior to the class period.  That couldn't possibly have impacted the stock.

I mean, this isn't a game of semantics.  It's economics.  It's why we both have an economics expert here. It's basically a corollary of the Efficient Market Hypothesis. If the market is incorporating all public information, then that information, if it's already been disclosed, is incorporated.

So let me -- one other thing I heard Mr. Fredericks say during his comments is, like, you know, how could we have been any clearer all along in our complaint and so on about this is the omission theory about the label.

I'll tell you how you could be clearer:  State a fact. You didn't one time suggest that there was an omission associated with the FDA agreement.  We literally asked them in discovery, Please tell us what is omitted -- or, sorry -- just why anything is false.  Because now you know there's an agreement.  You got through a motion to dismiss basically saying there's no agreement.  Now you know there clearly is an agreement.

They wouldn't tell us.  They said, "Just look at the complaint."  Well, there's nothing in the complaint about this labeling thing.  There's nothing in the complaint at all about priority review; right?  This is a complete 90-degree turn from where -- from the allegations that they made.  And so that's the third point I want to make.

The fourth point I want to make is he spent all this time talking about the FDA agreement and how we lied about the labeling, which we've talked about now *ad nauseam*, but nothing about all the data that we submitted on Harmony and on 019.

It's out there.  In fact, ironically, if we're going to go back to the motion to dismiss, all of the information that they put in their complaint is from public information.  It's

literally based on the information that the company disclosed.

So I -- you know, if anyone is at a loss, I'm at a loss.  You cannot -- they cannot go forward on a theory of omission based on information -- and now I'm talking about the Harmony and the 019 data.  They cannot go forward on a theory of omission that you omitted this data, and therefore you misled the public, when it's -- when it's public.

If they've got some other theory, right -- oh, no, no, no, you said something else, right, that led me away, or you said something else and concealed something else, or you lied about something else.  Fine.  But there is -- there's absolutely no price impact associated with the Harmony and the 019 information.  They didn't submit any evidence to rebut all the evidence that we submitted.

And I'll just say one more time on the -- on the piece about the omission, I don't understand -- there's heaps and heaps of information in this End-of-Phase-2 meeting minutes.  In fact, I recall in the briefing that in a footnote, they said why didn't we disclose, like, the whole back-and-forth between the agency in connection with -- I think maybe it was Question 2(a).  I think your Honor mentioned this early on, when the FDA was expressing some concerns about the randomized withdrawal trial.  This is starting on page 64 of 100, Document 117-4.  So this is the End-of-Phase-2 meeting minutes.

And that Question 2(a), "Does the agency agree with the

proposed overall study design?"  And the first response there was, "We have some concerns."  But then the meeting goes on, and there's a long discussion about that.  And the conclusion is:

"After the discussion, the Division agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of an sNDA for the indication of hallucinations and delusions associated with dementia-related psychosis."

**THE COURT:**  Excuse me.  Was it your view, then, that the agreement was that the FDA agreed to rely on top-of-the-line results, that that was what they were going to look at?  Is that your understanding?

Like with the agreement, was it your view, or is it your view that the agreement that was done with the FDA was that the FDA was going to rely on the top-of-the-line test results, that that's what mattered to the FDA?

**MR. ADAMS:**  My interpretation of the agreement is that the FDA agreed that you could conduct this pivotal trial --

**THE COURT:**  Right.

**MR. ADAMS:**  -- with its primary and secondary end point; right?  And if, as the FDA said in response to Question -- sorry, I'm getting -- Question No. 3, "If you're going to rely on this study for your sNDA, the findings must be very persuasive."

**THE COURT:** When you say the "findings," are you -- and maybe it's a term of art. But it's used as sort of the top-of-the-line results versus the subtypes.

Do you understand my question?

**MR. ADAMS:** I understand your question, but let's take a step back. Because the FDA can do whatever it wants.

**THE COURT:** Sure.

**MR. ADAMS:** Right? The FDA is never going to agree in writing, "If you conduct this study and you hit the primary and secondary end point, we will grant your application."

**THE COURT:** That's not at all what I'm asking.

**MR. ADAMS:** Right.

**THE COURT:** So what I'm asking is, is it your understanding that this agreement, the agreement with the FDA, that the FDA was talking about the top -- the top of the line, that they approved this single study because they were willing to accept the top-of-the-line results?

Do you understand my question?

**MR. ADAMS:** No, I don't. Because they approved this study, right, with a primary and secondary end point, which the primary and secondary end point didn't have anything to do with the subgroups. Right?

**THE COURT:** So I guess in your view, then, does the agreement, do the subgroups have anything to do with the agreement? Was the FDA --

**MR. ADAMS:** No.

**THE COURT:** Did the FDA express any concern, or was it your thought, or your client's thought, that the FDA would approve -- or they were approving the study, and they were going to look at the top-of-the-line results, that that's what mattered?

**MR. ADAMS:** Our client's thought was if they approved the study, right, with a primary and secondary end point approved by the FDA, and if we achieved those with a very high level of significance, which they did, and no safety concerns, right, that there was a very high likelihood they would get approval.

You cannot -- no one was like, oh, it's a hundred percent sure.

**THE COURT:** I understand.

**MR. ADAMS:** And no one at the company thought, oh, the FDA is never going to look at the subgroup data. Right?

The company submitted the Parkinson's Disease data. There's thousands upon thousands of pages that get submitted with this application.

**THE COURT:** So is it the case then that your client's view is that the FDA changed -- sort of changed their mind? They were not consistent with what they told your client that they -- they didn't emphasize or indicate that the subgroups were important, and then when they denied it, they said your

problem is with the subgroups, and so the FDA changed their position?

**MR. ADAMS:**   That's precisely what --

**THE COURT:**   And that's where I think the dispute is, or certainly the -- because I think the plaintiff reads this -- reads these minutes and comes to a very different conclusion.

**MR. ADAMS:**   I understand.

**THE COURT:**   Right.

**MR. ADAMS:**   I just think if they're going to make this argument and this theory of omission, we should have a chance to respond to it.

**THE COURT:**   Right, right.  I understand that argument's been made as well, and I understand their argument as well that they think they have made it.  But that's why there's litigation.

**MR. ADAMS:**   I guess I would say, just to finish up --

**THE COURT:**   You don't have to rush.  We're at this point where I think we don't need to --

*(Interruption in proceedings.)*

**THE COURT:**   There we go.  You have to exit the building.  The stairs are on the left.  Exit the building, and then as soon as you can come back, come back.  Leave your things there, and we'll finish the conversation when you come back.

*(Recess taken at 3:30 p.m.)*

///

***WEDNESDAY, FEBRUARY 28, 2024, 4:29 P.M.***

**\*\*\***

**THE CLERK:**  Recalling Matter No. 4, 21-cv-762, City of Birmingham Relief and Retirement System, *et al.,* vs. Acadia pharmaceuticals for motion hearing.

**THE COURT:**  We're all back.  Counsel, you can resume your argument, Mr. Adams.

**MR. ADAMS:**  Thank you very much, your Honor.  Why don't I just pick up, I think, where we left off --

**THE COURT:**  Sure.

**MR. ADAMS:**  -- before the fire alarm.  You were, I think, asking me about Acadia's view of the agreement with the FDA.

**THE COURT:**  Correct.

**MR. ADAMS:**  And so let me just first say, I mean, Acadia's view was they met with the FDA at the End-of-Phase-2 meeting.  They agreed on a design for this trial.  It certainly included subgroups.  It's in the design.  It's in the statistical analysis plan.

But the primary point and secondary point were overall not by subgroup.  Again, I don't think the company thought the FDA wouldn't look at the subgroup data.  Right?  The issue was when the CRL came out, the justification, or at least part of the justification, for denying the application was not showing statistical significance by certain subgroups and not having

sufficient sample sizes, which is a design issue.

That's the big disconnect; right? And that's why I think that was the focus. And that's why I'm sure the company was upset, and they hadn't heard anything about that in the four years, right, since the End-of-Phase-2 meeting.

They could -- if the FDA is saying, oh, well, you didn't have enough people in this subgroup, or you didn't show statistical significance by a particular subgroup, it's because when they designed the study, it wasn't powered to do that. You have to recruit enough patients in a particular subgroup and make certain assumptions about the Type-2 error in order to try and show statistical significance. And that wasn't part of the design.

So I guess -- I don't know if that answers your question. You had asked something about top-line results or top-line data. I wasn't really clear on --

**THE COURT:** You've answered my question.

**MR. ADAMS:** -- what you were asking about.

But in any event, sort of all this back-and-forth about the labeling omission and -- I mean, I think we're essentially arguing the merits, and we're actually here on class cert. Right? So obviously, we disagree with Plaintiffs and their characterization and their position.

But if the Court is inclined to sort of let them move forward with this theory, I think we should have an opportunity,

one, at least to move to dismiss, and if the Court is not going to give us that opportunity, to fully brief this issue.

It clearly was not in the complaint. Despite what Mr. Fredericks said, it's not patently obvious; right? It's the whole reason why we sent all this discovery to them asking them what is their theory.

Because once we got past the motion to dismiss, we knew there was an agreement, right, so this whole "existence of an agreement" thing was no longer going to survive. They were going to have to concede that there was an agreement, so they were going to have to pivot to something, and they never told us. It's not in the complaint.

**THE COURT:** Excuse me for interrupting. It's your understanding that they're arguing -- that their complaint was that there was no agreement, that -- completely fictitious that there was an agreement, and that was their only claim that -- so if you had an agreement, without regard to what it was, if you had an agreement on anything, then their claim would fail;

That's the only claim they have, is they said you -- you said you had an agreement, you didn't have an agreement, and it's without regard to what the words of the agreement were?

**MR. ADAMS:** Not quite. But certainly, if we said, "Hey, we have an agreement to do this study," and it just simply did not exist, right, that would be --

**THE COURT:** Right.

**MR. ADAMS:** -- one such -- that's part of their theory. Because they literally say, "You fabricated the existence of an agreement."  I don't know what else that means.

**THE COURT:**  Right.

**MR. ADAMS:**  The second would be if we say you have an agreement, right, you've affirmatively misrepresented the agreement.  You said you had an agreement, but it's false.

Where, for example, I say, hey, you know, you and I have an agreement to go skiing next weekend.

**THE COURT:**  Sure.

**MR. ADAMS:**  We don't have an agreement to go skiing; right?  We have an agreement to go, I don't know, to Mexico; right?  It's what we literally said was not true.  But here, that's not what they're alleging.  Like if --

That was the point of our demonstrative, I think on pages 2 through 4.  It wasn't to talk about, like, what happened at the motion to dismiss.  It was to show that, literally, the words that the defendants were saying about the agreement track the various agreements that were made with the FDA in the End-of-Phase-2 meeting minutes.  That's the whole point.

And so if they're not alleging what you literally said was false, the only thing -- and that's what we -- how we interpreted the complaint.  You're affirmatively misrepresenting that you have an agreement.  No such agreement exists.  There is -- they fabricated the existence of an agreement.  If you're

going to allege an omission, you've got to say why whatever we did say was false. And that's absent.

You can't have a false statement by omission without explaining what the information that was omitted that renders it misleading.

THE COURT: What about -- what's your interpretation of paragraphs 103 and 108 of the complaint?

(Pause.)

MR. ADAMS: First of all, 103 is not focused on any statement. Right? If there was an agreement that they could do a study, it was obviously contingent on the data being supported; right?

THE COURT: Sure.

MR. ADAMS: I'm saying look at the statements that they're alleging are false. Fine if they're going to say that. It's obviously contingent. But where's the -- what's the omitted fact that renders something that we said false?

I can make a conclusory allegation like this one in paragraph 103. But if you go to paragraph -- let's go to paragraph 109 --

THE COURT: Okay.

MR. ADAMS: -- for example.

THE COURT: Sure.

MR. ADAMS: These are the actual statements. They highlighted one. It says, "I would like to remind that you as

the end of" --

THE COURT:  I have it.  I just want to you read it, because I'm afraid you're reading it very quickly.  But I have it in front of me.  So if you want to point me to what you want me to -- or say whatever you want to say, but just make it so -- speak a little bit slower.

MR. ADAMS:  Okay.  I'm just pointing, for example, to paragraph 109.

THE COURT:  Okay.

MR. ADAMS:  Right?  And if you go to page 4 of the demonstrative, so that highlighted language, right --

THE COURT:  Right.

MR. ADAMS:  -- is in this very first sort of subpart; right?

THE COURT:  Right.

MR. ADAMS:  What we're saying is tracking the agreement.  So I don't know.  I'll ask Mr. Fredericks.  Is he saying when we say that at the Phase-2 meeting with the FDA, "We confirmed for our supplemental NDA submission in DRP we could rely on a single well-controlled study whose results were both statistically and clinically persuasive," is that false?

Because it's not false, because it tracks exactly what the agreement was in Question 3.  What they're alleging now is no, it's not false, those language -- you did reach an agreement with the FDA on that.

But I'm assuming they're saying you should have said, by the way, there was this -- there was also a statement about labeling that you needed -- that the label would reflect the actual results and composition of the trial; right?  That's a much different thing.

How in the world am I to divine that this statement is false because of that if it's nowhere alleged?  And we're here at class cert on the complaint that they pled.

And if there was any ambiguity, your Honor, we tried to resolve it.  Because like I said, we knew they weren't going to be able to say there was no agreement.  We've known from the start that was made up.

And so we served discovery asking them, hey, what is it that you're alleging?  Why are you saying these statements are false?  Right?  They just said, "Look at the complaint."

So that's where we are.  We're looking at the complaint.  So I guess I would say again, I don't want to argue the merits of their new theory.

**THE COURT:**  I don't, either.

**MR. ADAMS:**  I just think we should have the opportunity to dismiss.  And if your Honor is not inclined to do that, we should have an opportunity to fully brief price impact as to this new theory -- and, by the way, the new priority review theory.  That's completely absent from the complaint.  In fact, I don't even know which statements they're alleging are false

based on that.

Presumably, it would just be one where we're talking about getting standard review instead of priority review. But those statements aren't challenged because it's a new -- it's a new theory.

And so the bottom line is I think we need some clarity on, you know, what it is that they're saying is false and why it's false. And they refuse to do that. So I'll stop there unless there are additional questions.

**THE COURT:** Okay. Are you finished?

**MR. ADAMS:** I think I'm finished.

**THE COURT:** Thank you. Mr. Fredericks -- oh, I think he wants his complaint back.

**MR. FREDERICKS:** Thank you, Peter.

**THE COURT:** Counsel, anything -- anything you want to respond to the last two points that counsel made?

**MR. FREDERICKS:** Yes, your Honor.

I've never heard a defendant quite so concerned that they think that we may have had discovery of a document which would add additional support to our theory, and therefore they say, well, we should file a whole amended complaint. This is this argument that Mr. Adams is talking about with respect to a document where the FDA denied priority review.

We may have an additional claim there; we may not. I'm told Mr. Adams's firm is producing another 30,000 pages of

documents to us today.  But on the complaint that's alleged is a case certifiable based on the claims that are in the complaint.  There's only one complaint.  We respectfully suggest -- suggest or argue that those claims are certifiable; they should be certified.

With respect to Mr. Adams's rather novel argument that, you know, we should now be forced to plead a brand new complaint, brand new motion to dismiss, do all of that, I respectfully suggest to your Honor that with all the heightened pleading standards of Rule 9 and the PSLRA, they haven't abdicated Rule 8 and the notion of noticed pleading.

You know, you have some particularity requirements.  You need to meet a heightened standard with respect to *scienter*.  But once you get over that burden, you go, you have discovery, you gather evidence.

You never have to plead all your evidence.  That would be horrendous.  You take discovery.  And then, usually, the next stop on the bus is summary judgment.

And we're going to get another 30,000 pages of documents.  If we find another document that's helpful to our case and we bring it to Defense's attention, do we have to file a new complaint?  Do we need to plead all our evidence?

In fact, all of this has been in front of Magistrate Judge Berg, who has basically agreed with Plaintiffs that most of what defendants have asked for are contention

interrogatories.

We've given them -- we've pointed them to the complaint because the complaint gives an adequate summary statement of our theory of liability. It gives them notice of our theory, we certainly think. So we think the Court's orders reflect that.

What we don't have to do, though, is plead every piece of evidence, every fact, every new deposition excerpt that we might get that somehow supports our basic theory. That would be totally unworkable under the federal rules. I mean, you get 20 months of discovery, then get 20 new amended complaints every time you have some new evidence that, you know, supports the claim? That's not workable.

But I think it does give some indication, your Honor, of what I think defendants are trying to do. They're trying to stall the train, get a third bite at the apple.

They've been trying to get us to file a new complaint. We know what will happen as soon as we file a new complaint. Defendants are going to say, oh, we've got an opportunity to file a motion to dismiss, and everything is stayed, you know, and I'd probably have to agree with them.

So you know, we pled an adequate theory. It's been sustained by a motion to dismiss. It's been sustained on a motion to reconsider. It gives them fair notice of the basis of our claim.

I don't know how it's possibly improper for us to refer

the defendants to paragraphs of the complaint for an explanation of why we've alleged falsity, when the Court itself has held that the complaint meets the PSLRA standard, meets Rule 9.

We'll send our contention interrogatories at the end of fact discovery. We'll give you answers to your contention interrogatories, all the facts that support this that everything we've learned in discovery.

Magistrate Judge Berg has agreed with us: These are contention interrogatories. You don't get to ask them now. You deal with them at the end. You don't get to make all these arguments at summary judgment.

It's very nice to have Mr. Adams's testimony as to what he thinks this case is about, his story of what his clients believed and what happened. But I don't think lawyer argument, also, is actually a substitute for meeting, you know, their evidentiary burden of disproving price impact or grounds for a new theory.

But your Honor, I think I can provide what I hope is some helpful context to how we got here. Because Mr. Adams gave some context, I'll give some context. And this is also in the May 2017 minutes.

Defendants have a theory that all forms of DRP, whether in people with frontal temporal dementia or in Parkinson's or Alzheimer's or other types, that everyone should respond similarly. They had some theoretical basis for that. I'm not a

pharmacologist, I'm not a scientist.  Maybe there will be some expert testimony on this at some point.

But they say FDA -- dear FDA, we have this theory that all the different types of DRP should respond similarly, and so we want to do a single study, and we understand it's not going to be powered for statistical significance in each subgroup. But our view is it's not going to matter.  Here's all the subgroups that, basically, are going to perform the same way.

FDA said, well, you know, this isn't necessarily the way we would do it, but it's a free country.  It's your theory. It's your decision whether to take this sort of shortcut road or to do a, you know, bigger sample, different trial design.  But okay, we'll let you do it.  And we'll concede DRP is potentially approvable.  We'll let you do your study.

The problem here is when they did the study, the study undercut the premise for their own assumption.  Because far from all the subgroups performing like the Parkinson's Disease patients did -- the Parkinson's group, even though it was only 15 percent of the study -- the response of pimavanserin in those patients was so great that it drove the nominal success of the rest of the study.  I mean, it was off-the-charts successful for the Parkinson's patients.

The problem is not so much for the other subgroups.  We have debate over how much, you know -- some responses, actually, the placebo actually did better.  But I think that what we

captured here is we exactly allege this in the complaint at paragraph 8.  I mean, this is exactly what we alleged. Paragraph 8, in the middle, says:

"Accordingly, because the study" -- "the Harmony study was underpowered from the outset for purposes of generating the kinds of results at relevant patient subgroup levels that would support FDA approval for additional types of DRP patients, Defendants knew or recklessly disregarded that the Harmony study would have to prove results within the relevant subgroup populations to support approval for those subgroups."

We didn't allege they had to show statistical significance.  Everyone knew that the subgroups were not powered at that level.

But this is really what happened, and I hope that this context is helpful to the Court.  And it also goes to the study design and why it's actionable in the context -- in the context of the Harmony study results being announced.

Because when you saw the Harmony study results, this latent defect, this contingent risk in the study design would become apparent to anyone who read through the FDA minutes and who understood the rationale for the trial design.

That's why, again, you know, sometimes A happens, and then B happens, and nothing may have happened with respect to A, except the new information, B, gives you an entirely new way of

appreciating the significance of A.

So the notion that counsel made earlier that, you know, there's no omission that could have contributed to any price-end impact on the front end is just logically wrong.  You know, it was the confluence of the Harmony results coming out, revealing this problem and the design defect, in addition to the problems with the subgroup data, the requirements for which defendants never admitted, that made -- that caused the stock -- that was the source of the fraud here.

I realize it's late in the day, and perhaps that's a little much.  And I'm on New York time, and I perhaps have got to be careful.  So I'm going to try to wrap up very quickly as well.

But, you know, I think counsel has helped dig his own grave, in terms of his comments on what the FDA was expecting with the subgroup data.  That information was never -- never disclosed, clearly had price impact.

And counsel -- I just wanted to correct one thing he said.  He said everything in our complaint was based on public information, so how can there be any fraud on the market?

Well, not everything in the complaint was based on public information available during the class period.  To the contrary, we based our complaint -- and the Court can re-read its own motion to dismiss.

We based the complaint on the fact that the FDA had

rejected the complaint *[sic]* and had told everybody the reason they rejected it was because of problems with subgroup data. And we got the transformation of that in black and white in the Complete Response Letter.  You know, that's why we have the lawsuit.

As your Honor said, look, at the end of the day, this case is going to come down to -- I think I alluded to this at the very beginning of my own remarks.  Is this a case where the FDA moved the goalposts, pulled a fast one on the applicant, and somehow pulled out of a hat these brand new requirements and some bizarre interpretation of labeling that only the FDA ever could have thought of?

Or is this a case where defendants really understood from the beginning that this subgroup data was always going to be important?

And as it turned out badly, it would kind of blow up the whole *raison d'être* of the theory of design of the study and would not provide a basis for approval.  Which is it?

But I can tell you one thing, your Honor.  On this motion, I agree with Mr. Adams, this Court can't decide that issue, you know, as a matter of law on this motion.

The Supreme Court's made it hard for district judges and all judges to figure out how to do this price-impact analysis because of materiality.  It's a loss causation.  It's reliance.  You can only look at them to the extent, you know,

the inquiry overlaps with the price impact inquiry. But we all agree that *scienter* is not part of the price-impact analysis.

They know what this case is about, your Honor. They'll have an opportunity to present it to a jury, if we go that far. They may have some arguments on summary judgment. I'm pretty confident that their truth-on-the-market arguments aren't going to pass on summary judgment, but that's got to be a decision for the Court to make when the time comes.

But the point is on this complaint, have Plaintiffs shown that the class alleged in this complaint should be certified. We respectfully suggest that Defendants have offered no reason why this complaint, this class, should not be certified.

**THE COURT:** All right. Thank you, counsel.

**MR. GRECO:** Thank you very much, your Honor.

**THE COURT:** Anything else, Mr. Adams, that you need? You're done?

**MR. ADAMS:** I'm finished. Thank you.

**THE COURT:** All right. Thank you, counsel. I appreciate you. It's a pleasure to have you here, as always. The briefing was very well done, was very helpful. I enjoyed reading your briefs, having you here. I enjoyed the oral arguments. It was very helpful.

I'll issue a written decision. Have a safe trip home, and at some point, hopefully I'll, have the pleasure of your

company all again.  Thank you.

**(Proceedings adjourned at 4:55 p.m.)**

**\*\*\***

*REPORTER'S CERTIFICATE*

I, Anne Roldan, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court, that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on February 28, 2024; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date:  March 9, 2024

_____

*Anne Roldan, RMR, CRR, CSR 13095*