# EXHIBIT 4

**B4** | Monday, May 19, 2025

**THE WALL STREET JOURNAL.**

## TECHNOLOGY

WSJ.com/Tech



### TIM HIGGINS

# What Are Tech Giants Trying to Hide?

Big technology companies are acting like they have something to hide.

And that isn't helping tech titans argue, in either the courts of law or public opinion, against the idea they have become too big for their own good. If anything, they are helping dig their own graves.

**Amazon.com** is the latest to face possible sanctions over allegations it improperly withheld tens of thousands of business records—including some unflattering to founder Jeff Bezos—in defending against an action by the Federal Trade Commission.

At Google, a federal judge in San Francisco has ruled the company didn't properly save evidence in a case brought by **Epic Games**, and its behavior has become a yoke as the Justice Department seeks to break up the search giant after winning two landmark antitrust cases.

A different federal judge recently referred the behavior of **Apple** to the Justice Department, in part because of alleged efforts to hide documents from legal scrutiny.

Such skulduggery gives new credence to complaints by rivals and regulators that these companies are often leaning into obfuscation as one of the tactics used to protect their kingdoms. In addition, their actions in court seemingly confirm what their many critics contend: that Big Tech needs to be reined in.

Apple, Google and Amazon have all argued in their individual legal battles that they have done nothing wrong. In Amazon's instance, a judge hasn't even ruled on the matter, and the FTC's accusation comes on the heels of Apple's rebuke.

Each company is accused of being overly aggressive in holding back internal documents under special legal standing—known as privilege—that should have, in fact, been turned over to the government or lawyers suing on behalf of Epic. The videogame company has been fighting separate multiyear battles against Apple and Google over its desire to load its app on smartphones outside the tech giants' 30% commission.

"The lawyers are the people who are supposed to be saying no when something crosses a line, and they aren't even failing that duty—they are actively encouraging this stuff," said John Newman, a law professor at the University of Miami and a former FTC deputy director. "That just seems to have created, or at least contributed to, a culture of what—if they weren't our crown jewel tech companies—I think we would call a culture of lawlessness."

Maybe it isn't surprising the companies can't help themselves in pushing the limits. It is, after all, what has made them so successful as disrupters turned conquerors. In their minds, they are the underdogs, whether they are facing the rise of AI, China or the Next Big Thing lurking beyond the horizon.

In addition, these companies' lawyers are fighting to protect the geese that lay their clients' golden eggs. They are trying to shield executives who live in an always-on digital chat and email culture from hurting themselves—and the companies. An unartful, or too truthful, missive can easily become a plaintiff's next smoking gun. Or maybe it is simply sloppiness in a complex legal process that can involve millions of records handed over through third-party contractors.

Still, that doesn't make it right.

Megan Gray chalks up abuse of legal privilege to "rich privilege." She is an antitrust lawyer who once worked for the FTC and Google's rival DuckDuckGo. She suggests some lawyers might not feel vulnerable for overstepping, especially when the ramifications of getting caught can seem inconsequential.

"Lawyers, especially at these large companies, make so much money—I mean it's just mind-boggling—and when you are making that much money, the worst possible consequences are that you get disbarred," she said.

In Apple's case, U.S. District Judge Yvonne Gonzalez Rogers wrote late last month that about half of the tens of thousands of documents the company claimed were privileged were later downgraded in the midst of extra scrutiny. She concluded it resulted in delay for the legal proceedings and "that delay equaled profits" for the iPhone maker. (For its part, Apple disagrees and plans to appeal.)

In a recent filing, the FTC made its case for seeking sanctions against Amazon for what it called "systematic abuse of privilege." It noted that after some probing, the company withdrew 92% of its claims and produced about 70,000 documents that it had previously held back. (A company spokesman responded: "We are working hard to ensure the FTC has all of the documents well in advance of trial." He added that Amazon is currently litigating how to handle having inadvertently turned over privileged information in another case. "Mistakes happen in both directions when you are dealing with complex productions of millions of documents on compressed time frames," the spokesman said.)

The FTC's case contends that Amazon knowingly duped millions of customers into unwittingly enrolling in its Prime service.

Documents the FTC pointed to as being improperly withheld include notes from a December 2020 meeting between executives reminiscing about when customers used to have to call to cancel subscriptions. In reference to that practice, one of the executives recalled how Bezos "used to be chief dark arts officer."

During Epic's trial against Google in late 2023, the search giant was taken to task by U.S. District Judge James Donato not just over improper privilege claims but also steps taken to not retain internal chat messages that should have been saved. In a rare move, Google parent **Alphabet**'s top lawyer, Kent Walker, a longtime corporate attorney and former assistant U.S. attorney, was called to testify.

Walker told the judge—outside the jury's presence—that he believed the company took its obligations to preserve and produce information in litigation seriously. The judge didn't agree, later calling his old law-school classmate's testimony evasive and "materially inconsistent" with other witnesses.

"All of this presents the most serious and disturbing evidence I have ever seen in my decade on the bench with respect to a party intentionally suppressing potentially relevant evidence in litigation," the judge said. "I have just never seen anything this egregious."

To take such heat, I can only imagine how embarrassing those messages must have been.



Documents related to the hearing between Apple and Epic Games are carted to court in Oakland, Calif., in 2021.

PHILIP PACHECO/GETTY IMAGES

---

### ADVERTISEMENT

# The Marketplace
To advertise: 800-366-3975 or WSJ.com/classifieds

## CLASS ACTION

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM
and OHIO CARPENTERS' PENSION FUND, Individually and
on Behalf of All Others Similarly Situated,
    Plaintiffs,
v.
ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS,
and SRDJAN (SERGE) R. STANKOVIC,
    Defendants.

No. 3:21-cv-00762-WQH-MSB

### SUMMARY NOTICE OF PENDENCY OF CLASS ACTION

**TO: ALL PERSONS AND ENTITIES WHO ACQUIRED THE COMMON SHARES OF ACADIA PHARMACEUTICALS, INC. DURING THE PERIOD FROM SEPTEMBER 9, 2019, THROUGH APRIL 4, 2021.**

**Please be advised that your rights may be affected by a class action lawsuit pending in the United States District Court for the Southern District of California if you acquired common shares of Acadia Pharmaceuticals, Inc. ("Acadia") during the period from September 9, 2019, through April 4, 2021.**

*A court authorized this notice. This is not a solicitation from a lawyer.*

PLEASE TAKE NOTICE that, pursuant to a Court Order dated March 11, 2024, a class has been certified in a class action entitled *City of Birmingham Relief and Retirement System v. Acadia Pharmaceuticals, Inc.*, Case No. 21CV00762 (the "Action"), pending before Judge William Q. Hayes of the United States District Court for the Southern District of California (the "Court").

The Action is brought on behalf of all persons and entities who acquired Acadia common stock during the period from September 9, 2019, through April 4, 2021, and asserts claims under the federal Securities Exchange Act of 1934 (the "Exchange Act") against (1) Acadia; (2) Stephen R. Davis; and (3) Ana Stankovic (collectively, "Defendants"). Plaintiffs, on behalf of the Class, allege that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making material misrepresentations and omissions concerning Acadia's supplemental New Drug Application ("sNDA") to expand the approved treatment indication for Acadia's flagship drug, pimavanserin. Defendants deny all of these allegations, deny that they engaged in any wrongdoing, and deny that they have any liability or violated the Exchange Act.

The Court has decided that the Action should proceed as a class action on behalf of a Class that (subject to certain exclusions) consists of "All persons and entities who purchased or otherwise acquired shares of Acadia common stock during the period from September 9, 2019, through April 4, 2021, (the "Class") and from the Class are (i) each Defendant in the Action; (ii) the past and current officers and directors of Acadia; (iii) the immediate family members, legal representatives, heirs, parents, subsidiaries, predecessors, successors, and assigns of any excluded person or entity; and (iv) any entity in which any excluded person(s) have or had a majority ownership interest, or that is or was controlled by any excluded person or entity.

If you are a member of the Class, your rights may be affected by this Action. If you have not received a detailed Notice of Pendency of Class Action ("Notice"), you may obtain copies by writing to the Notice Administrator at Acadia Securities Litigation, c/o A.B. Data, Ltd., P.O. Box 173110, Milwaukee, WI 53217, or by downloading this information at www.AcadiaSecuritiesLitigation.com. Inquiries, other than requests for a copy of the Notice, may be made to Class Counsel: Scott+Scott Attorneys at Law LLP, c/o Jacob Luterman, 156 South Main Street, Colchester, CT 06415, tel. (800) 404-7770.

You have the right to request exclusion (opt out) from the Class. If you do not request exclusion from the Class, you will be bound by past and any future rulings of the Court on the claims asserted against the Defendants, even if there is no recovery.

IF YOU WISH TO REMAIN IN THE CLASS, YOU DO NOT HAVE TO DO ANYTHING AT THIS TIME. HOWEVER, IF YOU WISH TO BE EXCLUDED FROM THE CLASS, YOU MUST SUBMIT A REQUEST FOR EXCLUSION BY JULY 18, 2025, IN THE MANNER AND FORM EXPLAINED IN THE NOTICE. ALL MEMBERS OF THE CLASS WHO DO NOT VALIDLY REQUEST EXCLUSION FROM THE CLASS WILL BE BOUND BY ALL OF THE DETERMINATIONS, INCLUDING ORDERS AND JUDGMENTS, THAT THE COURT HAS MADE OR WILL MAKE IN THIS ACTION, EVEN IF THERE IS NO RECOVERY.

PLEASE DO *NOT* CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.

Dated: April 15, 2025
                                              BY ORDER OF THE UNITED STATES DISTRICT COURT
                                              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

---

## COMMERCIAL REAL ESTATE

### UCC PUBLIC SALE NOTICE

PLEASE TAKE NOTICE THAT Jones Lang LaSalle Brokerage, Inc. ("**JLL**"), on behalf of ECDF Sub LLC (the "**Secured Party**") will offer for sale at public auction ("**Sale**") 100% of the common interests (the "**Interests**") held by Rancho Village Partners, LLC (the "**Pledgor**") in NOLA Sky JV, LLC, a Delaware limited liability company (the "**Pledged Entity**") as set forth in that certain Pledge and Security Agreement, dated as of March 31, 2024 (the "**Pledge Agreement**"), together with certain rights and property representing, relating to, or arising from the Interests (collectively, the "**Collateral**").

The Sale will take place on June 24, 2025 at 2:30 p.m. Eastern Time in compliance with Uniform Commercial Code Section 9-610 (i) in person at the offices of Morritt Hock & Hamroff LLP, 1407 Broadway, 39th Floor New York, NY 10018 and (ii) virtually via online video conference. The URL address and password for the online video conference will be provided to all registered participants.

The Sale is being made in connection with the foreclosure on a pledge of the Collateral to the Secured Party by Pledgor under the Pledge Agreement, pursuant to which Pledgor has granted to Secured Party a first priority lien on the Collateral as collateral for certain Recourse Obligations (as such term is defined in that certain Limited Liability Company Agreement of NOLA Sky JV, LLC dated as of March 31, 2024 executed by Pledgor and Secured Party (the "**Operating Agreement**")). It is the understanding of Secured Party (but without representation or warranty of any kind by Secured Party as to the accuracy of the following) that Pledgor is in default of its obligations under the Operating Agreement.

It is the understanding of Secured Party (but without representation or warranty of any kind by Secured Party as to the accuracy of the following) that (i) the Pledgor owns the Pledged Interests, (ii) the Pledged Interests constitute the principal asset of the Pledgor, (iii) Secured Party owns 100% of the preferred interests in Pledged Entity (the "**Preferred Interests**") and is the preferred member under the Operating Agreement, (iv) the Preferred Interests are not included in the Sale; (v) the Sale will not modify or extinguish the Preferred Interests and attendant rights under the Operating Agreement, and (vi) and will remain senior to the Pledged Interests and attendant rights under the Operating Agreement; (vii) Pledged Entity is the sole member and manager of RVP Phase 1 Mezz, LLC, a Delaware limited liability company; (viii) RVP Phase 1 Mezz, LLC owns 100% of the limited liability company interests in the RVP Phase 1, LLC, a Delaware limited liability company (the "**Property Owner**"); (viii) the Property Owner is the owner of the real property located at 2705 Rancho Drive, Las Vegas, NV 89130 and certain related rights, and (ix) the Property is encumbered by a mortgage lien granted by the Property Owner as security for a mortgage loan (the "**Mortgage Loan**") made pursuant to that certain Loan Agreement, dated as of June 3, 2022 and amended from time to time (the "**Mortgage Loan Agreement**").

An online datasite for the Sale (the "**Datasite**") is available at the following link: www.2705NRanchoDriveLasVegasUCCSale.com. The Datasite will include certain relevant information that Secured Party possesses concerning the Pledgor, the Pledged Entity, the Collateral, and the Mortgage Loan (collectively, the "**Disclosed Materials**") as well as the Terms of Sale for Public Auction relating to the Sale of the Collateral (the "**Terms of Sale**"). Access to such information will be conditioned upon execution of a confidentiality agreement which can be found on the Datasite. To participate in the auction, prospective bidders must confirm their ability to satisfy the Requirements in the manner described in the Terms of Sale, and following such confirmation, such qualified participants will be provided a URL and password enabling access to the video conference for the Sale. No information provided, whether in the Datasite or otherwise, shall constitute a representation or warranty of any kind with respect to such information, the Collateral or the Sale. Participants are encouraged to review all Disclosed Materials and perform such due diligence as they deem necessary in advance of the Sale.

The Interests will be offered in a single lot. The Interests are being sold strictly on an "AS IS AND WHERE IS" BASIS, AND, (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY THE SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS, THE QUANTITY, QUALITY, CONDITION OR DESCRIPTION OF THE INTERESTS, THE PROPERTY, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST THE SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SECURED PARTY). Without limiting the foregoing, any purchaser must purchase the Interests subject to requirements of the Mortgage Loan Agreement and the governing documents of the Pledged Entity (including its Operating Agreement).

There are specific requirements for any potential bidder in connection with obtaining information, bidding on the Collateral and purchasing the Collateral (collectively, the "**Requirements**"), including without limitation complying with: (1) the Mortgage Loan Agreement and other Mortgage Loan documents, including without limitation in each case any requirements contained therein for a sale and transfer of the Collateral, (2) the Pledged Entity's governing documents, and (3) the Terms of Sale.

The Secured Party reserves the right to require a showing of financial ability from prospective bidders prior to the date of the Sale. If a prospective bidder is a special purpose entity or an entity with creditworthiness that is, in the Secured Party's reasonable judgment, insufficient to support the requirements herein, the Secured Party reserves the right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

The Collateral includes unregistered securities under the Securities Act of 1933, as amended (the "**Securities Act**"), and Secured Party reserves the right to restrict participation in the Sale to prospective bidders that represent that the Collateral will not be sold, assigned, pledged, disposed of, hypothecated or otherwise transferred without the prior registration in accordance with the Securities Act and the securities laws of all other applicable jurisdictions, unless an exemption from such registration is available.

Secured Party may, prior to the Sale described herein, assign all of its right, title and interest in and to the Pledge Agreement to an affiliate, and in the case of such assignment the assignee shall be considered the "Secured Party" for all purposes hereunder. Secured Party reserves the right to credit bid, set a minimum reserve price, reject all bids and terminate or adjourn the sale to another time, without further notice. All bids (other than credit bids of Secured Party) must be for cash with no financing conditions and the successful bidder must deliver immediately available good funds (1) for the Required Deposit (as defined in the Terms of Sale) on the date of the Sale, and (2) for the balance of the purchase price for the Collateral on the closing date prescribed by the Terms of Sale. The winning bidder must pay all transfer taxes, recording fees, stamp duties and similar taxes as may be required to be paid under applicable law in connection with the purchase of the Collateral.

For questions and inquiries, please contact Mark Wintner at Jones Lang LaSalle Brokerage, Inc., NV RE License # BS.1002282, Telephone No.: (310) 407-2118, Email: 2705NRanchoDriveLasVegasUCCSale@jll.com

## COMMERCIAL REAL ESTATE

### NOTICE OF PUBLIC SALE OF COLLATERAL

PLEASE TAKE NOTICE that 100% of the limited liability company interests in ASAP Highline Ocala, LLC, a Delaware limited liability company ("**Pledged Entity**"), together with all related rights and property relating thereto as described in the Pledge Agreement (as defined below) (collectively, the "**Collateral**"), will be offered for sale at a public auction and to the "Successful Bidder" on July 29, 2025 at 3:00 p.m. Eastern Prevailing Time. The sale will be conducted in person at the offices of Newmark, 400 S Park Ave Suite 220, Winter Park, FL 32789, and virtually via Zoom (or a similar online platform).

The principal asset of Pledged Entity is a manufactured housing and RV community located at 4039 NW Blitchton Road, Ocala, Florida (the "**Property**").

This sale is held to enforce the rights of CPIF MRA, LLC ("**Secured Party**"), as secured party, under (A) that certain Loan Agreement dated November 17, 2022 (as amended and modified from time to time, the "**Loan Agreement**") between Secured Party and Pledged Entity, and (B) that certain Pledge Agreement dated November 17, 2022 (as amended and modified from time to time, the "**Pledge Agreement**") between Oaktree Ocala JV, LLC, a Florida limited liability company ("**Pledgor**") and Secured Party.

The Collateral is offered **AS IS, WHERE IS, WITH ALL FAULTS** and Secured Party makes no guaranty, representation or warranty (including, without limitation, any representation or warranty of merchantability or fitness), express or implied, as to: the existence or nonexistence of other liens or liabilities; the quantity, quality, condition or description of the Collateral, the Property, or the direct or indirect owners thereof, the value of the Collateral, or Pledgor's direct or indirect right in or title to the Collateral or the Property.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Agreement. Secured Party reserves the right, in its sole and absolute discretion (for any reason or no reason), to (a) reject all bids and terminate the sale or adjourn the sale to such other date and time as Secured Party may deem proper, by announcement at the place and on the date of such sale, and any subsequent adjournment thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of the Collateral as Secured Party may deem proper and in its sole and absolute discretion.

Interested parties who would like additional information regarding the Collateral and bidding procedures for the public sale (including the requirements to be a "Qualified Bidder") should execute the confidentiality agreement which can be reviewed at the website, https://tinyurl.com/34uzaak5. For questions and inquiries, please contact Stephen Schwalb of NEWMARK, 2601 Olive Street, Suite 1600, Dallas, Texas 75201, (469) 467-2084, Email: stephen.schwalb@nmrk.com.

### THE WALL STREET JOURNAL.

# THE MARKETPLACE
ADVERTISE TODAY
**(800) 366-3975**
For more information visit:
**wsj.com/classifieds**

© 2025 Dow Jones & Company, Inc.
All Rights Reserved.

---

## BUSINESS OPPORTUNITIES

### INVESTMENT
http://www.HedgehogROI.com

**Trading on fundamentals** - SESIM method -
[Scalable Economy/Efficiency Shared Iterative
Model Trading] - 100M or more Investment
- 20 - 40% ROI - Trading on your Institutional
account or our AUM account- consistent profits
- covered/protected for Market ups/downs/
correction/crash - Results & testimonials
Licensed team. **Do not respond if you are only
looking to receive info via email.** Respond only
if you/your company can share contact details
and can connect / join for a brief appointment
via phone/zoom/in-person.

**No Obligations.**

Kevin | SportyKarma@yahoo.com
713-489-7550

## BUSINESS OPPORTUNITIES

### Hot Spots For Sale in SoFL
Restaurant Bar $3M
Cabaret $1.5M
Diner $500K
Call Julie Negovan: 305-595-9522

### THE WALL STREET JOURNAL.
# SHOWROOM
(800) 366-3975
wsj.com/classifieds
© 2025 Dow Jones & Company, Inc.
All Rights Reserved.

---

# Walmart Plans for New Kind Of Customer: AI Shoppers

BY ISABELLE BOUSQUETTE

**Walmart** is preparing for sweeping changes in the way consumers shop, investigating how to make products appealing not just to human consumers, but also to the AI agents that will one day shop on their behalf.

AI bots, able to perform tasks autonomously, have the potential to transform online shopping, completely bypassing traditional online search and promotional tricks aimed at attracting human beings.

"It will be different," said Walmart U.S. Chief Technology Officer Hari Vasudev. "Advertising will have to evolve."

AI has already changed the way consumers research products on search engines, with results serving up AI-generated summaries. But shopping agents operating without human intervention is another thing entirely.

At some point in the future, shoppers will deploy an agent, like OpenAI's Operator, and tell it they want to restock on groceries or buy a new flat-screen TV. Operator will scan the internet and surface relevant products based on what it knows about the user's preferences. Ultimately, agents will even be able to complete the purchase, including payment.

That change will force retailers to rethink the way they advertise, describe products online and even price them,

said Robert Hetu, vice president analyst for retail at market research and consulting firm Gartner. Retailers risk losing control of the direct customer relationship if the checkout process moves from their own website to that of the third-party agent, like Operator or others to come.

Walmart is building its own shopping agents that customers can access on its app and website. These agents will be able to execute basic repetitive tasks like reordering groceries, and fill a shopping basket in response to prompts like "I want to plan a unicorn-themed party for my daughter," Vasudev said.

The company is also anticipating that consumers might instead use third-party shopping agents developed by tech companies.

Vasudev foresees the establishment of an industry protocol that enables third-party agents to communicate with retailers' own agents, he said, handing over product recommendations from the retailer's website based on user preferences.

Third-party agents could scan retailers' websites without interacting with the store's agents, Vasudev said.

Still, when third-party agents are used, retailers are to some extent at the mercy of their algorithms.

A user could tell its agent to shop at Walmart, or tell its agent to just find the lowest price on a certain item, Vasudev said. But some of the nuances of what customers get shown will come from the agents themselves.

One factor OpenAI's Operator uses is how prominently a page ranks in web searches.

Highly ranked pages, including paid ads and sponsored posts on search, can make content more likely to appear on Operator, the company said, noting that the model still heavily considers a user's prompt and prior behavior and preferences.

Even then, the way a bot shops is fundamentally different from the way a human shops, meaning retailers should think carefully about the way they display products on their sites, said Gartner's Hetu. Agents may be less likely to be attracted to images or visuals designed to elicit an emotional response.

Retailers may also have to make split-second decisions on pricing and when to offer discounts, Hetu said.

> ## Ultimately, AI bots will even be able to complete purchases.