COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
MATTHEW D. MARTINEZ (333932)
(mmartinez@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone: +1 858 550 6000
Facsimile: +1 858 550 6420

CHRISTOPHER B. DURBIN (218611)
(cdurbin@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
Telephone: +1 206 452 8700
Facsimile: +1 206 452 8800

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) Stankovic

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) Stankovic

Defendants.

Case No. 3:21-CV-00762-WQH-MSB

CLASS ACTION

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS DR. CARL C. PECK AND DR. STEVEN P. FEINSTEIN**

Date: March 16, 2026
Judge: Hon. William Q. Hayes

NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1
II. LEGAL STANDARDS ..... 3
III. THE COURT SHOULD EXCLUDE DR. PECK'S OPINIONS ..... 5
A. Background Relevant to Dr. Peck's Opinions ..... 5
1. Procedural history ..... 5
2. Dr. Peck's opinions ..... 6
B. Argument Supporting Exclusion of Dr. Peck's Opinions ..... 7
1. Dr. Peck's "Probability of Success" opinions are the product of irrelevant source data and unreliable methodology. ..... 8
a. Dr. Peck's "base-case" PoS opinion is not based on relevant data or a reliable methodology. ..... 9
b. Dr. Peck does not identify any reliable or generally accepted methodology to support his PoS opinions ..... 13
2. Dr. Peck's State of Mind opinions are unreliable and intrude on the jury's role as fact finder on the element of scienter. ..... 16
a. Dr. Peck's State of Mind opinions are not the product of *any* methodology, much less a reliable one. ..... 16
b. Dr. Peck's State of Mind opinions impermissibly intrude on the province of the fact finder. ..... 17
IV. THE COURT SHOULD EXCLUDE DR. FEINSTEIN'S OPINIONS ..... 19
A. Background Relevant to Dr. Feinstein's Opinions ..... 19
1. Plaintiffs' Theory of Fraud and Associated Damages ..... 19
2. Key Definitions ..... 20
3. Artificial Inflation as of September 9, 2019 ..... 21
4. Artificial Inflation as of December 5, 2019 ..... 22
5. Loss Causation ..... 23
B. Argument Supporting Exclusion of Dr. Feinstein's Opinions ..... 24
1. Dr. Feinstein's Analysis of Loss Causation Is Unreliable ..... 24
a. Dr. Feinstein assumes the truth of Plaintiffs' loss causation allegations rather than performing a rigorous analysis of them. ..... 26
b. Dr. Feinstein's opinion is not helpful to a jury because it does not isolate the impact of alleged fraudulent statements from non-fraudulent statements. ..... 27

# TABLE OF CONTENTS


2. Dr. Feinstein's Analysis of Artificial Inflation Associated With Acadia's Disclosures on September 9, 2019 Is Unreliable. .......... 30

a. Dr. Feinstein's reliance on Dr. Feigal's PoS opinions is unreliable and unscientific. .......... 31

b. Dr. Feinstein's analysis shows a lack of scientific rigor by failing to deal with potential error. .......... 33

3. Dr. Feinstein's Analysis of Artificial Inflation Associated With Acadia's Disclosures on December 4, 2019 Is Unreliable. .......... 36

a. Dr. Feinstein's analysis is unreliable because he fails to apply any discernible methodology supporting his conclusions. .......... 36

b. Dr. Feinstein fails to disentangle the impact of fraud-related and non-fraud-related information on Acadia's stock price. .......... 39

V. CONCLUSION .......... 42

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AIG Retirement Services, Inc. v. Altus Finance S.A.*, 2011 WL 13213589 (C.D. Cal. Sept. 26, 2011) .... 17

*AT&T Wireless Services of California, LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148 (S.D. Cal. 2003) .... 7

*In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2017 WL 10434367 (N.D. Cal. Jan. 23, 2017) .... 31

*CCM Rochester, Inc. v. Federated Investors, Inc.*, 2016 WL 11617452 (S.D.N.Y. Aug. 31, 2016) .... 33

*In re Celera Corp. Shareholder Litigation*, 2012 WL 1020471 (Del. Ch. Mar. 23, 2012) .... 12

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) .... 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) .... 17, 33, 38

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .... *passim*

*Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002) .... 4, 33

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .... 25, 26, 27

*Elsayed Mukhtar v. California State University*, 299 F.3d 1053 (9th Cir. 2002) .... 4

*In re Ephedra Products Liability Litigation*, 494 F. Supp. 2d 256 (S.D.N.Y. 2007) .... 36

*Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015) .... 23

## TABLE OF AUTHORITIES

Page(s)

*Erica P. John Fund v. Halliburton*,
563 U.S. 804 (2011) .......... 26

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) .......... *passim*

*Good v. Fluor Daniel Corp.*,
222 F. Supp. 2d 1236 (E.D. Wash. 2002) .......... 26

*In re Google Play Store Antitrust Litigation*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......... 40

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .......... 12, 14, 15, 38

*Graves v. Mazda Motor Corp.*,
405 F. App'x 296 (10th Cir. 2010) .......... 38

*Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*,
2005 WL 5955701 (S.D. Fla. Aug. 17, 2005) .......... 33

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .......... 5

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) .......... 35

*Holley v. Gilead Sciences, Inc.*,
2023 WL 2469632 (N.D Cal. Feb. 27, 2023) .......... 19

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 1547625 (N.D. Cal. May 30, 2025) .......... 13, 19

*In re Incretin-Based Therapies Products Liability Litigation*,
524 F. Supp. 3d 1007 (S.D. Cal. 2021) .......... 5

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) .......... 7, 9, 10, 13

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .......... 4, 5, 33, 39

## TABLE OF AUTHORITIES

Page(s)

*Leese v. Lockheed Martin Corp.*,
6 F. Supp. 3d 546 (D.N.J. 2014) ... 32

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ... 34

*In re Lipitor*,
892 F.3d 624 (4th Cir. 2018) ... 36

*Lust v. Merrell Dow Pharmaceuticals, Inc.*,
89 F.3d 594 (9th Cir. 1996) ... 3

*Miltrano v. Lederle Laboratories*,
769 N.Y.S. 2d 839 (N.Y. Supr. 2003) ... 13

*Mitchell v. Geo Group Inc.*,
2022 WL 874287 (D. Ariz. Mar. 24, 2022) ... 15

*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022) ... 25

*Nelson v. Matrixx Initiatives, Inc.*,
592 F. App'x 591 (9th Cir. 2015) ... 27

*NetFuel, Inc. v. Cisco Systems Inc.*,
2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ... 32

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ... 25

*Obesity Research Institute, LCC v. Fiber Research International, LLC*,
2017 WL 1174756 (S.D. Cal. Mar. 29, 2017) ... 4

*In re Onglyza Products Liability Litigation*,
93 F.4th 339 (6th Cir. 2024) ... 3, 36

*Open Text S.A. v. Box, Inc.*,
2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ... 7, 15, 38

*In re Oracle Corp. Securities Litigation*,
2009 WL 1709050 (N.D. Cal. June 19, 2009) ... 26

# TABLE OF AUTHORITIES

Page(s)


*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) .......... 27

*Pascal v. Nissan North America, Inc.*, 2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) .......... 10, 17, 32

*Persian Gulf Inc. v. BP West Coast Products LLC*, 632 F. Supp. 3d 1108 (S.D. Cal. 2022) .......... 12

*In re Qualcomm Inc. Securities Litigation*, 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .......... 41

*In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) .......... 28, 30, 39, 40

*Sims v. Kia Motors of America, Inc.*, 839 F.3d 393 (5th Cir. 2016) .......... 31

*Snyder v. Bank of America, N.A.*, 2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) .......... 15

*Strougo v. Tivity Health, Inc.*, 2025 WL 1415896 (M.D. Tenn. May 15, 2025) .......... *passim*

*U.S. Fidelity and Guaranty Co. v. Ulbricht*, 576 F. Supp. 3d 850 (W.D. Wash. 2021) .......... 19

*United States v. Cytogel Pharma, LLC*, 2018 WL 6169266 (E.D. La. Nov. 26, 2018) .......... 10, 11, 36

*United States v. Valencia*, 971 F.3d 891 (9th Cir. 2020) .......... 4

*In re Vale S.A. Securities Litigation*, 2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .......... 29, 38

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) .......... 32


**Other Authorities**


Federal Rule of Evidence 702 .......... *passim*

# I. INTRODUCTION

Defendants bring this motion to exclude the opinions of two of Plaintiffs' experts: (i) ***Dr. Carl Peck***, a consultant and former FDA official; and (ii) ***Dr. Steven Feinstein***, an economist. Plaintiffs use these experts to construct a house of cards, piling one unreliable opinion atop another to fill the evidentiary gaps in their case and to jerry-rig a damages model that cannot withstand scrutiny. This runs afoul of Federal Rule of Evidence 702 and the Supreme Court's *Daubert* line of authority. As a result, this Court can and should exercise its role as "gatekeeper" to exclude Dr. Peck's and Dr. Feinstein's opinions for all purposes at summary judgment and trial.

Plaintiffs' gambit begins with Dr. Peck, who was hired at the eleventh hour to adopt the opinions of Plaintiff's *prior* FDA expert, Dr. David Feigal (who withdrew from this case two days before his deposition and the close of expert discovery). Dr. Peck purports to adopt all of Dr. Feigal's opinions, including Dr. Feigal's speculation as to the *true* likelihood that Acadia's supplemental New Drug Application ("sNDA") would be approved by the FDA at various points in time. But Dr. Feigal's (now Dr. Peck's) probability-of-success ("PoS") guesses are not premised on data that is relevant to the facts of this case, and they are not the product of any reliable, generally accepted methodology that passes muster under *Daubert*. These faults alone are enough to exclude the PoS opinions. But Plaintiffs' problems run much deeper: Dr. Peck testified that he could not replicate Dr. Feigal's "methodology," and he expressly disavowed Dr. Feigal's PoS numbers—which he admitted are "highly uncertain" because "nobody knows what the specific [PoS] number is."

Dr. Peck also "adopts" Dr. Feigal's opinion as to what a "reasonable" pharmaceutical company and its executives would or should have known about the PoS for Acadia's sNDA (among other things) during the Class Period. These state-of-mind opinions carry the same indicia of unreliability—especially the absence of any discernable methodology—as the PoS opinions. But they also cross a red line by invading the jury's sole province as factfinder. During his deposition, Dr. Peck

confirmed that his trial testimony would encourage the jury to find that a pharmaceutical company executive (like the individual defendants) who disagreed with Dr. Peck's opinions had *by definition* acted unreasonably. Both of Dr. Peck's opinions, PoS and State of Mind, are so methodologically flawed and unreliable that exclusion is the only adequate remedy.

Dr. Feinstein, in turn, offers transparently outcome-driven opinions regarding loss causation and damages. As to loss causation, Dr. Feinstein performs no analysis at all. Instead, he *assumes* the alleged corrective disclosures (in March and April 2021) are related to the alleged fraud simply because Plaintiffs said so. Because that is obviously insufficient under Rule 702 and *Daubert*, Plaintiffs have no expert support for their loss causation argument.

As to damages, Dr. Feinstein purports to calculate "artificial inflation" on two dates: September 9, 2019 (the first day of the Class Period, when Acadia announced the Harmony Study's top-line results) and December 5, 2019 (when Acadia disclosed the complete Harmony Study results). In each case, Dr. Feinstein fails to reliably disaggregate fraud-related and non-fraud-related impacts on Acadia's stock price. As to September 9, Dr. Feinstein blindly adopts Dr. Feigal's made-up 70% PoS—a number that Dr. Peck subsequently disavowed—as the key input in his damage calculation.

Dr. Feinstein's "methodology" as to December 5 is even more outlandish. He abandons Dr. Feigal's defective PoS guesstimates (which Dr. Peck disowned) and instead relies on his own *post-hoc* inference to calculate artificial inflation. He assumes that if Acadia had disclosed "the truth," then its stock price would have plummeted back to where it was just before the start of the Class Period, thereby reversing the observed stock increases on December 5 ***and*** September 9. Thus, he attributes the entire price reaction on December 5 (and much more) to the alleged fraud, even though Acadia released other information on that date, including extensive Harmony Study data that numerous analysts considered positive. This

"methodology" also assumes that Acadia should have told investors that the sNDA was doomed—an opinion Defendants did not hold and a separate alleged omission whose supposed impact he does not disaggregate.

Like Dr. Peck's PoS and State of Mind opinions, Dr. Feinstein's damages and loss-causation opinions are unreliable and should be excluded from summary judgment and trial.

## II. LEGAL STANDARDS

District courts are "gatekeepers" with respect to expert testimony, responsible for ensuring that unreliable and irrelevant evidence is excluded from trial. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 permits testimony by a qualified expert witness, but ***only*** if the expert's "specialized knowledge" will assist the jury in its fact-finding role *and* the testimony (i) is "***based on sufficient facts or data***"; (ii) is "the product of ***reliable principles and methods***"; and (iii) "reflects a ***reliable application*** of the principles and methods ***to the facts*** *of the case*." FED. R. EVID. 702.[1] Rule 702 thus requires the proponent to establish the reliability and relevance of the proffered testimony. *See Lust v. Merrell Dow Pharms, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). These gatekeeping determinations cannot be left to the jury's assessment of an expert's credibility; it is an "incorrect application" of Rule 702 to hold "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." FED. R. EVID. 702, advisory committee notes to 2023 Amendment; *In re Onglyza Prods. Liab. Litig.*, 93 F.4th 339, 348 n.7 (6th Cir. 2024) (explaining that the purpose of the amendments was to override some court decisions that incorrectly held that "critical questions of the sufficiency of an expert's basis" went to weight

[1] Unless otherwise stated, all emphasis is added, and all internal citations are omitted. To avoid potential confusion, all pincites to deposition transcripts are to the internal page and line number(s) in the original document. All other pincites to exhibits attached to the Declaration of Peter M. Adams are to the consecutive page numbers appearing in the bottom right corner, or to paragraphs (¶) or appendices (App'x) therein.

and not admissibility). The district court's gatekeeping function is thus critical to prevent unreliable expert testimony from contaminating jury trials. *See Elsayed Mukhtar v. California State Univ*., 299 F.3d 1053, 1063–64 (9th Cir. 2002) ("Maintaining *Daubert's* standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.").

Reliability: Evidence is reliable when "the principles and methodology used by the expert proffering it are grounded in the methods of science." *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). Under *Daubert*, the Court is to consider several non-exclusive factors when assessing the reliability of "scientific" expert opinion: whether the expert's "scientific theory or technique" (1) "can be (and has been) tested," (2) has been "subjected to peer review and publication," and (3) "is generally accepted"; as well as (4) "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." *Cooper v. Brown*, 510 F.3d 870, 942–43 (9th Cir. 2007). The Court need not admit expert opinion "that is connected to existing data only by the *ipse dixit* of the expert," and can exclude the opinion if the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999).

Under Rule 702, the inquiry into reliability becomes "more, not less, important" when the proffered expert opinion is "not subject to routine testing, error rate, or peer review type analysis." *United States v. Valencia*, 971 F.3d 891, 898 (9th Cir. 2020). Accordingly, experts offering experience-based opinions "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702, adv. comm. note (2000); *see Obesity Research Institute, LCC v. Fiber Research Int'l, LLC*, 2017 WL 1174756, at *2 (S.D. Cal. Mar. 29, 2017) ("'[I]t will at times be useful to ask even of a witness whose expertise is based purely

on experience . . . whether his preparation is of a kind that others in the field would recognize as acceptable.'" (quoting *Kumho Tire*, 526 U.S. at 151)).

Relevance: An expert's proffered testimony "must be relevant to the task at hand," meaning "that it logically advances a material aspect of the proposing party's case." *In re Incretin-Based Therapies Prods. Liability Litig.*, 524 F. Supp. 3d 1007, 1035 (S.D. Cal. 2021) (quotations and citations omitted). Relevant opinions are those "that would assist the trier of fact in reaching a conclusion necessary to the case." *Id.* As the Supreme Court has explained, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002) ("Whether testimony is helpful within the meaning of Rule 702 is in essence a relevance inquiry.").

## III. THE COURT SHOULD EXCLUDE DR. PECK'S OPINIONS

### A. Background Relevant to Dr. Peck's Opinions[2]

#### 1. Procedural history

On September 4, 2024, Plaintiffs disclosed four expert witnesses, including David M. Feigal, M.D., who was designated to offer testimony on various regulatory aspects of the FDA's review and eventual decision not to approve Acadia's supplemental New Drug Application ("sNDA") for pimavanserin to treat hallucinations and delusions in dementia-related psychosis ("DRP"). *See* Declaration of Peter M. Adams ("Adams Decl.") ¶ 3. On February 13, 2025, Plaintiffs served opening reports for each of their four experts, including Dr. Feigal. *See id.* ¶ 4. On March 27, 2025, Defendants served rebuttal reports from five expert witnesses, four of whom challenged, at least in part, the opinions of Dr. Feigal. Two of Defendants' expert witnesses, Drs. Paul Andreason and Christopher Breder, devoted their entire reports to rebutting the opinions in Dr. Feigal's report. *See id.* ¶ 5. Dr. Andreason

[2] Additional factual background is set forth in Defendants' Memorandum in Support of Motion for Summary Judgment and Statement of Undisputed Facts.

addressed Dr. Feigal's opinions regarding FDA procedures and Acadia-FDA communications. And, Dr. Breder addressed Dr. Feigal's opinions about the probability that Acadia's sNDA would receive FDA approval. *See id.*; *see generally* Ex. 1; Ex. 2.

On May 1, 2025, Plaintiffs served reply reports for three of their four experts—but Plaintiffs chose not to serve one from Dr. Feigal. *See* Adams Decl. ¶ 6. Plaintiffs thus offered no response to the rebuttal opinions by Drs. Andreason and Breder. In June 2025, Dr. Feigal abruptly withdrew from the case just days before his deposition. *See* ECF 179-2 at 2. The Court permitted Plaintiffs to substitute a new regulatory expert for Dr. Feigal. *See* ECF 187. On August 14, 2025, Plaintiffs served Dr. Peck's expert report ("Peck Report"), which attached and "adopted" the opening report by Dr. Feigal ("Feigal Report"). Ex. 3.[3] Dr. Peck was deposed on September 24, 2025. *See* Ex. 4.

**2. Dr. Peck's opinions**

Dr. Peck's Report contains just 18 paragraphs, of which 13 are devoted to his experience and qualifications. Ex. 3 ¶¶ 1–13. Dr. Peck purports to "adopt the Feigal Report (including the opinions set forth therein) in full." Ex. 3 ¶ 17; Ex. 4 at 135:11–17. This is the first and only time in Dr. Peck's career that he has been asked to adopt the opinions of a different expert set forth in a report that Dr. Peck himself did not write. Ex. 4 at 24:19–25:11. Dr. Peck never spoke with Dr. Feigal about the Report, *id*. at 71:13–23, had "[n]o idea" how Dr. Feigal "went about drafting the [R]eport," *id.* at 71:13–25, and had "no idea" how Dr. Feigal "identified and selected the materials considered" in the Report, *id.* at 82:11–83:2. Dr. Peck nonetheless "adopted" the Report in full because, "[b]ased on [his] review [of Dr. Feigal's report], and on [his] own professional training, experience, and expertise, [he has] not identified any points of material disagreement between [him]self and Dr. Feigal." Ex.

[3] Dr. Feigal's report, as appended to Dr. Peck's report, is cited as the "the Report."

3 ¶¶ 16–17; *see also* Ex. 4 at 61:7–63:1. The opinions offered—originally by Dr. Feigal, and now by Dr. Peck—fall into three general categories:

1. FDA processes and procedures relating to Acadia's sNDA, as well as the "meaning and significance" of "understandings or agreements" and "contents of communications exchanged" between Acadia and the FDA;

2. the "probability, at different points during the Class Period, that, based on information known to the Company, Acadia would succeed in obtaining FDA approval of its contemplated sNDA" (the "**PoS**" opinions); and

3. "[w]hat the senior management of a reasonable pharmaceutical drug development company should and/or would have known and understood regarding" the first two categories of opinions (the "**State of Mind**" opinions).

Ex. 3, App'x C ¶¶ 24–25; *see* Ex. 4 at 135:2–10.

**B. Argument Supporting Exclusion of Dr. Peck's Opinions**

Dr. Peck's PoS and State of Mind opinions are incurably unreliable at each step of his analysis: he does not rely on data that is relevant to the facts of this case, fails to identify or employ a sound methodology, and offers conclusions that are hopelessly arbitrary and speculative. In other words, Dr. Peck's testimony is a "black box into which [irrelevant] data is fed at one end and from which an [unreliable] answer emerges at the other." *See Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015). Whether the Court construes Dr. Peck's opinions as "experience based[,] strictly scientific," or a blend of both, they "must be reliable." *AT&T Wireless Servs. of California, LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148, 1156 (S.D. Cal. 2003). As explained below, Dr. Peck's opinions are "inherently unreliable" because they "do not rest on a sufficient factual foundation and are speculative." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025). Plaintiffs should not be permitted to rely on his PoS or State of Mind opinions at summary judgment or trial.

### 1. Dr. Peck's "Probability of Success" opinions are the product of irrelevant source data and unreliable methodology.

Dr. Peck's PoS opinions address what he characterizes as "[t]he probability of successfully obtaining FDA approval for an expanded DRP indication for pimavanserin." Ex. 3, App'x C ¶ 25(e); *see id.* ¶¶ 149–162. Claiming to rely on "data from industry-wide analysis of successful drug approvals" and the "specific facts of the [DRP] indication being sought," *id.* ¶ 149, Dr. Peck purports to identify the ***actual likelihood of FDA approval***, expressed with precision as a single-point percentage—at five different times before and during the Class Period:

- **Prior to September 2019**, before "any of Harmony's results [were] known," the PoS "on the basis of the as-yet-unknown Harmony results was **50%**." *Id.* ¶ 156.
- "**In September 2019**[,] once Acadia learned of Harmony's successful top-line results," the PoS "increased from 50% to **70%**." *Id.* ¶ 158.
- In **November 2019**, once "Acadia learned of Harmony's subgroup efficacy results," the PoS "dropped from 70% to **30%**." *Id.* ¶¶ 159–160.
- In **July 2020**, when FDA indicated to Acadia its "belief that the data supporting the sNDA did not show a benefit in meeting the unmet medical need of DRP," the PoS "was **10% or less**." *Id.* ¶ 161.
- On **April 2, 2021**, "when FDA issued the CRL," the PoS "went to **0%**." *Id.* ¶ 162.

Dr. Peck's PoS figures are not—and he does not claim them to be—the product of any methodology that has been subjected to peer review or is generally accepted in the relevant field. Rather, he describes his "methodology" as (i) starting from "several decades of published statistics on the likelihood of success," then (ii) applying his years of FDA experience (or perhaps *Dr. Feigal's* experience) and his assessment of FDA-Acadia communications and the Harmony Study data. *See id.* ¶ 24(d); *see also id.* ¶¶ 149–151. He then simply declares, "it is my opinion" that the actual PoS for Acadia's sNDA is X% at Y point in time. *Id.* ¶ 156.

**a. Dr. Peck's "base-case" PoS opinion is not based on relevant data or a reliable methodology.**

The first step of Dr. Peck's PoS opinions is constructing what he calls a "base-case" PoS just before the Class Period begins in September 2019. *See* Ex. 3, App'x C ¶¶ 150–156. He starts by citing probability figures that he claims reflect "relatively stable aggregate success rate[s] for progress from stage to stage for previously unapproved drugs." *Id*. App'x C ¶ 152. These benchmark rates, which Dr. Peck attributes to the Tufts University Center for the Study of Drug Development ("Tufts Center"), are as follows: "Phase 1 to 2: 35%, phase 2 to 3: 50%, phase 3 to NDA filing: 50%, NDA filing to approval: 85%." *Id*. From there, Dr. Peck arrives at a pre-September 2019 "base-case" PoS of 50%, which he says reflects "the probability of successfully obtaining FDA approval for a new DRP indication on the basis of the as-yet-unknown Harmony results." *Id*. App'x C ¶ 156.

Rule 702 empowers a trial court to "evaluate the data offered . . . to determine if that *data provides adequate support* to mark the expert's testimony as reliable." *Klein*, 766 F. Supp. 3d at 961. Viewed through that lens, Dr. Peck's "base-case" PoS is arbitrary and unreliable for three reasons:

<u>**First**</u>, although Dr. Peck attributes the "aggregate success rates" he uses as the source for his benchmarks to the Tufts Center, the Report does not cite any publications by the Tufts Center nor any data from the Tufts Center itself. *See* Ex. 3, App'x C ¶ 152; Ex. 2 ¶ 41. Instead, the Report references a handful of academic articles, only some of which even mention PoS (or "LOA," likelihood of approval). *See* Ex. 3, App'x C ¶¶ 152–55 nn.164, 166, 168. Asked to clarify which of the referenced materials *he* relied on, Dr. Peck pointed to three articles by Drs. DiMasi and Kaitin, Ex. 4 at 117:4–23, and *disclaimed* reliance on any other materials cited in the Report, *id*. at 201:25–206:25. But the three articles Dr. Peck claimed to rely on are irrelevant to, or in conflict with, his benchmark probabilities. Two of the three

articles *do not even mention* PoS or LOA probabilities.[4] *See generally* Ex. 5 (addressing overall volume and timing of approvals); Ex. 6 (addressing differences between "first-in-class" and "follow-on" drugs). The third article, by Dr. DiMasi, reports probabilities that are very different from the much-lower figures in the Report. *Compare* Ex. 3, App'x C ¶ 152 *with* Ex. 9 at 7, Figure 2. Those differences are particularly stark for the only phase transitions that are relevant to the facts of this case: (1) from the start of a Phase 3 study to submission of the application for FDA review; and (2) from submission of the application to FDA approval:

| Phase Transition | DiMasi | Peck | Delta |
|---|---|---|---|
| Phase 3 to Submission | 84.1% | 50% | -34.1 points |
| Submission to Approval | 92.6% | 85% | -7.6 points |

Ex. 3, App'x C ¶ 152; Ex. 9 at 330, Figure 2. Simply put, the data relied upon by Dr. Peck does not support his conspicuously low benchmark probabilities. This alone warrants exclusion. *See Pascal v. Nissan N. Am., Inc.*, 2022 WL 19076763, at *16 (C.D. Cal. Dec. 21, 2022) ("[A]n expert opinion is unreliable where the opinion is based on *data*, a methodology, or *studies* that are *inadequate to support the conclusions* reached."); *Klein*, 766 F. Supp. 3d at 963 (expert's citation to "literature alone is not enough to satisfy FRE 702" or to "demonstrate that [relevant scientific] principles . . . were reliably applied to the facts of this case").

**Second**, the failure to select benchmark data that is relevant to the facts of this case renders Dr. Peck's "base-case" PoS (which depends on those benchmarks) unreliable and irrelevant. *See United States v. Cytogel Pharma, LLC*, 2018 WL 6169266, at *5 (E.D. La. Nov. 26, 2018) (Expert opinions are not reliable when they fail to "establish [that data relied upon] fit the facts of the instant case."). To be clear, Dr. Peck himself did not select *any* data: he has no idea why Dr. Feigal selected the

[4] The Report cites two other papers in footnotes, but those too are irrelevant to the PoS benchmarks. *See* Ex. 3, App'x C at 48–49 nn. 166, 168; Ex. 7 (reporting on "clinical trial success rates" but no mention of FDA-approval probabilities); Ex. 8 (reporting only Phase-2-to-FDA-approval probabilities).

articles cited in the Report, and he can only guess how (if at all) Dr. Feigal used the data cited in those articles to come up with his benchmark probabilities. *See* Ex. 4 at 82:16–24. He also has no independent basis to claim that his benchmarks are derived from data that is relevant to the facts of this case—*i.e.*, data on drug-development programs that are *comparable to Acadia's DRP program*. For example, the articles cited in the Report do not reference data sets that are specific to (i) antipsychotic drugs under the purview of the FDA's Division of Psychiatry, (ii) *supplemental* (rather than original) applications, or even (iii) applications submitted in United States to the FDA.[5] Dr. Peck's failure to "establish the 'fit' between the probability estimates" for drugs in a given study and the particular drug at issue renders his resulting opinions unreliable. *Cytogel*, 2018 WL 6169266, at *4–5 (excluding proffered opinions because expert's cited study, which "estimate[d] the probability of success of clinical trials testing lead indications for central nervous system drugs," had "not been shown to fit the facts of the case").

**Third**, Dr. Peck's "base-case" PoS erroneously conflates *phase* success—*i.e.*, the likelihood of advancing from one clinical phase to the next—with the probability of ultimate *approval* by the FDA. This methodological error renders each of his PoS figures for Acadia's sNDA arbitrary and unreliable, beginning with his 50% "base-case" PoS before Acadia announced that the Harmony Study had met its primary endpoint on September 9, 2019 (the start of the Class Period). To get there, the Report: (1) restates a **benchmark** probability from submission to approval of **85%**, Ex. 3 ¶ 154; (2) **reduces** that probability to **80%**, "without consideration to the actual results of the [Harmony] study or factoring in FDA's requirement that the subgroup data be directionally consistent across the different dementia subtypes," *id*. ¶ 156; and (3) **reduces** the probability again, this time to **50%** (his "benchmark" for Phase

[5] One of the articles studied approval rates for *infectious disease* therapeutics, (which are irrelevant to *psychiatric* drugs) and reported "regulatory approval for marketing *anywhere in the world*," Ex. 9 at 3; Ex. 2 ¶ 41, while another relies largely on outdated pre-2014 data, Ex. 10; Ex. 11; Ex. 5; Ex. 2 ¶ 44, n.49. None of the articles contain data specific to *supplemental* applications. *See* Exs. 5–11.

3 to Submission), because "the overall industry track record of successful phase 3 trials is only 50%, not the 80% since the effects seen are often less than those anticipated in the study planning," *id*. ***None of this makes sense***. As acknowledged elsewhere in the Report, the probability of clinical *phase* success and probability of eventual *approval* are fundamentally different concepts. *See id.* ¶ 152; *see also* Ex. 2 ¶¶ 48–51; *In re Celera Corp. Shareholder Litig.*, 2012 WL 1020471, at *4 (Del. Ch. Mar. 23, 2012) (explaining similar error in conflating probability of clinical-phase transition with probability of FDA approval), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012). Dr. Peck's "base-case" PoS does not follow logically (or even perceptibly) from the data he claims to rely on.

Even if the Report cited any data supporting Dr. Peck's 85% benchmark, he offers neither data nor methodology for his arbitrary reduction to 80%—just a generic disclaimer about the Harmony Study results being unknown at the time. Dr. Peck's 30-point reduction of the base-case PoS to 50% is even more confounding: he does not explain what "industry track record" he is relying on, what defines a "successful phase 3 trial," or what he means by "the effects seen are often less than those anticipated in the study planning"—nor *how* any of these generic, undefined elements logically result in a 30-point reduction of the base-case PoS. In short, Dr. Peck's PoS opinions cannot be reliable if they are not even comprehensible. *See GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) ("[T]he Court must be able to see the mechanisms in order to determine if they are reliable and helpful" and "cannot simply take an expert's word for a specific proposition.").

This absence of methodology is compounded by its occurrence at *the first step* of Dr. Peck's PoS opinions—thus rendering each of his subsequent PoS adjustments arbitrary and unreliable. *See Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1165 (S.D. Cal. 2022) ("[A]n expert's scientific conclusions must be supported by good grounds for *each step in the analysis*, meaning that *any step that*

*renders the analysis unreliable* under the *Daubert* factors renders the expert's testimony inadmissible.").

**b. Dr. Peck does not identify any reliable or generally accepted methodology to support his PoS opinions.**

Even if Dr. Peck *had* relied on relevant data for his benchmarks and *if* his base-case PoS was the product of a reliable methodology, Dr. Peck's subsequent PoS figures for Acadia's sNDA would still be arbitrary and unreliable. Because "methodology remains the central focus of a *Daubert* inquiry," *Klein*, 766 F. Supp. 3d at 961, Dr. Peck's failure to articulate a reliable methodology requires the exclusion of his PoS opinions.

At four different points in time—beginning in September 2019, after the Harmony Study was stopped at the interim analysis—Dr. Peck declares the PoS to be a precise numerical percentage, which he increases or decreases (each time by multiples of exactly 10 percentage points) without explaining how the increment or decrement was calculated. Ex. 3, App'x C ¶¶ 156–162. These numbers are presented in the Report without confidence intervals, error rates, or any other caveat or qualification as the *actual* probability that the FDA would approve Acadia's sNDA.[6] *See id*. The Report also conspicuously fails to cite a single treatise, study, article, or any other resource that explains (much less endorses) an accepted methodology to calculate a specific probability figure for a single application as Dr. Peck does here.[7] Moreover, despite offering these PoS opinions *post hoc*—knowing the decision the

[6] This reveals Dr. Peck's PoS opinions to be thinly veiled speculation about the FDA's state of mind—*i.e.*, purporting to know the extent to which the FDA viewed the sNDA as approvable. Courts have repeatedly excluded expert opinion on similar grounds. *See Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at *12 (N.D. Cal. May 30, 2025) (excluding expert opinions about what FDA believed during regulatory review period as "impermissible speculation as to the state of mind of the FDA"); *Miltrano v. Lederle Labs.*, 769 N.Y.S. 2d 839, 852 (N.Y. Supr. 2003) ("No expert could honestly opine that approval would have been granted [by FDA] without engaging in rank speculation."), *aff'd sub nom.*, 810 N.Y.S. 2d 506 (2006).

[7] As Dr. Breder explains, a reliable methodology for estimating the approval-probability of a single drug in isolation does not exist. *See* Ex. 2 ¶¶ 30–34.

FDA ultimately made—there is no indication that Dr. Peck made any effort to control for (or even acknowledge) the risk of hindsight bias.

Instead, the Report offers only a brief description of the event in question, assesses whether it was positive or negative for Acadia's sNDA, and then proclaims that the PoS had changed to 50%, 30%, etc. *See* Ex. 3, App'x C ¶¶ 158, 160–62; Ex. 2, ¶ 29 ("This is a list of generic factors, not a methodology."); *see also GPNE Corp.*, 2014 WL 1494247, at *2 (ordering exclusion where expert's methodology consisted of "recit[ing] a number of qualitative factors . . . before simply concluding that Apple and GPNE would agree to a per unit royalty of $1 per accused device"). Asked to provide an explanation of the methodology employed in the Report, Dr. Peck could state only that Dr. Feigal relied on "his experience" and "understand[ing of] the significance and meanings of communications, and the facts in the case" to "come up with [his PoS] estimates." Ex. 4 at 123:1–17 (denying that Dr. Feigal employed "[a]ny other methodology"). Tellingly, neither Dr. Peck nor Dr. Feigal provide any examples in their collective experience of having concocted PoS figures as they do here. But even if they could, their "experience" is no substitute for a reliable methodology. *See GPNE Corp.*, 2014 WL 1494247, at *5 (expert's "'30 years of experience' does not constitute 'sufficient facts or data,' or 'reliable principles and methods'" under Rule 702; "'30 years of experience' cannot be tested or 'subjected to peer review and publication,' nor is there a 'known or potential rate of error,'" (quoting *Daubert*, 509 U.S. at 593–94)).

If the Report presented these PoS opinions with even a veneer of reliability, it was stripped away during Dr. Peck's deposition. Under oath, he refused to commit to Dr. Feigal's PoS figures, which he described as "***highly uncertain***" and "***not based in rigor***." Ex. 4 at 181:8–17, 112:11–113:7; *see also id.* at 180:18–181:17 (testifying that 50% PoS "could have been 60 percent, [or] could have been 45 percent"). More than once, Dr. Peck refused to "specifically adopt [the PoS] number[s]" in Dr. Feigal's Report, Ex. 4 at 180:18–190:21, and insisted that he was "***not going to be***

***held to any specific number***," *id.* at 188:16–17. This alone is sufficient to exclude Dr. Peck's PoS opinions. *See GPNE Corp.*, 2014 WL 1494247, at *4 ("When pressed to provide the calculations from which he derived" his specific royalty amount, expert conceded "[t]here's no specific math'"). But Dr. Peck went on to testify that **"*nobody knows what the specific number is*"** Ex. 4 at 181:14–15, and **"*even God doesn't know what the exact probability is*,"** *id.* at 192:14–193:1. This cannot be reconciled with Dr. Peck's affirmation that he had "adopt[ed] the Feigal Report (*including the opinions* set forth therein) *in full*." Ex. 3 ¶ 17. Because Dr. Peck has "affirmatively repudiate[d] or disavow[ed]" Dr. Feigal's PoS opinion, he "should be precluded from offering that opinion at trial." *See Mitchell v. Geo Grp. Inc.*, 2022 WL 874287, at *5 (D. Ariz. Mar. 24, 2022); *see also Snyder v. Bank of America, N.A.*, 2020 WL 6462400, at *6 (N.D. Cal. Nov. 3, 2020) (sufficiently serious "contradiction renders [expert's] opinion unreliable").

With or without Dr. Peck's catastrophic testimony, his PoS opinions are quintessential *ipse dixit*—the hallmark of unreliable expert testimony. *See Open Text*, 2015 WL 349197 at *4–6. In *Open Text*, as here, the expert (i) undertook a "*qualitative* assessment" of various factors based on her experience, (ii) purported to draw "precise *quantitative*" conclusions from the preceding qualitative assessment, and (iii) made an analytical leap between the two without any "formula, method, or calculation, however approximate, . . . to explain or justify [it]." *Id.* at *4. The court thus excluded the expert's testimony in its entirety:

> What mandates exclusion here, rather than simply subjecting the opinions to cross-examination, is not that the qualitative factors Holt discusses are improper considerations in determining a royalty, or that the reams of evidence that she claims she considered are beyond the pale. ***Exclusion is required because the link, if any, between those inputs and Holt's final royalty is written in invisible ink. Rather than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her "experience"—an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination***. Holt's method is a "black box into

> which data is fed at one end and from which an answer emerges at the other," and the jury cannot see how the pieces fit together or how the data drives the conclusion. Cross-examination cannot fix that problem.

*Id*. at *6. Here too, admitting Dr. Peck's PoS opinions would require the Court, Defendants, and the jury to blindly trust that a connection between Dr. Peck's or Dr. Feigal's "experience" and their made-up PoS numbers not only exists, but is *reliable*. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence" under these circumstances. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

#### 2. Dr. Peck's State of Mind opinions are unreliable and intrude on the jury's role as fact finder on the element of scienter.

In his final category of opinions, Dr. Peck presumes to know "what *senior management* of a *reasonable* drug manufacturer *would have understood* about [Acadia's] communications with FDA and the [PoS] for the DRP sNDA." Ex. 3, App'x C ¶¶ 163–65. In just three paragraphs, the Report concludes that, based on Dr. Peck's (or Dr. Feigal's) "experience and training, . . . a reasonable drug developer ***in the same situation as Acadia*** would have understood the relevant communications with FDA *as I have described and analyzed them*" and "assessed the probability of successfully obtaining FDA approval of the new DRP indication similarly to *how I have assessed that probability*." *Id.* ¶ 165.

These opinions should be excluded for two reasons: (1) they are not the product of any reliable methodology; and (2) they impermissibly intrude on the province of the fact finder with respect to the ultimate issue of scienter.

##### a. Dr. Peck's State of Mind opinions are not the product of *any* methodology, much less a reliable one.

At the outset, Dr. Peck's State of Mind opinions are necessarily unreliable for the same reasons as his underlying PoS opinions. If "even God doesn't know what the exact [PoS] is" at any point in time, Ex. 4 at 192:14–193:1, and if Dr. Peck himself

is unwilling to endorse the PoS figures in the Report, *id.* at 180:18–190:21, then he cannot reliably opine that a "reasonable" pharmaceutical-company executive would have assessed the likelihood of FDA approval as the Report did. *See Pascal*, 2022 WL 19076763, at *16 (opinions based on other unreliable opinions are, themselves, unreliable).

Nor is there any basis to conclude that Dr. Peck himself is qualified to opine about what a "reasonable" pharmaceutical company or executive would have "known" or "understood." There is nothing in his CV to demonstrate relevant experience, having never been a pharmaceutical company executive. Ex. 3, App'x A at 2–3. And while Dr. Feigal may have had at least some industry experience, Ex. 3, App'x C ¶ 1, Dr. Peck expressly disclaimed any reliance on Dr. Feigal's experience to support his opinions, Ex. 4 at 70:2–7. So, it cannot be said that *Dr. Peck's* opinions about what a "reasonable" pharmaceutical company or executive would have known are "matters growing naturally and directly" from his experience. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). This requires the exclusion of Dr. Peck's State of Mind opinions. *See Joiner*, 522 U.S. at 146; *AIG Retirement Servs., Inc. v. Altus Fin. S.A.*, 2011 WL 13213589, at *1–4 (C.D. Cal. Sept. 26, 2011) (excluding opinions regarding "what actions a 'prudent insurance commissioner' or what actions 'a reasonable [Board of Governors of the Federal Reserve System]' would have taken").

**b. Dr. Peck's State of Mind opinions impermissibly intrude on the province of the fact finder.**

Even if Dr. Peck had articulated a reliable methodology (he did not), his State of Mind opinions must be excluded because they intrude on the province of the fact finder by answering an ultimate issue in the case—whether Defendants acted with scienter. While the Report cloaks these opinions in the guise of a *hypothetical* "reasonable" pharmaceutical company or executive, Dr. Peck's deposition revealed how Plaintiffs intend to offer his opinions at trial: (a) to establish the standard by

which the jury should assess what *Defendants* knew or should have known, and (b) as conclusive evidence that Defendants acted *unreasonably* if they disagree (as they do) with Dr. Peck's interpretations of FDA communications and his PoS figures.

In his deposition, Dr. Peck effectively conceded that he is opining on Defendants' state of mind. Asked to explain what "reasonable" means, he offered "experienced" or "mature" as synonyms "[b]ecause ***Acadia*** is a well-known, established pharmaceutical company." Ex. 4 at 126:8–19. He then explicitly connected the dots, testifying that "***Acadia*** is the subject of this report," in which he opines as to what "***a reasonable company*** would have known with respect to the information and signals that they were aware of." *Id.* at 130:9–14. It follows, as Dr. Peck acknowledged, that a pharmaceutical company or its executives would necessarily be acting *unreasonably* if they disagreed with Dr. Peck's opinions. *See id.* at 216:7–12 ("Q. . . . whatever in the world [Dr. Feigal] meant by 'reasonable drug companies,' my question is, could a reasonable drug company have come to a dissimilar conclusion? A. Under my understanding of the word 'reasonable,' the answer is no."). He stepped even further across the line by suggesting that his "reasonable company" would have conformed its "public communications"—*i.e.*, Defendants' statements to investors that are alleged to be misleading—to Dr. Peck's own opinions of FDA communications and probabilities. *See id.* at 130:17–131:12.

Dr. Peck's testimony also confirms that his hypothetical pharmaceutical-company executive is a stand-in for the Acadia witnesses who would feature prominently at trial—including the individual defendants. *See id.* at 125:5–8 ("Q. What is your understanding of what Dr. Feigal meant by 'senior management'? A. CEO, head of regulatory, head of biostatistics, head of clinical development."); *id.* at 132:4–10 ("Q. What about [Defendant] Serge Stankovic? Are you offering an opinion as to what he should have or would have known? A. Well, to the extent that they are senior management, that could be in—that could be interpreted from this report, from—from our opinions.").

Dr. Peck's coy disclaimer that "the reader of this report will have to come their own conclusion as to whether or not [he's] discussing Acadia specifically" offers no reassurance. *Id.* at 130:14–16. His "testimony that a 'reasonable pharmaceutical company' would have done something different than [Defendants] is equivalent to opining that [Defendants] did not act reasonably." *Holley v. Gilead Sciences, Inc.*, 2023 WL 2469632, at *4–5 (N.D Cal. Feb. 27, 2023). Excluding Dr. Peck's State of Mind opinions is the only adequate remedy. *See id.* ("[E]ven if 'reasonable' lacks a specialized meaning in the law, allowing an expert to opine on how a 'reasonable' company would have acted would impermissibly intrude on the province of the jury."); *U.S. Fidelity and Guar. Co. v. Ulbricht*, 576 F. Supp. 3d 850, 857–58 (W.D. Wash. 2021) (excluding opinions "on the ultimate issue of [defendant's] reasonableness" or that otherwise constitute "testi[mony] on the applicable law"); *ChemoCentryx*, 2025 WL 1547625, at *11 (excluding opinions that "go[] to [the company's] state of mind and invade[] upon the province of factual determinations that the jury can make").

## IV. THE COURT SHOULD EXCLUDE DR. FEINSTEIN'S OPINIONS

### A. Background Relevant to Dr. Feinstein's Opinions

#### 1. Plaintiffs' Theory of Fraud and Associated Damages

Plaintiffs' overarching theory of fraud is that "Defendants violated the federal securities laws by deceiving investors regarding the ***likelihood of [FDA] approval*** of [pimavanserin for DRP] . . . to artificially inflate the market price of Acadia securities." ECF 65 at 2. At class certification, Plaintiffs' expert, Dr. Feinstein, claimed he could calculate damages by: (1) computing the difference between the market's ***perceived*** and ***true*** likelihood of approval—or PoS—of Acadia's sNDA, and (2) then analyzing how that difference manifested in Acadia's stock price. ECF 122-4 ¶ 101. Dr. Feinstein stated he could use "consensus analyst estimates" to compute the market's ***perceived*** PoS, and he could "rely on the likelihood of approval as assessed by a competent expert with expertise relevant to assessing the prospects

for FDA drug approval" to estimate the market's ***true*** PoS. *Id*. ¶¶ 101–02.

In his Loss Causation & Damages Report, Dr. Feinstein contends that (i) Acadia's stock price was artificially inflated by alleged misstatements made on two dates at the beginning of the Class Period (September 9 and December 4, 2019);[8] and (ii) that the truth about the alleged misstatements was revealed in disclosures on two dates at the end of the Class Period (March 8 and April 5, 2021),[9] thereby dissolving the alleged artificial inflation and causing investors' losses. Ex. 12 ¶¶ 265–81, 289–305.

### 2. Key Definitions

For simplicity, this motion defines the following concepts, which are central to Plaintiffs' theory of damages and are critical components of Dr. Feinstein's (flawed) attempt to calculate artificial inflation:

- ***Actual Market PoS***.[10] This is the ***market's unobserved*** PoS for Acadia's sNDA that actually existed during the Class Period. It is the parameter that would be calculated if one could survey every one of the millions of Acadia investors to obtain their own PoS estimates and find the average of those estimates. This PoS is unobserved because it is theoretical—such a survey could not feasibly be conducted. Ex. 22 at 153:3–16.
    - ***Average Analyst PoS***. This is Dr. Feinstein's ***estimate*** of the *Actual Market PoS*, which he calculates by averaging the PoS numbers reported by certain analysts covering Acadia at various points in time. Ex. 12, App'x A–E. Dr. Feinstein admits (as he must) that his averages of analysts' PoS numbers are ***estimates*** of the *Actual Market PoS*. Ex. 22 at 134:2–20, 150:5–10.
- ***But-For Market PoS***.[11] This is the ***market's unobserved*** PoS for Acadia's sNDA that would have existed in the but-for world (of full disclosure absent any alleged fraud) during the Class Period. Again, this parameter is unobserved for the same reason as the *Actual Market PoS* and because it is the population parameter in an alternate state of the world. Dr. Feinstein assumes *But-For Market PoS* is numerically equivalent to the unobserved "true" PoS. *Id*. at 140:7–23.

---

[8] *See* Exs. 13, 14, 15, 16, 17.

[9] *See* Exs. 18, 19, 20, 21.

[10] The *Actual Market PoS* was also referred to as the "market-assessed PoS" during Dr. Feinstein's deposition. *E.g.*, Ex. 22 at 143:10–14.

[11] The *But-For Market PoS* was also referred to as the "but-for market-assessed PoS" and "true PoS" during Dr. Feinstein's deposition. *E.g.*, Ex. 22 at 143:15–22.

- ***Dr. Feigal's PoS***. This is Dr. Feinstein's ***estimate*** of the *But-For Market PoS*, which is equal to Dr. Feigal's subjective PoS opinions as to the "true" likelihood of approval of Acadia's sNDA at various points in time. Again, Dr. Feinstein admits that Dr. Feigal's opinions are ***estimates*** of the *But-For Market PoS*. Ex. *Id*. at 165:23–166:6.

| | Pre-9/9/19 | Post-9/9/19 | Post-12/4/19 | Post-7/20/20 | Post-3/9/21 | Post-4/5/21 |
|---|---|---|---|---|---|---|
| *Avg. Analyst PoS*[12] | 41% | 84% | 86% | 88% | 68% | 37% |
| *Dr. Feigal's PoS*[13] | 50% | 70% | 30% | ≤10% | ≤10% | 0% |

### 3. Artificial Inflation as of September 9, 2019

The Class Period begins on September 9, 2019. On that date, Acadia announced (in a press release and during an investor call) that it was stopping the Harmony Study early because it met the prespecified efficacy condition. Exs. 13, 14. According to Dr. Feinstein, there was a statistically significant increase in Acadia's stock price following these disclosures. Ex. 12 ¶ 265. Plaintiffs allege that Defendants made material misstatements on September 9, so Dr. Feinstein concludes that Acadia's stock price was artificially inflated as a result. *Id*. ¶¶ 265–74. However, he concedes that "not all of that increase was fraud-related artificial inflation"—some of it was legitimate inflation that would have occurred without any alleged fraud. *Id*. ¶ 30. To isolate alleged artificial inflation present in Acadia's stock as of that date, Dr. Feinstein starts with the difference in *Average Analyst PoS* ***pre***-September 9 (41%) and ***post***-September 9 (84%). *Id*. ¶¶ 266, 271. He then assumes that the observed residual price increase ($15.40) was driven entirely by the observed change (43 percentage points) in *Average Analyst PoS* that he calculated. *Id*. ¶¶ 266–67. Dr. Feinstein then borrows *Dr. Feigal's PoS* (of 70% post-September 9) as his estimate for the unobserved *But-For Market PoS*. Using this guesstimate, Dr. Feinstein assumes that the unobserved market PoS would have increased by only 29 percentage

[12] Ex. 12, App'x A–E.

[13] Ex. 3, App'x C ¶¶ 149–62.

points (from 41% to 70%), instead of 43 percentage points (from 41% to 84%), in the but-for world of full disclosure and no fraud. And, in turn, he assumes that the market's PoS post-September 9 was overstated by 14 percentage points—*i.e.*, the difference between his two estimates: *Average Analyst PoS* (84%) and Dr. Feigal's PoS (70%). From this arithmetic, he then concludes that 67.44% (29 divided by 43), or $10.39, of Acadia's $15.40 residual stock price increase on September 9 "was legitimate optimism borne of the promising top-line Harmony Study results, and was not induced by the alleged misrepresentations and omissions." *Id.* ¶ 272. And the remaining 32.56% (14 divided by 43), or $5.01, of Acadia's $15.40 residual stock price increase on September 9 was artificial inflation due to "an overestimation of the PoS that was induced by the misrepresentations and omissions." *Id.* ¶¶ 265, 272–73.

**4. Artificial Inflation as of December 5, 2019**

To calculate artificial inflation present in Acadia's stock price as of December 5, 2019 (following Acadia's presentation of the Harmony Study results at CTAD and during an investor call on December 4), Dr. Feinstein abandons the methodology he used for September 9. He does not analyze any changes or observed differences in *Average Analyst PoS* or *Dr. Feigal's PoS*. In fact, he does not use any PoS estimates at all. Instead, he just asserts that, in the but-for world, Acadia's stock price would not have risen by $7.03 (the residual stock price increase on that date) and instead would have dropped by $15.40. Ex. 12 ¶¶ 275–81. This is because "the market would have known that all of the prior increased optimism, higher assessed PoS, and both the legitimate and illegitimate components of the stock price increase that was elicited by Defendants' statements on 9 September 2019 and was thereafter maintained by Defendants' subsequent statements, were unwarranted." *Id.* ¶¶ 280, 39 ("any substantial hope for a near-term FDA approval based on completed studies would have been all but dashed"). Dr. Feinstein bases his conclusions on (1) Defendants' alleged failure to disclose the existence of the purported directional

consistency requirement; ***and*** an additional omission: Defendants' alleged failure to ***either*** (2a) affirmatively tell the public that Harmony's results did not meet that requirement, ***or*** (2b) disclose additional subgroup data that would have allowed investors to conclude the requirement had not been met (although Dr. Feinstein could not say what that additional data might have been). Ex. 22 at 114:21–116:20.

Thus, Dr. Feinstein concludes that "as of 5 December 2019, the artificial inflation in Acadia's stock price comprised all of the residual stock price increase that had occurred on 9 September 2019 ($15.40) plus all of the residual stock price increase that occurred on 5 December 2019 ($7.03). This combined amount is $22.43 per share." Ex. 12 ¶ 281.

**5. Loss Causation**

Dr. Feinstein concludes that the $22.43 per share of artificial inflation present in Acadia's stock price (as of December 5, 2019) was first dissipated on March 9–10, 2021,[14] right after Acadia announced its receipt of the FDA's Deficiencies Letter ("DL"). Ex. 12 ¶¶ 289–98. Dr. Feinstein claims the entire net residual stock price decline ($19.69) following the disclosure of the DL was fraud-related and, therefore, dissipation of artificial inflation. *Id.* ¶¶ 297. He then claims that the remaining artificial inflation ($2.74) was eliminated on April 5, 2021, when Acadia's stock price suffered a residual decline of $4.51 right after the Company announced its receipt of the FDA's Complete Response Letter ("CRL"). *Id.* ¶¶ 299–305. This is just arithmetic. The two residual stock drops add up to $24.20. So, Dr. Feinstein subtracted $22.43 (alleged artificial inflation) from $24.20, which then yielded a difference of $1.77. He graciously attributes this remainder to the "margin of conservatism" he claims to have built into his estimate of artificial inflation or to "the

[14] Dr. Feinstein's use of a two-day event window on March 9–10, 2019 is inconsistent and self-serving. He uses a two-day window only because not doing so would leave him with virtually no remaining inflation left to be dissipated on April 5, 2021—an absurd result he would be hard-pressed to adequately explain. *See* Ex. 23 ¶¶ 45, 112–13. *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015) (rejecting two-day window in efficient market).

elimination of a vestige of optimism in the market's outlook that was not caused by the alleged misrepresentations and omissions." *Id.* ¶¶ 304–05. Thus, Dr. Feinstein calculates damages up to $22.43 per share. *Id.* ¶ 25.

Dr. Feinstein did not analyze Acadia's announcements of the DL or CRL, or the DL and CRL themselves, to connect the information contained therein to specific alleged misstatements. Instead, he relied on his event study to purportedly demonstrate that the ***totality*** of "Company information" conveyed to the market on March 8 and April 5, 2021, resulted in decreases in Acadia's stock price, thereby dissipating artificial inflation. *Id.* ¶¶ 246–53. That is, his loss causation analysis is limited to "the observed statistically significant Acadia price increases following alleged misrepresentations and omissions, and based further on the observed statistically significant price decreases when markets opened after the corrective disclosures . . . ." *Id.* ¶ 254.

Dr. Feinstein claims he did not need to analyze the alleged corrective disclosures to determine whether they did indeed correct previous alleged misstatements and omissions because that was simply a factual allegation by Plaintiffs which he could assume was true. *See infra* at IV.B.1.a. Likewise, Dr. Feinstein did not disentangle the materialization of known from unknown risks associated with the alleged corrective disclosures because he "determined that by measuring inflation based on the front end of this class period and in this case would not require me to make that disaggregation on the back end." Ex. 22 at 273:6–274:2.

### B. Argument Supporting Exclusion of Dr. Feinstein's Opinions

Dr. Feinstein's opinions should be excluded because: (1) his loss causation analysis is unreliable; (2) his calculation of artificial inflation on September 9, 2019 is unreliable, and (3) his calculation of artificial inflation on December 5, 2019 is unreliable.

#### 1. Dr. Feinstein's Analysis of Loss Causation Is Unreliable.

Loss causation is the "causal connection between the material

misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To satisfy this element, Plaintiffs "must show that revelation of [Defendants'] misrepresentation or omission was a substantial factor in causing a decline in the security's price." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013). Plaintiffs must show that "it was the ***very facts about which the defendant lied which caused its injuries***." *Id.* at 1119–20. In the end, the ultimate issue is whether Defendants' misstatements, "***as opposed to some other fact***, foreseeably caused the plaintiff's loss." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022). Therefore, for Feinstein's opinions to be admissible, he must help a jury understand Plaintiffs' theory that the alleged misstatements resulted in Plaintiffs' losses.

Here, Dr. Feinstein identifies two corrective disclosure dates that he says caused Plaintiffs' loss: (a) March 8, 2021, when Acadia announced receipt of the DL; and (b) April 5, 2021, when Acadia announced receipt of the CRL. As to the first (March 8), Dr. Feinstein says the disclosures on that day "partially corrected" the alleged misstatements because, absent those misstatements, the news "would not have been a surprise to the market." Ex. 12 ¶¶ 40–41. And, as to the second (April 5), that day's disclosures revealed that "the FDA had not been persuaded that the contents of the sNDA, contrary to the market's induced belief engendered by the Defendants' prior alleged misrepresentations and omissions." *Id.* ¶ 43. But these conclusions are untethered to any analysis at all, much less one demonstrating that investors' losses were caused by the "very facts about which the defendant[s] lied." *Nuveen*, 730 F.3d at 1119–20. And to the extent he performs any analysis, it does not prove loss causation and thus is not helpful to a jury. Instead, Dr. Feinstein (a) assumes the very element that he was asked to prove—loss causation; and (b) does not disaggregate the losses, if any, caused by the disclosure of fraud-related and non-fraud-related information. This renders his loss causation opinions unreliable, unhelpful to a jury, and inadmissible under Rule 702.

#### a. Dr. Feinstein assumes the truth of Plaintiffs' loss causation allegations rather than performing a rigorous analysis of them.

Dr. Feinstein cannot simply ***assume*** the very fact he is required to prove—that the allegedly fraudulent statements caused Plaintiffs' damages. *See In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *28 (N.D. Cal. June 19, 2009) (excluding expert testimony where expert "assumes what he sets out to prove"), *aff'd sub nom. In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1243 (E.D. Wash. 2002) (excluding expert testimony where expert "assumes the fact to be proved"). Further, it is not enough to show that Acadia's stock price was artificially inflated and that the artificial inflation was later dissipated—Plaintiffs must also prove that ***Defendants' misstatements*** caused their loss. *Dura*, 544 U.S. at 342–46 (rejecting the "inflated purchase price" approach to loss causation and holding that plaintiffs "need to ***prove*** proximate causation and economic loss"); *Erica P. John Fund v. Halliburton*, 563 U.S. 804, 812 (2011) (to prove loss causation, a plaintiff must "show that a misrepresentation that affected the integrity of the market price ***also caused*** a subsequent economic loss").

Here, Dr. Feinstein did not even attempt to analyze whether or how the specific information disclosed by Acadia at the end of the Class Period corrected Defendants' previous alleged misstatements.[15] Instead, he testified that he ***assumed*** as true Plaintiffs' allegations, rather than performing his own analysis. For example:

- "[M]y understanding is the allegation is that the deficiencies that were

[15] Dr. Feinstein did not analyze the content of the March 8 and April 5, 2021 disclosures to determine whether they were indeed corrective, despite claiming to have done so regarding Acadia's July 20, 2020 disclosures (Exs. 24, 25). Dr. Feinstein claims that, as to July 20, 2020, he could not "conclude ***definitively*** that any portion of the price decline was caused by a correction of the alleged misrepresentations" because no information was disclosed that "***specifically*** corrected prior misrepresentations." Ex. 12 ¶¶ 243, 285. His "analysis" and conclusion are self-serving and transparent. The disclosures of March 8 and April 5, 2021, did not ***specifically*** correct prior misrepresentations such that one could ***definitively*** conclude they were corrective, yet Dr. Feinstein claims they caused loss. And, if he had treated the July 20, 2020 disclosures as partially corrective, then he would have had very little (or even zero) artificial inflation left to dissipate on April 5, 2021, when Acadia announced the CRL—an absurd result.

identified are alleged to have been related to what's alleged to have been misrepresented to the market. And that's why it wasn't necessary for me to dig deeper into the causes for this letter, the DL." Ex. 22 at 219:23–221:7.

- "***It's a factual allegation that I assumed***; the DL was motivated by information related to what was also alleged to have been misrepresentations and omissions. The same for the CRL. ***So I didn't do that analysis myself***." *Id*. at 221:8–17.

This is fatal because, absent any analysis of the corrective disclosures, Dr. Feinstein has, at best, only shown that Defendants' alleged misstatements may have contributed to inflating Acadia's stock price. But this "inflated purchase price approach to proving causation and loss" is ***precisely*** what the U.S. Supreme Court rejected in *Dura*. 544 U.S. at 342–46 (An "inflated purchase price suggests that the misrepresentation . . . touches upon a later economic loss," but "[t]o touch upon a loss is not to ***cause*** a loss, and it is the latter that the law requires"). Thus, by failing to perform any relevant analysis, Feinstein's testimony cannot satisfy Rule 702's reliability requirement. *See Strougo v. Tivity Health, Inc.*, 2025 WL 1415896, at *5 (M.D. Tenn. May 15, 2025) (excluding expert opinion for simply assuming that information in a corrective disclosure was attributable to defendants' fraud).

**b. Dr. Feinstein's opinion is not helpful to a jury because it does not isolate the impact of alleged fraudulent statements from non-fraudulent statements.**

Moreover, Dr. Feinstein fails to isolate losses caused by the disclosure of allegedly corrective information. Instead, his analysis shows only that Acadia's "stock reacted to the ***entire bundle*** of negative information" surrounding the announcements of the DL and CRL, but "this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the ***culpable*** disclosure to the stock-price movement." *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007) (abrogated in part on other grounds); *see also Nelson v. Matrixx Initiatives, Inc.*, 592 F. App'x 591, 592 (9th Cir. 2015) (affirming district court's exclusion of expert testimony where expert was unable to provide a reliable method for determining specific causation and noting

"[e]limination of the potential causes must be founded on more than subjective beliefs or unsupported speculation"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010) (excluding expert opinion that "fail[ed] to separate the loss caused by the disclosure of corrective information (new, negative, company-specific, revealing a prior misrepresentation or omission) from loss caused by the disclosure of other company-specific information"); *Tivity*, 2025 WL 1415896, at *6 (excluding expert opinion where it did not "apply any principled or economic method" to establish that the information labeled corrective was indeed corrective).

Here, Dr. Feinstein's event study does not, and cannot, separate the loss associated with any fraud-related information from the loss associated with non-fraud-related information. At best, Dr. Feinstein's event study shows that Acadia's stock price reacted to the ***entire bundle*** of information disclosed on each of the alleged corrective disclosure dates. In other words, Dr. Feinstein has done nothing to prove whether, and to what extent, Plaintiffs' losses were, in fact, caused by the materialization of ***unknown*** risks (*e.g.*, Plaintiffs' alleged risk of FDA rejection based on Harmony's alleged failure to achieve the so-called directional consistency requirement) instead of the materialization of ***known*** risks (*e.g.*, the risk of FDA rejection because FDA changed its mind about Harmony or was simply not convinced by Acadia's submission). *See Tivity*, 2025 WL 1415896, at *6.

In *Tivity*, the court confronted this exact issue and excluded plaintiffs' loss causation expert because he did not consider whether factors other than the defendants' alleged fraud may have played a role in causing the stock price decline, particularly in light of the defendants' prior risk disclosures. *See* 2025 WL 1415896, at *5–6. Plaintiffs' expert "knew that the market *did* know information about the Nutrition segment's poor performance prior to the release of the Corrective Disclosures," and "knew that the market already anticipated that the Nutrisystem merger may have failed irrespective of Defendants' fraud." *Id.* at *6. He "ignore[d] this information" and did not "account in any way" for the possibility "that Tivity's

stock drop occurred not from information Defendants hid from the public, but from market forces that investors already had knowledge of." *Id.*

The same is true here. Dr. Feinstein did not even consider, much less analyze, the content of the corrective disclosures. And he did nothing to disentangle known risks from unknown risks.

> Q. Okay. Let's go to talk again about the deficiency letter and the CRL. So in connection with those disclosures, did you do anything to disentangle the known risks from the unknown risks in connection with the deficiency letter and the CRL?
>
> A. I considered it and then realized that the methodology that was best suited to this particular case didn't require that. I was well aware of the argument about known risks—about realization of known and disclosed risks versus realization of concealed or underestimated risks. I was well aware of that argument. ***And I had determined that by measuring inflation based on the front end in this class period and in this case would not require me to make that disaggregation on the back end***.

Ex. 22 at 273:4–21. Confronted at his deposition with the fact that neither Acadia's announcements of the DL and CRL, nor the CRL itself, reference any directional consistency requirement, and thus cannot have corrected a previous omission of the alleged requirement, Dr. Feinstein opined that, post-April 5, 2021, analysts "fe[lt] they were misled about what the FDA required." *Id.* at 286:5–11; *see also* Ex. 12 ¶¶ 155–56. Further confronted with the fact that ***no analyst said anything of the sort***, Dr. Feinstein gave a convoluted answer making clear that his "analysis" of analysts' statements was nothing but subjective guesswork about what he believed they might have meant or implied by their comments. Ex. 22 at 286:13–302:20. *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *12 (E.D.N.Y. Jan. 11, 2022) (rejecting Dr. Feinstein's opinions as "purely subjective analysis masquerading as a kind of objective assessment" because he cherry-picked analyst statements to fit his narrative).

Moreover, Dr. Feinstein admits that some of the information cited in the CRL was previously disclosed back in December 2019. *See* Ex. 22 at 274:13–279:2. For example, in the April 5, 2021 disclosure, Acadia flagged the "lack of statistical

significance" and small sample sizes in some of the subgroups of dementia as shortcomings cited by the FDA in the CRL. Ex. 20 at 1. But this information was already public, which Dr. Feinstein readily admitted:

> But what I did see is that from what was divulged or released, ***one can see that there was a lack of statistical significance on one metric—at least one metric in some subgroups***. . . . I know there was information released about sample sizes. I don't know if all the information about sample sizes was released. ***But some sample size data was definitely released***.

Ex. 22 at 273:5–18.

Thus, Dr. Feinstein "fails to both causally link Defendants' fraud to [Acadia's] stock decline, and to identify the exact portion of that decline that differentiates between any revealed fraud" and natural reactions of investors to the occurrence of a risk they always knew about—that the sNDA might fail. *Tivity*, 2025 WL 1415896, at *6; *see also REMEC*, 702 F. Supp. 2d at 1274 (striking plaintiffs' loss causation expert—whose own analysis demonstrated that the corrective disclosures "contained multiple pieces of company specific information, some negative, some positive, some allegedly fraudulent, and some not"—because his "***failure to consider [confounding] information demonstrates that his methodology is flawed to the point of being unreliable***").

**2. Dr. Feinstein's Analysis of Artificial Inflation Associated With Acadia's Disclosures on September 9, 2019 Is Unreliable.**

Dr. Feinstein's analysis of artificial inflation associated with Defendants' alleged misstatements on September 9, 2019, is unreliable for at least two reasons: (a) his reliance on Dr. Feigal's subjective PoS number as a stand-in for the unobserved *But-For Market PoS* is misguided and (b) he fails to measure and account for obvious error associated with his PoS estimates.

**a. Dr. Feinstein's reliance on Dr. Feigal's PoS opinions is unreliable and unscientific.**

Dr. Feinstein's calculation of artificial inflation at the start of the Class Period depends entirely on Dr. Feigal's 70% guess of the "true" PoS for Acadia's sNDA following the September 9, 2019 disclosures. *See supra* at IV.A.3. This is problematic for several reasons.

**First**, all of Dr. Feigal's PoS numbers are unreliable and should be excluded. *See supra* at III.B.1. Indeed, Dr. Peck has disowned Dr. Feigal's PoS opinions (*see supra* at III.B.1.b.) and provided no PoS estimates of his own. Dr. Peck refused to endorse even a ***range*** of possible PoS estimates because "***[t]hat's not a reasonable thing for an expert to do***." Ex. 4 at 184:1–190:2. Without Dr. Feigal's 70% PoS estimate, Dr. Feinstein has no baseline with which to measure artificial inflation under his own methodology. Thus, if this Court excludes Dr. Peck's PoS opinions (as it should), then it must also exclude Dr. Feinstein's September 9, 2019 artificial inflation analysis. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases her opinion on—or simply repeats—the unreliable opinion of another expert, a district court may properly exclude the first expert's testimony."); *see Sims v. Kia Motors of America, Inc.*, 839 F.3d 393, 404–406 (5th Cir. 2016) (excluding expert opinion that relied on another expert's inadmissible opinion). The Court need look no further to exclude Dr. Feinstein's analysis of September 9.

**Second**, even if Dr. Feigal's PoS numbers were admissible (they are not), Dr. Feinstein cannot rely on them because he admitted that he could not, and did not, assess their validity. When asked how Dr. Feigal arrived at his PoS figures, Dr. Feinstein admitted he could not articulate Dr. Feigal's methodology and did not know what data Dr. Feigal relied on. Instead, he pointed only to Dr. Feigal's "expertise" and "impeccable credentials," while claiming he "paid more attention to [Dr. Feigal's] conclusions [than] his methodology" because he "believed they were

reliable." Ex. 22 at 164:21–166:17. By uncritically relying on Dr. Feigal, Dr. Feinstein's analysis falls well short of Rule 702's reliability threshold. *See Pascal*, 2022 WL 19076763, at *16 ("when an expert does not assess the validity of the opinions of another expert that he relies on and shows unblinking reliance on another's opinions, that demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results"); *Leese v. Lockheed Martin Corp*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (finding expert opinions were "not of a type reasonably relied upon by experts" where they were based upon the opinions of another expert "without an explanation"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (excluding expert who relied on party's damages estimates but failed to "explain why he relied on such estimates" and "demonstrate why he believed the estimates were reliable").

Experts may not rely on "arbitrary, plucked out of thin air percentages in damages apportionment analyses." *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *2 (N.D. Cal. Mar. 17, 2020) (excluding opinion of expert who relied on percentages proffered by another expert who failed to provide the methodology or facts supporting them). Yet, that is precisely what Dr. Feinstein does by blindly relying on Dr. Feigal's PoS numbers. There is no evidence suggesting Dr. Feigal's subjective PoS figures are accurate, much less that they can be used to approximate the unobserved *But-For Market PoS*.[16] Prior to September 9, ***before*** the market was allegedly misled, *Dr. Feigal's PoS* of 50% was substantially different than Dr. Feistein's *Average Analyst PoS* of 41%. *Compare* Ex. 3, App'x C ¶ 156 *with* Ex. 12 ¶ 64. In other words, at precisely the time when the two ***unobserved*** parameters should have been the same (because no alleged fraud had yet occurred), the observed PoS ***estimates*** were different (by nine percentage points)—but that difference ***cannot have been caused by fraud***. Why then should Dr. Feinstein assume any observed

[16] Dr. Feigal did not purport to estimate *But-For Market PoS*—he estimated ***true*** PoS. *See supra* at III.B.1. Dr. Feinstein simply assumes *But-For Market PoS* is numerically equal to true PoS here. Ex. 22 at 140:7–23.

difference between the PoS estimates ***after*** September 9, 2019 consists entirely of artificial inflation caused by fraud? He presents no evidence at all for this inferential leap. *See Domingo*, 289 F.3d at 607 ("a trial court may exclude evidence when it finds that there is simply too great an analytical gap between the data and the opinion proffered").

**b. Dr. Feinstein's analysis shows a lack of scientific rigor by failing to deal with potential error.**

An expert's opinion fails Rule 702—and ***must*** be excluded as unreliable—when the expert does not use the same rigor as an expert in the field. *See Kumho Tire*, 526 U.S. at 147. Courts consider "whether the known or potential rate of error is acceptable" when determining an expert opinion's reliability. *Daubert*, 43 F.3d at 1316. And a failure to "explain what measure is used to determine the margin of error" is grounds for expert exclusion. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 2005 WL 5955701, at *3–4 (S.D. Fla. Aug. 17, 2005); *see also CCM Rochester, Inc. v. Federated Invs., Inc.*, 2016 WL 11617452, at *5–7 (S.D.N.Y. Aug. 31, 2016) (failure to calculate and account for standard deviation was "sufficiently egregious for the Court to conclude that [the expert] lacks good grounds for his conclusions").

**First**, Dr. Feinstein fails to calculate and account for any error associated with the PoS point estimates used in his inflation analysis. Dr. Feinstein admits the numbers he calculates (41% and 84%) to approximate the unobserved *Actual Market PoS* are ***estimates***, derived by averaging the PoS assumptions reported by a sample of analysts covering Acadia. *Supra* at IV.A.2–IV.A.3. Likewise, Dr. Feinstein admits that *Dr. Feigal's PoS* of 70%, which he uses to measure the unobserved *But-For Market PoS*, is also a "***point estimate***." *Id.*; Ex. 22 at 167:3–4.

A point estimate in this context is a single number, derived from a sample, that approximates a population parameter. *See* Ex. 26 ¶¶ 35–36 (where Plaintiffs' biostatistics expert, Dr. Madigan, describes the use of point estimates in the analysis

of clinical study results to make broader inferences, a similar process to what Dr. Feinstein should have done here). Here, the population parameters of interest are the: (a) *Actual Market PoS*; and (b) *But-For Market PoS*, both of which are ***unobserved***. And the associated samples are: (i) the Acadia analysts identified by Dr. Feinstein (a sample of 9); and (ii) Dr. Feigal (a sample of 1).[17] It is well understood that "[r]andom error will throw [an] estimate off the mark." Federal Judicial Center, *Reference Guide on Statistics* (3rd ed., 2015), at 241.[18] As a result, it is customary to report "the standard error and a confidence interval" associated with an estimate. *Id.* Here, Dr. Feinstein does not even bother to report standard errors, much less calculate a confidence interval around his point estimates, even though "[o]ne could easily do that." Ex. 22 155:15–156:10.[19] Instead, when asked about this at his deposition, Dr. Feinstein suggested that it was "irrelevant" and "meaningless." *Id.* at 157:4–12. This strains credulity and cannot be squared with Plaintiffs' own biostatistics expert (Dr. Madigan), who said: "[Y]ou can use the difference between two point estimates as an estimate of the difference. ***But, yeah, it is subject to random error, and it's also subject potentially to systematic error***." Ex. 27 at 60:13–61:4.

**Second**, Dr. Feinstein does not perform any testing or provide any reliable evidence to suggest that the unobserved *Actual Market PoS* was truly different from the unobserved *But-For Market PoS*. *E.g.*, Ex. 22 at 155:7–156:10. The testimony of Plaintiffs' expert Dr. Madigan on this point is fatal. At his deposition, Dr. Madigan was asked how he would determine whether there is any true difference between two

[17] Dr. Feinstein provides no explanation, much less a sound justification in statistics or economics, for relying on a ***single*** person's subjective guesswork to estimate an unobserved market parameter. Indeed, had Dr. Feinstein consulted multiple experts to independently generate estimates of "true" PoS, those estimates likely would have varied significantly. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018) ("[I]nconsistent results are an 'indicia of unreliability' in an expert's methodologies.").

[18] https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf

[19] Dr. Feinstein could ***not*** calculate a standard error associated with Dr. Feigal's 70% number because he has no idea how Dr. Feigal arrived at his number. Ex. 22 166:24–169:6.

unknown parameters: A and B. He explained, "You should do a hypothesis test and compute a p-value. You can compute the confidence intervals . . . ***The right thing to do is just do a hypothesis test of the difference and get a p-value. That would be [] the direct route to answer the question that you're focused on***." Ex. 27 at 60:13–63:1.[20]

But Dr. Feinstein did not test the very hypothesis that motivates Plaintiffs' theory of damage—*i.e.*, whether the unobserved *Actual Market PoS* was artificially high following the alleged misstatements on September 9, 2019. Stated differently, was there a statistically significant difference between the unobserved *Actual Market PoS* and the unobserved *But-For Market PoS*? Dr. Feinstein has no reliable answer because he did not even compute standard errors for his PoS estimates, much less calculate confidence intervals or formally test this hypothesis.[21] Thus, Dr. Feinstein has no reasonable basis for confidence in the PoS estimates, yet he uses them to calculate artificial inflation as of September 9, 2019, with purported precision down to the cent. Ex. 12 ¶ 273 ($5.01 per share of artificial inflation). This lack of reliability is particularly striking here because every percentage point difference represents millions of dollars in potential damages.

Put simply, Dr. Feinstein's failure to deal with the error in his PoS estimates—or to even admit that error exists—warrants exclusion. *See Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1168 (E.D. Wash. 2009) (failure to properly account for error "shows a lack of scientific rigor" resulting in "scientifically

[20] This is particularly salient here, where Dr. Feinstein's sample of analyst PoS assumptions ranged from 15% to 65% before September 9, 2019, and from 65% to 100% right after. Ex. 12, App'x A. Thus, *Dr. Feigal's PoS* of 70%, which Feinstein uses as the estimate for the *But-For Market PoS* post-September 9, 2019, is ***inside*** the range of analyst PoS assumptions used to calculate the *Average Analyst PoS*. This should have been a red flag to Dr. Feinstein that he needed to test whether there was evidence of an actual difference between the two unobserved parameters of interest.

[21] Dr. Feinstein could not have conducted this test even if he wanted to because his use of one observation (*i.e.*, *Dr. Feigal's PoS* of 70%) to estimate the *But-For Market PoS* makes it impossible: one cannot compute a standard error based on a single observation. *See* Ex. 27 at 63:22–64:21.

unsupported leap[s] of faith which [are] condemned by *Daubert*"); *Cytogel*, 2018 WL 6169266, at *7 (expert "report is an exercise in arithmetic that disguises the fact that it is based on unsupported and unreliable assumptions").

### 3. Dr. Feinstein's Analysis of Artificial Inflation Associated With Acadia's Disclosures on December 4, 2019 Is Unreliable.

On December 4, 2019, Acadia presented the Harmony Study results at the 12th Annual Clinical Trials of Alzheimer's Disease (CTAD) meeting and during an investor call later that same day. Exs. 15, 16. According to Dr. Feinstein, the alleged misstatements on this day[22] caused an additional $17.42 of artificial inflation in Acadia's stock price (for a total of $22.43 per share), where it allegedly remained until March 9, 2021. Ex. 12 ¶ 38. Dr. Feinstein's analysis of artificial inflation regarding Acadia's alleged misstatements on December 4, 2019 is unreliable for two reasons: (a) he abandons his PoS comparison methodology, which leaves him with no methodology at all; and (b) he fails to disentangle the fraud-related and non-fraud-related impacts on Acadia's stock price.

#### a. Dr. Feinstein's analysis is unreliable because he fails to apply any discernible methodology supporting his conclusions.

Rule 702 does not permit a court to overlook glaring inconsistencies in an expert's application of a chosen methodology, because inconsistent application of an expert's methodology is strong evidence of unreliability. *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 494 F. Supp. 2d 256, 258 (S.D.N.Y. 2007) ("an expert's own failure to consistently apply his methodology can form the basis for the exclusion of any resulting opinions"); *Onglyza*, 93 F.4th at 347–48 (excluding expert who "inconsistently applied" his methodology); *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking . . . is a quintessential example of applying methodologies . . . in an unreliable fashion").

[22] In their complaint, Plaintiffs do not challenge the disclosures on December 4, 2019 as false or misleading. ECF 45.

Here, Dr. Feinstein admits he followed a different methodology for evaluating the impact of the September 9 and December 4, 2019 statements. For September 9, 2019, Dr. Feinstein tried to measure artificial inflation by estimating the difference between the *Actual Market PoS* and the *But-For Market PoS*. *Supra* at IV.A.3. But he abandons that effort for December 4, 2019, despite having an estimate for the *Actual Market PoS* (86%) and another number from Dr. Feigal (30%) available for comparison. *Supra* at IV.A.2. This leaves Dr. Feinstein with only his conclusory assertion that a "reasonably full and non-misleading disclosure" on that date would have revealed that "any substantial hope for a near-term FDA approval based on completed studies would have been all but dashed," rendering ***all*** residual stock price increases on September 9 and December 5, 2019 artificial inflation. *Supra* at IV.A.4.

But there is no analysis or methodology at all to support Dr. Feinstein's self-serving conjecture. Dr. Feinstein assumes that analysts would have concluded that the sNDA was destined for rejection by the FDA, but in fact numerous analysts reviewed the Harmony subtype data released at that time for directional consistency and concluded that it supported the application. *E.g.*, Ex. 28 at 1 ("Nuplazid showed a ***positive trend across*** Alzheimer's disease, dementia with Lewy bodies, and Parkinson's disease ***subgroups***"); Ex. 29 at 1–2 ("the efficacy is ***consistent across dementia subgroups*** . . . [i]n the open-label period, Nuplazid had ***clinically meaningful reduction of psychosis across all 5 dementia subtypes***"); Ex. 30 at 1 ("data showed ***strong initial response as well as relapse prevention*** with pima treatment ***across the subtypes***"); Ex. 31 at 1 ("Nuplazid demonstrated significant benefit in psychosis reduction in the open-label treatment period and reduced the risk of relapse [] and all-cause discontinuation [] in in the double-blind randomized withdrawal period – which was ***consistent across all dementia subtypes***"); *see also* Ex. 23 ¶¶ 71–72, 100–01. Dr. Feinstein provides no evidence or methodology supporting his conclusion that a "reasonably full and non-misleading disclosure" would necessarily have resulted in Acadia's stock price returning to pre-Class Period

levels—*i.e.*, before the Harmony trial was stopped early for meeting the primary endpoint. Indeed, given the wealth of positive information disclosed on December 4, Acadia's stock price could still have gone up in the but-for world but by a lesser amount. Or, it might have remained unchanged. Or perhaps it would have fallen, but not to pre-Class Period levels. Thus, Dr. Feinstein's conclusion is not only unsupported, but also contrary to facts.[23]

Dr. Feinstein provides no explanation, much less reliable evidence or analysis that clears Rule 702's bar for admissibility. And the Court cannot simply take Dr. Feinstein's word for it—*i.e.*, that his subjective conclusion, which drives his purportedly precise damages calculations, is based on a sound (but undisclosed) methodology. *See Daubert*, 43 F.3d at 1316 ("the expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology"); *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 299 (10th Cir. 2010) (Gorsuch, J.) (affirming exclusion of expert when "the evidence he proffered in this case rests on no more than his say so—and that isn't good enough to require its admission"); *Open Text*, 2015 WL 349197, at *6 (excluding opinions of expert whose "method [was] a black box" that precluded "the jury [from seeing] how the pieces fit together or how the data drives the conclusion"); *GPNE Corp.*, 2014 WL 1494247, at *4 ("Experts must follow some discernable methodology, and may not be a black box into which data is fed at one end and from which an answer emerges at the other."); *Vale*, 2022 WL 122593, at *13 (rejecting Dr. Feinstein's opinions and stating "[s]uch subjectivity can never be replicated, tested, or reliably verified, except by the person conducting the analysis

---

[23] His assumption is counterfactual for another reason. In the but-for world of full disclosure, ***Acadia still submitted the sNDA*** and ***the FDA still accepted it with no review issues identified***, as announced on July 20, 2020. Ex. 24. And if, in the but-for world, Harmony's failure to demonstrate directional consistency is as apparent as Dr. Feinstein assumes, then neither of those things would have happened. Once again, his analysis is entirely self-serving.

in the first place”).

Where, as here, expert opinion evidence “is connected to existing data only by the *ipse dixit* of the expert,” a “court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.” *Joiner*, 522 U.S. at 146; *Kumho Tire*, 526 U.S. at 157 (same).

**b. Dr. Feinstein fails to disentangle the impact of fraud-related and non-fraud-related information on Acadia’s stock price.**

For Dr. Feinstein’s opinion to be reliable under Rule 702, he “must show that all non-fraudulent contributing forces are isolated and removed.” *Tivity*, 2025 WL 1415896, at *4. However, Dr. Feinstein fails to isolate the impact on Acadia’s stock price of fraud-related information from that of non-fraud-related information on December 4, 2019, rendering his opinions unreliable and inadmissible.

**First**, Dr. Feinstein cannot rely on his event study, which only shows that the market reacted to the ***entire bundle*** of information disclosed on December 4, 2019. *See supra* at IV.B.1.b. (analyzing Dr. Feinstein’s failure to disentangle in his loss causation analysis). He never analyzes, much less disaggregates, the specific impact of the bundle of information disclosed on that day. In *REMEC*, the court considered an expert opinion that did not “account for categories of news” and did not separate the impact of “multiple pieces of company specific information, some negative, some positive, some allegedly fraud related, and some not.” 702 F. Supp. 2d at 1274. The court excluded the opinion despite the expert’s argument that he did not need to “isolate the effects of multiple pieces of information” because “all of the new, material information [disclosed on any given date in his report] was related to REMEC’s allegedly concealed earnings prospects.” *Id.*; *see also Tivity*, 2025 WL 1415896, at *6 (excluding loss causation expert’s opinion because it did not isolate the effects of different pieces of information).

The same is true here, and it shows why Dr. Feinstein’s opinion is unreliable. On December 4, Acadia presented the Harmony Study results at CTAD and hosted

an investor event and webcast, which included a 38-slide presentation (covering Harmony's open-label, double-blind, and safety results) and a Q&A discussion with KOLs. Exs. 15, 16. ***Most*** of this information is not the subject of Plaintiffs' fraud allegations. *See also supra* at IV.B.3.a. (listing analyst reactions characterizing Harmony's subgroup results as "consistent"). But Dr. Feinstein does not account for any of this non-fraud-related information. Instead, he claims that all new information provided to the market on December 4, 2019 "concerned the sNDA and its prospects for approval." Ex. 32 ¶68. But *REMEC* rejected this very argument. The fact that the information is merely related to the sNDA does not mean it was the subject of fraud-allegations, or that Dr. Feinstein can bundle ***all*** the sNDA-related disclosed information together into one big fraud-related mass, such that entire residual stock price increase on September 9 and December 5, 2019, can be considered artificial inflation caused by the alleged misstatements. *See REMEC*, 702 F. Supp. 2d at 1274.

**Second**, Dr. Feinstein does not disentangle the effect of different bits of fraud-related information, which "does not provide usable guidance" on how to apply a damages formula, and "create[s] a serious risk of the jury simply guessing." *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128 at *7–9 (N.D. Cal. Aug. 28, 2023). Dr. Feinstein assumes that Defendants misled the market by not informing it of the existence of the purported directional consistency requirement ***and by not affirmatively telling investors that Harmony's subgroup data had failed that requirement***. *See supra* at IV.A.4.

But Defendants were not obligated to disclose an ***opinion*** that Harmony's dementia subtype data did not satisfy a directional consistency requirement, particularly because there is no evidence that anyone at Acadia held that opinion. This omission fails as a matter of law. *See* Defendants' Motion for Summary Judgment (filed concurrently herewith) at IV.A.1.B. And Acadia disclosed to investors Harmony's open-label and double-blind results across the dementia subtypes. Ex. 15 at 26–29. Thus, in the but-for world of full disclosure, investors

would have learned of the alleged directional consistency requirement and could have decided for themselves whether Harmony's dementia subtype data satisfied that requirement. And there is no evidence to suggest that they would have concluded that it failed. To the contrary, multiple analysts specifically highlighted the Harmony dementia subtype results and concluded the opposite: the data ***did*** demonstrate directional consistency. *See supra* at IV.B.3.a. (listing analyst reactions characterizing Harmony's subgroup results as "consistent").

Dr. Feinstein admits that with disclosure of the purported directional consistency requirement—but absent any affirmative statement from Defendants that Harmony had failed that requirement—***"it's not clear whether market participants would have come to th[e] conclusion" that "optimism was undue"*** regarding the sNDA's chances of approval. Ex. 22 at 120:13–122:9. This is a critical (and fatal) admission. What is the jury supposed to do when the Court rules (as it should) that Defendants were not obligated to self-flagellate regarding the Harmony subgroup data? Dr. Feinstein did not analyze a situation where the existence of the directional consistency requirement was disclosed but no affirmative statement was made that Harmony had failed the requirement. *Id*. at 122:13–19, 125:3–6. Thus, the jury would need to guess, ***with no guidance whatsoever***, how much artificial inflation to remove from the equation to determine damages. *Cf. In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *14 (S.D. Cal. Mar. 20, 2023) ("The Court finds that Plaintiffs' proposed damages methodology is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each.").[24] This further undermines his analysis of inflation as of December 5, 2019.

[24] Dr. Feinstein likewise did no disaggregation regarding the causes of artificial inflation as of September 9, 2019. Indeed, he struggled to even articulate the specific disclosures Defendants would have made in the but-for world of full disclosure, much less assign portions of the alleged artificial inflation caused by each misstatement or omission. Ex. 22 at 80:7–24, 85:1–11, 87:23–91:7. He attempted to avoid this shortcoming by speculating that damages would still be the same even if Plaintiffs

## V. CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Peck's PoS and State of Mind opinions, as well as Dr. Feinstein's loss causation and damages opinions.

Dated: November 12, 2025

COOLEY LLP

By: */s/ Koji F. Fukumura*
Koji F. Fukumura

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic

---

prevailed only on some of their claims. *Id.* at 91:15–99:2. But that only highlights the deficiencies in his analysis. *See Tivity*, 2025 WL 1415896, at *8 ("The absurdity of this approach comes to bear by [the expert's] conclusion . . . that Lead Plaintiff's damages would be the same if it prevailed on all, or only a portion of, its claims.").