# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic,

Defendants.

Case No. 3:21-cv-00762-WQH-MSB

CLASS ACTION

Judge: Hon. William Q. Hayes

**CORRECTED REBUTTAL EXPERT REPORT OF PAUL ANDREASON, M.D.**

Original Report – March 27, 2025
Corrected Report – April 28, 2025

**CONFIDENTIAL**

## Table of Contents

I. QUALIFICATIONS ..... 4

II. ASSIGNMENT AND SCOPE ..... 8

III. SUMMARY OF OPINIONS ..... 10

IV. DR. FEIGAL'S INTERPRETATION OF FDA COMMUNICATIONS WITH ACADIA IS UNSUPPORTED BY AND INCONSISTENT WITH APPLICABLE REVIEW GUIDELINES AND STANDARD FDA PRACTICE ..... 12

A. Dr. Feigal Fails to Consider FDA Guidance and Review Practices that Applied to Acadia's sNDA During the Relevant Time Period. ..... 13

B. Dr. Feigal Misinterprets the Events and Communications Between FDA and Acadia Before and During the EOP2 Meeting in 2017. ..... 19

1. Dr. Feigal's opinions rest on an incomplete and inaccurate description of FDA's actions and communications in EOP2 meetings. ..... 20

2. Acadia's questions and FDA's responses regarding the proposed Phase 3 study design ..... 24

3. Dr. Feigal downplays the importance of FDA's agreement that DRP is a potentially approvable indication. ..... 27

4. Dr. Feigal misinterprets the discussion in the EOP2 meeting minutes regarding Harmony's randomized withdrawal study design. ..... 28

5. Dr. Feigal misinterprets Acadia's draft protocol and the EOP2 Meeting Minutes to suggest that approval would rely on additional analyses of subgroup efficacy data. ..... 30

6. Dr. Feigal downplays FDA's agreement for Acadia to rely on a single Phase 3 trial to support the approval of the DRP sNDA. ..... 35

C. Dr. Feigal Appears to Overlook Further Agreement and Positive Signals from FDA In Connection with Acadia's IND Submission. ..... 38

D. In Assessing the Significance of FDA's Responsibilities to Communicate with Acadia, Dr. Feigal Overlooks the Relevance of FDA's Breakthrough Therapy Designation for Pimavanserin for DRP. ..... 42

E. Dr. Feigal Misinterprets Acadia's Statistical Analysis Plan and the Surrounding FDA Communications. ..... 45

F. Dr. Feigal Overlooks the Fact that FDA Presented No Potential Major Review Concerns at the Pre-sNDA Meeting, a Positive Sign for Application Review. ..... 47

G. Dr. Feigal Understates the Significance of FDA Filing Acadia's sNDA Submission and Misinterprets FDA's Standard Review Designation. ..... 56

1. Dr. Feigal understates the importance of FDA agreeing to file Acadia's sNDA with no filing issues identified. ..... 59

2. Dr. Feigal misconstrues the significance of FDA assigning a standard review timeline for the sNDA for DRP. ..... 61

3. Dr. Feigal overreads FDA's communications with Acadia regarding the decision to deny priority review. ..... 63

H. Dr. Feigal Does Not Consider the Significance of Additional Positive Signals for the Approvability of Pimavanserin DRP sNDA After Filing. ..... 65

1. Dr. Feigal does not consider that the absence of an AdComm meeting is a positive indication of approvability. .......... 65

2. Dr. Feigal overlooks the significance of the mid-cycle review, where FDA identified no major review concerns. .......... 66

I. Dr. Feigal Incorrectly Asserts that the Issues Raised in FDA's Complete Response Letter Were Communicated Previously as Major Review Concerns. .......... 68

1. Dr. Feigal does not identify any FDA communication in which the major review concerns in the CRL had been previously communicated to Acadia. .......... 70

2. Dr. Feigal does not consider evidence from the Type A meeting further demonstrating that FDA had not communicated major review issues to Acadia prior to the CRL. .......... 74

V. APPENDIX .......... 80

A. CV of Dr. Paul Andreason .......... 80

B. Materials Considered .......... 92

## I. QUALIFICATIONS

1. I am a physician and retired Uniformed Public Health Service ("USPHS") Officer.[1] My 26-year USPHS tenure (1990–2016) included 14 years as a U.S. Food and Drug Administration ("FDA") Reviewer, Team Lead, and Deputy Division Director within the review Divisions responsible for Psychiatry Drug Products at FDA.

2. I hold a Medical Degree from University of Utah, Salt Lake City, and have extensive post-graduate training in psychiatry. I completed my residency in General Psychiatry at the University of Utah Medical Center. I pursued advanced research training as a Medical Staff Fellow and later as a Senior Staff Fellow at the National Institute of Mental Health ("NIMH") and the National Institute on Alcohol Abuse and Alcoholism ("NIAAA"). In these roles, I focused on neuroimaging, psychiatric disorders, and psychopharmacology. I am board-certified in Psychiatry by the American Board of Neurology and Psychiatry and hold active medical licenses in Maryland and Utah.

3. My clinical experience spans both public and private sectors where I have provided psychiatric evaluation, treatment, and medication management in private practice and community mental health settings for over two decades. I have treated a wide range of psychiatric and neuropsychiatric disorders, including schizophrenia, depression, and dementia-related psychosis.

4. My clinical experience in the public sector during my tenure as a USPHS Officer included two years with the Office of Human Research Protections ("OHRP"), and six years with the Department of Defense ("DOD"). While at OHRP from 2006 to 2008 I organized, trained, equipped, and led USPHS Mental Health Team #3 ("MHT3"), a deployable disaster-relief mental health team. After three years as MHT3 Lead, I continued serving as a MHT3 psychiatrist until 2015. During my tenure with the DOD, I was the Attending Psychiatrist for the active-duty, combat trauma recovery, intensive outpatient treatment

[1] The USPHS Commissioned Corps is one of the nation's uniformed services—a branch committed to the service of health, serving in agencies across the government. *See* "About Us," Commissioned Corps of the U.S. Public Health Service, *available at* https://www.usphs.gov/about-us.

program at Walter Reed Army Medical Center and Walter Reed National Military Medical Center.

5. My clinical experience in the private sector has included several roles in psychiatry. From 1993 to 2000, I served as an Attending Physician in General Psychiatry at Johns Hopkins Bayview Medical Center where I provided inpatient, emergency and consultative psychiatric clinical care. I also had my own private practice in psychiatry for more than 25 years, in which I provided diagnostic assessment, treatment planning, and psychopharmacologic management for a wide range of psychiatric disorders. My clinical expertise includes the evaluation and management of patients with neuropsychiatric symptoms associated with dementia, severe mood disorders, schizophrenia, anxiety disorders, substance use disorders, and post-traumatic stress disorder ("PTSD"), as well as the treatment-resistant psychiatric conditions associated with these disorders. From 2021 to 2022, I was a Senior Medical Officer and Locum Tenens Consulting Psychiatrist at the Mid-Central District Health Board, Palmerston North Hospital in New Zealand. In this role, I provided psychiatric care in community mental health and addiction recovery services, focusing on severe mental health conditions during the COVID-19 pandemic.

6. In addition to my clinical experience, I served 14 years at FDA reviewing and evaluating hundreds of applications, including new drug applications ("NDAs"),[2] efficacy supplements (also referred to as supplemental NDAs, or "sNDAs"), and investigational new drug ("IND")[3] protocols—both commercial and non-commercial—within the two Divisions responsible for psychiatric drug products. These two divisions were the Division of Psychiatric Products ("DPP") and Division of Neuropharmacological Drug Products, which are a part of the Center for Drug Evaluation Research ("CDER").[4] My FDA service was in two major time blocks: from 1995 to 2006 and from 2014 to 2016.

[2] I discuss these concepts further in Section IV.A.

[3] I discuss these concepts further in Section IV.C.

[4] CDER regulates prescription and over-the-counter small molecule drugs. *See* "Center for Drug Evaluation and Research (CDER)," U.S. Food and Drug Administration, *available at* https://www.fda.gov/about-fda/fda-organization/center-drug-evaluation-and-research-cder.

7. During my first period at FDA, from 1995 to 2006, I served in multiple roles, including Clinical Review Officer, Clinical Review Team Leader, and Deputy Division Director. As a Team Lead for the Clinical Psychopharmacology Review Team within the Division on Neuropharmacological Drug Products, I supervised five physicians and conducted both primary and supervisory clinical reviews of NDAs, sNDAs, and IND protocols for psychiatric use. As Deputy Division Director for the DPP, I supervised 30 employees, including physicians and scientists, who performed all aspects of psychiatric drug review.

8. Throughout this first period at FDA, I actively reviewed the latest research and was involved in evaluating human and animal studies related to experimental psychiatric drug treatments. I assessed the safety and efficacy of drugs seeking market approval, including both U.S. and foreign studies relevant to new drug applications. I was responsible for monitoring the safety of marketed drugs for emerging safety signals in the post-marketing phase, ensuring regulatory compliance, and formulating recommendations regarding drug approval and labeling. Additionally, I was responsible for documenting the review process,[5] authoring FDA communications, and presenting clinical findings at international meetings[6] and the Psychopharmacological Drugs Advisory Committee.[7]

---

[5] Documenting the review process entails writing the review itself, as well as the administrative interactions that one has with supervisory staff. For example, each milestone meeting has minutes that are reviewed and approved by the attendees. Some of these minutes or summaries of the meetings are shared with the sponsor, including minutes for the filing meeting, mid-cycle meeting, and Advisory Committee planning meetings. I discuss these meeting types further in Section IV. If there are particular review issues that require collaboration with other FDA Divisions or Offices, minutes are recorded for these meetings as well. These meeting minutes reflect the process of the review as well as discuss the contents of the reviews that will result in a final regulatory action. *See generally CDER 21st Century Review Process Desk Reference Guide*, Nov. 2010, [updated Sept. 2014], available at https://www.fda.gov/media/78941/download.

[6] I presented frequently at the New Clinical Drug Evaluation Unit ("NCDEU") Conference. I was a panel member for the Young Investigators Program at NCDEU for several years. I presented at APA Child Division in Canada. I presented in Greece at the International College of Neuropsychopharmacology (CINP) and at the American College of Neuropsychopharmacology ("ACNP").

[7] The Psychopharmacological Drugs Advisory Committee reviews and evaluates data of marketed and investigational human drug products for use in the practice of psychiatry and related fields. The Committee provides advice to the Commissioner of Food and Drugs. *See* "Psychopharmacologic Drugs Advisory Committee Charter," U.S. Food and Drug Administration, June 4, 2024, *available at* https://www.fda.gov/advisory-committees/psychopharmacologic-drugs-advisory-committee/psychopharmacologic-drugs-advisory-committee-charter.

9. During my second period at FDA, from 2014 to 2016,[8] I was a Clinical Reviewer in the DPP,[9] where I performed similar activities to those described during my first period. These activities included reviewing and evaluating drug applications and IND protocols, representing the DPP at national and international meetings, and consulting with other Divisions at FDA and government Agencies as an expert on psychiatric drug regulatory issues.

10. During my tenure at FDA, I reviewed hundreds of applications. Publicly available examples of reviews I have conducted include Effexor XR (venlafaxine) for major depressive disorder and general anxiety disorder, Zyprexa (olanzapine) for psychotic disorders, Sonata (zaleplon) for insomnia, Paxil (paroxetine) for panic disorder, Nuplazid (pimavanserin) for Parkinson's Disease psychosis, Concerta (methylphenidate) for adolescent attention deficit disorder, Lunesta (eszopiclone) for insomnia, Zoloft (sertraline) for Social Anxiety disorder, and Risperdal (risperidone) for autism spectrum disorder.

11. Since departing FDA, I have also consulted with investors regarding the regulatory drug review process. This consulting work was restricted to psychiatric or neurologic drugs and often involved responding to investor questions about the significance of publicly available information from pharmaceutical companies, FDA filing and review behavior, FDA Advisory Committee meeting briefing materials, or outcomes with respect to applications for FDA approval.

---

[8] In 2014, after completing a six-year assignment in the Department of Defense at the Walter Reed facilities in Washington, DC and then Bethesda, Maryland, I returned to FDA in December of 2014 as a Clinical Review Officer. Due to my fluency with the French language, I was immediately detailed to the Center for Disease Control for a two-month assignment to Conakry, Guinea, Africa in response to the Ebola outbreak of 2014–2015. Upon my return from Africa, I was assigned the primary clinical review of Nuplazid (pimavanserin) for the treatment of Parkinson's Disease Psychosis.

[9] During my time as an FDA reviewer, I also reviewed the pimavanserin NDA for delusions associated with Parkinson's Disease Psychosis ("PDP") in 2016. FDA approved that NDA on April 29, 2016. FDA approved that NDA on April 29, 2016. *See* "FDA Approves ACADIA Pharmaceuticals' NUPLAZID™ (pimavanserin) - The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis," Acadia Pharmaceuticals, Apr. 29, 2016, available at https://acadia.com/en-us/media/news-releases/fda-approves-acadia-pharmaceuticals-nuplazidtm-pimavanserin.

12. Additionally, I have contributed to psychiatric research as a Clinical Investigator at the NIAAA, from 1991 to 1994 and at NIMH, from 1988 to 1991. I have published numerous peer-reviewed scientific papers on neurological and psychiatric disorders including functional brain imaging studies in eating disorders, personality disorders, and mood disorders. I have presented on Good Review Management Practices Guidelines and importance of detailed clinical trial protocols.

13. My complete curriculum vitae can be found in **Appendix V.A**.

## II. ASSIGNMENT AND SCOPE

14. I have prepared this report at the request of Cooley LLP, counsel for Defendants Acadia Pharmaceuticals, Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic, in connection with this class action litigation. I understand that Plaintiffs in this matter are alleging, among other things, that Defendants made false and misleading statements regarding (1) the Company's supplemental new drug application ("sNDA") seeking FDA approval for an additional indication of the drug pimavanserin to treat hallucinations and delusions associated with dementia related psychosis ("DRP"); and (2) the Harmony Study, which was the pivotal Phase 3 trial that supported the Company's sNDA for DRP

15. I have been asked by counsel to review the report of Dr. David W. Feigal, evaluate the opinions and conclusions presented within his report, and provide my response to certain of those opinions and conclusions.

16. In addition to the reports by Plaintiffs' Experts, I reviewed communications between Acadia and FDA concerning Acadia's sNDA[10] for the DRP indication; Acadia's regulatory filings relating to the DRP sNDA; materials cited in the reports from Plaintiffs' Experts; FDA guidance materials in effect during the relevant time period; and other materials that

[10] I discuss these concepts further in Section IV. sNDAs are regulatory submissions requesting approval for post-approval changes to an existing drug, such as new indications, dosage forms, formulations, labeling updates, or manufacturing modifications. *See* "Drugs@FDA Glossary of Terms," U.S. Food and Drug Administration, Nov. 14, 2017, *available at* https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms.

are publicly available or were produced during discovery in this litigation. A complete listing of the materials I considered in preparing this report is attached as **Appendix V.B**.

17. Based on my review of the materials described above, as well my own experience at FDA, I was asked by counsel to respond to the opinions and conclusions rendered by Plaintiffs' Experts regarding the following subject matters:

- the meaning and significance of FDA's communications (and lack thereof) with Acadia between 2017 and 2021 related to the DRP sNDA;
- whether FDA's communications and actions relating to the DRP sNDA demonstrate that FDA identified and communicated to Acadia any major issues or concerns prior to Acadia's receipt of FDA's April 2, 2021 Complete Response Letter ("CRL"); and
- whether the specific issues identified by FDA in the CRL had been communicated to Acadia in FDA's earlier communications before and after Acadia's submission of the DRP sNDA.

18. I have been assisted in the preparation of this report by the staff of Keystone Strategy, who worked under my direction. I am being compensated at my standard billing rate of $500 per hour.

19. My compensation in this matter is not contingent on the content of this report, my testimony in this matter, or the outcome of this or any other matter.

20. I reserve the right to amend or supplement my opinions if new relevant information becomes available, and to use graphics and demonstratives at trial to explain and illustrate the matters I discuss in this report.

## III. SUMMARY OF OPINIONS

21. During my 14 years at FDA, I reviewed and evaluated hundreds of drug applications and protocols[11]—both commercial and non-commercial NDAs, sNDAs, and INDs[12]—within the two Divisions responsible for psychiatric drug products. Based on my experience, my review of communications between Acadia and FDA regarding the June 3, 2020, DRP sNDA, and other materials cited herein, I conclude the following:

22. Dr. Feigal's interpretation of FDA's communications with Acadia is unsupported by and inconsistent with FDA review guidelines and standard practice, and my own experience at FDA. Dr. Feigal overlooks key FDA review practices and guidance that were in place during the relevant time period (from 2017–2021). These review practices include the *CDER 21st Century Review Process Desk Reference Guide* ("Desk Reference") and various *Good Review Management Principles and Practices* ("GRMPPs"). By failing to consider these critical guidance documents, Dr. Feigal misinterprets several communications between Acadia and FDA—most significantly, FDA's comments during the End of Phase 2 ("EOP2") meeting regarding the Harmony Study's proposed patient population, which Dr. Feigal mistakenly interprets as communicating a so-called "directional consistency" requirement. He also ignores several positive signals from FDA, including at the EOP2 meeting, during review of the IND Phase 3 amendment and statistical analysis plan ("SAP"), during the pre-sNDA meeting, at the time of filing, and during Mid-Cycle review. Based on his flawed analysis of Acadia-FDA communications,

---

[11] In *E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1)*, a "protocol" is defined as "a document that describes the objective(s), design, methodology, statistical considerations, and organization of a trial," p. 7, *available at* https://www.fda.gov/media/93884/download.

[12] An Investigational New Drug (IND) application is a request submitted to the FDA to obtain authorization to conduct clinical trials involving an investigational drug in humans before it is approved for marketing. A commercial IND is submitted by a company intending to develop a drug for future FDA approval and commercial marketing, while a non-commercial IND is typically submitted for research, investigator-initiated studies, expanded access, or emergency use without intent for commercialization. *See* "Investigational New Drug (IND) Application," U.S. Food and Drug Administration, Nov. 18, 2024, *available at* https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

Dr. Feigal incorrectly concludes that FDA had informed Acadia of major issues before and during the review cycle.[13]

23. Contrary to what Dr. Feigal suggests, FDA had never previously communicated to Acadia any of the issues described in the CRL, despite having had several opportunities to do so throughout the development and review process. At each of the critical milestones of the development and review process, FDA did not communicate to Acadia that it had identified any major review concerns with the Harmony Study. Instead, at several key stages of the development and review process—such as at the EOP2 meeting, the Study May Proceed letter, the Breakthrough Therapy Designation Granted letter, the pre-sNDA meeting, and in agreeing to file the sNDA—FDA communicated its continued agreement with the Harmony Study's design, patient population, study protocol, and SAP, all while signaling that it had not identified any major issues or concerns before or after accepting the sNDA for filing. I therefore disagree with Dr. Feigal's opinion, which is unsupported by the materials I reviewed, that the FDA had previously communicated to Acadia any of the major review issues identified in the CRL. It is inconsistent with my experience and FDA guidance on the need for early, clear, and frequent communications—especially for Breakthrough Therapy Designation ("BTD") drugs like pimavanserin—for FDA to have communicated major review issues to a sponsor for the first time in a CRL.[14] This lack of communication is particularly surprising in light of the applicable guidance in effect during the relevant time period, which called for FDA to promptly communicate any major review concerns or requirements for approval in clear, unequivocal terms.[15] Further, contrary to Dr. Feigal's claim that it was Acadia who failed to ask FDA questions regarding the

[13] Feigal Affirmative Report, ¶ 112.

[14] *See* "Breakthrough Therapy," U.S. Food and Drug Administration, Jan. 4, 2018 ("Breakthrough Therapy designation is a process designed to expedite the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."), *available at* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

[15] This rebuttal report does not address Dr. Feigal's Sections V.B (Acadia's Probability of Success for the sNDA) or V.C (What Senior Management of a Reasonable Drug Manufacturer Would Have Understood About the Company's Communications with FDA and the Probability of Success for the DRP sNDA).

Harmony Study's clinical data,[16] sponsors are not responsible for calling FDA's attention to every possible question that might be asked about the clinical data.[17] Rather, as I explain further below, if FDA had identified potential concerns or review issues in connection with Acadia's submission or the Harmony Study data more broadly, the relevant guidance documents make clear that it was FDA's responsibility to communicate those concerns or issues to Acadia at the earliest opportunity.

## IV. DR. FEIGAL'S INTERPRETATION OF FDA COMMUNICATIONS WITH ACADIA IS UNSUPPORTED BY AND INCONSISTENT WITH APPLICABLE REVIEW GUIDELINES AND STANDARD FDA PRACTICE.

24. Between May 2017 and June 2021, Acadia developed and sought approval for an additional indication of pimavanserin to treat hallucinations and delusions associated with DRP.[18] **Figure 1**, below, provides an overview of the development and review timeline associated with this application.

Figure 1: *Timeline of the development and review of Acadia's sNDA of pimavanserin for DRP*[19]




[16] Feigal Affirmative Report, ¶¶ 99, 102.

[17] *See, e.g.,* MAPP 6030.9 at p. 27, Apr. 29, 2013 ("It is the responsibility of CDER review staff to ensure that the meeting purpose is understood in advance, to share preliminary responses to questions raised in the meeting package with the sponsor in advance of the meeting, to determine whether other important discussion points not considered by the sponsor should be raised at the meeting. . . ."), *available at* https://www.fda.gov/media/85790/download.

[18] Dementia-Related Psychosis (DRP) is defined by delusions or hallucinations occurring after the onset of cognitive decline, persisting for at least 1 month, and not better explained by delirium or some other mental illness. *See* J. Cummings, *et al.*, "Dementia-related psychosis and the potential role for pimavanserin," CNS Spectr, at p. 2, Feb. 2022, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8318559/#R11.

[19] This demonstrative illustration provides an overview of the development and review timeline for the DRP sNDA, and is not intended to catalog every event and communication.

25. In his report, Dr. Feigal misinterprets and overlooks several critical milestones and communications between Acadia and FDA during the development and review process outlined in Figure 1. His analysis is based on a flawed characterization of FDA's review practices and expectations regarding FDA's communications with a sponsor. Based on his flawed analysis of Acadia-FDA communications, Dr. Feigal incorrectly concludes that Acadia should have known there would be major review concerns with its application—in particular, FDA's supposed communication of an approval "requirement" that the Harmony subgroup data demonstrate "directional consistency."[20]

26. In the following **Sections IV.A–IV.I**, I describe and contextualize FDA guidance at relevant stages of the development review process and explain why Dr. Feigal's analysis and conclusions are unsupported and unreliable. Among other things, I explain that, contrary to Dr. Feigal's contention, FDA did not convey any potential major review concerns in its communications with Acadia prior to receipt of the CRL in April 2021.[21] In fact, even in the CRL itself, FDA did not communicate any requirement that the Harmony data demonstrate "directional consistency" amongst dementia subgroups as a condition of approval.[22]

### A. Dr. Feigal Fails to Consider FDA Guidance and Review Practices that Applied to Acadia's sNDA During the Relevant Time Period.

27. In my experience as a reviewer for the Division of Psychiatry, FDA guidance documents such as the Desk Reference and GRMPP for NDAs, sNDAs, and BLAs outlined a clear roadmap of the development and review cycle, as well as standard practices and expectations for FDA's communications with sponsors during the review process.[23] These

[20] Feigal Affirmative Report, ¶ 112.

[21] Acadia received a Deficiencies Preclude Discussion letter from FDA less than one month prior to the CRL, on March 3, 2021. This letter stated that, as part of its ongoing review of the DRP sNDA, FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/ commitments at this time." The letter did not identify or provide any details regarding the nature of the referenced deficiencies. ACAD_SECLIT_0019463 at p. 1, Deficiencies Preclude Letter, Mar. 3, 2021.

[22] *See* Table 2.

[23] The Desk Reference and GRMPP for NDAs and BLAs applied to both original NDAs and supplemental NDAs. While both application types are subject to a similar rigor of review, there are some

standard practices included, most significantly, a commitment to timely, clear, and consistent communication with sponsors and, relatedly, an expectation that FDA would notify sponsors of any potential major review concerns as soon as they were identified.[24] In this section, I will explain the role these FDA guidance documents played during the relevant time period in guiding FDA's conduct and setting sponsors' expectations regarding FDA communications through the development and review process.

28. Dr. Feigal refers to some of these regulations and guidance documents when describing FDA's review process.[25] But he fails to provide a complete picture of FDA review guidelines that were applicable during the relevant time period (2017 to 2021), which I was trained on and used in practice as a reviewer at FDA.

29. FDA's guidelines and regulations are constantly evolving. FDA publishes regulatory guidelines that spell out best practices and regularly updates them to account for recent developments or requirements. The laws that inform these guidelines are dynamic as well.

---

differences that can impact the regulatory approach, review timeline, and FDA requirements. For example, the Division Director typically has signatory authority over sNDAs, in contrast to the Office Director who has signatory authority over NDAs and New Molecular Entities (NMEs). Additionally, there are differences in the potential composition of the NDA and sNDA review teams.

[24] *See, e.g.*, *Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development*, at p. 3, Dec. 2017 ("Each year, sponsors and FDA engage in thousands of communications, including meetings and teleconferences, during the IND phase of drug development. Because these communications are often opportunities to share information and provide critical advice (e.g., trial design, dose selection, analytical similarity assessment, nonclinical study requirements, manufacturing and facility issues), it is important that interactions be conducted efficiently and consistently, with clear, concise, and timely communication."), *available at* https://www.fda.gov/media/94850/download.

[25] *See, e.g.*, *Code for Federal Regulations*, *Guidance for Industry: Formal Meetings between FDA and Sponsors or Applicants*, E6(R3) Good Clinical Practice (GCP), Feigal Affirmative Report, ¶ 27, 31, 39. Dr. Feigal also cites a March 2024 draft of *Guidance for Industry, Early Alzheimer's Disease: Developing Drugs for Treatment*. Feigal Affirmative Report, ¶ 43, n.20. In addition to this guidance dating outside the relevant time period, it is unclear why Dr. Feigal cites guidance relating to drugs for the treatment of Alzheimer's Disease itself when Acadia's DRP sNDA was seeking approval for the treatment of psychosis *symptoms* in various dementia etiologies.

For example, the Prescription Drug User Fee Act ("PDUFA") was enacted in 1992 to increase the efficiency of the drug review process and is amended every five years.[26]

30. When evaluating and interpreting FDA communications, it is necessary to do so in the context of the review guidelines applicable to the relevant time period. Dr. Feigal's interpretation of FDA's communications with Acadia fails to provide this important context. He references the initial passage of PDUFA in 1992,[27] but overlooks the fact that FDA review practices changed dramatically between 1992 and the development and review period for the pimavanserin sNDA for DRP (2017–2021). These changes began with PDUFA I (1993) and PDUFA II (1998), which were intended to reduce backlogs, as well as to shorten and set predictable timelines.[28] Of particular relevance, PDUFA III (2003) was intended to increase interaction between FDA and sponsors[29] during the review cycle. As described in CDER's Manual of Policies and Procedures ("MAPP"), the "June 2002 reauthorization of PDUFA performance goals directed the FDA to '*report substantive deficiencies identified in the initial filing review to the sponsor* by letter, telephone conference, facsimile, secure e-mail, or other expedient means.'"[30] This included

---

[26] *See PDUFA Performance Reports*, U.S. Food and Drug Administration, Apr. 22, 2024 ("PDUFA provides FDA revenue to hire additional reviewers and support staff and upgrade its information technology systems to maximize the efficiency of the application review process for new drugs and biological products without compromising FDA's high standards for approval."), *available at* https://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports; *see also generally* PDUFA Performance Reports, U.S. Food and Drug Administration, Apr. 22, 2024, for a list of PDUFA revisions from 1993 to 2022.

[27] Feigal Affirmative Report, ¶ 53.

[28] *See generally PDUFA Performance Reports*, U.S. Food and Drug Administration, Apr. 22, 2024, for a list of PDUFA revisions from 1993 to 2022, available at https://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

[29] In this report, I refer to the entity submitting an application to FDA for review as the "sponsor." *See* "PDUFA Performance Reports," U.S. Food and Drug Administration, Apr. 22, 2024, *available at* https://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

[30] CDER's Manual of Policies and Procedures ("MAPP") 6010.5 at pp. 1–2, Mar. 27, 2018 (emphasis added), *available at* https://www.fda.gov/files/about%20fda/published/NDAs-and-BLAs--Filing-Review-Issues.pdf . *See also CDER Manual of Policies & Procedures | MAPP*, Mar. 11, 2025, U.S. Food and Drug Administration ("CDER's Manual of Policies and Procedures (MAPPs) are federal directives and documentation of internal policies and procedures. MAPPs are required by law and made available to the public to make CDER a more transparent organization."), *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-manual-policies-procedures-mapp.

several measures to increase early and clear communications regarding deficiencies, with the intent that FDA communicate any potential review concerns to a sponsor well before an application was filed. To that end, new goals set in the PDUFA III included a review process under which "FDA would give an application an initial quick review and report any significant deficiencies to the drug sponsor" and an expectation that FDA "give sponsors early notification of deficiencies."[31]

31. Dr. Feigal also does not consider the two critical resources that emerged from PDUFA III (following his departure from FDA in 2004) that helped guide and streamline FDA practices regarding drug review and approval during the relevant time period. The first resource is *Guidance for Review Staff and Industry, Good Review Management Principles and Practices for PDUFA Products* (the "GRMPP for PDUFA Products"), published in 2005.[32] This FDA guidance document is aimed at enhancing the efficiency and consistency of the drug review process.[33] It outlines best practices for managing the review of drug applications, ensuring clear communication between FDA and sponsors, and promoting timely and effective decision-making.[34] The second resource, which I discuss in detail below, is the *CDER 21st Century Review Process Desk Reference Guide* (the "Desk Reference"), first published in 2008.[35]

---

[31] *See* The Prescription Drug User Fee Act: Structure and Reauthorization Issues, Congressional Research Service, Oct. 7, 2002, at p. 8, *available at* https://crsreports.congress.gov/product/pdf/RL/RL31453/3.

[32] *Guidance for Review Staff and Industry Good Review Management Principles and Practices for PDUFA Products*, Apr. 2005, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-review-staff-and-industry-good-review-management-principles-and-practices-pdufa-products.

[33] *See, e.g.*, GRMPP for PDUFA Products at p. 3, ("The fundamental values on which the GRMPs are based include quality, efficiency, clarity, transparency, and consistency.").

[34] *See, e.g.*, GRMPP for PDUFA Products at p. 3, ("Clarity: The clarity of the FDA's findings, expectations, and bases for decisions supports review efficiency and requires accurate review and effective communication. . . . Communications during the ongoing review, within CDER and CBER or with external groups such as the applicant or advisory committees (AC), are expected to consistently achieve the highest possible degree of clarity.").

[35] *CDER 21st Century Review Process Desk Reference Guide*, Nov. 2010, [updated Sept. 2014], *available at* https://www.fda.gov/media/78941/download. Hereinafter, when referring to this document, I refer to it as the "Desk Reference."

32. The Desk Reference and GRMPP documents are critical to understanding FDA's actions and communications during its review of NDAs, BLAs, and sNDAs. [36] These guidance documents are intended to facilitate timely, clear, and consistent communications between FDA and sponsors throughout the development and review process. In support of that objective, these guidance documents provide a structured and detailed set of guidelines for clinical reviewers to rely on during the drug development and review process,[37] including a clear schedule for work products, regulatory milestones, expected communications with the sponsor, schedules for decision making, internal FDA meetings, and regulatory actions.[38] Moreover, FDA understands and expects that sponsors will rely on these publicly available documents to evaluate their applications' progress, to anticipate what to expect from FDA throughout the review stages, and to understand the meaning and significance of FDA communications (or lack thereof) during the development and review processes.[39]

33. Since its publication in 2008, the Desk Reference has been "considered the current review procedure for NDA/BLA and efficacy supplement review in accordance with the 21st Century Review process."[40] When I left FDA in 2006, the Desk Reference did not exist. When I rejoined FDA in 2014, the entire FDA reviewer training was based on the Desk Reference. Despite my extensive prior experience, I was required to attend the entire FDA reviewer training program again because the guidelines had changed so drastically. During

---

[36] Note that in FDA guidance documents, sNDAs are also referred to as "efficacy supplements." *See GRMPP for PDUFA Products* at p. 2 ("The emphasis of GRMPs is on first cycle reviews of NDAs and BLAs for PDUFA products in CDER and CBER. The principles of this guidance also pertain, in general, to all preapproval reviews of NDAs, BLAs, and efficacy supplements."); *see also* Desk Reference at p. 1 ("The DRG is intended for use in the review of New Drug Applications (NDAs), Biologics License Applications (BLAs), and efficacy supplements. Although it is focused on the review of original applications, the principles and procedures are applicable to resubmissions").

[37] Desk Reference at p.1.

[38] Desk Reference at p.1.

[39] "The GRMPs outline the FDA's procedures and objectives for communicating with applicants during each phase of the review cycle. . . . *Applicants interacting with the Agency are strongly encouraged to be fully knowledgeable about the GRMPs*." *GRMPP for PDUFA Products* at p. 2 (emphasis added).

[40] MAPP 4180.4 at p. 2, Nov. 8, 2010 [recertified Mar 17, 2015], *available at* https://fda.report/media/80084/NDAs-BLAs--Using-the-21st-Century-Review-Process-Desk-Reference-Guide.pdf.

my 2014 to 2016 tenure in the Division of Psychiatric Products, my colleagues and I relied on the Desk Reference as the go-to resource for all aspects of NDA and sNDA reviews and the definitive roadmap for how to interact with sponsors.[41]

34. The Desk Reference embodies FDA's philosophy during the relevant time period that "*timely interactive communications* with sponsors during drug development is a core Agency activity to help achieve the Agency's mission to facilitate the conduct of efficient and effective drug development programs[.]"[42] Further, the GRMPP for PDUFA Products confirms that "[c]ommunications during the ongoing review . . . are expected to *consistently achieve the highest possible degree of clarity*."[43]

35. On this point, the Desk Reference emphasizes that, "[f]or applications found to have *significant deficiencies that may affect approval*, the review team should obtain appropriate input from the signatory authority and *communicate the deficiencies promptly to the applicant*."[44] This commitment to timely communication encompasses both correctible *and* potentially uncorrectable deficiencies.[45] In other words, FDA's views as to whether a sponsor's application contains deficiencies that are correctible (or not) during the current review cycle have no bearing on FDA's obligations to promptly communicate significant deficiencies to the sponsor.

36. In sum, Dr. Feigal's characterization of FDA's review process is outdated and incomplete. By failing to consider critical guidance documents during the relevant time period, including the Desk Reference and GRMPP documents, Dr. Feigal misconstrues and

---

[41] Additional guidance and best-practices relating to FDA communications with sponsors were, during the relevant time period, documented in FDA's *Guidance for Industry* publications and CDER's Manual of Policies and Procedures ("MAPPs").

[42] PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2018 Through 2022, at p. 20 (emphasis added), *available at* https://www.fda.gov/media/99140/download.

[43] *GRMPP for PDUFA Products*, at 3 (emphasis added).

[44] *GRMPP for PDUFA Products,* at p. 7 (emphasis added).

[45] *GRMPP for PDUFA Products*, at p. 7 ("Timely notification of correctable deficiencies allows the applicant to begin corrective actions, maximizes the chance for a first cycle approval, and shortens the overall time to approval when one or more review cycles are necessary. Timely notification of significant and potentially uncorrectable deficiencies in the marketing application may also influence product development decisions.").

understates the significance of FDA *not* communicating review concerns during the development and review cycle, both generally and in the specific case of Acadia.

37. In the sections that follow, I explain in greater detail the FDA development and review process during the relevant time period, based on then-applicable FDA guidance and my own FDA experience. I focus this discussion on specific milestones that are most relevant to assessing the significance and meaning of FDA's communications with Acadia, particularly the FDA communications that Dr. Feigal mischaracterizes or overlooks.

### B. Dr. Feigal Misinterprets the Events and Communications Between FDA and Acadia Before and During the EOP2 Meeting in 2017.

38. In this section, I respond to Dr. Feigal's interpretations of FDA's communications with Acadia during the EOP2 meeting. I first provide context on the purpose of and standard practices for EOP2 meetings, without which FDA's comments to Acadia during the EOP2 meeting cannot be properly understood. I then discuss the communications between FDA and Acadia in the pre-meeting correspondence and during the meeting itself regarding the proposed Harmony Study design, study population, and statistical considerations. Next, I explain the significance of the *outcome* of the meeting—namely, FDA's agreements to (1) the proposed design of a randomized withdrawal trial, (2) the proposed study population, and (3) relying on a single Phase 3 pivotal trial, as well as the fact that FDA did not raise any potential major review concerns. Contrary to Dr. Feigal's incomplete and unsupported interpretations of these communications, I conclude that FDA's communications during the EOP2 meeting (as recorded in the minutes) are properly understood as a positive signal that meeting the primary efficacy endpoint as per the agreed upon study design would be sufficient to support the filing and potential approval of an sNDA for DRP.

**1. Dr. Feigal's opinions rest on an incomplete and inaccurate description of FDA's actions and communications in EOP2 meetings.**

39. The EOP2 meeting is a critical interaction between the sponsor and FDA.[46] One of the primary goals of the meeting is to align on the proposed Phase 3 study design[47] and the study's potential to generate the necessary clinical data (for safety and efficacy) to support a marketing application. As outlined in the Code of Federal Regulations, "[t]he meeting should be directed primarily at establishing agreement between FDA and the sponsor of the overall plan for Phase 3 and the objectives and design of particular studies."[48]

40. As part of the process of an EOP2 meeting, the sponsor submits a Meeting Briefing Package, which FDA responds to in preliminary comments prior to the meeting, and in discussion during the actual EOP2 meeting.[49] As explained in FDA's Guidance for Industry, FDA's preliminary comments sent to the sponsor in advance of the meeting are, as the name suggests, "*preliminary*," and intended to "serve as a foundation for discussion."[50] It is common, in my experience, for FDA to change or adjust its position on

---

[46] *See Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 14, Dec. 2017 ("EOP2 meetings are of considerable importance in determining the safety of, and sufficiency of data (e.g., on dose selection) for, proceeding to phase 3, and for planning a complete and well-designed phase 3 development program. EOP2 meetings serve to evaluate the phase 3 plan and protocols, the adequacy of current studies and plans to assess pediatric safety and effectiveness, evaluate the human factors validation plan, and identify any additional information necessary to support a marketing application for the uses under investigation."), *available at* https://www.fda.gov/media/94850/download.

[47] Phase 3 studies aim to demonstrate whether or not a product offers a treatment benefit to a specific population. They are also known as pivotal studies and provide most of the safety data, including less common side effects. *See Step 3: Clinical Research*, U.S. Food and Drug Administration, Jan. 4, 2018, *available at* https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

[48] 21 C.F.R. § 312.47, Mar. 19, 1987 [updated Mar. 4, 2002], *available at* https://www.govinfo.gov/content/pkg/CFR-2013-title21-vol5/pdf/CFR-2013-title21-vol5-sec312-47.pdf.

[49] 21 C.F.R. § 312.47, Mar. 19, 1987 [updated Mar. 4, 2002], *available at* https://www.govinfo.gov/content/pkg/CFR-2013-title21-vol5/pdf/CFR-2013-title21-vol5-sec312-47.pdf.

[50] Guidance for Industry: Formal Meetings Between the FDA and Sponsors or Applicants at p. 9, May 2009, *available at* https://www.fda.gov/media/72253/download.

a particular issue following discussion with the sponsor.[51] If preliminary comments are agreed upon, then no discussion on those topics are necessary at the meetings.

41. After the EOP2 meeting, FDA's final comments are communicated in Meeting Minutes, which "stand as the official documentation of the meeting," reflecting the final agreements reached between FDA and the sponsor.[52]

42. In his affirmative report, Dr. Feigal correctly notes that the general purpose of EOP2 meetings is for FDA and the sponsor "to reach agreement on the confirmatory 'pivotal' trials that will be necessary for approval."[53] He goes on to claim that:

> FDA can halt any clinical trial for safety concerns, and in some circumstances, not allow a study to proceed if its design is unlikely to accomplish its scientific purpose. There is often a degree of uncertainty about accomplishing a scientific purpose but, absent safety concerns, FDA generally allows studies to proceed and finds proposed study designs "acceptable," even if it advises alternatives and/or the Agency believes the study is unlikely to be successful.[54]

43. It is true, as Dr. Feigal states, that FDA can halt a clinical trial for safety concerns or if it is unlikely to accomplish its scientific purpose. However, Dr. Feigal provides no support for his assertion that FDA allows studies to proceed even if it believes the study is unlikely to be successful. Based on my experience in the Division of Psychiatric Products, FDA

---

[51] *See Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products* at p. 14, Sept. 2023 ("Communications before the meeting between requesters and the FDA, including preliminary responses, can serve as a foundation for discussion or as the final meeting responses. Preliminary responses should not be construed as *final* unless there is agreement between the requester and the FDA that additional discussion is not necessary for any question (i.e., when the meeting is canceled because the responses and comments are clear to the requester), or a particular question is considered resolved allowing extra time for discussion of the more complex questions during the meeting. Preliminary responses communicated by the FDA are not intended to generate the submission of new information or new questions."), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-pdufa-products.

[52] *See Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products* at p. 18, Sept. 2023 ("If the minutes are deemed to accurately and sufficiently reflect the meeting discussion, the FDA project manager will convey this decision to the requester and the minutes will stand as the official documentation of the meeting."), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-pdufa-products.

[53] Feigal Affirmative Report, ¶ 43.

[54] Feigal Affirmative Report, ¶ 43.

generally *does not* allow Phase 3 studies to proceed if FDA believes the study is designed in an unacceptable manner or if the sponsor is pursuing a labeling claim that FDA is reluctant to grant. Dr. Feigal's assertion defies common sense and is directly contrary to FDA guidance that encourages "minimiz[ing] the conduct of studies/trials that are unlikely to produce useful information but unnecessarily consume sponsor and CDER resources," and "early termination of development for drugs unlikely to be safe or effective[.]"[55]

44. Dr. Feigal also fails to consider that FDA guidance regarding communications with sponsors (as described above in **Section IV.A**) applies to EOP2 meetings. Accordingly, at the EOP2 meeting, FDA is expected to communicate any major concerns already identified with the Phase 3 study, and "to identify any additional information necessary to support a marketing application for the uses under investigation."[56] This includes communicating concerns with the proposed indication, labeling claims, study design, and the overall requirements for an appropriate safety database.[57] It also includes any concerns regarding the proposed study's primary and key secondary efficacy endpoints. As described in FDA guidelines, "[e]fficacy endpoints are measures intended to reflect the effects of a drug."[58] Primary endpoints establish the efficacy of a drug for its intended indication and serve as

---

[55] *See* MAPP 6030.9 at p. 7, Apr. 29, 2013 ("Implementation of these principles is intended to lead to greater consistency within and across CDER review divisions, to minimize the conduct of studies/trials that are unlikely to produce useful information but unnecessarily consume sponsor and CDER resources, to encourage early termination of development for drugs unlikely to be safe or effective, and to facilitate submission of a complete marketing application with quality information and well-designed/well-conducted nonclinical and clinical trials for review."), *available at* https://www.fda.gov/media/85790/download.

[56] 21 C.F.R. § 312.47(b)(1), Mar. 19, 1987 [updated Mar. 4, 2002], *available at* https://www.govinfo.gov/content/pkg/CFR-2013-title21-vol5/pdf/CFR-2013-title21-vol5-sec312-47.pdf.

[57] 21 C.F.R. § 312.47(b)(1)(v) ("The meeting should be directed primarily at establishing agreement between FDA and the sponsor of the overall plan for Phase 3 and the objectives and design of particular studies. The adequacy of the technical information to support Phase 3 studies and/or a marketing application may also be discussed.").

[58] *Multiple Endpoints in Clinical Trials: Guidance for Industry*, p. 2, Jan. 2017, *available at* https://www.fda.gov/files/drugs/published/Multiple-Endpoints-in-Clinical-Trials-Guidance-for-Industry.pdf.

the primary basis for approval, while secondary endpoints may be used to support additional labeling claims but are not themselves sufficient to support approval.[59]

45. Contrary to Dr. Feigal's suggestion,[60] when FDA agrees to a Phase 3 study design during an EOP2 meeting and does not raise any potential major review concerns, it sends a highly positive signal. As FDA guidance explains, the "EOP2 meetings serve to evaluate the phase 3 plan and protocols, the adequacy of current studies . . . , and *identify any additional information necessary to support a marketing application for the uses under investigation*."[61] Based on my experience applying this guidance, if FDA believes that the proposed Phase 3 plan is *not* adequate to support a drug application for a particular indication, FDA promptly and clearly communicates to the sponsor any potential major review concerns that may impede the application's approval. Potential *minor* review concerns, in contrast, are deficiencies that are not likely to impact approval and can be "handled through mechanisms such as *labeling* or [post-marketing commitments]" or through additional information requested and supplemented during the same review cycle.[62]

---

[59] *Multiple Endpoints in Clinical Trials, Guidance for Industry* at p. 2, Jan. 2017 ("The set of primary endpoints consists of the outcome or outcomes (based on the drug's expected effects) that establish the effectiveness, and/or safety features, of the drug in order to support regulatory action… Secondary endpoints may be selected to demonstrate additional effects after success on the primary endpoint. For instance, a drug may demonstrate effectiveness on the primary endpoint of survival, after which the data regarding an effect on a secondary endpoint, such as functional status, would be tested… All other endpoints are referred to as exploratory in this document."), *available at* https://www.fda.gov/files/drugs/published/Multiple-Endpoints-in-Clinical-Trials-Guidance-for-Industry.pdf.

[60] Feigal Affirmative Report, ¶¶ 87–90.

[61] *Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 14, Dec. 2017 (emphasis added), *available at* https://www.fda.gov/files/drugs/published/Best-Practices-for-Communication-Between-IND-Sponsors-and-FDA-During-Drug-Development.pdf.

[62] Desk Reference at p. 29 (emphasis added). A post-marketing commitment ("PMC") is a commitment by the sponsor to conduct a specific study or provide additional data *after* the drug is approved, often to further characterize safety, confirm clinical benefit, or support labeling changes. *See* "Postmarketing Requirements and Commitments: Introduction, U.S. Food and Drug Administration at pp. 1–2, Aug. 9, 2024, *available at* https://www.fda.gov/drugs/guidance-compliance-regulatory-information/postmarketing-requirements-and-commitments-introduction.

46. Consistent with this guidance, as well as my experience, FDA's concurrence in the sponsor's proposed Phase 3 study design at the EOP2 meeting without mention of potential major review concerns generally represents a strong signal that if the study meets the agreed upon primary endpoints, the results are positive and clinically meaningful, and there are no major safety concerns, FDA is likely to file and ultimately approve the application.

47. In the following sections, I first discuss Acadia's questions and FDA responses as reflected in the EOP2 Meeting Minutes, and then explain the flaws in Dr. Feigal's characterization of those communications.

### 2. Acadia's questions and FDA's responses regarding the proposed Phase 3 study design

48. On April 14, 2017, Acadia submitted a Type B Meeting Briefing Package, which included detailed information on Acadia's proposed Phase 3 pivotal trial (later known as Study ACP-103-045 or the "Harmony" study) and several questions for FDA's feedback around the proposed study design.[63] On May 10, 2017, FDA provided preliminary comments in response to these questions.[64] The EOP2 meeting occurred on May 15, 2017, and the final EOP2 Meeting Minutes were transmitted on May 24, 2017.[65]

49. To frame this discussion, I provide below in **Table 1** a summary of the most-relevant Acadia questions and FDA responses relating to Acadia's proposed Phase 3 trial design, as recorded in the EOP2 Meeting Minutes.

---

[63] ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2) at pp. 10-34, Apr 14, 2017. There were four questions submitted in the Briefing Package. I primarily discuss Questions 1 through 3, and FDA's responses to each in detail, because these are the most relevant for my opinions with respect to Dr. Feigal's characterization of the EOP2 meeting.

[64] ACAD_SECLIT_0019765, PIND 133880 EOP2 Preliminary Comments, May 10, 2017.

[65] *See generally* ACAD_SECLIT_0019792, EOP2 Meeting Minutes, May 15, 2017.

Table 1: *Questions and FDA responses regarding Phase 3 trial design in EOP2 Meeting Minutes*[66]

| **Acadia Question** | **FDA Response/Discussion** |
|---|---|
| **1.** "Does the Agency agree that treatment of hallucinations and delusions in dementia-related psychosis is an approvable indication?" | "We agree that treatment of hallucinations and delusions in dementia-related psychosis is a potentially approvable indication. We agree that dementias need not to be etiologically related for the common symptom of psychosis to respond to pimavanserin." |
| **2.** "The proposed ACP-103-045 study is a randomized, double-blind, placebo-controlled, relapse prevention study to evaluate the efficacy and safety of pimavanserin in subjects with hallucinations and delusions in dementia-related psychosis associated with neurodegenerative disorders, and is intended to be the basis of an sNDA for the proposed indication."<br><br>**2.a.** "Does the Agency agree with the proposed overall study design?" | Following discussion around FDA's "concerns with the proposal to use a randomized withdrawal trial to establish efficacy," "the Division agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of a sNDA for the indication of hallucinations and delusions associated with dementia-related psychosis." |
| **2.b.** "Does the Agency agree with the proposed study population to be included in the study?" | "Yes, we agree with the proposed study population as long as subjects are stratified by their current clinical diagnosis (as proposed). Labeling will reflect the actual composition and response of patients enrolled in the study." |
| **3.** It is ACADIA's position that in the context of the overall existing and planned safety database for pimavanserin that the single well-controlled Phase 3 study in the proposed patient population would be sufficient for a | "If you wish to rely on a single well-controlled study for your sNDA filing, the findings must be very persuasive. This means statistically significant with a very small probability of Type I error and a finding that |

66 ACAD_SECLIT_0019792, EOP2 Meeting Minutes, May 15, 2017, pp. 5–7.

| Acadia Question | FDA Response/Discussion |
|---|---|
| sNDA filing in the proposed indication. . . . Does the Agency agree? | is clinically meaningful. We agree that the total exposures from pimavanserin's development programs would provide a sufficient safety database once the safety-related PMC studies from the psychosis in Parkinson's disease approval are completed. |

50. Within each of these questions, and elsewhere throughout its submissions in advance of the EOP2 Meeting, Acadia provided significant detail about the proposed study design and additional studies that would be used to support the application. For example, in Question 2, Acadia stated that the Phase 3 study was a "randomized, double-blind, placebo-controlled relapse prevention study" to "to evaluate the efficacy and safety of pimavanserin in subjects with hallucinations and delusions in dementia-related psychosis."[67] Acadia further described how in the study, patients would be "administered pimavanserin in an open-label fashion over 12 weeks. Subjects who met response criteria[68] at Weeks 8 and 12 of the open-label period will then be randomized into a double-blind treatment period where they will be randomized (1:1) to continued pimavanserin treatment or placebo."[69] Acadia also described that "[t]he majority of dementia subtypes will be represented in this study, including [Alzheimer's Disease dementia ("AD")], [vascular dementia ("VaD")], [Parkinson's Disease ("PD")] dementia, [Lewy Bodies dementia ("LBD")], and [frontotemporal dementia ("FTD")]."[70]

---

[67] A randomized, double-blind, placebo-controlled relapse prevention study is a type of clinical trial designed to evaluate the effectiveness of a treatment in preventing the recurrence or worsening of a condition after initial improvement. ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2), April 14, 2017, p. 28. In relation to this case, the relevant condition is hallucinations and delusions in Alzheimer Disease patients with psychosis. *See also* ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2), April 14, 2017, p. 6.

[68] Response criteria was defined in the briefing package as "≥30% improvement in the SAPS-Hallucinations and Delusions subscale (SAPS-H+D) and score of 1 [very much improved] or 2 [much improved]." ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2) at p. 22, Apr. 14, 2017

[69] ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2) at p. 22, Apr. 14, 2017.

[70] ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2) at p. 25, Apr. 14, 2017.

51. Acadia also defined the study's proposed primary and secondary endpoints. The primary endpoint was defined as "time from randomization to relapse."[71] This endpoint was to be measured across *all* dementia subtypes—the briefing package *did not* include any subgroup-by-subgroup efficacy analyses in the primary or secondary *endpoints*.

### 3. Dr. Feigal downplays the importance of FDA's agreement that DRP is a potentially approvable indication.

52. It is unclear what opinion (if any) Dr. Feigal offers about FDA's response to Question 1, in which FDA agreed that DRP "is a potentially approvable indication" and that "dementias need not be etiologically related for the common symptom of psychosis to respond to pimavanserin."[72] To start, he notes that FDA had indicated in November 2008 that it "did not 'recognize 'dementia-related psychosis'' as 'a legitimate diagnostic entity.'"[73] What Dr. Feigal fails to mention, however, is that it is not uncommon for FDA to change or update its thinking in response to new information or analyses. In my opinion, FDA's decision to update its thinking in this way and stake out a very different position during the 2017 EOP2 meeting (and later in granting Breakthrough Therapy designation for DRP) represented a significant and positive signal for the ultimate approval of the sNDA.

53. Dr. Feigal further asserts that "when FDA tells a sponsor an indication is 'potentially approvable,' it simply means that the sponsor can *try* for the new indicated use, but there is no assurance that FDA will ultimately conclude that the proposed indication, as defined by the sponsor, will be approved."[74] It is true, as Dr. Feigal states, that FDA approval "will always depend on evidence showing clinical benefit for the proposed use from an adequate and well-controlled clinical trial."[75] He seems to imply, however, that the agreements documented in FDA's response to Question 1 did not represent an important milestone and positive signal for the ultimate approval of the DRP sNDA. As explained above, FDA

[71] ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2) at p. 26, Apr. 14, 2017.

[72] *See* Feigal Affirmative Report, ¶¶ 80, 102, 122.

[73] Feigal Affirmative Report, ¶ 122.

[74] Feigal Affirmative Report, ¶ 123.

[75] Feigal Affirmative Report, ¶ 123.

guidance stipulates that it should *not* permit studies to proceed that are "unlikely to produce useful information" and should "encourage early termination of development for drugs unlikely to be safe or effective."[76] In light of that guidance, as well as my own experience, FDA would not have agreed to Acadia's proposed indication if it believed that positive results from the agreed-upon pivotal trial to study pimavanserin's efficacy for DRP was unlikely to succeed.

### 4. Dr. Feigal misinterprets the discussion in the EOP2 meeting minutes regarding Harmony's randomized withdrawal study design.

54. In its preliminary response to Question 2a ("[d]oes the agency agree with the proposed overall study design"), FDA stated that it had "concerns with the proposal to use a randomized withdrawal trial to establish efficacy."[77] In the meeting discussion, FDA further stated that they were "concerned with establishing which patients might respond and characterizing the non-responders."[78] Dr. Feigal appears to focus exclusively on the discussion of FDA's concerns leading into the meeting, and largely ignores the most-significant communications in the EOP2 meeting minutes—i.e., FDA's ultimate *agreement* to Acadia's proposed trial design.

55. In response to FDA's comments regarding the proposed randomized withdrawal study design, Acadia "referenced the regulatory requirement for a 'well-controlled trial' and emphasized how randomized withdrawal studies have been accepted as well-controlled trials by the Agency."[79] As further support, Acadia explained that "the recently completed trial in Alzheimer's [019] disease patients and the trials in Parkinson's disease, where approximately a quarter of the subjects had dementia, provide prospective, placebo-controlled data."[80] Study 019 was a Phase 2 randomized controlled trial designed to evaluate the clinical efficacy of pimavanserin compared to a placebo in reducing hallucinations and delusions for the treatment of psychosis in Alzheimer's Disease. The

[76] *See* MAPP 6030.9 at p. 7, Apr. 29, 2013, *available at* https://www.fda.gov/media/85790/download.

[77] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 5, May 15, 2017.

[78] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 6, May 15, 2017.

[79] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 6, May 15, 2017.

[80] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 6, May 15, 2017.

study met its primary endpoint with statistical significance.[81] Acadia also discussed the difficulties of alternative trial designs, explaining, for example, the "the difficulties of enrollment and locating study sites for prospective, placebo-controlled studies in dementia."[82]

56. Following this discussion and explanation from Acadia, FDA ultimately "agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of a sNDA."[83]

57. Dr. Feigal's characterization of this discussion between FDA and Acadia regarding the randomized withdrawal study design is flawed and misleading. Specifically, he states that "FDA pointed out the limitations of 'basing a regulatory decision' (*i.e.*, granting approval of the new indication) 'on a single, randomized withdrawal study.'"[84] He correctly acknowledges that FDA ultimately "permitted Acadia to proceed with the Harmony Study."[85] However, he incorrectly asserts that this agreement was *not* a "clear endorsement by FDA that Acadia's proposed study was likely to generate the data necessary to support approval of a new DRP indication for pimavanserin."[86]

58. In my experience, and as explained in FDA's Guidance for Industry, it is common for the sponsor and FDA to engage in back-and-forth discussions regarding study design during an EOP2 meeting—as was the case here between Acadia and FDA.[87] What is most

---

[81] ACAD_SECLIT_0055692, REQUEST FOR BREAKTHROUGH THERAPY DESIGNATION Pimavanserin in Dementia-related Psychosis, August 3, 2017, p. 18. ("On the primary endpoint analysis, pimavanserin was statistically superior to placebo (Table 3–3).") .

[82] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 6, May 15, 2017.

[83] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 7, May 15, 2017.

[84] Feigal Affirmative Report, ¶ 128.

[85] Feigal Affirmative Report, ¶ 129.

[86] Feigal Affirmative Report, ¶ 129.

[87] *See Guidance for Industry Formal Meetings Between the FDA and Sponsors or Applicants* at p. 10, May 2009 ("Documentation of meeting outcomes, agreements, disagreements, and action items is critical to ensuring that this information is preserved for meeting attendees and future reference. FDA minutes are the official record of the meeting. The official, finalized minutes will be issued to all FDA attendees (with copies to appropriate files) and to the sponsor or applicant within 30 days of the meeting.").

significant is the *outcome* of these discussions—namely, FDA's ultimate agreement with Acadia's proposed study design. As I have explained previously, in my experience, when FDA agrees to a Phase 3 study design at an EOP2 meeting, it serves as a positive indication that an application would be approved should the study reach efficacy at the primary endpoint. This is true regardless of whether FDA *previously* expressed concerns in its preliminary pre-EOP2 responses or during the meeting itself; after all, the fundamental purpose of those responses is to provide a "foundation for discussion."[88]

**5. Dr. Feigal misinterprets Acadia's draft protocol and the EOP2 Meeting Minutes to suggest that approval would rely on additional analyses of subgroup efficacy data.**

59. Dr. Feigal's entire report appears to be based largely on his interpretation of FDA's response to Question 2b in the EOP2 Meeting Minutes. Acadia asked FDA whether it agreed with the "proposed study population to be included in the study," and FDA responded by (1) stating that it "agree[s] with the proposed study population so long as subjects are stratified by the current clinical diagnosis (as [Acadia had] proposed)"; and (2) noting that "[l]abeling will reflect the actual composition and response of patients enrolled in the study."[89] As I explain below, this is an unremarkable response by FDA to a straightforward question about the proposed study *population*—not the study's endpoints or any other efficacy-related approval requirements. Dr. Feigal, however, reads into FDA's comments an implicit "confirm[ation] that FDA approval of the new DRP indication will depend upon the types of dementia enrolled in the Harmony Study *and* how those patients respond to treatment."[90] In other words, according to Dr. Feigal, FDA's statement that "[l]abeling will reflect the actual composition and response of patients enrolled in the

---

[88] *See Guidance for Industry Formal Meetings Between the FDA and Sponsors or Applicants* at p. 9, May 2009 ("Communications before the meeting between sponsors or applicants and the FDA, including preliminary responses, can serve as a foundation for discussion or can be the final meeting responses.").

[89] Feigal Affirmative Report, ¶ 130; ACAD_SECLIT_0019792, EOP2 Meeting Minutes, at p. 5, May 15, 2017.

[90] Feigal Affirmative Report, ¶ 134.

study" meant that "the subgroup efficacy data would have to show *directionally consistent* benefit across different DRP subtypes."[91]

60. Dr. Feigal's interpretation of FDA's comments are unsupported and unreliable for several reasons. First, based on my experience and FDA guidance (including the GRMPP for PDUFA Products and Guidance for Industry), if FDA intended to communicate "directional consistency" amongst subgroups as a "requirement" for approval, it would have done so expressly and unambiguously.[92] FDA's comment regarding stratification does not state or imply that its approval of Acadia's sNDA would depend on *any* subgroup-level results—much less on some undefined concept of "directional consistency" found nowhere in FDA's communications with Acadia. Rather, in response to Acadia's question ("Does the Agency agree with the *proposed study population* to be included in the study?"), FDA simply stated its agreement with the Harmony Study design.[93] Dr. Feigal cites no support in FDA guidance, and I am not aware of any such support, for his opinion that FDA would communicate a "directional consistency" approval requirement vaguely and implicitly.

61. Second, Dr. Feigal attempts to support his interpretation of the labeling statement by asserting that "the terms 'label' and 'labeling' are often used as shorthand for 'FDA approval' or 'FDA authorization' by FDA."[94] Nothing in FDA guidance or my own experience suggests that FDA uses the word "labeling" as shorthand for "approval." In

---

[91] Feigal Affirmative Report, ¶¶ 130, 135 (emphasis added).

[92] *See GRMPP for PDUFA Products* at p. 3, Apr. 2005 ("The fundamental values on which the GRMPs are based include quality, efficiency, clarity, transparency, and consistency . . . Clarity: The clarity of the FDA's findings, expectations, and bases for decisions supports review efficiency and requires accurate review and effective communication. . . . Communications during the ongoing review, within CDER and CBER or with external groups such as the applicant or advisory committees (AC), are expected to consistently achieve the highest possible degree of clarity."); *see also Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 10, Dec. 2017 ("In all cases, FDA needs to take a thoughtful approach to answering sponsor questions both efficiently and comprehensively, particularly when the questions could have an important effect on critical decisions in development programs or that represent FDA views related to the evidence that will be used to support marketing."); Feigal Affirmative Report, ¶ 112.

[93] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 5, May 15, 2017.

[94] Feigal Affirmative Report, ¶ 61.

fact, Dr. Feigal's interpretation of FDA's comments is disconnected from the actual purpose and process of labeling. As stated in Title 21 of the CFR (cited by Dr. Feigal)[95], a drug's labeling (i.e., the informational packet that accompanies a drug) is required, among other things, to "discuss those clinical studies that facilitate an understanding of *how* to use the drug safely and effectively . . . , including discussion of study design, *population*, endpoints, and results."[96] Consistent with this guidance, as well as my experience as a medical practitioner, all information included in the labeling informs a clinician's decision to prescribe certain medication to their patients. Any information on efficacy and safety, including additional information on the study population, is useful information in supporting a clinician's medical decision.

62. When viewed in this context, FDA's "labeling will reflect" statement is properly understood to mean exactly what it says: "the actual composition and response of patients enrolled in the study" will be *reflected* (i.e., "reported" or "written") in labeling. Based on my experience, the composition and treatment response of the *enrolled* patients more reasonably describes the open-label response; as not all *enrolled* patients move on to be randomized in the double-blind phase. If FDA had meant to refer to the composition and treatment response of the *randomized* patients, they would have stated so explicitly. Further, FDA's references to the open-label treatment response in labeling is consistent with the purpose of labeling to "facilitate an understanding of how to use the drug safely and effectively,"[97] as, in my experience, open-label data informs clinicians of the study results that are most reflective of real-world response rates. In any event, because labeling is negotiated *as part of* approval,[98] any FDA communications regarding labeling before or during the review cycle necessarily concern what information will be reflected in the label *in the event of approval*, not *whether* approval will be granted. Simply put, this is a

[95] Feigal Affirmative Report, ¶ 59.

[96] 21 CFR § 201.57(c)(15), Jan. 24, 2006, [updated Dec. 4, 2014] (emphasis added), *available at* https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-201/subpart-B/section-201.57.

[97] 21 CFR § 201.57(c)(15), Jan. 24, 2006, [updated Dec. 4, 2014], *available at* https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-201/subpart-B/section-201.57.

[98] Labelling is distinct from approval, and labelling discussions occur for "products whose approval can be anticipated." *GRMPP for PDUFA Products* at p. 21.

labeling statement, not an implicit signal that FDA will require "directional consistency" as a summary basis of approval.

63. Third, Dr. Feigal does not acknowledge that there is no clearly defined definition of directional consistency (i.e., the consistency of the efficacy data across subgroups) in FDA regulations or guidance.[99] In my years of reviewing applications, I have not seen any statistical, technical, or even objective definition of directional consistency. Given the inherent ambiguity and subjectivity of "directional consistency," FDA guidance dictates that if FDA intended to impose such a requirement, it should not only explicitly communicate that requirement to the sponsor, but also clearly define the efficacy data that would (and would not) suffice to demonstrate "directional consistency."[100]

64. Fourth, to support his conclusion regarding this supposed "directional consistency" requirement, Dr. Feigal misinterprets the stratification language in Acadia's draft protocol and FDA's responses in the EOP2 Meeting Minutes.[101] Acadia's briefing package for the EOP2 meeting, which included the proposed study protocol, described how the Study

[99] As Tom Laughren testified, if the study is not designed to achieve statistical significance in each subgroup, then the reviewer must rely on "just eyeballing the data" by "looking numerically to see if everything is leaning in the same direction." *See* T. Laughren Dep. at 61:11–25 ("Q. How would you go about showing consistency?  A. I would start with—as I used the somewhat loose term, eyeballing: Just looking numerically to see if everything is leaning in the same direction. It's going to be very difficult to do statistical testing since you're not powering the study to achieve statistical significance in the different subgroups. You can't. Because some of the subgroups are going to be very small. And so you're going to have to [rely] on just eyeballing the data. And this—I mean, I know this may sound, you know, too informal. But, again, this would not be the primary end point of the study which does rely on formal statistical testing by hypothesis. So you're not really testing a hypothesis on each individual subgroup.").

[100] It appears that FDA did not even attempt to define "directional consistency" (much less communicate such a requirement to Acadia) until long after it issued the CRL in April 2021. *See* T. Farchione Dep. 86:3–8 ("[Y]ou can see that there was a—that you had different results in different subgroups. That's what we [FDA] mean by differential response."); *see also* ACAD_SECLIT_0322764, Clinical Study Protocol, ACP-103-045, Apr. 11, 2017, at p. 12-13; S. Davis Dep. at 115:2–15 ("When you have subpopulations, meaning it could be male/female, it could be based on age, or in this case, based upon specific types of dementia, it's not uncommon -- and we agreed with the FDA that we would stratify them. And so that's meant to try to get within individual subpopulations. The objective is to get the same number of patients on drug as placebo so that you can do things like look for are there differences in side effect profiles or drug-drug interactions or things like that.").

[101] Feigal Affirmative Report, ¶¶ 131-32; ACAD_SECLIT_0094235, at p. 1; S. Davis Dep. 105:16–106:6.

involved randomization and stratification by dementia subtypes.[102] In other words, Acadia's description of stratification in its draft protocol simply references the statistical method in which it will randomize its patient population.[103] More importantly, FDA's agreement to Acadia's Phase 3 study design at the EOP2 meeting included the study's primary endpoint[104]—time to relapse in the intent to treat population[105]—which serves as the key measure of efficacy for approval. As explained above, neither the final EOP2 Minutes nor any of Acadia's pre-EOP2 briefing materials suggest any primary or secondary endpoints related to subgroup efficacy.[106] Consequently, and taken together with FDA's failure to identify any potential major concerns, the EOP2 meeting minutes indicate that FDA agreed with Acadia's study design and that approval in DRP *would not* hinge on the undefined concept of directional consistency in subgroup efficacy data.[107]

65. Fifth, and similarly, Dr. Feigal's conclusions seem to reflect a misunderstanding of the use of subgroups in clinical trials, as well as a failure to consider relevant FDA guidance about the use of subgroups.[108] FDA guidance states that, in a given clinical trial, subgroups can be defined by several factors, including demographic (such as age, gender, or sex) or

[102] *See* ACAD_SECLIT_0499628, End-of-Phase 2 Meeting, Briefing Package, Apr. 14, 2017; *see also* Feigal Affirmative Report, ¶ 86.

[103] ACAD_SECLIT_0322764, Draft Clinical Study Protocol, ACP-103-045, Apr. 11, 2017.

[104] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 5, May 15, 2017.

[105] The intent to treat population includes patients across several dementia subtypes—e.g., Alzheimer's disease, Parkinson's disease dementia, dementia with Lewy bodies, FTD-spectrum disorders, Vascular dementia. ACAD_SECLIT_1189898, Acadia Type A Meeting Request and Briefing Package, May 20, 2021, p. 12.

[106] *See Good Review Practice: Clinical Review of Investigational New Drug Applications* at p. 69, Dec. 2013 ("In general, the primary endpoint is the trial outcome that will be used to show whether the drug has clinically significant beneficial effect. If it does not, in all but the most unusual cases, the trial will not be considered to demonstrate a drug effect and will not support marketing approval. A secondary endpoint, in most cases, cannot be used as evidence of efficacy if the primary endpoint analysis was not clinically and statistically significant."), *available at* https://www.fda.gov/media/87621/download.

[107] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 5, May 15, 2017.

[108] Subgroups are distinct subsets of a study's population. *See Toolkit for Patient-Focused Therapy Development, Glossary: Subgroup*, U.S. Department of Health and Human Services, accessed March 26, 2025 ("Subgroup refers to a subset of the study population or study sample defined by specific baseline characteristics. For example, demographic subgroups are commonly defined by subject sex, race, and age."), *available at* http://toolkit.ncats.nih.gov/glossary/subgroup.

disease related (e.g., disease severity or etiology).[109] The types of subgroups can vary across clinical trials depending on factors such as the therapeutic area or patient population. They may be used to inform labeling, even if the primary and/or secondary endpoint is *not* to assess consistency of treatment effect within those subgroups.[110] However, in my experience, when subgroup analyses are performed during NDA/sNDA review, they are not considered a principal basis of approval. In fact, FDA guidance explains that subgroup analyses are exploratory and should be interpreted with caution: "*the results of such analyses cannot be used as a substitute for the primary analysis.*"[111] Further, the guidance states that "[c]are must be taken to avoid specific efficacy claims based on such a subset analysis."[112] Given these varied types and uses of subgroups in clinical trials, one would expect that FDA would expressly state during the EOP2 meeting that it was imposing a "directional consistency requirement" *and* explain clearly what that requirement meant. FDA did not do so, and Dr. Feigal offers no support for his contrary interpretation of the meeting minutes.

#### 6. Dr. Feigal downplays FDA's agreement for Acadia to rely on a single Phase 3 trial to support the approval of the DRP sNDA.

66. In response to Question 3, FDA agreed to Acadia relying on a single well-controlled trial, stating, "If you wish to rely on a single well-controlled study for your sNDA filing, the findings must be very persuasive. This means statistically significant with a very small

[109] *See, e.g.,* Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products, May 1998, at p. 10 ("e. Studies in a closely related disease: Studies in etiologically or pathophysiologically related conditions, or studies of a symptom common to several diseases (e.g., pain) can support each other, allowing initial approval of several uses or allowing additional claims based on a single adequate and well-controlled study."), *available at* https://www.fda.gov/media/71655/download.

[110] One well-known example is FDA's review of sertraline (Zoloft) for post-traumatic stress disorder, in which Tom Laughren "noted [that] limiting the indication to a specific sub-group identified by *post hoc* analyses . . . is treacherous business, and should not be done lightly." *See* "Subject: Action Memo for NDA 19-839/S-026, for the use of Zoloft (sertraline) in patients with Post Traumatic Stress Disorder (PTSD)," Division of Neuropharmacological Drug Products/HFD 120 at p. 2, Dec. 6, 1999, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/99/19-839S026_Zoloft_corres.pdf.

[111] *See Good Review Practice: Clinical Review of Investigational New Drug Applications* at p. 60, Dec. 2013 ("These analyses should be prospectively specified, despite the fact that *the results of such analyses cannot be used as a substitute for the primary analysis*.").

[112] *Good Review Practice: Clinical Review of Investigational New Drug Applications* at p. 46, Dec. 2013.

probability of Type I error and a finding that is clinically meaningful. We agree that the total exposures from pimavanserin's development programs would provide a sufficient safety database once the safety-related PMC studies from the psychosis in Parkinson's disease approval are completed."[113]

67. Dr. Feigal claims that two Phase 3 trial are typically required by FDA to demonstrate a drug's efficacy.[114] In fact, as FDA guidance explains, Congress expressly directed "the Agency may consider 'data from one adequate and well-controlled clinical investigation and confirmatory evidence' to constitute substantial evidence if FDA determines that such data and evidence are sufficient to establish effectiveness."[115] Furthermore, pimavanserin had already been approved for Parkinson's Disease Psychosis ("PDP") on the basis of a single study, as was noted in an article on which FDA officials Mitchell Mathis, Tiffany Farchione, and Brendan Muoio appear as authors.[116]

68. Dr. Feigal further claims that a single Phase 3 trial may be adequate if it "is as large as two trials and has a p-value . . . of less than .0125," or "is supported by other strong evidence."[117] Dr. Feigal does not cite any FDA guidance to support these criteria, nor am I aware of any guidance that imposes such requirements. However, even if Dr. Feigal's

---

[113] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 7, May 15, 2017.

[114] Feigal Affirmative Report, ¶ 40.

[115] *See Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products*, p. 3–4, May 1998 ("In section 115(a) of the Modernization Act, Congress amended section 505(d) of the Act to make it clear that the Agency may consider 'data from one adequate and well-controlled clinical investigation and confirmatory evidence' to constitute substantial evidence if FDA determines that such data and evidence are sufficient to establish effectiveness."), *available at* https://www.fda.gov/media/71655/download.

[116] *See* M. Mathis *et al.*, *The US Food and Drug Administration's Perspective on the New Antipsychotic Pimavanserin*, JOURNAL OF CLINICAL PSYCHIATRY at p. 669, June 2017, ("In discussions with the Applicant, the FDA agreed that a single well-designed and robustly positive study demonstrating both improvement in PDP symptoms and no worsening of motor symptoms of Parkinson's disease could support approval. In fact, the evidence supporting approval for pimavanserin in PDP was obtained from a single, strongly positive study with supportive data from other studies.").

[117] Feigal Affirmative Report, ¶ 40.

claimed requirements are accepted at face value, the second criteria for p-value was met by the results of Harmony Study.[118]

69. FDA guidance describes circumstances in which only one Phase 3 trial may be sufficient to support approval that are directly applicable to Acadia's situation in the relevant time period. For example, FDA guidance states "Studies in etiologically or pathophysiologically related conditions, or studies of a symptom common to several diseases (e.g., pain) can support each other, allowing initial approval of several uses or allowing additional claims based on a single adequate and well-controlled study."[119] This was exactly the case in Acadia's DRP sNDA, as Studies 019 and 020 had already demonstrated pimavanserin's effectiveness in treating psychosis attributable to Parkinson's disease and Alzheimer's disease respectively.[120]

70. Finally, Dr. Feigal argues that FDA's requirement for the findings of the study to be "very persuasive" meant that Harmony's subgroup data had to be particularly compelling.[121] But there is no support in FDA guidance or the EOP2 Meeting Minutes for this position. In fact, FDA defined precisely what it meant by "very persuasive" in the meeting minutes: "[t]his means statistically significant with a very small probability of Type I error and a finding that is clinically meaningful."[122] The notion that Acadia ought to have divined a

---

[118] *See* ACAD_SECLIT_0499628, Briefing Package, Type B Meeting (End-of-Phase 2), Apr. 14, 2017; *see also* ACAD_SECLIT_0001467, Pre-sNDA briefing package.pdf at pp. 26–27 (Primary endpoint p values: one-sided - 0.0023, O'Brien-Fleming: 0.0033; secondary endpoint p values: one-sided – 0.0024, O'Brien Fleming - 0.0033).

[119] *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* at p. 10, May 1998, May 1998, *available at* https://www.fda.gov/media/71655/download.

[120] ACAD_SECLIT_0055692, Request for Breakthrough Therapy Designation Pimavanserin in Dementia-related Psychosis, August 3, 2017, p. 18. ("On the primary endpoint analysis, pimavanserin was statistically superior to placebo (Table 3–3)."); *See also* ACAD_SECLIT_1189898, Type A Meeting Request and Briefing Package at p. 6, May 20, 2021. ("The pivotal Study 045 results are supported by positive results in two separate placebo-controlled, parallel group design studies, one in subjects with Alzheimer's disease psychosis (ADP, Study 019) and the other in the subset of subjects with PDP (Study 020). Both studies demonstrated statistically significant and clinically meaningful benefit in their respective patient populations.").

[121] Feigal Affirmative Report, ¶ 138; *see id.*, ¶ 137 ("Acadia intentionally chose a path to approval that was more difficult and would make Harmony's subgroup data even more important.").

[122] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 7, May 15, 2017.

third *unstated* condition—i.e., directionally consistent subgroup efficacy data—when two are explicitly outlined is inconsistent with common sense and my experiences as an FDA reviewer.[123]

### C. Dr. Feigal Appears to Overlook Further Agreement and Positive Signals from FDA In Connection with Acadia's IND Submission.

71. In this section, I examine the significance of the FDA's review and acceptance of Acadia's Investigational New Drug Application ("IND") submission for the Harmony Study.[124] I begin by explaining the role of the IND process in establishing the regulatory foundation for Phase 3 clinical trials and how it functions as an early checkpoint for FDA to raise concerns about safety, trial design, or scientific rationale. I then describe how FDA's review of Acadia's IND—culminating in a Study May Proceed letter—reflected no objections to the proposed Harmony Study and marked an important regulatory milestone. In conclusion, I explain how the absence of major concerns during the IND stage would have reasonably reinforced Acadia's understanding that its clinical development program was aligned with FDA expectations. Finally, I explain how Dr. Feigal fails to address this communication and therefore omits important context that supports Acadia's understanding that the Harmony Study was on an acceptable path toward approval.

72. Before beginning a Phase 3 study, a sponsor will submit their proposed phase 3 protocol for FDA review as part of the IND. This protocol incorporates feedback received from FDA at the EOP2 meeting. The protocol for a Phase 3 study is reviewed significantly

---

[123] *See Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 12, Dec. 2017 ("Effective and timely communication between FDA and sponsors promotes understanding of mutual goals and is invaluable to the drug development process. Central to this is *the ability to communicate clearly, both verbally and in writing, inside and outside the formal meeting format*. It is also *important that FDA and sponsors have a common understanding of terms and phrasing* used in communications with each other, and that *they are used consistently by both parties*. In FDA communications related to INDs, as a best practice FDA staff will: Use words such as *shall*, *must*, *required*, or *requirement* to convey a statutory or regulatory requirement." (emphasis added)) *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development.

[124] An Investigational New Drug Application (IND) is filed to receive approval to conduct phase 3 trials in human subjects when testing a drug in a new patient population or indication. *See* "Investigational New Drug (IND) Application," U.S. Food and Drug Administration, Nov. 18, 2024, *available at* https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

differently than earlier protocols. Whereas Phase 1 and 2 protocols are reviewed primarily for safety, rather than providing pivotal efficacy data, Phase 3 protocols are reviewed with both of these goals in mind.[125]

73. The submission of the Phase 3 protocol is a key milestone at which FDA should and typically does communicate any deficiencies with the protocol. As set forth in FDA's Guidance for Industry, "sponsors and FDA engage in thousands of communications, including meetings and teleconferences, during the IND phase of drug development [that are] opportunities to share information and provide critical advice (e.g., trial design, dose selection, analytical similarity assessment, nonclinical study requirements, manufacturing and facility issues), [and] it is important that interactions be conducted efficiently and consistently, with *clear, concise, and timely communication*."[126] Accordingly, when FDA does *not* raise any issues with the Phase 3 protocol design and concurs with a sponsor's statistical analysis plan, FDA is signaling that it will likely accept a positive result of the Phase 3 study as a basis for drug approval.

74. Dr. Feigal significantly understates the importance of this review, culminating in the issuance of FDA's Study May Proceed Letter, and seems to conflate the review processes for Phase 2 and Phase 3 Studies. On July 7, 2017, after incorporating feedback from FDA based on the discussion in the EOP2 meeting, Acadia sent FDA its IND for the Phase 3 study protocol.[127] This included the Harmony Study protocol, which provided extensive details on the study's design, including the patient population, primary and secondary endpoints, and study timeline.[128] Notably, as reflected in the below "Protocol Synopsis,"

---

[125] 21 CFR § 312.23, Mar. 19, 1987 [updated Mar. 4, 2002], *available at* https://www.ecfr.gov/current/title-21/chapter-I/subchapter-D/part-312/subpart-B/section-312.23.

[126] *Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 3, Dec. 2017 (emphasis added), *available at* https://www.fda.gov/media/94850/download.

[127] *See generally* ACAD_SECLIT_0019827, RE: IND 133880, Original IND and Protocol ACP-103-045, July 7, 2017.

[128] ACAD_SECLIT_0019792, EOP2 Meeting Minutes at p. 5, May 15, 2017.

subgroup-level analyses was not included among the study's primary, secondary, or even exploratory objectives or endpoints:[129]

**PROTOCOL SYNOPSIS**

<table>
<tr><td colspan="3">Sponsor: ACADIA Pharmaceuticals Inc.</td></tr>
<tr><td colspan="3">Name of Investigational Product: Pimavanserin</td></tr>
<tr><td colspan="3">Indication: Treatment of hallucinations and delusions associated with dementia-related psychosis</td></tr>
<tr><td colspan="3">Protocol Title: A Double-blind, Placebo-controlled, Relapse Prevention Study of Pimavanserin for the Treatment of Hallucinations and Delusions Associated With Dementia-related Psychosis</td></tr>
<tr><td>Protocol Number: ACP-103-045</td><td>EudraCT Number: 2017-002227-13</td><td>Phase: 3</td></tr>
<tr><td>Primary Objective<br>• To evaluate relapse prevention in subjects with dementia-related psychosis treated with pimavanserin compared to placebo</td><td colspan="2">Primary Endpoint<br>• Time from randomization to relapse in the double-blind period</td></tr>
<tr><td>Key Secondary Objective<br>• To evaluate the time to discontinuation of the study for any reason in subjects with dementia-related psychosis treated with pimavanserin compared to placebo</td><td colspan="2">Key Secondary Endpoint<br>• Time from randomization to discontinuation from the double-blind period for any reason</td></tr>
<tr><td>Exploratory Objectives<br>• To evaluate the benefit of pimavanserin compared to placebo in the following domains in subjects with dementia-related psychosis who have been stabilized on pimavanserin therapy:<br>o symptoms of hallucinations and delusions<br>o clinical global impressions<br>o caregiver burden<br>o daytime sleepiness<br>o quality of life</td><td colspan="2">Exploratory Endpoints<br>• Change from double-blind Baseline to Week 38/End-of-Treatment (EOT) on the following:<br>o Scale for the Assessment of Positive Symptoms-Hallucinations+Delusions (SAPS-H+D) score<br>o SAPS Hallucinations domain score<br>o SAPS Delusions domain score<br>o Clinical Global Impression-Severity (CGI-S)-dementia-related psychosis<br>o Zarit Burden Interview (ZBI) score<br>o Karolinska Sleepiness Scale (KSS) score<br>o EQ-5D-5L score<br>o Clinical Global Impression-Improvement (CGI-I)-dementia-related psychosis</td></tr>
</table>

[129] ACAD_SECLIT_0499534, Clinical Study Protocol: A Double-blind, Placebo-controlled, Relapse-Prevention Study of Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis at p. 4, July 5, 2017.

75. The amendment also referenced FDA's agreement on the overall study design and described the modifications Acadia has made to the protocol in response to feedback from the EOP2 meeting.[130]

76. On August 10, 2017, after reviewing the IND amendment 133880, FDA sent an email with feedback on the proposed study protocol.[131] In its feedback, FDA stated its willingness to accept the Harmony Study protocol to support the filing of the sNDA, as well as a PMC for the previously approved PDP indication.[132] On August 11, 2017, FDA sent a "Study May Proceed" letter to Acadia,[133] confirming "FDA ha[d] concluded that [Acadia] may proceed with [its] proposed IND."[134] In neither of these communications did FDA identify any major protocol concerns, changes to the primary endpoint, or raise any further requirements around stratification—much less any requirement that the Harmony Study demonstrate "directional consistency" amongst subgroups. On the basis of these agreements with FDA, Acadia began the Harmony Study on October 4, 2017.[135]

77. In his report, Dr. Feigal fails to even acknowledge FDA's acceptance of the revised Harmony Study protocol, as reflected in the August 10, 2017 email and the August 11, 2017 Study May Proceed Letter. In so doing, he overlooks another critical milestone where

---

[130] *See, e.g.*, ACAD_SECLIT_0105223, RE: IND 133880 ACP-103-045 Statistical Analysis Plan, last sent Dec. 6, 2018; ACAD_SECLIT_0159711, IND 133880, Serial No. 0033 Pimavanserin tartrate Response to FDA Comments on ACP-103-045 Statistical Analysis Plan, Jan. 10, 2019; s*ee also* generally ACAD_SECLIT_0158441, IND 133880 Serial No. 0048 Pimavanserin tartrate Information Amendment: Protocol ACP-103-045 Statistical Analysis Plan, Aug. 1, 2019. Notably, FDA did not request any changes to the protocol to incorporate analyses of "directional consistency" in subgroup efficacy data.

[131] ACAD_SECLIT_0023944, FDA Feedback on studies -044, -045, and -046 at p. 1, Aug. 10, 2017.

[132] ACAD_SECLIT_0023944, FDA Feedback on studies -044, -045, and -046, Aug. 10, 2017, p 1. ("This is conditional on the submission of the results of -045 for review and the determination that enough subjects with Parkinson's disease have been randomized to provide sufficient data to fulfill the spirit of the PMC. If the Division determines that not enough patients with Parkinson's disease have completed Study -045, we will require you to complete Study -044.").

[133] ACAD_SECLIT_0019847, Study May Proceed at p. 1, Aug. 11, 2017.

[134] ACAD_SECLIT_0019847, Study May Proceed at p. 1, Aug. 11, 2017.

[135] "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," ACADIA, Oct. 4, 2017, *available at* https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-initiates-phase-iii-study-pimavanserin-0.

FDA had the opportunity to raise major issues or concerns but did not, instead reaffirming its agreement with the study design.

### D. In Assessing the Significance of FDA's Responsibilities to Communicate with Acadia, Dr. Feigal Overlooks the Relevance of FDA's Breakthrough Therapy Designation for Pimavanserin for DRP.

78. In this section, I evaluate the regulatory significance of FDA's decision to grant BTD to pimavanserin for the treatment of DRP. I begin by outlining FDA's heightened obligations in BTD cases, including the expectation of early, frequent, and clear communication with the sponsor throughout development. I then explain how these obligations applied during the review of pimavanserin. In conclusion, I describe how Dr. Feigal fails to account for the implications of BTD status, FDA's decision to maintain that designation throughout the review cycle, and the absence of any potential major review concerns, which collectively signaled Acadia's continued alignment with FDA expectations for approval of the sNDA.

79. BTD is a process designed to expedite the development and review of drugs that treat serious life-threatening conditions, where "preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."[136] While FDA is always expected to communicate issues with sponsors, the expectations for FDA to proactively communicate review concerns to a sponsor for an application that is designated as BTD are significantly higher.[137] As stated in FDA's Guidance for Industry, "[f]or drugs developed under expedited programs, such as

[136] *See* "Breakthrough Therapy," U.S. Food and Drug Administration, Jan. 4, 2018 ("Breakthrough Therapy designation is a process designed to expedite the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."), *available at* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

[137] *See Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 4, Dec. 2017, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development; *see also* MAPP 6025.6 at p. 3, July 29, 2014 ("The features of a breakthrough therapy designation include intensive CDER guidance on an efficient drug development program, assignment of a cross-disciplinary project lead (CDPL) for the review team, and an organizational commitment to involve senior management, as appropriate, in a collaborative, cross-disciplinary review."), *available at* https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.

breakthrough therapy and fast track, sponsors receive more intensive guidance on an efficient drug development program with *increased interactions and communications* with FDA, including meetings."[138] In sum, a sponsor can reasonably expect more frequent and proactive communication—including prompt and clear communications of potential major review concerns—from FDA for drugs that are granted BTD.

80. Acadia submitted a formal request for BTD on August 3, 2017.[139] The request was supported by the following facts: (1) DRP is a "serious condition with severe medical and human consequences for which there is no approved treatment,"[140] (2) the "[p]reliminary clinical evidence shows significant effects of pimavanserin on clinically meaningful endpoints,"[141] and (3) "[t]he significance of pimavanserin's unique pharmacologic profile is supported by preclinical and clinical evidence of antipsychotic activity, without detrimental effects on cognitive function or other off-target toxicities often associated with current treatment options."[142]

81. FDA agreed with Acadia's request and granted BTD status to pimavanserin in a formal letter on October 2, 2017.[143] This letter, along with the referenced FDA guidance document,[144] details FDA's commitment to work closely with a sponsor to ensure a

---

[138] *Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 4, Dec. 2017 (emphasis added), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development; *see also* MAPP 6025.6 at p. 3, July 29, 2014 ("The features of a breakthrough therapy designation include intensive CDER guidance on an efficient drug development program, assignment of a cross-disciplinary project lead (CDPL) for the review team, and an organizational commitment to involve senior management, as appropriate, in a collaborative, cross-disciplinary review."), *available at* https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.

[139] *See generally* ACAD_SECLIT_0055692, Request for Breakthrough Therapy Designation, Aug. 3, 2017.

[140] ACAD_SECLIT_0055692, Request for Breakthrough Therapy Designation at p. 5, Aug. 3, 2017.

[141] ACAD_SECLIT_0055692, Request for Breakthrough Therapy Designation at p. 5, Aug. 3, 2017.

[142] ACAD_SECLIT_0055692, Request for Breakthrough Therapy Designation at p. 5, Aug. 3, 2017.

[143] *See generally* ACAD_SECLIT_0019878, Grant – Breakthrough Therapy Designation, Oct. 2, 2017.

[144] MAPP 6025.6 at p. 3, July 29, 2014 ("The features of a breakthrough therapy designation include intensive CDER guidance on an efficient drug development program, assignment of a cross-disciplinary project lead (CDPL) for the review team, and an organizational commitment to involve senior

successful review process—including by designing and conducting an efficient development program for the sNDA—as well as FDA's commitment that its primary reviewer will "[i]dentif[y] issues with the development program, proposes potential solutions, and *communicate issues . . . as soon as possible*."[145] Given the BTD designation, then, FDA's lack of communication regarding any major review concerns in the DRP sNDA even more significant and positive.[146]

82. In his report, Dr. Feigal only briefly mentions that pimavanserin for DRP was granted BTD. He then states that BTD "do[es] not change the regulatory standards or requirements for approval, or the amount and rigor of review by FDA, but . . . do[es] allow more meetings and interactions, prior to NDA or sNDA filing, between the Agency and IND holders, as well as priority review of BLA or NDA/sNDA marketing applications. FDA shortens the review cycle, not by lowering the standards for review, but by allocating more resources to applications in these programs."[147]

83. Dr. Feigal's characterization of BTD during the relevant time period is flawed and incomplete. For one thing, Feigal's discussion of BTD is not anchored by analysis of (or even reference to) the relevant FDA guidelines on BTD, which I discuss earlier in this section.[148] Likely due to this missing information, he then proceeds to overlook the implications of FDA's granting BTD—namely that a sponsor would expect even greater transparency by FDA in promptly and clearly communicating any major review concerns. As a consequence, Dr. Feigal fails to incorporate the pimavanserin's BTD status into his

---

management, as appropriate, in a collaborative, cross-disciplinary review."), *available at* https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.

[145] MAPP 6025.6 at p. 5 (emphasis added), July 29, 2014, *available at* https://www.fda.gov/media/89155/download.

[146] Breakthrough Therapy Designation for the DRP sNDA was not rescinded till April 27, 2021, therefore these expectations apply through the development and review period for the DRP sNDA. *See generally* ACAD_SECLIT_0045918, re: IND 133880 Intent to Rescind Breakthrough Therapy Designation, April 27, 2021.

[147] Feigal Affirmative Report, ¶ 46.

[148] While Dr. Feigal refers FDA's cite to *Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics* (See Feigal Affirmative Report ¶ 108), he does not consider other FDA Guidance on the Breakthrough Therapy Designation program.

analysis of Acadia's communications with FDA and, in so doing, further misinterprets those communications by understating the positive significance of FDA's lack of communication regarding any major issues or concerns.

### E. Dr. Feigal Misinterprets Acadia's Statistical Analysis Plan and the Surrounding FDA Communications.

84. In this section, I examine FDA's review of the Statistical Analysis Plan ("SAP") submitted by Acadia. I begin by describing the role of the SAP in defining how trial data will be evaluated and its importance in FDA's review process. I then outline how FDA had the opportunity to raise any potential major review concerns at this stage and did not do so. FDA's agreement with Acadia's final SAP and the absence of FDA objections to the SAP during review supports the view that no major statistical concerns had been identified, and that Acadia's analysis plan for evaluating the results of the Harmony Study and its primary efficacy endpoints would serve as the basis for review.

85. Along with the Phase 3 study protocol, the sponsor is expected to submit an SAP, which reviews and provides comments and recommendations to ensure the statistical approach aligns with regulatory standards and is sufficient to demonstrate efficacy and safety. According to FDA's Guidance for Industry, the Agency may ask for additional information or provide feedback on the analysis plan, especially for a BTD drug.[149] The sponsor then revises the SAP to address FDA's feedback and submits the finalized SAP before analyzing any trial data.

86. Where, as in the case of Acadia, the sponsor accepts and implements FDA's feedback on the SAP, the final SAP thus represents an agreed-upon plan between the sponsor and FDA,

---

[149] *See Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics* at pp. 13–14, May 2014 ("FDA will seek to ensure that a sponsor of a product designated as a breakthrough therapy receives timely advice and interactive communications to help the sponsor design and conduct a drug development program as efficiently as possible. During these interactions, the Agency may suggest, or a sponsor may propose, alternative clinical trial designs (e.g., adaptive designs, an enrichment strategy, crossover or N-of-1 design, use of historical controls) or use of an interim analysis by a data monitoring committee. These trial designs may result in smaller trials or more efficient trials that require less time to complete and may help minimize the number of patients exposed to a potentially less efficacious treatment (i.e., the control group treated with available therapy)."), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics.

providing a clear, pre-specified statistical framework for analyzing trial data. This agreed upon plan ensures that, if the trial results are statistically significant and clinically meaningful, FDA is likely to consider this a positive pivotal trial in support of the approval of the indication sought for the drug.[150]

87. Dr. Feigal's analysis of the SAP, however, overlooks critical milestones around the time of SAP submission. On September 18, 2018, Acadia submitted a 100-page draft of their SAP to FDA. The SAP also included a plan for an interim analysis, whereby Acadia would potentially conclude the study early if the efficacy data met a prespecified measure of statistical significance. On December 6, 2018, FDA provided feedback on Acadia's SAP, focusing on enhancing statistical rigor, accounting for biases, and ensuring the validity of assumptions and results. None of FDA's comments raised concerns about subgroup stratification or directional consistency.

88. Acadia also discussed the SAP with FDA during a Type B Guidance Meeting on June 13, 2019. Once again, FDA did not raise any concerns about directional consistency or additional subgroup analyses as a basis for approval. Then, on August 1, 2019, after discussions with the FDA, Acadia submitted its final SAP, incorporating the agency's prior feedback.[151]

89. Dr. Feigal attempts to support the existence of a "directional consistency" requirement by asserting it is "clearly reflected in Harmony's statistical analysis plan, which outlines a number of subgroup efficacy analysis."[152] This is inaccurate and misleading. The final SAP did not include subgroup efficacy data among the primary or key secondary study *endpoints*. The SAP did include certain exploratory *analyses* of subgroups,[153] but that is, in

---

[150] MAPP 6030.1, rev. 3 at p. 1, Nov. 20, 1995, [updated Feb. 20, 2018], *available at* https://www.fda.gov/media/72751/download.

[151] *See generally* ACAD_SECLIT_0158441, IND 133880 Serial No. 0048 Pimavanserin tartrate Information Amendment: Protocol ACP-103-045 Statistical Analysis Plan, Aug. 1, 2019.

[152] Feigal Affirmative Report, ¶ 132.

[153] In addition to dementia subtypes, the protocol also specified subgroup analyses based on of age, race, region, gender, providing further confirmation that this language cannot reasonably be interpreted to imply that individual subgroup response rates would be considered a primary or even secondary endpoint. *See* ACAD_SECLIT_0089039, ACP-103-045 Statistical Analysis Plan, July 26, 2019, at pp. 22, 42-44.

my experience, a standard feature of most clinical trial protocols—and does not in any way imply that the exploratory subgroup analyses will be considered as a basis for approval.[154] FDA raised no concerns or objections regarding the final SAP.

90. In conclusion, Dr. Feigal overlooks the multiple touchpoints Acadia had with FDA regarding the SAP, as well as the numerous opportunities FDA had to raise major review concerns regarding the study design or SAP.[155] These ongoing communications between FDA and Acadia reflect the measures taken to ensure the statistical validity of the Harmony Study results, consistent with the agreement reached at the EOP2 Meeting. In my opinion, none of this feedback represented major review concerns, indicated concerns about the study's primary endpoint, or suggested that approval would hinge on any directional consistency in subgroups.

### F. Dr. Feigal Overlooks the Fact that FDA Presented No Potential Major Review Concerns at the Pre-sNDA Meeting, a Positive Sign for Application Review.

91. In the following section, I analyze the pre-sNDA meeting between FDA and Acadia, which occurred shortly before submission of the DRP application. I begin by explaining the purpose of a pre-sNDA meeting and its role as a final checkpoint for identifying unresolved issues before filing. I then explain that FDA did not communicate any potential major review concerns during this meeting, which Dr. Feigal fails to recognize as another positive signal that Acadia's sNDA was on track for filing acceptance and ultimate approval.

92. After FDA reviews and accepts the IND—including the Phase 3 protocol and the SAP—the sponsor proceeds with the study, collects the clinical data, and analyzes the data as agreed upon in the SAP. The sponsor expects and relies upon timely and clear FDA communications at these critical milestones to identify any major review concerns before

---

[154] ACAD_SECLIT_0158441, IND 133880 Serial No. 0048 Pimavanserin tartrate Information Amendment: Protocol ACP-103-045 Statistical Analysis Plan at pp. 42–43, Aug. 1, 2019.

[155] *See Guidance for Industry: E9 Statistical Principles for Clinical Trials (ICH E9)* at p. 27, Sept. 1998 ("The statistical analysis plan (SAP) may be written as a separate document to be completed after finalizing the protocol.").

filing the sNDA. As explained in the GRMPP for PDUFA Products, FDA is expected to foster "*open communication* of advice, guidance, and *notification of deficiencies* . . . at pivotal points during product development," which "can lead to *identification of potential filing and review issues* that the applicant can, and should, address before the marketing application is submitted for review.[156]

93. In his Affirmative Report, Dr. Feigal does not cite FDA guidance (or any other authority) to support his mischaracterization of FDA's role and responsibilities relating to pre-sNDA meetings. He claims that the "results of the studies are not reviewed (at the pre-sNDA meeting stage) or, usually, even commented upon by FDA prior to or even at a pre-filing meeting" because, in his opinion, "the purpose of this meeting is to assure the *reviewability* of the application and its completeness, and not whether the application does (or does not) meet the standards that would warrant approval (which is what the separate *review* process, described below, is about)."[157]

94. In my experience, FDA not only assesses whether the sNDA is complete, but also identifies any major concerns relating to safety or efficacy that could affect approval. This involves an in-depth substantive review of the sponsor's preliminary meeting package, including the safety and efficacy data from studies agreed to at the EOP2 meeting. Indeed, FDA guidance confirms that pre-sNDA meetings are "intended to *uncover major issues*, identify studies intended to establish the drug's safety and effectiveness, . . . and *discuss statistical analysis methods*, or the results of analyses."[158] During my tenure in DPP, our preparations for pre-sNDA meetings were consistent with this guidance. Among other steps, the Primary Clinical Review Officer would review the outcomes for the Primary Efficacy variables, the agreed-upon study protocols, the statistical outcomes for those

---

[156] *See* GRMPP for PDUFA Products at p. 5 (emphasis added) ("It is preferred that open communication of advice, guidance, and notification of deficiencies occur at pivotal points during product development. This communication can lead to identification of potential filing and review issues that the applicant can, and should, address before the marketing application is submitted for review.").

[157] Feigal Affirmative Report, ¶ 51.

[158] *Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 14 (emphasis added), Dec. 2017, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development.

primary variables, and whether the submission as a whole was likely to meet the threshold for adequate evidence of efficacy. In my experience, if the submission appeared unlikely to meet this requirement for efficacy, FDA would either refuse to file the application or, at the very least, identify and communicate major review concerns and suggest potential resolutions through AdComm or a request for additional information from the sponsor.

95. One of the most-significant events leading up to Acadia's pre-sNDA meeting occurred several months earlier, on September 9, 2019, when Acadia ended the Harmony Study early due to the trial meeting its primary efficacy endpoint—as discussed at the EOP2 meeting and agreed to in the Phase 3 protocol.[159] Note that, according FDA guidance, the "boundaries for monitoring efficacy require more evidence to terminate a trial early (i.e., they are more conservative) than boundaries for monitoring safety."[160]

96. After the complete data set was unblinded and analyzed per the agreed-upon SAP, Acadia presented the results of the Harmony Study at the 12th annual Clinical Trials for Alzheimer's Disease (CTAD), on December 4, 2019.[161] Among other information, Acadia presented "exploratory analyses by most likely clinical diagnosis," which included subgroup data for the open-label and randomized withdrawal phases shown in **Figure 2** and **Figure 3**, respectively.

[159] "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," ACADIA, Sept. 9, 2019, *available at* https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-pivotal-phase-3-harmony-trial.

[160] *Guidance for Industry: E9 Statistical Principles for Clinical Trials* at p. 25, Sept. 1998, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e9-statistical-principles-clinical-trials.

[161] *See generally* ACAD_SECLIT_0290802, Presentation and Discussion of the Phase 3 HARMONY Top-line Results, 12th Clinical Trials of Alzheimer's Disease, Dec. 4, 2019.

Figure 2: *Open-label data by most likely clinical diagnosis presented at CTAD*[162]




Figure 3: *Stablization and relapse rates by most likely clinical diagnosis presented at CTAD*[163]

| | Open-label Stabilization rate % | Double-blind relapse rate | |
|---|---|---|---|
| | | PBO % | PIM % |
| Overall | 61.8 | 28.3 | 12.6 |
| **Most Likely Clinical Diagnosis** | | | |
| AD | 59.8 | 22.6 | 13.1 |
| DLB | 45.5 | 66.7 | 0.0 |
| PDD | 71.2 | 50.0 | 6.7 |
| VaD | 71.4 | 16.7 | 16.7 |
| FTD | 50.0 | 0.0 | 100 |

Relapses on PBO (n/N): Overall=28/99; AD: 14/62; DLB 2/3; PDD: 10/20; VaD 2/12; FTD 0/2
Relapses on PIM (n/N): Overall=12/95; AD: 8/61; DLB 0/6; PDD: 1/15; VaD 2/12; FTD 1/1

[162] ACAD_SECLIT_0290802, Presentation and Discussion of the Phase 3 HARMONY Top-line Results, 12th Clinical Trials of Alzheimer's Disease, p. 27, Dec. 4, 2019.

[163] ACAD_SECLIT_0290802, Presentation and Discussion of the Phase 3 HARMONY Top-line Results, 12th Clinical Trials of Alzheimer's Disease, p. 28, Dec. 4, 2019.

97. The next critical event was Acadia's submission of the briefing package for the pre-sNDA meeting on February 13, 2020, which included relevant information on study data, statistical analyses, safety analyses, efficacy endpoints, and a list of questions for FDA.[164] Specifically, Acadia's briefing package included the relevant topline results relevant to its primary efficacy endpoint of time from randomization to relapse (see **Figure 4**), as well as exploratory analyses of subgroup data on the open label (see **Figure 5**) and double-blind (see **Figure 6**) phases of the trial.

Figure 4: *Topline results from the Harmony Study included in pre-sNDA briefing package*[165]

**Figure 1: Time from Randomization to Relapse in the Double-Blind Period – Study 045 Interim Analysis**




[164] *See generally* ACAD_SECLIT_0001467, Type B Meeting pre-sNDA Briefing Package, Feb. 13, 2020.

[165] ACAD_SECLIT_0045894 at p. 3, Meeting Minutes, pre-sNDA meeting, Apr. 15, 2020 (citing Type B Meeting pre-sNDA Briefing Package at p. 26, Figure 12-3, Feb. 13, 2020).

Figure 5: *Open-label phase trial results by dementia subtypes in pre-sNDA briefing package*[166]

**Figure 13–2 SAPS-H+D Mean Change From Open-Label Baseline in Open-Label Period by Visit Prior to Study Discontinuation Date (Observed Cases) – Open-Label Safety Analysis Set -Study 045**

Mean Change All Subjects    Mean Change by Dementia Subtype




Abbreviation: SAPS-H+D=Scale for the Assessment of Positive Symptoms–Hallucinations and Delusions subscales

Note: Data summarized up to the study discontinuation date.

Figure 6: *Double-blind phase trial results by dementia subtypes in pre-sNDA briefing package*[167]

**Table 13–9 Analysis of Risk of Relapse Determined by IAC by Dementia Subtype – ITT Analysis Set – Study 045**

| | Subjects With a Relapse Event | | Cox Regression Analysis |
|---|---|---|---|
| | **Placebo n/N (%)** | **Pimavanserin n/N (%)** | **Hazard Ratio (Pimavanserin/Placebo) (95% CI)** |
| **Designated dementia subtype (strata)** | | | |
| AD or FTD spectrum disorders | 14/64 (21.9) | 9/62 (14.5) | 0.690 (0.295, 1.611) |
| VaD | 2/12 (16.7) | 2/12 (16.7) | 1.065 (0.159, 7.122) |
| PDD or DLB | 12/23 (52.2) | 1/21 (4.8) | 0.034 (0.010, 0.116) |
| **Dementia subtype** | | | |
| AD | 14/62 (22.6) | 8/61 (13.1) | 0.618 (0.257, 1.487) |
| PDD | 10/20 (50.0) | 1/15 (6.7) | 0.054 (0.017, 0.175) |
| DLB | 2/3 (66.7) | 0/6 | - - |
| FTD spectrum disorders | 0/2 | 1/1 (100.0) | - - |
| VaD | 2/12 (16.7) | 2/12 (16.7) | 1.065 (0.159, 7.122) |

Abbreviations: AD=Alzheimer's disease; CI=confidence interval; DLB=dementia with Lewy bodies; FTD=frontotemporal dementia; IAC=independent adjudication committee; ITT=Intent-to-treat; VaD=vascular dementia

[166] ACAD_SECLIT_0001467 at p. 52, Type B Meeting pre-sNDA Briefing Package, Feb. 13, 2020.

[167] ACAD_SECLIT_0001467 at p. 63, Type B Meeting pre-sNDA Briefing Package, Feb. 13, 2020.

98. On March 11, 2020 FDA provided preliminary comments to Acadia on relevant questions included in the briefing package,[168] ahead of the pre-sNDA meeting held on May 16, 2020.[169] During the meeting, FDA agreed that the results from the Harmony Study, along with supportive data from the 019 Study and the 020 Study, provided a sufficient basis for Acadia to submit a sNDA for pimavanserin for DRP. This is consistent with FDA guidance (discussed above) expressly authorizing FDA to accept a "single and well-controlled study demonstrating effectiveness of a new use" in support of an application.[170] FDA also made no comment that the efficacy data presented was inadequate to support filing or was inconsistent with the agreements reached during the EOP2 meeting. Nor did FDA suggest that it had any questions or concerns about the subgroup data, including around any purported requirement for consistency of treatment effect amongst the various subgroups.[171]

99. In light of these FDA communications, as well as applicable guidance and my own experience, Dr. Feigal's interpretation of the pre-sNDA meeting is flawed for several reasons. First, Dr. Feigal mistakenly claims that FDA's comments before and during the meeting were necessarily limited to the information that "Acadia chose to highlight to FDA, which did not include the subgroup efficacy data."[172] Whatever Dr. Feigal means by "chose to highlight," the subgroup efficacy data *was* presented to FDA—as shown in Figures 5 and 6, above. He nonetheless offers the misleading conclusion that FDA's

---

[168] ACAD_SECLIT_0001670 at pp. 5–8, preliminary comments for pre-sNDA meeting, May 16, 2020; ACAD_SECLIT_0395883, Preliminary Meeting Comments, Mar. 11, 2020.

[169] *See generally* ACAD_SECLIT_0045894, Meeting Minutes, pre-sNDA meeting, Apr. 15, 2020.

[170] *See Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* at p. 3, May 1998 ("FDA has been flexible within the limits imposed by the congressional scheme, broadly interpreting the statutory requirements to the extent possible where the data on a particular drug were convincing. In some cases, FDA has relied on pertinent information from other adequate and well-controlled studies of a drug, such as studies of other doses and regimens, of other dosage forms, in other stages of disease, in other populations, and of different endpoints, to support a single adequate and well-controlled study demonstrating effectiveness of a new use. In these cases, although there is only one study of the exact new use, there are, in fact, multiple studies supporting the new use, and expert judgment could conclude that the studies together represent substantial evidence of effectiveness."), *available at* https://www.fda.gov/media/71655/download.

[171] *See generally* ACAD_SECLIT_0001467, Type B Meeting pre-sNDA Briefing Package, Feb. 13, 2020.

[172] Feigal Affirmative Report, ¶ 141.

silence about the subgroup efficacy data cannot be construed as a positive signal for filing acceptance and ultimate approval. In fact, FDA's decision not to question or even discuss efficacy data means that it had no concerns about that data's sufficiency to support filing or approval. Dr. Feigal ignores[173] FDA guidance that the sponsor is not responsible for calling FDA's attention to every possible question that might be asked about the clinical data. Rather, "[i]t is the *responsibility of CDER review staff* to ensure that the meeting purpose is understood in advance [. . . and] to determine *whether other important discussion points not considered by the sponsor should be raised at the meeting*."[174] In light of this guidance, and given that Acadia submitted comprehensive clinical data for FDA's review in advance of the pre-sNDA meeting, FDA's silence with respect to subgroup efficacy data signifies that FDA had not identified any deficiencies (correctible or potentially uncorrectable) that could impact filing or approval.[175] This is particularly so considering that certain subgroup data—specifically the PDP subgroup data being offered by Acadia to satisfy its PMC—were specifically discussed at the meeting.[176] Based on my experience applying FDA's review guidelines, if FDA had identified any reasons that the application appeared unlikely to be approved—including a failure to meet Dr. Feigal's so-called "directional

---

[173] Feigal Affirmative Report, ¶ 99 ("Importantly, the minutes from the March 2020 meeting do not contain any indication that Acadia ever raised Harmony's subgroup efficacy results or any issues with 019 with FDA, or that FDA asked any questions about these data."), ¶ 102 ("At the time of the March 2020 pre-sNDA meeting there was no additional advice requested by Acadia on the issue of subgroup effectiveness consistency.").

[174] *See* MAPP 6030.9 at p. 27, Apr. 29, 2013 ("It is the responsibility of CDER review staff to ensure that the meeting purpose is understood in advance, to share preliminary responses to questions raised in the meeting package with the sponsor in advance of the meeting, to determine whether other important discussion points not considered by the sponsor should be raised at the meeting."), *available at* https://www.fda.gov/media/85790/download.

[175] *See* MAPP 6030.9 at p. 10 ("CDER review staff are responsible for reviewing the content of the sponsor's IND submissions and providing advice on critical safety and efficacy concerns, even in the absence of a specific question from the sponsor."), Apr. 29, 2013, *available at* https://www.fda.gov/media/85790/download; *see also id.* at p. 11 ("At times, a sponsor's questions may focus on protocol details but not directly ask whether the overall trial design will support approvability. In such a case, *the review division should outline the regulatory basis of approval and inform the sponsor of any critical trials that are missing or that use inappropriate endpoints* (e.g., *will not support approval*).") (emphasis added).

[176] Official Meeting Minutes of March 16, 2020 Type B, pre-sNDA Meeting, ACAD_SECLIT 0001032, at -1039 (addressing whether FDA "agree[d] that Study ACP-103-045 fulfills PMC 3069-1").

consistency" requirement—FDA should have clearly communicated its recommendation *against* submitting the sNDA for filing.

100. Second, Dr. Feigal disregards FDA's agreement during the pre-sNDA meeting FDA that Acadia's proposed pivotal Harmony Study and supportive study 019 are sufficient to file the sNDA.[177] Acadia asked FDA, in its pre-sNDA Meeting Briefing Package, whether FDA agreed that the "persuasive results from Study ACP-103-045 together with confirmatory and supportive results from Studies ACP-103-019 and ACP-103-020 present an adequate basis for the submission of"[178] the DRP sNDA. In my experience, and based on Desk Reference review guidelines, FDA would have prepared its response to Acadia's question only after reviewing the data—including but not limited to the topline Harmony Study results that addresses the primary efficacy endpoint as agreed upon at the EOP2 meeting. After doing so, FDA responded in its preliminary comments that, based on the provided information, "ACP-103-045 together with supportive results from ACP-103-019 and ACP-103-020 are sufficient to file the sNDA."[179] This was a positive signal that FDA was prepared to accept the sNDA for filing and harbored no significant concerns about approvability.

101. In sum, Dr. Feigal understates the significance of FDA's comments (and lack thereof) before and during the pre-sNDA meeting. If FDA intended to condition filing or approval of the sNDA on any additional subgroup analyses, it would be expected to say so clearly in pre-meeting comments and formal meeting minutes. Indeed, as explained previously, FDA staff are encouraged to strive for "the highest possible degree of clarity" in their sponsor communications, and to ensure "timely notification" of any deficiencies, whether correctable or potentially uncorrectable.[180] FDA did not communicate any such

---

[177] "Based on the information you have provided thus far, ACP-103-045 together with supportive results from ACP-103-019 and ACP-103-020 are sufficient to file the sNDA." ACAD_SECLIT_0045894 at p. 5, Meeting Minutes, pre-sNDA meeting, Apr. 15, 2020.

[178] ACAD_SECLIT_0001467, Type B Meeting pre-sNDA Briefing Package, Feb. 13, 2020, at p. 22.

[179] ACAD_SECLIT_0001670, Pre-sNDA Preliminary Meeting Comments, Mar. 11, 2020, at p. 5.

[180] *GRMPP for PDUFA Products* at pp. 3, 7.

requirement to Acadia at the pre-sNDA meeting, nor did FDA flag any major review concerns.

### G. Dr. Feigal Understates the Significance of FDA Filing Acadia's sNDA Submission and Misinterprets FDA's Standard Review Designation.

102. In this section, I address the regulatory significance of FDA's decision to file Acadia's sNDA for DRP and assign it a standard review timeline. I begin by explaining the filing process and how it signals that FDA considers an application complete and ready for substantive review. I then respond to Dr. Feigal's claim that the standard review designation should have been interpreted as a harbinger of FDA's ultimate decision not to approve the sNDA. I explain why FDA's acceptance of the filing without any identified concerns or issues is properly understood as a positive sign of continued progress toward approval.

103. After the pre-sNDA meeting, FDA evaluates "whether the application, on its face, is sufficiently complete to permit a substantive review."[181] As a practical matter, it was my experience at FDA that this statement conveys that the application is reviewed to assess whether it is likely to fulfill requirements of substantive efficacy and adequate safety to support a successful approval of the application. The Desk Reference explicitly outlines FDA's responsibilities regarding "filing review issues," defined above in **Section IV.A-F** as major review concerns:

- "During the filing review, reviewers identify *any **substantive** deficiencies or concerns* that appear to have been inadequately addressed in the application and *merit particular attention during the review process*. These issues *may have significant impact on the Agency's ability to complete the review of the application **or approve the application***. Filing review issues are distinct from application deficiencies that serve as the basis for a Refusal-to-File action.

- "If an application is filed, these filing review issues are communicated to the applicant in the filing communication . . . Potential refusal-to-file issues should be

[181] Desk Reference at p. 18.

conveyed to the applicant as soon as possible (preferably before the filing meeting) so the review team has adequate time to work with the applicant to try and resolve the deficiencies before the 60-day filing date."[182]

104. Based on this review, FDA makes one of three filing decisions, described below and illustrated in **Figure 7**:[183]

- File the application—if there are no major review concerns;
- Potentially refuse to file the application—if there are deficiencies in the application that can be corrected by working with the sponsor; or
- Refuse to file the application—if the application is missing a required section, includes inadequate content for the successful approval of the application, fails to include evidence of effectiveness, or is missing other critical data.[184]

---

[182] Desk Reference at pp. 18–19 (emphasis added).

[183] Desk Reference at p. 20.

[184] Desk Reference, Appendix B.

Figure 7: *FDA filing options*[185]




105. As outlined in the GRMPP for PDUFA Products, the "primary goals of the filing process are to: (1) determine whether the submitted application meets the regulatory requirements for filing; (2) define the scope of review activity needed; and (3) identify major elements of the application that may pose concerns during the review."[186] If FDA finds that there are no major review concerns at this point and therefore that the application is sufficient to file, FDA will issue a letter accepting the sponsor's application.[187]

106. Acadia submitted the DRP sNDA on June 3, 2020.[188] This submission included the application to market pimavanserin for the DRP indication, a request for priority review

---

[185] Desk Reference at pp. 18–20; *see also* ACAD_SECLIT_0023856, Filing Communication - No Filing Review Issues Identified, July 10, 2020 ("We have completed our filing review and have determined that your application is sufficiently complete to permit a substantive review.").

[186] *See* GRMPP for PDUFA Products at p. 9.

[187] Desk Reference at p. 20 ("File the application – If there are no major omissions of data or other identified major deficiencies, the application is fileable. The applicant is expected to rectify any minor issues.").

[188] *See generally* ACAD_SECLIT_0187492, sNDA for pimavanserin for DRP, June 3, 2020.

based pimavanserin for DRP being granted BTD, and a fulfillment of the PMC for the previously approved PDP indication.[189] FDA reviewed Acadia's application and filed the sNDA for DRP with no filing issues identified and assigned standard review on July 10, 2020.[190]

### 1. Dr. Feigal understates the importance of FDA agreeing to file Acadia's sNDA with no filing issues identified.

107. Dr. Feigal erroneously portrays FDA's decision to accept Acacia's sNDA for filing as one reflecting *only* its determination that all portions of the application were "complete."[191] In doing so, Dr. Feigal posits an artificial distinction between the concept of "completeness" and the "substantive merits" of the application bearing on its ultimate approvability:

> In this context, "complete" means that the application contains all the information (e.g., clinical study data, manufacturing information) that FDA needs to conduct its comprehensive review. In other words, *the "completeness" of an application says nothing about its substantive merits or whether FDA will ultimately approve the application* (although an incomplete application will not be reviewed by FDA and, therefore, by definition, cannot be approved while it remains incomplete).[192]

108. Dr. Feigal's opinion is entirely inconsistent with applicable FDA guidance and my own experience for several reasons. First, the Desk Reference specifies that FDA's filing communication is intended to "give[] the applicant early notice of any review issues identified to this point."[193] Accordingly, if FDA had identified major review concerns in the sNDA they would file it *with review issues noted*; or, if FDA had identified application deficiencies that "cannot be rectified readily,"[194] they would refuse to file the application.

---

[189] *See generally* ACAD_SECLIT_0187492, sNDA for pimavanserin for DRP, June 3, 2020.

[190] *See generally* ACAD_SECLIT_0023856, Filing Communication - No Filing Review Issues Identified, July 10, 2020.

[191] Feigal Affirmative Report, ¶ 52.

[192] Feigal Affirmative Report, ¶ 52 (emphasis added).

[193] Desk Reference at p. 21.

[194] Desk Reference at pp. 18–19.

FDA did neither in this case, and instead informed Acadia that it was opting to file the sNDA with "no filing review issues identified" and that FDA "ha[d] not identified any potential review issues."[195] This is properly understood as communicating that FDA had not identified any major review concerns that could impact the sNDA's approvability.

109. Second, Dr. Feigal's description of "completeness" grossly understates the rigor of the review process that leads FDA to accept the application for filing.[196] The filing review of the application goes far beyond checking that every section of the form is filled out. Based on my experience, and as outlined extensively in the Desk Reference and MAPP 6010.5, the decision to file is based on several factors—including whether the clinical data appears adequate to achieve a successful approval to market the drug.[197] Among other potential refusal-to-file issues, FDA must determine whether the application reflects a "clear failure to include evidence of effectiveness compatible with statute and regulations," which requires FDA to consider the efficacy data presented in the application.[198] Further, MAPP 6010.5 defines "filing review issues" as "*[s]ubstantive deficiencies or concerns* identified by the review team during the initial filing review for an . . . efficacy supplement that appear to have been inadequately addressed in the application and *merit particular attention during the review process*"—all of which "should be identified and discussed within the review team."[199] Given these clear guidelines, if FDA accepts the sponsor's sNDA filing, it is a signal that no major concerns were identified.

---

195 ACAD_SECLIT_0023856, Filing Communication - No Filing Review Issues Identified, July 10, 2020.

196 Feigal Affirmative Report, ¶ 52.

197 Desk Reference at pp. 18–19; *see also* MAPP 6010.5 at pp. 3–4, May 8, 2003 [updated Mar. 27, 2018].

198 Desk Reference, Appendix B.

199 *See* MAPP 6010.5 at pp. 3–4, Mar. 27, 2018 ("Filing review issues: Substantive deficiencies or concerns identified by the review team during the initial filing review for an NDA, BLA, or efficacy supplement that appear to have been inadequately addressed in the application and merit particular attention during the review process. These issues may have significant impact on the FDA's ability to complete the review of the application or approve the application or parts of the application. Filing review issues are distinct from application deficiencies that serve as the basis for a refuse-to-file action. Filing review issues pertain only to applications that have been filed."), *available at* https://www.fda.gov/files/about%20fda/published/NDAs-and-BLAs--Filing-Review-Issues.pdf.

110. In sum, FDA does undertake a careful substantive review of the clinical data during filing review, and thus would have identified (and communicated) "any obvious deficiencies" with Acadia's "efficacy claims." Dr. Feigal is simply wrong in asserting that "FDA needed to complete its review before further specifying the precise problems they had identified."[200] To the contrary, FDA's decision to file Acadia's DRP sNDA signified the absence of major review issues or concerns and thus was a positive sign for eventual approval.

### 2. Dr. Feigal misconstrues the significance of FDA assigning a standard review timeline for the sNDA for DRP.

111. Next, Dr. Feigal mistakenly suggests that FDA's assignment of a standard review timeline indicated that FDA harbored serious concerns with the approvability of the sNDA.[201] Dr. Feigal's opinion is inconsistent with FDA guidance and my own experience as an FDA reviewer. In particular, Dr. Feigal appears to disregard the implications of DRP's continuing designation as a Breakthrough Therapy while overstating the decision to assign standard review.

112. BTD and priority review are two distinct concepts. As explained above (*see* **Section IV.D**), the designation of BTD occurs *prior* to the assignment of standard or priority review. One of the many benefits of the BTD includes the "eligibility," *not guarantee*, for a "priority review" designation.[202] Most relevant here, however, BTD carries the heightened expectation that FDA will communicate any reason to rescind the designation as soon as possible.[203] As explained in FDA guidance, if FDA believed that the drug no

---

[200] Feigal Affirmative Report, ¶ 144.

[201] Feigal Affirmative Report, ¶ 144.

[202] Frequently Asked Questions: Breakthrough Therapies, *available at* https://www.fda.gov/regulatory-information/food-and-drug-administration-safety-and-innovation-act-fdasia/frequently-asked-questions-breakthrough-therapies

[203] *See Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics* at p. 10, May 2014 ("Not all products designated as breakthrough therapies ultimately will be shown to have the substantial improvement over available therapies suggested by the preliminary clinical evidence at the time of designation. If the designation is no longer supported by subsequent data, FDA may rescind the designation.") *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics; *see also* MAPP 6025.6 at p. 12, July

longer qualified for BTD designation after filing review—i.e., if FDA believed that the clinical data showed that the DRP sNDA no longer demonstrates a "substantial improvement over available therapy"—it should have rescinded BTD designation at that time. FDA did not do so.[204]

113. In contrast, FDA's decision to assign standard versus priority review simply determines the timeline within which FDA will review the application: 10 months from filing date to action date for standard review, and six months for priority review. The purpose of priority review is to permit the sponsor to more quickly make necessary changes to their development program and "to direct overall attention and resources [of the Agency] to the evaluation of applications for drugs that, *if approved*, provide significant improvements to public health."[205] In other words, FDA's review-designation decision begins with the *presumption* that the application *will be approved*. And because an application can be approved even if it does *not* provide a "significant improvement in safety or effectiveness" of "treat[ing] a serious condition" compared to existing treatments,[206] FDA's decision to assign standard review says nothing about the likelihood that an application will ultimately be approved.

114. In short, while BTD can lead to the assignment of priority review, the *denial* of priority review for a BTD drug does not mean FDA believes the drug no longer qualifies for BTD

---

29, 2014 ("When the criteria for breakthrough therapy designation are no longer met, CDER may choose to rescind the breakthrough therapy designation. The review team may consider rescinding in instances such as: Emerging data no longer show substantial improvement over available therapy."), *available at* https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.

[204] *See Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics* at p. 10, May 2014 ("Not all products designated as breakthrough therapies ultimately will be shown to have the substantial improvement over available therapies suggested by the preliminary clinical evidence at the time of designation. If the designation is no longer supported by subsequent data, FDA may rescind the designation.") *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics; *see also* MAPP 6025.6 at pp. 11–12, July 29, 2014, *available at* https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.

[205] MAPP 6020.3 at p. 2 (emphasis added), June 25, 2013.

[206] *Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics*, May 2014, at p. 24.

designation.[207] Nor does it signal that FDA has identified major review issues or concerns that are likely to impact approvability—particularly where, as here, FDA does not communicate any such issues to the sponsor.

**3. Dr. Feigal overreads FDA's communications with Acadia regarding the decision to deny priority review.**

115. Dr. Feigal also incorrectly asserts that FDA's email communications with Acadia regarding its decision to designate a standard review timeline for the application was a clear indication that FDA had "serious problems with Harmony Study's results."[208] His opinion is based entirely on speculation, disconnected from relevant FDA guidance and my own experience at FDA.

116. Following the standard review designation, Acadia proactively sought FDA's feedback regarding this decision. In an email exchange from July 2020, Acadia asked for information about FDA's decision not to assign priority review. In its reply on July 17th, FDA cited *Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics*, and quoted that guidance nearly verbatim[209] in stating that "a qualifying criterion for priority review designation is demonstrating the potential to be a *significant improvement* in safety or effectiveness (e.g., evidence of safety and effectiveness in a new subpopulation)," and that "it is unclear if the [Harmony] clinical data demonstrate this potential."[210] After Acadia followed up with additional materials summarizing their

---

[207] *See Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics*, p. 10 May 2014 ("Section 506(a) of the FD&C Act provides for designation of a drug as a breakthrough therapy '. . . if the drug is intended, alone or in combination with 1 or more other drugs, to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on 1 or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development.'").

[208] Feigal Affirmative Report, ¶ 144.

[209] *See Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics* at p. 24, May 2014 ("On a case-by-case basis, FDA determines . . . whether the proposed drug would be a *significant improvement* in the safety or effectiveness of the treatment, prevention, or diagnosis of a serious condition. Significant improvement may be illustrated by the following examples: Evidence of increased effectiveness in treatment, prevention, or diagnosis of a condition. . . ."), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics.

[210] ACAD_SECLIT_0023894, RE: Nuplazid supplements - updated email, last sent on July 28, 2020.

findings, FDA replied on July 28, 2020—and again quoted nearly verbatim from the standard for priority review set forth in applicable guidance—stating that the "application did not receive priority review designation because, based on our initial review, your application does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."[211] In other words, FDA simply stated that the sNDA was not assigned priority review because it did not meet the standard for priority review set forth in published guidance. FDA's emails thus did not convey any information that was not already implicit in its decision to assign standard review. It is pure speculation for Dr. Feigal to read into those emails any signal that FDA had identified (but not communicated) major review issues or concerns.[212]

117. I also disagree with Dr. Feigal's assertion that FDA's designation of standard review "inform[ed] Acadia that the data supporting the sNDA showed no improvement in safety or effectiveness in the treatment of DRP (*i.e.*, pimavanserin was not better than no treatment) such that it was no better than a dangerous, off-label alternative."[213] Dr. Feigal's reasoning on this point is not clear, but he seems to erroneously suggest *both* that FDA was comparing pimavanserin to what it considered to be "*dangerous*, off-label alternatives" *and* that FDA was suggesting that pimavanserin was not better than no treatment – i.e., was not effective. In doing so, he conflates *off-label* alternatives with *no* alternatives. While Dr. Feigal acknowledges that FDA may sometimes look at off-label treatments in assessing priority review, [214] FDA was vague in their email—they did not define what they meant by "significant improvement."

---

[211] ACAD_SECLIT_0023894, RE: Nuplazid supplements - updated email, last sent on July 28, 2020.

[212] Notably, former FDA-office Tom Laughren, who consulted Acadia at the time, expressed the view that FDA assigning a standard review timeline to the DRP sNDA was a "mystery" but did not indicate that FDA had serious concerns going to approvability. *See* ACAD_SECLIT_0034049, FW: Nuplazid supplements - updated email, last sent on July 29, 2020 (stating that Acadia has a "strong package and [has an] agreement with [FDA] on the critical issues, so you should be ok regarding the final outcome").

[213] Feigal Affirmative Report, ¶ 112.

[214] Feigal Affirmative Report, ¶ 112.

118. In any event, FDA's decision on the review clock has no ostensible bearing on the approvability of the pimavanserin sNDA for DRP and this decision to grant Standard Review cannot be considered in isolation given FDA's decisions to file the sNDA, ***communicate no review concerns***, ***not withdraw BTD designation***, and (as discussed below) ***not convene an AdComm meeting***.

### H. Dr. Feigal Does Not Consider the Significance of Additional Positive Signals for the Approvability of Pimavanserin DRP sNDA After Filing.

119. In this section, I examine the post-filing phase of FDA's review and highlight two critical milestones that occurred: the mid-cycle review and the agency's decision not to convene an Advisory Committee (AdComm) meeting. I begin by explaining the function of each milestone and what FDA's actions typically indicate in practice. I then describe how neither the decision to forgo an AdComm nor the mid-cycle review suggested any unresolved major review concerns. In conclusion, I explain how Dr. Feigal's failure to account for these positive indicators misrepresents the overall regulatory posture of the DRP sNDA prior to the Complete Response Letter.

#### 1. Dr. Feigal does not consider that the absence of an AdComm meeting is a positive indication of approvability.

120. When FDA notified Acadia that the DRP sNDA had been accepted for filing in July 2020, in addition to not identifying any filing or review issues, FDA stated that it did not at that time plan to convene an AdComm meeting[215] and ultimately did not convene an AdComm meeting during the review cycle. In my experience, and based on review guidelines defining the purpose of AdComm meetings, this would have been a positive indication for approvability of the DRP sNDA. Dr. Feigal completely disregards this important milestone, offering only a brief reference to FDA's prerogative to "schedule[], as it deems necessary or appropriate, 'Advisory Committee' meetings. . . .[216]

[215] ACAD_SECLIT_0023856, Filing Communication – No Filing Review Issues Identified, July 10, 2020.

[216] Feigal Affirmative Report, ¶ 53.

121. An AdComm meeting is convened to address significant concerns about safety and/or efficacy, novel clinical trial design or indication, major regulatory or policy considerations, public health interest, internal FDA disagreements, or departures from earlier agreements with the sponsor.[217] FDA guidance further dictates that "[t]he decision to go to [AdComm] should be made as soon as possible, perhaps even before receipt of the application," while allowing that, "if issues arise during the review, a decision to hold an [AdComm] meeting may be made later."[218] Based this guidance, as well as my experience, convening an AdComm meeting is a very significant signal that FDA has concerns with an application's safety and/or efficacy data. Additionally, AdComm meetings add more uncertainty to the review process, since their recommendations are not binding on FDA's ultimate review decision,[219] potentially creating mixed signals for sponsors.

122. Given these purposes and potential impacts of an AdComm meeting, FDA's decision not to convene such a meeting for the DRP sNDA—at filing and throughout the review cycle—represented yet another clear signal that FDA had not identified any major review concerns.

**2. Dr. Feigal overlooks the significance of the mid-cycle review, where FDA identified no major review concerns.**

123. Mid-cycle reviews serve as another critical checkpoint for FDA to identify and communicate to sponsors any issues that could prevent approval.[220] As explained in the

[217] *See* GRMPP for PDUFA Products, at p. 19, ("A review division may seek AC input, for example, when: (1) the application is for a new molecular entity (NME), especially if it is the first member of a new class of drug; (2) the clinical study design used novel clinical or surrogate endpoints; (3) the application raises significant issues on the safety and/or effectiveness of the drug or biologic; or (4) the application raises significant public health questions on the role of the drug or biologic in the diagnosis, cure, mitigation, treatment, or prevention of a disease.").

[218] Desk Reference at p. 24.

[219] *See* Advisory Committees: Critical to the FDA's Product Review Process, ("Their recommendations are just that--advice--and do not bind the agency to any decision. While committee discussions and final votes are very important to the FDA, the final regulatory decision rests with the agency.") May 4, 2016, *available at* https://www.fda.gov/drugs/information-consumers-and-patients-drugs/advisory-committees-critical-fdas-product-review-process.

[220] Desk Reference, at p. 28 (noting that "[o]bjectives of the [mid-cycle] meeting" include "identify[ing] any issues that could preclude an approval action").

Desk Reference, "[r]eviewers should identify approvability and high level labeling issues by mid-cycle in order to facilitate the planning of internal labeling."[221] It is standard practice for FDA to hold a mid-cycle review meeting for all sNDAs to assess the progress of the review process and discuss key findings. Although FDA is not required to convene a formal meeting with the sponsor for mid-cycle review of an sNDA, guidance instructs that, if FDA identifies any major review concerns during the mid-cycle review, it communicates these major review concerns to the sponsor in a timely manner.[222]

124. Dr. Feigal states that for "an NDA (but not necessarily an sNDA), it is common practice to schedule a 'mid-cycle' teleconference to convey such requests, about halfway through the review period."[223] It is unclear, however, whether Dr. Feigal is implying that FDA's internal mid-cycle review is optional for sNDAs. As explained above, FDA guidance instructs that although a formal meeting with the sponsor is not required for sNDAs, FDA must still conduct a mid-cycle review to identify any major review issues *and* communicate any such issues or concerns to the sponsor.[224]

125. As with FDA's decision not to convene an AdComm meeting, the fact that FDA did not communicate any major review issues or concerns to Acadia in late 2020—when FDA's internal mid-cycle review meeting would have occurred—was a further confirmation that FDA had identified no such issues at that stage. However, FDA's silence after the mid-cycle review meeting takes on even greater significance because it is the last major

---

[221] Desk Reference at p. 26

[222] *See* GRMPP for PDUFA Products at p. 7 ("For applications found to have significant deficiencies that may affect approval, the review team should obtain appropriate input from the signatory authority and communicate the deficiencies promptly to the applicant. Timely notification of correctable deficiencies allows the applicant to begin corrective actions, maximizes the chance for a first cycle approval, and shortens the overall time to approval when one or more review cycles are necessary. Timely notification of significant and potentially uncorrectable deficiencies in the marketing application may also influence product development decisions."); *see also* ACAD_SECLIT_0023834, FW: [EXTERNAL] RE: Matter involving review of Breakthrough Therapy Product, last sent on March 13, 2021. ("Thanks for raising your concerns. I have had a chance to review the matters you raised. First, for a supplement, there is not a formal mid-cycle communication letter within the program, so the correspondence you received was as expected for such a review.").

[223] Feigal Affirmative Report, ¶ 55.

[224] Desk Reference, at p. 30.

checkpoint for FDA to report major review issues or concerns or convene an AdComm meeting. At this late stage, FDA's continuing silence represented a very positive signal that it had not identified any review issues or concerns that were likely to impact the approvability of the DRP sNDA.[225]

**I. Dr. Feigal Incorrectly Asserts that the Issues Raised in FDA's Complete Response Letter Were Communicated Previously as Major Review Concerns.**

126. In this section, I address Dr. Feigal's claim that the issues raised in FDA's April 2, 2021 Complete Response Letter had been previously communicated to Acadia during the development and review process.[226] I begin by analyzing the content of the CRL and comparing it to FDA's prior correspondence with the sponsor. I then discuss evidence from the post-CRL Type A meeting that further confirms that Acadia had not been informed of major review issues prior to its receipt of the CRL. In conclusion, I explain how the issues raised in the CRL were not foreshadowed by FDA's earlier communications and therefore could not have been reasonably anticipated by the sponsor.

127. After the several stages of development and review where FDA has opportunities to identify and address any major review concerns with the sponsor, FDA communicates its regulatory decision with the sponsor with an Approval or a Complete Response Letter. Under PDUFA, as Dr. Feigal notes, "FDA is directed to complete NDA reviews within

---

[225] I have reviewed documents and deposition testimony indicating that Acadia repeatedly sought clarity from FDA in late 2020 regarding mid-cycle review and an update on any plans for FDA to hold an AdComm. *See* ACAD_SECLIT_0023912, RE: sNDA 210793/S-008 and 207318/S-011; Nuplazid (pimavanserin) supplements, last sent on Nov. 17, 2020. It further appears that Acadia executive Teresa Brandt spoke with the FDA Project Manager for the DRP sNDA in mid-December, who informed Dr. Brandt that the mid-cycle meeting had occurred and that "no major review issues came out of the meeting." *See* ACAD_SECLIT_0497943, Health Authority Contact Form, Dec. 18, 2020; *see also* Brandt Depo. Dep. at 103:01-104:16; DeKarske Dep. at p. 175:24-177:16; ACAD_SECLIT_0227678 (March 7, 2021 Email between Teresa Brandt and Daryl Dekarske, Dep. Exhibit 278). Dr. Feigal references these communications, and asserts that the substance of Dr. Brandt's December 18th call with the Project Manager "is not reliably recorded in any document." Feigal Affirmative Report, ¶ 145 & n.155. I disagree with Dr. Feigal, but my opinions in this matter do not change regardless of whether that call occurred as the evidence suggests. The absence of any communication in which FDA communicated major review issues identified in the mid-cycle review meeting is the critical event. That remains true whether FDA affirmatively stated that it had not identified any such issues or simply remained silent.

[226] Feigal Affirmative Report, ¶ 146.

specific times, so that by the relevant 'PDUFA' dates FDA will either approve the application or issue a 'Compete Response Letter' ('CRL') describing why the application cannot be approved."[227]

128. As explained throughout this report, FDA is expected to identify major review issues at multiple milestones during the development and review process and to communicate clearly and promptly any such issues to sponsors.[228] Put differently, it is inconsistent with FDA guidance, as well as my own FDA experience, for a sponsor to learn of major review issues for the first time in a CRL. Dr. Feigal ignores FDA's responsibilities under these FDA guidance documents as well as a sponsor's expectations that FDA's communications will be consistent with guidance that major review issues will be communicated early and unambiguously. Although I render no opinion as to whether FDA had, in fact, identified major review issues before issuing the CRL, it is my opinion (as shown below in **Table 2**) that FDA *had not communicated* to Acadia the issues identified in the CRL at any earlier point in time.

Table 2: Stages in application development/review process where FDA had the opportunity to raise major review concerns

| **Concerns raised in CRL[229]** | **Communicated at EOP2 Meeting?** | **Communicated at IND Submission?** | **Communicated at pre-sNDA Meeting?** | **Communicated at Filing?** | **Communicated at Mid-Cycle Review?** |
|---|---|---|---|---|---|
| **Directional consistency as a requirement for approval** | No | No | No | No | No |
| **Small populations in DLB and FTD subgroups** | No | No | No | No | No |

[227] Feigal Affirmative Report, ¶ 114.

[228] *See* Desk Reference at p. 19 ("Potential refusal-to-file issues should be conveyed to the applicant as soon as possible (preferably before the filing meeting) so the review team has adequate time to work with the applicant to try and resolve the deficiencies before the 60-day filing date."); *see also* GRMPP for PDUFA Products at p. 3 (the "fundamental values on which the GRMPs are based include quality, efficiency, clarity, transparency, and consistency"); *see also id.* at p. 7 (emphasizing the importance of "[t]imely notification of correctable deficiencies" and "[t]imely notification of significant and potentially uncorrectable deficiencies in the marketing application").

[229] ACAD_SECLIT_0047638, Complete Response Letter, April 2, 2021.

| | | | | | |
|---|---|---|---|---|---|
| **Weak treatment response in VaD subgroup** | No | No | No | No | No |
| **Lack of nominal significance in AD subgroup** | No | No | No | No | No |
| **Overall results are driven by PDD subgroup** | No | No | No | No | No |
| **Study 019 is not adequate/ well-controlled** | No | No | No | No | No |

**1. Dr. Feigal does not identify any FDA communication in which the major review concerns in the CRL had been previously communicated to Acadia.**

129. Acadia received a Deficiencies Preclude Discussion letter from FDA on March 3, 2021, which stated that, as part of its ongoing review of the DRP sNDA, FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/ commitments at this time."[230] However, the letter did not specify the nature of the deficiencies. Despite repeated inquiries from Acadia, FDA did not provide any further context regarding the identified deficiencies.[231] This is inconsistent with my experience and FDA's Guidance for Industry and Review Staff for FDA to "take a thoughtful approach to answering sponsor questions both efficiently and comprehensively."[232] Acadia did not receive further information regarding the "deficiencies" referenced by FDA until April 2, 2021, when FDA issued a Complete Response Letter (CRL) to Acadia, stating that FDA "cannot approve these applications in their present form."[233]

[230] ACAD_SECLIT_0019463 at p. 1, Deficiencies Preclude Letter, Mar. 3, 2021.

[231] Acadia reached out to FDA seeking clarity on the CRL on March 22, 2021. *See* ACAD_SECLIT_0226953, FW: [EXTERNAL] Communication Requested: URGENT, sent March 22, 2021.

[232] *See Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development* at p. 10, Dec. 2017 ("In all cases, FDA needs to take a thoughtful approach to answering sponsor questions both efficiently and comprehensively, particularly when the questions could have an important effect on critical decisions in development programs or that represent FDA views related to the evidence that will be used to support marketing."), *available at* https://www.fda.gov/media/94850/download.

[233] ACAD_SECLIT_0047638 at p. 1, Complete Response Letter, Apr. 2, 2021.

130. Within the CRL, FDA stated that Acadia's sNDA submission—including the results from the Harmony Study, Study 019, and Study 020—"does not provide substantial evidence of effectiveness to support the approval of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis."[234]

131. In contrast to Dr. Feigal's opinions, I find that FDA's communications with Acadia throughout the development and review process did not convey any of the issues described in the CRL. FDA had several opportunities to communicate any major review issues it had identified, and guidance instructed that it do so.[235] As explained below, FDA communicated no such issues.

132. First, in the CRL, FDA described its issues with the Harmony Study as follows: [236]

> The intent-to-treat population included only nine subjects with dementia with Lewy bodies and three subjects with frontotemporal dementia, which is too few subjects to be an adequate representation of the response to pimavanserin for either dementia subtype.
>
> There was no numeric difference on time-to-relapse between pimavanserin and placebo in subjects with vascular dementia (this subgroup also included a relatively small group of 24 subjects).
>
> There were 123 subjects with Alzheimer's disease (AD), a large enough number to expect a nominally statistically significant result for the AD subgroup. However, the results for the AD subgroup were not nominally significant.
>
> Despite having fewer subjects (35) than the AD subgroup, the effect of pimavanserin on time-to-relapse in the Parkinson's disease dementia (PDD) subgroup was highly nominally statistically significant. It appears that the finding in this subgroup is driving the overall study results. The drug effect in this subgroup supports the effectiveness of pimavanserin in the treatment of hallucinations and delusions associated with Parkinson's

---

[234] ACAD_SECLIT_0047638 at p. 1, Complete Response Letter, Apr. 2, 2021.

[235] *See* GRMPP for PDUFA Products at p. 3, Apr. 2005 ("The fundamental values on which the GRMPs are based include quality, efficiency, clarity, transparency, and consistency . . . . Clarity: The clarity of the FDA's findings, expectations, and bases for decisions supports review efficiency and requires accurate review and effective communication . . . . Communications during the ongoing review, within CDER and CBER or with external groups such as the applicant or advisory committees (AC), are expected to consistently achieve the highest possible degree of clarity.").

[236] ACAD_SECLIT_0047638 at pp. 1–2, Complete Response Letter, Apr. 2, 2021.

> disease psychosis; pimavanserin is already labeled for that indication (the PDD subpopulation is subsumed in the current indication).[237]

133. FDA had several opportunities to communicate major review concerns with the study design and results *but did not do so*. For example, FDA could have raised issues during the EOP2 meeting, during review of the IND Phase 3 amendment and SAP, after Acadia published detailed subgroup efficacy results, during the pre-sNDA meeting and at the time of filing, and during mid-cycle review. In none of these instances did FDA raise major review concerns with the Harmony Study design or, ultimately, its results.

134. Instead of raising major review concerns, FDA gave positive signals throughout the review process that indicated it had not identified any issues likely to impact approvability. FDA agreed to the study design and statistical analysis plan at the EOP2 meeting and through the Study May Proceed letter. FDA agreed to file the application with no major review concerns, with full knowledge of the study's topline and subgroup efficacy data, as Acadia made it available to the public well before the pre-sNDA meeting.

135. Dr. Feigal's view that FDA had previously communicated that approval would hinge on directionally consistent subgroup data is inaccurate. To start, Dr. Feigal asserts—without citing any FDA guidance for support—that the "reasoning of the CRL is consistent with the requirements FDA articulated at the May 2017 end-of-phase 2 meeting."[238] In fact, as explained above (*see* **Section IV.H.5**), if FDA intended to communicate in the CRL that it had previously imposed a "requirement" of "directional consistency," FDA guidance instructs that the CRL would identify a prior communication that clearly and unambiguously imposed such a requirement. The CRL itself identifies no such prior communication. Dr. Feigal appears to rely on the CRL's reference to the EOP2 labeling statement, but offers no support for his unwarranted inference. As explained above, FDA's statement at the EOP2 meeting that the study composition and results would be included in labeling did not state (or even imply) that directional consistency across subgroups was a requirement for approval.

---

[237] ACAD_SECLIT_0047638 at pp. 1, Complete Response Letter, Apr. 2, 2021.

[238] Feigal Affirmative Report, ¶ 146.

136. Given the absence of any FDA communication imposing and explaining a "directional consistency" requirement, there was no reason for Acadia to believe that the Harmony subgroup data needed to meet that unspoken and undefined "requirement." Nonetheless, in my opinion, the results of the Harmony Study are directionally consistent across subgroups. With reference to **Figure 8**, below, the results are consistent when looking at both the open-label and double-blind relapse phases of the study, as the treatment groups in each subgroup shows a better response that the corresponding placebo group. Any assessment of "directionality" is meaningless to make in a group as small as for FTD or VaD.

Figure 8: *Withdrawal phase trial results by dementia subtypes in pre-sNDA briefing package*

**Table 13–9 Analysis of Risk of Relapse Determined by IAC by Dementia Subtype – ITT Analysis Set – Study 045**

| | Subjects With a Relapse Event | | Cox Regression Analysis |
|---|---|---|---|
| | Placebo n/N (%) | Pimavanserin n/N (%) | Hazard Ratio (Pimavanserin/Placebo) (95% CI) |
| **Designated dementia subtype (strata)** | | | |
| AD or FTD spectrum disorders | 14/64 (21.9) | 9/62 (14.5) | 0.690 (0.295, 1.611) |
| VaD | 2/12 (16.7) | 2/12 (16.7) | 1.065 (0.159, 7.122) |
| PDD or DLB | 12/23 (52.2) | 1/21 (4.8) | 0.034 (0.010, 0.116) |
| **Dementia subtype** | | | |
| AD | 14/62 (22.6) | 8/61 (13.1) | 0.618 (0.257, 1.487) |
| PDD | 10/20 (50.0) | 1/15 (6.7) | 0.054 (0.017, 0.175) |
| DLB | 2/3 (66.7) | 0/6 | - - |
| FTD spectrum disorders | 0/2 | 1/1 (100.0) | - - |
| VaD | 2/12 (16.7) | 2/12 (16.7) | 1.065 (0.159, 7.122) |

Abbreviations: AD=Alzheimer's disease; CI=confidence interval; DLB=dementia with Lewy bodies; FTD=frontotemporal dementia; IAC=independent adjudication committee; ITT=Intent-to-treat; VaD=vascular dementia

137. Second, the CRL discussed certain issues relating to Study 019 as follows:

> As conducted, we do not consider Study 019 to be an adequate and well-controlled study; therefore, it cannot contribute to a finding of substantial evidence of effectiveness for pimavanserin in the treatment of hallucinations and delusions associated with AD psychosis. The study was conducted by a single researcher in the United Kingdom. There was no type I error control for any of the secondary endpoints. Approximately 25% of the enrolled subjects did not meet the study's eligibility criteria. Approximately 20% of the study subjects took prohibited concomitant

> medications during the study. There were also problems with obtaining informed consent from legally authorized representatives before subjects were enrolled in the study that, although not directly influencing the results of the study, indicate that the study was not well-conducted.[239]

138. With respect to the 019 and 020 studies, FDA again had many opportunities to identify and communicate major concerns with Acadia's use of these studies as supportive evidence of efficacy in the sNDA. And again, FDA did not do so. In fact, at the March 16, 2020 pre-sNDA meeting, FDA *agreed* that the results from the Harmony Study, along with supportive data from the 019 Study and the 020 Study, would provide a sufficient basis for Acadia to submit the DRP sNDA.[240] It would be inconsistent with my experience and FDA guidance for FDA not to clearly communicate these concerns long before issuing a CRL. Indeed, the Desk Reference instructs that if there are "clear failure[s] to include evidence of effectiveness," or "omission of critical data, information or analyses needed to evaluate effectiveness," then FDA must consider a Refuse-to-file action.[241]

**2. Dr. Feigal does not consider evidence from the Type A meeting further demonstrating that FDA had not communicated major review issues to Acadia prior to the CRL.**

139. On May 20, 2021, following receipt of the CRL, Acadia requested a Type A End of Review Meeting, as is typical for the sponsor to do in the event of receiving a Complete Response Letter, to gain insight into FDA's review decision.[242] This request included several questions for FDA, which reveal the difficulty the company had interpreting the

---

[239] ACAD_SECLIT_0047638 at p. 2, Complete Response Letter, Apr. 2, 2021.

[240] In a later AdComm meeting, Study 019 was found to be adequate by some members. *See Final Summary Minutes of the Psychopharmacologic Drugs Advisory Committee Meeting*, June 17, 2022, at p. 5 ("[S]ome members felt that Study 019 was positive and that the data were supportive, if not perfect. These members concluded that the study was persuasive despite the audit for the protocol deviations and noted that the study was technically a win."); *see also generally* Psychopharmacologic Drugs Advisory Committee Meeting Transcript, June 17, 2022.

[241] Desk Reference, Appendix B.

[242] *See Guidance for Industry: Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products* at p. 2–3, Sept. 2023 ("Type A meetings are those that are necessary for an otherwise stalled product development program to proceed or to address an important safety issue. Reasons for a Type A meeting include the following: … Post-action meetings requested within 3 months after receipt of an FDA regulatory action other than an approval (e.g., issuance of a complete response letter.").

CRL in light of previous agreement from FDA. As explained below, the materials relating to the Type A meeting further demonstrate that FDA had not previously communicated to Acadia the issues identified in the CRL—particularly the so-called "directional consistency" requirement.

140. ***In Clinical Question 1***, Acadia asked FDA whether it "continue[d] to view dementia-related psychosis as a potentially approvable indication, in general?" citing to EOP2 meeting where FDA had stated that it did see dementia-related psychosis as a potentially approvable indication. ***In Clinical Question 2***, Acadia asked FDA whether it "continue[d] to support dementia-related psychosis as a viable construct for a potential indication for pimavanserin?" As context, Acadia referenced previous agreements from FDA at the EOP2 meeting, as well as the "Division's lack of expressed concern at the pre-sNDA meeting during which the subgroup results were presented in detail."[243]

141. In response to Questions 1 and 2, FDA stated that "the etiology of psychosis in dementia is unknown. As noted in the CRL, the findings from Study 045 suggest a differential response to pimavanserin across dementia subtypes. Given the results, you should focus development on the treatment of hallucinations and delusions associated with specific dementia subtypes (e.g., AD)"[244] This is inconsistent with FDA's prior communications. At the EOP2 meeting FDA had agreed to Acadia pursuing an approval for the DRP indication. Further, at the pre-sNDA meeting, FDA had complete access to subgroup level data from the Harmony Data, but did not mention that there were any major review concerns. As stated in **Section IV.I.6** above, this is inconsistent with my experience and FDA guidance that instructs FDA to communicate any issues with the sponsor in a timely and efficient manner to support the successful approval of the application.

142. Acadia also provided support for its position that "differential response patterns among various subgroups is a common observation in clinical trials that show benefit overall,"

[243] ACAD_SECLIT_1189898 at p. 19, Type A Meeting Request and Briefing Package, May 20, 2021.

[244] ACAD_SECLIT_0498094 at p. 6, Type A Meeting Minutes, June 29, 2021.

even for drugs that are ultimately approved.[245] This position is consistent with my experience. Acadia pointed to the fact that FDA has "recognized the significant limitations to drawing conclusions on the basis of exploratory examination of subgroups within clinical trials."

143. Acadia further bolstered its position citing to a precedent example of FDA's decision to approve the use of sertraline for PTSD, even though it indicated differential response by subgroups. In a pooled analysis of two clinical studies associated with this development program, although the studies met the primary endpoint across the patient population, in the patient subgroup of men, there was no clinical significance. PTSD is a more common disorder in women than men, and 76% of patients in the two studies were women. Acadia described how "[r]ecognizing the limitations of subgroup analyses, FDA approved sertraline for the supplemental indication in PTSD generally, stating that 'the failure to find an effect in men with this disorder is something that could be noted in labeling.'"[246] The details of this example are available publicly. In the memo celebrating the approval of the sNDA, Tom Laughren notes that although "there is nothing in the . . . supplement that addresses [the questions regarding differential response by gender] definitively, and, more important, the evidence that the sponsor has submitted certainly meets the test for substantial evidence of effectiveness."[247] This exemplifies that the basis of approval is the primary efficacy endpoint, not post hoc exploratory subgroup analyses.

144. The Type A meeting occurred on June 29, 2021. As a part of this meeting, Acadia offered a presentation that described Acadia's objectives for the meeting, included gaining insight

---

[245] *See* Vik-Mo, Audun *et al.*, "The individual course of neuropsychiatric symptoms in people with Alzheimer's and Lewy body dementia: 12-year longitudinal cohort study" British Journal of Psychiatry 216, pp. 43–48, July 20, 2019, https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/individual-course-of-neuropsychiatric-symptoms-in-people-with-alzheimers-and-lewy-body-dementia-12year-longitudinal-cohort-study/03170C0BD3CE227967FB7E8D296AC9D0.

[246] ACAD_SECLIT_1189898, Acadia Type A Meeting Request and Briefing Package at pp. 23–24, May 20, 2021.

[247] "Subject: Action Memo for NDA 19-839/S-026, for the use of Zoloft (sertraline) in patients with Post Traumatic Stress Disorder (PTSD)," Dec. 6, 1999, Division of Neuropharmacological Drug Products/HFD 120, p. 2, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/99/19-839S026_Zoloft_corres.pdf.

into the Division's review of 045, providing the totality of evidence/analysis of consistent pimavanserin response demonstrated in studies 045, 019, and 020, discussing differences observed in HRs, and discussing qualification of study 019 as a supportive study.[248] The presentation also included slides to support each of these objectives.[249] For example, slide 4 of the presentation reiterated that the purpose of Study 045 was a Study of DRP as a "single clinical entity; not a trial of five separate clinical entities[.]" Slides 5–8 and 15 describe Acadia's position that in addition to achieving the primary endpoint of the Study, in their view, the results were generally consistent across subgroups.[250] Slide 12–13 described Acadia's view of why subgroup analysis of Study 045 should not be a basis for disapproval.[251] Slide 16 provided additional background on Acadia's position that FDA's labeling guidance was not a major review concern, but rather a labeling matter.[252] It provided examples of "multiple approved CNS product regulatory precedents for subgroup composition/response description in labeling" including the example I mentioned previously—sertraline (Zoloft)—as well as Neudexta and Bijuva.[253]

145. On July 8, 2021, the Type A Meeting Minutes were distributed. FDA made several statements that had not previously been communicated to Acadia prior to the CRL and were contradictory to FDA guidance on review practices in general. Specifically, FDA stated that "During the filing review, it became apparent that the results of Study 045 were driven by the subset of subjects with Parkinson's disease psychosis (the indication for which pimavanserin is already approved). Therefore, the sNDA was designated as standard review."[254] This suggests that FDA had concerns with the Harmony Study's results at least as early as July 10, 2020, when FDA filed the application and designated it standard review. If FDA was aware of major review concerns yet agreed to file an application

---

[248] ACAD_SECLIT_0498094 at pp. 11–26, Type A Meeting Minutes, June 29, 2021.

[249] ACAD_SECLIT_0498094 at pp. 11–26, Type A Meeting Minutes, June 29, 2021.

[250] ACAD_SECLIT_0498094 at pp. 14–18, 25, Type A Meeting Minutes, June 29, 2021.

[251] ACAD_SECLIT_0498094 at pp. 12–13, Type A Meeting Minutes, June 29, 2021.

[252] ACAD_SECLIT_0498094 at p. 16, Type A Meeting Minutes, June 29, 2021.

[253] ACAD_SECLIT_0498094 at p. 16, Type A Meeting Minutes, June 29, 2021.

[254] ACAD_SECLIT_0498094 at p. 3, Type A Meeting Minutes, June 29, 2021.

without citing any review concerns, that would be is inconsistent with both FDA guidance and my experience. Assuming that FDA was, in fact, aware of a major review concern before accepting to file, at a minimum, FDA had a responsibility to clearly and promptly communicate its concerns to Acadia.[255] However, FDA instead accepted to file with "no filing review issues identified,"[256] and indicated they would not be scheduling an AdComm meeting, each of which I would interpret as a positive signal.

146. FDA's statement that it based its approval decision on FDA's analysis of directional consistency across subgroup data is inconsistent with the SAP it agreed on before filing. FDA ICH guidance clearly warns against post hoc, unplanned subgroup analyses that were not outlined in detail in the agreed-upon SAP.[257] In fact, FDA's guidance for sponsors is that "[a]nalyses intended to support a marketing application . . . should be prospectively identified in the protocol and described in adequate detail," and that "results of [supportive/sensitivity] analyses cannot be used as a substitute for the primary analysis."[258] As a general comment and in response to ***Clinical Question 1***, FDA "acknowledged that the design of Study 045 had been agreed upon but explained that it is routine for the Agency to look at behavior across subgroups to ensure the evidence supports the use in the proposed population." When Acadia asked about "regulatory precedents in which drugs with negative results in certain subgroups were still indicated for a broad population," FDA responded that "other regulatory decisions were outside of the scope of this meeting."[259] This is inconsistent with my experience and FDA's own Guidance for Industry that precedent is a major driver of regulatory decision. FDA's MAPP 6030.9 on Good Review Practice states that "*review staff should try to support and adhere to its prior*

---

[255] *See* T. Farchione Dep., 62:12–14 ("[I]f there were deficiencies, we would have outlined them there [in the filing letter]."); *see also* Desk Reference at p. 18, ("If an application is filed, these filing review issues are communicated to the applicant in the filing communication.").

[256] ACAD_SECLIT_0023856 at p. 1, Filing Communication – No Filing Review Issues Identified, July 10, 2020.

[257] *See Guidance for Industry: E9 Statistical Principles for Clinical Trials* at p. 39, Sept. 1998 ("The potential dangers of over-interpretation of unplanned subgroup analyses are well known (see also section V.G) and should be carefully avoided.").

[258] *Good Review Practice: Clinical Review of Investigational New Drug Applications* at p. 60, Dec. 2013.

[259] ACAD_SECLIT_0498094, Type A Meeting Minutes at pp. 5–6, June 29, 2021.

*critical recommendations*," and emphasizes that if there is a change in recommendation about drug development, "*review staff should inform sponsors in writing of this decision and the rationale behind the decision*," which they did not in this case.[260]

147. In conclusion, FDA's comments before and during the Type A Meeting Minutes confirm my opinion that the major review issues described in the CRL had never previously been communicated to Acadia.

Executed this 27th day of March, 2025

Paul Andreason, M.D.

[260] *See* MAPP 6030.9 at p. 17, Apr. 29, 2013 (emphasis added) ("Although reviewers consider new information and revise recommendations as needed, CDER review staff should try to support and adhere to its prior critical recommendations. If CDER review staff change the recommendations, the changes should be based on new scientific information or advances in clinical practice that make earlier CDER recommendations about drug development irrelevant, inappropriate, or unethical. In such cases, review staff should inform sponsors in writing of this decision and the rationale behind the decision.").

**V. APPENDIX**

**A. CV of Dr. Paul Andreason**

**CURRICULUM VITAE**
17 March 2025
**NAME:** Paul J. Andreason, MD

**Work Address:**

**Paul J Andreason, MD- Psychiatry**
3927 Washington Street
Kensington, MD
20895

**Board Certification**
Psychiatry, American Board of Neurology and Psychiatry, Certificate #37618

**Current Medical Licenses**
Maryland
Utah

**Foreign Languages**
French Fluent

**CURRENT POSITION:**
Private Consulting -Paul J. Andreason, MD-Psychiatry July 1997-Current

**EDUCATION**

| **Degree/Year Institution and Field** | |
|---|---|
| M.D. – May 1984 | University of Utah School of Medicine<br>Salt Lake City, Utah 84132 |
| M.S. June -1981 | Chemistry<br>University of Utah<br>Salt Lake City, Utah 84132 |
| B.A. December -1976 | Chemistry<br>University of Colorado<br>Boulder, Colorado 80302 |

**POST-GRADUATE TRAINING**

Clinical Associate, Uniformed Public Health Service, Alcohol, Drug and Mental Health Administration, National Institute of Mental Health, Intramural Research Program, Laboratory of Cerebral Metabolism, Section on Clinical Brain Imaging. February 1990-May 1990.

Senior Staff Fellow, Alcohol, Drug Abuse, and Mental Health Administration,

National Institutes of Mental Health, Intramural Research Program,
Laboratory of Cerebral Metabolism, Section on Clinical Brain Imaging. July 1989-February 1990.

Medical Staff Fellow, Alcohol, Drug Abuse, and Mental Health Administration, National Institute of Mental Health, Intramural Research Program, Laboratory of Cerebral Metabolism, Section on Clinical Brain Imaging. July 1988-July 1989.

Resident, University of Utah Medical Center
Department of Psychiatry, June 1984-June 1988

**PROFESSIONAL EXPERIENCE**
Locum Tenens Consulting Psychiatrist
Senior Medical Officer, Mid-Central District Health Board
Palmerston North Hospital, Palmerston North 4410, New Zealand June 2021-June 2022

Locum tenens Psychiatrist with Santé Affiliated Group, 1400 Spring Street, Silver Spring, MD 20910. June 15, 2017-June 2019

**Medical Officer**- Clinical Pharmacologist, Food and Drug Administration, Center for Drug Evaluation and Research, Office for Drug Evaluations I, Division of Psychiatric Products (DPP), HFD130 December 2014-November 2016

- Perform primary clinical review of new drug applications (NDA) and investigational new drug (IND) protocols for psychiatric use
- Represent the FDA DPP at national and international meetings
- Consult with other Divisions of the FDA and government Agencies as an expert on psychiatric drug regulatory issues

**Attending Psychiatrist, Walter Reed National Military Medical Center,** Department of Defense/Joint Task Force Command. August 2011-December 2014
**Grade O-6 Billet**

- Team Lead and Attending Psychiatrist for Trauma Recovery Program of the Psychiatric Continuity Service at Walter Reed National Military Medical Center, 8901 Wisconsin Ave., Bethesda MD 20889-5000
- Provides direct psychiatric care for active-duty combat veterans with severe posttraumatic stress disorder in a day-hospital and outpatient setting.

**Attending Psychiatrist, Walter Reed Army Medical Center,** Department of Defense/Tricare Management Authority. November 2008-August 2011
**Grade O-6 Billet**

- Team Lead and Attending Psychiatrist for Trauma Recovery Program of the Psychiatric Continuity Service on Ward 53; Walter Reed Army Medical Center, 6900 Georgia Avenue, Washington, DC 20307.
- Provides direct psychiatric care for active-duty combat veterans with severe posttraumatic stress disorder in a day-hospital and outpatient setting.

**Compliance Oversight Coordinator-Division of Compliance Oversight, Office of Human Subjects Protection,** Office of Public Health Science, Office of the Secretary. July 2006-November 2008
**Grade O-6 Non-supervisory Billet**

- Performs both for-cause and not-for-cause investigations to assure compliances with federal human subject research regulations at 45 CFR 46.
- Writes compliance determinations and corrective actions based on the results of oversight investigations. Letters are publicly posted at www.hhs.gov/ohrp.
- Represents OHRP on site visits and at national meetings.

**Team Leader-** May 2006-June 2009
**Team Psychiatrist** June 2009-January 2016
**CCPHS Mental Health Response Team #3 (MHT3),** Office of Force Readiness and Deployment, Office of the Secretary

- Created in May 2006, MHT3 is a rapidly deployable team of mental health professionals. We are prepared to deploy within 36-hours of being notified. The team is made up of psychiatrists, psychologists, clinical social workers, nurse practitioners and nurses. I am the plank-holding team-leader.
- Recruit, train and supervise a team of 26 officers who fill various mental health treatment roles.

**Deputy Director-Division of Psychiatry Products-FDA,** Center for Drug Evaluation and Research, Office for Drug Evaluations I, HFD 130-July 2005-June 2006
**Grade-O6 Supervisory Billet**

- Supervised 30 employees including physicians and scientists who performed all aspects of psychiatric drug review
- Reviewed clinical safety and efficacy data from New Drug Applications (NDA) to formulate recommendations regarding drug approval and labeling. Included is the structured summarization of data, careful documentation of the review process, and, when indicated, presentation of clinical information to the Psychopharmacological Drugs Advisory Committee.
- Negotiate and write product labeling with NDA sponsors
- Represented the Division of Psychiatry Products at national/international meetings and to the press
- Consulted with other Divisions of the FDA and government Agencies as an expert on psychiatric drug regulatory issues

**Team Leader**- Clinical Psychopharmacology Review Team, Food and Drug Administration, Center for Drug Evaluation and Research, Office for Drug Evaluations I, Division on Neuropharmacological Drug Products, HFD120-Jan 2003-July 2005.
**Grade-O6 Supervisory Billet**

- Supervise five physicians who perform clinical psychopharmacology drug review
- Perform primary and supervisory clinical review of new drug applications (NDA) and investigational new drug (IND) protocols for psychiatric use
- Negotiate and write product labeling with new drug sponsors

- Represent the FDA Division of Psychiatry Drug Products at national and international meetings.
- Consult with other Divisions of the FDA and government Agencies as an expert on psychiatric drug regulatory issues

**Medical Officer**- Clinical Pharmacologist, Food and Drug Administration, Center for Drug Evaluation and Research, Office for Drug Evaluations I, Division on Neuropharmacological Drug Products, HFD120- 1995-2003.
**Grade-05 and 06 Non-Supervisory Billets**

- Perform primary clinical review of new drug applications (NDA) and investigational new drug (IND) protocols for psychiatric use
- Represent the FDA Division of Psychiatry Drug Products at national and international meetings
- Consult with other Divisions of the FDA and government Agencies as an expert on psychiatric drug regulatory issues

Medical Staff, Washington School of Psychiatry, Eugene Meyer Treatment Center, Washington, D.C., 1999-2010

Private Practice-General Psychiatry, 5411 West Cedar Lane, Suite 207A; Bethesda, MD 20814, July 1997-September 2014; moved to 3927 Washington Street, Kensington, MD 20895 September 2014-December 2019

Attending Physician, General Psychiatry, Johns Hopkins, Bayview Medical Center; 4940 Eastern Ave., Baltimore MD 21224 June 1993-June 2000

Senior Clinical Investigator, Uniformed Public Health Service, National Institutes of Health, Intramural Research Program, National Institute on Alcohol Abuse and Alcoholism, Laboratory of Clinical Studies, Bethesda, Maryland. May, 1991-January, 1995.

Senior Clinical Investigator, Uniformed Public Health Service, Alcohol, Drug, and Mental Health Administration, Intramural Research Program, National Institute of Mental Health, Laboratory of Cerebral Metabolism, Section on Clinical Brain Imaging, Bethesda, Maryland. May, 1990-May, 1991

Independent Disability Determinations Examiner, states of Idaho and Utah, 1986-1988.

**PROFESSIONAL ACTIVITIES**
**1. Society Membership**
PHS Commissioned Officers Association

**2. Consultations/Deployments**

USPHS Readiness and Deployment Operations Group (formerly OFRD) Ebola Crisis Response CDC- Border Health Deployment to Conakry, Guinea, Africa, French Speaking, 4 February- through 10 April 2015

OFRD Deployment-Boston Marathon Bombing- April 2013; Consulting Psychiatrist to Boston Athletic Association and Boston EMS, mental Health Team 3, Boston, Massachusetts.

OFRD_Deployment- Hurricane Sandy November 2012, Attending Psychiatrist Mental Health Team 3, Queens, New York.

OFRD-Deployment- Hurricane Gustav September 2008, RDF-X Commander and IRCT Liaison to Texas State Department of Mental Health, Austin, Texas

OFRD Deployment- Rosebud Sioux Reservation General Psychiatrist and Officer inCharge for USPHS emergency response to outbreak of completed suicides April 2008

OFRD-Deployment-Hurricane Katrina, Baton Rouge, LA, Camp Port Charles, September 6-20, 2005-Served as Director of Clinical Operations, Lead Medical Officer, Mental Health Provider and Medical Officer

Office of Force Readiness and Deployment (OFRD)-Orange Alert Presidential Elections 2004 Deployment- SERT Officer Secretary of Health and Human Services Operations Center; October 21, 2004-November 4, 2004

OFRD-Deployment- Hurricane Charley, Port Charlotte County, Florida; Mental Health Provider; August 15-28, 2004.

Consultation to the Center for Devices and Radiological Health, FDA for Review of Efficacy and Safety of the Cyberonics ® Vagal Nerve Stimulator for Treatment Resistant Depression 2003-04

Technical Panel Member for Food and Drug Administration National Transportation Safety Board Joint Public on Meeting Transportation Safety And Potentially Sedating or Impairing Medications, Washington, D.C. November 15, 2001 http://www.fda.gov/ohrms/dockets/dockets/01n0397/01N-0397_tr00002_111501.htm

Consultation to Division of Over-the-Counter Drugs, FDA for Review of the Safety and Efficacy of Flexeril® Over-the-Counter; 1999 www.fda.gov/ohrms/dockets/ac/99/transcpt/3525t1.rtf

**3. Abstracts and Presentations**

Andreason P, Managing Risk During Drug Development, Plenary Session on Ethics, American College of Neuro-Psychopharmacology Annual Meeting, December 11-15, 2005

Andreason P, New Good Review Management Practice Guidelines, FDA Symposium at the New Clinical Drug Evaluation Unit Annual Meeting, June 2005

Andreason P, If the Devil is in the Details, Salvation is in the Protocol, Improving Precision in Clinical Trials Symposium at the New Clinical Drug Evaluation Unit Annual Meeting, June 2005

Andreason P, Flexeril OTC,https://www.fda.gov/ohrms/dockets/ac/99/slides/3525s6/tsld001.htm

Andreason P, Regulatory Perspectives on the Development of Surgically Implantable Long-Term Drug Delivery Systems in Psychiatry. Symposium on the Ethics of Long-term Drug Delivery Systems in Psychiatry, September 25, 2003, University of Pennsylvania, Philadelphia, PA 19104

Andreason PJ, Umhau J, Williams W, Momenan R, Keric M, Rio D, Brown GL, Hommer D, Linnoila M, Cingulate and right temporal glucose metabolic rates correlate with impulsive aggression in closed head injury patients. Abstract presented at annual meeting of the Society for Biological Psychiatry, Miami, Florida, May 1995.

Andreason PJ, Altemus M, Zametkin A, King AC, Licino J, Cohen, RM. Regional cerebral glucose metabolism in bulimia nervosa. Abstract presented at the 141st annual meeting of the American Psychiatric Association, May 1991.

Andreason PJ, George DT, Szymanski H, Momenan R, Zametkin AJ, Linnoila M, Eckardt M, Cerebral glucose utilization in detoxified alcoholics administered the serotonin agonist m-CPP. Abstract presented at the annual meeting of the Research Society on Alcoholism, 1992.

Andreason PJ, Zametkin A, Guo A, Baldwin P, Cohen RM, Gender related PET differences in normal controls. Abstract presented at the 142nd Annual Meeting of the American Psychiatric Association. Washington, D.C., May 1992.

Benkelfat C, Andreason PJ, Murphy D, Semple WE, Nordahl TN, Cohen RM, Effect of the 5HT agonist m-CPP on brain metabolism. Abstract presented at the 141st annual meeting of the American Psychiatric Association, May 1991.

Berman KF, Torry EF, Abi-Dargham A, Randolph C, Andreason PJ, Weinberger DR, A positron emission tomography study of regional cerebral blood flow in monozygotic twins discordant for schizophrenia, presented at the annual meeting of the Society for Neuroscience, November 1991.
Goyer PF, Andreason PJ, Semple WE, Clayton AH, King AC, Schultz SC, Cohen RM, PET and personality disorders. Biological Psychiatry, 29,111A, 1991.

Mathis MV, Muoio BM, Andreason P, Avila AM, Farchione T, Atrakchi A, Temple RJ. The US Food and Drug Administration's Perspective on the New Antipsychotic Pimavanserin. J Clin Psychiatry. 2017 Jun;78(6):e668-e673. doi: 10.4088/JCP.16r11119. PMID: 28493654.

Matthew E, Andreason PJ, Cohen RM, Pettigrew K, Herscovitch P, Carson R, King AC, Johanson C-E, Barden K, Pikar D, Paul SM, Benzodiazepine Effects on Regional Cerebral Blood Flow are Receptor Mediated. National Institutes of Health, Bethesda, MD. Abstract presented at the 115th annual conference of the American Neurological Association.

Matthew E, Andreason PJ, Cohen RM, Herscovitch P, Carson R, King AC, Paul SM, Reproducibility of Resting Cerebral Blood Flow measurements with $H_2{}^{15}O$ PET. National Institutes of Health, Bethesda, MD..J. Nuc. Med. (Supplement),May 1990, 31:5, 887.

Rumsey JM, Andreason PJ, Zametkin A, Aquino T, Pinkus A, Hamburger S, King AC, Cohen RM, $^{15}O$ PET activation studies of severe dyslexia, Scientific proceedings of the 37th annual meeting of the American Academy of Child and Adolescent Psychiatry, October 1990.

Rumsey JM, Andreason PJ, Manniem G, Aquino R, Gordon CT, Neurophysiological and PET scan findings in calendar calculating savants. J Clin & Experimental Neurophysiology, 1992, 14(1), 110.

Rumsey J, Mannheim G, Andreason P, Gordon CT, Aquino T, and Hibbs E, $^{15}O$ Activation studies of autistic calendar calculators. Scientific proceedings of the 38th annual meeting of the American Academy of Child Psychiatry, San Francisco, October 1991, pg. 69.

**4. Publications**

**a. Journal Articles (peer reviewed)/Book Chapters**

Andreason, Paul J**.** "Mental Health and Hygiene During Disaster Relief", in Public Health Emergency Readiness and Response: Principles and Practice, First Edition 2010, Edited by Carmona et al, ISBN 978-0-9773149-3-5

Andreason PJ, Altemus M, Zametkin A, King AC, Licino J, Cohen RM, Regional cerebral glucose metabolism in bulimia nervosa. *American Journal of Psychiatry*, 149, 1506-1513, 1992.

Andreason PJ, Seidel J, Behavioral techniques in the treatment of patients with multiple personality disorder. *An Clin Psychiatry*, 4:1, 29-32, 1991.

Andreason PJ, Zametkin A, Guo A, Baldwin P, Cohen RM, Gender related PET differences in normal controls. *Psychiatry Research*; 51: 175-183, 1994.

Cohen RM, Andreason PJ, Doudet D, Carson R, Sunderland T, Opiate receptor avidity and cerebral blood flow in Alzheimer's disease. *J Neurological Sciences* 148:171-180, 1997.

Cohen RM, Andreason PJ, Sunderland T, The ratio of mesial to neocortical temporal lobe blood flow as a predictor of dementia. *Journal of the American Geriatric Society*. 45:329-33, 1997.

Cohen RM, Nordahl TE, Semple WE, Andreason P, Pikar D, Abnormalities in the distributed network of sustained attention predict neuroleptic treatment response in schizophrenia. *Neuropsychopharmacology* 19:36-47, 1998.

Cohen RM, Nordahl TE, Semple WE, Andreason P, Litman RE, Pikar D, The brain metabolic patterns of clozapine and fluphenazine treated patients with schizophrenia during a continuous performance task. *Archives of General Psychiatry*. 54:481-86, 1997.

Doudet D, Hommer D, Higley JD, Andreason PJ, Momenan R, Suomi S, Linnoila M, Cerebral glucose metabolism, CSF 5-HIAA and aggressive behavior in rhesus monkeys. *American Journal of Psychiatry*, 152:12, 1782-7, 1995.

Enoch MA, Rorbaugh JW, Davis EZ, Harris CR, Ellingson RJ, Andreason P, Moore V, Varner JL, Brown GL, Eckardt MJ et al., Relationship of genetically transmitted alpha EEG traits to anxiety disorders and alcoholism. *American Journal of Medical Genetics*. 60:5, 400-8, 1995.

Goyer PF, Andreason PJ, Semple WE, Clayton AH, King AC, Compton-Toth BA, Schultz SC, Cohen RM, Positron-emission tomography and personality disorders. *Neuropsychopharmacology* 10:21-28, 1994.

Hommer D, Andreason P, Rio , Williams W, Ruttimann U, Momenan R, Zametkin, Rawlings R, Linnoila M, Effects of m-chlorophenylpiperazine on regional brain glucose utilization: a positron emission tomographic comparison of alcoholic and control subjects. *Journal of Neuroscience*, 17:8, 2796-806, 1997

Johnson DN, Weingartner HJ, Andreason P, George DT, An effect of triazolam on visual attention and information processing. *Psychopharmacology* 121:2, 145-9, 1995.
Ketter TA, Andreason PJ, George MS, Lee C, Gill DS, Parekh PI, Willis MW, Herscovitch P, Post RM, Anterior paralimbic mediation of procaine induced emotional and psychosensory experiences. *Archives of General Psychiatry* 53:1 59-69, 1996.

Lombardi WJ, Sirocco KY, Andreason PJ, George DT, Effects of triazolam and ethanol on proactive interference: evidence for an impairment in retrieval inhibition. *J Clin Exp Neuropsychol* Oct;19(5):698-712, 1997.

Marangell LB, Ketter, TA, George MS, Pazzaglia PJ, Callahan AM, Parekh P, Andreason PJ, Horowitz B, Herscovitch P, Post RM, Inverse relationship of peripheral thyrotropin-stimulating hormone levels to brain activity in mood disorders. *American Journal of Psychiatry* 154:2 224-30, 1997.

Matthew E, Andreason PJ, Cohen RM, Pettigrew K, Herscovitch P, Carson R, King AC, Johanson C-E, Barden K, Pikar D, Paul SM, Benzodiazepine Effects on Regional Cerebral Blood Flow are Receptor Mediated. *Proceedings of the National Academy of Sciences*. Mar 28; 92(7): 2775-9, 1995.

Matthew E, Andreason PJ, Carson R, Herscovitch P, Pettigrew K, Cohen RM, King C, Johansen CE, Paul SM, Reproducibility of resting cerebral blood flow measurements with H2 15 O positron emission tomography in humans. *Journal of Cerebral Blood Flow and Metabolism*, 13(5), 748-54, 1993.

Parekh P, Spencer JW, George MS, Gill DS, Ketter TA, Andreason PJ, Herscovitch P, Post RM, Procaine-induced increases in limbic rCBF correlate positively with increases in occipital and temporal EEG fast activity. *Brain Topography* 7:3, 209-16, 1995.

Rumsey JM, Andreason PJ, Zametkin AJ, King AC, Hamburger SD, Aquino T, Hanahan AP, Pikus A, Cohen RM, Right frontotemporal activation by tonal memory in dyslexia, an 15O PET study. *Biological Psychiatry*, 35:171-180, 1994.

Rumsey JM, Andreason PJ, Zametkin A, Aquino T, King AC, Hamburger S, Pikus A, Rappaport JL, Cohen RM, Failure to activate left temporoparietal cortex in dyslexia: a 15O PET study. *Archives of Neurology*, 49, 527-534, 1992.

Rumsey JM, Donohue BC, Brady DR, Nace K, Giedd JN, Andreason P, A magnetic resonance imaging study of planum temporale asymmetry in men with developmental dyslexia. *Arch Neurol* Dec;54(12):1481-9 1997

Rumsey JM, Horwitz B, Donohue BC, Nace K, Maisog JM, Andreason P, Phonological and orthographic components of word recognition. A PET-rCBF study. *Brain* May;120 ( Pt 5):739-59, 1997.

Rumsey JM, Nace K, Donohue B, Wise D, Maisog JM, Andreason P, A positron emission tomographic study of impaired word recognition and phonologic processing in dyslexic men. *Archives of Neurology*, 54:562-573, 1997.

Rumsey JM, Zametkin A, Andreason PJ, Hanahan AP, Hamburger SD, Aquino T, King AC, Pikus A, Cohen RM, Normal activation of frontotemporal language cortex in dyslexia, as measured with O-15 positron emission tomography. *Archives of Neurology,* 51, 27-38,1994.

Ruttimann UE, Andreason PJ, Rio D, Head motion during positron emission tomography: is it significant? *Psychiatry Research.* 61:1, 43-51, 1995.

Carol Weil, Lisa Rooney, Patrick McNeilly, Karena Cooper, Kristina Borror, and Paul Andreason. OHRP Compliance Oversight Letters: An Update, *IRB: Ethics & Human Research*, 32:2, 1-6, March-April 2010

Weingartner HJ, Andreason PJ, Hommer DW, Sirocco KY, Rio DE, Ruttimann UE, Rawlings RR, Eckardt MJ, Monitoring the source of memory in detoxified alcoholics. *Biological Psychiatry*, 40:1 43-53, 1996.

Zametkin A, Andreason PJ, Kruesi M, Laboratory Tests in Child Psychiatry, from The Comprehensive Textbook of Child and Adolescent Psychiatry, Editor, J. Wiener, American Psychiatric Press Inc., Washington, D.C., 1991.

Zametkin A, Andreason PJ, Enrst M, Kruesi M, Laboratory and Diagnostic Testing, from The Comprehensive Textbook of Child and Adolescent Psychiatry, Editor, J. Wiener, American Psychiatric Press Inc., Washington, D.C., 1997.

**b. Publicly Available FDA Drug Reviews Through the Freedom of Information Act (FOI) and Best Pharmaceuticals for Children Act (BPCA)**

(Other reviews that are not available through FOI or BPCA can not be cited here as they are proprietary information)

Clinical Review for NDA 207-318 ACADIA Nuplazid ® (pimavanserin) for the treatment of psychosis associated with Parkinson's disease (PDP) 207318Orig1s000MedR.pdf

Clinical Review for NDA 21-121 Supplement SE1-08 Approvable Action for Pediatric Supplement for Concerta in the Treatment of Adolescent Attention Deficit Hyperactive Disorder https://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4152b2_01_03_Concerta%20medical.pdf

Clinical Review for NDA 20-151 Supplement SE5-024 Non-Approval Action for Pediatric Supplement for Effexor XR; negative results for Effexor XR in the treatment of Major Depressive Disorder (MDD and negative trial in Effexor XR in the treatment of Generalized Anxiety Disorder) in pediatric patients, www.fda.gov/cder/foi/esum/2003/20151se5-024BPCA.pdf - 06-18-2003
153569A [N20031] Paxil (SmithKline Beecham) 05/07/1996 Supplemental Approvals [Panic Disorder]: S7, S9 Clinical Review,

5215408B [N20592] Zyprexa 2.5, 5, 7.5, 10mg Tablets (Eli Lilly) 09/30/1996 Approval [Psychotic Disorders]: Medical Officers Review, http://www.foiservices.com/
5213862B [N20031]: Paxil (SmithKline Beecham) 05/07/1996 Supplemental Approvals: NDA 20-031/S7/S9 Clinical Review, http://www.foiservices.com/

5211430B [N20358] Wellbutrin 50, 100, 150mg Sustained Release SR Tablets (Glaxo Wellcome) 10/04/1996 Approval [Depression]: Clinical Review, http://www.foiservices.com/

5208071B [N20859] Sonata 5mg & 10mg Capsules (Wyeth-Ayerst Laboratories) 08/13/1999 Approval [Insomnia]: Medical Officers Review, https://www.accessdata.fda.gov/drugsatfda_docs/nda/99/20859_Sonata.cfm

5207819A [N18276]: Xanax 0.25 mg 0.5 mg 1 mg and 2 mg Tablets (Pharmacia & Upjohn) 12/20/1996 Supplemental Approval [Labeling Revision]: S33 Medical Officers Review, http://www.foiservices.com/

5201775A [N20592] Zyprexa Tablets (Lilly Research Laboratories) 11/09/2000 Supplemental Approval [Maintaining Treatment Response]: S11 Medical Review, http://www.foiservices.com/

**TEACHING and SERVICE**
2002-2016 OFRD (formerly Commissioned Corps Readiness Force [CCRF]) continuously active and currently advance readiness qualified as Mental Health Provider. Continuously Basic Readiness or Roster Qualified since December 2002

2002-2016 USPHS Vocal Ensemble Member and Organist
2002-2016 USPHS Medical Review Board and Medical Appeals Board

2004-2006 USPHS Associate Recruiter

2004-present USPHS Physicians PAC Mentor

2001-2014 Lecturer on Psychopharmacology, Washington School of Psychiatry, Washington, D.C.

2002-2006 FDA Center for Drug Evaluation and Research (CDER) Regulatory Science Research Grant Review Committee

1998-2002 FDA Division of Neuropharmacological Drug Products Clinical Psychiatry Review Mentor

1999-present Organist, Church of Jesus-Christ of Latter-day Saints, Kensington, MD

1995-1999 Scoutmaster and Assistant Scoutmaster, Boy Scouts of America, Troop 7, Kensington, MD

1979-1980 Teaching Assistant, Department of Chemistry

**HONORS and AWARDS**
2011 Surgeon General's Exemplary Service Medal, U.S. Public Health Service
2006 Surgeon General's Exemplary Service Medal, U.S. Public Health Service
2006 Outstanding Service Medal, U.S. Public Health Service
2002 Commendation Medal, U.S. Public Health Service
1999 Commendation Medal, U.S. Public Health Service
2014 Joint Service Commendation Medal
2010 Achievement Medal, U.S. Public Health Service
2005 Achievement Medal, U.S. Public Health Service
2011 Special Assignment Award U.S. Public Health Service
2007 Special Assignment Award U.S. Public Health Service
2012 Outstanding Unit Citation U.S. Public Health Service
2008 Outstanding Unit Citation U.S. Public Health Service
2007 Outstanding Unit Citation U.S. Public Health Service
2011 Superior Unit Award, U.S. Army
2001 Unit Commendation, U.S. Public Health Service
2005 Unit Commendation, U.S. Public Health Service
2006 Unit Commendation, U.S. Public Health Service
2014 Crisis Response Service Award, U.S. Public Health Service-2
2009 Crisis Response Service Award, U.S. Public Health Service
2008 Crisis Response Service Award, U.S. Public Health Service
2006 Crisis Response Service Award, U.S. Public Health Service
2004 Crisis Response Service Award, U.S. Public Health Service
2009 Global War on Terrorism Medal, Department of Defense

2009 National Defense Service Medal, Department of Defense
2003 Field Medical Readiness Badge, U.S. Public Health Service
2008 Office of the Secretary Health and Human Services Badge, U.S. Public Health Service
2002 Commissioned Corps Training Ribbon, U.S. Public Health Service

## B. Materials Considered

### Academic Literature

- J. Cummings, et al., "Dementia-related psychosis and the potential role for pimavanserin," CNS Spectr, Feb. 2022, available at DOI: 10.1017/S1092852920001765.
- M. Mathis, et al., The US Food and Drug Administration's Perspective on the New Antipsychotic Pimavanserin, Journal of Clinical Psychiatry, Jun. 2017, available at DOI: 10.4088/JCP.16r11119.
- Mosholder et al., "Mortality Among Parkinson's Disease Patients Treated With Pimavanserin or Atypical Antipsychotics: An Observational Study in Medicare Beneficiaries," American Journal of Psychiatry, Aug. 2022, available at DOI: 10.1176/appi.ajp.21090876.
- Vik Mo et al., "The individual course of neuropsychiatric symptoms in people with Alzheimer's and Lewy body dementia: 12-year longitudinal cohort study Publication", July 20, 2019, available at DOI: 10.1192/bjp.2019.195.

### Depositions

- Deposition of Daryl Dekarske, July 12, 2024
- Deposition of Erin Foff, May 9, 2024
- Deposition of Jeffrey Cummings, August 30, 2024
- Deposition of Mark Knowles, April 13, 2024
- Deposition of Stephanie Dunbar, April 26, 2024
- Deposition of Stephen Davis, June 8, 2024
- Deposition of Teresa Brandt, May 2, 2024
- Deposition of Tiffany Farchione, January 14, 2025
- Deposition of Tom Laughren, August 20, 2024

### Expert Reports

- Expert Report of David W. Feigal, Jr., MD, MPH, February 13, 2025 and materials cited therein
- Expert Report of Lon S. Schneider, MD, February 13, 2025
- Expert Report of David Madigan, Ph.D., February 13, 2025

### Legal Documents

- Amended Class Action Complaint, *City of Birmingham Relief and Retirement System et al v. Acadia Pharmaceuticals Inc. et al*, December 10, 2021, Dkt. No. 45
- 2024-02-02 Birmingham's Second Supplemental Answers and Objections to Acadia's First Interrogatories

- 2024-09-19 Birmingham's Answers and Objections to Acadia's Contention Interrogatories

**Press Releases**

- Acadia Pharmaceuticals Announces FDA Approves ACADIA Pharmaceuticals' NUPLAZID™ (pimavanserin) - The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis, News Releases, Acadia, Apr. 29, 2016, available at https://acadia.com/en-us/media/news-releases/fda-approves-acadia-pharmaceuticals-nuplazidtm-pimavanserin.
- Acadia Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis, News Releases, Acadia, Nov. 14, 2013, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-initiation-phase-ii-trial.
- Acadia Pharmaceuticals Announces Outcome of FDA Advisory Committee for NUPLAZID® (pimavanserin) for the Treatment of Alzheimer's Disease Psychosis, News Releases, Acadia, Jun. 18, 2022, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-outcome-fda-advisory-committee.
- Acadia Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis, News Releases, Acadia, Sep. 9, 2019, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-outcome-fda-advisory-committee.
- Acadia Pharmaceuticals Announces Plan for a Resubmission of its Supplemental New Drug Application to U.S. FDA for NUPLAZID® (pimavanserin), News Releases, Acadia, Dec. 20, 2021, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-plan-resubmission-its.
- Acadia Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis, News Releases, Acadia, Jul. 20, 2020, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-announces-us-fda-accepted-filing.
- Acadia Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis, News Releases, Acadia, Oct. 4, 2017, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-initiates-phase-iii-study-pimavanserin-0.
- Acadia Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12th Clinical Trials on Alzheimer's Disease (CTAD) Meeting, News Releases, Acadia, Dec. 5, 2019, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-presents-positive-top-line-results.
- Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis, News Releases, Acadia, Mar. 8, 2021, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-provides-regulatory-update-supplemental.

- Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis, News Releases, Acadia, Apr. 5, 2021, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-receives-complete-response-letter-us-fda.
- Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Alzheimer's Disease Psychosis, News Releases, Acadia, Aug. 5, 2022, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-receives-complete-response-letter-us-0.
- Acadia Pharmaceuticals Receives FDA Breakthrough Therapy Designation for NUPLAZID™ (Pimavanserin) for Parkinson's Disease Psychosis, News Releases, Acadia, Sep. 2, 2014, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-receives-fda-breakthrough-therapy.
- Acadia Pharmaceuticals to Present Data on Pimavanserin in Patients with Parkinson's Disease Dementia with Psychosis from the HARMONY trial at the 14th Clinical Trials on Alzheimer's Disease (CTAD) Conference, News Releases, Acadia, Oct. 25, 2021, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-present-data-pimavanserin-patients.
- Acadia Pharmaceuticals to Present New Scientific Data on Pimavanserin in Neurodegenerative Diseases at the 13th Clinical Trials on Alzheimer's Disease (CTAD) Conference, News Releases, Acadia, Oct. 26, 2020, available at https://acadia.com/en-us/media/news-releases/acadia-pharmaceuticals-present-new-scientific-data-pimavanserin.

**Produced Documents**

- ACAD_SECLIT_0001032
- ACAD_SECLIT_0001467
- ACAD_SECLIT_0001670
- ACAD_SECLIT_0019463
- ACAD_SECLIT_0019765
- ACAD_SECLIT_0019792
- ACAD_SECLIT_0019815
- ACAD_SECLIT_0019827
- ACAD_SECLIT_0019847
- ACAD_SECLIT_0019878
- ACAD_SECLIT_0019882
- ACAD_SECLIT_0023834

- ACAD_SECLIT_0023856
- ACAD_SECLIT_0023894
- ACAD_SECLIT_0023912
- ACAD_SECLIT_0023944
- ACAD_SECLIT_0034049
- ACAD_SECLIT_0045894
- ACAD_SECLIT_0045918
- ACAD_SECLIT_0047638
- ACAD_SECLIT_0055692
- ACAD_SECLIT_0077076
- ACAD_SECLIT_0089039
- ACAD_SECLIT_0094235
- ACAD_SECLIT_0105223
- ACAD_SECLIT_0158262
- ACAD_SECLIT_0158441
- ACAD_SECLIT_0159711
- ACAD_SECLIT_0187492
- ACAD_SECLIT_0219289
- ACAD_SECLIT_0226953
- ACAD_SECLIT_0227678
- ACAD_SECLIT_0290802
- ACAD_SECLIT_0290885
- ACAD_SECLIT_0322764
- ACAD_SECLIT_0395883
- ACAD_SECLIT_0497943
- ACAD_SECLIT_0498094
- ACAD_SECLIT_0499628
- ACAD_SECLIT_0963700
- ACAD_SECLIT_1066380

- ACAD_SECLIT_1068758
- ACAD_SECLIT_1107836
- ACAD_SECLIT_1189898
- ACAD_SECLIT_1389691
- ACAD_SECLIT_1765198

**Public Records**

- *Final Summary Minutes of the Psychopharmacologic Drugs Advisory Committee* Meeting*,* June 17, 2022.
- *Transcript of Psychopharmacologic Drugs Advisory Committee Meeting (PDAC), Virtual Meeting*, Jun. 17, 2022.

**Statutes**

- 21 C.F.R. § 201.57(c)(15)
- 21 C.F.R. § 312.47
- 21 C.F.R. § 312.21
- 21 C.F.R. § 312.23
- 21 C.F.R. § 312.42
- 21 C.F.R. § 314
- 21 C.F.R. § 314.126
- 21 C.F.R. § 201.57(c)(15)
- 21 C.F.R. § 312.23

**Websites**

- "About Us," Commissioned Corps of the U.S. Public Health Service, available at https://www.usphs.gov/about-us.
- "Advisory Committees: Critical to the FDA's Product Review Process," May 4, 2016, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/advisory-committees-critical-fdas-product-review-process.
- "Breakthrough Therapy," U.S. Food and Drug Administration, Jan. 4, 2018, available at https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.
- "Center for Drug Evaluation and Research (CDER)," U.S. Food and Drug Administration, available at https://www.fda.gov/about-fda/fda-organization/center-drug-evaluation-and-research-cder.

- "Drugs@FDA Glossary of Terms," U.S. Food and Drug Administration, Nov. 14, 2017, available at https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms.
- "Investigational New Drug (IND) Application," U.S. Food and Drug Administration, Nov. 18, 2024, available at https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.
- "Investigational New Drug (IND) Application," U.S. Food and Drug Administration, Nov. 18, 2024, available at https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.
- "Postmarketing Requirements and Commitments: Introduction", FDA, last updated Aug. 9, 2024, available at https://www.fda.gov/drugs/guidance-compliance-regulatory-information/postmarketing-requirements-and-commitments-introduction.
- "Psychopharmacologic Drugs Advisory Committee Charter," U.S. Food and Drug Administration, June 4, 2024, available at https://www.fda.gov/advisory-committees/psychopharmacologic-drugs-advisory-committee/psychopharmacologic-drugs-advisory-committee-charter.
- "Subject: Action Memo for NDA 19-839/S-026, for the use of Zoloft (sertraline) in patients with Post Traumatic Stress Disorder (PTSD)," Dec. 6, 1999, Division of Neuropharmacological Drug Products/HFD 120, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/99/19-839S026_Zoloft_corres.pdf.
- "U.S. Food and Drug Administration, Step 3: Clinical Research," Oct 1, 2024, U.S. Food and Drug Administration, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.
- MAPP 4180.4, Mar 17, 2015, available at https://fda.report/media/80084/NDAs-BLAs--Using-the-21st-Century-Review-Process-Desk-Reference-Guide.pdf.
- MAPP 6010.5, Mar. 27, 2018, available at https://www.fda.gov/files/about%20fda/published/NDAs-and-BLAs--Filing-Review-Issues.pdf.
- MAPP 6020.3, Jun. 25, 2013, available at https://www.fda.gov/media/72723/download.
- MAPP 6025.6, July 29, 2014, available at https://web.archive.org/web/20220313133144/https://www.fda.gov/media/89155/download.
- MAPP 6030.1, Nov. 20, 1995, [updated Feb. 20, 2018], available at https://www.fda.gov/media/72751/download.
- MAPP 6030.9, Apr. 29, 2013, available at https://www.fda.gov/media/85790/download.
- CDER 21st Century Review Process Desk Reference Guide, Nov. 2010, [updated Sept. 2014], available at https://www.fda.gov/media/78941/download.

- CDER's Manual of Policies and Procedures | MAPP, U.S. Food and Drug Administration, [last updated Mar. 11, 2025], available at https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-manual-policies-procedures-mapp.
- E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1), available at https://www.fda.gov/media/93884/download.
- E6(R3) Good Clinical Practice (GCP), June 2023, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e6r3-good-clinical-practice-gcp.
- Early Alzheimer's Disease: Developing Drugs for Treatment Guidance for Industry, Mar. 2024, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/early-alzheimers-disease-developing-drugs-treatment.
- Food & Drug Admin., Guidance for Industry: Formal Meetings Between the FDA and Sponsors or Applicants (May 2009), https://www.regulations.gov/document/FDA-2024-D-1244-0017.
- Frequently Asked Questions: Breakthrough Therapies, last updated Mar. 21, 2024, available at https://www.fda.gov/regulatory-information/food-and-drug-administration-safety-and-innovation-act-fdasia/frequently-asked-questions-breakthrough-therapies.
- Good Review Practice: Clinical Review of Investigational New Drug Applications, Dec. 2013, available at https://www.fda.gov/media/87621/download.
- Guidance for Industry and Review Staff: Best Practices for Communication Between IND Sponsors and FDA During Drug Development, Dec. 2017, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development.
- Guidance for Industry: E9 Statistical Principles for Clinical Trials, Sept. 1998, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e9-statistical-principles-clinical-trials.
- Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologics, May 2014, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics.
- Guidance for Industry: Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products, Sep. 2023, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-pdufa-products.
- Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products, May 1998, available at https://www.fda.gov/media/71655/download.
- Guidance for Review Staff and Industry Good Review Management Principles and Practices for PDUFA Products, Apr. 2005, available at https://www.fda.gov/regulatory-

information/search-fda-guidance-documents/guidance-review-staff-and-industry-good-review-management-principles-and-practices-pdufa-products.

- Multiple Endpoints in Clinical Trials: Guidance for Industry, Jan. 2017, available at https://www.fda.gov/files/drugs/published/Multiple-Endpoints-in-Clinical-Trials-Guidance-for-Industry.pdf.
- PDUFA Performance Reports, U.S. Food and Drug Administration, Apr. 22, 2024, https://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports; see also generally PDUFA Performance Reports.
- PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2018 Through 2022, at p. 20 (emphasis added), available at https://www.fda.gov/media/99140/download.
- Refuse to File: NDA and BLA Submissions to CDER Guidance for Industry, Dec. 2017, available at https://www.fda.gov/media/109758/download.
- SOPP 8212: Breakthrough Therapy Products - Designation and Management, CBER, Aug. 1, 2023, available at https://www.fda.gov/media/98351/download.
- Special Protocol Assessment Guidance for Industry, FDA, Apr. 2018, available at https://www.fda.gov/media/97618/download.
- Subgroup, U.S. Department of Health and Human Services, accessed March 26, 2025, available at https://toolkit.ncats.nih.gov/glossary/subgroup/.
- The Prescription Drug User Fee Act: Structure and Reauthorization Issues, Congressional Research Service, Oct. 7, 2002, available at https://crsreports.congress.gov/product/pdf/RL/RL31453/3.