# Exhibit 12

*CONFIDENTIAL*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and SRDJAN (SERGE) R. STANKOVIC,<br><br>Defendants. | No. 3:21-cv-00762-WQH-MSB<br><br>Judge: Hon. William Q. Hayes |

**REPORT ON LOSS CAUSATION AND DAMAGES**

**OF PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA**

**FEBRUARY 13, 2025**

# TABLE OF CONTENTS


I. PREVIOUS WORK CONDUCTED IN THIS CASE .................................. 1

II. QUALIFICATIONS ................................................................. 3

III. SCOPE OF PROJECT AND REPORT ........................................... 6

IV. SUMMARY OF CONCLUSIONS AND OPINIONS .............................. 7

V. FACTUAL BACKGROUND ........................................................ 20

A. About the Company ............................................................. 20

B. About Acadia Stock .............................................................. 22

C. Probability of Success for Expanded Pimavanserin Labeling ........... 23

D. Timeline of Events ............................................................... 27

1. Pre-Class Period Events ......................................................... 27

a) Acadia Begins Phase III Studies of, and Receives FDA Approval for, Pimavanserin as a Treatment for PDP ........................................ 27

b) Acadia Initiates its Phase II -019 Study of Pimavanserin as a Treatment for Alzheimer's Disease Psychosis ................................. 28

c) Acadia Provides Additional Details of the -019 Study ...................... 28

d) Acadia Announces -019 Study Results ........................................ 29

e) Acadia Meets with FDA Following -019 Study Completion ................. 30

f) Acadia Tells the Public About Its May 2017 End-of-Phase II Meeting with the FDA ............................................................... 33

g) Acadia Announces Initiation of the Harmony Study and Receipt of Breakthrough Therapy Designation ......... 34

2. 9 September 2019: Defendants Announce the Harmony Study's Top-Line Results and Allegedly Mislead Investors as to Terms of the FDA Agreement ......................... 36

*CONFIDENTIAL*

3. 11 November 2019: Acadia Presents at JPMorgan's 2019 Fall Biotechnology Conference Call Series ............................ 40

4. 21 November 2019: Defendant Davis Provides Harmony Study Subgroup Results to Acadia's Board of Directors and Privately Acknowledges FDA "Directional Alignment" Criterion ........................................................... 42

5. 4 December 2019: Acadia Presents Harmony Study Results (Including Subgroup Results) at CTAD Conference ............................................................... 43

6. 26 February 2020: During Earnings Announcement, Acadia Updates the Market on Planned sNDA Submission Based on Harmony Study Results ........................ 49

7. 7 May 2020: Acadia Updates on Planned sNDA for DRP ...... 50

8. 12 May 2020: Acadia Presents at Bank of America Merrill Lynch Healthcare Conference.................................... 51

9. 15 June 2020: Acadia Submits the sNDA ............................... 52

10. 20 July 2020: Acadia Announces that FDA Has Accepted the sNDA for Filing and Assigned It Standard Review ........... 53

11. 19 August 2020: Acadia Presents at the JMP Securities Central Nervous System Forum ............................................ 63

12. 14 September 2020: Acadia Presents at Morgan Stanley Global Healthcare Conference............................................... 65

13. 17 November 2020: Acadia Presents at Stifel Virtual Healthcare Conference ......................................................... 67

14. 12 January 2021: Acadia Presents at JPMorgan Healthcare Conference ......................................................... 69

15. 8 March 2021: Acadia Discloses Receipt of the FDA's Deficiency Letter ............................................................... 71

a) Defendants' Commentary ................................................ 72

b) Analyst Question re: the Disclosure Delay....................... 73

c) Analysts Ask for More Information ................................ 73

d) Analyst Concerns About a Potential CRL ........................ 76

e) Negative Analyst Reaction ........................ 76

f) Reduced PoS Estimates and Downgrades ........................ 78

g) Market Selloff ........................ 83

16. 5 April 2021: Acadia Announces Receipt of the CRL ........................ 84

a) The Announcement ........................ 84

b) Analyst and Market Reaction to the CRL Disclosure ........................ 86

VI. SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................ 95

VII. LOSS CAUSATION ........................ 100

A. Economic Materiality of the Alleged Misrepresentations and Omissions ........................ 100

1. Financial Principles Strongly Support a Finding that Defendants' Alleged Misrepresentations and Omissions Were Economically Material ........................ 102

a) The Economic Materiality of Revenue, Earnings, and Cash Flow ........................ 102

b) Economic Materiality of Clinical Trial Results and Product Development in the Biopharmaceuticals Sector ........................ 107

c) Expansion of Pimavanserin's FDA-Approved Usage to Include a DRP Indication was Highly Economically Material for Acadia ........................ 109

2. Defendants' Statements and Emphasis Evince the Economic Materiality of the Alleged Misrepresentations and Omissions ........................ 110

a) Proposed Expansion of Pimavanserin's Approved Usage to Include a DRP Indication ........................ 110

b) Acadia's Purported "FDA Agreement," the Purported Sufficiency of Harmony's Top-Line Results, and the Purportedly Supportive Nature of the -019 Study ........................ 114

c) Company Statements following the DL and CRL .......... 122

3. Analysts Deemed the Alleged Misrepresentations and Omissions to be Highly Economically Material .................... 123

a) Proposed Expansion of Pimavanserin Indication to Include DRP .......... 123

b) Acadia's Purported "FDA Agreement," the Purported Sufficiency of Harmony's Top-Line Results, and the Purportedly Supportive -019 Study...... 126

c) Analyst Commentary following the DL and CRL ......... 132

B. Economic Materiality of Misrepresentations, Omissions, and Corrective Disclosures is Compelling Proof of Loss Causation ...... 134

C. Event Study Analysis of Economic Materiality and Loss Causation ........ 135

1. Application of Event Study Analysis to Assess Loss Causation in this Action .......... 137

a) Misrepresentation and Omission Dates .......... 138

b) Corrective Disclosure Event Dates .......... 139

c) Isolating the Impact of Company-Specific Information .......... 140

d) t-Test .......... 143

2. Event Study Results and Analysis .......... 144

a) 9 September 2019 .......... 144

b) 5 December 2019 .......... 145

c) 21 July 2020 .......... 147

d) 9 March 2021 .......... 150

e) 5 April 2021 .......... 151

D. Loss Causation Summary and Conclusion .......... 152

VIII. QUANTIFICATION OF DAMAGES .......... 154

A. Out-of-Pocket Damages ... 154

B. Quantifying the Artificial Inflation Introduced by the Misrepresentations and Omissions and Dissipated by the Corrective Events ... 156

1. Introduction of Artificial Inflation Detected and Measured by the Event Study and Other Financial Analyses ... 157

a) 9 September 2019: Alleged Misrepresentations and Omissions about Purported FDA Agreement and Sufficiency of Harmony Study Top-Line Results ... 157

b) 5 December 2019: Release of Certain Subgroup Data from Harmony Study Accompanied by Alleged Misrepresentations and Omissions About Purported FDA Agreement and Sufficiency of Data ... 160

2. Artificial Inflation Dissipation and Stock Price Declines Caused by Corrective Disclosures ... 163

a) 20 July 2020: Announcements of Standard Review, No Advisory Committee, and Clarity Study Failure ... 163

b) 8 March 2021: Deficiency Letter Disclosure ... 166

c) 5 April 2021: Disclosure of the Complete Response Letter ... 168

C. Artificial Inflation Ribbon ... 171

1. 9 September 2019 to 4 December 2019 ... 171

2. 5 December 2019 to 8 March 2021 ... 172

3. 9 March 2021 to 4 April 2021 ... 173

4. 5 April 2021 and Beyond ... 173

D. Per Share Damages ... 173

IX. LIMITING FACTORS AND OTHER ASSUMPTIONS ... 175

X. APPENDIX A: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 9 SEPTEMBER 2019 ... 176

*CONFIDENTIAL*

XI. APPENDIX B: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 4 DECEMBER 2019 .......... 178

XII. APPENDIX C: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 20 JULY 2020 .......... 181

XIII. APPENDIX D: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 8 MARCH 2021 .......... 184

XIV. APPENDIX E: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 5 APRIL 2021 .......... 188

XV. APPENDIX-F: ANALYST TIME HORIZONS FOR DRP .......... 192

## I. PREVIOUS WORK CONDUCTED IN THIS CASE

1. In my expert report dated 21 August 2023 (the "Opening Feinstein Report"), I examined factors that are generally accepted as indicative of the efficiency of the market in which a security trades.[1] In the Opening Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supported a finding that the common stock of Acadia Pharmaceuticals, Inc. ("Acadia" or the "Company") traded in an efficient market throughout the period from 9 September 2019 through 4 April 2021, inclusive (the "Class Period").[2] As part of the analysis, I demonstrated – through the use of an event study – that Acadia common stock reacted promptly to new, Company-specific information as that information entered the market.[3] Reacting promptly to new, material information is the hallmark of an efficient market.

2. Based on my analysis presented in the Opening Feinstein Report, I concluded that Acadia common stock traded in an efficient market throughout the Class Period.[4]

3. In the Opening Feinstein Report, I also explained that damages under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") for all Class members could be computed using a common methodology – namely, the out-of-pocket damages methodology – which is used in virtually all Section 10(b)

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Opening Feinstein Report.

[2] Opening Feinstein Report, ¶¶18-20.

[3] Opening Feinstein Report, ¶19.

[4] Opening Feinstein Report, ¶17. I further note that Defendants' expert, Dr. Rene Stulz, did not dispute my conclusions as to market efficiency. *See also City of Birmingham R&R Sys. v. Acadia Pharma., Inc.*, Class Certification Order, dated 11 March 2024 ("Class certification Order") at 14-15, ECF No. 140 ("rather than disputing whether Plaintiffs made the requisite showing to establish the fraud-on-the-market presumption of reliance, Defendants attempt[ed] to rebut the presumption [by showing a lack of price impact]").

class action securities cases.[5]

4. On 6 October 2023, I provided deposition testimony in response to a subpoena by Defendants. I answered Defendants' questions about market efficiency, the damages methodology, price impact, and other issues.[6]

5. Following the Opening Feinstein Report, I submitted a reply report dated 12 December 2023 (the "Feinstein Reply Report"; together with the Opening Feinstein Report, the "2023 Feinstein Reports"). The Feinstein Reply Report addressed the arguments in the Expert Report of Rene Stulz, Ph.D., dated 20 October 2023 (the "Stulz Report"), submitted by Defendants in this matter. The Stulz Report focused on whether the alleged misrepresentations and omissions were important valuation-relevant information that impacted Acadia's stock price during the Class Period.[7] Contrary to abundant evidence and analysis, Dr. Stulz opined that they were not. In the Feinstein Reply Report, I identified critical flaws and inappropriate assumptions in Dr. Stulz's analyses that rendered erroneous his conclusions about alleged lack of price impact and economic irrelevance.[8]

6. I maintain my prior opinion that Dr. Stulz's conclusions about price impact are erroneous. The evidence does not support his conclusion that the alleged misrepresentations and omissions had no impact on the price of Acadia stock. On the contrary, as presented herein, the evidence compels the conclusion that the alleged misrepresentations and omissions did impact the price of Acadia stock over the course of the entire Class Period.

7. I understand that, in its Class Certification Order dated 11 March 2024,

---

[5] Opening Feinstein Report, ¶¶21 and 160-171.

[6] *See generally* Transcript of Videotaped Deposition of Steven P. Feinstein, Ph.D., CFA, 6 October 2023.

[7] *See, e.g.,* Stulz Report, ¶13.

[8] Feinstein Reply Report, ¶¶10-20.

the Court in this matter rejected Dr. Stulz's conclusion and Defendants' argument that the alleged misrepresentations and omissions had no price impact. The Court over-ruled all of Defendants' objections and granted Plaintiffs' motion for class certification.[9]

8. Exhibit-1 hereto lists the documents and data I considered, in addition to those referenced in the 2023 Feinstein Reports, in preparing this report and arriving at the opinions expressed herein.

## II. QUALIFICATIONS

9. I am a tenured Associate Professor of Finance at Babson College. I am also the founder and president of Crowninshield Financial Research, Inc., a financial economics consulting firm.

10. I hold a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts degree in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst (CFA) designation, granted by the CFA Institute.

11. At Babson College, I have taught undergraduate and MBA-level courses in Capital Markets, Investments, Equity Analysis, Fixed Income Analysis, Financial Management, Risk Management, Quantitative Methods, and Security Valuation. I have also taught executive courses on investments and corporate financial management for numerous corporations. Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

12. I have held the Chair in Applied Investments at Babson College and have served as the Director of the Stephen D. Cutler Center for Investments and Finance, a research and education center dedicated to the study and teaching of investments and capital markets.

---

[9] Class Certification Order at 35.

13. Prior to joining the faculty at Babson College, I taught at Boston University. Preceding my academic posts, I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank's President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the U.S.

14. I have published in the field of finance including, in particular, articles on market efficiency and the computation of damages in securities cases. My finance articles have appeared in the *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *The Journal of Forensic Economics*, *Managerial Finance*, *Risk Management*, *Primus*, and *The Review of Quantitative Finance and Accounting*. I am the author of *Finance and Accounting for Project Management*, published by the American Management Association. I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management. An article I recently co-authored about computing damages in class action securities cases has been accepted for publication in the *University of Pennsylvania Journal of Business Law*.

15. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Boston Area Finance Symposium, the Multinational Finance Society, the Financial Management Association, the Taxpayers Against Fraud Education Fund Conference, and the International Conference on Applied Business Research, and at the National Association of Certified Valuators and Analysts (NACVA) Business Valuation and Financial Litigation Super Conference. Papers I co-authored have been presented at the annual meetings of the Eastern Finance Association and the Midwestern Finance Association. A list of all the publications I have authored in the past ten years can

be found in my curriculum vitae, which is attached as Exhibit-2.

16. I have been selected to review papers for numerous finance journals and conferences. Specifically, I frequently serve as a referee for *The Journal of Forensic Economics* and *Managerial Finance*. I have also reviewed finance textbook manuscripts for Prentice-Hall, Elsevier, Blackwell, and Southwestern Publishing. I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times*, *The Boston Globe*, and *Bloomberg News*. Further, my research relating to financial analysis and valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

17. I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the National Association of Forensic Economics, the CFA Institute, and the CFA Society Boston. I have served as a member of the CFA Society Boston education committee and ethics subcommittee. I have also served on the Fixed Income Specialization Examination Committee of the CFA Institute.

18. The CFA designation is the premier credential for financial analysts worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as economics, equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. In addition to holding the CFA designation, for over ten years I taught in the Boston University CFA Review Program and the CFA Society Boston Review Program – two of the leading review programs that prepared candidates for the CFA exams. In both of these programs I taught candidates at the most advanced level of the CFA curriculum.

19. In addition to my teaching, research, and academic community responsibilities, I practice extensively as a financial consultant. My clients are

primarily law firms that are prominent in securities litigation and have also previously included the U.S. Securities and Exchange Commission (SEC), the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers. As an expert in financial economics, over the past 25 years I have conducted analyses and presented opinions related to financial markets, valuation, and damages in more than 200 cases. Testimony I have provided since the submission of my Feinstein Reply Report is presented in Exhibit-3.

20. I am the sole owner of the consulting firm Crowninshield Financial Research, Inc., which receives compensation for the work performed by me and the staff who assist me. My firm is being compensated at a rate of $995 per hour for my work, and at a range of lower rates for analysts and other personnel who are assisting me on this case. My compensation is not contingent on my findings or on the outcome of this matter.

## III. SCOPE OF PROJECT AND REPORT

21. Scott + Scott Attorneys at Law LLP ("Plaintiffs' Counsel"), the Court-appointed Class Counsel for the certified Class and counsel for the Class Representatives in this action (the City of Birmingham Relief and Retirement System and the Ohio Carpenters' Pension Fund (together "Plaintiffs")), has now asked me to determine whether Class members suffered losses as a result of the false or misleading statements ("misrepresentations and omissions") alleged in the Amended Complaint. Plaintiffs' Counsel has also asked me to estimate the amount, if any, of per share damages under Section 10(b) suffered by Class members in connection with their purchases of Acadia common stock during the Class Period.

22. This report presents my methodology, findings, and conclusions relating to loss causation and to the quantification of per share damages.

23. My conclusions are based on the information presently available to me.

I have reviewed and relied upon the data and documents cited and listed in the 2023 Feinstein Reports, as well as additional data and documents that are listed in Exhibit-1 hereto. For my loss causation and damages analyses, I have assumed that Plaintiffs will be able to prove their factual allegations. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## IV. SUMMARY OF CONCLUSIONS AND OPINIONS

24. Based on the financial and econometric analysis presented in this report and in the Opening Feinstein Report, and based on the assumption that Plaintiffs will prove their factual allegations, I conclude that Defendants' alleged misrepresentations and omissions caused investors who had purchased Acadia common stock during the Class Period (the "Class members"[10]) to suffer losses on those purchases, including damages that are recoverable under Section 10(b). Those Class members suffered losses that they would not have suffered had the Company not made the alleged misrepresentations and omissions.

25. Based on the financial and econometric analysis presented in this report and in the Opening Feinstein Report, based on the assumption that Plaintiffs will prove their factual allegations, and based on certain analysis presented by another expert engaged in this case, I further conclude that for each Class member the damages caused by the alleged misrepresentations and omissions range up to $22.43 per share, depending on (a) the timing of when during the Class Period the respective Class member purchased Acadia shares, and (b) if and when that Class member subsequently sold those shares. This quantification measures losses that Class members would not have sustained but for the alleged misrepresentations and

[10] The Court has excluded the Defendants and certain of their related or affiliated persons or entities from the definition of the Class.

omissions.

26. Over the course of the Class Period, the Company intended to submit, and did submit, a supplemental New Drug Application ("sNDA") seeking to obtain approval from the United States Food and Drug Administration ("FDA") for its lead product, pimavanserin, to be marketed as a treatment for an expanded range of indications.[11] Prior to the Class Period, pimavanserin had been approved by the FDA to treat Parkinson's Disease Psychosis ("PDP") in persons with Parkinson's Disease. Thereafter, the Company conducted a Phase III study of pimavanserin in patients diagnosed with a variety of different types of dementia (the "Harmony Study") and, primarily on the basis of the results of this "pivotal" study, sought FDA approval to expand pimavanserin's approved indication to include psychosis in persons suffering from any type of dementia – *i.e.*, for an indication of Dementia-Related Psychosis ("DRP") generally.[12]

27. If approved, such expanded labeling for pimavanserin would dramatically increase Acadia's future revenue, profit, and cash flow. As such, the value of Acadia as a company, and in turn, the value of Acadia stock during the Class Period depended heavily on the market's assessment of whether and when the Company might receive the necessary approval from the FDA to market pimavanserin to treat DRP.

28. Plaintiffs allege that the alleged misrepresentations and omissions at

---

[11] I understand that each FDA-approved drug has an "indication" (or "indications") referenced on its label, which identifies the medical condition(s) that the drug is approved for as a treatment. A drug requires FDA approval as a treatment for a particular indication in order for manufacturers, such as Acadia, to be allowed to market the drug for that indication.

[12] I further understand that the FDA approved Acadia's original new drug application ("NDA") for pimavanserin to treat the PDP indication in 2016. In 2020, during the Class Period, Acadia's efforts to expand the FDA's approved usage beyond PDP patients led to its submission of an sNDA for pimavanserin as a treatment for DRP. Amended Complaint, ¶¶2-4.

issue misled analysts and investors as to the terms of the "agreement" or "understandings" that Acadia and the FDA had reached as to what was needed to obtain FDA approval for expanded pimavanserin labeling, the nature and extent to which the FDA had blessed the Harmony Study's trial design and, ultimately, the likelihood that the data from the Harmony Study (and from certain other "supportive" clinical studies that had already been completed) would be sufficient to obtain FDA approval of the drug as a treatment for DRP.[13]

29. I conclude that the alleged misrepresentations and omissions caused analysts and investors to substantially overestimate the probability of success ("PoS") that the FDA would approve pimavanserin for expanded labeling based on the results of the clinical trials (including the Harmony Study and the -019 Study) that had been completed as of the start of the Class Period. Thus, the alleged misrepresentations and omissions caused the market price of Acadia stock to be artificially inflated. That is, the market price of Acadia stock was greater during the Class Period than what it would have been if the Defendants had not made the alleged misrepresentations and omissions. But for the alleged misrepresentations and omissions, the market's assessment of the PoS that the FDA would approve an expanded label for pimavanserin to treat DRP patients (rather than only PDP patients) would have been lower over the course of the Class Period, and so too the price of Acadia stock would have been lower.

30. As detailed herein, the Defendants' statements on 9 September 2019, which allegedly contained misrepresentations and omissions, caused the market's average assessed PoS, as reflected in publicly reported analyst reports, to rise from 41% to 84%, and also caused the market price of Acadia common stock to rise.[14]

---

[13] *See, e.g.*, Class Certification Order, at 19-20, 22-27.

[14] As I discuss further below, and as presented in Appendix F, a review of relevant analyst reports indicates that the market's assessed PoS before the Class Period

Event study analysis presented herein finds that the Defendants' statements caused the price of Acadia stock to rise $15.40 per share on 9 September 2019, after excluding the impact of market and sector factors.[15] But not all of that increase was fraud-related artificial inflation initially. The nature of the news that day might reasonably have caused *some* increase in the market's assessment of the PoS and Acadia's stock price even without misrepresentations and omissions. I parsed out the portion of the stock price increase that would have occurred without misrepresentations and omissions based on the analysis and opinion of Dr. David Feigal, who concludes that the true PoS immediately after 9 September 2019 was 70%.[16] Considering how much of the change in the market's assessed PoS is attributable to the rise in the true PoS and how much is attributable to the false and misleading portions of the statements made by Defendants on that date, I have

---

related to the probability that Acadia would obtain FDA approval of pimavanserin as a treatment for DRP based on a combination of studies already concluded (notably, the -019 study) plus the results of the then-ongoing Harmony Study, and that this approval would come in time for the Company to begin marketing pimavanserin for DRP in 2021 or 2022 (or late 2020 according to one analyst). After Acadia made its 9 September 2019 announcements regarding the Harmony's Study's purportedly positive results (and that it had terminated that study early based on those results), analysts' PoS estimates reflected a consensus estimate that the drug would be approved in the nearer-term horizon (*i.e.* in 2020 or 2021) given that the Harmony Study had now been terminated and Acadia was apparently now positioned to file an actual sNDA to expand pimavanserin's indication to include DRP as soon as it had finished formally assembling all of the required paperwork). *See* ¶¶58-62 and Appendix-F.

[15] The increase in Acadia's stock price that day was $15.05 per share, but the event study regression analysis indicates that the market and sector factors had a combined negative $0.35 impact on the stock price that day. As such, the effect of the Company specific news, which allegedly contained misrepresentations and omissions, was to push up the price of Acadia stock by $15.40 per share. The stock price movement after statistically controlling for market and sector effects is called the "residual return." Accordingly, Acadia's residual return on 9 September 2019 was $15.40 per share.

[16] Expert Report of David W. Feigal, Jr. MD MPH, dated 13 February 2025 ("Feigal Report").

attributed only 32.56% of the total $15.40 stock price increase caused by the Defendants' 9 September 2019 statements to the allegedly false and misleading portions thereof, which acknowledges that 67.44% of the increase in the market's assessed PoS (and 67.44% of increase in the stock price) would have occurred anyway even if their statements had been free of misrepresentations and omissions. *See also* ¶¶270-73, 308 below.

31. While the market's average assessed PoS rose from 41% to 84% after the misleading 9 September 2019 announcements (an increase of 43 percentage points (84%-41%)), consistent with Dr. Feigal's opinion I assume that the ***true*** PoS that market participants *would* have assessed – *i.e.*, what they would have assessed "but for" the false and misleading aspects of Defendants' statements during the 9 September through 4 December 2019 period – would have been 70% (which would have been an increase of only 29 percentage points (70%-41%)). In other words, absent the false and misleading aspects of Defendants' statements during this time frame, the PoS would have increased from 41% before 9 September 2019 to 70% after that date, which is an increase of 29/43rds (or 67.44%) of the total PoS increase assessed by analysts – which means that the remaining 32.56% of the increase in the market's assessed PoS during this period was induced by the alleged misrepresentations and omissions. Based on the conclusion that 32.56% of the total 43 percentage point increase in the market's assessed average PoS on 9 September 2019 was due to the alleged misrepresentations and omissions, I conclude that 32.56% of the $15.40 stock price increase elicited by the Company's announcements on 9 September 2019 is similarly attributable to the alleged misrepresentations and omissions, with the rest attributable to truthful positive information in the Company's announcement.

32. In dollar terms, the dollar amount of the 9 September 2019 stock price increase attributable to the alleged misrepresentations and omissions is $5.01 per share, while $10.39 of the stock price increase is attributable to positive, truthful

information. The alleged misrepresentations and omissions on 9 September 2019 therefore artificially inflated the market price of Acadia stock by $5.01 per share, which was the level of artificial inflation in the stock price until Defendants made additional statements containing alleged misrepresentations and omissions on 4 December 2019.

33. After the close of trading on 4 December 2019, Acadia released certain subgroup efficacy data produced by the Harmony Study.[17] Plaintiffs contend that the Defendants not only had this (and other) subgroup efficacy data by no later than mid-November 2019 but, more importantly, further contend that Defendants also knew – but nowhere disclosed – that the Harmony Study's subgroup efficacy data was ***not*** sufficient to satisfy the terms of the "FDA Agreement" regarding what the Company needed to obtain FDA approval for the hoped-for expanded pimavanserin label. *See* ¶87 below.

34. The Company's announcements on 4 December 2019, which contained alleged misrepresentations and omissions, caused the price of Acadia stock to rise again, this time by $7.03 per share.[18] This increase occurred on 5 December 2019, the first trading day after Defendants' allegedly false and misleading 4 December 2019 announcements and data release. All of this residual stock price increase was artificial inflation, because the concealed truth was that the relevant subgroup efficacy data would not only be critical to the FDA's assessment of the Harmony Study's results under the "FDA Agreement", but that it conspicuously failed to meet the FDA's requirement that this data be directionally consistent across the

---

[17] "ACADIA Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12(th) Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Business Wire*, 4 December 2019 8:45 PM.

[18] The total stock price increase was $6.20 per share, and the residual stock price increase after controlling for market and sector effects was $7.03 per share.

subgroups. But for the alleged misrepresentations and omissions made that day and previously, the Defendants' statements and release of data on 4 December 2019 would have informed the market that no new optimism for FDA approval was warranted, and that the prior optimism elicited by the Company's 9 September 2019 announcement (and maintained by Defendants' subsequent statements over the next nine weeks) was also unjustified. In sum, absent Defendants' false and misleading statements, the market would have understood that the Harmony Study had failed to satisfy all of the criteria necessary under the "FDA Agreement" for obtaining approval to expand pimavanserin's label to include a broad DRP indication.

35. Had there been adequate corrective disclosure on 4 December 2019 rather than alleged misrepresentations and omissions, the stock price would not have had a positive $7.03 per share residual return, and in addition the entire $15.40 residual stock price increase elicited by Defendants' previous announcements on 9 September 2019 would have been reversed, such that the stock price would have had a $15.40 per share residual decline. Thus, by the close on 5 December 2019, the Acadia stock price was artificially inflated by $22.43 per share on account of the alleged misrepresentations and omissions ($7.03 + $15.40).

36. Another way to conceptualize the impact of the alleged misrepresentations and omissions on artificial inflation and the Acadia stock price is as follows. Had there been no misrepresentations and omissions at the start of the Class Period, the Acadia stock price would have risen only $10.39 per share on 9 September 2019, rather than rising $15.40 (both on a residual return basis). Thus, the initial misrepresentations and omissions artificially inflated the Acadia stock price by $5.01 per share (the $15.40 total residual stock price increase minus the $10.39 legitimate residual return that would have occurred even without alleged misrepresentations and omissions). Then, after only rising $10.39 per share on 9 September 2019, if the announcements made on 4 December 2019 included no misrepresentations and omissions on 4 December 2019, the news delivered that day

– instead of resulting in a $7.03 net residual positive increase – would have instead caused the Acadia stock price to fall at least $10.39 per share on 5 December 2019. This decline would in effect have reversed the $10.39 worth of price increase previously attributable to the ***non***-fraud related price increase observed on 9 September 2019, as the market would have realized that the earlier preliminary optimism was no longer justified.

37. Thus, relative to the path the Acadia stock price actually took on account of the alleged misrepresentations and omissions, if there had been no misrepresentations and omissions the Acadia stock price would have been (a) lower by $5.01 between 9 September 2019 and 4 December 2019, and (b) lower by at least $22.43 per share after 4 December 2019. This $22.43 figure is equal to $5.01 (the lesser stock price increase on 9 September 2019) + $7.03 (the 5 December 2019 stock price increase that would not have happened) + $10.39 (the stock price decline that would have occurred on 5 December 2019).

38. This $22.43 per share of artificial inflation remained in the Acadia stock price from 5 December 2019 until near the end of the Class Period when corrective events informed the market of the concealed truth and/or its consequences, and thus caused the dissipation of the artificial inflation.

39. Of note, my estimate that the artificial inflation induced and maintained by the alleged misrepresentations and omissions amounted to $22.43 per share is based on the econometric analysis that proves that the Defendants' statements containing alleged misrepresentations and omissions caused the Acadia stock price to rise $22.43 per share ($15.40 on 9 September 2019, all of which ultimately proved to be unwarranted, plus $7.03 on 5 December 2019). This is a conservative estimate of artificial inflation because reasonably full and non-misleading disclosure from the start of the Class Period forward would not only have prevented the stock price from rising $22.43 per share, but would have caused the stock price to decline, as any substantial hope for a near-term FDA approval based on completed studies would

have been all but dashed by at latest, 4 December 2019. Therefore, $22.43 is a conservative quantification of the artificial inflation and per share damages caused by the alleged misrepresentations and omissions.

40. After the close of trading on 8 March 2021, Acadia issued a press release announcing that it had received a deficiency letter (the "Deficiency Letter" or "DL") on March 3rd from the FDA advising that "the FDA has identified [unspecified] deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time."[19] This development partially corrected the allegedly false and misleading information introduced into the marketplace by Defendants' alleged misrepresentations and omissions. Event study analysis, which includes consideration of potentially confounding information, attributes $19.69 of the per share decline in the Acadia stock price on 9 March 2021 to the corrective announcement made after the close on 8 March 2021. The 8 March 2021 disclosure provided information that partially corrected the substance of the alleged misrepresentations and omissions, and reduced the market's assessed PoS by an amount that was entirely due to the alleged misrepresentations and omissions. Therefore, all of this $19.69 per share residual stock price decline on 9 March 2021 is loss that was caused by the alleged misrepresentations and omissions.

41. Had it not been for the alleged misrepresentations and omissions, the news of 8 March 2021 (after the close of trading) that Acadia had received the Deficiency Letter would not have been a surprise to the market. Rather, the FDA's issuance of a deficiency letter would have been expected. Had it received reasonably full, honest, and timely disclosure rather than being misled by Defendants' alleged

---

[19] "Press Release: Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Dow Jones Institutional News*, 8 March 2021; *see also* "ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, conference call, 8 March 2021.

misrepresentations and omissions prior to 9 March 2021, the market would have priced Acadia stock at least $19.69 lower. Because the market price would have already reflected the truth and the inextricably related consequences that were revealed on 8 March 2021, the price of Acadia stock would not have fallen $19.69 on 9 March 2021, as the stock price would have already been lower by at least this amount. This analysis confirms that the $19.69 per share stock price decline elicited by the 8 March 2021 disclosures is entirely loss that was caused by the alleged misrepresentations and omissions.

42. While the 8 March 2021 disclosure of Acadia's receipt of the DL dramatically lowered the market's assessment of the PoS for FDA approval, the market still did not know the nature or extent of the FDA's concerns with the Harmony Study results. Therefore, the 8 March 2021 announcement was only a partially corrective disclosure, not a fully corrective disclosure, and the market's assessed PoS after the 8 March 2021 partial corrective disclosure remained elevated relative to the level it had been at prior to Defendants' alleged misrepresentations and omissions. This state of affairs persisted until the Company announced on 5 April 2021, before the market opened, that it had received a "Complete Response Letter" (or "CRL") from the FDA.

43. The announcement that the Company had received the CRL, which effectively amounted to a rejection by the FDA of the submitted pimavanserin sNDA, was a further adverse development for the Company, and it was a corrective disclosure. The 5 April 2021 press release and conference call commentary by Defendants confirmed analysts' fears that the FDA had ***not*** been persuaded that the contents of the sNDA (and notably the Harmony Study results) were sufficient to support approval of the sNDA, contrary to the market's induced belief engendered by the Defendants' prior alleged misrepresentations and omissions. The 5 April 2021 disclosure eliminated the vestiges of the market's optimism that the FDA might approve the submitted sNDA based on the completed clinical trials – optimism that

had previously been fueled by the alleged misrepresentations and omissions. As such, most of the stock price decline on 5 April 2021 elicited by the disclosures earlier that day regarding the FDA's issuance of a CRL represented the dissipation of artificial inflation in the Acadia stock price that had been introduced and maintained during the Class Period by the alleged misrepresentations and omissions.

44. As detailed below, the disclosures of 5 April 2021 caused the market's average assessment of the PoS to fall to 37%. This 37% is near but below the level that the market assessed PoS to be prior to the start of the Class Period, just before the initial alleged misrepresentations and omissions. As analysts made clear following the news of the CRL, they now understood that the submitted sNDA was almost certainly not going to be approved. PoS estimates that analysts subsequently published referred to the probability that pimavanserin might *ever* be approved for expanded labeling, rather than approved in the near term based on completed studies. By contrast, the inflated PoS assessments that analysts published just after the commencement of the Class Period on 9 September 2019 more closely represented the market's assessed probability of near term FDA approval based on then-completed studies (including the purportedly favorable results of the Harmony Study).

45. After the 5 April 2021 corrective event, the market understood that obtaining FDA approval to expand pimavanserin's label to include DRP as an approved indication was not only far from assured, but that trying to obtain an expanded indication would now almost certainly be more expensive and time consuming than previously thought, as it would likely require the collection of additional data from new clinical studies and, even if the new data were positive, a new sNDA submission. This is the outlook that would have been prevalent if the alleged concealed truth had been revealed on 4 December 2019.

46. Event study analysis, which included consideration of potential confounding information, finds that the (pre-market) 5 April 2021 disclosures

concerning the issuance of a CRL caused the price of Acadia stock to fall $4.51 per share. The remaining inflation in the stock price after the 8 March 2021 disclosures was $2.74 per share (equal to the conservatively estimated $22.43 of artificial inflation in the Acadia stock price immediately prior to the 8 March 2021 corrective disclosures, minus the $19.69 of artificial inflation dissipated by the 8 March 2021 corrective disclosures). Therefore, of the $4.51 per share residual decline on 5 April 2021, $2.74 per share represents the dissipation of artificial inflation caused by the alleged misrepresentations and omissions, while the additional $1.77 per share decline that day ($4.51 – $2.74 = $1.77), was due to the elimination of optimism that may be attributable to factors and considerations other than the alleged misrepresentations and omissions.

47. In sum, based on the analysis presented herein, it is my opinion that the alleged misrepresentations and omissions caused the market price of Acadia stock to be artificially inflated by $22.43 per share during the Class Period, of which (a) $5.01 was introduced on 9 September 2019, and (b) $17.42 was introduced after the close on 4 December 2019. The $17.42 introduced after the close on 4 December 2019 consisted of (i) the entire $7.03 per share residual stock price increase that occurred on 5 December 2019, plus (ii) the additional $10.39 portion of the 9 September 2019 residual stock price rise that may have occurred that day even without misrepresentations and omissions, but would ultimately have been revealed to be unjustified had there been full and truthful disclosure (especially as to the "FDA Agreement" and the significance of the Harmony Study's subgroup results) on 4 December 2019.

48. The Company's announcements on 8 March 2021 and 5 April 2021 were corrective events[20] that dissipated the $22.43 per share artificial inflation in

[20] I understand that the Court has described the events of 8 March 2021 and 5 April 2021, as either "corrective disclosures" and/or "materialization of risk," using the

Acadia's stock price that was caused by the alleged misrepresentations and omissions. The DL-related disclosures dissipated $19.69 of this per share artificial inflation, and the CRL-related disclosures dissipated the remaining $2.74 of per share artificial inflation.

49. It follows that on account of the alleged misrepresentations and omissions, Class members who purchased Acadia shares during the Class Period suffered damages of between $0 and $22.43 per share, depending on the timing of their stock purchases and any sales. The damages sustained by each respective investor depends on when the investor purchased and sold (if they sold) their shares of Acadia stock. The chart below shows the various changes in the Acadia stock price over the course of the Class Period on various dates. As discussed above and further detailed below, the observed Acadia stock price increases and decreases on particular dates do not necessarily equate to amounts reflecting increases or decreases in inflation on particular dates, but it does illustrate how, at the end of the Class Period, the price of Acadia stock – after being artificially inflated during the early months of the Class Period – basically returned to its pre-Class Period level after the earlier inflation had been fully dissipated by disclosure events that occurred in the last month of the Class Period.

---

applicable legal frameworks for such concepts. *See also City of Birmingham R&R Sys. v. Acadia Pharma., Inc.,* 3/11/24 Class Certification Order at 22-23, 30-31, ECF No. 140; 9/27/22 Motion to Dismiss Order, at 26, ECF No. 65. Such a distinction does not impact my economic analysis. As I understand it, the legal concepts of "corrective disclosure" and "materialization of risk," both involve the introduction of new information into the marketplace that has the effect of dissipating (in whole or in part) inflation in a stock's price. For convenience, throughout this report I may use the phrase "corrective event" and "corrective disclosure" interchangeably to describe occurrences – like the disclosures on 8 March 2021 and 5 April 2021 – where the market received new news that dissipated artificial inflation.




## V. FACTUAL BACKGROUND

### A. About the Company

50. Prior to and throughout the Class Period, Acadia was a California-based biopharmaceutical company that focused on the development and commercialization of drug treatments for illnesses affecting the central nervous system.[21] Throughout the Class Period, Acadia's only commercialized product was pimavanserin (sold under the brand name Nuplazid), which the FDA had approved in April 2016 to treat delusions and hallucinations associated with PDP.[22] The FDA's

[21] Acadia Form 10-K for fiscal year ended 31 December 2020, filed 25 February 2021, p. 1.

[22] Acadia Form 10-K for fiscal year ended 31 December 2019, filed 27 February 2020, p. 51; Acadia Form 10-K for fiscal year ended 31 December 2020, filed 25

limited approval of pimavanserin was based primarily on the strength of the results of a Phase III study that Acadia had commenced in 2011 to "evaluate … the efficacy, tolerability and safety" of pimavanserin to treat PDP.[23]

51. During the Class Period, pimavanserin was at all times approved to treat only PDP. However, since well before the start of the Class Period, Acadia had also been exploring the use of pimavanserin as a treatment for DRP generally (rather than for only DRP in PDP patients).[24] In addition, prior to and during the Class Period, Acadia was also exploring the use of the drug as a possible treatment for major depressive disorder ("MDD") and negative symptoms of schizophrenia.[25] According to the Company, however, DRP represented one of pimavanserin's (and Acadia's) "most important opportunities for further development."[26]

52. Prior to and throughout the Class Period, Acadia had not generated a profit, *i.e.*, it had not produced any positive net income. Instead, for the fiscal years 2019, 2020, and 2021, Acadia reported net losses of $235.3 million, $281.6 million, and $167.9 million, respectively, on revenues of $339.1 million, $441.8 million, and $484.1 million, respectively.[27] During these years, Acadia derived substantially all

---

February 2021, p. 61; and Acadia Form 10-K for fiscal year ended 31 December 2021, filed 1 March 2022, pp. 60-61.

[23] Class Certification Order at 3.

[24] Acadia Form 10-K for fiscal year ended 31 December 2020, filed 25 February 2021, pp. 1-2.

[25] Acadia Form 10-K for fiscal year ended 31 December 2019, filed 27 February 2020, pp. 2-3.

[26] Acadia Form 10-K for fiscal year ended 31 December 2019, filed 27 February 2020, p. 2; and Acadia Form 10-K for fiscal year ended 31 December 2020, filed 25 February 2021, p. 2.

[27] Acadia Form 10-K for fiscal year ended 31 December 2021, filed 1 March 2022, F-4 and F-5.

of this revenue from its sales of pimavanserin to treat PDP.[28]

**B. About Acadia Stock**

53. Acadia stock has traded on the Nasdaq since 27 May 2004 under the ticker symbol "ACAD."[29]

54. On the first day of the Class Period, 9 September 2019, the price of Acadia stock rose $15.05 per share, from its previous closing price of $23.80 per share to a new closing price of $38.85 per share.[30] This rise was equal to a one-day increase of 63.2%. Acadia's stock price thereafter peaked during the Class Period at $57.00 on 7 July 2020.

55. By the close of trading on 5 April 2021, the first trading day after the end of the Class Period, the Company's stock was priced at $21.18 per share in the market. From its Class Period high of $57.00 (reached on 7 July 2020), Acadia's stock price declined $35.82 per share, or 62.8%. A table setting forth Acadia's stock prices during the Class Period is presented at Exhibit-4.

56. Acadia's market capitalization, *i.e.*, the aggregate value of all its outstanding shares, was $5.61 billion at the start of the Class Period. Shortly after the start of the Class Period, on 20 September 2019, Acadia completed a secondary equity offering, raising $287.5 million from this offering of additional common shares.[31] The Company's market capitalization reached its Class Period peak on 1

---

[28] Acadia Form 10-K for the fiscal year ended 31 December 2020, filed 25 February 2021, p. 28.

[29] Acadia Form 10-K for fiscal year ended 31 December 2019, filed 27 February 2020, p. 48; Acadia Form 10-K for fiscal year ended 31 December 2020, filed 25 February 2021, p. 57; and Acadia Form 10-K for fiscal year ended 31 December 2021, filed 1 March 2022, p. 58.

[30] All stock price information referenced in this report and used in my analysis, unless otherwise stated, is taken from CRSP. CRSP is a reliable data source that is widely used by academic researchers and investment professionals.

[31] Acadia Form 8-K, filed 18 September 2019; and "ACADIA Pharmaceuticals

December 2020, when the aggregate market value of its outstanding stock hit $9.03 billion. By the close of trading on 5 April 2021, the first trading day after the end of the Class Period, the Company's market capitalization had fallen by $5.64 billion, from $9.03 billion to $3.39 billion, representing a 62.4% decline from its Class Period peak.[32]

57. From the first day of the Class Period (9 September 2019) when the stock price was artificially inflated, to the day of the final corrective event (5 April 2021) that dissipated the inflation, the decrease in market capitalization was $2.22 billion ($5.61 billion minus $3.39 billion), or 39.6%, even though the Company had added $287.5 million of equity in the secondary capital raise on 20 September 2019. Adding the raised $287.5 million to the initial market capitalization ($5.61 billion + $0.2875 billion = $5.90 billion), the decrease in market capitalization from the starting value plus the raised amount ($5.90 billion) to the final market capitalization ($3.39 billion) was $2.51 billion, or 42.5%.

### C. Probability of Success for Expanded Pimavanserin Labeling

58. From even before the start of the Class Period, the prospect of obtaining an expanded label for pimavanserin to treat the broad indication of DRP (beyond its existing label as a treatment for only the narrow PDP indication, which was a subset of the proposed DRP indication) represented an opportunity to substantially increase Acadia's future revenue stream. As a result – and in particular after Acadia announced its plans to conduct a Phase III study and to file an sNDA for an expanded DRP indication for pimavanserin – Acadia's valuation and the price of its stock depended, to a large extent, on the market's assessment of the probability that the

---

Announces Closing of Public Offering of Common Stock and Full Exercise of Underwriters' Option to Purchase Additional Shares," *Business Wire*, 20 September 2019.

[32] Apparent slight mathematical discrepancy due to rounding.

Company's efforts to obtain the sought-after expanded label from the FDA would succeed. The market's assessment of this PoS depended largely on the market's assessment of how the FDA would evaluate the Harmony Study's trial design, and the extent to which the study's actual results – in the context of the understandings that Acadia had (or had not) reached with the FDA (the "FDA Agreement") – satisfied the relevant FDA approval criteria.

59. Before, during, and after the Class Period, most analysts provided PoS estimates in their published reports concerning the FDA's approval of the sought-after DRP label.

60. Based on how analysts described their respective PoS estimates and how they used those estimates in their valuations of Acadia stock, one can infer that the PoS assessments published by analysts immediately prior to start of the Class Period related to the probability that Acadia would obtain FDA approval of pimavanserin as a treatment for DRP based on a combination of studies already concluded (notably, the -019 study) plus the results of the then-ongoing Harmony Study, and that this approval would come in time for the Company to begin marketing pimavanserin for DRP in 2021 or 2022 (or late 2020 according to one analyst). At that juncture, prior to 9 September 2019, there was no assurance that the "pivotal" Harmony Study would be stopped early – let alone that the Harmony Study would even generate sufficiently positive results to meet all FDA approval requirements and obviate the need for additional, protracted clinical trial testing.

61. After Defendants' 9 September 2019 announcement that the Harmony Study was stopping early, however, analysts became significantly more optimistic both that pimavanserin would be approved for the sought-after DRP indication ***and*** that such approval (now that the Harmony Study had been ended) would occur in 2020 or 2021.[33] Accordingly, from the start of the Class Period on 9 September 2019

---

[33] For example, in their first post-9 September 2019 reports, the following analysts

until the corrective events near and at the end of the Class Period, a review of analyst reports indicates that analysts' PoS estimates generally reflected analysts' assessments that pimavanserin was on track to obtain FDA approval on this more near-term timetable, based on the data from the now completed clinical trials.

62. Finally, after the market learned of the issuance of the DL and continuing after the end of the Class Period and into the aftermath of the 5 April 2021 disclosures, the meaning of analysts' assessed PoS changed again to reflect their assessment of the probability that Acadia would *eventually* succeed in obtaining FDA approval of pimavanserin as a treatment for DRP at some point in the future after more clinical trial data was obtained. This change in the meaning of assessed PoS was due to the fact that news of a DL and CRL eliminated the market's prior optimism (elicited beginning with the 9 September 2019 statements) that already completed clinical trials had generated enough favorable data to support approval of the contemplated sNDA (and approval of the actual sNDA that was filed with the FDA in the spring of 2021). These corrective events informed analysts that obtaining any expanded labeling indication for pimavanserin would likely require positive results from new clinical trials – trials that could take years to design, organize and complete (and would have no assurance of success).

63. I analyzed all analyst reports that I was able to obtain, including all analyst reports provided to me by Plaintiffs' Counsel (which I understand were all of the analyst reports that were produced in the course of this litigation) that covered Acadia. I reviewed each analyst's PoS assessment over time and computed the average of analysts' PoS assessments immediately prior to and immediately

---

provided the following estimates as to the expected approval date for the contemplated pimavanserin sNDA: BofA, 2021; Canaccord Genuity, 2021; Goldman Sachs, 2021; J.P. Morgan, late 2020/early 2021; JMP Securities, 2020 ("providing a clear path to label expansion in 2020"); PiperJaffray, 2020; SVB Leerink, 2020; TD Cowen, 2021; Stifel, "setting up DRP as a major 2020 event"; Raymond James, "expect approval by YE20".

following key dates during the Class Period. Appendices A through E present these average market PoS assessments.[34]

64. Prior to the first alleged misrepresentation at the start of the Class Period, the average of analysts' PoS estimates was 41%. After the first day of the Class Period, following Defendants' first set of alleged misrepresentations and omissions, the average of analysts' PoS estimates more than doubled, as it promptly rose to 84% and then trended upward to 85% just prior to 4 December 2019. On 4 December 2019, the Company released certain information concerning the Harmony Study's subgroup results, and made additional alleged misrepresentations and omissions. Following the 4 December 2019 announcements, the average assessed PoS rose to 86% and thereafter remained in a range of 86% to 88% until 8 March 2021, the date when the Company announced that it had received the DL. At that point, the average analyst PoS estimate fell to 68%. Following Acadia's disclosure on 5 April 2021, when the Company announced it had received the CRL, the average assessed PoS declined again to 37%. This 37% is near but below the level that the market assessed PoS to be just prior to the start of the Class Period, before the initial alleged misrepresentations and omissions.

65. As noted above, the 37% average PoS assessment after the end of the Class Period no longer reflected an assessment of the probability that the submitted sNDA would be approved. Indeed, most analysts made clear after the CRL disclosure that they now believed that the sNDA would almost certainly not be approved, even though Acadia's public statements tried to hold out hope that the Company had an outside chance of getting the FDA to change its mind. Accordingly,

---

[34] For each analyst, I used the PoS estimate that was provided closest in time prior to, and then closest in time after, the announcements on the following respective dates: 9 September 2019, 4 December 2019, 20 July 2020, 8 March 2021, and 5 April 2021. As presented in Appendices A through E some analysts' pre-event PoS assessments were obtained from post-event published analyst reports wherein the analyst explicitly stated the change in their PoS assessment.

the post-Class-Period 37% average PoS estimate reflected the market's assessment of the probability that pimavanserin might eventually be approved for expanded DRP labeling at some later date, which was now likely to be at least several years in the future (as it now appeared likely that Acadia would need roughly three years to conduct the additional studies to at least try, albeit with no assurance of success, to generate the additional data that FDA required for approval).

## D. Timeline of Events

66. A review of the events discussed below provides additional background and context for understanding Plaintiffs' allegations and the developments that occurred leading up to and during the Class Period. Included are descriptions of some of Defendants' alleged false and misleading statements and material omissions, as well as media and analyst commentary in response to the statements and other Acadia-related matters.

### 1. Pre-Class Period Events

#### *a) Acadia Begins Phase III Studies of, and Receives FDA Approval for, Pimavanserin as a Treatment for PDP*

67. In 2011, Acadia commenced a randomized placebo-controlled Phase III study of pimavanserin as a treatment for the indication of PDP. That study, (the "-020 Study") evaluated the efficacy, tolerability, and safety of pimavanserin in patients diagnosed with PDP.[35]

68. In April 2016, the FDA approved Acadia's NDA for pimavanserin as a treatment for delusions and hallucinations associated with PDP. The approval was based primarily on the efficacy results from the -020 Study and the overall safety profile of the drug.[36]

---

[35] Class Certification Order at 3; 15 May 2017 FDA EOP2 Meeting Minutes, ACAD_SECLIT 0000997-0000998.

[36] Memorandum and Opinion at 5; 15 May 2017 FDA EOP2 Meeting Minutes, ACAD_SECLIT 0000997-0000998.

*b) Acadia Initiates its Phase II -019 Study of Pimavanserin as a Treatment for Alzheimer's Disease Psychosis*

69. On 14 November 2013, the Company announced the initiation of a Phase II clinical trial of pimavanserin as a treatment for Alzheimer's Disease Psychosis ("ADP").[37] The trial, known as the "-019 Study," was a "randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of pimavanserin in about 200 patients with ADP."[38]

*c) Acadia Provides Additional Details of the -019 Study*

70. On 7 November 2016, Acadia provided additional details of the -019 Study to analysts during the Company's quarterly earnings conference call.[39] Defendant Srdjan Stankovic, Acadia's President and Head of Research and Development, explained that the -019 Study was being conducted at a single location near London, England within a large network of nursing homes.[40] Defendant Stankovic also noted that 181 patients were enrolled in the -019 Study, and described it as "an exploratory, Phase II, 12-week, randomized, double-blind, placebo-controlled study designed to examine the efficacy and safety of 34-milligram dose of pimavanserin compared to placebo in patients with AD psychosis."[41]

---

[37] "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 14 November 2013 9:00 AM.

[38] "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 14 November 2013 9:00 AM.

[39] "Q3 2016 ACADIA Pharmaceuticals Inc Earnings Call," *Refinitiv*, 7 November 2016, p. 7.

[40] "Q3 2016 ACADIA Pharmaceuticals Inc Earnings Call," *Refinitiv*, 7 November 2016, p. 7.

[41] "Q3 2016 ACADIA Pharmaceuticals Inc Earnings Call," *Refinitiv*, 7 November 2016, p. 7.

*d) Acadia Announces -019 Study Results*

71. On 20 December 2016, Acadia announced positive top-line results of the -019 Study in a press release titled, "ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis."[42] The press release stated in part:

> "ACADIA Pharmaceuticals Inc. (NASDAQ: ACAD) today announced positive top-line results from its Phase II exploratory study (-019 Study) of pimavanserin in patients with Alzheimer's disease psychosis (AD Psychosis). As a selective serotonin inverse agonist (SSIA) preferentially targeting 5-HT(2A) receptors, pimavanserin has a different biological mechanism than other marketed antipsychotics. Pimavanserin has been approved by the United States Food and Drug Administration (FDA) for hallucinations and delusions associated with Parkinson's disease psychosis and currently is being studied in several other disease states, including AD Psychosis. The FDA has not approved any drug to treat AD Psychosis. In this Phase II exploratory study, pimavanserin met the primary endpoint showing a statistically significant reduction in psychosis versus placebo as measured by the Neuropsychiatric Inventory-Nursing Home (NPI-NH) Psychosis score at week 6 of dosing (p=0.0451). Pimavanserin was generally well tolerated and the safety profile was consistent with what has been observed in previous studies. 'Alzheimer's disease patients suffer from a number of debilitating symptoms, of which psychosis carries a poor prognosis and is associated with earlier placement into nursing homes,' said Steve Davis, ACADIA's President and Chief Executive Officer. 'Data from the -019 Study provide solid evidence that pimavanserin can improve psychosis in another major neurological disorder and provide strategic momentum for the further development of pimavanserin to address the needs of AD Psychosis patients.'"
>
> - **"ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 20 December 2016 7:00 AM.**

---

[42] "ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 20 December 2016 7:00 AM.

*e) Acadia Meets with FDA Following -019 Study Completion*

72. On 15 May 2017, after further reviewing the -019 Study results, Acadia participated in an "End-of-Phase II" (or "EOP2") meeting with the FDA to obtain the FDA's feedback on Acadia's proposed Phase III study, then known as ACP-103-045, which would later become better known as the Harmony Study.[43] According to the meeting's minutes, which I understand were not made publicly available until after they were produced to Plaintiffs in the course of discovery in this matter, the meeting addressed Acadia's proposed design for the Harmony Study, the nature and quality of the data that the FDA would require to approve an sNDA for pimavanserin as a treatment for the proposed DRP indication, and other matters relating to the contents of Acadia's contemplated pimavanserin sNDA.[44] At the EOP2 meeting, Acadia also expressed its intention to submit a request for Breakthrough Therapy Designation ("BTD") with respect to pimavanserin to expedite the FDA's review of the contemplated sNDA.[45]

73. In addition, at the EOP2 meeting, there was discussion regarding the proposed patient population to be included in the Harmony Study.[46] That discussion included Acadia's request to include PDP patients in the Harmony Study's patient population – even though pimavanserin had already been proven effective for the treatment of PDP.[47] The primary rationale for including PDP patients in the Harmony Study was to collect certain additional safety data regarding

---

[43] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0000995-1012.

[44] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0000995-1012.

[45] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001003.

[46] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001002.

[47] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0000997, 0001004.

pimavanserin's adverse effects (if any) on PDP patients.[48] In connection with the FDA's 2016 approval of the original pimavanserin NDA, the FDA required Acadia to provide such additional safety data as part of its "post-marketing commitments" ("PMC").[49] At the May 2017 EOP2 meeting, Acadia sought confirmation that Harmony could perform the dual purpose of serving both as the pivotal Phase III study on which to base its planned sNDA for DRP generally *and* as a study that would be sufficient to meet Acadia's PMC commitment to FDA to obtain additional safety data on the drug's use in PDP patients.[50]

74. The minutes from the May 2017 EOP2 meeting stated that the FDA was "concerned" with the Harmony Study's design, but was amenable to its proposed study population "as long as subjects are stratified by their current clinical diagnosis."[51] Further, the FDA advised that any expanded labeling for pimavanserin would "reflect the actual composition and response of patients, enrolled in the study."[52] The minutes from the May 2017 EOP2 meeting included the following questions from Acadia to the FDA, and the FDA's responses:

> "Question 2: The proposed ACP-103-045 study is a randomized, double-blind, placebo-controlled, relapse prevention study to evaluate the efficacy and safety of pimavanserin in subjects with hallucinations and delusions in dementia-related psychosis associated with neurodegenerative disorders, and is intended to be the basis of an sNDA for the proposed [DRP] indication.
>
> a) Does the Agency agree with the proposed overall study design?

---

[48] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001004; *See also* Turner Dep. 69:3-8; Owen Dep. 186-188.

[49] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001002, 0001004, 0001010.

[50] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_ SECLIT_0001000-02.

[51] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_ SECLIT_0001000.

[52] FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_ SECLIT_0001000.

b) Does the Agency agree with the proposed study population to be included in the study?

c) Does the Agency agree with the timing and selection of study endpoints?

<u>FDA Response to Question 2a</u>: **We have concerns with the proposal to use a randomized withdrawal trial to establish efficacy**. As an alternative, we suggest combining the proposed study with the post marketing commitment (PMC) for a safety study in frail, elderly subjects. Subjects with dementia-related psychosis could be randomized to placebo or pimavanserin and counted towards the number required for the PMC safety study in the elderly. Responders could then be entered into a randomized withdrawal paradigm as proposed for study -045.

<u>FDA Response to Question 2b</u>: Yes, we agree with the proposed study population **as long as subjects are stratified by their current clinical diagnosis (as proposed). Labeling will reflect the actual composition and response of patients enrolled in the study**.

<u>FDA Response to Question 2c</u>: See our answer to Question 2a. In general, we agree with the timing and endpoints of the study. However, we believe capturing certain relapse criteria could potentially be difficult. For example, how will you ensure discontinuation due to inefficacy is distinguished from discontinuation due to adverse events? How will you assess a subject who is admitted to the hospital for a medical reason and receives an antipsychotic there for agitation or 'sun downing' without a clear record of whether psychosis worsened or not? We would like to review the planned case report form (CRF) for determining relapse to ensure that events are appropriately captured.

…

<u>Discussion for Question 2a</u>: **The Division began by explaining our concerns in basing a regulatory decision on a single, randomized withdrawal study. We are concerned with establishing which patients might respond and characterizing the non-responders. We also pointed out that one of the strongest factors supporting approval of pimavanserin for treatment of hallucinations and delusions in Parkinson's disease was the number of complete responders compared to placebo - this data would not be obtained with a randomized withdrawal study.** Finally, we asked how the data would be presented in the label to support clinical decision making.

> …
>
> Question 3: It is ACADIA's position that in the context of the overall existing and planned safety database for pimavanserin that the single well-controlled Phase 3 study in the proposed patient population would be sufficient for a sNDA filing in the proposed indication. Additionally, the safety database would include the data contained in the approved NUPLAZID® NDA, safety exposures from the completed Phase 2 study in Alzheimer's disease psychosis, as well as additional ongoing and planned pimavanserin studies. **Does the Agency agree?**
>
> FDA Response to Question 3: **If you wish to rely on a single well-controlled study for your sNDA filing**, **the findings must be very persuasive. This means statistically significant with a very small probability of Type I error and a finding that is clinically meaningful**. We agree that the total exposures from pimavanserin's development programs would provide a sufficient safety database once the safety-related PMC studies from the psychosis in Parkinson's disease approval are completed."
>
> ■ **FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001000-02 (emphasis added).**

*f) Acadia Tells the Public About Its May 2017 End-of-Phase II Meeting with the FDA*

75. On 8 August 2017, during its quarterly conference call with investors, Acadia announced that it had met with the FDA for an EOP2 meeting. Defendant Stankovic described the meeting as follows:

> "[W]e've now … met with the FDA, presented our Phase II data and presented our proposal for the Phase III program. And I'm happy to say that they aligned very closely with our proposal, that is[,] essentially the proposal we put in front of them was accepted. And we are quite encouraged with that. Also, I would say that [this] brought us closer to the initiation of the program because we started many activities at risk prior to the FDA meetings, **so their acceptance of our proposal enabled us to really initiate this program earlier than ordinarily would be the case.**"
>
> ■ **"Q2 2017 ACADIA Pharmaceuticals Inc Earnings Call,"** ***Thomson Reuters*****, 8 August 2017, p. 8 (emphasis added).**

*g) Acadia Announces Initiation of the Harmony Study and Receipt of Breakthrough Therapy Designation*

76. On 4 October 2017, the Company issued a press release titled "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis."[53] In the press release, the Company stated:

> "Harmony is a Phase III, randomized, double-blind, placebo-controlled study, evaluating the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis. The objective of the study is to evaluate the ability of pimavanserin to prevent relapse of psychotic symptoms in a broad population of patients with the most common subtypes of dementia: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia and frontotemporal dementia. The study will be conducted globally and is expected to enroll approximately 360 patients."
>
> - **"ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," *Business Wire*, 4 October 2017 4:05 PM.**

77. The Company further stated that it also intended to use data from the previously completed -019 Study and -020 Study, along with Harmony Study results, to support an sNDA for pimavanserin to treat DRP.[54] In addition, the Company announced that the FDA had granted BTD status to pimavanserin as a potential treatment for DRP generally.[55]

---

[53] "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," *Business Wire*, 4 October 2017 4:05 PM.

[54] "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," *Business Wire*, 4 October 2017 4:05 PM.

[55] "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," *Business Wire,* 4 October 2017 4:05 PM. The BTD is "designed to expedite the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)." *See* "Breakthrough Therapy," *U.S. Food & Drug Administration*, updated 4 January 2018, accessed through

78. The same day, Defendants held a conference call with analysts and investors. On the 4 October 2017 conference call, Defendants made further representations about its May 2017 EOP2 meeting with the FDA. For example, Acadia CEO Stephen Davis ("Defendant Davis") stated as follows:

> "The DRP indication of the HARMONY study design are results of the end-of-phase II meeting we held with the FDA around midyear. We went into the end of Phase II meeting with a plan we felt would provide the best results for patients, that is a plan which would enable us to reach the broadest number of patients as soon as possible, **and we came out of that meeting with exactly the plan we went in with.** We presented the case to FDA that's based on the following considerations: **One, that dementia is an overarching disorder with various subtypes;** two, while there are different subtypes of dementia with differing underlying etiologies, dementia-related psychosis is very similar between subtypes in that psychosis is clinically managed in the same way irrespective of subtype; and three, supported efficacy of pimavanserin in DRP has been shown in our acute study -019 in subjects with Alzheimer's disease psychosis as well is in our study -020, an acute 6-week study in patients with PD psychosis. Against this backdrop, we propose to study pimavanserin in a single DRP study with key subtypes represented. Having established supportive evidence of efficacy in acute studies -019 and -020, we also propose[d] that the DRP study be designed as a relapse prevention study. Serge [Stankovic] will go into some of the important benefits of this study design in a few minutes. As I've stated, we were pleased to come out of that meeting with the plan we went in with. There was alignment on the overall clinical development plan and the design of the proposed Phase III study. **We're confident that we have a clear understanding of the path forward to potential registration**. And as a result, we believe that robust positive results from a single Phase III study, together with supportive data from prior studies with pimavanserin, can serve as the basis of a supplemental new drug application, or sNDA, in dementia-related psychosis. At the end of the Phase II meeting, we also indicated that we would be filing for Breakthrough Therapy Designation and discussed this with the FDA.

---

https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy; *See also* FDA EOP2 Meeting Minutes, 15 May 2017, ACAD_SECLIT_0001003 – 1004.

Following the meeting, we filed, and we've recently received notice from the FDA that we have received that designation."

- **"ACADIA Pharmaceuticals Inc Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis - Call,"** ***Refinitiv*****, 4 October 2017, p. 3 (emphasis added).**

**2. 9 September 2019: Defendants Announce the Harmony Study's Top-Line Results and Allegedly Mislead Investors as to Terms of the FDA Agreement**

79. On 9 September 2019, the Company issued a press release titled "ACADIA Pharmaceuticals Announces Pivotal Phase 3 Harmony Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis."[56] According to the Company, the Harmony Study trial "met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis."[57]

80. On a conference call with investors prior to the start of trading that day, Defendant Stankovic stated: "I would also like to remind you that at the end of Phase II meeting with FDA, we confirmed that for our supplemental NDA submission in DRP we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive."[58] Defendant Stankovic represented to the market that the announced Harmony Study top-line results satisfied this

[56] "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," *Business Wire*, 9 September 2019 6:30 AM.

[57] "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," *Business Wire*, 9 September 2019 6:30 AM.

[58] "ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 4.

*CONFIDENTIAL*

standard.[59]

> "[Defendant Stankovic:] In terms of the end-of-phase 2 meeting, we received already agreement from FDA that a single, well-controlled trial will be sufficient for submission. So we – with these results and the study data at hand, we will be approaching FDA definitely in the first part of the next year and discussing the format and content of our sNDA submission."
>
> ■ **"ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 6.**

> "[Jason Butler, JMP Securities analyst:] Let me add my congratulations on the results also. Just 2 quick questions. One, at the end of Phase 2 meeting, was there any discussion with FDA around a statistical hurdle to support submission based on a single study? And then just briefly, can you give us just any historical context for the use of relapse prevention studies in other indications supporting either first approval or sNDA approval?"
>
> …
>
> "[Defendant Stankovic:] Yes, we certainly have the discussion, as I mentioned and agreements with FDA related to the supplemental NDA and our ability to support that supplemental NDA with a single well-controlled trial as long as that trial provides persuasive statistical and clinical benefit. And certainly, what we have in terms – usually, when people talk about statistically persuasive results, that means that the p-value is less than 0.01. And we certainly exceed substantively that threshold. And as I mentioned, we are even below the threshold of 0.0033. So second, we also submitted our statistical analysis plan in advance to – well in advance to our interim analysis and FDA had an opportunity to – and this provides comments to that. So we are very comfortable with where we stand in regards to that particular question."
>
> ■ **"ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 10.**[60]

---

[59] "ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 4.

[60] *See also* Amended Complaint, dated 10 December 2021, ¶¶7-8, and 107-110; and Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 7-9, 15-16.

*CONFIDENTIAL*

81. Plaintiffs allege that the foregoing statements by Defendants were materially false and misleading, inasmuch as, inter alia, they mischaracterized the nature and scope of Acadia's purported agreement with the FDA, misleadingly conveyed that the just-released Harmony top-line results satisfied the efficacy requirements for approval under the FDA Agreement, and failed to disclose that Defendants knew that the FDA would also require directionally consistent efficacy results across Harmony's subgroups.[61]

82. Analysts' reactions to Defendants' 9 September 2019 statements were overwhelmingly positive. Analysts accepted and repeated management's representation that the Company had an agreement with the FDA that top-line efficacy results of the type obtained from the Harmony Study would support approval of pimavanserin for DRP on efficacy grounds. For example:

> "Recall that following the end of Ph2 meeting with the FDA, ACAD confirmed that a single well-controlled study with statistically and clinically relevant data could serve as the basis for the supplemental NDA submission in combination with efficacy data from the two previous acute studies (Ph2 Alzheimer's disease psychosis (ADP; details below) and prespecified subgroup analysis of dementia patients from the Ph3 PDP trial) and additional safety data the ongoing placebo-controlled post-marketing commitment safety study of Nuplazid."
>
> - **"Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs analyst report, 9 September 2019, p. 3.**

> "We are confident that the results from this trial will support label expansion given: 1) the strength of the results and reinforcement of the clinical profile that has already secured Breakthrough Therapy designation in this indication, 2) clear feedback from the FDA at the end-of-Phase 2 meeting that a single trial would be supportive of approval, and 3) the unmet medical need."

---

[61] *See* Amended Complaint, dated 10 December 2021, ¶¶4-5, 57-58, 107-110; Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 7-10, 15-16, 19.

- **"HARMONY Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 9 September 2019, p. 1.**

"Nuplazid was previously designated a Breakthrough Therapy. FDA reportedly informed mgmt that a single well-controlled trial will be sufficient for approval in this indication."

- **"Positive Nuplazid Phase 3 Dementia Psychosis Trial Results. Raise PT to $60," by Alan Carr and Joseph Stringer, Needham analyst report, 9 September 2019, p. 1.**

83. Accepting Defendants' alleged misrepresentations about the purported agreement with the FDA and the corresponding significance of the Harmony Study's announced top-line results (irrespective of subgroup results), analysts increased their assessments of the PoS that the FDA would approve expanding pimavanserin's label to designate it as an approved treatment for DRP. Accordingly, analysts also increased their forecasts of expected revenue, valuation, and stock price targets for Acadia, as reflected in the following quotes:

"We (1) increase our PoS for Nuplazid in DRP ***to 85% (from 15%)*** on the positive interim read; (2) adjust our market build for DRP to incorporate the most common forms of dementia (Alzheimer's disease, Parkinson's disease dementia, Lewy body dementia, frontotemporal dementia, Lewy Body dementia) on the expected breadth of label (vs. Alzheimer's alone prior) … On account of the changes, our new 12-month PT of $46 (vs. $23 prior) is based on a 100% DCF analysis (unchanged 12% WACC, 1% TGR)."

- **"Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs analyst report, 9 September 2019, p. 6 (emphasis added).**

"DRP in our view is a sig[nificant] driver for ACAD shares given under-met need in a large addressable pop'n (1.2mn p[atien]ts) with no approved treatments available. In our model, we increase our likelihood of success (LoS) [*i.e.*, PoS] for DRP to 65% (prev. 40%), reflecting launch in 2021E. We now assume $100mn risk-adj. sales in DRP ($44/sh in our PO) at launch in 2021 ramping to peak sales (risk-adj.) of $2.9bn by 2027E. We also continue to model $200mn cash raises in 2019 and 2020 as ACAD could increase its sales footprint. We reit. our

Buy with new $48 PO [price objective] (prev. $31), which assumes impact from now in the money options."

- **"Interim Look at DRP Study Gives Positive Surprise; Reiterate Buy and PO to $48," by Tazeen Ahmad et al., BofA analyst report, 9 September 2019, p. 1.**

"**DRP Phase 3 interim hits on overwhelming efficacy, providing a clear path to label expansion in 2020**; we reiterate our Market Outperform rating and raise our price target on Acadia Pharmaceuticals from $30 to $55. We believe the results clearly demonstrate the potential for pimavanserin in a large addressable market with no approved drugs."

- **"HARMONY Phase 3 for Dementia-Related Psychosis Stopped Early for Succes," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 9 September 2019, p. 1 (emphasis in original).**

84. On 9 September 2019, following the announcement of the Harmony Study's top-line results, Acadia's stock price increased $15.05, or 63.2%, from $23.80 at the close of trading on 6 September 2019 (Friday), to $38.85 at the close of trading on 9 September 2019 (Monday). According to my statistical analysis as detailed later in this report, the net effect of market and sector factors on Acadia's stock price that day was actually slightly negative, so the isolated price impact of the Acadia news was to increase Acadia's stock price by $15.40 per share. This price impact is statistically significant at the 99% confidence level, indicating that Acadia's stock price increase was caused by the disclosure of new Company information, and not by random volatility or other market factors.

85. In the immediate aftermath of Defendants' 9 September 2019 statements, analysts increased their PoS estimates, causing analysts' average PoS estimate to more than double from the prior level of 41% to a new, higher level of 84%. *See* Appendix A.

### 3. 11 November 2019: Acadia Presents at JPMorgan's 2019 Fall Biotechnology Conference Call Series

86. On 11 November 2019, Acadia management presented at the JPMorgan

Fall Biotechnology Conference Call Series.[62] At this event, JPMorgan analyst Cory Kasimov inquired about the Harmony Study subgroup data and asked Defendants if the data would support the requested broad DRP label. Defendant Stankovic responded by stating that the Harmony Study was not designed to generate statistically significant proof of efficacy by individual subgroups, but that Acadia's understanding with the FDA was that statistically significant efficacy was required only over the study's collective population and the FDA did not require any particular efficacy result by subgroup. Plaintiffs allege that this representation was false and misleading.[63] The following is the exchange between the JPMorgan analyst and Defendant Stankovic:

> "[Cory Kasimov, JPMorgan analyst:] Okay. All right. So, then sticking with the statistical theme for a second, but going now to the subgroup analysis, which will likely be a focus, were the subpopulations, those different etiologies within DRP, were they each sufficiently powered in the HARMONY trial design? Or maybe to ask another way, what gives you confidence that these data are supportive of a broad label? Do you have feedback from regulators that the subgroups have to demonstrate statistical significance on their own, or is a positive trend sufficient in order to be included?
>
> [Defendant Stankovic:] Yes. The primary endpoint analysis, that we agreed with the FDA on, is based on the robust statistical significance in the overall study population. So across all of the subtypes that presented in the study. Just to be clear, the primary endpoint analysis is not powered to show significance by individual subtype of dementia, and neither is it required by the FDA for our label. We did have a very specific discussion on this because the number of relapse is overall, there was not that sort of powering by subtype. We plan to share subtype data from the open label portion of the trial, and we'll include subtypes in the demographic and descriptive open label and

[62] "J.P. Morgan Biotechnology Conference Call Series – Acadia Pharmaceutical (ACAD)," 11 November 2019, ACAD_SECLIT_0299836-65.

[63] *See, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 10-11, 16-17.

> randomized portion of the trial. So that's what we will be discussing. **But there is no requirement, nor expectation, nor power for analysis, of specific subtypes**."
>
> ■ **"J.P. Morgan Biotechnology Conference Call Series – Acadia Pharmaceutical (ACAD)," 11 November 2019, ACAD_SECLIT_0299844-45 (emphasis added).**

**4. 21 November 2019: Defendant Davis Provides Harmony Study Subgroup Results to Acadia's Board of Directors and Privately Acknowledges FDA "Directional Alignment" Criterion**

87. On 21 November 2019, Defendant Davis shared a presentation with the Company's Board of Directors that contained the Harmony Study's unblinded subgroup results.[64] Despite Defendant Stankovic's representation to investors that "there is no requirement, nor expectation, nor power for analysis, of specific subtypes," in his email to the Board of Directors Defendant Davis acknowledged that the FDA would evaluate the subgroup results and "look for directional alignment."

> "As you may recall, the FDA did not require that we achieve significance in individual dementia subgroups, but indicated they would look for directional alignment. In Harmony, subgroups are directionally aligned, however, the Parkinson's dementia and Lewy Body dementia subgroups outperformed others in the double-blind portion of the study."[65]
>
> ■ **E-mail from Defendant Davis to Acadia Board of Directors, 21 November 2019, ACAD_SECLIT_0094235.[66]**

---

[64] E-mail from Defendant Davis to Acadia Board of Directors, 21 November 2019, ACAD_SECLIT_0094235.

[65] My understanding is that Plaintiffs contend that Davis' statement in this email that the subgroup efficacy results were "directionally aligned" was false. In any event, Plaintiffs allege that Defendants never publicly disclosed any "directional consistency" requirement although they were well aware of it. *See* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 7-10, 15-16.

[66] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at

88. The presentation informed Acadia's Board of Directors of the "[R]isk of FDA/AdComm concern that driver of effect was PD subtype" or "Limited indication."[67] Plaintiffs allege that Defendants knew that pimavanserin had such a large effect on the PDP subgroup so that it skewed the study's reported top-line results. Plaintiffs further alleged that this skewing was particularly problematic because (i) pimavanserin had already been approved to treat patients with PDP, (ii) the outsized effect in PDP showed the Harmony Study results could not support expanding beyond PDP because it meant the subgroup efficacy was not directionally consistent across the subgroups as was required for FDA approval of a general DRP indication.

**5. 4 December 2019: Acadia Presents Harmony Study Results (Including Subgroup Results) at CTAD Conference**

89. On 4 December 2019 after the close of trading, the Company presented a summary of the Harmony Study's results at the Clinical Trials on Alzheimer's Disease conference ("CTAD").[68] That same day, the Company distributed to investors and analysts a summary of the Harmony Study's results by dementia subtype.[69] The Company also held a conference call with investors.[70]

---

10-11.

[67] "ACP-103-045 Topline Results Board Presentation 22 Nov. 2019," at ACAD_SECLIT_0094313.

[68] "Presentation and Discussion of the Phase 3 HARMONY Top-Line Results," 12th Clinical Trials of Alzheimer's Disease, 4 December 2019, JEFF00020873 - JEFF00020910.

[69] "ACADIA Pharmaceuticals Presents Positive Top-line Results from Pivotal Phase 3 HARMONY Trial of Pimavanserin in Patients with Dementia-Related Psychosis at 12(th) Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Business Wire*, 4 December 2019 8:45 PM.

[70] "Edited Transcript: ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019.

*CONFIDENTIAL*

90. During the conference call, Acadia's Senior Director of Clinical Research Erin Foff acknowledged that the Harmony Study was not powered to produce statistically significant subgroup efficacy results. Nonetheless, Defendant Stankovic dismissed this fact as unimportant, emphasized the top-line collective results, and omitted that the FDA had stated it required directionally consistent results across the subgroups to approve pimavanserin to treat the broad indication of DRP. The Harmony Study did not produce the required positive directionally consistent subgroup results.

91. Ms. Foff explained as follows:

> "[Erin Foff:] And when we talk about the double-blind results, some of those categories have just extremely small numbers of patients. So just a word of caution on overinterpretation.
>
> …
>
> When we look at the double-blind relapse rates, it's, again a bit hard to interpret these results given the small numbers. And we really were not powered to look at this in any meaningful statistical way. So the best we can do is just describe it."
>
> ■ **"ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 7.**[71]

92. Defendant Stankovic averred as follows, representing that the Harmony Study results ***did*** satisfy what the FDA had said was required to approve pimavanserin for DRP:

> "So at the end of Phase II meeting with the FDA, which we reported previously, FDA agreed with us that with the robust results of this trial that we would be able to file a supplemental NDA. We believe that we met that high threshold of the robustness of the results and are on track to meet with the FDA to discuss the content and format of our supplemental NDA submission in the second half – in the first half of

---

[71] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 71-73.

next year. And following that, we will be moving forward with a supplemental NDA."

■ **"ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 8.**

93. In response to an analyst seeking clarification about the nature of the data that the FDA would require to approve an sNDA, Defendant Stankovic again assured that the Harmony Study results met the FDA's requirements. He failed to disclose any requirements relating to directional consistency in the Harmony Study subgroup results:

"[Ritu Baral, TD Cowen analyst:] And you mentioned that the FDA asked for statistically and clinically persuasive data. Did they define this? And did they define any requirement for that initial response rate?

…

[Defendant Stankovic:] So to your second question, Ritu, 'What does FDA mean by persuasive – statistically and clinically persuasive?' I would just say in the world of statistics the persuasive and robust results are usually defined by the p-value of less than 0.01. So by that measure, we definitely exceeded that. And I think that from clinical meaningfulness that threefold reduction of risk and 65% reduction of risk for pimavanserin – with pimavanserin treatment definitely meets that clinical meaningfulness, with a hazard ratio that we saw in this trial. So I believe that certainly, we met that threshold. **Directly to answer to your question, there was no[t] any definition that we needed to meet other than what we shared."**

■ **"ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast From Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 11 (emphasis added).**

94. As evident in their published commentary, analysts believed the Company's representations about its purported agreement with the FDA regarding the data that would be required to have the sNDA approved. Analyst reaction to the new data, in light of Defendants' emphasis on the Harmony Study's top-line results and continued deemphasis of subgroup results was positive. Analysts also found that

the overall additional Harmony data presented at CTAD made it more likely that pimavanserin was on track to obtain "blockbuster" status. The following analyst report excerpts are illustrative:

> "Detailed HARMONY results at CTAD reflect a fairly strong dataset, with deep statistical significance and a large effect size on relapse reduction that looks similar to that of antipsychotics in other maintenance trials.
>
> ... If there's one (small) thing to nitpick in this trial it's that success at the interim may have been helped by the Parkinson's/Dementia-Lewy Bodies subset (12 relapses placebo, 1 drug), whereas evidence of efficacy in Alzheimer's is clearly there, but comes down to a meaningful but smaller event difference (14 relapses placebo, 8 drug).
>
> ... As we noted above, it's hard to poke any real holes in this data set (though we'll take our best shot). The relapse rate was notably smaller in this study (for both pbo and drug) versus prior psychosis relapse-prevention studies: in the most comparable study we've found (Devanand 2012 assessing risperidone in Alzheimer's Psychosis), there was a 60%/33% rate of relapse on placebo/risperidone, respectively (HR: ~0.5, p=0.004). A meta-analysis by Leucht et al also found that relapse rates in maintenance studies of various antipsychotics in schizophrenia (62 trials, 6392 patients) were 57% on placebo vs. 22% on drug. The lower levels (28%/13% placebo/pima) reported in HARMONY could therefore suggest a less-severe study population, or another dynamic in play; that said this probably doesn't matter in the grand scheme. As we noted above, this trial wasn't just favorable for pimavanserin because of its design, but also because ACAD was able to include patients with Parkinson's, where the drug is already approved. And while the numbers are small, the relapse reduction in PDD and DLB (closely related to Parkinson's) look superior to that in Alzheimer's, which ultimately represents the major population of interest, and is where bulls generally model multi-billions in revenue. Acadia plans to approach the FDA in 1H20 and is targeting an sNDA in 2H20. At its event, Acadia was clearly optimistic about their odds with the FDA; it sees HARMONY as firmly meeting the bar set by the FDA at the end-of-ph2 meeting for 'clinically and statistically meaningful results.'"

- **"Solid HARMONY Data at CTAD Underlie Mgmt's Confidence in Approaching FDA; Our Take on the Full Results," by Paul**

**Matteis and Nathaniel Tower, Stifel analyst report, 5 December 2019, p. 1.**

"Our view: Topline data in ACAD's HARMONY ph.III, at CTAD in San Diego, where we are on-site, reiterate pimavanserin's prospects in dementia-related psychosis, **eclipsing expectations on efficacy** and earning high marks on clinical application from KOLS, even following the program's recent stoppage for success in September. **The impressive benefit-risk profile now more established by last night's fuller data** continues to support a visible path to market and high likelihood of approval – and with pimavanserin's opportunity in DRP setting up as a robust source of revenue potential in the 2020's, **we believe ACAD's neuropsychiatric franchise is on the brink of a breakout.** We reiterate our Outperform rating and $60 PT."

- **"The Secret of Pim: Word Getting Out on Pimavanserin with Solid DRP Data at CTAD," by Gregory Renza, RBC Capital Markets analyst report, 5 December 2019, p. 1 (emphasis added).**

"Given the strong efficacy and favorable safety profile, we believe this data will support broad label expansion. The combined acute treatment data should address any FDA questions, especially given [that the] agency gave written agreement that the HARMONY [Study] would generate sufficient pivotal data to support sNDA review.

... We strongly expect approval, likely sometime in late 2020 or early 2021."

- **"Perfect Harmony: CTAD Data Shows 65% Reduction in Risk of Relapse in DRP," by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 5 December 2019, pp. 1 and 5.**

"Given our view of DRP as a blockbuster opportunity, **we expect substantial upside to shares (-20%) based on these results, the revenue potential and increased probability of DRP revenue.** We currently estimate peak market penetration to be reached in 2025, with sales of approximately $5.4BN. **We estimate pimavanserin could be on the market for DRP as soon as 2021 and have updated our P&L statement to include this revenue source**. As a result, our 2021 and 2022 revenue estimates increased to $889.4MM and $2,215.0MM, from $889.2MM and $1,716.0MM, respectively."

- **"Perfect Harmony: CTAD Data shows 65% Reduction in Risk of Relapse in DRP," by Ritu Baral et al., TD Cowen analyst report, 5 December 2019, p. 3.**

"We continue to believe that the interim data are supportive of Nuplazid's approval in DRP (a commercial drug with BTD and no approved therapies for this indication) **and will help drive 'blockbuster' status.** … **We suspect a positive reaction in shares off this update** highlighted by an HR of 0.353 on the primary endpoint. That said, this is a pretty dynamic situation with expectations something of a moving target…"

- **"Positive CTAD Update Bodes Well for Nuplazid's Label Expansion," by Cory Kasimov et al., J.P. Morgan analyst report, 4 December 2019, p. 1.**

"KOLs view these results (compelling therapeutic benefit with significantly improved tolerability profile and no worsening of cognitive or motor symptoms) as clinically meaningful **and likely to reshape the treatment paradigm -** where there are no approved therapies - which supports our view of an sNDA filing in 2H20 (following FDA discussions in 1H20)."

- **"Acadia Pharmaceuticals Inc. (ACAD): Impressive full Ph3 HARMONY data likely supports sNDA in 2H20," by Salveen Richter et al., Goldman Sachs analyst report, 5 December 2019, p. 1.**

"Based on the strong data, we are increasing our peak sales for this indication from $2B to $2.5B, which raises our PT to $56 from $50. We maintain our Outperform rating on the stock."

- **"Very Strong Nuplazid Data in DRP; PT to $56," by Marc Goodman et al., SVB Leerink analyst report, 5 December 2019, p. 1.**

95. On 5 December 2019, following the release of the detailed Harmony Study results, which were accompanied by Defendants' allegedly false and misleading reassurances about what was necessary to gain FDA approval for expanded labeling, Acadia's stock price rose to $50.48 per share from the prior day's closing price of $44.28 – a one day increase of $6.20 per share, or 14.0%.

96. According to my statistical analysis, detailed later in this report, which

controls for market and sector effects, the isolated price impact of the Company-specific news on 5 December 2019 was to increase Acadia's stock price by $7.03 per share. This price impact is statistically significant at the 99% confidence level, indicating that this stock price increase ($7.03 per share) was caused by Company-specific information, and not random volatility or other market factors.

97. In the immediate aftermath of Defendants' 4 December 2019 statements, some analysts increased their PoS estimates modestly, causing analysts' average PoS estimate to increase slightly, from 85% to 86%. The purportedly positive disclosure further fueled optimism as several analysts expressed heightened optimism that, in light of the CTAD data, pimavanserin would become a "blockbuster" drug. Most analysts' PoS estimates did not change over the next 15 months, and the average PoS estimate remained in the range of roughly 86% to 88% until Defendants' disclosures of early March 2021. *See* Appendix B.

98. Accepting the Company's representations, the market consensus was now strong that the Harmony Study results, together with the results of the other completed clinical trials, were likely sufficient to satisfy the FDA and secure approval of an sNDA. This outlook remained until reversed by the corrective events of early March 2021.

**6. 26 February 2020: During Earnings Announcement, Acadia Updates the Market on Planned sNDA Submission Based on Harmony Study Results**

99. On 26 February 2020 after the market close, the Company announced quarterly and yearly financial results and outlooks.[72] A conference call was held that day too, which included the following question and answer exchange between an analyst and Company management:

> "[Ritu Baral, TD Cowen analyst:] Great. A very quick follow-up. The sNDA for DRP, what's left to do before the summer submission?

[72] "ACADIA Pharmaceuticals Reports Fourth Quarter and Full Year 2019 Financial Results," *Business Wire*, 26 February 2020 4:05PM.

> …
>
> [Defendant Stankovic:] Yes. Ritu, we have all of the data that will constitute our supplemental NDA. **The pivotal HARMONY study results will be the basis of the sNDA submission, which was previously agreed upon at the end of Phase II meeting**. And in addition, we will have supportive efficacy results from our previous short-term studies, which provided evidence of acute efficacy of pimavanserin in Alzheimer's disease and in Parkinson's disease psychosis for patients – with patients with dementia. And finally, we plan to submit our extensive safety data from completed and ongoing studies. So what is left for us is to essentially put that all together in the format required for the supplemental NDA, all the study reports and summary documents and once we agree with FDA on that, to submit."
>
> ■ **"Q4 2019 ACADIA Pharmaceuticals Inc Earnings Call,"** ***Thomson Reuters*****, 26 February 2020, p. 7 (emphasis added).**

100. Plaintiffs contend that this statement by Defendants was also false or misleading, and consequently helped maintain the fraud.[73]

### 7. 7 May 2020: Acadia Updates on Planned sNDA for DRP

101. On 7 May 2020, after the market close, Acadia issued a press release announcing its Q1 2020 results and provided an update on the status of its planned sNDA for the DRP indication for pimavanserin. During the Company's earnings call later that day, Defendant Stankovic informed investors and analysts that the Company had met with the FDA and that the meeting purportedly confirmed that the Harmony Study results, together with other completed studies, would support a successful sNDA:

> "As planned, we successfully completed a pre-sNDA meeting with the FDA and confirm that the pivotal data from our HARMONY study, together with the confirmatory and supportive results from our Alzheimer's disease psychosis Phase II study and our Parkinson's disease psychosis Phase III study will all support the submission of an sNDA for pimavanserin in dementia-related psychosis. In addition, we

[73] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 11-12, 15-16.

> discussed the overall safety database and analysis plan. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect a priority review with a potential approval for DRP around year-end."
>
> ■ **"Q1 2020 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 7 May 2020, p. 5.**

102. Plaintiffs contend that these statements by Defendants were also false or misleading, and consequently helped maintain the fraud.[74]

### 8. 12 May 2020: Acadia Presents at Bank of America Merrill Lynch Healthcare Conference

103. On 12 May 2020, during the Company's presentation at the Bank of America Merrill Lynch Healthcare Conference, Defendant Davis was asked about the Company's pre-sNDA meeting with the FDA and Acadia's expected timeline for the sNDA's submission and approval.[75] Defendant Davis stated that the FDA feedback was consistent with the May 2017 EOP2 meeting of three years earlier. Defendant Davis reiterated that the meeting purportedly confirmed that the Harmony Study results, together with other completed studies, "can support" a successful sNDA:

> "[Tazeen Ahmad, BofA analyst:] So maybe we can talk a little bit about DRP, Steve, as one of your next indications. Can you review what you discussed with the FDA perhaps at the pre-sNDA meeting? Can you provide a little bit of expectations on time lines for submission and approval?
>
> …
>
> [Defendant Davis:] Yes, absolutely. So as I mentioned, we had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard with our end-of-Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA

---

[74] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 11-12, 15, 19.

[75] "ACADIA Pharmaceuticals Inc at Bank of America Merrill Lynch Healthcare Conference (Virtual)," *Thomson Reuters*, 12 May 2020, p. 4.

submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's disease psychosis study as supportive efficacy studies."

- **"ACADIA Pharmaceuticals Inc at Bank of America Merrill Lynch Healthcare Conference (Virtual),"** ***Thomson Reuters*, 12 May 2020, p. 4.**

104. Plaintiffs contend that these statements by Defendants were also false or misleading, and consequently helped maintain the fraud.[76]

### 9. 15 June 2020: Acadia Submits the sNDA

105. On 15 June 2020, Acadia announced that it had submitted to the FDA its sNDA to expand the label indication for pimavanserin to cover broadly "the treatment of hallucinations and delusions associated with dementia-related psychosis."[77]

106. The press release announcing the sNDA submission emphasized the top-line efficacy results produced by the Harmony Study, but omitted that the Harmony Study did not produce positive directionally consistent results among subgroups, which Plaintiffs contend was known by the Company to be an FDA requirement for approval.

107. The press release also claimed that the sNDA was supported by "positive efficacy results" from the -019 Study and -020 Study. Plaintiffs contend that these statements by Defendants were also false or misleading, and consequently

---

[76] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 11, 15, 19.

[77] "ACADIA Pharmaceuticals Submits Supplemental New Drug Application to U.S. FDA for NUPLAZID(R) (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 15 June 2020 9:00 AM. The actual submission date was roughly 10 days earlier, on 3 June 2020. *See* Acadia Form 10-K for fiscal year ended 31 December 2021, filed 1 March 2022, p. 20.

helped maintain the fraud.[78]

### 10. 20 July 2020: Acadia Announces that FDA Has Accepted the sNDA for Filing and Assigned It Standard Review

108. On 20 July 2020, after the close of trading, the Company announced that the FDA had accepted its pimavanserin sNDA for filing. Also announced was that the FDA assigned standard review to the sNDA rather than the "priority review" the Company had hoped for.[79] With priority review, the FDA's decision would take approximately six months, while standard review would take about 10 months. The Prescription Drug Fee Act ("PDUFA") action date was set for 3 April 2021.[80]

109. The Company further stated in its 20 July 2020 press release that "The FDA has also informed the Company that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee ('AdCom') meeting."[81] Defendants reiterated these points during a conference call with analysts that was held later that day.[82]

---

[78] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 11, 19, 57, 60.

[79] "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID(R) (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 20 July 2020 4:03 PM.

[80] "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID(R) (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 20 July 2020 4:03 PM. My understanding is that the sNDA would have had an earlier action date, in late 2020, if it had been assigned priority review status.

[81] "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID(R) (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 20 July 2020 4:03 PM.

[82] "ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of

110. Acadia issued a separate press release after the close of trading on 20 July 2020, titled "ACADIA Pharmaceuticals Announces Top-line Results from the Phase 3 CLARITY Study Evaluating Pimavanserin for the Adjunctive Treatment of Major Depressive Disorder."[83] According to this separate press release, the Clarity Study failed to achieve statistical significance with respect to that study's primary endpoint.[84] According to Acadia, the U.S. addressable market opportunity for pimavanserin as a treatment for MDD was twenty times larger than the U.S. addressable market opportunity for PDP and twice as large as the U.S. addressable market opportunity for DRP.[85]

111. During the conference call that day, analysts asked several questions about why the FDA had assigned standard review rather than priority review to the sNDA.[86] Defendants Stankovic and Davis answered, in substance, that they did not know why the FDA had done so.[87] Nonetheless, Defendants reiterated their

---

Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis Conference Call," *Thomson Reuters*, 20 July 2020, pp. 3, 5, and 7.

[83] "ACADIA Pharmaceuticals Announces Top-line Results from the Phase 3 CLARITY Study Evaluating Pimavanserin for the Adjunctive Treatment of Major Depressive Disorder," *Business Wire*, 20 July 2020 4:02 PM.

[84] "ACADIA Pharmaceuticals Announces Top-line Results from the Phase 3 CLARITY Study Evaluating Pimavanserin for the Adjunctive Treatment of Major Depressive Disorder," *Business Wire*, 20 July 2020 4:02 PM.

[85] Acadia Pharmaceuticals, Inc. Form 8-K, filed 13 January 2020, exhibit 99.1; and "Q2 2020 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 5 August 2020, p. 14.

[86] "ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis Conference Call," *Thomson Reuters*, 20 July 2020, p. 5.

[87] "ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related

confidence that the sNDA's data was sufficient to support approval of the sNDA:

> "[Ritu Baral, TD Cowen analyst:] I'm glad you guys have no indication of an AdCom, but I am a little confused why you wouldn't have gotten priority review for the DRP sNDA. I mean usually, that's a function of unmet need. Is that an FDA statement on unmet need? Or complexity of the NDA, especially given you guys have breakthrough status for this indication?
>
> …
>
> [Defendant Stankovic:] Yes, of course. Thanks, Ritu. We have anticipated a priority review. But based upon the FDA preliminary review, they designated a standard review. We have a different point of view on the classification, and I'm not really sure what their rationale is for the assigning of standard review classification. We have engaged with the FDA to try to get additional color around this. We remain highly confident in both the efficacy and safety data supporting our submission.
>
> …
>
> [Ritu Baral, TD Cowen analyst:] Within the communication, [were] there any statements about unmet need in DRP or how they view DRP?
>
> …
>
> [Defendant Stankovic:] Yes. In the preliminary review, what we know from their preliminary review is that they have assigned a standard review and that they haven't identified any potential review issues at this point in their evaluation as well as the – that they are not planning on holding the advisory committee. We are trying to get additional color from the FDA about the rationale for their classification of the review. But at this point, it's – we would like to avoid to speculate on what really the rationale is for their decision.
>
> [Defendant Davis:] I'll just echo Serge's thoughts there. **We just really don't have any information as to why they came to the determination they did on standard review versus priority.**"

- **"ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with**

Psychosis Conference Call," *Thomson Reuters*, 20 July 2020, p. 5.

**Dementia-Related Psychosis - Conference Call," *Thomson Reuters*, 20 July 2020, p. 5 (emphasis added).**

"[Cory Kasimov, JPMorgan analyst:] And I fully agree, it's good to see there's no AdCom that's necessary at this point. Do you know if there's precedent for a product with breakthrough therapy designation to be assigned standard review?

…

[Defendant Stankovic:] Yes. Here recently, there have been some of the breakthrough therapy designation products that did not receive priority review, but rather received a standard review. So there – these are – we are aware of some examples of that.

[Defendant Davis:] And Cory, I'll just maybe add just an additional thought there. Of course, when we look at breakthrough therapy designated drugs, the vast majority of them are in the oncology space. And there, it's relatively common to get an approval and then get another indication in a different tumor type, et cetera. And so you do see additional breakthrough designations and additional priority reviews frequently. When you get outside of the oncology space, there are not as many breakthrough therapy designations to start with, of course, and not as many of them that then have a priority review. So I want to be really clear, you do absolutely see it. But we, as Serge [Stankovic] mentioned, are aware of some recent examples where that has not happened. How much that has to play with the agency's position here or not? We don't know. But what we do know that it's much more of a common thing in the oncology space."

- **"ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis - Conference Call," *Thomson Reuters*, 20 July 2020, p. 6.**

"[Charles Duncan, Cantor Fitzgerald analyst:] I had a question on the DRP program…. I guess I'm wondering if you were surprised about there being no AdCom since this would be the first drug in this particular indication. Or do you think that it's lack of AdCom, at least at this point, is consistent with robust efficacy and within the context of no new safety observations that have been made?

> [Defendant Davis:] Yes. I would say we – I wouldn't say we were surprised with no AdCom. I think we've been very open in saying that it's more common than not for the FDA not to have an AdCom on an sNDA. We felt in our case that it might be more likely than normal given the importance of this for patients and physicians. **And as we said, at this point in their evaluation, the FDA has not identified any potential review issues** and the support for pimavanserin in DRP that we received from KOLs and physicians gives us great confidence that we can present a compelling case to FDA and to an AdCom if one were to be scheduled. And at this point, they've indicated they don't need one. So either way, we feel like we're in a very strong position."
>
> - **"ACADIA Pharmaceuticals Inc to Discuss U.S. FDA Acceptance of the Filing of Supplemental New Drug Application for NUPLAZID® (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis - Conference Call,"** ***Thomson Reuters*****, 20 July 2020, p. 7 (emphasis added).**

112. Plaintiffs contend that some of these statements by Defendants, including in particular their statements disavowing having "any information" as to why FDA denied granting priority review, were false or misleading, and helped maintain the fraud.[88]

113. As a result of Defendants' claims that they had no knowledge of why the FDA assigned standard review to the sNDA, analysts and commentators hypothesized that perhaps the FDA's decision to assign standard review was due to administrative delays and difficulties associated with the ongoing COVID-19 pandemic (and was in any event unrelated to any possible concerns regarding pimavanserin's efficacy data). Examples of such analyst commentary included the following:

> "What was more surprising to us and the market was ACAD's announcement that the FDA accepted, but did not grant priority review for, the supplemental new drug application (sNDA) for Nuplazid for

---

[88] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 13-15.

dementia-related psychosis (DRP)…. On the risks side, we would point to inherent unpredictability around FDA's actions. The FDA granted Nuplazid breakthrough therapy designation in Oct-17, and it is surprising that BTD did not lead to priority review, and whether that has any implications on approvability. **It is also possible that simpler logistics/time-related factors in a pandemic could be at play**. More importantly, we note ACAD had stopped the DRP trial for positive efficacy after Nuplazid hit the primary endpoint in an interim analysis; see here. ACAD's data presented at CTAD were very solid (see here), so we do not have a reason to believe in risks along the data front."

- **"We see MDD-out/DRP-delay pullback as an opportunity; reiterate BUY, $56 PT," by Sumant Kulkarni et al., Canaccord Genuity analyst report, 24 July 2020, p. 1.**

"A bigger deal is FDA acceptance of the Nuplazid sNDA in DRP, which comes alongside an encouraging update (no plans for a panel) but also one that's slightly disappointing (standard, not priority review) and candidly a bit confusing. Should we be concerned by the lack of priority review? Is anything else going on behind the scenes here? We think probably not, **and we think this likely has to do with an agency that is stretched within an ongoing pandemic**-we've also recently seen two recent neuro PDUFAs (Fintepla, Risdiplam) get extended. But mgmt doesn't know and conveyed a real sense of surprise; we might get additional color/feedback on the 2Q call."

- **"MDD Failure Not Thesis Changing; DRP sNDA Acceptance a Mixed Bag, but We're Maintaining Our Optimistic Stance on Approval," Paul Matteis et al., Stifel analyst report, 20 July 2020, p. 1.**

"Recall, Dr. Andreason was the lead medical reviewer at FDA on the original application for pimavanserin in PDP. We held a call with him on June 16th where he predicted that pimavanserin would be approved on a priority review timeline, possibly with an AdCom. You can access a transcript of that call here. We caught up with him again this afternoon to see what insight he could provide on the decision to review the DRP application under a standard timeline. Given that the FDA did accept the filing with no review issues noted and no Ad Com, he firmly believes that the FDA already has all of the information they need to make a decision in a timely manner. As such, he thinks the standard review timeline decision was due to an FDA-specific issue and is not related to the quality of the application for pimavanserin itself. His top three reasons were **1) it was due to lack of oversight or a simple**

**mistake, 2) FDA needs more time to inspect sites due to COVID-19, or 3) there is a broader issue at FDA such as lack of staffing due to COVID-19 that FDA has not made public**. Of those three, he believes the first is the most likely. He saw a case during his time at FDA where the incorrect review timeline was granted due to lack of oversight, and it was subsequently reversed. Further, management's surprise at not receiving priority review when they have access to frequent, high-quality interactions with FDA due to breakthrough therapy designation, suggests this may not have been a pre-planned or deliberate decision. See inside for more tidbits from our call with Dr. Andreason."

- **"Alert: Thoughts on DRP Review Decision from Regulatory Expert," by Neena Bitritto-Garg, Citi analyst report, 22 July 2020, p. 1.**

"The FDA has accepted the sNDA filing and not identified any review issue at this point, assigning a 10 Mth standard review w/ PDUFA date on April 3rd, 2021 and informing no plan of holding an Adcom. While Co has originally anticipated a 6M priority review and an Adcom, the current regulatory plan **is likely a function of known safety profile from approved PDP indication, robustness of DRP package, and CV19 environment, in our view.**"

- **"DRP sNDA Accepted w/o Adcom, but Surprised by MDD Miss," by Chris Howerton, Jefferies analyst report, 20 July 2020, p. 1.**

114. Several analysts lowered their price targets in response to the Company's disclosures of 20 July 2020. It appears, however, that these reductions were made predominantly in response to the negative results from the Clarity Study, which involved testing pimavanserin as a treatment for patients with MDD, rather than DRP, as those negative results caused analysts to reduce their estimates of Acadia's future revenue of drug sales to treat MDD.[89]

[89] *See, e.g.,* "Value Remains Evident in Pimavanserin Despite MDD Miss," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 21 July 2020, p. 1 ("We have updated our model, removing sales in MDD and incrementally lowering our 2021 sales estimates in DRP, which lowers our price target from $57 to $54"); "Acadia Pharmaceuticals Inc. (ACAD): Buy - Pivotal MDD Trial Misses, but DRP PDUFA is Key Catalyst," by Salveen Richter et al., Goldman Sachs analyst report,

115. Analysts expressed surprise that the pimavanserin sNDA was not assigned priority review, especially given the drug's BTD. However, several analysts noted in their published reports that the FDA's assignment of standard review to the sNDA (particularly in combination with the countervailing positive news that the FDA would not convene an AdCom for the sNDA) did not impact their PoS estimates. Analysts remained "enthusiastic" for the prospect that the Company would win approval for expanded indications for pimavanserin. Examples of such analysis and resulting sentiment include the following:

> "We, along with investors and ACAD itself, expected the sNDA for pima in DRP would receive Priority Review (typically associated with a 6-month review process) given its BTD designation and FDA's recognition of the unmet medical need in DRP. Instead, the FDA assigned an April 3, 2021 PDUFA, reflecting a Standard Review timeline. Importantly, as of now, the FDA has not requested an AdComm be convened **and ACAD noted the FDA did not identify any issues with their filed application, suggesting no 'review issues' have been identified. Despite the standard review, we maintain our optimism for pimavanserin's ultimate approval in DRP and we do not view the application being assigned a Standard Review as an indication of decreased likelihood of approval.**"
>
> - **"Ph3 Adjunct MDD Failure Not a Big Shock; DRP sNDA Gets April 2021 PDUFA," by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 20 July 2020, p. 3 (original emphasis removed and emphasis added).**
>
> "While the miss in MDD is at least incrementally disappointing, we **remain enthusiastic** for the near-term growth trajectory of NUPLAZID sales and longer-term growth from indications, including

---

20 July 2020, p. 1 ("While disappointing (our model indicates -14% to our PT on removal of MDD) - post (and even pre-) this binary event, we see investors opting to own the name for Nuplazid in dementia-related psychosis"); and "Nuplazid Fails in MDD; DRP Review Slightly Longer Than Expected but No AdCom is a Plus," by Cory Kasimov et al., JPMorgan analyst report, 20 July 2020, p. 3 ("On the heels of today's results, we are updating our model to exclude MDD contribution and we moderately decrease our op ex forecasts. As a result of these changes our Dec 2021 PT goes to $60 (from $66 prior). Reiterate Overweight").

DRP and other label expansion opportunities such as schizophrenia negative symptoms.

…

We do not believe the assignment of a standard review period (vs. expectations for priority review) negatively impact probability of approval and gain encouragement that FDA does not currently intend to convene an AdComm.

…

Clearly priority review would have been preferable, however we remain confident that the Phase 3 HARMONY results were stronger than the Phase 2 results in Alzheimer's disease psychosis, upon which Breakthrough Therapy Designation was granted. Ultimately, the timeline difference is inconsequential and we continue to believe there is a high (90%) probability of approval."

- **"Value Remains Evident in Pimavanserin Despite MDD Miss," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 21 July 2020, p. 1 (emphasis added).**

"Management also provided an update on the sNDA for DRP. While not currently planning to hold an ad com, FDA assigned a PDUFA date April 3rd, 2021 under standard review (ACAD had expected a priority review which would have allowed for approval by end of 2020). **We were surprised FDA granted breakthrough designation (BTD) but not grant priority review. However, the ramp rate in our model for DRP would not be meaningfully impacted by the delay.**"

- **"Minor Impact from Setbacks in MDD; Maintain Buy," by Tazeen Ahmad et al., BofA analyst report, 20 July 2020, p. 1 (emphasis added).**

"Separately, we were surprised to learn the FDA has accepted ACAD's sNDA for pimavanserin to treat DRP with a standard review after we were told on the 4Q19 earnings call that ACAD was expecting a priority review. **On the positive side, FDA is not planning an Ad Comm for DRP, which is yet another surprise**, since ACAD was expecting one. **We update our model removing MDD**, which lowers our revenue and EPS estimates, driving our new PT to $42 from $53 prior. We maintain our Perform rating."

- **"Lack of Clarity; PT to $42," by Jay Olson and Matthew Hershenhorn, Oppenheimer analyst report, 20 July 2020, p. 1 (emphasis added).**

> **"While the company has elected to discontinue MDD altogether, we maintain the PE miss does not negatively impact the perception and revenue potential in PDP or DRP**. Secondly, the concurrent sNDA acceptance from the FDA for pim's DRP expansion on a surprisingly standard (rather than priority) review timeline, yet encouragingly with no AdComm planned, arguably adds more confusion than risk to an otherwise smooth path to market, though now a more elongated regulatory focus into 2021 is in store for ACAD. **Still, we believe the longer-term fundamentals and growth out of pimavanserin remain intact and, despite an incremental delay in the modeled launch, we continue to see multi-billion dollar sales potential in PDP and DRP.** We reduce our price target to $55 (from $61) based on model changes related to the ins and outs of MDD and DRP, and we remain Outperform rated."
>
> - **"MDD Miss, DRP 2021 PDUFA Hinder Pim's Near-term Momentum; Though Long-term View Intact," by Gregory Renza and Yinglu Zhang, RBC Capital analyst report, 20 July 2020, p. 1 (emphasis added).**

116. On 21 July 2020 – the first trading day after the Company's disclosures of 20 July 2020 – Acadia's stock price declined 19.4%, falling $10.73 to $44.69 per share from the prior day's closing price of $55.42 per share. Controlling for market and sector factors, as explained later in this report, the impact of the prior day's Company-specific news was to decrease the stock price by $9.69 per share. This price impact is statistically significant at the 99% confidence level, indicating that $9.69 of the 21 July 2020 stock price decline was caused by new Company information and not random volatility or other market factors.

117. Defendants' 20 July 2020 announcements did not change the average of analysts' PoS estimates, which remained at the roughly 88% level where it had been immediately prior to those announcements. Unsurprisingly, however, the news did cause analysts' forecasts of the timing of the expected FDA approval to be modestly pushed back, as analysts now understood that the FDA's review was scheduled to be completed by 3 April 2021, rather than (as would have been the case had priority review been granted) by as early as December 2020.

### 11. 19 August 2020: Acadia Presents at the JMP Securities Central Nervous System Forum

118. On 19 August 2020, Acadia presented at the JMP Securities CNS ("Central Nervous System") Forum.[90] Emphasizing the Company's prior messaging to investors and analysts, Defendant Davis told investors that, with respect to the planning and implementation of the sNDA process, the Company "got clear agreement from with [sic] the FDA at our end-of-Phase 2 meeting **and we executed the plan that we agreed to with them**."[91] More specifically, at this forum, the following colloquy between research analysts and Defendants Davis and Stankovic occurred:

> "[Defendant Davis:] And I would just – just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the – and as we've said before, the 'subtypes' of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer, dementia with Lewy bodies or vascular dementia et cetera.
>
> And so – and one of the advantages of course of pursuing dementia-related psychosis broadly which is just as a reminder we got clear agreement from with the FDA at our end-of-Phase 2 meeting and we executed the plan that we agreed to with them. One of the advantages is it picks up what's referred to as dementia, not otherwise specified. That's 'it is not otherwise specified.' And that's a big chunk of patients. And that the fact that so many patients are not specified other than beyond just saying dementia is again a reflection of the fact that these categories are very difficult to diagnose. So, as Michael mentioned, the good news is physicians understand that they operate in that world and with the indication that we are seeking, it won't matter. Then we'll have to try to make a determination, whether it's Alzheimer's or vascular dementia or something else.

---

[90] "ACADIA Pharmaceuticals to Present at The JMP Securities CNS Forum on August 19, 2020," *Business Wire*, 12 August 2020 9:00 AM.

[91] "ACADIA Pharmaceuticals, Inc.," JMP Securities CNS Forum, corrected transcript, 19 August 2020, pp. 7-8 [JEFF00024272 – 73] (emphasis added).

*CONFIDENTIAL*

> [Jason Butler, JMP Securities analyst:] And that's a really good point. And so let me just ask one more question about the FDA there. You obviously have this very broad patient population under the DRP umbrella. How do you think about more broadly the label indication statement based on the Phase 3 trial design, specifically the relapse prevention relative to PDP where you had an initiation kind of trial design?
>
> [Defendant Davis:] Yeah[.] Well, let me take it from two perspectives. So let me take it from a regulatory perspective and then from a medical perspective. From the regulatory perspective, just want to remind everyone that the sNDA that we've submitted includes the Harmony study, the relapse prevention study, but also includes or the kind of study that we did in Parkinson's disease psychosis. And it includes acute – we'll call it acute data as well over a much shorter timeframe, and showed positive results both in an Alzheimer's population as well as our – of course our Parkinson's disease psychosis population. So we have both in the submission… **More importantly, we agreed with the FDA on that approach in the Phase 2 meeting and agreed on the plan for Phase 3 and then we've executed that plan**."
>
> - **"ACADIA Pharmaceuticals, Inc., JMP Securities CNS Forum," corrected transcript, 19 August 2020, p. 8 [JEFF00024273] (emphasis added).**

119. Plaintiffs contend that these statements by Defendants were false or misleading, and helped maintain the fraud.[92]

120. Shortly following the JMP Securities CNS Forum, Raymond James initiated coverage of Acadia, expressing confidence that pimavanserin would receive FDA approval for the broad DRP indication and that pimavanserin consequently would become a multibillion-dollar drug. Reflecting Defendants' prior assurances that the FDA had agreed that the Harmony Study needed only to produce statistically significant top-line results to establish pimavanserin's efficacy as a treatment for DRP – and Defendants' concomitant failures to disclose that their "FDA

---

[92] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at ___ 13, 15, 17, 19, 64.

Agreement" also allegedly required that the Harmony Study's subgroup results be directionally consistent – Raymond James cited the Harmony Study's collective, top-line efficacy results as a key basis for its optimism.

> "We are initiating coverage of Acadia with an Outperform rating and a $65 price target. Though the company has faced some recent setbacks, including a Phase 3 failure in major depressive disorder (MDD) and announcement that its sNDA for Nuplazid in dementia related psychosis (DRP) would have a standard (10-month) review as opposed to a priority (6-month) review that was originally anticipated … [W]e considered the [MDD] trial as high risk and believe the main value proposition of Acadia remains the DRP indication. In our view, DRP is a ~$3B+ opportunity, and it's hard to poke holes in the efficacy and safety data generated with Nuplazid in the indication. We still fully expect approval by its April PDUFA date (90% probability of success). Yes, it was a bit puzzling to find out the FDA was not giving the drug a priority review, but after some digging, we discovered expedited reviews for BTD drugs doesn't always mean a typical priority review (sometimes it means the FDA sets the target action date approximately one month before the set PDUFA date). Plus, we think the fact that there is no AdCom planned is a positive indicator for approval. As such, we see significant upside for ACAD with DRP, especially considering the recent pullback in shares. We're still confident in Nuplazid approval for DRP… We won't speculate as to what led to the FDA's decision, but given what we know – (1) Phase 3 efficacy and safety data were robust, (2) drug was granted BTD, (3) no plans to hold an AdCom, and (4) the drug is already on the market for PDP (meaning CMC and preclinical tox types of issues are not a concern) – we see little risk to approval on or before the April 3, 2021, PDUFA date."
>
> - **"A Little Delay Won't Sway Our View; Confident DRP Will Be a Multibillion-Dollar Market," by Danielle Brill et al., Raymond James analyst report, 24 August 2020, p. 344.**

### 12. 14 September 2020: Acadia Presents at Morgan Stanley Global Healthcare Conference

121. On 14 September 2020, the Company virtually presented at the Morgan Stanley Global Healthcare Conference. During the conference, Defendants Davis and Stankovic again represented that Acadia had an agreement with the FDA concerning the sufficiency of the Harmony Study's top-line efficacy results to

support approval of the sNDA.

> "[Jeff Hung, Morgan Stanley analyst:] And what is your view on the recent string of complete response letters? Is there any reason to believe that there are any changes at the agency that might add risk to approval in DRP?
>
> [Defendant Stankovic:] Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review or details of the data and all that. We do not see – each situation is different, and we do not see any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to be able to complete those things and asking for additional data. We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval.
>
> …
>
> [Jeff Hung, Morgan Stanley analyst:] Okay. And then multiple neurodegenerative disorders have patients with dementia-related psychosis, such as Alzheimer's. Which disorders do you think are more likely to have faster adoption? Do you think there will be certain ones that contribute more early on in the launch? And then, I guess, on the other hand, what kinds of things do you need to work on for the disorders that may not ramp up as quickly or early on in the launch such as patient or physician education?
>
> [Defendant Davis:] Yes. Let me take just a little bit of running start at it. So in dementia-related psychosis, sometimes people think about various subtypes. And of course, we've talked about that as well. **But just one, just as a background reminder that we received agreement with the FDA that we would pursue dementia-related psychosis broadly in order to treat the symptoms of psychosis, regardless of their clinically diagnosed subtype.** And I just want to be clear here, that subtype diagnosis is very subjective. It's difficult to diagnose. Many times, physicians don't know what the underlying etiology is as you sometimes going to only find it out through autopsy. And these patients are in terms of the kind of subtype that is assigned to them, many times it's wrong. And it's confirmed through autopsy."

> ■ **"ACADIA Pharmaceuticals Inc at Morgan Stanley Global Healthcare Conference (Virtual),"** ***Refinitiv*****, 14 September 2020, pp. 6-7 (emphasis added).**

122. Plaintiffs contend that these statements by Defendants, particularly with regard to implying that individual subgroup efficacy results were unimportant under the "FDA Agreement," were false or misleading, and helped maintain the fraud.[93]

**13. 17 November 2020: Acadia Presents at Stifel Virtual Healthcare Conference**

123. On 17 November 2020, the Company presented at the Stifel Virtual Healthcare Conference.[94] At the conference, Defendant Davis reemphasized how Acadia had an agreement with the FDA concerning the sufficiency of the Harmony Study's top-line efficacy results to support approval of the sNDA:

> "[Paul Matteis, Stifel analyst:] I guess as you've had continued engagement with the FDA, is there any interpretation you have on the lack of priority review? Investors and analysts love to read these tea leaves. And I've been misled by priority review and no panel, resulting in a CRL. So I won't overdo it, but what did you think internally then? And how do you guys feel about the intent?"
>
> "[Defendant Davis:] So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission. And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. **And just as a brief reminder, our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study**. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in

---

[93] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 13, 15, 19, 64.

[94] "Acadia Pharmaceuticals to Present at the Stifel 2020 Virtual Healthcare Conference on November 17, 2020," *Business Wire*, 10 November 2020 9:00 AM.

Alzheimer's and Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP.

So again, just as I put it – with that backdrop, at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in acute setting. **We'd like you [FDA] to agree to 3 things: one, that we studied DRP generally. They agreed to that**. **That was actually a very short discussion**. Two, that we run a relapse-prevention study now to demonstrate the – not only that we can stabilize patient symptoms, but that we get a durable effect over time. **And then three, that we – that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those**. That's documented in our minutes. **So fast forward to today, we then executed the exact plan that we laid out for them.** And again, that underlines the confidence we have in the potential for approval in DRP."

"[Paul Matteis, Stifel analyst:] Got it. Okay. Great, Steve. What were your discussions with the FDA and what you need to show for safety? I mean, there's this whole – we had Alzheimer's panel here at this conference yesterday and one of the panelists walked through the whole back history, going back to the 2000s with atypicals in the elderly and the original black box and changes in policy and things like that. What did FDA – did they ever articulate to you what they wanted to see, right? It's obviously very hard to disprove a negative. And I guess, were they going to rely more on just your DRP clinical data? Or how much of the PDP post-marketing data goes into this?"

"[Defendant Davis:] Yes. They're both important. **One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in addition to those 3 points, we also just asked FDA very specifically**. We said we just want to make certain that you are on board with approving a drug to treat dementia-related psychosis. Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. **We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to. And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that – if we weren't of that mind.**"

- **"ACADIA Pharmaceuticals Inc at Stifel Virtual Healthcare Conference,"** ***Refinitiv*****, 17 November 2020, p. 3 (emphasis added).**

124. Plaintiffs contend that these statements by Defendants, particularly those regarding the actual terms of the "FDA Agreement" and Acadia's alleged "execution" of the plan that they had agreed on with the FDA, were false or misleading, and helped maintain the fraud.[95]

**14. 12 January 2021: Acadia Presents at JPMorgan Healthcare Conference**

125. On 12 January 2021, Acadia presented at the JPMorgan Healthcare Conference.[96] In the course of a colloquy with JPMorgan analyst Cory Kasimov, Defendant Davis again represented that the Company had an agreement with the FDA that the Harmony Study top-line efficacy results, together with the results of other completed studies, were sufficient to support FDA approval of pimavanserin for DRP, irrespective of the Harmony Study's efficacy results by subgroup:

> "[Cory Kasimov, JPMorgan analyst:] [O]bviously, everybody is really focused, as I'm sure you are, on your pending PDUFA date for NUPLAZID for DRP. Can you just kind of frame expectations for what you would maybe expect or hope a label would look like, and the importance that will play in the commercialization of the product for the indication?
>
> [Defendant Davis:] Yes. Thanks much, Cory. I'll start and then – and Serge [Stankovic] may want to add some additional color as well. So the indication we'll be seeking is as NUPLAZID … for the treatment of dementia-related psychosis. And there are probably 2 key elements that we should touch on here: One is the – as I mentioned, we're seeking

[95] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 14-17, 19, 64-65.

[96] "ACADIA Pharmaceuticals Inc.'s (ACAD) CEO Stephen Davis at 39th Annual JPMorgan Healthcare Conference (Transcript) >ACAD," *Dow Jones Institutional News*, 12 January 2021 5:22 PM; and "ACADIA Pharmaceuticals Inc at JPMorgan Healthcare Conference (Virtual)," *Refinitiv*, 12 January 2021.

the treatment of dementia-related psychosis. **So we're not looking at individual subtypes as they are often referred to of dementia. The psychosis that we see is very similar between the – irrespective of the underlying etiology and it responds in a similar way. So we're seeking that broad indication. That's supported by a very both alignment we established with the FDA at our end of Phase II meeting and then again at their pre-sNDA meeting when we submitted our application**. The efficacy and safety data that we have, that underpins that indication, is very strong."

- **"ACADIA Pharmaceuticals Inc at JPMorgan Healthcare Conference (Virtual),"** ***Refinitiv*****, 12 January 2021, p. 5 (emphasis added).**

126. Plaintiffs contend that these statements by Defendants were false or misleading, and helped maintain the fraud.[97]

127. Analysts accepted the Company's assurances, and based on them expressed continued confidence that the pimavanserin sNDA for DRP would receive FDA approval.

"We continue to view ACAD positively based on the favorable efficacy/safety profile in DRP and late-stage pipeline potential in Rett syndrome and negative symptoms of schizophrenia. We maintain our Buy on ACAD shares with $66 PO, as we await 4Q results and DRP sNDA decision."

- **"DRP Label Expansion in Sight; Maintain Buy," by Tazeen Ahmad et al., BofA analyst report, 12 January 2021, p. 1.**

"We continue to believe that pimavanserin will be approved for DRP by the PDUFA date of April 3rd and that the launch will begin to quickly and meaningfully contribute to numbers this year. Reiterate Buy/High Risk."

- **"Alert: Incremental Updates on Nuplazid Commercial, DRP, and Pipeline from Management Meeting," by Neena Bitritto-Garg, Citigroup analyst report, 13 January 2021, p. 1.**

"We found the management Q&A session to be helpful and underscored their confidence in the approvability and commercial

---

[97] *See also, e.g.,* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 13-15, 18-19, 56-57, 65.

> potential of Nuplazid in DRP. We remain optimistic on the outlook for ACAD heading into the DRP approval and launch, further supported by encouraging commercial execution to date. As such, we continue to expect ACAD shares to grind higher into the anticipated approval. Maintain Overweight."

- **"The J.P. Morgan Healthcare Conference Hot Take," by Cory Kasimov et al., JPMorgan analyst report, 12 January 2021, p. 1.**

### 15. 8 March 2021: Acadia Discloses Receipt of the FDA's Deficiency Letter

128. On 8 March 2021, after the close of trading, the Company issued a press release that disclosed that it had received the Deficiency Letter from the FDA five days earlier (on 3 March 2021). According to the Company's press release, the DL stated that "the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time."[98] According to the press release, the FDA's DL did not "specify the deficiencies identified by the FDA," and had also advised that the DL "does not reflect a final decision on the information under review."[99]

129. The Company held a conference call shortly thereafter, at 5:00 PM Eastern Time on 8 March 2021 to discuss this development.[100] Comments made by analysts on the call show that they were very surprised to learn that the FDA had

---

[98] "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 8 March 2021 4:05 PM.

[99] "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 8 March 2021 4:05 PM.

[100] "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 8 March 2021 4:05 PM.

issued a DL that identified deficiencies in the sNDA that "preclude[d] discussion of labeling and post-marketing requirements/commitments at this time." This development was contrary to what Defendants had led analysts to expect. Analysts' questions and comments reflected the extent of their surprise and disappointment. Analysts wanted to know why the FDA had taken this step, and why Acadia had delayed announcing the receipt of the DL. Analysts also expressed concern that more bad news from the FDA concerning the sNDA would follow.

*a) Defendants' Commentary*

130. During the conference call, Defendant Davis stated that Acadia had been unable to get more information from the FDA regarding the deficiencies referred to in the agency's letter.[101] Defendant Stankovic also stated that despite the DL the Company was still confident in the sNDA for pimavanserin to treat DRP, and that the data submitted in the sNDA supported approval.[102]

131. Defendant Stankovic opened the conference call discussion with the following comments:

> "In the normal course of review, we responded to 2 data requests and 1 statistical question. In January of this year, the FDA conducted an inspection at ACADIA, focusing on HARMONY study, the pivotal trial in the sNDA, and the Phase II Alzheimer's disease psychosis study, one of the supportive studies for the DRP sNDA. We did not receive any observations related to the pivotal Phase III HARMONY study. We did receive observations related to the Phase II supportive study that we believe are not impactful on the efficacy and benefit/risk conclusions from this study."
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 3.**

---

[101] "ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, pp. 2-3.

[102] "ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 3.

*b) Analyst Question re: the Disclosure Delay*

132. During the 8 March 2021 conference call, JPMorgan analyst Cory Kasimov asked why the Company had waited several days before publicly disclosing the DL.[103]

> "[Cory Kasimov, JPMorgan analyst:] I'm kind of confused here. I mean, you got this letter last week on March 3, and you're just announcing it now almost a week later. Is it you were trying to – you've been trying to get in touch with the FDA and they won't respond to your incoming e-mails, phone calls, whatever it is? Is there anything else behind that?"
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 4.**

*c) Analysts Ask for More Information*

133. Analysts pushed Defendants for more information. Some analysts' questions harkened back to concerns they raised earlier in the Class Period about the Harmony Study's design and the potential importance of the Harmony Study's subgroup results[104] – concerns that, Plaintiffs allege, had previously been assuaged by the Defendants' repeated prior misrepresentations and omissions.[105]

134. For example, in light of the news of Acadia's receipt of the DL, some

---

[103] "ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 4.

[104] *See, e.g.*, "J.P. Morgan Biotechnology Conference Call Series – Acadia Pharmaceutical (ACAD)," 11 November 2019, ACAD_SECLIT_0299844-45; "Solid HARMONY Data at CTAD Underlie Mgmt's Confidence in Approaching FDA; Our Take on the Full Results," by Paul Matteis and Nathaniel Tower, Stifel analyst report, 5 December 2019, p. 1; "ACAD - A Psychosis Success Story; Initiate at BUY and $60 PT," by Yatin Suneja et al., Guggenheim analyst report, 16 December 2019, p. 25; and "ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, pp. 9-10.

[105] *See* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 7-19.

*CONFIDENTIAL*

analysts pressed Acadia on whether the deficiencies that had led the FDA to issue that letter might include the sNDA's failure to sufficiently demonstrate pimavanserin's efficacy in patients diagnosed with non-PDP dementia subtypes. That is, some analysts apparently construed that the deficiencies identified by the FDA would draw into question the representations made by Defendants since the start of the Class Period that touted the sufficiency of the Harmony Study's top-line efficacy results and -019 Study data, and Acadia's "execution" of its "agreed plan" with the FDA for obtaining sNDA approval (but that never disclosed the FDA's alleged requirement that the Harmony Study also generate directionally consistent subgroup results). For example, the following exchanges took place on Acadia's conference call with analysts on 8 March 2021:

> "[Paul Matteis, Stifel analyst:] And the clarification is really, you mentioned that there were FDA questions related to particular patient profiles. Did that have anything to do with the different subindications within the DRP trial, and whether or not the effect size kind of held up across groups? …
>
> [Defendant Stankovic:] Yes. Let me start with the first clarification in terms of the data request. These were not related to any specific subtype of dementia. They were more related to the response and relapse. And so the FDA wanted to look at the entirety of the patient profile and just ask us to make it easier for you to review the individual patients – not all, but some of the patients and ask us for those patient profiles. So statistics, just biometrics produced those reports, and we send them back to them. So there were not any specific targeted questions about that, but it must please help us so that we can review this easier."
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application,"** ***Refinitiv*****, 8 March 2021, pp. 6-7.**
>
> "[Joseph Stringer, Needham analyst:] I just wanted to clarify on comments that Serge [Stankovic] had made on no observations related to the pivotal study. But you mentioned the Phase II supportive trial, could you maybe just sort of – I guess, repeat what you had said in terms of observations from that and expand on that, if you could?

[Defendant Stankovic:] Yes, absolutely, I'd be happy to do that, and maybe provide a little bit of the color. Just to repeat, in January, we had an inspection that was focused on these 2 studies: Our pivotal trial, HARMONY study; and [our] Alzheimer's disease psychosis study, which is one of the supportive trials in this supplemental NDA. No observations related to HARMONY study, observations related to supportive Phase II study, and we believe that this observation really were – are not impactful on the – any conclusions from this study, but either in efficacy or benefit/risk profile. The observations were related to investigator and sponsor oversight. This sort of things in any inspections often happen that some observations are noted. And as I said, the impact of this observation in our belief is not really affecting the overall conclusion from this study."

- **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application,"** ***Refinitiv*****, 8 March 2021, pp. 8-9.**

"[David Hoang, SMBC analyst:] So I just had a question on the Phase III HARMONY study, just kind of going back to the design of that study. I understand it's a randomized withdrawal design. Could you just remind us why that design was selected versus sort of a more standard placebo-controlled design? And then are there any precedents within the CNS space for FDA approving a drug based on one pivotal study that uses a randomized withdrawal design?

[Defendant Stankovic:] Right. Let me start. There is a few questions here that I would like to address. First, I want to emphasize that the design of the single pivotal trial, an agreement that one single – robustly positive pivotal trial of the design, as we proposed, would be sufficient for approval of this indication was agreed with the FDA both at the end of Phase II meeting as well as the pre-sNDA meeting. So this was – FDA was well informed about the design, and we have the discussions of that and agreement even before we started the study. The choice of the design was not in the absence of already available efficacy data for pimavanserin in both Parkinson's disease patients with psychosis and dementia and in the Alzheimer's disease psychosis patients, where in both of this, in the 6-weeks efficacy evaluation, the drug showed superiority over placebo."

- **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application,"** ***Refinitiv*****, 8 March 2021, p. 9.**

*d) Analyst Concerns About a Potential CRL*

135. On the call, JPMorgan analyst Cory Kasimov broached the subject of a potential CRL, and suggested that the DL might be a precursor to a CRL rejecting the sNDA.

136. In response, Defendants acknowledged that a CRL denying approval of the sNDA was possible, but that it was ultimately a matter of speculation in the absence of more information. Defendants offered hope that a CRL would not be issued.

> "[Cory Kasimov, JPMorgan analyst:] Okay. I mean – so you just sit here in limbo until they decide to respond. I mean, maybe just ask this another way. Is there – can you talk about the precedent for this type of communication? I am aware of some other companies that have gotten notifications like this. Is there any way to avoid a CRL at this point?
>
> [Defendant Davis:] It's – without having more information ourselves and knowing the nature of the deficiencies, it's hard for us to speculate. We are aware of some precedent situations where other companies have received letters that sound similar to this letter. And based upon those precedents, it would appear, likely, that we may have a CRL, but we just don't know at this juncture. We're still in the middle of a pandemic. I think the normal rules of engagement are perhaps a little bit different. And I'm not sure that precedents earlier are necessarily the best guide now. So I wish that we had more information to share. We just have not been provided any information from the FDA."
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application,"** ***Refinitiv*****, 8 March 2021, p. 4.**

*e) Negative Analyst Reaction*

137. Analyst reaction to the news of Acadia's receipt of the DL was decidedly negative. Having previously been optimistic that the sNDA would be approved because they had been told by Defendants, inter alia, that the Harmony Study had produced the efficacy results that were needed to secure approval under the FDA Agreement, and that Acadia had "executed the plan," analysts were

surprised by the turn of events and the reported negativity in the DL. That the "identified deficiencies" could relate to the Harmony Study's subgroup efficacy results would run contrary to Defendants' prior alleged (mis)representations and omissions with respect to the FDA's alleged endorsement of the Harmony Study's design and the purported understanding with the FDA that only the Harmony Study's top-line efficacy results would be important to the approval decision.

138. Many analysts now believed an adverse complete response letter was likely. The following excerpts from analyst reports are illustrative of analysts' reactions.

> "We are surprised by news that the FDA has 'identified deficiencies' in the Nuplazid application for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). While the actual deficiencies have apparently not been communicated to the company, **we assume they will likely receive a Complete Response Letter** for the application on the April 3 Action Date."
>
> - **"Application Deficiencies Increase Risk and Likely Push Out DRP Approval; Lower PT to $55," by Vamil Divan et al., Mizuho analyst report, 8 March 2021, p. 1 (emphasis added).**

> "In our DCF-based model, **we adjust our assumptions to now assume a Complete Response Letter [CRL]**."
>
> - **"FDA Surprisingly Delays Start of Label Discussion for DRP; Lower to Neutral," by Tazeen Ahmad et al., BofA analyst report, 9 March 2021, p. 1 (emphasis added).**

> "FDA notified ACAD that it identified deficiencies in the DRP sNDA for pimavanserin that preclude discussion of labeling and post-marketing requirements. Although the exact deficiencies are not yet specified, FDA stated this notification does not reflect its final decision on the sNDA, and the originally scheduled PDUFA date (4/3/2021) remains unchanged. **We expect ACAD to receive a CRL**, and consequently adjust our DRP sales forecast for launch in 2022."
>
> - **"Challenging Path to DRP Lays Groundwork for Followers," by Jay Olson et al., Oppenheimer analyst report, 9 March 2021, p. 1 (emphasis added).**

> **"[W]e believe a complete response letter (CRL) is likely, per prior precedents**. We are disappointed by the news and note the regulatory

path for Nuplazid in DRP (key value driver; GSe of $4.4bn in 2030) is now uncertain – we outline potential scenarios within."

- **"Acadia Pharmaceuticals Inc. (ACAD): Nuplazid sNDA for DRP Hangs in the Balance; Decent Likelihood of a CRL," by Salveen Richter et al., Goldman Sachs analyst report, 9 March 2021, p. 1 (emphasis added).**

"**Though the notification does not reflect a final decision on the sNDA, the company will likely receive a CRL, in our view**. Based on past examples of companies received deficiency notifications that precluded further review in the space, almost all the companies received CRLs within one month following the notification – reasons include insufficient data on efficacy, long-term safety, as well as CMC capabilities."

- **"FDA's sNDA Deficiency Notice Adds New Surprise, Uncertainty to DRP Opportunity," by Gregory Renza and Yinglu Zhang, RBC Capital Markets analyst report, 8 March 2021, p. 1 (emphasis added).**

"Ahead of the Apr. 3rd PDUFA date for pimavanserin in dementia-related psychosis (DRP), FDA communicated negative feedback to ACAD. **Based on past precedent, it now appears likely FDA will issue a complete response letter (CRL) rejecting pimavanserin for DRP**, a surprise outcome for the Street and investors."

- **"Ominous FDA Feedback Forebodes CRL for Dementia-Related Psychosis sNDA," by David Hoang and Tong Liu, SMBC analyst report, 9 March 2021, p. 1 (emphasis added).**

*f) Reduced PoS Estimates and Downgrades*

139. Nearly every analyst that issued a report on Acadia in the wake of the DL disclosure either (a) lowered their PoS estimate (while also lowering their rating and/or price target for Acadia stock), or (b) implicitly lowered their PoS estimate as reflected in their lowered rating and/or price target for Acadia stock.

140. As shown in Appendix D, analysts' average PoS estimate fell from 88% to 68% following the news of the DL. In light of the number of analyst comments that a CRL was now likely (and in light of Defendant Davis's own statement that a CRL was likely), and based upon my review of analyst reports issued in the wake of

the DL disclosure, I conclude that some portion of what analysts had previously estimated as the probability of approval of the sNDA (as submitted) shifted to become part of their estimated probability of FDA approval of a later, amended sNDA that would likely require additional supportive data from new studies (which analysts noted could be expected to take years to conduct). In other words, to the extent that analysts reported positive (non-zero) PoS estimates for ultimate FDA approval of pimavanserin to treat DRP, based on a review of their reports it is reasonable to conclude that they now believed that obtaining such approval would take longer than they had previously factored into their valuation models, if it happened at all.

141. Following the news that Acadia had received a DL, analysts lowered their valuations for Acadia stock. For example:

> "We are downgrading ACAD from Strong Buy to Outperform following today's disclosure that the FDA found deficiencies in their sNDA filing that preclude labeling discussions for Nuplazid in dementia related psychosis (DRP)."
>
> - **"Downgrading to Outperform; Did Not See This One Coming – DRP Seems to be Headed for a CRL," by Danielle Brill and Daniil Gataulin, Raymond James analyst report, 9 March 2021, p. 1.**

> "We believe the post-market ACAD share reaction is consistent with our scenario analysis. We lower our POS estimate for DRP to 50% from 90%, driving our new $28 price target ($42 prior) and maintain our Perform rating."
>
> - **"Challenging Path to DRP Lays Groundwork for Followers," by Jay Olson et al., Oppenheimer analyst report, 9 March 2021, p. 1.**

> "Pending further clarity on: the specifically identified deficiencies from the FDA for the DRP program; availability of FDA guidance prior to the April 3 2021 PDUFA date; and whether the PDUFA date itself could ultimately be impacted, we are reducing our POS to 40%, from 75% for the DRP program, and reducing our price target to $43, from $60 per share."

- **"FDA Identified Deficiencies Present Cloud Around DRP Headway; PT to $43," by Andrew Fein et al., H.C. Wainwright analyst report, 9 March 2021, p. 1.**

"We think it unlikely that Acadia would be forced to run another trial, but may be asked rather for additional analyses of the HARMONY data. **This would require another review cycle and delay approval by -1 year. As a result we are updating our model with a 2022 DRP launch and are lowering our NPV-based target to $57 as a result.**"

- **"FDA ID's Deficiencies in Pima SNDA; Potential CRL on PDUFA," by Ritu Baral et al., TD Cowen analyst report, 8 March 2021, p. 3.**

132. Moreover, even those analysts that did not immediately lower their stated PoS estimate or their price target or rating for Acadia stock in the wake of the DL disclosure were also unsettled by the news, and advised their readers that they would be re-evaluating Acadia after they had more time to assess and digest what appeared to be a new set of circumstances. For example:

"We are placing our rating and price target on ACADIA Pharmaceuticals under review until we gain clarity on the sNDA for pimavanserin in dementia related psychosis (DRP). **Yesterday afternoon, ACADIA announced receipt of a notification from the FDA that it had identified deficiencies in the sNDA that preclude label discussions. The company has reached out to the agency, but has not yet received visibility into the deficiencies. We do not view it as prudent to speculate on next steps without additional details, however, we believe more clarity will be available at the latest by the April 3 PDUFA date. Our confidence in the approvability of the drug in DRP, as well as the commercial potential in PDP and ongoing Phase 3 program in schizophrenia negative symptoms remains unchanged and robust."**

- **"DRP Review Deficiencies a Mystery One Month Ahead of the PDUFA," by Jason N. Butler et al., JMP analyst report, 9 March 2021, p. 1.**

"Our $63 PT includes $32 for the DRP indication, which assumes >$2B of additional sales at 100% POS, *i.e.*, with the positive Phase 3 data and previous comments from management, we had assumed that this

> indication was going to get approved. At this point, we are making no changes to our model, but if the PDUFA date is extended, we will then adjust our financial model accordingly. We remain Outperform and at this depressed after-hours trading level of ~$27-29 we continue to recommend the stock. The risk/reward is very favorable at this level, in our view."

- **"Surprise Negative FDA Letter, but We Still Think DRP Can Work," by Marc Goodman et al., SVB Leerink analyst report, 8 March 2021, p. 1.[106]**

142. Even though analyst reports published after 8 March 2021 show a decline in the stated PoS estimates, as noted above those nominal declines tell only part of the negative story, because the revised PoS numbers now largely assumed that any approval of pimavanserin to treat DRP generally – even if granted – would now take substantially longer than they had previously anticipated. In other words, analysts' references to PoS were now becoming more of an estimate of the probability that Acadia would ever *eventually* obtain approval of its requested DRP indication, not in 2021 but in roughly the next three years, based on the realization that the FDA would likely require Acadia to conduct additional studies before it would consider approving a DRP indication in the future. The following quotes illustrate how analysts began to define PoS in terms of the probability that Acadia would ultimately succeed in expanding pimavanserin's label after the completion of additional clinical studies, rather than in terms of the PoS based on the completed set of studies (especially Harmony Study and -019 Study) on which Acadia's prior sNDA had been based:

> "Given DRP is the biggest contributor to our PO [price objective] for ACAD shares, we think it is prudent to lower our rating to Neutral (from Buy) and adjust our expectations as we await visibility. In our DCF-based model, we adjust our assumptions to now assume a Complete Response Letter (CRL). We push out DRP launch to 2022

[106] Stifel, having previously issued a report on Acadia in February 2021, did not issue a new report on Acadia until after the further disclosures of 5 April 2021.

(prev. 2021), decrease DRP peak penetration to 10% (prev. 12%) and adjust our DRP ramp and op ex assumptions. We also lower our LoS [Likelihood of Success] for DRP to 60% (from 75%) and raise WACC to 11% (from 10%) to reflect higher risk. Our model changes result in our new $40 PO (prev. $66)."

- **"FDA Surprisingly Delays Start of Label Discussion for DRP; Lower to Neutral," by Tazeen Ahmad et al., BofA analyst report, 9 March 2021, p. 1.**

"Deficiencies in the review for pima in DRP suggest a CRL is likely by April 3rd (PDUFA). **FDA has not defined these deficiencies, but we think they're either 1) need for more efficacy data** or 2) needing for more time to internally develop a strategy for how to handle the black box warning. We believe the latter was the genesis of the standard review vs. priority review timeline, given the precedent an approval for DRP would set with other APs, but that the full review may have raised questions around the totality of the efficacy data. **If this is as simple as FDA being highly diligent avoid a post-marketing safety questions, the delay could be ~1 year, but we think most likely additional efficacy data may be needed**. We're taking our price target down to $35/share (-$31/share) and downgrading to Neutral/High Risk.

…

As we think additional efficacy data may be needed, we've pushed DRP approval out at least two years, which removes $24/share from our price target. We also lowered PoS to 70% from 95%, which removes another $7/share, and raised our WACC from 8.5% to 9.0% to reflect more uncertainty in future cash flows, which removes another $0.50/share from our valuation."

- **"CRL Likely on April 3rd, Expect Delay of 1.5-2 Years; Comments from Management Follow-up; Downgrade to Neutral, PT to $35," by Neena Bitritto-Garg, Citigroup analyst report, 9 March 2021, pp. 1 and 3 (emphasis added).**

"If a CRL is issued with the requirement for an additional clinical trial – for illustrative purposes, we consider two possible outcomes: ▪ If an additional clinical trial is required but no issues are raised with the prior Ph3 HARMONY trial design (*i.e.* suggesting a second relapse prevention trial is employed), on maintaining our PoS of 85% for Nuplazid in DRP and pushing out our launch by 3 years – and a current PoS of 50% for trofinetide in Rett syndrome, the DCF valuation would be $51. No contribution from trofinetide would result in a DCF valuation of $40. ▪ If an additional clinical trial is required that is of a

different design from the prior Ph3 HARMONY study, we would have less conviction in its success. On a PoS to 50% for Nuplazid in DRP and delaying the launch by 3 years – and a current PoS of 50% for trofinetide in Rett syndrome, the DCF valuation would be $38. No contribution from trofinetide, would result in a DCF valuation of $31."

- **"Acadia Pharmaceuticals Inc. (ACAD): Nuplazid sNDA for DRP Hangs in the Balance; Decent Likelihood of a CRL," by Salveen Richter et al., Goldman Sachs analyst report, 9 March 2021, pp. 2-3.**

"We return our overall probability of success of the DRP program to 75% (from 90%), on a base case for a now delayed launch year to 2023 to capture a path where a CRL and FDA dictate that another study be required for approval (which, if the potential path forward, would have full resource commitment from management, per our conversations)."

- **"FDA's sNDA Deficiency Notice Adds New Surprise, Uncertainty to DRP Opportunity," by Gregory Renza and Yinglu Zhang, RBC Capital Markets analyst report, 8 March 2021, p. 3.**

"Given Nuplazid is already an approved product, we wonder if the FDA is looking for additional data that is specific to the DRP indication (such as potentially more data in patients with various types of dementia) or has concerns with the randomized withdrawal study design that was used in the HARMONY trial. As a result, we are taking a more conservative stance relative to our previous assumptions and now assume a longer delay (including a scenario in which the company would need to conduct an additional pivotal study), leading us to assume a 60% POS (from 70% before) and a 2024 DRP launch, which lowers our PT to $37."

- **"Upon Further Review…Lower PT to $37 on DRP's Likely Lengthier Delay, But Not Its Demise," by Vamil Divan et al., Mizuho Securities analyst report, 11 March 2021, p. 1.**

*g) Market Selloff*

143. Consistent with analysts' increased pessimism regarding the future of Acadia's pimavanserin franchise, Acadia's stock price declined 45.3% on 9 March 2021, (which was the first trading day after the announcement of Acadia's receipt of the DL) from the prior day's closing price of $45.78 per share. In dollar terms,

Acadia's stock price fell $20.76 per share, from $45.78 per share at the close on the prior day, to $25.02 per share at the close on 9 March 2021.

144. Statistically controlling for market and sector factors, which had a positive impact on the Acadia stock price that day, as further detailed below in this report, the isolated impact of the Company-specific disclosures of 8 March 2021 on Acadia's stock price was to decrease it by $21.57 per share on 9 March 2021. This price impact is statistically significant at the 99% confidence level, which establishes that this stock price decline was caused by the adverse Company-specific news disclosed on 9 March 2021, and not by random volatility or other market factors.

### 16. 5 April 2021: Acadia Announces Receipt of the CRL

#### *a) The Announcement*

145. On 5 April 2021 before the start of trading, Acadia issued a press release that announced that it had received a CRL from the FDA, which advised Acadia that the FDA, having completed its review of the sNDA, had "determined that the application cannot be approved in its present form."[107]

146. I understand that the CRL (like the DL) did not become publicly available until 12 December 2023 (*i.e.*, more than two-and-half years after the 5 April 2021 press release). However, Defendants purported to summarize certain aspects of the CRL in their 5 April 2021 press release and during a conference call with analysts held later that same day.

147. According to Acadia, in the CRL, the FDA "cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence

[107] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 5 April 2021 6:30 AM.

of effectiveness to support approval."[108] That is, the Company disclosed that the FDA had rejected the sNDA due at least in part to deficient subgroup efficacy data.

148. In addition, according to the press release, the FDA had concluded that the -019 Study was "not … adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred."[109] The Company had previously represented that the -019 Study was supportive of the sNDA, and using it to support the pimavanserin sNDA was part of the executed plan agreed upon with the FDA.

149. In its press release disclosing its receipt of the CRL, the Company stated:

> "'Acadia stands behind the robustly positive results from the pivotal Phase 3 HARMONY study and the prospectively agreed trial design and criteria for establishing efficacy in DRP. Over the entire course of the review, the Division did not raise any concerns regarding the agreed upon study design, including the issues raised in the CRL,' said Steve Davis, Chief Executive Officer of Acadia. 'We will immediately request a Type A meeting to work with the FDA to address the CRL and determine an expeditious path forward for the approval of pimavanserin in DRP.'"
>
> ■ **"Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis,"** ***Business Wire*****, 5 April 2021 6:30 AM.**

150. With these defensive statements, the Company continued to try to

---

[108] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 5 April 2021 6:30 AM.

[109] "Acadia Pharmaceuticals Receives Complete Response Letter from U.S. FDA for Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 5 April 2021 6:30 AM.

persuade analysts and investors that Acadia and the FDA had agreed that subgroup efficacy data would not be relevant to the FDA's decision as to whether to approve the sNDA, contrary to Plaintiffs' allegations.

151. Prior to the start of trading on 5 April 2021, Defendants held a conference call with analysts to discuss the CRL. The conference call was convened after the issuance of the press release but still before the start of trading.[110] On the call, some analysts inquired about the next steps in the regulatory process. Other major topics of analyst queries were the specific deficiencies in the sNDA mentioned in the CRL, and whether Defendants could or should have been aware of those deficiencies earlier, including with respect to the Harmony Study.[111]

152. Analysts also asked specific questions about the nature and quality of the supporting data from the -019 Study that had been submitted as part of the sNDA concerning the efficacy of pimavanserin for Alzheimer's patients with ADP.[112]

*b) Analyst and Market Reaction to the CRL Disclosure*

153. Unsurprisingly, the reaction by the market and analysts to the news of the issuance of the CRL was decidedly negative.

---

[110] "ACADIA Pharmaceuticals Inc to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application," *Refinitiv*, 5 April 2021, pp. 1-14.

[111] "ACADIA Pharmaceuticals Inc to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application," *Refinitiv*, 5 April 2021, pp. 5-14 ([Question from Andrea Tan, Goldman Sachs:] "I guess we understand that it's early and you're planning on engaging with the FDA here, but just in thinking about the potential range of scenarios, do you think it's potentially likely that you would need 2 additional studies if they are bringing up the Phase II trial as well as some deficiencies with HARMONY?"; [Question from Danielle Brill, Raymond James:] "So I'm curious when in the review cycle these types of deficiencies would typically be highlighted? I mean given the magnitude of the issues cited, Steve, would you have expected to have heard something earlier on?").

[112] "ACADIA Pharmaceuticals Inc to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application," *Refinitiv*, 5 April 2021, pp. 12-14 ([Question from Danielle Brill, Raymond James:] "And then what protocol violations occurred in the Phase II trial and were these ever disclosed in the past?").

154. Analysts promptly further lowered their valuations of Acadia and its stock in light of the CRL, which they construed as making clear that the FDA would not approve the sNDA in its current form. In addition, while two analysts revised their stated PoS to zero (to reflect their belief that the prospects for approval of the sNDA in its current form had dropped to nil), it is apparent from a review of the other analysts' reports that – to the extent they had not already done so following the disclosures of 8 March 2021 – analysts who gave a positive PoS had changed their approach to PoS to focus on the probability that Acadia would *eventually* obtain approval for an expanded pimavanserin label, which would take as much as 3 years more time and substantially more cost. Analysts understood that the FDA would likely require Acadia to conduct additional studies to try to collect better efficacy data before approving expanded labeling for pimavanserin. Accordingly, even though analyst reports issued after 5 April 2021 reflected sharp declines in the PoS estimates, the nominal decline in those PoS numbers – as compared to pre-5 March 2021 PoS numbers – tell only part of the negative story, as after the DL disclosure the PoS estimates were now more of an estimate of the probability that pimavanserin would be approved to treat DRP at some much later point in the future rather than an assessment of the likelihood that the submitted sNDA would be approved. In all events, by 5 April 2021, analysts generally agreed that no sNDA was going to be approved in the immediate future, and that FDA approval of pimavanserin to treat DRP – if it were ever to be granted – would now likely take substantially more time and money than had been previously anticipated.[113]

155. Many analysts also pointed out that the reasons underlying the FDA's

[113] In addition, some analysts began to expressly consider additional sub-optimal approval scenarios, such as scenarios where the FDA might ultimately approve only a partial expansion of pimavanserin's label (beyond the treatment of PDP) to include treatment of only one or more specific non-PDP DRP subtypes, rather than the originally hoped-for broad indication of DRP.

issuance of a CRL ran contrary to what Defendants had told the market about what efficacy data would (or would not) be considered by the FDA under the Company's purported agreement with the FDA. The following excerpts from analyst reports issued in the wake of the disclosures of 5 April 2021 are examples of such commentary:

> "ACAD announced today FDA issued a Complete Response Letter (CRL) for Nuplazid in Dementia-Related Psychosis (DRP) We think the news was mostly expected as ACAD had hosted a recent (3/8/21) update call where it disclosed FDA had identified deficiencies in the sNDA. However, the issues raised today in the CRL are significant and include FDA concerns around a broad DRP label based the Ph3 HARMONY trial due in part to 1) lack of stat sig diff w/in some dementia subgroups and 2) insufficient # pts w/ certain less common dementia subtypes. ACAD will request a Type A mtg w/ FDA and we await outcome to gain more visibility on a regulatory path forward. **The issues raised by FDA in the CRL suggest addn trial(s) will likely be needed prior to any type of approval. We are lowering our DRP POS to 20% (was 60%) and adjusting our Nuplazid sales ests**."
>
> - **"FDA Issues CRL for Nuplazid in DRP. Lowering PT to $30," by Joseph Stringer, Needham analyst report, 5 April 2021, p. 1 (emphasis added).**
>
> "This morning, ACAD announced that it had received a complete response letter (CRL) from the FDA for its sNDA for Nuplazid in dementia related psychosis (DRP), which was unsurprising given the prior announcement on unidentified deficiencies with the application. **Despite prior alignment with the agency on the trial design and proposed study population, the FDA cited a lack of benefit demonstrated for Nuplazid across the various dementia subtypes** (the trial was not powered to detect statistical changes; details within). We await clarity regarding next steps (ACAD has stated that it is planning to request a Type A meeting to understand the rationale for the decision and to make a case for the strong benefit/risk profile in the broader DRP population); **however, we expect the base case is now for an additional pivotal trial which could delay commercial launch by about three years**, while noting the evolving competitive landscape that could limit ACAD's first-mover advantage. **Given the setback, we now see a lack of meaningful near-term value drivers and**

**downgrade ACAD to Neutral, lowering our 12-month PT to $25 from $73**.

…

While we acknowledge ACAD's next steps to engage with the FDA in the aforementioned Type A meeting, we expect the base case now is likely to require an additional pivotal trial to demonstrate Nuplazid benefit across specific subtypes of dementia …"

- **"Nuplazid CRL as Expected; Looking for Clarity on Forward Path From Type A Meeting – Downgrade to Neutral," by Salveen Richter et al., Goldman Sachs analyst report, 5 April 2021, pp. 1 and 4 (emphasis added).**

"The pivotal trial was designed to hit on overall effect size, and frustratingly could have been powered to achieve stat sig for subgroups. Despite Co's assertion they can convince FDA, **we now expect add'l clin work will be required, delaying launch to '24 & lower PoS in the indication to a 'coin-flip.'** As a result, we D/G to HOLD & lower PT to $21. Despite prior agreements, the CRL cites efficacy in dementia subgroups as insufficient for approval."

- **"CRL Portends More Clinical Work Required for DRP – D/G to HOLD & PT to $21," by Chris Howerton et al., Jefferies analyst report, 5 April 2021, p. 1 (emphasis added).**

"Worst case scenario now priced in; we are reinstating our Market Outperform rating from 'under review' on ACADIA Pharmaceuticals while lowering our risk-adjusted, DCF-derived price target to $40 (from $62 previously). ACADIA announced this morning that the company received a Complete Response Letter (CRL) for the sNDA for pimavanserin to treat dementia related psychosis (DRP). The company plans to seek a Type A meeting with the agency and we expect an additional update by mid-year. Acknowledging that the near-term path forward for the DRP indication is unclear with many potential scenarios (best case: resolution without additional clinical trials and approval ~YE 2021; worst case: new clinical trials and multi-year delay), we believe the stock is now discounting any value for NUPLAZID in indications beyond Parkinson's disease dementia or pipeline assets. We have delayed our projected launch in DRPs by three years, to 2024, on the assumption the company will need an additional clinical trial, and have lowered our probability of approval to 75% from 90% to reflect clinical risk."

- **"FDA Moves the Goal Posts on DRP Regulatory Path," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 5 April 2021, p. 1 (original emphasis removed).**

"We now assume **a three-year delay** (vs. two years previously) for DRP, which removes $7/share from our model and a lower 60% PoS (vs. 70% previously), which removes another $3/share."

- **"Likely to Pursue New Phase 3 Planning & Dispute Resolution in Parallel; Additional Comments from Mgmt; PT to $25 (-$10)," by Neena Bitritto-Garg, Citi analyst report, 5 April 2021, p. 2.**

"As such, we await visibility on whether the CRL will result in a multi-month or **multi-year delay** to re-assess the mid to long-term outlook for Nuplazid. We still believe this is ultimately an approvable indication based on the compelling data to date (which suggests value at these levels), but that has to be balanced against the opportunity cost of a potentially extended wait.

…

**Under a scenario in which the FDA requires one or two more clinical studies, we assume a 3-year delay, decrease our POS to 55% (from 70%) for US DRP (to account for the additional risk in running those studies) and increase R&D spend.**

…

Alternatively, if we remove DRP from our model altogether, our fair value would go to $20 - $22 per share. It is important to note that this excludes contribution from trofinetide in Rett syndrome (Ph3 expected 4Q21) and Nuplazid in schizophrenia (among other early-stage clinical candidates). Bottom line is that at the current valuation and near-term outcome of the Type A meeting, we are maintaining our OW rating based on a risk/reward basis and will re-assess as details emerge. We do suspect that ACAD has quite an uphill battle in front of it. That said, we assume the market also currently reflects this expectation, and thus at these levels, we'd wait for the added clarity in the coming 1-2 months."

- **"CRL as Expected…Path to Market Remains Unknown," by Cory Kasimov, J.P. Morgan analyst report, 5 April 2021, p. 1.**

"While waiting for further clarity on path forward from ACAD following their Type A meeting, we continue to see viability of pimavanserin in DRP though now expect additional trial to support approval broad or narrower indications and an even longer runway to

> patients. We continue to see activity of pimavanserin and potential in the DRP indication, though additional clinical trials could be required – either in certain subtypes or in a broad population – to support approval. Mgmt confirmed that they have initiated planning for additional trials to support approval in a proactive manner, and will finalize the decision based on feedback and clarity from the Type A meeting. **We are making several tweaks to our model, including a reduced POS of the DRP program (to 55%), a prospective launch in DRP now to 2024 to incorporate any additional trialing**, and adjusted SG&A expenses over 2021 and the near-term, which results in our $32 PT – we remain Outperform rated."

- **"Tension Mounts on DRP Expansion with CRL; Unsurprising Development, Unclear Path Forward," by Gregory Renza and Yinglu Zhang, RBC Capital Markets analyst report, 5 April 2021, p. 2 (original emphasis removed and emphasis added).**

> "**At this point, it's pretty clear the agency is looking for at least 1 additional Ph 3 trial that shows robust efficacy by the different dementia subtypes.** We are now modeling this as our base case (launch ~2024, 25% PoS)."

- **"CRL Suggest at Least 1 More Trial Needed for DRP Approval; Downgrading to Market Perform," by Danielle Brill and Daniil Gataulin, Raymond James analyst report, 5 April 2021, p. 1.**

156. Some analysts noted that the FDA's rationale for the CRL, as reported by the Company, contradicted what the Company had previously told them about the agreement with the FDA and about what data was necessary for FDA approval, in response to prior concerns and questions raised by the analysts. Some analysts offered that the Company might have misrepresented what the FDA had said at the May 2017 EOP2 meeting. The following excerpts from analyst reports are illustrative of such analyst commentary:

> "Failure to appreciate FDA advice presents Achilles' heel for program. **Based on the CRL, we believe ACAD completely failed to appreciate the FDA's advice at the end of the Phase 2 meeting, which clearly stated that a single well-controlled study must be very persuasive, offer statistical significance with a very small probability of Type I error, and that it should be clinically meaningful**. In effect, failure to fully appreciate a prospective

worst-case scenario following the EOP2 meeting has resulted in just that for DRP advancement, in our view. Based on the emerging details since the last March update (our note here), we believe ACAD clearly failed in satisfying all three of these requirements. Apart from the HARMONY trial being internally inconsistent, the supportive data from the AD trial based on our analysis below was weak enough not to offer clinically meaningful data. **We believe the HARMONY trial and the AD trial in retrospect were anything but persuasive**. Therefore, announcement of the CRL is not that surprising despite the way the company projected it to be.… As discussed below, we are reducing our price target to $18 from $43, and downgrading our rating to Neutral from Buy."

- **"CRL Debacle Seemingly Pushes DRP Progression Years Into Future; PT to $18," by Andrew Fein et al., H.C. Wainwright analyst report, 7 April 2021, p. 1 (emphasis added).**

"**We believe ACAD potentially misread FDA's view of Nuplazid's ability to deliver on unmet medical needs in DRP and what is required for approval**."

- **"CRL Reveals Growing DRP Disconnect," by Jay Olson et al., Oppenheimer analyst report, 5 April 2021, p. 1 (emphasis added).**

"**That said, it's interesting that FDA is also raising issues with subgroups from the relapse prevention ph3. This is something that we called out when the initial data were presented at CTAD: pimavanserin's efficacy in the relapse prevention trial was most robust in the Parkinson's sub-population, and one could argue that this is the primary reason why the trial was stopped at the interim**. We had figured this detail could be overlooked since the data for ADP was still pretty good (14 relapses placebo, 8 drug), **but data in some or the other rarer subgroups is less consistent,** and perhaps if one is not a believer in the 'acute' ph2 trial the small numbers issue with the ph3 become more prominent."

- **"ACAD Initial Take: CRL for Efficacy Reasons, Citing Gripes with Both Trials, Seems Hard to Overcome," by Paul Matteis et al., Stifel analyst report, 5 April 2021, p. 1 (emphasis added).**

157. The FDA's rejection of the sNDA and criticism of the -019 Study also reminded some analysts of their prior concerns with that study, which Defendants had addressed with allegedly false and misleading assurances. For example:

“**Acadia also provided added clarifications on the deviations in Phase 2 protocols the FDA noted in the CRL. The protocol deviations included deviations in terms of entry criteria, use of prohibited meds, and deviations in providing informed consent.** Acadia subsequently performed a per protocol analysis on the data (as is typical in these situations), and the analysis continued to support the observations of efficacy in the study. Importantly, these per-protocol analyses were included in the sNDA data package for the FDA to review. **However, we suspect the number and nature of protocol violations likely lowered the supportive value of the ’019 trial to pima’s DRP sNDA, correspondingly raising the bar for the HARMONY data.**”

- **“Pima CRL for DRP: Opp’y in DRP in Question as FDA Asks for More Efficacy Data,” by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 5 April 2021, p. 4 (emphasis added).**

“Seeing what you want to see – meek data from the Phase 2 ADP trial. **As we think about the AD trial, instead of being supportive, that trial should have been the trial for introspection, in our view. The data as we had discussed in our earlier note had all the red flags for ACADIA to take a step back and re-analyze the trial design.** Recall that the mean change in NPI-NH psychosis score -3.76 points [SE 0.65] for pimavanserin and -1.93 points [0.63] for placebo shows a mean difference -1.84 [95% Cl -3.64 to -0.04]; p=0.045), suggesting that the effect might be small (Schneider, L., The Lancet Neurol., 2018). We also noted that there was no effect on the NPI-NH psychosis scale at any other time during the 12-week trial. The designation of a primary efficacy outcome at six weeks while continuing double-blind treatment for 12 weeks allowed assessment for a continuing effect over 12 weeks and was a unique feature of this trial, in our opinion. Therefore, the absence of an effect for pimavanserin both before and after six weeks questions the MOA of the drug for AD patients at the very least, in our view. This meant that had the primary outcome been specified for 12 weeks (which is typical of previous trials with anti psychotics), then pimavanserin might not have been considered efficacious. FDA clearly has a very similar conclusion from the AD trial data in our opinion, and hence we think it was a strategic mistake to include the AD data in support of the HARMONY trial. The point that ACAD used weak data as a supportive dataset shows that they were not confident in the HARMONY trial data based on its own strengths, in our assessment. Tell-tale signs from the AD trials were overlooked.”

- **"CRL Debacle Seemingly Pushes DRP Progression Years Into Future; PT to $18," by Andrew Fein et al., H.C. Wainwright analyst report, 7 April 2021, p. 2 (emphasis added).**

"Candidly we're surprised that FDA is raising issues with the DRP ph3 too … we had thought the CRL would largely be due to the ADP ph2 as insufficient demonstration of 'acute' benefit. Really, even when we were bullish on the stock, we were always surprised that the ADP ph2 has resulted in Breakthrough Therapy Designation, given that the trial *barely* hit stat sig at week 6 (primary endpoint) but missed at weeks 9 and 12. Thus, when ACAD recently announced that FDA informed the company they were not ready to enter labeling discussions, our mind immediately went to this trial as it was the only one for DRP that was set up to demonstrate 'acute' efficacy in the most prevalent population (ADP) within Dementia."

- **"ACAD Initial Take: CRL for Efficacy Reasons, Citing Gripes with Both Trials, Seems Hard to Overcome," by Paul Matteis et al., Stifel analyst report, 5 April 2021, p. 1 (emphasis in original).**

158. As shown in Appendix E, following the news of the CRL, the average of analysts' PoS estimates fell to 37%, slightly below the level the average PoS estimate had been prior to the alleged misrepresentations and omissions made on the first day of the Class Period. Moreover, as the true PoS of the submitted sNDA was revealed to be zero, analysts' average 37% PoS now reflected, as previously discussed above, the assessed probability of much later ultimate approval (if ever) of a substantially revised sNDA that would need to be backed by additional efficacy data or analysis that would likely take roughly three or more years to complete.

159. Following the disclosure of the CRL, on 5 April 2021 Acadia's stock price fell $4.41 per share to $21.18, from the prior day's closing price of $25.59 per share, amounting to a one-day decline of 17.2%. Statistically controlling for the effects of market and sector factors, which had a positive impact on the Acadia stock price that day, the residual stock price decline, representing the isolated impact of the Company-specific news was a decline of $4.51 per share. This price impact is statistically significant at the 99% confidence level, which establishes that this stock

price decline was caused by the adverse Company-specific disclosure.

## VI. SUMMARY OF PLAINTIFFS' ALLEGATIONS

160. Plaintiffs allege that Defendants made a series of materially false and misleading statements and omissions during the Class Period that caused the market to overestimate the probability that Acadia's planned (and ultimately filed) sNDA for pimavanserin to treat DRP would be approved by the FDA. By causing the PoS to be overestimated, Plaintiffs further allege that Defendants' misrepresentations and omissions artificially inflated the market price of Acadia stock. Plaintiffs further allege that when corrective events unfolded that informed the market that it had been misled, and disclosed the omitted truths whose prior concealment had rendered Defendants' Class Period statements materially false or misleading, these disclosure events caused the market's assessed PoS and valuation of the pimavanserin franchise to decline, which dissipated the artificial inflation that had been introduced and maintained by the misrepresentations and omissions, and caused the market price of Acadia stock to fall sharply.

161. Plaintiffs allege that Defendants caused the markets' assessed PoS to be overestimated by, among other things, misleading investors as to the terms of Acadia's agreement with the FDA about the scientific data needed for FDA approval of the expanded labeling of pimavanserin. Plaintiffs allege that, although the FDA had agreed to let Defendants try to obtain approval of pimavanserin as treatment for a broad indication of DRP based on the results of a single Phase III study (the Harmony Study) that would test the drug on patients suffering from a variety of dementia subtypes, Defendants failed to disclose to the public that under the "FDA Agreement" the FDA's decision on whether to approve an expanded label for pimavanserin would depend not only on whether the Harmony Study generated positive top-line efficacy results (*i.e.*, in its patient pool analyzed as a whole), but also on whether the study generated positive efficacy results that were directionally

consistent across the different dementia subgroups represented in the study.

162. In other words, according to Plaintiffs, while Defendants effectively represented that Acadia had an agreement with the FDA that an sNDA for pimavanserin to treat the proposed DRP indication could be approved based solely upon statistically significant top-line efficacy data from the Harmony Study, in reality the FDA had told the Company that ***two*** efficacy conditions needed to be satisfied. One requirement was statistically significant top-line results, but the other requirement – which Defendants concealed – was that the Harmony Study also needed to produce positive efficacy results that were directionally consistent across Harmony's subgroups.

163. As previously noted, on the first day of the Class Period, 9 September 2019, Acadia announced purportedly positive top-line results from the Harmony Study, including that the study had shown "a highly statistically significant longer time to relapse of psychosis with pimavanserin compared to placebo in a planned interim efficacy analysis."[114] Plaintiffs allege that Defendants misleadingly assured investors that the Harmony Study provided a strong foundation for obtaining approval of the proposed DRP indication for pimavanserin by misleading the public as to the nature and scope of the FDA's endorsement of the Harmony Study's design, and misleading the public about the nature and scope of the FDA Agreement, and as to the nature and quality of the results obtained from the Harmony Study and the "supportive" -019 Study.[115]

164. For example, the Amended Complaint states:

> "Defendants represented that the FDA had already blessed the adequacy of the study's design for purposes of obtaining such lucrative

---

[114] MTD Order, p. 6; Amended Complaint, ¶¶4, 57, and 107; and "ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial Stopped Early for Positive Efficacy as Pimavanserin Meets the Primary Endpoint in Patients with Dementia-Related Psychosis," *Business Wire*, 9 September 2019.

[115] Amended Complaint, ¶¶5, 111, 117, 125, 128, 132, and 135.

> approval. For example, on 9 September 2019, Defendant Stankovic stated: 'I would also like to remind you that at the end of [our] Phase II meeting with FDA, we confirmed that for our [s]NDA [supplemental New Drug Application] submission [for pimavanserin] in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.'"

- **Amended Complaint, ¶5.**

165. Similarly, Plaintiffs allege that on 9 September 2019, when the Company announced that it had stopped the Harmony Study early and that the early efficacy results were sufficient to establish statistically significant positive top-line results in the Harmony Study's overall patient pool, and continuing thereafter, Defendants misleadingly downplayed and allegedly misrepresented the importance of the Harmony Study's subgroup results, omitting that the FDA had told the Company that positive and directionally consistent subgroup results were necessary.[116]

166. Plaintiffs further allege that the Defendants, while repeatedly referencing the purportedly "supportive" findings of the -019 Study, failed to disclose throughout the Class Period certain problems (notably protocol deviations) with this separate study – which meant, according to Plaintiffs, that the FDA would not deem the -019 Study to be sufficiently supportive to make up for the inadequacies of the Harmony Study in determining whether to approve the sNDA.[117]

---

[116] *See* Amended Complaint, dated 10 December 2021, ¶¶4-5, 57-58, 107-110; Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at 7-10, 15-16, 19.

[117] MTD Order, p. 11, citing Plaintiffs' arguments at ECF No. 56, p. 18; S*ee also* MTD Order, pp. 18-19 ("There are no adequately alleged facts from which the Court can infer that the Defendants' objective descriptions of the Acadia studies were false. Further, Defendant[s]' interpretation of the data and results of studies were plainly expressions of opinion. However, statements that are demonstrably true or expressions of opinion are nevertheless actionable if the statements omit additional material information whose absence makes the fact or opinion misleading to a reasonable person reading the statements fairly and in context") (cited cases omitted).

167. Plaintiffs further claim that by no later than November 2019 the Defendants knew that the Harmony Study's positive top-line results had been driven by the very strong positive efficacy of pimavanserin in patients in the PDP subgroup – the one indication for which the drug had already been approved – and that the efficacy results in Harmony's other dementia subgroups showed a differential (rather than consistent) response.[118] Thus, by no later than mid-November 2019, Defendants also knew (but continued to conceal) that the Harmony Study had failed to produce the directionally consistent subgroup results that were required under the FDA Agreement to obtain approval of an sNDA for expanded use of pimavanserin to treat DRP. Whether viewed by individual subgroup or based on pooling of all DRP subtypes excluding PDP, the results simply did not support a finding that pimavanserin was effective in any subgroup other than PDP patients (for which the drug had already been approved).[119] As a result, the optimism expressed and high PoS assessed by analysts over the course of the Class Period were entirely unjustified, and such misguided assessments (and resulting inflation in Acadia's stock price) would not have occurred but for Defendants' alleged misrepresentations

---

[118] I understand that although there were a total of *five* different diagnosed dementia subtypes represented in the Harmony Study (namely patients suffering from PDD, ADD, Vascular Dementia ("VaD"), Dementia with Lewey Bodies ("DLB") and Frontotemporal Dementia ("FTD")), under Harmony's statistical analysis plan the study's results were stratified by *three* dementia subgroups (which combined the data for ADD and FTD patients, and for PDD and DLB patients, for subgroup analysis purposes). My understanding is that there was a lack of directional consistency across the subgroups, regardless of whether one examined the data on the basis of five subgroups (PDD, ADD, VaD, DLB, and FTD) or on the basis of the three stratified subgroups (PDD/DLB, ADD/FTD, and VaD).

[119] Amended Complaint, ¶8; *See also* Amended Complaint, ¶¶103, 108, 110, 112, 114, 116, 118, 120, 122, 124, 126, 129, 131, 133, 136, 139, and 142; *See also* MTD Order, pp. 8-10, 18; *See also* MTD Order, p. 26 ("The Court has determined that the [Complaint] alleges sufficient facts to support an inference that Defendants' statements concerning the agreement with the FDA and omissions of adverse information about the Harmony and -019 studies misled investors into underestimating the risk that the FDA would deny Acadia's sNDA").

and omissions.[120]

168. A more comprehensive summary of Defendants' allegedly false and misleading statements, and of the reasons why Plaintiffs allege that such statements were materially false and misleading, is set forth in, respectively, (a) Lead Plaintiff['s] Second Supplemental Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Interrogatories (at response No. 1), dated 2 February 2024. and (b) Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024.

169. The alleged truth about the agreement between Acadia and the FDA concerning the requirement of positive directionally consistent subgroup results from the Harmony Study, and the alleged truth about the deficiencies in both the Harmony and -019 Studies, which Defendants had allegedly distorted and concealed through their misrepresentations and omissions, publicly emerged through a pair of corrective events near and at the end of the Class Period. The first corrective event was the announcement of the DL on 8 March 2021 after the close of trading. On that day, Defendants reported that the FDA had issued a DL to Acadia on 3 March 2021, and further reported that the DL stated that the FDA had identified unspecified "deficiencies" in the sNDA that "preclude discussion of labeling and post-marketing requirements/commitments at this time."[121] The second corrective event was the announcement of the CRL on 5 April 2021. On that day, Defendants disclosed that Acadia had received a CRL from the FDA, and further reported that the CRL stated that the sNDA could not be approved in its present form because of inadequate

---

[120] Amended Complaint, ¶8; *See also* Plaintiffs['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 Sept. 2024, at 10, 16-17, 24, 63-64.

[121] Amended Complaint, ¶¶9, 143.

subgroup data from the Harmony Study and deficiencies in the -019 Study.[122]

170. According to Plaintiffs, had Defendants not made the false and misleading statements that caused the market to overestimate the PoS, Acadia's stock price would have been lower throughout the Class Period, and would have fallen less or perhaps not at all when the market was informed about Acadia's receipt of the DL and then the CRL. In other words, the disclosures of 8 March 2021 and 5 April 2021 surprised the market primarily because the market had been misled by the alleged misrepresentations and omissions, and but for Defendants' misrepresentations and omissions the later developments of 8 March and 5 April 2021 would have been largely expected.

171. Consequently, according to Plaintiffs, all or most of the losses suffered by Class members when the Acadia stock price fell dramatically on 9 March 2021 and 5 April 2021 were therefore caused by Defendants' alleged misrepresentations and omissions.

## VII. LOSS CAUSATION

172. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."[123] My loss causation analysis addresses this question of whether or not Defendants' alleged misrepresentations and omissions caused Class member losses.

### A. Economic Materiality of the Alleged Misrepresentations and Omissions

173. Typically, a loss causation study includes analysis to determine whether

[122] Amended Complaint, ¶¶10, 145. I understand that the actual text of the CRL was not made public until after it was produced in discovery in this matter.

[123] Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4.

or not the alleged misrepresentations and omissions constituted information that is economically material – that is, important for the determination of the stock's market price.[124]

174. In an efficient market, economically material information impacts the stock price. If financial analysis determines that the misrepresentations and omissions are economically material and positive in nature, it follows that those misrepresentations and omissions would have a positive impact on the stock price, introducing and/or maintaining artificial inflation in the stock price. If financial analysis determines that subsequent disclosures or events were economically material, negative, and dissipated that artificial inflation, either by correcting the misinformation propagated by the misrepresentations and omissions, or by taking the form of an adverse event that is the materialization of a risk concealed or understated by the misrepresentations and omissions, then investors who purchased the stock at an artificially inflated price would have suffered losses caused by the misrepresentations and omissions. These determinations, based on financial and statistical analysis, would compel the conclusion that the misrepresentations and omissions caused investor losses. Consequently, assessing the economic materiality of the alleged misrepresentations and omissions is an important step in assessing loss causation.

175. Analysis of the economic materiality of alleged misrepresentations and omissions may comprise examination of fundamental principles of valuation, a

---

[124] I understand that materiality has a legal definition in matters such as this one. As the term is used in financial analysis and in this report, "economic materiality" means the importance of information, announcements, and/or events to investors and the market, such that these items would affect the valuation of a security and investors' demand for the security. Whether specific information is important for valuation purposes is a central focus of financial economics. Therefore, the question of economic materiality, given this definition, is squarely within the realm of financial economics and consequently within my area of expertise and the purview of a financial expert.

review of company statements, examination of analysts' commentary and valuation models, and analysis of the empirical behavior of the subject security following the alleged misrepresentations and corrective events. This analysis can also establish whether the alleged misrepresentations and omissions were positive in nature, and whether the corrective disclosures were negative.

176. As detailed next, I conducted all of these analyses. Empirical event study analysis addresses economic materiality, and is also an independent analysis of loss causation.

### 1. Financial Principles Strongly Support a Finding that Defendants' Alleged Misrepresentations and Omissions Were Economically Material

#### *a) The Economic Materiality of Revenue, Earnings, and Cash Flow*

177. If Acadia were to receive approval from the FDA for pimavanserin as a treatment for the proposed DRP indication, the resulting much larger market for the Company's product would dramatically increase Acadia's future revenue, earnings, and cash flow. Acadia's expected revenue, earnings, and cash flow therefore depended (in large part) on whether the Company would receive FDA approval for the sought after expanded pimavanserin labeling. Therefore, throughout the Class Period, the mathematically expected level of future revenue, earnings, and cash flow were functions of the PoS of that FDA approval.

178. Generally accepted economic principles of valuation dictate that the value of a company, and in turn the value of its stock, are fundamentally related to the revenue, earnings, and cash flow the company is expected to generate. The following quotes from the finance literature speak to the importance of expected future revenue to the valuation of a company and its stock.

> "Revenue growth is the most significant driver of shareholder value over the long term. Other drivers are very important, but tend to reach a limit in terms of value creation.
>
> …

Recall that a critical aspect for valuation is the expectation of *future* revenue levels."

- ***Performance Dashboards and Analysis for Value Creation*, by Jack Alexander, John Wiley & Sons, Inc., 2007, pp. 79 and 263 (emphasis in original).**

"Revenues are generally the first component to be reviewed by financial analysts. All other things being equal, trends in revenues will translate into trends in profit margins, as well as the Company's ultimate fate. Increases in revenues should lead to higher profitability as the Company's fixed costs are spread over a wider revenue base leading to lower fixed costs per dollar of revenue."

- ***Financial Valuation: Applications and Models*, by James Hitchner, John Wiley & Sons, Inc., 3rd Edition, 2011, p. 1230.**

"Certain types of privately held companies, including investment management companies and many types of companies in partnership form, have long been valued by a multiple of annual revenues. In recent decades, the ratio of price to sales has become well known as a valuation indicator for the equity of publicly traded companies as well. Based on US data, O'Shaughnessy (2005) characterized P/S as the best ratio for selecting undervalued stocks."

- **"Market-Based Valuation: Price and Enterprise Value Multiples," in *Equity Valuation*, by Jerald Pinto et al., Association for Investment Management and Research (CFA Institute), 2019, p. 425.**

"All else being equal, companies with greater sales volumes tend to benefit from scale, market share, purchasing power, and lower risk profile, and are often rewarded by the market with a premium valuation relative to smaller peers."

- ***Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, by Joshua Rosenbaum and Joshua Pearl, John Wiley & Sons, Inc., 2nd Edition, 2013, p. 79.**

"Tests based on the first model focus on the ability of revenue to *summarize* contemporaneous information on firm performance (hereafter, value relevance) by examining the association between firm-specific quarterly stock returns and revenue level and growth. … Our analysis shows that the valuation role of revenue is pervasive and not driven by selected subsets of observations for which earnings may

be less informative (*i.e.*, for technology firms and observations with extreme earnings and losses)."

- ***"The Role of Revenue in Firm Valuation,"* by Uday Chandra and Byung Ro, *Accounting Horizons*, Vol. 22, No. 2, June 2008, p. 201 (emphasis in original).**

"Revenue is the closet proxy in financial statements for market size and dominance, factors that often determine the survival and future profits of modern corporations.

…

Revenue deserves a separate examination because it is typically the largest number in financial statements and is an indicator of firm size … It is also the closest proxy in financial statements for a firm's market potential, share, and dominance, which are increasingly the principal value drivers for modern corporations, in addition to current profits …

…

Growth or decline in revenue communicates the change in product market's size and the emergence of competitors and product substitutes. Hence, revenue per se could offer value-relevant information on a firm's performance in a given period beyond information conveyed by the earnings."

- **"Alignment Between Compensation-Contracting and Value-Relevance Role of Revenues," by Hanni Liu et al., *Journal of Financial Reporting*, Vol. 8, No. 1, Spring 2023, pp. 1-2, and 7-8 (internal citations omitted).**

"Understanding a company's potential for growing revenues in the future is critical to valuation and strategy assessment."

- ***Valuation: Measuring and Managing the Value of Companies*, by Tim Koller et al., John Wiley & Sons, Inc. / McKinsey & Co., 5th Edition, 2010, p. 97.**

"In fact, it is hard to imagine performing a valuation without weighing various operating metrics relative to revenue. At the most basic level, revenue is an indication of breadth of the target's customer relationships or product acceptance, which is among the defining elements of a successful enterprise."

- ***Distressed Debt Analysis: Strategies for Speculative Investors*, by Stephen Moyer, J. Ross Publishing, 2005, p. 115.**

"The firm's ability to generate revenue beyond costs is one of the most important components to a valuation. This excess revenue creates value

to debt holders in the form of interest payments, or to equity holders in the form of dividends, or kept internally, which also yields return for equity holders in the form of capital appreciation. If a company has a decline of revenue or has none, then it must pay costs with other sources. Typically, some type of short-term facility, long-term loan, or equity infusion would be required to meet these costs. If there is a continued lack of revenue generation, then the liabilities of a firm can grow beyond the assets and the company could technically be classified as defaulted. Given the critical nature of generating revenue beyond costs, a significant amount of time should be spent analyzing the revenue and cost assumptions that go into a model and the methodologies employed for projections."

- ***Corporate Valuation Modeling: A Step-by-Step Guide*, by Keith Allman, John Wiley & Sons, Inc., 10th Edition, 2010, p. 39.**

"Naturally, forecasting revenues is an important part of most financial models, for as we have seen, revenue forecasts typically drive many of the other forecasts in a financial model. … In a financial model, we sometimes use a simple single growth rate, g, to forecast revenues–for example, $\text{revenue}_t = (1+g) \times \text{revenue}_{t-1}$ … The magnitude of this growth rate, however, is the result of either an implicit or an explicit forecast of macroeconomic factors, industry factors, and company-specific factors that eventually forecast the company's market share (volume) and prices. … Simply stated, revenue is equal to price multiplied by volume; thus, a revenue growth rate is the result of growth in volume, a change in price, or both. Disaggregating the revenue growth into its components and other drivers can be helpful in understanding the factors that drive a company's value (value drivers)."

- ***Corporate Valuation: Theory, Evidence & Practice*, by Robert Holthausen and Mark Zmijewski, Cambridge Business Publishers, 1st Edition, 2014, p. 150.**

179. The following quotes from the academic literature attest to the central role of earnings in the valuation of a company and its stock:

"Earning power is a chief driver of investment value, and EPS [earnings per share], the denominator in the P/E ratio, is perhaps the chief focus of security analysts' attention."

- **"Market-Based Valuation: Price and Enterprise Value Multiples," in *Equity Valuation*, by Jerald Pinto et al., Association for Investment Management and Research (CFA Institute), 2019, p. 383.**

"Generally, earning power is the important internal variable affecting the going-concern value of the business. Earning power may be expressed in terms of the ability to realize cash flows, dividends, net income, or any of several other measures."

- ***Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, by Shannon Pratt and Alina Niculita, McGraw-Hill, 5th Edition, 2008, p. 60.**

"Valuation ratios have long been used in investment decision making. A well known example is the price to earnings ratio (P/E ratio)—probably the most widely cited indicator in discussing the value of equity securities—which relates share price to the earnings per share (EPS)."

- **"Financial Analysis Techniques," in *Financial Reporting and Analysis*, by Elaine Henry et al., Association for Investment Management and Research (CFA Institute), 2019, pp. 284-285.**

"Much of the real-world discussion of stock market valuation concentrates on the firm's **price-earnings multiple**, the ratio of price per share to earnings per share, commonly called the P/E ratio."

- ***Investments*, by Zvi Bodie et al., McGraw-Hill Education, 10th Edition, 2014, p. 609 (emphasis in original).**

"Consider the most widely used relative asset valuation tool, the P/E. Ultimately, the strongest formulation of the P/E principle states that an intrinsic, natural ratio exists between the price of a stock and its earnings and that this ratio is universal."

- ***Equity Valuation: Science, Art, or Craft?*, by Frank Fabozzi et al., Association for Investment Management and Research (CFA Institute), 2017, p. 23.**

180. Similarly, the following quotes from the academic literature attest to the importance of expected future cash flow in the valuation of a company and stock:

"The free cash flow approach is the one [valuation model] used most often in corporate finance. The analyst first estimates the value of the entire firm as the present value of expected future free cash flows to the entire firm and then subtracts the value of all claims other than equity."

- ***Investments*, by Zvi Bodie et al., McGraw-Hill Education, 10th Edition, 2014, p. 624.**

"In finance, the value of the firm is its ability to generate financial cash flow."

- ***Corporate Finance*, by Stephen Ross et al., McGraw-Hill Irwin, 8th Edition, 2008, p. 29.**

"One way to think about the question of how much a firm is worth is to calculate the present value of its future cash flows."

- ***Corporate Finance*, by Stephen Ross et al., McGraw-Hill Irwin, 8th Edition, 2008, p. 116.**

"The discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows by the return that can be earned in the capital market on securities of comparable risk."

- ***Principles of Corporate Finance*, by Richard Brealey et al., McGraw-Hill Irwin, 10th Edition, 2011, p. 78.**

181. Because expected revenue, earnings, and cash flow are key determinants of the valuation of a company and its stock, any information that affects the market's forecast of these metrics is also economically material.

*b) Economic Materiality of Clinical Trial Results and Product Development in the Biopharmaceuticals Sector*

182. It is generally understood and noted in the academic and professional business literature that clinical trial results and successful product development, which includes market expansion for existing products, is especially important for companies in the biopharmaceuticals business. Companies in this sector may market their products themselves, or they may choose to sell the rights for developed products to other pharmaceutical companies. In either case, companies in the biopharmaceuticals business need a pipeline of new products in order to maintain and grow revenue, earnings, and cash flow. Such expansion is a continuing need because the lifespan of existing products is limited as patent expiration and competition erode the current revenue stream derived from the company's existing product portfolio over time. Thus, for biopharmaceutical companies such as Acadia, the prospect and probability of successful product development, which includes market expansion, are highly economically material as product development

determines expected future revenue, earnings, and cash flow, which in turn determine the valuation of the company and its stock.

183. The following excerpts from the business literature attest to these fundamental principles establishing the economic materiality of product development for biopharmaceutical companies such as Acadia.

> "Many factors are known to influence the stock prices of companies. They include earnings announcements, dividends, corporate actions, the release of new products, etc. For biopharmaceutical companies, apart from these general factors, clinical trial outcomes are critical since they play a major role in determining the future revenue, growth, and valuation of the company sponsoring the trial. For investors in this sector, clinical trial results are the predominant factor determining their return on investment. Therefore, quantifying the impact of clinical trial results on the stock prices of the companies is of great financial significance."
>
> ■ **"The Reaction of Sponsor Stock Prices to Clinical Trial Outcomes: An Event Study Analysis," by Andrew Lo et al., *PLoS One*, Vol. 17, No. 9, 2022, p. 1 (internal citations omitted).**

> "Phase III clinical trials and regulatory decisions by the US Food and Drug Administration (FDA) are high-profile events that are critical for the financial success of new drugs. These events can also have a substantial impact on the market valuation of the companies that might bring these drugs to market. Therefore, these events attract great interest from investors."
>
> ■ **"Company Stock Prices Before and After Public Announcements Related to Oncology Drugs," by Jeffrey Rothenstein et al., *Journal of the National Cancer Institute*, Vol. 103, No. 20, 2011, p. 1507 (internal citations omitted).**

> "Investors' approach to pharmaceutical stocks further confirms their focus on economic fundamentals beyond earnings figures. In the pharmaceutical industry, announcements about products under development can affect share prices far more than quarterly earnings announcements. This makes sense because product and pipeline development are much better indicators of the long-term growth and profitability of pharmaceutical companies than short-term earnings. Markets understand this well … prices react strongly to pipeline

announcements, even though these herald no impact on current earnings."

- ***Valuation: Measuring and Managing the Value of Companies*, by Tim Koller et al., John Wiley & Sons, Inc. / McKinsey & Co., 5th Edition, 2010, p. 364.**

*c) Expansion of Pimavanserin's FDA-Approved Usage to Include a DRP Indication was Highly Economically Material for Acadia*

184. As discussed above, during the Class Period the main thrust of Acadia's product development effort was to gain approval for expanded use of pimavanserin. Acadia derived most of its revenue during the Class Period from its commercial sales of pimavanserin as a treatment for PDP. PDP was the only indication for which the FDA had approved pimavanserin. Accordingly, if pimavanserin were to receive FDA approval for the treatment of DRP generally, rather than be limited to the indication of PDP, Acadia would be able to increase its revenue, earnings, and cash flows significantly, which would in turn have a significant positive impact on Acadia's valuation and stock price. Acadia needed FDA approval for pimavanserin as a treatment for DRP in order to unlock greater revenue, earnings, and cash flow potential. Thus, any information that increased the market's assessment of the PoS of obtaining FDA approval for expanded pimavanserin labeling constituted positive economically material information.

185. The alleged misrepresentations and omissions all relate to the likelihood of the FDA approving an sNDA for pimavanserin as a treatment for the DRP indication. The alleged misrepresentations and omissions misled the market into assigning a higher probability of sNDA approval than what the true facts warranted, which induced overestimation would inflate expected revenue, earnings, and cash flow, and thereby inflate Acadia's stock price. Consequently, according to generally accepted financial principles, the alleged misrepresentations and omissions were economically material and positive.

### 2. Defendants' Statements and Emphasis Evince the Economic Materiality of the Alleged Misrepresentations and Omissions

#### *a) Proposed Expansion of Pimavanserin's Approved Usage to Include a DRP Indication*

186. Throughout the Class Period, the Company repeatedly emphasized that expanding the approved indications for pimavanserin would increase its revenue and raise the Company's value. The following quotes are examples of the Company's and the other Defendants' acknowledgement of the economic importance of expanding pimavanserin's potential patient population.

> "If the clinical development program is successful, and pimavanserin is ultimately approved by the FDA for the treatment of dementia-related psychosis, it would represent a significant expansion of the approved use of pimavanserin. Currently, pimavanserin is the only drug approved by the FDA for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. It is marketed under the trade name NUPLAZID(R)."
>
> ■ **"ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis,"** ***Business Wire*****, 4 October 2017 4:05 PM.**
>
> "[Ritu Baral, TD Cowen analyst:] My question's on the DRP commercial opportunity. As you have indicated the ramping up in SG&A, how is your, I guess, your commercial efforts going to change specifically? Is there more call points? Are there different types of call points that you're already teeing up with the sales force? Are you anticipating expansion? And further, just as you think of how the label will translate into the commercial opportunity, how do you think you'll reconcile the Alzheimer's mortality black box with the indication that you'll be going after with DRP?
>
> [Defendant Davis:] Thanks for the question, Ritu. I think there's 2 parts to that question. I'm going to ask Michael to answer the first part. And Serge, after Michael's done, if you could answer the second part.
>
> [Michael Yang, Acadia Chief Commercial Officer:] Great, yes. Thanks for the question. We're very excited about the potential of A DRP indication, and it represents a very large opportunity. I think it's important to understand that we'll be able to leverage our existing

approach with PDP, and that is to say that we currently call on neurology, psychiatry and long-term care, and all of those are important channels and call points for us for DRP. However, as you could expect, the number of targets and the number of patients are substantially larger, which makes it a very exciting opportunity. So in terms of the approach and the planning for our commercial buildout, it's obvious that we will need to build out and expand our footprint. And you could expect a kind of a standard approach appropriate size CNS specialty sales force and field force to just to give you some grounding on that, the benchmarks. And when you look at others CNS specialty field forces, you're typically in the range of about 400 to 500 people. So that would be the expansion kind of framework that we're looking to kind of optimize as we look into DRP."

- **"Q3 2019 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 30 October 2019, pp. 6-7.**

"[Defendant Davis:] On Slide 6, we highlight the breadth and depth of our pipeline, which is generating a multiyear cadence of pivotal study readouts and potential regulatory approvals that position ACADIA for significant and attractive long-term growth. In 2020, we are driving toward a potential approval in DRP by year-end and 3 additional approvals over the next 3 years."

- **"Q4 2019 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 26 February 2020, p. 3.**

"[Neena Bitritto-Garg, Citigroup analyst:] So I just want to ask about the DRP launch. Just thinking about whether or not there's going to be kind of a resurgence of COVID-19, kind of around the time that you would be launching and the bunch of patients are, of course, going to be in that higher risk bucket. I mean, how are you thinking about that? Are you kind of making plans to assume that this is going to be a virtual launch?

[Defendant Davis:] Yes. Thanks much for the question. I'll just start by saying we've done a lot of alternate scenario planning, and I'll let Michael fill you in a little bit more on that.

[Michael Yang, Acadia Chief Commercial Officer:] Yes. Thanks for the question. We have very thoughtful online plans to execute the expansion to support the launch that #1 are tied to the key regulatory milestones. As you've already alluded to, the environment is different than just simply a few months ago, and we're monitoring that

environment very carefully. And I just want to remind you that this is a significant expansion opportunity for ACADIA and for NUPLAZID, but we already have a very well-established team, we have ongoing support in our operations model, and are on the ground supporting PDP. So we can leverage that to build upon and support our launch plans. But again, you've outlined it. This is a fluid situation. We'll continue to kind of monitor the situation as things evolve, and we're being prepared for multiple scenarios. And I think we'll be ready to go no matter what environment we find ourselves into."

- **"Q1 2020 ACADIA Pharmaceuticals Inc Earnings Call,"** ***Thomson Reuters*****, 7 May 2020, p. 8.**

"[Gregory Renza, RBC Capital analyst:] Great. And then, Steve, as you alluded to, just the multiplier effect of the potential market with DRP, how should we be thinking about the value proposition and potentially even the reimbursement for pimavanserin as it relates to what's in the market now with NUPLAZID in PDP, but as far as capturing that larger DRP patient population?

[Defendant Davis:] Great. Let me take just a little bit of a running start at that question. So there's clearly a significant value proposition for NUPLAZID in DRP. No, currently at the approved treatment options, the symptoms of dementia-related psychosis are associated with significant distress to families, significant distress to caregivers, progression to more severe dementia, overall greater caregiver burden that repeated hospital admissions and just increased likelihood to nursing home placement. So we think the case is very strong for the value potential for NUPLAZID. Today, we enjoy very good access with payers for NUPLAZID in PDP. And the payer dynamics that I just described in DRP are very similar to PDP. For example, many times in PDP, we've made the point that use of the previous generation dopaminergic antipsychotics off-label in PDP, they're not approved for that use requires a compromise that they can interfere with the motor therapies. In DRP, those same drugs are often used off-label, they're not approved for DRP, used in this patient population. And they – it's been demonstrated in multiple studies that they have the potential to accelerate cognitive decline when used in those patients. So in both cases, you can undermine the – maybe the primary symptom that patients are experiencing. So payers get that. And so while it's a little bit premature to comment precisely on pricing for NUPLAZID in DRP because many times you want to get the final wording of your label and make sure that you can make your strongest case to payers. And of

course, we're not at that juncture yet. I think based on everything we know today, we've got a situation that we feel like the dynamics are very similar between PDP and DRP."

■ **"ACADIA Pharmaceuticals Inc at RBC Global Healthcare Conference," *Thomson Reuters*, 19 May 2020, p. 5.**




■ **"Second Quarter 2020 Earnings Call," ACADIA Pharmaceuticals, Inc., 5 August 2020, slide 22.**

"[Defendant Davis:] And so what we've seen, again, with PDP, it is very linear shape**, very attractive revenue growth year-over-year, and that's what we anticipate in DRP as well**. Now of course, my absolute numbers, the DRP numbers will be very different than PDP, but the shape of the curve, we expect to be similar."

■ **"ACADIA Pharmaceuticals Inc at Morgan Stanley Global Healthcare Conference (Virtual)," *Refinitiv*, 14 September 2020, p. 7 (emphasis added).**

"[Defendant Davis:] The second pillar is delivering on the DRP opportunity. **It will be a strong driver of value for us this year**. There's no approved treatment for DRP today. It's a disease that has very serious health consequences. And we're eager to get to our PDUFA date of April 3, 2021, highly confident in the efficacy and safety data supporting that NDA – sNDA submission."

■ **"ACADIA Pharmaceuticals Inc at Cantor Fitzgerald Global Healthcare Conference (Virtual)," *Refinitiv*, 16 September 2020, p. 3 (emphasis added).**

"[Defendant Davis:] We're on the cusp of a potential approval in DRP, which represents a much larger market opportunity, it's about 10 times the size of PDP. NUPLAZID could be the first and only approved treatment for DRP, and it would certainly represent a true breakthrough for patients and their families."

- **"ACADIA Pharmaceuticals Inc at JPMorgan Healthcare Conference,"** ***Refinitiv*****, 12 January 2021, p. 2.**

"So we expect very similar dynamics to what we observed with PDP, but of course, on a much larger scale. If you recall, when we launched in PDP, we said with these kinds of drugs, particularly when you're entering a new space, where there's been nothing approved before, you should expect the progressive linear type of sales growth, and that's exactly what we've seen with PDP. And this is really just because of 2 primary factors, one we're educating both on the disease state as well as getting physicians familiar with prescribing a new drug. And as we start to get more of that familiarity then the prescriber base grows and your depth of prescribing growth. So we expect the same thing to be true for DRP, and we're very much looking forward to launching in – following the PDUFA."

- **"Q4 2020 ACADIA Pharmaceuticals Inc Earnings Call,"** ***Refinitiv*****, 24 February 2021, p. 11.**

"So all things considered, as I mentioned before, we would expect in DRP, you should expect a very attractive revenue growth, linear shaped curve through this launch."

- **"ACADIA Pharmaceuticals Inc at SVB Leerink Global Healthcare Conference (Virtual),"** ***Refinitiv*****, 26 February 2021, p. 5.**

*b) Acadia's Purported "FDA Agreement," the Purported Sufficiency of Harmony's Top-Line Results, and the Purportedly Supportive Nature of the -019 Study*

187. Acadia repeatedly represented to the market that there was a "clear agreement" between the FDA and Acadia on the study and scientific data necessary for approval of the DRP label, that Acadia had "executed" this plan, and that Harmony's top-line efficacy results met the FDA's requirement for an sNDA approval. These statements were allegedly false or rendered misleading on account of omissions, but nonetheless elevated the market's assessment of the PoS of FDA

approval to expand pimavanserin's labeling to include the broad DRP indication. The Company's emphasis on and repetition of these representations make clear that the Company viewed the subject matter of the alleged misrepresentations to be important information, as illustrated by the following.

> "[Defendant Stankovic:] Yes, we certainly have the discussion, as I mentioned and agreements with FDA related to the supplemental NDA and our ability to support that supplemental NDA with a single well-controlled trial as long as that trial provides persuasive statistical and clinical benefit. And certainly, what we have in terms – usually, when people talk about statistically persuasive results, that means that the p-value is less than 0.01. And we certainly exceed substantively that threshold. And as I mentioned, we are even below the threshold of 0.0033. So second, we also submitted our statistical analysis plan in advance to – well in advance to our interim analysis and FDA had an opportunity to – and this provides comments to that. So we are very comfortable with where we stand in regards to that particular question."
>
> ■ **"ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 10.**

> "[Defendant Stankovic:] In terms of the end-of-phase 2 meeting, we received already agreement from FDA that a single, well-controlled trial will be sufficient for submission. So we – with these results and the study data at hand, we will be approaching FDA definitely in the first part of the next year and discussing the format and content of our sNDA submission."
>
> ■ **"ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 6.**

> "[Cory Kasimov, JPMorgan Analyst:] Okay. All right. So, then sticking with the statistical theme for a second, but going now to the subgroup analysis, which will likely be a focus, were the subpopulations, those different etiologies within DRP, were they each sufficiently powered in the HARMONY trial design? Or maybe to ask another way, what gives you confidence that these data are supportive of a broad label? Do you have feedback from regulators that the subgroups have to demonstrate statistical significance on their own, or is a positive trend sufficient in order to be included?

[Defendant Stankovic:] Yes. The primary endpoint analysis, that we agreed with the FDA on, is based on the robust statistical significance in the overall study population. So across all of the subtypes that presented in the study. Just to be clear, the primary endpoint analysis is not powered to show significance by individual subtype of dementia, and neither is it required by the FDA for our label. We did have a very specific discussion on this because the number of relapse[s] is overall, there was not that sort of powering by subtype. We plan to share subtype data from the open label portion of the trial, and we'll include subtypes in the demographic and descriptive open label and randomized portion of the trial. So that's what we will be discussing. **But there is no requirement, nor expectation, nor power for analysis, of specific subtypes."**

- **"JPMorgan Biotechnology Conference Call Series – Acadia Pharmaceutical (ACAD)," 11 November 2019, ACAD_SECLIT 0299844-45 (emphasis added).**

"[Defendant Stankovic:] So at the end of Phase II meeting with the FDA, which we reported previously, FDA agreed with us that with the robust results of this trial that we would be able to file a supplemental NDA. We believe that we met that high threshold of the robustness of the results and are on track to meet with the FDA to discuss the content and format of our supplemental NDA submission in the second half – in the first half of next year. And following that, we will be moving forward with a supplemental NDA."

- **"ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting,"** ***Thomson Reuters*****, 4 December 2019, p. 8.**

"[Ritu Baral, TD Cowen analyst:] And you mentioned that the FDA asked for statistically and clinically persuasive data. Did they define this? And did they define any requirement for that initial response rate? …

[Defendant Stankovic:] So to your second question, Ritu, 'What does FDA mean by persuasive – statistically and clinically persuasive?' I would just say in the world of statistics the persuasive and robust results are usually defined by the p-value of less than 0.01. So by that measure, we definitely exceeded that. And I think that from clinical meaningfulness that threefold reduction of risk and 65% reduction of risk for pimavanserin – with pimavanserin treatment definitely meets that clinical meaningfulness, with a hazard ratio that we saw in this trial.

So I believe that certainly, we met that threshold. Directly to answer to your question, there was no[t] any definition that we needed to meet other than what we shared."

- **"ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast From Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 11.**

[Ritu Baral, TD Cowen analyst:] "Great. A very quick follow-up. The sNDA for DRP, what's left to do before the summer submission?

…

[Defendant Stankovic:] Yes. Ritu, we have all of the data that will constitute our supplemental NDA. The pivotal HARMONY study results will be the basis of the sNDA submission, which was previously agreed upon at the end of Phase II meeting. And in addition, we will have supportive efficacy results from our previous short-term studies, which provided evidence of acute efficacy of pimavanserin in Alzheimer's disease and in Parkinson's disease psychosis for patients – with patients with dementia. And finally, we plan to submit our extensive safety data from completed and ongoing studies. So what is left for us is to essentially put that all together in the format required for the supplemental NDA, all the study reports and summary documents and once we agree with FDA on that, to submit."

- **"Q4 2019 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 26 February 2020, p. 7.**

"[Tazeen Ahmad, BofA analyst:] So maybe we can talk a little bit about DRP, Steve, as one of your next indications. Can you review what you discussed with the FDA perhaps at the pre-sNDA meeting? Can you provide a little bit of expectations on time lines for submission and approval?

…

[Defendant Davis:] Yes, absolutely. So as I mentioned, we had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard with our end-of-Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's disease psychosis study as supportive efficacy studies."

- **"ACADIA Pharmaceuticals Inc at Bank of America Merrill Lynch Healthcare Conference (Virtual)," *Thomson Reuters*, 12 May 2020, p. 4.**

"[Defendant Davis:] And I would just – just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the – and as we've said before, the 'subtypes' of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer, dementia with Lewy bodies or vascular dementia, et cetera.

**And so – and one of the advantages of course of pursuing dementia-related psychosis broadly which is just as a reminder and we got clear agreement from with the FDA at our end-of-Phase 2 meeting and we executed the plan that we agreed to with them**.

One of the advantage[s] is it picks up what's referred to as dementia, not otherwise specified. That's 'it is not otherwise specified.' And that's a big chunk of patients. And that the fact that so many patients are not specified other than beyond just saying dementia is again a reflection of the fact that these categories are very difficult to diagnose. So, as Michael mentioned, the good news is physicians understand that they operate in that world and with the indication that we are seeking, it won't matter. Then we'll have to try to make a determination, whether it's Alzheimer's or vascular dementia or something else.

[Jason Butler, JMP Securities analyst:] And that's a really good point. And so let me just ask one more question about the FDA there. You obviously have this very broad patient population under the DRP umbrella. How do you think about more broadly the label indication statement based on the Phase 3 trial design, specifically the relapse prevention relative to PDP where you had an initiation kind of trial design?

[Defendant Davis:] Yeah[.] Well, let me take it from two perspectives. So let me take it from a regulatory perspective and then from a medical perspective. From the regulatory perspective, just want to remind everyone that the sNDA that we've submitted includes the Harmony study, the relapse prevention study, but also includes or the kind of study that we did in Parkinson's disease psychosis. And it includes acute – we'll call it acute data as well over a much shorter timeframe, and showed positive results both in an Alzheimer's population as well as our – of course our Parkinson's disease psychosis population. So we have both in the submission…"

- **"ACADIA Pharmaceuticals, Inc.," JMP Securities CNS Forum, corrected transcript, 19 August 2020, pp. 7-8 [JEFF00024272 – 73] (emphasis added).**

"[Jeff Hung, Morgan Stanley analyst:] And what is your view on the recent string of complete response letters? Is there any reason to believe that there are any changes at the agency that might add risk to approval in DRP?

[Defendant Stankovic:] Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review or details of the data and all that. We do not see – each situation is different, and we do not see any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to be able to complete those things and asking for additional data. We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval.

…

[Jeff Hung, Morgan Stanley analyst:] Okay. And then multiple neurodegenerative disorders have patients with dementia-related psychosis, such as Alzheimer's. Which disorders do you think are more likely to have faster adoption? Do you think there will be certain ones that contribute more early on in the launch? And then, I guess, on the other hand, what kinds of things do you need to work on for the disorders that may not ramp up as quickly or early on in the launch such as patient or physician education?

[Defendant Davis:] Yes. Let me take just a little bit of running start at it. So in dementia-related psychosis, sometimes people think about various subtypes. And of course, we've talked about that as well. But just one, just as a background reminder that we received agreement with the FDA that we would pursue dementia-related psychosis broadly in order to treat the symptoms of psychosis, regardless of their clinically diagnosed subtype. And I just want to be clear here, that subtype diagnosis is very subjective. It's difficult to diagnose. Many times, physicians don't know what the underlying etiology is as you sometimes going to only find it out through autopsy. And these patients

are in terms of the kind of subtype that is assigned to them, many times it's wrong. And it's confirmed through autopsy."

- **"ACADIA Pharmaceuticals Inc at Morgan Stanley Global Healthcare Conference (Virtual),"** ***Refinitiv*****, 14 September 2020, pp. 6-7.**

"[Defendant Davis:] So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission. And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. **And just as a brief reminder, our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study**. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in Alzheimer's and Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP.

So again, just as I put it – with that backdrop, at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in acute setting. **We'd like you [FDA] to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion**. Two, that we run a relapse-prevention study now to demonstrate the – not only that we can stabilize patient symptoms, but that we get a durable effect over time. **And then three, that we – that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those**. That's documented in our minutes. **So fast forward to today, we then executed the exact plan that we laid out for them.** And again, that underlines the confidence we have in the potential for approval in DRP."

[Paul Matteis, Stifel analyst:] Got it. Okay. Great, Steve. What were your discussions with the FDA and what you need to show for safety? I mean, there's this whole – we had Alzheimer's panel here at this conference yesterday and one of the panelists walked through the whole back history, going back to the 2000s with atypicals in the elderly and the original black box and changes in policy and things like that. What did FDA – did they ever articulate to you what they wanted to see, right? It's obviously very hard to disprove a negative. And I guess, were

they going to rely more on just your DRP clinical data? Or how much of the PDP post-marketing data goes into this?

[Defendant Davis:] Yes. They're both important. **One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in addition to those 3 points, we also just asked FDA very specifically**. We said we just want to make certain that you are on board with approving a drug to treat dementia-related psychosis. Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. **We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to. And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that – if we weren't of that mind.**"

- **"ACADIA Pharmaceuticals Inc at Stifel Virtual Healthcare Conference,"** ***Refinitiv*****, 17 November 2020, p. 3 (emphasis added).**

"[Cory Kasimov, JPMorgan analyst:] Obviously, everybody is really focused, as I'm sure you are, on your pending PDUFA date for NUPLAZID for DRP. Can you just kind of frame expectations for what you would maybe expect or hope a label would look like, and the importance that will play in the commercialization of the product for the indication?

[Defendant Davis:] Yes. Thanks much, Cory. I'll start and then – and Serge [Stankovic] may want to add some additional color as well. So the indication we'll be seeking is as NUPLAZID … for the treatment of dementia-related psychosis. And there are probably two key elements that we should touch on here: One is the – as I mentioned, we're seeking the treatment of dementia-related psychosis. **So we're not looking at individual subtypes as they are often referred to of dementia.** The psychosis that we see is very similar between the – irrespective of the underlying etiology and it responds in a similar way. **So we're seeking that broad indication. That's supported by a very both alignment we established with the FDA at our end of Phase II meeting and then again at their pre-sNDA meeting when we submitted our application**. The efficacy and safety data that we have, that underpins that indication, is very strong."

- **"ACADIA Pharmaceuticals Inc at JPMorgan Healthcare Conference (Virtual),"** ***Refinitiv*****, 12 January 2021, p. 5 (emphasis added).**

*c) Company Statements following the DL and CRL*

188. As the examples below make clear, Acadia acknowledged that its receipt of the DL and the CRL were highly *negative* developments, and these same comments are additional compelling evidence that Defendants' *prior* alleged misrepresentations and omissions, which understated the risk of these negative developments and caused those risks to be underappreciated by the market, had been economically material and *positive*:

> "[Defendant Davis:] We were extremely surprised and disappointed to receive such a communication from the FDA and to receive it so late in the review cycle."
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 2.**

> "[Cory Kasimov, JPMorgan analyst:] I'm kind of confused here. I mean, you got this letter last week on March 3, and you're just announcing it now almost a week later. Is it you were trying to – you've been trying to get in touch with the FDA and they won't respond to your incoming e-mails, phone calls, whatever it is? Is there anything else behind that? Like when do you expect to engage in conversations with the agency to understand the path forward?
>
> [Defendant Davis:] Yes. Thanks for the question, Cory. You're exactly right. We immediately and repeatedly have been pushing the FDA. We've escalated the issue. We just don't have any feedback from them yet. They've told us twice that they don't have any additional questions for us, and that's where things stand at the moment."
>
> ■ **"ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 4.**

> "[Defendant Stankovic:] Based on not having been advised by the FDA or any issues throughout the sNDA review until now, the March 3 notification came as a complete surprise this late in the review. This situation is particularly disappointing given the fact that pimavanserin has a breakthrough therapy designation for the treatment of DRP, and this designation should come with more transparency from the FDA."

- **"ACADIA Pharmaceuticals Inc Corporate Call – Regulatory Update on Supplemental New Drug Application," *Refinitiv*, 8 March 2021, p. 3.**

"[Defendant Davis:] Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase III HARMONY study design, targeting a broad DRP population analyzed as a single group, the division in the CRL cited a lack of statistical significance in some of the subgroups of dementia and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support an approval. This is very disappointing and is not consistent with our agreements with the division on the pivotal study design since the time of our end of Phase II meeting that the study would have a representative sample of the various etiologies but not be individually powered for statistical significance by subtype."

- **"ACADIA Pharmaceuticals Inc to Discuss Complete Response Letter from U.S. FDA for Supplemental New Drug Application," *Refinitiv*, 5 April 2021, pp. 2-3.**

### 3. Analysts Deemed the Alleged Misrepresentations and Omissions to be Highly Economically Material

#### *a) Proposed Expansion of Pimavanserin Indication to Include DRP*

189. Analysts well understood that the expansion of pimavanserin to DRP and any information related to that prospect were highly important to the valuation of Acadia and its stock. During the Class Period, analysts explained that expanded approval for pimavanserin would increase the Company's revenue and represented a near- and long-term value creation opportunity.

190. For example, the following analyst commentary supports that expanded regulatory approval of pimavanserin for DRP, and all information related to that prospect, constituted economically material information.

"If approved, Nuplazid will serve as a stand-alone drug for DRP, which we estimate as a ~$1.8B oppy at peak. We think ACAD shares are now significantly de-risked and are raising our PT to $56 (was $35)."

- **"Early Termination of DRP Trial for Efficacy = Drastic Near-Term Market Expansion," by Danielle Brill and Nirav Shelat, PiperJaffray analyst report, 9 September 2019, p. 1.**

"We model DRP as a blockbuster opportunity, with a potential of $5B+ sales in ~2028. We believe formal on-label sales for non-PDP DRP will likely start as early as 2021."

- **"Hitting the Harmony: DRP Success, New Market Opp Raises PT to $66," by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 9 September 2019, p. 3.**

"DRP in our view is a sig[nificant] driver for ACAD shares given under-met need in a large addressable pop'n (1.2mn p[atien]ts) with no approved treatments available. In our model, we increase our likelihood of success (LoS) for DRP to 65% (prev. 40%), reflecting launch in 2021E. We now assume $100mn risk-adj. sales in DRP ($44/sh in our PO) at launch in 2021 ramping to peak sales (risk-adj.) of $2.9bn by 2027E. We also continue to model $200mn cash raises in 2019 and 2020 as ACAD could increase its sales footprint. We reit. our Buy with new $48 PO [price objective] (prev. $31), which assumes impact from now in the money options."

- **"Interim Look at DRP Study Gives Positive Surprise; Reiterate Buy and PO to $48," by Tazeen Ahmad et al., BofA analyst report, 9 September 2019, p. 1.**

"While it is possible for Nuplazid to reach consensus $152M in DRP sales for 2021 given the large market, educational efforts, and physician enthusiasm for the drug, we model a more conservative $106M in 2021 sales given expansion into a new indication and uncertainties associated with COVID-19. We still expect the launch in DRP to be fairly linear and don't expect a large bolus of patients. Still, we think DRP will have more rapid uptake than PDP with the larger population and expanded salesforce. Management has already launched a healthcare professional website (morethancognition.com) to help educate physicians on the prevalence and burden of psychosis for DRP patients. Additionally, uptake could be faster given greater recognition of the correlation between dementia and psychosis from physicians treating DRP compared to physicians primarily treating Parkinson's who focus mainly on motor symptoms. Given these factors, we estimate DRP sales of $106M in 2021, increasing to $3.3B by 2029."

- **"Strong Foundation in PDP with Attractive Risk/Reward; Initiating at Overweight," by Jeffrey Hung et al., Morgan Stanley analyst report, 20 August 2020, pp. 13-14.**

"If pimavanserin were to be approved in DRP, it could expand the treatable patient population very significantly; we don't doubt that, and

even from current levels, ACAD shares deserve to be materially higher if DRP hits based on the premise that sales projections for the drug have to go up. **According to ACAD, ~8MM people in the U.S. have dementia and approximately 30% (1.2MM) are estimated to be diagnosed with psychosis (~50% of the overall dementia psychosis population), a significant increase compared to the ~250k patients that we estimate to have PDP (pimavanserin's approved indication).** For patients with dementia-related psychosis, there are no approved therapies, and even a small amount of market share in this subset of patients could be very meaningful for the product. In turn, we believe that DRP could expand the pimavanserin market opportunity significantly, though in our model DRP represents a TAM that's ~2x larger, not ~3x or ~4x as prevalence might imply."

- **"Deep Dive on DRP: The Tremendous Trial vs The Weak Antipsychotic," by Paul Matteis et al., Stifel analyst report, 2 September 2019, p. 12 (emphasis added).**

"The market opportunity in DRP is very attractive, with -1.2 million diagnosed patients in the U.S. (up to -1 Ox larger than the approved PDP indication for NUPLAZID) and no approved therapies."

- **"Harmony Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason N. Butler et al., JMP, 9 September 2019, p. 1.**

"The drug is on track to become the established standard of card in PDP, and we believe the approval (and launch) of Nuplazid in DRP **(10x the size of the PDP market) is** likely to significantly increase the commercial appeal of the asset."

- **"ACAD - A Psychosis Success Story; Initiate at BUY and $60 PT," by Yatin Suneja et al., Guggenheim analyst report, 16 December 2019, p. 1.**

"Specifically, we are encouraged by FDA's acceptance of the sNDA for a product for DRP where no products are approved, and the unmet need and market opportunity remain high."

- **"We see MDD-out/DRP-delay pullback as an opportunity; reiterate BUY, $56 PT," by Sumant Kulkarni et al., Canaccord Genuity, 24 July 2020, p. 1.**

"Noting DRP is 10x the size of the currently approved Parkinson's disease psychosis (PDP) market, ACAD is in the process of expanding its sales force to ~450 from ~250."

- **"DRP label expansion in sight; Maintain Buy," by Tazeen Ahmad et al., BofA Securities analyst report, 12 January 2021, p. 1.**

*b) Acadia's Purported "FDA Agreement," the Purported Sufficiency of Harmony's Top-Line Results, and the Purportedly Supportive -019 Study*

191. Analysts considered factors related to the probability of regulatory approval of the DRP sNDA to be important in valuing the Company's stock. Such factors included Acadia's representation that it purportedly had a "clear agreement" with the FDA and that it had executed on that agreement, information as to whether the Harmony Study's efficacy data could be fairly represented as positive (particularly in light of the FDA's actual position on the importance of supportive subgroup data), and information relating to the strengths (or weaknesses) of the -019 Study as further support for the sNDA. The Company's representations about these subjects constitute the alleged misrepresentations and omissions in this case.

192. That analysts considered the Company's representations that comprise the alleged misrepresentations and omissions to be economically material is evident in their published commentary. The following are examples.

> "The combined acute treatment data should address any FDA questions, especially given agency conferred breakthrough status and written agreement that the HARMONY would generate sufficient pivotal data to support sNDA review.
>
> …
>
> ACAD plans to submit a sNDA to the FDA next year; we think likely in 1H20. We believe ACAD will hold a pre-NDA meeting with FDA once additional analysis is complete, likely around end of 2019 or early 2020. We expect this meeting to be straightforward given previous discussion/agreements with FDA on the DRP regulatory path and decent continuity within the psychiatry division (despite recent division head turnover). … We are raising our price target to $66 based on a greatly increased probability of success (now at 70% up from 30%) in DRP."

- **"Hitting the Harmony: DRP Success, New Market Opp Raises PT to $66," by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 9 September 2019, p. 3.**

"Bottom line, with breakthrough-designation, a buy-in from the FDA on trial design, and the unmet need in DRP, we remain confident in Nuplazid's potential within this indication. Maintain Overweight."

- **"Why Not Start Off Fall in Harmony," by Cory Kasimov et al., JPMorgan analyst report, 9 September 2019, p. 1.**

"Earlier today (9/9), ACAD announced that it is stopping its pivotal Phase 3 HARMONY trial in dementia-related psychosis (DRP) after pimavanserin hit its primary endpoint at a planned interim efficacy analysis. We had previously noted the need for symptomatic treatments in dementia (see our post-AAIC note here) and were expecting the HARMONY trial to continue (see here). So, we are pleasantly surprised by today's early stoppage, which is based on hitting a relatively high bar of pre-specified stopping criteria that required a one-sided p-value of <0.0033 on the primary endpoint, *i.e.*, time of relapse of DRP. We await more details/data on HARMONY at upcoming medical meetings. While the stock is up ~65% on the news, we believe there is more room for upside from these levels as DRP is an indication that: 1) has no currently approved drugs; and 2) is significantly larger than Parkinson's disease psychosis (PDP), for which pimavanserin is currently approved as Nuplazid. As such, we are upgrading ACAD from what we have long-characterized as a constructive Hold (see here) to a BUY. We are also raising our DCF-based price target from $29 to $50.

…

Recall ACAD had reached agreement with the FDA at its end-of-Phase 2 meeting that a single, well-controlled trial would be enough for sNDA submission. Given the lack of details on HARMONY data currently, our obvious caveat is if the FDA agrees with what ACAD presents. To us, ACAD appears very confident that it has everything necessary to support potential approval. We now model 21E DRP launch/80% probability of approval vs. 22E/35% previously[.]"

- **"Pleasantly Surprised by Dementia-Related Psychosis Trial News; Upgrade to BUY, PT from $29 to $50," by Sumant Kulkarni and Jay Shah, Canaccord Genuity analyst report, 9 September 2019, p. 1.**

"The company is initiating study stopping procedures and the completion of clinical trial activities, which will be followed by full

analysis of study data. We anticipate an FDA meeting and sNDA submission in early 2020. Pima' has BTD for DRP, which is an unmet need. A previous P2 in Alzheimer's pts showed statistically significant results for reduction in psychotic symptoms in pima' arm vs placebo without impact on measure of cognitive function. At the EOP2 meeting with the FDA, ACADIA confirmed that for the sNDA in DRP it could rely on a single well-controlled study that met clear statistical significance that showed clinical benefit. The company plans to submit data from HARMONY and the two previous efficacy studies (PDP and Alzheimer's) as well as additional safety data from the ongoing pbo controlled post-marketing safety study of pima' in elderly frail pts with neuropsychiatric symptoms related to neurodegenerative disease. We also view this early interim read as a capital efficient event that allows ACADIA to allocate additional resources towards it commercialization efforts. The current infrastructure in place for NUPLAZID sales is focused on neurology, psychiatry and long-term care, which overlaps with a significant part of the DRP market. The DRP market is much larger than PDP in terms of healthcare practitioners/pts and we anticipate that it will leverage the approach and resources in place, although expansion will likely be required for launch readiness, in our view. **Changes to our ACADIA model.** We decreased our discount rate from 30% to 25% for DRP in our US model and from 35% to 30% in our E.U. model. That said, we believe there is upside to our timeline and penetration assumptions and we may re-visit these once the detailed data from the HARMONY study are made available. Our ACADIA model uses a fully diluted share count for the valuation."

- **"DRP Interim Read Bodes Well for TAM-Expansion; Raising PT," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerald analyst report, 9 September 2019, pp. 1-2 (emphasis in original).**

"We continue to believe that the interim data are supportive of Nuplazid's approval in DRP (a commercial drug with BTD and no approved therapies for this indication) and will help drive 'blockbuster' status (DRP > 10x PDP). Maintain OW."

- **"Positive CTAD Update Bodes Well for Nuplazid's Label Expansion," by Cory Kasimov et al., JPMorgan analyst report, 4 December 2019, p. 1.**

"We view DRP as a blockbuster market opportunity. … Given the strong efficacy and favorable safety profile, we believe this data will support broad label expansion. The combined acute treatment data

should address any FDA questions, especially given agency gave written agreement that the HARMONY would generate sufficient pivotal data to support sNDA review.

…

Based on mgmt's end-of-Ph2 meeting with the FDA, the basis for the sNDA submission for DRP can rely on data from the HARMONY study, as well as key supportive positive data from the prior positive Ph2 in ADP, positive data from the Ph3 pivotal study in PDP, safety and tolerability data from all completed PBO-controlled studies, and an ongoing PBO-controlled post-marketing safety study. We believe, based on a recent meeting with FDA, that acute initial response rates (from HARMONY and the Ph2, both encouraging) are important to the agency, along with primary analysis maintenance data. We expect the combined acute treatment data should address any FDA questions, especially given agency conferred breakthrough status and written agreement that the HARMONY would generate sufficient pivotal data to support sNDA review. We strongly expect approval, likely sometime in late 2020 or early 2021. We expect the 34 mg dose to be the dose in the upcoming sNDA submission for DRP."

- **"Perfect Harmony: CTAD Data Shows 65% Reduction in Risk of Relapse in DRP," by Ritu Baral and Lyla Youssef, TD Cowen analyst report, 5 December 2019, pp. 1 and 5.**

"Recall we had upgraded ACAD on 9/9 (see here) when the company announced it was stopping the trial for positive efficacy. While not many details were known at the time, we believed the initial success warranted a thesis change based on the potential size of the DRP opportunity. Given the additional data from yesterday, we came away with even more confidence in our BUY thesis. Our bottom-line take is that HARMONY DRP data are very robust, and pimavanserin has a very compelling safety profile in DRP. Recall DRP has no currently-approved products and off-label options have side effects that limit use. Based on the solidity of ACAD's DRP data, we are reiterating our BUY. While quarterly sales of Nuplazid (pimavanserin, approved for Parkinson's disease psychosis) will remain important, we believe the DRP indication is under-appreciated by investors.

…

ACAD still expects to meet with the FDA in 1H20 to discuss next steps. Recall that ACAD and the FDA had agreed that a single, well-controlled trial would be enough to support a supplemental new drug application (sNDA) filing provided the trial was statistically and clinically persuasive. We believe a filing is possible in 2H20. **Working**

**through model, but our estimates could be conservative[.]** We are still working through the potential model ramifications here, but based on the solid HARMONY results, we believe our sales estimates in DRP could be conservative. For reference, our model continues to be based on a starting point of ~ l.2mn US DRP patients. Our 2021E launch pricing estimate is at parity with Nuplazid in PDP ($32.5k net price). We model peak share of 6% in 2029E and peak unadjusted sales of $2.8bn."

- **"HARMONY Data for Dementia-Related Psychosis Strike a Nice Chord at CTAD; Reiterate BUY," by Sumant Kulkarni and Jia Min, Canaccord Genuity analyst report, 6 December 2019, p. 1 (emphasis in original).**

"Based on the results of HARMONY by subgroup, lack of prior regulatory precedent for an approval in 'dementia' broadly rather than a specific subtype, and the class black box warning that pimavanserin carries in a modified form, a focus for investors is whether or not the drug will get a broad, clean label for use in DRP.

Currently there are four NCEs approved to treat the symptoms of dementia ... The fact that these drugs have labels specific to one or more type of dementia could suggest that FDA may be inclined to approve new drugs for only the specific dementia subtypes where a stat sig benefit is shown. However, the HARMONY study was not powered to show an effect on a specific subtype based on discussions the company has had with FDA. Given that [and] that Acadia has Breakthrough Therapy Designation for pimavanserin in DRP enabling more frequent and open dialog with FDA, we find it unlikely that FDA will choose now to discriminate in the label based on dementia subtype barring any significant differences in safety between dementia subgroups."

- **"2019 Was Just the Tip of the Iceberg. Initiating at Buy With $69 PT," by Neena Bitritto-Garg, Citigroup analyst report, 5 March 2020, p. 19.**

"We are confident that the results from this trial will support label expansion given: 1) the strength of the results and reinforcement of the clinical profile that has already secured Breakthrough Therapy designation in this indication, 2) clear feedback from the FDA at the end-of-Phase 2 meeting that a single trial would be supportive of approval; and 3) the unmet medical need."

- **"Harmony Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason N. Butler, JMP analyst report, 9 September 2019, p.1**

"Nuplazid was previously designated a Breakthrough Therapy. FDA reportedly informed mgmt that a single well-controlled trial will be sufficient for approval in this indication."

- **"Positive Nuplazid Phase 3 Dementia Psychosis Trial Results. Raise PT to $60," by Alan Carr et al., Needham analyst report, 9 September 2019, p. 1.**

"ACAD plans to meet with FDA in 1H20 to discuss sNDA submission. ACAD believes previous discussions indicate robust Ph3 HARMONY results along with Ph2 DRP and previous PDP data are supportive of filing."

- **"Favorable HARMONY Strikes a Chord with Investors," by Jay Olson et al., Oppenheimer analyst report, 6 December 2019, p. 1.**

193. Analysts specifically pointed out the very statements that are alleged to be misrepresentations and rendered false by omissions to be the bases for their optimistic estimates of the PoS. Analysts identifying the misrepresentations as the rationales for their PoS assessments confirms that the misrepresentations and omissions were economically material.

"We are confident that the results from this trial will support label expansion given: 1) the strength of the results and reinforcement of the clinical profile that has already secured Breakthrough Therapy designation in this indication, 2) clear feedback from the FDA at the end-of-Phase 2 meeting that a single trial would be supportive of approval, and 3) the unmet medical need.

…

Our increased price target (Summarized in Figure 1) reflects a higher probability of approval in DRP (90% vs. prior 65%) and higher penetration rates (12% at peak vs. prior 4%)."

- **"HARMONY Phase 3 for Dementia-Related Psychosis Stopped Early for Success," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 9 September 2019, p. 1.**

"This morning, ACAD reported that the ongoing Ph3 HARMONY trial in dementia-related psychosis (DRP) has been stopped early for

> positive efficacy with Nuplazid demonstrating a statistically significant longer time (p=0.0033) to psychosis relapse compared to placebo on an interim look. … We (1) increase our PoS for Nuplazid in DRP to 85% (from 15%) on the positive interim read … ."

- **"Ph3 HARMONY Stopped Early on Efficacy; Schizophrenia Data Next," by Salveen Richter et al., Goldman Sachs analyst report, 9 September 2019, pp. 1 and 6.**

> "On the heels of the positive interim readout of HARMONY, we're increasing our probability of success (PoS) for Nuplazid in DRP to 90% (from 50%)."

- **"Updating Model for DRP; PT to $50," by Cory Kasimov et al., JPMorgan analyst report, 10 September 2019, p. 1.**

> "On the back of the strong data, KOL enthusiasm, and likely FDA alignment on the submission path, we model for the broad indication of DRP…and assign an 85% PoS."

- **"More legs to Nuplazid in 2020 and beyond; Upgrade to Buy," by Salveen Richter et al., Goldman Sachs analyst report, 31 March 2010, p. 7.**

*c) Analyst Commentary following the DL and CRL*

194. Following the news of Acadia's receipts of the DL and the CRL, analysts wrote that the developments would negatively impact Acadia's valuation. As the risk of the rejection embodied by the DL and CRL was caused to be understated by the alleged misrepresentations and omissions, analysts' negative reactions to these developments are further confirmation of the economic materiality of the alleged misrepresentations and omissions. The following quotes are examples of the negative reactions by analysts to the DL and CRL disclosures.

> "We are downgrading ACAD from Strong Buy to Outperform following today's disclosure that the FDA found deficiencies in their sNDA filing that preclude labeling discussions for Nuplazid in dementia related psychosis. … We lowered our PoS for DRP to 25% (from 90%), and removed 2021 revenue estimates for DRP from our model. Our new 10-year DCF yields a $35 PT (was $65)."

- **"Downgrading To Outperform; Did Not See This One Coming – DRP Seems To Be Headed For A CRL," by Danielle Brill and**

**Daniil Gataulin, Raymond James Analyst Report, 9 March 2021, p. 1.**

"FDA notified ACAD that it identified deficiencies in the DRP sNDA for pimavanserin that preclude discussion of labeling and post-marketing requirements. Although the exact deficiencies are not yet specified, FDA stated this notification does not reflect its final decision on the sNDA, and the originally scheduled PDUFA date (4/3/2021) remains unchanged. We expect ACAD to receive a CRL, and consequently adjust our DRP sales forecast for launch in 2022. We believe potential competitors in DRP such as KRTX should benefit from ACAD's regulatory precedence, and we consider KarXT uniquely differentiated. We believe the post-market ACAD share reaction is consistent with our scenario analysis. We lower our POS estimate for DRP to 50% from 90%, driving our new $28 price target ($42 prior) and maintain our Perform rating."

- **"Challenging Path To DRP Lays Groundwork For Followers," by Jay Olson et al., Oppenheimer, Analyst Report, 9 March 2021, p. 1.**

"Given DRP is the biggest contributor to our PO [price objective] for ACAD shares, we think it is prudent to lower our rating to Neutral (from Buy) and adjust our expectations as we await visibility. In our DCF-based model, we adjust our assumptions to now assume a Complete Response Letter (CRL). We push out DRP launch to 2022 (prev. 2021), decrease DRP peak penetration to 10% (prev. 12%) and adjust our DRP ramp and op ex assumptions. We also lower our LoS [Likelihood of Success] for DRP to 60% (from 75%) and raise WACC to 11% (from 10%) to reflect higher risk. Our model changes result in our new $40 PO (prev. $66)."

- **"FDA Surprisingly Delays Start of Label Discussion for DRP; Lower to Neutral," by Tazeen Ahmad et al., BofA analyst report, 9 March 2021, p. 1.**

"This morning, ACAD announced that it had received a complete response letter (CRL) from the FDA for its sNDA for Nuplazid in dementia related psychosis (DRP), which was unsurprising given the prior announcement on unidentified deficiencies with the application. **Despite prior alignment with the agency on the trial design and proposed study population, the FDA cited a lack of benefit demonstrated for Nuplazid across the various dementia subtypes** (the trial was not powered to detect statistical changes; details within).

We await clarity regarding next steps (ACAD has stated that it is planning to request a Type A meeting to understand the rationale for the decision and to make a case for the strong benefit/risk profile in the broader DRP population); however, we expect the base case is now for an additional pivotal trial which could delay commercial launch by about three years, while noting the evolving competitive landscape that could limit ACAD's first-mover advantage. Given the setback, we now see a lack of meaningful near-term value drivers and downgrade ACAD to Neutral, lowering our 12-month PT to $25 from $73."

- **"Nuplazid CRL as Expected; Looking for Clarity on Forward Path From Type A Meeting – Downgrade to Neutral," by Salveen Richter et al., Goldman Sachs analyst report, 5 April 2021, p. 1 (emphasis added).**

"Despite Co's assertion they can convince FDA, we now expect add'l clin work will be required, delaying launch to '24 & lower PoS in the indication to a 'coin-flip.' As a result, we D/G to HOLD & lower PT to $21. Despite prior agreements, the CRL cites efficacy in dementia subgroups as insufficient for approval."

- **"CRL Portends More Clinical Work Required for DRP – D/G to HOLD & PT to $21," by Chris Howerton et al., Jefferies analyst report, 5 April 2021, p. 1.**

### B. Economic Materiality of Misrepresentations, Omissions, and Corrective Disclosures is Compelling Proof of Loss Causation

195. As presented above, Plaintiffs allege that with misrepresentations and omissions, Defendants concealed from investors the full terms of the purported agreement that Acadia arrived at with the FDA at the EOP2 meeting. The alleged misrepresentations and omissions misled investors about the clinical trial results that would be required by the FDA to approve Acadia's DRP sNDA, and whether the announced clinical results were sufficient to support the sNDA. In sum, the alleged misrepresentations and omissions caused investors and analysts to overestimate the PoS that pimavanserin would be approved for DRP. The alleged misrepresentations and omissions thus caused the market to overvalue Acadia stock.

196. The corrective events eliminated the induced anticipation that the submitted sNDA would likely be approved. They reversed the market's

overestimation of the PoS that pimavanserin would ultimately be approved for a broader array of indications. Following the corrective disclosures on 8 March 2021 and 5 April 2021, analysts decreased their PoS estimates and their valuations of Acadia stock.

197. Generally accepted economic principles, Company statements, and analyst commentary all uniformly confirm that the alleged misrepresentations and omissions were economically material and positive, while the corrective events were economically material and negative. As such, given that Acadia stock traded in an efficient market, it follows that the alleged misrepresentations and omissions artificially inflated Acadia stock, and the corrective events dissipated that inflation, causing investor losses.

198. This conclusion is further confirmed by the empirical analysis presented next.

### C. Event Study Analysis of Economic Materiality and Loss Causation

199. In addition to establishing economic materiality and loss causation based on economic principles, Defendants' statements, and the commentary of market participants, economic materiality and loss causation can also be assessed empirically with the application of an event study. An event study can determine if the subject security price rose when (and because) inflationary representations were made, and fell when (and because) corrective events occurred. Event study analysis is one of the most commonly used analytic methodologies employed by finance researchers in general. Event studies are also the most widely accepted form of empirical analysis used by financial economists to determine whether the disclosure of a previously concealed truth (in whole or in part) caused a company's share price to fall.

200. MacKinlay [1997] presents a description and examples of the event study methodology and writes of its general acceptance and wide use in academic

research.[125] Gold et al. [2017] explain that the methodology is generally accepted and widely used in forensic applications.[126]

201. An event study investigates whether a security price reacted to the release of new information. A statistically significant security price reaction in response to the release of new information demonstrates that the new information caused the change in price (and that, conversely, the change in price was not due to random volatility movements or "noise"). Event study analysis can also be used to measure how much a security's price has risen (or fallen) in response to new, company-specific information.

202. An event study controls for the effects of market and industry sector factors, and thereby measures how much a company's stock price rose or fell specifically in response to new, company-specific information.[127] The methodology for isolating the effect of company-specific information involves conducting a statistical regression analysis that determines how much of the change in the subject security price is explained by market and industry sector factors. With the sensitivity of the stock price to market and industry sector factors quantified by the regression analysis, one can quantify the effect of the observed movements in the market and sector indices on the event days of interest. This quantification allows the forensic financial analyst to factor out market and industry influences from observed stock

---

[125] "Event Studies in Economics and Finance," by A. Craig MacKinlay, *Journal of Economic Literature*, Vol. 35, 1997.

[126] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, edited by Roman Weil et al., John Wiley & Sons, Inc., 6th edition, 2017.

[127] For example, if the nominal return on a company's stock is +10% on a given day, but all stocks in the company's same industry sector and all stocks in the broader market generally also traded up (say, by roughly 3%), after adjusting for industry and market effects the ***net*** residual return would be closer to +7% (rather than +10%). However, if industry and overall market returns were both ***down*** roughly 3% on that day, the net residual in our example would be roughly +13%.

price movements.

203. The remaining portion of a stock price change, which cannot be attributed to market or industry sector factors, is called the residual stock price movement, and is also referred to as the "net residual return," or simply the "residual return." It is the stock price change after controlling for market and industry sector effects.

204. Having isolated and quantified the net residual return, event study analysis then applies further statistical tests to determine whether or not the observed net residual return can reasonably be explained as merely a random fluctuation in the stock price. If the residual return on an identified event date is greater than a particular threshold established by statistical standards, the residual return is deemed to be statistically significant, which means that that portion of the stock return cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new, company-specific information.

205. In short, an event study is essentially a controlled experiment that allows one to compare the market's valuation of a stock before and after an event, and determine how much of the change in price was caused by the company-specific information disclosed by the event.

206. If event study analysis indicates that the alleged misrepresentations and omissions caused the Acadia stock price to rise, and that corrective events caused the stock price to fall, that finding would be both compelling empirical confirmation of the economic materiality of the alleged misrepresentations and omissions, and compelling proof of loss causation.

**1. Application of Event Study Analysis to Assess Loss Causation in this Action**

207. I focused my event study on event dates on which alleged misrepresentations and omissions reasonably could have caused Acadia's stock price to rise by introducing artificial inflation, and also on dates on which events

occurred that reasonably would have dissipated artificial inflation introduced or maintained by the alleged misrepresentations and omissions.

208. A misrepresentation can artificially inflate a stock price by introducing false and misleading information into the marketplace that distorts the mix of information in a manner that would seem to justify a higher stock price. An omission can introduce artificial inflation into a stock price, and thereby increase the stock price, by rendering an affirmative statement misleading. Omissions can also introduce artificial inflation by concealing an adverse development. Omissions can maintain artificial inflation in a stock price by failing to correct prior misrepresentations and omissions. If an omission introduces artificial inflation by concealing an adverse development, or an omission serves to maintain prior inflation, it would impact the stock price by keeping the stock price from falling, but it would not be expected to be evident in an observable stock price movement.

*a) Misrepresentation and Omission Dates*

209. Based on the allegations in the Amended Complaint, the Court's determinations in its Class Certification Order, and on my examination of the Company's experience as presented in the timeline above, the alleged misrepresentations and omissions that caused the market to overestimate the PoS and thus may have artificially inflated the Acadia stock price, occurred on 9 September 2019 (before the market open) and 4 December 2019 (after the market close).

210. Intervening and subsequent alleged misrepresentations and omissions were reiterations of the misrepresentations and omissions made on those two days, and so would not necessarily be expected to cause an observable increase in the stock price, but rather would have served to maintain the artificial inflation introduced on those two dates. Reiterations of misrepresentations and omissions generally maintain artificial inflation, rather than introduce new artificial inflation.

211. The first alleged misrepresentation and omission occurred before the market's open, and therefore the effective date for testing whether this event caused a stock price increase is 9 September 2019.

212. The second alleged misrepresentation and omission occurred after the market's close, and therefore the effective date for testing whether this event caused a stock price increase is the next trading day, 5 December 2019.

*b) Corrective Disclosure Event Dates*

213. Based on the allegations in the Amended Complaint, Lead Plaintiff's answers and objections to Defendant Acadia's Contention Interrogatories, the Court's determinations in its Class Certification Order, and on my examination of the Company's experience as presented in the timeline above, the events that may have corrected the inflationary effects of the alleged misrepresentations and omissions were: 20 July 2020 (after the market close), when the market learned the submitted sNDA would receive standard rather than priority review; 8 March 2021 (after the market close), when the market was told about the DL; and 5 April 2021 (before the market open), when the Company announced the receipt of the CRL.

214. The first of these events (occurring on 20 July 2020) raised suspicions among analysts as to whether the market's high degree of confidence in the success of the submitted sNDA was justified. The second event (occurring on 8 March 2021) provided information that contradicted the market's induced belief that the FDA had agreed that the Harmony Study's top-line efficacy results, coupled with the results of prior studies, would be sufficient for approval. The third event (occurring on 5 April 2021) eliminated hope that the submitted sNDA would be approved, and confirmed that (i) the FDA did not accept that the Harmony Study's top-line efficacy results alone could support approval of the sNDA, and (ii) that issues with the -019 Study meant that data from that study would not be sufficient to make up for the deficient subgroup data from the Harmony Study.

215. The 20 July 2020 and 8 March 2021 announcements occurred after the market's close, and therefore the effective dates for testing whether these corrective events caused the stock price to decline are 21 July 2020 and 9 March 2021, respectively. The CRL announcement occurred before the market's open, and therefore the effective date for testing whether that corrective disclosure event caused the stock price to decline is 5 April 2021.

*c) Isolating the Impact of Company-Specific Information*

216. One component of an event study is executing statistical analysis to isolate the impact of company-specific news on the stock price by removing market and industry sector effects. This is accomplished by (a) constructing a regression model that determines how the price of the stock typically behaves in relation to the overall market and to its industry sector, and then (b) using the estimated regression model to determine how much of any given day's actual return for the company's stock is explained by those market and industry sector factors. The portion of the stock return that is apportioned to market and industry sector factors is called the explained return. The explained return is then subtracted from the actual stock return to isolate the residual return, which is the stock's return after controlling for market and industry sector effects.

217. I ran a regression modeling the observed return on Acadia stock as a function of (a) a constant term, (b) the return of the overall stock market, and (c) an industry sector index return.

218. I ran the regression on daily returns covering the entire Class Period, that is, 9 September 2019 through 4 April 2021, inclusive. The choice of using data encompassing the event dates of interest for the regression estimation period is a widely used and generally accepted practice in event study analysis.[128]

[128] *See, e.g.*, "Materiality and Magnitude: Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, Chapter 19 of the *Litigation Services Handbook: The*

219. For the overall stock market factor, I used the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index (the "Market Index"), which is a generally accepted and widely used measure of the overall stock market performance.[129]

220. For the industry sector factor, I began with the same sector index that Acadia identified during the Class Period as representative of its industry sector for SEC Regulation S-K disclosure purposes.[130] In its Class Period annual reports, Acadia compared the performance of its shares to the Nasdaq Biotechnology Index.[131] I reconstructed the industry sector index to remove Acadia, because Acadia was itself a constituent in that index. This adjustment produces an industry sector index that excludes Acadia shares, which I hereafter refer to as the "Sector Index."[132] This adjustment is appropriate to mitigate any simultaneity of effects, whereby Acadia's stock returns would otherwise both cause and be caused by changes in an unadjusted sector index. The adjustment thus results in a purer measure of industry sector effects.

221. All returns used in the regression are logarithmic returns – *i.e.*, the natural logarithm of the ratio of the subject day's closing price to the previous day's

---

*Role of the Financial Expert*, edited by Roman Weil et al., John Wiley & Sons, Inc., 3rd Edition, 2001, p. 5. ("Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window").

[129] Data obtained from CRSP.

[130] Regulation S-K requires a public company to identify an index or peer group that is representative of its industry sector. *See* 17 CFR §229.201.

[131] Acadia Form 10-K for fiscal year ended 31 December 2019, filed 27 February 2020, p. 48; Acadia Form 10-K for the fiscal year ended 31 December 2020, filed 25 February 2021, p. 57; and Acadia Form 10-K for the fiscal year ended 31 December 2021, filed 1 March 2022, p. 58.

[132] I obtained the constituents of the Nasdaq Biotechnology Index from *Nasdaq*.

closing price. Logarithmic returns are commonly used in event studies and equity analysis because of various computational advantages. Appendix-2 of the Opening Feinstein Report (Dkt. No. 108-3 at 72-73) presents the mathematical formula I used to calculate logarithmic returns and a further discussion of that measure.

222. Event study analysis compares potentially atypical event days to typical stock return days for the subject security. One purpose of the regression analysis is to establish the typical stock return behavior, which includes measuring the typical level of random volatility affecting the stock. In performing this analysis, it is customary and appropriate to control for or exclude potentially atypical days in the regression analysis. Using dummy variables in the regression is the generally accepted and widely used approach for this purpose.[133]

223. I used dummy variables in the regression for the two identified event dates on which alleged misrepresentations reasonably may have caused observable stock price increases, 9 September 2019 and 5 December 2019. I also used dummy variables for 21 July 2020 and 9 March 2021. Using dummy variables in this manner to control for potentially atypical observations in the regression estimation period, especially when those dates are the subject of the event study analysis, so that the estimated regression parameters reflect typical stock price dynamics, is a widely used and generally accepted methodology.[134]

---

[133] "The Adjustment of Stock Prices to New Information," by Eugene Fama et al., *International Economic Review*, Vol. 10, No. 1, 1969, pp. 1-21; "Using Dummy Variables in the Event Study Methodology," by Imre Karafiath, *The Financial Review*, Vol. 23, No. 3, 1988, pp. 351-357; and "The Use of Dummy Variables to Compute Predictions, Prediction Errors, and Confidence Intervals," by David Salkever, *Journal of Econometrics*, Vol. 4, No. 4, 1976, pp. 393-397.

[134] *See*, *e.g.*, "Event Studies with a Contaminated Estimation Period," by Nihat Aktas et al., *Journal of Corporate Finance*, Vol. 13, No. 1, 2007; and "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," by David Larcker et al., *Journal of Financial and Quantitative Analysis*, Vol. 15, No. 2, 1980.

224. Acadia stock price and trading data are presented in Exhibit-4. Exhibit-5 presents the Market Index and Sector Index data.

225. For each of the tested event dates, I computed the explained portion of Acadia's stock return by adding (a) the estimated regression intercept term, (b) that date's Market Index return multiplied by the regression's estimated Market Index coefficient, and (c) that date's Sector Index return multiplied by the regression's estimated Sector Index coefficient. I then computed the residual return for each tested event date by subtracting the explained return from the actual return.

226. The regression results are presented in Exhibit-6.

*d) t-Test*

227. For each event, a statistical test called a *t*-test was conducted to determine whether the Acadia stock residual return was statistically significant. Statistical significance means that the stock return, after controlling for the market and industry sector effects, was of such magnitude that it cannot be reasonably attributed to random volatility, but alternatively must have been caused by Company-specific information. A *t*-test compares the residual return on an event date to the typical residual return and volatility exhibited over the regression estimation period. If the event date residual return is far greater (positively or negatively) than the typical residual return, the *t*-test indicates that the residual return is statistically significant.[135]

228. The results of the event study are summarized below and presented in Exhibit-7.

---

[135] The test is called the *t*-test because it involves the computation of a *t*-statistic, which is the event day residual return divided by the standard deviation of residual returns from the control period, *i.e.*, the regression estimation data comprising all other days. If the absolute value of the *t*-statistic is greater than the critical *t*-statistic value (±1.96 for large samples), the likelihood of the stock having this residual return caused by random volatility alone is less than 5%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected, and the stock return for that day is deemed statistically significant.

### 2. Event Study Results and Analysis

*a) 9 September 2019*

229. On 9 September 2019, Defendants announced the Harmony Study top-line results, and made alleged misrepresentations and omissions, including the statement, "… at the end of Phase II meeting with FDA, we confirmed that for our supplemental NDA submission in DRP, we could rely on a single, well controlled study whose results were both statistically and clinically very persuasive."[136]

230. On this day, the price of Acadia stock increased 49.00% (measured on a logarithmic return basis). The Market Index that day was virtually flat, with a logarithmic return of 0.06%. The Sector Index return that day was -0.82%. Based on the regression model, the explained return on Acadia stock was -0.88%. The difference between the actual return of 49.00% and the explained return of -0.88% is a statistically significant positive residual return of 49.89%.[137] This residual return is associated with a *t*-statistic of 20.17, which indicates statistical significance at the 99% confidence level.

231. The statistically significant logarithmic residual return of 49.89% corresponds to a stock price increase of $15.40 per share, caused by Company information that day.

232. I examined all Company news that emerged between the close of trading on 6 September 2019 (Friday) and the close of trading on 9 September 2019 (Monday) in order to assess whether any other valuation-relevant Company news had been disclosed besides the Company's announcement of the Harmony Study top-line results and accompanying statements, which Plaintiffs allege constituted misleading misrepresentations and omissions. There was no such confounding news.

---

[136] "ACADIA Pharmaceuticals Inc ACADIA Pharmaceuticals Announces Pivotal Phase 3 HARMONY Trial," *Thomson Reuters*, 9 September 2019, p. 4.

[137] Apparent mathematical discrepancy due to rounding.

233. While the Harmony Study's top-line results were presented accurately, but for Defendants' alleged misrepresentations and omissions that distorted the interpreted import of those results, those results would not have warranted the entire dramatic increase in the PoS that Defendants' statements elicited. Thus, based on the nature of the information announced, on financial valuation principles, on analyst commentary and valuations, on the statistical significance of the stock price increase, and on Dr. Feigal's opinion as to how much the true PoS would have been understood to have risen but for the alleged misrepresentations and omissions (as compared to how much analysts actually adjusted their PoS estimates in light of the misrepresentations and omissions) I conclude that the alleged misrepresentations and omissions were a substantial cause of the stock price increase that occurred on 9 September 2019, which therefore introduced artificial inflation into the Acadia stock price.[138]

*b) 5 December 2019*

234. On 4 December 2019, after the close of trading, the Company released more results from the Harmony Study, including some subgroup efficacy data. In addition, Defendant Stankovic stated that the "FDA agreed with us that with the robust results of this trial that we would be able to file a supplemental NDA. We believe that we met that high threshold of the robustness of the results and are on track to meet with the FDA to discuss the content and format of our supplemental

---

[138] As noted at ¶31 above and further discussed at ¶¶271-73 below, I find that 32.56% ($5.01) of the $15.40 residual stock price increase on 9 September 2019 is attributable to the alleged misrepresentations and omissions, and the remaining 67.44% ($10.39) is appropriately apportioned to the market's reaction to information in the announcement that would still have been considered positive by the market even without alleged misrepresentations and omissions. This attribution is based in part on the analysis and conclusion of Dr. Feigal, who determined that a proper assessment of the PoS would have risen only 29 percentage points to 70% if unaccompanied by misrepresentations and omissions, rather than rising 43 percentage points to the 84% level, which the market assessed on account of the alleged misrepresentations and omissions.

NDA submission in the second half – first half of next year."[139] Plaintiffs allege that the representation that the Harmony Study results conformed to what the FDA had stated would be sufficient for approval of expanded pimavanserin labeling was a misrepresentation.[140]

235. On the next trading day, 5 December 2019, the price of Acadia stock increased 13.10% (on a logarithmic return basis). The Market Index return that day was 0.11%. The Sector Index return that day was -1.54%. Based on the regression, the explained return on Acadia stock was -1.63%. The difference between the actual return of 13.10%, and the explained return of -1.63% is a statistically significant residual increase of 14.74%, which is $7.03 per share.[141] This residual return is associated with a *t*-statistic of 5.96, which is statistically significant at the 99% confidence level. The residual stock price increase that day was not caused by market or industry sector effects, or by random volatility. Rather, it was caused by Company information.

236. I examined the Company news that emerged between the close of trading on 4 December 2019 and the close of trading on 5 December 2019 to assess whether any other Company-specific news besides the Company's announcements could have contributed to the stock price increase on 5 December 2019. That is, I searched for confounding information. I identified no such confounding information.

237. While the additional Harmony Study results that were disclosed on 4 December 2019 (including certain subgroup efficacy data) may have been presented

---

139 "ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 8.

140 *See, e.g.,* Plaintiffs['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 Sept. 2024, at 57-58, 61, 68-73.

141 Apparent mathematical discrepancy due to rounding.

accurately, by themselves those results would not have warranted the dramatic stock price increase prompted by the Defendants' 4 December 2019 disclosures absent (a) the allegedly false and misleading aspects of those disclosures, which reiterated that Harmony's efficacy results met all the FDA's requirements, and (b) the allegedly false and misleading aspects of Defendants' pre-4 December 2019 disclosures, which had also touted Harmony's purportedly positive efficacy topline results without ever publicly disclosing the need to ***also*** obtain directionally consistent subgroup data.

238. Had the market been apprised of the FDA's position that directionally consistent subgroup results were needed for approval of the contemplated sNDA, Acadia's stock price would not have risen at all on 5 December 2019 – and instead would have fallen because the market would have known that the Harmony Study failed to produce results necessary for sNDA approval. Thus, based on the nature of the information announced, on financial valuation principles, on analyst commentary and valuations, and on the statistical significance of the stock price increase, I conclude that the alleged misrepresentations and omissions of 4 December 2019 introduced additional artificial inflation into the Acadia stock price that day, and were the cause of the increase in the price of Acadia stock that day.

*c) 21 July 2020*

239. On 20 July 2020, after the market closed, Acadia announced that the FDA had accepted Acadia's pimavanserin sNDA for filing, but assigned it standard rather than priority review. The Company also stated that the FDA had advised that the agency would not convene an AdCom to review the sNDA. In a separate press release also issued on 20 July 2020 after the market closed, the Company announced that its Clarity Study for MDD failed to achieve statistical significance on its primary endpoint, and that Acadia would completely abandon its effort to develop

pimavanserin as a therapy for MDD.[142]

240. On 21 July 2020, the first trading day after the July 20th announcements, the price of Acadia stock decreased 21.52% (on a logarithmic return basis). The Market Index return that day was 0.23%. The Sector Index return that day was -2.19%. Based on the regression, the explained return on Acadia stock was -2.31%. The difference between the actual return and the explained return is a statistically significant residual decline of -19.21%, which is equivalent to a decline of $9.69 per share. This residual return is associated with a *t*-statistic of -7.77, which is statistically significant at the 99% confidence level. The residual stock price decline on 21 July 2020 was not caused by market or industry sector effects, or by random volatility, but rather was a response to the newly announced Company information on 20 July 2020, after the close of trading.

241. I examined the Company news that emerged between the close of trading on 20 July 2020 and the close of trading on 21 July 2020 in order to identify any Company information, other than that referenced in these two press releases, that could have been responsible for or contributed to the 21 July 2020 stock price decline. I identified none.

242. Acadia's announcement regarding the Clarity Study's disappointing failure was neither an alleged misleading statement nor a corrective event. Instead, the news about the Clarity Study's disappointing results were an adverse non-fraud-related development that had a negative impact on the price of Acadia shares.[143]

---

[142] *See*, *e.g.*, "ACADIA Pharmaceuticals Announces Top-line Results from the Phase 3 CLARITY Study Evaluating Pimavanserin for the Adjunctive Treatment of Major Depressive Disorder," *Business Wire*, 20 July 2020 4:02 PM; and "MDD Miss, DRP 2021 PDUFA Hinder Pim's Near-term Momentum; Though Long-term View Intact," by Gregory Renza and Yinglu Zhang, RBC Capital analyst report, 20 July 2020, pp. 1 and 3.

[143] *See*, *e.g.*, "Lack of Clarity; PT to $42," by Jay Olson and Matthew Hershenhorn,

243. The assignment of standard review was certainly new information with respect to the pimavanserin sNDA, but Plaintiffs allege that Defendants kept analysts and investors in the dark as to the FDA's reasons for denying priority review. It was not publicly known at the time if the FDA had made this decision based on potential problems with the sNDA or for other reasons. Similarly, it is not entirely clear how, if at all, the FDA's decision not to convene an AdCom was related to the alleged misrepresentations and omissions. As shown above, however, analysts believed the lack of an AdCom was on balance a positive development.

244. The statistical result referenced in ¶240 above establishes that Company-specific developments that may have been driven by conditions concealed by the alleged misrepresentations and omissions may have caused some of the residual stock price decline on 21 July 2020. However, while the event study proves that the Company information announced on 20 July 2020 caused the price of Acadia stock to fall on 21 July 2020, due to the nature and mix of the news, I cannot conclude definitively that any portion of this price decline was caused by a correction of the alleged misrepresentations and omissions or was the adverse consequence of concealed conditions. Consequently, the Acadia stock price decline on 21 July 2020 does not provide independent proof of loss causation, and I do not include any portion of that stock price decline in my quantification of damages.

245. It is possible that some portion of the stock price decline on 21 July 2020 was the dissipation of artificial inflation, owing to the reduction in the value of the artificial inflation on account of the time value of money and the four-month lengthening of the time horizon until the greater expected pimavanserin revenue would be realized (due to the assignment of standard rather than priority review). However, it would necessarily follow that that quantum of dissipated artificial inflation would have been artificial inflation that accrued in the eight months since

---

Oppenheimer analyst report, 20 July 2020.

5 December 2019 as the expected time until FDA approval shortened due to the simple passage of time. As I conservatively exclude from my quantification of artificial inflation and damages any increase in artificial inflation attributable to the passage of time between 5 December 2019 and 20 July 2020 (and the time value of money), it is appropriate not to attribute any of the 21 July 2020 stock price decline to the dissipation of inflation that was embedded into the Acadia stock price on or prior to 5 December 2019.

*d) 9 March 2021*

246. After the close of trading on 8 March 2021, Acadia issued a press release announcing that it had received a DL from the FDA. The Company reported that the DL stated that "the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time."[144]

247. On 9 March 2021, the trading day following the corrective event, the price of Acadia stock fell 60.42% (on a logarithmic return basis). The Market Index return that day was 1.67%. The Sector Index return that day was 3.21%. Based on the regression, the explained return on Acadia stock was 3.27%. The difference between the actual return of -60.42% and the explained return of 3.27% is a statistically significant residual decline of 63.69%, which is equivalent to a decline of $21.57 per share. This residual return is associated with a *t*-statistic of -25.75, which is statistically significant at the 99% confidence level. The residual stock price decline that day was not caused by market or industry sector effects, or by random volatility. Rather, it was caused by Company information.

248. I examined the Company news that emerged between the close of trading on 8 March 2021 and the close of trading on 9 March 2021 in order to identify

---

[144] "Acadia Pharmaceuticals Provides Regulatory Update on Supplemental New Drug Application for Pimavanserin for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 8 March 2021 4:05 PM.

any other Company information that could have been responsible for or contributed to the 9 March 2021 stock price decline. I identified none.

249. The disclosure that Acadia had received a DL was a signal to the marketplace that the FDA likely had significant concerns about the Harmony Study's design and/or the extent to which the Harmony Study's data was sufficient to support approval – and a signal that the market had been led to materially overestimate the sNDA's true PoS based on factors that had likely not previously been adequately explained or disclosed to the market. Thus, the disclosure concerning Acadia's receipt of the DL partially corrected both the substance of and the valuation impact of the alleged misrepresentations and omissions. The correction was only partial, however, because the disclosure did not inform the public about what the specific deficiencies were or what it would take to remedy those deficiencies, and the disclosure still left open some possibility that the FDA would approve the sNDA at some later point.

250. The event study proves that the DL disclosure, which was a partially corrective event, caused the Acadia stock price to fall precipitously. This partially corrective event dissipated in substantial part (though not fully) artificial inflation caused by the alleged misrepresentations and omissions. As such, this event study result proves that the alleged misrepresentations and omissions caused investor losses.

*e) 5 April 2021*

251. The Company announced the receipt of the CRL before the start of trading on Monday, 5 April 2021. That day, the price of Acadia stock fell 18.91% (on a logarithmic return basis). The Market Index return that day was 1.14%, and the Sector Index return was 0.51% that day. Based on the regression, the explained return on Acadia stock was 0.48%. The difference between the actual return of -18.91% and the explained return of 0.48% is a statistically significant residual

decline of 19.40%, which is equivalent to a decline of $4.51 per share.[145] This residual return is associated with a *t*-statistic of -7.84, which is statistically significant at the 99% confidence level.

252. As proved by the event study, the disclosure of the CRL and the portions of its contents regarding the FDA's reasons for issuing it dissipated additional artificial inflation that had previously been caused by the alleged misrepresentations and omissions. As such, this event study result proves that the alleged misrepresentations and omissions caused investor losses.

253. I examined the Company news that emerged between the close of trading on 1 April 2021 and the close of trading on 5 April 2021 in order to identify any other Company information that could have been responsible for or contributed to the 5 April 2021 stock price decline. I identified none.

**D. Loss Causation Summary and Conclusion**

254. Based on the observed statistically significant Acadia price increases following alleged misrepresentations and omissions, and based further on the observed statistically significant price decreases when markets opened after the corrective disclosures occurred that corrected these misrepresentations and omissions – and after also taking into account potentially confounding information that could explain these results or some portion thereof – I conclude that the alleged misrepresentations and omissions caused investors to suffer losses.

255. The stock price chart below illustrates how Acadia's stock rose on 9 September 2019 and 5 December 2019, and declined on 9 March 2021 and 5 April 2021:

[145] Apparent mathematical discrepancy due to rounding.




256. Moreover, given that Acadia stock traded in an efficient market, it follows that Defendants' alleged misrepresentations and omissions which (a) touted the Harmony Study's positive top-line trial results, but downplayed the Harmony Study's problematic subgroup results; (b) cited Acadia's purported alignment with the FDA but failed to disclose how risky the Harmony Study's trial design actually was given the need for directionally consistent subgroup data; (c) claimed that Acadia had "executed" on its "agreed plan" with the FDA, even though establishing positive directionally subgroup results were a concealed part of that "plan;" and (d) failed to disclose the full extent of the deficiencies in the sNDA's "supportive" -019 Study – caused the price of Acadia's stock to be artificially inflated throughout the Class Period.

257. In sum, my consideration and analysis of the facts of this case, relevant financial principles, Defendants' statements, and analyst commentary, combined

with my quantitative analysis and empirical event study analysis, proves loss causation.

## VIII. QUANTIFICATION OF DAMAGES

### A. Out-of-Pocket Damages

258. The "out-of-pocket" measure of per share damages is applied in virtually all Section 10(b) cases. As explained in the Opening Feinstein Report, it fits the theory of liability in this case and can be applied commonly for all Class members.[146]

259. Damages according to this methodology are based on the difference between (a) the actual purchase price of the stock and (b) what the purchase price would have been had there been no alleged fraud such that investors would have known the correct concealed truth rather than having been misled by misrepresentations and omissions. The stock price in the scenario sans fraud is commonly referred to as the "but-for price." The difference between the actual price in the market and the but-for price is known as "artificial inflation," and that quantity is the amount that an investor would have overpaid for the stock on account of the fraud. As one leading commentor explained it:

> "[M]any courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule 10b-5 cases. The out-of-pocket measure rule defines damages as 'the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in other words, the difference between the amount parted with and the value of the thing received.' Typically, courts measure this as the plaintiffs' purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation."

---

[146] *See also* Class Certification Order, at 29 ("The proposed damages model is therefore 'consistent' with Plaintiffs' theory of liability and is able to 'isolate' damages attributable to the alleged misrepresentations.")

- **"Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017, 6th edition, p. 27.6, (internal citations omitted).**

260. The U.S. Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005) ("*Dura*") clarified that recoverable damages in Section 10(b) actions are not the entire amount by which an investor overpaid for a security on account of fraud (*i.e.*, all of the artificial inflation in the stock price at the time of purchase), but rather only that portion of the artificial inflation that came out of the stock price during the period the investor held the security. That is, recoverable damages are the amount by which fraud-induced artificial inflation dissipated after the investors' purchase but before the investor's sale – subject to certain statutory and case law limitations.[147]

261. In addition, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides a further limitation on damages, as follows:

---

[147] For example, assume that on Day 1 an investor buys a stock at a price of $100 per share, of which $25 is fraud-related artificial inflation. But for the fraud, the stock price would have been $75 per share. If the investor sells the stock later for $98 per share, but does so before any corrective events have occurred that would have disclosed the fraud or otherwise dissipated any of the artificial inflation in the share price, then – despite a nominal $2 investment loss – that investor would have no recoverable Section 10(b) damages. While the investor would have overpaid by $25 per share due to the fraud, the investor would have recouped the full amount of that $25 in artificial inflation at the time of sale. In effect, the investor would have both suffered from and then benefited by the same $25 of artificial inflation, with no net loss caused by the fraud. Alternatively, if the investor sold at a later date – by which time $15 of the artificial inflation (out of the original $25 of artificial inflation) had dissipated as a result of an intervening partially corrective disclosure – and if we further assume that the sale price was $83 per share – the investor would have $17 per share in nominal investment loss (*i.e.*, $100 - $83), and would have recoverable losses of $15 per share (equal to the amount of artificial inflation that dissipated between the date of purchase and the date of sale). An investor would only be able to recover the full amount of the artificial inflation caused by the fraud if they sold after (or continued to hold the stock until after) the corrective disclosures had dissipated all of the artificial inflation.

> "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

- **15 U.S.C. §78u-4(e)-(1).**

262. For Class members who sell within the 90-day period described by the PSLRA, an upper limit on per share damages is "the difference between the purchase or sale price paid or received" and "the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which" the security is sold.[148]

263. In the instant case, the mean per share trading price of Acadia stock during the 90-days beginning on 5 April 2021 is $22.59. Acadia stock closing prices over the 90 days from 5 April 2021 through 2 July 2021 are presented in Exhibit-8. The PSLRA damages limitation can be applied formulaically to the calculation of per share damages set forth below for all Class members.

### B. Quantifying the Artificial Inflation Introduced by the Misrepresentations and Omissions and Dissipated by the Corrective Events

264. To implement the out-of-pocket damages methodology for all Class members incorporating the constraints imposed by *Dura* requires the computation of how much artificial inflation was in the Acadia stock price on each day of the Class Period. This time series of artificial inflation amounts is known as the "inflation ribbon." The inflation ribbon can be constructed using the results of the event study, combined with other financial analysis to assess the effect of confounding information (if any), to assess how artificial inflation may have changed over the course of the Class Period.

[148] 15 U.S.C. §78u-4(e)-(2).

### 1. Introduction of Artificial Inflation Detected and Measured by the Event Study and Other Financial Analyses

#### *a) 9 September 2019: Alleged Misrepresentations and Omissions about Purported FDA Agreement and Sufficiency of Harmony Study Top-Line Results*

265. As discussed above, on 9 September 2019, when the Company announced that the top-line results from the Harmony Study met its primary endpoint and would be stopped early and (mis)represented that Acadia and the FDA had an "agreement" with respect to the sufficiency of Harmony top-line results for sNDA approval, the price of Acadia stock rose. The residual stock price increase (the price movement after controlling for market and sector effects) was a statistically significant $15.40 per share. This residual return was 49.89% on a logarithmic return basis, which is statistically significant at the 99% confidence level. These statistical results establish that the Company announcements that day caused the Acadia stock price to rise $15.40 per share that day.

266. As discussed above, the Company's announcements on 9 September 2019 caused analysts to increase their PoS estimates, causing the average PoS estimate to increase from 41% to 84%. Analysts attributed their increased optimism to the Company's announcement, which included alleged misrepresentations and omissions.

267. As noted above, there was no economically important Company-specific information that could have been responsible for the increase in the PoS and stock price increase on 9 September 2019 aside from the Defendants' announcements and commentary relating to the Harmony Study top-line results and their importance in the context of the "FDA Agreement," which included alleged misrepresentations and omissions.

268. Absent the alleged misrepresentations and omissions, analysts and investors might still have been encouraged by the positive top-line Harmony Study

results. However, absent the alleged misrepresentations and omissions, they would have understood that the FDA had also advised the Company that positive, directionally consistent subgroup data was also necessary for sNDA approval – and it would have been known that while the top-line results were promising, they were not sufficient for approval.

269. It was on account of the alleged misrepresentations and omissions that investors and analysts believed that the just-released top-line Harmony Study results (in combination with the previously released efficacy data from the -019 Study) constituted sufficient evidence of efficacy – without regard to the Harmony Study's subgroup data – to support FDA approval of pimavanserin to treat DRP under the terms of the FDA Agreement. Had investors known that, with respect to efficacy data, more than just positive top-line results were needed from the Harmony Study, analysts' assessed PoS would not have risen as much, nor would Acadia's stock price have risen as much, on 9 September 2019. Therefore, a portion of the stock price increase that occurred on 9 September 2019 (and that was thereafter maintained) was due to the introduction on that date of artificial inflation that is attributable to the alleged misrepresentations and omissions.

270. I note, however, that the $15.40 per share residual stock price increase on 9 September 2019 can be disaggregated between artificial inflation attributable to the alleged misrepresentations and omissions on the one hand, and the price increase that would have occurred anyway in a "but-for scenario" absent misrepresentations or omissions. This disaggregation can be computed by comparing how much the market's assessed PoS rose in the actual scenario that occurred *versus* how much the market's assessed PoS would have risen in the hypothetical but-for scenario where the top-line Harmony Study results were released unaccompanied by misrepresentations or omissions.

271. I understand that Dr. Feigal has estimated that, but for the alleged misrepresentations and omissions, the positive (but far from sufficient) Harmony

Study top-line results would have likely increased the average of analysts' assessed PoS from the 41% level where it had been prior to 9 September 2019 to 70% (a raw increase of 29%). By contrast, in the wake of Defendants' alleged misrepresentations and omissions of 9 September 2019, analysts on average assessed that the PoS had increased to 84% (reflecting a raw increase of 43%).

272. Therefore, 67.44% (*i.e.*, $^{29\%}/_{43\%}$) of the 43 percentage-point increase in the assessed PoS was legitimate optimism borne of the promising top-line Harmony Study results, and was ***not*** induced by the alleged misrepresentations and omissions. However, the remaining 32.56% (*i.e.*, $^{14\%}/_{43\%}$) of the 43 percentage-point increase in the assessed PoS ***was*** an overestimation of the PoS that was induced by the misrepresentations and omissions.

273. Consistent with the above, I conclude that 32.56% of the observed residual stock price increase was caused by the alleged misrepresentations and omissions. This amount in dollar terms is $5.01 per share (equal to $15.40 times 32.56%). This $5.01 per share figure is the amount of artificial inflation that was introduced into the Acadia stock price on 9 September 2019 by the alleged misrepresentations and omissions.

274. If the fact-finder in this matter adopts a different view as to how much of the $15.40 per share residual stock price rise observed on 9 September 2019 would have occurred absent the alleged misrepresentations and omissions, then the artificial inflation ribbon can be adjusted to reflect that different allocation. Any such adjustment would be easily applied to the computation of damages for all Class members on a formulaic basis. Nonetheless, based on the allegations, on my analysis of analyst commentary, on the empirical event study results, and the but-for scenario alternative PoS assessed by Dr Feigal, I conclude that the alleged misrepresentations and omissions introduced $5.01 per share of artificial inflation into Acadia's stock price on 9 September 2019.

*b) 5 December 2019: Release of Certain Subgroup Data from Harmony Study Accompanied by Alleged Misrepresentations and Omissions About Purported FDA Agreement and Sufficiency of Data*

275. On 4 December 2019, after the market close, Defendants announced certain subgroup efficacy results from the Harmony Study at CTAD,[149] while also restating many of its prior alleged misleading statements regarding the Harmony Study's results (including, *e.g.*, how the Harmony Study's results had "met the high threshold of robustness" under the FDA Agreement while also conveying false assurances that Harmony's subgroup efficacy data was not important to the FDA).[150] Following these statements and related commentary, the price of Acadia stock rose the next trading day, 5 December 2019, resulting in a statistically significant residual stock price increase of $7.03. The residual return on 5 December 2019 was 14.74% on a logarithmic return basis, which is statistically significant at the 99% confidence level. This statistically significant result establishes that Defendants' statements after the close on 4 December 2019 caused Acadia's stock price to rise $7.03 per share on 5 December 2019.

276. Based on Plaintiffs' allegations and my analysis, which included analysis of analyst reports and conference call transcripts, I observe that had it not been for the alleged misrepresentations and omissions of 4 December 2019, analysts and investors would have known that the FDA required directionally consistent subgroup efficacy results from the Harmony Study in order to approve an expansion of pimavanserin's approved usages to include a DRP indication. But for the alleged

---

[149] "Edited Transcript: ACADIA Pharmaceuticals Inc to Host Investor Event and Webcast from Clinical Trials on Alzheimer's Disease (CTAD) Meeting," *Thomson Reuters*, 4 December 2019, p. 8.

[150] *See* Lead Plaintiff['s] Omnibus Answers and Objections to Def. Acadia Pharmaceutical Inc.'s Contention Interrogatories, dated 19 September 2024, at p. 57-58, 61, 68-70, 71-73.

misrepresentations and omissions, the market would have understood that the Harmony Study had failed to produce the kind of subgroup results that the FDA had told the Company was necessary for the hoped-for FDA approval.

277. But for the alleged misrepresentations and omissions, not only would the market have understood that the available data as of 4 December 2019 was very likely to be insufficient to obtain FDA approval of an expanded indication for pimavanserin, but the market would also have understood that – in light of Harmony's failure to generate "directionally consistent" efficacy data across its subgroups – Acadia would now be unlikely to obtain such FDA approval in the future until it was able to obtain positive results from further trials, which in turn would likely require substantial additional time (and money) to design, conduct and analyze.

278. In the but-for scenario of sufficiently complete and honest disclosure to avoid misleading investors, the market's optimism (and consequently its assessed PoS and outlook for near-term blockbuster status) would not have been any greater after 4 December 2019 than it was before the start of the Class Period. In fact, it reasonably would have been much lower, as before any Harmony Study data was released (*i.e.*, before the start of the Class Period) the market had some reasonable hope that the FDA would approve a DRP indication for pimavanserin based on positive efficacy data from the Harmony Study – whereas once the Harmony Study subgroup data became public on 4 December 2019 investors would have understood, in the but-for scenario, that the Harmony data was likely insufficient, that more trials (whose results were also unknowable in advance) would likely be required, and that the PoS for "ultimate" approval would thus have been no greater than what it was immediately prior to the start of the Class Period.

279. Because the Harmony Study data disclosed on 4 December 2019 would not have been good news if the market had known that that data was not likely to satisfy the FDA, the Acadia stock price would not have risen at all on 5 December

2019 absent Defendants' misrepresentations and omissions. Consequently, all of the $7.03 per share residual stock price increase that occurred on 5 December 2019 was artificial inflation introduced into the Acadia stock price by the alleged misrepresentations and omissions.

280. Furthermore, had the full truth been told on 4 December 2019, the market would have known that all of the prior increased optimism, higher assessed PoS, and both the legitimate and illegitimate components of the stock price increase that was elicited by Defendants' statements on 9 September 2019 and was thereafter maintained by Defendants' subsequent statements, were unwarranted. Any optimism borne of the fact that Harmony passed the FDA's requirement for a top-line showing of efficacy would have been wiped out by the new information that Harmony had ***failed*** to pass the FDA's second requirement of showing directionally consistent subgroup results. Accordingly, not only would Acadia's stock price not have risen after the disclosures of 4 December 2019 (on a residual basis) in the but-for scenario, but its stock price would have instead fallen to reverse the prior increase of 9 September 2019.[151]

281. Therefore, as of 5 December 2019, the artificial inflation in the Acadia stock price comprised all of the residual stock price increase that had occurred on 9 September 2019 ($15.40) plus all of the residual stock price increase that occurred on 5 December 2019 ($7.03). This combined amount is $22.43 per share.

---

[151] I understand that, as of 9 September 2019, the Defendants apparently did not yet have any subgroup efficacy data, so that even if the market had been informed of the "directional consistency" requirement for subgroups, the market – consistent with Dr. Feigal's opinion – still would have likely reacted positively to Acadia having met the requirement of topline efficacy even in the absence of subgroup data showing that the second criteria had not been met. However, after 4 December 2019, Defendants' alleged false and misleading statements were made against the backdrop of a market that had been misled as to not only the existence of a directional consistency requirement, but also as to existence of actual Harmony Study efficacy data that now allegedly showed that Harmony ***had in fact failed*** to meet this requirement.

### 2. Artificial Inflation Dissipation and Stock Price Declines Caused by Corrective Disclosures

#### *a) 20 July 2020: Announcements of Standard Review, No Advisory Committee, and Clarity Study Failure*

282. On 20 July 2020, the Company issued two press releases. One press release announced that the Clarity Study failed to achieve statistical significance with respect to that study's primary endpoint.[152] In the other press release, the Company announced that the FDA assigned standard review to the pimavanserin sNDA for DRP and that the FDA was not planning to convene an advisory committee (AdCom) to evaluate and discuss the sNDA.[153]

283. The failure of the Clarity Study was new valuation-relevant negative news – but it was unrelated to the allegations at issue in the instant matter. Several analysts reduced their price targets and valuation for Acadia stock in response to learning of the Clarity Study's failure.[154] The news of this failure was thus a

[152] "ACADIA Pharmaceuticals Announces Top-line Results from the Phase 3 CLARITY Study Evaluating Pimavanserin for the Adjunctive Treatment of Major Depressive Disorder," *Business Wire*, 20 July 2020 4:02 PM.

[153] "ACADIA Pharmaceuticals Announces U.S. FDA Accepted for Filing the Supplemental New Drug Application for NUPLAZID(R) (pimavanserin) for the Treatment of Hallucinations and Delusions Associated with Dementia-Related Psychosis," *Business Wire*, 20 July 2020 4:03 PM.

[154] *See, e.g.,* "Value Remains Evident in Pimavanserin Despite MDD Miss," by Jason Butler and Roy Buchanan, JMP Securities analyst report, 21 July 2020, p. 1 ("We have updated our model, removing sales in MDD and incrementally lowering our 2021 sales estimates in DRP, which lowers our price target from $57 to $54"); "Acadia Pharmaceuticals Inc. (ACAD): Buy - Pivotal MDD Trial Misses, but DRP PDUFA is Key Catalyst," by Salveen Richter et al., Goldman Sachs analyst report, 20 July 2020, p. 1 ("While disappointing (our model indicates -14% to our PT on removal of MDD) - post (and even pre-) this binary event, we see investors opting to own the name for Nuplazid in dementia-related psychosis"); and "Nuplazid Fails in MDD; DRP Review Slightly Longer Than Expected but No AdCom is a Plus," by Cory Kasimov et al., JPMorgan analyst report, 20 July 2020, p. 3 ("On the heels of today's results, we are updating our model to exclude MDD contribution and we moderately decrease our op ex forecasts. As a result of these changes our Dec 2021 PT goes to $60 (from $66 prior). Reiterate Overweight").

substantial contributor to Acadia's negative stock price reaction on 21 July 2020, but as noted, did not disclose any facts that Defendants are alleged to have misrepresented or concealed in this case.

284. While the assignment by the FDA of standard review to the sNDA for DRP was disappointing news, this event did not disclose any facts that were previously misrepresented or concealed by the alleged misrepresentations and omissions. Defendants did not disclose the actual text of the FDA's statement that explained the reasons for denial of priority review. Some analysts speculated that the FDA's reasons for assigning only standard review to the sNDA may have been due to practical difficulties in completing an expedited review due to the ongoing COVID pandemic.[155] Even at this juncture (as of the date of this report) it is unclear to me whether or not the rationale for the FDA's standard review decision was driven by concerns over the Harmony Study design or the study's results. Thus, I refrain from deeming this development a corrective disclosure.

285. With respect to the prospects for the DRP sNDA, analysts viewed the announcements (and related comments by Defendants on the analyst conference call that followed) as being a mix of good and bad news, but not information that specifically corrected prior misrepresentations. Analysts noted that while news of the standard review was disappointing, they viewed the announcement that the FDA would not convene an AdCom to evaluate Acadia's sNDA as positive news.

286. Standard review implied an approximately four-month delay before an FDA decision, and this delay would modestly reduce the economic value of an FDA

---

[155] *See*, *e.g.*, "We See MDD-out/DRP-delay Pullback as an Opportunity; Reiterate BUY, $56 PT," by Sumant Kulkarni and Jia Min, Canaccord analyst report, 24 July 2020, p. 1; "With DRP TAM-Expansion, MDD Clarity Does Not Depress Us," by Charles Duncan and Pete Stavropoulos, Cantor Fitzgerlad analyst report, 20 July 2020, p. 1; and "MDD Failure Not Thesis Changing; DRP sNDA Acceptance Mixed Bag, But We're Maintaining Our Optimistic Stance on Approval," by Paul Matteis et al., Stifel analyst report, 20 July 2020, p. 1.

approval due to the time value of money. However, the valuation impact of a four-month delay (equal to just one month longer than a single fiscal quarter) would be relatively modest here, as analysts' discounted cash flow valuations of an expanded pimavanserin franchise assumed many *years* of future revenue based on the drug obtaining approval as a treatment for the broader DRP indication.

287. While it is possible that some portion of the stock price decline on 21 July 2020 was the result of a reduction in the present value of expected future pimavanserin cash flows on account of the time value of money and the four-month delay for an FDA decision, this price effect cannot be the dissipation of any of the $22.43 per share artificial inflation that was in the Acadia stock price as of 5 December 2019. The present value of such expected future cash flows would have increased between 5 December 2019 and 20 July 2020 on account of the time value of money and the simple passage of time that reduced the time until the expected cash flows would be earned. As the simple passage of time decreased the horizon until expected marketability by eight months, while the FDA's decision delayed expected marketability by approximately four months, any stock price decline caused by this factor would be offsetting a positive stock price effect that occurred since 5 December 2019 and which I conservatively excluded from the quantification of artificial inflation and damages.

288. Given the mixed nature of the information released on 20 July 2020, the most important of which (failure of the Clarity Study) had nothing to do with the alleged misrepresentations and omissions, and given the tenuous relationship between the remaining news and the allegations, I attribute none of the losses sustained on 21 July 2020 to the alleged fraud in this case. If, however, the trier of fact was to determine that some portion of the 21 July 2020 residual stock price decline was allegation related, the inflation ribbon can be adjusted commonly for all Class members in accord with any such determination.

*b) 8 March 2021: Deficiency Letter Disclosure*

289. After the close of trading on 8 March 2021, the Company disclosed that it had received the DL from the FDA, which partially informed the marketplace that it was unlikely the FDA would consider the data produced by the Harmony Study (either alone or in combination with the -019 Study) to be sufficient for approval of the sNDA. All of this information was partially corrective of what had been conveyed and/or concealed by Defendants' alleged false and misleading statements during the Class Period. Assuming Plaintiffs' factual allegations to be true, but-for Defendants' misrepresentations and omissions, the market would not have been surprised by the DL.

290. The disclosed information contradicted what the alleged misrepresentations and omissions had misled the market into believing. Nonetheless, the 8 March 2021 disclosure was still only partially corrective because it still left the market wondering what specific deficiencies were troubling the FDA, how severe those deficiencies were, and what their implications might be (*e.g.*, how might the deficiencies be repaired, whether they could be repaired, and/or whether Acadia would have to try to obtain more and better data from new clinical trials).

291. While the DL announcement was informative, it was also only partially corrective because the disclosures were accompanied by Defendants' reiterated assurances that Acadia had an agreement with the FDA as to the sufficiency of the Harmony Study's design, and alignment with the FDA over what results would be sufficient for FDA approval. For example, as noted above, on 8 March 2021, Defendant Stankovic assured investors as follows:

> "First, I want to emphasize that the design of the single pivotal trial, an agreement that one single – robustly positive pivotal trial of the design, as we proposed, would be sufficient for approval of this indication was agreed with the FDA both at the end of Phase II meeting as well as the pre sNDA meeting. So this was – FDA was well informed about the design, and we have the discussions of that and agreement even before we started the study."

- **"ACADIA Pharmaceuticals Inc Corporate Call - Regulatory Update on Supplemental New Drug Application,"** ***Refinitiv*****, 8 March 2021, p. 9.**

292. As shown in Appendix D, following the disclosures about the DL – which contradicted and partially corrected the alleged misinformation conveyed by Defendants' alleged misrepresentations and omissions – the average of analysts' PoS estimates fell from 88% to 68%.

293. This partially corrective event precipitated a dramatic decline in Acadia's stock price. The residual stock price decline was a statistically significant $21.57 per share on 9 March 2021, the first trading day after the prior evening's disclosure. The residual return was -63.69% on a logarithmic return basis, which is statistically significant at the 99% confidence level. This statistical result establishes that the DL disclosure caused Acadia's stock price to fall $21.57 per share on 9 March 2021.

294. From the statistical significance of the residual stock price decline on 9 March 2021, one may conclude that that residual decline was caused by Company-specific information. As noted above, there was no other information aside from the DL disclosure that could have been responsible for or contributed to the residual stock price decline on 9 March 2021.

295. While all of the residual price decline on 9 March 2021 was precipitated by the disclosure of the DL, I observed that there was a large price rebound the next day, 10 March 2021. To ascertain whether that price rebound was a random fluctuation or was related to the news event that had just occurred, I investigated whether there was any additional news announced, and I tested the 10 March 2021 residual stock return for statistical significance. That is, I conducted event study analysis for that date.

296. From the close on 9 March 2021 to the close on 10 March 2021, Acadia stock rose from $25.02 per share to $26.89, an increase of 7.47%. The residual return

was $1.87 per share, corresponding to 7.21% on a logarithmic return basis, which is statistically significant at the 99% confidence level. There was no new Company-specific news on 10 March 2021 that could have caused this stock price increase independent of an extended reaction to the prior day's disclosure of the DL. Apparently, the market continued to evaluate on 10 March 2021 the implications of the DL.

297. As all of the information provided by the DL disclosure directly related to and corrected the alleged misrepresentations and omissions, the net two-day residual price reaction to that disclosure was the dissipation of artificial inflation. Therefore, the amount of artificial inflation dissipated by the DL disclosure was the sum of the $21.57 per share residual stock price decline experienced on 9 March 2021, offset by the $1.87 per share residual stock price rebound on 10 March 2021. The sum of these movements is a net per share decrease of $19.69, which is -56.48% on a logarithmic return basis.[156]

298. This $19.69 net residual stock price decline is the dissipation of artificial inflation caused by the alleged misrepresentations and omissions and thereby constitutes a loss suffered by shareholders that was caused by the alleged misrepresentations and omissions.

*c) 5 April 2021: Disclosure of the Complete Response Letter*

299. The CRL, the receipt of which was disclosed to the market on 5 April 2021, all but eliminated the possibility that the FDA would approve the sNDA for expanded use of pimavanserin based on completed clinical studies. Expanded use might eventually be approved, but such approval would require more trials.

300. These practical implications of what the Company disclosed about the CRL would not have been surprising to the market had Defendants not previously misled investors by conveying that Acadia had an agreement with the FDA that

---

[156] Apparent mathematical discrepancy due to rounding.

successful top-line results from the Harmony Study (as supplemented by results from the -019 Study) would be sufficient evidence of efficacy for sNDA approval, irrespective of any subgroup efficacy results. The Defendants' disclosures regarding the CRL would have been expected by the market if, instead, Defendants had previously informed the market that the Harmony Study failed to produce the subgroup efficacy data that the FDA told the Company was necessary to obtain approval of an expanded DRP indication for pimavanserin or, at a minimum, had truthfully disclosed all of FDA's efficacy approval requirements. Such prior disclosure would have informed the market that the prospect for near-term approval was dim and that the prospects for ultimate approval almost certainly depended on the uncertain results of additional studies that would have to be run and that would likely take at least 2-3 years to design, conduct, and analyze. Thus, the CRL-related disclosure provided virtually the same information to the market that adequate and honest disclosure would have provided previously in a but-for scenario. Consequently, the CRL disclosure was a corrective disclosure, and virtually all of the price decline it elicited was the dissipation of artificial inflation.

301. As shown in Appendix E, following the CRL disclosure, the average of analysts' PoS estimates fell to 37% on average. This 37% is near but below the PoS level the market had assessed before the start of the Class Period when, according to Plaintiffs, the Company misled the market with misrepresentations and omissions.

302. While the initial 41% PoS reflected the prospects of a comparatively near-term approval after completion of the already ongoing Harmony Study, the newly assessed 37% PoS represented the probability of success only under a much longer timetable, as any need for new studies would likely mean taking another 2-3 years to try, without any assurance of success, to obtain better data. Thus, the 37% PoS estimated by analysts at the end of the Class Period was not only a quantitatively more negative outlook than what was represented by the initial 41% PoS estimate just prior to the Class Period, but it also reflected the PoS of approval on a

qualitatively less attractive basis (due to the less favorable outlook as to when approval was likely to take place). This realistic shift to a more negative outlook would have happened as of 4 December 2019, rather than at the end of the Class Period, if there had been no misrepresentations and omissions.

303. Following the CRL disclosure, the price of Acadia stock fell. The residual stock price decline was a statistically significant $4.51 per share that day. This residual return was -19.40% on a logarithmic return basis, which is statistically significant at the 99% confidence level. This statistical result establishes that the CRL disclosure and its implications caused Acadia's stock price to fall $4.51.

304. I determined how much of the $4.51 residual stock price decline precipitated by the CRL disclosure was the dissipation of artificial inflation as follows. As discussed earlier, the amount of artificial inflation introduced by the alleged misrepresentations and omissions during the Class Period was at least $22.43 per share, conservatively estimated.[157] The disclosures about the DL and the CRL together caused the Acadia stock price to decline $24.20 ($19.69 + $4.51). The $1.77 per share residual price decline in excess of the conservatively estimated $22.43 per share artificial inflation can be attributed either to the margin of conservatism built into the $22.43 per share artificial inflation computation, or alternatively could have been due to the elimination of a vestige of optimism in the market's outlook that was not caused by the alleged misrepresentations and omissions. Either way, I exclude that $1.77 per share loss from the computation of damages.

305. With $22.43 per share of artificial inflation embedded into the Acadia

[157] The estimate is conservative as it represents how much the Acadia stock price rose on account of the misrepresentations and omissions, and excludes how much the stock price would have, alternatively, fallen without the misrepresentations and omissions. It is also conservative as it excludes how much the value of the artificial inflation would have risen on account of the time value of money as the time to expected marketability shortened due to the passage of time over the course of the Class Period.

stock price by the alleged misrepresentations and omissions, and $19.69 per share of that artificial inflation dissipated by the DL disclosure, there would have been $2.74 per share of artificial inflation remaining in the stock price just before the CRL disclosure. The CRL disclosure eliminated all remaining artificial inflation. I therefore conclude that $2.74 per share, of the $4.51 per share residual stock price decline caused by the CRL disclosure, represented the dissipation of artificial inflation. The rest ($1.77 per share) represents either the margin of conservatism built into the $22.43 per share artificial inflation computation, or alternatively the economic value of the vestiges of optimism caused by factors other than the alleged misrepresentations and omissions, or a combination of these two sources. Either way, I conservatively conclude that the final corrective event caused $2.74 of the total $4.51 per share residual stock price decline on 5 April 2021, and I exclude the remaining $1.77 per share loss from the computation of damages.

**C. Artificial Inflation Ribbon**

306. For each Class member, Section 10(b) damages are the out-of-pocket damages, which equal the level of artificial inflation in the stock price when the investor bought the stock, minus the amount of artificial inflation in the stock price at the time of sale, subject to various statutory constraints. To compute damages for all Class members, therefore, one must compute an inflation ribbon, which is the time series indicating the level of artificial inflation in the stock price over the course of the Class Period.

307. The evidentiary record and the damages analysis presented above establish that the inflation ribbon over the course of the Class Period was as follows.

**1. 9 September 2019 to 4 December 2019**

308. The Class Period begins with alleged misrepresentations and omissions that artificially inflated Acadia stock. As discussed above at ¶¶270-73, of the statistically significant $15.40 per share price increase on 9 September 2019, $5.01

per share was artificial inflation introduced into the Acadia stock price by the alleged misrepresentations and omissions that misled the market into believing that the FDA required only statistically significant top-line Harmony Study results to approve pimavanserin for DRP. It was concealed from investors that the FDA required both statistically significant top-line Harmony Study results and subgroup results that were positive and directionally consistent. Artificial inflation stood at $5.01 per share until the Harmony Study subgroup efficacy data was available and then released after the close of trading on 4 December 2019, accompanied by alleged misrepresentations and omissions.

**2. 5 December 2019 to 8 March 2021**

309. The release of the Harmony Study subgroup data accompanied by alleged misrepresentations and omissions on 4 December 2019 introduced an additional $17.42 of artificial inflation into the Acadia stock price. As the data release and Company statements were made after the close of trading on 4 December 2019, the Acadia stock price rose (when it otherwise would have fallen in a but-for scenario) and the new artificial inflation was impounded into the Acadia stock price on 5 December 2019.

310. At that juncture, after 4 December 2019, it was allegedly known by Defendants but not disclosed that the subgroup Harmony Study efficacy results did not meet the FDA's second requirement for sNDA approval. Defendants allegedly knew of, but concealed, the requirement that the subgroup data demonstrate positive directional consistency, and that the Harmony Study failed to produce that result. If the market had known by 5 December 2019 what was allegedly fraudulently concealed, the market would have understood that none of the optimism and increased PoS assessment elicited by the previous 9 September 2019 announcement was justified. The market would have understood that none of the $15.40 residual stock price increase that occurred on 9 September 2019 would have been warranted,

and all of it would have been reversed if the truth had been revealed.

311. Therefore, as of 5 December 2019, all of the 9 September 2019 residual stock price increase of $15.40 per share represented artificial inflation, as did the statistically significant residual stock price increase of $7.03 that occurred on 5 December 2019. Together, these amounts sum to the new level of artificial inflation, which was $22.43 per share as of 5 December 2019.

312. Artificial inflation stood at this $22.43 per share level until the first definitive corrective disclosure was made after the close of trading on 8 March 2021, which came in the form of the DL disclosure.

#### 3. 9 March 2021 to 4 April 2021

313. The disclosure of the DL on 8 March 2021 partially corrected the alleged misrepresentations and omissions, and by so doing, dissipated $19.69 per share of artificial inflation. As the disclosure was made after the close of trading on 8 March 2021, the trading price fell to reflect the dissipation of artificial inflation starting on 9 March 2021.

314. Falling $19.69 from the prior level of $22.43 per share, artificial inflation as of 9 March 2021 stood at $2.74 per share. Artificial inflation remained at this $2.74 per share level until the disclosure of the CRL on 5 April 2021, which was the final corrective disclosure.

#### 4. 5 April 2021 and Beyond

315. The disclosure of the CRL on the morning of 5 April 2021 dissipated all remaining artificial inflation from the Acadia stock price. On 5 April 2021 and dates thereafter, there was no artificial inflation remaining in the Acadia stock price stemming from the alleged misrepresentations and omissions.

316. Exhibit-9 presents the inflation ribbon for Acadia stock in tabular form.

### D. Per Share Damages

317. Based on the foregoing analysis and statutory formulas, Section 10(b)

damages for each Class member range up to $22.43 per share, excluding prejudgment interest. As in most Section 10(b) actions, a particular investor's recoverable per share damages depend on (a) when during the Class Period the investor purchased its shares and (b) if and when those shares were subsequently sold. Class members who sold their shares prior to the first corrective disclosure (here, on or before the close on 8 March 2021) suffered no recoverable losses on those shares. Similarly, Class members who both purchased and sold during the period that begins immediately after the first corrective event and ends immediately before the second corrective event (*i.e.*, between the close on 9 March 2021 and the pre-market open disclosures of 5 April 2021) similarly suffered no recoverable loss. However, Class members who bought at an artificially inflated price, and who thereafter sustained a loss after a subsequent corrective disclosure dissipated all or some of the artificial inflation, suffered recoverable damages caused by the alleged misrepresentations and omissions.

318. As an example of how per share damages are computed for a particular investor, consider an investor who purchased Acadia stock on 13 January 2020 for $41.80 per share, and later sold those shares at the close of trading on 5 April 2021 for $21.18 per share. The amount of artificial inflation on 13 January 2020 was $22.43 per share. At the close of trading on 5 April 2021, artificial inflation had been reduced to $0.00 per share, as all artificial inflation had by then been dissipated by the corrective disclosures. The reduction in artificial inflation over this investor's holding period is this investor's economic/inflation loss, which equals $22.43 per share. The investor's investment loss is $20.62 per share, equal to the $41.80 per share purchase price minus the $21.18 per share sale price. The recoverable per share damages are the lesser of the investment loss of $20.62 per share and the $22.43 economic/inflation loss, which is $20.62.[158]

[158] This loss limitation rule is one imposed by applicable law, rather than by any

## IX. LIMITING FACTORS AND OTHER ASSUMPTIONS

319. This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

320. I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 13, 2025

Steven P. Feinstein, Ph.D., CFA

economic principle.

## X. APPENDIX A: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 9 SEPTEMBER 2019

| | Analyst Firm | Pre 9-Sep-19 | Post 9-Sep-19 |
|---|---|---|---|
| 1 | Bank of America | 40% | 65% |
| 2 | Canaccord Genuity | 35% | 80% |
| 3 | Goldman Sachs | 15% | 85% |
| 4 | JMP Securities | 65% | 90% |
| 5 | J.P. Morgan | 50% | 90% |
| 6 | PiperJaffray | 25% | 90% |
| 7 | Stifel | 40% | 85% |
| 8 | SVB Leerink | 65% | 100% |
| 9 | TD Cowen | 30% | 70% |
| | **Average PoS Assessment** | 41% | 84% |

Sources:

[1] "In our model, we increase our likelihood of success (LoS) for DRP to 65% (prev. 40%), reflecting launch in 2021E," (BofA, 9 September 2019, p. 1).

[2] "[D]ementia-related psychosis (DRP) and trofinetide (Rett syndrome) each at 35% probability of approval," (Canaccord Genuity, 31 July 2019, p. 15); and "We now model 21E DRP launch/80% probability of approval vs. 22E/35% previously," (Canaccord Genuity, 9 September 2019, p. 1).

[3] "Valuation: Our 12-month price target is $20 based on 100% risk-adjusted DCF value of $20 (Nuplazid: 60% PoS in PDP and 15% in DRP, 12% WACC, 1 % TGR)," (Goldman Sachs, 24 October 2018, p. 5); and "We assign a 85% PoS (vs. 15% prior) and assume an sNDA filing in 2020 with subsequent launch in 2021 (EU in 2022)," (Goldman Sachs, 9 September 2019, p. 6).

[4] Figure 1, JMP Securities, 31 October 2018, p. 3; and "Our increased price target (summarized in Figure 1) reflects a higher probability of approval in DRP (90% vs. prior 65%)," (JMP Securities, 9 September 2019, p. 1).

[5] "We currently assume a 50% POS," (J.P. Morgan, 4 September 2019, p. 2); and "[W]e're increasing our probability of success (PoS) for Nuplazid in DRP to 90% (from 50%)," (J.P. Morgan, 9 September 2019, p. 1).

[6] "DRP (25% POS)," (PiperJaffray, 11 June 2019, p. 30); and "We increased our POS to 90% (was 25%) which raises our PT to $56 (was $35)," (PiperJaffray, 9 September 2019, p. 1).

[7] "We are raising our ACAD target to $28 from $24, reflecting an increased probability-of-clinical/regulatory success (40% from 20%) for the company's Dementia-Related Psychosis program," (Stifel, 2 September 2019, p. 1); "[O]our probability of regulatory approval in a positive scenario is 80%," (Stifel, 9 September 2019, p. 1); and "Updating our DRP probability-of-success in HARMONY to 100% and our odds of regulatory approval from 80% to 85%," (Stifel, 9 September 2019, p. 1).

[8] "[I]n our model we assume a POS of 65%, peak sales of ~$450M, and a launch in 2022 for the new DRP indication," (SVB Leerink, 13 August 2019, p. 1); and "We increased the POS for DRP from 65% to 100%," (SVB Leerink, 13 September 2019, p. 2).

[9] "We are raising our price target to $66 based on a greatly increased probability of success (now at 70% up from 30%) in DRP," (TD Cowen, 9 September 2019, p. 3).

## XI. APPENDIX B: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 4 DECEMBER 2019

| | Analyst Firm | Pre 4-Dec-19 | Post 4-Dec-19 |
|---|---|---|---|
| 1 | Bank of America | 65% | 75% |
| 2 | Canaccord Genuity | 80% | 80% |
| 3 | Goldman Sachs | 85% | 85% |
| 4 | JMP Securities | 90% | 90% |
| 5 | J.P. Morgan | 90% | 90% |
| 6 | Oppenheimer | 90% | 90% |
| 7 | PiperJaffray/Raymond James | 90% | 90% |
| 8 | RBC Capital Markets | 90% | 90% |
| 9 | Stifel | 85% | 85% |
| 10 | SVB Leerink | 100% | 100% |
| 11 | TD Cowen | 70% | 70% |
| | **Average PoS Assessment** | 85% | 86% |

Sources:

[1] "In our model, we increase our likelihood of success (LoS) for DRP to 65% (prev. 40%), reflecting launch in 2021E." (BofA, 9 September 2019, p. 1); and "Reflecting doctors' enthusiasm for pima' in DRP, we increase likelihood of success (LoS) to 75% (prev. 65%) and adjust our ramp rate in our model," (BofA, 16 December 2019, p. 1).

[2] "We now model 21E DRP launch/80% probability of approval vs. 22E/35% previously" (Canaccord Genuity, 9 September 2019, p. 1); and "[I]nclude pimavanserin for dementia-related psychosis (DRP) at an 80% probability of approval," (Canaccord Genuity, 6 December 2019, p. 15).

[3] "We assign a 85% PoS (vs. 15% prior) and assume an sNDA filing in 2020 with subsequent launch in 2021 (EU in 2022)." (Goldman Sachs, 9 September 2019, p. 6); and "[W]e model for the broad indication of DRP (inclusive of the most common dementia subtypes including AD, PDD, vascular dementia, Lewy body dementia, and frontotemporal dementia with psychosis prevalence as described in literature, Exhibit 4) and assign an 85% PoS," (Goldman Sachs, 31 March 2020, p. 7).

[4] "Our increased price target (summarized in Figure 1) reflects a higher probability of approval in DRP (90% vs. prior 65%)"

(JMP Securities, 9 September 2019, p. 1); and "Ultimately, the timeline difference is inconsequential and we continue to believe there is a high (90%) probability of approval" (JMP Securities, 21 July 2020. p. 1).

[5] "[W]e're increasing our probability of success (PoS) for Nuplazid in DRP to 90% (from 50%)," (J.P. Morgan, 9 September 2019, p. 1); and "We decrease our POS to 70% (from 90% prior)," (J.P. Morgan, 9 March 2021, p. 3).

[6] "We estimate peak PDP revenue of $855M, DRP risk-adj. (90%) revenue of $2.1B," (Oppenheimer, 26 November 2019, p. 2); and "We estimate peak PDP revenue of $855M, DRP risk-adj. (90%) revenue of $2.1B," (Oppenheimer, 6 December 2019, p. 2).

[7] "We increased our POS to 90% (was 25%) which raises our PT to $56 (was $35)." (PiperJaffray, 9 September 2019, p. 1); and "We still fully expect approval by its April PDUFA date (90% probability of success)," (Raymond James, 24 August 2020, p. 344).[159]

[8] "We assume U.S. peak sales of Nuplazid reach $2.4B in PDP and DRP, and expect 90% likelihood of approval in DRP." (RBC Capital Markets, 26 November 2019, p. 2; and "We assume U.S. peak sales of Nuplazid reach $2.4B in PDP and DRP, and expect 90% likelihood of approval in DRP." (RBC Capital Markets, 5 December 2019, p. 2).

[9] "Updating our DRP probability-of-success in HARMONY to 100% and our odds of regulatory approval from 80% to 85%," (Stifel, 9 September 2019, p. 1); and "We assume a 100% odds-of-success for pimavanserin in Parkinson's Disease Psychosis, a 50% odds-of-success for Major Depressive Disorder and 85% probability-of-approval for Dementia-Related Psychosis, respectively," (Stifel, 5 December 2019, p. 2).

[10] "We increased the POS for DRP from 65% to 100%," (SVB Leerink, 13 September 2019, p. 2); and "Our $63 PT includes

[159] Analyst Danielle Brill relocated from PiperJaffray to Raymond James where she continued coverage.

$32 for the DRP indication, which assumes >$2B of additional sales at 100% POS, *i.e.*, with the positive Phase 3 data and previous comments from management, we had assumed that this indication was going to get approved. At this point, we are making no changes to our model, but if the PDUFA date is extended, we will then adjust our financial model accordingly," (SVB Leerink, 8 March 2021, p. 1).

[11] "We are raising our price target to $66 based on a greatly increased probability of success (now at 70% up from 30%) in DRP," (TD Cowen, 9 September 2019, p. 3); and "ACAD pNPV," (TD Cowen, 5 December 2019, p. 7).

# XII. APPENDIX C: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 20 JULY 2020

**Analyst Firm Assessments of PoS Surrounding 20 July 2020**

| | Analyst Firm | Pre 20-Jul-20 | Post 20-Jul-20 |
|---|---|---|---|
| 1 | Bank of America | 75% | 75% |
| 2 | Canaccord Genuity | 80% | 80% |
| 3 | Citigroup | 95% | 95% |
| 4 | Goldman Sachs | 85% | 85% |
| 5 | Guggenheim | 85% | 85% |
| 6 | Jefferies | 90% | 90% |
| 7 | JMP Securities | 90% | 90% |
| 8 | J.P. Morgan | 90% | 90% |
| 9 | Oppenheimer | 90% | 90% |
| 10 | RBC Capital Markets | 90% | 90% |
| 11 | Stifel | 85% | 85% |
| 12 | SVB Leerink | 100% | 100% |
| 13 | TD Cowen | 90% | 90% |
| | **Average PoS Assessment** | 88% | 88% |

Sources:

[1] "We model early 2021 launch in DRP and risk-adj. $121mn 2021 sales, ramping to peak $3.9bn in 2027, assuming 75% LoS (likelihood of success)." (BofA, 26 February 2020, p. 1); and "We model DRP launching in 2021 with risk-adj. $122mn sales and ramping up to $4bn peak sales (risk-adj.) in 2027 under our 75% likelihood of success (LoS)." (BofA, 20 July 2020, p. 1).

[2] "We currently include DRP in our valuation at an 80% probability of approval," (Canaccord, 8 May 2020, p. 1); and "An sNDA acceptance would usually lead us to raise our probability of approval, but we are staying at 80% for DRP mainly for conservatism," (Canaccord, 24 July 2020, p. 1).

[3] "PoS for DRP is 95%," (Citigroup, 24 June 2020, p. 4); and "PoS for DRP is 95%," (Citigroup, 20 July 2020, p. 4).

[4] "[W]e model for the broad indication of DRP (inclusive of the most common dementia subtypes including AD, PDD, vascular dementia, Lewy body dementia, and frontotemporal dementia with psychosis prevalence as described in literature,

Exhibit 4) and assign an 85% PoS," (Goldman Sachs, 31 March 2020, p. 7); and "Model changes: We (1) reduce Nuplazid in DRP PoS to 55% (from 85% prior)," (Goldman Sachs, 5 April 2021, p. 4).

[5] Exhibit-2, Guggenheim, 8 May 2020, p. 4; and Exhibit-2, and Guggenheim, 6 August 2020, p. 4. [160]

[6] "Key-value driver is dementia-related psychosis (DRP), which we give 90% chance of approval in '21," (Jefferies, 23 June 2020, p. 3); and "Key-value driver is dementia-related psychosis (DRP), which we give 90% chance of approval in '21" (Jefferies, 5 August 2020, p. 2).

[7] "Ultimately, the timeline difference is inconsequential and we continue to believe there is a high (90%) probability of approval," (JMP Securities, 21 July 2020. p. 1).

[8] "[W]e're increasing our probability of success (PoS) for Nuplazid in DRP to 90% (from 50%)," (J.P. Morgan, 9 September 2019, p. 1); and "We decrease our POS to 70% (from 90% prior)," (J.P. Morgan, 9 March 2021, p. 3).

[9] "DRP risk-adj. (90%) revenue of $2.1B," (Oppenheimer, 27 May 2020, p. 2); and "DRP risk-adj. (90%) revenue of $2.1B," (Oppenheimer, 20 July 2020, p. 2).

[10] "We assume U.S. peak sales of Nuplazid reach $2.4B in PDP and DRP and expect 90% likelihood of approval in DRP" (RBC Capital Markets, 9 July 2020, p. 2); and "We assume U.S. peak sales of Nuplazid reach $2.5B+ in PDP and DRP and expect 90% likelihood of approval in DRP," (RBC Capital Markets, 20 July 2020, p. 2).

[11] "We assume a 100% odds-of-success for pimavanserin in Parkinson's Disease Psychosis, a 50% odds-of-success for Major

[160] Before their 9 March 2021 report, Guggenheim provided a PoS *range* (*i.e.*, 85 to 100%, or 90% to 100%) in its analyst reports covering Acadia. To be conservative, I have included the figure at the bottom end of their ranges in this Appendix C and in Appendix D.

Depressive Disorder and 85% probability-of-approval for Dementia-Related Psychosis, respectively," (Stifel, 6 July 2020, p. 8); and "We are maintaining our probability-of-success for DRP," (Stifel, 20 July 2020, p. 2).

[12] "We increased the POS for DRP from 65% to 100%," (SVB Leerink, 13 September 2019, p. 2); and "Our $63 PT includes $32 for the DRP indication, which assumes >$2B of additional sales at 100% POS, *i.e.*, with the positive Phase 3 data and previous comments from management, we had assumed that this indication was going to get approved," (SVB Leerink, 8 March 2021, p. 1).

[13] "ACAD pNPV," (TD Cowen, 12 July 2020, p. 10); and "ACAD pNVP," (TD Cowen, 20 July 2020, p. 5).

# XIII. APPENDIX D: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 8 MARCH 2021

**Analyst Firm Assessments of PoS Surrounding 8 March 2021**

| | Analyst Firm | Pre 8-Mar-21 | Post 8-Mar-21 |
|---|---|---|---|
| 1 | Bank of America | 75% | 60% |
| 2 | Canaccord Genuity | 80% | 66% |
| 3 | Citigroup | 95% | 70% |
| 4 | Goldman Sachs | 85% | 85% |
| 5 | Guggenheim | 90% | 75% |
| 6 | HC Wainwright | 75% | 40% |
| 7 | Jefferies | 92.5% | 75% |
| 8 | JMP Securities | 90% | 90% |
| 9 | J.P. Morgan | 90% | 70% |
| 10 | Mizuho | 80% | 70% |
| 11 | Morgan Stanley | 85% | 75% |
| 12 | Needham | 95% | 60% |
| 13 | Oppenheimer | 90% | 50% |
| 14 | Raymond James | 90% | 25% |
| 15 | RBC Capital Markets | 90% | 75% |
| 16 | SMBC | 100% | 50% |
| 17 | Stifel | 85% | - |
| 18 | SVB Leerink | 100% | 100% |
| 19 | TD Cowen | 90% | 90% |
| | **Average PoS Assessment** | 88% | 68% |
| | **Average PoS Assessment Excluding Firm Without a Stated Post Estimate** | 88% | 68% |

Sources:

[1] "We model DRP launching in 2021 with risk-adj. $122mn sales and ramping up to $4bn peak sales (risk-adj.) in 2027 under our 75% likelihood of success (LoS)," (BofA, 20 July 2020, p. 1); and "We also lower our LoS for DRP to 60% (from 75%)," (BofA, 9 March 2021, p. 1).

[2] "We continue to model a relatively conservative 80% probability of approval as a factor in arriving at our unchanged price target of $61," (Canaccord Genuity, 25 February 2021, p. 1); and "But, we are pushing our launch assumptions out by two years to 2023, and lowering our probability of approval in DRP from 80% to 66% (as this remains an sNDA for a product that is

already on the market for PDP)," (Canaccord Genuity, 9 March 2021, p. 1).

[3] "PoS for DRP is 95%," (Citigroup, 24 February 2021, p. 1); and "We also lowered PoS to 70% from 95%," (Citigroup, 9 March 2021, p. 3).

[4] "[W]e model for the broad indication of DRP (inclusive of the most common dementia subtypes including AD, PDD, vascular dementia, Lewy body dementia, and frontotemporal dementia with psychosis prevalence as described in literature, Exhibit 4) and assign an 85% PoS," (Goldman Sachs, 31 March 2020, p. 7); and "Model changes: We (1) reduce Nuplazid in DRP PoS to 55% (from 85% prior)," (Goldman Sachs, 5 April 2021, p. 4).

[5] Exhibit-2, Guggenheim, 24 February 2021, p. 4; and, "Delaying the approval of Nuplazid in DRP by 1 year to 1H22. and lowering PoS for approval from 90% to 75%. Removing PT," (Guggenheim, 9 March 2021, p. 4).

[6] "[W]e are reducing our POS to 40%, from 75% for the DRP program," (H.C. Wainwright, 9 March 2021, p. 1).

[7] "Main focus for investors is the upcoming DRP label expansion. We see this as a high prob event - we currently adjust revenues by 92.5%," (Jefferies, 25 February 2021, p. 1); and "we lower PoS (92.5% to 75%)," (Jefferies, 9 March 2021, p. 1).

[8] Figure 2, JMP Securities, 25 February 2021, p. 2; and "We have also removed European sales from our model and lowered probabilities of approval in DRP, from 90% to 75%," (JMP Securities, 5 April 2021, p. 1).

[9] "[W]e're increasing our probability of success (PoS) for Nuplazid in DRP to 90% (from 50%)," (J.P. Morgan, 9 September 2019, p. 1); and "We decrease our POS to 70% (from 90% prior)," (J.P. Morgan, 9 March 2021, p. 3).

[10] "Based on our high expectation for a positive FDA outcome (80% probability), we recommend buying ACAD shares ahead of the news," (Mizuho, 24 February 2021, p. 2); and "[W]e now

lower our probability of success to 70% (from 80%)," (Mizuho, 8 March 2021, p. 1).

[11] "We model 85% PoS for pimavanserin in DRP," (Morgan Stanley, 25 February 2021, p. 2); and "Given increased uncertainty surrounding approvability of Nuplazid in DRP, we lower the probability of success to 75% from 85%," (Morgan Stanley, 9 March 2021, p. 1).

[12] "Our POS for Nuplazid FDA approval in DRP is 95%," (Needham, 25 February 2021, p. 1); and "[A] probability-adjusted DCF through 2030 with an 11 % discount rate, 0% terminal growth, 100% POS Parkinsons Psychosis, 60% Dementia Psychosis," (Needham, 9 March 2021, p. 4).

[13] "DRP risk-adj. (90%) revenue of $2.3B," (Oppenheimer, 3 March 2021, p. 2); and "We lower our POS estimate for DRP to 50% from 90%," (Oppenheimer, 9 March 2021, p. 1).

[14] "We remain confident in DRP approval given the body of efficacy and safety generated (90% POS)," (Raymond James, 24 February 2021, p. 1); and "[W]e are lowering our PoS to 25% (was 90%)," (Raymond James, 9 March 2021, p. 1).

[15] "We assume U.S. peak sales of Nuplazid reach $3B+ in PDP and DRP and expect 90% likelihood of approval in DRP," (RBC, 24 February 2021, p. 2; and "We return our overall probability of success of the DRP program to 75% (from 90%)," (RBC, 8 March 2021, p. 3).

[16] "We believe the sNDA review in DRP will be an easy lay-up for ACAD, modeling 100% PoS with full expectation of approval on April 3rd," (SMBC, 25 February 2021, p. 1); and "We increase risk discount for DRP to 50% (prior 0%) and push back DRP launch to 2024," (SMBC, 9 March 2021, p. 1).

[17] "We assume a 100% odds-of-success for pimavanserin in Parkinson's Disease Psychosis, a 50% odds-of-success for Major Depressive Disorder and 85% probability-of-approval for Dementia-Related Psychosis, respectively," (Stifel 24 February 2021, p. 2).

[18] "We increased the POS for DRP from 65% to 100%," (SVB Leerink, 13 September 2019, p. 2); and "Our $63 PT includes $32 for the DRP indication, which assumes >$28 of additional sales at 100% POS," (SVB Leerink, 8 March 2021, p. 1).

[19] "ACAD pNPV," (TD Cowen, 25 February 2021, p. 5); and "ACAD pNVP," (TD Cowen, 8 March 2021, p. 4).

## XIV. APPENDIX E: ANALYST FIRM ASSESSMENTS OF POS SURROUNDING 5 APRIL 2021[161]

| Analyst Firm Assessments of PoS Surrounding 5 April 2021 | | | |
|---|---|---|---|
| | **Analyst Firm** | **Pre 5-Apr-21** | **Post 5-Apr-21** |
| 1 | Bank of America | 60% | - |
| 2 | Canaccord Genuity | 66% | 35% |
| 3 | Citigroup | 70% | 60% |
| 4 | Goldman Sachs | 85% | 55% |
| 5 | Guggenheim | 75% | - |
| 6 | HC Wainwright | 40% | 20% |
| 7 | Jefferies | 75% | 50% |
| 8 | JMP Securities | 90% | 75% |
| 9 | J.P. Morgan | 70% | 55% |
| 10 | Mizuho | 60% | 0% |
| 11 | Morgan Stanley | 75% | 50% |
| 12 | Needham | 60% | 20% |
| 13 | Oppenheimer | 50% | 25% |
| 14 | Raymond James | 25% | 25% |
| 15 | RBC Capital Markets | 75% | 55% |
| 16 | SMBC | 50% | - |
| 17 | Stifel | - | 40% |
| 18 | SVB Leerink | 100% | 0% |
| 19 | TD Cowen | 90% | 30% |
| | **Average PoS Assessment** | 68% | 37% |
| | **Average Assessment Excluding Firms Without a Stated Pre or Post Assessment** | 69% | 37% |

Sources:

[1] "We also lower our LoS for DRP to 60% (from 75%)," (BofA, 9 March 2021, p. 1).

[2] "But, we are pushing our launch assumptions out by two years to 2023, and lowering our probability of approval in DRP

161 In their reports issued following the 5 April 2021 disclosures, SVB and Mizuho removed all DRP revenues from their pricing model, which I have treated as the equivalent of estimating a 0% PoS in this table.

from 80% to 66% (as this remains an sNDA for a product that is already on the market for PDP)," (Canaccord Genuity, 9 March 2021, p. 1); and "We now assume a 35% (vs. 66%) probability of approval for Nuplazid in DRP," (Canaccord Genuity analyst report, 6 April 2021, p. 1).

[3] "We also lowered PoS to 70% from 95%," (Citigroup, 9 March 2021, p. 3); and "We now assume a three-year delay (vs. two years previously) for DRP, which removes $7/share from our model and a lower 60% PoS (vs. 70% previously)," (Citigroup, 5 April 2021, p. 2).

[4] "Model changes: We (1) reduce Nuplazid in DRP PoS to 55% (from 85% prior)," (Goldman Sachs, 5 April 2021, p. 4); and "Model changes: We (1) reduce Nuplazid in DRP PoS to 55% (from 85% prior)," (Goldman Sachs analyst report, 5 April 2021, p. 4).

[5] "Delaying the approval of Nuplazid in DRP by 1 year to 1H22. and lowering PoS for approval from 90% to 75%. Removing PT," (Guggenheim, 9 March 2021, p. 2).

[6] "[W]e are reducing our POS to 40%, from 75% for the DRP program," (H.C. Wainwright, 9 March 2021, p. 1); and "We adjusted our POS to 20%, down from 40% for the DRP indication," (H.C. Wainright, 7 April 2021, p. 2).

[7] "[W]e lower PoS (92.5% to 75%)," (Jefferies, 9 March 2021, p. 1); and "PoS to a coinflip (prev 75%)," (Jefferies, 5 April 2021, p. 1).

[8] "We have also removed European sales from our model and lowered probabilities of approval in DRP, from 90% to 75%," (JMP Securities, 5 April 2021, p. 1).

[9] "We decrease our POS to 70% (from 90% prior)," (J.P. Morgan, 9 March 2021, p. 3); and "Under a scenario in which the FDA requires one or two more clinical studies, we assume a 3-year delay, decrease our POS to 55% (from 70%) for US DRP," (J.P. Morgan, 5 April 2021, p. 2).

[10] "[W]e now lower our probability of success to 70% (from 80%)," (Mizuho, 8 March 2021, p. 1; and "We remove all DRP

sales from our model and lower our price target to $25 (from $37)," (Mizuho, 5 April 2021, p. 1).

[11] "Given increased uncertainty surrounding approvability of Nuplazid in DRP, we lower the probability of success to 75% from 85%," (Morgan Stanley, 9 March 2021, p. 1); and "We lower our probability of success (PoS) for DRP to 50% from 75%," (Morgan Stanley, 5 April 2021, p. 1).

[12] "[A] probability-adjusted DCF through 2030 with an 11 % discount rate, 0% terminal growth, 100% POS Parkinsons Psychosis, 60% Dementia Psychosis," (Needham, 9 March 2021, p. 4); and "We are lowering POS in DRP to 20% (was 60%) and are further shifting out our Nuplazid sales ests," (Needham, 5 April 2021, p. 1).

[13] "We lower our POS estimate for DRP to 50% from 90%," (Oppenheimer, 9 March 2021, p. 1); and "We consequently lower our POS estimate for approval of pimavanserin in DRP to 25% from 50%," (Oppenheimer, 5 April 2021, p. 1).

[14] "[W]e are lowering our PoS to 25% (was 90%)," (Raymond James, 9 March 2021, p. 1); and "We are now modeling this as our base case (launch ~2024, 25% PoS)," (Raymond James, 5 April 2021, p. 1).

[15] "We return our overall probability of success of the DRP program to 75% (from 90%)," (RBC, 8 March 2021, p. 3); and "We are making several tweaks to our model, including a reduced POS of the DRP program (to 55%)," (RBC, 5 April 2021, p. 2).

[16] "We increase risk discount for DRP to 50% (prior 0%) and push back DRP launch to 2024," (SMBC, 9 March 2021, p. 1).

[17] "We assume a 100% odds-of-success for pimavanserin in Parkinson's Disease Psychosis and a 40% probability-of-approval for Dementia-Related Psychosis (20% first cycle, 20% later), respectively." (Stifel, 5 April 2021, p. 2).

[18] "Our $63 PT includes $32 for the DRP indication, which assumes >$2B of additional sales at 100% POS," (SVB Leerink, 8 March 2021, p. 1); and "we have now: (1) included R&D

spending for the program for the next few years and for now pushed out sales and SG&A spending to a 2025 launch; and (2) removed any value for now from our price target for this DRP indication," (SVB Leerink, 5 April 2021, p. 1).

[19] "ACAD pNVP," (TD Cowen, 8 March 2021, p. 4); and "we have updated our model to reflect a reduced probability of success for pima in DRP (30%) in our NPV analysis," (TD Cowen, 5 April 2021, p. 3).

## XV. APPENDIX-F: ANALYST TIME HORIZONS FOR DRP

| | Analyst Firm | Pre 9-Sep-19 | Post 9-Sep-19 |
|---|---|---|---|
| 1 | Bank of America | 2021 | 2021 |
| 2 | Canaccord Genuity | 2022 | 2021 |
| 3 | Goldman Sachs | -- | 2021 |
| 4 | J.P. Morgan | Late 2020 | Late 2020 / Early 2021 |
| 5 | JMP Securities | -- | 2020 |
| 6 | PiperJaffray | -- | 2020 |
| 7 | SVB Leerink | 2022 | 2020 |
| 8 | TD Cowen | 2022 | 2021 |

Sources:

[1] "In our model, Pimavanserin in dementia-related psychosis (DRP) remains the largest contributor ($23/sh) in our PO with risk-adj. sales of $87mn at launch in 2021E," (BofA, 22 July 2019, p. 1); and "We now assume $100mn risk-adj. sales in DRP ($44/sh in our PO) at launch in 2021 ramping to peak sales (risk-adj.) of $2.9bn by 2027E," (BofA, 9 September 2019, p. 1).

[2] "We now model 21E DRP launch/80% probability of approval vs. 22E/35% previously," (Canaccord, 9 September 2019, p. 1).

[3] "[W]e adjust our model to reflect today's announcement (DRP US/EU launches in 2021/2022 with WW peak sales of $3bn in 2030)," (Goldman Sachs, 9 September 2019, p. 1).

[4] "For Nuplazid, we forecast a linear launch trajectory, starting in late 2020, with peak penetration of ~4% in 2025," (J.P. Morgan, 4 September 2019, p. 2) and; "We forecast a late 2020/early 2021 approval and launch in DRP with peak US sales of $1.8B," (J.P. Morgan, 9 September 2019, p. 1).

[5] "DRP Phase 3 interim hits on overwhelming efficacy, providing a clear path to label expansion in 2020," (JMP Securities, 9 September 2019, p. 1).

[7] "We expect commercial launch by YE20," (PiperJaffray, 9 September 2019, p. 1).

[8] "We increased peak sales in DRP from ~ $500-750M range to ~$2B as a result of early launch (2020E vs previous 2022E)," (SVB Leerink, 13 September 2019, p. 2).

[9] "ACAD pNPV," (TD Cowen, 1 August 2019. p. 6); and "We believe formal on-label sales for non-PDP DRP will likely start as early as 2021," (TD Cowen, 9 September 2019, p. 3).

# Exhibit-1

## Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports

### CASE DOCUMENTS

- Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA, dated 12 December 2023.
- Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated 12 December 2023.
- Lead Plaintiff's Second Supplemental Answers and Objections to Defendant Acadia Pharmaceuticals Inc.'s Interrogatory No. 1 from Its First Set of Interrogatories, dated 2 February 2024.
- Order Granting Class Certification, dated 11 March 2024.
- Lead Plaintiff and Class Representative City of Birmingham Retirement and Relief System's Omnibus Answers and Objections to Defendant Acadia Pharmaceuticals Inc.'s Contention Interrogatories, dated 19 September 2024.
- Order on Joint Motion to Extend Pretrial Deadlines, dated 8 October 2024.
- Expert Report of David W. Feigal, Jr. MD MPH, dated 13 February 2025.

### DEPOSITION TRANSCRIPTS

- Transcript of Videotaped Deposition of Steven P. Feinstein Ph.D., CFA, dated 6 October 2023.

### NEWS ARTICLES AND PRESS RELEASES

- "ACADIA Pharmaceuticals Announces Initiation of Phase II Trial with Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 14 November 2013 9:00 AM.
- "ACADIA Pharmaceuticals Announces Positive Top-Line Results from Phase II Study of Pimavanserin for Alzheimer's Disease Psychosis," *Business Wire*, 20 December 2016 7:00 AM.
- "ACADIA Pharmaceuticals Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis," *Business Wire*, 4 October 2017 4:05 PM.

# Exhibit-1

## Documents and Other Information Considered
## In Addition to Those Cited in the 2023 Feinstein Reports

## ANALYST REPORTS

- J.P. Morgan, 13 September 2018.
- Bank of America, 17 September 2018.
- Bank of America, 20 September 2018.
- Cantor, 20 September 2018.
- JMP Securities, 20 September 2018.
- J.P. Morgan, 20 September 2018.
- TDCowen, 20 September 2018.
- Piper, 20 September 2018.
- Cantor, 21 September 2018.
- H.C. Wainwright, 21 September 2018.
- TDCowen, 1 October 2018.
- Cantor, 2 October 2018.
- J.P. Morgan, 8 October 2018.
- Piper, 8 October 2018.
- Cantor, 15 October 2018.
- TDCowen, 19 October 2018.
- Goldman Sachs, 24 October 2018.
- J.P. Morgan, 24 October 2018.
- Stifel, 29 October 2018.
- Stifel, 30 October 2018.
- Bank of America, 31 October 2018.
- Cantor, 31 October 2018.
- Cantor, 31 October 2018 (1).
- Goldman Sachs, 31 October 2018.
- JMP Securities, 31 October 2018.
- J.P. Morgan, 31 October 2018.
- Needham, 31 October 2018.
- Stifel, 31 October 2018.
- Stifel, 31 October 2018 (1).
- Piper, 31 October 2018.
- H.C. Wainwright, 1 November 2018.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- J.P. Morgan, 2 November 2018.
- TDCowen, 4 November 2018.
- TDCowen, 5 November 2018.
- Piper, 6 November 2018.
- Cantor, 7 November 2018.
- Goldman Sachs, 7 November 2018.
- H.C. Wainwright, 7 November 2018.
- JMP Securities, 7 November 2018.
- J.P. Morgan, 7 November 2018.
- Needham, 7 November 2018.
- Stifel, 7 November 2018.
- Stifel, 7 November 2018 (1).
- TDCowen, 7 November 2018.
- TDCowen, 7 November 2018 (1).
- Cantor, 8 November 2018.
- J.P. Morgan, 12 November 2018.
- LeerinkPartners, 25 November 2018.
- TDCowen, 2 December 2018.
- TDCowen, 3 December 2018.
- Cantor, 5 December 2018.
- Canaccord, 10 December 2018.
- TDCowen, 21 December 2018.
- J.P. Morgan, 3 January 2019.
- J.P. Morgan, 9 January 2019.
- J.P. Morgan, 14 January 2019.
- J.P. Morgan, 14 January 2019 (1).
- Cantor, 15 January 2019.
- TDCowen, 15 January 2019.
- LeerinkPartners, 16 January 2019.
- J.P. Morgan, 17 January 2019.
- TDCowen, 27 January 2019.
- TDCowen, 28 January 2019.
- Cantor, 29 January 2019.

# Exhibit-1

## Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports

- Cantor, 29 January 2019 (1).
- Cantor, 29 January 2019 (2).
- Cantor, 4 February 2019.
- Canaccord, 15 February 2019.
- J.P. Morgan, 24 February 2019.
- Piper, 25 February 2019.
- Bank of America, 26 February 2019.
- Piper, 26 February 2019.
- Canaccord, 26 February 2019.
- Cantor, 27 February 2019.
- Goldman Sachs, 27 February 2019.
- H.C. Wainwright, 27 February 2019.
- JMP Securities, 27 February 2019.
- J.P. Morgan, 27 February 2019.
- Needham, 27 February 2019.
- Stifel, 27 February 2019.
- TDCowen, 27 February 2019.
- TDCowen, 27 February 2019 (1).
- LeerinkPartners, 27 February 2019.
- Piper, 27 February 2019.
- Goldman Sachs, 28 February 2019.
- LeerinkPartners, 28 February 2019.
- TDCowen, 1 March 2019.
- Goldman Sachs, 7 March 2019.
- LeerinkPartners, 20 March 2019.
- J.P. Morgan, 1 April 2019.
- TDCowen, 1 April 2019.
- Cantor, 8 April 2019.
- Needham, 9 April 2019.
- TDCowen, 12 April 2019.
- LeerinkPartners, 23 April 2019.
- Cantor, 25 April 2019.
- Bank of America, 1 May 2019.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- J.P. Morgan, 1 May 2019.
- Stifel, 1 May 2019.
- TDCowen, 1 May 2019.
- LeerinkPartners, 1 May 2019.
- Piper, 1 May 2019.
- Canaccord 1 May 2019.
- Cantor, 2 May 2019.
- Goldman Sachs, 2 May 2019.
- JMP Securities, 2 May 2019.
- Needham, 2 May 2019.
- Stifel, 2 May 2019.
- TDCowen, 2 May 2019.
- H.C. Wainwright, 3 May 2019.
- J.P. Morgan, 28 May 2019.
- TDCowen, 3 June 2019.
- Goldman Sachs, 11 June 2019.
- Piper, 11 June 2019.
- J.P. Morgan, 13 June 2019.
- Bank of America, 19 June 2019.
- Cantor, 19 June 2019.
- Cantor, 21 June 2019.
- J.P. Morgan, 25 June 2019.
- Needham, 27 June 2019.
- TDCowen, 1 July 2019.
- Goldman Sachs, 15 July 2019.
- TDCowen, 18 July 2019.
- Bank of America, 22 July 2019.
- J.P. Morgan, 22 July 2019.
- Stifel, 22 July 2019.
- LeerinkPartners, 22 July 2019.
- LeerinkPartners, 22 July 2019 (1).
- Piper, 22 July 2019.
- Canaccord, 22 July 2019.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Cantor, 23 July 2019.
- Goldman Sachs, 23 July 2019.
- H.C. Wainwright, 23 July 2019.
- JMP Securities, 23 July 2019.
- Needham, 23 July 2019.
- Stifel, 23 July 2019.
- TDCowen, 23 July 2019.
- TDCowen, 23 July 2019 (1).
- Bank of America, 31 July 2019.
- J.P. Morgan, 31 July 2019.
- Piper, 31 July 2019.
- Canaccord, 31 July 2019.
- Cantor, 1 August 2019.
- Goldman Sachs, 1 August 2019.
- H.C. Wainwright, 1 August 2019.
- JMP Securities, 1 August 2019.
- Needham, 1 August 2019.
- Stifel, 1 August 2019.
- TDCowen, 1 August 2019.
- TDCowen, 1 August 2019 (1).
- LeerinkPartners, 13 August 2019.
- Cantor, 27 August 2019.
- TDCowen, 1 September 2019.
- Stifel, 2 September 2019.
- TDCowen, 2 September 2019.
- Stifel, 3 September 2019.
- J.P. Morgan, 4 September 2019.
- TDCowen, 6 September 2019.
- Canaccord, 9 September 2019.
- Bank of America, 9 September 2019.
- Bank of America, 9 September 2019 (1).
- Cantor, 9 September 2019.
- Cantor, 9 September 2019 (1).

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Goldman Sachs, 9 September 2019.
- JMP Securities, 9 September 2019.
- J.P. Morgan, 9 September 2019.
- J.P. Morgan, 9 September 2019 (1).
- J.P. Morgan, 9 September 2019 (2).
- Needham, 9 September 2019.
- Stifel, 9 September 2019.
- Stifel, 9 September 2019 (1).
- TDCowen, 9 September 2019.
- LeerinkPartners, 9 September 2019.
- Piper, 9 September 2019.
- H.C. Wainwright, 10 September 2019.
- J.P. Morgan, 10 September 2019.
- Stifel, 13 September 2019.
- LeerinkPartners, 13 September 2019.
- Stifel, 16 September 2019.
- TDCowen, 16 September 2019.
- Cantor, 23 September 2019.
- Canaccord, 24 September 2019.
- RBC, 1 October 2019.
- TDCowen, 1 October 2019.
- Cantor, 3 October 2019.
- RBC, 4 October 2019.
- RBC, 4 October 2019 (1).
- LeerinkPartners, 7 October 2019.
- RBC, 11 October 2019.
- TDCowen, 16 October 2019.
- J.P. Morgan, 17 October 2019.
- RBC, 18 October 2019.
- Goldman Sachs, 18 October 2019.
- LeerinkPartners, 21 October 2019.
- RBC, 22 October 2019.
- Oppenheimer, 23 October 2019.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- LeerinkPartners, 24 October 2019.
- RBC, 25 October 2019.
- RBC, 30 October 2019.
- Bank of America, 30 October 2019.
- J.P. Morgan, 30 October 2019.
- Stifel, 30 October 2019.
- TDCowen, 30 October 2019.
- LeerinkPartners, 30 October 2019.
- Piper, 30 October 2019.
- Canaccord, 30 October 2019.
- Oppenheimer, 31 October 2019.
- Cantor, 31 October 2019.
- Goldman Sachs, 31 October 2019.
- JMP Securities, 31 October 2019.
- Needham, 31 October 2019.
- Stifel, 31 October 2019.
- TDCowen, 31 October 2019.
- RBC, 1 November 2019.
- H.C. Wainwright, 1 November 2019.
- H.C. Wainwright, 1 November 2019 (1).
- TDCowen, 1 November 2019.
- RBC, 8 November 2019.
- J.P. Morgan, 12 November 2019.
- J.P. Morgan, 13 November 2019.
- J.P. Morgan, 13 November 2019 (1).
- RBC, 15 November 2019.
- Goldman Sachs, 18 November 2019.
- Goldman Sachs, 21 November 2019.
- RBC, 22 November 2019.
- Canaccord 25, November 2019.
- Bank of America, 25 November 2019.
- Cantor, 25 November 2019.
- Goldman Sachs, 25 November 2019.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- J.P. Morgan, 25 November 2019.
- Stifel, 25 November 2019.
- TDCowen, 25 November 2019.
- LeerinkPartners, 25 November 2019.
- Piper, 25 November 2019.
- RBC, 26 November 2019.
- Oppenheimer, 26 November 2019.
- H.C. Wainwright, 26 November 2019.
- JMP Securities, 26 November 2019.
- Needham, 26 November 2019.
- Stifel, 26 November 2019.
- TDCowen, 26 November 2019.
- TDCowen, 26 November 2019 (1).
- Piper, 27 November 2019.
- RBC, 29 November 2019.
- Jefferies, 2 December 2019.
- Piper, 3 December 2019.
- J.P. Morgan, 4 December 2019.
- J.P. Morgan, 4 December 2019 (1).
- RBC, 5 December 2019.
- Bank of America, 5 December 2019.
- Cantor, 5 December 2019.
- Goldman Sachs, 5 December 2019.
- H.C. Wainwright, 5 December 2019.
- Needham, 5 December 2019.
- Needham, 5 December 2019 (1).
- Stifel, 5 December 2019.
- TDCowen, 5 December 2019.
- LeerinkPartners, 5 December 2019.
- Piper, 5 December 2019.
- Canaccord, 6 December 2019.
- RBC, 6 December 2019.
- Oppenheimer, 6 December 2019.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- RBC, 13 December 2019.
- Bank of America, 16 December 2019.
- Guggenheim, 16 December 2019.
- RBC, 17 December 2019.
- RBC, 18 December 2019.
- RBC, 20 December 2019.
- RBC, 27 December 2019.
- RBC, 3 January 2020.
- RBC, 6 January 2020.
- RBC, 8 January 2020.
- RBC, 9 January 2020.
- RBC, 10 January 2020.
- J.P. Morgan, 14 January 2020.
- TDCowen, 14 January 2020.
- TDCowen, 14 January 2020 (1).
- Oppenheimer, 15 January 2020.
- RBC, 17 January 2020.
- Cantor, 21 January 2020.
- RBC, 24 January 2020.
- TDCowen, 24 January 2020.
- LeerinkPartners, 24 January 2020.
- RBC, 31 January 2020.
- Cantor, 31 January 2020.
- TDCowen, 1 February 2020.
- Bank of America, 3 February 2020.
- RBC, 7 February 2020.
- Guggenheim, 7 February 2020.
- RBC, 14 February 2020.
- Canaccord, 18 February 2020.
- Cantor, 18 February 2020.
- H.C. Wainwright, 20 February 2020.
- RBC, 21 February 2020.
- J.P. Morgan, 23 February 2020.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- TDCowen, 24 February 2020.
- Canaccord, 26 February 2020.
- Bank of America, 26 February 2020.
- Cantor, 26 February 2020.
- Guggenheim, 26 February 2020.
- J.P. Morgan, 26 February 2020.
- LeerinkPartners, 26 February 2020.
- Piper, 26 February 2020.
- RBC, 27 February 2020.
- Oppenheimer, 27 February 2020.
- Goldman Sachs, 27 February 2020.
- H.C. Wainwright, 27 February 2020.
- JMP Securities, 27 February 2020.
- Needham, 27 February 2020.
- Stifel, 27 February 2020.
- TDCowen, 27 February 2020.
- TDCowen, 27 February 2020 (1).
- RBC, 28 February 2020.
- Guggenheim, 28 February 2020.
- Citigroup, 1 March 2020.
- Cantor, 3 March 2020.
- Goldman Sachs, 3 March 2020.
- TDCowen, 4 March 2020.
- Citigroup, 5 March 2020.
- TDCowen, 5 March 2020.
- RBC, 6 March 2020.
- RBC, 10 March 2020.
- Piper, 12 March 2020.
- RBC, 13 March 2020.
- J.P. Morgan, 13 March 2020.
- RBC, 20 March 2020.
- RBC, 23 March 2020.
- Cantor, 23 March 2020.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- TDCowen, 24 March 2020.
- TDCowen, 25 March 2020.
- RBC, 27 March 2020.
- RBC, 31 March 2020.
- Goldman Sachs, 31 March 2020.
- RBC, 1 April 2020.
- Oppenheimer, 1 April 2020.
- RBC, 2 April 2020.
- RBC, 3 April 2020.
- Piper, 3 April 2020.
- RBC, 6 April 2020.
- Needham, 7 April 2020.
- RBC, 8 April 2020.
- LeerinkPartners, 8 April 2020.
- RBC, 12 April 2020.
- Jefferies, 13 April 2020.
- Jefferies, 16 April 2020.
- Jefferies, 16 April 2020 (1).
- TDCowen, 16 April 2020.
- TDCowen, 16 April 2020 (1).
- RBC, 17 April 2020.
- RBC, 17 April 2020 (1).
- Jefferies, 17 April 2020.
- J.P. Morgan, 17 April 2020.
- Jefferies, 19 April 2020.
- Jefferies, 23 April 2020.
- RBC, 24 April 2020.
- Goldman Sachs, 24 April 2020.
- Jefferies, 24 April 2020.
- RBC, 26 April 2020.
- Jefferies, 26 April 2020.
- Jefferies, 26 April 2020 (1).
- Cantor, 27 April 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Jefferies, 28 April 2020.
- RBC, 1 May 2020.
- Jefferies, 3 May 2020.
- Jefferies, 3 May 2020 (1).
- J.P. Morgan, 3 May 2020.
- Canaccord, 5 May 2020.
- Bank of America, 7 May 2020.
- Cantor, 7 May 2020.
- Jefferies, 7 May 2020.
- J.P. Morgan, 7 May 2020.
- Stifel, 7 May 2020.
- LeerinkPartners, 7 May 2020.
- Canaccord, 8 May 2020.
- RBC, 8 May 2020.
- RBC, 8 May 2020 (1).
- Oppenheimer, 8 May 2020.
- Cantor, 8 May 2020.
- Citigroup, 8 May 2020.
- Goldman Sachs, 8 May 2020.
- H.C. Wainwright, 8 May 2020.
- Guggenheim, 8 May 2020.
- JMP Securities, 8 May 2020.
- Needham, 8 May 2020.
- Stifel, 8 May 2020.
- TDCowen, 8 May 2020.
- TDCowen, 8 May 2020 (1).
- RBC, 14 May 2020.
- RBC, 15 May 2020.
- RBC, 15 May 2020 (1).
- RBC, 15 May 2020 (2).
- RBC, 19 May 2020.
- RBC, 20 May 2020.
- Cantor, 21 May 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- RBC, 22 May 2020.
- Cantor, 22 May 2020.
- Jefferies, 25 May 2020.
- RBC, 26 May 2020.
- Cantor, 26 May 2020.
- Guggenheim, 26 May 2020.
- JMP Securities, 26 May 2020.
- Oppenheimer, 27 May 2020.
- Cantor, 27 May 2020.
- RBC, 28 May 2020.
- J.P. Morgan, 28 May 2020.
- RBC, 29 May 2020.
- Citigroup, 29 May 2020.
- J.P. Morgan, 29 May 2020.
- Jefferies, 31 May 2020.
- RBC, 5 June 2020.
- Jefferies, 6 June 2020.
- Jefferies, 8 June 2020.
- Goldman Sachs, 9 June 2020.
- Jefferies, 9 June 2020.
- RBC, 11 June 2020.
- RBC, 12 June 2020.
- Citigroup, 14 June 2020.
- RBC, 15 June 2020.
- RBC, 15 June 2020 (1).
- Cantor, 15 June 2020.
- Cantor, 16 June 2020.
- Citigroup, 16 June 2020.
- Citigroup, 17 June 2020.
- RBC, 18 June 2020.
- RBC, 19 June 2020.
- Jefferies, 22 June 2020.
- Jefferies, 23 June 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Citigroup, 24 June 2020.
- RBC, 26 June 2020.
- RBC, 26 June 2020 (1).
- Jefferies, 28 June 2020.
- RBC, 29 June 2020.
- LeerinkPartners, 29 June 2020.
- J.P. Morgan, 1 July 2020.
- TDCowen, 1 July 2020.
- RBC, 3 July 2020.
- RBC, 6 July 2020.
- Stifel, 6 July 2020.
- TDCowen, 6 July 2020.
- TDCowen, 6 July 2020 (1).
- Stifel, 7 July 2020.
- RBC, 9 July 2020.
- RBC, 10 July 2020.
- Cantor, 10 July 2020.
- Jefferies, 12 July 2020.
- TDCowen, 12 July 2020.
- LeerinkPartners, 12 July 2020.
- Bank of America, 13 July 2020.
- Cantor, 13 July 2020.
- TDCowen, 13 July 2020.
- J.P. Morgan, 16 July 2020.
- J.P. Morgan, 16 July 2020 (1).
- Needham, 16 July 2020.
- TDCowen, 16 July 2020.
- RBC, 17 July 2020.
- J.P. Morgan, 19 July 2020.
- RBC, 20 July 2020.
- Oppenheimer, 20 July 2020.
- Bank of America, 20 July 2020.
- Cantor, 20 July 2020.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Citigroup, 20 July 2020.
- Goldman Sachs, 20 July 2020.
- Guggenheim, 20 July 2020.
- Jefferies, 20 July 2020.
- Jefferies, 20 July 2020 (1).
- Jefferies, 20 July 2020 (2).
- J.P. Morgan, 20 July 2020.
- Stifel, 20 July 2020.
- TDCowen, 20 July 2020.
- LeerinkPartners, 20 July 2020.
- Cantor, 21 July 2020.
- H.C. Wainwright, 21 July 2020.
- JMP Securities, 21 July 2020.
- J.P. Morgan, 21 July 2020.
- Needham, 21 July 2020.
- Stifel, 21 July 2020.
- TDCowen, 21 July 2020.
- RBC, 22 July 2020.
- Citigroup, 22 July 2020.
- Canaccord, 24 July 2020.
- RBC, 24 July 2020.
- Oppenheimer, 26 July 2020.
- Jefferies, 26 July 2020.
- Goldman Sachs, 27 July 2020.
- RBC, 31 July 2020.
- RBC, 31 July 2020 (1).
- J.P. Morgan, 2 August 2020.
- TDCowen, 3 August 2020.
- RBC, 5 August 2020.
- Bank of America, 5 August 2020.
- Cantor, 5 August 2020.
- Citigroup, 5 August 2020.
- Goldman Sachs, 5 August 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Jefferies, 5 August 2020.
- Canaccord, 5 August 2020.
- J.P. Morgan, 5 August 2020.
- Stifel, 5 August 2020.
- TDCowen, 5 August 2020.
- Oppenheimer, 6 August 2020.
- Cantor, 6 August 2020.
- H.C. Wainwright, 6 August 2020.
- Guggenheim, 6 August 2020.
- JMP Securities, 6 August 2020.
- Needham, 6 August 2020.
- Stifel, 6 August 2020.
- TDCowen, 6 August 2020.
- LeerinkPartners, 6 August 2020.
- RBC, 7 August 2020.
- Jefferies, 9 August 2020.
- LeerinkPartners, 9 August 2020.
- RBC, 14 August 2020.
- RBC, 14 August 2020 (1).
- MorganStanley, 20 August 2020.
- RBC, 21 August 2020.
- RaymondJames, 24 August 2020.
- Goldman Sachs, 24 August 2020.
- RBC, 25 August 2020.
- Citigroup, 25 August 2020.
- JMP Securities, 25 August 2020.
- LeerinkPartners, 25 August 2020.
- Jefferies, 26 August 2020.
- RBC, 28 August 2020.
- TDCowen, 1 September 2020.
- RBC, 4 September 2020.
- RBC, 11 September 2020.
- J.P. Morgan, 11 September 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Cantor, 16 September 2020.
- Cantor, 17 September 2020.
- RBC, 18 September 2020.
- Jefferies, 20 September 2020.
- Stifel, 24 September 2020.
- RBC, 25 September 2020.
- Stifel, 25 September 2020.
- Jefferies, 27 September 2020.
- RBC, 1 October 2020.
- J.P. Morgan, 1 October 2020.
- TDCowen, 1 October 2020.
- TDCowen, 1 October 2020 (1).
- TDCowen, 1 October 2020 (2).
- RBC, 2 October 2020.
- RBC, 5 October 2020.
- RBC, 9 October 2020.
- Cantor, 12 October 2020.
- J.P. Morgan, 13 October 2020.
- RBC, 16 October 2020.
- JMP Securities, 20 October 2020.
- RBC, 21 October 2020.
- TDCowen, 21 October 2020.
- RBC, 23 October 2020.
- Oppenheimer, 26 October 2020.
- RBC, 30 October 2020.
- Cantor, 2 November 2020.
- RBC, 4 November 2020.
- RaymondJames, 4 November 2020.
- Oppenheimer, 4 November 2020.
- Bank of America, 4 November 2020.
- Cantor, 4 November 2020.
- Canaccord, 4 November 2020.
- Citigroup, 4 November 2020.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Guggenheim, 4 November 2020.
- Jefferies, 4 November 2020.
- J.P. Morgan, 4 November 2020.
- Stifel, 4 November 2020.
- TDCowen, 4 November 2020.
- LeerinkPartners, 4 November 2020.
- LeerinkPartners, 4 November 2020 (1).
- Goldman Sachs, 5 November 2020.
- H.C. Wainwright, 5 November 2020.
- Jefferies, 5 November 2020.
- JMP Securities, 5 November 2020.
- MorganStanley, 5 November 2020.
- Needham, 5 November 2020.
- Stifel, 5 November 2020.
- TDCowen, 5 November 2020.
- RBC, 6 November 2020.
- Citigroup, 6 November 2020.
- RBC, 13 November 2020.
- LeerinkPartners, 15 November 2020.
- RBC, 16 November 2020.
- RaymondJames, 16 November 2020.
- Citigroup, 19 November 2020.
- RBC, 27 November 2020.
- TDCowen, 1 December 2020.
- RBC, 3 December 2020.
- TDCowen, 4 December 2020.
- RBC, 11 December 2020.
- LeerinkPartners, 13 December 2020.
- J.P. Morgan, 14 December 2020.
- Mizuho, 15 December 2020.
- Mizuho, 15 December 2020 (1).
- Mizuho, 18 December 2020.
- Cantor, 28 December 2020.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Jefferies, 29 December 2020.
- Jefferies, 31 December 2020.
- RBC, 1 January 2021.
- Goldman Sachs, 4 January 2021.
- Guggenheim, 4 January 2021.
- Mizuho, 4 January 2021.
- TDCowen, 4 January 2021.
- Mizuho, 7 January 2021.
- Mizuho, 8 January 2021.
- SMBC, 8 January 2021.
- Bank of America, 12 January 2021.
- J.P. Morgan, 12 January 2021.
- RBC, 13 January 2021.
- Citigroup, 13 January 2021.
- Mizuho, 13 January 2021.
- Oppenheimer, 14 January 2021.
- SMBC, 14 January 2021.
- Mizuho, 15 January 2021.
- J.P. Morgan, 19 January 2021.
- Mizuho, 20 January 2021.
- Mizuho, 22 January 2021.
- LeerinkPartners, 22 January 2021.
- Cantor, 26 January 2021.
- RBC, 27 January 2021.
- Bank of America, 27 January 2021.
- Guggenheim, 27 January 2021.
- Mizuho, 27 January 2021.
- Stifel, 27 January 2021.
- Citigroup, 28 January 2021.
- Stifel, 28 January 2021.
- TDCowen, 28 January 2021.
- TDCowen, 28 January 2021 (1).
- TDCowen, 28 January 2021 (2).

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Mizuho, 29 January 2021.
- J.P. Morgan, 31 January 2021.
- TDCowen, 1 February 2021.
- TDCowen, 1 February 2021 (1).
- Oppenheimer, 4 February 2021.
- Mizuho, 5 February 2021.
- Canaccord, 7 February 2021.
- Mizuho, 12 February 2021.
- Mizuho, 19 February 2021.
- TDCowen, 19 February 2021.
- Mizuho, 21 February 2021.
- Oppenheimer, 23 February 2021.
- RBC, 24 February 2021.
- RaymondJames, 24 February 2021.
- Bank of America, 24 February 2021.
- Cantor, 24 February 2021.
- Citigroup, 24 February 2021.
- Goldman Sachs, 24 February 2021.
- Guggenheim, 24 February 2021.
- Mizuho, 24 February 2021.
- Mizuho, 24 February 2021 (1).
- J.P. Morgan, 24 February 2021.
- Stifel, 24 February 2021.
- LeerinkPartners, 24 February 2021.
- Oppenheimer, 25 February 2021.
- Canaccord, 25 February 2021.
- H.C. Wainwright, 25 February 2021.
- Jefferies, 25 February 2021.
- JMP Securities, 25 February 2021.
- MorganStanley, 25 February 2021.
- Needham, 25 February 2021.
- Stifel, 25 February 2021.
- TDCowen, 25 February 2021.

**Exhibit-1**

**Documents and Other Information Considered**

**In Addition to Those Cited in the 2023 Feinstein Reports**

- TDCowen, 25 February 2021 (1).
- SMBC, 25 February 2021.
- Goldman Sachs, 26 February 2021.
- Mizuho, 26 February 2021.
- LeerinkPartners, 26 February 2021.
- Jefferies, 28 February 2021.
- TDCowen, 1 March 2021.
- Oppenheimer, 3 March 2021.
- Mizuho, 5 March 2021.
- RBC, 8 March 2021.
- Cantor, 8 March 2021.
- Jefferies, 8 March 2021.
- Mizuho, 8 March 2021.
- TDCowen, 8 March 2021.
- LeerinkPartners, 8 March 2021.
- Canaccord, 9 March 2021.
- RaymondJames, 9 March 2021.
- RaymondJames, 9 March 2021 (1).
- Oppenheimer, 9 March 2021.
- Bank of America, 9 March 2021.
- Citigroup, 9 March 2021.
- Goldman Sachs, 9 March 2021.
- H.C. Wainwright, 9 March 2021.
- Guggenheim, 9 March 2021.
- Jefferies, 9 March 2021.
- JMP Securities, 9 March 2021.
- J.P. Morgan, 9 March 2021.
- MorganStanley, 9 March 2021.
- Needham, 9 March 2021.
- TDCowen, 9 March 2021.
- SMBC, 9 March 2021.
- Mizuho, 11 March 2021.
- Citigroup, 12 March 2021.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Mizuho, 12 March 2021.
- Citigroup, 14 March 2021.
- Jefferies, 14 March 2021.
- Citigroup, 16 March 2021.
- Mizuho, 19 March 2021.
- Goldman Sachs, 23 March 2021.
- Mizuho, 26 March 2021.
- Citigroup, 30 March 2021.
- TDCowen, 1 April 2021.
- Mizuho, 4 April 2021.
- RBC, 5 April 2021.
- RaymondJames, 5 April 2021.
- Oppenheimer, 5 April 2021.
- Bank of America, 5 April 2021.
- Citigroup, 5 April 2021.
- Goldman Sachs, 5 April 2021.
- Guggenheim, 5 April 2021.
- Jefferies, 5 April 2021.
- Mizuho, 5 April 2021.
- Mizuho, 5 April 2021 (1).
- JMP Securities, 5 April 2021.
- J.P. Morgan, 5 April 2021.
- MorganStanley, 5 April 2021.
- Needham, 5 April 2021.
- Needham, 5 April 2021 (1).
- Stifel, 5 April 2021.
- TDCowen, 5 April 2021.
- LeerinkPartners, 5 April 2021.
- SMBC, 5 April 2021.
- Jefferies, 6 April 2021.
- Canaccord, 6 April 2021.
- H.C. Wainwright, 7 April 2021.
- H.C. Wainwright, 7 April 2021 (1).

# Exhibit-1

## Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports

- Mizuho, 9 April 2021.
- SMBC, 12 April 2021.
- Cantor, 14 April 2021.
- Mizuho, 16 April 2021.
- Jefferies, 19 April 2021.
- TDCowen, 19 April 2021.
- Cantor, 20 April 2021.
- Mizuho, 20 April 2021.
- J.P. Morgan, 20 April 2021.
- Mizuho, 23 April 2021.
- Goldman Sachs, 25 April 2021.
- Mizuho, 25 April 2021.
- Oppenheimer, 29 April 2021.
- Mizuho, 30 April 2021.
- Jefferies, 2 May 2021.
- TDCowen, 3 May 2021.
- RaymondJames, 5 May 2021.
- Cantor, 5 May 2021.
- Citigroup, 5 May 2021.
- Guggenheim, 5 May 2021.
- Jefferies, 5 May 2021.
- J.P. Morgan, 5 May 2021.
- Stifel, 5 May 2021.
- TDCowen, 5 May 2021.
- LeerinkPartners, 5 May 2021.
- Canaccord, 11 May 2021.
- RBC, 6 May 2021.
- Oppenheimer, 6 May 2021.
- Goldman Sachs, 6 May 2021.
- H.C. Wainwright, 6 May 2021.
- Mizuho, 6 May 2021.
- JMP Securities, 6 May 2021.
- MorganStanley, 6 May 2021.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Needham, 6 May 2021.
- Stifel, 6 May 2021.
- TDCowen, 6 May 2021.
- SMBC, 6 May 2021.
- Oppenheimer, 12 May 2021.
- RBC, 14 May 2021.
- RBC, 14 May 2021 (1).
- RBC, 19 May 2021.
- RBC, 20 May 2021.
- RBC, 21 May 2021.
- Goldman Sachs, 24 May 2021.
- RBC, 26 May 2021.
- RBC, 28 May 2021.
- RBC, 1 June 2021.
- TDCowen, 1 June 2021.
- Jefferies, 2 June 2021.
- RBC, 4 June 2021.
- RBC, 4 June 2021 (1).
- RBC, 8 June 2021.
- Goldman Sachs, 8 June 2021.
- RBC, 11 June 2021.
- Jefferies, 13 June 2021.
- RBC, 18 June 2021.
- Goldman Sachs, 25 June 2021.
- Jefferies, 27 June 2021.
- TDCowen, 1 July 2021.
- RaymondJames, 8 July 2021.
- Jefferies, 11 July 2021.
- MorganStanley, 16 July 2021.
- J.P. Morgan, 20 July 2021.
- TDCowen, 21 July 2021.
- Guggenheim, 23 July 2021.
- Cantor, 25 July 2021.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Jefferies, 25 July 2021.
- Cantor, 28 July 2021.
- Oppenheimer, 29 July 2021.
- Canaccord, 29 July 2021.
- RBC, 30 July 2021.
- RaymondJames, 4 August 2021.
- Citigroup, 4 August 2021.
- Guggenheim, 4 August 2021.
- Jefferies, 4 August 2021.
- Mizuho, 4 August 2021.
- J.P. Morgan, 4 August 2021.
- Stifel, 4 August 2021.
- TDCowen, 4 August 2021.
- Oppenheimer, 5 August 2021.
- Cantor, 5 August 2021.
- Goldman Sachs, 5 August 2021.
- Canaccord, 5 August 2021.
- H.C. Wainwright, 5 August 2021.
- JMP Securities, 5 August 2021.
- MorganStanley, 5 August 2021.
- Needham, 5 August 2021.
- Stifel, 5 August 2021.
- TDCowen, 5 August 2021.
- SMBC, 5 August 2021.
- RBC, 6 August 2021.
- RBC, 6 August 2021 (1).
- Oppenheimer, 6 August 2021.
- Canaccord, 12 August 2021.
- RBC, 13 August 2021.
- Goldman Sachs, 13 August 2021.
- RBC, 20 August 2021.
- RBC, 27 August 2021.
- RBC, 1 September 2021.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- RBC, 1 September 2021 (1).
- MorganStanley, 1 September 2021.
- TDCowen, 1 September 2021.
- TDCowen, 1 September 2021 (1).
- Cantor, 6 September 2021.
- RBC, 7 September 2021.
- RBC, 9 September 2021.
- RBC, 10 September 2021.
- RBC, 17 September 2021.
- Cantor, 20 September 2021.
- Needham, 22 September 2021.
- RBC, 24 September 2021.
- TDCowen, 24 September 2021.
- RBC, 1 October 2021.
- TDCowen, 1 October 2021.
- RBC, 6 October 2021.
- Mizuho, 7 October 2021.
- RBC, 8 October 2021.
- RBC, 8 October 2021 (1).
- RBC, 15 October 2021.
- Needham, 19 October 2021.
- TDCowen, 20 October 2021.
- RBC, 22 October 2021.
- RBC, 29 October 2021.
- RBC, 1 November 2021.
- Guggenheim, 1 November 2021.
- RBC, 5 November 2021.
- J.P. Morgan, 6 November 2021.
- RaymondJames, 8 November 2021.
- Bank of America, 8 November 2021.
- Cantor, 8 November 2021.
- Citigroup, 8 November 2021.
- Guggenheim, 8 November 2021.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- Jefferies, 8 November 2021.
- J.P. Morgan, 8 November 2021.
- Stifel, 8 November 2021.
- RBC, 9 November 2021.
- Goldman Sachs, 9 November 2021.
- H.C. Wainwright, 9 November 2021.
- Mizuho, 9 November 2021.
- JMP Securities, 9 November 2021.
- MorganStanley, 9 November 2021.
- Needham, 9 November 2021.
- Stifel, 9 November 2021.
- TDCowen, 9 November 2021.
- Oppenheimer, 10 November 2021.
- RBC, 12 November 2021.
- Canaccord, 14 November 2021.
- RBC, 15 November 2021.
- Needham, 15 November 2021.
- RBC, 19 November 2021.
- RBC, 26 November 2021.
- RBC, 30 November 2021.
- TDCowen, 1 December 2021.
- RBC, 3 December 2021.
- RBC, 6 December 2021.
- RaymondJames, 6 December 2021.
- Oppenheimer, 6 December 2021.
- Cantor, 6 December 2021.
- Citigroup, 6 December 2021.
- Jefferies, 6 December 2021.
- Mizuho, 6 December 2021.
- J.P. Morgan, 6 December 2021.
- Stifel, 6 December 2021.
- Bank of America, 7 December 2021.
- Goldman Sachs, 7 December 2021.

**Exhibit-1**

**Documents and Other Information Considered**

**In Addition to Those Cited in the 2023 Feinstein Reports**

- H.C. Wainwright, 7 December 2021.
- Guggenheim, 7 December 2021.
- JMP Securities, 7 December 2021.
- MorganStanley, 7 December 2021.
- Needham, 7 December 2021.
- Stifel, 7 December 2021.
- TDCowen, 7 December 2021.
- J.P. Morgan, 8 December 2021.
- RBC, 10 December 2021.
- RBC, 17 December 2021.
- RBC, 20 December 2021.
- RaymondJames, 20 December 2021.
- Citigroup, 20 December 2021.
- Jefferies, 20 December 2021.
- Mizuho, 20 December 2021.
- J.P. Morgan, 20 December 2021.
- MorganStanley, 20 December 2021.
- Stifel, 20 December 2021.
- TDCowen, 20 December 2021.
- Canaccord, 21 December 2021.
- Oppenheimer, 21 December 2021.
- Bank of America, 21 December 2021.
- Cantor, 21 December 2021.
- H.C. Wainwright, 21 December 2021.
- Guggenheim, 21 December 2021.
- JMP Securities, 21 December 2021.
- Needham, 21 December 2021.
- Stifel, 21 December 2021.
- TDCowen, 21 December 2021.
- RBC, 23 December 2021.
- RBC, 24 December 2021.
- RBC, 31 December 2021.
- Cantor, 13 January 2022.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

- Cantor, 19 January 2022.
- Cantor, 25 January 2022.
- Mizuho, 3 February 2022.
- Cantor, 28 February 2022.
- Cantor, 9 March 2022.
- Mizuho, 9 March 2022.
- Canaccord, 15 March 2022.
- Mizuho, 18 April 2022.
- Canaccord, 18 April 2022.
- Cantor, 25 April 2022.
- Mizuho, 25 April 2022.
- Mizuho, 4 May 2022.
- Mizuho, 15 June 2022.
- Needham, 15 June 2022.
- Mizuho, 17 June 2022.
- Needham, 21 June 2022.
- Mizuho, 9 August 2022.
- Needham, 9 August 2022.

## PRODUCED DOCUMENTS

- ACAD_SECLIT_0000995-1012.
- ACAD_SECLIT_0094235.
- ACAD_SECLIT_0094284-343.
- ACAD_SECLIT_0299836-65.
- JEFF00020873-910.
- JEFF00024266-75.

## CONFERENCE CALL TRANSCRIPTS

- "Q3 2016 ACADIA Pharmaceuticals Inc Earnings Call," *Refinitiv*, 7 November 2016.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**

- "Q2 2017 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 8 August 2017.
- "ACADIA Pharmaceuticals Inc Initiates Phase III Study of Pimavanserin in Dementia-Related Psychosis - Call," *Refinitiv*, 4 October 2017.
- "Q1 2019 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 1 May 2019.
- "ACADIA Pharmaceuticals Inc at Bank of America Merrill Lynch Health Care Conference," *Thomson Reuters*, 14 May 2019.
- "ACADIA Pharmaceuticals Inc at Goldman Sachs Global Healthcare Conference," *Thomson Reuters*, 11 June 2019.
- "ACADIA Pharmaceuticals Inc Corporate Call Announces Top-line Results from Phase 3 ENHANCE Trial," *Thomson Reuters*, 22 July 2019.
- "Q2 2019 ACADIA Pharmaceuticals Inc Earnings Call," *Thomson Reuters*, 31 July 2019.

## ACADEMIC AND PROFESSIONAL LITERATURE


- Alexander, Jack, *Performance Dashboards and Analysis for Value Creation*, John Wiley & Sons, Inc., 2007.
- Allman, Keith, *Corporate Valuation Modeling*, John Wiley & Sons, Inc., 10th Edition, 2010.
- Bodie, Zvi, Alex Kane, and Alan Marcus, *Investments*, 10th Edition, by McGraw-Hill Education, 2014.
- Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th Edition, McGraw-Hill Irwin, 2011.
- Chandra, Uday and Byung Ro, "The Role of Revenue in Firm Valuation," *Accounting Horizons*, Vol. 22, No. 2, June 2008.
- Fabozzi, Frank, Sergio Focardi, and Caroline Jonas, *Equity Valuation: Science, Art, or Craft?*, Association for Investment Management and Research (CFA Institute), 2017.
- Fama, Eugene, Lawrence Fisher, Michael Jensen, and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review*, Vol. 10, No. 1, 1969.

**Exhibit-1**

**Documents and Other Information Considered In Addition to Those Cited in the 2023 Feinstein Reports**


- Gold, Kevin L., Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th ed., edited by Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017.
- Henry, Elaine, Thomas Robinson, and Jan Hendrik van Greuning, "Financial Analysis Techniques," in *Financial Reporting and Analysis*, Association for Investment Management and Research (CFA Institute), 2019.
- Hitchner, James, *Financial Valuation: Applications and Models*, John Wiley & Sons, Inc., 2nd Edition, 2011.
- Holthausen, Robert and Mark Zmijewski, *Corporate Valuation: Theory, Evidence, & Practice*, Cambridge Business Publishes, 1st Edition, 2014.
- Karafiath, Imre, "Using Dummy Variables in the Event Study Methodology," *The Financial Review*, Vol. 23, No. 3, 1988.
- Koller, Tim, Marc Goedhart, and David Wessels, *Valuation: Measuring and Managing the Value of Companies*, 5th Edition, John Wiley & Sons, Inc. / McKinsey & Co., 2010.
- Liu, Hanni, Anup Srivastava, and Jennifer Yin, "Alignment Between Compensation-Contracting and Value-Relevance Role of Revenues," *Journal of Financial Reporting*, Vol. 8, No. 1, Spring 2023.
- Lo, Andrew, Manish Singh, Roland Rocafort, Cathy Cai, and Kien Wei Siah, "The Reaction of Sponsor Stock Prices to Clinical Trial Outcomes: An Event Study Analysis," *PLoS One*, Vol. 17, No. 9, 2022.
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997.
- Moyer, Stephen, *Distressed Debt Analysis: Strategies for Speculative Investors*, J. Ross Publishing, 2005.
- Pinto, Jerald, Elaine Henry, Thomas Robinson, and John Stowe, "Market-Based Valuation: Price and Enterprise Value Multiples," in *Equity Valuation*, Association for Investment Management and Research (CFA Institute), 2019.
- Pratt, Shannon, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, John Wiley & Sons, Inc., 5th Edition, 2008.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**


- Rosenbaum, Joshua and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, 2nd Edition, John Wiley & Sons, Inc., 2013.
- Ross, Stephen, Randolph Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 8th Edition, McGraw-Hill Irwin, 2008.
- Rothenstein, Jeffrey, George Tomlinson, Ian Tannock, and Allan Detsky, "Company Stock Prices Before and After Public Announcements Related to Oncology Drugs," *Journal of the National Cancer Institute*, Vol. 103, No. 20, October 2011.
- Salkever, David, "The Use of Dummy Variables to Compute Predictions, Prediction Errors, and Confidence Intervals," *Journal of Econometrics*, Vol. 4, No. 4, 1976.
- Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd ed., edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001.


## DATA AND DATABASES

- CRSP
- EDGAR
- Factiva
- LSEG Workspace
- Nasdaq

## LEGAL CASES

- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the 2023 Feinstein Reports**

## OTHER

- 15 U.S.C. §78u-4(e).
- Any other documents cited in the report.

**Exhibit-2**

# Curriculum Vitae
## Steven P. Feinstein, Ph.D., CFA

Babson College
Finance Division
Babson Park, MA 02457
781-239-5275
Feinstein@Babson.edu

## EDUCATION

1989 YALE UNIVERSITY
Ph.D. in Economics (Concentration in Finance)

1986 YALE UNIVERSITY
M.Phil. in Economics

1983 YALE UNIVERSITY
M.A. in Economics

1981 POMONA COLLEGE
B.A. in Economics (Phi Beta Kappa, *cum laude*)

## TEACHING EXPERIENCE

1996 - present BABSON COLLEGE
Babson Park, MA
Full-time Faculty, Finance Division
Associate Professor (2000-present)
Donald P. Babson Chair in Applied Investments (2002-2010)
Faculty Director of the Babson College Fund (2002-2009)
Director of the Stephen D. Cutler Center for Investments and Finance (2002-2007)
Assistant Professor (1996-2000)

1990 - 1995 BOSTON UNIVERSITY SCHOOL OF MANAGEMENT
Boston, MA
Full-time Faculty, Department of Finance

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

| | |
|---|---|
| 1993 - 1994 | WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS<br>St. Louis, MO<br>Visiting Assistant Professor, Department of Finance |

## BUSINESS EXPERIENCE

| | |
|---|---|
| 2008 - present | CROWNINSHIELD FINANCIAL RESEARCH, INC.<br>Brookline, MA<br>President and Senior Expert |
| 1996 - 2008 | THE MICHEL-SHAKED GROUP<br>Boston, MA<br>Senior Expert (2001 - 2008)<br>Affiliated Expert (1996 - 2001) |
| 1987 - 1990 | FEDERAL RESERVE BANK OF ATLANTA<br>Economist |

## PROFESSIONAL DESIGNATIONS

1998 Awarded the Chartered Financial Analyst designation by the Association for Investment Management and Research.

## RESEARCH AWARDS

1999 Greater Boston Real Estate Board/Real Estate Finance Association – Research Grant and Featured Speaker at Real Estate Finance Association Meetings.

## PAPERS AND PUBLICATIONS

"The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," (with Don Chance and Onnig Dombalagian) forthcoming in *University of Pennsylvania Journal of Business Law*, 2025.

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Securities Litigation Event Studies in the Covid Volatility Regime," (with Miguel Villanueva) *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," (with Miguel Villanueva) *Review of Quantitative Finance and Accounting*, vol. 57, no. 1, 2021.

"What A Solar Eclipse Has To Do With Market Efficiency," (with Daniel Bettencourt) *Law360.com*, 2017.

"Underestimation of Securities Fraud Aggregate Damages Due to Inter-Fund Trades," (with Gang Hu, Mark Marcus, and Zann Ali) *Journal of Forensic Economics*, September 2013, Vol. 24, No. 2, 161-173.

"Lehman Equity Research Tipping: Evidence in the Stock Price Data," Working paper, March 2010. Cited in *New York Times* May 19, 2012, and made available on the *New York Times* website.

"Distortion in Corporate Valuation: Implications of Capital Structure Changes," (with Allen Michel and Jacob Oded) *Managerial Finance*, 2011, Vol. 37(8), 681-696.

"Market Signals of Investment Unsuitability," (with Alexander Liss and Steven Achatz) Law360.com, June 3, 2010. Available from http://www.law360.com/articles/170690.

"Planning Capital Expenditure," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 3rd edition 2001, and 4th edition 2009.

"Financial Management of Risks," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 2nd edition 1997, 3rd edition 2001, and 4th edition 2009.

"Fraud-on-the-Market Theory: Is a Market Efficient?" (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, May 2005.

"Valuation of Credit Guarantees," (with Allen J. Michel and Israel Shaked) *Journal of Forensic Economics* 17(1), pp. 17-37, 2005.

"A Better Understanding of why NPV Undervalues Managerial Flexibility," (with Diane Lander) in *The Engineering Economist*, 2002, Vol. 47, No. 4.

"Teaching the Strong-Form Efficient Market Hypothesis: A Classroom Experiment," *Journal of Financial Education*, fall 2000.

*A Future for Real Estate Futures: Potential Applications of Derivatives in Real Estate Investment and Finance* (with Linda Stoller). Monograph. Boston: Real Estate Finance Association / Greater Boston Real Estate Board, May 2000.

"The Risk Budget: Using Your Human Resources," (with John Marthinsen and John Edmunds) *Risk Management*, April 2000.

"Scenario Learning: A Powerful Tool for the 21st Century Planner," (with Jeffrey Ellis and Dennis Stearns) *The Journal of Financial Planning*, April 2000.

"Protecting Future Product Liability Claimants in the Case of Bankruptcy," (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, January 2000.

"Measuring Risk with the Bodie Put When Stocks Exhibit Mean Reversion," *The Journal of Risk*, Vol. 1, No. 3, 1999.

"Just-in-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) *Primus*, Vol. IX, No. 2, June 1999.

*Atlanta Park Medical Center v. Hamlin Asset Management.* (with Natalie Taylor). Babson Case Collection, Harvard Business School Press, 1998.

"Dealing with Delta," *Derivatives Week*, VII, No. 44, November 2, 1998.

"Expected Return in Option Pricing: A Non-Mathematical Explanation," *Derivatives Week*, VII, No. 35, August 31, 1998.

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"When Hedges Fail: The Put Paradox and its Solution," *Derivatives Quarterly*, Vol. 4, No. 2, Winter 1997.

*Finance and Accounting for Project Management*. New York: American Management Association, 1996.

"International Investing," in *Irwin's Directory of Emerging Market Brokerages*. New York: Irwin, 1996.

"The Hull and White Implied Volatility," Boston University Working Paper #92-51, 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) in *Financial Systems and Risk Management*, the proceedings of the US-Japan Forum on Financial Strategy in the 1990s, sponsored by Osaka Foundation of International Exchange and Boston University, August 1991.

"Covered Call Options: A Proposal to Ease LDC Debt," (with Peter Abken) *Federal Reserve Bank of Atlanta Economic Review*, March/April 1990. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Forecasting Stock-Market Volatility Using Options on Index Futures," *Federal Reserve Bank of Atlanta Economic Review*, May/June 1989. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"The Black-Scholes Formula is Nearly Linear in Sigma for At-the-Money Options; Therefore Implied Volatilities from At-the-Money Options are Virtually Unbiased," Federal Reserve Bank of Atlanta Working Paper #88-9, December 1988.

"The Effect of the 'Triple Witching Hour' on Stock Market Volatility," (with William Goetzmann) *Federal Reserve Bank of Atlanta Economic Review*, September/October 1988. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Stock Market Volatility," *Federal Reserve Bank of Atlanta Economic Review*, November/December 1987.

Book review of *In Who's Interest: International Banking and American Foreign Policy*, by Benjamin J. Cohen, Yale University Press, in *Federal Reserve Bank of Atlanta Economic Review*, Summer 1987.

**PRESENTATIONS**

"Proving and Disproving Market Efficiency for Appraisal Hearings," at the NACVA/CTI Business Valuation and Financial Litigation Super Conference, July 2023.

"SPAC Public Warrant Valuation Using Iterative Monte Carlo Simulation," (with Ayussh Ahuja, Achraf Krafssi, and Dukalion Tsapalas) at the Financial Management Association Annual Meeting, October 2021.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Boston Area Finance Symposium, April 2018.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Eastern Finance Association Conference, April 2018.

"Determining the Defendant's Ability to Pay," at Taxpayers Against Fraud Education Fund Conference, October 2010.

"The Computation of Damages in Securities Fraud Cases," at the Grant and Eisenhofer Institutional Investor Conference, December 2002.

"The Role of the Financial Expert in Complex Litigation," at the Financial Management Association Conference, October 2000.

"Entrepreneurial Incentives and Resource Allocation Among Corporate Venturing Initiatives," (with Joel Shulman and U. Srinivasa Rangan), Babson Entrepreneurship Research Conference, May 2000.

"Application of Real Options in Purchasing Strategies," (with Juan Orozco), presented at the International Applied Business Research Conference, March 2000.

"A Future for Real Estate Futures," (with Linda Stoller) at the Fairfield County chapter of the Real Estate Finance Association, November 1999, and at the Greater Boston Real Estate Board, November 2000.

"Atlanta Park Medical Center v. Hamlin Asset Management," (with Natalie Taylor) at the 1999 convention of the North American Case Research Association.

"Using Future Worlds™ in the Financial Planning Process," (with Jeffrey Ellis) at the Institute of Certified Financial Planners Masters Retreat, October 1999.

"Toward a Better Understanding of Real Options: A Weighted Average Discount Rate Approach," at the 1999 Financial Management Association Conference, the 1999 European Financial Management Association Conference, and the 1999 Multinational Finance Society Conference.

"Just-In-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) at the 1999 Financial Management Association Conference.

"Alternative Dow Investments for the Individual Investor: Diamonds, Synthetics, and the Real Thing," at the 1999 Academy of Financial Services Convention.

"Evidence of Yield Burning in Municipal Refundings," at Financial Management Association Convention, October 1997; Government Finance Officers Association, 1997; and Northeast Regional Convention of the National Association of State Treasurers, 1997.

"Teaching the Strong-Form Efficient Market Hypothesis," at Conference on Classroom Experiments in the Teaching of Economics at University of Virginia, September 1995.

"Efficient Consolidation of Implied Standard Deviations," (with Shaikh Hamid) at Midwest Finance Association, March 1995.

"A Test of Intertemporal Averaging of Implied Volatilities," (with Shaikh Hamid) at Eastern Finance Association, April 1995.

"Taking Advantage of Volatility: Non-linear Forecasting and Options Strategies," (with Hassan Ahmed) at Chicago Board of Trade / Chicago Board Options Exchange Conference on Risk Management, February 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) at Japan-U.S. Conference on Financial Strategies in the 1990s, Osaka, Japan, August 1991.

"The Hull and White Implied Volatility," at American Finance Association Convention, December 1990.

**REVIEWED ARTICLES AND BOOKS FOR:**

Harvard Business School Publishing
Elsevier
Journal of Economic Education
Journal of Forensic Economics
Journal of Risk
Financial Review
North American Case Research Association
Financial Management
Journal of Business
Journal of Money, Credit and Banking
Quarterly Review of Economics and Finance
Blackwell
Prentice Hall
Southwestern Publishing

## COURSES TAUGHT

Advanced Derivative Securities (MBA)
Babson College Fund (Undergraduate and MBA)
Capital Markets (MBA)
Continuous-Time Finance (Doctoral)
Corporate Finance (MBA and Executive)
Corporate Financial Strategy (MBA)
Cross-Functional Management (Integrated curriculum, Undergraduate)
Equity Markets (MBA)
Derivatives: Theory and Practice (MBA)
Financial Reporting and Corporate Finance (MBA)
Financial Management (MBA)
Fixed Income Analysis (Undergraduate and MBA)
Introduction to Derivative Securities (Executive)
International Finance (Executive)
Integrated Management (Undergraduate)
Investments (MBA and Executive)
Mod B: Decision Making and Applications, Finance stream (MBA)
Options and Futures (Undergraduate)
Risk Management (MBA)
Portfolio Theory / Management Information Systems (Executive)
Quantitative Methods for Investment Management (Undergraduate and MBA)
Security Valuation (Undergraduate and MBA)

## TEACHING AWARDS

Reid Teaching Award, Washington University, Olin School of Business, 1993-94.

## SELECT LIST OF MEDIA CITATIONS

"Is Insider Trading Part of the Fabric?" by Gretchen Morgenson, *The New York Times*, May 19, 2012.

"Bankers Rigging Municipal Contract Bids Admit to Cover-Up Lies," by William Selway and Martin Z. Braun, *Bloomberg Markets Magazine*, November 24, 2010.

"Hospital Move Presents Buy-Out Groups with New Risks," by Francesco Guerra, Christopher Bowe, and Rebecca Knight, *Financial Times*, July 15, 2006.

"Funds of Knowledge Add Value," by Rebecca Knight, *Financial Times*, March 12, 2006.

"City's Financial Picture Worse Than Ever, Sanders Says," by Matthew T. Hall, *San Diego Union-Tribune*, January 7, 2006.

"Downer: Stock Market Takes Another Dive," by John Chesto, *Boston Herald*, July 23, 2002.

"Banks, Developers, Are Main Beneficiaries," [editorial column] by Steven Feinstein, *The Boston Globe*, March 31, 2002, p. C4.

"Washington Investing: What Michael Saylor is Really Worth," by Jerry Knight, *The Washington Post*, March 6, 2000.

"IBM Retools Pensions," by Stephanie Armour, *USA Today*, May 4, 1999.

"L.A. MTA's Law Firm Says Lissack Strategy Will be a Replay," by Andrea Figler, *Bond Buyer,* September 30, 1998.

"Fed Key Player in Rescue of Floundering Hedge Fund," by Andrew Fraser, Associated Press, September 25, 1998.

"Top Banks Plan Bailout for Fund," by Andrew Fraser, Associated Press, September 24, 1998.

"Clarion Call to the Small Investor," by Jo-Ann Johnston, *The Boston Globe*, March 4, 1998.

"L.A. Authority Study Shows Rampant Yield Burning Abuse," by Michael Stanton, *The Bond Buyer*, April 22, 1997.

"Dispute Over Yield Burning Dominates GFOA Session," by Michael Stanton, *The Bond Buyer*, January 29, 1997.

"Men Behaving Badly (Yield Burning)," *Grants Municipal Bond Observer*, January 24, 1997.

"Municipal Bond Dealers Face Scrutiny," by Peter Truell, *The New York Times*, December 17, 1996.

"Iowa Market Takes Stock of Presidential Candidates," by Stanley W. Angrist, *The Wall Street Journal*, August 28, 1995.

"Looking for Clues in Options Prices," by Sylvia Nasar, *The New York Times*, July 18, 1991.

"For Fed, A New Set of Tea Leaves," by Sylvia Nasar, *The New York Times*, July 5, 1991.

## MEMBERSHIP IN PROFESSIONAL SOCIETIES

American Finance Association
CFA Society Boston
Chartered Financial Analyst Institute
Financial Management Association
Foundation for Advancement of Research in Financial Economics (founding member)
National Association of Forensic Economics
North American Case Research Association

**Exhibit-3**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Reply Report**

In Re Ripple Labs Inc. Litigation
Case No. 4:18-cv-06753-PJH
United States District Court
Northern District of California
Deposition Testimony
January 2023
Deposition Testimony
December 2023

In Re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District of Pennsylvania
Deposition Testimony
May 2021
Deposition Testimony
July 2021
Deposition Testimony
July 2023
Deposition Testimony
March 2024

In Re Valeant Pharmaceuticals International, Inc. Securities Litigation
Master No. 3:15-cv-07658-MAS-LHG
United States District Court
District of New Jersey
Deposition Testimony
May 2024

**Exhibit-3**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Reply Report**

In re Vale S.A. Securities Litigation
Case No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
October 2023
Testimony at Evidentiary Hearing
August 2024

Alicia Marshall, et al v. Prestamos CDFI, LLC
Case No. 5:21-ev-04337-JMG
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
August 2024

In re Cassava Sciences, Inc. Securities Litigation
Master File No. 1:21-cv-00751-DAE
United States District Court
Western District of Texas
Austin Division
Deposition Testimony
June 2024
Deposition Testimony
September 2024

In re Waste Management Securities Litigation
Civil Action No. 1:22-cv-04838-LGS
United States District Court
Southern District of New York
Deposition Testimony
September 2024

**Exhibit-3**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Reply Report**

In re Exxon Mobil Corp. Securities Litigation
Civil Action No. 3:16-cv-03111-K
United States District Court
Northern District of Texas
Deposition Testimony
January 2025

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 9/6/2019 | $23.80 | 1,043,129 | -2.98% |
| 9/9/2019 | $38.85 | 22,614,862 | 49.00% |
| 9/10/2019 | $41.22 | 7,558,262 | 5.92% |
| 9/11/2019 | $41.39 | 3,380,486 | 0.41% |
| 9/12/2019 | $39.14 | 2,448,825 | -5.59% |
| 9/13/2019 | $40.45 | 2,955,583 | 3.29% |
| 9/16/2019 | $44.01 | 4,421,383 | 8.44% |
| 9/17/2019 | $42.60 | 3,385,030 | -3.26% |
| 9/18/2019 | $42.16 | 6,113,698 | -1.04% |
| 9/19/2019 | $41.68 | 1,970,548 | -1.15% |
| 9/20/2019 | $40.74 | 4,215,395 | -2.28% |
| 9/23/2019 | $41.61 | 2,679,939 | 2.11% |
| 9/24/2019 | $38.67 | 2,759,157 | -7.33% |
| 9/25/2019 | $39.21 | 1,960,136 | 1.39% |
| 9/26/2019 | $37.48 | 1,249,688 | -4.51% |
| 9/27/2019 | $36.78 | 1,331,905 | -1.89% |
| 9/30/2019 | $35.99 | 1,390,386 | -2.17% |
| 10/1/2019 | $36.21 | 2,410,117 | 0.61% |
| 10/2/2019 | $37.40 | 2,470,079 | 3.23% |
| 10/3/2019 | $38.30 | 1,827,457 | 2.38% |
| 10/4/2019 | $38.16 | 1,474,507 | -0.37% |
| 10/7/2019 | $38.70 | 1,125,039 | 1.41% |
| 10/8/2019 | $39.07 | 1,699,491 | 0.95% |
| 10/9/2019 | $39.88 | 1,589,394 | 2.05% |
| 10/10/2019 | $40.48 | 1,752,995 | 1.49% |
| 10/11/2019 | $40.52 | 1,395,128 | 0.10% |
| 10/14/2019 | $39.48 | 915,479 | -2.60% |
| 10/15/2019 | $40.16 | 1,251,846 | 1.71% |
| 10/16/2019 | $39.90 | 1,254,841 | -0.65% |
| 10/17/2019 | $39.98 | 1,286,355 | 0.20% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| **Date** | **ACAD Closing Price** | **ACAD Trading Volume** | **ACAD Logarithmic Return** |
|---|---|---|---|
| 10/18/2019 | $39.95 | 3,054,315 | -0.08% |
| 10/21/2019 | $43.24 | 2,800,675 | 7.91% |
| 10/22/2019 | $42.51 | 1,249,832 | -1.70% |
| 10/23/2019 | $41.81 | 784,641 | -1.66% |
| 10/24/2019 | $41.13 | 1,061,012 | -1.64% |
| 10/25/2019 | $41.58 | 950,334 | 1.09% |
| 10/28/2019 | $42.15 | 966,597 | 1.36% |
| 10/29/2019 | $42.26 | 957,941 | 0.26% |
| 10/30/2019 | $43.05 | 1,461,136 | 1.85% |
| 10/31/2019 | $42.41 | 2,060,024 | -1.50% |
| 11/1/2019 | $43.00 | 1,461,160 | 1.37% |
| 11/4/2019 | $42.45 | 1,043,885 | -1.28% |
| 11/5/2019 | $41.62 | 886,117 | -1.97% |
| 11/6/2019 | $40.99 | 968,607 | -1.53% |
| 11/7/2019 | $41.20 | 603,601 | 0.51% |
| 11/8/2019 | $42.61 | 1,013,457 | 3.37% |
| 11/11/2019 | $45.24 | 2,605,545 | 5.99% |
| 11/12/2019 | $46.33 | 2,045,500 | 2.38% |
| 11/13/2019 | $46.41 | 765,014 | 0.17% |
| 11/14/2019 | $45.47 | 1,459,345 | -2.05% |
| 11/15/2019 | $46.10 | 1,343,648 | 1.38% |
| 11/18/2019 | $45.07 | 1,255,160 | -2.26% |
| 11/19/2019 | $46.81 | 1,251,674 | 3.79% |
| 11/20/2019 | $46.19 | 1,775,036 | -1.33% |
| 11/21/2019 | $47.53 | 1,271,040 | 2.86% |
| 11/22/2019 | $47.08 | 645,964 | -0.95% |
| 11/25/2019 | $47.76 | 1,139,447 | 1.43% |
| 11/26/2019 | $47.40 | 1,606,163 | -0.76% |
| 11/27/2019 | $47.00 | 903,617 | -0.85% |
| 11/29/2019 | $45.29 | 869,043 | -3.71% |

## Exhibit-4

## Acadia Stock Prices, Volume, and Returns

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 12/2/2019 | $45.78 | 1,579,519 | 1.08% |
| 12/3/2019 | $44.94 | 1,394,997 | -1.85% |
| 12/4/2019 | $44.28 | 1,952,073 | -1.48% |
| 12/5/2019 | $50.48 | 7,419,812 | 13.10% |
| 12/6/2019 | $51.40 | 1,872,077 | 1.81% |
| 12/9/2019 | $47.93 | 1,727,754 | -6.99% |
| 12/10/2019 | $46.26 | 1,838,290 | -3.56% |
| 12/11/2019 | $45.01 | 1,980,125 | -2.73% |
| 12/12/2019 | $44.52 | 1,967,925 | -1.09% |
| 12/13/2019 | $44.34 | 1,347,458 | -0.41% |
| 12/16/2019 | $46.06 | 1,808,199 | 3.81% |
| 12/17/2019 | $46.12 | 2,161,534 | 0.13% |
| 12/18/2019 | $43.44 | 3,178,051 | -5.99% |
| 12/19/2019 | $43.63 | 1,318,739 | 0.44% |
| 12/20/2019 | $45.19 | 2,967,186 | 3.51% |
| 12/23/2019 | $44.57 | 1,188,623 | -1.38% |
| 12/24/2019 | $45.45 | 329,836 | 1.96% |
| 12/26/2019 | $45.05 | 494,634 | -0.88% |
| 12/27/2019 | $43.97 | 786,917 | -2.43% |
| 12/30/2019 | $43.16 | 808,645 | -1.86% |
| 12/31/2019 | $42.78 | 1,403,461 | -0.88% |
| 1/2/2020 | $41.11 | 2,185,871 | -3.98% |
| 1/3/2020 | $40.35 | 2,287,053 | -1.87% |
| 1/6/2020 | $42.81 | 1,689,100 | 5.92% |
| 1/7/2020 | $42.18 | 1,508,558 | -1.48% |
| 1/8/2020 | $44.41 | 1,300,550 | 5.15% |
| 1/9/2020 | $45.58 | 1,724,966 | 2.59% |
| 1/10/2020 | $45.24 | 2,073,728 | -0.74% |
| 1/13/2020 | $41.80 | 3,182,927 | -7.91% |
| 1/14/2020 | $44.05 | 1,593,310 | 5.24% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 1/15/2020 | $45.40 | 1,446,152 | 3.02% |
| 1/16/2020 | $44.56 | 876,418 | -1.87% |
| 1/17/2020 | $43.43 | 1,075,208 | -2.57% |
| 1/21/2020 | $43.37 | 900,505 | -0.14% |
| 1/22/2020 | $42.16 | 1,091,300 | -2.83% |
| 1/23/2020 | $40.79 | 2,062,878 | -3.30% |
| 1/24/2020 | $39.34 | 1,496,661 | -3.62% |
| 1/27/2020 | $40.43 | 1,620,257 | 2.73% |
| 1/28/2020 | $41.55 | 1,317,427 | 2.73% |
| 1/29/2020 | $40.24 | 1,230,548 | -3.20% |
| 1/30/2020 | $39.98 | 711,342 | -0.65% |
| 1/31/2020 | $39.94 | 1,045,144 | -0.10% |
| 2/3/2020 | $40.90 | 729,341 | 2.38% |
| 2/4/2020 | $41.67 | 1,283,579 | 1.87% |
| 2/5/2020 | $42.75 | 970,112 | 2.56% |
| 2/6/2020 | $41.94 | 740,905 | -1.91% |
| 2/7/2020 | $41.67 | 800,852 | -0.65% |
| 2/10/2020 | $43.49 | 928,262 | 4.28% |
| 2/11/2020 | $43.88 | 997,802 | 0.89% |
| 2/12/2020 | $45.22 | 1,038,975 | 3.01% |
| 2/13/2020 | $46.87 | 1,844,166 | 3.58% |
| 2/14/2020 | $46.09 | 1,201,709 | -1.68% |
| 2/18/2020 | $45.44 | 787,646 | -1.42% |
| 2/19/2020 | $45.84 | 742,920 | 0.88% |
| 2/20/2020 | $44.83 | 981,714 | -2.23% |
| 2/21/2020 | $45.13 | 1,140,476 | 0.67% |
| 2/24/2020 | $42.25 | 1,535,984 | -6.59% |
| 2/25/2020 | $40.67 | 1,181,775 | -3.81% |
| 2/26/2020 | $40.22 | 1,187,952 | -1.11% |
| 2/27/2020 | $39.10 | 3,755,751 | -2.82% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 2/28/2020 | $42.74 | 2,251,199 | 8.90% |
| 3/2/2020 | $43.76 | 1,710,773 | 2.36% |
| 3/3/2020 | $41.98 | 1,277,396 | -4.15% |
| 3/4/2020 | $44.53 | 1,095,579 | 5.90% |
| 3/5/2020 | $44.39 | 1,069,714 | -0.31% |
| 3/6/2020 | $41.91 | 1,211,387 | -5.75% |
| 3/9/2020 | $39.32 | 1,197,149 | -6.38% |
| 3/10/2020 | $41.01 | 1,141,702 | 4.21% |
| 3/11/2020 | $36.87 | 1,511,769 | -10.64% |
| 3/12/2020 | $35.39 | 2,288,167 | -4.10% |
| 3/13/2020 | $35.63 | 1,769,561 | 0.68% |
| 3/16/2020 | $31.65 | 2,720,434 | -11.85% |
| 3/17/2020 | $34.38 | 2,338,834 | 8.27% |
| 3/18/2020 | $33.21 | 1,526,361 | -3.46% |
| 3/19/2020 | $34.76 | 1,487,368 | 4.56% |
| 3/20/2020 | $33.37 | 1,777,933 | -4.08% |
| 3/23/2020 | $35.00 | 1,204,000 | 4.77% |
| 3/24/2020 | $38.06 | 1,414,550 | 8.38% |
| 3/25/2020 | $38.06 | 1,161,956 | 0.00% |
| 3/26/2020 | $39.52 | 1,076,348 | 3.76% |
| 3/27/2020 | $38.83 | 1,063,685 | -1.76% |
| 3/30/2020 | $41.32 | 1,120,874 | 6.22% |
| 3/31/2020 | $42.25 | 2,277,482 | 2.23% |
| 4/1/2020 | $39.26 | 1,324,166 | -7.34% |
| 4/2/2020 | $41.68 | 1,122,805 | 5.98% |
| 4/3/2020 | $40.76 | 1,049,658 | -2.23% |
| 4/6/2020 | $43.29 | 1,317,864 | 6.02% |
| 4/7/2020 | $41.71 | 1,355,919 | -3.72% |
| 4/8/2020 | $42.80 | 1,053,019 | 2.58% |
| 4/9/2020 | $43.80 | 861,577 | 2.31% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 4/13/2020 | $42.85 | 783,090 | -2.19% |
| 4/14/2020 | $44.93 | 1,647,297 | 4.74% |
| 4/15/2020 | $45.19 | 1,439,597 | 0.58% |
| 4/16/2020 | $46.55 | 1,236,724 | 2.97% |
| 4/17/2020 | $48.90 | 1,311,608 | 4.93% |
| 4/20/2020 | $49.73 | 1,945,659 | 1.68% |
| 4/21/2020 | $47.84 | 1,042,499 | -3.87% |
| 4/22/2020 | $49.41 | 1,201,747 | 3.23% |
| 4/23/2020 | $49.14 | 1,003,110 | -0.55% |
| 4/24/2020 | $50.93 | 1,087,869 | 3.58% |
| 4/27/2020 | $51.89 | 1,885,893 | 1.87% |
| 4/28/2020 | $50.64 | 1,181,101 | -2.44% |
| 4/29/2020 | $50.76 | 1,089,463 | 0.24% |
| 4/30/2020 | $48.31 | 1,354,733 | -4.95% |
| 5/1/2020 | $44.93 | 1,178,888 | -7.25% |
| 5/4/2020 | $46.59 | 1,133,893 | 3.63% |
| 5/5/2020 | $47.38 | 764,010 | 1.68% |
| 5/6/2020 | $48.18 | 895,907 | 1.67% |
| 5/7/2020 | $49.34 | 961,904 | 2.38% |
| 5/8/2020 | $50.72 | 1,988,213 | 2.76% |
| 5/11/2020 | $50.89 | 1,565,392 | 0.33% |
| 5/12/2020 | $49.37 | 1,286,144 | -3.03% |
| 5/13/2020 | $46.02 | 1,530,512 | -7.03% |
| 5/14/2020 | $47.36 | 1,576,134 | 2.87% |
| 5/15/2020 | $50.83 | 1,277,267 | 7.07% |
| 5/18/2020 | $52.06 | 1,324,728 | 2.39% |
| 5/19/2020 | $51.04 | 862,915 | -1.98% |
| 5/20/2020 | $52.55 | 838,714 | 2.92% |
| 5/21/2020 | $51.57 | 649,043 | -1.88% |
| 5/22/2020 | $51.24 | 419,434 | -0.64% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 5/26/2020 | $51.17 | 1,142,830 | -0.14% |
| 5/27/2020 | $50.63 | 1,050,445 | -1.06% |
| 5/28/2020 | $50.69 | 1,020,533 | 0.12% |
| 5/29/2020 | $49.68 | 1,209,951 | -2.01% |
| 6/1/2020 | $48.89 | 1,211,736 | -1.60% |
| 6/2/2020 | $48.02 | 1,058,261 | -1.80% |
| 6/3/2020 | $46.90 | 1,197,412 | -2.36% |
| 6/4/2020 | $45.75 | 1,181,177 | -2.48% |
| 6/5/2020 | $45.61 | 859,761 | -0.31% |
| 6/8/2020 | $46.81 | 1,050,519 | 2.60% |
| 6/9/2020 | $47.49 | 953,999 | 1.44% |
| 6/10/2020 | $47.02 | 782,722 | -0.99% |
| 6/11/2020 | $45.19 | 1,093,868 | -3.97% |
| 6/12/2020 | $45.85 | 1,100,374 | 1.45% |
| 6/15/2020 | $46.49 | 924,664 | 1.39% |
| 6/16/2020 | $47.34 | 775,152 | 1.81% |
| 6/17/2020 | $47.12 | 717,762 | -0.47% |
| 6/18/2020 | $49.32 | 1,489,662 | 4.56% |
| 6/19/2020 | $52.03 | 3,002,000 | 5.35% |
| 6/22/2020 | $52.32 | 1,618,614 | 0.56% |
| 6/23/2020 | $52.73 | 1,548,170 | 0.78% |
| 6/24/2020 | $52.02 | 3,281,677 | -1.36% |
| 6/25/2020 | $50.19 | 2,852,543 | -3.58% |
| 6/26/2020 | $47.93 | 15,833,850 | -4.61% |
| 6/29/2020 | $48.16 | 1,857,276 | 0.48% |
| 6/30/2020 | $48.47 | 1,744,932 | 0.64% |
| 7/1/2020 | $50.29 | 1,548,199 | 3.69% |
| 7/2/2020 | $51.61 | 1,078,762 | 2.59% |
| 7/6/2020 | $53.69 | 2,783,839 | 3.95% |
| 7/7/2020 | $57.00 | 3,052,831 | 5.98% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 7/8/2020 | $56.40 | 1,387,573 | -1.06% |
| 7/9/2020 | $56.07 | 1,234,501 | -0.59% |
| 7/10/2020 | $55.45 | 752,677 | -1.11% |
| 7/13/2020 | $52.32 | 1,264,201 | -5.81% |
| 7/14/2020 | $53.72 | 802,506 | 2.64% |
| 7/15/2020 | $55.13 | 673,086 | 2.59% |
| 7/16/2020 | $54.58 | 768,436 | -1.00% |
| 7/17/2020 | $54.97 | 895,556 | 0.71% |
| 7/20/2020 | $55.42 | 951,715 | 0.82% |
| 7/21/2020 | $44.69 | 10,727,775 | -21.52% |
| 7/22/2020 | $42.92 | 4,171,023 | -4.04% |
| 7/23/2020 | $43.75 | 2,653,988 | 1.92% |
| 7/24/2020 | $43.46 | 1,367,283 | -0.67% |
| 7/27/2020 | $44.33 | 1,529,929 | 1.98% |
| 7/28/2020 | $43.15 | 878,922 | -2.70% |
| 7/29/2020 | $42.53 | 1,107,644 | -1.45% |
| 7/30/2020 | $42.49 | 1,038,427 | -0.09% |
| 7/31/2020 | $41.57 | 1,638,572 | -2.19% |
| 8/3/2020 | $43.27 | 1,216,212 | 4.01% |
| 8/4/2020 | $43.52 | 1,718,716 | 0.58% |
| 8/5/2020 | $42.87 | 1,190,351 | -1.50% |
| 8/6/2020 | $43.63 | 2,192,941 | 1.76% |
| 8/7/2020 | $42.73 | 1,331,395 | -2.08% |
| 8/10/2020 | $41.29 | 2,548,504 | -3.43% |
| 8/11/2020 | $40.23 | 1,159,816 | -2.60% |
| 8/12/2020 | $39.86 | 2,818,871 | -0.92% |
| 8/13/2020 | $39.91 | 2,082,583 | 0.13% |
| 8/14/2020 | $39.35 | 960,012 | -1.41% |
| 8/17/2020 | $39.46 | 1,083,668 | 0.28% |
| 8/18/2020 | $39.66 | 1,075,971 | 0.51% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| **Date** | **ACAD Closing Price** | **ACAD Trading Volume** | **ACAD Logarithmic Return** |
|---|---|---|---|
| 8/19/2020 | $38.91 | 3,484,186 | -1.92% |
| 8/20/2020 | $39.27 | 1,286,710 | 0.92% |
| 8/21/2020 | $38.32 | 1,615,834 | -2.44% |
| 8/24/2020 | $38.00 | 1,306,894 | -0.84% |
| 8/25/2020 | $38.37 | 1,433,934 | 0.97% |
| 8/26/2020 | $37.67 | 1,116,169 | -1.84% |
| 8/27/2020 | $37.98 | 921,389 | 0.82% |
| 8/28/2020 | $37.98 | 687,234 | 0.00% |
| 8/31/2020 | $39.59 | 1,228,453 | 4.15% |
| 9/1/2020 | $38.08 | 995,550 | -3.89% |
| 9/2/2020 | $39.22 | 1,054,542 | 2.95% |
| 9/3/2020 | $38.39 | 950,417 | -2.14% |
| 9/4/2020 | $38.27 | 1,370,999 | -0.31% |
| 9/8/2020 | $38.20 | 945,648 | -0.18% |
| 9/9/2020 | $37.90 | 855,136 | -0.79% |
| 9/10/2020 | $36.42 | 1,017,887 | -3.98% |
| 9/11/2020 | $36.62 | 944,316 | 0.55% |
| 9/14/2020 | $38.61 | 1,200,972 | 5.29% |
| 9/15/2020 | $38.79 | 853,868 | 0.47% |
| 9/16/2020 | $39.20 | 956,999 | 1.05% |
| 9/17/2020 | $40.76 | 1,323,238 | 3.90% |
| 9/18/2020 | $42.42 | 2,420,215 | 3.99% |
| 9/21/2020 | $41.32 | 1,155,003 | -2.63% |
| 9/22/2020 | $40.97 | 925,306 | -0.85% |
| 9/23/2020 | $40.45 | 802,948 | -1.28% |
| 9/24/2020 | $38.61 | 2,245,726 | -4.66% |
| 9/25/2020 | $40.18 | 818,154 | 3.99% |
| 9/28/2020 | $40.23 | 628,358 | 0.12% |
| 9/29/2020 | $40.41 | 599,364 | 0.45% |
| 9/30/2020 | $41.25 | 878,886 | 2.06% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 10/1/2020 | $42.14 | 718,932 | 2.13% |
| 10/2/2020 | $41.36 | 1,041,011 | -1.87% |
| 10/5/2020 | $42.14 | 1,156,697 | 1.87% |
| 10/6/2020 | $41.68 | 626,387 | -1.10% |
| 10/7/2020 | $42.89 | 716,864 | 2.86% |
| 10/8/2020 | $43.18 | 629,534 | 0.67% |
| 10/9/2020 | $42.73 | 546,287 | -1.05% |
| 10/12/2020 | $43.12 | 733,510 | 0.91% |
| 10/13/2020 | $43.26 | 412,329 | 0.32% |
| 10/14/2020 | $42.92 | 541,020 | -0.79% |
| 10/15/2020 | $42.71 | 696,261 | -0.49% |
| 10/16/2020 | $42.61 | 1,499,384 | -0.23% |
| 10/19/2020 | $41.49 | 743,544 | -2.66% |
| 10/20/2020 | $41.21 | 1,025,002 | -0.68% |
| 10/21/2020 | $41.04 | 526,489 | -0.41% |
| 10/22/2020 | $42.23 | 491,531 | 2.86% |
| 10/23/2020 | $43.17 | 912,656 | 2.20% |
| 10/26/2020 | $44.87 | 1,352,316 | 3.86% |
| 10/27/2020 | $46.36 | 2,209,977 | 3.27% |
| 10/28/2020 | $46.42 | 2,093,190 | 0.13% |
| 10/29/2020 | $47.35 | 1,002,902 | 1.98% |
| 10/30/2020 | $46.45 | 1,313,309 | -1.92% |
| 11/2/2020 | $45.64 | 1,295,918 | -1.76% |
| 11/3/2020 | $46.60 | 765,262 | 2.08% |
| 11/4/2020 | $49.13 | 1,848,451 | 5.29% |
| 11/5/2020 | $48.56 | 1,569,884 | -1.17% |
| 11/6/2020 | $50.19 | 961,515 | 3.30% |
| 11/9/2020 | $50.03 | 1,067,472 | -0.32% |
| 11/10/2020 | $49.01 | 1,143,202 | -2.06% |
| 11/11/2020 | $49.07 | 775,409 | 0.12% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 11/12/2020 | $50.61 | 754,196 | 3.09% |
| 11/13/2020 | $51.57 | 569,819 | 1.88% |
| 11/16/2020 | $54.63 | 1,787,716 | 5.76% |
| 11/17/2020 | $55.29 | 1,284,866 | 1.20% |
| 11/18/2020 | $53.82 | 1,038,154 | -2.69% |
| 11/19/2020 | $53.61 | 774,323 | -0.39% |
| 11/20/2020 | $53.57 | 929,535 | -0.07% |
| 11/23/2020 | $53.84 | 641,497 | 0.50% |
| 11/24/2020 | $54.72 | 1,109,407 | 1.62% |
| 11/25/2020 | $55.86 | 1,268,509 | 2.06% |
| 11/27/2020 | $56.00 | 493,899 | 0.25% |
| 11/30/2020 | $56.66 | 1,177,465 | 1.17% |
| 12/1/2020 | $56.79 | 922,232 | 0.23% |
| 12/2/2020 | $54.73 | 952,253 | -3.69% |
| 12/3/2020 | $53.28 | 1,084,765 | -2.69% |
| 12/4/2020 | $54.24 | 721,829 | 1.79% |
| 12/7/2020 | $53.38 | 1,015,840 | -1.60% |
| 12/8/2020 | $54.06 | 1,154,264 | 1.27% |
| 12/9/2020 | $52.33 | 886,477 | -3.25% |
| 12/10/2020 | $52.57 | 651,777 | 0.46% |
| 12/11/2020 | $51.26 | 1,018,301 | -2.52% |
| 12/14/2020 | $52.13 | 980,126 | 1.68% |
| 12/15/2020 | $52.57 | 640,721 | 0.84% |
| 12/16/2020 | $53.08 | 939,126 | 0.97% |
| 12/17/2020 | $55.21 | 1,032,045 | 3.93% |
| 12/18/2020 | $55.25 | 1,930,710 | 0.07% |
| 12/21/2020 | $56.69 | 1,181,740 | 2.57% |
| 12/22/2020 | $55.59 | 864,722 | -1.96% |
| 12/23/2020 | $55.09 | 936,382 | -0.90% |
| 12/24/2020 | $55.01 | 247,214 | -0.15% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 12/28/2020 | $53.17 | 901,141 | -3.40% |
| 12/29/2020 | $53.78 | 744,067 | 1.14% |
| 12/30/2020 | $53.69 | 605,981 | -0.17% |
| 12/31/2020 | $53.46 | 518,994 | -0.43% |
| 1/4/2021 | $52.81 | 616,737 | -1.22% |
| 1/5/2021 | $52.03 | 900,905 | -1.49% |
| 1/6/2021 | $53.79 | 1,384,996 | 3.33% |
| 1/7/2021 | $54.99 | 913,922 | 2.21% |
| 1/8/2021 | $53.13 | 1,051,725 | -3.44% |
| 1/11/2021 | $54.42 | 885,708 | 2.40% |
| 1/12/2021 | $53.57 | 702,934 | -1.57% |
| 1/13/2021 | $53.31 | 627,271 | -0.49% |
| 1/14/2021 | $54.46 | 552,897 | 2.13% |
| 1/15/2021 | $53.66 | 752,961 | -1.48% |
| 1/19/2021 | $53.37 | 682,150 | -0.54% |
| 1/20/2021 | $53.34 | 789,712 | -0.06% |
| 1/21/2021 | $52.01 | 645,313 | -2.53% |
| 1/22/2021 | $52.83 | 560,731 | 1.56% |
| 1/25/2021 | $53.95 | 1,109,848 | 2.10% |
| 1/26/2021 | $51.61 | 987,380 | -4.43% |
| 1/27/2021 | $48.61 | 1,549,369 | -5.99% |
| 1/28/2021 | $49.54 | 1,381,836 | 1.90% |
| 1/29/2021 | $48.05 | 958,910 | -3.05% |
| 2/1/2021 | $46.58 | 1,658,973 | -3.11% |
| 2/2/2021 | $49.43 | 1,439,138 | 5.94% |
| 2/3/2021 | $49.32 | 1,118,539 | -0.22% |
| 2/4/2021 | $51.07 | 573,577 | 3.49% |
| 2/5/2021 | $51.70 | 795,653 | 1.23% |
| 2/8/2021 | $51.28 | 754,251 | -0.82% |
| 2/9/2021 | $50.45 | 779,700 | -1.63% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| Date | ACAD Closing Price | ACAD Trading Volume | ACAD Logarithmic Return |
|---|---|---|---|
| 2/10/2021 | $51.63 | 882,650 | 2.31% |
| 2/11/2021 | $51.24 | 660,686 | -0.76% |
| 2/12/2021 | $50.13 | 718,174 | -2.19% |
| 2/16/2021 | $49.12 | 1,029,362 | -2.04% |
| 2/17/2021 | $50.07 | 791,262 | 1.92% |
| 2/18/2021 | $50.42 | 651,333 | 0.70% |
| 2/19/2021 | $51.73 | 527,135 | 2.57% |
| 2/22/2021 | $50.18 | 650,003 | -3.04% |
| 2/23/2021 | $49.74 | 919,035 | -0.88% |
| 2/24/2021 | $48.69 | 1,012,608 | -2.13% |
| 2/25/2021 | $47.31 | 1,181,242 | -2.88% |
| 2/26/2021 | $48.97 | 987,486 | 3.45% |
| 3/1/2021 | $49.56 | 813,213 | 1.20% |
| 3/2/2021 | $46.94 | 788,684 | -5.43% |
| 3/3/2021 | $47.44 | 1,611,626 | 1.06% |
| 3/4/2021 | $45.82 | 1,181,692 | -3.47% |
| 3/5/2021 | $48.98 | 1,713,691 | 6.67% |
| 3/8/2021 | $45.78 | 2,834,898 | -6.76% |
| 3/9/2021 | $25.02 | 24,183,937 | -60.42% |
| 3/10/2021 | $26.89 | 11,621,994 | 7.21% |
| 3/11/2021 | $26.75 | 4,974,058 | -0.52% |
| 3/12/2021 | $27.04 | 2,753,665 | 1.08% |
| 3/15/2021 | $29.99 | 4,525,353 | 10.35% |
| 3/16/2021 | $27.34 | 4,498,575 | -9.25% |
| 3/17/2021 | $27.55 | 2,351,513 | 0.77% |
| 3/18/2021 | $27.05 | 1,752,157 | -1.83% |
| 3/19/2021 | $27.75 | 2,877,083 | 2.55% |
| 3/22/2021 | $27.00 | 1,701,129 | -2.74% |
| 3/23/2021 | $25.88 | 2,512,321 | -4.24% |
| 3/24/2021 | $25.34 | 1,506,639 | -2.11% |

**Exhibit-4**

**Acadia Stock Prices, Volume, and Returns**

6 September 2019 through 5 April 2021

| **Date** | **ACAD Closing Price** | **ACAD Trading Volume** | **ACAD Logarithmic Return** |
|---|---|---|---|
| 3/25/2021 | $26.02 | 1,492,427 | 2.65% |
| 3/26/2021 | $25.86 | 1,380,823 | -0.62% |
| 3/29/2021 | $25.30 | 1,493,178 | -2.19% |
| 3/30/2021 | $25.71 | 1,034,338 | 1.61% |
| 3/31/2021 | $25.80 | 1,817,872 | 0.35% |
| 4/1/2021 | $25.59 | 1,502,216 | -0.82% |
| 4/5/2021 | $21.18 | 11,594,084 | -18.91% |

**Sources:** CRSP and computations performed by Crowninshield Financial Research, Inc.

## Exhibit-5

## Market and Sector Logarithmic Returns

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 9/9/2019 | 0.06% | -0.82% |
| 9/10/2019 | 0.12% | 1.22% |
| 9/11/2019 | 0.81% | 1.70% |
| 9/12/2019 | 0.24% | -0.55% |
| 9/13/2019 | -0.04% | 0.14% |
| 9/16/2019 | -0.13% | 0.73% |
| 9/17/2019 | 0.22% | 0.10% |
| 9/18/2019 | -0.07% | -0.83% |
| 9/19/2019 | -0.01% | 0.32% |
| 9/20/2019 | -0.41% | 0.82% |
| 9/23/2019 | -0.01% | -0.91% |
| 9/24/2019 | -0.92% | -2.09% |
| 9/25/2019 | 0.56% | -0.26% |
| 9/26/2019 | -0.31% | -1.97% |
| 9/27/2019 | -0.57% | -0.81% |
| 9/30/2019 | 0.44% | 0.35% |
| 10/1/2019 | -1.26% | -1.67% |
| 10/2/2019 | -1.63% | -0.81% |
| 10/3/2019 | 0.76% | 1.69% |
| 10/4/2019 | 1.26% | 0.81% |
| 10/7/2019 | -0.39% | -0.16% |
| 10/8/2019 | -1.52% | -2.03% |
| 10/9/2019 | 0.83% | 0.22% |
| 10/10/2019 | 0.56% | 1.33% |
| 10/11/2019 | 1.13% | 1.25% |
| 10/14/2019 | -0.16% | 0.39% |
| 10/15/2019 | 0.91% | 1.82% |
| 10/16/2019 | -0.19% | -0.18% |
| 10/17/2019 | 0.37% | 0.76% |
| 10/18/2019 | -0.37% | -0.77% |
| 10/21/2019 | 0.66% | 1.47% |

# Exhibit-5

## Market and Sector Logarithmic Returns

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 10/22/2019 | -0.33% | 1.44% |
| 10/23/2019 | 0.24% | 0.27% |
| 10/24/2019 | 0.23% | 0.07% |
| 10/25/2019 | 0.41% | -0.17% |
| 10/28/2019 | 0.52% | 1.40% |
| 10/29/2019 | -0.06% | 0.49% |
| 10/30/2019 | 0.28% | 0.05% |
| 10/31/2019 | -0.35% | -0.30% |
| 11/1/2019 | 1.02% | 2.32% |
| 11/4/2019 | 0.38% | -0.31% |
| 11/5/2019 | -0.11% | 0.01% |
| 11/6/2019 | -0.03% | -1.08% |
| 11/7/2019 | 0.28% | 0.02% |
| 11/8/2019 | 0.26% | 1.97% |
| 11/11/2019 | -0.16% | -0.47% |
| 11/12/2019 | 0.11% | 0.40% |
| 11/13/2019 | 0.03% | 0.09% |
| 11/14/2019 | 0.10% | -0.54% |
| 11/15/2019 | 0.70% | 1.47% |
| 11/18/2019 | 0.01% | -0.17% |
| 11/19/2019 | 0.00% | 1.82% |
| 11/20/2019 | -0.30% | 0.58% |
| 11/21/2019 | -0.17% | 0.24% |
| 11/22/2019 | 0.20% | 0.87% |
| 11/25/2019 | 0.85% | 2.53% |
| 11/26/2019 | 0.22% | 0.16% |
| 11/27/2019 | 0.43% | 0.76% |
| 11/29/2019 | -0.41% | 0.25% |
| 12/2/2019 | -0.86% | -1.03% |
| 12/3/2019 | -0.57% | 0.78% |
| 12/4/2019 | 0.60% | 0.97% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 12/5/2019 | 0.11% | -1.54% |
| 12/6/2019 | 0.84% | 1.09% |
| 12/9/2019 | -0.27% | -0.49% |
| 12/10/2019 | -0.07% | 0.76% |
| 12/11/2019 | 0.27% | -0.63% |
| 12/12/2019 | 0.78% | 0.82% |
| 12/13/2019 | 0.00% | 0.05% |
| 12/16/2019 | 0.70% | 0.94% |
| 12/17/2019 | 0.05% | -0.45% |
| 12/18/2019 | 0.02% | -0.37% |
| 12/19/2019 | 0.42% | 0.51% |
| 12/20/2019 | 0.45% | 0.71% |
| 12/23/2019 | 0.10% | 0.73% |
| 12/24/2019 | 0.04% | 0.52% |
| 12/26/2019 | 0.46% | -0.71% |
| 12/27/2019 | -0.06% | -0.92% |
| 12/30/2019 | -0.51% | -1.12% |
| 12/31/2019 | 0.30% | 0.37% |
| 1/2/2020 | 0.74% | -0.60% |
| 1/3/2020 | -0.58% | -1.27% |
| 1/6/2020 | 0.33% | 0.71% |
| 1/7/2020 | -0.21% | 0.06% |
| 1/8/2020 | 0.40% | 0.86% |
| 1/9/2020 | 0.58% | 0.54% |
| 1/10/2020 | -0.26% | -0.35% |
| 1/13/2020 | 0.71% | -1.14% |
| 1/14/2020 | -0.04% | 1.73% |
| 1/15/2020 | 0.19% | 0.43% |
| 1/16/2020 | 0.84% | 0.42% |
| 1/17/2020 | 0.25% | -0.33% |
| 1/21/2020 | -0.30% | -0.99% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 1/22/2020 | 0.04% | -0.13% |
| 1/23/2020 | 0.10% | -0.72% |
| 1/24/2020 | -0.89% | -2.33% |
| 1/27/2020 | -1.50% | -0.69% |
| 1/28/2020 | 0.96% | 1.19% |
| 1/29/2020 | -0.12% | -0.08% |
| 1/30/2020 | 0.28% | -1.47% |
| 1/31/2020 | -1.68% | -1.59% |
| 2/3/2020 | 0.75% | 1.83% |
| 2/4/2020 | 1.47% | 2.35% |
| 2/5/2020 | 0.93% | 2.50% |
| 2/6/2020 | 0.26% | 0.66% |
| 2/7/2020 | -0.55% | -0.78% |
| 2/10/2020 | 0.67% | 1.02% |
| 2/11/2020 | 0.34% | -0.09% |
| 2/12/2020 | 0.64% | 0.18% |
| 2/13/2020 | -0.08% | -0.78% |
| 2/14/2020 | 0.17% | 0.35% |
| 2/18/2020 | -0.19% | 0.19% |
| 2/19/2020 | 0.52% | 0.76% |
| 2/20/2020 | -0.26% | -0.28% |
| 2/21/2020 | -0.98% | -0.09% |
| 2/24/2020 | -3.23% | -2.66% |
| 2/25/2020 | -2.99% | -2.35% |
| 2/26/2020 | -0.54% | 1.24% |
| 2/27/2020 | -4.19% | -4.22% |
| 2/28/2020 | -0.86% | 0.47% |
| 3/2/2020 | 3.95% | 4.48% |
| 3/3/2020 | -2.49% | -2.51% |
| 3/4/2020 | 3.69% | 4.44% |
| 3/5/2020 | -3.20% | -1.73% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 3/6/2020 | -1.79% | -1.20% |
| 3/9/2020 | -8.26% | -7.09% |
| 3/10/2020 | 4.34% | 2.10% |
| 3/11/2020 | -5.12% | -4.97% |
| 3/12/2020 | -10.19% | -9.15% |
| 3/13/2020 | 8.20% | 6.87% |
| 3/16/2020 | -12.58% | -10.15% |
| 3/17/2020 | 5.17% | 6.71% |
| 3/18/2020 | -6.15% | -2.42% |
| 3/19/2020 | 1.42% | 2.61% |
| 3/20/2020 | -3.79% | -2.85% |
| 3/23/2020 | -2.72% | -0.96% |
| 3/24/2020 | 8.76% | 5.59% |
| 3/25/2020 | 1.62% | -1.00% |
| 3/26/2020 | 5.59% | 5.10% |
| 3/27/2020 | -3.36% | -2.42% |
| 3/30/2020 | 2.86% | 4.04% |
| 3/31/2020 | -1.24% | -0.96% |
| 4/1/2020 | -4.61% | -4.03% |
| 4/2/2020 | 1.93% | 3.75% |
| 4/3/2020 | -1.59% | -1.19% |
| 4/6/2020 | 6.57% | 4.97% |
| 4/7/2020 | 0.05% | -1.89% |
| 4/8/2020 | 3.33% | 2.88% |
| 4/9/2020 | 1.81% | 0.87% |
| 4/13/2020 | -1.02% | 0.53% |
| 4/14/2020 | 2.78% | 3.47% |
| 4/15/2020 | -2.33% | -2.38% |
| 4/16/2020 | 0.42% | 2.96% |
| 4/17/2020 | 2.73% | 4.37% |
| 4/20/2020 | -1.57% | 1.45% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 4/21/2020 | -2.96% | -3.22% |
| 4/22/2020 | 2.16% | 0.82% |
| 4/23/2020 | 0.12% | -0.07% |
| 4/24/2020 | 1.30% | 2.19% |
| 4/27/2020 | 1.74% | 1.10% |
| 4/28/2020 | -0.23% | -2.20% |
| 4/29/2020 | 2.85% | 0.81% |
| 4/30/2020 | -1.32% | -1.19% |
| 5/1/2020 | -2.84% | -2.52% |
| 5/4/2020 | 0.48% | 2.79% |
| 5/5/2020 | 0.87% | 1.95% |
| 5/6/2020 | -0.59% | 0.09% |
| 5/7/2020 | 1.32% | 0.22% |
| 5/8/2020 | 1.84% | 0.82% |
| 5/11/2020 | -0.04% | 4.12% |
| 5/12/2020 | -2.06% | -1.94% |
| 5/13/2020 | -1.92% | -1.18% |
| 5/14/2020 | 1.02% | -0.43% |
| 5/15/2020 | 0.52% | 2.32% |
| 5/18/2020 | 3.28% | 1.20% |
| 5/19/2020 | -0.98% | -2.00% |
| 5/20/2020 | 1.72% | 2.08% |
| 5/21/2020 | -0.67% | -1.12% |
| 5/22/2020 | 0.27% | 0.84% |
| 5/26/2020 | 1.41% | -1.95% |
| 5/27/2020 | 1.49% | 0.79% |
| 5/28/2020 | -0.35% | 0.24% |
| 5/29/2020 | 0.47% | 1.89% |
| 6/1/2020 | 0.66% | -0.51% |
| 6/2/2020 | 0.84% | 0.30% |
| 6/3/2020 | 1.48% | -1.23% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 6/4/2020 | -0.30% | -1.01% |
| 6/5/2020 | 2.47% | 0.07% |
| 6/8/2020 | 1.41% | 1.21% |
| 6/9/2020 | -0.96% | -0.24% |
| 6/10/2020 | -0.67% | 0.37% |
| 6/11/2020 | -6.00% | -4.62% |
| 6/12/2020 | 1.40% | 0.71% |
| 6/15/2020 | 1.06% | 1.82% |
| 6/16/2020 | 1.75% | 1.50% |
| 6/17/2020 | -0.41% | 0.42% |
| 6/18/2020 | 0.12% | 0.41% |
| 6/19/2020 | -0.46% | 3.27% |
| 6/22/2020 | 0.67% | 0.09% |
| 6/23/2020 | 0.39% | 0.48% |
| 6/24/2020 | -2.61% | -1.93% |
| 6/25/2020 | 1.12% | 1.46% |
| 6/26/2020 | -2.31% | -2.15% |
| 6/29/2020 | 1.44% | -0.37% |
| 6/30/2020 | 1.46% | 1.65% |
| 7/1/2020 | 0.40% | 0.44% |
| 7/2/2020 | 0.50% | 0.74% |
| 7/6/2020 | 1.48% | 0.61% |
| 7/7/2020 | -1.03% | 0.51% |
| 7/8/2020 | 0.84% | 0.49% |
| 7/9/2020 | -0.57% | -0.24% |
| 7/10/2020 | 1.03% | -0.90% |
| 7/13/2020 | -1.13% | -1.41% |
| 7/14/2020 | 1.32% | 2.27% |
| 7/15/2020 | 1.17% | 1.56% |
| 7/16/2020 | -0.40% | -0.86% |
| 7/17/2020 | 0.36% | 1.89% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 7/20/2020 | 0.85% | 1.19% |
| 7/21/2020 | 0.23% | -2.19% |
| 7/22/2020 | 0.51% | -0.22% |
| 7/23/2020 | -1.10% | -1.92% |
| 7/24/2020 | -0.70% | -2.17% |
| 7/27/2020 | 0.90% | 2.68% |
| 7/28/2020 | -0.70% | -1.48% |
| 7/29/2020 | 1.33% | -0.96% |
| 7/30/2020 | -0.38% | 0.29% |
| 7/31/2020 | 0.45% | -1.94% |
| 8/3/2020 | 0.87% | 3.09% |
| 8/4/2020 | 0.45% | -0.79% |
| 8/5/2020 | 0.75% | -0.14% |
| 8/6/2020 | 0.46% | -0.49% |
| 8/7/2020 | 0.02% | -0.35% |
| 8/10/2020 | 0.26% | -1.07% |
| 8/11/2020 | -0.80% | -2.23% |
| 8/12/2020 | 1.29% | 1.50% |
| 8/13/2020 | -0.06% | 0.26% |
| 8/14/2020 | -0.07% | -0.60% |
| 8/17/2020 | 0.50% | 2.05% |
| 8/18/2020 | 0.14% | -0.59% |
| 8/19/2020 | -0.44% | -1.16% |
| 8/20/2020 | 0.28% | -0.28% |
| 8/21/2020 | 0.16% | -0.58% |
| 8/24/2020 | 0.89% | -1.18% |
| 8/25/2020 | 0.34% | 1.64% |
| 8/26/2020 | 0.87% | -0.25% |
| 8/27/2020 | 0.17% | -0.04% |
| 8/28/2020 | 0.69% | 0.20% |
| 8/31/2020 | -0.16% | 2.00% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 9/1/2020 | 0.85% | -1.90% |
| 9/2/2020 | 1.20% | 1.46% |
| 9/3/2020 | -3.46% | -3.77% |
| 9/4/2020 | -0.81% | -0.60% |
| 9/8/2020 | -2.72% | -1.88% |
| 9/9/2020 | 1.96% | 1.90% |
| 9/10/2020 | -1.57% | -1.79% |
| 9/11/2020 | -0.02% | 0.63% |
| 9/14/2020 | 1.53% | 5.23% |
| 9/15/2020 | 0.54% | 1.10% |
| 9/16/2020 | -0.32% | 0.03% |
| 9/17/2020 | -0.79% | -0.41% |
| 9/18/2020 | -0.89% | 0.38% |
| 9/21/2020 | -1.26% | -2.50% |
| 9/22/2020 | 0.93% | 0.84% |
| 9/23/2020 | -2.43% | -1.39% |
| 9/24/2020 | 0.20% | -0.97% |
| 9/25/2020 | 1.56% | 2.14% |
| 9/28/2020 | 1.64% | 0.69% |
| 9/29/2020 | -0.40% | 0.15% |
| 9/30/2020 | 0.69% | 0.54% |
| 10/1/2020 | 0.78% | 0.93% |
| 10/2/2020 | -0.78% | -2.22% |
| 10/5/2020 | 1.81% | 4.32% |
| 10/6/2020 | -1.20% | -1.18% |
| 10/7/2020 | 1.69% | 2.17% |
| 10/8/2020 | 0.85% | 0.26% |
| 10/9/2020 | 0.85% | 0.81% |
| 10/12/2020 | 1.34% | 0.72% |
| 10/13/2020 | -0.50% | 0.49% |
| 10/14/2020 | -0.60% | -1.29% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 10/15/2020 | -0.08% | -2.37% |
| 10/16/2020 | -0.07% | 0.50% |
| 10/19/2020 | -1.43% | -1.82% |
| 10/20/2020 | 0.38% | -0.58% |
| 10/21/2020 | -0.34% | -1.62% |
| 10/22/2020 | 0.61% | 1.32% |
| 10/23/2020 | 0.38% | 0.25% |
| 10/26/2020 | -1.83% | -0.96% |
| 10/27/2020 | -0.30% | 0.50% |
| 10/28/2020 | -3.34% | -2.59% |
| 10/29/2020 | 1.04% | 0.60% |
| 10/30/2020 | -1.32% | -2.16% |
| 11/2/2020 | 1.20% | 0.12% |
| 11/3/2020 | 1.86% | 1.66% |
| 11/4/2020 | 1.94% | 6.02% |
| 11/5/2020 | 2.09% | -0.11% |
| 11/6/2020 | 0.00% | -1.61% |
| 11/9/2020 | 1.06% | -0.73% |
| 11/10/2020 | -0.06% | 0.21% |
| 11/11/2020 | 0.80% | 1.19% |
| 11/12/2020 | -0.97% | -0.03% |
| 11/13/2020 | 1.32% | 1.24% |
| 11/16/2020 | 1.23% | -0.05% |
| 11/17/2020 | -0.15% | -0.45% |
| 11/18/2020 | -0.91% | -1.95% |
| 11/19/2020 | 0.58% | 0.15% |
| 11/20/2020 | -0.43% | 0.62% |
| 11/23/2020 | 0.79% | 0.24% |
| 11/24/2020 | 1.50% | -0.68% |
| 11/25/2020 | 0.02% | 0.52% |
| 11/27/2020 | 0.40% | 3.09% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 11/30/2020 | -0.58% | 1.08% |
| 12/1/2020 | 0.96% | 0.37% |
| 12/2/2020 | 0.12% | -0.25% |
| 12/3/2020 | 0.23% | 0.93% |
| 12/4/2020 | 1.04% | 0.99% |
| 12/7/2020 | -0.02% | -0.02% |
| 12/8/2020 | 0.43% | 1.71% |
| 12/9/2020 | -0.96% | -1.77% |
| 12/10/2020 | 0.26% | 1.48% |
| 12/11/2020 | -0.23% | 0.23% |
| 12/14/2020 | -0.33% | 2.39% |
| 12/15/2020 | 1.30% | 0.08% |
| 12/16/2020 | 0.14% | -0.64% |
| 12/17/2020 | 0.79% | 1.36% |
| 12/18/2020 | -0.21% | 0.41% |
| 12/21/2020 | -0.29% | 0.45% |
| 12/22/2020 | 0.06% | 0.29% |
| 12/23/2020 | 0.14% | 0.31% |
| 12/24/2020 | 0.23% | -0.78% |
| 12/28/2020 | 0.38% | -1.54% |
| 12/29/2020 | -0.37% | -1.21% |
| 12/30/2020 | 0.33% | 0.46% |
| 12/31/2020 | 0.36% | -0.67% |
| 1/4/2021 | -1.32% | -0.59% |
| 1/5/2021 | 0.90% | 0.16% |
| 1/6/2021 | 0.80% | 1.28% |
| 1/7/2021 | 1.61% | 2.88% |
| 1/8/2021 | 0.47% | 0.64% |
| 1/11/2021 | -0.57% | -0.16% |
| 1/12/2021 | 0.42% | 0.25% |
| 1/13/2021 | 0.09% | -0.22% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 1/14/2021 | 0.00% | 2.41% |
| 1/15/2021 | -0.86% | -0.07% |
| 1/19/2021 | 0.85% | 1.91% |
| 1/20/2021 | 1.20% | 0.25% |
| 1/21/2021 | -0.09% | -1.04% |
| 1/22/2021 | -0.15% | 0.91% |
| 1/25/2021 | 0.24% | 1.71% |
| 1/26/2021 | -0.29% | -1.79% |
| 1/27/2021 | -2.51% | -3.02% |
| 1/28/2021 | 0.92% | 0.34% |
| 1/29/2021 | -1.78% | 0.33% |
| 2/1/2021 | 1.71% | 1.19% |
| 2/2/2021 | 1.39% | 1.03% |
| 2/3/2021 | 0.14% | -0.34% |
| 2/4/2021 | 1.12% | 1.43% |
| 2/5/2021 | 0.61% | 1.66% |
| 2/8/2021 | 0.97% | 2.10% |
| 2/9/2021 | 0.10% | -0.61% |
| 2/10/2021 | -0.03% | -0.86% |
| 2/11/2021 | 0.19% | -0.19% |
| 2/12/2021 | 0.47% | 0.51% |
| 2/16/2021 | -0.11% | -2.18% |
| 2/17/2021 | -0.23% | 0.41% |
| 2/18/2021 | -0.66% | -1.88% |
| 2/19/2021 | 0.27% | 1.03% |
| 2/22/2021 | -0.97% | -2.44% |
| 2/23/2021 | -0.13% | -1.44% |
| 2/24/2021 | 1.12% | 0.88% |
| 2/25/2021 | -2.70% | -2.59% |
| 2/26/2021 | -0.39% | -0.05% |
| 3/1/2021 | 2.45% | 1.61% |

**Exhibit-5**

**Market and Sector Logarithmic Returns**

9 September 2019 through 5 April 2021

| Date | Market Index Return | Sector Index Return |
|---|---|---|
| 3/2/2021 | -0.91% | -1.99% |
| 3/3/2021 | -1.48% | -3.71% |
| 3/4/2021 | -1.68% | -2.45% |
| 3/5/2021 | 1.72% | 1.94% |
| 3/8/2021 | -0.59% | -1.94% |
| 3/9/2021 | 1.67% | 3.21% |
| 3/10/2021 | 0.68% | 0.04% |
| 3/11/2021 | 1.41% | 2.78% |
| 3/12/2021 | 0.15% | -0.61% |
| 3/15/2021 | 0.70% | 1.46% |
| 3/16/2021 | -0.43% | 0.03% |
| 3/17/2021 | 0.36% | 0.63% |
| 3/18/2021 | -1.81% | -3.27% |
| 3/19/2021 | 0.18% | 1.72% |
| 3/22/2021 | 0.48% | 1.36% |
| 3/23/2021 | -1.21% | -4.02% |
| 3/24/2021 | -0.91% | -2.97% |
| 3/25/2021 | 0.65% | 1.11% |
| 3/26/2021 | 1.52% | 0.27% |
| 3/29/2021 | -0.53% | -1.39% |
| 3/30/2021 | 0.00% | -0.36% |
| 3/31/2021 | 0.56% | 2.52% |
| 4/1/2021 | 1.27% | 0.84% |
| 4/5/2021 | 1.14% | 0.51% |

**Sources:** CRSP (Market Index), Nasdaq (Sector Index), and computations performed by Crowninshield Financial Research, Inc.

**Exhibit-6**

**Acadia Stock Regression Results**

Estimation Period: 9 September 2019 through 4 April 2021

| Regression Statistics | |
|---|---|
| R Squared | 0.775 |
| Adjusted R Squared | 0.771 |
| Standard Error | 2.47% |
| Observations | 395 |

| | Coefficient | Standard Error | *t*-statistic |
|---|---|---|---|
| Intercept | -0.04% | 0.13% | -0.33 |
| Market Index | -0.006 | 0.117 | -0.05 |
| Sector Index | 1.034 | 0.111 | 9.32 |

**Source:** Computations performed by Crowninshield Financial Research, Inc.
**Note:** Dummy variables were used to control for potentially abnormal return event dates: 9/9/2019, 12/5/2019, 7/21/2020, and 3/9/2021.

**Exhibit-7**

**Acadia Stock Event Study Results**

| Date | ACAD Closing Price | ACAD Prior Day Closing Price | ACAD Logarithmic Return | Market Index Logarithmic Return | Sector Index Logarithmic Return | ACAD Explained Return | ACAD Residual Return | *t*-statistic | Dollar Residual Return |
|---|---|---|---|---|---|---|---|---|---|
| 9/9/2019 | $38.85 | $23.80 | 49.00% | 0.06% | -0.82% | -0.88% | 49.89% | 20.17 *** | $15.40 |
| 12/5/2019 | $50.48 | $44.28 | 13.10% | 0.11% | -1.54% | -1.63% | 14.74% | 5.96 *** | $7.03 |
| 7/21/2020 | $44.69 | $55.42 | -21.52% | 0.23% | -2.19% | -2.31% | -19.21% | -7.77 *** | ($9.69) |
| 3/9/2021 | $25.02 | $45.78 | -60.42% | 1.67% | 3.21% | 3.27% | -63.69% | -25.75 *** | ($21.57) |
| 3/10/2021 | $26.89 | $25.02 | 7.21% | 0.68% | 0.04% | -0.00% | 7.21% | 2.91 *** | $1.87 |
| 4/5/2021 | $21.18 | $25.59 | -18.91% | 1.14% | 0.51% | 0.48% | -19.40% | -7.84 *** | ($4.51) |

**Sources:** CRSP, Nasdaq, and computations performed by Crowninshield Financial Research, Inc.

**Note:** "***" Statistically significant at the 99% confidence level.

**Exhibit-8**

**Acadia Closing Prices**

90 Days: 5 April 2021 through 2 July 2021

| Date | ACAD Closing Price |
|---|---|
| 4/5/2021 | $21.18 |
| 4/6/2021 | $20.64 |
| 4/7/2021 | $21.23 |
| 4/8/2021 | $20.68 |
| 4/9/2021 | $20.39 |
| 4/12/2021 | $20.43 |
| 4/13/2021 | $20.60 |
| 4/14/2021 | $21.28 |
| 4/15/2021 | $21.20 |
| 4/16/2021 | $21.15 |
| 4/19/2021 | $20.72 |
| 4/20/2021 | $20.80 |
| 4/21/2021 | $21.47 |
| 4/22/2021 | $20.87 |
| 4/23/2021 | $20.50 |
| 4/26/2021 | $21.35 |
| 4/27/2021 | $21.05 |
| 4/28/2021 | $20.77 |
| 4/29/2021 | $20.59 |
| 4/30/2021 | $20.56 |
| 5/3/2021 | $20.25 |
| 5/4/2021 | $19.52 |
| 5/5/2021 | $19.40 |
| 5/6/2021 | $20.95 |
| 5/7/2021 | $21.07 |
| 5/10/2021 | $21.02 |
| 5/11/2021 | $20.84 |
| 5/12/2021 | $21.83 |
| 5/13/2021 | $21.22 |
| 5/14/2021 | $21.77 |
| 5/17/2021 | $21.23 |

**Exhibit-8**

**Acadia Closing Prices**

90 Days: 5 April 2021 through 2 July 2021

| Date | ACAD Closing Price |
|---|---|
| 5/18/2021 | $21.39 |
| 5/19/2021 | $20.72 |
| 5/20/2021 | $21.58 |
| 5/21/2021 | $21.94 |
| 5/24/2021 | $21.32 |
| 5/25/2021 | $21.28 |
| 5/26/2021 | $21.71 |
| 5/27/2021 | $22.04 |
| 5/28/2021 | $22.34 |
| 6/1/2021 | $22.35 |
| 6/2/2021 | $22.62 |
| 6/3/2021 | $23.31 |
| 6/4/2021 | $23.69 |
| 6/7/2021 | $25.40 |
| 6/8/2021 | $26.57 |
| 6/9/2021 | $26.13 |
| 6/10/2021 | $27.30 |
| 6/11/2021 | $27.42 |
| 6/14/2021 | $27.24 |
| 6/15/2021 | $26.27 |
| 6/16/2021 | $25.90 |
| 6/17/2021 | $25.85 |
| 6/18/2021 | $26.03 |
| 6/21/2021 | $25.01 |
| 6/22/2021 | $24.88 |
| 6/23/2021 | $24.52 |
| 6/24/2021 | $25.01 |
| 6/25/2021 | $26.17 |
| 6/28/2021 | $25.33 |
| 6/29/2021 | $24.13 |
| 6/30/2021 | $24.39 |
| 7/1/2021 | $24.77 |
| 7/2/2021 | $24.30 |

**Source:** CRSP.

**Exhibit-9**

**Acadia Stock Artificial Inflation Ribbon**

| Date | Inflation |
|---|---|
| 9/9/2019 - 12/4/2019 | $5.01 |
| 12/5/2019 - 3/8/2021 | $22.43 |
| 3/9/2021 - 4/4/2021 | $2.74 |
| 4/5/2021 and thereafter | $0.00 |

**Source:** Computations performed by Crowninshield Financial Research, Inc.