John T. Jasnoch (SBN 281605)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff City of*
*Birmingham Retirement and Relief System*
*and the Certified Class*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic,<br><br>Defendants. | No. 3:21-cv-00762-WQH-MSB<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. William Q. Hayes |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND.................................................................................2

    A.    The Key Undisputed Material Facts ........................................................2

    B.    The Disputed Material Facts...................................................................4

        1.    Consistency Across Subgroups Was the Theory of Harmony ....................................................................................5

        2.    Defendants Knew FDA Was Looking for "Consistency" or "Alignment" Across the Subgroup Efficacy Data. ...............6

        3.    Harmony's Subgroups Were Not Directionally Consistent ...................................................................................8

        4.    Inconsistent Subgroup Efficacy Was a Known Risk.................8

        5.    Defendants Deliberately Concealed the Importance of Harmony's Subgroup Data ........................................................11

        6.    Acadia Also Concealed the Full Contents of the CRL.............13

        7.    Defendants Davis and Stankovic Monetized their Fraud.........13

LEGAL STANDARD ..........................................................................................14

ARGUMENT.......................................................................................................14

I.    A JURY MUST DECIDE IF DEFENDANTS MISLED INVESTORS ......14

    A.    The Evidence Shows Defendants Made Misstatements .....................14

        1.    Defendants Misled Investors About the FDA Agreement .......15

        2.    Defendants Also Misled Investors About the Strength of the Data Supporting the sNDA.................................................17

    B.    A Battle of the Experts Also Precludes Summary Judgment.............19

    C.    Defendants' Remaining Falsity Arguments Are Meritless.................20

II.    A JURY MUST DECIDE IF DEFENDANTS ACTED WITH SCIENTER .........................................................................................................24

    A.    Evidence of Defendants' Actual Knowledge or Deliberate Recklessness Is Extensive..................................................................25

        1.    Defendants Knew the Terms of the FDA Agreement and the Risk of Inconsistent Subgroup Data .................................25

        2.    Defendants' Concealment of Key Facts Supports Scienter .....27

21cv00762

3.   Defendants' Argument About the 019 Misstatements Fails........................................................................27

B.   Davis and Stankovic Had Motive to Commit the Fraud ....................28

III.   A JURY MUST DECIDE IF THE FRAUD CAUSED LOSSES.................29

A.   The Evidence Shows the Fraud Caused Losses...................................29

B.   Defendants' Loss Causation Arguments Are Meritless......................31

1.   It Is Irrelevant that the DL and CRL Do Not Contain the Words "Directional Consistency" ............................................31

2.   Defendants' Truth-on-the-Market Reprisal Is Meritless..........33

3.   Defendants' 019-Specific Argument Fails ..............................34

IV.   NO STATEMENTS ARE BARRED FROM THE JURY ..........................35

CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp.3d 852 (S.D. Cal. 2024) ................................................................... 15

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ....................................................... 14, 31, 32

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ............................................. *passim*

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms, Inc..*,
2023 WL 1769810 (S.D. Cal. Feb. 2, 2023) ................................................. *passim*

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
348 F.R.D. 372 (S.D. Cal. 2024) ................................................................. *passim*

*Highfields Cap. I, LP v. SeaWorld Ent., Inc.*,
2022 WL 1037210 (S.D. Cal. Apr. 6, 2022) ................................................ 33, 35

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ............................................................................ 31

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................... 25

*In re JDS Uniphase Corp. Sec. Litig.*,
2007 WL 2429593 (N.D. Cal. Aug. 24, 2007) .................................................. 35

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) ....................................................... 24, 31, 32

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) .............................................................................. 28

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................... 19, 20

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 13863616 (N.D. Cal. 2020) ........................................................... 29, 31

*In re Twitter, Inc. Sec. Litig.*,
  2020 WL 4188787 (N.D. Cal. May 19, 2020) ...................................................... 35

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................................... 35

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) .............................................................................. 35

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .......................................................................*passim*

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...................................................................... 28, 34

*Pearlstein v. Blackberry Ltd*,
  2022 WL 19792 (S.D.N.Y. Jan. 3, 2022) ........................................................... 19

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ...................................................................... 24, 32

*Roditi v. New River Invs. Inc.*,
  2022 WL 7728596 (S.D. Cal. Oct. 13, 2022) ..................................................... 15

*SEC v. Retail Pro, Inc.*,
  673 F. Supp. 2d 1108 (S.D. Cal 2009) ............................................................... 14

*Smilovits v. First Solar, Inc.*,
  2019 WL 7282026 (D. Ariz. 2019) ..................................................................... 29

**RULE**

Fed. R. Civ. P. 56(a) .............................................................................................. 14

-iv-

21cv00762

## TABLE OF DEFINED TERMS

| Term | Definition |
|---|---|
| "019 Study" or "019" | Study ACP-103-019, a phase 2 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for patients with Alzheimer's disease psychosis. |
| "020 Study" | Study ACP-103-020, a phase 3 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for patients with Parkinson's disease psychosis. |
| "Acadia" or the "Company" | Defendant Acadia Pharmaceuticals, Inc. |
| "AdComm" | Advisory Committee |
| "ADP" | Alzheimer's Disease Psychosis |
| "Brief" or "Br." | Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment (Dkt. No. 199-1). |
| "Class" | All persons and entities who purchased or otherwise acquired shares of Acadia common stock during the period from September 9, 2019 through April 4, 2021 (inclusive), and were damaged thereby. Excluded from the Class are (i) Defendants; (ii) the past and current officers and directors of Acadia; (iii) the immediate family members, legal representatives, heirs, parents, subsidiaries, predecessors, successors, and assigns of any excluded person or entity; and (iv) any entity in which any excluded person(s) have or had a majority ownership interest, or that is or was controlled by any excluded person or entity. |
| "*Cert. Order*" | The Court's March 11, 2024 Order granting Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. No. 140). *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372 (S.D. Cal. 2024). |
| "Class Period" | September 9, 2019 to April 4, 2021, both dates inclusive. |

| Term | Definition |
|---|---|
| "Corrective Events" | (i) Disclosure of the Deficiencies Letter on March 8, 2021, and (ii) disclosure of the CRL on April 5, 2021. |
| "CRL" | The April 2, 2021 Complete Response Letter issued by FDA to Acadia regarding the sNDA. |
| "CTAD" | Clinical Trials on Alzheimer's Disease |
| "Defendants" | Refers collectively to Acadia, Stephen R. Davis and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic, the defendants in this action. |
| "DL" | The March 3, 2021 Deficiencies Preclude Letter issued by FDA to Acadia. |
| "DRP" | Dementia-Related Psychosis |
| "DUF" | Plaintiffs' Statement in Response to Defendants' Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment. |
| "EOP2 Meeting" | End-of-Phase 2 meeting between Acadia and FDA on May 15, 2017 regarding the sNDA. |
| "FDA" | U.S. Food and Drug Administration |
| "FTD" | Frontotemporal Dementia |
| "Harmony" or "Harmony Study" | Study ACP-103-045, a Phase 3 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for DRP. |
| "DLB" | Dementia with Lewy bodies |
| "Motion" | Defendants' Notice of Motion and Motion for Summary Judgment (Dkt. No. 199). |
| "*MTD Order*" | The Court's September 27, 2022 Order denying Defendants' Motion to Dismiss (Dkt. No. 65). *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022). |
| "PD" | Parkinson's Disease |
| "PDD" | Parkinson's Disease Dementia |
| "PDP" | Parkinson's Disease Psychosis |
| "Plaintiffs" | Class Representatives City of Birmingham Retirement and Relief System and Ohio Carpenters' Pension Fund. |

| Term | Definition |
|------|-----------|
| "PUF" | Plaintiffs' Separate Statement of Undisputed Material Facts. |
| "*Recons. Order*" | The Court's February 2, 2023 Order denying Defendants' Motion for Reconsideration (Dkt. No. 82). *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810 (S.D. Cal. Feb. 2, 2023). |
| "SAP" | Statistical Analysis Plan for Harmony, submitted by Acadia to FDA on August 1, 2019. |
| "sNDA" | Acadia's supplemental new drug application for pimavanserin for the treatment of hallucinations and delusions associated with DRP. |
| "VaD" | Vascular Dementia |

Plaintiffs respectfully submit this memorandum in opposition to Defendants' Motion for Summary Judgment (Dkt. No. 199 ("Motion")) and in response to Defendants' brief (Dkt. No. 199-1 ("Brief" or "Br.")).

## INTRODUCTION

Defendants are right "that this Court has considered and ruled on [the] various issues" relevant to the Motion, Br. 14, but, tellingly, they cite none of those decisions in their Brief. Given the Court's prior rulings on falsity, scienter, and loss causation, Plaintiffs have adduced ample evidence to take their claims to trial.

This case proceeded to discovery because the events surrounding FDA's denial of Acadia's sNDA seeking to expand pimavanserin's indication from just PDP to all DRP supported a strong inference that Defendants' statements recklessly or intentionally misled investors about (i) the terms of Acadia's "FDA agreement" on the data necessary for sNDA approval, and (ii) the sufficiency of the data from Harmony and 019. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ("*MTD Order*"); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms, Inc..*, 2023 WL 1769810 (S.D. Cal. Feb. 2, 2023) ("*Recons. Order*"). This Court then certified the Class based largely on evidence that Defendants had misled investors as to both (i) the existence of a key, undisclosed term of the FDA agreement, and (ii) the insufficiency of the sNDA's data. In certifying the Class, the Court also rejected Defendants' "truth-on-the-market" and "mirror image" price impact arguments. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372 (S.D. Cal. 2024) ("*Cert. Order*").

With discovery complete, Plaintiffs now have even more evidence confirming that the Court's prior rulings were correct: Defendants knew that the subgroup term of the FDA agreement required subgroup "consistency" and "directional alignment." PUF 130-35, 151-53, 161, 177. They were also concerned about Harmony's subgroup results and the results from 019 but actively hid these problems from investors. And the known problems with Harmony's subgroup data and 019 are the

reasons why the sNDA was denied, which caused investors' losses. Tellingly, Defendants now concede that they "knew the FDA would *look* at the subgroup analyses." Br. 26. But this is too little too late: Defendants repeatedly told investors the exact opposite: "we're not looking at individual subtypes as they are often referred to of dementia," in "alignment we established with the FDA." Ex. 60 at 5.

For the reasons herein, Defendants' Motion should be denied.

## FACTUAL BACKGROUND

### A.    The Key Undisputed Material Facts

This case centers on whether Defendants "misrepresented the terms of an agreement with the FDA" about the efficacy data necessary to obtain approval of an expanded label for Acadia's main product, pimavanserin, to treat DRP. *Cert. Order*, at 388. These are the key undisputed facts:

In spring 2017, as reflected in FDA's May 17, 2017 EOP2 minutes, Acadia and FDA agreed on the design of the Phase III Harmony study, and the data needed to support the DRP indication. DUF 27. That agreement's terms included:

- *First*, FDA "agree[d] with the proposed study population" for Harmony "as long as subjects are stratified by their current clinical diagnosis (as proposed [by Acadia]). Labeling will reflect the actual composition and response of patients enrolled in the study." *Id.*

- *Second*, Acadia could "rely on a single-well controlled study for your sNDA filing [for DRP]" if the results were "very persuasive. This means statistically significant with a very small probability of Type I error and a finding that is clinically meaningful." *Id.*

In September 2019, Acadia announced Harmony had produced positive "top-line" results. DUF 59. In June 2020, Acadia submitted an sNDA seeking to expand pimavanserin's indication from PDP to DRP. DUF 86. That sNDA was based on just Harmony and purportedly supported by two previously completed clinical trials of pimavanserin for PDP (the 020 study) and for ADP (the 019 Study). DUF 82.

On April 2, 2021, Acadia received the CRL denying the sNDA. DUF 113-14; PUF 230-32. The letter reiterated that FDA had told Acadia "during development that labeling would reflect the actual composition and response of the subjects

-2-

21cv00762

enrolled in the trial" and then identified four problems with Harmony's efficacy data "[b]ased on an examination of dementia subgroups."  DUF 116; Ex. 19.

- *First*, there were "too few subjects" in the DLB and FTD subgroups "to be an adequate representation of the response to pimavanserin for either." *Id.*

- *Second*, "[t]here was no numeric difference on time-to-relapse between pimavanserin and placebo in subjects with [VaD]" and "this subgroup also included a relatively small group of 24 subjects." *Id.*

- *Third*, "there were 123 subjects with [ADP], a large enough number to expect a nominally statistically significant result for the [ADP] subgroup," but those results "were not nominally significant." *Id.*

- *Fourth*, "[d]espite having fewer subjects (35) than the [ADP] subgroup, the effect of pimavanserin on time-to-relapse in the [PDD] subgroup was highly nominally statistically significant," such that "[i]t appears that the finding in this subgroup is driving the overall study results." *Id.*  This "supports the effectiveness of pimavanserin in the treatment of [PDP]" but the drug "is already labeled[1] for that indication (the PDD subpopulation is subsumed in the current indication)." *Id.*

The CRL concluded Harmony's data "suggest a differential response to pimavanserin across dementia subtypes."  DUF 117.  FDA also did "not consider Study 019 to be an adequate and well-controlled study" due to protocol deviations that meant it was not "evidence of effectiveness for pimavanserin in the treatment of [ADP]."  DUF 120; PUF 251, 254.

These undisputed facts prove at least two things:  *First*, a term of Acadia's agreement with FDA was that "FDA would base its decision to expand 'labeling' of pimavanserin on the 'actual composition and response of patients' in each dementia subtype," i.e., approval of the sNDA would turn in part on Harmony's subgroup efficacy results.  *Cert. Order*, at 387.  *Second*, the sNDA was denied because Harmony's subgroup results did "not provide substantial evidence of effectiveness" and, as FDA had advised, "labeling would reflect the actual composition and response of the subjects enrolled in the trial."  DUF 114; Ex. 19.

What Defendants told investors about the FDA agreement, Harmony, and the likelihood of FDA approval of a DRP sNDA is also undisputed.  Plaintiffs challenge

---

[1] "Labeled" here means "approved," a common shorthand.  PUF 145-46.

two categories of misstatements: (i) those stating "that the FDA agreed to base its review of the sNDA on the Harmony Study's overall results across all DRP patients, instead of analyzing the efficacy data for each dementia subgroup"; and (ii) those touting the data supporting that application which "omit[ted] adverse information about the Harmony and -019 Studies." *Cert. Order*, at 381. And that Acadia's stock price tanked on news in March and April 2021 that FDA was unlikely to approve the sNDA is also undisputed. DUF 112, 127.

### B. The Disputed Material Facts

Faced with the undisputed facts, Defendants say they "accurately disclosed the terms of their agreements," "had no intent to deceive investors," and "Acadia's stock drops were caused by unexpected bad news." Br. 3. Defendants' contentions rest on denying that Harmony's subgroup efficacy data was part of Acadia's agreement with FDA. Br. §IV.A (falsity), §IV.B (scienter), §IV.C (loss causation). But whether there was a subgroup-efficacy requirement is a jury question.

At trial, Plaintiffs will prove Defendants "never disclosed the FDA's condition that expanding pimavanserin's label would turn," in part, on Harmony's subgroup results and "that this term of Acadia's agreement with FDA 'rendered the data for individual subgroups more relevant than Acadia" disclosed. *Cert. Order*, at 390. As this Court noted, the EOP2 Meeting minutes (Ex. 5) "were not publicly available" and show "FDA agreed to the Harmony Study design on the conditions that (1) 'subjects are stratified by their current clinical diagnosis (as proposed),' and (2) 'labeling will reflect the actual composition and response of patients enrolled in the study.'" *Cert. Order*, at 387. Read together, these conditions show "FDA would base its decision to expand 'labeling' of pimavanserin" on Harmony's subgroup data. *Id.* As summarized here and detailed in the PUF, this condition meant the subgroup data needed to show "directional consistency."[2]

---

[2] Defendants insinuate Plaintiffs made up the phrase "directional consistency." *E.g.*, Br. 3. Not so. This is how Acadia described the purpose of the subgroup analysis in Harmony to FDA in May 2021. PUF 130; Ex. 282 at -094.

This is far from a "new theory" of fraud or "pivot" on liability, *see* Br. 2-3, but rather further explanation of the meaning of the aspect of FDA's agreement about which Defendants lied. Plaintiffs will prove at trial (i) this approval condition existed; (ii) Defendants knew (or recklessly disregarded) it; and (iii) Defendants never disclosed it to investors making their statements materially false or misleading.

**1.      Consistency Across Subgroups Was the Theory of Harmony**

Harmony was designed to test whether pimavanserin was a safe and effective treatment for DRP. DUF 14-16. This required evidence of effectiveness beyond PDP, the one type of dementia for which pimavanserin had already been approved as a treatment for psychosis. PUF 134. Thus, from inception, the purpose of Harmony was to generate data showing treatment efficacy across *all* DRP.

This fact is confirmed by numerous Acadia employees. PUF 134-35. For example, CEO Davis testified that "a key objective" of Harmony "was to try to study a broad population" to show the "benefit from the drug" across types of dementia. Ex. 130 at 72:7-12. It is also confirmed by internal Company documents. *See* PUF 135 (collecting evidence). And it is confirmed by the testimony of Dr. Tom Laughren, a former head of FDA's Division of Psychiatry who Acadia hired to help pitch the study to FDA. PUF 132. Dr. Laughren told Acadia that to get approved for DRP, Harmony needed consistency across the subgroups, i.e., showing "the effect is similar in the different subgroups." PUF 133; Ex. 135 at 99:16-100:1.

Plaintiffs' expert, Dr. Lon Schneider, reached the same conclusion (the "Consistency Hypothesis"). Ex. 146 ¶¶55-56; PUF 135. Defendants have not moved to exclude Dr. Schneider's testimony, and their purported rebuttal expert—Dr. Anton Porsteinsson[3]—does not dispute Harmony's underlying theory was "that the different subtypes of dementia enrolled the HARMONY study would react" similarly "regardless of the patient's underlying dementia type." Ex. 146 ¶¶56-58.

---

[3]      For the reasons stated in Plaintiffs' Motion to Exclude, Dr. Porsteinsson's testimony should be excluded. Dkt. No. 197-1 at 17-30.

### 2.       Defendants Knew FDA Was Looking for "Consistency" or "Alignment" Across the Subgroup Efficacy Data

The key Acadia witnesses who were involved in overseeing the Company and Harmony uniformly testified that consistency of the subgroup efficacy data was required by FDA to obtain approval of the sNDA:

- CEO Davis:  FDA "indicated that they would look for directional alignment," which meant it would check for "anything that stands out" in the subgroups, including "efficacy."  Ex. 130 at 114:13-116:16; Ex. 79.

- Dr. Erin Foff, who oversaw Harmony:  "[I]t was the collective understanding at Acadia that to support the DRP indication that the subtypes and the analysis of the behavior of the subtypes would be looked at to ask whether they directionally supported the behavior of the entire population."  Ex. 127 at 122:2-8.

- Dr. Jim Youakim, Acadia's VP who helped design Harmony:  Acadia "would need to show consistency in the results across the subpopulations, which means that in the subpopulations, you would need to show that there's improvement consistent with the overall population."  Ex. 131 at 68:13-18.

- Dr. Mark Knowles, the biostatistician who drafted Harmony's SAP:  His "recollection from the [May 2017 EOP2] meeting was that, while [FDA] agreed we did not need to power the study for individual subtypes, I think there was an expectation that there would be a . . . reasonable amount of data in the subtypes and a certain amount of consistency in the results across subtypes."  Ex. 124 at 183:10-184:5.

- Daryl DeKarske, Head of Regulatory Affairs:  "[T]here was an intention to . . . examine the subtypes for sure," "we had always intended in the subgroups to be looking at trends, directionality for all the subgroups," and that "the expectation was that from an efficacy standpoint that the symptoms and treatment would be consistent across the subtypes . . . [t]hat was our proposal that we presented to the FDA."  Ex. 133 at 84:2-85:4; 212:14-224:6; 223:6-22.

- Teresa Brandt, regulatory affairs officer who supervised the sNDA's preparation: "directional consistency" meant a "consistent result in the same direction or results in the same direction," and agreed "directional consistency for the [Harmony] subgroup would be that the subgroups were reacting similarly" to treatment with pimavanserin.  Ex. 126 at 150:25-151:11.[4]

This uniform understanding comes primarily from the EOP2 Meeting and FDA's response to Question 2b.  The document itself presents FDA's two-sentence answer to one question.  PUF 138-44, 150.  As Dr. Tiffany Farchione—Director of

---

[4]       *See also* PUF 131 (collecting testimony).  To the extent these witnesses are now walking back their testimony through declarations in support of Defendants' Motion, this inconsistency is a disputed issue of material fact for the jury.

FDA's Division of Psychiatry, EOP2 Meeting attendee, and CRL signatory—testified, these "two sentences are together . . . for a reason." Ex. 136 at 45:12-46:15. Plaintiffs' FDA Expert—Dr. Carl Peck, a former Director of FDA's Center for Drug Evaluation and Research with 40+ years' experience with the FDA approval process—agrees these sentences "must be read in concert." Ex. 154, App. C, ¶88; *see also id.* ¶130. Read together, these two sentences mean "FDA would base its decision to expand 'labeling' of pimavanserin on the 'actual composition and response of patients' in each dementia subtype." *Cert. Order*, at 387.

Plaintiffs' reading of the agreement is further supported by what Acadia "proposed" to FDA for Harmony's population and "stratification." *See* PUF 136-38. As reflected in the proposed Harmony protocol sent to FDA before the EOP2 Meeting, Acadia intended to do a robust review of Harmony's subgroup efficacy results, not just an analysis of the top-line efficacy results:

- Patients in Harmony would "be stratified by most likely dementia subtype." Ex. 4 at 12. This was necessary to perform any analysis of the subgroups separately. PUF 137; Ex. 154, App. C, ¶88.

- The proposed protocol for Harmony also stated that while the primary efficacy analysis would be based on the results for "all randomized subjects," the results would also be "compared between treatment groups," which would be "stratified by most likely dementia subtype or most prominent cause of dementia." Ex. 4 at 12.

- There was also "Additional Subgroup Analysis" to "be performed in subgroups defined by most likely dementia subtype," and separate from Harmony's "Exploratory Efficacy Analysis." Ex. 4 at 63.

Harmony's SAP also contained an entire section on "Subgroup Analysis," which pre-specified analyses of subgroup efficacy. PUF 156-61. The SAP pre-specified the comparisons to make for each dementia subgroup and required Acadia to prepare and present "Kaplan-Meier curves," "hazard ratios with corresponding [confidence intervals]," and "forest plots for primary and key secondary efficacy variables" for each subgroup. Ex. 13 at 43-44. As Acadia later admitted, "the intended objective" of these analyses "was to explore directional consistency." PUF

130.   These pre-specified subgroup efficacy analyses were necessary for FDA to determine whether the subgroup results were directionally consistent.  PUF 161-62.

### 3.   Harmony's Subgroups Were Not Directionally Consistent

In September 2019, Harmony stopped early at an interim analysis.  DUF 59; PUF 163, 165-67.  On or around November 15, 2019, Harmony's full dataset was unblinded and Defendants quickly identified that the PDD subgroup had dramatically outperformed all other subtypes.  PUF 175.  CEO Davis conveyed this fact to Acadia's board on November 22 in a slide deck noting the "Risk of FDA/AdComm concern that driver of effect was PD subtype."  PUF 177; Ex. 176 at -313.  Defendants also determined that, absent PDD's outperformance, Harmony's positive results on the primary endpoint (time to relapse) evaporated.  PUF 197; *see also* PUF 234.  Stankovic also had Acadia's biostatisticians run an "interaction test" and determined that there was an interaction between dementia subtype and treatment effect.  PUF 223.  This meant the treatment effect of the drug varied based upon the patient's underlying dementia.  PUF 223.

Beyond the PDP subgroup, the rest of the subgroup efficacy data proved nothing.  For VaD, there was *no* difference between pimavanserin and placebo.  DUF 116.  And the FTD and DLB subgroups had too few patients to tell whether pimavanserin was an effective treatment.  DUF 116.  Plaintiffs' biostatistician—Dr. David Madigan—will explain this to the jury and also confirm that the ADP subgroup had enough patients to achieve statistical significance (like the PDP subgroup), if pimavanserin worked as intended.  PUF 176.  Dr. Madigan will also testify that far from being directionally consistent, Harmony's results proved that the drug worked for PDP but failed to show benefit in any other subgroup.[5]  PUF 176.

### 4.   Inconsistent Subgroup Efficacy Was a Known Risk

Defendants were told and knew that inconsistent subgroup efficacy data was a threat to FDA approval of the sNDA.  This is seen in, *inter alia*:

---

[5]   Defendants also are not seeking to exclude Dr. Madigan's testimony.

-8-

*First,* before Harmony even started enrolling patients, Acadia formed a working group of over 10 employees (reporting to Stankovic) to identify and address risks to Acadia's forthcoming sNDA. PUF 152. From its inception, this working group identified the "risk" of "inconsistent efficacy across subtypes" as a threat to FDA approval of the DRP indication. PUF 153. That risk was reiterated repeatedly within Acadia between October 2017 and September 2019. PUF 153. The group also considered clarifying with FDA whether a DRP "indication depend[ed] on dementia subtypes in [Harmony]." PUF 154. Acadia never asked this question, although it is a sponsor's obligation to ask if they are confused. PUF 264-65.

*Second*, in September 2019 when Harmony's top-line results became known, but the subgroup results were unknown, the Head of Regulatory Affairs warned Davis and Stankovic that Acadia would not know if Harmony's results were "clinically meaningful" until November 2019—when subgroup data would be available—and advised against giving "specific p-value and testing methodology" to investors "in advance of having full results and knowing the clinical meaningfulness of them." PUF 164. Defendants did not listen. PUF 167.

*Third,* in addition to Davis' warning of the "Risk of FDA/AdComm concern that driver of effect was PD subtype. Limited indication," Ex. 176 at -313; PUF 177, Acadia's internal biostatisticians also noted that Harmony's data was too sparse in some subgroup "strata" to "verify" to FDA that "the hazard ratio is similar in all of the strata," PUF 180.

*Fourth*, in December 2019, Acadia hired consultants at 3D Communications to assist with the FDA-approval process. PUF 195. These consultants concluded that whether the PDP subgroup was the "driving force for efficacy" was a "major concern" and would be a "top question" for FDA. PUF 196. It also asked Acadia employees what might "prevent approvability" of the sNDA and compiled a list of issues/questions, which was widely circulated inside Acadia. PUF 203-04. The final list identified the same problems with the subgroup data that FDA cited in the CRL:

- "Subtypes like FTD have very few patients." Ex. 193 at -044.

- "In VaD there was no difference in relapse rates between [placebo] and [pimavanserin]" *Id*. at -043.

- "In [Harmony], in Alzheimer's Disease you showed a trend towards efficacy in reducing relapse rates, but did not reach statistical significance." *Id*. at -041.

- "What evidence do you have to say that the overall efficacy you observed in [Harmony] was not merely driven by great efficacy in the PDD/DLB subjects?" *Id*. at -043.

- "The differential treatment effects observed across dementia subtypes in [Harmony] suggests there is a different risk-benefit profile for the different dementia subtypes." *Id*.

PUF 203-04.[6]  Acadia even had a mock "advisory committee" to simulate an FDA debate on approval of the sNDA.  PUF 222.  Acadia's summary of the event stated: "[s]ome panelists (statistician mostly) questioned if efficacy results were driven by PDP and if the results are truly applicable across subgroups." Ex. 221 at -755.

*Fifth*, in July 2020, FDA accepted the sNDA for review, but denied Acadia's request for an expedited, "priority review."[7]  PUF 206-19, 266.  This was unwelcome because pimavanserin had a "Breakthrough Therapy Designation."  PUF 206. Acadia questioned denial of priority review and FDA told them it was "unclear if the clinical data" in the sNDA showed the "potential to be a *significant improvement* in safety or effectiveness."  Ex. 286 at -439; PUF 208.  Acadia kept pushing and FDA said the sNDA did "not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of [DRP]."  Ex. 286 at -439; PUF 215.  After the Class Period, FDA confirmed priority review was denied because Harmony's top-line results "were driven by" PDP.  PUF 220; *see also* PUF 241-44.  Dr. Peck will testify this was the obvious import of priority review denial.  PUF 218.

---

[6]    This process also flagged the 019 issues highlighted in the CRL.  PUF 204.

[7]    FDA could not reject the sNDA filing because FDA needed to review Harmony to see if it fulfilled a 2016 post-marketing commitment.  PUF 259-61.

-10-

*Sixth*, in March 2021, after Acadia received the DL from FDA—but before the "deficiencies" were identified by FDA—it quickly determined (rightly) that "the broad DRP indication," the "totality of subtype efficacy" and "efficacy (not just due to PDP) effects," along with "019 [being] discarded" were the likely "deficiencies." PUF 224. Davis and Stankovic even considered arguing to FDA that insufficient subgroup efficacy data was a "labeling issue" that could be addressed with a narrower indication, rather than rejection of the sNDA. PUF 225.

In sum, the record is littered with evidence, from even before the Class Period, showing Defendants internally recognized that a failure to generate directionally consistent subgroup efficacy was a serious risk to approval of the sNDA.

### 5. Defendants Deliberately Concealed the Importance of Harmony's Subgroup Data

Starting no later than September 2019, investors began asking about Harmony's subgroup data and their relevance to sNDA approval. PUF 167-70. In response, Davis eventually instructed Acadia's investor relations personnel to "remove[] all mention of sub-types" in press releases about Harmony or the sNDA. PUF 199-200. The evidence shows that thereafter references to subgroups were struck from draft press releases. PUF 201-02. Defendants also downplayed the importance of subgroup efficacy to investors.

For example, on October 30, 2019, when an analyst asked if Acadia would show "a breakout of the different subsets of patients" at CTAD and if the new label for pimavanserin would be specific to subgroups, Stankovic confirmed "data related to different subtypes of dementia" would be presented at CTAD and brushed aside the possibility of subgroup results having any effect on the label, citing "discussions that we had with the FDA." PUF 171. Similarly, on November 11, 2019, in response to yet another analyst question regarding how FDA will assess the subgroup results, Stankovic claimed "that we agreed with the FDA" that the primary endpoint analysis would look at "robust statistical significance in the overall study population" and

-11-

that "show[ing] significance by individual subtype of dementia . . . is [not] required by the FDA for our label." Stankovic even claimed that Acadia "did have a very specific discussion on this" with FDA, and that "there is no requirement, nor expectation, nor power for analysis, of specific subtypes." PUF 173-74.

The worst example of Defendants' campaign to downplay the subgroup data was at CTAD in December 2019. At that conference, Acadia showed two slides of subgroup data to investors with an express "word of caution on overinterpretation" because it was purportedly "a bit hard to interpret these results given the small numbers" and because Harmony was "not powered to look at this in any meaningful statistical way." Ex. 50 at 8; PUF 181-86. The first slide showed data from the open-label (not double-blind) portion of the study reflecting improvements on the "SAPs+HD" scale of psychosis, which was not a measure of efficacy in Harmony. PUF 184. Then, while the second slide had data from the double-blind period, those data did "not reflect the primary endpoint of time to relapse" and therefore "should not be used to draw conclusions on efficacy," as Acadia employees admitted internally after CTAD. Ex. 179 at -247, -248, -261; PUF 185, 194. Tellingly, Acadia decided (in early November 2019) not to disclose at CTAD the main measure of treatment efficacy—hazard ratios for time to relapse—for each subgroup, despite Stankovic advising that FDA "will look at the [hazard ratio] for each dementia subgroup and or dementia subtype." PUF 172.[8] Significantly, Stankovic followed up the CTAD data by reminding investors, "FDA agreed with us that with the robust results of this trial that we would be able to file" the sNDA and, when asked to clarify FDA's approval requirements for the sNDA, he said "there was no[t] any definition that we needed to meet other than what we shared." Ex. 50 at 13; PUF 188.

---

[8] The slides also did not reflect any p-values for the subgroups, so it was not apparent to investors that the PDD subgroup had dramatically outperformed the other dementia subtypes and was driving the overall results. PUF 185. Acadia also did not show investors the pre-specified forest plot and Kaplan-Meier curves, which were going to FDA with the sNDA and were given to Acadia's board. PUF 181.

-12-

In other words, while Defendants knew FDA wanted "directional alignment" in the subgroups and flagged the "risk" that "FDA/AdComm concern" about those data could lead to a "limited indication," they gave investors cherry-picked data and cautioned against "overinterpretation."  PUF 179, 189-93.

### 6.   Acadia Also Concealed the Full Contents of the CRL

Acadia announced FDA's rejection of the sNDA on April 5, 2021.  PUF 255. It told investors the CRL identified two problems with Harmony's subgroup data (along with concluding 019 was not a well-controlled trial): (i) "a lack of statistical significance in some of the subgroups of dementia, and [(ii)] insufficient numbers of patients with certain less common dementia subtypes."  Ex. 43 at -321.  Acadia *did not* disclose the two other subgroup problems in the CRL: (i) "no numeric difference on time-to-relapse between pimavanserin and placebo in subjects with [VaD]"; and (ii) that "the finding in [the PDP] subgroup is driving the overall study results."  Ex. 19 at -089; PUF 235.  Instead, Defendants blamed FDA, claiming it had reneged on its "agreement" with Acadia and had moved the goal posts to somehow require new analyses by subtype that the original program was never "intended, designed or powered to demonstrate."  PUF 236.  This is particularly shocking because at this time (April 7, 2021), Acadia internally recognized FDA's requirement that "Labeling will reflect the actual composition and response of patients enrolled in the study" was a "Key Prior Agreement."  PUF 237.

### 7.   Defendants Davis and Stankovic Monetized Their Fraud

Defendants Davis and Stankovic combined made over $43 million by selling Acadia shares at inflated prices during the Class Period.  *See* PUF 272-80.  Davis sold at least 530,392 shares of Acadia common stock—approximately 80% of his vested equity interests in Acadia shares as of February 4, 2021—earning at least $24.6 million.  PUF 272.  These sales were unusual for Davis, as he had never sold any Acadia shares before the Class Period and, in the year after the Class Period, he sold a mere 18,459 shares.  PUF 273.  So too for Stankovic, who sold 368,993 shares

-13-

of Acadia common stock during the Class Period—equal to roughly 82% of his vested beneficial interests as of February 4, 2021—earning at least $18.9 million. PUF 277.  Stankovic's sales were also unprecedented as he had never sold Acadia shares before the Class Period and in the year after the Class Period, sold a mere 11,809 shares.  PUF 278.  Some of these suspicious sales were made pursuant to 10b5-1 trading plans.  But those plans were all adopted *after* Defendants knew of FDA's approval requirements from the EOP2 meeting and most were enacted after the misstatements started and Defendants knew at least some of the results from Harmony.  PUF 274-75, 279-80.

## LEGAL STANDARD

Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Defendants have "the burden of showing the absence of a genuine issue as to any material fact."  *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 923 (S.D. Cal. 2019).  "An issue of fact is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *SEC v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108, 1130 (S.D. Cal 2009) (Hayes, J.).  However, in ruling on such a motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Id*. at 1131.

## ARGUMENT

**I.      A JURY MUST DECIDE IF DEFENDANTS MISLED INVESTORS**

     **A.      The Evidence Shows Defendants Made Misstatements**

Plaintiffs allege two categories of misstatements:  *First*, statements that "misrepresented the terms of [Acadia's] agreement with the FDA," which were materially false or misleading "by omitting that the FDA would focus on subgroup data when deciding to expand the 'labeling' of pimavanserin." *Cert. Order*, at 388. *Second*, statements touting the results of the Harmony and 019 Studies, which were materially misleading because they failed to disclose these studies had

"disappointing data, and that these known shortcomings posed major obstacles to FDA approval." *MTD Order*, at \*10; *Cert. Order*, at 390-92. Defendants' principal argument here is that Plaintiffs "cannot prove falsity" and that they cannot show any statement was misleading by omission. Br. 15-25. Both arguments fail.[9]

### 1.      Defendants Misled Investors About the FDA Agreement

Defendants' "statements asserting an agreement with the FDA" that were "contradicted" by what Defendants knew "at the time the statements were made" were materially false and misleading. *MTD Order*, at \*9. These statements concern representations "that the agreement contained terms that are inconsistent with the FDA's basis for ultimately denying approval," namely that FDA "would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." *Id.*; *Cert. Order*, at 389. Defendants ignore this law.

Discovery has now confirmed this Court's prior rulings. It shows that there was an undisclosed and critical term of the FDA agreement, Defendants knew this term, never disclosed it to investors, and this term was the very reason why FDA denied the sNDA. The primary evidence of this comes from the EOP2 Meeting minutes. Ex. 5. The Court reviewed these minutes and the CRL previously and concluded that FDA's two conditions in the response to Acadia's Question 2b "provide[] key information with respect to the significance of the subgroup data" for the approvability of the sNDA because "[t]aken together, these conditions indicate that the FDA would base its decision to expand 'labeling' of pimavanserin" on Harmony's subgroup efficacy data. *Cert. Order*, at 387. Stankovic and eight other Acadia employees attended the EOP2 meeting. Ex. 5 at -794. Davis admits he was

---

[9]      Defendants wrongly claim that deciding falsity requires "a statement-by-statement analysis," citing cases that conduct but do not mandate such analysis. Br. 22. This Court and others disagree. *See Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp.3d 852, 869 n.1 (S.D. Cal. 2024) (Hayes, J.) ("The Court does not read [the law] as requiring the Court to conduct a 'statement-by-statement analysis.'"); *Roditi v. New River Invs. Inc.*, 2022 WL 7728596, at \*3-4 (S.D. Cal. Oct. 13, 2022) (no statement-by-statement analysis). Defendants also belie their argument by categorizing the statements. Br. 21-22.

-15-

informed by Stankovic of what happened at the meeting, had read the meeting minutes, and told Acadia's board in November 2019 that FDA indicated "they would look for directional alignment" in Harmony's subgroup data.  Dkt. No. 200-20 ¶¶7-11; Ex. 130 at 105:16-106:6; Ex. 177.  And in this Motion, Defendants now concede they "knew the FDA would *look* at the subgroup analyses."  Br. 26. This is more than enough for a reasonable jury to conclude that Defendants knew about FDA's subgroup requirements at or around the time of the EOP2 Meeting in May 2017.

There is also ample additional evidence for the jury to find that there was an omitted subgroup term of the FDA agreement requiring that Harmony show a directionally consistent effect across the subgroups in order to obtain approval.  *See supra* §B.1-2.  For example:

- The very theory underlying Harmony was that all the subgroups would react consistently to treatment with pimavanserin.  PUF 135.

- As the Acadia witnesses testified: "[I]t was the collective understanding at Acadia that to support the DRP indication that the subtypes and the analysis of the behavior of the subtypes would be looked at to ask whether they directionally supported the behavior of the entire population."  Ex. 127 at 117:25-124:7.  In other words, Acadia "would need to show consistency in the results across the subpopulations, which means that in the subpopulations, you would need to show that there's improvement consistent with the overall population."  Ex. 131 at 68:13-18.

- As was repeatedly noted in internal Company documents, the "risk" of "inconsistent efficacy across subtypes" was identified even before the study started.  PUF 153.

- Once the full results became available, Defendants quickly identified that the PDD subgroup was "driving" the overall results—i.e., that the "risk" of "inconsistent efficacy across subtypes" had materialized—and so when Davis sent the subgroup data to Acadia's board they were warned, "Risk of FDA/AdComm concern that driver of effect was PD subtype" and a "Limited indication."  Ex. 176 at -313; PUF 179.

Applying these facts to the Court's prior legal conclusions shows there is enough evidence for a jury to find Defendants misled investors about the terms of the FDA agreement.  For example, Davis' representations that "we got a clear agreement from . . . FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them," PUF 221 (Am. Compl. ¶125), and "we're seeking the

-16-

treatment of [DRP] . . . [s]o we're not looking at individual subtypes," which is in "alignment [with] the FDA," PUF 221 (Am. Compl. ¶135), all claimed that FDA would base its decision on the overall results of [Harmony]" when that was not true. *MTD Order*, at *9. So too for Stankovic's claim that Acadia "did have a very specific discussion on this" with FDA, and that "there is no requirement, nor expectation, nor power for analysis, of specific subtypes," and Defendants' statements that the FDA agreed that Acadia "studied DRP generally" and that "a single relapse prevention study serve as the basis of approval."[10] *Id.*; PUF 173, 221. The evidence cited above shows a jury could find these statements misleading.

### 2. Defendants Also Misled Investors About the Strength of the Data Supporting the sNDA

As with the misstatements about the FDA agreement, denying summary judgment on the second category of misstatements requires a simple application of this Court's prior holdings to the evidence uncovered in discovery. The Court found "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." *MTD Order*, at *11. This omitted information concerned both the subgroup term of the FDA agreement and that "[Harmony] had disappointing subgroup data" given that agreement. *Id.* at *10; *Cert. Order*, at 390. There is now ample evidence for a jury to apply this law and find that Defendants misleadingly touted the results from Harmony and 019.

The evidence shows that the adverse information FDA cited in denying approval of the sNDA was previously identified by Acadia as a threat to sNDA approval. For example, Acadia employees repeatedly flagged both the "risk" of "inconsistent subgroup results" and identified the problems with Harmony's subgroup efficacy results that FDA cited in the CRL:

---

[10]    More FDA-agreement misstatements are at PUF 166, 187, 198, 221.

| Acadia's Internal Assessment | CRL Conclusion |
|---|---|
| "Subtypes like FTD have very few patients." | "[T]oo few subjects to be an adequate representation of the response to pimavanserin for [DLB and FTD]." |
| "In VaD there was no difference in relapse rates between [placebo] . . ." | "There was no numeric difference on time-to-relapse between pimavanserin and placebo in [VaD]." |
| "In [Harmony], in Alzheimer's Disease you showed a trend towards efficacy in reducing relapse rates, but did not reach statistical significance." | ADP subgroup was "large enough . . . to expect a nominally statistically significant result for the AD subgroup. However, the results . . . were not nominally significant." |
| "What evidence do you have to say that the overall efficacy you observed in [Harmony] was not merely driven by great efficacy in the PDD/DLB subjects?" | "It appears that the finding in [the PDD] subgroup is driving the overall study results." |
| "The differential treatment effects observed across dementia subtypes in [Harmony] suggests there is a different risk-benefit profile for the different dementia subtypes." | "The findings from [Harmony] suggest a differential response to pimavanserin across dementia subtypes, which questions whether [DRP] is a useful construct for a potential indication for pimavanserin." |

The evidence also shows Defendants, specifically Davis, sought to downplay Harmony's disappointing subgroup data by expunging references to subgroups from Acadia's press releases, misrepresenting the import of this data to FDA, and not fully disclosing the data at CTAD. *See supra* §B.5. Likewise, Defendants internally recognized that 019 was "a messy study at best" and were "sure FDA [would] point out all the warts and flaws." PUF 249; Ex. 191 at -679. Defendants also knew by July 2020 that FDA believed the sNDA did not "include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of [DRP]." Ex. 286 at -439; PUF 206-19. And by January 2021, FDA issued formal reports to Acadia on defects in 019. PUF 252-53.

Indeed, when Acadia received the March 2021 DL, employees quickly (and correctly) identified "the broad DRP indication," the "totality of subtype efficacy" and "efficacy (not just due to PDP effects)," along with "019 [being] discarded" as the likely "deficiencies." PUF 224. Stankovic and others involved in Harmony

-18-

21cv00762

admitted (after the Class Period) "[l]onger and larger trials are required to determine the effects of pimavanserin in dementia-related psychosis" and that the PDP "may have skewed the results in favor of pimavanserin," when Harmony's results were published in the *New England Journal of Medicine*. Ex. 294 at 309, 318; PUF 245.[11]

A jury applying the law already set out by the Court to the evidence could easily find Defendants' touting of Harmony and 019 was materially misleading. For example, Defendants repeatedly told investors that Harmony's top-line results "demonstrat[ed] a highly statistically significant longer time to relapse of psychosis" and characterized the data as "meaningful," "positive," "pivotal," "robust," and "strong," but in reality Defendants knew, but failed to disclose, that "the Harmony Study had disappointing subgroup data," rendering their "positive statements regarding the results . . . materially misleading."[12] *MTD Order*, at *10.

### B.    A Battle of the Experts Also Precludes Summary Judgment

Falsity is supported by admissible expert testimony. Drs. Peck and Schneider opine that directionally consistent subgroup efficacy data was an FDA approval requirement outlined in the EOP2 minutes. PUF 135. Drs. Schneider and Madigan will tell the jury how the Harmony subgroups failed to meet this requirement. PUF 176, 250. Defendants have not moved to exclude these opinions, but have competing experts with contrary opinions. *See* Dkt. No. 198-1. Thus, on the critical issues of whether (i) there was a subgroup term of the FDA agreement, and (ii) Harmony's data had satisfied that term, "there are dueling experts" who "put forward opinions in contradiction with each other." *Pearlstein v. Blackberry Ltd*, 2022 WL 19792, at *9 (S.D.N.Y. Jan. 3, 2022); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1228 (S.D. Cal. 2010) (falsity of statements "a jury question" where "there [were] competing expert opinions as to whether [defendant's] valuation of goodwill

---

[11]    This evidence also supports Plaintiffs' first category of misstatements because it shows Defendants understood the importance of the subgroup data to FDA.

[12]    More data misstatements are at PUF 167, 221, 236, 256.

-19-

violated GAAP"). Since, "those opinions are important to the result of a material factual dispute," it precludes summary judgment. *Id*.

### C.    Defendants' Remaining Falsity Arguments Are Meritless

Faced with this Court's prior rulings, the strong evidence of their wrongdoing, and uncontested expert testimony, Defendants raise a host of meritless arguments.

*First*, they argue there was no subgroup requirement because the phrase "directional consistency" is not in the FDA correspondence. Br. 16. This is wrong because "directional consistency" *does appear* in Acadia's explanation to FDA of the "intended objective" of the subgroup analyses in Harmony. PUF 130. It also misses the point. As exemplified by Acadia's Dr. Foff, the evidence shows "[i]t was the collective understanding at Acadia that to support the DRP indication," Harmony's subgroup data needed to be "directionally" consistent. PUF 131. And Defendants are essentially silent on the evidence showing Acadia was concerned about the subgroup data and understood its importance for sNDA approval. This evidence includes: (i) Acadia's identification of the "risk" of "inconsistent subgroup data" on multiple occasions; (ii) Davis telling Acadia's board that FDA was looking for "directional alignment"; and (iii) Acadia concluding the subgroup data were the likely "deficiencies" in March 2021. PUF 153, 177, 224; *see supra* §B.1-5.

FDA guidance also confirms the existence of a subgroup efficacy requirement, despite Defendants' arguments to the contrary. *See* Br. 16-18. The CRL makes clear that FDA believed there was a subgroup requirement for approval and nothing in the FDA guidance documents says otherwise. Indeed, FDA confirmed to Acadia that it had followed all applicable procedures. PUF 270. And Defendants have offered no reason for why FDA would break its own rules and guidance in this case to move the goal posts. The more compelling reading of the FDA guidance and the evidence is that these documents do "not create or confer any rights on any person" or "operate to bind FDA or the public," and so do not establish

the kinds of rules and requirements Defendants ascribe to them.  PUF 263; Exs. 21-31.  Moreover, the guidance makes clear that:

- FDA "*should not communicate to applicants the proposed or planned regulatory action before issuance of the official written regulatory action*" (e.g., the CRL), Ex. 23 at 11;

- "communication . . . during the review of an application" is limited to things like "requests for additional information" and "conveyance of identified deficiencies that need to be" and can be "corrected before the application can be approved," *id.*; PUF 268-69;

- and so "[d]eficiencies that require significant additional work by the applicant" should "be conveyed to the applicant in an appropriate action letter" (again, like the CRL), Ex. 26 at 34; PUF 268.

That's exactly what happened here.  FDA concluded the subgroup efficacy data was inconsistent because the results were being driven by PDD.  PUF 220.  Acadia could do nothing about this—because Harmony was over—but FDA still reviewed the sNDA to determine if Harmony satisfied a separate commitment to FDA.  PUF 261.

*Second*, Defendants claim there can be "no implicit" or undefined requirements.  Br. 19-20.  But this rehashes Defendants' incorrect claim that the EOP2 minutes not using the phrase "directionally consistent" means there was no subgroup requirement.   This argument also makes no sense because FDA's requirement that Harmony's results be "clinically meaningful" *was* undefined.  DUF 55, 58; PUF 147-49.  The term "clinically meaningful" has no set meaning in FDA guidance or law.  PUF 262.  And the SAP and protocol never mention the phrase "clinically meaningful," much less specify how Harmony's data will demonstrate clinical meaningfulness. PUF 155.  In fact, the "clinically meaningful" requirement has *less* specificity than FDA's subgroup requirement.  Harmony "as proposed" by Acadia pre-specified stratification by the dementia subgroups and the SAP detailed analyses of these data.  PUF 157.  As Acadia said, the "purpose" of these analyses "was to explore directional consistency," so this is a red herring.  PUF 130.

*Third*, Defendants wrongly claim that FDA never bases an approval decision on data not "reflected in the *primary endpoint*," so there could have been no

-21-

subgroup requirement. Br. 17-18. Defendants' support for this comes only from their "FDA Expert's" interpretation of FDA guidelines. *See id.* But Plaintiffs' FDA expert has a contrary interpretation, which presents a battle of the experts that must be resolved by the jury. *See supra* §I.B. This contention is also counterfactual as FDA *did* make its approval decision based on Harmony's subgroup data. The more plausible reading of the evidence is that Acadia needed *both* positive top-line results *and* directionally consistent subgroup results, as Dr. Peck says. PUF 151, 271.

*Fourth*, Defendants argue that there was not "any actionable omission" because all of Harmony's data was disclosed along with any subgroup approval requirements. Br. 20-21. The claim that "negative information about the studies was fully disclosed to investors" is an affirmative truth-on-the-market defense. *MTD Order*, at *11; *see also* Defs.' Answer, Dkt. No. 69 at 36 ("Second Affirmative Defense"). To prevail, Defendants must *prove* that the withheld information "was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *Recons. Order*, at *5-6 (citation modified). To meet this burden Defendants point to a comment from Plaintiffs' expert,[13] purported disclosure of "stratification" and Harmony's "subtype results," and one FDA guidance. Br. 20.

To start, as shown above, they never disclosed the EOP2 minutes and whether Defendants actually disclosed the subtype results at CTAD is contested. *See supra* §B.5. Moreover, there is not a shred of evidence that investors were aware of the FDA guidance "published nearly 20 years earlier." Br. 20. To the contrary, the

---

[13] Dr. Peck did not contradict Plaintiffs' theory of the case. *See* Br. 19-20. His report makes clear: "what FDA said is that Acadia could enroll patients with different types of dementia—as opposed to running separate studies in each disease—'so long as' Harmony allowed for, and included, analysis of the individual dementia subtypes to assess the safety and effectiveness of pimavanserin in each subtype," and labeling "refers to changes the indications for use from the treatment of PD to approval of an expanded indication for DRP," i.e., "FDA approval of the new DRP indication" depended on "the types of dementia enrolled in the Harmony study *and* how those patients respond to treatment." Ex. 154, App. C, ¶¶132, 134. He confirmed this at deposition. Ex. 142 at 274:20-280:25.

-22-

21cv00762

evidence shows Defendants hid the importance of the subgroup data and misled investors about the terms of the FDA agreement such that investors misapprehended the importance of Harmony's subgroup data. For example, one analyst noted that "the results of HARMONY by subgroup [and] lack of regulatory precedent for an approval in 'dementia' broadly rather than a specific subtype" might be a hurdle to sNDA approval, but "based on discussions the company has had with FDA" and the "open dialog with FDA" (i.e., Defendants' misstatements about the FDA agreement) found "it unlikely that FDA will choose now to discriminate in the label based on dementia subtype." Ex. 246 at -111. Defendants have not carried their burden here.

*Fifth*, Defendants claim there was no fraud because none of the misstatements "have anything to do with the subject matter of Question 2b" in the EOP2 minutes. Br. 23. This is another red herring. FDA's response to Question 2b was the precise term "Acadia did not fully disclose." *Cert. Order*, at 387. This missing term is why statements about the FDA agreement were false or misleading *and* is one of the reasons why Defendants' touting of Harmony's top-line results was misleading because, in both instances, investors were robbed of the facts necessary to evaluate "the risk that the sNDA would not be approved." *MTD Order*, at *10. The misstatements have everything to do with FDA's answer to Question 2b.[14]

*Finally*, Defendants wrongly claim that their touting of the results of Harmony and 019 are inactionable opinions. Br. 23-24. While it may be true that some of "Defendants' interpretation[s] of the data and results" were opinions, Br. 24, this Court has already held (and Defendants conveniently ignore), those "are

---

[14] The absurdity of this argument is easily seen in the statements Defendants cite but tellingly do not quote. For example, Davis' statements, "as a reminder, we got a clear agreement from FDA . . . at our end of Phase II meeting, and we executed the plan that we agreed to with them" and "we agreed with the FDA . . . at our end of Phase II meeting and agreed on the plan for Phase III, and then we've executed that plan," have everything to do with the terms of the FDA agreement. *See* Br. 23 (citing Am. Compl. ¶125). So too for Davis' statement that Acadia asked FDA "to agree to 3 things," that FDA "agreed to all 3 of those," which is "documented in our minutes" and "underlines the confidence we have in the potential for approval in DRP" because Acadia "executed the exact plan that we laid out for [FDA]." *Id*.

-23-

21cv00762

nevertheless actionable if the statements omit additional material information whose absence makes the fact or opinion misleading to a reasonable person reading the statement fairly and in context," *MTD Order*, at \*10.  This is precisely the case here.  As shown above, *see supra* §I.A.2, there is enough evidence for the jury to find Defendants understood the truth about Harmony's disappointing subgroup data, its significance to the approvability of the sNDA, and the FDA's subgroup approval criteria, which all "increase[d] the risk that the sNDA would not be approved" and "rendered Defendants' positive statements regarding the results of the studies materially misleading," even if they were opinions.  *MTD Order*, at \*10.  Defendants also knew 019 was "messy" and likely to be a problem for FDA and never disclosed these facts.  PUF 249, 257-58.[15]  Defendants' contrary opinions are actionable.

In sum, there is more than enough disputed evidence for Plaintiffs to prove falsity at trial so summary judgment on this element should be denied.

## II.    A JURY MUST DECIDE IF DEFENDANTS HAD SCIENTER

"Generally, scienter should *not* be resolved by summary judgment." *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996).  Because "a *simple inference* of scienter is sufficient to support a jury's verdict," "at summary judgment, the standard" for establishing disputes of material fact "is less stringent" than the "strong inference" standard at the pleading stage.  *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1017 (S.D. Cal. 2011) (emphasis added), *abrogated on other grounds by Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025).  The Court has already found that Plaintiffs met the higher standard twice.  *See MTD Order*, at \*12; *Recons. Order*, at \*4.  Since then, discovery has uncovered extensive evidence of scienter.

---

[15]    FDA's post-Class Period comments on 019 do not exonerate Defendants. They are hearsay and, in all events, FDA again *rejected* Acadia's claim that 019 (and Harmony) were sufficient to approve a re-submitted sNDA.  PUF 246-48.

-24-

21cv00762

### A.    Evidence of Defendants' Actual Knowledge or Deliberate Recklessness Is Extensive

"[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (citation modified).   The evidence here shows Defendants made many objectively false statements while they knew the contrary truth about those statements, which evidences scienter.  *See supra* §I.

### 1.    Defendants Knew the Terms of the FDA Agreement and the Risk of Inconsistent Subgroup Data

This Court has already found a strong inference of scienter and that, given their positions in the Company, Defendants Davis and Stankovic "plausibly would have been aware of the terms of any agreement with the FDA and the alleged shortcomings" with the "results of the Harmony and -019 Studies." *MTD Order*, at *12.  The evidence has confirmed exactly that.  Stankovic and Davis personally attended FDA meetings about the sNDA, contemporaneously received copies of the minutes of those meetings documenting FDA's position that the subgroup results mattered, and received and discussed the results of the studies.  *E.g.*, PUF 153, 177-79.  For instance, Stankovic wrote internally that "per discussion with FDA," "both [Acadia] and [FDA] will look at the [hazard ratio] for each dementia subgroup and or dementia subtype."  PUF 172.  Likewise, in an e-mail to Acadia's board, Davis recounted that FDA "indicated they would look for directional alignment" across the subgroups.  PUF 177.  Thus, Defendants knew that FDA was going to analyze Harmony's subgroup efficacy before approving the sNDA.

Defendants now concede they "knew the FDA would *look* at the subgroup analyses."  Br. 26.  Defendants then try to escape the obvious import of that knowledge by claiming that because the subgroup results were not "the primary benchmark for success" in Harmony and FDA did not state differential subgroup

data would "present an absolute barrier to approval," there can be no scienter. Br. 26-27 (citation modified). Defendants are wrong for numerous reasons.

To begin with, they told investors *the opposite* of what they now concede. For example, at a January 12, 2021 investor conference, Davis said "*we're not looking at individual subtypes* as they are often referred to of dementia," in "alignment we established with the FDA" at the EOP2 Meeting. Ex. 60 at 5 (emphasis added). Furthermore, the evidence confirms that the problems with Harmony and 019 identified in the CRL, including "inconsistent" subgroup results, were well known and long considered *risks to approval* of the sNDA. *See supra* §B.2-4. If Defendants honestly believed that FDA would not analyze the subgroup data before approving the sNDA, then why did they repeatedly classify "differential treatment effects" in subtypes as a risk to approval? *See* PUF 153, 203.

This same evidence also rebuts the claim that there can be no scienter because various witnesses "testified that they believed the dementia subtype results *were* directionally consistent." Br. 27-28. A jury will have to weigh a mountain of contemporaneous evidence showing widespread belief at the Company that the differential effects by dementia subtype was a threat to the sNDA with excerpts of after-the-fact deposition testimony of highly prepped Acadia loyalists, and determine which is more persuasive. PUF 281-83. But even if Defendants did believe the results were directionally consistent, it was the epitome of recklessness to conceal from investors FDA's subgroup approval criteria.

Defendants' reliance on *Kuyat v. BioMimetic Therapeutics, Inc.*, a non-binding case, is unavailing. Br. 26-27 (quoting 747 F.3d 435, 442-43 (6th Cir. 2014)). In that case, it was unclear whether FDA would base its decision on the results in the ITT or mITT populations of the study, so the sponsor "fully disclosed the results of the study and told investors that the FDA wanted to see an analysis of both the ITT and mITT populations." *Kuyat*, 747 F.3d at 443. And because the sponsor's "stock price dropped 16% after the company released the [study] data,"

the court reasoned investors "understood the significance of the results of the study" as negative, and the disclosures were thus not misleading. *Id.* The evidence here is the opposite. Defendants told investors they were "not looking at individual subtypes" in Harmony because they "got a clear agreement from" FDA to "pursu[e] [DRP] broadly." Ex. 56 at 6-7; Ex. 57 at 8; Ex. 60 at 5. And since Defendants misled investors about the import of the subgroup results, Acadia's share price soared on both the initial disclosure of Harmony's top-line results and later disclosure of limited subgroup efficacy data. DUF 65, 73.

### 2. Defendants' Concealment of Key Facts Supports Scienter

While Company insiders viewed the evidence of pimavanserin's differential treatment effect as a threat behind closed doors, Davis instructed the Company to stop talking about the subgroups in public communications. For example, a draft of Acadia's June 15, 2020 press release announcing the sNDA's filing referred to "the five most common clinically diagnosed subtypes of dementia," but Davis had that language scrubbed "per history of not wanting to highlight subtypes." PUF 200; Ex. 128 at 146:1-2. Similarly, on July 20, Acadia announced that FDA had accepted the sNDA for standard, not priority, review and that FDA had "not identified any potential review issues at this point." DUF 93; Ex. 39 at 1. But FDA had privately advised the Company three days earlier that "it [wa]s unclear if the clinical data" in the sNDA "demonstrate[d] the potential to be a *significant improvement* in safety or effectiveness." PUF 208. Thus, after receiving this communication (and a similar one on July 28) Defendants knew, and kept secret, the basis of FDA's denial of priority review was the agency's concern that the "clinical data" in the sNDA did not show a "significant improvement in safety or effectiveness." PUF 208, 215.

### 3. Defendants' Argument About the 019 Misstatements Fails

Defendants' claim that Plaintiffs cannot prove scienter for their "statements characterizing the 019 Study" is unavailing. Br. 28. It turns solely on outlier, non-binding authority in which the Second Circuit applied a bright-line rule that no other

-27-

Court of Appeal has since discussed or adopted. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023). The record here is clear: the protocol deviations and other deficiencies that rendered the 019 Study incapable of supporting the sNDA were known to Defendants but unknown to the market. PUF 204-05, 250. Failing to disclose known adverse facts is a classic hallmark of scienter. *MTD Order*, at *12. Defendants also ignore, as the Court previously found, "that Defendants intentionally or recklessly misrepresented the terms of an agreement with the FDA buttress the allegation that Defendants acted with scienter in shielding negative information about the studies from the public." *Recons. Order*, at *4. Thus, Defendants' misstatements about the agreement independently support the inference that Defendants lied about other things, like known problems with 019.

### B.   Davis and Stankovic Had Motive to Commit the Fraud

Defendants also made massive stock sales that Defendants largely ignore. "To evaluate [the] suspiciousness of stock sales" for purposes of scienter, courts consider "three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). Here, those factors indicate the stock sales of Defendants Davis and Stankovic were suspicious, and evidence of scienter. Davis sold at least 530,392 Acadia shares at artificially inflated prices during the Class Period for roughly $24.6 million, equal to roughly 80% of his vested equity interests at the time. PUF 272. Similarly, Stankovic sold at least 368,993 shares during the Class Period for roughly $18.93 million, equal to roughly 82% of his vested equity interests at the time. PUF 277. These sales were out of line with their prior trading because neither had sold any Acadia shares before the Class Period. PUF 273, 278. The Court previously held "the absence of any sales of stock prior to the class period supports an inference that the individual Defendants' sales were unusual or suspicious and weigh in favor of an inference of scienter." *MTD Order*, at *13. The evidence has borne out that inference.

-28-

## III.   A JURY MUST DECIDE IF THE FRAUD CAUSED LOSSES

"To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation modified); *see* Br. 18.   There is ample evidence, including from Plaintiffs' expert Dr. Feinstein, to prove that most of the losses following Acadia's March 8 and April 5, 2021 disclosures were caused by the fraud.

### A.   The Evidence Shows the Fraud Caused Losses

Based just on his exhaustive review of, *inter alia*, Plaintiffs' factual allegations, Acadia's own statements, and analyst reports, and applying generally accepted economic principles, Dr. Feinstein found strong evidence that the alleged misrepresentations and omissions caused the market to overestimate the probability that FDA would approve pimavanserin for DRP, and thus caused the market to overvalue Acadia stock.   Ex. 144 ¶¶173-98.   He also performed a customary event study—the gold standard for assessing loss causation—which provided confirmatory, empirical proof of loss causation.   *Id.* ¶¶198-257; *see Smilovits v. First Solar, Inc.,* 2019 WL 7282026, at *5-9 (D. Ariz. 2019) (event studies are "standard operating procedure" in securities cases); *In re Twitter, Inc. Sec. Litig.,* 2020 WL 13863616, at *9 (N.D. Cal. 2020) ("[e]vent studies [like Dr. Feinstein's] are routinely accepted" to assess loss causation).

Event studies investigate whether a security price "rose or fell specifically in response to new, company-specific information."   Ex. 144 ¶¶201-02.   After using regression analysis to control for the effects of market and industry sector factors, Dr. Feinstein's event study analysis showed that Acadia's stock price experienced statistically significant *increases* after the issuance of Defendants' statements on September 9 and December 4, 2019—and statistically significant *declines* after their disclosures of March 8 and April 5, 2021.   *Id.* ¶¶229-53.   This analysis, combined with his further analysis to account for the effect of potentially "confounding" (non-

fraud-related) information that might otherwise explain those price changes (or some portion thereof), shows that investors suffered large, quantifiable losses that were caused by the alleged misrepresentations and omissions. *Id.* ¶¶254-57.

Defendants focus primarily on the "back-end" disclosures of March 8 and April 5, 2021 (with one exception addressed in §III.B.3, *infra*). But this ignores the fact that Dr. Feinstein was able to measure the amount of artificial price inflation caused by Defendants' alleged misrepresentations and omissions directly, by examining their price impact at the "front end" on September 9 and December 5, 2019. Ex. 144 ¶¶229-38, 265-82. That event study analysis identifies such clear price impact at the front end, which is so closely matched by corresponding losses upon the identified dissipation of the fraud-induced inflation, illustrates how Dr. Feinstein's "back-end" analysis fits hand-in-glove with his "front-end" analysis of loss causation. *See id.* ¶255 & accompanying chart.

Defendants' attacks on Dr. Feinstein's back-end analysis fail in any event. For example, his analysis shows that on March 9, 2021 (after Acadia's after-market disclosure of its receipt of the DL the prior day), Acadia stock had a "statistically significant residual decline of 63.69%" ($21.57 per share). *Id.* ¶247. Dr. Feinstein also reviewed related analyst commentary about the negative news of March 8, which showed that analysts linked it back to concerns that several of them had raised earlier about Harmony's design and the potential importance of its subgroup data. *Id.* ¶¶133-34, 142; *see also* PUF 226-29. Accordingly, and after looking for possible non-fraud confounding factors and finding none, he concluded that Defendants' March 8 statements "partially corrected both the substance of and the valuation impact of [the prior] alleged misrepresentations and omissions." Ex. 144 ¶¶248-49.

Similarly, Dr. Feinstein's event study analysis for April 5, 2021 (when Acadia disclosed the CRL) shows that Acadia stock had a statistically significant residual decline of 19.40%, or $4.51 per share, that day. *Id.* ¶251. He again reviewed relevant analyst reports, which showed that they "pointed out that the reasons

-30-

underlying the FDA's issuance of a CRL ran contrary to what Defendants had told the market about what efficacy data would (or would not) be considered by the FDA." *Id.* ¶155; *see, e.g.*, PUF 238-40. Accordingly, and after he again looked for non-fraud confounding factors and found none, Dr. Feinstein concluded that the April 5 disclosure "dissipated the additional artificial inflation" remaining in Acadia stock after the March 9 partial corrective disclosure "that had previously been caused by [the] alleged misrepresentations and omissions." Ex. 144 ¶252.[16]

Thus, even in the absence of the additional "front-end" analysis that Defendants ignore, Plaintiffs have "sufficient evidence to show a causal connection between the material misrepresentation[s] and the loss[es]." *Novatel*, 830 F. Supp. 2d at 1019 (citation modified). Instead, Defendants raise at most disputes that can only be resolved at trial, not summary judgment. *See Twitter*, 2020 WL 4187915, at *15-16; *Baker*, 423 F. Supp. 3d at 934 ("consistent with [plaintiff's expert's] opinion," reasonable jury could find loss causation).

### B.   Defendants' Loss Causation Arguments Are Meritless

Defendants' loss causation attacks ignore the law, distort Plaintiffs' case, and reprise truth-on-the-market defenses that the Court has rejected three times.

#### 1.   It Is Irrelevant that the DL and CRL Do Not Contain the Words "Directional Consistency"

Defendants rely on a "mirror-image" loss causation rule that the Ninth Circuit has rejected. In short, "to be corrective, a disclosure need not precisely mirror the earlier misrepresentation," and "[i]t is enough if the disclosure reveals new facts that . . . render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Here, Defendants misled investors about the likelihood of sNDA approval by

---

[16]   Dr. Feinstein noted that had he included all of the $4.51 per share residual decline, it would mean that the total residual *declines* observed on March 9 and April 5, 2021 ($24.20), slightly exceed (by $1.77) the total residual increases of September 9 and December 5, 2019 ($22.43). As a matter of conservatism, he therefore capped damages (in Defendants' favor) at the lower level, and thus excluded $1.77 of the $4.51 April 2021 drop from his damages estimate. Ex. 144 ¶304.

-31-

misrepresenting the terms of the FDA agreement and the sufficiency of Harmony and 019 to support such approval, and Dr. Feinstein's analysis shows how (assuming those allegations are true), news of the DL and CRL were corrective events that informed the market about these misstatements. This meets *BofI*'s test.

By contrast, Defendants' argument that Plaintiffs cannot establish loss causation because neither the DL nor the CRL "contain[ed] the phrase 'directional consistency'" is baseless. Br. 30. Indeed, Defendants merely repackage their prior price impact challenge to class certification—i.e., that there was "a mismatch" between the contents of the challenged statements and the corrective events—that this Court properly rejected. *Cert. Order*, at 389-91 (finding, under a preponderance of evidence standard, that the CRL "contain[ed] information regarding the FDA's focus on the Harmony Study's subtype data that was not previously disclosed"). In short, Defendants come nowhere close to carrying their "heavy burden" at summary judgment, *Provenz*, 102 F.3d at 1493, of establishing "that, as a matter of undisputed fact, the depreciation in the value of the stock could not have resulted from the alleged false statement[s] or omission[s] of the defendant," *Novatel*, 830 F. Supp. 2d at 1019, as there is an issue of material fact as to whether "the *subject* of the [DL and CRL] relate[d] back to the misrepresentation[s]," *Baker*, 423 F. Supp. 3d at 932.

Similarly, Defendants baselessly claim that "[t]he DL said nothing specific at all," and Acadia's after-market disclosure on March 8 "reiterated th[at] point" without introducing new information to the market. Br. 30. Acadia's March 8 press release did say *something*: that "FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments." Ex. 42 at 1. The "deficiencies" that "preclude[d] discussion of labeling" were the very matters Defendants misrepresented to investors—notably, the deficient subgroup data and its failure to show directional consistency. This is ample "causal connection" between the DL and "the very facts about which defendants lied." *See Mineworkers'*, 881 F.3d at 753. And Defendants' mirror-image-based argument that

"analysts never mentioned 'directional consistency'" or a related approval requirement, Br. 31, fails as already explained. And in any event, after the announcement of the CRL, many analysts pointed out that the reasons underlying the CRL contradicted what Defendants had told investors about their purported agreement with FDA. *See* PUF 238; Ex. 144 ¶¶155-57.

Defendants also err in arguing that "the CRL's reference to a 'differential response' across dementia subtypes and its callback to the Labeling Statement" in the EOP2 minutes do not relate to "'directional consistency.'" Br. 31. *First*, it rests on a mirror-image rule that does not exist. *Second*, it is merely Defendants' reading of a key disputed fact that is subject to competing evidence and disputed interpretations. For example, Plaintiffs' FDA expert has opined that the CRL's "differential response" language "is a direct referenc[e] to the lack of directional consistency" in Harmony's subgroup results. PUF 233. Defendants' expert's contrary view simply raises another fact dispute for the jury. *See, e.g.*, *Highfields Cap. I, LP v. SeaWorld Ent., Inc.*, 2022 WL 1037210, at *36 (S.D. Cal. Apr. 6, 2022).

### 2. Defendants' Truth-on-the-Market Reprisal Is Meritless

Defendants' claim that the price declines at the end of the Class Period resulted from "known risks and known material facts" about Harmony reprises a truth-on-the-market argument the Court has already rejected. Br. 32. The Court has determined "that Acadia did not fully disclose the terms of [its] agreement" with FDA. *Cert. Order*, at 387. The FDA agreement was the context in which Harmony's data had to be assessed because "this omitted term provides key information with respect to the significance of the subgroup data." *Id.*[17] Thus, because all the terms of the FDA agreement were not disclosed, the data could not have been, either.

Defendants' argument is also factually wrong because the two slides at CTAD that covered Harmony's subgroup results did not disclose the necessary subgroup

---

[17] Indeed, this is precisely how securities analysts assessed the clinical trial data—through the lens of the FDA agreement Defendants touted. PUF 168.

-33-

21cv00762

efficacy data. As detailed above, Acadia did not disclose the primary efficacy data for the subgroups, downplayed the importance of the cherry-picked data that was disclosed, and then reminded investors about Acadia's agreement with FDA to assuage any concerns. *See supra* §B.5. Thus, there is a genuine dispute of material fact regarding whether (and if so, to what extent) Defendants conveyed the full truth about the subjects of their misrepresentations and omissions to the public at CTAD.[18]

### 3. Defendants' 019-Specific Argument Fails

Defendants wrongly claim Dr. Feinstein "concede[d] that the alleged misstatements about the 019 Study did not cause any artificial inflation on either the September 9 or December 4, 2019 dates analyzed in his report." Br. 33. This grossly mischaracterizes the testimony. As to all the material omissions at issue, Dr. Feinstein testified: "[t]hey all have an inflationary effect." Ex. 143 at 93:24. Further, Defendants ignore that here, investors viewed information about the 019 Study in the context of being misled about Defendants' purported agreement with FDA about the sNDA and the import of Harmony's subgroup data, which collectively misled investors as to the likelihood of FDA approving the sNDA. Thus, Dr. Feinstein's analysis does not seek to apportion artificial inflation in piecemeal fashion based on each "category" of misstatements Defendants have tried to cabin Plaintiffs' case to.[19]

_____

[18] Even assuming the CTAD presentation disclosed "all of the FDA's observations about the Harmony Study recited in the CRL" (it did not), summary judgment is inappropriate because Defendants omitted the key terms of the FDA agreement. Br. 32. Without that information, investors did not understand the import of Harmony's data. *In re Oracle Corp. Securities Litigation*, which Defendants cite for the proposition that "the only new information revealed in the CRL was the FDA's verdict" on the sNDA, is thus inapposite. Br. 33 (quoting 2009 WL 1709050, at *16 (N.D. Cal. June 19, 2009)). In *Oracle*, the disclosure was about an earnings miss, which plaintiffs construed as disclosing a specific product's deficiencies, contrary to defendants' "overwhelming evidence that the market understood the announcement as disclosing that the earnings shortfall was caused by the economic downturn." 2009 WL 1709050, at *14-16.

[19] Defendants' remaining argument is that Plaintiffs cannot prove loss causation if Dr. Feinstein's opinions are excluded. Br. 28-29. As set forth in Plaintiffs' concurrently filed opposition to Defendants' motion to exclude, Dr. Feinstein's opinions are admissible, and the Court should reject this argument.

-34-

## IV.   NO STATEMENTS ARE BARRED FROM THE JURY

Courts allow plaintiffs to present statements to the jury as false or misleading when those statements were not expressly challenged in the operative complaint. *See, e.g.*, *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 2429593, at *5-6 (N.D. Cal. Aug. 24, 2007) (unpled challenged statements "deemed part of the complaint" at summary judgment where defendants "were on notice that [plaintiffs] were challenging the disputed statements because [plaintiffs] included them in their responses to [d]efendants' contention interrogatories"); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 242 n.11 (2d Cir. 2016) (unpled statements identified in "interrogatory responses" and "[p]laintiffs' expert reports" properly presented to jury because plaintiffs are not bound "to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation"). Defendants concede that they have been on notice for months that Plaintiffs intend to challenge the statements identified in Appendix B to the Fukumura Declaration as false or misleading at trial. Br. 34. As in *JDS* and *Vivendi*, Plaintiffs have identified those statements in their answers to Defendants' contention interrogatories and expert reports, as Defendants also concede. In contrast, Defendants rely on inapposite cases where there was no such notice. *See Kaplan v. Rose*, 49 F.3d 1363, 1369-70 (9th Cir. 1994); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4188787, at *1-2 (N.D. Cal. May 19, 2020); *SeaWorld*, 2022 WL 1037210, at *21. And Defendants' own authority makes clear that the additional misstatements are *evidence* supporting the misstatements pled in the complaint, which can be presented to the jury at trial. *SeaWorld*, 2022 WL 1037210, at *25 n.13 (not pleading statements did "not prohibit Plaintiffs from seeking to introduce these statements into evidence" at trial). Accordingly, the Court should not preclude Plaintiffs from challenging the statements identified in Appendix B to the Fukumura Declaration.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

-35-

DATED: January 14, 2026

Respectfully submitted,

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

/s/ *William C. Fredericks*

William C. Fredericks (*pro hac vice*)
Donald A. Broggi (*pro hac vice*)
Marc J. Greco (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
mgreco@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
Jacob B. Lieberman (*pro hac vice*)
Jessica M. Casey (*pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
alawrence@scott-scott.com
jlieberman@scott-scott.com
jcasey@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
John T. Jasnoch (SBN 281605)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff and Class Representative City of Birmingham Retirement and Relief System and the Certified Class*

-36-

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
P. Cole von Richthofen (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
shopkins@zlk.com
gpotrepka@zlk.com
cvrichthofen@zlk.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th & 19th Floors
Los Angeles, CA 90071
Telephone: (213) 985-7290
aapton@zlk.com

*Counsel for Additional Plaintiff and Class Representative Ohio Carpenters' Pension Fund*

-37-