John T. Jasnoch (SBN 28105)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff City of Birmingham Retirement and Relief System and the Certified Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM and OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic,<br><br>Defendants. | No. 3:21-cv-00762-WQH-MSB<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF DR. CARL C. PECK AND DR. STEVEN P. FEINSTEIN**<br><br>Hon. William Q. Hayes |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

LEGAL STANDARD ................................................................................... 3

ARGUMENT ................................................................................................ 3

I.   DR. PECK'S OPINIONS ARE ADMISSIBLE.................................... 3

    A.   Defendants Have Waived Objection to Most of Dr. Peck's Opinions .................................................................................... 5

    B.   Dr. Peck's Probability of Success Opinions Are Reliable................... 6

        1.   Defendants Fundamentally Misconstrue Dr. Peck's Approach ................................................................................. 7

        2.   Defendants' Quibbles Go to Weight and Not Admissibility............................................................................ 11

    C.   Dr. Peck's Remaining Opinions Are Admissible .............................. 14

        1.   The Opinions Are Reliable .................................................. 15

        2.   Dr. Peck's Opinions Will Be Helpful to a Jury ....................... 16

II.  DR. FEINSTEIN'S OPINIONS ARE ADMISSIBLE................................. 18

    A.   Dr. Feinstein's Qualifications and Summary of Opinions ................. 18

    B.   Defendants' Attacks on Feinstein's Loss Causation Analysis Fail............................................................................................... 20

        1.   Defendants' Argument That Dr. Feinstein Failed to Analyze Causation, and Instead Simply "Assumed" It, Is Baseless................................................................................ 20

        2.   Dr. Feinstein Did Not Rely on Any Improper Assumptions ...................................................................... 23

        3.   Defendants' Assertion That Dr. Feinstein Did Not Consider Potentially Confounding Information Is Also Baseless................................................................................ 24

    C.   Dr. Feinstein's Analysis of Artificial Inflation Is Reliable ............... 31

        1.   Overview of Dr. Feinstein's Damages Analysis ...................... 31

        2.   Dr. Feinstein's Analysis Properly Disaggregates the Non-Fraud-Related Share Price Increase On 9 September 2019 ..... 31

            a.   Dr. Feinstein's Use of Dr. Peck's 9-Sep-2019 But-For POS Was Appropriate, and Dr. Feinstein's Model Can, in Any Event, Easily Adopt to *Any* POS the Jury Ultimately Finds ..................................... 31

b.      Defendants' Arguments Regarding an Alleged Need for "Potential Error Testing" Are Baseless...........35

3.      Dr. Feinstein Correctly Analyzed the Extent of Additional Inflation in Acadia Shares Post-December 4, 2019 .................................................................................39

a.      There Is No Inconsistency in Dr. Feinstein's Analysis .................................................................39

b.      Dr. Feinstein's Analysis *Does* Disentangle the Impact of Fraud- and Non-Fraud-Related Information ...................................................................42

CONCLUSION...................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*,
2014 WL 1494023 (W.D. Wash. Apr. 16, 2014).....................................................8

*AIG Ret. Servs., Inc. v. Altus Fin. S.A.*,
2011 WL 13213589 (C.D. Cal. Sept. 26, 2011).....................................................18

*Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)................................................................................3, 30

*Angley v. UTI Worldwide Inc.*,
311 F. Supp. 3d 1117 (N.D. Cal. 2018) ...................................................................29

*Aslan v. Ferrari N. Am., Inc.*,
2018 WL 6321635 (C.D. Cal. Oct. 19, 2018) ........................................................13

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) .....................................................................6

*Blue Bottle Coffee, LLC v. Liao*,
2023 WL 6850573 (N.D. Cal. Oct. 16, 2023)...........................................................8

*Cabrera v. Cordis Corp.*,
134 F. 3d 1418 (9th Cir. 1998).................................................................................38

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
348 F.R.D. 372 (S.D. Cal. 2024).........................................................................1, 30

*Doe v. City of Los Angeles*,
2025 WL 3190789 (C.D. Cal. Oct. 28, 2025) ........................................................23

*Dorn v. Burlington N. Santa Fe R.R. Co.*,
397 F.3d 1183 (9th Cir. 2005)..................................................................................24

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................26

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022)......................................................................................3

*Erhart v. BofI Holding, Inc.*,
   445 F. Supp. 3d 831 (S.D. Cal. 2020) ....................................................... 9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015)............................................................. 26

*Freeland v. Iridium World Commc'ns, Ltd.*,
   545 F. Supp. 2d 59 (D.D.C. 2008) ..........................................24, 30, 43

*FTC v. Amazon.com, Inc.*,
   2025 WL 2381704 (W.D. Wash. Aug. 15, 2025) ................................... 17

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...................................... 14

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004)........................................................... 12, 17

*Hayes v. MagnaChip Semi., Inc.*,
   2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ...................................... 29

*Hicks v. Milton*,
   2024 WL 6848787 (D. Utah Dec. 31, 2024)......................................... 24

*Hsu v. Puma Biotechnology, Inc.*,
   2018 WL 4956520 (C.D. Cal. Oct. 5, 2018) ................................... 30, 42

*In re Bard IVC Filters Prods. Liab. Litig.*,
   2017 WL 6523833 (D. Ariz. Dec. 21, 2017)........................................... 9

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020)................................................................. 28

*In re Celera Corp. Shareholder Litigation*,
   2012 WL 1020471 (Del. Ch. Mar. 23, 2021)........................................ 11

*In re Citimortgage, Inc. Home Afford. Modification Prog. Litig.*,
   2013 WL 8844095 (C.D. Cal. Oct. 7, 2013) ........................................ 38

*In re Countrywide Fin'l Corp. Sec. Litig.*,
   273 F.R.D. 586 (C.D. Cal. 2009) .......................................................... 29

*In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods.
   Liability Litig.*,
   2021 WL 3286439 (S.D. Ohio Aug. 1, 2021)......................................... 7

-iv-

*In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*,
2021 WL 2577490 (D. Kan. June 23, 2021) ........................................................ 10

*In re Fosamax Prods. Liability Litig.*,
645 F. Supp. 2d at 191 ........................................................................................... 17

*In re Groupon*, *Inc., Sec. Litig.*,
2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ........................................... 21, 30, 42

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) ................................................................. 24

*In re Namenda Indirect Purchaser Antitrust Litig.*,
2021 WL 2403727 (S.D.N.Y. June 11, 2021) ............................................... 12, 13

*In re Oracle Corp. Sec. Litig.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009) ..................................................... 23

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................................ 27, 42

*In re Solodyn (Minocycline Hydrocholoride) Antitrust Litig.*,
2018 WL 734655 (D. Mass. Feb. 6, 2018) ............................................................ 9

*In re Tesla, Inc. Sec. Litig.*,
2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) ..................................................... 26

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 13863616 (N.D. Cal. Jan. 28, 2020) .............................................. 21, 22

*In re Vale S.A. Sec. Litig.*,
2022 WL 122593 (E.D.N.Y Jan. 11, 2022) ................................................... 29, 30

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods.*
*Liab. Litig.*,
2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ........................................... 9, 10, 17

*Jordan v. City of Chicago*,
2012 WL 254243 (N.D. Ill. Jan. 27, 2012) ........................................................... 8

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ................................................................. 14

*Maldonado v. Apple, Inc.*,
2021 WL 1947512 (N.D. Cal. May 14, 2021) ..................................................... 23

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014)................................................................................ 3

*Open Text S.A. v. Box, Inc.*,
2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ................................................ 13, 14

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010)........................................................................... 3, 7

*Ramirez v. Olympic Health Mgmt. Sys., Inc.*,
610 F. Supp. 2d 1266 (E.D. Wash. 2009) ......................................................... 10

*SEC v. Leslie*,
2010 WL 2991038 (N.D. Cal. July 29, 2010)............................................... 30, 42

*Sjunde AP-Fonden v. Goldman Sachs, Inc.*,
798 F. Supp. 3d 416 (S.D.N.Y. 2025)................................................................ 26

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 27, 2019)..............................11, 21, 26, 42

*Strougo v. Tivity Health, Inc.*,
2025 WL 1415896 (M.D. Tenn. May 15, 2025)........................................27, 28

*Torliatt v. Ocwen Loan Servicing, LLC*,
570 F. Supp. 3d 781 (N.D. Cal. 2021) .............................................................. 17

*United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ........................................................... 17

*United States v Diaz*,
876 F.3d 1194 (9th Cir. 2017)......................................................................... 17

*Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*,
2022 WL 17369626 (C.D. Cal. Oct. 4, 2022) .................................................... 8

*Wroth v. City of Rohnert Park*,
2019 WL 1766163 (N.D. Cal. Apr. 22, 2019) .................................................. 13

**OTHER AUTHORITIES**

Federal Rule of Evidence 403 ............................................................................ 38

Federal Rule of Evidence 702 ......................................................................... 3, 8

Standard & Poor's, *Consensus Estimates: An Introductory Understanding*, www.spglobal.com/market-intelligence/en/news-insights/research/2024/09/consensus-estimates-an-introductory-understanding (Mar. 27, 2024) ........................................................................ 36

21cv00762

**TABLE OF DEFINED TERMS**

| Term | Definition |
|---|---|
| "Acadia" | Defendant Acadia Pharmaceuticals, Inc. |
| "Brief" or "Br." | Memorandum in Support of Defendants' Motion to Exclude the Opinions and Testimony of Plaintiffs' Experts Dr. Carl C. Peck and Dr. Steven Feinstein (Dkt. No. 198-1). |
| "CDER" | FDA's Center for Drug Evaluation and Research |
| "*Cert. Order*" | The Court's March 11, 2024 Order granting Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. No. 140). *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372 (S.D. Cal. 2024). |
| "Class Period" | September 9, 2019 to April 4, 2021, both dates inclusive. |
| "Class" | All persons and entities who purchased or otherwise acquired shares of Acadia common stock during the period from September 9, 2019 through April 4, 2021 (inclusive), and were damaged thereby. Excluded from the Class are (i) Defendants; (ii) the past and current officers and directors of Acadia; (iii) the immediate family members, legal representatives, heirs, parents, subsidiaries, predecessors, successors, and assigns of any excluded person or entity; and (iv) any entity in which any excluded person(s) have or had a majority ownership interest, or that is or was controlled by any excluded person or entity. |
| "Corrective Events" | (i) Disclosure of the Deficiencies Letter on March 8, 2021, and (ii) disclosure of the CRL on April 5, 2021. |

| Term | Definition |
|---|---|
| "CRL" | The April 2, 2021 Complete Response Letter issued by FDA to Acadia regarding the sNDA. |
| "CTAD" | Clinical Trials on Alzheimer's Disease |
| "Defendants" | Refers collectively to Acadia, Stephen R. Davis and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic, the defendants in this action. |
| "DiMasi Articles" | Joseph A. DiMasi articles [Exhibits 5, 6, and 9 to the Adams Declaration] cited in the Peck Report [Exhibit 3 to the Adams Declaration] ¶151 n. 164. |
| "DL" | The March 3, 2021 Deficiencies Preclude Letter issued by FDA to Acadia. |
| "DRP" | Dementia-Related Psychosis |
| "FDA" | U.S. Food and Drug Administration |
| "Feinstein's Reply Report" | Reply Report of Professor Steven P. Feinstein, PhD, CFA, dated May 1, 2025 [Exhibit 32 to the Adams Declaration]. |
| "Harmony" or "Harmony Study" | Study ACP-103-045, a Phase 3 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for DRP. |
| "LCD Report" | Expert Report of Professor Steven P. Feinstein, PhD, CFA on Loss Causation and Damages, dated February 13, 2025 [Exhibit 12 to the Adams Declaration]. |
| "Motion" | Defendants' Notice of Motion and Motion to Exclude the Opinions and Testimony of Plaintiffs' Experts Dr. Carl C. Peck and Dr. Steven P. Feinstein (Dkt. No. 198). |
| "PDP" | Parkinson's Disease Psychosis |
| "Peck Report" or "Peck Rpt." | Expert Report of Carl C. Peck, M.D., dated August 14, 2025 [Exhibit 3 to the Adams Declaration]. |

| Term | Definition |
|---|---|
| "Peck Tr." | Deposition of Carl C. Peck, M.D., conducted September 24, 2025. [Exhibit 4 to the Adams Declaration]. |
| "Plaintiffs" | Class Representatives City of Birmingham Retirement and Relief System and Ohio Carpenters' Pension Fund. |
| "PoS" | Probability of Success |
| "PTRS" | Probability of Technical and Regulatory Success |
| "PUF" | Plaintiffs' Separate Statement of Undisputed Material Facts. |
| "SJ Opp." | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment. |
| "sNDA" | Acadia's supplemental new drug application for pimavanserin for the treatment of hallucinations and delusions associated with DRP. |

Plaintiffs respectfully submit this Opposition to Defendants' Motion to Exclude the Opinions of Dr. Carl C. Peck, M.D., and Dr. Steven P. Feinstein, Ph.D.

**PRELIMINARY STATEMENT**

This case involves Defendants' false and misleading public statements concerning Acadia's efforts to obtain FDA approval of an sNDA to expand the approved label for pimavanserin beyond the treatment of PDP. The Court has certified a Class of investors who bought Acadia shares between September 9, 2019 (when Defendants announced positive top-line results from Acadia's Phase III Harmony Study) and April 4, 2021 (when they disclosed that FDA had issued the CRL denying Acadia's request to approve pimavanserin as a treatment for all forms of DRP). *See, e.g., City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 396 (S.D. Cal. 2024) ("*Cert. Order*").

Plaintiffs designated four merits expert witnesses and served four opening expert reports. Dkt. No. 197-2 ¶2-4. Plaintiffs' experts are: (1) Carl Peck, M.D. ("Dr. Peck"), on FDA and drug industry matters; (2) Lon Schneider, M.D., on different dementia subtypes and their causes and treatments and on aspects of clinical trial data Acadia filed in support of the sNDA; (3) David Madigan, Ph.D., on biostatistical matters; and (4) Prof. Steven Feinstein, Ph.D. ("Dr. Feinstein"), on loss causation, materiality, and damages. *Id.* ¶3. Defendants served five rebuttal reports, with Drs. Andreason and Breder rebutting Dr. Peck's opinions and Drs. Lehn and Porsteinsson submitting rebuttals to the opinions of both Drs. Feinstein and Schneider. *Id.* ¶7. Defendants' Dr. Gibbons also prepared a rebuttal to Dr. Madigan's opening report and to parts of Drs. Schneider and Peck's reports. *Id.* Defendants now move to exclude Dr. Peck's and Dr. Feinstein's opinions (Dkt. No. 198 (("Motion")).

In their brief (Dkt. No. 198-1 ("Br.")), Defendants make a number of repeated and equally flawed arguments for both Dr. Peck and Dr. Feinstein.

For both experts, the vast majority of Defendants' disagreements (to the extent they have any merit at all) are of the type classically reserved for cross-examination and simply provide no basis for excluding opinions at the *Daubert* stage. On top of this, Defendants also attack Plaintiffs' highly experienced experts based largely on misrepresentations of their reports and testimony and offer arguments that rely on inapposite cases and misconstrue (or ignore) the relevant law.

For example, as to Dr. Peck—a distinguished scientist, academic, pharmaceutical industry consultant, and former senior FDA official who headed the agency's Center for Drug Evaluation and Research—Defendants: (i) demand of him a statistical methodology not required by law; (ii) overlook his vast FDA and industry experience, including his experience in assessing literally hundreds of new drug applications; and (iii) disingenuously twist the words of his testimony. As detailed below, none of these challenges remotely warrant exclusion.

As for Dr. Feinstein (whose merits loss causation and damages opinions have been accepted in dozens of securities cases), Defendants primarily accuse him of failing to perform various analyses. But Defendants simply ignore (or misrepresent) the extent of Dr. Feinstein's exhaustive event study analysis—which is universally recognized as the gold standard approach in securities fraud cases. As for Defendants' complaints with "subjective" aspects of Dr. Feinstein's analysis of "disaggregation" and "confounding information," they relate (at most) to weight, not admissibility. Similarly, Defendants' "lack of error testing" argument is a red herring, and their further claims that he improperly assumed that Plaintiffs will prove their factual allegations at trial, or that his analysis is unreliable because it used one of Dr. Peck's PoS estimates, are absurd.

For all of these reasons and those discussed further below, the Court should deny Defendants' Motion in its entirety.

-2-

21cv00762

**LEGAL STANDARD**

"Federal Rule of Evidence 702 governs the admissibility of expert testimony." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014). "Rule 702 . . . tasks a district judge with 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023 (9th Cir. 2022). This gatekeeping responsibility, however, "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026. Instead, "'[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

The inquiry into admissibility of expert opinion is a "flexible one," where even "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564. "Under *Daubert,* the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give the testimony." *Id.* The Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). The admissibility standard is easily met here.

**ARGUMENT**

**I.    DR. PECK'S OPINIONS ARE ADMISSIBLE**

Plaintiffs offered the expert report and testimony of Dr. Peck on three FDA-related topics (i) the meaning and significance of agreements and communications between FDA and Acadia for the Harmony trial; (ii) the estimated probability of

success ("PoS") of pimavanserin's approval for DRP at various points; and (ii) whether a reasonable pharmaceutical company would have understood the communications in the same way as Dr. Peck did.  These are set forth in his report dated August 14, 2025 (the "Peck Rpt.") (Ex. 3).[1]  Dr. Peck adopted the opinions of Dr. Feigal who was unable to continue in his role as an expert for reasons unrelated to the action.  *See* Dkt. Nos. 179-87.[2]

This unusual retention in no way taints Dr. Peck.  As a threshold matter, Dr. Peck's credentials are stellar.  Dr. Peck founded NDA Partners, an international consulting firm that provides scientific and regulatory advice and services to biotech and large pharmaceutical companies, as well as government agencies.  Peck Rpt. ¶11.  Previously, Dr. Peck served as Director of the Center for Drug Evaluation and Research.  In that senior FDA position, he supervised over 1,700 scientists, managers, and staff and regularly participated in meetings and communications between FDA and sponsors developing new drugs, and reviewed, commented, or rendered decisions on over 500 new drug applications.  *Id.* ¶¶4-5.  Since leaving CDER and through to the present, he has continued to engage with FDA as an advisor, teacher, academic, researcher, and consultant, and has testified before Congress on several occasions regarding FDA policies and decisions.  *Id.*[3]  Dr. Peck

---

[1]   All references to "Ex." are to the exhibits attached to the Declaration of Peter M. Adams (Dkt. No. 198-2).

[2]   Dr. Peck entered the case after the deadline for reply reports,  While Defendants continue to make much of the fact that Dr. Feigal opted not to respond to the expert reports of either Drs. Breder or Andreason, Dr. Peck was clear at his deposition that this is certainly not some red flag as most of the time he does not file a reply.  Ex. 4 (Transcript of Deposition of Dr. Peck ("Peck Tr.")) 75:15-16.

[3]   Dr. Peck has also published over more than 150 peer-reviewed scientific papers, as well as a book and several book chapters, and has been an active journal reviewer.  His experience also includes serving as Professor of Medicine and Pharmacology and Director of the Center for Drug Development Science at Georgetown University Medical Center, and as Director of the Division of Clinical Pharmacology at the Uniformed Services University in Maryland.  Earlier in his career, he served as Assistant Surgeon General in the Public Health Service and held the rank of colonel in the U.S. Army.  He has received numerous awards in the drug development realm and continues to routinely consult on new drug applications.  *Id.* ¶¶2-3, 7-12.

21cv00762

mentored Dr. Feigal when he first came to FDA and testified that he had the same level of training and understanding of FDA issues.  Peck Tr. 97:6-13.

Nevertheless, prior to committing to adopting the report, Dr. Peck read the report and its sources, concluding that he agreed. *Id.* 48:7-11.[4]  He therefore adopted Dr. Feigal's conclusions on the three topics.  Dr. Peck in no way "disavowed" Dr. Feigal's PoS numbers.  In fact, he made it clear that: "I didn't disagree with those numbers.  I respected his assessment of the—of the numbers which fall within my estimates of the—of the same numbers.  So there was no disagreement." *Id.* 66:1-4. Defendants now seek to have Dr. Peck excluded for various reasons by misrepresenting his report and his testimony and lodging attacks that go to the weight and not the reliability of his opinions.  Their Motion should therefore be denied.

**A.     Defendants Have Waived Objection to Most of Dr. Peck's Opinions**

Although Defendants ask that Dr. Peck's testimony be excluded altogether, they do not actually articulate any objection to the first section of Dr. Peck's Report concerning the process for obtaining FDA approval, "[t]he meaning and significance of any understanding or agreements that FDA and [Acadia] had" and "[t]he meaning and significance of the contents of communications exchanged between Acadia and FDA concerning matters relating to the sNDA for pimavanserin for the treatment of hallucinations and delusions associated with DRP."  Peck Rpt., App. C, ¶24b-c. Defendants' Motion is entirely targeted at the other two sections.  They therefore have no basis to exclude any of Dr. Peck's first opinions.  Those opinions therefore include, *inter alia,*

---

[4]     While Defendants chide Dr. Peck for not speaking to Dr. Feigal about the report (Br. 6), this was due both to the nature of the circumstances and the protocols that had been agreed upon with Defendants.  Dr. Feigal was unavailable to continue in the case, making consulting with him impracticable.  Had Dr. Peck done so, Defendants surely would have cried prejudice.

-5-

21cv00762

- "FDA is further confirming that FDA approval of the new DRP indication will depend upon the types of dementia enrolled in the Harmony study *and* how those patients respond to treatment." *Id.* ¶134;

- "[I]t is my opinion that FDA communicated that there were two efficacy requirements that needed to be met to approve adding a DRP indication to pimavanserin's label. First, the Harmony study would have to succeed on its primary endpoint of demonstrating a statistically significant benefit in time to relapse. Second, the subgroup efficacy data would have to show directionally consistent benefit across different DRP subtypes . . . ." *Id.* ¶135; and

- "These statements show that FDA had serious problems with Harmony's study results." *Id.* ¶144.[5]

Having decided not to challenge the opinions identified in this section, Defendants have waived the ability to do so in the future. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1323 (S.D. Cal. 2020) (plaintiff's failure to present arguments on a *Daubert* motion "'constitutes waiver or abandonment in regard to the uncontested issue'").

### B.    Dr. Peck's Probability of Success Opinions Are Reliable

The vast majority of Defendants' attacks on Dr. Peck pertain to his PoS analysis. They do not contest the relevance of these opinions, nor could they, so the only question is whether Dr. Peck's PoS opinions are reliable. They are.

As background, Dr. Peck used a combination of his vast experience, the actual facts of Harmony, and industry benchmarks to come to an initial estimated probability of success.[6] He then explained his analysis and the facts he considered as he walks through each step of the likely probability of expanded approval for pimavanserin. As explained by Dr. Peck, the industry sources provided "milestones" and then he applied his "personal experience and knowledge with respect to how to move probabilities up and down specifically in the case of the Acadia information." Peck Tr. 203:8-12. Using this approach, Dr. Peck concluded that the starting

---

[5]    At his deposition, Dr. Peck further confirmed these opinions. For example, when asked whether directional consistency was an FDA requirement for Harmony, Dr. Peck succinctly answered, "Yes, it is." Peck. Tr. 234:17-20.

[6]    Those documents include the Tufts Center for the Study of Drug Development and summary level data published in the medical literature, including in the Kaitin & DiMasi articles cited in Dr. Peck's report at ¶151 n.164 (the "DiMasi Articles").

estimated probability of success for the approval of pimavanserin for DRP was 50%, and:

- rose to 70% when Acadia learned the top-line results in September 2019;
- dropped to 30% with the subgroup efficacy results in November 2019; and
- fell to 10% and subsequently zero with the FDA's July 2020 letter and with the CRL, respectively. Peck Rpt., App. C, ¶¶156-162.

These opinions are rooted in his deep experience, combined with relevant literature and case-specific facts. Defendants' arguments, at best, are classic weight-of-the-evidence arguments for cross-examination, not grounds for exclusion.

### 1. Defendants Fundamentally Misconstrue Dr. Peck's Approach

Defendants completely misrepresent the approach that Dr. Peck actually took to arrive at his PoS estimates of probability. They fixate on the fact that his analysis does not involve statistics or other mathematical equations. Br. 12-15. First of all, this is misleading. The materials cited by Dr. Peck as guidance do, in fact, employ statistical methods. *See, e.g.,* Peck Tr. 114:20-115:4 ("When you look at the DiMasi articles, there are statistical methods employed for coming up with the point estimates and the ranges of success and lack of success for certain metrics . . . . So it can't be said that confidence intervals didn't come into the considerations that Dr. Feigal and I made in coming up with our opinions."); Ex. 9 at 326 (looking at 1,814 investigational drugs, employing means and medians, and regression analyses).

Furthermore, not all expert testimony involves statistical equations, and Defendants impute a standard of absolute certainty that the law does not demand of experts. *Daubert* does not mandate adherence to a given methodology, particularly when the basis for an expert's opinion is his experience. *See Primiano*, 598 F.3d at 565 (medical experts "'use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties'"). Rather, courts "'consider other factors when determining admissibility, such as whether the expert has enough education and relevant experience to reach a reliable opinion.'" *In re Davol,*

*Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liability Litig.*, 2021 WL 3286439, at *9 (S.D. Ohio Aug. 1, 2021); *see also Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*, 2022 WL 17369626, at *3 (C.D. Cal. Oct. 4, 2022) (expert's opinion was reliable "based on his knowledge and experience, and he need not have used a particular methodology in arriving at his conclusions"). Therefore, to the extent Defendants are arguing that Dr. Peck was *required* to develop his opinions via some particular methodology, they are incorrect.

Indeed, a qualified expert may "render opinions based on experience alone." *Jordan v. City of Chicago*, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012); Fed. R. Evid. 702 Comm. Notes ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Blue Bottle Coffee, LLC v. Liao*, 2023 WL 6850573, at *6 (N.D. Cal. Oct. 16, 2023) (admitting expert and quoting advisory committee notes); *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 2014 WL 1494023, at *5 (W.D. Wash. Apr. 16, 2014) (an expert's "application of his expertise" to his review of evidence constituted a reliable methodology). In fact, Defendants' own expert testified that companies performing PoS analyses use experience in the industry to evaluate how to adjust the PoS at various points. Dkt. No. 197-1 at 14.

Here, Defendants do not contest Dr. Peck's impeccable experience. As Dr. Peck stated at his deposition and will explain at trial, he has routinely analyzed the specifics of drug applications and advised on the likelihood of their being approved. During his time at FDA and then in private consulting practice, he has been involved in hundreds of new drug applications. And, importantly, Dr. Peck's PoS approach is done routinely in the pharmaceutical industry. As Dr. Peck stated: "I mean this is—this is a method adopted widely in the industry. I am not aware of an alternative that would come up with wildly different numbers or widely different opin[ions or]

conclusions." Peck Tr. 218:6-10;[7] *see Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 839 (S.D. Cal. 2020) (use of information permitted if "'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion'"). Therefore, Dr. Peck applied the same methodology that he uses outside of the courtroom to evaluate pimavanserin's probability of success.

This type of expert testimony is wholly admissible. For example, in a case cited by Defendants, *Holley v. Gilead Sciences, Inc.*, plaintiffs offered the testimony of an expert who created three timelines by which a pharmaceutical company would have obtained approval for a given drug. 2023 WL 2469632, at *2 (N.D. Cal. Feb. 27, 2023). He explained that to come to these predicted timelines, he used his eight years at FDA and additional experience as an independent regulatory consultant. Therefore, the court found his "'opinions are based on more than a subjective belief of unsupported speculation.'" *Id.* In concluding that the testimony was reliable, the court explicitly stated that his "testimony is 'not contingent upon a particular methodology or technical framework'" and instead was "'reliable based on his knowledge and experience.'" *Id.*; *see also In re Solodyn (Minocycline Hydrocholoride) Antitrust Litig.*, 2018 WL 734655, at *6 (D. Mass. Feb. 6, 2018) (expert report on probability of success in developing drug products was not speculative, but was admissible based on the expert's requisite experience); *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *5 (D. Ariz. Dec. 21, 2017); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2011 WL 6302287, at *16-17 (S.D. Ill. Dec. 16, 2011).[8]

---

[7] Ironically, Defendants' rebuttal experts have suggested that Dr. Peck should have employed a "PTRS" methodology and that would be acceptable. But, as set forth in detail in Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Exclude (Dkt. No. 197-1 at 11-13), Dr. Peck did precisely what a PTRS analysis requires. In fact, when asked "would [you] disagree if I were to say to you that Dr. Feigal was not conducting a PTRS analysis in this report?" Dr. Peck responded "I would disagree with you." Peck Tr. 124:4-7.

[8] Defendants' cited cases are off base. For example, in *United States v. Cytogel Pharma, LLC*, the expert relied on the precise PoS number from one study (not used

In the face of this industry-wide approach—supported by decades of experience—Defendants resort to mischaracterizing Dr. Peck's report and deposition testimony. While Defendants wishfully assert that he gave "disastrous" deposition testimony, the reality is that Dr. Peck was clear and adamant that his PoS numbers were well supported estimates of probability. For example, when badgered at his deposition, Dr. Peck stated that his analysis did not involve the same "rigor" associated with statistical methodologies. Peck Tr. 112:19-21. However, his entire answer is telling and Defendants leave it out. Dr. Peck clarified that he:

> applied a standard methodology for estimating the probability of one event or another in drug development. So it—it employed some statistical methodologies, but I wouldn't—I wouldn't call it a rigorous statistical methodology.

*Id.* 113:15-20. In the same vein, Defendants do not seem to comprehend that Dr. Peck presented and labeled the PoS numbers as "estimates of the probability." Their deposition questioning reveals this shortsightedness as Dr. Peck repeatedly tried to explain to defense counsel that a PoS analysis is, by definition, providing an estimate of an unknown. But, he was also clear that these estimates were "well-supported by the citations and the facts in this case." Peck Tr. 192-93.[9] Therefore, Dr. Peck's PoS analysis is well supported, routinely used by him and across the pharmaceutical industry, and thus readily admissible.

---

by Dr. Peck) and employed no individualized analysis based upon the facts of the case even though the applications in the cited study varied drastically from the one at issue. 2018 WL 6169266, at *4-5 (E.D. La. Nov. 26, 2018). Notably, the court admitted that "reliable expert testimony often involves estimation and reasonable inferences." *Id.* at *4.

[9] It is from this colloquy that Defendants parse out Dr. Peck's statement that "even God doesn't know what the exact probability is." Peck. Tr. 192-93. But that merely stands for the fact that PoS calculations are estimated probabilities, as Dr. Peck made patently clear. *See, e.g., id.* 190:1-3 ("And as I have explained repeatedly, that's an estimated probability that is a reasonable one."); *see also In re Epipen Mktg., Sales Pracs. & Antitrust Litig.,* 2021 WL 2577490, at *52-53 (D. Kan. June 23, 2021) (permitting expert to provide estimates of likelihood of success based upon a "holistic" analysis); *Ramirez v. Olympic Health Mgmt. Sys., Inc.,* 610 F. Supp. 2d 1266, 1278 (E.D. Wash. 2009) (permitting expert testimony on estimated sales losses).

-10-

## 2.    Defendants' Quibbles Go to Weight and Not Admissibility

Besides requiring a standard from Dr. Peck that does not exist, Defendants raise numerous inconsequential criticisms of Dr. Peck's PoS opinions.  These are all best reserved for cross-examination, but they also involve incorrect counter-interpretations of Dr. Peck's testimony, his analysis, and his cited documents.

***First,*** Defendants attack Dr. Peck's 50% "base case" because it does not rely on specific data, while also mistaking the purpose behind Dr. Peck's cited 85%.  Br. 9-12.  To be clear (as the Peck Report is), 85% is an industry PoS *once studies are complete and the results are known*.  Peck Rpt., App. C, ¶152.  For this, he cites numerous sources (Tufts data as well as Siah, K.W., *et al*. (2021), "Predicting Drug Approvals: The Novartis Data Science and Artificial Intelligence challenge," *Patterns* (New York, N.Y.), 2(8), 100312).  Peck Rpt., App. C, ¶155 n.168.  But, his 50% base case number here is estimated "prior to any of Harmony's results being known."  *Id.* ¶156.  Therefore, he uses the overall industry track record of 50% as his base case because the analysis starts before Harmony's results were known.  *Id.* Moreover, even Defendants' own expert testified that Dr. Peck had an objective basis for his 50% benchmark PoS and that sources "have cited 50 percent as a general benchmark."  Dkt. No. 197-1 at 14.  Defendants therefore simply fail to understand the distinction between the 85% and the 50% that Dr. Peck uses.  Additionally, the base case probability is of little import given that the most important PoS numbers are the values during the Class Period.[10]

---

[10]    Defendants also misunderstand Dr. Peck's subsequent numbers.  Each of these (70%, 30%, 10%, and zero), unequivocally refers to "the probability of successfully obtaining FDA approval for a new DRP indication" and not moving to some next phase. *See, e.g.,* Peck Rpt., App. C, ¶¶158-62.  Their case on this point, *In re Celera Corp. Shareholder Litigation,* 2012 WL 1020471, at * 4, 25 (Del. Ch. Mar. 23, 2021), is actually instructive, although irrelevant.  For a merger, an analyst valued a company's drug assets still in development by looking at Tufts studies to determine the PoS at various stages.  However, that analyst wrongly concluded that the PoS in the Tufts studies reflected the PoS of advancing to the next stage and thus deeply discounted the rates.  The court in no way challenged, dismissed, or criticized the analysts' PoS approach.  Instead, it simply looked at whether the board acted in bad faith by relying on these mistaken estimates. *Id.*

-11-

*Second,* Defendants pick at the sources cited by Dr. Peck to claim they do not support his conclusions.  Br. 9-11.  Their interpretations of the literature are incorrect.  For example, they misconstrue the figures contained in one article (Ex. 9)—both homing in on the highest percentage despite others given *and* themselves mistaking success from moving from Phase 3 to NDA submission with the probability of ultimate approval at a given point in time.  Ex. 9 at 330.  Then, ironically, one of Defendants' critiques is that the DiMasi Articles do not pertain to this exact class of drugs.  Br. 11.  But, Dr. Peck was clear that he did consult the BIO report (which does separate by class of drug), but he ultimately did not have to rely on it because "it lines up pretty well with—with the Tufts data."  Peck Tr. 202:2-4.  Defendants fail to appreciate that the combined articles and the extensive data they contained served (along with his experience) as background and context for Dr. Peck in arriving at his numbers.  *See, e.g.*, Ex. 7 at 276 (discussing use of success rates for drugs in the pipelines of the 50 largest pharmaceutical firms, as likely to represent "very large proportions of the total number" of drugs).

Furthermore, disagreements about the sources underlying an expert's analysis go to weight and are not grounds for exclusion.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (opinions were based on expert's knowledge and experience within the insurance industry and critiques on documents reviewed went to weight of his testimony and not to reliability).

*Third,* Defendants resort to "nit picking" at Dr. Peck's PoS analysis by claiming, for example, that he does not use confidence intervals or error rates.  Br. 13.  As discussed at length above, Dr. Peck was under no obligation to employ a statistical methodology.  Indeed, courts routinely permit estimates of probability. *See, e.g., In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *8 (S.D.N.Y. June 11, 2021) (patent case discussing how, even though expert attempted to "quantify an unquantifiable evaluation" of chance of prevailing, his

21cv00762

estimates were admissible).[11]  And, Defendants are factually incorrect on a number of their petty criticisms:

- They are just wrong in claiming Dr. Peck provides no examples of ever employing this approach (Br. 14) as he has done it repeatedly for decades, as discussed above;

- They complain about hindsight bias when their own expert admitted that bias is to be expected in these analyses and cannot be controlled for.  *See* Dkt. No. 197-1 at 14.  Similarly, Defendants cannot complain about a lack of confidence intervals when their own expert admitted that such intervals are not "routinely given" in a PoS analysis.  *Id.*

- They fixate on Dr. Peck's round numbers versus ranges.  Br. 8, 13.  Dr. Peck, however, was clear that these numbers were probability estimations derived from benchmark reports and they need not be a range.[12]  And their own expert admitted that the PoS analyses he relied upon also used round numbers.  Dkt. No. 197-1 at 15.

Such criticisms are again classic examples of matters that go to the weight and not the admissibility of Dr. Peck's opinions.  *See Aslan v. Ferrari N. Am., Inc.*, 2018 WL 6321635, at *1 (C.D. Cal. Oct. 19, 2018) (holding that "certain weaknesses in [an expert's report] . . . do not require exclusion; instead, they are proper topics for cross-examination")*; Wroth v. City of Rohnert Park*, 2019 WL 1766163, at *4 (N.D. Cal. Apr. 22, 2019).

 **Fourth,** Defendants' cases regarding "rigor" and "speculation" provide no support for their arguments.  For example, they assert that Dr. Peck's PoS testimony should be excluded based on "*ipse dixit*," relying on *Open Text S.A. v. Box, Inc.*, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015).  Br. 15.  But that case involved the calculation of royalty rates where there is a precise set of factors to be employed (the "*Georgia Pacific*" factors), and the expert there did not use any of them.  Instead,

---

[11]   The court in that case went on to state that "much of what they are asked to predict cannot be based on anything that reduces to numbers and mathematics. . . . [But that] does [not] mean that [the expert] did not employ any ascertainable or reliable methodology in reaching his conclusions."  *Id.* at *9.

[12]   *See, e.g.,* Peck Tr. 121:13-23 (when asked "[s]o you would agree with me that estimate of a probability implies a range of possible outcomes?," Dr. Peck responded: "Not necessarily.  An estimate can be a point estimate, or it can be a range, it can be a confidence interval.  But the important meaning of the word 'estimate' is that it is an estimate, it is not a precise deterministic number.").

he simply offered a 15% royalty rate without "formula, method, or calculation, however approximate." *Open Text,* 2015 WL 349197, at *4. Tellingly, the *Open Text* court noted that "'mathematical precision is not required'" but "'some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed.'" *Id.* at *5[13] Here, Dr. Peck offers his reasoning for each PoS estimation.

Defendants also repeatedly cite *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025), a nuanced antitrust case, that is easily distinguished. There, an economics expert created a "but-for world" where Meta faced greater competition and then made conclusions about what would have happened in this "but for" speculative world. *Id.* at 962. The court, in a detailed and specific opinion, looked at the expert's conclusion that in the but-for world, Meta would compete on price and not quality. *Id.* However, the court found that both the facts of the case and the literature cited showed that, in fact, Meta had competed on quality, flying in the face of the expert's conclusions. *Id.* at 964-66. It is difficult to see any relevance of *Klein* to the case at hand, and Defendants merely pull out isolated quotations from it.

In conclusion, Dr. Peck's PoS opinions are supported by his vast experience, what is actually done in the industry, and copious case law. They are admissible.

## C.    Dr. Peck's Remaining Opinions Are Admissible

Having failed to demonstrate that Dr. Peck's PoS opinions are unreliable, Defendants spend their remaining time on the final section of Dr. Peck's report, which is related to what a reasonable pharmaceutical company in Acadia's shoes would have or should have understood from the FDA communications. Br. 16-19.

---

[13]    *GPNE Corp. v. Apple, Inc.,* 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014)—another patent infringement case—falls short for the same reasons as the expert again did not employ the *Georgia Pacific* factors at all but instead assigned an appropriate royalty rate without any explanation other than his experience. The court did note that it allows for "some approximation," but found that skipping the specified factors—including doing no apportionment analysis—was a step too far. *Id.* at *4-5.

-14-

21cv00762

They argue the opinions are unreliable and invade the province of the jury. Again, they are incorrect on both counts.

### 1.    The Opinions Are Reliable

There is no question that Dr. Peck's opinions on what a reasonable pharmaceutical company would have understood are reliable. Defendants' only argument against reliability is that, once again, Dr. Peck does not employ some statistical methodology. And, once again, the law stops Defendants' argument in its tracks as it does not require mathematical equations for every expert opinion and, as made clear by the advisory committee notes and numerous cases discussed above, experience alone can demonstrate an expert's reliability.

Indeed, Dr. Peck's report is clear that he is relying on his "experience and training" to arrive at his opinion that a "reasonable drug developer would have assessed the probability of successfully obtaining FDA approval of the new DRP indication similarly to how I have assessed that probability in this report." Peck Rpt., App. C, ¶165. Therefore, Defendants' only possible avenue is to anemically challenge Dr. Peck's experience. Br. 17. But this is absurd. At FDA, Dr. Peck was involved in more than 500 new drug applications. Peck Rpt. ¶5. Since then, he has personally consulted on more than 200 additional drug applications and helped companies develop strategies for new drugs according to FDA standards and served on boards of biopharmaceutical companies. *Id.* ¶11. Indeed, when asked what factors were used to arrive at these precise conclusions, Dr. Peck was clear: "So like Dr. Feigal, he and I both have engaged with numerous drug companies over several decades ranging from startups to mega pharma companies. And we have an understanding of personnel and the organization and experience that drug companies typically have that are experienced in this domain." Peck Tr. 127:6-12. These opinions are squarely within his expertise developed at his time in FDA leadership

-15-

and through his consulting and other work, and nowhere in his report does he purport to opine on Defendants' state of mind.[14]

### 2. Dr. Peck's Opinions Will Be Helpful to a Jury

Defendants' last argument is that Dr. Peck is somehow offering a legal opinion on scienter. But Defendants' arguments here are based primarily on a mischaracterization of Dr. Peck's report and testimony. *See* Br. 18. They engage in cherry picking and veritable verbal gymnastics to make it appear that Dr. Peck's opinion is on Defendants' scienter. For example, they pull out the unsurprising testimony that "Acadia [was] the subject" of his report and then cobble it with testimony on a "reasonable [pharmaceutical] company" to claim Dr. Peck is offering an opinion precisely on what Defendants themselves knew. *Id.* This gamesmanship should not be countenanced. And, Dr. Peck's deposition responses to such gamesmanship show that he in no way is offering an opinion on Defendants' state of mind. In fact, counsel for Acadia asked him directly, "[a]re you offering an opinion as to whether Acadia behaved reasonably?" and he responded:

> . . . but at this point it is not referencing Acadia. This is a general statement about an expectation that a pharmaceutical company working in this domain should, knowing what Acadia knew, would have understood what these probability of successes were and the other things cited above.

Peck Tr. 126-128.

Defendants also deeply misconstrue the law in this area. Dr. Peck does not offer an opinion on an ultimate issue of law, i.e., that Defendants acted with scienter. Instead, he offers opinions about what a reasonable pharmaceutical company would have known or should have known from the FDA communications. While an expert may not opine that a violation of law occurred, she may offer testimony that supports

---

[14]    In a last-ditch effort, Defendants attempt to say that these opinions are unreliable because they rely upon the PoS opinions. Br. 17. But this is demonstrably false. If anything, Dr. Peck's opinions on what a reasonable company should have understood relate to his opinions on the meaning of FDA communications with Acadia. Defendants do not challenge those opinions.

-16-

21cv00762

a finding of such violation. *See, e.g., Hangarter*, 373 F.3d at 1016 (expert testimony admissible because it supported a finding that a party acted in good faith; expert did not testify that party acted in bad faith); *Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 791 (N.D. Cal. 2021) (expert testimony admissible where expert did not testify that defendants in fact violated the law). And the mere fact that he uses the word "reasonable" or referred to Acadia at his deposition does not render his opinions an impermissible legal conclusion. The Ninth Circuit has allowed testimony opining on what is reasonable or typical, based on industry standards and the expert's experience, so long as the expert does not opine on the ultimate issue for the jury. *Hangarter*, 373 F.3d at 1016; *Gilead Scis.*, 2023 WL 2469632, at *4.[15] Dr. Peck's testimony does not do this.

Defendants' cases on this topic are inapposite. First, in *Homyk v. ChemoCentryx, Inc.*, an expert actually sought to offer an opinion on whether statements were misleading and as to the actual state of mind of executives. 2025 WL 1547625, at *11 (N.D. Cal. May 30, 2025). The court there did not wholesale forbid even these opinions and permitted the expert to offer an opinion as to what warnings would have signaled to a reasonable doctor. *Id.* And while the court did say that the expert could not opine on whether a company was alerted to dangers or not, he could testify on the meaning and significance of data known to the company and use his expertise to interpret them to the jury. *Id.* Then, *Holley* is distinguishable as it was a negligence case and plaintiffs acknowledged an expert could not opine

---

[15] *See, also United States v Diaz,* 876 F.3d 1194, 1199 (9th Cir. 2017); *United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA,* 296 F. Supp. 3d 1142, 1180-81 (N.D. Cal. 2017) (permitting pharmaceutical company expert to testify regarding what a "reasonable" company would do); *In re Fosamax Prods. Liability Litig.,* 645 F. Supp. 2d at 191 (expert's assessment of reasonableness of conduct in light of FDA experience was helpful to jury); *In re Yasmin v. Yaz,* 2011 WL 6302287, at *10-12 (expert's opinion that defendant violated law and FDA regulations did not constitute impermissible legal conclusions); *FTC v. Amazon.com, Inc.,* 2025 WL 2381704, at *1 (W.D. Wash. Aug. 15, 2025) (expert report on what a reasonable market participant would have believed admissible as it stopped short of saying what defendants actually knew).

on whether defendant acted unreasonably as it was tantamount to acting negligently. 2023 WL 2469632, at *4.[16]  Here, by contrast, Dr. Peck is not offering any opinion regarding Defendants' motive or intent and never purports to know Defendants' state of mind.  While he opines as to what a "reasonable pharmaceutical company" would have or should have known, this pertains to his experience with and understanding of the industry and the FDA approval process.  He should be permitted to explain to the jury his interpretation of complicated FDA communications and how the industry would understand them.

In conclusion, both Dr. Peck's PoS opinions and his opinions on what a reasonable pharmaceutical company would have known are reliable and admissible. Any of Defendants' arguments to the contrary are questions for the jury.  And, they have waived arguments on Dr. Peck's remaining opinions.

## II.    DR. FEINSTEIN'S OPINIONS ARE ADMISSIBLE

### A.    Dr. Feinstein's Qualifications and Summary of Opinions

Defendants do not challenge Dr. Feinstein's qualifications, which include a Ph.D. in economics from Yale; his position as a tenured associate professor of finance and former Director of the Cutler Center for Investments and Finance at Babson College; his Chartered Financial Analyst (CFA) credential; and his authorship of numerous writings in economics and finance.  He has been an economist at the Federal Reserve Bank of Atlanta, and a financial consultant to, *inter alia,* the SEC, the IRS, and the National Association of Securities Dealers.  He has given expert testimony on loss causation and damages in over 50 securities fraud cases, and his merits testimony thereon has never been excluded.

---

[16]    *AIG Ret. Servs., Inc. v. Altus Fin. S.A.,* 2011 WL 13213589, at *1-4 (C.D. Cal. Sept. 26, 2011) is also distinguishable because there, the expert opined on hypothetical situations such as if "a prudent commissioner had learned [X], a prudent commissioner would have done [Y]."  The court called this "discretionary, multi-layered, and speculative."  *Id.* at *4.  Tellingly, though, the court also stated that while ultimate conclusions about actions were not admissible, testimony on factors that would have affected a reasonable commissioner would be helpful to a jury.  *Id.* at *5.

In his thorough 176-page LCD Report (excluding appendices), Dr. Feinstein summarizes his conclusions as to loss causation and damages as follows:

**Loss Causation**: "Based on [my] financial and econometric analysis . . . [and] assum[ing] that Plaintiffs will prove their factual allegations, I conclude that Defendants' alleged misrepresentations and omissions caused investors who had purchased [Acadia stock] during the Class Period (the 'Class members') to suffer losses on those purchases, including damages . . . recoverable under [§]10(b). Those Class members suffered losses that they would not have suffered [but for] the alleged misrepresentations and omissions."

**Damages:** "Based on the [same work and assumptions], and based on certain analysis presented by [Dr. Peck[17]] . . . I further conclude that for each Class member the damages caused by the alleged misrepresentations and omissions range up to $22.43 per share, depending on (a) [when they] purchased Acadia shares, and (b) if and when [they] subsequently sold those shares. This quantification measures losses that Class members would not have sustained but for the alleged misrepresentations and omissions." Ex. 12 ¶¶24, 25.

Defendants attack Dr. Feinstein's loss causation opinions because he purportedly "perform[ed] no analysis at all," but simply "assume[d] the alleged corrective disclosures (in March and April 2021) are related to the alleged fraud simply because Plaintiffs said so." Br. 2. But these attacks are baseless, and ignore Dr. Feinstein's extensive work that included, *inter alia*, conducting a comprehensive event study analysis—the method for assessing loss causation in §10(b) cases. Moreover, Defendants' alternative argument, that Dr. Feinstein's analysis is unreliable because it accepted Plaintiffs' *factual* allegations, is contrary to case law. And Defendants' attacks on his alleged failure to properly consider, and disaggregate, the impact of "confounding information" are not only baseless, but even if they had merit (which they do not) they go only to weight, not admissibility.

---

[17]    As discussed above, Dr. Peck adopted Dr. Feigal's opinions in their entirety. Accordingly, although all of Dr. Feinstein's reports and testimony refer to "Dr. Feigal" for ease of reference, all of Dr. Feinstein's references to Dr. Feigal have been uniformly changed to references to Dr. Peck.

**B.**     **Defendants' Attacks on Feinstein's Loss Causation Analysis Fail**

**1.**     **Defendants' Argument that Dr. Feinstein Failed to Analyze Causation, and Instead Simply "Assumed" It, Is Baseless**

Defendants claim that Dr. Feinstein "did not even attempt to analyze whether or how the specific information disclosed by Acadia at the end of the Class Period" was "corrective," and that he simply "assumed . . . the allegedly fraudulent statements caused Plaintiffs' damages." Br 26. This claim is spurious.

To begin with, as he has done in dozens of other securities fraud cases, here Dr. Feinstein based his loss causation and damages opinions on his application of basic financial principles, examination of Defendants' public statements, review of analyst commentary, and an empirical event study analysis. Ex. 12 ¶¶172-257.

First, he assessed the economic materiality of the alleged misrepresentations and omissions, i.e., whether they could be reasonably expected to affect the price of Acadia stock. Dr. Feinstein's analysis included "examination of fundamental principles of valuation, a review of company statements, [and] examin[ing] analysts' commentary and valuation models." *Id.* ¶¶175-85 (reviewing academic literature and identifying financial principles that strongly support a finding of economic materiality of Defendants' statements and later disclosures); *id.* ¶¶186-88 (finding Acadia's own statements as to, e.g., its "clear agreement" with FDA on the data needed for approval of a DRP sNDA and its "execut[ion]" of the "agreed plan," showed that Defendants also viewed the subjects of their alleged misrepresentations to be economically material); *id.* ¶¶189-94 (review of analyst reports further confirming that expanding pimavanserin's indication to include all forms of DRP, "and all information related to that prospect," were economically material). In sum, as Dr. Feinstein concluded, the economic materiality of the (positive) alleged misrepresentations and omissions at the front end of the Class Period, and of the (negative) disclosures at the back end—combined with the undisputed efficiency of the market for Acadia shares and sharp stock price increases in response to

-20-

Defendants' 2019 front-end statements (and sharp decreases in response to the 8-Mar-2021 and 5-Apr-2021 back-end disclosures)—are strong evidence of loss causation. *Id.* ¶¶195-98.

However, Dr. Feinstein did not stop there. He also conducted an event study, *id.* ¶¶199-257, to analyze "the empirical behavior of the subject security following the alleged misrepresentations and corrective events." *Id.* ¶175; *see also id.* ¶206 ("If event study analysis indicates that the alleged misrepresentations . . . caused the Acadia stock price to rise, and that corrective events caused the stock price to fall, that finding would be . . . *compelling* proof of loss causation." (emphasis added)). Event studies are "standard operating procedure" in securities cases, *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *5-9 (D. Ariz. Dec. 27, 2019), and event study methodology is "routinely" used to determine whether release of particular information has "a significant effect on a company's stock price," *In re Groupon, Inc., Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015) (finding Dr. Feinstein to be "reliable and clearly an expert in conducting event studies"); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 13863616, at *9 (N.D. Cal. Jan. 28, 2020) ("Event studies [like Feinstein's] are routinely accepted by courts in securities fraud cases as a means . . . to conduct loss causation analyses."). Unsurprisingly, Defendants do not dispute that event study methodology is appropriate here.

Based on, *inter alia*, Plaintiffs' allegations, this Court's prior orders, and his own review of Acadia-related matters as detailed in his 60-page Timeline of Events, Ex. 12 ¶¶66-159, Dr. Feinstein's event study identified likely potential misrepresentation/omission dates and corrective disclosure dates, *id.* ¶¶207-14. He then performed a regression analysis for each date to isolate the impact of Acadia-specific news on its share price by *removing* market and industry sector effects, thereby generating a "residual return." *Id.* ¶¶216-26. Dr. Feinstein then performed a statistical "*t*-test" to determine whether the residual returns on those dates were statistically significant—i.e., whether the observed stock return, after controlling for

market and industry sector effects, was of such magnitude that it could only reasonably be explained by Acadia-specific news, as opposed to random volatility. *Id.* ¶227. While a "*t*-stat" with an absolute value of only *1.96* is generally viewed as statistically significant (*id.*), Dr. Feinstein's analysis confirmed *t*-stats of:

- *20.17* for the 49.9% residual stock price increase (on a logarithmic basis) observed on 9-Sep-2019 (when Acadia announced Harmony's topline results, while also misrepresenting, *inter alia*, that it could "rely on a single, well-controlled study whose results were both statistically and clinically very persuasive"). *Id.* ¶¶229-30 & ¶¶79-85 (discussing Defendants' statements in greater detail, and how analysts reacted by doubling their prior PoS estimates to 84%);

- *5.96* for the 14.7% residual price increase on 5-Dec-2019 (after Acadia disclosed some Harmony subgroup data, and also allegedly misrepresented that its efficacy results would suffice to get approval of expanded pimavanserin labeling). *Id.* ¶¶234-35; *see also id.* ¶¶89-98 (discussing their 4-Dec-2019 statements in more detail, and how the consensus analyst PoS further increased in response);

- *-25.75* for the 63.7% residual price *decrease* of 9-Mar-2021 (after Acadia disclosed it had received a DL from FDA). *Id.* ¶¶246-47; *see also id.* ¶¶128-144 (discussing Defendants' 8-Mar-2021 statements in greater detail, and how every analyst reacted by: (a) lowering their PoS, and/or (b) implicitly lowered their PoS as reflected in their lowered rating or price target for Acadia stock, *id.* ¶139; and

- *-7.84* for the 19.4% residual price *decrease* of 5-Apr-2021 (when Acadia disclosed that it had received a CRL from FDA). *Id.* ¶¶251-52; *see also id.* ¶¶145-59 (discussing Defendants' 5-Apr-2021 statements in more detail, how analysts reacted by again lowering their price targets and PoS, and how (as in March, *see id.* ¶142), those PoS reductions told only part of the story because, post-disclosure of the DL, those PoS figures were now more of an estimate of the probability that a broadened sNDA would only be approved much later, rather than an estimate that any sNDA could be approved without new trials). *Id.* ¶154.

Each price movement was statistically significant at the 99% confidence level. *Id.* Dr. Feinstein also examined all other Acadia news that emerged on or around each of these dates for any other news that could have caused these price movements—and found none.[18] *Id.* ¶¶232, 236, 248, 253; *see Twitter*, 2020 WL 13863616, at *9 (rejecting attack that Dr. Feinstein had "assumed" causation, stating that defendants'

---

[18] As discussed at §§III.C.2, as part of his disaggregation analysis, Dr. Feinstein also carefully assessed whether and to what extent any of the company-specific news on these dates constituted fraud-induced artificial inflation.

concerns were at most matters for cross-examination, and distinguishing *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), also cited by Defendants here, as involving an expert who cited "no evidence" to back his conclusion, whereas Dr. Feinstein based his opinions "in sufficient statistical analysis").

In sum, Dr. Feinstein's careful event study analysis provides compelling (and reliable) empirical evidence of loss causation, not mere "assumptions." Ex. 12 ¶257.

### 2. Dr. Feinstein Did Not Rely on Any Improper Assumptions

Defendants next argue that Dr. Feinstein's analysis is unreliable because it "assumed" that FDA's issuance of the DL and CRL were "related to what [was] alleged to have been misrepresented to the market." Br. 26-27 (citing Ex. 22 at 219:23-221:17). But this claim is also spurious, as it conflates: (A) what Dr. Feinstein's analysis indisputably shows—namely, that the losses of 9-Mar-2021 and 5-Apr-2021 were due to news concerning the issuance of the DL and CRL, respectively—with (B) the entirely *separate* question of whether, *as a factual matter*, FDA's decisions to issue the DL and CRL were based on, and hence caused by: (i) factors whose importance Defendants had misrepresented or concealed (e.g., the directional consistency requirement and the significance of subgroup data under the FDA agreement), or based on (ii) factors unrelated to the alleged fraud.

It is not Dr. Feinstein's role to opine on (B) above, which is a *fact question* for the jury. Indeed, case law is clear that loss causation and damages experts can, and should, assume that plaintiffs will prove the facts needed to establish their theory of the case. *See, e.g., Doe v. City of Los Angeles*, 2025 WL 3190789, *5 n.3 (C.D. Cal. Oct. 28, 2025) ("'[U]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.'" (quoting *Williams v. Illinois*, 567 U.S. 50, 57 (2012)); *Maldonado v. Apple, Inc.*, 2021 WL 1947512 (N.D. Cal. May 14, 2021)

-23-

(same); *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59 (D.D.C. 2008) (*rejecting* defendants' attempt to exclude plaintiffs' loss causation expert in securities case for assuming that certain disclosures were corrective). So too here. Thus, it was appropriate for Dr. Feinstein to assume that Plaintiffs will prove that Defendants' statements were misleading, and that FDA issued the DL and CRL for reasons Defendants concealed from investors, rather than "other reasons" urged by Defendants (i.e., that the DL and CRL were due to FDA's decision to renege on its agreement and "move the goalposts," PUF 236).[19]

### 3. Defendants' Assertion that Dr. Feinstein Did Not Consider Potentially Confounding Information Is Also Baseless

Defendants next attack Dr. Feinstein for allegedly failing to isolate (disaggregate): (a) losses caused by disclosure of corrective, fraud-related information (i.e., negative news that corrected, in whole or in part, the market's prior optimism about matters as to which it had been misled by Defendants' fraud), as opposed to (b) losses due to disclosure of *non*-fraud-related (and hence non-corrective) information (i.e., disclosures that did *not* disclose any aspect of the alleged fraud or of the underlying truth that had previously been concealed by the alleged fraud). Br. 27-30.[20]

Specifically, Defendants aver that Dr. Feinstein's analysis shows only that Acadia stock "reacted to the *entire bundle* of negative information surrounding the

---

[19]    *See also, e.g., In re MyFord Touch Consumer Litig.,* 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018) (because court acts merely as gatekeeper and not fact-finder, "an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which [their] opinions are predicated are in dispute, unless their assumptions are 'indisputably wrong'"); *Hicks v. Milton,* 2024 WL 6848787 (D. Utah Dec. 31, 2024) ("'An expert opines on facts which the expert assumes will be proven . . . . [If] the jury disagrees with the assumed facts on which [the expert] relied . . . it can discount or ignore [their] report and testimony."); *Dorn v. Burlington N. Santa Fe R.R. Co.,* 397 F.3d 1183, 1196 (9th Cir. 2005) (reversing exclusion of expert because "reasonableness of the assumptions underlying the experts' analysis, or criticisms of an expert's method of calculation are matters for the jury's consideration in weighing that evidence" (citation modified)).

[20]    Defendants' separate argument, that Feinstein did not reliably disaggregate the impact of non-fraud-related information from the misleading statements that inflated Acadia's stock price at the "front end," is discussed at §II.C.2 below.

-24-

[news] of the DL and CRL," without separating that "bundle" into disclosures of (a) fraud-related corrective information vs. (b) non-fraud-related information.  Br. 27. But Feinstein's reports and deposition confirm that he *did* consider whether non-fraud-related disclosures might have caused the sharp stock price declines that followed Defendants' post-market-close disclosures of 8-Mar-2021 (about the DL) and their 5-April-2021 disclosures (about the CRL), and that there were no confounding disclosures on either date.  *See* Ex. 12 ¶¶248, 253 (confirming that he examined all Acadia news that emerged on or immediately around the stock declines of 9-Mar-2021 and 5-Apr-2021 to identify any "that could have been responsible for or contributed to [those declines]," but found none); Ex. 32 ¶¶114-30; Ex. 22 at 186:5-90:10.  Thus, while Dr. Feinstein considered the "entire bundle" of news that emerged around the 8-Mar-2021 and 5-Apr-2021 disclosures, the contents of that "bundle" (including both Defendants' own statements and related analyst commentary, *id.* ¶¶128-44, 145-59, 188, 196-97, were all fraud-related, as: (a) the 8-Mar-2021 news signaled that FDA "likely had significant concerns about the Harmony Study's design and/or the extent to which [its] data was sufficient to support approval," and that "the market had been led to materially overestimate the sNDA's true PoS based on factors that had likely not previously been adequately explained or disclosed"; and (b) the 5-Apr-2021 disclosures confirmed that message, thereby dissipating the remaining inflation caused by the alleged misrepresentations and omissions).  *Id.* ¶¶249, 252.  In sum, he plainly measured, and excluded, the price effect of any elimination of optimism that was not due to alleged misrepresentations or omissions.  *See also id.* ¶¶40-46.[21]

---

[21]    Dr. Feinstein did, however, adjust his damages estimate—in *Defendants'* favor—by *capping* total artificial inflation at the amount he calculated at the Class Period's "front-end" based on the disaggregation-and-market-&-sector-effects-adjusted price increases observed on 9-Sep-2019 and 5-Dec-2019. Ex. 12 ¶304. Defendants seem to indirectly attack even this adjustment by urging that it became needed only because Feinstein "inconsistently" used a two-day event window of March 9-10, 2021 in assessing damages resulting from the 9-Mar-2021 disclosures. Br. 23 n.14.  Defendants' attack on the use of a two-day event window is both

Defendants' remaining arguments relating to confounding information are equally baseless. *First*, Defendants do not (and cannot) identify any disclosures of confounding, non-fraud-related information that might have caused Acadia's stock price declines on those dates. There was, for example, no Acadia news disclosed on either date that concerned, e.g., disappointing earnings results, or bad news about any of Acadia's non-pimavanserin-related clinical trials. *Cf. Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (plaintiff does not show loss causation if the lower share price reflects "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"); *In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *11 (N.D. Cal. Oct. 13, 2022) (collecting cases that declined to exclude experts for alleged failure to consider non-fraud-related, company-specific news).[22]

*Second,* unable to identify any disclosures of *bona fide* non-fraud-related information, Defendants urge the Court to invent confounding information by accepting *their* factual assumptions. Specifically, Defendants contend:

> Dr. Feinstein has done nothing to prove whether, and to what extent, Plaintiffs' losses were, in fact, caused by the materialization of **unknown** risks (*e.g.,* Plaintiffs' alleged risk of FDA rejection based on Harmony's alleged failure to achieve the so-called directional consistency requirement) instead of the materialization of **known** risks (*e.g.,* the risk of FDA rejection because FDA changed its mind about Harmony or was simply not convinced by Acadia's submission).

Br. 28. But here there is no real dispute that, as Dr. Feinstein shows, the price drops of 9-Mar-21 and 5-Apr-21 were due to the market's reassessment of the probability that an sNDA would be approved based on then-available data, and that new trials would now likely be needed to get approval of an expanded label for pimavanserin.

---

economically misguided (*see* Ex. 32 ¶129) and wrong on the law. *E.g., Sjunde AP-Fonden v. Goldman Sachs, Inc.,* 798 F. Supp. 3d 416, 472 (S.D.N.Y. 2025) (distinguishing *Erica P. John Fund, Inc. v. Halliburton Co.,* 309 F.R.D. 251 (N.D. Tex. 2015) and finding use of two-day window appropriate).

[22] Defendants also do not dispute that Dr. Feinstein ran multiple regression analyses that isolated the impact of Acadia-specific news by removing general market and pharmaceutical industry-sector effects. Ex. 12 ¶¶216-28.

-26-

And as to whether the negative news on those dates was (as Plaintiffs allege) due to Acadia's failure to satisfy a directional consistency requirement that Defendants concealed—or whether it was (as Defendants assert) due to FDA having "changed its mind" and "moved the goal posts"—*that* question, as discussed at §II.B.2, is a *jury question,* and Dr. Feinstein properly assumed that the jury here will adopt Plaintiffs' (rather than Defendants') theory of the case.

*Third,* Defendants rely on inapposite case law. For example, they claim that *Strougo v. Tivity Health, Inc.*, 2025 WL 1415896 (M.D. Tenn. May 15, 2025) excluded an expert based on the "exact issue" here. However, the corrective event in *Tivity* had at least *five* elements: (1) Q4 & FY2019 earnings; (2) Q1 & FY2020 earnings guidance; (3) impairments to Tivity's goodwill and its recently acquired Nutri-system unit; (4) the resignation of that unit's head; and (5) the firing of Tivity's CEO. *Plaintiff's expert also conceded that he "could not tie these [five items] to any of the alleged misrepresentations or describe why they [were] corrective." Id.* at \*5 (emphasis added). That expert treated all five items as one bundle "despite acknowledg[ing] that some of [them] implicated [negative] information beyond [the] alleged fraud." *Id. Tivity* also noted the expert had conceded that the market had expected that the Tivity/Nutrisystems merger might fail "irrespective of Defendants' fraud," and that the executives might leave, yet the expert did not account for that "in any way"; and the court also found that the expert's live testimony was "evasive and inconsistent." *Id.* at \*6-8. By contrast, Dr. Feinstein readily tied the 8-Mar-21 and 5-Apr-21 disclosures to the alleged price-inflating misrepresentations, Ex. 12 ¶¶246-50, 251-53, 289-305, and, based on his review, *rejected* (rather than conceded) any notion that those disclosures implicated non-fraud-related news. *Id.* ¶¶248 & 253.[23] Nor, of course, has this Court previously found Dr. Feinstein to be

---

[23]   *In re REMEC Inc. Securities Litigation,* 702 F. Supp. 2d 1202, 1274 (S.D. Cal. 2010) (excluding expert who *admitted* that corrective disclosures included confounding, non-fraud-related news that he didn't consider), is inapt for the same reasons.

-27-

"evasive and inconsistent." And, in further contrast to *Tivity,* Dr. Feinstein necessarily considered the market's assessment of the generic risk of FDA rejection of the sNDA, and he found that the market assessed that generic risk to be 13% (the stable consensus PoS of 87% post-5-Dec-2019 implies a generic risk of non-approval of 13% [100% - 87% PoS]).[24] *Id.* ¶97 & App. B-D.

*Fourth,* Defendants simply rehash their previously rejected arguments that Dr. Feinstein's causation opinion must be rejected because "neither Acadia's announcements of the DL and CRL, nor the CRL itself, reference any directional consistency requirement, and thus cannot have corrected a previous omission of the alleged requirement." Br. 29. But as this Court has already held and for the further reasons detailed in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 31-33, courts in this circuit squarely reject Defendants' "mirror image" rule for corrective disclosures. *See, e.g., In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (corrective disclosure need not "mirror" earlier

---

[24] In other words, throughout the Class Period the efficient market for Acadia stock had already (as reflected in the consensus PoS) recognized that there was always some generic risk that FDA would reject the sNDA based on non-fraud related factors (e.g., risk of FDA deciding to "move the goal posts") that Defendants claim were determinative. What Feinstein's analysis shows is the extent to which investors were damaged when the market realized that its prior high PoS estimates appeared to have been vastly overstated—and his analysis thus plainly takes into account the impact of that overestimation (based on the assumption, as discussed above, that Plaintiffs will prove that the overestimation was due to fraud-related factors). Ex. 12 ¶¶28-29, 160-71, 196, 249-50, 252. Similarly, Defendants are simply wrong to the extent that they try to frame this case as one where losses must be assessed through a "materialization the risk" prism, i.e., one that requires viewing causation and damages through a backward-looking analysis that measures artificial inflation based on declines observed in the wake of "*back-end*" disclosures. As Dr. Feinstein explained in his reports and deposition, here, he measured artificial inflation as it was introduced into Acadia's stock price by the misrepresentations and omissions at the "*front end*," rather than by basing it on "back-end" stock price declines observed when the DL and CRL were disclosed. Only the back-end approach would involve loss caused by an alleged unaccounted-for "materialization of known risk," and which in turn might require separate analysis (beyond all the customary disaggregation analyses that he did perform) to disaggregate Defendant's posited impact of "materialization" of any known risks. *See* Ex. 22 at 273:4-274:12.

-28-

21cv00762

misrepresentation, and instead need only "reveal[] new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading").[25]

*Fifth,* Defendants wrongly argue that Dr. Feinstein's opinion is "unreliable" because he purportedly has no basis to believe that any analyst, post-5-Apr-2021, was "misled about what the FDA required."  Br. 29.  But he identified *numerous* analysts in both March and April 2021 who raised issues as to whether deficiencies identified by FDA undercut Acadia's statements about the sufficiency of Harmony's top-line results, and whether FDA's issuance of a CRL "ran contrary to what Defendants had [said] about what efficacy data would (or would not) be considered by FDA under [the] purported [FDA] agreement."  Ex. 12 ¶¶133-34, 155-57.

Defendants' alternative attack, that Dr. Feinstein's analysis of analyst reports is mere "subjective guesswork" (Br. 29), fares no better, as courts routinely hold that "some subjectivity is unavoidable in the context of event studies."  *Hayes v. MagnaChip Semi., Inc.*, 2016 WL 7406418, at *7 n.3 (N.D. Cal. Dec. 22, 2016); *accord In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009).  Given his qualifications and experience in event study analysis, attacks on Dr. Feinstein's use of subjective judgment (and common sense) in analyzing analyst commentary thus go, at most, to weight, not admissibility.  *E.g. Angley v. UTI Worldwide Inc.*, 311 F. Supp. 3d 1117, 1125-26 (N.D. Cal. 2018) (whether expert should have dealt with subjective event study issues differently went to weight, not admissibility).[26]

---

[25]  Defendants also make no effort to refute (other than by denying that they committed fraud) Dr. Feinstein's opinion that the "practical implications of what [Defendants] disclosed about the CRL [on April 5] would not have been surprising to the market had Defendants not previously misled investors by conveying that Acadia had an agreement with the FDA that successful top-line results from the Harmony Study . . . would be sufficient evidence of efficacy for sNDA approval, irrespective of any subgroup efficacy results."  Ex. 12 ¶300.

[26]  Defendants cite only *In re Vale S.A. Sec. Litig.,* 2022 WL 122593, at *12 (E.D.N.Y Jan. 11, 2022) to support their view that Dr. Feinstein's analysis of analyst reports is so subjective as to be unreliable.  But *Vale* involved both: (1) a different issue (i.e., whether *more dates* should have been tested to assess market efficiency,

-29-

*Finally*, Defendants note that Feinstein "admits" that some information disclosed in April 2021 (e.g., subgroup sample sizes and lack of statistically significant results in those samples) had been known to the market since December 2019.  Br. 29-30.  But as the Court noted in the *Class Cert. Order* at 390-391, the impact *of what had previously been misrepresented and concealed about the subgroup data* did not begin to emerge until the DL was issued.  And in any event, Defendants' arguments that Dr. Feinstein did not properly consider "other information already known" goes only to "weight, not admissibility." *Freeland,* 545 F. Supp. 2d at 88.

In the end, Defendants' loss causation assertions boil down to disagreement about Dr. Feinstein's assessment of what should, or should not, be deemed confounding information on the facts of this case.  But such subjective disagreements (even if they had any validity) fall far short of showing that Dr. Feinstein's analysis is somehow so unreliable as to require exclusion.  *See, e.g. SEC v. Leslie*, 2010 WL 2991038, at *14-15 (N.D. Cal. July 29, 2010) ("While [a rebuttal expert] certainly may argue to the jury that [the other expert] did not reliably filter out other confounding variables that would have affected the stock price . . . he has not shown that [the expert's] opinion is so unreliable that it must be excluded"); *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4956520, at *4 (C.D. Cal. Oct. 5, 2018) (rejecting contention that Dr. Feinstein's testimony was "unreliable because he hasn't sufficiently connected the purported corrective disclosures to the decline in [the] stock price"); *Groupon*, 2015 WL 1043321, at *6 (denying motion to exclude Feinstein for alleged failure to consider confounding information); *Alaska Rent-a-Car, Inc., v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013) (rejecting

---

rather than whether the results for any date actually chosen were unreliable), and (2) a *very* different procedural context (assessing market efficiency at class certification) where the court had to act as fact-finder.  Indeed, as *Vale* expressly stated, if the alleged flaws "like the ones identified [here]" had instead been raised in the context of a *Daubert* motion, they would "go to weight, not admissibility." *Id.* at *14.

*Daubert* challenge, as expert's application of an accepted general methodology goes to weight, not admissibility).

### C.    Dr. Feinstein's Analysis of Artificial Inflation Is Reliable

#### 1.    Overview of Dr. Feinstein's Damages Analysis

While Defendants offer their own summary, a more accurate summary is set forth in Dr. Feinstein's Report.   Ex. 12 ¶¶26-49; *see also id.* ¶¶258-305.

#### 2.    Dr. Feinstein's Analysis Properly Disaggregates the Non-Fraud-Related Share Price Increase On 9 September 2019

Defendants first assert that Feinstein's artificial inflation analysis for the 9-Sep to 5-Dec-2019 period is unreliable because it: (1) uses Dr. Peck's 9-Sep-2019 but-for PoS estimate to disaggregate the non-fraud-related part of Acadia's $15.40 residual stock price increase on that date; and (2) fails to account for "error" associated with that PoS estimate.  Br. 30-36.  They are wrong on both counts.

#### a.    Dr. Feinstein's Use of Dr. Peck's 9-Sep-2019 But-For PoS Was Appropriate, and Dr. Feinstein's Model Can, in Any Event, Easily Adapt to *Any* PoS the Jury Ultimately Finds

Defendants assert that Dr. Feinstein's inflation analysis for the early Class Period (9-Sep-2019 through 4-Dec-2019) is somehow flawed because it used Dr. Peck's allegedly "unreliable" 9-Sep-2019 but-for PoS.  Br. 31.  This argument fails for multiple reasons.

First and foremost, *every* Peck PoS estimate—including his 9-Sep-2019 but-for PoS, is reliable.  In short, for all the reasons already detailed at §I above, they are supported by Dr. Peck's vast experience in both government and the private sector, as well as by his application of relevant benchmark guidance in conformity with customary industry practice.  Moreover, at the time Dr. Feinstein performed his analysis, Dr. Peck's PoS numbers were not only reliable, they were the only ones offered by *any* expert in this case.  Of course, and as further shown below, had Defendants tendered an expert who offered a different 9-Sep-2019 but-for PoS, Dr. Feinstein could have *also* easily run an *additional*, alternate scenario using that

PoS—but tellingly, Defendants declined to even offer any such "alternate" PoS (let alone reliable ones) of their own.

Second, Dr. Feinstein did not use Dr. Peck's PoS estimate to prove that Defendants' 9-Sep-2019 statements (and alleged misrepresentations and omissions) caused Acadia's stock price to increase. Instead, *that* finding was based on Dr. Feinstein's event study, Ex. 12 ¶¶230-33, and he used Dr. Peck's 9-Sep-2019 but-for PoS only to assess what fraction of the 9-Sep-2019 price increase would have occurred anyway (i.e., even absent the alleged misrepresentations and omissions). It should also be noted that, as Defendants do not dispute, no other part of Dr. Feinstein's loss causation or damages analysis required (and therefore did not use) any of Dr. Peck's other PoS estimates.

Moreover, Dr. Feinstein's artificial inflation analysis for the 9-Sep-2019 to 4-Dec-2019 period *can be easily adjusted to reflect whatever PoS figure that the jury ultimately finds* is the best estimate of the true but-for PoS number following the news of 9-Sep-2019. Again, Dr. Feinstein's method for disaggregating the fraud-related artificial inflation from the stock price increase that would have occurred anyway on that date in the "but-for" scenario (i.e., absent any misrepresentations or omissions) is to compare **(A)** Dr. Peck's but-for PoS estimate of 70% as of 9-Sep-2019, which represents a raw ***29-percentage-point increase,*** from 41% to 70%, in the but-for scenario compared to the market's actual *pre*-9-Sep-2019 consensus PoS of 41%, to **(B)** the actual ***43-percentage-point increase*** (from the prior 41% PoS to 84% on 9-Sep-2019 in the market's consensus PoS) that actually occurred. Using these numbers, Dr. Feinstein calculates that 67.44% (i.e., $^{29\%}/_{43\%}$) of the 43-percentage-point increase in the market consensus PoS that occurred on 9-Sep-2019 was due to legitimate, non-fraud-related optimism caused by news of Harmony's positive top-line results—but that the remaining 32.56% of that increase was due to market overestimation of the true PoS that ***was*** fraud-related (i.e., induced by the alleged misrepresentations and omissions). Ex. 12 ¶¶270-73. In dollar terms, these

-32-

numbers equate to the conclusion that $5.01 of the $15.40 residual stock price return on 9-Sep-2019 [32.56% of $15.40] **was** fraud-related, while $10.39 [67.44% of $15.40] was not. *Id.* ¶273.

Indeed, while attacking the $5.01 figure as set forth in ¶273 of Dr. Feinstein's Report (Ex. 12), Defendants do not rebut (and instead ignore) the next paragraph (¶274), which states:

> If the fact-finder in this matter adopts a different view as to how much of the $15.40 per share residual stock price rise observed on 9 September 2019 would have occurred absent the alleged misrepresentations and omissions, **then the artificial inflation ribbon can be adjusted to reflect that different allocation**. Any such adjustment would be easily applied to the computation of damages for all Class members on a formulaic basis. (Emphasis added).

In other words, rather than challenge Dr. Feinstein's disaggregation *methodology* (comparing the actual market consensus PoS to what the but-for PoS would have been absent the alleged fraud), Defendants simply challenge his use of *one* particular input—Dr. Peck's 9-Sep-2019 but-for PoS of 70%. But Dr. Peck's number, as discussed, is itself reliable. Dr. Feinstein's *methodology* not only correctly recognizes that it is ultimately up to the *jury* (as fact-finder) to determine what the 9-Sep-2019 but-for PoS was, but his methodology also has the flexibility to "easily" incorporate whatever PoS number the jury might find in the highly unlikely event that they did not credit Dr. Peck's uncontested PoS number. Ex. 12 ¶274.

In sum, Defendants' insinuation that Dr. Feinstein's disaggregation method somehow relies on an "arbitrary, plucked out of thin air" percentage to apportion damages is absurd. *Cf.* Br. 32 (citing *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, *2 (N.D. Cal. Mar. 17, 2020); and *Pascal v. Nissan North Am., Inc.*, 2022 WL 19076763, *16 (C.D. Cal. Dec. 21, 2022)). Nor does Defendants' assertion, Br. 32 (citing *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546 (D.N.J. 2014); and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir 2012)), that Dr. Feinstein "fail[s] to explain" why he used Dr. Peck's 70% PoS make sense: Dr. Feinstein simply applied an input provided by a renowned expert. And again, given that Dr. Peck's

70% but-for PoS number is the only one submitted by *any* expert who assumed that Plaintiffs would prove their factual allegations, Dr. Feinstein's use of it was hardly improper. And, as noted above, Dr. Feinstein's disaggregation method does not depend on **any** particular but-for PoS number, so Defendants are free to try to persuade a jury that the 9-Sep-19 but-for PoS should be higher than Dr. Peck's,[27] and his methodology would calculate inflation in precisely the same way (i.e., using that input to determine his disaggregation fraction).[28]

Defendants also attack Dr. Feinstein for not explaining why he used Dr. Peck's (post) 9-Sep-2019 but-for PoS, given that Dr. Peck's **pre**-9 Sep-2019 PoS (50%) "was substantially different than [the] Average Analyst PoS of 41%" for the same period. Br. 32. But Defendants' assertion—that Dr. Peck's *pre*-9-Sep-2019 PoS (50%) and the *Average* Analyst PoS (41%) for that period should have been "the same," *id.*—is plainly wrong. For example, if one asked nine (or 900) analysts for their PoS, to the nearest whole number, of the Padres winning their next game, and their answers *averaged* 54.63%, one could confidently bet that *none* said 54.63%. Similarly, when Defendants attack Dr. Peck's *pre*-9-Sep-19 PoS (50%) as unreliable, the issue is not whether it is *the same* as the Average Analyst PoS, but whether it is so far *outside the range* of individual analyst PoSs as to be unreliable. Here, Dr. Peck's 50% number *matched* JP Morgan's estimate, was lower than two

---

[27]    For example, if Defendants wished to defy all common sense, they could argue to the jury that Average Analyst PoS (which rose 43 percentage points, from 41% to 84% on 9-Sep-2019) would have risen by just as much even if Defendants had not misled investors as to, *inter alia*, the FDA agreement and the importance of Harmony's subgroup data. In that case, Dr. Feinstein's disaggregation fraction, rather than discounting putative damages of $15.40 per share by 67.44% ($^{[70-41\%]}$/43%), would instead "discount" them by $^{[84\%-41\%]}$/43% (i.e., 1.0), such that all 100% (and not just 67.44%) of the $15.40 would be disaggregated (and removed) from recoverable damages for the 9-Sep-19 to 5-Dec-19 period.

[28]    Ironically, Defendants' expert suggested that Dr. Feinstein *should* have used a second Dr. Peck PoS estimate—namely Dr. Peck's 50% PoS for the *pre*-9-Sep 2019 period (rather than the Average Analyst (consensus) PoS of 41%) in determining the appropriate disaggregation fraction. But Defendants have apparently abandoned that additional (and wrong) argument, as Dr. Feinstein's Reply Report showed why his use of the Average Analyst PoS was *conservative*, as it results in *lower* damages (i.e., it favors *Defendants*). Ex. 32 ¶¶79-85.

other analysts', and higher than the remaining six analysts—clearly "within the range" and refuting any claim that Dr. Peck's *pre*-9-Sep-19 PoS is unreliable. *See* Ex. 12 ¶176 & App. A; *see also supra* §I.B (discussing reliability of Dr. Peck's PoS approach and Defendants' own expert's agreement that 50% is routinely used as a base case PoS). Moreover, Defendants' attacks on Dr. Peck's *pre*-9-Sep-2019 PoS estimate are beside the point, as Dr. Feinstein's disaggregation analysis does *not* depend on using any of Dr. Peck's PoS estimates, as it will work equally well with *any* pre-9-Sep-19 but-for PoS that the *jury* ultimately decides should be used.[29]

### b.  Defendants' Arguments Regarding an Alleged Need for "Potential Error Testing" Are Baseless

Defendants next attack Dr. Feinstein for not analyzing potential "error rates" associated with the PoS estimates he considered. These arguments also fail.

Defendants first argue that Dr. Feinstein needed to conduct statistical analysis to assess "error rates," "standard deviations," and "statistical significance" associated with market analyst PoS numbers (as well as the one Peck PoS number that Dr. Feinstein actually used), purportedly because they all involve "point estimates." Br. 33-34. Indeed, citing Plaintiffs' *biostatistics* expert (Dr. Madigan) and a Federal Judicial Center *Reference Guide on Statistics*, Defendants assert that it is "customary" to analyze "the standard error and a confidence interval" associated with "an estimate." Br. 34.

However, Defendants cite *no* authority that shows (let alone suggests) that such analyses are performed or considered relevant—let alone customary—*in the context of assessing the utility of average (a/k/a "consensus") Wall Street analyst*

---

[29]  Defendants also attack Dr. Feinstein's use of Dr. Peck's (post) 9-Sep-2019 but-for PoS, claiming that it is not really a "but-for" PoS, but was instead an estimate of the "true" PoS. Br. 32. But this attack is sophistry, as Dr. Peck's 9-Sep-19 PoS assumes that Plaintiffs will prove the truth of their factual allegations, such that his "true POS" *is* the same thing as the "but-for POS" here.

*estimates*.[30]  Instead, as Dr. Feinstein's unrebutted deposition testimony states, such calculations are irrelevant in this context, as it is the *mean* (average) of analyst estimates that *is* routinely treated as equaling the market consensus, without further "analysis."  Ex. 22 at 155:24-156:22 ("The mean is considered the consensus for the market.").[31]  Nor is analysis of the "statistical significance" (i.e., whether one can conclude that a result derived from a sample accurately reflects, within a certain error margin, what the "true" result would be for an entire population) of the *difference* in Average Analyst POSs between two points in time relevant to assessing whether markets actually reacted to the news that caused analysts' PoS estimates to change.  The following colloquy from Dr. Feinstein's deposition makes this point:

> Q:    [D]id you … test to see if the difference between [Analysts' Average 9-Sep-19 PoS of] 41% and 84% [after 9-Sep-19] was statistically significant?
>
> A:    The question is meaningless…. What matters is that the mean changed.  [Here], each analyst increased [its PoS].  So [BofA's, e.g.] went from 40 [pre-9-Sep-19] to 65 percent [on 9-Sep-19].  [It's] ridiculous to think that [BofA] simply changed their number for random

[30]    That statistical error analysis is customary in assessing if responses in a drug trial occurred in enough patients to prove effectiveness (i.e., that the trial results were not due to random chance but were actually caused by the drug)—the context in which Dr. Madigan testified—obviously says *nothing* as to whether any such analysis is customary in assessing analyst consensus estimates.

[31]    In other words, Defendants argue that "Actual Market PoS" necessarily differs from the known Average Analyst PoS, as the latter is based on estimates of "only" the analysts that were made public, vs. the theoretical 'Actual Market PoS' that would reflect the views of *every* analyst, *every* institutional investor, and every other market participant.  Defendants thus posit that Dr. Feinstein needed to statistically analyze the difference between (a) the *theoretical* Actual Market PoS, and (b) the average of all published analyst PoS numbers, to determine if the latter is a valid proxy for the former.  But as a practical matter (as Defendants concede) it is *impossible* to calculate the theoretical 'Actual Market PoS' for any point in time.  They thus necessarily fail to show that analyzing "differences" between their incalculable PoS number and the known Average Analyst PoS (based on all available analyst PoSs) is even possible, let alone customary.  *See* Ex. 22 153:10-22 ("No one's ever going to do that sort of [PoS] survey of the entire population [of market participants].").  Thus, as a real-world matter, the mean of public analyst estimates **is** the market consensus estimate.  *Id.; see also* Standard & Poor's, *Consensus Estimates: An Introductory Understanding* (Mar. 27, 2024) ("Consensus estimates are critical in financial analysis.  [They] are derived from the aggregate forecasts of multiple analysts … and embody the collective insight and foresight of financial experts, reflecting a blend of analytical rigor and market sentiment"), www.spglobal.com/market-intelligence/en/news-insights/research/2024/09/consensus-estimates-an-introductory-understanding.

reasons;that they [had a PoS of 40%] pre-September 9th, 2019,… and they did another random draw, without considering [new] information, and happened to get 65% the second time . . . .

Ex. 22 at 156:23-157-58; *see also id.* at 158:3-159:10 (because analysts made clear they were revising their PoS estimates based on Defendants' statements, there is no point in doing error testing to determine if, or to what extent, their revised PoSs might have instead been due to random chance alone, as Defendants' attack suggests).[32]

Defendants also offer no authority that remotely suggests that Dr. Feinstein was required to perform unspecified "error analysis" on any of Dr. Peck's PoS estimates. To begin with, Dr. Feinstein used *only one* of Dr. Peck's PoS numbers in his analysis, namely Dr. Peck's 9-Sep-2019 but-for PoS of 70%—and Feinstein used that number ***only*** for the limited purpose of gauging how much Acadia's share price might have risen in the but-for scenario on 9-Sep-2019 if Defendants had not (as Plaintiffs allege) concealed material facts that day. Ex. 32 ¶¶80-81.

More fundamentally, *there is also simply no "But-For Market PoS" against which to compare Dr. Peck's 9-Sep-19 but-for PoS because the "but-for" scenario did not happen* (and what the "Actual [consensus] Market PoS" would have been in that case *must* instead be estimated). *Id.* Yet Defendants provide no explanation as to why Dr. Feinstein should be barred from even considering Dr. Peck's estimate of what that but-for PoS would have been. *Cf.* §I (discussing Dr. Peck's qualifications and reliability). At most, Defendants aver that "had Dr. Feinstein consulted multiple experts to independently generate" more PoS estimates, they "likely" would have varied "significantly." Br. 34 n.17. But Defendants cite nothing—let alone any legal authority—that requires damages experts (or their plaintiff clients) to hire *multiple* experts to opine on but-for PoSs (or other unobservable inputs) to lend "reliable"

---

[32]    Of course, Feinstein's *event study* analysis did include regression analyses and statistical significance calculations, which proved that the sNDA-related disclosures of 9-Sep-19 and 5-Dec-19 caused the *price increases* on those dates. *See supra* §II.B.1.

weight to the first expert's opinion. By contrast, Rule of Evidence 403 endorses exclusion of needlessly cumulative evidence, including duplicative expert witness opinions.[33] Thus, if Defendants believe that Dr. Peck's PoS estimate at issue is wrong, the remedy is not to exclude that estimate (or the part of Dr. Feinstein's opinion on disaggregation that cites it), but to let Defendants try to attack that PoS by cross-examining Dr. Peck at trial and/or offering competent expert testimony of their own (if Defendants have not already waived that right) of a "more accurate" 9-Sep-2019 but-for PoS. And as noted earlier, the reliability of Dr. Feinstein's methodology does not even require the jury to adopt Dr. Peck's 9-Sep-2019 but-for PoS, as it allows for relevant disaggregation and damages calculations to be easily adjusted to reflect the jury's finding as to the appropriate 9-Sep-19 but-for PoS number, if it differs from Dr. Peck's.

Finally, though damages must be based on a reliable method, they need not be calculated with scientific precision or be based on theoretical (but impractical) notions of perfection to be reliable. *In re Citimortgage, Inc. Home Afford. Modification Prog. Litig.*, 2013 WL 8844095, at *2 (C.D. Cal. Oct. 7, 2013) (issue under *Daubert* "is not whether an expert's report relies on and analyzes perfect data . . . but rather whether [it] is sufficiently reliable to warrant consideration"). For all of the above reasons, even if Defendants' attacks on Dr. Feinstein's method for calculating damages for the 9-Sep-19 to 5-Dec-2019 period had any merit (which they do not), they would go only to weight, not admissibility.[34]

---

[33]    *See, e.g., Cabrera v. Cordis Corp.*, 134 F. 3d 1418, 1421-22 (9th Cir. 1998) (excluding expert based on "needless presentation of cumulative evidence"). And even if Plaintiffs had retained more experts to opine on the same PoS issues, would Defendants argue that there were still not enough to yield "statistically valid" PoSs?

[34]    Defendants also assert that Dr. Feinstein "did not test the very hypothesis that motivates Plaintiff's theory of damage—i.e., whether the unobserved Actual Market PoS was artificially high following the alleged misstatements [and omissions] on September 9, 2019," Br. 35—which is simply another way of trying to attack his *loss causation* analysis as unreliable. However, they also offer no authority for their contention, *id.*, that loss causation analysis somehow **requires** testing for statistically significant differences between (a) "the unobserved Actual Market PoS" and (b) "the

-38-

### 3.      Dr. Feinstein Correctly Analyzed the Extent of Additional Inflation in Acadia Shares Post-December 4, 2019

Having reiterated in prior weeks the substance of the misleading parts of their 9-Sep-2019 statements, on 4-Dec-2019 (post-market close) Defendants made further false and misleading statements concerning what they had since learned about Harmony's subgroup data. *See* PUF ¶¶181-187. Dr. Feinstein estimates that, on 5-Dec-2019, a further $17.42 of artificial inflation was injected into Acadia's share price, which remained until 9-Mar-2021's partial disclosures. Ex. 12 ¶¶275-81. Defendants' attacks on his analysis of post-4-Dec-2019 inflation also fail.

### a.      There Is No Inconsistency in Dr. Feinstein's Analysis

Defendants' claim that Dr. Feinstein used a different method to assess the impact of the 9-Sep and 4-Dec-2019 statements, and is thus "inconsistent," is absurd. In sum, he applied the *same* financial analysis and event study method to both disclosures, and—after performing regression analysis to eliminate the effect of broader market and industry sector effects—found in each case that the statistically significant price movements on those days (or next trading day as to the post-market close 4-Dec-2019 statements) confirmed that the residual returns on those days were due ***entirely*** to Defendants' disclosures (of 9-Sep-2019 and 4-Dec-2019) concerning Harmony and the upcoming sNDA. *See supra* §II.B.3. Based on that analysis, Dr.

---

unobserved But-For Market PoS." In fact, as Dr. Feinstein states, event study analysis involves **(I)** extensive analysis (which he performed) to identify statistically significant differences between (x) observed Acadia stock price movements on the alleged misrepresentation and disclosure dates, and (y) the stock price movements observed on those dates that are explainable by market, industry and/or random volatility effects (rather than company-specific news), and **(II)** use of the expert's reasonable, professional and common sense judgment (rather than further "statistical analysis") of whether company-specific news on those dates was, or was not, fraud-related. As shown above, Defendants also offer no authority to suggest that Dr. Feinstein applied any event study or other analysis that was somehow inappropriate or unreliable. Moreover, in addition to being non-customary, irrelevant and unnecessary, Defendants' own brief concedes that *their* proposed additional test would be *impossible* to conduct here. *See* Br. 35 n.21. And it is obviously not "customary" to perform tests that are impossible.

Feinstein calculated residual returns of $15.40 caused by Defendants' 9-Sep-2019 statements, and of a further $7.03 due to their 4-Dec-2019 statements.

The *only* "difference" in Dr. Feinstein's analysis of news on these days is that, as he appropriately determined, *the 9-Sep-2019 statements needed to be further analyzed* (and their impact on Acadia's positive residual return that day *reduced* for damages purposes) *so as to __disaggregate__ (and remove) the impact of the non-fraudulent parts of the "new news" announced on that day*—thereby isolating that fraction of the increase attributable to artificial inflation caused by the alleged fraud. No such disaggregation was necessary for the 4-Dec-2019 news, because Dr. Feinstein concluded that there was no such confounding information. That difference is plainly *not* an inconsistency; rather, it is simply the byproduct of Dr. Feinstein's application of customary event study analysis, which found that (a) the price increase observed on 9-Sep-2019 required disaggregation adjustments, while (b) the increase observed on 5-Dec-2019 did not.

Next, Defendants assert that Dr. Feinstein erred in concluding that markets would have reacted differently on 5-Dec-2019 but for the alleged misrepresentations and omissions. In support, they cite four analysts who allegedly reviewed the limited subgroup data disclosed at CTAD on 4-Dec-2019 for consistency and said that it "supported" the sNDA. Br. 37-38. But those analyst reports were based on a "first glance" at "detailed data" on Harmony as a whole that had been presented at CTAD, *see* Ex. 28 at 1, but that had included just two slides (out of 38) on subgroup data. And that limited data was cherry-picked, as it highlighted *non*-placebo controlled "open-label" results on the "SAPs+HD" psychosis scale, which was not a pre-specified efficacy measure, *see* SJ Opp. at 12—*while at the same time Defendants continued to: (i) conceal adverse placebo-controlled subgroup information (including pre-specified hazard ratio (HR) data for time-to-relapse by subgroup*

*and related forest plot and Kaplan-Meier analyses that FDA required)*;[35] *(ii) falsely downplay the importance of subgroup data*, *e.g.*, PUF ¶186 (advising against "overinterpretation" of subgroup data "given the small numbers"); *and (iii) misrepresent what the "FDA Agreement" actually called for*.[36]  Finally, whatever slim merits Defendants' arguments might have at trial, they fail in the *Daubert* context for the same reasons discussed earlier, namely because: (a) Dr. Feinstein may appropriately assume that Plaintiffs will prove their factual allegations,[37] (b) Defendants offer no evidence that he deviated from accepted event study methodology, and (c) Defendants' various efforts to prevail on their version of a "truth on the market" defense are matters for cross-examination and the jury, not *Daubert* motions.[38]

---

[35]    *See* SJ Opp at 12 (discussing how Defendants actually instructed Acadia staff to ***not*** publicly disclose any subgroup hazard ratio data, even as Defendant Stankovic was internally warning Acadia officials that FDA would be "look[ing] at" that very data.

[36]    Indeed, two of Defendants' four cited analysts, in interpreting the 4-Dec-2019 news positively, "remind[ed]" their readers of Acadia's (false) comments as to what FDA had allegedly agreed to at prior meetings.  *See* Ex. 30 at 5; Ex. 31 at 3.

[37]    Defendants also conclusorily assert that FDA's acceptance of the sNDA for filing "with no review issues identified" bars Plaintiffs from proving (and Feinstein from assuming) that directional consistency would have been "apparent" in the but-for world of full disclosure. Br. 38 n.23.  But they ignore Dr. Peck's opinion that such acceptance meant only that FDA deemed the sNDA *complete* (i.e., that it had the material FDA needed to conduct its review), but said nothing as to *merits* (i.e., whether the sNDA data actually supported approval.  Ex. 3, App. C, ¶52; Ex. 4 at 255:10-17.

[38]    Relatedly, Defendants assert that given the "wealth" of positive information disclosed on 4-Dec-2019, Acadia's stock would still have risen in the but-for world, "but by a lesser amount." Br. 38.  But they cite no evidence to suggest that such "other" positive information would have prevented Acadia's share price from accruing *all* the artificial inflation quantified in Dr. Feinstein's damages analysis based on Plaintiffs' liability theory (under which more *confirmatory* positive news about Harmony's PDP-driven top-line results would, in an efficient market, not have caused Acadia's stock price to increase above what it had been just prior to the Class Period, since Harmony's *overall* results were *not* sufficient to support approval under the actual terms of the FDA agreement).  And that bottom-line conclusion is not "unsupported," but is strongly confirmed by Dr. Peck's expert testimony.

-41-

21cv00762

**b.    Dr. Feinstein's Analysis *Does* Disentangle the Impact of Fraud- and Non-Fraud-Related Information**

Finally, Defendants renew their arguments that Dr. Feinstein's analysis is unreliable for not disentangling more strands of information. Br. 39-41.

*First,* Defendants again err by claiming that Feinstein "never analyze[d]" the 4-Dec-2019 disclosures for confounding information for possible disaggregation. Instead, as with the 9-Sep-2019 disclosures, he reviewed the 4-Dec-2019 disclosures and analysts' reactions thereto, but found (as Defendants do not dispute) that they were all sNDA-related and relevant to the market's PoS assessment. Br. 39. Dr. Feinstein thus found it unnecessary (and inappropriate) to try to disaggregate the impact of separate pieces of information disclosed on that date, regardless of how positive they might have appeared, as each component's impact on Acadia's stock price was (per basic financial principles) to simply maintain and/or increase the perceived PoS of the upcoming sNDA—and ***none*** of the increased optimism about the PoS would have occurred or been maintained but-for Defendants' positive sNDA-related statements that (as Plaintiffs allege and Dr. Feinstein assumes) misled investors as to the existence of likely fatal deficiencies in the data on which the sNDA was based. Ex. 12 ¶¶89-98, 237-38, 275-81. Again, Defendants' beef reduces to mere disagreement with Dr. Feinstein's views as to what is confounding information on the facts of this case—matters that go only to weight, not admissibility. *See Leslie*, 2010 WL 2991038, at *14-15; *Hsu*, 2018 WL 4956520, at *4; *Groupon*, 2015 WL 1043321, at *6.[39]

*Second*, Defendants invoke a straw man by asserting that Dr. Feinstein's analysis assumes that Defendants violated a duty to "affirmatively tell[] investors that Harmony's subgroup data had failed [the directional consistency] requirement."

---

[39]    Defendants' reliance on *REMEC* involved a *very* different mix of information, whose alleged link to earnings prospects was far more attenuated than the connection between the sNDA-related information and the sNDA's market-assessed POS. And as noted at §II.B.3, *REMEC* is inapt as the expert there (unlike here) *admitted* that the disclosure event included confounding news that he did not consider.

-42-

Br. 40. But Plaintiffs' claim is **not** (nor did Dr. Feinstein assume) that Defendants had to publicly render such an **opinion**; rather, the claim is that they made false and misleadingly incomplete and cherry-picked representations. *See* Ex. 22 at 114:21-115:14 (in the but-for world Defendants would have disclosed both the directional consistency requirement and *either* that Acadia would likely not meet it *or* the available information on subgroup results that would have allowed the market to reach the same conclusion). Defendants' rehashed truth-on-the-market arguments, Br. 40-41, fail for the reasons also discussed above at §II.B.2 and in Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 33-34. *See also Freeland,* 545 F. Supp. 2d at 88.

*Lastly*, Defendants claim that Dr. Feinstein said "it's not clear whether market participants would have come to th[e] conclusion [that] optimism was undue" absent an "affirmative statement from Defendants that Harmony had failed [the directional consistency requirement]." Br. 41. But Defendants rely on selectively quoting Dr. Feinstein's answer to an objected-to question that mischaracterized the relevant "but-for" scenario that he actually, and appropriately, analyzed. *See* Ex. 22 at 120:13-122:12. Ignoring phony scenarios is not grounds for exclusion.

## CONCLUSION

For the above reasons, the Court should deny Defendants' Motion to Exclude the Opinions and Testimony of Dr. Peck and Dr. Feinstein in its entirety.

DATED: January 14, 2026    Respectfully submitted,

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

 /s/ William C. Fredericks
William C. Fredericks (*pro hac vice*)

-43-

Donald A. Broggi (*pro hac vice*)
Marc J. Greco (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
mgreco@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
Jacob B. Lieberman (*pro hac vice*)
Jessica M. Casey (*pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
alawrence@scott-scott.com
jlieberman@scott-scott.com
icasey@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
John T. Jasnoch (SBN 281605)
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff and Class
Representative City of Birmingham
Retirement and Relief System and the
Certified Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
P. Cole von Richthofen (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
shopkins@zlk.com
gpotrepka@zlk.com
cvrichthofen@zlk.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th & 19th Floors
Los Angeles, CA 90017
Telephone: (213) 985-7290
aapton@zlk.com

*Counsel for Additional Plaintiff and Class Representative Ohio Carpenters' Pension Fund*

-45-

21cv00762