COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
MATTHEW D. MARTINEZ (333932)
(mmartinez@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:   +1 858 550 6000
Facsimile:   +1 858 550 6420

CHRISTOPHER B. DURBIN (218611)
(cdurbin@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
Telephone:   +1 206 452 8700
Facsimile:   +1 206 452 8800

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R.
Davis, and Ana Stankovic, as Special Personal
Representative of the Estate of Srdjan (Serge)
Stankovic

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) Stankovic,<br><br>    Defendants. | Case No. 3:21-CV-00762-WQH-MSB<br><br>CLASS ACTION<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF DR. CHRISTOPHER BREDER, DR. ANTON PORSTEINSSON, AND DR. KENNETH LEHN**<br><br>Date: April 10, 2026<br>Judge: Hon. William Q. Hayes |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. LEGAL STANDARDS .................................................................................... 2

III. DR. BREDER'S TESTIMONY IS ADMISSIBLE. ...................................... 4

    A.    Background Relevant to Dr. Breder's Rebuttal Opinions ................... 4

    B.    Argument Supporting Admission of Dr. Breder's Opinions .............. 6

        1.    Dr. Breder's opinions do not invade the province of the jury. ...................................................................................... 6

        2.    Dr. Breder's opinions are reliable and well supported. ............. 8

        3.    Dr. Breder has not "disavowed" any of his rebuttal opinions. ............................................................................... 11

        4.    Dr. Breder's opinions are not duplicative or cumulative. ........ 13

IV. DR. PORSTEINSSON'S TESTIMONY IS ADMISSIBLE. ......................... 16

    A.    Background Relevant to Dr. Porsteinsson's Opinions ...................... 16

    B.    Argument Supporting Admissibility of Dr. Porsteinsson's Opinions ........................................................................................... 18

        1.    Dr. Porsteinsson's rebuttal opinions are relevant. ................... 18

        2.    Dr. Porsteinsson's opinions are reliable. .................................. 22

            a.    Dr. Porsteinsson does not "regurgitate" the facts. ......... 22

            b.    Dr. Porsteinsson's opinions are well supported. ............ 23

        3.    Dr. Porsteinsson's opinions are within the scope of rebuttal. ................................................................................. 26

V. DR. LEHN'S TESTIMONY IS ADMISSIBLE. ......................................... 28

    A.    Background Relevant to Dr. Lehn's Opinions .................................. 28

        1.    Dr. Lehn's opinions challenging Dr. Feinstein's conclusions regarding materiality .......................................... 28

        2.    Dr. Lehn's opinions regarding Dr. Feinstein's failure to account for confounding information and contradictory facts .......................................................................................... 29

        3.    Dr. Lehn's opinions regarding Dr. Feinstein's failure to demonstrate that any disclosures were actually corrective ...... 30

        4.    Dr. Lehn's opinions regarding the inconsistency with which Plaintiffs' experts deal with the FDA's 1998 public guidance .................................................................................. 31

    B.    Argument Supporting Admission of Dr. Lehn's Opinions ............... 32

        1.    Defendants do not raise a truth-on-the-market defense to Plaintiffs' theory of fraud. ....................................................... 32

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

i

**TABLE OF CONTENTS**

2.    Dr. Lehn is not an affirmative merits expert because none of his opinions raise or rely on truth-on-the-market arguments. ..............................................................34

     a.    Plaintiffs obfuscate the relevant burdens of proof. ........34

     b.    Dr. Lehn does not rely on or raise a truth-on-the-market defense. ..................................................36

3.    Dr. Lehn's opinions do not usurp the role of the jury. .............40

VI.    CONCLUSION ..............................................................43

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Advanced Telemedia, LLC v. Charter Communications, Inc.*,
2008 WL 6808442 (N.D. Ga. July 17, 2008) ...................................................... 7

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
738 F.3d 960 (9th Cir. 2013) ............................................................................ 3

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) ................................................................................... 35, 40

*In re Apple Inc. Securities Litigation*,
2023 WL 4556765 (N.D. Cal. July 17, 2023) .................................................. 42

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) ............................................................ 42

*In re Bard IVC Filters Products Liability Litigation*,
2018 WL 11447290 (D. Ariz. Feb. 21, 2018) ................................................. 3, 8

*In re Bard IVC Filters Products Liability Litigation*,
2018 WL 6186496 (D. Ariz. Feb. 21, 2018) ..................................................... 24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ......................................................................................... 35

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998) .......................................................................... 14

*Celador International, Ltd. v. Walt Disney Co.*,
2008 WL 11342595 (C.D. Cal. Dec. 17, 2008) ........................................... 14, 15

*Century Indem. Co. v. Marine Group LLC*,
2015 WL 5521986 (D. Or. Sep. 16, 2015) ....................................................... 36

*Cherry v. United States*,
2019 WL 1505862 (D. Ariz. Apr. 5, 2019) ...................................................... 21

*Christian Copyright Licensing International LLC v. Multitracks.com LLC*,
2025 WL 1615462 (D. Ariz. June 6, 2025) ..................................................... 3, 6

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii

## TABLE OF AUTHORITIES

Page(s)

*Clear-View Technologies, Inc. v. Rasnick,*
2015 WL 3509384 (N.D. Cal. June 3, 2015) ........................................................ 36

*Community Associationn for Restoration of Environment, Inc. v. Cow Palace, LLC,*
80 F. Supp. 3d 1180 (E.D. Wash. 2015) ........................................................... 3, 6

*Connecticut Retirement Plans & Trust Funds v. Amgen Inc.,*
660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) .............................. 40

*Cook v. County of Los Angeles,*
2022 WL 1470574 (C.D. Cal. Mar. 21, 2022) ................................................... 36

*Czuchaj v. Conair Corp.,*
2016 WL 4414673 (S.D. Cal. Aug. 19, 2016) ................................................. 3, 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) .................................................................................*passim*

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.,*
2009 WL 10696044 (N.D. Cal. June 23, 2009) .................................................... 7

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ............................................................................................ 35

*In re DVI, Inc. Securities Litigation,*
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010)........................................................ 41

*FLIR Systems, Inc. v. Fluke Corp.,*
2012 WL 13051121 (D. Or. Nov. 5, 2012) ........................................................... 7

*Friedman v. Medjet Assistance, LLC,*
2010 WL 9081271 (C.D. Cal. Nov. 8, 2010) ...................................................... 14

*Halbert v. County of San Diego,*
2011 WL 13356067 (S.D. Cal. June 27, 2011) .................................................. 14

*Gemmrig v. Asante Three Rivers Medical Center, LLC,*
2025 WL 2555337 (D. Or. Sept. 5, 2025)........................................................... 21

*Holley v. Gilead Sciences, Inc.,*
2023 WL 3607289 (N.D. Cal. Mar. 27, 2023)..................................................... 21

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iv

## TABLE OF AUTHORITIES

Page(s)

*Homevestors of America, Inc. v. Warner Brothers Discovery*,
2025 WL 2301911 (D. Del. Aug. 8, 2025)................................................................41

*In re Human Tissue Products Liability Litigation*,
582 F. Supp. 2d 644 (D.N.J. 2008).........................................................................10

*In re Intel Corp. Securities Litigation*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019).........................................................33

*Johns v. Bayer Corp.*,
2013 WL 1498965 (S.D. Cal. Apr. 10, 2013)...........................................................21

*Laflamme v. Safeway, Inc.*,
2010 WL 3522378 (D. Nev. Sept. 2, 2010).......................................................8, 26, 41

*Lilley v. Charren*,
17 F. App'x 603 (9th Cir. 2001)...............................................................................35

*Liu v. State Farm Mutual Automobile Insurance Co.*,
2021 WL 717540 (W.D. Wash. Feb. 24, 2021).......................................................14

*Maldonado v. Apple, Inc.*,
2021 WL 1947512 (N.D. Cal. May 14, 2021).......................................................7, 8

*McLellan v. I-Flow Corp.*,
710 F. Supp. 2d 1092 (D. Or. 2010)........................................................................24

*Mitchell v. Geo Group Inc.*,
2022 WL 874287 (D. Ariz. Mar. 24, 2022).............................................................11

*Montera v. Premier Nutrition Corp.*,
2022 WL 1225031 (N.D. Cal. Apr. 26, 2022).........................................................24

*Morton v. County of San Diego*,
2024 WL 5126281 (S.D. Cal. Dec. 16, 2024)..........................................................23

*Nationwide Transport Finance v. Cass Information Systems, Inc.*,
523 F.3d 1051 (9th Cir. 2008)..................................................................................42

*Nguyen v. Radient Pharmaceuticals*,
2013 WL 12149241 (C.D. Cal. July 19, 2023).......................................................36

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

**DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB**

## TABLE OF AUTHORITIES

Page(s)

*In re Novatel Wireless Securities Litigation*,
  2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) ....................................................42

*In re Novatel Wireless Securities Litigation*,
  846 F. Supp. 2d 1104 (S.D. Cal. 2012) ...............................................................25

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*,
  2019 WL 4780183 (N.D. Cal. Sept. 30, 2019)....................................................26

*Orgain, Inc. v. Northern Innovations Holding Corp.*,
  2022 WL 2189648 (C.D. Cal. Jan. 28, 2022)...........................................22, 23, 42

*PacTool International, Ltd. v. Kett Tool Co., Inc.*,
  2012 WL 3637391 (W.D. Wash. Aug. 22, 2012) ................................................10

*Pinterest, Inc. v. Pintrips, Inc.*,
  2015 WL 2268498 (N.D. Cal. May 14, 2015) .....................................................42

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)..............................24

*Qualey v. Pierce County*,
  2025 WL 254810 (W.D. Wash. Jan. 21, 2025)....................................................26

*Quidel Corp. v. Siemens Medical Solutions USA, Inc.*,
  2019 WL 4727939 (S.D. Cal. Sept. 27, 2019) ..............................................18, 41

*RingCentral, Inc. v. Nextiva, Inc.*,
  2021 WL 12171869 (N.D. Cal. June 25, 2021) ................................................3, 6

*Rose v. Boston Scientific Corp.*,
  2020 WL 4195470 (W.D. Wash. July 21, 2020)..................................................24

*Self v. Perspecta Enterprise Solutions, LLC*,
  2023 WL 6020792 (S.D. Cal. Jan. 31, 2023) ................................................26, 41

*Sinclair Wyoming Refining Co. v. Infrassure Ltd.*,
  2017 WL 11094221 (D. Wyo. May 19, 2017)......................................................41

*Space Data Corp. v. Alphabet Inc.*,
  2019 WL 2603285 (N.D. Cal. June 25, 2019) ..............................................41, 42

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

vi

**TABLE OF AUTHORITIES**

Page(s)

*Taylor v. County of Pima,*
   2023 WL 2652602 (D. Ariz. Mar. 27, 2023) ........................................................ 42

*Teledyne Risi v. Martin-Baker Aircraft Co., Ltd.,*
   2018 WL11352632 (C.D. Cal. Apr. 24, 2018) ...................................................... 23

*United States v. Alisal Water Corp.,*
   431 F.3d 643 (9th Cir. 2005) .............................................................................. 14

*United States v. Miguel,*
   87 F. App'x 67 (9th Cir. 2004) ........................................................................... 14

*In re Xyrem (Sodium Oxybate) Antitrust Litig*ation,
   2024 WL 4023562 (N.D. Cal. Aug. 26, 2024) ................................ 3, 14, 15, 16

*Yphantides v. County of San Diego,*
   2023 WL 7555301 (S.D. Cal. Nov. 14, 2023) ..................................................... 42

*Zucchella v. Olympusat, Inc.,*
   2023 WL 2628107 (C.D. Cal. Jan. 10, 2023) ..................................................... 41

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 26 ........................................................................ 26, 40

Federal Rule of Evidence 403 .......................................................................... *passim*

Federal Rule of Evidence 702 .......................................................................... *passim*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

vii

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

## I.   INTRODUCTION

Plaintiffs' Motion presents no legitimate basis under the Federal Rules of Evidence to exclude the rebuttal opinions of three of Defendants' experts (Drs. Breder, Porsteinsson, and Lehn). Instead, it resorts to mischaracterizing the Defendants' experts' testimony and attacking their *credibility*, which are not grounds for exclusion. It is Plaintiffs who bear the burden of proof in this case, and it is their experts who offer affirmative opinions in an attempt to meet that burden. Here, Defendants' experts do nothing more than critique those affirmative opinions. And they do so by identifying flawed premises and unfounded assumptions, by exposing faulty or non-existent methodologies, and by highlighting critical facts and inconsistencies that Plaintiffs' experts failed to consider. Such testimony is plainly admissible under Rules 702 and 403 and is routinely admitted in this Circuit. There is no factual or legal merit to Plaintiffs' Motion, which should be denied as to each of Defendants' rebuttal experts:

**Dr. Breder.** Plaintiffs accuse Dr. Breder of "usurp[ing] the role of the fact finder." He does no such thing. He opines that Dr. Peck's numerical estimates of the Probability of Success ("PoS") of Acadia's sNDA are guesswork and, therefore, unreliable. That is not weighing evidence; he is performing a core function of rebuttal expert testimony by critiquing Dr. Peck's non-existent "methodology." Plaintiffs also contend that Dr. Breder's rebuttal opinions are speculative and unsupported. This too is made up. Dr. Breder's opinions find ample support in the evidentiary record and relevant academic literature. Dr. Breder has not, as Plaintiffs claim, disavowed any of his rebuttal opinions; that argument is a misrepresentation of Dr. Breder's report and deposition testimony. And his rebuttal of Dr. Peck's PoS opinions is not duplicative of Dr. Andreason's (unchallenged) rebuttal of Dr. Peck's FDA opinions.

**Dr. Porsteinsson.** Plaintiffs' attempt to exclude Dr. Porsteinsson rests on blatant mischaracterizations of Dr. Porsteinsson's opinions and the Federal Rules of Evidence. According to Plaintiffs, Dr. Porsteinsson is obliged to accept Dr.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Schneider's self-serving definition of "scientific evidence" capable of supporting a proposed clinical trial—*i.e.*, evidence that *the same drug* has *already* been proven effective in *the same population* for *the same indication*. But Rules 702 and 403 do not require a rebuttal expert to accept or adopt any portion of the opposing expert's opinions. Dr. Porsteinsson is well qualified as an experienced clinician to reject Dr. Schneider's myopic view of the relevant clinical evidence. And he does so with reference to clinical trials, case studies, and guidelines that support his rebuttal opinions, all of which are relevant, reliable, and responsive to Dr. Schneider's affirmative opinions.

**Dr. Lehn.** Plaintiffs groundlessly assert that Dr. Lehn's rebuttal of Dr. Feinstein's opinions (on materiality, damages, and loss causation) is an improper and "dressed up" presentation of truth-on-the-market evidence. This is more fiction. Defendants do not assert a truth-on-the-market defense against Plaintiffs' *latest* theory of fraud. So, Dr. Lehn's rebuttal opinions cannot be a "rehash of Defendants' factual arguments." Further, Dr. Lehn does not raise truth-on-the-market arguments on his own, and no distortion of his testimony can alter that fact. In addition, Dr. Lehn does not invade the province of the jury by drawing inferences that a jury could make on its own. Instead, he highlights the unreliability of Dr. Feinstein's methods and assumptions, Dr. Feinstein's failure to consider key facts, and the fatal implications of the inconsistency between Dr. Feinstein's opinion about market efficiency and Dr. Peck's opinion about the 1998 FDA Guidance.

## II.   LEGAL STANDARDS

District courts are responsible for ensuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Under Rule 702, a qualified expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence," provided the testimony rests on (i) "sufficient facts or data"; (ii) "reliable principles and methods"; and (iii) "the expert's

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702. An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education." *Id.*

*Daubert* motions require a "focus on the principles and methodology employed by the expert, not the conclusions the expert ultimately reaches." *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 4023562, at *1 (N.D. Cal. Aug. 26, 2024). Thus, courts must not exclude expert opinions "merely because they are impeachable," or attempt to "decid[e] whether the expert is right or wrong"—the focus is "just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–970 (9th Cir. 2013); *see In re Bard IVC Filters Products Liability Litig.*, 2018 WL 11447290, at *2 (D. Ariz. Feb. 21, 2018) ("mere disagreement with the opinion is no basis for exclusion under Rule 702"). Nor is it grounds to exclude a rebuttal expert that he or she does not offer "alternative, affirmative opinions." *Community Ass'n for Restoration of Environment, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1215 (E.D. Wash. 2015) (denying motion to exclude defendants' expert, who "was assigned *to rebut* the assumptions, data, and findings of Plaintiffs' expert." (emphasis added)); *accord Czuchaj v. Conair Corp.,* 2016 WL 4414673, at *5 (S.D. Cal. Aug. 19, 2016) ("Mr. Carnahan is a rebuttal expert and, as such, he need not offer an ultimate opinion about what caused the hair dryer failures."); *RingCentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171869, at *4 (N.D. Cal. June 25, 2021) (rebuttal expert "is entitled to rest his rebuttal on [opposing expert]'s assumptions and is not required to conduct independent alternative opinions or investigations"); *Christian Copyright Licensing Int'l LLC v. Multitracks.com LLC*, 2025 WL 1615462, at *9 (D. Ariz. June 6, 2025) ("'[Defendant's rebuttal expert] need not develop alternative, affirmative opinions in order to adequately rebut the evidence presented by Plaintiffs—that is not Defendants' burden.'" (quoting *Cow Palace*, 80 F. Supp. 3d at 1215)).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

## III.   DR. BREDER'S TESTIMONY IS ADMISSIBLE.

### A.   Background Relevant to Dr. Breder's Rebuttal Opinions

Dr. Christopher Breder was retained by Defendants to rebut the "Probability of Success" opinions offered by Plaintiffs' FDA expert (Dr. Carl Peck)[1]—*i.e.*, Dr. Peck's speculative guesses about the "probability, at different points during the Class Period, that, based on information known to the Company, Acadia would succeed in obtaining FDA approval of its contemplated sNDA" (the "PoS Opinions"). Ex. 1, App'x C ¶¶ 24–25. With his PoS Opinions, Dr. Peck purports to identify the **actual likelihood** of FDA approval at five different points in time. *Id.* ¶¶ 156–162; *see also* Dkt. 198-1 at 8. He begins with a "base-case" PoS of 50% as of September 2019, which he says reflects "the probability of successfully obtaining FDA approval for a new DRP indication on the basis of the as-yet-unknown Harmony results." Ex. 1, App'x C ¶ 156; *see also* Dkt. 198-1 at 9–12. From there, Dr. Peck "calculates" the PoS at each subsequent date as a precise numerical percentage (which he arbitrarily increases or decreases by exact multiples of 10 percentage points) without explaining how the increment or decrement was calculated. Ex. 1, App'x C ¶¶ 156–162; *see also* Dkt. 198-1 at 13–16. The resulting PoS numbers are presented—without reference to relevant source data, methodological explanation, or any measure of uncertainty—as the *actual* probability that the FDA would approve Acadia's sNDA. *See id.*

Dr. Breder has over 25 years of relevant experience, including 12 years in the pharmaceutical industry, during which he held executive positions at companies such as Bristol Meyers Squibb, Supernus, and Sunovion. *See* Ex. 3 ¶¶ 1–6; *see also id.* App'x A. In these roles, Dr. Breder was responsible for overseeing interactions with the FDA and various aspects of clinical development, which included making recommendations regarding the allocation of resources among different drug

---

[1] Dr. Peck's report purports to "adopt the Feigal Report (including the opinions set forth therein) in full." Ex. 1 ¶ 17; Ex. 12 at 135:11–17. The circumstances by which Plaintiffs substituted Dr. Peck for their original expert, Dr. Feigal, are set forth in Defendants' *Daubert* motion. *See* Dkt. 198-1 at 6–7.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

4

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

candidates. *See id.* Through this work, Dr. Breder gained extensive experience with the Probability of Technical and Regulatory Success ("PTRS"), which "is a tool used for portfolio prioritization decisions" and "to make strategic decisions on which projects to accelerate, decelerate, or terminate." *Id.* ¶ 32; *see also id.* ¶¶ 4, 6, 24.

Dr. Breder also spent more than 10 years at the FDA in various roles in the Division of Neurology Products and the Division of Analgesia, Anesthesiology, and Addiction Products. In these roles, Dr. Breder was responsible for, among other things, organizing and participating in review of New Drug Applications ("NDA") and Supplemental New Drug Applications ("sNDA"), coordinating Advisory Committee Meetings, and drafting clinical reviewer guidelines. *See id.* ¶¶ 8–10.

In his written report, and during his May 22, 2025 deposition, Dr. Breder offers three sets of opinions in response to Dr. Peck: *First*, Dr. Peck's PoS Opinions suffer from methodological defects that render his probability figures inherently speculative and unreliable. *See id.* ¶¶ 23, 26–29, 36–68; Ex. 13 at 56:25–57:10, 104:8–17. These defects include (i) failing to select relevant comparator data, or to explain the origins of the data he claims to have used, Ex. 3 ¶¶ 40–46; (ii) making arbitrary and unexplained changes to the "base-case" PoS, *id.* ¶¶ 48–51; (iii) making arbitrary and unjustified adjustments to the PoS numbers, *id.* ¶¶ 52–68; and (iv) premising the PoS adjustments on misinterpretations of FDA communications, *see id.* ¶¶ 69–79.

*Second*, Dr. Peck does not conduct a true PTRS analysis, and even if he had done so, a PTRS analysis is incapable of reliably estimating the true likelihood that a single new drug application will be approved by the FDA. *See id.* ¶¶ 24, 30–35; Ex. 13 at 56:22–57:22. If "[p]roperly conducted," a PTRS analysis is "a means of *comparative* analysis." Ex. 3 ¶ 32. "[I]t is *not* a reliable method of predicting regulatory approval for a *single* application—as one author notes, in that use case, '*the number is always wrong anyway*'—but is useful and widely employed to 'calibrate [a single] project's value *against the portfolio* of other development

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

5

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

opportunities.'" *Id.* (quoting Ex. 5 at p. 197).[2]

*Third*, Dr. Peck misinterprets the FDA's "Labeling Statement" in the End of Phase 2 ("EOP2") Meeting Minutes, which Dr. Peck cites to support his speculative and arbitrary PoS adjustments. Ex. 1, App'x C ¶ 135; *see also id.* ¶¶ 87–88, 92–93. In that context, Dr. Breder disputes Dr. Peck's opinion that the Labeling Statement imposed a requirement that the Harmony Study demonstrate "directionally consistent benefit across different DRP subtypes." Ex. 3 ¶¶ 69–79. Dr. Breder opines that a correct interpretation of the Labeling Statement—*i.e.*, if the sNDA were approved, the label would reflect "the enrolled numbers of each subgroup population and their response rates"—does not support Dr. Peck's downward adjustments to PoS. *Id.* ¶ 72.

**B.    Argument Supporting Admission of Dr. Breder's Opinions**

**1.    Dr. Breder's opinions do not invade the province of the jury.**

Plaintiffs first argue that Dr. Breder "usurps the role of the fact finder," insofar as he "does no more than criticize and weigh the evidence underlying Dr. Peck's PoS opinions," Mot. at 9, and fails to "offer[] his own PoS analysis," *id.* at 4, 9. This is not a basis for exclusion under Rule 702. As a rebuttal expert, Dr. Breder is under no obligation to "develop alternative, affirmative opinions in order to adequately rebut the evidence presented by [Dr. Peck]." *Cow Palace*, 80 F. Supp. 3d at 1215; *see also RingCentral*, 2021 WL 12171869, at *4; *Christian Copyright Licensing*, 2025 WL 1615462, at *9; *Czuchaj*, 2016 WL 4414673, at *5.

Plaintiffs also ignore Dr. Breder's core rebuttal opinion: a *reliable* probability estimate *cannot be calculated for a single drug candidate*, much less with the pinpoint precision claimed by Dr. Peck. As Dr. Breder explains in his Report, "even the most robust PTRS analysis—using *specific data* from *reputable and reliable data sources* from the *appropriate timeframe*, controlling for variables in the data that are *most relevant to Acadia's DRP sNDA*, and employing *industry-standard*

---

[2] Unless otherwise stated, all emphases are added and internal citations are omitted.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*methodologies*—has *inherent* limitations that render it largely **unsuitable for producing *reliable* approval estimates for a *single* application**." Ex. 3 ¶ 24. Dr. Breder confirmed this opinion during his deposition, testifying that the "appropriate context" for PTRS is a "relative comparison" between assets. Ex. 13 at 54:21–57:22

In effect, Plaintiffs argue that Dr. Breder cannot say that a *reliable* methodology to estimate PoS for a single drug *does not exist*. Instead, according to Plaintiffs, Dr. Breder must accept Dr. Peck's black-box methodology and somehow use it to generate *his own* PoS figures—despite his opinion that the resulting numbers would be inherently arbitrary and unreliable, Ex. 3 ¶ 24. Plaintiffs cite no authority (because there is none) that imposes such a catch-22 on rebuttal experts. Regardless, Dr. Breder *does* offer opinions of his own—including as to the inherent limitations of PTRS analysis—and detailed critiques of the materials relied upon and methodology (or lack thereof) employed by Dr. Peck. *See, e.g.*, Ex. 3 ¶¶ 18–19.

Plaintiffs' cited cases undermine their position by confirming that Dr. Breder's testimony would *not* infringe on the jury's fact-finding role. *See* Mot. at 10–11. In *FLIR Systems*, the expert did not "offer a single positive or affirmative opinion" and made no effort "to familiarize himself with the information [that the opposing expert] evaluated in order to form his own opinions." *FLIR Sys., Inc. v. Fluke Corp.*, 2012 WL 13051121, at *2 (D. Or. Nov. 5, 2012). Likewise, in *Advanced Telemedia*, the rebuttal expert "did not actually review the underlying data himself" and "did not perform the sampling method he proposed." *Advanced Telemedia, LLC v. Charter Commc'ns, Inc.*, 2008 WL 6808442, at *1 (N.D. Ga. July 17, 2008). Similarly, in *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, 2009 WL 10696044 (N.D. Cal. June 23, 2009), the court *overruled* objections that the rebuttal expert "merely criticizes the report of [the other] expert, . . . without providing an alternative model or calculation for the assessment of damages." *Id*. at *1. And, in *Maldonado v. Apple, Inc.*, 2021 WL 1947512 (N.D. Cal. May 14, 2021), the excluded opinion was a "conclusory assertion," never "explain[ed]" or "elaborated on." *Id*. at *20. Here, Dr.

Cooley LLP
Attorneys at Law
San Diego

7

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Breder's rebuttal does much more than summarily dismiss Dr. Peck's PoS Opinions. *Cf. id.* He explains in detail *how* Dr. Peck's flawed selection and use of data sources and methodological errors are apparent and *why* those flaws render Dr. Peck's PoS Opinions unreliable. *See* Ex. 3 at 40–68.

In short, Dr. Breder's testimony is "precisely the type of rebuttal testimony the court would expect"—*i.e.*, "[c]ontradicting [Dr. Peck's] expert opinions, questioning [his] methodology, and opining on methods and facts [that Dr. Peck] did not consider." *See Laflamme v. Safeway, Inc.*, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010).

## 2. Dr. Breder's opinions are reliable and well supported.

Plaintiffs next assert that Dr. Breder's opinions should "be excluded as improper speculation that lacks any support in the record." Mot. at 11. But their argument has nothing to do with reliability under Rule 702—it's just a disagreement about whether Dr. Peck conducted a "'true' PTRS analysis." *Id*. Dr. Breder opines that he did not, Ex. 3 ¶¶ 30–35, while Plaintiffs insist that he did, Mot. at 11. This is fodder for cross-examination at trial, not a basis for exclusion under Rule 702. *See Bard*, 2018 WL 11447290, at *2 ("mere disagreement" with expert's "interpretation of the relevant [medical] literature" insufficient to warrant exclusion).

In any event, none of Plaintiffs' arguments establish that Dr. Breder's rebuttal opinions are speculative or unsupported. <u>First</u>, Plaintiffs focus on "the primary source that Dr. Breder relies on for a 'true' PTRS analysis (Dr. Joseph P. Stalder's book chapter 'Creating a Clinical Development Plan')." Mot. at 11. The notion that Dr. Stalder's book undercuts Dr. Breder's rebuttal opinions (or vindicates Dr. Peck's PoS Opinions) is belied by the key passage from the chapter cited in Dr. Breder's Report—which Plaintiffs conspicuously omit from their Motion:

> The value of going through this PTRS exercise is *less about the resultant PTRS number (**the number is always wrong anyway**)* and more about the process of identifying and assessing the risks and then *using the PTRS to calibrate the project's value **against the portfolio of other development opportunities***.

Cooley LLP
Attorneys at Law
San Diego

8

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

Ex. 5 at 197. This fully supports Dr. Breder's opinion that Dr. Peck's retrospective PoS analysis of a single application (Acadia's sNDA) is not capable of producing reliable probabilities. *See* Ex. 3 ¶¶ 26–39. As Dr. Breder explains, PTRS practitioners consider the output of PTRS analysis to be reliable *only* in a *comparative* context: "Used in the appropriate context—***comparing two or more drugs for portfolio prioritization***—these [methodological] controls can be effective because the same assumptions and potential biases apply uniformly across the sample set—which cancels out errors in system (*e.g.*, flawed assumptions)." Ex. 3 ¶ 34; *see also id*. ¶¶ 32–33.

When PTRS is employed as a comparative tool, it is less problematic that (as Dr. Stalder observes) "***the number is always wrong anyway***." Ex. 5 at 197. But that inherent flaw is fatal to the precise PoS figures that Dr. Peck purports to generate (and Dr. Feinstein uses in his damages model). *See* Ex. 14 ¶¶ 30–31. Dr. Breder explained this critique in his Report, Ex. 3 ¶¶ 32–34, and Dr. Peck offered no defense during his deposition: not only did he admit that his PoS numbers are "highly uncertain," he actually confirmed that "***even God doesn't know what the exact probability is***." Ex. 12 at 192:14–193:1; *see id.* at 112:11–113:7, 180:18–181:17.

*Second*, Dr. Breder cites ample support for his opinion that Dr. Peck's admittedly "highly uncertain" PoS figures were *not* the product of "precisely what a PTRS [] analysis requires," Mot. at 11–12. Chief among these supporting materials is Dr. Stalder's book, which Dr. Breder discusses and quotes in his Report. Ex. 3 ¶ 32. Dr. Stalder does not even suggest that PTRS can or should be employed retrospectively, which may explain why his book is not among the materials that Dr. Peck relied upon or even considered. Plaintiffs, nonetheless, cling to superficial similarities between Dr. Peck's PoS Opinions and PTRS as described by Dr. Stalder—*none of which undermine the methodological flaws that Dr. Breder identifies*. For example, while PTRS analysis does start with the selection of benchmarks rates (Mot. at 12), Dr. Breder opines that Dr. Peck appears to have relied

Cooley LLP
Attorneys at Law
San Diego

9

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

on data sources that are irrelevant to or in conflict with the benchmark rates that Dr. Peck presents. Ex. 3 ¶¶ 40–41; *see also* Dkt. 198-1 at 9–12. Similarly, it does Plaintiffs no good to assert that Dr. Peck "modulates [his] PoS benchmark up or down using 'project-specific factors.'" Mot. at 12 (quoting Ex. 5 at 197). Dr. Breder's critique is that Dr. Peck failed to "identify any specific primary source data to *support* his PoS [adjustments]" or explain "*how* his subjective assessments about FDA actions and communications translate into his specific PoS estimates." Ex. 3 ¶ 53. As Dr. Breder testified—consistent with Dr. Stalder's book—a rigorous PTRS analysis requires that adjustments to benchmarks be "done in a standardized fashion" according to the company's past experience in similar circumstances. Ex. 13 at 77:23–79:18. Yet Dr. Peck provides no discussion or analysis of any comparable past experiences that led him to select the specific PoS adjustments in the Report. *See* Ex. 1, App'x C ¶¶ 158, 160–61; *see also generally* Dkt. 198-1.[3]

In sum, Dr. Breder's cited references—including but not limited to Dr. Stalder's book—amply support his rebuttal opinions. Plaintiffs cite several cases in their Motion, *see* Mot. at 13, but those authorities preclude any finding that Dr. Breder's opinions are so lacking in support as to be unreliable and subject to exclusion. *See PacTool Int'l, Ltd. v. Kett Tool Co., Inc.*, 2012 WL 3637391, at *4 (W.D. Wash. Aug. 22, 2012) (excluding opinion offered as "self-evident," which "conveys the idea that the principle is widely accepted and could be supported by some accepted literature on the subject," but expert's cited references "failed to connect the gap between the data and the proffered conclusions"); *In re Hum. Tissue Prods. Liability Litig.*, 582 F. Supp. 2d 644, 676–77 (D.N.J. 2008) (excluding surgeon's opinion regarding transmissibility of infectious diseases in transplanted

---

[3] Plaintiffs do not even mention many of the other deficiencies that Dr. Breder catalogs in Dr. Peck's PoS Opinions: inexplicably failing to leverage more relevant (*e.g.*, "psychiatry-specific") data to generate his benchmark probabilities. Ex. 3 ¶ 47; and a "base-case" probability that appears to result from confusion between "the likelihood that a drug will progress from one [clinical] phase to the next" and "the likelihood that a drug application will be approved by FDA." Ex. 3 ¶ 50.

Cooley LLP
Attorneys at Law
San Diego

10

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-cv-00762-WQH-MSB

tissue based on "inferences" and "extrapolations" and unsupported by "*any* medical or scientific evidence"). Here, unlike in those cases, Dr. Breder's rebuttal opinions are directly supported by and connected to the reference materials cited in his Report.

### 3. Dr. Breder has not "disavowed" any of his rebuttal opinions.

Next, Plaintiffs argue Dr. Breder "repeatedly disavowed many of his opinions at deposition." Mot. at 13. Dr. Breder did no such thing. Each of the four supposed "disavowals" is, in reality, just Plaintiffs' incomplete and self-serving reading of Dr. Breder's Report and his deposition testimony. Plaintiffs thus fail to show that any part of Dr. Breder's deposition testimony is "difficult to reconcile with the opinions disclosed in [his] report," much less that he "affirmatively repudiate[d] or disavow[ed] an opinion expressed in [his] report." *See Mitchell v. Geo Grp. Inc.*, 2022 WL 874287, at *5 (D. Ariz. Mar. 24, 2022). Accordingly, there is no valid basis to exclude Dr. Breder's testimony under Rule 702.

*First*, Plaintiffs mischaracterize Dr. Breder's opinions regarding "hindsight bias." His criticism is *not* that Dr. Peck *could have* controlled for the risk of hindsight bias. Rather, Dr. Breder opines that hindsight bias is unavoidably *inherent* in Dr. Peck's *ex post* PoS Opinions: by "interpreting" the FDA's comments and actions "retrospectively, **with actual knowledge of the regulatory action that he purports to predict**," Dr. Peck cannot control for the risk of hindsight bias infecting his subjective PoS adjustments. Ex. 3 ¶ 36. This opinion, as documented in Dr. Breder's Report, is entirely consistent with his deposition testimony, where he said that he cannot estimate the "magnitude" or "degree" of hindsight bias that may have influenced Dr. Peck's PoS figures. *See* Ex. 13 at 52:15–53:18; *see also id.* at 52:23–53:6 ("when one performs a[n] assessment in a retrospective manner, that there is an inherent bias . . . that frankly cannot be controlled for, or at least not that I have seen."). Dr. Breder cannot be faulted—much less excluded—for failing to calculate the magnitude of a bias that, in his opinion, "cannot be controlled for."

*Second*, Plaintiffs wrongly assert that Dr. Breder "contradicted his own report

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

by admitting that confidence intervals . . . 'are not routinely given.'" Mot. at 14 (quoting Ex. 13 at 102:25–103:2). This ignores the full context of Dr. Breder's opinion that "even the most robust PTRS analysis . . . has *inherent* limitations that render it largely unsuitable for producing reliable approval estimates for a single application." Ex. 3 ¶ 24; *see also id.* ¶ 33 ("[A] properly conducted PTRS analysis does not allow for numerical precision."). In this context, Dr. Breder criticized Dr. Peck for conveying a false sense of precision by presenting single-point PoS numbers as the actual probabilities of FDA approval without any concession to uncertainty. *Id.* ¶ 53. Put differently, because there is no accepted methodology to generate *reliable* probabilities in *hindsight* for a *single application*, purporting to do so without any form of caveat or qualification—*e.g.*, "confidence intervals *or other indicia of sampling uncertainty*"—is baseless and unreliable. *See* Ex. 3 ¶¶ 33–34, 53. Dr. Breder's deposition testimony is entirely consistent with these opinions, including his observation that competent PTRS practitioners typically present—unlike Dr. Peck—*at least* a "narrative" setting out an "assessment of the degree of uncertainty" surrounding a probability estimate. Ex. 13 at 39:10–40:18.

*Third*, Dr. Breder did not "disavow" his opinion that Dr. Peck's PoS figures "are his own subjective forecasts, unsupported by data, methodology, experience, or anything else that provides a basis to validate or test whether his subjective PoS numbers are accurate." Ex. 3 ¶ 27. Plaintiffs again mischaracterize Dr. Breder's testimony by arguing that he conceded the existence of "*objective* bases supporting Dr. Peck's opinions." Mot. at 14 (emphasis in original). Dr. Breder made no such concession. His testimony that "some people have cited 50 percent as a general benchmark," Ex. 13 at 132:25–133:2, does not contradict his opinion that Dr. Peck failed to rely on relevant source data or employ a reliable methodology to arrive at his own 50% benchmark, Ex. 3 ¶¶ 40–51. Similarly, Dr. Breder's testimony that PTRS practitioners make adjustments to benchmark probabilities "based upon their experience in the industry," among other factors, Ex. 13 at 150:5–7, is not an

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

admission that Dr. Peck's PoS numbers are anything but speculative and arbitrary, Ex. 3 ¶ 29.

*Fourth*, Plaintiffs' misguided attack on Dr. Breder's criticism of the "round even numbers" reflected in Dr. Peck's PoS adjustments, Mot. at 15, glosses over the substance of Dr. Breder's opinion: "Among other unanswered questions, Dr. Feigal's report provides no *insight* into *why* his estimates are round even numbers (rather than, *e.g.*, 52% or 73%) and *why* he reduces his point estimates by exactly 20% or 40% intervals at various milestones." Ex. 3 ¶ 54. Dr. Breder did not retreat from this opinion (much less disavow it) by acknowledging that a *hypothetical example* of benchmark and adjusted probabilities in Dr. Stalder's book uses "round numbers." Ex. 13 at 71:7–11; Ex. 5 at 197.

Because Dr. Breder's deposition testimony is entirely consistent with the opinions set forth in his Report, there is no basis to exclude Dr. Breder's rebuttal opinions under *Daubert* or Rule 702.

### 4. Dr. Breder's opinions are not duplicative or cumulative.

Finally, Plaintiffs argue that Dr. Breder's rebuttal opinions "improperly duplicate" those of Dr. Paul Andreason (Defendants' regulatory expert). Plaintiffs assert that both experts "offer identical reasons [*sic*] vis-à-vis FDA communications, review the same communications, and reach the same conclusions." Mot. at 15, 17. Plaintiffs are wrong for multiple reasons, and they offer no valid basis to exclude any portion of Dr. Breder's rebuttal opinions under Rule 403.

*First*, Drs. Breder and Andreason each respond to separate and distinct opinions offered by Dr. Peck. **Dr. Breder's rebuttal opinions are expressly limited to Dr. Peck's PoS Opinions**—*i.e.*, the facts Dr. Peck relies upon, the methodology he employs (or fails to employ), and the PoS conclusions he reaches. *See* Ex. 3 ¶¶ 23–25 (opining that Dr. Peck's "interpretation is unsupported and unreliable *as a basis for his POS opinions*"). **Dr. Andreason does not address Dr. Peck's PoS Opinions; in fact, he expressly disclaims offering any rebuttal to those opinions**.

Cooley LLP
Attorneys at Law
San Diego

13

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

Ex. 6 ¶ 23 n.15. Plaintiffs ignore this distinction, arguing instead that Dr. Peck's PoS Opinions are insulated from expert rebuttal because he refers to the FDA communications that underpin his FDA opinions—to which *only* Dr. Andreason responds with his own rebuttal opinions. Simply put, the fact that both of Defendants' experts respond to Dr. Peck's interpretations of FDA communications (in the context of their distinct rebuttal opinions) does not merit excluding either expert's opinions under Rule 403. *See United States v. Miguel*, 87 F. App'x 67, 68 (9th Cir. 2004) ("Rule 403's cumulative evidence provision does not prohibit the introduction of cumulative evidence; rather, it merely permits courts to exclude cumulative evidence when it has little incremental value."). Drs. Andreason and Breder each have "distinct" expertise. *Friedman v. Medjet Assistance, LLC*, 2010 WL 9081271, at *6 (C.D. Cal. Nov. 8, 2010). And they "leverage their differing backgrounds and perspectives so as to render their testimony independently useful." *In re Xyrem*, 2024 WL 4023562, at *15; *see also Celador Int'l, Ltd. v. Walt Disney Co.*, 2008 WL 11342595, at *6 (C.D. Cal. Dec. 17, 2008) ("[E]xperts from different, albeit related, disciplines may both testify, even if their findings are consistent with each other and even if their testimony overlaps."), *report and recommendation approved*, 2009 WL 10675217 (C.D. Cal. Feb. 13, 2009). Unlike the cases cited in Plaintiffs' Motion, Dr. Breder's rebuttal to Dr. Peck's *PoS Opinions* offers something new; it is neither duplicative of, nor subsumed by, Dr. Andreason's rebuttal to Dr. Peck's *FDA opinions*.[4]

*Second*, Plaintiffs ignore the express purpose of Dr. Breder's response to Dr.

---

[4] *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1421–22 (9th Cir. 1998) (affirming exclusion of expert whose sole opinion was subsumed in more detailed analysis of another expert); *United States v. Alisal Water Corp.*, 431 F.3d 643, 660 (9th Cir. 2005) (affirming exclusion of post-trial damages expert whose opinions offered nothing "new or different from the evidence" introduced at trial); *Halbert v. Cnty. of San Diego*, 2011 WL 13356067, at *3 (S.D. Cal. June 27, 2011) (excluding testimony where two experts were "designated [] on the same issue" and produced reports "covering the same ground"); *Liu v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 717540, at *3 (W.D. Wash. Feb. 24, 2021) (excluding one of two experts designated to opine on defendant insurer's claims process, both of whom concluded that claims process "deviated from industry standards").

Cooley LLP
Attorneys at Law
San Diego

14

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Peck's interpretation of the FDA's Labeling Statement, *see* Mot. at 16, which is entirely distinct from Dr. Andreasons's rebuttal opinions. Dr. Breder *necessarily* addresses this issue because Dr. Peck bases each of his PoS adjustments on his interpretation of the Labeling Statement as requiring "directionally consistent benefit across DRP subtypes." *See* Ex. 1, App'x C ¶¶ 135, 158, 160 ("This decline reflects the fact that the subgroup efficacy results failed to demonstrate a directionally consistent benefit across the subgroups."); Ex. 3 ¶ 69. In that context, Dr. Breder (a) rejects Dr. Peck's conclusion that the Labeling Statement conveyed a "directional consistency" requirement, and (b) opines that Dr. Peck's reliance on an unsupported interpretation of the Labeling Statement further renders his PoS adjustments arbitrary and unreliable. Ex. 3 ¶¶ 69–79.

Dr. Andreason's rebuttal opinions, in contrast, have nothing to do with Dr. Peck's PoS Opinions. Dr. Andreason opines that, "[a]t each of the critical milestones of the development and review process, FDA did *not* communicate to Acadia that it had identified any major review concerns with the Harmony Study." Ex. 6 ¶ 23. To reach that conclusion, Dr. Andreason *necessarily* considers Dr. Peck's "interpretation of FDA's communications with Acadia," which he opines "is unsupported by and inconsistent with FDA review guidelines and standard practice, and [his] own experience at FDA." Ex. 6 ¶ 22. Drs. Andreason and Breder thus respond to Dr. Peck's interpretation of the Labeling Statement for different purposes, from different "perspectives," *In re Xyrem*, 2024 WL 4023562, at *15, and through the lens of "different, albeit related, disciplines," *Celador*, 2008 WL 11342595, at *6.

*Third*, and for the same reasons, there is nothing cumulative about Dr. Breder's response to Dr. Peck's interpretation of FDA-Acadia communications in July 2020—after the FDA agreed to file the sNDA and assigned it to standard (rather than priority) review. *See* Ex. 3 ¶¶ 64, 66; Ex. 1, App'x C ¶¶ 161–162. Dr. Breder explains that Dr. Peck attributed his 20% PoS reduction (from 30% to 10%) to FDA-Acadia email correspondence *without acknowledging* that the FDA's Filing Letter "indicated

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

that no major approval-impacting review issues had been identified." Ex. 3 ¶ 64. This was, in Dr. Breder's opinion, an "unquestionably positive signal" that does not support Dr. Peck's 20% drop in PoS. *Id*. Dr. Breder also opines that Dr. Peck "appears to overlook the Mid-Cycle meeting" and "the *absence* of [any ensuing] communication of deficiencies of major review concerns"—which Dr. Breder again views as positive signals that do not justify any reduction in the PoS. *Id*. ¶ 68.

Just as Drs. Breder and Andreason respond to Dr. Peck's interpretation of the Labeling Statement from different perspectives to reach different conclusions, their separate opinions regarding the July 2020 FDA communications also are not cumulative or duplicative. Because their rebuttal opinions are "independently useful," *In re Xyrem*, 2024 WL 4023562, at *15, there are no grounds to exclude Dr. Breder's opinions under Rule 403.

## IV.   DR. PORSTEINSSON'S TESTIMONY IS ADMISSIBLE.

### A.   Background Relevant to Dr. Porsteinsson's Opinions

Dr. Schneider offers three categories of expert opinion, each of which Dr. Porsteinsson responds to in his rebuttal report and his June 5, 2025 deposition testimony. <u>First</u>, Dr. Schneider opines that Acadia designed the Harmony Study to test whether patients with dementia-related psychosis ("DRP") would respond to treatment with pimavanserin in consistent manner, regardless of underlying dementia etiology—a concept he refers to as the "Consistency Hypothesis." Ex. 9 ¶ 10. He then purports to conduct, in hindsight, a predictive exercise: In 2018, when "the HARMONY study was commenced," "the scientific evidence" known at that time "strongly demonstrated that patients with the different types of dementia represented in HARMONY . . . were *unlikely* to respond consistently to treatment with pimavanserin." *Id*. ¶ 11; *see also id*. ¶ 78. Dr. Schneider further opines that "[t]he *scientific consensus* today, as in the past[,] is that treatments for psychosis in different types of dementia should be evaluated individually by dementia type or diagnosis," *id*. ¶ 86, and that "[v]iewing dementia-related psychosis as one condition with a

Cooley LLP
Attorneys at Law
San Diego

16

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-cv-00762-WQH-MSB

corresponding single treatment is thus *not well-accepted* within the medical profession," *id*. ¶ 50.

In response, Dr. Porsteinsson disputes Dr. Schneider's assessment of the relevant "scientific evidence" when Harmony was designed and conducted. He opines that then-existing research demonstrated "the *similarities* of psychotic symptoms across different dementia etiologies" and "suggested the possibility that the common symptom complex associated with these different dementia etiologies *could be treated effectively with the same drug*." Ex. 10 ¶ 15; *see also id*. ¶¶ 65–72. Dr. Porsteinsson also rejects Dr. Schneider's claimed "scientific consensus" against the possibility of a single treatment for DRP. Ex. 9 ¶¶ 50, 86. He opines that, "[b]ecause the underlying causes [of dementia] can be difficult to determine, clinical guidelines and clinical practice at the time of the HARMONY Study, as well as today, recommend similar approaches to treating symptoms of dementia such as psychosis—regardless of the underlying dementia etiologies." Ex. 10 ¶ 14; *see also id*. ¶¶ 49–63; Ex. 16 at 70:14–71:20, 132:4–19.

*Second*, Dr. Schneider concedes that the Harmony study "did meet its primary endpoint—improvement in time to relapse over placebo." Ex. 9 ¶ 69. But he then asserts that the results were "not consistent across the five dementia diagnostic subgroups," and that "any evidence for the effectiveness of pimavanserin that could be inferred from HARMONY was solely due to pimavanserin's effect on [Parkinson's patients]." *Id*. ¶ 11.

Dr. Porsteinsson disagrees, finding that Harmony's results "offer clinically meaningful evidence supporting the use of pimavanserin in treating DRP." Ex. 10 ¶ 16. He explains that Dr. Schneider overlooks reductions in relapse rates that, "even if not statistically significant," are "large and clinically meaningful," while ignoring altogether positive results in Harmony's open-label phase. *Id.* ¶¶ 75–80. Dr. Porsteinsson further notes that Dr. Schneider's view regarding a possible "acute withdrawal effect" responsible for pimavanserin's effectiveness in treating PDP is

Cooley LLP
Attorneys at Law
San Diego

17

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

unsupported conjecture. *See* Ex. 10 ¶¶ 81–85; Ex. 16 at 90:17–92:1.

*Third*, Dr. Schneider opines that the results of the 019 Study "were not positive or clinically meaningful," and that, due to "major issues with how the study was administered," the 019 study could not "support pimavanserin as a treatment for [Alzheimer's Disease psychosis ("ADP")], let alone make up for [Harmony's] deficient subgroup efficacy results." Ex. 9 ¶¶ 89, 91, 93; *see generally id*. ¶¶ 89–96.

Dr. Porsteinsson disputes Dr. Schneider's assessment of the 019 Study results, opining that they were positive and "clinically meaningful" and offered evidence supporting the use of pimavanserin in populations outside of PDP. Ex. 10 ¶¶ 16, 90–97; *see also* Ex. 16 at 125:19–127:6.

**B.      Argument Supporting Admissibility of Dr. Porsteinsson's Opinions**

**1.      Dr. Porsteinsson's rebuttal opinions are relevant.**

Plaintiffs argue that *all* of Dr. Porsteinsson's opinions are rendered irrelevant by his references to: (1) antipsychotic drugs other than pimavanserin, (2) clinical case studies, (3) clinical guidelines regarding off-label use of pimavanserin, and (4) clinical guidelines published after 2017. Each of these arguments stem from Plaintiffs' mistaken belief that Rule 702 obligates Dr. Porsteinsson to accept Dr. Schneider's self-serving definition of "scientific evidence" as a prerequisite to rebutting Dr. Schneider's broadly sweeping claims about a "scientific consensus" and his pseudo-predictive opinion that pimavanserin was "unlikely" to be effective in treating DRP. *See* Ex. 9 ¶¶ 11, 86. "Rebuttal testimony is permitted to question the assumptions and methods of an opposing expert." *Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, 2019 WL 4727939, at *2 (S.D. Cal. Sep. 27, 2019). That is exactly what Dr. Porsteinsson does.

*First*, Plaintiffs attack Dr. Porsteinsson's references to clinical evidence concerning antipsychotics other than pimavanserin, which, according to Plaintiffs, are irrelevant "because the only issue here is the *approvability* of . . . pimavanserin[] to treat the broader indication of DRP." Mot. at 21. Not so. Neither Dr. Schneider nor

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Dr. Porsteinsson are designated as regulatory experts and *they offer no opinions regarding the "approvability" of pimavanserin to treat DRP*. *See* Ex. 16 at 129:1–4, 146:10–147:13; Ex. 17 at 75:7–13. Dr. Porsteinsson instead responds to Dr. Schneider's *actual* opinion that differences in dementia etiologies imply the need for different treatments, rendering it "unlikely that a single drug would have efficacy across all dementia diagnoses." Ex. 9 ¶ 80. Dr. Porsteinsson directly rejects Dr. Schneider's opinion that any "single drug" was "unlikely" to prove efficacious as a common treatment for DRP by citing, among other evidence, "clinical trial data regarding the effectiveness of [other] antipsychotics *across dementia etiologies*." *See* Ex. 10 ¶ 71. Dr. Porsteinsson also explains why clinicians (like himself) viewed pimavanserin itself as a promising potential treatment for DRP: because "different dementia etiologies are all associated with polynmorphisms . . . in serotonogenic genes, *pimavanserin's* serotonergic activity further supported *the plausibility of its use to treat different dementia-related psychoses*." Ex. 10 ¶ 70. These points are directly responsive and relevant to Dr. Schneider's opinions.

*Second*, Plaintiffs criticize Dr. Porsteinsson for "bas[ing] his opinions about pimavanserin's ability to treat DRP generally on favorable outcomes in clinical case studies." Mot. at 22. But they again ignore the opinions that Dr. Porsteinsson is actually rebutting. Dr. Schneider broadly declares that there was "strong[]" evidence or a "scientific consensus" *against* the possibility that pimavanserin could be an effective DRP treatment. Ex. 9 ¶¶ 11, 86. Dr. Porsteinsson disagrees. He responds by citing clinical data, academic literature, and his own clinical experience as *supportive* of pimavanserin's potential as a DRP treatment. Ex. 10 ¶¶ 56–63 (citing case studies to rebut Dr. Schneider's opinion that "differences in the underlying dementia etiologies imply the need for differential treatment of resulting psychoses").

Plaintiffs insist, however, that Dr. Porsteinsson's rebuttal is irrelevant unless he *also* opines "that a selection of case-study results can substitute for the results of controlled clinical trials in terms of constituting scientifically valid evidence of the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

truth of a hypothesis for purposes of drug approval." Mot. at 22. This wrongly presumes (again) that Dr. Porsteinsson is obligated to accept Plaintiffs' definition of "scientifically valid evidence" and must concede that case studies cannot "substitute for . . . controlled clinical trials." *Id.* Plaintiffs may argue as much to the jury, but they cite no authority supporting exclusion of rebuttal opinions that rely on case studies in this context. *See* Ex. 10 at 45, n.157 ("Historically, case reports have been important in . . . evaluating the beneficial and harmful effects of an intervention." (quoting David S. Riley *et al.*, "CARE Guidelines for Case Reports: Explanation and Elaboration Document," J. CLINICAL EPIDEMIOLOGY 89, 2017, at p. 219)).

*Third*, Plaintiffs fault Dr. Porsteinsson for relying on "nebulous notions of 'clinical guidelines' and 'clinical practice' about administering antipsychotic medications to patients, [even though] these guidelines and practices are overwhelmingly for unapproved off-label use of antipsychotics." Mot. at 22. Plaintiffs contend that this renders Dr. Porsteinsson's opinions irrelevant because "[w]hether non-FDA-approved clinical guidelines recommend off-label use of a class of drugs has no bearing on the scientific evidence" needed for *regulatory approval*. *Id*. This is nonsense. There has never been an FDA-approved treatment for DRP. *See* Ex. 9 ¶ 54. Clinical guidelines relevant to the treatment of DRP therefore *necessarily* discuss off-label treatment options. More importantly, Dr. Schneider *offers no opinion* about "the scientific evidence" that would be required "to obtain regulatory approval." Rather, he opines that "[v]iewing [DRP] as one condition with a corresponding single treatment is thus *not well-accepted within the medical profession*." Ex. 9 ¶ 50. Dr. Porsteinsson disagrees, opining that Dr. Schneider's claims "are incorrect and unsupported by clinical guidelines and actual clinical practice," Ex. 10 ¶¶ 49–50, "which recommend treating psychotic *symptoms* rather than focusing on the underlying dementia *etiologies*," *id.* ¶ 55 (emphasis in the original). This too is directly responsive and relevant to Dr. Schneider's opinions.

*Fourth*, Plaintiffs criticize Dr. Porsteinsson's citation to clinical guidelines that

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

were "published after the Harmony Study was designed and launched in 2017." Mot. at 22. But Plaintiffs do not even suggest (much less demonstrate) that the guidelines cited by Dr. Porsteinsson differ in any material way from the versions available prior to 2018. Even if Plaintiffs *could* point to some relevant distinction, that would not provide grounds to exclude Dr. Porsteinsson's opinions. *See Holley v. Gilead Sciences, Inc.*, 2023 WL 3607289, at *2 (N.D. Cal. Mar. 27, 2023) (citation to later-published articles "does not warrant exclusion"); *Cherry v. United States*, 2019 WL 1505862, at *6 (D. Ariz. Apr. 5, 2019) (concerns regarding later-published "literature reviews . . . go to weight, not admissibility").

Plaintiffs also overlook that clinical guidelines, by their very nature, reflect an *accumulation and compilation* of *already-existing* best practices. *See, e.g.*, Ex. 18 at 1 (Alzheimer's guidelines "created after review of practices throughout the country, and all instruments . . . were selected based on a thorough review of research literature"); Ex. 19 at 2 (reviewing "[e]xisting best practice[s]"). Indeed, many of the relevant treating guidelines cited by Dr. Porsteinsson also appear in the editions of those same sources available at the time Harmony was designed. *Compare, e.g.*, Ex. 10 ¶ 51 (quoting 2024 Alzheimer's guidelines) *with* Ex. 20 at 17 (nearly identical language in 2016 Alzheimer's guidelines); Ex. 10 ¶ 51, n.149 (quoting current Alzheimer's guidelines) *with* Ex. 21 at 1 (similar language in 2011 Alzheimer's guidelines regarding benefits of antipsychotics to treat BPSD); *see also* Ex 19 (guidelines cited at n.151, reporting consensus developed in 2015); Ex. 10 ¶ 51, n.146 (citing guidelines from 2003). All of Plaintiffs' cited authorities are distinguishable on this basis; in those cases, the later-produced evidence was not available *at all* during the relevant time period.[5]

---

[5] *See Gemmrig v. Asante Three Rivers Med. Ctr., LLC*, 2025 WL 2555337, at *2–3, n.1 (D. Or. Sept. 5, 2025) (later-conducted studies excluded because, in disability discrimination context "it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship assessment"); *Johns v. Bayer Corp.*, 2013 WL 1498965, at *17 (S.D. Cal. Apr. 10, 2013) (excluding results of later-conducted studies not available during class period).

Cooley LLP
Attorneys at Law
San Diego

21

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

In any event, many of Dr. Schneider's own opinions are *not* limited to the pre-2018 time period. *See, e.g.*, Ex. 9 ¶ 11 (claiming that, "through *the present*," there is "no disclosed scientifically valid evidence"); ¶ 86 ("the scientific consensus *today*"); ¶ 88 ("as true *today* as it was when [Harmony] was first conceived"). And Dr. Schneider too supports his opinions with references to post-2017 articles and other materials. *See, e.g.*, Ex. 9 nn.3, 4, 8, 11–13, 20, 31, 32, 80, 81. Dr. Porsteinsson's references to clinical guidelines are thus entirely relevant to Dr. Schneider's "consensus" opinions *before and after* the Harmony trial.

### 2. Dr. Porsteinsson's opinions are reliable.

#### a. Dr. Porsteinsson does not "regurgitate" the facts.

Plaintiffs misrepresent Dr. Porsteinsson's opinions—and fail to show that his opinions are unreliable under Rule 702—by arguing that "his analysis consists of mere regurgitations of the clinical trial data that Acadia cited in its EOP2 Briefing Package." Mot. at 24. In response to Dr. Schneider's categorical "scientific consensus" claims, Dr. Porsteinsson surveys the relevant pre-2018 clinical data and academic literature—including, but *not limited to*, the studies referenced in Acadia's EOP2 Briefing package: "the data and studies included in Acadia's briefing package *were consistent with* the clinical guidance and clinical practice at the time—including my own practice, both then and now—that '[d]ementia-related psychosis is clinically managed the same way regardless of dementia subtype.'" Ex. 10 ¶ 72. Dr. Porsteinsson appropriately cites those materials to support his opinion that, "at the time the Harmony Study was designed and conducted," there was "compelling evidence suggesting the possibility of a single treatment for [DRP]." Ex. 10 ¶¶ 69–72.

Plaintiffs' own cases do not even suggest that Dr. Porsteinsson's discussion of the materials in Acadia's EOP2 Briefing package renders his opinions unreliable. *See* Mot. at 24. In *Orgain*, the court excluded expert opinion in a trademark case because he did nothing more than "state that [the company] responded to customer complaints

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

indicating confusion." *Orgain, Inc. v. Northern Innovations Holding. Corp.*, 2022 WL 2189648, at *9 (C.D. Cal. Jan. 28, 2022) The court held that "the jury can read such emails and make the relevant deductions and inferences themselves." *Id.* Similarly, in *Morton*, the challenged testimony consisted of "an *unadorned regurgitation* of the facts [or] evidence," including the expert's opinion regarding an auditor's report, in which the expert "simply summarize[d] the report and its findings" without any "opinions or other commentary." *Morton v. Cty. of San Diego*, 2024 WL 5126281, at *15 (S.D. Cal. Dec. 16, 2024). Here, in contrast, Dr. Porsteinsson explains the clinical significance of the studies in question, among other evidence, to support his rebuttal of Dr. Schneider's "scientific evidence" and "consensus" opinions. The fact that Dr. Porsteinsson also notes that those studies were included in Acadia's EOP2 Briefing Package to the FDA does not somehow render his opinions unreliable under Rule 702. *See Teledyne Risi v. Martin-Baker Aircraft Co., Ltd.*, 2018 WL 11352632, at *7 (C.D. Cal. Apr. 24, 2018) ("Experts are permitted to analyze [party] materials and formulate a narrative based on that information.").

### b. Dr. Porsteinsson's opinions are well supported.

Plaintiffs' remaining attacks on the reliability of Dr. Porsteinsson's opinions just rehash the same mischaracterizations they employ in previous arguments. None support a finding that Dr. Porsteinsson's opinions are unreliable in any way.

*First*, Plaintiffs repeat their attack on Dr. Porsteinsson for referring to case studies, as well as his own clinical experience treating DRP with pimavanserin and other antipsychotics. Mot. at 25–26. This again presumes (mistakenly) that Dr. Porsteinsson must accept Dr. Schneider's self-serving definition of "scientific evidence," but Plaintiffs still have no authority to support their position. Dr. Porsteinsson's discussion of case studies—which clinicians understand are valid evidence to "evaluat[e] the beneficial and harmful effects of an intervention"—is just one of the relevant and well-supported points in his rebuttal to Dr. Schneider's

Cooley LLP
Attorneys at Law
San Diego

23

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE No. 3: 21-CV-00762-WQH-MSB

opinion regarding the supposed "scientific consensus" against a single treatment for DRP. Ex. 10 ¶ 56, n. 157; *see id*. ¶¶ 56–63.

Plaintiffs again miss the point by dismissing case studies as something less than "*regulatory* evidence," Mot. at 25—a subject on which *Dr. Schneider offers no opinion*, *see* Ex. 17 at 75:7–13, 118:12–19. Accordingly, Dr. Porsteinsson's rebuttal opinions do not (and need not) offer case studies as "regulatory evidence" sufficient to support FDA approval. Rather, he marshals the evidence relevant to his rebuttal of Dr. Schneider's *clinical* opinions. In this context, there is nothing improper or unreliable about Dr. Porsteinsson's discussion of case studies that are "anecdotal [or] based on [his] personal experience." *In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 6186496, at *2 (D. Ariz. Feb. 21, 2018) ("Testimony about a doctor's own clinical experiences is not based on mere speculation" and does not merit "excluding the statement under Rule 702."); *see also McLellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1138 (D. Or. 2010) (surgeon's reliance "on his own clinical experience" not rendered unreliable merely "because he performed no systematic review of his patients' records"); *Primiano v. Cook*, 598 F.3d 558, 564–66 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("A trial court should admit medical expert testimony if physicians would accept it as useful and reliable, but it need not be conclusive because medical knowledge is often uncertain.").[6]

*Second*, Plaintiffs twist themselves into knots by attacking Dr. Porsteinsson's references to "the FDA's designation of pimavanserin as a potential breakthrough therapy ('BTD') and FDA's subsequent acceptance of the sNDA for review." Mot at 26. They first say that Dr. Porsteinsson's discussion of these regulatory events "is unreliable *regurgitation* of the factual record," but then argue that Dr. Porsteinsson

---

[6] Neither Dr. Schneider nor Dr. Porsteinsson assert that *conclusive* evidence of pimavanserin's efficacy (or lack thereof) in treating DRP existed prior to Harmony. This alone distinguishes Plaintiffs' authorities addressing "doctors' observations about rates of patient outcomes," *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022), or medical-device "complication rates in [the expert's] personal practice," *Rose v. Bos. Sci. Corp.*, 2020 WL 4195470, at *1 (W.D. Wash. July 21, 2020).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

is attempting to *interpret* "FDA's thinking." *Id.* Plaintiffs are wrong on both points. Dr. Porsteinsson testified unambiguously that he "offer[s] no opinion on the FDA's decision making," including the FDA's ultimate decision to deny the sNDA. Ex. 16 at 146:10–147:6. Instead, as Dr. Porsteinsson explains, these undisputed events "undercut Dr. Schneider's posited 'scientific evidence' and 'consensus' claims"—as does the FDA's agreement at the EOP2 Meeting that "dementias need not be etiologically related for the common symptom of psychosis to respond to pimavanserin." Ex. 10 ¶ 73. In other words, Dr. Porsteinsson appropriately supports his rebuttal opinion by referencing (among other supporting facts) the FDA's agreement to a study design that ran counter to the "scientific consensus" that Dr. Schneider claims existed at the time.

*Third*, Plaintiffs argue that Dr. Porsteinsson's views regarding the "clinical meaningfulness" of Harmony's and the 019 Study's results are "utterly unreliable," Mot. at 27, even though **their own expert opines on the same subject**, Ex. 9 ¶ 91 ("[T]he results of [the 019] trial were *not* positive or *clinically meaningful*."). Plaintiffs cite no authority for their position that, to assess "clinical meaningfulness," an expert must provide an objective, universally applicable definition.[7] Moreover, Dr. Porsteinsson (unlike Dr. Schneider) *does* explain his own understanding of the concept, which "depends on the context, it depends on what you're studying," and refers generally to clinical outcomes that patients and their families and caregivers consider to be meaningful. Ex. 16 at 114:10–116:4. He also explains why he concludes that the Harmony and 019 results *were* clinically meaningful. *See* Ex. 10 ¶ 79 (in Harmony, "for the DLB subgroup, 67 percent of placebo patients had a relapse versus zero percent of treated patients," and "[f]or the ADP subgroup, 23 percent of placebo patients had a relapse versus 13 percent of treated patients"); *id.* ¶

---

[7] The sole case Plaintiffs cite addresses the well-established *legal* concept of "corrective disclosures" in the context of expert economists' analysis of the Rule 10b-5 element of loss causation. *See* Mot. at 28, citing *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1107 (S.D. Cal. 2012).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

91 ("In th[e] primary endpoint analysis [of the 019 Study], patients taking pimavanserin saw a nearly 40% reduction in their NPI-NH psychosis score . . . compared to a 19% reduction for patients taking placebo," a "two-fold difference in the percentage decline of psychosis symptoms"); *see also id.* ¶¶ 80–89, 92–97 (further discussing results of Harmony and 019 Study).

Both sides' experts are well qualified to offer their respective opinions as to whether the clinical trial results were "clinically meaningful," and "the jury can decide which side's expert[] to credit." *Qualey v. Pierce Cnty.*, 2025 WL 254810, at *12 (W.D. Wash. Jan. 21, 2025). Plaintiffs' arguments are, at best, subjects for cross-examination at trial, not legitimate bases for exclusion under Rule 702.

### 3. Dr. Porsteinsson's opinions are within the scope of rebuttal.

Finally, Plaintiffs offer a last-ditch argument that Dr. Porsteinsson's opinions "are not responsive to, and exceed the scope of Dr. Schneider's affirmative opinions." Mot. at 28. This is just another variation on Plaintiffs' theme that Dr. Porsteinsson is obligated by Rule 702 to accept Dr. Schneider's self-serving definition of "scientific evidence." Plaintiffs are wrong, and they cite no authority supporting their mistaken view of the scope of rebuttal under Rule 702. *See id.*, citing *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*, 2019 WL 4780183, at *6 (N.D. Cal. Sept. 30, 2019) (excluding rebuttal expert because his opinions concerned "*damages*" issues "none of [which] relate[d]" to the "*manufacturing*" opinions of plaintiffs' affirmative expert); *cf. Laflamme*, 2010 WL 3522378, at *3 ("As long as defendant's rebuttal expert witnesses speak to the same subject matter the initial experts addressed and do not introduce novel arguments, their testimony is proper under Federal Rule of Civil Procedure 26(a)(2)(C) and related case law from District Courts in this circuit."); *Self v. Perspecta Enterprise Solutions, LLC*, 2023 WL 6020792, at *6 (S.D. Cal. Jan. 31, 2023) (proper for rebuttal expert to "opine[] on the same general subject matter as [the affirmative expert]"). As explained below, Dr. Porsteinsson's opinions directly respond to and rebut Dr. Schneider's opinions.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*First*, Dr. Schneider's *actual opinions* are far broader than Plaintiffs suggest. His expansive (and *subjective*) opinions include (a) "[v]iewing dementia-related psychosis as one condition with a corresponding single treatment is thus *not well-accepted within the medical profession*," Ex. 9 ¶ 50; (b) "[t]he *scientific consensus* today, as in the past is that treatments for psychosis in different types of dementia should be evaluated individually by dementia type or diagnosis," *id.* ¶ 86; and (c) "patients with the different types of dementia represented in HARMONY . . . *were unlikely* to respond consistently to treatment with pimavanserin," *id.* ¶ 11. Dr. Schneider is entitled to limit the materials he cites in support *his own opinions* to those falling within *his preferred definition* of "scientific evidence." But his broad opinions place directly at issue the views and practices of clinicians like Dr. Porsteinsson, as well as the clinical guidelines on which they rely. *See* Ex. 10 ¶¶ 49–63, nn. 146–154. It is, therefore, entirely appropriate for Dr. Porsteinsson to disagree with Dr. Schneider's view that the *only* relevant considerations are "the established etiological and pathological characteristics of distinct types of dementia, and the results of controlled clinical trials," Mot. at 29. If Plaintiffs believe that the sources relied upon by Dr. Schneider are—despite considerable overlap—more instructive or persuasive than those relied upon by Dr. Porsteinsson, they can make that argument to the jury. But they cannot use their own self-serving definition of "scientific evidence" to insulate Dr. Schneider's opinions from legitimate criticism and rebuttal.

*Second*, Plaintiffs recycle their argument that Dr. Porsteinsson's opinions "about the supposed 'clinical meaningfulness' of the results of the Harmony and 019 Studies" are irrelevant. Mot. at 30. But they again ignore that Dr. Schneider himself opines on the "clinical meaningfulness" of the 019 Study's results, as well as the "meaningfulness" of Harmony's results. Ex. 9 ¶¶ 91, 69. Plaintiffs nonetheless insist that the concept of "clinical meaningfulness" is irrelevant to Dr. Schneider's opinions about "*efficacy* results." Mot. at 30. But the extent to which "clinical meaningfulness" is entirely distinct from "efficacy" is (like the definition of "scientific evidence") a

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

27

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

matter upon which the parties' well-qualified experts simply disagree. *See* Ex. 10 ¶ 74 ("Dr. Schneider overlooks or mischaracterizes the clinical data in both the HARMONY and -019 studies that provide *evidence of pimavanserin's **efficacy*** in treating DRP."). Plaintiffs have cited no authority that suggests Dr. Porsteinsson's rebuttal opinions are untethered from or beyond the scope of Dr. Schneider's affirmative opinions.

## V.   DR. LEHN'S TESTIMONY IS ADMISSIBLE.

### A.   Background Relevant to Dr. Lehn's Opinions

Plaintiffs argue for the exclusion of 40 paragraphs of Dr. Lehn's rebuttal expert report. *See* Mot. at 41. His opinions in these paragraphs can be grouped into four buckets: (1) contesting Dr. Feinstein's conclusions regarding materiality, Ex. 7 ¶¶ 34, 49–50; (2) pointing out Dr. Feinstein's flawed methods and assumptions, and failure to account for confounding information and facts contradicting his conclusions, *id*. ¶¶ 35, 37, 42–43, 59–62, 66–67, 69–73, 97, 99, 100; (3) highlighting Dr. Feinstein's failure to demonstrate that the alleged corrective disclosures were actually corrective, *id*. ¶¶ 38, 39, 45, 74–78, 98, 111; and (4) revealing the inconsistency with which Plaintiffs' experts deal with the FDA's 1998 published guidance, *id*. ¶¶ 36, 63–65, 68, 96.[8]

#### 1.   Dr. Lehn's opinions challenging Dr. Feinstein's conclusions regarding materiality

Dr. Feinstein declares that his event study, along with Company statements and analyst commentary, "uniformly confirm that the alleged misrepresentations and omissions were economically material." Ex. 14 ¶ 197. In response, Dr. Lehn offers two rebuttal opinions: *First*, Dr. Feinstein's analysis merely indicates that Acadia's

---

[8] The three other paragraphs in Dr. Lehn's Report that Plaintiffs seek to exclude cannot reasonably be challenged. Paragraphs 19–20 are part of the "Relevant Case Background" in Lehn's Report and discuss uncontested facts surrounding Acadia's presentation of the Harmony Study's results. And paragraph 116 is a final summary of Dr. Lehn's opinions—*i.e.*, his conclusion that Dr. Feinstein has not established materiality, loss causation, and artificial inflation.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

28

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

revenues, earnings, clinical trial results, and approval of its sNDA were important for the valuation of its stock—but none of these is probative of the materiality of any *specific challenged statement*. Ex. 7 ¶ 47.

*Second*, Dr. Feinstein's analysis, including his event study, only suggests, at most, that the *entire bundle* of information disclosed on a given date was material to investors. *Id.* ¶¶ 34, 49. But Dr. Feinstein fails to conduct any inquiry to answer the relevant question: whether the **alleged misrepresentations** contained **within** the larger bundles of information were material; he just **assumes** they were. *Id.* ¶ 48. As such, Dr. Feinstein has merely shown that Acadia's stock price increased following good news and decreased following bad news—but that does not establish materiality as to any challenged statement. *Id.* ¶¶ 49–50.

### 2. Dr. Lehn's opinions regarding Dr. Feinstein's failure to account for confounding information and contradictory facts

Dr. Feinstein claims that, if, as of December 5, 2019, investors had known that the FDA would require "directional consistency" across dementia subgroups as a condition of sNDA approval (the so-called "Directional Consistency Requirement"), then they would have realized that the sNDA was doomed because Harmony had failed to produce directionally consistent results. *E.g.*, Ex. 14 ¶¶ 275–278, 300. As a result, he argues that (a) the residual increases in Acadia's stock price on September 9 *and* December 5, 2019 (totaling $22.43 per share) were artificial inflation caused by fraud, and (b) in the but-for world of full disclosure, Acadia's stock price would have reversed **the entirety** of those two prior gains. *Id.* ¶ 280. Dr. Lehn offers four opinions to rebut Dr. Feinstein's self-serving conclusions:

*First*, Dr. Lehn explains that Dr. Feinstein simply **assumes** that "directional consistency" has a "meaning that was commonly understood by Acadia, the FDA, and the market." Ex. 7 ¶¶ 59, 35, 62. But Dr. Feinstein does not establish that "directional consistency" has *any* commonly understood meaning. Accordingly, Dr. Feinstein cannot show that if the market was aware of the alleged Directional

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

29

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Consistency Requirement, it "would have understood precisely what that meant" or "would have reached different conclusions about whether the subgroup efficacy results were directionally consistent." *Id.* ¶ 60.[9]

*Second*, Dr. Lehn notes Dr. Feinstein's ignorance of analysts who were "keenly focused on DRP subtype results" before their disclosure, Ex. 7 ¶ 66, and reacted positively to the subtype results after their disclosure, many of whom characterized the subtype results as "consistent," *id.* ¶¶ 37, 42–43, 67, 69–73, 97. This shows that the market was focused on and reacted positively to Harmony's dementia subtype results *without* knowledge of any (allegedly omitted) Directional Consistency Requirement. As a result, Dr. Feinstein cannot reliably conclude that, *with* knowledge of such a requirement, the market would have reversed course and concluded that those same results were directionally inconsistent. *Id.* ¶¶ 37, 43, 72–73, 97. Dr. Lehn further notes the lack of support for Dr. Feinstein's conclusion that the *entirety* of the residual increases in Acadia's stock price on September 9 and December 5, 2019 (as opposed to none or some smaller amount) was artificial inflation. *Id.* ¶ 43.

*Third*, Dr. Lehn notes that Dr. Feinstein's conclusion that the market would have determined the sNDA was doomed had it known of the alleged Directional Consistency Requirement is contradicted by Dr. Peck's opinion that the sNDA still had a 30% probability of success as of December 5, 2019. *Id.* ¶ 99.

*Fourth*, Dr. Lehn highlights that Dr. Feinstein ignores the impact of positive confounding information on Acadia's stock price as of December 5, 2019. *Id.* ¶ 100.

### 3. Dr. Lehn's opinions regarding Dr. Feinstein's failure to demonstrate that any disclosures were actually corrective

Dr. Feinstein posits that Acadia's disclosures on March 8 and April 5, 2021, were corrective because they dissipated artificial inflation and that his event study

---

[9] In any event, Dr. Lehn points out that Defendants believed the Harmony Study's dementia subtype results *were* directionally aligned, further undercutting Dr. Feinstein's conclusions. Ex. 7 ¶ 61.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

30

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

"proves that the alleged misrepresentations and omissions caused investor losses." Ex. 14 ¶¶ 249–250, 252. He also asserts that analysts stated that the FDA's denial of the sNDA "contradicted what the Company had previously told them[.]" *Id.* ¶¶ 155–156. Dr. Lehn offers two opinions to rebut Dr. Feinstein's conclusions:

*First*, Dr. Lehn explains that Acadia's disclosures ***did not mention a lack of directional consistency***. Instead, the Company reported what it had been told by the FDA—*i.e.*, that the FDA had denied the sNDA based on "a lack of statistical significance in some of the subgroups of dementia," "insufficient numbers of patients with certain less common dementia subtypes," and concerns about the 019 Study. Ex. 7 ¶¶ 25, 38, 45, 74, 77, 98, 111. Thus, "there is no plausible basis to conclude" that the alleged misstatements—which Plaintiffs now contend should have revealed the existence of the purported Directional Consistency Requirement—were "corrected" by either disclosure. *Id.* ¶¶ 38, 39.

*Second*, Dr. Lehn highlights Dr. Feinstein's mischaracterization of analysts' post-CRL statements. Although analysts were, of course, surprised by the CRL and some speculated that Acadia may have misunderstood the FDA's approval requirements, there is nothing in the analyst commentary from which to infer that the market learned of a Directional Consistency Requirement or that the disclosures were otherwise "corrective" of a prior misstatement. *Id.* ¶¶39, 75–78.

### 4. Dr. Lehn's opinions regarding the inconsistency with which Plaintiffs' experts deal with the FDA's 1998 public guidance

In Dr. Peck's initial expert report, he declares that the FDA's 1998 guidance "is in line with" the alleged Directional Consistency Requirement here. Ex. 1, App'x C, ¶ 93. And in Dr. Feinstein's opening report, he asserts that the market for Acadia's stock was efficient. Ex. 14 ¶ 2; Ex. 7 ¶¶ 36, 64.

In rebuttal, Dr. Lehn notes that these opinions are inconsistent. The FDA guidance cited by Dr. Peck was publicly available well before the start of the Class Period. Ex. 7 ¶¶ 36, 63. This is undisputed. Thus, if the market for Acadia's stock is

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

31

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

efficient (as Dr. Feinstein contends), then the guidance "was known to the market and reflected in Acadia's stock price throughout (and before) the Class Period." *Id.* ¶¶ 64, 68. Indeed, analysts *did* focus on and examine those subtype results. *Id.* ¶¶ 67, 71–72. Plaintiffs cannot have their cake and eat it, too. In other words, Dr. Feinstein cannot reliably conclude "that market participants were not aware that the FDA would focus on the dementia subtype data from the Harmony Study." *Id.* ¶ 65; *see also id.* ¶¶ 36, 68, 96.

### B.    Argument Supporting Admission of Dr. Lehn's Opinions

Plaintiffs move to exclude Dr. Lehn's opinions because they are supposedly "dress[ed] up" truth-on-the-market evidence, which is not expert testimony, and because Defendants did not disclose Dr. Lehn as a merits expert to testify regarding this affirmative defense for which they claim Defendants bear the burden of proof. Mot. at 31. These arguments depend entirely on the fallacious claim that Dr. Lehn relies on truth-on-the-market arguments and they fail for at least three reasons: (1) Defendants do not assert a truth-on-the-market defense to Plaintiffs' theory of fraud; (2) none of Dr. Lehn's rebuttal opinions rely on or raise such a defense; and (3) none of Dr. Lehn's opinions impermissibly attempt to usurp the role of the jury.

### 1.    Defendants do not raise a truth-on-the-market defense to Plaintiffs' theory of fraud.

At the motion-to-dismiss and class-certification stages of this action, Plaintiffs' theory of fraud was, in part, that Acadia's supportive studies suffered from undisclosed statistical and design deficiencies. Defendants argued that they *had* disclosed this information. The Court construed this as a "truth-on-the-market" defense and then declined to "draw an inference in favor of Defendants **at the pleadings stage** that all information disseminated at various conferences and in different forms was necessarily transmitted to the market with the same intensity as Defendants' allegedly misleading statements." Dkt. 82 at 9–12. This Court's labeling of Defendants' motion-to-dismiss arguments as a "truth-on-the-market" defense is

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

32

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

the false predicate for Plaintiffs' misguided attempt to exclude Dr. Lehn's testimony. But Defendants did not argue a truth-on-the-market defense in their motion to dismiss. They argued only that "they disclosed all required information, **not** that they failed to make required disclosures but should be excused because other sources ha[d] already made the same information available." *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *13, n.18 (N.D. Cal. Mar. 29, 2019). Regardless, this is a sideshow.

Even if Defendants' motion to dismiss *had* raised truth-on-the-market arguments to Plaintiffs' *previous* theory of fraud, Plaintiffs have largely abandoned that theory in favor of a new one. After multiple iterations and despite never amending their complaint, they have settled on this: Defendants allegedly concealed from the market that the FDA required "directional consistency" across Harmony's dementia subtypes **as a condition of sNDA approval**, and Defendants knew, but failed to disclose, that Harmony's dementia subtype results failed this requirement. *See, e.g.*, Ex. 14 ¶¶ 34, 81, 162, 167.[10]

Defendants certainly have not argued that truth-on-the-market is a defense to Plaintiffs' *current* theory of fraud. To prevail on that argument, Defendants would have to prove that their failure to disclose the so-called Directional Consistency Requirement was immaterial because the market already knew of the requirement. **But Defendants contend that no such requirement ever existed** as a condition of sNDA approval—not that the market was already aware of it. *See* Dkt. 199-1 at 16–21. Plaintiffs plainly acknowledge this in their Motion. *See* Mot. at 36 n.19

---

[10] Plaintiffs appear to have abandoned the claim that Defendants did not sufficiently disclose the designs of the Harmony and 019 Studies, as well as the allegation that Acadia withheld relevant Harmony dementia subtype results. *See, e.g.*, Ex. 15 at 91:2–97:24 (Feinstein admitting that alleged omission of "Directional Consistency Requirement" was sufficient *on its own* to account for *entirety* of alleged artificial inflation as of September 9, 2019); *id.* at 102:14–105:2 (testifying that "full disclosure" as of December 5, 2019 would have meant *only* additional disclosure of Directional Consistency Requirement and that Harmony failed to satisfy it). If Plaintiffs still contend that Acadia misled investors by failing to disclose additional dementia subtype results from Harmony, neither Plaintiffs nor their experts have articulated what additional information should have been disclosed. *See, e.g.*, *id.* at 114:21–116:11 (Feinstein did not know what additional subgroup data Acadia would have needed to be disclosed).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

33

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

("Defendants' position [is] that no such requirement existed"). So, how is it that Dr. Lehn is improperly "dressing up Defendants' one-sided truth-on-the-market evidence" when Defendants are not even asserting that defense? This makes no sense.[11]

### 2. Dr. Lehn is not an affirmative merits expert because none of his opinions raise or rely on truth-on-the-market arguments.

Even if Defendants had ***previously*** raised a truth-on-the-market defense in response to Plaintiffs' ***former*** theory of fraud, they were under no obligation to designate Dr. Lehn as an affirmative expert witness in order for his rebuttal opinions to be admissible. This is so for at least two reasons: (a) Plaintiffs blatantly obfuscate the relevant burdens of proof; and (b) despite Plaintiffs' mischaracterizations, Dr. Lehn offers no affirmative opinions raising a truth-on-the-market defense regarding the alleged Directional Consistency Requirement; nor does he rely on arguments about the disclosure of the designs and results of the Harmony and 019 Studies, which the Court previously labeled as a truth-on-the-market defense.

### a. Plaintiffs obfuscate the relevant burdens of proof.

Plaintiffs assert that Dr. Lehn's opinions are inadmissible because he "attempt[s] to back door" Defendants' alleged truth-on-the-market defense, which Defendants bear the burden of proving. Mot. at 40–41. Thus, they claim, Dr. Lehn is precluded from offering *any* meaningful rebuttal to Dr. Feinstein's failure to demonstrate materiality, damages, and loss causation. Plaintiffs' arguments are a transparent attempt to misguide the Court.

The elements of a Rule 10b-5 action are: (1) "a material misrepresentation (or omission)"; (2) "scienter"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *Dura Pharms., Inc. v.*

---

[11] Having admitted that *Defendants* do not raise a truth-on-the-market defense regarding the alleged Directional Consistency Requirement, Plaintiffs pivot to arguing that *Dr. Lehn* affirmatively raises such a defense on his own via his rebuttal to Plaintiffs' experts' discussion of the FDA's 1998 public guidance. Mot. at 34, 36. This is a misrepresentation of Dr. Lehn's opinions. *See infra* at V.B.2.b.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

34

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*Broudo*, 544 U.S. 336, 341–42 (2005). In fraud-on-the-market cases (such as this one), the fourth element (reliance) "may be presumed" on a class-wide basis without direct proof. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). A defendant, in turn, may use a truth-on-the-market defense to "rebut the [fraud-on-the-market] presumption of reliance" by proving immateriality. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481–82 (2013).

Thus, if Defendants assert a truth-on-the-market defense (they do not), then they bear the burden of proving immateriality ***to rebut the fraud-on-the-market presumption of reliance*** (a *single* element of Plaintiffs' claim). But Plaintiffs cite no authority (because there is none) holding that there is a shift of the ***overall*** burden of proof for Plaintiffs' Rule 10b-5 claim. In other words, whether a truth-on-the-market defense is asserted or not, *Plaintiffs* still bear the burden of proof for *all* elements of their Rule 10b-5 claim, including materiality, damages, and loss causation. 15 U.S.C.A. § 78u-4(b)(4); *see also Lilley v. Charren*, 17 F. App'x 603, 606 (9th Cir. 2001).

Here, if the Court excludes Dr. Lehn's rebuttal opinions, it would essentially be holding that Dr. Lehn cannot rebut Dr. Feinstein on materiality, damages, and loss causation because ***Defendants*** bear the burden of ***disproving*** those essential elements. That is not the law. So long as Dr. Lehn does not attempt to raise new arguments to ***affirmatively prove*** that Defendants' challenged statements were not materially false or misleading ***because the market was already aware of the alleged Directional Consistency Requirement***, then he is free to challenge Dr. Feinstein's opinions on materiality, damages, and loss causation—elements for which *Plaintiffs* bear the burden of proof.

Indeed, all of Plaintiffs' cited cases, Mot. at 40–41, confirm that courts exclude only *new*, *affirmative* expert opinions and *allow* rebuttal opinions that respond directly to an initial expert. *See Century Indem. Co. v. Marine Grp. LLC*, 2015 WL 5521986, at *4 (D. Or. Sep. 16, 2015) (excluding rebuttal testimony only where

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

expert did not "merely contradict or rebut the subject matter" of the initial experts but presented *new* arguments and *affirmative* opinions to establish the existence and terms of lost insurance policies); *Cook v. Cnty. of L.A.*, 2022 WL 1470574, at *4–7 (C.D. Cal. Mar. 21, 2022) (excluding plaintiff's rebuttal expert where plaintiff bore the burden of proving excessive use of police force and where the expert did not merely contradict or rebut the opposing expert but instead offered *new affirmative* opinions); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *4 (N.D. Cal. June 3, 2015) (excluding rebuttal expert only where he failed to review the initial report he was supposedly rebutting and offered *new affirmative* opinions on issues not raised in the initial expert report); *Nguyen v. Radient Pharms.*, 2013 WL 12149241, at *2 (C.D. Cal. July 19, 2023) (*allowing* testimony of late-disclosed expert where defendants agreed to limit expert's testimony to rebuttal). *Nguyen*, in particular, proves Defendants' argument. *Nguyen* stated *in dicta* that a defendant's expert could not opine on matters for which defendants bore the burden of proof "such as a truth-on-the-market defense." *Id*. But the court specifically held that the defendants' expert was *permitted to rebut the plaintiffs' expert report which opined "on the issues of economic materiality, loss causation, and damages*." *Id*. That is precisely what Dr. Lehn is doing here.

### b.      Dr. Lehn does not rely on or raise a truth-on-the-market defense.

Plaintiffs egregiously misrepresent Dr. Lehn's opinions to fit their specious truth-on-the-market construct. Dr. Lehn does nothing more than rebut specific assumptions and conclusions by Plaintiffs' experts about issues for which *Plaintiffs* bear the burden of proof. As such, Dr. Lehn's opinions are admissible rebuttal expert testimony, and did not require Dr. Lehn to be designated as an affirmative expert.

*First*, Plaintiffs claim that "Dr. Lehn's materiality opinions . . . are predicated on his truth-on-the-market views." Mot. at 35. But Dr. Lehn simply points out that Dr. Feinstein failed to conduct any analysis to determine whether the **specific alleged**

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

36

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*misstatements* contained *within* larger bundles of statements made by Defendants on relevant dates were *themselves* material. *See supra* at V.A.1. This rebuttal opinion does not attempt to affirmatively prove that the market already knew of a Directional Consistency Requirement (Plaintiffs' new theory), nor does it depend on an argument that the market already knew about the designs and results of Defendants' supportive studies (Plaintiffs' old theory).

*Second*, Plaintiffs distort Dr. Lehn's rebuttal opinions about Dr. Feinstein failing to account for confounding information and neglecting facts that contradict his conclusions. Plaintiffs mischaracterize this rebuttal as Dr. Lehn affirmatively opining that "there was somehow no way 'market participants would have reacted any differently to the release of [Harmony's] results'—even if investors had known the full truth about FDA's requirements for approval of the sNDA" because Harmony's "results and data set" were known to investors in December 2019 and because Dr. Lehn points out that analysts stated that Harmony's results were 'consistent across the dementia subtypes." Mot. at 33.

But Dr. Lehn's rebuttal opinions do not attempt to prove that the market already knew of a Directional Consistency Requirement. Nor do his opinions attempt to prove immateriality by demonstrating that there was "no way market participants would have reacted differently" with knowledge of that alleged requirement due to Acadia's disclosure of the designs and results of the Harmony and 019 Studies. Instead, Dr. Lehn explains *Dr. Feinstein's* failure to demonstrate that the market *would* have reacted differently (which *Plaintiffs* must prove) had it learned of a Directional Consistency Requirement on December 4, 2019. *See supra* atV.A.2; *see also* Ex. 7 ¶¶ 42–43. Regardless, as Dr. Lehn explains, Dr. Feinstein has no reliable basis to conclude that the market would necessarily have regarded the sNDA as *completely* doomed, such that the *entire* residual increase in Acadia's stock price on September 9 and December 5, 2019 (totaling $22.43) is artificial inflation. *Id*. ¶ 43. Put differently, the market could just as easily have concluded that sNDA approval

Cooley LLP
Attorneys at Law
San Diego

was as likely as it was previously (or less likely but not entirely *un*likely), in which case the entire residual stock price increase cannot be artificial inflation. None of these opinions rely on any truth-on-the-market argument or evidence.

*Third*, Plaintiffs distort Dr. Lehn's opinions regarding Dr. Feinstein's failure to show that the alleged corrective disclosures were actually corrective. They recast Dr. Lehn's testimony as an attempt to affirmatively prove that "[b]ecause the full truth about FDA's approval requirements and Harmony's subgroup data were allegedly known by December 2019 . . . nothing in Acadia's disclosures of March 8 or April 5, 2021 could have provided any new information to investors—so that 'there is no plausible basis to conclude that the alleged misrepresentations were "corrected" on these days'" and therefore cannot have caused loss. Mot. at 33–34. This is made up.

Dr. Lehn does not opine that Acadia's March 8 and April 5, 2021 disclosures provided no new information to the market—***of course they did***; they announced the FDA's denial of the sNDA. Dr. Lehn merely points out that, if Dr. Feinstein had analyzed the content of these disclosures, then: (1) he would have noticed that neither disclosure informed the market of a previously hidden Directional Consistency Requirement; and (2) he would have to admit that these disclosures revealed that the FDA had rejected the sNDA for reasons other than a failure to meet this alleged requirement.[12] *See supra* at V.A.3. Thus, the disclosures cannot have "corrected" earlier alleged misstatements that omitted the purported Directional Consistency Requirement. *Id*. Dr. Lehn also flags Dr. Feinstein's mischaracterization of the content of analysts' post-CRL statements. *Id*. Again, *none* of these rebuttal opinions raises or depends on any truth-on-the-market argument that investors already knew

---

[12] Plaintiffs claim that Dr. Lehn "is forced to concede that several analysts . . . 'blamed Acadia or criticized the results of [Harmony]' . . . which shows that at least some significant market participants were surprised by what they clearly viewed as new news that was revealed by the Corrective Events." Mot. at 37 n.20. So what? *Of course* analysts were surprised by the denial of the sNDA and *of course* this was "new news." The relevant question is whether Dr. Feinstein established that this new news *corrected previous misstatements*—Dr. Lehn simply points out that he did not.

Cooley LLP
Attorneys at Law
San Diego

38

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-cv-00762-WQH-MSB

of a Directional Consistency Requirement or that Acadia had already disclosed all material information regarding the designs and results of the Harmony and 019 Studies.

*Fourth*, Plaintiffs also contort Dr. Lehn's rebuttal opinions regarding the FDA's 1998 guidance. They say Dr. Lehn now affirmatively raises a truth-on-the-market defense *on his own*. And they accuse him of concluding that: "FDA's directional consistency requirement was so well 'known to the market' that no investors could have possibly been misled by 'the non-disclosure of the alleged Directional Consistency Requirement' in the FDA agreement." Mot. at 34, 36. This is pure fiction.

Dr. Lehn **never says that the market already knew of a so-called Directional Consistency Requirement** as a condition of sNDA approval.[13] *Plaintiffs' experts* first cited the FDA's 1998 guidance in *their* initial reports, and it does show that the FDA would generally consider "consistency across study subsets" when it received an application that included subgroup data. Dr. Lehn merely observes that the FDA's 1998 guidance *was public*. *See supra* at V.A.4. Thus, the market must have accounted for this FDA guidance—whatever it contained—if Acadia's stock traded in an efficient market (as asserted by Plaintiffs and Dr. Feinstein). *Id*.; Ex. 7 ¶¶63–65.

Dr. Lehn's point here is a simple one: there is a fatal inconsistency between the opinions of Plaintiffs' own experts. If the public FDA guidance *is* evidence of the existence of a Directional Consistency Requirement (as Dr. Peck claims), then it "was known by the market and reflected in Acadia's stock price throughout (and before) the Class Period." Ex. 7 ¶64. If not, then the market for Acadia's stock was not efficient. Plaintiffs cannot invoke the presumption of class-wide reliance and then

---

[13] Thus, Plaintiffs' claims that "Dr. Lehn's views as to investor knowledge of FDA's directional consistency requirement are also shockingly at odds with Defendants' position that no such requirement existed" and that "[s]omehow, following this logic, investors knew about FDA requirements, but Defendants did not," Mot. at 36 n.19, are pure nonsense. There is no inconsistency here—neither Defendants nor Dr. Lehn claim this requirement ever existed or that the market ever knew about it.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

39

ignore the basis for that presumption when it does not suit their arguments. *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) (The fraud-on-the-market presumption of reliance "rests on the efficient capital market hypothesis[.]"). Either way, Plaintiffs' experts do not agree with one another.

None of this can be construed as an attempt by Dr. Lehn to affirmatively prove a truth-on-the-market argument—*i.e.*, that the market already knew of the existence of the alleged Directional Consistency Requirement. Nor is it connected with the purported truth-on-the-market defense to Plaintiffs' *previous* theory of fraud (that the market already knew the designs and results of the Harmony and 019 Studies).

### 3.   Dr. Lehn's opinions do not usurp the role of the jury.

Finally, Plaintiffs argue that Dr. Lehn's rebuttal opinions are inadmissible because he attempts to substitute his own judgment for that of the jury by instructing the jury on what conclusions to reach based on evidence a jury could understand on its own. Mot. at 35–40. Dr. Lehn does nothing of the sort.

Rule 26(a)(2)(D)(ii) permits rebuttal expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified" by an initial expert. "The relevant inquiry is whether a responding expert witness limits himself to poking holes in the [opposing] expert report" or instead "offer[s] new theories or address[es] topics not directly presented in the . . . original experts' opinions." *Zucchella v. Olympusat, Inc.*, 2023 WL 2628107, at *12 (C.D. Cal. Jan. 10, 2023).

Here, Dr. Lehn does not assert any *affirmative* expert opinions, raise *new* arguments, dictate to the jury what conclusions to reach, merely regurgitate evidence in the record, or present his own narrative of the facts. Instead, he challenges *Dr. Feinstein's* assumptions, questions his methodologies, and points out relevant facts that Dr. Feinstein completely ignored.[14] *See supra* at V.A. and V.B.2.b. It is well

---

[14] Plaintiffs' arguments that Dr. Lehn's rebuttal opinions are inadmissible because he has no "specialized knowledge in FDA drug approval requirements, interpreting

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

40

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

established that such rebuttal opinions are legitimate and admissible. *See, e.g.*, *Self, LLC*, 2023 WL 6020792, at *6 (challenging "underlying assumption" of damages calculation "is a permissible exercise of rebuttal testimony"); *Quidel*, 2019 WL 4727939, at *2 (rebuttal expert may "respond[] to what Defendants deem to be a 'fundamental flaw' in [plaintiff's expert's] report" because such "testimony is permitted to 'question the assumptions and methods' of an opposing expert"); *Sinclair Wyo. Ref. Co. v. Infrassure Ltd.*, 2017 WL 11094221, at *3 (D. Wyo. May 19, 2017) (quoting *Laflamme*, 2010 WL 3522378, at *3 ("questioning methodology, and opining on methods and facts [the initial] experts did not consider are precisely the type of rebuttal testimony [that] court[s] would expect.")). The fact that Dr. Lehn "pokes holes" in Dr. Feinstein's opinions, in part by citing evidence which a juror could understand, is perfectly acceptable. *See Pinterest, Inc. v. Pintrips, Inc.*, 2015 WL 2268498, at *1, 3 (N.D. Cal. May 14, 2015) ("challenging the assumptions of an expert witness report is a permissible topic of rebuttal testimony" and "an expert witness is permitted to compile . . . materials that a lay person would understand, and then explain how those materials inform and support his or her expert opinions."); *Space Data Corp. v. Alphabet Inc.*, 2019 WL 2603285, at *3 (N.D. Cal. June 25, 2019) (same).

Plaintiffs' cited cases are inapposite. *See* Mot. at 35–38. Several cases excluded experts who offered clear-cut legal conclusions or improperly opined on

---

Harmony's subgroup data, or the reasons why the FDA issued the CRL," Mot. at 38–39, entirely miss the mark. Plaintiffs did not offer *Dr. Feinstein* to testify based on any claimed expertise about these topics either. There is no dispute that Dr. Lehn is a qualified *damages and loss causation* expert, and his rebuttal opinions merely point out how Dr. Feinstein's failure to account for facts contradicting his conclusions impacts his *damages and loss causation analysis*. That is well within the permissible bounds of rebuttal expert testimony. *See, e.g.*, *Homevestors of Am., Inc. v. Warner Bros. Discovery*, 2025 WL 2301911, at *10 (D. Del. Aug. 8, 2025) ("[A] damages expert need not have specialized experience in the industry on which he or she is expressing an opinion in order to survive Daubert," rather the expert "need only be qualified to run the numbers"); *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *12 n.22 (E.D. Pa. Sept. 3, 2010) ("[A]ny argument as to Dr. Lehn's qualifications is rejected. … It is clear that Dr. Lehn possesses specialized expertise to qualify as an expert on loss causation.")

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

the state of mind of relevant parties. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) (expert offered numerous legal conclusions and attempted to apply Uniform Commercial Code to facts of case); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320–22 (S.D. Cal. 2020) (expert impermissibly interpreted contract provisions and "form[ed] conclusions as to their effects on competition and states of mind of industry participants"); *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *3–5 (S.D. Cal. Nov. 17, 2011) (expert who opined that defendant company exerted "undue pressure" to "manage its earnings" invaded the jury's authority to reach this legal conclusion on its own). Some pertain to experts who clearly cherry-picked the record and instructed the jury on determinations regarding evidence. *See Taylor v. Cnty. of Pima*, 2023 WL 2652602, at *3–5 (D. Ariz. Mar. 27, 2023) (expert constructed factual narratives based on cherry-picked documents, implicitly made witness credibility determinations, attempted to resolve evidentiary conflicts, and explicitly instructed the jury regarding what legal conclusions to reach). Others involved experts who offered opinions that were manifestly unhelpful because any average juror could have conducted the same analysis. *See In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023) (expert did nothing but purport to summarize and quote analyst reports and earnings calls); *Orgain*, 2022 WL 2189648, at *9 (expert opined that defendant was aware of customer complaints based solely on fact that it responded to them—but a jury could make this obvious inference on its own). And one of the cases cited by Plaintiffs cuts against them because it *allowed* the expert opinion. *See Yphantides v. Cnty. of San Diego*, 2023 WL 7555301, at *7 (S.D. Cal. Nov. 14, 2023) (*allowing* expert opinion because it did *not* usurp the role of fact finder and opined on matters that were *not* "common knowledge known by the average layperson"). Dr. Lehn's rebuttal opinions suffer from *none* of the problems identified in these decisions.

Cooley LLP
Attorneys at Law
San Diego

42

Defs.' Opp. to Pltfs' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

## VI.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion as to the opinions and testimony of Drs. Breder, Porsteinsson, and Lehn.

Dated: January 14, 2026                    COOLEY LLP


By: */s/ Koji F. Fukumura*
       Koji F. Fukumura

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

43

DEFS.' OPP. TO PLTFS' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB