John T. Jasnoch (SBN 281605)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Lead Plaintiff City of*
*Birmingham Retirement and Relief System*
*And the Certified Class*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

CITY OF BIRMINGHAM RELIEF
AND RETIREMENT SYSTEM and
OHIO CARPENTERS' PENSION
FUND, Individually and on Behalf of
All Others Similarly Situated,

Plaintiffs,

v.

ACADIA PHARMACEUTICALS
INC., STEPHEN R. DAVIS, and ANA
STANKOVIC, as Special Personal
Representative of the Estate of Srdjan
(Serge) R. Stankovic,

Defendants.

No. 3:21-cv-00762-WQH-MSB

**PLAINTIFFS' REPLY MEMORANDUM
OF POINTS AND AUTHORITIES IN
FURTHER SUPPORT OF MOTION TO
EXCLUDE THE EXPERT OPINIONS
AND TESTIMONY OF
DR. CHRISTOPHER BREDER,
DR. ANTON PORSTEINSSON, AND
DR. KENNETH LEHN**

Hon. William Q. Hayes

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT...................................................................................................... 1

I.    DR. BREDER'S OPINIONS SHOULD BE EXCLUDED ........................... 1

      A.    Dr. Breder's Views Invade the Province of the Jury and Are Unreliable and Unsupported ................................................................ 2

            1.    Dr. Breder's Opinions Are Not Helpful to a Jury ............ 2

            2.    Dr. Breder's Chief Source Contradicts His Opinions ................................................................................ 4

      B.    Dr. Breder Has Disavowed Key Opinions........................................... 5

      C.    Dr. Breder's Views on FDA Communications Improperly Duplicate Those of Acadia's Other FDA Expert................................. 7

II.   DR. PORSTEINSSON'S OPINIONS SHOULD BE EXCLUDED .............. 9

      A.    Dr. Porsteinsson's Consistency Hypothesis Opinions Are Irrelevant .............................................................................................. 10

      B.    Dr. Porsteinsson's Consistency Hypothesis Opinions Are Also Unreliable.................................................................................... 12

            1.    Experts Cannot Merely Regurgitate the Factual Record ................................................................................ 12

            2.    Dr. Porsteinsson's Sources Show His Consistency Hypothesis Opinions Are Unreliable ............................... 13

      C.    Dr. Porsteinsson Exceeds the Scope of Rebuttal ............................... 14

      D.    Dr. Porsteinsson's Opinions on the Harmony Results and the 019 Study Should Likewise Be Excluded........................................... 15

III.  DR. LEHN'S OPINIONS SHOULD BE EXCLUDED IN PART............... 16

      A.    Defendants Cannot Obscure Their Use of Dr. Lehn to Support a Truth-on-the-Market Defense .......................................................... 16

      B.    The Opposition Confirms Dr. Lehn's Opinions Are Improper ......... 18

      C.    Dr. Lehn Is Not Qualified to Poke Many of the Purported "Holes" Identified in His Report ....................................................... 21

CONCLUSION............................................................................................... 22

21cv00762

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advanced Telemedia, L.L.C. v. Charter Commc'ns, Inc.*,
2008 WL 6808442 (N.D. Ga. July 17, 2008).......................................................3

*Alaska Rent-a-Car v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)...............................................................................2

*Cabrera v. Cordis Corp.*,
134 F. 3d 1418 (9th Cir. 1998).............................................................................7

*Easton v. Asplundh Tree Experts, Co.*,
2017 WL 4005833 (W.D. Wash. Sept. 12, 2017)................................................2

*Fed. Trade Comm'n v. Amazon.com, Inc.*,
2016 WL 4154284 (W.D. Wash. Feb. 9, 2016)..................................................15

*FLIR Sys., Inc. v. Fluke Corp.*,
2012 WL 13051121 (D. Or. Nov. 5, 2012)..........................................................3

*Friedman v. Medjet Assistance, LLC*,
2010 WL 9081271 (C.D. Cal. Nov. 8, 2010)........................................................8

*Halbert v. County of San Diego*,
2011 WL 13356067 (S.D. Cal. June 27, 2011)....................................................8

*In re Bard IVC Filters Prods. Liab. Litig.*,
2018 WL 11447290 (D. Ariz. Feb. 21, 2018).......................................................5

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020).............................................................................20

*In re Ethicon Inc. Pelvic Repair Sys. Prods. Liab. Litig.*,
2018 WL 3575936 (S.D. W. Va. July 24, 2018)................................................11

*In re Novatel Wireless Sec. Litig.*,
846 F. Supp. 2d 1104 (S.D. Cal. 2012)..............................................................16

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................12

*In re Solodyn (Minocycline Hydrocholoride) Antitrust Litig.*,
2018 WL 734655 (D. Mass. Feb. 6, 2018)...........................................................4

*In re Xyrem*,
2024 WL 4023562 (N.D. Cal. Aug. 26, 2024).....................................................8

*Johns v. Bayer Corp.*,
2013 WL 1498965 (S.D. Cal. Apr. 10, 2013).....................................................12

*Kaepplinger v. Michelotti*,
2022 WL 267886 (N.D. Ill. Jan. 28, 2022)..........................................................8

-ii-

*Laflamme v. Safeway, Inc.*,
  2010 WL 3522378 (D. Nev. Sept. 3, 2010) ....................................................... 15

*Liu v. State Farm Mut. Auto. Ins. Co.*,
  2021 WL 717540 (W.D. Wash. Feb. 24, 2021) .................................................... 8

*Maldono v. Apple, Inc.*,
  2021 WL 1947512 (N.D. Cal. May 14, 2021) ...................................................... 4

*Mitchell v. Geo Grp. Inc.*,
  2022 WL 874287 (D. Ariz. Mar. 24, 2022) ......................................................... 7

*Montera v. Premier Nutrition Corp.*,
  2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) .................................................... 13

*Nunez v. Harper*,
  2014 WL 979933 (D. Nev. Mar. 12, 2014) ......................................................... 15

*PacTool Int'l, Ltd. v. Kett Tool Co.*,
  2012 WL 3637391 (W.D. Wash. Aug. 22, 2012) .................................................. 5

*Rodriguez v. Walt Disney Parks & Resorts U.S., Inc.*,
  2018 WL 3532906 (C.D. Cal. July 2, 2018) ....................................................... 15

*Rose v. Bos. Sci. Corp.*,
  2020 WL 4195470 (W.D. Wash. July 21, 2020)........................................... 11, 13

*SEC v. Perry*,
  No. 2:11-cv-01309 (C.D. Cal. July 12, 2012) ................................................... 16

*Self v. Perspecta Enter. Sols., LLC*,
  2023 WL 6020792 (S.D. Cal. Jan 31, 2023) ..................................................... 22

*Sinclair Wyo. Refining Co. v. Infrassure Ltd.*,
  2017 WL 11094221 (D. Wyo. May 18, 2017) .................................................... 22

*Space Data Corp. v. Alphabet Inc.*,
  2019 WL 2603285 (N.D. Cal. June 25, 2019) ................................................... 22

*Trust v. Apple, Inc.*,
  2013 WL 12094821 (S.D. Cal. May 7, 2013) ...................................................... 8

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 6887043 (N.D. Cal. Nov. 14, 2017)................................................... 13

*Zucchella v. Olymustat, Inc.*,
  2023 WL 2628107 (C.D. Cal. Jan. 10, 2023)..................................................... 22

-iii-

## TABLE OF DEFINED TERMS

| Term | Definition |
|---|---|
| "019 Study" or "019" | Study ACP-103-019, a phase 2 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for patients with Alzheimer's disease psychosis. |
| "Acadia" | Defendant Acadia Pharmaceuticals, Inc. |
| "Andreason Report" or "Andreason Rpt." | Rebuttal Report of Paul Andreason, M.D., dated March 27, 2025 [Ex. 6]. |
| "Breder Dep." | Deposition of Dr. Christopher Breder, conducted May 22, 2025 [Ex. 4]. |
| "Breder Report" or "Breder Rpt." | Rebuttal Expert Report of Dr. Christopher Breder, dated March 27, 2025 [Ex. 3]. |
| "BTD" | Breakthrough Therapy Designation |
| "Cert. Order" | The Court's March 11, 2024 Order granting Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. No. 140). *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372 (S.D. Cal. 2024). |
| "Class Period" | September 9, 2019 to April 4, 2021, both dates inclusive. |
| "Class" | All persons and entities who purchased or otherwise acquired shares of Acadia common stock during the period from September 9, 2019 through April 4, 2021 (inclusive), and were damaged thereby. Excluded from the Class are (i) Defendants; (ii) the past and current officers and directors of Acadia; (iii) the immediate family members, legal representatives, heirs, parents, subsidiaries, predecessors, successors, and assigns of any excluded person or entity; and (iv) any entity in which any excluded person(s) have or had a majority ownership interest, or that is or was controlled by any excluded person or entity. |
| "CRL" | The April 2, 2021 Complete Response Letter issued by FDA to Acadia regarding the sNDA. |
| "Defendants" | Refers collectively to Acadia, Stephen R. Davis and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic, the defendants in this action. |
| "Defs' MSJ Br." | Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment (Dkt. No. 199-1). |
| "DLB" | Dementia with Lewy Bodies |

-iv-

21cv00762

| Term | Definition |
| --- | --- |
| "DRP" | Dementia-Related Psychosis |
| "EOP2 Meeting" | End-of-Phase 2 meeting between Acadia and FDA on May 15, 2017 regarding the sNDA. |
| "Exhibit" or "Ex." | Exhibits to the Declaration of William C. Fredericks in Support of Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (Dkt. No. 197-2), the Declaration of Peter M. Adams in Support of Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (Dkt. No. 207-1), and the Declaration of William C. Fredericks in Further Support of Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (filed concurrently herewith). The numbering of exhibits across these declarations was maintained in a single, consecutive order by the parties. |
| "FDA" | U.S. Food and Drug Administration |
| "Feinstein Report" or "Feinstein Rpt." | Report on Loss Causation and Damages of Professor Steven P. Feinstein, Ph.D., CFA, dated February 13, 2025 [Ex. 14]. |
| "Harmony" or "Harmony Study" | Study ACP-103-045, a Phase 3 clinical trial conducted by Acadia to evaluate the use of pimavanserin as a treatment for DRP. |
| "Lehn Report" or "Lehn Rpt." | Rebuttal Expert Report of Kenneth M. Lehn, dated March 27, 2025 [Ex. 7]. |
| "Motion" or "Mot." | Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (Dkt. No. 197-1). |
| "NDA" | New Drug Application |
| "Opposition" or "Opp." | Defendants' Opposition to Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (Dkt. No. 207). |
| "PDD" | Parkinson's Disease Dementia |
| "PDP" | Parkinson's Disease Psychosis |
| "Peck Deposition" or "Peck Dep." | Deposition of Carl C. Peck, M.D., conducted September 24, 2025 [Ex. 2]. |

-v-

| Term | Definition |
|---|---|
| "Peck Report" or "Peck Rpt." | Expert Report of Carl C. Peck, M.D., dated August 14, 2025 [Ex. 1].<br><br>Citations to "Peck Rpt. ¶__" herein refer to paragraphs contained in Appendix C of the Peck Report, which Appendix consists of the report of Plaintiffs' prior FDA expert that Dr. Peck has adopted in full. |
| "Plaintiffs" | Class Representatives City of Birmingham Retirement and Relief System and Ohio Carpenters' Pension Fund. |
| "Pltfs' Daubert Opp." | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Exclude the Expert Opinions and Testimony of Dr. Carl C. Peck and Dr. Steven P. Feinstein (Dkt. No. 206). |
| "Pltfs' MSJ Opp." | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 204). |
| "Porsteinsson Report" or "Porsteinsson Rpt." | Rebuttal Expert Report of Anton P. Porsteinsson, M.D., dated March 27, 2025 [Ex. 10]. |
| "PoS" | Probability of Success |
| "PTRS" | Probability of Technical and Regulatory Success |
| "Schneider Reply" | Reply Expert Report of Lon Schneider, M.D., dated May 1, 2025 [Ex. 23]. |
| "Schneider Report" or "Schneider Rpt." | Expert Report of Lon S. Schneider, M.D., dated February 13, 2025 [Ex. 9]. |
| "sNDA" | Acadia's supplemental new drug application for pimavanserin for the treatment of hallucinations and delusions associated with DRP. |

-vi-

21cv00762

**PRELIMINARY STATEMENT**

Plaintiffs respectfully submit this Reply Memorandum in further support of their Motion to Exclude the Expert Opinions and Testimony of Dr. Christopher Breder, Dr. Anton Porsteinsson, and Dr. Kenneth Lehn (Dkt. No. 197). Defendants' Opposition makes clear they have no serious answers to the glaring problems with three of their five rebuttal experts. Dr. Breder's opinions about the "impossibility" of conducting PoS analyses are speculative and contradicted by his own sources, and his views on the meaning of FDA communications are duplicative of Defendants' other FDA expert. *Infra* §I. Dr. Porsteinsson "rebuts" Dr. Schneider's opinions on scientific evidence with non-scientific, clinical sources that are irrelevant and unreliable. *Infra* §II. And the excludable portions of Dr. Lehn's opinions are simply his spinning of disputed facts to find there was no fraud because Acadia told the whole truth. It is the jury's job to weigh the evidence and Dr. Lehn is not qualified to do so in any event. *Infra* §III. As a result, Plaintiffs' Motion should be granted.

**ARGUMENT**

**I.      DR. BREDER'S OPINIONS SHOULD BE EXCLUDED**

The crux of Dr. Breder's opinion is that PoS analysis to assess the likelihood of FDA approval is impossible. Opp. 5. Not only is this patently false, but it is belied by Dr. Breder's sources, deposition testimony, and experience. Defendants concede all of this and, in doing so, confirm that Dr. Breder's "criticisms" of Dr. Peck's PoS calculations invade the province of the jury and are unreliable to boot. They also fail to explain the clear contradictions between Dr. Breder's report and his testimony. For example, his report states that "PTRS" analysis is used to compare multiple drug candidates, but at his deposition he admitted that PTRS is also used in the pharmaceutical industry for valuation purposes, i.e., to determine the likelihood of successful FDA approval so as to estimate the monetary value of a drug to a company. Breder Rpt. ¶32; Breder Dep. 50:1-8. Such discrepancies underscore that Dr. Breder's attacks on Dr. Peck's PoS are baseless. Finally,

-1-

Defendants do not dispute that Dr. Breder's opinions as to the meaning of certain FDA communications are identical to those of their other FDA expert, Dr. Andreason, but assert that cumulative testimony here is allowed as it serves "distinct" purposes. Yet Dr. Breder's views appear in a standalone part of his report, and are untethered to his hollow challenge to Dr. Peck's PoS analysis.

### A. Dr. Breder's Views Invade the Province of the Jury and Are Unreliable and Unsupported

Dr. Breder's criticisms of Dr. Peck's PoS analysis must be excluded for two related reasons. *First*, Dr. Breder's opinion does no more than weigh the evidence offered by Dr. Peck to assert that any PoS analysis of "a single drug candidate" is impossible—but weighing evidence is for the jury. *See* Mot. §I.B. *Second*, Dr. Breder's criticisms amount to mere unreliable *ipse dixit*, as his own sources and testimony show that a PoS analysis for a single drug approval is possible and widely done with a customary methodology, which Dr. Peck plainly used. *See* Mot. §I.C.

### 1. Dr. Breder's Opinions Are Not Helpful to a Jury

Defendants begin with several spurious arguments as to why Dr. Breder's opinions would allegedly help the jury. First, they claim that Dr. Breder need not "develop alternative, affirmative opinions" simply because he is a rebuttal expert. Opp. 6. But *all* expert testimony must "ha[ve] substance such that it would be helpful to a jury." *Alaska Rent-a-Car v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013). Expert opinions that do not "identify [a] source" supporting the opinion, "include any analysis," or offer any "explanation" must be excluded because they do not "offer any expertise to assist [a] jury." *Easton v. Asplundh Tree Experts, Co.*, 2017 WL 4005833, at *4-5 (W.D. Wash. Sept. 12, 2017).

Defendants relatedly argue that Dr. Breder's belief that a reliable PoS cannot exist for a single drug absolves him from further assessing Dr. Peck's analysis. Opp. 6. But this just confirms why his opinion should be excluded. Because Dr. Breder (baselessly) opines that Dr. Peck's analysis is impossible, he never engages with it

-2-

21cv00762

and, instead, merely asserts criticisms (missing "confidence intervals," allegedly better sources of PoS data, etc.) all without substantively explaining why any of this should matter. This is naysaying, not expert testimony. And, in all events, Defendants ignore that Dr. Breder admitted PoS methodology is routinely used to value a single drug in the pharmaceutical industry, and by investment analysts (*see infra* n.6) who assessed pimavanserin's PoS here.[1] They similarly ignore that Dr. Breder himself often used it while employed in the pharmaceutical industry. *See* Breder Rpt. ¶4 ("I regularly utilized Probability of Technical and Regulatory Success ('PTRS') framework.").[2] Dr. Breder cannot be absolved of the requirement to offer "helpful" testimony by claiming PoS "cannot be calculated" where all the evidence—except Dr. Breder's litigation opinion—shows this kind of analysis is done all the time.[3]

Case law supports excluding Dr. Breder's opinions on these grounds. For example, in *FLIR*, the court excluded a rebuttal expert who "made no effort 'to familiarize himself with the information [that the opposing expert] evaluated in order to form his own opinions.'" *FLIR Sys., Inc. v. Fluke Corp.*, 2012 WL 13051121, at *2 (D. Or. Nov. 5, 2012). Similarly here, Dr. Breder admits he did not analyze Dr. Peck's key sources, or any alternative sources. *See* Breder Dep. 42:20-22 ("Q. [T]here are no numbers from the BIO report in your report, correct? A. No."). In *Advanced Telemedia*, the court excluded a rebuttal expert who "did not perform the sampling method he proposed." *Advanced Telemedia, L.L.C. v. Charter Commc'ns,*

---

[1] *See* Breder Dep. 24:22-25 ("Q. And is [PoS] sometimes used within the pharmaceutical industry to assess the valuation of an asset? A. Yes, that can be applied as well."); *accord id.* 50:1-14, 52:6-13. Dr. Breder's own sources confirm this. Ex. 5 at 196 ("PTRS is used in many ways: . . . To adjust the valuation estimates.").

[2] *See also* Peck Dep. 123:20-124:3 ("Q: What do you understand [Probability of Technical and Regulatory Success, or 'PTRS'] to be? A: That's the methodology [I] used here. Q. It's the same? … A: Exactly the same.").

[3] Plaintiffs also do not seek to impose a "catch-22" on Dr. Breder by forcing him to accept Dr. Peck's PoS methodology. Opp. 7. Rather, he needs to apply his own PTRS methodology (like Dr. Peck).

-3-

21cv00762

*Inc.*, 2008 WL 6808442, at *1 (N.D. Ga. July 17, 2008).  Here, Dr. Breder does not perform his own PTRS methodology or propose any alternative methodology.  And, in *Maldono*, the court excluded a rebuttal expert that "conclusorily" dismissed the opposing expert's opinion with "no elaboration or explanation."  *Maldono v. Apple, Inc.*, 2021 WL 1947512, at *19 (N.D. Cal. May 14, 2021).  As in *Maldono*, Dr. Breder, beyond his own *ipse dixit*, never explains *how* Dr. Peck's methodology is allegedly flawed or *why* those flaws make Dr. Peck's opinion unreliable.

### 2. Dr. Breder's Chief Source Contradicts His Opinions

Defendants next ignore a fundamental conflict between the views of Dr. Breder and his own prime source (Dr. Stalder's book), which flatly contradicts his opinion that PTRS/PoS analysis is "impossible" here.

For example, Defendants base much on Dr. Stalder's comment that calculated PTRS/PoS numbers are "always wrong anyway" or can only be used to compare two or more drug candidates "to calibrate the projects value against . . . other development opportunities."  Opp. 8 (quoting Ex. 5 at 197).  But Dr. Stadler's methodology—which is widely used within the industry—shows both that (i) a PoS analysis *is* possible; and (ii) it is not done solely for comparative purposes and, instead, can also be used to "adjust the valuation estimates," like "net present value," which are used to calculate the expected monetary value of a drug to a company.  Ex. 5 at 196.  The inherent uncertainty in estimating PoS (*see* Opp. 8-9) is likewise irrelevant.  The point of such analysis is not omniscient precision, but *reasonably reliable estimates* of regulatory approval.  Indeed, Dr. Stalder's book undeniably confirms that PTRS is an *industry-standard* method for estimating PoS.  *See also In re Solodyn (Minocycline Hydrocholoride) Antitrust Litig.*, 2018 WL 734655, at *6 (D. Mass. Feb. 6, 2018) (expert report on PoS was not unreliably "speculative").

Moreover, Dr. Peck's and Dr. Stadler's PoS methodologies are not "superficial[ly] similar[]" (Opp. 9) but are *exactly the same*.  In establishing a benchmark PoS, Dr. Peck uses (as Dr. Stalder suggests) "the published literature that

reports on industry averages." *Compare* Ex. 5 at 196-97, *with* Peck Rpt. ¶¶151-52 (using Tufts Center reports). Dr. Peck then, following Dr. Stalder's methodology, modulates the benchmark up and down using the same "project-specific factors" suggested by Dr. Stalder. *Compare* Ex. 5 at 197, 199 ("Potential downward adjustments include . . . [e]fficacy is not comparable to current standard of care."), *with* Peck Rpt. ¶160 (lowering PoS to reflect "the fact that the subgroup efficacy results failed to demonstrate a directionally consistent benefit").

Because Dr. Breder's chief source conflicts with his opinion that Dr. Peck's PoS methodology is "flawed," his opinion must be excluded as unreliable and unsupported. *PacTool Int'l, Ltd. v. Kett Tool Co.*, 2012 WL 3637391, at *4 (W.D. Wash. Aug. 22, 2012) (excluding testimony where "[t]he proffered literature [did] not support [the expert's] extrapolation from the underlying data").[4]

### B.  Dr. Breder Has Disavowed Key Opinions

Despite Defendants' feeble denials (Opp. 11), Dr. Breder also repeatedly disavowed his key criticisms of Dr. Peck at his deposition. *See* Mot. §I.D.

*First*, Defendants assert that Dr. Breder did not mean to criticize Dr. Peck for failing to control for hindsight bias, but simply meant to say that Dr. Peck's analysis is flawed because it *cannot* control for such bias. However, the fact remains that Dr. Breder *did* fault Dr. Peck for not controlling for such possible bias. Breder Rpt. ¶36 ("He does not even acknowledge this inherent hindsight bias, *much less attempt to control for it.*" (emphasis added)); *see also id.* ¶¶33, 53, 55, 64 (same). Defendants' revised position is inadmissible in any event. Dr. Breder cannot criticize Dr. Peck for failing to control for possible hindsight bias when all agree it cannot be done.

---

[4]  Defendants cite *In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 11447290, at *2 (D. Ariz. Feb. 21, 2018) to argue that whether Dr. Peck conducted a "true" PTRS analysis is mere "fodder for cross-examination." Opp. 8. But in *Bard* (*see id.* at *2) plaintiffs disagreed with the sources used by the defendants' expert, whereas here Dr. Breder is disagreeing *with his own source*.

-5-

*Second*, Defendants argue that Dr. Breder's admission that PoS analyses do not "routinely" assess confidence intervals is somehow not inconsistent with his original view that such analysis is actually essential, because what he really meant to say all along was that PoS practitioners should simply provide some "narrative" discussing an "assessment of the degree of certainty" for a PoS estimate. Opp. 12. But despite Defendants' "spin," Dr. Breder's report never mentions anything like the "narrative requirement" he made up at his deposition. *Cf.* Breder Rpt. §IV. And the fact remains that one of his *main* criticisms was that Dr. Peck "provides no confidence intervals" (*id.* ¶53), yet he now admits they are "not routinely given." Breder Dep. 102:25-103:2.

*Third*, Dr. Breder's deposition testimony squarely contradicted his criticisms of Dr. Peck's use of a 50% benchmark when he conceded that "some people have cited 50 percent as a general benchmark." Breder Dep. 132:25-133:2. Defendants' related arguments that Dr. Breder somehow showed that Dr. Peck used an unreliable benchmark also fail to salvage the admissibility of Dr. Breder's testimony because (i) Dr. Breder admitted he had *no opinion* as to whether 50% was "a benchmark . . . one could use" (*id.* 133:15-16), and thus had no foundation to opine that Dr. Peck's 50% benchmark was wrong; and (ii) contrary to Defendants' claims (Opp. 10 n.3), Dr. Peck *did* consider, for example, alternate sources of allegedly "more relevant" benchmark data, but found them consistent with his numbers. *See, e.g.*, Breder Dep. 200:18-22 (citing "very similar report from the BIO trade association, which essentially corroborated all the Tufts Center reports [I used]," and which Dr. Breder also cited).

*Finally*, Defendants deny that Dr. Breder retreated from his critique of Dr. Peck for using round PoS numbers when Breder admitted that Dr. Stadler's book also uses round numbers. Instead, Defendants urge that Dr. Stalder—Dr. Breder's most-favored PoS authority—used round numbers only when giving "hypothetical examples." Opp. 13. Really? Dr. Breder cites no evidence of Dr. Stalder (or anyone

21cv00762

else) calculating a single PoS number that did *not* end in either zero or five.[5]  For Defendants to suggest that Dr. Breder could rely on Dr. Stalder's book for the "PTRS" methodology—and then pretend that source's use of round numbers was a "coincidence"—is absurd.  In sum, Dr. Breder cannot credibly claim both that Dr. Stalder's PoS method is correct *and* that Dr. Peck's use of numbers rounded to the nearest 5% rendered his analysis unreliable.  Such patently inconsistent testimony must be excluded.  *Mitchell v. Geo Grp. Inc.*, 2022 WL 874287, at \*5 (D. Ariz. Mar. 24, 2022) (when expert "affirmatively repudiates or disavows an opinion expressed in [their] report, courts have not hesitated to conclude that the expert should be precluded from offering that opinion at trial").

### C.    Dr. Breder's Views on FDA Communications Improperly Duplicate Those of Acadia's Other FDA Expert

Tellingly, Defendants do not contest that Drs. Andreason and Breder offer identical interpretations on the relevant FDA communications.  *See* Opp. 16.  And their arguments that this case merits an exception to the general rule against admitting plainly duplicative expert testimony, *see Cabrera v. Cordis Corp.*, 134 F. 3d 1418, 1421-22 (9th Cir. 1998), should be rejected.

*First*, Defendants argue that Dr. Breder's opinions regarding FDA materials are not duplicative because he addresses them in the "limited" context of discussing "Dr. Peck's PoS opinions," whereas Dr. Andreason's *identical* opinions on the same FDA materials are "distinct" because Dr. Andreason does not address PoS.  Opp. 13.  But both experts have standalone sections of their reports setting out their respective—and identical—interpretations of the same documents.  *See* Breder Rpt. §V; Andreason Rpt. §IV.  Nor does the fact that Drs. Breder's and Andreason's use of their shared opinions on the same materials for *different purposes* make those opinions any less duplicative here.  At most, Defendants' cases allow two experts to

---

[5]    Indeed, out of the dozens of PoS calculations done by investment analysts that are in the record, all but three assessed pimavanserin's PoS in numbers ending in either 0 or 5.  *See* Feinstein Rpt. App'x A-E.

-7-

testify on closely related issues where their different backgrounds bring incremental probative value.[6]  But Drs. Breder and Andreason here both opine, as third parties, on the same documents, based on their common perspective as doctors familiar with FDA drug approval processes, and thus have no *meaningfully* "distinct" perspective on the meaning of those same FDA documents here. *See Kaepplinger v. Michelotti*, 2022 WL 267886, at *5 (N.D. Ill. Jan. 28, 2022) ("whether or not [] two experts have different perspectives does not diminish the fact that . . . [they] will render essentially the same opinions"); *Liu v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 717540, at *3 (W.D. Wash. Feb. 24, 2021) (that each expert reached their views by reviewing defendant's actions from a "different perspective" did *not* make their conclusions any less duplicative).  And persuading a jury through multiple experts having the *same* opinion on the *same* issue is improper.  *Halbert v. County of San Diego*, 2011 WL 13356067, at *3 (S.D. Cal. June 27, 2011) (excluding "either of [] two experts" where each had a "separate report covering the same ground").

*Second*, Defendants argue that Dr. Breder's FDA-communications opinions cannot be excluded because he "necessarily" had to interpret FDA's statements to critique Dr. Peck's PoS methods.  Opp. 15.  But they ignore that his communications opinions appear in a standalone, concluding section of his report—after already critiquing Dr. Peck's PoS methodology.  *See* Breder Rpt. §V.  And even if Dr. Breder needed to interpret the Labeling Statement to opine on Dr. Peck's PoS method, he could have used Dr. Andreason's identical interpretations to do so.  *See Trust v. Apple, Inc.*, 2013 WL 12094821, at *5 (S.D. Cal. May 7, 2013) (one expert may rely on "opinions of another expert in forming his own expert opinions").

---

[6]  *Cf., e.g.*, *Friedman v. Medjet Assistance, LLC*, 2010 WL 9081271, at *6 (C.D. Cal. Nov. 8, 2010) (plaintiff's treating physician, with knowledge of plaintiff's then-present condition, and independent non-treating neurologist, with knowledge of potential future complications, brought different perspectives to discrete issues); *In re Xyrem*, 2024 WL 4023562, at *15 (N.D. Cal. Aug. 26, 2024) (though both experts had expertise to opine on probability of patent suit being successful, opinion of expert former judge had sufficiently different perspective to be admitted).

-8-

21cv00762

*Third*, as discussed above, Drs. Breder's and Andreason's views on the import of FDA's July 2020 communications do *not* come from such "different" perspectives as to warrant admission.  *See* Opp. 16.  Indeed, Drs. Breder and Andreason approach these communications from *the same perspective,* as both have degrees in chemistry, both have medical degrees, both worked as "medical officers" at FDA (where they both reviewed NDAs and sNDAs), and both are now consultants for pharmaceutical companies and investors.  *See* Breder Rpt. App'x A; Andreason Rpt. App'x A.  Simply stated, nothing about Dr. Breder's "perspective" is so "distinct" from Dr. Andreason's as to justify allowing his patently cumulative views on FDA communications.

In sum, Dr. Breder's opinions and testimony should be excluded in full.

## II.    DR. PORSTEINSSON'S OPINIONS SHOULD BE EXCLUDED

Defendants do not, and cannot, show why Dr. Porsteinsson's opinions are relevant, reliable or admissible.  Fundamentally, Defendants mischaracterize the opinions offered by Dr. Schneider.  Opp. 16.  Dr. Schneider actually opined: *First*, that the scientific evidence at the time of the Harmony Study showed that the dementia subtypes are sufficiently heterogenous such that pimavanserin was unlikely to improve DRP symptoms across all subtypes.  Schneider Reply ¶9.  Nothing in this opinion is, or portends to be, "predictive" as Defendants suggest, but instead he evaluates the medical literature in 2018.  Furthermore, crucial to his opinions on the Consistency Hypothesis is the premise that different subtypes of dementia have important differences across symptoms and pathology.  Dr. Porsteinsson does not contest this central conclusion.  *Second*, Dr. Schneider succinctly concluded that the results of the Harmony Study were not consistent across the subgroups.  *Third,* he opined (based on extensive review and analysis of) the 019 Study could not support the treatment efficacy of pimavanserin for DRP.

In response, Defendants offered the Porsteinsson Report.  While he purports to respond to Dr. Schneider's analysis of the scientific evidence, Dr. Porsteinsson

-9-

instead offers almost no actual scientific evidence (under any definition), but cites to unrelated and inapplicable clinical guidelines, a handful of his own anecdotes, the self-serving record cites Acadia gave to FDA, and later articles written by Acadia-funded doctors.  Not only does this fail to respond to (let alone rebut) Dr. Schneider's analysis of the scientific evidence, but it is irrelevant, unreliable, and would mislead and confuse the jury.  None of Defendants' arguments show otherwise.

### A. Dr. Porsteinsson's Consistency Hypothesis Opinions Are Irrelevant

Dr. Porsteinsson—as a rebuttal expert—offers opinions that are not relevant or helpful to the fact finder.  They should thus be excluded.  Underlying all of Defendants' relevance arguments is their notion that Dr. Porsteinsson does not need to accept Dr. Schneider's definition of "scientific evidence."  Opp. 18.  Plaintiffs agree.  However, no definition of "scientific evidence" encompasses the materials relied upon by Dr. Porsteinsson.  Mot. 25-26.  Dr. Schneider cites to peer-reviewed articles, industry and government sponsored studies, and diagnostic criteria to conclude that the scientific evidence at the time of the Harmony Study did not support the Consistency Hypothesis.  Schneider Rpt. ¶¶82-85; *see* Mot. 19.  In response, Dr. Porsteinsson does not focus on the scientific evidence cited by Dr. Schneider, but instead points to completely nonscientific sources such as a handful of anecdotal off-label instances of prescribing pimavanserin in his own practice.  Porsteinsson Rpt. ¶¶55-63; *see* Mot. 25-26.  The mismatch is fatal.  In the face of this, Defendants make a number of spurious arguments.

*First*, Defendants attempt to defend Dr. Porsteinsson's reliance on studies and literature related to drugs other than pimavanserin.  Opp. 18-19.  To do this, they seize onto an excerpt from Dr. Schneider's reports to claim that his opinions are about subtypes' responses to any "single drug."  *Id.*  But Dr. Schneider is patently clear that he is opining not on a random drug, but on pimavanserin.  He states numerous times that the scientific evidence demonstrated that the subgroups "were

-10-

unlikely to respond consistently to treatment with pimavanserin." Schneider Rpt. ¶¶10-11, 77-78. Dr. Schneider explains why, even though pimavanserin had shown some reduced DRP symptoms in Parkinson's patients, that was not evidence of the drug's efficacy for other subtypes because "pimavanserin's success in treating PDP is due to its ability to treat hallucinations and delusions in Parkinson's disease that is induced by or associated with dopaminergic drugs" taken by Parkinson's patients, not their underlying condition. *Id.* ¶¶11, 28-33. And he is also clear that pimavanserin has unique qualities making it dissimilar to other psychotics, including that it has relatively less blockade of $D_{2/3}$ receptors than other antipsychotic drugs. *Id.* ¶¶51-52.

*Second*, Defendants make numerous disingenuous arguments as to why Dr. Porsteinsson's use of clinical case studies is relevant. Opp. 19-20. But Defendants themselves prove the point here—they note that Dr. Schneider opined there was strong evidence and scientific consensus against the Consistency Hypothesis. *Id.* But to rebut this evidence and scientific conclusion, Dr. Porsteinsson attempts to rely on completely nonscientific grounds: namely, a handful of his own case studies. Courts have found such reliance on an expert's own personal practice to be irrelevant. *See, e.g.*, *Rose v. Bos. Sci. Corp.*, 2020 WL 4195470, at *1 (W.D. Wash. July 21, 2020) (observations from doctor's own practice were "not relevant to the trier of fact as his own practices is not the subject of the litigation"); *In re Ethicon Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, 2018 WL 3575936, at *3 (S.D. W. Va. July 24, 2018) (finding what doctor relied on in his/her practice not helpful or relevant).

*Third*, Defendants do not establish that the clinical guidelines on which Dr. Porsteinsson relies are relevant. They contend that since "[t]here has never been an FDA-approved treatment for DRP," Dr. Porsteinsson can rely on all manner of unscientific information such as later clinical guidelines. Opp. 20. But, again, they overlook that Dr. Schneider's opinions are limited both to *scientific* evidence and

-11-

such evidence that existed at the time when the Harmony Study began. Their clinical guidelines fit neither category and Dr. Porsteinsson's opinions will not assist a factfinder in resolving an issue necessary to this case.[7]   In conclusion, Dr. Porsteinsson's opinions on the Consistency Hypothesis are not relevant and will not assist the factfinder and thus should be excluded.

### B. Dr. Porsteinsson's Consistency Hypothesis Opinions Are Also Unreliable

Dr. Porsteinsson's opinions regurgitate the factual record, rely on no verified or tested documents or methodology, and go far beyond the scope of a rebuttal report. Again, Defendants make no salient arguments to the contrary.

### 1. Experts Cannot Merely Regurgitate the Factual Record

Under the vein of "rebutting" Dr. Schneider, the Porsteinsson Report contains a section entitled "Contrary to Dr. Schneider's Claims, at the Time the HARMONY Study Was Designed and Conducted, There Was Compelling Evidence Suggesting the Possibility of a Single Treatment for Dementia-Related Psychosis." Porsteinsson Report §VII.B. But the footnotes to this section and the "compelling evidence" are telling. They almost uniformly cite the "EOP2 Briefing Package." The only other cites are later-issued articles which are irrelevant to what existed at the time of the Harmony Study.[8]  He therefore offers nothing new to the factfinder—just citing to the documents submitted by Acadia to FDA. This is impermissible as copious case law dictates. *See, e.g.*, *Johns v. Bayer Corp.*, 2013 WL 1498965, at \*28 (S.D. Cal. Apr. 10, 2013) (expert report quoted extensively from evidence admissible at trial and thus offered nothing to the jury); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.

---

[7]   Nor do Defendants' cases help them. In *Holley v. Gilead Scis., Inc.*, the expert's citations, unlike Dr. Porsteinsson's, were not limited to research that postdated the clinical trial at issue. 2023 WL 3607289, at \*2 (N.D. Cal. Mar. 27, 2023). And in *Cherry v. United States*, the testimony was not on the effectiveness of a drug, but the clinical standard of care. 2019 WL 1505862, at \*6 (D. Ariz. Apr. 5, 2019).

[8]   The one possibly relevant article (from 2001) that Dr. Porsteinsson does cite is actually not helpful at all. It simply states that Alzheimer's and related dementias are associated with changes in serotonergic neurotransmission.

-12-

2d 531, 551 (S.D.N.Y. 2004) (rejecting portions of plaintiff's expert's testimony that was "a narrative reciting selected regulatory events"); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 6887043, at \*6 n.3 (N.D. Cal. Nov. 14, 2017) ("If Uber also plans on using an 'expert' who is little more than a mouthpiece for presenting the argument of counsel based on uncomplicated evidence already in the case, then fair play will require exclusion of that expert too.").

### 2. Dr. Porsteinsson's Sources Show His Consistency Hypothesis Opinions Are Unreliable

Again, Dr. Porsteinsson responds to Dr. Schneider's opinion on the scientific consensus and evidence at the time of the Harmony trial with clinical sources. This distinction is critical. Indeed, Defendants themselves say that Dr. Porsteinsson is responding to Dr. Schneider's "clinical opinions" (Opp. 24), but Dr. Schneider does not offer a clinical opinion. He offers an opinion on the scientific evidence— evidence that has been tested and subject to review and is typically found reliable by courts of law. None of Dr. Porsteinsson's clinical "evidence" meets this standard.

*First*, his handful of anecdotal cases where he prescribed pimavanserin (off label) are not reliable and merit exclusion. The law is clear on this. *See, e.g.*, *Rose*, 2020 WL 4195470 at \*1 (testimony on an expert's personal practice not reliable as it was not supported by verifiable data); *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at \*9 (N.D. Cal. Apr. 26, 2022) (personal observations lacked support and were thus excluded). Indeed, while Defendants cling to one line from the CARE guidelines article (Opp. 20), that article also states that "[t]he usefulness of case reports has been limited by inconsistent and incomplete reporting," that case reports "are often insufficiently rigorous," and advocates for a checklist to be used by those reporting individual cases to make them "accurate, complete, and transparent," Ex. 24 at 219. Dr. Porsteinsson appears to have disregarded this checklist.

*Second*, Defendants' cases do not save them. For example, in *McLellan v. I-Flow Corp.* (*see* Opp. 24), the doctors serving as experts relied not only on clinical

-13-

experience, but on the peer-reviewed medical literature. 710 F. Supp. 2d 1092, 1137-38 (D. Or. 2010). And the expert there performed 500 of the procedures in question as opposed to Dr. Porsteinsson's handful of examples of prescribing pimavanserin. *Id.* Furthermore, that handful is comprised solely of patients with DLB. As Dr. Schneider points out in his reply report, DLB and PDD have some overlapping symptoms and brain pathology unique to the two of them, so it might be expected that the two react to some drugs similarly. Schneider Reply ¶30. And, as Dr. Schneider further points out, Dr. Porsteinsson can only use case studies because any reviewed or government sponsored study that is listed on Dr. Porsteinsson's CV demanded that patients be diagnosed with a specific dementia subtype. Schneider Reply n.21.

*Finally*, Dr. Porsteinsson's only other "sources" are the listed FDA events including the designation of Harmony as "BTD" and the comments from FDA. These in no way are defensible responses to Dr. Schneider's overview of the scientific evidence at the time of the trial. Instead, it is merely an interpretation of actions by FDA—after Harmony was conceived—with no discussion, analysis, or contemplation of the difference in dementia etiologies.[9]

### C.    Dr. Porsteinsson Exceeds the Scope of Rebuttal

Dr. Schneider's Consistency Hypothesis conclusions are clear and concise: (i) different subgroups of dementia present with important differences across symptoms and pathology; and (ii) the scientific evidence at the time of the Harmony Study showed that these differences are sufficiently heterogenous so that pimavanserin was unlikely to improve symptoms across all subtypes. Schneider Rpt. ¶11. Defendants resort to pulling in extraneous sentences from his report and cobbling them together to suggest that Dr. Schneider's Consistency Hypothesis

---

[9]    In fact, BTD simply means that there is no existing drug for the desired outcome of the study. This in many ways proves Dr. Schneider's conclusion as, up to that date, the scientific community viewed it unlikely that, due to the differences in dementia subtypes, pimavanserin would improve symptoms across all subtypes.

-14-

opinions go further. Opp. 27. They do not. Therefore, Dr. Porsteinsson is limited to rebutting (i) and (ii). As to the first, he does not dispute it. Then, as to the second, he launches into an analysis of the clinical (not scientific) evidence largely from after Harmony. This is blatantly beyond the scope of permissible rebuttal testimony.

Indeed, in a case criticizing one of Defendants' cases (*Laflamme v. Safeway, Inc.*, 2010 WL 3522378, at *3 (D. Nev. Sept. 3, 2010)), a district court noted that rebuttal expert testimony is restricted to subjects which are "intended solely to contradict or rebut evidence on the same subject matter identified by another party." *Nunez v. Harper*, 2014 WL 979933, at *1 (D. Nev. Mar. 12, 2014). "Rebuttal testimony cannot be used to advance new arguments or new evidence." *Fed. Trade Comm'n v. Amazon.com, Inc.*, 2016 WL 4154284, at *1 (W.D. Wash. Feb. 9, 2016). As one California District Court stated: "[i]f the phrase 'same subject matter' is read broadly and encompasses any possible topic that relates to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert.'" *Rodriguez v. Walt Disney Parks & Resorts U.S., Inc.*, 2018 WL 3532906, at *2 (C.D. Cal. July 2, 2018). Here, Dr. Schneider in no way opined on the views and practices of clinicians like Dr. Porsteinsson, and Dr. Porsteinsson's opinions on such matters should be excluded.

### D. Dr. Porsteinsson's Opinions on the Harmony Results and the 019 Study Should Likewise Be Excluded

Defendants do not establish that Dr. Porsteinsson's opinions about the "clinical meaningfulness" of the results of the Harmony and 019 Studies are reliable. They concede that he offers no definition or understanding of the term "clinically meaningful" in his report, and unavailingly resort to rewording the incoherent explanation he gave at his deposition to try to fill that critical gap. Opp. 25. Defendants also disingenuously contend Plaintiffs must cite authority for the proposition that "to assess 'clinical meaningfulness,' an expert must provide an objective, universally applicable definition." *Id.* Such a myopic view misses the

-15-

mark because Dr. Porsteinsson's opinions fail the threshold requirement that an "expert must explain precisely how he went about reaching his conclusions." *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1107 (S.D. Cal. 2012). He does not do so, instead citing certain data from the trials and concluding, without explanation, that the results were "clinically meaningful."

In sum, Dr. Porsteinsson's expert views should be excluded in their entirety.

## III.   DR. LEHN'S OPINIONS SHOULD BE EXCLUDED IN PART

Plaintiffs moved to exclude the portion of Dr. Lehn's report that consisted of improper argument on Defendants' fact-bound truth-on-the-market defense. *See* Mot. 30-41. But even if not excludable solely for being improper argument, Dr. Lehn is also neither qualified nor designated[10] to opine on topics like FDA approval requirements, the relevance of undisclosed data, or FDA communications. Defendants' arguments in opposition are conspicuously devoid of merit.[11]

### A.   Defendants Cannot Obscure Their Use of Dr. Lehn to Support a Truth-on-the-Market Defense

Defendants first argue that Dr. Lehn's opinions are not part of a truth-on-the-market defense, because that defense was only relevant to *prior* fraud theories that Plaintiffs have since "largely abandoned" in favor of "new" theories, including that Defendants failed to disclose an FDA requirement of "'directional consistency' across Harmony's dementia subtypes." Opp. 33. Such argument is nonsense.

This case has *always* been about whether Defendants "misrepresented the terms of an agreement with the FDA" about the efficacy data needed to obtain approval of an expanded label for pimavanserin. *See, e.g.*, *Cert. Order*, at 388. The

---

[10]   Defendants do not seriously contest that if Dr. Lehn's opinions *are* merits opinions, then he was not properly designated as a merits expert and could be excluded on this basis. *See* Mot. §III.C.

[11]   As noted in the Motion, this is not the first time a portion of Dr. Lehn's opinion in a securities case has crossed the line. *See SEC v. Perry*, No. 2:11-cv-01309 (C.D. Cal. July 12, 2012) (Real, J.), Dkt. No. 124 at 1 (barring Dr. Lehn from testifying as to "what investors would understand" from various documents in a securities fraud case). Defendants do not address *Perry*, and their silence speaks volumes.

-16-

misrepresented terms were in the May 2017 EOP2 meeting minutes (which Defendants did not disclose) and showed that FDA agreed to Harmony being the pivotal trial for the sNDA subject to two conditions: "(1) that 'subjects are stratified by their current clinical diagnosis (as proposed) [i.e., by subgroup] and (2) that 'labeling will reflect the actual composition and response of patients enrolled in the study.'" *Id.* at 387. "Taken together, these conditions indicate that the FDA would base its decision to expand 'labeling' of pimavanserin on the 'actual composition and response of patients' in each dementia subtype." *Id.* As for *what* the subgroup data needed to show, Plaintiffs contend that a mountain of evidence (*see* Pltfs' MSJ Opp., Dkt. No. 204, §§B.1-4) proves that the subgroup results had to be "directionally consistent"—a phrase that Acadia used to describe the purpose of the subgroup analyses in Harmony, Ex. 25 at -080. That Plaintiffs now use Acadia's language to refer to what Defendants concealed throughout the Class Period obviously does not mean that Plaintiffs' theory of liability has changed.[12]

Defendants, however, resort to such charades to try to elide the Court's prior truth-on-the-market analysis as being relevant only to other, "abandoned" theories. The Court should not take the bait. Defendants' efforts to use a truth-on-the-market theory (including through Dr. Lehn), whether denominated as such or not, remain. Indeed, consistent with their Second Affirmative Defense (asserting that Plaintiffs' claims are barred because all allegedly misrepresented or omitted facts were "publicly available" (Dkt. No. 69 at 35)), and their arguments for dismissal and class

---

[12]   Defendants also assert, three times, that Dr. Feinstein somehow concluded that, "[if] investors had known that FDA would require 'directional consistency'" then the market would have concluded that the sNDA was "*doomed*." Opp. 29, 30, 37 (emphasis added). Dr. Feinstein *actually* concluded that "[b]ut for the alleged misrepresentations and omissions . . . the market would have understood that the available data as of 4 December 2019 was *very likely* to be insufficient to obtain approval of an expanded indication for pimavanserin," and that "in the but-for scenario of [adequate] disclosure . . . the market's optimism (and consequently its assessed PoS and outlook for near term blockbuster status) *would not have been any greater* after 4 December 2019 than it was before the start of the Class Period." Feinstein Rpt. ¶¶277-78 (emphasis added). Defendants' repeated resort to misrepresenting Dr. Feinstein's conclusions to save Dr. Lehn is also telling.

-17-

21cv00762

certification, Defendants currently seek summary judgment based in part on their argument that there was not "any actionable omission" (because they still assert that all relevant Harmony data and subgroup requirements were disclosed). *See* Defs' MSJ Br. 20-21; Pltfs' MSJ Opp. 20-24. If Defendants truly wish to abandon their truth-on-the-market defense they are free to do so, but they cannot invoke that defense (whether they label it as such or not), or use Dr. Lehn's opinions to support it, either at summary judgment or before a jury.[13]

### B.    The Opposition Confirms Dr. Lehn's Opinions Are Improper

Defendants concede that an expert cannot merely draw reasonable inferences from evidence or present a factual narrative where (as here) he is no better placed to do so than a lay juror. Mot. 35 (collecting cases). Instead, they try to sidestep the issue by claiming that Dr. Lehn is just rebutting the assumptions and conclusions of Plaintiffs' experts. Opp. 36. This misses the mark. The issue here is *how* the challenged parts of Dr. Lehn's opinion *improperly* attack Dr. Feinstein by trying to construct an alternative factual narrative. That (false) factual narrative includes:

- That FDA's approval requirements were somehow "known by the market," so "the non-disclosure of the alleged Directional Consistency Requirement" would not have changed Acadia's stock price. Lehn Rpt. ¶¶63-65.

- That "no later than December 4, 2019" the market somehow had "access" to Harmony's *full* results and could thus reliably conclude they were "consistent across the dementia subtypes," so that even if FDA's approval requirements had been disclosed investors would not "have reacted any differently to the release of [Harmony's] results." *Id*. ¶¶37; 70-72; *see also ¶¶65-68*.

---

[13]    Plaintiffs are not trying to "shift the overall burden." Opp. 35. Defendants' pleading is clear that they intend to argue at trial that all the claims are barred because "the facts alleged to have been misrepresented or omitted . . . were publicly available." It is black letter law that Defendants have the burden of proving their affirmative defenses at trial. *See* Ninth Circuit Model Civil Jury Instructions, 1.5 ("The defendant . . . has the burden of proof on . . . affirmative defenses.").

- That because Harmony's subgroup data and relevant FDA approval requirements were, allegedly, "fully" disclosed, "there is no plausible basis to conclude that the alleged misrepresentation were corrected" in March/April 2021 when news of negative FDA actions was disclosed. *Id.* ¶¶74-78.

Importantly, all of Dr. Lehn's alleged "facts" are based on evidence that a jury can weigh for itself, such that his opinions become inseparable from factual matters on which jurors can (and should) make their own findings without his assistance.

Defendants implicitly concede the Dr. Lehn's factual account goes too far by claiming there is a meaningful distinction between him opining that "the market already knew of the alleged Directional Consistency Requirement" (Opp. 40) and testifying at trial that these facts would have been known to investors. This is a smoke screen for which Defendants can cite no supporting authority. It also makes no sense. As Plaintiff's Motion (at 36-37) and the above bullet points show, Dr. Lehn's conclusions that the "market already knew" of FDA's approval requirements and "all" relevant Harmony data is the root of Defendants' defense (whether labeled truth-on-the-market or not): namely, that "the facts alleged to have been misrepresented or omitted" about the importance of Harmony's subgroup data, Acadia's agreement with FDA, and the true risks regarding FDA approval were all somehow known to the market. Dkt. No. 69 at 35. In sum, Defendants plainly intend to use Dr. Lehn's "opinions" to prove a form of truth-on-the-market defense, which is patently improper.

Defendants' remaining arguments on this point are meritless. *First*, they focus on Dr. Lehn's claim that "the market already knew of the Directional Consistency Requirement" from a 1998 FDA Guidance document, and that this knowledge was "confounding information." Opp. 37-38. But, again, if there was no fraud due to the (alleged) relevance in 2019 of a 1998 FDA document, that is a *factual* issue as to which Dr. Lehn has no special expert competence.

-19-

21cv00762

*Second*, the Opposition confirms that Dr. Lehn's opinions about the "March 8 and April 5, 2021 disclosures" and content of "analysts' post-CRL statements" are based on nothing more than his personal reading of the content of these disclosures. Opp. 37-38. Based solely on his own reading, Dr. Lehn divines that (i) "nether disclosure informed the market of a previously hidden Directional Consistency Requirement,"[14] but instead (ii) finds "that the FDA had rejected the sNDA for reasons other than a failure to meet this alleged requirement." Opp. 38. This is simply Dr. Lehn "interpreting" evidence to find that no fraud could have occurred. Such fact-finding or weighing of evidence is the jury's job.

*Third*, Defendants try to obfuscate Dr. Lehn's conclusions about the 1998 FDA guidance by asserting he "never says that the market already knew of the . . . Directional Consistency Requirement." Opp. 39. That argument is disingenuous. His report clearly states that "the FDA guidance [from 1998] was known by the market and reflected in Acadia's stock price," such that "there is no reliable basis to assume . . . that market participants were misled by the non-disclosure of the alleged Directional Consistency Requirement." Lehn Rpt. ¶¶64-65. Nor do Defendants even *try* to defend the other two factual assertions underlying his *de facto* truth-on-the-market opinions, namely that investors somehow (i) had full "access to Harmony's results" such that they (ii) could (and did) conclude, "after Acadia disclosed those results in December 4, 2019," that the subgroup results were "consistent." *Id.* ¶67. In sum, even excluding his opinions about the 1998 FDA guidance, Dr. Lehn unequivocally *does* say that investors had the full truth about

---

[14] If Dr. Lehn's opinion is simply based on the mere fact that neither corrective event referenced the phrase "directional consistency" (as suggested at Opp. 38), then that anodyne finding is one that a jury needs no expert help to make. Nor should Dr. Lehn be permitted to base any opinion on such a "finding" because Ninth Circuit law is clear that a corrective disclosure need not be the "mirror image" of what was withheld from investors. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (rejecting "mirror image" loss causation standard, and holding instead that "[i]t is enough if the disclosure reveals new facts that . . . render some aspect of the defendant's prior statements false or misleading").

-20-

Harmony's data *and* concluded that the subgroup data was "consistent."  But such findings are for the jury, not Dr. Lehn.

*Finally*, Defendants harp on the relevance of paragraphs 46-48 of Dr. Lehn's report to their materiality arguments.  But Plaintiffs do *not* seek exclusion of those paragraphs, but rather seek to exclude only paragraph 49 (i.e., that part of his materiality opinion that is based on his *de facto* truth-on-the-market loss causation analysis).  Mot. 33, 41.[15]  Paragraph 49 asserts that Dr. Lehn's opinions in paragraphs 50-78—his loss causation opinions—means that Dr. Feinstein has not "establish[ed] that the alleged misrepresentation were material."  Lehn. Rpt. ¶49.  This is clearly a truth-on-the-market opinion even under Defendants' truncated view of the doctrine.  Opp. 35 (asserting that "a truth-on-the-market defense" is only focused on "proving immateriality").

In sum, Defendants have offered no basis for Dr. Lehn to present his alternative factual narrative to the jury.

### C.  Dr. Lehn Is Not Qualified to Poke Many of the Purported "Holes" Identified in His Report

Finally, Defendants assert Dr. Lehn merely "pokes holes" in Dr. Feinstein's analysis, as rebuttal experts are allowed to do.  Opp. 40-41.  As Plaintiffs demonstrated in their Motion (at 38-39), Dr. Lehn admits he's not an expert in FDA approval requirements, Harmony's subgroup data, or the reasons why FDA issued the CRL.  Defendants agree that he is only "a qualified damages and loss causation expert."  Opp. 41 n.14.  Thus, while *some* rebuttal expert on these topics might be appropriate, Dr. Lehn is *not* that expert.  And unlike Plaintiffs' expert, Dr. Feinstein, who properly assumed the truth of Plaintiffs' allegations (*see* Pltfs' Daubert Opp., Dkt. No. 206, §II.B.1) and then analyzed whether those allegations, *if* true, would be material and cause losses, the excludable portions of Dr. Lehn's "rebuttal" are just a

---

[15]  This further confirms that the Motion is targeted at only a portion of Dr. Lehn's opinions and belies Defendants' assertion that Plaintiffs are seeking to "preclude[]" Dr. Lehn "from offering any meaningful rebuttal."  Opp. 34.

-21-

presentation of alternative facts on the very topics about which he is not qualified to testify. *See* Mot. 37-38; *see also supra* §III.B (bulleted list).

The cases Defendants cite (Opp. 41) make clear that Dr. Lehn has gone well beyond his expertise and the role of an appropriate rebuttal expert. *See, e.g.*, *Self v. Perspecta Enter. Sols., LLC*, 2023 WL 6020792, at *7 (S.D. Cal. Jan 31, 2023) (rebuttal expert could not testify on the "subject of mitigation" as that was "relevant to Defendant's affirmative defense of failure to mitigate, on which Defendant bears the burden of proof").[16] As a result, the Court should grant the Motion in full and preclude Dr. Lehn from offering the portion of his opinion contained in ¶¶19-20, 34-39, 42, 45, 49-50, 59-78, 96-100, 111, and 116 of his report.

<strong>CONCLUSION</strong>

For the foregoing reasons and those stated in the Motion, Plaintiffs respectfully request that the Motion be granted.

DATED:  February 25, 2026

Respectfully submitted,

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

 /s/ William C. Fredericks

William C. Fredericks (*pro hac vice*)
Donald A. Broggi (*pro hac vice*)
Marc J. Greco (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444

---

[16]  *See also Space Data Corp. v. Alphabet Inc.*, 2019 WL 2603285, at *4 (N.D. Cal. June 25, 2019) (damages expert "may not testify that a given trade secret has no value because it is not a trade secret" because "such testimony falls outside the purview of damages" thus the expert could "not offer testimony that in his opinion the publicly available information" meant there was no trade secret); *Zucchella v. Olymustat, Inc.*, 2023 WL 2628107, at *12 (C.D. Cal. Jan. 10, 2023) (rebuttal expert testimony allowed only where it "relies on other figures and assumptions made by [opening] expert" not "a new model, methodology, or theory"); *Sinclair Wyo. Refining Co. v. Infrassure Ltd.*, 2017 WL 11094221, at *3 (D. Wyo. May 18, 2017) (rebuttal expert was "focused on critiquing the *method* Plaintiff used to calculate its business interruption expenses" not offering new factual arguments or interpretations).

-22-

Facsimile: (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
mgreco@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
Jacob B. Lieberman (*pro hac vice*)
Jessica M. Casey (*pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06413
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
alawrence@scott-scott.com
jlieberman@scott-scott.com
jcasey@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
John T. Jasnoch (SBN 281605)
Jimmy S. McBirney (SBN 259830)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
jmcbirney@scott-scott.com

*Counsel for Lead Plaintiff and Class Representative City of Birmingham Retirement and Relief System and the Certified Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
P. Cole von Richthofen (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
shopkins@zlk.com
gpotrepka@zlk.com
cvrichthofen@zlk.com

-23-

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th & 19th Floors
Los Angeles, CA 90071
Telephone: (213) 985-7290
aapton@zlk.com

*Counsel for Additional Plaintiff and Class Representative Ohio Carpenters' Pension Fund*

-24-