COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:  +1 858 550 6000
Facsimile:  +1 858 550 6420

CHRISTOPHER B. DURBIN (218611)
(cdurbin@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
Telephone:  +1 206 452 8700
Facsimile:  +1 206 452 8800

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R.
Davis, and Ana Stankovic, as Special Personal
Representative of the Estate of Srdjan (Serge)
Stankovic

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) Stankovic<br><br>Defendants. | Case No. 3:21-CV-00762-WQH-MSB<br><br>CLASS ACTION<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS DR. CARL C. PECK AND DR. STEVEN P. FEINSTEIN**<br><br>Date: April 10, 2026<br>Judge: Hon. William Q. Hayes |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. THE COURT SHOULD EXCLUDE FEINSTEIN'S OPINIONS. ................. 3

    A. Feinstein's Loss Causation Opinions Are Unreliable. ......................... 3

        1. Feinstein's event study does not prove loss causation. .............. 3

        2. Feinstein's assumptions cannot prove loss causation. ................ 4

        3. Feinstein failed to disaggregate confounding information. ......... 5

        4. An "inflated purchase price" does not prove loss causation. ....................................................................................... 7

    B. Feinstein's September 9 Analysis Is Unreliable. ................................. 9

    C. Feinstein's December 5 Analysis Is Unreliable .................................. 12

III. THE COURT SHOULD EXCLUDE PECK'S OPINIONS. ......................... 14

    A. Peck's Irrelevant Benchmark Data and Unreliable Base-Case PoS. ........................................................................................................ 14

        1. Peck derives his benchmarks from irrelevant source data. ...... 14

        2. Peck's base-case PoS is a methodological disaster. ................. 16

    B. Peck's PoS Adjustments Are Unreliable and Inadmissible. ............... 17

        1. Peck did not employ any reliable methodology. .................... 18

        2. Peck identifies no specific relevant experience. ....................... 20

    C. Peck's State of Mind Opinions Must Be Excluded. .......................... 21

IV. CONCLUSION ................................................................................................... 22

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIG Retirement Services, Inc. v. Altus Finance S.A.*,
2011 WL 13213589 (C.D. Cal. Sep. 26, 2011) ..................................................... 21

*In re Apple iPhone Antitrust Litigation*,
2025 WL 3124160 (N.D. Cal. Oct. 27, 2025) ................................................ 11, 13

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................... 13

*In re Bard IVC Filters Products Liability Litigation*,
2017 WL 6523833 (D. Ariz. Dec. 21, 2017) ....................................................... 20

*In re Countrywide Financial Corp. Mortgage-Backed Securities
Litigation*,
984 F.Supp.2d 1021 (C.D. Cal. 2013) .................................................................. 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir. 1995) .......................................................................*passim*

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh
Products Liability Litigation*,
2021 WL 3286439 (S.D. Oh. Aug. 1, 2021) ........................................................ 20

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) ........................................................... 13, 15, 16, 18

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ......................................................................................... 1, 8

*Elsayed Mukhar v. California State University*, *Hayward*,
299 F.3d 1053 (9th Cir. 2002) .............................................................................. 2

*In re EpiPen Marketing, Sales Practices & Antitrust Litigation*,
2021 WL 2577490 (D. Kan. June 23, 2021) ........................................................ 20

*Farmers Insurance Company of Arizona v. DNS Auto Glass Shop LLC*,
2024 WL 1256042 (D. Ariz. Mar. 25, 2024) ....................................................... 20

*In re Fosamax Products Liability Litigation*,
645 F.Supp.2d 164 (S.D.N.Y. 2009) ................................................................... 22

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

## TABLE OF AUTHORITIES

Page(s)

*Freeland v. Iridium World Communications, Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008) ...............................................................................7

*Federal Trade Commission v. Amazon.com, Inc.*,
2025 WL 2381704 (W.D. Wash. Aug. 15, 2025) ........................................................22

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ............................................................21

*Graves v. Mazda Motor Corp.*,
405 F. App'x 296 (10th Cir. 2010)..............................................................................13

*Hangarter v. Provident Life & Accident Insurance Company*,
373 F.3d 998 (9th Cir. 2004) ............................................................................... 15, 22

*Highfields Capital I, LP v. SeaWorld Entertainment, Inc.*,
2022 WL 1037210 (S.D. Cal. Apr. 6, 2022) ......................................................... 14, 17

*Holley v. Gilead Sciences, Inc.*,
2023 WL 2469632 (N.D. Cal. Feb. 27, 2023).......................................................20, 22

*Holzhauer v. Golden Gate Bridge, Highway & Transportation District*,
2015 WL 12976923 (N.D. Cal. June 11, 2015) ..........................................................16

*In re Incretin-Based Therapies Products Liability Litigation*,
2022 WL 898595 (9th Cir. Mar. 28, 2022) ................................................................14

*In re Incretin-Based Therapies Products Liability Litigation*,
524 F.Supp.3d 1007 (S.D. Cal. 2021) ...................................................................19, 21

*Li v. Northeastern University*,
2023 WL 3722227 (W.D. Wash. May 30, 2023)..........................................................21

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)..................................................................................8, 9

*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022).........................................................................................4

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda, California*,
730 F.3d 1111 (9th Cir. 2013)........................................................................................8

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

# TABLE OF AUTHORITIES

Page(s)

*Open Text S.A. v. Box, Inc.*,
2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ....................................3, 13, 18, 21

*Pascal v. Nissan North America, Inc.*,
2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) ...................................................16

*In re REMEC Inc. Securities Litigation*,
702 F.Supp.2d 1202 (S.D. Cal. 2010) ............................................................6, 7

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*,
2018 WL 7346455 (D. Mass. Feb. 6, 2018).........................................................20

*Strougo v. Tivity Health, Inc.*,
2025 WL 1415896 (M.D. Tenn. May 15, 2025) .........................................5, 7, 9

*In re Tesla, Inc. Securities Litigation*,
2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) .......................................................9

*Torliatt v. Ocwen Loan Servicing, LLC*,
570 F.3d 781 (N.D. Cal. 2021).............................................................................22

*Toscano v. PGA Tour, Inc.*,
201 F.Supp.2d 1106 (E.D. Cal. 2002)..................................................................12

*United Food & Commercial Workers Local.. 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA*,
296 F.Supp.3d 1142 (N.D. Cal. 2017).................................................................22

*United States v. Cytogel Pharma, LLC*,
2018 WL 6169266 (E.D. La. Nov. 26, 2018)........................................15, 16, 19

*United States v. Ramirez-Robles*,
386 F.3d 1234 (9th Cir. 2004).............................................................................14

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020)...............................................................................20

*In re Williams Securities Litigation-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009)..............................................................................6

*In re Xerox Corporation Securities Litigation*,
935 F.Supp.2d 448 (D. Conn. 2013) .....................................................................7

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iv

## TABLE OF AUTHORITIES

Page(s)

*In re Yasmin & YAZ (Drospirenone) Marketing, Sales Practices & Products Liability Litigation*,
2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ................................................20, 22

**Other Authorities**

FED. R. CIV. P.
26(a)(2)(B) ......................................................................................... 16
37(c)(1) .............................................................................................. 16

FED. R. EVID. 702 ........................................................................ 1, 3, 15, 20

Federal Judicial Center, *Reference Guide on Statistics* (3rd ed. 2015) ................... 10

Frank Torchio, *Proper Event Study Analysis in Securities Litigation*,
35 J. CORP. L. 159, 163-64 (2009) ..................................................... 13

Jill E. Fisch, Jonah B. Gelbach & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 TEX. L. REV. 553, 556, 612–14 (2018) .............................................. 3

Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U. CHI. L. REV. 1393, 1410–11 (1991) ................................................................................................. 11

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

## I.    INTRODUCTION

The central theme of Plaintiffs' Opposition is that Defendants' critiques are "of the type classically reserved for cross-examination." Not so. Feinstein's and Peck's opinions are not "the product of reliable principles and methods," FED. R. EVID. 702, and the "critical questions of the sufficiency of [each] expert's basis, and the application of [each] expert's methodology," are questions of *admissibility*. *Id*., adv. comm. note (2023).

Feinstein's Loss Causation and Damages Opinions. The Opposition fails to cure the defects in Feinstein's outcome-driven loss causation and damages opinions. Plaintiffs concede (as they must) that Feinstein conducted no back-end analysis of the corrective disclosures. He simply assumed those disclosures revealed the alleged fraud. This leaves Feinstein with, at best, an artificially inflated purchase price and a back-end price decline. But that is the "inflated purchase price" approach to loss causation that was soundly rejected by the Supreme Court in *Dura*.

Feinstein's damages "analysis" is also fatally deficient. To calculate artificial inflation for September 9, Feinstein adopts a PoS comparison approach that hinges entirely on Peck's made-up (and disclaimed) PoS numbers. Plaintiffs respond by arguing that Peck's PoS numbers "were the only ones offered by any expert in this case," but that does not mean they are *reliable*. Feinstein also refuses to admit, let alone account for, obvious error in his PoS estimates (both Peck's PoS and the Average Analyst PoS numbers), even though Plaintiffs acknowledge its existence.

Even worse is Feinstein's artificial inflation "analysis" for December 5. For that date, Feinstein abandons his PoS comparison approach. Instead, *he just assumes*, with no methodology or evidence, that, but for the alleged omissions, *100 percent of the observed stock price increases*—both on December 5 ($7.03) and previously on September 9 ($15.40)—*would have been entirely reversed* if Acadia had disclosed the supposed "truth." But Plaintiffs do not even challenge statements made on December 4 in their complaint. And, even if they did, Acadia disclosed numerous

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

facts that day, most of which are not alleged to be false by Plaintiffs. Feinstein did nothing to disentangle the inflation attributable to the many disclosures, and his "bald assurance of validity is not enough." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995).

Instead of grappling with these issues, Plaintiffs tout Feinstein's "vast experience" and "stellar" credentials. But that just underscores the Court's critical gatekeeping role with respect to expert testimony. *See Elsayed Mukhar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063–64 (9th Cir. 2002) ("Maintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.").

Peck's PoS and State of Mind Opinions. The Opposition also fails to demonstrate that Peck's PoS Opinions bear *any* hallmarks of reliability—sound methodology, source data that fits the facts of this case, or relevant experience. To start, Peck said he adopted the *entirety* of Feigal's PoS Opinions, but then refused to adopt any of Feigal's PoS numbers, said he won't be "held" to *any* specific number, and finally admitted that "nobody knows" the *real* probabilities ("not even God"). Now, Plaintiffs urge the Court to let that slide because Peck's PoS Opinions are all just "estimates of an unknown."

Peck also adopted *every* cited reference in Feigal's Report (from which Feigal purportedly derived his PoS "benchmarks"), despite having "no idea" how or why Feigal selected those specific references. Peck later disclaimed reliance on all but three of those cited references, one of which contradicts his benchmarks and base-case PoS, and the remaining two do not even relate to PoS. Now, Plaintiffs dismiss the need for supporting evidence because it's all just "context and background."

Worse yet is the "methodology" by which Peck supposedly calculated a series of adjusted PoS numbers. Peck's Report describes his "methodology" as a series of generic factors, filtered through "experience," somehow resulting in a precise PoS on four specific dates. After Defendants' rebuttal expert explained that the Report

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

violated the cardinal precepts of the only accepted industry-standard methodology, Peck insisted that he actually *had* employed that methodology. But he hasn't identified a *single instance* in his career in which he employed *any* probability analysis using *any* methodology as he supposedly does here. Now, Plaintiffs say, Peck's methodology is close enough, and if it's not, that's fine too because he just relied on his "impeccable experience."

Peck's PoS Opinions, as well as his State of Mind Opinions, are "a black box into which data is fed at one end and from which an answer emerges at the other, and the jury cannot see how the pieces fit together or how the data drives the conclusion. Cross-examination cannot fix that problem."[1] *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015).

In sum, Defendants' critiques of Feinstein and Peck are not "weight-of-the-evidence" or expert credibility issues for the jury to sort out. Rule 702 tasks the Court with keeping their unreliable expert testimony out of the courtroom.

## II.    THE COURT SHOULD EXCLUDE FEINSTEIN'S OPINIONS.

### A.    Feinstein's Loss Causation Opinions Are Unreliable.

Defendants' Motion exposed that Feinstein's loss causation opinions are "untethered to any analysis at all, much less one demonstrating that investors' losses were caused by the very facts about which defendant[s] lied." Mot. 25. Plaintiffs do not meaningfully dispute this reality and their *ex post* counterarguments lack merit.

#### 1.    Feinstein's event study does not prove loss causation.

Plaintiffs contend that Feinstein's "event study analysis provides compelling (and reliable) empirical evidence of loss causation." Opp. 21–23. But event studies are not sufficient on their own to demonstrate loss causation. That is because, "in cases involving multiple 'bundled' disclosures, event studies have limited capacity to identify the particular contribution of each piece of information" and "no event study can by itself separate out the effects of the different news." Jill E. Fisch *et. al.*,

---

[1] Unless otherwise stated, all emphasis is added, and all internal citations are omitted.

Cooley LLP
Attorneys at Law
San Diego

3

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 TEX. L. REV. 553, 556, 612–14 (2018). Additional analysis is needed to prove that Defendants' "misstatement[s], as opposed to some other fact, foreseeably caused" Plaintiffs' loss. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022).

Plaintiffs admit that Feinstein's event study measures only the impact of disclosures on a particular date—*e.g.*, "Acadia-specific news," Opp. 21, "news concerning the issuance of the DL and CRL," *id*. 23, "sNDA-related disclosures," *id*. 37 n.32, disclosures "concerning Harmony and the upcoming sNDA," *id*. 39, and "statements containing alleged misrepresentations," Ex. 12 ¶39. At best then, Feinstein's event study shows statistically significant stock price movements in response to these *entire bundles* of information. *See* Ex. 22 at 191:12–19. But it cannot isolate the impact of new, Acadia-specific information that *is* fraud-related from information in the same disclosures that is *not* fraud-related.

### 2. Feinstein's assumptions cannot prove loss causation.

Plaintiffs say Feinstein doesn't opine on whether, "*as a factual matter*," the FDA denied the sNDA based on "factors whose importance Defendants had misrepresented or concealed." Opp. 23, 27. Instead, they say, Feinstein may "*assume* that *Plaintiffs* will prove*" this, rather than connecting alleged corrective information to specific challenged statements. *Id*. 23, 24, 27. This argument fails for two reasons.

First, Feinstein does not assume that Plaintiffs will prove the alleged misstatements caused Plaintiffs' losses—he repeatedly claims that *his* analysis proves it: "*I conclude that Defendants' alleged misrepresentations and omissions caused investors who had purchased Acadia common stock . . . to suffer losses*." Ex. 12 ¶24; *see also id*. ¶¶25, 40, 41, 49, 172, 250, 252, 254, 257. Plaintiffs try to walk this back, belatedly realizing that Feinstein never analyzed whether Acadia's stock dropped because the market realized that the sNDA was denied due to a lack of directional consistency—*i.e.*, whether and to what extent Defendants' *alleged misstatements* caused Plaintiffs' losses. But they cannot have it both ways. If

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

4

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Feinstein does not opine on loss causation, as Plaintiffs now contend, then his opinion that Defendants' alleged misstatements caused loss must be excluded.

Second, even if Feinstein had relied on Plaintiffs' allegations (rather than his own "analysis"), he may not do so "to such extremis as to relieve him of his obligation to . . . connect corrective information to [Acadia's] stock decline, or to calculate the loss attributable to Defendants' fraud, based on the evidence before him." *Strougo v. Tivity Health, Inc.*, 2025 WL 1415896, at *8 (M.D. Tenn. May 15, 2025). In *Tivity*, plaintiff's expert did not analyze whether the corrective disclosure revealed any omitted information. Instead, he "made an 'assumption' of the liability Lead Plaintiff seeks to prove," and thus "label[ed] any negative information . . . a 'corrective' disclosure, and attribute[d] all losses to the revelation of fraud because Lead Plaintiff sa[id] so." *Id*. at *5. Here too, Plaintiffs justify their expert's approach by claiming he "may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Id*. at *8; *see* Opp. 23. But for his analysis to be helpful in proving loss causation, Feinstein must show that, based on the evidence before him[2] and assuming the existence of a "directional consistency" requirement,[3] it was the omission of ***that fact*** that caused Plaintiffs' losses. If it was not Feinstein's role to analyze whether the alleged corrective disclosures informed the market that the FDA denied the sNDA ***due to a lack of directional consistency***, then his opinion is hopelessly circular—in effect: "My analysis proves loss causation because I assume Plaintiffs will prove loss causation." This unhelpful testimony must be excluded.

### 3. Feinstein failed to disaggregate confounding information.

It is undisputed that Feinstein did not attempt to parse out the confounding effects of different pieces of information in the alleged corrective disclosures. *See* Ex. 22 at 247:13–248:15. Plaintiffs try to sidestep this problem by arguing that the

---

[2] The evidence shows ***exactly*** why the FDA denied the sNDA. The FDA's reasons for doing so were clearly stated in Acadia's April 5 disclosures, Exs. 20 and 21, and there is no dispute that these reasons match up with those contained in the CRL itself.
[3] Feinstein reasonably assumed the truth of this ***factual allegation***. But unlike in Plaintiffs' cited cases, Opp. 23–24, he ***also*** assumes the truth of his own ***conclusions***.

Cooley LLP
Attorneys at Law
San Diego

5

Reply i/s/o Defs.' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-CV-00762-WQH-MSB

"entire bundle of news" was "fraud-related"—*i.e.*, "signaled that . . . the market had been led to materially overestimate the sNDA's true PoS based on factors that had likely not previously been adequately explained or disclosed." Opp. 25. But this does not excuse Feinstein's failure to disaggregate confounding information.

First, Feinstein says the DL and CRL disclosures were the ***only*** information that caused Acadia's stock drops. Ex. 12 ¶¶248, 253. That much is undisputed. But Feinstein goes much further, labeling all the information in those announcements as "fraud related" without "separat[ing] the loss caused by the disclosure of ***corrective*** information" from "***other*** company-specific information." *In re REMEC Sec. Litig.*, 702 F.Supp.2d 1202, 1273–74 (S.D. Cal. 2010). Acadia's disclosures listed the FDA's several reasons for denying the sNDA. *See* Exs. 20, 21. But Feinstein did not analyze whether any of those reasons were linked to the alleged misstatements and omissions. Instead, he asserts that the DL and CRL announcements "signaled" (but did not actually reveal) corrective information and says analysts supposedly implied post-CRL that Defendants had misled them. *See* Opp. 29. But analysts said no such thing, and Feinstein goes way beyond "some subjectivity" in his characterization of their statements. *Id*. His qualifications and experience do not give him license to divine what analysts "meant," but did not say. *See* Mot. 29.

Feinstein's methodological shortcuts are well illustrated by *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009). There, the plaintiffs justified their expert's failure to tie pieces of corrective information "specifically to alleged misrepresentations" by claiming they all "revealed the same relevant truth." *Id*. at 1140. The court held, however, that "the truth they revealed was not sufficiently within the zone of risk such that [the expert] could show that it was the revelation of the fraud, and not other factors, that caused the [stock drop]." *Id*. Here, Plaintiffs claim the zone of risk concealed by the alleged misstatements includes the risk of denial of the sNDA ***for any reason***. But alleged corrective information "cannot fall within the 'zone of risk' of Defendants' alleged fraud"

Cooley LLP
Attorneys at Law
San Diego

6

Reply i/s/o Defs.' Mot. to Exclude
Expert Opinions and Testimony
Case No. 3: 21-cv-00762-WQH-MSB

absent evidence that it "revealed any fraud perpetuated by Defendants." *Tivity*, 2025 WL 1415896, at *7. The FDA's denial of the sNDA alone does not show that it was the revelation of fraud (*i.e.*, that the sNDA had been denied due to a lack of directional consistency)—instead of other factors—that caused the loss.

Second, it is undisputed that certain information in the alleged corrective disclosures is *not* "fraud related." For example, the CRL disclosure revealed that one of the FDA's reasons for denying the sNDA was a "lack of statistical significance" in certain dementia subgroups. *See* Ex. 20 at 1. But Plaintiffs do not allege that Defendants concealed a requirement to achieve statistical significance by subtype, and Feinstein admits the market *already knew* of this lack of statistical significance. Mot. 29–30. So, how could this information possibly "reveal[] a prior misrepresentation or omission"? *REMEC*, 702 F.Supp.2d at 1273–74. Feinstein's failure to account for the losses attributable to this and other types of undeniably confounding information renders his analysis unreliable and unhelpful.[4] *See Tivity*, 2025 WL 1415896, at *8 (excluding expert who "ignore[d] the possibility that a portion of the five items in the [c]orrective [d]isclosure do not relate to Defendants' fraud, [and] also chose[] to ignore his own knowledge confirming as much").[5]

### 4. An "inflated purchase price" does not prove loss causation.

According to Plaintiffs, since Feinstein measured artificial inflation on the *front end*, which was dissipated by the alleged corrective disclosures, he need not conduct any *back-end* analysis. Opp. 28 n.24. Or, as Feinstein puts it: the entire

---

[4] Similarly, Plaintiffs' FDA expert (Peck) testified that stratification of Harmony subjects by dementia subtype was the key term of Acadia's agreement with FDA that conveyed a "directional consistency" requirement for sNDA approval. Dkt. 199-1 at 20–21. There is, however, no dispute that Acadia publicly disclosed the stratification of Harmony subjects by dementia subtype. *Id*. How then could the revelation of a directional consistency requirement have been the materialization of an *unknown* risk? Feinstein never grapples with this because it is fatal to Plaintiffs' theory of loss.
[5] Plaintiffs claim that Feinstein's failure to consider other non-fraud information "goes only to weight, not admissibility," Opp. 30, citing only an out-of-circuit district court order. *See Freeland v. Iridium World Commc'ns*, 545 F.Supp.2d 59 (D.D.C. 2008). That case is an outlier that incorrectly "treated loss causation as an affirmative defense." *See In re Xerox Sec. Litig.*, 935 F.Supp.2d 448, 496 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

7

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

bundle of information in the alleged corrective disclosures "dissipated . . . artificial inflation that had previously been caused by the alleged misrepresentations and omissions," thereby "prov[ing] that the alleged misrepresentations and omissions caused investor losses." Ex. 12 ¶¶252, 250; *see also* Ex. 22 at 205:15–206:3.

This "inflated purchase price" approach was rejected by the Supreme Court in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 342–46 (2005). Loss causation requires more than an artificially inflated price and subsequent decline. *Id.* Back-end analysis is ***always*** necessary to determine why (and to what extent) artificial inflation was dissipated. Feinstein cannot do so by claiming that "[c]lass members suffered losses that they would not have suffered [***but for***] the alleged misrepresentations." Opp. 19; *see also* Ex. 22 at 254:4–24 ("I proved . . . that the stock price would not have gone up ***but for*** the misrepresentations and omissions" and when the stock price fell, "I did some simple subtraction" to determine what portion of the decline was loss). Plaintiffs' "but-for" approach "renders the concept of loss causation meaningless by collapsing it into transaction causation." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1121 (9th Cir. 2013).

Even if Defendants concealed a "directional consistency" requirement, thereby artificially inflating Acadia's stock price, there is no loss causation if the market did not react to the FDA's denial of the sNDA ***due to a lack of directional consistency***. Likewise, if the FDA denied the sNDA due to a lack of directional consistency ***and*** other reasons, then Defendants' alleged misstatements did not ***entirely*** cause the loss. Feinstein analyzes none of this.[6] "Enabling [Plaintiffs] to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price." *Metzler Inv. v.*

---

[6] Plaintiffs never explain why Feinstein analyzed the contents of the July 2020 disclosure—which he concluded did not "specifically correct[] prior misrepresentations." Ex. 12 ¶285. According to Feinstein, that disclosure "raised suspicions among analysts as to whether the market's high degree of confidence in the success of the submitted sNDA was justified," *id.* ¶214, and caused a substantial stock price decline, *id.* ¶240. But Feinstein inexplicably did ***not*** analyze the contents of the alleged corrective disclosures. *See* Mot. 26 n.15. The inconsistency is glaring.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

*Corinthian Colls.*, 540 F.3d 1049, 1064 (9th Cir. 2008); *see also* Mot. 26–27.

In sum, Feinstein "fails to both (1) bridge *any* connection between the alleged corrective information, Defendants' fraud, and [Acadia's] stock decline, and (2) apply any principled or economic method to support his conclusion that the items in the [c]orrective [d]isclosure[s] did not constitute confounding information that required removal from his total damages calculation." *Tivity*, 2025 WL 1415896, at *5. This is not merely a "disagreement about Feinstein's assessment of what should, or should not, be deemed confounding information." Opp. 30. Feinstein never applied any principled analysis to sort corrective from confounding information in the first place.[7] His "judgment calls . . . without any methodological underpinning is not the stuff reliable scientific analysis is made of." *Tivity*, 2025 WL 1415896, at *5.

### B.    Feinstein's September 9 Analysis Is Unreliable.

The Opposition fails to resurrect Feinstein's unreliable artificial inflation analysis as of September 9, 2019, for several reasons: <u>First</u>, Plaintiffs admit that Feinstein uncritically relied on Peck's PoS estimates. Opp. 31–32. Peck's credentials and the absence of any other PoS estimates do not relieve Feinstein of his obligation to understand how Peck's PoS estimates were derived and demonstrate their reliability. His failure to do so precludes his use of Peck's numbers. *See* Mot. 31–32.

<u>Second</u>, Plaintiffs do not dispute that, pre-September 9 (when there was no alleged fraud), there was an observed nine-percentage-point difference between Average Analyst PoS and Peck's PoS. *See* Mot. 32–33. Nor do they dispute the obvious existence of error (before and after September 9) causing these two estimates of the unobserved parameters (*Actual Market PoS* and *But-For Market PoS*) to be different. Instead, Plaintiffs try to move the goalposts, saying: "the issue is not whether [Peck's PoS] is *the same* as the Average Analyst PoS, but whether it is so

---

[7] This renders Plaintiffs' cited cases inapposite. Opp. 26, 30; *e.g.*, *In re Tesla Sec. Litig.*, 2022 WL 7374936, at *11 (N.D. Cal. Oct. 13, 2022) ("failure to consider *some* non-fraud related company-specific news is not grounds for total exclusion under *Daubert* where the expert made some effort to disaggregate other variables").

Cooley LLP
Attorneys at Law
San Diego

9

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

far *outside the range* of individual analyst PoSs as to be unreliable." Opp. 34 (emphasis in original). In doing so, Plaintiffs admit (as they must) that Peck's PoS is an estimate with substantial error. Opp. 34–35; Ex. 12, App'x A (range of analysts' PoSs was **50 percentage points**). But Feinstein himself does not report any error rates—much less account for them in his "analysis." Instead, he (1) assumes that the *entire* observed difference in PoS estimates post-September 9 is due to fraud, and (2) uses that 14-point difference to calculate artificial inflation and damages to the penny.[8] Mot. 32–33. Because Feinstein makes no effort to assess "whether the known or potential rate of error [in Peck's PoS estimates] is acceptable," his reliance on Peck renders his own opinion unreliable. *Daubert*, 43 F.3d at 1316–17.

Third, Plaintiffs disingenuously argue that Feinstein's Average Analyst PoS has no error because it is "the market consensus estimate." Opp. 36 n.31. Average Analyst PoS is an estimate of the unobserved *Actual Market PoS*—which is the implied PoS of the entire market, representing the views of analysts and millions of Acadia investors. *See* Mot. 20. Unlike "consensus" Wall Street estimates, Opp. 35–36, Average Analyst PoS is a point estimate based on a very small sample with wide variability, from which Feinstein draws conclusions about a much larger population. Thus, **it necessarily contains error**. Mot. 20–22; *see In re Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*, 984 F.Supp.2d 1021, 1033 (C.D. Cal. 2013) ("the margin of error is used to express the amount of error that results from using a sample smaller than the whole population to draw conclusions about the whole"); Federal Judicial Center, *Reference Guide on Statistics*, at 243 (3rd ed. 2015) ("An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error").[9]

---

[8] Plaintiffs' Padres analogy, Opp. 34, is a straw man. The point here is that the observed difference between Peck's PoS and Average Analyst PoS pre-September 9 could not have been caused by fraud. Thus, it **must** have been caused by random error. Yet, Feinstein assumes this error-caused difference disappears post-September 9, and that any observed difference can then be presumed to be **entirely** due to fraud. But he offers no support at all for this eyebrow-raising presumption.

[9] Available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10

Feinstein's "failure to provide an error rate, confidence interval, or otherwise meaningfully validate his work weighs in favor of exclu[sion]." *See In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at \*9 (N.D. Cal. Oct. 27, 2025).

Plaintiffs wave off this flaw, claiming that accounting for error is unnecessary because analysts did not revise their PoS estimates for "random" reasons. Opp. 36–37. That's entirely beside the point. Even "unbiased" estimates have error "due to differences in analysts' methodologies and to human inability to forecast the future," but "the amount and direction of any error . . . will be random." Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U. CHI. L. REV. 1393, 1410–11 (1991). This is why Feinstein's failure to report a confidence interval and conduct a hypothesis test renders his opinion unreliable: he cannot exclude the possibility that observed differences in the PoS estimates are attributable to random error.[10] *See* Mot. 34–35. Feinstein reported no standard error for his Average Analyst PoS despite admitting he could have calculated one. Ex. 22 at 153:23–156:10. And his choice to use a sample of one (*i.e.*, a PoS from a single expert) to estimate *But-For Market PoS* means he cannot calculate a standard error for that estimate even though there certainly is error.[11] Ex. 4 at 192:14–193:1 (Peck admitting that "***even God doesn't know what the exact probability is***"). In short, Feinstein does not even acknowledge the ***existence*** of error in his PoS estimates, much less account for it. This renders his analysis unreliable. *See* Mot. 33–36.

Fourth, Plaintiffs insist they don't really need Peck's PoS figures because Feinstein's inflation ribbon can accommodate whatever PoS a jury elects to use. Opp. 32–33. But this presumes that Feinstein's testimony would aid the jury in estimating

---

[10] Plaintiffs also ignore that, post-September 9, Peck's self-proclaimed ***true*** PoS was ***within*** the range of PoS estimates by analysts who were unaware of the alleged omissions. *See* Mot. 35 n.20. But, without any confidence intervals or hypothesis testing, Feinstein cannot analyze at all, much less rule out, whether the observed 14-point difference between the two ***estimates*** (Average Analyst PoS and Peck's PoS) is caused by error.

[11] Using PoS estimates from multiple FDA experts and computing a standard error around the average would not be "cumulative," Opp. 37–38, just as using multiple analysts' estimates for Average Analyst PoS is not cumulative.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

the unobserved *But-For Market PoS* on its own. Here, Peck, a supposed expert, can only produce a single guesstimate (**which he now disclaims**, *see* Section III.B., *infra*) with no source data, no methodology, and an undefined (but large) margin of error. How, in the absence of Peck's deficient PoS, could a jury do anything but *speculate* about the *But-For Market PoS*? Plaintiffs offer no evidence to ensure that "the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Toscano v. PGA Tour*, 201 F.Supp.2d 1106, 1124 (E.D. Cal. 2002).[12]

### C.     Feinstein's December 5 Analysis Is Unreliable.

Plaintiffs do not dispute that Feinstein abandons his PoS comparison methodology when attempting to calculate artificial inflation as of December 5, 2019.[13] They say he did so because the September statements needed to be disaggregated while the December statements did not, and that this conclusion is "simply the byproduct of application of customary event study analysis." Opp. 39–41. But they offer no credible explanation for this self-serving conclusion, nor any reliable methodology by which Feinstein calculated $22.43 of artificial inflation.

<u>First</u>, Plaintiffs argue that Feinstein need not explain why disaggregation was unnecessary because there was no confounding information disclosed on December 4. Opp. 39–42. According to them, ***all*** the information disclosed "concern[ed] Harmony and the upcoming sNDA," *id*. at 39, and was "relevant to the market's PoS assessment," *id*. at 42. But Plaintiffs do not challenge every (or ***any***[14]) December 4 statement concerning Harmony and the sNDA. Feinstein nonetheless ignores the price impact of these ***non***-fraudulent statements. *See* Mot. 22–23. This is no methodology at all—just Feinstein's subjective *ipse dixit*, which is "an abstraction

---

[12] *See also* Ninth Circuit Manual of Model Civil Jury Instructions 5.1 (damages "must be based upon evidence and not upon speculation, guesswork or conjecture"), *available at* https://www.ce9.uscourts.gov/jury-instructions/node/106.

[13] This despite Feinstein previously asserting he ***would*** compute artificial inflation and damages by analyzing how the difference in perceived and true likelihood of sNDA approval manifested in Acadia's stock price. Dkt. 122-4 ¶101; Mot. 19.

[14] ***The complaint challenges no statements made on December 4***. *See* Dkt. 199-1 at 34–35. Therefore, ***none*** of Defendants' statements on this date are part of this case and thus cannot have caused ***any*** artificial inflation.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination." *Open Text*, 2015 WL 349197, at *6. Feinstein's "bald assurance of validity is not enough," and Plaintiffs offer no "objective, independent validation of [his] methodology." *See Daubert*, 43 F.3d at 1316; Mot. 38–39.[15]

Second, and regardless of whether any confounding information was disclosed on December 4, Feinstein's analysis is not "grounded in the methods of science." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). He just assumes that, *but for* the alleged misstatements on December 4, the market would have viewed the sNDA as a lost cause and thus *entirely* erased the observed residual stock price increases on September 9 ($15.40) and December 5 ($7.03). *E.g.*, Ex. 12 ¶¶39, 300. But Feinstein never explains why or how he reached that conclusion—*i.e.*, why Acadia's stock could not have (a) gone up but by an amount less than $7.03, or (b) gone down but by an amount less than $15.40. Mot. 37–38. Instead, he summarily concludes there *must* have been *exactly* $22.43 of artificial inflation. This conclusion "rests on no more than [Feinstein's] say so—and that isn't good enough to require its admission."[16] *See Graves v. Mazda Motor*, 405 F. App'x 296, 299 (10th Cir. 2010) (Gorsuch, J.); *see also Apple*, 2025 WL 3124160, at *8 (although "an expert may make reasoned judgment calls based on their expertise, that expert must document and record those judgment calls so that they may be tested and analyzed.").

---

[15] Plaintiffs offer no excuse for Feinstein's failure to recognize that artificial inflation would have *decreased* (because *But-For Market PoS* would have *increased*) in the but-for world of full disclosure when the FDA filed the sNDA with no review issues in July 2020. *See* Mot. 38 n.23. Plaintiffs cite Peck's opinion that the FDA's acceptance of the sNDA was purely ministerial, Opp. 41 n.37, but this is belied by FDA Guidance, Ex. 1 ¶¶107–110. Regardless, Feinstein ignores the obvious fact that the market would *not* have viewed the sNDA as doomed after the FDA filed it, even if the market *had* held that view immediately post-December 4, 2019.

[16] Feinstein relies on his own unsupported, subjective assessment of artificial inflation because he cannot measure the inflationary impact of *omissions* on the front end. "It is an oxymoron to have an event study of an omitted piece of information." Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 J. CORP. L. 159, 163–64 (2009). This is why plaintiffs attempting to analyze the inflationary impact of omissions start at the "back end" with the alleged corrective disclosure under the theory that "back-end price drop equals front-end inflation." *See, e.g., Ark. Tchr. Ret. Sys. v. Goldman Sachs*, 77 F.4th 74, 80 (2d Cir. 2023).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

In the end, Plaintiffs admit that Feinstein's assumed $22.43 of artificial inflation as of December 5, 2019, is based on nothing more than his "professional and common sense judgment."[17] *See* Opp. 38 n.34. But *Daubert* requires an expert to "provide sufficient explanation for their methodology such that someone else using the same data and methods would be able to replicate the results." *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022). Because Feinstein offers no such explanation, the Court cannot ensure that his "conclusions [a]re not mere subjective beliefs or unsupported speculation." *Id.*; *see also Highfields Cap. I v. SeaWorld Ent.*, 2022 WL 1037210, at *17–18 (S.D. Cal. Apr. 6, 2022) (expert who "does not follow his own methodology," relying instead on his own "experience" and "sense," may be excluded).

## III. THE COURT SHOULD EXCLUDE PECK'S OPINIONS.[18]

### A. Peck's Irrelevant Benchmark Data and Unreliable Base-Case PoS.

The methodological flaws that render Peck's "base-case" PoS of 50% unreliable, Mot. 9–13, are ***not*** "classic weight-of-the-evidence arguments for cross-examination," Opp. 7. Plaintiffs insist that "[t]hese opinions are rooted in [Peck's] deep experience, combined with relevant literature and case-specific facts." Opp. 7. But there is no substance behind those words. Peck's base-case PoS is "rooted" ***only*** in: (1) source data that is irrelevant to the facts of this case and inconsistent with his benchmark probabilities; and (2) an inexplicable leap from his benchmarks that reveals a complete absence of reliable methodology.

#### 1. Peck derives his benchmarks from irrelevant source data.

The foundation of Peck's PoS Opinions is the "aggregate success rate" data he

---

[17] Plaintiffs also fail to show that Feinstein disentangled the different bits of "fraud-related" information (*e.g.*, the "directional consistency" requirement, Harmony's alleged failure to meet it, and 019 Study deficiencies). This leaves the jury to guess as to how to determine damages if it finds any of these inactionable. Mot. 39–42.
[18] Defendants have not "waived" any evidentiary objections to Peck's testimony. *See* Opp. 5. Defendants are not foreclosed from asserting evidentiary objections to Peck's testimony on grounds suitable for presentation in pretrial motions in limine or at trial. *See United States v. Ramirez-Robles*, 386 F.3d 1234, 1245–46 (9th Cir. 2004).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

purportedly used to generate his benchmarks and base-case PoS. *See* Mot. 9–10. The Opposition fails to remedy Peck's inconsistent and nonsensical testimony about what data he relied on, where that data appears in his Report, and how (if at all) that data supports his benchmark figures. *See* Opp. 12.

To start, Plaintiffs do not dispute that Peck: (a) did not select **any** source data, (b) has no idea why the author of the Report (Feigal) selected the cited articles, and (c) ultimately disclaimed reliance on all but three of the cited references. *See* Mot. 9–11. And Plaintiffs offer no meaningful response to Peck's reliance on the obviously irrelevant source data in the only three articles he claims to rely on, two of which have nothing to do with PoS benchmarks. *Id. at* 9–10. The third article contains figures that are dramatically higher than Peck's benchmarks, *id.* at 10, as well as success rates for "biologics" and "vaccines" that are irrelevant to "small molecule" drugs like pimavanserin, *see* Ex. 9 at 7, Figure 2.

The best Plaintiffs can do is make vague references to the "combined articles" and "extensive data" that "served . . . as background and context for Dr. Peck in arriving at his [benchmarks]." Opp. 12. This "tell, don't show" approach is precisely the kind of *ipse dixit* forbidden by Rule 702 and *Daubert*. On this point, *United States v. Cytogel Pharma*, 2018 WL 6169266 (E.D. La. Nov. 26, 2018), is instructive despite Plaintiffs' weak efforts to distinguish it. *See* Opp. 10 n.8. There, as Plaintiffs note, the court excluded expert testimony because "the applications in the [expert's] cited study varied drastically from the one at issue." *Id.*; *Cytogel*, 2018 WL 6169266, at *5. The same is true here. Peck cannot identify **any** relevant source data that aligns with his benchmarks. So, one can only guess at the **quantitative inputs** he relied on and **how** he derived his PoS benchmarks from those data. This is **not** a "weight of the evidence" issue because it cannot be effectively cross-examined.[19] *See Cytogel*, 2018

---

[19] The "sources" at issue here are **not** the **case-specific** materials reviewed by Peck. *Cf. Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (for experience-based expert opinion on industry standards, selection of **case-specific** documents "went more to the weight of his testimony").

Cooley LLP
Attorneys at Law
San Diego

15

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

WL 6169266, at *5, 10; *Domingo*, 289 F.3d at 606 (excluding expert who "did not establish that the studies he uses to support his theory are applicable"); *Pascal v. Nissan N. Am.*, 2022 WL 19076763, at *16–17 (C.D. Cal. Dec. 21, 2022) (excluding expert for "too large an analytical gap between the data and conclusions").

Finally, Plaintiffs attempt to shore up Peck's opinions by referencing a so-called "BIO report" that appears nowhere in his Report. Opp. 12. But, in doing so, they effectively concede that the sources Peck **actually cites** cannot support his benchmarks. Regardless, this gambit runs afoul of the requirement that an expert's report identify **all** "**facts or data considered** by [him] in forming" his opinions. FED. R. CIV. P. 26(a)(2)(B). Testimony based on undisclosed information must be excluded. *See Holzhauer v. Golden State Gate Bridge, Highway & Transp. Dist.*, 2015 WL 12976923, at *2 (N.D. Cal. June 11, 2015); FED. R. CIV. P. 37(c)(1).

Plaintiffs have failed to meet their burden to show that Peck's benchmark PoS figures are reliably derived from relevant source data that fit the facts of this case.

### 2.   Peck's base-case PoS is a methodological disaster.

Peck compounds his failure to generate benchmarks traceable to relevant source data by ginning up an arbitrary base-case PoS that is untethered to his benchmarks and derived from no reliable methodology. *See* Mot. 9–13. Plaintiffs dismiss these fundamental flaws by insisting that Peck's "base case probability is of little import." Opp. 11. But **Peck disagrees**, saying **his base-case PoS is the foundation and starting point** for his specific PoS numbers during the Class Period. *See* Ex. 3, App'x C ¶¶156–162; Ex. 4 at 203:8–12. For this and two additional reasons, Plaintiffs fail to establish the reliability of Peck's base-case PoS.

First, Plaintiffs make no attempt to explain the methodology (if any) by which Peck moved from (i) an **80% base-case PoS** "*without consideration to the actual results of the study* or factoring in FDA's [supposed directional-consistency] requirement," to (ii) a **50% base-case PoS** "because the analysis starts *before Harmony's results were known.*" *See* Opp. 11; Ex. 3, App'x C ¶¶154, 156. This still

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

doesn't make any sense. According to Peck, **both** figures represent the likelihood of ultimate FDA approval **before** the Phase III trial results are known. *See* Ex. 3, App'x C ¶¶154, 156. But Plaintiffs do not even mention the 80% base-case; instead, they labor to distinguish an 85% benchmark that applies **after** "studies are complete and the results are known." *See* Opp. 11. This does not explain whether **any** methodology led to Peck's abandonment of his **80%** base-case PoS in favor of the much-lower (and self-serving) **50%** base-case PoS.

Second, the Opposition confirms that Peck's 50% base-case PoS also confuses the probability of **phase success** with the probability of **regulatory approval**. *See* Mot. 12. Specifically, Peck takes a 50% base-case figure that, according to his own benchmarks, represents **only** the likelihood of progressing from **Phase 3 to Submission**—*i.e.*, from the start of the Harmony trial through the submission of Acadia's sNDA in June 2020. *See* Ex. 3, App'x C ¶¶152, 156. This completely ignores the **Submission to Approval** phase, which starts at the submission of Acadia's sNDA in June 2020. Peck's benchmark PoS for the Submission-to-Approval phase is **85%**. Ex. 3, App'x C ¶152. But he never explains whether or how he accounted for this 85% benchmark after the sNDA submission. Plaintiffs brush off Peck's methodological gaps as "inconsequential," Opp. 11, but they result in a **starting point** for Peck's PoS adjustments that is completely arbitrary and unreliable.

In short, Plaintiffs have failed to meet their burden to explain these discrepancies in a way that demonstrates the reliability of Peck's base-case PoS. *See SeaWorld*, 2022 WL 1037210, at *17 (expert opinion must be "supported by good grounds for **each step** in the analysis," and "**any step** that renders the analysis unreliable under *Daubert* factors renders the expert's testimony inadmissible").

### B.    Peck's PoS Adjustments Are Unreliable and Inadmissible.

Defendants' Motion demonstrated that Peck jumps from his arbitrary 50% base case to a series of PoS adjustments on four different dates without explaining **how** the degree of adjustment was calculated. *See* Mot. 13–16. And, despite

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

"adopting" the PoS figures in Feigal's Report, Peck **refuses** "to be held to **any** specific [PoS] number" in that Report. Ex. 4 at 188:16–17; *id.* at 192:14–193:1 (admitting that "***even God doesn't know what the exact probability is***"). This makes no sense. And Peck's "black box" expert analysis, in which the link (if any) between the inputs and outputs "is written in invisible ink" must be excluded because it cannot be effectively cross-examined. *Open Text*, 2015 WL 349197, at \*6; *see* Mot. 14–16.

In response, Plaintiffs try to defend Peck's hopelessly vague and contradictory testimony by first arguing that Peck **did** employ an "industry standard" methodology, then dismissing the need for **any** methodology because Peck relied on his experience alone. Neither argument withstands scrutiny.

### 1.      Peck did not employ any reliable methodology.

In their effort to show that Peck employed a reliable methodology, Plaintiffs raise three equally unconvincing arguments.

First, they pretend that Peck's disastrous deposition testimony was a non-event. After Peck "adopt[ed] the Feigal Report (***including the opinions*** set forth therein) ***in full***," he **refused to commit** to the "highly uncertain" PoS numbers in that same Report and would **not** "be held to **any** specific number." *See* Mot. at 14–15. Now, Plaintiffs say his disavowal of his Report's PoS numbers simply reflects that his PoS Opinions are "estimate[s] of an unknown." Opp. 10. This confirms that Peck's PoS adjustments cannot be replicated or tested by any reliable methodology.

Second, Plaintiffs insist that Peck's methodology is the same Probability of Technical and Regulatory Success ("PTRS") analysis that is "done routinely" and "adopted widely" in the pharmaceutical industry. Opp. 8. But Peck's Report does not even mention PTRS; nor does it cite any treatise, study, or publication even suggesting that Peck's PoS Opinions followed **any** well-accepted methodology. *See Domingo*, 289 F.3d at 605–06 (experts must cite "some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

method, as it is practiced by (at least) a recognized minority of scientists in their field."). And Peck did not claim to have employed PTRS until his deposition, months *after* Defendants' rebuttal expert explained that methodology and its inherent limitations—particularly how ***PTRS cannot produce reliable probabilities for a single application***. *See* Dkt. 207 at 8–10; Ex. 2 ¶¶29–35. Plaintiffs simply ignore the literature showing Peck's PoS Opinions to be nothing like a true PTRS analysis, for which the only accepted use case is "to calibrate the project's value ***against the portfolio of other development opportunities***." Dkt. 197-8 at 197. This is why Plaintiffs cannot cite a single authority that endorses applying PTRS ***retrospectively*** to assign a specific probability for a ***single*** application, as Peck purports to do here. *See Cytogel*, 2018 WL 6169266, at *10 (excluding expert whose "report does not cite peer-reviewed studies or any sources that validate his methodology in reaching his opinions" and "does not cite a single study using the methodology he used").[20]

Third, Plaintiffs claim that "Peck applied the same methodology that he uses outside of the courtroom to evaluate pimavanserin's probability of success." Opp. 9. But neither Peck's Report nor the Opposition offers ***a single example*** from Peck's experience to back up this claim. *Id.*, n.7. Plaintiffs dispute that Peck "provides no examples of ever employing this approach," *id.* at 13, ***without identifying any such examples***—claiming only that Peck "has done it repeatedly for decades," *id.*

In sum, Plaintiffs fail to demonstrate the reliability of Peck's PoS opinions by showing that he employed any accepted methodology ***or*** reliably applied whatever methodology he used here in any other professional context. *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F.Supp.3d 1007, 1043–44 (S.D. Cal. 2021) (excluding expert who failed to explain "how he weighed the evidence he considered, what weight he gave to them, why he gave them that weight, and how he balanced

---

[20] Plaintiffs miss the point by arguing that Peck was not required to utilize "statistics or other mathematical equations," or "to develop his opinions via some particular methodology." Opp. 7–8. Whatever methodology Peck ***did*** use must be reliable and explained in sufficient detail to allow effective cross examination. *See* Mot. 13–16.

Cooley LLP
Attorneys at Law
San Diego

19

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

the weight of certain evidence against other[] evidence").

### 2. Peck identifies no specific relevant experience.

Unable to establish Peck's reliability with reference to PTRS or any other "industry standard" methodology, Plaintiffs argue that Peck's opinions are sufficiently grounded in his "impeccable experience." Opp. 8. But they cannot meet their burden to demonstrate reliability based on Peck's experience alone.

"[R]eliability becomes *more*, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *United States v. Valencia-Lopez*, 971 F. 3d 891, 898 (9th Cir. 2020). Accordingly, an expert "relying solely or primarily on experience . . . must explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts." Fed. R. Evid. 702, adv. comm. note (2000).

Here, Peck makes no effort to anchor his PoS Opinions to *any* specific experience. Unlike the experts in Plaintiffs' cited cases, Peck does not claim to have conducted a similar PoS analysis during his tenure at FDA[21] and does not present any examples of doing so in his other professional experience.[22] Indeed, ***Peck provides no description of any specific experience analyzing probability of FDA approval***. *See generally* Ex. 3 ¶¶1–18.[23] In other words, Peck "does not sufficiently explain *how* his experiences led to [his conclusions], *why* this was a sufficient basis for his opinions, or *how* these experiences were reliably applied to the facts." *Farmers Ins. of Ariz. v. DNS Auto Glass Shop*, 2024 WL 1256042, at *10 (D. Ariz. Mar. 25, 2024).

---

[21] *See* Opp. 9–10, citing *Holley v. Gilead Scis.*, 2023 WL 2469632, at *2 (N.D. Cal. Feb. 27, 2023); *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *5 (D. Ariz. Dec. 21, 2017); *In re Yasmin & YAZ Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2011 WL 6302287, at *16–17 (S.D. Ill. Dec. 16, 2011); *In re Davol*, 2021 WL 3286439, at *9–10 (S.D. Oh. Aug. 1, 2021).

[22] *See* Opp. 9, citing *In re Solodyn Antitrust Litig.*, 2018 WL 7346455, at *6 (D. Mass. Feb. 6, 2018); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *53 (D. Kan. June 23, 2021).

[23] Although *Feigal* claimed experience with probability analysis, *see* Ex. 3, App'x C ¶20, Peck denies that he is relying on Feigal's experience. *See* Ex. 4 at 70:2–7.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

His PoS Opinions instead reflect "a subjective, conclusory approach that cannot reasonably be assessed for reliability"—nor effectively cross-examined. *See Li v. Ne. Univ.*, 2023 WL 3722227, at *25 (W.D. Wash. May 30, 2023).

Courts consistently reject "black box" methodologies like Peck's as unreliable, *see* Mot. 15, and Plaintiffs offer no valid reason why the holdings in those cases should not control here. *See id.* 5, 14–17 (citing *Open Text*, 2015 WL 349197, at *6; *Incretin*, 524 F.Supp.3d at 1044; *GPNE v. Apple*, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014)); *see also AIG Ret. Servs. v. Altus Fin. S.A.*, 2011 WL 13213589, at *4 (C.D. Cal. Sep. 26, 2011) (excluding expert who "expect[ed] the Court to simply take his word for it that his experience supports his opinion").

### C.     Peck's State of Mind Opinions Must Be Excluded.

The Opposition also fails to demonstrate the reliability of Peck's State-of-Mind Opinions for three reasons:

First, Plaintiffs wrongly assert that these opinions relate **only** to Peck's interpretation of FDA communications. *See* Opp. 16 n.14. In fact, Peck also purports to know how a "reasonable drug developer in the same situation as Acadia" would have "**assessed the probability** of successfully obtaining *FDA* **approval** of the new DRP indication." *See* Ex. 3, App'x C ¶¶163–65. If Peck's underlying PoS Opinions are held unreliable—as they should be—he cannot be allowed to testify that a hypothetical "reasonable drug developer" would have assessed PoS "similarly."

Second, Peck does not explain **how** he concluded that any "reasonable" pharmaceutical manufacturer would understand things as he does. *See id*. He simply **assumes** that because these are **his** opinions, it would be unreasonable for a pharmaceutical company to have had any different understanding. *See* Ex. 4 at 216:7–12. Even if, in **some** circumstances, "experience alone can demonstrate an expert's reliability," Opp. 15, Plaintiffs' vague references to Peck's "experience" are not nearly enough to demonstrate the reliability of his State-of-Mind opinions in this case. *See* Section III.B.2, *supra*.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

<u>Third</u>, even *if* Peck's State of Mind Opinions were reliable, they still would invade the jury's province as fact-finder to decide whether Defendants acted "reasonably." Mot. 17–19.[24] Plaintiffs argue that Peck's opinions are not about "whether *Acadia* behaved reasonably" simply because Peck says so. Opp. 16. But Peck *will* testify that *any* reasonable company would have agreed with his opinions, and the Acadia witnesses will testify that they do not—invariably leading the jury to conclude that Defendants acted *un*reasonably. *See Holley*, 2023 WL 2469632, at *5 ("[T]estimony that a 'reasonable pharmaceutical company' would have done something different than [defendant] is equivalent to opining that [defendant] did not act reasonably."); *see id.* (forbidding expert "to use 'reasonable' or any version of that term when presenting his opinions to the jury").

Finally, none of Plaintiffs' cited cases—which deal with testimony on specific and objectively verifiable (often legal or regulatory) standards of conduct—countenance the type of self-serving "reasonableness" testimony Peck offers here, tethered only to his own subjective interpretations of FDA communications and unreliable PoS estimates. *See* Opp. 17 & n.15.[25]

## IV.   CONCLUSION

For these reasons, the Court should grant Defendants' Motion.[26]

---

[24] That scienter requires more than unreasonableness does not change the analysis. *See Holley*, 2023 WL 2469632, at *4.

[25] *See Hangarter*, 373 F.3d at 1016 ("industry standards" for insurance claim-adjustment procedures); *United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA*, 296 F.Supp.3d 1142, 1180–81 (N.D. Cal. 2017) (specific factors to be considered in connection with pharmaceutical product launch and "why a reasonable pharmaceutical executive considers those factors *in particular*"); *Torliatt v. Ocwen Loan Servicing*, 570 F.3d 781, 790–93 (N.D. Cal. 2021) (customary nature of specific loan terms in conformance with "agency guidelines"); *Yasmin*, 2011 WL 6302287, at *10–12 (conformance with FDA regulations regarding disclosure of adverse events); *In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 190–92 (S.D.N.Y. 2009) (conformance with FDA regulations regarding labeling and promotional materials); *FTC v. Amazon.com*, 2025 WL 2381704, at *5–6 (W.D. Wash. Aug. 15, 2025) (reasonableness of expectations regarding FTC enforcement action based on specific prior FTC actions and allegations).

[26] The only relevant, admissible, substantive opinions *remaining* in Feinstein's report are contained in Ex. 12 ¶¶199–205, 216–28, 229–31, 234–35, 239–40, 246–47, and 251. The opinions that should be *excluded* from Peck's report are contained in Ex. 3, App'x C ¶¶24(d–e), 25(e–f), 149–165.

Cooley LLP
Attorneys at Law
San Diego

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB

Dated: February 25, 2026

COOLEY LLP

By: */s/ Koji F. Fukumura*
    Koji F. Fukumura

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23

REPLY I/S/O DEFS.' MOT. TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY
CASE NO. 3: 21-CV-00762-WQH-MSB