COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
10265 Science Center Drive
San Diego, California 92121
Telephone:   (858) 550 6000
Facsimile:   (858) 550 6420

CHRISTOPHER B. DURBIN (218611)
(cdurbin@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
Telephone:   (206) 452 8700
Facsimile:   (206) 452 8800

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis,
and Ana Stankovic, as Special Personal
Representative of the Estate of Srdjan (Serge)
R. Stankovic

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM AND OHIO CARPENTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACADIA PHARMACEUTICALS INC., STEPHEN R. DAVIS, and ANA STANKOVIC, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic,<br><br>Defendants. | Case No. 3:21-CV-00762-WQH-MSB<br><br>CLASS ACTION<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 10, 2026<br>Judge: Hon. William Q. Hayes |

**DEFENDANTS' REPLY I/S/O MSJ**
**Case No. 3:21-CV-00762-WQH-MSB**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. PLAINTIFFS CANNOT RELY ON THE COURT'S PRIOR DECISIONS TO CREATE A DISPUTED ISSUE OF MATERIAL FACT ........................... 2

III. PLAINTIFFS CANNOT PROCEED ON UNPLED STATEMENTS. .............. 2

IV. THERE IS NO EVIDENCE TO SUPPORT A CLAIM FOR THE ALLEGED MISREPRESENTATIONS REGARDING THE HARMONY STUDY. ................................................................................................................ 3

   A.  Plaintiffs Cannot Prove Falsity. ............................................................... 3

      1.  Acadia disclosed the terms of its agreement with the FDA. .......... 4

      2.  Defendants believed the Harmony results were positive. .............. 7

   B.  Plaintiffs Cannot Prove Scienter. ............................................................ 7

   C.  Plaintiffs Cannot Prove Loss Causation. ............................................... 10

V.  THERE IS NO EVIDENCE TO SUPPORT A CLAIM FOR THE ALLEGED MISREPRESENTATIONS REGARDING THE 019 STUDY. ... 15

VI. CONCLUSION ................................................................................................ 15

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

**DEFENDANTS' REPLY I/S/O MSJ**
**Case No. 3:21-CV-00762-WQH-MSB**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F.Supp.3d 852 (S.D. Cal. 2024) ........................................................................3

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sep. 20, 2021)..........................................................10

*Arguedas v. Carson*,
2024 WL 253644 (S.D. Cal. Jan. 22, 2024) ..............................................................2

*City & Cnty. of S.F. v. U.S. Postal Serv.*,
2011 WL 5079582 (N.D. Cal. Oct. 25, 2011) .........................................................14

*In re Clorox Co. Sec. Litig.*,
238 F.Supp.2d 1139 (N.D. Cal. 2002)........................................................................3

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F.Supp.2d 1150 (S.D. Cal. 2008) ......................................................................11

*Edleson v. Travel Insured Int'l*,
744 F.Supp.3d 1090 (S.D. Cal. 2024) (Hayes, J.).....................................................2

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)....................................................................................................8

*Highfields Capital I, LP v. SeaWorld Entertainment, Inc.*,
2022 WL 1037210 (S.D. Cal. Apr. 6, 2022) .........................................................2, 3

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 4110430 (N.D. Cal. Aug. 15, 2025).................................................7, 14, 15

*In re JDS Uniphase Corp. Sec. Litig.*,
2007 WL 2429593 (N.D. Cal. Aug. 24, 2007)......................................................2, 3

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) .....................................................................................2

*Kuyat v. BioMimetic Therapeutics, Inc.*,
747 F.3d 435 (6th Cir. 2014) .....................................................................................9

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

-ii-

**TABLE OF AUTHORITIES**
continued

Page(s)

*Mandalevy v. Bofl Holding, Inc.*,
2018 WL 3032588 (S.D. Cal. June 19, 2018) ......................................................7

*Martinez v. Welk Grp. Inc.*,
907 F.Supp.2d 1123 (S.D. Cal. 2012) ..................................................................2

*In re Mellanox Techs. Ltd. Sec. Litig.*,
2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ..................................................10

*Metzler Inv. v. Corinthian Colls. Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................10, 11

*In re Mylan N.V. Sec. Litig.*,
666 F.Supp.3d 266 (S.D.N.Y. 2023) ...................................................................15

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .............................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................7

*OpenAI, Inc. v. Open Artificial Intelligence, Inc.*,
791 F.Supp.3d 1106 (N.D. Cal. 2025).................................................................12

*In re Oracle Corp. Sec. Litig.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009)......................................................12

*Peltz v. Polyphase Corp.*,
36 F.App'x 316 (9th Cir. 2002)..............................................................................9

*In re PETCO Corp. Sec. Litig.*,
2008 WL 8876554 (S.D. Cal. Apr. 29, 2008) ......................................................15

*In re PG&E Corp. Sec. Litig.*,
806 F.Supp.3d 962 (N.D. Cal. 2025)......................................................................7

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) .................................................................................15

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

**DEFENDANTS' REPLY I/S/O MSJ**
**Case No. 3:21-CV-00762-WQH-MSB**

## TABLE OF AUTHORITIES
### continued

**Page(s)**

*In re REMEC Inc. Sec. Litig.*,
  702 F.Supp.2d 1202 (S.D. Cal. 2010) ...............................................................10

*Roditi v. New River Invs. Inc.*,
  2022 WL 7728596 (S.D. Cal. Oct. 13, 2022)........................................................3

*Stephens v. Maplebear Inc.*,
  2025 WL 1359125 (N.D. Cal. May 9, 2025).......................................................10

*TDY Holdings, LLC v. U.S.*,
  2011 WL 11072878 (S.D. Cal. July 15, 2011).....................................................14

**Other Authorities**

Federal Rules of Evidence
  803(8) .................................................................................................................13

## I.   INTRODUCTION

The Opposition[1] confirms that Plaintiffs' theory of fraud depends on a fiction: that the FDA's two-sentence response to Question 2b in the EOP2 Minutes conveyed an implicit "directional consistency" requirement that Defendants concealed. But there is no dispute that:

- Acadia accurately disclosed the primary endpoints for the Harmony Study, which were based on the Harmony data as a whole, not by subtype;

- Acadia repeatedly disclosed that its efficacy data would be stratified by subtype, a disclosure which Plaintiffs' own FDA expert testified means that the FDA would review the data for "directional consistency";

- It is common knowledge in the industry that the FDA reviews subtype data for, among other things, consistency of treatment effect, just as analysts did here following the disclosure of the subtype results in December 2019; and

- The FDA ultimately rejected the sNDA because of small sample sizes, a lack of statistical significance, and a differential magnitude of response to the drug—*not* because of a lack of directional consistency.

Because the undisputed facts demonstrate that Defendants disclosed everything material—and that the CRL reflected the FDA's own, subjective assessment of the Harmony Study results, not some hidden fraud—summary judgment should be granted.

If the Court does not grant summary judgment and dismiss the Complaint in its entirety, it should substantially narrow Plaintiffs' case. The vast majority of Plaintiffs' claimed damages are attributable to the alleged inflation of Acadia's stock price on December 4, 2019. But the Complaint does not plead any false statement on that date. Plaintiffs' attempt to rely on this (and other) unpled statements should be rejected—as another judge in this district did under strikingly similar circumstances. Further, as set forth in Defendants' *Daubert* motion, Plaintiffs' expert's analysis of artificial inflation on that date is riddled with errors rendering it unreliable. Thus, at a minimum, the Court should dismiss December 4, 2019, and all other unpled statements from this case.

---

[1] Unless otherwise noted, abbreviations are consistent with those in Defendants' Motion for Summary Judgment ("MSJ") and Plaintiffs' Opposition thereto ("Opp."), emphasis is added, and internal citations, quotation marks, and alterations are omitted.

## II. PLAINTIFFS CANNOT RELY ON THE COURT'S PRIOR DECISIONS TO CREATE A DISPUTED ISSUE OF MATERIAL FACT.

Summary judgment is the "put up or shut up moment in a lawsuit, when the nonmoving party must show what **evidence** it has that would convince a trier of fact to accept its version of events." *Arguedas v. Carson*, 2024 WL 253644, at *2 (S.D. Cal. Jan. 22, 2024). The Opposition fails this mandate, attempting to mask Plaintiffs' lack of evidence by repeatedly claiming the issues have already been decided at the pleading or class certification stage. *See, e.g.*, Opp. 17 ("The Court found Defendants' statements…misled investors..."); *id.* 23 (claiming prior order found that "Acadia did not fully disclose" the FDA agreement terms); *id.* 24 (claiming prior order found "Defendants' positive statements" were "misleading"). Plaintiffs are wrong. The Court made no findings of fact at those prior stages; to the contrary, it was *required* to accept *allegations* as true. As this Court reasoned in rejecting the same tactic, "the standard of review at the summary judgment stage is different than those at the motion to dismiss and class certification stages." *Edleson v. Travel Insured Int'l*, 744 F.Supp.3d 1090, 1099 (S.D. Cal. 2024) (Hayes, J.). "To present a genuine dispute, and thereby survive summary judgment, Plaintiff cannot hang his hat on the Court's ruling at the motion to dismiss stage." *Martinez v. Welk Grp.*, 907 F.Supp.2d 1123, 1143 (S.D. Cal. 2012).

## III. PLAINTIFFS CANNOT PROCEED ON UNPLED STATEMENTS.

Plaintiffs rely on one out-of-circuit opinion (*Vivendi*) and one out-of-date opinion (*JDS*) to claim that "**no statements** are barred from the jury." Opp. 35. Plaintiffs' whack-a-mole approach is inconsistent with Ninth Circuit authority and promises only chaos should the case proceed to trial (it should not).

In the Ninth Circuit, plaintiffs cannot premise a fraud claim on unpled challenged statements. *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). As Judge Anello recently observed, the Second Circuit's holding in *Vivendi* "directly conflicts with *Kaplan* and so the Court must disregard it." *Highfields v. SeaWorld*, 2022 WL 1037210, at *23 (S.D. Cal. Apr. 6, 2022). Plaintiffs' lone in-circuit case agrees. *JDS Uniphase*

*Sec. Litig.*, 2007 WL 2429593, at *5 (N.D. Cal. Aug. 24, 2007) ("In *Kaplan,* the Ninth Circuit held that, in considering the parties' motions for summary judgment, the district court had properly excluded statements which did not appear in the complaint.").

Plaintiffs nonetheless claim *JDS* supports proceeding on unpled statements here because Defendants purportedly were "on notice" of them. Opp. 35. Not so. Although *JDS* analyzed leave to amend under Rule 15 (which encompasses concepts of notice and prejudice), more recent in-circuit authority from this district makes clear that where, as here, the deadline to amend has passed, the analysis must be conducted under Rule 16 (which requires a showing of good cause). *SeaWorld*, 2022 WL 1037210, at *23-24 (analyzing development of case law). Plaintiffs make no attempt to show good cause. Nor could they given that they unequivocally disavowed any intent to seek leave to amend. MSJ 34-35; *SeaWorld*, 2022 WL 1037210, at *25 ("Plaintiffs were not diligent in seeking amendment" as they proceeded on the "misplaced" "assumption" that "amendment is not needed"). And despite claiming they intend to add only those statements Defendants identified in Appendix B, the Opposition purports to challenge at least 13 brand new statements ***never before previewed***. *See* Appendix C.

## IV.   THERE IS NO EVIDENCE TO SUPPORT A CLAIM FOR THE ALLEGED MISREPRESENTATIONS REGARDING THE HARMONY STUDY.

### A.   Plaintiffs Cannot Prove Falsity.

Plaintiffs identify two categories of alleged Harmony-related misrepresentations (by omission): (1) those concerning the terms of Acadia's agreement with the FDA; and (2) those concerning the data supporting the sNDA.[2] Opp. 4, 14-15. Plaintiffs cannot

---

[2] Summary judgment is the time to conduct a statement-by-statement analysis. *See In re Clorox Co. Sec. Litig.*, 238 F.Supp.2d 1139, 1144-47 (N.D. Cal. 2002) (granting motions for partial summary judgment after individually analyzing each alleged misrepresentation), *aff'd*, 353 F.3d 1125 (9th Cir. 2004). Neither case Plaintiffs cite says otherwise. In *Alger Dynamic Opportunities Fund v. Acadia Pharmacueticals*, this Court held that at "this stage in the proceedings"—*i.e.* on a motion to dismiss—it was not necessary to conduct a "statement-by-statement analysis" because the plaintiff had pled at least one false statement. 756 F.Supp.3d 852, 869 n.1 (S.D. Cal. 2024). And in *Roditi v. New River Invs.*, the court held that the statements proffered, "citing at least five

prove any statement in either category was materially false or misleading when made.

### 1.    Acadia disclosed the terms of its agreement with the FDA.

The Opposition makes one thing crystal clear: the allegedly "undisclosed" term of the FDA agreement is the response to Question 2b:

> Question 2b: "Does the Agency agree with the proposed study population to be included in the study?"
>
> FDA Response: "Yes, we agree with the proposed study population as long as subjects are stratified by their current clinical diagnosis (as proposed). Labeling will reflect the actual composition and response of patients enrolled in the study."

Ex. 5 at 7; Opp 23. Plaintiffs contend this response conveyed that approval would hinge on "directionally consistent" efficacy results across dementia subtypes. Opp. 4, 8.

As an initial matter, their interpretation is facially implausible. Why would the FDA bury a critical efficacy requirement in a response to a question about study population rather than in response to the two other questions that *specifically focus on approval requirements* (Question 2c [endpoints] and Question 3 [reliance on a single pivotal trial])? Ex. 5 at 7-9.

But even accepting Plaintiffs' implausible interpretation, the testimony of their own FDA expert (Peck) destroys their claim. He admitted that the stratification language is the *only* relevant portion of the FDA's response to Question 2b:

> Q: Are you now able to show the sentence or paragraphs that you would point to for the conclusion that the FDA communicated directional consistency to Acadia?
>
> A: Yes…FDA response to Question 2(b)…So *it's the "stratified by their current diagnosis" that is the operative term of art* that a -- an expert would understand that these stratified subgroups would be expected to have consistent positive results to support the proposed indication.

Ex. 142 at 275:6-25; *see* MSJ 20. On cross-examination, Peck doubled-down, confirming that the labeling sentence says nothing about directional consistency:

---

instances of misrepresentations and/or omissions," were sufficient to defeat summary judgment. 2022 WL 7728596, at *3-4 (S.D. Cal. Oct. 13, 2022). At this stage, the Court should determine which, if any, statements remain to submit to a jury.

Q: "What did you understand the phrase 'labelling will reflect the actual composition and response of patients enrolled in the study' to mean?"

A: "Well, that's a - *that's an indication to the sponsor that the results of the stratified analysis will be subject to disclosure in the FDA label*…"

Q: "Does that sentence alone inform your opinion that there was a directional consistency requirement for Harmony?"

A: "*The labelling statement does not. But stratified means everything to me with respect to directional consistency*."

Ex. 142 at 276:7-13, 19-25 (internal quotations included); *see* MSJ 20.[3]

That testimony is fatal because it is **undisputed** that stratification was publicly disclosed. DUF 46; *see, e.g.*, Ex. 44 at 9 ("*We'll be stratifying by groups of dementia* but just certain groups of dementia…"); Dkt. No. 117-6, Ex. 35 at 3 ("ACAD noted the HARMONY trial will stratify results by 3 major categories of dementia…."). There can be no falsity by omission where the allegedly omitted information was, in fact, publicly disclosed. *See* MSJ 21 (collecting cases, including *ChemoCentryx*—a recent in-circuit summary judgment decision that is directly on point and ignored in the Opposition).

That should be the end of the analysis; Peck's testimony, alone, shows Plaintiffs cannot prove falsity under their omitted-term theory. Cornered, Plaintiffs suggest that Defendants made **affirmative** misstatements that "downplayed the importance of subgroup efficacy." Opp 11. But that argument relies on misleading excerpts of Defendants' statements, which is why it is so critical that the Court review the **actual** statements pled and **in context**. For example, Plaintiffs repeatedly quote Davis's January 12, 2021, statement: "we're not looking at individual subtypes." Opp. 2, 16-17, 26-27 (citing ¶135). But they omit that Davis was responding to a question about the target indication Acadia was seeking in the sNDA: "[W]e're seeking the treatment of [DRP]. So we're not looking at individual subtypes as they are often referred to of dementia…we're seeking that broad indication." Ex. 60 at 5. That is unquestionably

---

[3] Plaintiffs' clinical expert (Schneider) similarly pointed to stratification as the source of the "directional consistency" requirement. *See* Ex. 139 at 68:9-21, 72:14-73:13.

accurate. He did not claim that Acadia or the FDA would ignore the dementia subtype results; merely that the indication Acadia sought was DRP.[4] The other example is Davis's August 2020 statement that "we got a clear agreement from…FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them." Opp. 16.[5] That says nothing about subtype analyses or how that impacts approval.

The undisputed evidence, however, shows that Defendants told investors that both Acadia and the FDA would look at dementia subtypes:

- **Oct. 4, 2017**: "*[W]e will be [] analytically evaluating different subtypes or groups of subtypes*." Ex. 44.

- **Oct. 6, 2017**: "[I]f we don't randomize some of the subtypes, then the question would often be whether this broad indication should be limited by absence of some of the subtypes…*It's possible in that scenario, that when we get to the FDA, that they might say, 'You know, you didn't really cover the whole waterfront because…[t]hey didn't respond to therapy or at least the ones you tried didn't or not enough of them did. So we're not comfortable giving you dementia-related psychosis*.'" Ex. 45.

- **Oct. 6, 2017**: "[I]f we don't have in our trial and if we don't randomize some of the subtypes, *then the question would often be whether this broad indication should be limited by absence of some of the subtypes*…But there is no specific requirement that there is a certain number of any of the subtypes included." *Id.*

- **Dec. 4, 2019**: "What will be included in this application [the sNDA]? *Obviously*, …[the subtype] *results of the pivotal trial that Erin just described*…." Ex. 50.

These public statements are consistent with Acadia's internal communications that the FDA would look at the dementia subtype results and planning for possible AdComm questions about the same. DUF 28, 69; PUF 172, 203. But there is no evidence that understanding came from a "term" of Acadia's agreement with the FDA. Plaintiffs admit that the FDA's review of subgroup analyses is set forth in public FDA

---

[4] This is in-line with other public statements that the DRP indication would encompass mixed dementia and dementia-not-otherwise-specified. *E.g.*, Ex. 44 at 6; Ex. 50 at 5, 8.

[5] Plaintiffs remaining examples are inactionable unpled statements. Nonetheless, they fail for the same reasons. For example, Plaintiffs cite Stankovic's November 11, 2019 statement that "there is no requirement, nor expectation, nor power for analysis, of specific subtypes." Opp. 17. Read in context, he is clearly referring to statistical power, which aligns with the statement in the CRL that "Study 045 was not powered to demonstrate an effect in the subgroups of dementia included." Ex. 19 at 1.

Guidance.[6] Opp. 20; *see also* DUF 32; MSJ 18, 20-21. Plaintiffs thus have no evidence that Defendants misled investors by omitting a term of the agreement.[7]

### 2. Defendants believed the Harmony results were positive.

Plaintiffs fare no better with their second category of Harmony-related statements. The Opposition contends that Defendants' positive *opinions* about the Harmony Study results were misleading because they did not disclose that Harmony had "disappointing subgroup data." Opp. 19. This theory fails as a matter of law under *Omnicare*. Plaintiffs offer no evidence that: (i) Defendants did not genuinely hold their positive opinions; (ii) those opinions contained a false embedded ***fact***; or (iii) Defendants omitted a material ***fact*** going to the basis for their opinions. *See Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-86 (2015). To the contrary, Defendants disclosed the dementia subtype results, so investors could (and did) draw their own conclusions about the strength of the data. They were not "required to characterize" the Harmony Study results as "dismal," as "companies are not required to engage in self-flagellation." *In re PG&E Sec. Litig.*, 806 F.Supp.3d 962, 1006 (N.D. Cal. 2025); *see Homyk v. ChemoCentryx*, 2025 WL 4110430, at *12 (N.D. Cal. Aug. 15, 2025) ("Defendants are not required to disclose the most negative framing of their trial data as a matter of securities law.").

### B. Plaintiffs Cannot Prove Scienter.

The Opposition shows that Plaintiffs can prove only what Defendants readily

---

[6] Plaintiffs claim "there is not a shred of evidence that investors were aware of the FDA guidance published nearly 20 years earlier." Opp. 22. But under Plaintiffs' fraud-on-the-market theory, all publicly available information is digested into the market price. "The efficient market theory…is a Delphic sword: it cuts both ways." *Mandalevy v. Bofl Holding*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018). Moreover, analysts' review of the Harmony data published by Acadia shows they ***were*** aware of the FDA's guidance with respect to the consideration of subtype data. DUF 74.

[7] Plaintiffs claim "directional consistency" *does* appear in one FDA communication (the Type A Briefing Package) ***after*** the Class Period. Opp. 20. This document, however, does not state that directional consistency was a condition of approval; rather it explains that the dementia subtype analysis was intended only to "***explor[e]*** directional consistency" *and* that "directional consistency ***was observed***." Ex. 282 at 5-6.

admit—that they expected the FDA to look at the exploratory dementia subtype analysis (and every other analysis and piece of data submitted) in its evaluation of the sNDA. That is not evidence of an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 n.12 (1976). That is simply a known fact, documented in publicly available FDA guidance. Ex. 21 at 16; Ex. 22 at 36-37.

To defeat summary judgment, Plaintiffs must put forth evidence that Defendants knew the response to Question 2b meant sNDA approval depended on showing "directionally consistent" efficacy results across dementia subtypes *and* that Defendants did not believe the results were directionally consistent. Plaintiffs fail on both fronts.

The absence of evidence to support such an improbable theory is glaring. Plaintiffs have not pointed to a single document identifying directional consistency as a "term" of the agreement. This was one of the most important regulatory interactions in Acadia's history, attended by nine Acadia employees and advisors. The fact that no one contemporaneously identified this supposed key "term" conveyed by FDA defies logic. Nor is there any evidence Defendants believed the dementia subtype results were *not* directionally consistent. So, Plaintiffs fall back on misleading excerpts from internal Acadia emails. Opp. 25-27. However, when read in full, those emails refute—rather than support—Plaintiffs theory of fraud. Exs. 172, 177. For example, Plaintiffs quote a November 1, 2019 email from Stankovic that says "both [Acadia] and [FDA] will look at the [hazard ratio] for each dementia subgroup and or dementia subtype." Opp. 25. But they omit the earlier sentence, which confirms the SAP does "not require subtype analysis in the primary endpoint to get the DRP indication" and further states that "per discussion with FDA[,] *we are not required to achieve significant superiority for each subtype* of even for each stratified subtype group." Ex. 172 at 763-64; Ex. 73 at 809-10. Likewise, Plaintiffs tout Davis's November 2019 email that the FDA "indicated they would look for directional alignment." Opp. 25. Davis does not say this was a term of the agreement. Ex. 177. But even so, he says the results *are* "directionally aligned." *Id.* Plaintiffs also claim that "Davis instructed the Company to stop talking about the

subgroups in public communications." Opp. 27. Again, Plaintiffs omit context. In those same documents, Davis explained: "we've tried very hard to get people to see our point of view that the subtypes are an artificial distinction." Ex. 223 at 093. This explanation mirrors the rationale Acadia presented to the FDA to support the proposed indication in DRP (as opposed to specific subtypes). *See* Ex. 3 at 10 ("there is a significant overlap in clinical presentation and clinical pathology of the subtypes of dementias" and "[DRP] is clinically managed the same way regardless of dementia subtype"). This was fundamental to the design of the Harmony Study, so of course Davis would emphasize it. Plaintiffs further cite AdComm preparation materials that identify "differential treatment effects" as a risk. Opp. 26. But none link this to an agreement. And Acadia witnesses testified this referred to differences in magnitude, ***not direction***. PUF 203.

Finally, the Opposition's attempt to distinguish *Kuyat* only reinforces its applicability. Opp. 26-27. Plaintiffs argue that, in *Kuyat*, it was "unclear" which of two analyses the FDA would base its approval decision on. *Id.* 26. But in that case, both analyses were expressly discussed with the FDA and clearly defined. *Kuyat v. BioMimetic Therapeutics*, 747 F.3d 435, 443 (6th Cir. 2014). Here, there is not a single explicit reference to a "directional consistency" requirement in any FDA communication, let alone a discussion of what that requirement entailed. MSJ 15-20. Plaintiffs also argue that, in *Kuyat*, defendants published the results of the study and told the market that the FDA wanted to see an analysis of both the ITT and mITT populations. Opp. 26-27. The same is true here. Acadia disclosed the sample sizes and relapse rates for both the entire randomized DRP population as well as by dementia subtypes, and Defendants told investors that the FDA would look at subtypes. DUF 72.

Left with no direct evidence of scienter, Plaintiffs fall back on Defendants' stock sales, claiming they are suspicious and thus prove a motive for fraud. Opp. 28. It is well-settled that motive is not enough to prove scienter. *See Peltz v. Polyphase*, 36 F.App'x 316, 319-20 (9th Cir. 2002) (no "triable issue" where plaintiffs presented no evidence of "red flags" to buttress motive). Regardless, Plaintiffs wildly exaggerate the

magnitude of those transactions, falsely claiming Davis and Stankovic respectively sold 80% and 82% of their beneficial holdings, with no support for those numbers. Opp. 28; PUF 272, 277. In fact, Davis and Stankovic respectively sold 23% and 38% of their holdings.[8] Neither figure is suspicious. *See In re AnaptysBio*, 2021 WL 4267413, at *9 (S.D. Cal. Sep. 20, 2021) (rejecting claim that defendant sold 91% of holdings when math showed it was only 20%); *Metzler Inv. v. Corinthian Colls.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (37% not suspicious). Plus, every sale was pursuant to 10b5-1 plans or to cover taxes on RSU vesting; neither of which supports scienter.[9] *See In re Mellanox Techs. Sec. Litig.*, 2014 WL 12650991, at *19 (N.D. Cal. Mar. 31, 2014) (10b5-1 plans); *Stephens v. Maplebear*, 2025 WL 1359125, at *8 (N.D. Cal. May 9, 2025) (taxes).

### C.   Plaintiffs Cannot Prove Loss Causation.

Last, but not least, Plaintiffs cannot prove loss causation for at least four reasons.

*First*, Plaintiffs' loss causation expert (Feinstein) should be excluded because his opinions are unreliable. Dkt. No. 198-1. ***Plaintiffs do not dispute that if Feinstein is excluded, they cannot prove loss causation.*** MSJ 28-29; Opp. 34 n.19; *see In re REMEC Sec. Litig.*, 702 F.Supp.2d 1202, 1275 (S.D. Cal. 2010) (granting summary judgment on loss causation after excluding plaintiff's expert).

*Second*, even *with* Feinstein, Plaintiffs cannot prove loss causation based on

---

[8] The percentage of shares sold equals total sales during the Class Period divided by the sum of those sales plus shares beneficially owned at the end of the Class Period. Davis sold 530,392 shares and Stankovic sold 368,993 shares during the Class Period. Opp. 28. That is the numerator. As of February 28, 2021, Davis and Stankovic beneficially owned 1,774,502 shares and 610,357 shares, respectively. *See* Ex. 299 at 33. Davis's calculation is: 530,392 / 2,304,894 = 23%. Stankovic's is: 368,993 / 979,350 = 38%.

[9] Davis made sales under two plans. The first was adopted in August 2019, *before* the Class Period and "*before* he learned the results of the Harmony Study's interim analysis." PUF 274. And the second was adopted December 19, 2019—*after* the Harmony Study results were publicly disclosed at CTAD. PUF 276; DUF 70-73. Stankovic made sales under three plans. The first was adopted on November 8, 2019—*after* the public announcement that Harmony stopped early and *before* he received the unblinded study data on November 15, 2019—and was set the commencement date for January 1, 2020, so no trades could occur until after CTAD. Ex. 175; Ex. 228 at 577. The other two were adopted in May 2020 and December 2020, neither of which Plaintiffs claim is suspicious.

Feinstein's front-end inflation analysis. Opp. 29-30. The Ninth Circuit, following the Supreme Court's command, has rejected that approach. *See Metzler*, 540 F.3d at 1064 ("Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price.").

Moreover, most of Feinstein's fraud-related ("artificial") inflation stems from statements made on December 4, 2019—none of which are challenged in the complaint. Ex. 144 at ¶¶33-36, 89-93; *supra* §III. Because there is no actionable misrepresentation on that date, "there can be no link between that fictional misrepresentation and plaintiffs' loss." *In re Dot Hill Sys. Sec. Litig.*, 594 F.Supp.2d 1150, 1164 (S.D. Cal. 2008). Even if there could be, Feinstein's quantification of artificial inflation on that date is unreliable because it ignored key evidence. Specifically, Feinstein opined that if Defendants had disclosed the "directional consistency" requirement, "any substantial hope for a near-term FDA approval based on completed studies would have been ***all but dashed*** by at latest, 4 December 2019"—*i.e.*, "***wiped out***" to 0%—when Acadia disclosed the dementia subtype results. Ex. 144 at ¶¶39, 280. But that opinion contradicts the 30% probability of success posited by Plaintiffs' own FDA expert (Peck). Ex. 154, Appx. C, at ¶160. Moreover, it cannot be reconciled with the undisputed fact that in July 2020, the FDA ***accepted*** the sNDA for filing with ***no review issues***.[10] DUF 88, 92. Even if the market believed, as Plaintiffs allege, that "directional consistency" was required for approval, it would not assess the likelihood of approval at 0% after the FDA accepted the sNDA. That makes no sense, and Feinstein's failure to account for this event renders his analysis unreliable, and thus insufficient to create a genuine dispute of material fact. *See OpenAI v. Open AI*, 791 F.Supp.3d 1106, 1118-

[10] Plaintiffs' new theory that the FDA could not reject the sNDA because of Acadia's 2016 post-marketing commitment ("PMC") (Opp. 10 n.7) is pure fiction and is not supported by any evidence, as the FDA had already "determined that [Harmony] appears to satisfy PMC 3069-1." PUF 261; Ex. 15; *see also* Ex. 137 at 233:20-235:9.

19 (N.D. Cal. 2025) ("An expert's opinion which ignores the evidence in the case does not create a genuine dispute of material fact.").

*Third*, Plaintiffs' rebuttal arguments about the back-end price declines are equally unpersuasive. To start, Plaintiffs misstate the evidence. They claim Feinstein linked analyst commentary following the March 9 and April 5, 2021, disclosures to the alleged fraud. Opp. 30-31. That is false. Not a single analyst report cited by Plaintiffs attributes the DL or CRL to a lack of directionally consistent dementia subtypes results. PUF 226-27, 238-39. In fact, only one (Stifel) even mentioned dementia subtypes and noted that it previously "called out" potential issues with the dementia subtype results in December 2019 (*i.e.*, that "pimavanserin's efficacy…was most robust in the [PDP] sub-population"), but "figured this detail," as well as the fact that "data in some of the other rarer subgroups is less consistent," "could be overlooked since the data for ADP was still pretty good." Ex. 272 at 227. Thus, Plaintiffs' own evidence refutes their argument—it shows Acadia disclosed the relevant dementia subtype results in December 2019, after which analysts drew their own conclusions about consistency. DUF 72; Ex. 243. *See In re Oracle Sec. Litig.*, 2009 WL 1709050, at *15-16 (N.D. Cal. June 19, 2009) ("Analysts who linked the [earnings] miss to deficiencies with Suite 11i did not do so on the basis of information that had previously been hidden from the market."), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

Plaintiffs further claim Defendants' arguments amount to a mirror-image requirement that the Ninth Circuit has rejected. Opp. 31. That is a strawman. Plaintiffs are unable to prove loss causation, not only because the alleged corrective disclosures did not use the words "directional consistency," but also because ***there is no evidence that the DL or CRL were issued because of a failure to demonstrate directional consistency across dementia subtypes***. DUF 114-20; Ex. 19. It is undisputed that the phrase "directional consistency" does not appear in either letter. The DL says nothing about the nature of the deficiencies. DUF 107, 109. And the CRL stated the "findings from Study 045 suggest a differential response to pimavanserin across dementia

subtypes," and included four bullet points about the dementia subtype data:

- "The intent-to-treat population included **only nine subjects** with dementia with Lewy bodies and **three subjects** with frontotemporal dementia, which is **too few subjects** to be an adequate representation of the response to pimavanserin for either dementia subtype."

- "There was **no numeric difference** on time-to-relapse between pimavanserin and placebo in subjects with vascular dementia (this subgroup also included a relatively **small group of 24 subjects**)."

- "There were 123 subjects with Alzheimer's disease (AD), a large enough number to expect a nominally statistically significant result for the AD subgroup. However, the results for the AD subgroup **were not nominally significant**."

- "Despite having fewer subjects (35) than the AD subgroup, the effect of pimavanserin on time-to-relapse in the Parkinson's disease dementia (PDD) subgroup was **highly nominally statistically significant**. It appears that the finding in this subgroup is driving the overall study results…."

Ex. 19 at 1-2. Each of these points focuses on small sample sizes and the magnitude of effect, *not* directionality. No fact witness disputes that. DUF 119. And the FDA itself said the same in 2022: there is "apparent variation in the magnitude, ***though not the direction***, of the treatment effect across subgroups." MSJ 31-32. Plaintiffs offer no substantive response to this evidence.[11] They further admit that Feinstein offers nothing to rebut this evidence either. Indeed, Plaintiffs expressly deny that Feinstein offered any opinion at all as to the reason the FDA issued the DL and CRL. Dkt. No. 206 at 23.

Thus, the ***only*** evidence to support loss causation—*i.e.*, that the CRL was issued because of a lack of directional consistency—is a single sentence of deposition testimony from Plaintiffs' FDA expert (Peck). Ex. 142 at 268:12-14 (stating that "differential response" means "directional consistency"). The words here matter. "Differential response" focuses on comparative magnitude of effects. "Directional consistency," by contrast, concerns whether those effects move in the same positive or negative direction, regardless of how large or different the effects may be. Peck provides

---

[11] Plaintiffs claim this "do[es] not exonerate Defendants" because the FDA later denied Acadia's re-submitted sNDA. Opp. 24 n.15. But that denial had nothing to do with a lack of directional consistency. PUF 246-248. Plaintiffs also claim this statement is hearsay, but it is admissible as an official public record. Fed. R. Evid. 803(8).

nothing to support his bald assertion that defies this common-sense interpretation. He does not identify which of the four bullet points in the CRL lead to that conclusion. Nor does he claim to have ever encountered the phrase "differential response" in this context before. As such, Peck's self-serving interpretation of the FDA's comment in the CRL does not create a genuine issue of material fact. *See City & Cnty. of S.F. v. U.S. Postal Serv.*, 2011 WL 5079582, at *11 (N.D. Cal. Oct. 25, 2011) (no genuine dispute of material fact where "no facts support the conclusion of plaintiffs' expert"); *TDY Holdings v. U.S.*, 2011 WL 11072878, at *3 (S.D. Cal. July 15, 2011) ("Without specific facts to support the conclusion, a bald assertion of the 'ultimate fact' is insufficient.").

*Fourth*, Plaintiffs mischaracterize Defendants' arguments about materialization of known risks as an already decided truth-on-the-market defense. Opp. 33. As discussed above, the Court's prior orders made no findings of fact; they *assumed* the truth of Plaintiffs' allegation that Acadia failed to disclose the full terms of its agreement with the FDA. *Supra* §II. "[T]he Court's analysis is now informed by a fuller summary-judgment record," *ChemoCentryx*, 2025 WL 4110430, at *12, and the **evidence** does **not** support that allegation. It is undisputed that the four observations about the dementia subtype results listed in the CRL were publicly disclosed in December 2019. DUF 72, 116. And, as discussed above, Plaintiffs' FDA expert (Peck) confirmed that the key term of the agreement that supposedly conveyed a "directional consistency" requirement was the stratification, which was undisputedly disclosed. *Supra* §V.A.1. Defendants do not cite these prior disclosures to support a truth-on-the-market defense, but rather, to demonstrate that the market had all the relevant information to assess the risk that the sNDA would not be approved. When the DL and CRL were issued and the stock price dropped, that was not a materialization of an *unknown* or *understated* risk that could support loss causation but rather the materialization of a *known* risk—*i.e.,* that the FDA could reject the application. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120, 1123 (9th Cir. 2013) (no loss causation based on a materialization of a concealed risk where that risk was disclosed).

## V.   THERE IS NO EVIDENCE TO SUPPORT A CLAIM FOR THE ALLEGED MISREPRESENTATIONS REGARDING THE 019 STUDY.

Finally, Defendants' claims concerning the 019 Study are also unsupported.

**Falsity.** Plaintiffs do not dispute that the challenged statements about the 019 Study—claiming it was "positive" and "supportive"—are *opinions*. Opp. 23-24; MSJ 24-25. Nor do they dispute that *Philip Morris* is directly on point and unequivocally held that where the FDA later accepts defendants' interpretation of data, that opinion is *per se* reasonable and inactionable. *In re Philip Morris Int'l Sec. Litig.*, 89 F.4th 408, 420-23 (2d Cir. 2023). Plaintiffs' only retort is that *Philip Morris* is a Second Circuit opinion that has not been addressed (positively or negatively) by other appellate courts. Opp. 27-28. But it **has been** expressly adopted **within** the Ninth Circuit in *ChemoCentryx*, 2025 WL 4110430, at *8. Plaintiffs make no attempt to distinguish this case, which directly demonstrates why the 019 Study statements should be dismissed.

**Scienter.** Plaintiffs belabor the protocol deviations in the 019 Study but cite no evidence that any Defendant believed those deviations rendered the study not positive or not supportive. DUF 13; *In re PETCO Sec. Litig.*, 2008 WL 8876554, at *7 (S.D. Cal. Apr. 29, 2008) (holding "generalized evidence" and attempts to "characterize" facts as "red flags" did not raise a genuine dispute). They rely entirely on the Court's prior orders, Opp. 28, none of which contain findings of fact, *supra* § II.

**Loss Causation.** Plaintiffs concede that their expert made no attempt to apportion inflation or loss between alleged misstatements about Harmony versus the 019 Study, and thus, has no basis to conclude that the alleged 019 Study misstatements had **any** impact on the stock price at all. Opp. 34. This "failure to 'disaggregate' the losses" from different theories of fraud "is a failure to satisfy their summary judgment burden on loss causation." *In re Mylan Sec. Litig.*, 666 F.Supp.3d 266, 325 (S.D.N.Y. 2023).

## VI.   CONCLUSION

Defendants respectfully request that the Court grant summary judgment.

Dated: February 25, 2026

COOLEY LLP


By: */s/ Koji F. Fukumura*
    Koji F. Fukumura

Attorneys for Defendants
Acadia Pharmaceuticals Inc., Stephen R. Davis, and Ana Stankovic, as Special Personal Representative of the Estate of Srdjan (Serge) R. Stankovic